UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ODED GREENBERG,

                            Plaintiff,                    15 Civ. 2343 (PKC) (VMS)

- against -                                              **NOTICE OF APPEAL**

SUNY DOWNSTATE et al.,

                            Defendants.

-------------------------------------------------------------X

TO:    Office of the New York State Attorney General
       By: Mr. Christopher V. Coulston, Esq.
       *Attorneys for State University Hospital –*
         *Downstate Medical Center, Steven Pulitzer*
         *Deborah L. Reede*
       28 Liberty Street
       New York, NY 10005
       Tel.: 212-416-8556
       Fax: 212-416-6075

       New York City Law Department
       Office of the Corporation Counsel
       By: Ms. Amanda Blair, Esq.
       *Attorneys for New York City Health and Hospitals Corp. and*
         *Kings County Hospital Center*
       100 Church Street
       New York, NY 10007
       Tel.: 212-356-8767
       Fax: 212-356-2089

       United States District Court, EDNY
       (NOA via ECF)
       Clerk of the Court
       225 Cadman Plaza East
       Brooklyn, NY 11201
       Tel.: 718-613-2600

       PLEASE TAKE NOTICE that plaintiff Oded Greenberg, by his attorneys Cardi & Edgar

LLP, hereby appeals to the United States Court of Appeals for the Second Circuit, from an Order

of the United States District Court for the Eastern District of New York, Hon. Pamela K. Chen,

filed and entered on September 29, 2019.  Plaintiff-appellant Oded Greenberg also appeals all

other related orders, judgment and papers in this action, if any.

The Order appealed from granted defendants' motions for summary judgment.

This appeal is taken from each and every part of the Order described above as well as the

whole thereof.

Dated: New York, New York
       October 29, 2019

Respectfully submitted,

Cardi & Edgar LLP

/s/ Chad L. Edgar

_____

By: Chad L. Edgar, Esq.
Attorneys for Plaintiff
99 Madison Avenue, 8th Floor
New York, NY 10016
Tel.: 212-481-7770

**CERTIFICATE OF SERVICE**

I, Chad L. Edgar, counsel for plaintiff Oded Greenberg, hereby certify that a copy of the foregoing Notice of Appeal was served on October 29, 2019 on counsel of record for defendants, Mr. Christopher V. Coulston, Esq. and Ms. Amanda Blair, Esq., via this Court's ECF filing system.

Dated:  New York, New York
October 29, 2019

/s/ Chad L. Edgar
_____

Chad L. Edgar

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ODED GREENBERG, M.D.,

                    Plaintiff,

          - against -

STATE UNIVERSITY HOSPITAL-
DOWNSTATE MEDICAL CENTER a/k/a
THE STATE UNIVERSITY OF NEW YORK
HEALTH SCIENCE CENTER AT
BROOKLYN a/k/a SUNY DOWNSTATE
MEDICAL CENTER, NEW YORK CITY
HEALTH AND HOPSITALS
CORPORATION, KINGS COUNTY
HOSPITAL CENTER, DEBORAH L. REEDE,
STEVEN PULITZER, AND JOHN and JANE
DOES 1-20,

                    Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CV-2343 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

Plaintiff Oded Greenberg, M.D., brings this action, alleging various types of employment-related discrimination, against Defendants State University Hospital-Downstate Medical a/k/a The State University of New York Health Science Center at Brooklyn a/k/a SUNY Downstate Medical Center ("SUNY"); Individual Defendants Deborah L. Reede and Steven Pulitzer ("SUNY-Employees"); New York City Health and Hospitals Corporation ("HHC"); and Kings County Hospital Center ("KCHC"). Plaintiff asserts 28 causes of action, *i.e.*, violations of the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); Title VII of the Civil Rights Act of 1964 ("Title VII"), as codified, 42 U.S.C. Sections 2000e *et. seq.*; Sections 1981 and 1983 of Title 42 of the United States Code, 42 U.S.C. §§ 1981, 1983 ("§ 1981" and "§ 1983," respectively); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et.*

1

*seq*.  (*See* Second Amended Complaint ("SAC"), Dkt. 23, ¶ 8.)  Plaintiff seeks relief in the form

of damages, declaratory relief, and permanent injunctive relief.  (*Id.* at 30–31.)  Currently before

the Court are dispositive motions for summary judgment from SUNY and the SUNY-Employees

(collectively "SUNY-Defendants"), and KCHC and HHC.  For the following reasons the Court

grants Defendants' motions, in full, and dismisses the case.

## BACKGROUND

I.      **Facts**[1]

      A.      **Parties to this Action**

Plaintiff is a white, Jewish man who was 54 or 55 years old at the time he was terminated

from his employment with Defendant SUNY.  (SUNY-Defendants' 56.1 Statement ("S-Defs.'

56.1"), Dkt. 77, ¶ 1; Plaintiff's 56.1 Statement in Response to SUNY-Defendants' Motion ("Pl.'s

56.1-1"), Dkt. 92, ¶ 1; Plaintiff's Declaration, dated July 6, 2018 ("Pl.'s Decl."), Dkt. 94, ¶ 1.)

Plaintiff is a board-certified radiologist authorized to practice in the State of New York (Plaintiff's

56.1 Statement in Response to KCHC & HHC's Motion, Dkt. 91, ¶ 1) who began his employment

at SUNY in 2001, and was assigned to the KCHC emergency room, pursuant to an affiliation

agreement (Pl.'s Decl., Dkt. 94, ¶ 2).  Plaintiff worked as a SUNY employee assigned to KCHC

---

[1] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a party's 56.1 statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to the underlying document.  The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)).  Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement. *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).

from 2001 until his termination in October 2014, with the exception of a brief hiatus to stay at home to assist with the care of his special-needs son.  (Pl.'s 56.1-1, Dkt. 92, ¶ 1; Pl.'s Decl., Dkt. 94, ¶ 2.)

Defendant SUNY is a legal entity constituted under N.Y. Educ. Law §§ 351 *et seq.*  SUNY Downstate is a subdivision of SUNY and is not a legally-cognizable entity separate from SUNY.  (S-Defs.' 56.1, Dkt. 77, ¶ 4.)  SUNY employs a number of radiologists who practice at KCHC, a hospital operated by New York City that is across the street from SUNY Downstate, through an affiliation agreement.  (*Id.* ¶ 1; *see generally* Affiliation Agreement, Dkt. 81-10.)

Defendant HHC "is a body corporate and politic constituting a public benefit corporation existing and organized under the laws of the State of New York pursuant to Chapter 214-A of the New York Consolidated Laws."  (KCHC's & HHC's Answer[2] to Plaintiff's Second Amended Complaint, Dkt. 25, ¶ 3.)

KCHC is a hospital administered by HHC and maintains an affiliation agreement with SUNY-Downstate.  (*Id.* ¶ 4.)  Pursuant to that affiliation agreement, Plaintiff was assigned by Defendants to perform his employment duties as a radiologist at KCHC.  (*Id.*)

Defendant Dr. Deborah Reede is an African-American, non-Jewish, female physician, who was 67 years old at the time this lawsuit was filed.  (S-Defs.' 56.1, Dkt. 77, ¶ 2; Pl.'s 56.1-1, Dkt. 92, ¶ 2.)  In 2013, Dr. Reede was appointed Chair of the Radiology Department at SUNY Downstate.  (S-Defs.' 56.1, Dkt. 77, ¶ 2.)

---

[2] *See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation."); *Secs. & Exch. Comm'n v. Penn*, 225 F. Supp. 3d 225, 234 (S.D.N.Y. 2016) (assuming truth of "admissions in [the defendant's] answer" for purposes of summary judgment).

3

Defendant Dr. Stephen Pulitzer is a white, Jewish, male physician, who was 51 years old at the time this lawsuit was filed. (*Id.* ¶ 3; Pl.'s 56.1-1, Dkt. 92, ¶ 3; Dr. Pulitzer's March 26, 2018 Declaration ("Pulitzer Decl."), Dkt. 79, ¶ 2.) In July 2014, Dr. Pulitzer was appointed the Interim Chair of the Radiology Department at KCHC, the full Chair of the KCHC Radiology Department in January 2015, and the Chief Medical Officer at KCHC in November 2016. (Pl.'s 56.1-1, Dkt. 92, ¶ 3; Pulitzer Decl., Dkt. 79, ¶ 2.) In those roles, Dr. Pulitzer acted as the site director, with responsibility for the daily operations of KCHC's Radiology Department. (*Id.* ¶ 3.) During the relevant time period, Dr. Pulitzer was a SUNY employee, working at KCHC through an affiliation agreement. (Pulitzer Decl., Dkt. 79, ¶ 2.)

**B.      The ACGME Report**

SUNY Downstate is a teaching hospital, and in April 2014, the Radiology Department's residency program was put on academic probation by the Accreditation Council for Graduate Medical Education ("ACGME"), the body responsible for accrediting the majority of graduate medical training programs for physicians in the United States. (Pl.'s 56.1-1, Dkt. 92, ¶ 5; ACGME April 15, 2014 Report, Dkt. 87-1.) The ACGME noted in its findings that "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule." (ACGME Report, Dkt. 87-1, at 2; Pl.'s 56.1-1, Dkt. 92, ¶ 6.) The Department was further criticized for not demonstrating that "an appropriate level of supervision is in place for all residents," and it was found that "faculty do not demonstrate a strong interest in the education of the residents." (ACGME Report, Dkt. 87-1, at 2.) On April 9, 2014, Dr. Reede met with Dr. Ross Clinchy, a physician from the Dean's Office at SUNY and the KCHC Chief Medical Officer at that time, to discuss changes they believed necessary to fix issues in the Radiology Department. (Pl.'s 56.1-1, Dkt. 92, ¶ 8.) Dr. Reede (1) proposed replacing a number of faculty members,

4

primarily based on teaching evaluations, and providing short-term extensions for several others, and (2) emphasized the need for monitoring of faculty member performance, increased work performance for physicians, productivity monitoring, and monitoring of teaching and scholarly activity. (Pl.'s 56.1-1, Dkt. 92, ¶ 9; Deposition of Dr. Deborah Reede ("Reede Dep."), Dkt. 81-19, at 70:12–22; Deposition of Dr. Ghassan Jamaleddine ("Jamaleddine Dep."), Dkt. 87-61, at 101:11–17.) The group also agreed to replace the then-current Chief of Radiology, Dr. Allen Cantor. (Jamaleddine Dep., Dkt. 87-61, at 103:19–104:24.) On June 23, 2014, the Department announced that five SUNY Downstate radiologists would not be renewed. (Dr. Reede's March 26, 2018 Declaration ("Reede Decl."), Dkt. 80, ¶ 9).) Plaintiff's contract was renewed in June 2014. (*See id.*; Reede Reply Decl., Dkt. 98, ¶ 4.)

Following the non-renewal of the five radiologists,[3] on June 23, 2014, Plaintiff e-mailed Dr. Cantor (former Chief of the Radiology Department), that "[t]here is a special place in Hell for the administration and the powers that be for what has happened here. . . . [and] [h]opefully I will remain employed at least long enough to make a certain someones [sic] life miserable." (Dkt. 87-3, at 2.)

### C.    Defendant Dr. Reede's Alleged Anti-Jewish Bias

In support of his allegations of SUNY Defendants' anti-Jewish bias, Plaintiff submits a declaration sworn to by Esther Neiman, who was the full-time Medical Student Coordinator for the University Physicians of Brooklyn, an affiliate of SUNY Downstate's Radiology Department. (Esther Neiman's June 27, 2018 Declaration ("Neiman Decl."), Dkt. 93, ¶ 2.) Ms. Neiman worked

---

[3] There is no admissible evidence in the record indicating the religious affiliations of the five radiologists whose contracts were not renewed. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (requiring admissible evidence in opposition to summary judgment).

at SUNY Downstate five days per week, from about 10 am. to 6 p.m., from approximately 2002 until December of 2013. (*Id.*) In her declaration, Ms. Neiman states that her position required daily contact with Dr. Reede in 2013 and that she sat within earshot of Dr. Reede's office. (*Id.* ¶ 3.) According to Ms. Neiman, after Dr. Reede became the Chief of SUNY Downstate's Radiology Department, she referenced several Orthodox Jewish physicians as "you people" and "those people," was openly upset that Orthodox Jewish physicians would meet for midday prayers, and took as her own office a room that the Orthodox Jewish physicians had used for their midday prayers, and then announced that physicians would not be allowed to meet to pray during the workday on department premises. (*Id.* ¶¶ 4–6.) Dr. Reede disputes that she made any of these remarks. (*See* Dr. Reede's September 14, 2018 Declaration ("Reede Reply Decl."), Dkt. 98, ¶ 5.)

### D. Plaintiff's Work Performance Issues

On May 5, 2014, following the ACGME Report, Dr. Reede "met with Plaintiff to discuss an incorrect time entry from April 21, 2014" and "reminded Plaintiff that his job responsibilities require him to be present for consultations as well as resident supervision and education[.]" (S-Defs.' 56.1, Dkt. 77, ¶ 14 (quotation marks omitted); *see also* Reede Dep., Dkt. 87-59, at 142:22–143:9.)[4] On May 8, 2014, at a SUNY Downstate Radiology Department meeting, Dr. Reede "reminded all of the attending radiologists in the department that 'everyone [must] document[] accurate information on their timesheets.'" (S-Defs.' 56.1, Dkt. 77, ¶ 15.) At a KCHC Radiology Department meeting on June 26, 2014, Dr. Pulitzer noted that time and attendance will be monitored and time sheets must be accurate. (*Id.*)

---

[4] Plaintiff does not contest that this meeting occurred but disputes any suggestion that it was a disciplinary meeting. (Pl.'s 56.1-1, Dkt. 92, ¶ 14.)

SUNY-Defendants contend that beginning in late July or August 2014 Plaintiff's work schedule became unpredictable. (*Id.* ¶ 16.) Dr. Pulitzer testified that Plaintiff was "coming in late, he was on occasion leaving early. I often didn't know what time he was going to be in that day . . . I couldn't reliably plan the schedule." (Deposition of Dr. Steven Pulitzer ("Pulitzer Dep."), Dkt. 87-57, at 305:23–306:9.) Dr. Reede testified that she received reports that Plaintiff was sometimes not available when "residents would be looking for him." (Reede Dep., Dkt. 87-59, at 142:22–143:9.) Additionally, an August 22, 2014 memorandum, submitted by SUNY-Defendants, outlines five days between July 28 and August 7, 2014, when Plaintiff did not adhere to standard working hours. (Dkt. 87-18.)

In August 2014, Plaintiff originally requested vacation time for August 11–22, 2014, but on August 13, he emailed Dr. Pulitzer, who was himself on vacation, and asked if he (Plaintiff) could return the following week and instead use his vacation time during the week of August 25. (S-Defs.' 56.1, Dkt. 77, ¶ 19.) Despite his then-scheduled vacation during the week of August 25, 2014, Plaintiff returned to work on August 26. (*Id.* ¶ 21.) Dr. Pulitzer contends that he received reports that Plaintiff was working "erratic hours," and that his time sheet indicates that, instead of working 9:30 a.m. to 5:30 p.m., he claimed to have worked from 11 a.m. to 7 p.m. three days that week and 10 a.m. to 6 p.m. another day that week. (*Id.* ¶ 21.) Data from the "talk station"[5] showed that, at the time, Plaintiff was frequently not reading his first film until after 10:30 a.m. (Dkt. 87-

---

[5] SUNY-Defendants explain that "Talk Station data comprises information about a particular film, including which radiologist read the film, and when the film was opened and signed for by a radiologist. By reviewing the data for one day, an approximation of when a radiologist started and stopped reading film can be discerned." (Dkt. 78, at 8 n.2 (citing Pulitzer Decl., Dkt. 79, ¶ 6 (internal citation omitted)).) Plaintiff disputes whether Talk Station data is an accurate measure as to when radiologists are at work because the data is only first captured when a radiologist *completes* his or her first study, and not when the film is first opened for review. (Pl.'s Decl., Dkt. 94, ¶ 5.)

7

18, at 2). Defendants contend that Plaintiff "maintained erratic hours" on multiple dates in August, necessitating Dr. Pulitzer to counsel him "on issues of time and attendance." (*Id.*; Dkt. 87-17, at 2; Dkt. 87-18, at 2).)

Plaintiff disputes SUNY Defendants' characterization of these events. Plaintiff insists that his schedule cannot be criticized as "erratic" as he "was scheduled to be off [that week] but instead decided to work both because his vacation plans fell through and the Department appeared to need the assistance." (Pl.'s 56.1-1, Dkt. 92, ¶ 21.) Moreover, Plaintiff asserts, his schedule conformed with the busiest hours and the Department's "acute need." (*Id.*) Plaintiff further claims that when he saw that his Department was understaffed, he felt "morally obligated . . . to pitch in," and that the physician supervising the department while Dr. Pulitzer was on vacation "appeared to welcome [Plaintiff's] assistance that week and never complained about [his] presence." (Pl.'s Decl., Dkt. 94, ¶ 8.)

Plaintiff also claims that he was not approached by Dr. Pulitzer about his allegedly erratic hours in August until August 22, 2014. (Pl.'s 56.1-1, Dkt. 92, ¶ 16.) Plaintiff further avers that although Dr. Pulitzer stated at a Departmental meeting that radiologists were expected to arrive at KCHC by 9 a.m., the "delay in applying the requirement to [Plaintiff] suggests that the set, earlier schedule did not apply to him, which it did not historically." (*Id.*) Plaintiff further disputes that he was "counseled or warned" about his hours, but acknowledges that "[i]n mid-to late August of 2014, [Dr.] Steve Pulitzer approached [him] at work about [his] schedule . . . [and] related to [him] . . . that Dr. Reede wanted [him] to start to adhere to a set work schedule of 9 a.m. to 5 p.m." (Pl.'s Decl., Dkt. 94, ¶ 7.) According to Plaintiff, he responded that "such a schedule made no sense," in light of the Department's work-flow, and that the prior Service Chief of Radiology at KCHC, Dr. Cantor, had "pushed" a 4 p.m. to 8 p.m. schedule that was "compromise[ed] to the extent that

[Plaintiff] tended to come in around 10 or 11 a.m. and work for 8 hours from that point." (*Id.*) Plaintiff states that he "agreed to the new set schedule once school [for his special-needs child] was underway in September." (*Id.*)

### E.        Failure to Promote Plaintiff in July 2014

In July 2014, Dr. Reede denied Plaintiff's application for reappointment and promotion to the position of Director of KCHC's ER Radiology Department. (*Id.* ¶ 6.) Around July 2014, Dr. Reede fired the then-current Director of ER Radiology, a physician of Orthodox Jewish faith, and hired Dr. Jinel Scott-Moore, a black non-Jewish radiologist who was younger than Plaintiff[6] and whom Plaintiff had supervised during her residency a few years earlier. (Pl.'s Decl., Dkt. 94, ¶ 6.) According to Plaintiff, Dr. Reede told Plaintiff that she hired Dr. Scott-Moore because she wanted someone closer to residency who could relate better to and educate resident physicians. (*Id.*) Defendants dispute that Dr. Reede made that statement, and offer that the statement is nevertheless neutral as to age. (S-Defs.' Reply 56.1, Dkt. 97, ¶ 10.) In her deposition, Dr. Reede testified that she hired Dr. Scott-Moore "because she had expressed a strong interest in academics . . . and she had very good reports from the residents regarding her teaching." (Reede Dep., Dkt. 87-59, at 124:10–22.) According to Dr. Reede, Dr. Scott-Moore also had "more interest in scholarly activity than [Plaintiff] at the time [Dr. Reede] decided on a new Chief of ER Radiology." (*Id*. at 131:15–132:25.) Plaintiff admits that when SUNY Downstate asked him to submit a form detailing his "research/scholarly activity with residents," he wrote that he "spen[t] zero hours," but claims in his declaration that he "did not understand what exactly was meant by this category" and that he

---

[6] Because Plaintiff's statements about the former ER Radiology Director's religion and Dr. Scott-Moore's race and age could be based on his personal observations of these individuals, as opposed to statements made to him, the Court does not preclude consideration of this evidence as inadmissible hearsay.

"was interested in academic research and scholarship in 2014." (Pl.'s Decl., Dkt. 94, ¶ 14.) Plaintiff cites the fact that "in 2013, for example, [he] and fellow radiologists and residents had two case reports published." (*Id.*) Plaintiff does not state whether his employer was made aware of those publications. Dr. Reede also noted in her deposition that both Plaintiff and the other physician being considered at that time for promotions had issues relating to "time and attendance and availability." (Reede Dep., Dkt. 87-59, at 137: 18–25.)[7]

### F. Plaintiff's FMLA Request

Plaintiff's child has special needs due to his disability.[8] Dr. Pulitzer does not dispute that he was aware that Plaintiff has a special-needs child. (SUNY-Defs.' Reply 56.1, Dkt. 97, ¶ 17.) On August 29, 2014, Plaintiff was told by the child's school that due to difficulties relating to his disability, the school could not continue to educate him, which, according to Plaintiff, required him to take emergency leave at that time to care for his son. (Pl.'s Decl., Dkt. 94, ¶ 9.) Plaintiff states that he called Dr. Reede to notify her that same day, but her voicemail was full so he could not leave her a message and that he could not ask Dr. Pulitzer about his need for leave because Dr. Pulitzer was on vacation at the time. (Pl.'s 56.1-1, Dkt. 92, ¶ 22; Pl.'s Decl., Dkt. 94, ¶ 9.) The next day, Plaintiff inquired of Dr. Reede's assistant about the proper steps for taking emergency

---

[7] SUNY-Defendants have proffered multiple e-mails documenting alleged issues with Plaintiff's time, attendance, and behavior. (*See, e.g.*, Dkts. 87-5, 87-6, 87-7, 87-8.)

[8] Plaintiff's child, J.G., was diagnosed with autism spectrum disorder at the age of two years old, and has also been diagnosed with depression, anxiety, and attention deficit disorder. (Pl.'s Decl., Dkt. 94, ¶ 4.) Since prior to the age of two, and continuously to date, he has received services including weekly speech therapy, occupational therapy, physical therapy, psychotherapy, and social skills therapy. (*Id.*) J.G. also has an Individualized Education Program, and has attended a school that caters to children with learning disabilities. (*Id.*) J.G. is medicated for anxiety and depression. (*Id.*) During the time relevant to the litigation, J.G. was eight years old and "unable to dress, eat and groom himself without assistance . . . requir[ing] adult supervision at all times." (*Id.*)

leave but received no response. (Pl.'s Decl., Dkt. 94, ¶ 9.) On or about September 2, 2014, Plaintiff spoke with his immediate superior, Dr. Pulitzer, to inform him of his need for a two-day leave on September 4 and 5, 2014. (*Id.*; *see also* Pulitzer Decl., Dkt. 79, ¶ 9.) SUNY-Defendants contest whether Plaintiff advised Dr. Pulitzer or anyone else at SUNY Downstate that the reason Plaintiff needed leave on September 4 and 5 was to care for his child with autism. (Pulitzer Dep., Dkt. 87-57, at 344:5–9; 345:16–346:12; 359:16–22); *see also* Pulitzer Decl., Dkt. 79, ¶ 9.) It is uncontested, however, that Dr. Pulitzer told Plaintiff that the department was short-staffed and that Plaintiff could not take those days off. (Pl.'s Decl., Dkt. 94, ¶ 9.) Plaintiff reiterated his request to Dr. Pulitzer on September 3 (still without stating that the reason was to take care of Plaintiff's child, according to Defendants), after which Dr. Pulitzer consulted with Dr. Reede and then presented Plaintiff with a letter stating that his request was denied, and that if he failed to appear for work on those days, the matter would be referred to "Labor Relations." (Pulitzer Decl., Dkt. 79, ¶¶ 9–10.) Plaintiff contends he then told Dr. Pulitzer that he did not think it was fair that Drs. Reede and Pulitzer were forcing him to choose between his career and family, and that he had no alternative but to address the urgent family leave. (Pl.'s 56.1-1, Dkt. 92, ¶ 27.) Dr. Pulitzer replied: "I hope you know what you are doing." (Pulitzer Dep., Dkt. 87-57, at 360:4–10.) On September 4, 2014, which was a Thursday, Plaintiff emailed Linda McMurren, Dr. Reede's assistant, to confirm that he was not coming in that day "due to important family issues," the nature of which he did not specify. (S-Defs.' 56.1, Dkt. 77, ¶ 28; Dkt. 87-26, at 2.)

On Friday, September 5, 2014, Plaintiff e-mailed Ms. McMurren again, copying Dr. Pulitzer, and stating that he "was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out." (S-Defs.' 56.1, Dkt. 77, ¶ 29; Dkt. 87-21, at 2.) During his deposition, Plaintiff testified that he wrote this

11

e-mail to provide an excuse for his absence as he was in fear of losing his job. (Deposition of Oded Greenberg ("Pl.'s Dep."), Dkt. 95-1, at 246:14–247:16.) Plaintiff then attempted to return to work on September 8, 2014. (Pl.'s Decl., Dkt. 94, ¶ 10.) It is undisputed that he notified Ms. McMurren that he would be late because he had to seek medical treatment for his back injury. (S-Defs.' 56.1, Dkt. 77, ¶ 30.) After Plaintiff reported to work on September 8, he was instructed to report to the Labor Relations office. (*Id.* ¶ 31.) Plaintiff's meeting with Labor Relations was recorded, lasted for approximately four hours, and during which time, according to Plaintiff, he was not permitted to leave the room to eat, stretch, or take the pain medication he had been prescribed that morning for his recent back condition. (Pl.'s Decl., Dkt. 94, ¶ 10.)

During the meeting, Plaintiff admitted that he was "on the [Department's] schedule as 9 to 5," but he would occasionally "come in later and stay[] later," sometimes arriving at 10-10:30 or even "a little bit later." (Pl.'s 56.1-1, Dkt. 92, ¶ 32.) Plaintiff further stated that "if I come in late it doesn't make any difference. I stay a little bit later. I've been keep—adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening." (*Id.*) When Plaintiff was asked whether he had the authority to make his own schedule, he replied that he felt that he had the "moral authority to do so." (*Id.*) Plaintiff admitted that he had recently been told by Dr. Pulitzer to adhere to set hours, which he assumed were "9 to 5 as written on the schedule." Plaintiff promised during the meeting that he would abide by "the cookie cutter hours that they require . . . from now on." (*Id.*)

In discussing his September 4 and 5, 2014 absences, Plaintiff stated during the meeting that "I have a child with special needs and he was kicked out of his school and he was to attend a new school and I had to spend time with him." (Dkt. 87-24, at 11–12).) However, Plaintiff also stated that when he was absent on September 4 and 5, his mother-in-law came to help with his son, and he "had initially planned to take the day off, . . . [but] I rolled out of bed and I – and I stretched

12

my back out and I've been in pain and not able to be mobile since then." (*Id.* at 12; *see also* Pl.'s 56.1-1, Dkt. 92, ¶ 33.)

> At the meeting, Plaintiff signed an agreement where
>
> [i]n lieu of [his] . . . being served a Notice of Discipline for: (1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department; (4) insubordination; (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, switching schedule without authorization of his supervisor, all parties agree that [Plaintiff] shall have a fine ranging from a letter of reprimand to termination from state service held in abeyance until one year from the signing of this agreement.

(Settlement Agreement, Dkt. 87-29, ¶ 1.)  The Agreement further specified that Plaintiff's work schedule would be from 9 a.m. to 5 p.m. on Monday through Friday, and that Plaintiff "understands that he must accurately list the hours that he works . . . [and] that day's [*sic*] off/vacation/changes to vacation need to be approved by his supervisor." (*Id.* ¶ 2.)  The Agreement "placed [Plaintiff] on Time and Attendance Watch," requiring him to "submit verifiable documentation for each unscheduled absence; including non-medical absences," and outlined specific procedures for those requests. (*Id.* ¶ 3.)  The Agreement further waived Plaintiff's rights to bring any suit, civil action, legal claim, or to impose liability in any forum with respect to SUNY or any SUNY employee. (*Id.* ¶ 6.)  Lastly, the Agreement noted that Plaintiff "voluntarily waived his right to legal or union representation," and "represented himself in this matter." (*Id.* at ECF[9] 3.)  Plaintiff, however, asserts that he "did not negotiate the terms of the Settlement Agreement and signed it without reviewing it carefully . . . [as he] was in acute pain from back spasms during the time that he sat through the Interrogation . . . a time period spanning approximately 4–5 hours." (Pl.'s 56.1-1, Dkt. 92, ¶ 36.)  Plaintiff eventually submitted time sheets claiming September 4 and 5, 2014 as sick

---

[9] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

days. (Dkt. 87-32, at 5.) Plaintiff's sick leave accruals were charged, and he received compensation for those days. (*Id.*)

Several weeks later, around September 23, 2014, Plaintiff advised Dr. Pulitzer that he needed to take a leave for approximately two hours. (S-Defs.' 56.1, Dkt. 77, ¶ 44.) Plaintiff states that he "asked for the additional leave in order to attend further meetings related to the funding for the education of his special needs son, J[]," but does not indicate that this information was communicated to SUNY-employees. (Pl.'s 56.1-1, Dkt. 92, ¶ 44.) Dr. Pulitzer denied the request, claiming insufficient staffing. (*Id.*) Plaintiff then arranged for another physician to cover for him and used his lunch hour to attend to the family matter. (S-Defs.' 56.1, Dkt. 77, ¶ 45.) SUNY-Defendants maintain that Plaintiff was off-site for at least two hours, as evidenced by the Talk Station data, and that the physician asked to cover for Plaintiff was unable to read neuroradiology cases, which left the emergency room with inadequate coverage. (*Id.* ¶ 45.)

## II. Plaintiff's Unapproved Attestations

An attestation is "a written statement made by an attending physician to certify that he or she ha[s] reviewed a patient's report and that the report is now final." (Pulitzer Decl., Dkt. 79, ¶¶ 12, 13.) It is a "legal document[] that [is] vital to hospital billing, and non-conforming ones could trigger an investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well as potential financial liability." (*Id.*) CMS requires attestations in a standard format on all reports initially read by a resident, and three standard attestations for use of the Radiology Department were approved by SUNY's Risk Management Department. (Reede Decl., Dkt. 80, ¶ 14; Dkt. 87-

14

33, at 3).)[10]  Once an attestation is added to a patient's record it cannot be deleted and becomes part of the permanent record.  (Pulitzer Dep., Dkt. 87-57, at 265:23–266:2.)  Plaintiff complained on numerous occasions about the requirement to use attestations.  (*See* Pl.'s Decl., Dkt. 94, ¶ 11 ("I have no doubt that I may have expressed my frustration with this new requirement to some of my colleagues.").)  For example, one of Plaintiff's colleagues stated that

> [d]irectly after the meeting [about attestations], [Plaintiff] composed his own attestation.  He read it to me and he was laughing.  I thought he was joking, as he read it to me in a jovial way.  I didn't think he would actually use it.  Afterwards, I heard that a clinician had called down and asked 'what was the meaning of this' after they saw his modified attestation on an actual patient report . . .

(Dkt. 95-55, at 2.)

Shortly after September 22, 2014, Plaintiff attached to patients' records approximately 180 unapproved attestations filled with "sarcastic language" inconsistent with the approved attestations.  (S-Defs.' 56.1, Dkt. 77, ¶ 40; Dkt. 87-38.)  Moreover, Defendants contend that Dr. Pulitzer was informed that Plaintiff had asked an employee in the IT Department, to "take off" or "erase" the incorrect attestations, which he believed would have constituted tampering with patients' legal medical files.  (Pulitzer Dep., Dkt. 87-57, at 143:13–144:11.)

---

[10] The parties dispute whether Plaintiff was fully informed as to the form of the attestation to be used.  Plaintiff submits that he "was late in arriving to the [September 22, 2014 Departmental] meeting" where Dr. Pulitzer discussed the correct forms of attestations, missed the departmental meeting where KCHC's billing vendor explained the attestations, and could not attend the September 15, 2014 presentation by the company that handles the Radiology Department's billing because he was covering the Emergency Room that day.  (Pl.'s 56.1-1, Dkt. 92, ¶¶ 37–38.)  In contrast, Dr. Pulitzer contends that he personally instructed each staff member, including Plaintiff, on use of the approved attestations during a meeting on September 22, 2014.  (S-Defs.' 56.1, Dkt. 77, ¶ 39; *see also* Pulitzer Decl., Dkt. 79, ¶ 12.)

Plaintiff essentially admits these facts,[11] but attempts to justify his actions. In his declaration, Plaintiff states that he was late to the Radiology department meeting at which it was explained that attestations were necessary for the hospital to be paid for patients receiving Medicaid and/or Medicare benefits, and that he was "under the impression that each faculty member would be required to author an attestation that met insurers' requirements." (Pl.'s Decl., Dkt. 94, ¶ 11.) Plaintiff further states that, "[a]s we were a department down in manpower, I was in disbelief that we were going to be required to perform another bureaucratic task that would slow our reading of cases and detrimentally affect our ability to timely provide care to patients." (*Id.*)

Regarding Dr. Pulitzer's belief that Plaintiff sought to have the hospital's IT Department erase the unauthorized attestations, Plaintiff states in his declaration that at some point on September 22, 2014—the day that Plaintiff inserted his unapproved attestations into approximately 180 patient records—a colleague "alerted" him that his self-authored attestation was "causing a stir in the hallways" and "suggested that [he] modify [the] attestation and see if it could be inserted in the studies" that were already completed. (*Id.* ¶ 12.) Plaintiff asked the IT Department if this was possible, to which an IT employee responded that "it would get him into trouble"; Plaintiff withdrew his request. (*Id.*)

---

[11] In his declaration, Plaintiff states that he has

> no doubt that I may have expressed my frustration with this new requirement to some of my colleagues, and when he returned to work after the meeting at which the attestations were discussed, out of frustration and in a fit of pique, I drafted an attestation that I believed met the insurers' requirements but was playful or at worst sarcastic. I started using it immediately on cases that were months old, had already been acted upon in terms of treating patients, had been submitted to insurers for reimbursement[,] and rejected for lack of an attestation.

(Pl.'s Decl., Dkt. 94, ¶ 12.)

16

Following this incident, Dr. Pulitzer consulted with the then Medical Director of KCHC, Dr. Jamaleddine, and scheduled a meeting with the Risk Management Department at KCHC. (Pulitzer Dep., Dkt. 87-57, at 155:3–156:11; *see also* Pulitzer Decl., Dkt. 79, ¶ 15.)   Risk Management told Dr. Pulitzer to consider a Medical Board Hearing for Plaintiff, which could have led to the revocation of his medical credentials, and to have a "second reader" add a "new, proper attestation to each file," to avoid "potential exposure to the hospital."  (Pulitzer Dep., Dkt. 87-57, at 155:3–156:11; 287:8–20.)   Dr. Reede was consulted and agreed with Dr. Pulitzer that the appropriate course of action would be to refer the matter back to Labor Relations.  (Pulitzer Decl., Dkt. 79, ¶ 16; Reede Decl., Dkt. 80, ¶ 15.)  Dr. Pulitzer eventually corrected the attestations himself by affixing a new counter-attestation to each of the 180 charts.  (S-Defs. 56.1, Dkt. 77, ¶ 56.)

## III.   Plaintiff's Termination

On October 3, 2014, Drs. Reede and Pulitzer sent Plaintiff another letter directing him to report to Labor Relations on October 8, 2014 to "discuss allegations of insubordination, leaving the worksite without authorization[,] and related matters."  (S-Defs.' 56.1, Dkt. 77, ¶ 46; *see also* Letter, Dkt. 87-44.)   After a delay to allow Plaintiff an attempt to locate an outside attorney, Plaintiff's "interrogation" was postponed to October 10, 2014.  (S-Defs.' 56.1, Dkt. 77, ¶ 46.)

At the October 10, 2014 interrogation,[12] Stephanie Bernadel, Labor Relations Personnel Associate (Dkt. 87-44, at ECF 2), questioned Plaintiff about his lunch-hour absence on September 23, 2014.  (S-Defs.' 56.1, Dkt. 77, ¶ 47.)   She further informed Plaintiff that he was being considered for discharge for a second instance of unauthorized leave and insubordination.  (*Id.*) During the meeting, Plaintiff stated, in part, that

---

[12] Transcripts of Plaintiff's interrogations by SUNY-Defendants' employee were submitted in support of SUNY-Defendants' motion for summary judgment.  (*See* Dkt. 87-24; Dkt. 87-43.)

> I'm being singled out. And to me, it doesn't seem like it makes sense that all of this is happening because of something I did. I mean, it's clear to me that I'm being singled out and, I don't know, I mean, is someone trying to fire me? Is it [be]cause I'm Jewish? Is it because of some other reason? I don't know. Is it for some economic reason? I have no idea, but it doesn't make any sense to me . . . To me it seems like there's clearly something different about the way I'm being treated. I don't know exactly what it is, but on the face of it, it could be something like [discrimination]. I don't know.

(Dkt. 87-43, at 28–29.) A few days subsequent, Bernadel sent Plaintiff a letter informing him that claims of discrimination were handled by Defendants' "Office of Diversity." (S-Defs.' 56.1, Dkt. 77, ¶ 49.)

On or about October 20, 2014, another meeting was held between personnel from the Labor Relations Department, including Bernadel and Leonzo Cuiman, Assistant Vice-President for Labor Relations, and Plaintiff. (*Id.* ¶ 54.) At the meeting, Plaintiff was offered the opportunity to resign his position instead of being discharged. (Dkt. 87-30, at 47.) Plaintiff reiterated his concerns about Dr. Reede firing Jewish physicians.[13] (*Id.* at 35.) During the meeting, Plaintiff continued to complain about the use of the required attestations, repeating his view that the

---

[13] Plaintiff stated:

> I – this is a deliberate action on Dr. Reede's part to replace me with people from her own institution from [Long Island College Hospital]. She's done this repeatedly. She's fired seven people from our department; five of who were Jewish, all of whom were white. She's replaced—and I don't have any issue with them replacing people with African-American or Caribbean-Americans, that's fine. But there's a pattern here, and I'm being treated differently; despite the fact that I am the best producer in the department, I'm the most important person, the most important cog in the wheel, at Kings County Hospital . . . This is retaliation . . . This is the issue. She is deliberately trying to get rid of me and she is putting all this stuff in front of me to trip me up deliberately so she can fire me . . . But I just—this is just to point to her character and to point to the fact that there's a deliberate attempt to get rid of me. Deliberate attempt to get rid of me for complaining about patient care issues; she's fired half our department.

(*Id.* at 35–37.)

18

"purpose of the attestation" was "so that insurance companies make you jump through another hoop before they pay you," or "so that you can get sued better. . . . there's no real good reason for it;" Plaintiff went on to say that "[i]t just adds more work to my day." (*Id.* at 11–21.) Plaintiff concluded the meeting by stating that "I expect to get my job back. I expect an apology from [Dr. Reede] and I expect a raise." (*Id.* at 50.)

Two days later, on October 22, 2014, Plaintiff was terminated from his employment with SUNY Downstate. (S-Defs.' 56.1, Dkt. 77, ¶ 55.)

## IV.     Procedural History

Plaintiff commenced this action, *pro se*, on April 22, 2015. (Dkt. 1.) He retained counsel and amended the complaint on October 19, 2015. (Dkt. 6.) After SUNY-Defendants indicated they would move to dismiss certain claims (Dkt. 13), Plaintiff amended the complaint again and filed the operative complaint in this action, the Second Amended Complaint, on December 23, 2015 (Dkt. 17); a redacted and non-sealed version of the Second Amended Complaint was filed on January 21, 2016 (Dkt. 23 ("SAC")). Following the close of discovery, all Defendants filed motions for summary judgment (Dkts. 76, 86), which are currently before the Court.

## DISCUSSION

## I.     Kings County Hospital Center is Not a Suable Entity[14]

KCHC argues that it is not a suable entity (*see* Dkt. 75, at 4), an assertion to which Plaintiff fails to respond (*see generally* Dkt. 89). Thus, all of Plaintiff's claims against KCHC are deemed abandoned. *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response

---

[14] To the extent that HHC asserts that it was not Plaintiff's employer for the purposes of any of the statutes at issue, the Court declines to reach that question, as all claims against HHC are dismissed on other grounds.

19

arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

However, even assuming that Plaintiff properly responded, Plaintiff's claims against KCHC would have to be dismissed because an agency of the City of New York is not an entity that can be sued. N.Y. City Charter ch. 17, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the [C]ity of New York and not in that of any agency, except where otherwise provided by law."); *see also Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *Winters v. NYCDOC*, No. 19-CV-7271 (RA), 2019 WL 3817400, at \*1 (S.D.N.Y. Aug. 14, 2019); *Emerson v. City of New York*, 740 F. Supp. 2d 385, 395 (S.D.N.Y. 2010) ("[A] plaintiff is generally prohibited from suing a municipal agency.").

Accordingly, KCHC is dismissed as a Defendant in this matter.

## II. Eleventh Amendment Sovereign Immunity and State Defendants[15]

SUNY-Defendants assert that, pursuant to the Eleventh Amendment, Plaintiff's FMLA, § 1983, and NYSHRL claims against SUNY and SUNY-Employees in their official capacities,

---

[15] Despite SUNY-Defendants' assertion to the contrary (Dkt. 78, at 21), whether a state's sovereign immunity under the Eleventh Amendment presents a question of subject matter jurisdiction is an open question in the Supreme Court and the Second Circuit. *See Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 391 (1998) ("[A]t the time of removal, this case fell within the 'original jurisdiction' of the federal courts. The State's later invocation of the Eleventh Amendment placed the particular *claim* beyond the power of the federal courts to decide, but it did not destroy [subject matter] jurisdiction over the entire case."); *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) (leaving open "whether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense"). In light of this uncertainty, the Court will first address the sovereign immunity defenses raised by Defendants. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("[S]ubject-matter jurisdiction necessarily precedes a ruling on the merits."). However, SUNY-Defendants only expressly assert a sovereign immunity defense with respect to Plaintiff's FMLA, § 1983, NYSHRL, and NYCHRL claims, and do not reference Plaintiff's causes of action

and his NYCHRL claims against SUNY-Employees in their official capacities, should all be dismissed. (Dkt. 78, at 21.)  The Court agrees with respect to Plaintiff's § 1983 claim for damages, NYSHRL, and NYCHRL claims, but disagrees with respect to the FMLA to the extent that Plaintiff asserts claims under the "family-care provisions."

"As a general matter, states enjoy sovereign immunity from suit in federal court, even if the claim arises under federal law." *KM Enters., Inc. v. McDonald*, 518 F. App'x 12, 13 (2d Cir. 2013) (summary order) (citing U.S. Const. amend. XI; *Alden v. Maine*, 527 U.S. 706, 727–28 (1999)); *see also McCluskey v. N.Y. State Unified Ct. Sys.*, No. 10-CV-2144 (JFB) (ETB), 2010 WL 2558624, at *5 (E.D.N.Y. June 17, 2010) ("Absent a state's consent to suit or an express statutory waiver, the Eleventh Amendment bars federal court claims against states."), *aff'd*, 442 F. App'x 586 (2d Cir. 2011) (summary order); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) ("[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State.").  The Eleventh Amendment of the United States Constitution "generally bars suits in federal court by private individuals against non-consenting states," and precludes "actions in which a state is actually named as a defendant, and certain actions against state agents and instrumentalities, including actions for the recovery of money from the state." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *see also Seminole Tribe of Fla. v. Florida*,

---

pursuant to 42 U.S.C. § 1981.  (Dkt. 78, at 19–21; SAC, Dkt. 23, ¶¶ 88–99.)  A § 1981 claim brought against SUNY or SUNY-Employees in their official capacities should be barred by sovereign immunity, as Congress did not abrogate immunity in enacting § 1981 and New York State has not consented to suit under that statute. *See Jennings v. SUNY Health Sci. Ctr.*, 201 F. Supp. 3d 332, 335 (E.D.N.Y. 2016).  However, given the uncertainty as to whether sovereign immunity presents a jurisdictional bar (as opposed to an affirmative defense that SUNY-Defendants must assert), the Court reaches and dismisses the § 1981 claims against SUNY and SUNY-Employees on their merits.

21

517 U.S. 44, 54 (1996); *Hans v. Louisiana*, 134 U.S. 1 (1890).  New York's sovereign immunity extends to the State University of New York system, *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990), and can protect a state university hospital from being sued in an employment discrimination action, *see, e.g.*, *Bamba v. Fenton*, 758 F. App'x 8, 10 (2d Cir. 2018) (summary order).  The Eleventh Amendment, under most circumstances, also immunizes state officials sued in their official capacities, *see Stinson v. City Univ. of N.Y.*, No. 17-CV-3949 (KBF), 2018 WL 2727886, at *5 (S.D.N.Y. June 6, 2018) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984); *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir. 2004)).

However, there exists an exception to sovereign immunity, first announced in *Ex parte Young*, 209 U.S. 123 (1908), that "permits plaintiffs seeking prospective, injunctive relief to sue state government officials for violations of federal law." *Gringas v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019).  The *Ex parte Young* exception "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy*, 563 U.S. at 255 (internal citation omitted).  As the Second Circuit has reasoned, "[i]n such circumstances, a plaintiff does not ask equity to create a remedy not authorized by the underlying law.  Rather, it generally invokes equity preemptively to assert a defense that would be available to it in a state or local enforcement action." *Friends of the E. Hampton Airport v. Town of East Hampton*, 841 F.3d 133, 144 (2d Cir. 2016).

Accordingly, absent an express waiver of sovereign immunity, a clear abrogation of that immunity by Congress, or the applicability of the *Ex parte Young* exception, the Eleventh Amendment generally bars Plaintiff from suing SUNY and SUNY-Employees in their official capacities.

### A.      FMLA Claims

Plaintiff asserts claims pursuant to the FMLA against all Defendants.   The FMLA allows eligible employees to take up to 12 work weeks of unpaid leave per year for, *inter alia*, the care of a "spouse . . . son, daughter, or parent" with "a serious health condition," and the employee's own "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(C), (D).  "The Act creates a private right of action to seek both equitable relief and money damages 'against any employer (including a public agency) in any Federal or State court of competent jurisdiction.'"  *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 34 (2012) (quoting 29 U.S.C. § 2617(a)(2)).

For the purposes of sovereign immunity analysis, the Supreme Court has distinguished the "family-care provisions" of the FMLA from the "self-care" provisions.  *Id.*  Supreme Court and Second Circuit precedent make clear that Congress has not abrogated state sovereign immunity by enacting the "self-care" provision of the FMLA.  *See id.* at 37 ("Standing alone, the self-care provision [of the FMLA] is not a valid abrogation of the States' immunity from suit.").  However, that is not the case with respect to the "family-care provisions" of the FMLA, through which, the Supreme Court has determined, Congress expressly abrogated the States' immunity from suit pursuant to its powers under § 5 of the Fourteenth Amendment.  *Id.* at 35–37 (citing *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (1972)).  Plaintiff and SUNY-Defendants disagree about whether Plaintiff's FMLA claims were brought pursuant to the "self-care" or "family-care" provisions; however, given that Plaintiff asserted three causes of action pursuant to the "family-care" provisions of 29 U.S.C. § 2615(a) and (b) (*see* SAC, Dkt. 23, ¶¶ 60, 65, 70), and that he expressly alleges discriminatory and retaliatory actions were taken against him due to his need to care for his child with a disability (*see id.* ¶¶ 28, 32, 34–36, 53–55), the Court finds that Plaintiff

23

has asserted his FMLA claims pursuant to the "family-care" provisions of the statute, which are thus not barred by the sovereign immunity doctrine.

## B.    Section 1983 Claims

"It is well-established that New York State has not waived its sovereign immunity from Section 1983 claims." *Harrison v. New York*, 95 F. Supp. 3d 293, 314 (E.D.N.Y. 2015) (internal quotations and citation omitted); *see id.* (collecting cases).  Moreover, "it is well settled that 42 U.S.C. § 1983 does not constitute an exercise of [Congress's] authority [to abrogate sovereign immunity]." *Dube*, 900 F.2d at 594.  Therefore, Plaintiff's Equal Protection claim brought pursuant to § 1983 against SUNY is dismissed. For substantially the same reasons, the damages claims brought pursuant to § 1983 against SUNY-Employees in their official capacities are dismissed.[16] *See Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities.").

However, the Court finds that Plaintiff's claims for prospective injunctive relief against SUNY-Employees in their official capacities are not barred by sovereign immunity.  Under *Ex parte Young*, a plaintiff may only sue a state official acting in his official capacity "for *prospective, injunctive relief* from violations of federal law." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (internal quotation marks and citation omitted) (emphasis added). "The Second Circuit has held that claims for reinstatement to previous employment fall under the Ex parte Young exception." *Ighile v. Kingsboro ATC*, No. 16-CV-4294 (AMD) (JO), 2019 WL 267042, at *3 (E.D.N.Y. Jan. 18, 2019) (citing *Rowland*, 494 F.3d at 96); *Dotson v. Griesa*, 398 F.3d 156, 178 (2d Cir. 2005) ("A court order of reinstatement, whether of government benefits or

---

[16] To the extent that SUNY-Employees also raise a qualified immunity defense to Plaintiff's § 1983 claims (SUNY-Defendants' Reply Brief, Dkt. 96, at 2 n.2), the Court does not reach this issue, as these claims are dismissed on other bases.

24

employment, is not barred by sovereign immunity.")); *cf. Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 245 (E.D.N.Y. 2015) (finding that plaintiff's claims against individual state officers in their official capacities did not fall under the *Ex parte Young* exception because plaintiffs did not "allege[] that the [i]ndividual CUNY [d]efendants have the responsibility or capacity to provide him with the prospective relief he seeks, i.e. reinstate him"); *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014) (finding that the Ex parte Young "exception to sovereign immunity only authorizes suits against officials with the authority to provide the requested relief"). As described *infra*, Plaintiff has asserted sufficient facts to allege that the SUNY-Employees have at least some capacity to provide the requested prospective injunctive relief. The Court, therefore, addresses these claims on the merits.

## III. Pendant Claims Arising Under State and City Laws

New York State also has not waived its Eleventh Amendment immunity and consented to suit in federal court under the NYSHRL. *Lambert v. N.Y. State Office of Mental Health*, No. 97-CV-1347 (JG), 2000 WL 574193, at \*7 (E.D.N.Y. Apr. 24, 2000), *aff'd*, 22 F. App'x 71 (2d Cir. 2001) (summary order) ("[D]istrict courts in this circuit have uniformly found [that] the New York Human Rights Law [New York State Executive Law § 296] includes no waiver of the state's immunity to suit in federal court."); *see also Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 537–38 (S.D.N.Y. 2014). The same can be said for claims against the State brought pursuant to the NYCHRL. *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) ("The City of New York does not have the power to abrogate the immunity of the State, and we have found no evidence that the State has consented to suit in federal court under the NYCHRL."). Accordingly, Plaintiff's claims against SUNY under the NYSHRL and NYCHRL must be dismissed.

25

The same claims must also be dismissed as to SUNY-Employees in their official capacities. *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as [the plaintiff] is suing the individual defendants [who are SUNY administrators and professors] in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent that it shields SUNY."); *Serrano v. N.Y. State Dep't of Envtl. Conservation*, No. 12-CV-1592 (MAD) (CFH), 2013 WL 6816787, at *14 (N.D.N.Y. Dec. 20, 2013) (dismissing plaintiffs "[NYSHRL] discrimination and retaliation claims against [the] [d]efendant DEC and in individual [d]efendants sued in their official capacities" based on "Eleventh Amendment immunity").

Likewise, Plaintiff's prospective claims against SUNY-Employees in their official capacities under the NYSHRL and NYCHRL fail because "a federal court's grant of injunctive relief against a state official may *not* be based on violations of state law." *Dube*, 900 F.2d at 595.

\*     \*     \*

Thus, Plaintiff is not barred by sovereign immunity from asserting FMLA interference and retaliation (family-care) claims against all SUNY-Defendants; § 1981 claims against all SUNY-Defendants; and § 1983, NYSHRL, and NYCHRL damages claims against SUNY-Employees in their individual capacities, and § 1983 claims for prospective injunctive relief against SUNY-employees in their official capacities. Plaintiff's ability to assert claims under Title VII was not challenged as a threshold matter. Having addressed these threshold issues, the Court now considers whether the movants are entitled to summary judgment on the surviving claims.

## IV.    Summary Judgment

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (internal quotation marks omitted) (alteration in original). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotation marks omitted). In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

The Second Circuit has "explicitly cautioned district courts to use extra care when deciding

whether to grant summary judgment [in employment discrimination cases] because the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." *Thompson v. Kaufman's Bakery, Inc.*, No. 03-CV-340 (WMS), 2005 WL 643433, at *3 (W.D.N.Y. March 16, 2005) (internal quotation marks and citation omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (noting that "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions" (internal quotation marks and citation omitted)). Nevertheless, the "summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."); *Marmulszteyn v. Napolitano*, No. 08-CV-4094 (DLI), 2012 WL 3645776, at *5 (E.D.N.Y. Aug. 22, 2012) ("Although '[t]he Second Circuit has stated that district courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question,' summary judgment in such a case may still be warranted if the plaintiff relies 'on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." (quoting *Figueroa v. N.Y. Health & Hosps. Corp.*, 500 F. Supp. 2d 227–28 (S.D.N.Y. 2007))). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### A.    Plaintiff's FMLA Claims

"The FMLA provides generally that a covered employer is required to grant an eligible employee up to a total of 12 weeks leave during any 12-month period for personal or family needs indicated in the Act." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017) (citing 29 U.S.C. § 2612(a)).  The FMLA also provides a "private right of action" to "employees who need to take time away from work to deal with serious health conditions of the employee or [his] family" and are not provided that time by their employers.  *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006)).

In order to ensure that eligible employees are not deprived of their statutory rights, the FMLA makes it unlawful for an employer (1) "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" established by the FMLA, or (2) "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C. § 2615(a).  Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions[,] or disciplinary actions."  29 C.F.R. § 825.220(c).  Employers are also prohibited from discriminating against any employee for filing any charge or instituting any proceeding under or related to the FMLA.  *See* 29 U.S.C. § 2615(b)(1).  In the Second Circuit, these prohibitions give rise to two distinct types of FMLA claims:  interference claims and retaliation claims.  *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).  Plaintiff has asserted both types of FMLA claims in this case.  (*See* SAC, Dkt. 23, at 3.)

29

1.      SUNY-Employees' Individual Liability

"Eligibility is a threshold issue" for an FMLA claim. *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 465 (S.D.N.Y. 2011) (quoting *Spurlock v. NYNEX*, 949 F. Supp. 1022, 1033 (W.D.N.Y. 1996)).  SUNY-Employees assert that they cannot be held liable as "individuals" under the FMLA.  (Dkt. 78, at 34.)  The Court disagrees.

"An individual may be held liable under the FMLA only if she is an 'employer,' which is defined as encompassing 'any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer.'" *Graziadio v. Culinary Institute of Am.*, 817 F.3d 415, 422 (2d Cir. 2016) (quoting 29 U.S.C. § 2611(4)(A)(ii)(I)) (citing 29 C.F.R. § 825.104(d)).  In *Graziadio*, the Second Circuit analyzed the appropriate test for individual liability under the FMLA, and concluded that the "economic-reality test," tracking the language applied in the context of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d), is the appropriate analysis:

> Under this test, courts ask whether the alleged employer possessed the power to control the worker in question, with an eye to the economic reality presented by the facts of each case.  To do so, they consider a nonexclusive and overlapping set of factors intended to encompass the totality of circumstances.  These factors include whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.  No one of the four factors standing alone is dispositive and any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition.  In the FMLA context, courts assessing the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer controlled in whole or in part plaintiff's rights under the FMLA.

*Graziadio*, 817 F.3d at 422–23 (internal quotation marks, citations, and alterations omitted).  In *Graziadio*, the district court had dismissed an individual defendant on a motion for summary judgment after focusing on the facts that the defendant "lacked meaningful 'power to hire and fire,'" and that the plaintiff had not offered evidence that the defendant "supervised or controlled

30

employee work schedules or conditions of employment, determined the rate and method of employee payment, or maintained employment records." *Id.* at 423. The Second Circuit reversed, and in applying the economic-reality test, focused on the evidence demonstrating that

> on the overarching question of whether [the defendant] controlled plaintiff's rights under the FMLA, there seems to be ample evidence to support the conclusion that she did: deposition testimony and email exchanges demonstrate a) that [the defendant] reviewed [the plaintiff's] FMLA paperwork, b) that she determined its adequacy, c) that she controlled [the plaintiff]'s ability to return to work and under what conditions, and d) that she sent [the plaintiff] nearly every communication regarding her leave and employment (including the letter ultimately communicating her termination). Indeed, [the defendant] specifically instructed [other employees] that they were not to communicate with [the plaintiff] and that [the defendant] alone would handle [her] leave dispute and return to work.

*Id.* at 424. Given that evidence, the panel in *Graziadio* concluded, that "a rational jury could find, under the totality of the circumstances, that [the defendant] exercised sufficient control over [the plaintiff]'s employment to be subject to liability under the FMLA." *Id.*

Among other material, the following evidence was submitted by the parties on this issue:

- Stephanie Bernadel, a member of SUNY's Labor Relations Department, testified at her deposition that "[a]fter reviewing the facts and the result of the investigation, we discussed it . . . with Dr. Pulitzer and with Dr. Reede[,] . . . and Dr. Reede and Dr. Pulitzer both together and separately felt that [Plaintiff] had violated his agreement and so he, you know, should be terminated. . . . After consulting with Dr. Pulitzer and Dr. Reede, they both felt that [Plaintiff] had been insubordinate and had violated the terms of his agreement, and so we all discussed it and we all decided that he was in violation of his agreement." (Bernadel Dep., Dkt. 95-30, at 9:5–10:24).

- Letters from Dr. Reede to physicians in the SUNY Downstate Department of Radiology, not including Plaintiff, regarding salary adjustments. (Dkt. 95-47.)

- An email from Dr. Pulitzer to Dr. Reede regarding Radiology Department personnel and a coverage proposal. (Dkt. 95-48.)

- Dr. Pulitzer's declaration in support of SUNY-Defendants' summary motion (Pulitzer Decl., Dkt. 79) stating, *inter alia*, that:

    o In his role as Chair of Radiology at KCHC he "did not hire or fire radiologists, determine the rate of their pay, or maintain employment records." (*Id.* ¶ 3.)

31

- o In his role as "Interim Chair of the [KCHC] department," Dr. Pulitzer "assumed a supervisory role with respect to managing radiologists' schedules and ensuring adequate coverage for the department." (*Id.* ¶ 5.)

- o Dr. Pulitzer, in his role as Chair of the KCHC Radiology Department, "reviewed requests for time off." (*Id.* ¶ 7.)

- o Dr. Pulitzer did not approve Plaintiff's leave request for September 4 and September 5, 2014 (*Id.* ¶ 9), communicated with Dr. Reede about that absence, and with Dr. Reede referred that issue to SUNY Downstate's Labor Relations Department (*Id.* ¶ 10).

- o Following Plaintiff's alleged attachment of inappropriate attestations to patients' charts, Dr. Pulitzer "brought the issue to the attention of . . . the Chief Medical Officer of KCHC," met with an individual in KCHC's Office of Risk Management, considered convening a Medical Board Hearing, and "notified Dr. Reede of the situation[.]" "Dr[s]. Reede and [Pulitzer] agreed to refer the issue to SUNY Downstate's Department of Labor Relations. Following the investigation by Labor Relations, [Dr. Pulitzer] conferred with Labor Relations and Dr. Reede, and . . . ultimately concluded that Plaintiff should be terminated." (*Id.* ¶¶ 15–16.)

- Dr. Reede's declaration in support of SUNY-Defendants' summary judgment motion (Reede Decl., Dkt. 80), in which she stated, *inter alia*, that:

- o In her "role as Chair of Radiology [at SUNY Downstate], [she] cannot by [her]self hire or fire physicians in the department or determine their rate of pay, and [she] do[es] not maintain employment records." (*Id.* ¶ 3.)

- o Dr. Reede was aware of the September 2014 attendance incident to the extent that Dr. Pulitzer informed her that Plaintiff insisted on taking time off without Dr. Pulitzer's approval, and that Dr. Reed "advised [Dr.] Pulitzer to refer Plaintiff to Downstate's Department of Labor Relations." (*Id.* ¶ 12.)

- o Dr. Reede "was very familiar with Plaintiff's issues with time and attendance, having counseled Plaintiff in May and having heard reports that Plaintiff was often not in the ER when he was supposed to be." (*Id.*)

- o Dr. Reede discussed the non-standard attestation issue with Dr. Pulitzer and "agreed that the matter should be referred to the Department of Labor Relations at SUNY Downstate." (*Id.* ¶ 15.)

- o Following the Labor Relations investigation, Dr. Reede "conferred with Labor Relations and Dr. Pulitzer, and . . . ultimately concluded that Plaintiff should be terminated." (*Id.* ¶ 16.)

- A meeting summary regarding "time and attendance" between Drs. Reede and Plaintiff, written by Dr. Reede (Dkt. 87-9) and the same written by Dr. Pulitzer (Dkt. 87-18).

- Dr. Pulitzer's letters denying Plaintiff's request for time off and Plaintiff's attendance sheets. (*E.g.*, Dkt. 87-23; Dkt. 87-32, at ECF 4–7.)

- Plaintiff's e-mails to Dr. Pulitzer regarding his attendance, time-off requests, and absences. (*See, e.g.*, Dkt. 87-14.)

The Court finds that this evidence presents a genuine dispute as to material facts underlying any analysis of the *Graziadio* factors for purposes of determining whether SUNY-Employees are subject to individual liability under the FMLA. *See* Fed. R. Civ. P. 56(a). The economic reality test does not require an individual to have absolute control over the Plaintiff's rights under the FMLA, but sufficient control in whole or in part. *See Graziadio*, 817 F.3d at 422.

The evidentiary submissions demonstrate that it would be reasonable for a jury to conclude that: (1) Dr. Pulitzer was sufficiently involved in both the investigation referrals and the actual decision to terminate Plaintiff, such that he "had the power to hire and fire the employees"; (2) the fact that Plaintiff had to ask Dr. Pulitzer for leave time, that Dr. Pulitzer had the authority to deny that time, and that Dr. Pulitzer testified that he assumed that supervisory role shows that Dr. Pulitzer "supervised and controlled employee work schedules"; and (3) the fact that Dr. Pulitzer authored documents for placement in Plaintiff's employment file shows that Dr. Pulitzer "maintained [Plaintiff's] employment records." *See id.* at 422–23. Although the evidence does not suggest that Dr. Pulitzer "determined the rate and method of [Plaintiff's] payment," "[n]o one of the four factors standing alone is dispositive[.]" *Id.* at 422. Rather, "in the FMLA context, courts assessing the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer "controlled in whole or in part plaintiff's rights under the FMLA." *Id.* at 423. The Court concludes that there is sufficient evidence to allow a

reasonable jury to find that Dr. Pulitzer controlled, at least in part, Plaintiff's rights under the FMLA.

The evidence similarly demonstrates that it would be reasonable for a jury to conclude that Dr. Reede is also subject to individual liability. A jury could look at Dr. Reede's involvement in both the investigation referrals and actual decision to terminate Plaintiff to conclude that she "had the power to hire and fire the employees"; that she was sufficiently involved in the oversight of SUNY Downstate's Radiology staff; in consultation with Dr. Pulitzer, "supervised . . . employee work schedules" at KCHC; that she "determined the rate and method of payment," as reflected in the letters Dr. Reede sent to the Radiology Department physicians regarding their rates of pay; and that she "maintained [Plaintiff's] employment record," as reflected in the numerous employment-related documents she authored. *Id.* at 422.

Accordingly, the Court denies SUNY-Defendants' summary judgment motion as to SUNY-Employees on the ground that no jury could find that they qualify as "individuals" under the FMLA.

### 2.     Plaintiff's FMLA Interference Claims

Plaintiff asserts both an FMLA interference cause of action and FMLA retaliation cause of action, based on the same facts. SUNY-Defendants argue that Plaintiff's allegations sound entirely as a retaliation claim and not as an interference claim. (Dkt. 78, at 30.) The Court agrees.

Plaintiff is essentially claiming that he was subjected to adverse employment actions—probation and then termination—for exercising his FMLA rights. (*See* SAC, Dkt. 23, ¶¶ 26–58.) He does not state that he was ever prevented from actually taking FMLA leave. (*See generally id.*) As the Second Circuit explained:

> In a general sense, an employee brings an "interference" claim when [his] employer
> has prevented or otherwise impeded the employee's ability to exercise rights under

34

the FMLA. "Retaliation" claims, on the other hand, involve an employee actually exercising [his] rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer. The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA.

*Woods*, 864 F.3d at 166 (internal citations omitted); *see also LeClair v. Berkshire Union Free Sch. Dist.*, No. 08-CV-1354 (LEK) (RFT), 2010 WL 4366897, at *6 (N.D.N.Y. Oct. 28, 2010) ("Plaintiff's theory of interference by termination is merely a retaliation theory in disguise"); *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009) (holding plaintiff's interference claim "really is no more than an effort to dress [his] retaliation claim in (barely) different clothing"). To the extent that Plaintiff relies on a District of Maryland decision to argue that the "distinction between an interference claim and a retaliation claim under the FMLA is not always clear," and that his decision to proceed with FMLA-eligible leave led to his probation, thus asserting an interference claim, that reliance is misplaced. (Dkt. 90, at 29–30 (quoting *Edusei v. Adventist Healthcare, Inc.*, No. 13-CV-157 (DKC), 2014 WL 3345051, at *6 (D. Md. July 7, 2014). The facts of *Edusei* do not support Plaintiff's argument. The Court there distinguished between a claim arising from the deprivation of an FMLA entitlement—such as being denied the ability to take leave—from retaliation for an employee's exercise of their FMLA rights—such as being fired or placed on probation for taking that leave. *See Edusei*, 2014 WL 3345051, at *6. As previously described, Plaintiff is alleging retaliation and not interference.

For these reasons, Plaintiff's FMLA interference claims are dismissed.[17]

---

[17] Regardless, Plaintiff's interference claims would fail. To succeed on an FMLA interference claim, Plaintiff must establish

1) that [he] is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that [he] was entitled to take leave under the

### 3.   Plaintiff's FMLA Retaliation Claims

A plaintiff may bring FMLA retaliation claims for violations of both 29 U.S.C. § 2615(a)(1) and 29 U.S.C. § 2615(a)(2).  *See Woods*, 864 F.3d at 167; *see also* § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."); § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA].").  FMLA retaliation claims are analyzed under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Graziadio*, 817 F.3d at 429.  Accordingly, "[t]o establish a prima facie case of FMLA retaliation, a plaintiff must establish that (1) he exercised rights protected under the FMLA, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (internal quotation marks omitted).  There is no dispute that Plaintiff has established the second and third prongs of a *prima facie* case—that Plaintiff was qualified for his position and that he suffered an

---

FMLA; 4) that [he] gave notice to the defendant of [his] intention to take leave; and 5) that [he] was denied benefits to which [he] was entitled under the FMLA.

*Graziadio*, 817 F.3d at 424 (adopting requirements for a *prima facie* case of interference with FMLA rights).  At a minimum, Plaintiff did not assert sufficient facts to prevail on the fifth prong: that he was denied benefits to which he was entitled.  It is undisputed that Plaintiff utilized accrued sick leave for the time he was absent from work on September 4 and 5, 2014, and therefore was not denied any benefit.  *See* 29 U.S.C. § 2612(d)(2)(B) ("An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided . . . for any part of the 12-week period of such leave under [the Act.]").

adverse employment action.[18]  (SUNY-Defendants' Opening Brief, Dkt. 78, at 31 ("Plaintiff has failed to establish the first and fourth prongs of a *prima facie* FMLA retaliation claim."); Plaintiff's Memorandum in Response, Dkt. 90, at 35 ("SUNY Defendants move to dismiss the retaliation claim on two grounds: (1) [Plaintiff] did not exercise rights protected under the FMLA; and (2) he cannot show that his termination occurred under circumstances that give rise to an inference of retaliatory intent.").)  The parties' source of disagreement lies in the analysis of the first and fourth prongs.

The first prong requires that Plaintiff establish that he exercised rights protected under the FMLA.  SUNY-Defendants contend that Plaintiff did not exercise rights protected by the FMLA because, when he missed work on September 4 and 5 and was subsequently placed on probation, he missed those days due to an injured back, unrelated to a need to care for his son, the reason he is asserting FMLA protections.  (Dkt. 78, at 20–21.)   Plaintiff, in opposition, contends that he sought the leave to assist with planning for his child with autism to be placed at an appropriate school, and to "provide love and support" to that child, who was having difficulty with transitions. (Dkt. 90, at 8 (citing Pl.'s Decl., Dkt. 94, ¶ 9).)[19]

---

[18] The Court declines to address SUNY-Defendants' arguments regarding whether the settlement agreement and subsequent probation constituted an adverse action under the FMLA, given the dismissal of the FMLA retaliation claim on other grounds.

[19] To the extent that SUNY-Defendants also advance the argument that Plaintiff did not follow the proper notice and procedural requirements for an FMLA leave request, that assertion is belied by their own evidence.  Generally, while the FMLA allows an employer to establish its own policies for usual and customary notice for requesting leave, 29 C.F.R. § 825.303(c), "[a]n employer cannot use its own notice policy to circumscribe an employee's rights under the FMLA," *Slaughter v. Am. Bldg. Maint. Co. of N.Y.*, 64 F. Supp. 2d 319, 327 (S.D.N.Y. 1999); *see also Hill v. City of New York*, 136 F. Supp. 3d 304, 343 (E.D.N.Y. 2015).  "The FMLA does not impose a specific time requirement for an employee to request FMLA leave, only requiring that 'an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case.'"  *Id.* at 343 (quoting 29 C.F.R. § 825.303(a)).  SUNY-

37

The evidence adduced by the parties demonstrates that:

- Plaintiff's request for time-off does not indicate that he made the request based on the need to care for his child.  (*See* Dr. Pulitzer's contemporaneous notes, letters, and e-mails regarding Plaintiff's leave request, Dkts. 87-19, at ECF 3; 87-23, at ECF 2; 95-19, at ECF 3; Dkt. 95-26, at ECF 2.)

- Plaintiff's initial request does not indicate a reason for the requested time off.  (*See* Dkt. 87-21 at ECF 3; Dkt. 95-38, at ECF 3.)

- An Impartial Hearing Officer at the New York City Department of Education did indicate that certain paperwork regarding Plaintiff's child's school placement had to be completed by September 4, 2014.  (Dkt. 95-22, at ECF 2.)

- During the Labor Relations Interrogation on September 8, 2014, Plaintiff admitted that he had planned to go to work on September 4, because the situation with his son had been resolved, but that he hurt his back getting out of bed, which led to him not appearing for work that day.  (Dkt. 87-24, at 12:7–8 (Plaintiff stating, "I-I-I was gonna come in, I rolled out of bed and I – and I stretched my back out and I've been in pain and not able to be mobile since then.").)

- Plaintiff sent Dr. Pulitzer an email on September 5, 2014, stating, "[a]s it turns out I was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out.  My mobility has been severely limited since.  Please forgive the confusion."  (Dkt. 87-21, at ECF 2.)

- Plaintiff visited an urgent care center on September 8, 2014 to receive care for his back injury.  (Dkt. 87-28.)

- During the second Labor Relations meeting on October 20, 2014, Plaintiff stated, "[s]o rather than just call in sick the next day, Thursday and Friday, which is what everybody else does, and what everybody else has told me that I should have done, I prepared the department for my absence . . . And it turns out, the next morning, I got out of bed and I threw out my back.  So I physically, even if I wanted to, couldn't come to the hospital . . . I couldn't – I couldn't physically make it to the hospital, and I had to deal with my son's issues.  He's the most important thing in the world to me."  (Dkt. 87-30, at 4:1–16.)

---

Defendants contend that "Plaintiff first requested the [alleged FMLA] leave on August 29, 2014 by emailing Ms. McMurren, who was not the appropriate person to contact."  (Dkt. 78, at 32.) However, SUNY-Defendants submitted a slide detailing the "Sick Day Policy for KCHC" which states that Ms. McMurren, who works for Dr. Reede, is indeed one of the correct people to contact. (Dkt. 87-13, at ECF 8; *see also* Dkt. 87-22, at ECF 10 ("Department Chair's office must be promptly notified . . . Additional daily email notification to Chair and Chair's staff is also expected *where possible.*" (emphasis added)).)  To the extent that SUNY-Defendants argue that Plaintiff did not follow the precise notification procedures, within a practicable time, they appear to be promoting form over the substance of the law.

Even after drawing all inferences in the light most favorable to Plaintiff and considering his own statements and deposition testimony, this Court finds that a reasonable jury could not conclude that Plaintiff did not report to work on September 4 and 5, 2014 to care for his son.  The Court finds *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), analogous.  There, the Second Circuit reasoned:

> In the circumstances presented in the instant case—where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe [plaintiff]'s testimony, we hold that the District Court did not err by awarding summary judgment.

*Id.* at 555 (internal citations, quotation marks, and alterations omitted).[20]

For these reasons alone Plaintiff's FMLA retaliation claims fail.  However, even assuming *arguendo* that Plaintiff did sufficiently allege a *prima facie* case, the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse action, *see Esser v. Rainbow Advert. Sales Corp.*, 448 F. Supp. 2d 574, 581 (S.D.N.Y. 2006), which SUNY-

---

[20] To the extent that Plaintiff relies on the Second Circuit decision in *Coutard v. Municipal Credit Union*, 848 F.3d 102 (2d Cir. 2017), to argue that Dr. Pulitzer was under an obligation to ask further questions of Plaintiff as to the exact nature of the circumstances of his request for leave to see if the leave was FMLA-eligible, that reliance is misplaced.  (Dkt. 90, at 34.)  In *Coutard* the Plaintiff sought leave to take care of his seriously ill grandfather with whom he had an *in loco parentis* relationship, and informed his employer that he needed leave, without describing that relationship.  The Court concluded that because "[plaintiff] met the eligibility requirements for FMLA leave and requested that leave expressly to care for his seriously ill grandfather, [defendant] as an employer covered by the Act had an obligation to specify the additional information that it needed in order to determine whether he was entitled to such leave." *Coutard*, 848 F.3d at 104.  Here, the question is whether Plaintiff, as an initial matter, met the eligibility requirements for FMLA leave by "expressly" stating that he sought leave to take care of a family member—which the plaintiff in *Coutard* did.  *Id.*  Since Plaintiff did not, the additional requirements imposed on the employer by *Coutard* to obtain additional information about the reasons for the leave simply have no application here.

39

Defendants have done.  There is no dispute that Plaintiff attached unapproved attestations required for proper hospital reimbursements to multiple—indeed, almost 200—patients' charts, and then sought information from IT about if and how the attestations could be deleted.  (*See* Pulitzer Dep., Dkt. 87-57, at 143:13–144:11; Pl.'s Decl., Dkt. 94, ¶ 12.)  Furthermore, it is clear that Plaintiff was terminated, in large part, due to attaching the unapproved attestations to patients' charts.  (*See* S-Defs.' 56.1, Dkt. 77, ¶¶ 42–43, 46, 55–56.)[21]  SUNY Defendants' have established a legitimate, non-discriminatory reason for Plaintiff's termination.  Thus, the Court finds that Plaintiff cannot prove that the cause of his termination was merely a pretext for discrimination.

Accordingly, Plaintiff's FMLA retaliation claims are dismissed.

### B.  Federal Race and Religion Discrimination Claims

Plaintiff also brings discrimination and retaliation claims under Title VII, and §§ 1981 and 1983, and alleges that he faced discrimination because of his race and religion.  (SAC, Dkt. 23, ¶¶ 1, 21–27, 73–81; Dkt. 90, at 17.)  Plaintiff asserts that, as a result of this discrimination, he was not promoted to Director of the ER Radiology Department, a job he had previously occupied, despite being more qualified than the doctor hired for that position.  Plaintiff also claims that as a result of race and religion, in combination with the FMLA discrimination discussed *supra*, he was placed on probation and ultimately terminated.  (Dkt. 90, at 17–19.)

---

[21] Plaintiff does not dispute that he was terminated for violations of the September 8, 2014 disciplinary settlement due to, *inter alia*, "allegations of insubordination," but disputes which employees made the decision.  (Pl.'s 56.1-1, Dkt. 91, ¶ 55.)  Plaintiff notes that the evidence shows that Drs. Reede and Pulitzer decided he should be terminated; that Ms. Bernadel and Mr. Cuiman agreed with that decision; and, that, according to Dr. Pulitzer, Dr. Jamaleddine, KCHC's Chief Medical Officer, "made it known that he would not allow Dr. Greenberg to continue to practice at KCHC and therefore, in effect, he was saying that Dr. Greenberg had to be terminated."  (*Id.*)

1.      Plaintiff's Section 1981 Claims

At the outset, the Court notes that it will consider Plaintiff's § 1981 claims in tandem with his § 1983 claims.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts[.]"  42 U.S.C. § 1981(a).   The Civil Rights Act of 1991 expanded § 1981 to outlaw discrimination occurring after contract formation "with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship[.]"  *Patterson v. Cty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004).  Section 1981 does not provide an independent cause of action against state actors; rather, § 1981 claims must be brought through § 1983.  *Duplan v. City of New York*, 888 F.3d 612, 619–21 (2d Cir. 2018) (joining nine other circuits to reaffirm the applicability of *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)); *see Jett*, 491 U.S. at 733 ("[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.").  "[W]here defendants are state actors, Section 1983, not Section 1981, is the appropriate vehicle through which a plaintiff may pursue discrimination claims for damages."  *Zaniewska v. City of New York*, No. 11-CV-2446 (RRM) (VVP), 2013 WL 3990751, at *8 (E.D.N.Y. Aug. 5, 2013), *aff'd*, 569 F. Appx. 39 (2d Cir. 2014) (summary order); *see also Jett*, 491 U.S. at 735 ("We hold that the express action at law provided by § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States], provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.") (internal quotation marks omitted).   "The holding in *Jett* has been interpreted to encompass not only governmental entities, but also individuals sued in their individual capacities who are state actors."  *Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381, 400-01 (S.D.N.Y. 2008) (internal quotation

41

marks omitted); *Bamba*, 2017 WL 3446806, at *10 (collecting cases). The Court, therefore, analyzes Plaintiff's §§ 1981 and 1983 claims together under § 1983.

2.       Plaintiff's Title VII, § 1981, and § 1983 Discrimination Claims[22]

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The purpose of the section to which Plaintiff cites, 42 U.S.C. § 2000e–16a, "is to provide procedures to protect the rights of certain government employees, with respect to their public employment, to be free of discrimination on the basis of race, color, religion, sex, national origin, age, or disability." To succeed on a claim of discrimination under Title VII a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. To do this, the plaintiff must show that he was (1) "within the protected class"; (2) "qualified for the position"; (3) "was subject to an adverse employment action"; and (4) "the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009), *superseded in part by statute as stated in Vogel v. CA, Inc.*, 662 F. App'x 72 (2d Cir. 2016) (summary order). When a plaintiff alleges a failure to promote, the fourth prong requires that plaintiff to show "that the failure to promote occurred under circumstances giving rise to an inference of discriminatory intent." *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 266 (citing *Yi v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122 (2d Cir. 2012) (summary order), among other cases).

---

[22] The Court notes that Plaintiff only asserts age discrimination claims in the context of his state law and municipal law claims. (*See* SAC, Dkt. 23, ¶¶ 59–161.)

Once a *prima facie* case has been established the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Once the defendant has made a showing of a neutral reason for the alleged action, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trs. of Columbia Univ. in City of N.Y.*, 131 F.3d 305, 312 (2d Cir. 1997). "If the plaintiff's evidence was barely sufficient to make out a prima facie case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral rationale." *Id.*; *see also Naumovski v. Norris*, 934 F.3d 200, 215 n.39 (2d Cir. 2019). "Showing an employer's motivation to discriminate is 'usually' accomplished through the 'cumulative weight of circumstantial evidence.'" *United States v. City of New York*, 713 F. Supp. 2d 300, 322 (S.D.N.Y. 2010) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).

Section 1983 employment discrimination claims may generally be analyzed using the same *McDonnell Douglas* framework that applies in a Title VII discrimination case. *Naumovski*, 934 F.3d at 214. However, a § 1983 claim carries a higher burden: "a Title VII plaintiff need only prove that the employer's stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action. By contrast, to establish 'pretext' under § 1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action." *Id.* at 214–15 (emphasis in the original). Put another way, "a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Id.* at 215. "A plaintiff pursuing a claim for employment discrimination under § 1983 . . . must establish that the defendant's discriminatory

43

intent was a 'but-for' cause of the adverse employment action or the hostile environment. It is insufficient to establish simply that invidious discrimination was 'a motivating factor' of the offending conduct." *Id*. at 214. "Accordingly, a court considering a § 1983 claim at summary judgment must determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred 'but-for' [the] discrimination." *Id*.

There is no dispute that Plaintiff Greenberg is Jewish and white, and thus within two protected classes, *see Klings v. N.Y. State Office of Ct. Admin.*, No. 04–CV–3400 (KAM) (LB), 2010 WL 1292256, at *6 (E.D.N.Y. Apr. 5, 2010); *Vill. of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016) ("[In a prior case] we assumed the viability of a Title VII claim for intentional racial discrimination based on the plaintiff's status as 'white, Jewish, and/or not Hispanic.'" (internal citation omitted)), or that by reason of his non-promotion, *see Ellis*, 975 F. Supp. 2d at 266, and probation and subsequent termination, he was subject to adverse employment actions, *see Terry v. Ashcroft,* 336 F.3d 128, 137–138 (2d Cir. 2003) (finding an adverse employment action is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities," and may "include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." (internal quotation marks, citations, and alterations omitted)). However, the Court finds that taking the submissions of the parties, together, do not show a genuine dispute as to material facts that would give rise for a reasonable jury to find that any of the alleged adverse actions gives rise to an

44

inference of discrimination based on religion or race.[23]  *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 248; *cf. Patterson*, 375 F.3d at 223 ("In sum, [plaintiff] produced no evidence that racial harassment at the hands of fellow officers had any bearing on the Department's decision to terminate his employment.  We conclude that there plainly was a dearth of evidence to show that the termination of his employment occurred under circumstances giving rise to an inference of discrimination.").

First, as relevant to all of Plaintiff's claims of discrimination, he could have been terminated, without cause, in June 2014.  (*See* Reede Decl., Dkt. 80, ¶ 9 (noting that at the time five radiologists were not renewed in June of 2014, Plaintiff was renewed); Reede Reply Decl., Dkt. 98, ¶ 4 ("I made the decision to renew [Plaintiff] in June 2014 at the time that five radiologists were no[t]-renewed, and I was aware of his race and age at the time of the decision to renew him.").)  Moreover, the same actors Plaintiff alleges to have discriminated against him actually renewed his contract four months prior (*see id.* ¶ 4), strongly suggesting that invidious discrimination was not the likely cause.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[S]ome factors strongly suggest that invidious discrimination was unlikely.  For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.").

With respect to Plaintiff's claims of race and religious discrimination, the Court notes that

---

[23] The Court notes that it is analyzing Plaintiff's Title VII and §1983 claims together although the causation standard is more demanding for § 1983 actions and requires "a court considering a § 1983 claim at summary judgment . . . [to] determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred but-for [the] discrimination." *Naumovski*, 934 F.3d at 214.  Since, as discussed below, the Court does not reach the causation element as to the Title VII or § 1983 claims, it analyzes Plaintiff's Title VII and § 1983 claims together.

45

Dr. Pulitzer is also white and Jewish and belongs to the same class as Plaintiff. (Pulitzer Decl., Dkt. 79, ¶ 2 ("I self-identify as White and am Jewish.")) "It is a well-settled, albeit not dispositive, principle that where the alleged discriminator is a member of the same protected class as Plaintiff, an inference against discrimination exists and claims of discrimination become less plausible." *Meyer v. State of N.Y. Office of Mental Health*, 174 F. Supp. 3d 673, 687 (E.D.N.Y. 2016) (citing *Allen v. Chanel, Inc.*, No. 12-CV-6758 (LAP), 2015 WL 3938096, at *5 (S.D.N.Y. June 26, 2015); *see Allen*, 2015 WL 3938096, at *5 (granting summary judgment on sex discrimination claim because "when the decision-maker is in the same protected class(es) as the plaintiff-employee, courts can draw inferences against discriminatory intent," and here the decision makers were "all female" just like plaintiff); *Palak v. St. Francis Hosp.*, No. 14–CV–4383 (JG), 2015 WL 3682805, at *8, 2015 (E.D.N.Y. June 12, 2015) (collecting cases for proposition that it "provides an additional inference against discrimination" "where the person who participated in the allegedly adverse decision is also a member of the same protected class" (internal quotation marks omitted)).

In support of his claim of religious discrimination, Plaintiff asserts that Dr. Reede "appeared to harbor anti-Semitic sentiment." (Dkt. 90, at 4 n.4.) Plaintiff submitted a declaration from a SUNY Downstate staff member who worked near Dr. Reede alleging, *inter alia*, that: (1) Dr. Reede "expressed disapproval" when she saw observant Jewish staff gathering to pray; (2) Dr. Reede stated that she would end midday prayers of observant Jews; (3) Dr. Reede "sarcastically comment[ed] that she wished she were Jewish in order to get so many holidays from work;" and (4) Dr. Reede "express[ed] dissatisfaction with Jewish radiologists and staff leaving work early on Fridays in order to observe Shabbat." (*Id.*) Aside from his own termination, discussed *supra*, this declaration is the only evidence Plaintiff proffers regarding SUNY-Defendants' alleged anti-Jewish animus. This is plainly insufficient. As a general matter, scant, isolated references are not

46

enough to allege discrimination under the fourth element of Title VII. *See Gonzalez v. Allied Barton Sec. Servs.*, No. 08-CV-9291 (RJS) (RLE), 2010 WL 3766964, at \*5 (S.D.N.Y. Sept. 7, 2010) (explaining that "isolated derogatory remarks . . . alone do not raise an inference of discrimination" (citing *Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir.1998))), *report and recommendation adopted*, 2010 WL 3766954 (S.D.N.Y. Sept. 27, 2010). As the Second Circuit has explained,

> district courts in this circuit have developed a standardized approach for applying these concepts to individual cases. In determining whether a remark is probative, they have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process). While we caution that none of these factors should be regarded as dispositive, we think this framework will often provide a useful approach to the admission or exclusion of remarks not directly related to the adverse action against the plaintiff, and employ it here.

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010) (internal citations omitted).

Applying these factors, the Court notes that even assuming Dr. Reede made the comments attributed to her, Plaintiff offers no evidence establishing a connection between the comments and the adverse employment actions at issue. The undated remarks by Dr. Reede were made at least six months prior to Dr. Scott-Moore's appointment and ten months before Plaintiff's termination, given that the staff member stopped working at KCHC in December of 2013. (Neiman Decl., Dkt. 93, ¶ 2.) *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (finding that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). And, it bears repeating that these alleged remarks by Dr. Reede were made *prior* to the decision to *renew* Plaintiff's contract. Lastly,

47

Plaintiff, though Jewish, does not claim to be Orthodox or to pray during the work day; thus, even assuming *arguendo* that Dr. Reede harbored any negative sentiments about the Orthodox Jewish doctors at SUNY Downstate, that fact would have little to no connection to any action taken against Plaintiff.

For these reasons, the Court finds that Plaintiff failed to establish a *prima facie* case of discrimination.  However, for the reasons discussed *supra* in the context of the FMLA discussion, even assuming *arguendo* that Plaintiff could successfully establish a *prima facie* case, SUNY-Defendants have established a legitimate and non-discriminatory rationale for his termination: Plaintiff's conduct in attaching 180 unapproved attestations to patients' charts—which not only violated hospital policy, but placed the hospital at risk of liability—and then seeking the IT Department's assistance to conceal his actions.  Plaintiff has failed to prove, under both the Title VII and the § 1983 standards, that his termination was pre-textual, based in whole or in part on discrimination, or that discrimination was a "but-for" cause of his termination.  Plaintiff has failed to show that discrimination on the basis of race or religion was even a *minimal* factor in his termination.

With respect to Plaintiff's claims of discrimination as related to the failure to promote him, Plaintiff asserts that Dr. Scott-Moore's appointment as Director of ER Radiology alone—"as a non-Jewish black who was also younger than Dr. Greenberg"—satisfies the fourth element of a *prima facie* case.  (Dkt. 90, at 19 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) (additional citation omitted).)  "[A] plaintiff may seek to raise an inference of discrimination by 'showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group.'" *Perreti v. Bank*, No. 11-CV-3925 (BMC), 2012 WL 2458137, at *4 (E.D.N.Y. Jun. 27, 2012) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368,

379 (2d Cir. 2003)). That inquiry requires the plaintiff to demonstrate that he "was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted). In the promotion context, that means comparing the qualifications of the plaintiff with those of the person promoted. *See Mandell*, 316 F.3d at 379 (finding that plaintiff had adduced sufficient evidence to show that "the promoted officers and plaintiff were sufficiently similarly situated to support an inference of discrimination"); *see also Terry*, 336 F.3d at 139.

> Plaintiff asserts that he
>
> was not only a legendary radiologist within the KCHC universe but he was highly respected by his colleagues who sought to imitate him. He had been a radiologist for more than twice the number of years as Dr. Scott; he had spent more than a decade practicing at a Level One Trauma Center[,] . . . while Dr. Scott had no such experience, except when she was doing her residency at KCHC under Dr. Greenberg's supervision amongst others; and she had never been a Director of an ER Radiology Department at a Level One Trauma Center, while Dr. Greenberg had.

(Dkt. 90, at 19–20.)

While it is undisputed that Plaintiff had more years of experience as a radiologist than Dr. Scott-Moore, Defendants argue that the criteria that separated the two candidates and resulted in Dr. Scott-Moore's appointment over Plaintiff was their education-related experience and accomplishments.[24] Thus, the crux of the factual dispute between the parties is how important the candidates' involvement in scholarly activity and academics was in SUNY-Defendants' hiring/promotion decision. (*Compare* Dkt. 96, at 11, *with* Dkt. 90, at 20–21.) SUNY-Defendants contend that academic and scholarship achievements was a significant consideration when making

---

[24] Although not highlighted by SUNY-Defendants' briefs (*see generally* Dkts. 78, 96), the Court notes that Dr. Scott-Moore was also a section chief of Musculoskeletal Radiology prior to her appointment as Director of Emergency Room Radiology at KCHC (*see* Reede Dep., Dkt. 87-60, at 122:22–123:2).

the promotion decision, pointing to the ACGME probation report that specifically criticized the faculty for their perceived lack of interest in the education of residents. (Dkt. 96, at 11 (quoting Dkt. 87-1, at 3).) In her meeting with Plaintiff on July 23, 2014, Dr. Reede told him that he was not offered the position due to: his "[l]ack of participation in major administrative and educational meetings in the department . . ."; "[r]esident evaluations show[ing] deficiencies in several areas"; "[n]o significant scholarly activity"; and the hospital's "[n]eed [for] someone that is more interested in academics because [the hospital] want[ed] to explore the possibility of starting an ER Fellowship." (Dkt. 87-53, at ECF 2.)

"Eligibility requirements are defined by the employer, and a plaintiff's subjective belief that [he] is qualified for the position is not sufficient." *Ellis*, 975 F. Supp. 2d at 267; *see also Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 127 (2d Cir. 2004) (explaining that "being 'qualified' refers to the criteria the employer has specified for the position"); *Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 131 (E.D.N.Y. 2012). Plaintiff does not deny that he filled out a form indicating that he spent "zero hours doing 'research/ scholarly activity with residents.'" (Pl.'s Decl., Dkt. 94, ¶ 14.) Plaintiff's CV, provided to Dr. Reede during the application process, listed only two papers over the course of Plaintiff's at least nineteen-year career; both papers were undated and without the name of a journal.[25] (Dkt. 87-51, at ECF 3.) During Plaintiff's February 2014 annual review, prior to Dr. Scott-Moore's appointment, Plaintiff left the boxes for "scholarly distinction and accomplishment" entirely blank. (Dkt. 100-1, at ECF 2.) By contrast, the current

_____

[25] In his deposition, Plaintiff admitted that one of the papers, which was written in the late 1980s, was never published. (Pl.'s Dep., Dkt. 87-55, at 10:23–11:18.)

*curriculum vitae* of Dr. Scott-Moore that SUNY-Defendants submitted into evidence[26] listed three entries for "educational responsibilities;" membership in two professional societies; numerous awards and honors beginning in 1999; three visiting professorships, grand rounds, and invited lectures; and five scientific posters or education exhibits. (Dkt. 87-52, at ECF 6–8.) Additionally, Dr. Scott-Moore and the other candidate besides Plaintiff for the Director position, did not have the same time and attendance issues as Plaintiff, which was a particular concern to SUNY-Defendants given the recent ACGME report placing SUNY Downstate's radiology residency program on probation, in part, because "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule." (AGCME Report, Dkt. 87-1, at 2; *see* Reede Dep., Dkt. 87-59, at 137:18–25.)

For these reasons the Court finds that Dr. Scott-Moore and Plaintiff were not similarly situated in all material respects and that Plaintiff cannot establish that he was qualified for the position based on the criteria the employer specified. Plaintiff, therefore, cannot establish a *prima facie* case with respect to his discrimination claims for failure to promote. *Cf. Workneh*, 897 F. Supp. 2d at 131 ("[I]n determining whether a plaintiff has met his *prima facie* burden of demonstrating he was qualified for a position, being qualified refers to the criteria the employer has specified for the positions, and a plaintiff's subjective belief he is qualified will not suffice[.]"

---

[26] The Court notes that SUNY-Defendants did not submit the version of the Dr. Scott-Moore's curriculum vitae that was considered at the time of her promotion. However, based on the testimony discussed *supra*, and the information contained within the *curriculum vitae*, the Court assumes the validity of Dr. Scott-Moore's credentials. But the Court does not consider scholarship or educational efforts that Dr. Scott-Moore engaged in *after* being promoted, in assessing SUNY-Defendants' asserted reasons for promoting Dr. Scott-Moore over Plaintiff and the other candidate (*see* Dkt. 96, at 12–13), since that information could not possibly have been available to Defendants for their consideration.

(internal quotation marks omitted) (quoting *Williams*, 368 F.3d at 127)).[27]

### 3. Plaintiff's Retaliation Claims

"Once the color of state law requirement is met, except for the issue of individual liability, an 'equal protection claim parallels a plaintiff's Title VII claim . . . [and] there is no sound reason to deviate from this principle for a retaliation claim.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 81–82 (2d Cir. 2015). The Court accordingly considers Plaintiff's Title VII and § 1981/§ 1983 claims in tandem.

> Title VII . . . prohibits an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. . . .
>
> [T]he antiretaliation provision . . . covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56–57 (2006).

To prevail on a retaliation claim under Title VII, "an employee must show that (1) [he] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected

---

[27] In addition to Dr. Reede's allegedly disparaging comments about observant Jews and Dr. Scott-Moore's appointment over Plaintiff as Director of ER Radiology, Plaintiff points to the alleged termination or "micro-management" of "a number of Jewish, white, and/or older physicians" at KCHC, at a time when "younger, black, non-Jewish physicians" are being hired or "given more leeway" at work, as another fact upon which an inference of discrimination can be found. Plaintiff, however, has offered no evidence to support either part of this assertion. Thus, the Court does not consider it. Moreover, for the reasons previously discussed, the Court does not find, even when considered in combination, that Dr. Reede's alleged hostility to observant Jews— even if established—and Dr. Scott-Moore's appointment are enough to support an inference of discrimination on the basis of religion or race for purposes of Plaintiff's §1981, § 1983, and Title VII claims.

activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "[E]ven without direct evidence of causation, a plaintiff can indirectly establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Zann Kwan v. Andalez Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (internal quotation marks and alterations omitted).

Plaintiff's *prima facie* retaliation claim fails because he cannot establish that there was a causal nexus between any protected activity and an adverse employment action. Plaintiff contends that he complained about discrimination in his meeting with Ms. Bernadel on October 10, 2014 and was then terminated only twelve days later, giving rise to that nexus. (Dkt. 90, at 28.) However, similar to the plaintiff in *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (internal citation omitted):

> The only basis [Plaintiff] suggests for finding such a nexus is time. He claims that his placement on probation and his subsequent firing followed his complaints closely enough to support an inference of retaliation. It is, of course, true that temporal proximity can demonstrate a causal nexus. But in this case the adverse employment actions were both part, and the ultimate product, of "an extensive period of progressive discipline" which began when [Defendant] diminished [Plaintiff]'s job responsibilities a full five months prior to his filing of the EEOC charges. Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.

Although Plaintiff disputes when SUNY-Defendants began subjecting him to progressive discipline (*see* Dkt. 90, at 27–28), it is undisputed that he was subjected to some form of discipline at least by September 8, 2014, when he met with Labor Relations staff and signed an agreement placing him on probation—forty-four days before his termination, and prior to his complaint of anti-Jewish bias to Ms. Bernadel in Labor Relations. (Settlement Agreement, Dkt. 87-29.) *See also Hazelwood v. Highland Hosp.*, 763 F. App'x 60, 63 (2d Cir. 2019) (summary order) (finding no causal nexus where the adverse employment action occurred ten months after the alleged

protected activity, and plaintiff's "supervisors began calling performance deficiencies to her attention months before she complained to management . . . ." (internal citations omitted)).

Moreover, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015) (summary order). For all the reasons discussed *supra*, Plaintiff is not able to rebut the legitimate and non-discriminatory reason for his termination established by SUNY-Defendants. *Cf. Parron v. Herbert*, 768 F. App'x 75, 77 (2d Cir. 2019) (summary order) ("Even if there were a genuine dispute as to whether [plaintiff] had violated company policy, [plaintiff] did not produce any evidence demonstrating that these reasons were pretextual other than the timing of his suspension. . . . But timing alone is insufficient to establish pretext."); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (finding in context of a Title VII retaliation claim that, while timing "might be enough to establish a prima facie case, temporal proximity alone is not enough to establish pretext in this Circuit").

For these reasons Plaintiff's Title VII, and §§ 1981 and 1983 retaliation claims are dismissed.

### C.  NYSHRL and NYCHRL Claims

In light of the Court's dismissal of all of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims, which are therefore dismissed without prejudice. *See Missick v. City of New York*, 707 F. Supp. 2d 336, 354–55 (E.D.N.Y. 2010); *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170

(2d Cir. 2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (internal quotation marks omitted)).

## CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment are granted in their entirety. All claims against KCHC are dismissed because it is not a suable entity. Plaintiff's claims against SUNY and SUNY-Employees in their official capacities, seeking damages pursuant to § 1983, and Plaintiff's damages claims against SUNY and SUNY-Employees pursuant to the NYSHRL and NYCHRL, are dismissed under the Eleventh Amendment. Plaintiff's remaining claims for FMLA interference and retaliation, Title VII discrimination and retaliation, § 1981 discrimination and retaliation, and § 1983 discrimination claims are dismissed for failure to establish a *prima facie* case. In light of the Court's dismissal of all of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims, which are dismissed without prejudice.

The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: September 29, 2019
      Brooklyn, New York

55

APPEAL,NPROSE

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:15−cv−02343−PKC−VMS

Greenberg v. State University Hospital et al
Assigned to: Judge Pamela K. Chen
Referred to: Magistrate Judge Vera M. Scanlon
Cause: 28:1331 Fed. Question

Date Filed: 04/22/2015
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **MD Oded Greenberg** | represented by | **Chad L. Edgar**<br>Cardi & Edgar LLP<br>99 Madison Avenue<br>8th floor<br>New York, NY 10016<br>212−481−7770<br>Fax: 212−684−3008<br>Email: cedgar@cardiedgarlaw.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Dawn M. Cardi**<br>Cardi & Edgar LLP<br>2 Park Avenue, 19th Floor<br>New York, NY 10016<br>212−481−7770<br>Fax: 212−684−3008<br>Email: DCardi@CardiEdgarLaw.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Eric M. Nelson**<br>Eric M. Nelson, Attorney at Law<br>112 Madison Avenue<br>Sixth Floor<br>New York, NY 10016<br>212−354−3666<br>Fax: 212−354−2555<br>Email: emnlegal@gmail.com<br>*TERMINATED: 08/31/2017*<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **State University Hospital − Downstate Medical Center**<br>*also known as*<br>The State University of New York Health Science Center at Brooklyn<br>*also known as*<br>State University of New York Downstate Medical Center | represented by | **Christopher Vance Coulston**<br>Office of the New York State Attorney General<br>28 Liberty Street<br>New York, NY 10005<br>(212)416−8556<br>Fax: (212)416−6075<br>Email: christopher.coulston@ag.ny.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Monica Anne Connell**<br>Office of the New York State Attorney General<br>120 Broadway, 24th Floor<br>New York, NY 10271<br>212−416−8965<br>Fax: 212−416−6009 |

Email: Monica.Connell@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**United University Professions**
*(UUP)*
*TERMINATED: 12/23/2015*

represented by **Michael James Del Piano**
NEW YORK STATE UNITED
TEACHERS OFFICE OF GENERAL
COUNSEL
52 Broadway
9th Floor
New York, NY 10004
212–533–6300
Fax: 212–228–9253
Email: mdelpian@nysutmail.org
*TERMINATED: 12/23/2015*
*ATTORNEY TO BE NOTICED*

**Defendant**

**New York City Health and Hospitals
Corporation**

represented by **Amanda Blair**
New York City Law Department
Office of the Corporation Counsel
100 Church St
New York, NY 10007
212–356–8767
Fax: 212–356–2089
Email: ablair@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Glenn Shaffer**
New York Law Dept.
100 Church Street
New York, NY 10007
212–356–2549
Fax: 212–356–2439
Email: rshaffer@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tanya N Blocker**
Gordon Rees Scully Mansukhani, LLP
1 Battery Park Plaza, 28th Floor
New York, NY 10004
212–453–0783
Fax: 212–269–5505
Email: tblocker@grsm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Michael Piercey**
NYC Law Department
100 Church Street, Room 2–303(b)
New York, NY 10007
212–356–2428
Fax: 212–356–2089
Email: epiercey@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kings County Hospital Center**

represented by **Amanda Blair**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Glenn Shaffer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tanya N Blocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Michael Piercey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **SUNY Downstate Medical Center Chapter of United University Professions** *TERMINATED: 12/23/2015* | represented by | **Michael James Del Piano** (See above for address) *TERMINATED: 12/23/2015* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Deborah L Reede** | represented by | **Christopher Vance Coulston** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Monica Anne Connell** (See above for address) *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Steven Pulitzer** | represented by | **Christopher Vance Coulston** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Monica Anne Connell** (See above for address) *ATTORNEY TO BE NOTICED* |

**Defendant**

**JOHN AND JANE DOES (1–20)**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/22/2015 | 1 | COMPLAINT against Downstate Medical Center, State University Hospital, United University Professions, filed by Oded Greenberg. (Attachments: # 1 Civil Cover Sheet) (Gillespie, Saudia) (Entered: 04/24/2015) |
| 04/22/2015 | | FILING FEE: $ 400, receipt number 4653087383 (Gillespie, Saudia) (Entered: 04/24/2015) |
| 04/24/2015 | 2 | Summons Issued as to Downstate Medical Center, State University Hospital, United University Professions. (Gillespie, Saudia) (Entered: 04/24/2015) |
| 04/24/2015 | 3 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following |

| | | link:http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences**. **Do NOT return or file the consent <u>unless</u> all parties have signed the consent.** (Gillespie, Saudia) (Entered: 04/24/2015) |
|---|---|---|
| 04/30/2015 | 4 | ORDER. Plaintiff will serve a copy of the attached Order on Defendants with the Summons and Complaint or, if those documents have already been served, by mail. Chambers mailed a copy of this Order, its attachment, the public docket and the NEF Consent Form to pro se Plaintiff. Ordered by Magistrate Judge Vera M. Scanlon on 4/30/2015. (Rice, Liane) (Entered: 04/30/2015) |
| 08/19/2015 | 5 | Letter MOTION for Extension of Time to File . *Pltff request an extension of time to serve the summons and complaint. Pltff seeks an additional 120 days, through and including 12/18/15 to first amend, and then serve, filed* by Oded Greenberg. (Galeano, Sonia) (Entered: 08/20/2015) |
| 08/26/2015 | | ORDER granting 5 Motion for Extension of Time to File: On April 22, 2015 plaintiff filed the instant complaint setting forth allegations against his union. By letter dated August 19, 2015 5 , plaintiff requests an extension of time to serve the defendants on the grounds that he is currently exhausting his administrative remedies with the EEOC and seeks to amend his complaint with these claims. Plaintiffs request to amend the complaint is granted. He must submit the amended complaint by December 18, 2015. The amended complaint will completely replace the original complaint and the time for service of the amended complaint will run from the date of filing of the amended complaint. Ordered by Judge Pamela K. Chen on 8/26/2015. (Chiang, May) (Entered: 08/26/2015) |
| 10/19/2015 | 6 | AMENDED COMPLAINT *and Demand for Jury Trial* against All Defendants, filed by Oded Greenberg. (Attachments: # 1 Proposed Summons) (Nelson, Eric) (Entered: 10/19/2015) |
| 10/20/2015 | 7 | Summons Issued re Amended Complaint as to Kings County Hospital Center, New York City Health and Hospitals Corporation, Steven Pulitzer, Deborah L Reede, SUNY Downstate Medical Center Chapter of United University Professions, State University Hospital – Downstate Medical Center, United University Professions. (Lee, Tiffeny) (Entered: 10/20/2015) |
| 11/03/2015 | 8 | MOTION for Extension of Time to File Answer by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 11/03/2015) |
| 11/03/2015 | 9 | NOTICE of Change of email address by Eric M. Nelson (Nelson, Eric) (Entered: 11/03/2015) |
| 11/04/2015 | 10 | ORDER granting 8 Motion for Extension of Time to Answer until 12/18/2015. SCHEDULING ORDER: As set forth in the attached Order, an Initial Conference is scheduled for 1/5/2016 at 12:00 PM before Magistrate Judge Scanlon in Courtroom 504 North. Plaintiff's counsel is directed to confirm with Defendant's counsel that all necessary participants are aware of this conference. Counsel must complete the attached joint proposed scheduling order and file on ECF no later than 12/30/2015. Ordered by Magistrate Judge Vera M. Scanlon on 11/4/2015. (Quinlan, Krista) (Entered: 11/04/2015) |
| 11/11/2015 | 11 | MOTION for Extension of Time to File Answer by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Blocker, Tanya) (Entered: 11/11/2015) |
| 11/11/2015 | 12 | RESPONSE to Motion re 11 MOTION for Extension of Time to File Answer filed by Oded Greenberg. (Nelson, Eric) (Entered: 11/11/2015) |
| 11/12/2015 | | ORDER granting 11 Motion for Extension of Time to Answer: Defendants Kings County Hospital Center and New York City Health and Hospitals Corporation have until 12/18/2015 to answer. SCHEDULING ORDER: Pursuant to Plaintiff's letter at 12 , the Initial Conference is moved to 1/20/2016 at 10:00 AM. Counsel must complete the joint proposed scheduling order and file on ECF no later than 1/13/2016. Ordered by Magistrate Judge Vera M. Scanlon on 11/12/2015. (Entered: 11/12/2015) |

| | | |
|---|---|---|
| 12/08/2015 | 13 | First MOTION for pre motion conference by SUNY Downstate Medical Center Chapter of United University Professions, United University Professions. (Del Piano, Michael) (Entered: 12/08/2015) |
| 12/15/2015 | 14 | Letter *Response to Request for Pre−Motion Conference* by Oded Greenberg (Nelson, Eric) (Entered: 12/15/2015) |
| 12/16/2015 | | ORDER finding as moot 13 Defendants' Motion for Pre Motion Conference: In light of 14 Plaintiff's letter agreeing to withdraw the claims that were the subject of Defendants' letter request for a pre−motion conference, the Court finds Defendants' request to be mooted. Plaintiff shall file an amended complaint by 12/30/2015 reflecting the changes proposed in its 14 12/15/2015 letter. Ordered by Judge Pamela K. Chen on 12/16/2015. (Chan, Grace) (Entered: 12/16/2015) |
| 12/18/2015 | 15 | MOTION for pre motion conference by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Blocker, Tanya) (Entered: 12/18/2015) |
| 12/23/2015 | 16 | Letter *Response to Pre−Motion Conference Request of City Defendants* by Oded Greenberg (Nelson, Eric) (Entered: 12/23/2015) |
| 12/23/2015 | 17 | AMENDED COMPLAINT *Second Amended Complaint* against All Defendants, filed by Oded Greenberg. (Nelson, Eric) (Entered: 12/23/2015) |
| 12/28/2015 | | ORDER finding moot Defendants' Motion for a Pre Motion Conference [Dkt. 13]: In light of Plaintiff's letter [Dkt. 14] agreeing to withdraw the claims that were the subject of Defendants United University Professions' and SUNY Downstate Medical Center Chapter of United University Professions' letter request for a pre−motion conference, the Court finds the request to be mooted. Plaintiff also indicated that it is prepared to withdraw his claim under 29 USC 185 against Defendant State University Hospital − Downstate Medical Center. Accordingly, Plaintiff shall file an amended complaint by 12/30/2105 reflecting these changes proposed in his 12/15/2015 letter. Ordered by Judge Pamela K. Chen on 12/28/2015. (Abdallah, Fida) (Entered: 12/28/2015) |
| 12/28/2015 | | ORDER granting 15 Motion for Pre Motion Conference by Kings County Hospital Center, New York City Health and Hospitals Corporation: A Pre−motion conference will be held on January 13, 2016, at 10:00 a.m. Ordered by Judge Pamela K. Chen on 12/28/2015. (Abdallah, Fida) (Entered: 12/28/2015) |
| 01/06/2016 | 18 | ANSWER to 17 Amended Complaint by Steven Pulitzer, Deborah L Reede, State University Hospital − Downstate Medical Center. (Coulston, Christopher) (Entered: 01/06/2016) |
| 01/13/2016 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Pre−Motion Conference held on 1/13/2016. Appearances by Eric Nelson for Plaintiff; Tanya Blocker for Defendants HHC and KCHC; and Christopher Vance Coulston for Defendants SUNY Downstate, Deborah Reede, and Steven Pulitzer. Discussion held. Defendants HHC and KCHC shall file a letter on or before 1/20/2016 informing the Court of their intent to file a motion to dismiss. If Defendants intend to file a motion to dismiss, the letter should also include a proposed briefing schedule agreed upon by the parties. If Defendants decide not to file a motion to dismiss, their Answer shall be filed by 2/3/2016. (Court Reporter Joshua Edwards.) (Chan, Grace) (Entered: 01/13/2016) |
| 01/13/2016 | 19 | Proposed Scheduling Order *Jointly Submitted By All Parties* by Oded Greenberg (Nelson, Eric) (Entered: 01/13/2016) |
| 01/14/2016 | 20 | Letter by Oded Greenberg (Nelson, Eric) (Entered: 01/14/2016) |
| 01/20/2016 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Initial Conference Hearing held on 1/20/2016 in Room 504 North. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #9:55−11:07.) (Quinlan, Krista) Modified on 1/21/2016 (Quinlan, Krista). (Entered: 01/20/2016) |
| 01/20/2016 | 21 | SCHEDULING ORDER: s discussed during the 1/20/2016 conference (see attached order for additional detail and deadlines), all discovery must be completed by 12/22/2016. On or before 1/6/2017, the Parties will file a joint status report letter confirming that discovery is complete. On or before 1/27/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. |

| | | |
|---|---|---|
| | | On or before 2/23/2017, the Parties will file their joint Proposed Pretrial Order. A Telephone Conference is set for 5/17/2016 at 2:30 PM before Magistrate Judge Vera M. Scanlon. Plaintiff's counsel is to organize a conference call, then phone Chambers at (718) 613–2300 with all counsel on the line. On or before 5/10/2016, the Parties will file a joint status report letter, of no more than three pages, identifying any outstanding discovery disputes.Counsel will consult as to an ESI agreement and submit their proposed plan by joint letter by 2/3/2016. Counsel will submit a proposed confidentiality order by 2/3/2016. Plaintiff is to file the complaint under seal (all copies) because they contain home addresses and file publicly a redacted amended complaint. Ordered by Magistrate Judge Vera M. Scanlon on 1/20/2016. (Quinlan, Krista) (Entered: 01/20/2016) |
| 01/20/2016 | 22 | Letter *Re: Anticipated Motion To Dismiss* by Kings County Hospital Center, New York City Health and Hospitals Corporation (Blocker, Tanya) (Entered: 01/20/2016) |
| 01/21/2016 | 23 | AMENDED COMPLAINT *Second Amended Complaint (redacted)* against All Defendants, filed by Oded Greenberg. (Nelson, Eric) (Entered: 01/21/2016) |
| 02/03/2016 | 24 | Joint MOTION for Extension of Time to File *Proposed Confidentiality Order and Discovery Plan Letter* by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 02/03/2016) |
| 02/03/2016 | 25 | ANSWER to 23 Amended Complaint by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Blocker, Tanya) (Entered: 02/03/2016) |
| 02/04/2016 | | ORDER granting 24 Motion for Extension of Time to File; STATUS REPORT ORDER: On or before 2/10/2016 the Parties are to file their discovery plan letter and proposed confidentiality order. Ordered by Magistrate Judge Vera M. Scanlon on 2/4/2016. (Calabrese, Corey) (Entered: 02/04/2016) |
| 02/10/2016 | 26 | Letter *regarding Discovery Plan* by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center (Coulston, Christopher) (Entered: 02/10/2016) |
| 02/10/2016 | 27 | Joint MOTION for Protective Order *under Rule 502(d)* by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 02/10/2016) |
| 02/10/2016 | 28 | Joint MOTION for Protective Order by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 02/10/2016) |
| 02/12/2016 | | ORDER granting 27 Motion for Protective Order: The protective order is so ordered. Ordered by Magistrate Judge Vera M. Scanlon on 2/12/2016. (Calabrese, Corey) (Entered: 02/12/2016) |
| 02/12/2016 | | ORDER granting 28 Motion for Protective Order: The protective order is so ordered. Ordered by Magistrate Judge Vera M. Scanlon on 2/12/2016. (Calabrese, Corey) (Entered: 02/12/2016) |
| 05/10/2016 | 29 | Letter *(Joint) Regarding Status of Discovery* by Oded Greenberg (Nelson, Eric) (Entered: 05/10/2016) |
| 05/17/2016 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Telephone Conference held on 5/17/2016 in Room 504 North. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #2:31–2:56.) (Gillespie, Saudia) (Entered: 05/18/2016) |
| 05/17/2016 | 30 | SCHEDULING ORDER: As discussed during the 5/17/2016 conference (see attached order for additional detail and deadlines), on or before 6/27/2016 the Parties are to file their joint status report letter. Status Conference is set for 6/29/2016 at 2:15 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. The municipal defendants expect document discovery to be completed primarily by late June. The State is on a similar schedule. The parties are encouraged to plan their deposition schedules as soon as possible. Counsel are reminded of the 1/20/2016 scheduling order. Counsel should expect to adhere to this schedule. Ordered by Magistrate Judge Vera M. Scanlon on 5/17/2016. (Gillespie, Saudia) (Entered: 05/18/2016) |

| 06/24/2016 | | SCHEDULING ORDER: Due to a conflict in the Court's schedule, the **TIME** of the 6/29/2016 status conference will be held at **9:30 a.m.** instead of 2:15 p.m. in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Ordered by Magistrate Judge Vera M. Scanlon on 6/24/2016. (Gillespie, Saudia) (Entered: 06/24/2016) |
|---|---|---|
| 06/27/2016 | 31 | Letter *Joint Submission of the Parties Regarding Discovery Status and Open Issues* by Oded Greenberg (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (Nelson, Eric) (Entered: 06/27/2016) |
| 06/29/2016 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Status Conference held on 6/29/2016 in Room 504 North. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding.(Tape #9:36–9:46; 11:00–11:10.) (Gillespie, Saudia) (Entered: 06/30/2016) |
| 06/29/2016 | 32 | STATUS REPORT ORDER: As discussed during the 6/29/2016 conference (see attached order for additional detail and deadlines). Counsel will continue to confer about outstanding discovery issues. Any remaining issues are to be identified briefly in the 7/20/2016 joint status letter and will be discussed during the conference. Status Conference set for 7/25/2016 at 2:15 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Ordered by Magistrate Judge Vera M. Scanlon on 6/29/2016. (Gillespie, Saudia) Modified: typographical error on 6/30/2016 (Gillespie, Saudia). (Entered: 06/30/2016) |
| 06/30/2016 | | Set/Reset Hearings (Gillespie, Saudia) (Entered: 06/30/2016) |
| 07/14/2016 | | SCHEDULING ORDER: Due to a conflict in the Court's schedule, the TIME of the 7/25/2016 status conference will be held at 4:00 p.m. instead of 2:15 p.m. in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Ordered by Magistrate Judge Vera M. Scanlon on 7/14/2016. (Gillespie, Saudia) (Entered: 07/14/2016) |
| 07/19/2016 | 33 | Joint MOTION for Extension of Time to File *Discovery Status Letter, and for Adjournment of Conference* by Oded Greenberg. (Nelson, Eric). Added MOTION to Adjourn Conference on 7/20/2016 (Gillespie, Saudia). (Entered: 07/19/2016) |
| 07/20/2016 | | ORDER: granting in part and denying in part 33 Motion for Extension of Time to File and Motion to Adjourn Conference. The Status Conference scheduled for 7/25/2016 is adjourned to 8/10/2016 at 11:30 a.m. in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. The discovery status report letter is due by 8/4/2016. Counsel are to confirm amongst themselves that all are aware of this change. Ordered by Magistrate Judge Vera M. Scanlon on 7/20/2016. (Gillespie, Saudia) (Entered: 07/20/2016) |
| 08/04/2016 | 34 | Letter *Regarding Discovery Status (Jointly Submitted)* by Oded Greenberg (Nelson, Eric) (Entered: 08/04/2016) |
| 08/10/2016 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Status Conference held on 8/10/2016 in Room 504 North. Eric Nelson and Christopher Vance Coulston appearing on behalf of Plaintiffs. Tanya N Blocker appearing on behalf of Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #11:38–12:49.) (Gillespie, Saudia) (Entered: 08/10/2016) |
| 08/10/2016 | 35 | SCHEDULING ORDER: As discussed during the 8/10/2016 conference (see attached order for additional detail and deadlines). A Status Conference is set for 8/11/2016 at 10:00 AM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. City Defendant is excused from the conference. Ordered by Magistrate Judge Vera M. Scanlon on 8/10/2016. (Gillespie, Saudia) (Entered: 08/10/2016) |
| 08/11/2016 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Status Conference held on 8/11/2016 in Room 504 North. Eric Nelson appearing for Plaintiff and Christopher Coulston appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #10:10–11:17.) (Gillespie, Saudia) (Entered: 08/11/2016) |
| 08/11/2016 | 36 | SCHEDULING ORDER: As discussed during the 8/11/2016 conference (see attached order for additional detail and deadlines), a Status Conference is set for 10/20/2016 at 3:00 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Plaintiff's |

| | | oral request for additional information about compensation is denied as stated on the record, as too burdensome given that defendant does not key records in a way that makes the information accessible. To create files with the requested information would be burdensome. Ordered by Magistrate Judge Vera M. Scanlon on 8/11/2016. (Gillespie, Saudia) (Entered: 08/11/2016) |
|---|---|---|
| 09/20/2016 | 37 | Letter MOTION to Appoint Expert *Joint Request to Extend Deadline* by Oded Greenberg. (Nelson, Eric) (Entered: 09/20/2016) |
| 09/21/2016 | | ORDER granting 37 Motion to Appoint Expert. The parties must designate experts by 10/31/2016. Ordered by Magistrate Judge Vera M. Scanlon on 9/21/2016. (Gersovitz, Ryan) (Entered: 09/21/2016) |
| 10/11/2016 | | RE–SCHEDULING ORDER: Due to a conflict in the Court's schedule, the Status Conference originally scheduled for 10/20/2016 will be held on 10/18/2016 at 10:30 AM in Courtroom 504 before Magistrate Judge Vera M. Scanlon. Counsel are to confirm amongst themselves that all are aware of this change. Ordered by Magistrate Judge Vera M. Scanlon on 10/11/2016. (Quinlan, Krista) (Entered: 10/11/2016) |
| 10/11/2016 | 38 | MOTION to Adjourn Conference *scheduled for October 18* by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 10/11/2016) |
| 10/12/2016 | | ORDER granting 38 Motion to Adjourn Conference. RE–SCHEDULING ORDER: Counsel are advised that the Status Conference currently scheduled for 10/18/2016 has been rescheduled to 10/24/2016 at 12:00 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Counsel are to confirm amongst themselves that all are aware of this change. Ordered by Magistrate Judge Vera M. Scanlon on 10/12/2016. (Quinlan, Krista) (Entered: 10/12/2016) |
| 10/19/2016 | 39 | Joint MOTION for Extension of Time to Complete Discovery by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 10/19/2016) |
| 10/24/2016 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon: Status Conference held on 10/24/2016 in Room 504 North. Eric Nelson appearing for Plaintiff. Tanya Blocker and Christopher Coulston appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #11:56–12:08.) (Quinlan, Krista) (Entered: 10/24/2016) |
| 10/24/2016 | 40 | ORDER granting 39 Motion for Extension of Time to Complete Discovery; SCHEDULING ORDER: As discussed during the 10/24/2016 conference (see attached order for additional detail and deadlines), all discovery must be completed by 2/13/2017. On or before 2/13/2017, the Parties will file a joint status report letter confirming that discovery is complete. On or before 3/2/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. A Status Conference is set for 2/7/2017 at 3:00 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Counsel are still awaiting DOE materials. Counsel are encouraged to start settlement discussions as soon as it is practical. Ordered by Magistrate Judge Vera M. Scanlon on 10/24/2016. (Quinlan, Krista) (Entered: 10/24/2016) |
| 01/10/2017 | 41 | Letter MOTION for Extension of Time to Complete Discovery by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 01/10/2017) |
| 01/11/2017 | | ORDER granting 41 Motion for Extension of Time to Complete Discovery. No further extensions will granted absent exigent and unforeseen circumstances. Ordered by Magistrate Judge Vera M. Scanlon on 1/11/2017. (Gersovitz, Ryan) (Entered: 01/11/2017) |
| 02/07/2017 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Status Conference held on 2/7/2017 in Room 504 North. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #2:58–3:42.) (Quinlan, Krista) (Entered: 02/07/2017) |

| | | |
|---|---|---|
| 02/07/2017 | 42 | SCHEDULING ORDER: As discussed during the 2/7/2017 conference (see attached order for additional detail and deadlines), on or before 3/10/2017, the Parties will file a joint status report letter confirming that discovery is complete. On or before 3/27/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. On or before 5/26/2017, the Parties will file their joint Proposed Pretrial Order. Plaintiff's request for a telephone directory other than Defendants' counsel's search for a 2014 directory is denied as impractical for Defendant to produce. Plaintiff is capable of searching the documents for the information and failed to inquire during depositions such that Defendants should not be required to gather and produce the information at this late date. All Parties are contemplating summary judgment motions. Ordered by Magistrate Judge Vera M. Scanlon on 2/7/2017. (Quinlan, Krista) (Entered: 02/07/2017) |
| 03/10/2017 | 43 | Letter *Regarding Completion of Discovery on Behalf of Plaintiff and State Defendants* by Oded Greenberg (Nelson, Eric) (Entered: 03/10/2017) |
| 03/13/2017 | | ORDER directing the Parties to submit a Status Report on or before 3/17/2017 outlining any outstanding discovery disputes. Otherwise, the Court will mark discovery as having concluded in this matter. Ordered by Magistrate Judge Vera M. Scanlon on 3/13/2017. (Gersovitz, Ryan) (Entered: 03/13/2017) |
| 03/13/2017 | 44 | MOTION to Compel *Local Rule 37.3* by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Blocker, Tanya) (Entered: 03/13/2017) |
| 03/15/2017 | | SCHEDULING ORDER: A Status Conference is set for 4/12/2017 at 04:15 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Plaintiff is to respond to Defendants' motion at 44 by 3/17/2017. On or before 4/27/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. On or before 6/26/2017, the Parties will file their joint Proposed Pretrial Order. Ordered by Magistrate Judge Vera M. Scanlon on 3/15/2017. (Gersovitz, Ryan) (Entered: 03/15/2017) |
| 03/17/2017 | 45 | RESPONSE to Motion re 44 MOTION to Compel *Local Rule 37.3* filed by Oded Greenberg. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (Nelson, Eric) (Entered: 03/17/2017) |
| 03/23/2017 | 46 | NOTICE of Appearance by Monica Anne Connell on behalf of Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center (aty to be noticed) (Connell, Monica) (Entered: 03/23/2017) |
| 04/12/2017 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Motion Hearing held on 4/12/2017 re 44 MOTION to Compel Local Rule 37.3 filed by New York City Health and Hospitals Corporation, Kings County Hospital Center. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #4:22–4:37.) (Quinlan, Krista) (Entered: 04/13/2017) |
| 04/12/2017 | 47 | ORDER granting 44 Motion to Compel. SCHEDULING ORDER: As discussed during the 4/12/2017 conference (see attached order for additional detail and deadlines), on or before 5/31/2017, the Parties will file a joint status report letter confirming that discovery is complete. On or before 6/16/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. Plaintiff may issue contention interrogatories as to municipal Defendants by 4/19/2017. Plaintiff must respond to the contention interrogatories of Defendant City of New York etc. Ordered by Magistrate Judge Vera M. Scanlon on 4/12/2017. (Quinlan, Krista) (Entered: 04/13/2017) |
| 05/02/2017 | 48 | NOTICE of Appearance by Ryan Glenn Shaffer on behalf of Kings County Hospital Center, New York City Health and Hospitals Corporation (aty to be noticed) (Shaffer, Ryan) (Entered: 05/02/2017) |
| 05/31/2017 | 49 | Letter *Regarding Status of Discovery* by Oded Greenberg (Nelson, Eric) (Entered: 05/31/2017) |
| 06/01/2017 | | Order Certifying Discovery is complete. Per the letter at 49 , discovery is certified as complete. Ordered by Magistrate Judge Vera M. Scanlon on 6/1/2017. (Quinlan, Krista) (Entered: 06/01/2017) |

| 06/06/2017 | 50 | Letter MOTION for Extension of Time to File *Pre−Summary−Judgment−Motion Letters* by Oded Greenberg. (Nelson, Eric) (Entered: 06/06/2017) |
|---|---|---|
| 06/07/2017 | | ORDER granting 50 Motion for Extension of Time to File: On or before August 15, 2017, the Parties will initiate any dispositive motions. Ordered by Judge Pamela K. Chen on 6/7/2017. (Lee, Helen) (Entered: 06/07/2017) |
| 07/18/2017 | 51 | NOTICE of Appearance by Chad L. Edgar on behalf of Oded Greenberg (aty to be noticed) (Edgar, Chad) (Entered: 07/18/2017) |
| 07/18/2017 | 52 | NOTICE of Appearance by Dawn M. Cardi on behalf of Oded Greenberg (aty to be noticed) (Cardi, Dawn) (Entered: 07/18/2017) |
| 08/03/2017 | 53 | Letter MOTION to Withdraw as Attorney *for Plaintiff, by Eric Nelson* by Oded Greenberg. (Nelson, Eric) (Entered: 08/03/2017) |
| 08/07/2017 | 54 | RESPONSE to Motion re 53 Letter MOTION to Withdraw as Attorney *for Plaintiff, by Eric Nelson* filed by Oded Greenberg. (Edgar, Chad) (Entered: 08/07/2017) |
| 08/08/2017 | | ORDER: By 8/15/2017, Mr. Nelson shall file a letter responding to 54 Plaintiff's August 7, 2017 letter. In light of the fact that Plaintiff has obtained new counsel, the August 15, 2017 deadline for the parties to initiate dispositive motions is adjourned. Ordered by Judge Pamela K. Chen on 8/8/2017. (Lee, Helen) (Entered: 08/08/2017) |
| 08/15/2017 | 55 | REPLY to Response to Motion re 53 Letter MOTION to Withdraw as Attorney *for Plaintiff, by Eric Nelson , As Per 8/8/17 Order (Hon. P.K. Chen, USDJ)* filed by Oded Greenberg. (Nelson, Eric) (Entered: 08/15/2017) |
| 08/17/2017 | 56 | RESPONSE to Motion re 53 Letter MOTION to Withdraw as Attorney *for Plaintiff, by Eric Nelson* filed by Oded Greenberg. (Edgar, Chad) (Entered: 08/17/2017) |
| 08/17/2017 | | SCHEDULING ORDER: A conference regarding the motion to withdraw as attorney for Plaintiff 53 shall be held on August 31, 2017, at 2:00 p.m. in Courtroom 4F North. Mr. Eric Nelson and Plaintiff's attorneys at Cardi & Edgar LLP shall attend the conference. Ordered by Judge Pamela K. Chen on 8/17/2017. (Lee, Helen) (Entered: 08/17/2017) |
| 08/28/2017 | 57 | First MOTION to Adjourn Conference by Oded Greenberg. (Edgar, Chad) (Entered: 08/28/2017) |
| 08/28/2017 | | ORDER granting 57 Motion to Adjourn Conference: The conference is rescheduled to 8/30/2017, at 3:00 p.m. Ordered by Judge Pamela K. Chen on 8/28/2017. (Abdallah, Fida) (Entered: 08/28/2017) |
| 08/30/2017 | | Minute Entry for proceedings held before Judge Pamela K. Chen:Status Conference held on 8/30/2017. Appearances by Eric Nelson and Chad Edgar. The Court directed Mr. Nelson that he should transfer Dr. Greenberg's files to Mr. Edgar's firm, provided that Dr. Greenberg pays him a transfer fee of $2,500 plus the cost of copying non−electronic portions of the files. The Court did not determine the amount of Mr. Nelson's retaining and/or charging lien and noted that Dr. Greenberg and Mr. Nelson can reach an agreement to resolve that issue on their own or defer that issue for the Court to resolve after a motion for summary judgment is fully briefed. (Court Reporter Anthony Frisolone.) (Lee, Helen) (Entered: 08/30/2017) |
| 08/30/2017 | 58 | Letter *Regarding 8/30/17 Conference and Application to Withdraw* by Oded Greenberg (Nelson, Eric) (Entered: 08/30/2017) |
| 08/31/2017 | | ORDER granting 53 Motion to Withdraw as Attorney. Attorney Eric M. Nelson terminated. Ordered by Judge Pamela K. Chen on 8/31/2017. (Lee, Helen) (Entered: 08/31/2017) |
| 09/05/2017 | | ORDER: By October 2, 2017, Cardi & Edgar LLP shall provide the Court with the status of the transfer of Dr. Greenberg's files. Ordered by Judge Pamela K. Chen on 9/5/2017. (Lee, Helen) (Entered: 09/05/2017) |
| 10/02/2017 | 59 | Letter *re Status of Transfer of Files from Prior Counsel* by Oded Greenberg (Edgar, Chad) (Entered: 10/02/2017) |

| | | |
|---|---|---|
| 10/11/2017 | | SCHEDULING ORDER: The Court grants the requested extension (Dkt. 59) and further gives Plaintiff *sua sponte* until October 27, 2017 to file a pre–motion conference request or advise the Court that he does not intend to file a summary judgment motion. In the latter event, the parties shall confer regarding a date by which they can submit a joint pre–trial order, which date will be set forth in Plaintiff's October 27, 2017 letter. Ordered by Judge Pamela K. Chen on 10/11/2017. (Abdallah, Fida) (Entered: 10/11/2017) |
| 10/12/2017 | 60 | MOTION to Continue *Time To File Pre–Motion Letters* by Oded Greenberg. (Edgar, Chad) (Entered: 10/12/2017) |
| 10/16/2017 | | ORDER: The Court grants the parties' motion for an extension of time 60 to submit pre–motion letters. Defendants will file their pre–motion letters by November 17, 2017. Plaintiff will file his answer by November 27, 2017. A pre–motion conference shall be held on January 11, 2018 at 12:30 p.m. in Courtroom 4F before Judge Pamela K. Chen. Ordered by Judge Pamela K. Chen on 10/16/2017.(Hess, Alexandra) (Entered: 10/16/2017) |
| 11/17/2017 | 61 | Letter MOTION for pre motion conference by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 11/17/2017) |
| 11/17/2017 | 62 | MOTION for pre motion conference by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 11/17/2017) |
| 11/27/2017 | 63 | Letter *Response to Defendants' Motions for Pre–Motion Conference* by Oded Greenberg (Edgar, Chad) (Entered: 11/27/2017) |
| 01/03/2018 | | SCHEDULING ORDER: Due to a change in the Court's schedule, a pre–motion conference shall be held on January 11, 2018 at **2:00 p.m.** in Courtroom 4F before Judge Pamela K. Chen. Ordered by Judge Pamela K. Chen on 1/3/2018. (Hess, Alexandra) (Entered: 01/03/2018) |
| 01/11/2018 | | MINUTE ENTRY: Pre Motion Conference held on 1/11/2018. Appearances by Chad L. Edgar for plaintiff; Ryan G. Shaffer for defendants SUNY Downstate, Reede, and Pulitzer and Matthew J. Lawson for defendants KCHC and HCC. Case called. Discussion held. The Court sets the following schedule for Defendants' motion for summary judgment: (1) Defendants' motion shall be served by March 12, 2018; (2) Plaintiff's opposition shall be served by May 11, 2018; and (3) Defendants' reply, if any, shall be served by May 25, 2018.As a courtesy to the Court, the parties are encouraged to not file their motion papers until the motion is fully briefed. If the parties follow this practice, the motion and all supporting papers are to be served on the other parties along with a cover letter setting forth whom the movant represents and the papers being served. Only a copy of the cover letter should be filed electronically, as a letter, not as a motion. On the day the motion is fully briefed, in this case May 25, 2018, each party shall electronically file its moving papers, and provide one (1) courtesy copy of their entire submission(s) to the Court. (Court Reporter Annette Montalvo) (Hess, Alexandra) (Entered: 01/11/18) (Entered: 01/11/2018) |
| 02/07/2018 | 64 | NOTICE of Change of Firm Address and Fax Number Changed by Chad L. Edgar (Edgar, Chad) (Entered: 02/07/2018) |
| 03/02/2018 | 65 | First MOTION for Extension of Time to File *Motions for Summary Judgment and Ten Page Extension of Memorandum of Law* by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 03/02/2018) |
| 03/03/2018 | | ORDER: Defendants' motion 65 for extension of time and ten–page extension is granted. The Court sets the following schedule: Defendants' motions shall be served by March 26, 2018; Plaintiff's opposition shall be served by May 25, 2018; and Defendants' replies, if any, shall be served by June 8, 2018. Ordered by Judge Pamela K. Chen on 3/3/2018. (Hess, Alexandra) (Entered: 03/03/2018) |
| 03/26/2018 | 66 | Letter *re: Service of Motion for Summary Judgment* by Kings County Hospital Center, New York City Health and Hospitals Corporation (Shaffer, Ryan) (Entered: 03/26/2018) |

| | | |
|---|---|---|
| 03/26/2018 | 67 | Letter *re Service of Motion for Summary Judgment* by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center (Coulston, Christopher) (Entered: 03/26/2018) |
| 04/24/2018 | 68 | NOTICE of Change of Office Address by Christopher Vance Coulston (Coulston, Christopher) (Entered: 04/24/2018) |
| 05/11/2018 | 69 | First MOTION for Extension of Time to File *Opposition to Defendants' Motions for Summary Judgment* by Oded Greenberg. (Edgar, Chad) (Entered: 05/11/2018) |
| 05/11/2018 | | ORDER granting 69 Motion for Extension of Time to File: (1) Plaintiff's opposition shall be served by June 15, 2018 and (2) Defendants' replies, if any, shall be served by July 20, 2018. Ordered by Judge Pamela K. Chen on 5/11/2018. (Hess, Alexandra) (Entered: 05/11/2018) |
| 06/08/2018 | 70 | Second MOTION for Extension of Time to File *Opposition to Defendants' Motions for Summary Judgment* by Oded Greenberg. (Edgar, Chad) (Entered: 06/08/2018) |
| 06/08/2018 | | ORDER granting, on consent, 70 Motion for Extension of Time to File: Plaintiff's opposition shall be served by June 29, 2018, and Defendants' replies, if any, shall be served by August 10, 2018. Ordered by Judge Pamela K. Chen on 6/8/2018. (Abdallah, Fida) (Entered: 06/08/2018) |
| 06/28/2018 | 71 | Third MOTION for Extension of Time to File *Oppositions to Motions for Summary Judgment* by Oded Greenberg. (Edgar, Chad) (Entered: 06/28/2018) |
| 06/28/2018 | | ORDER: Plaintiff's motion for extension of time and leave to file excess pages 71 is granted. The Court sets the following schedule: (1) Plaintiff's opposition (35 pages max) shall be served by July 6, 2018; (2) Defendants' replies, if any, shall be served by August 31, 2018. No further extensions will be granted absent extraordinary circumstances. Ordered by Judge Pamela K. Chen on 6/28/2018. (Hess, Alexandra) (Entered: 06/28/2018) |
| 07/06/2018 | 72 | Letter *re Service of Opposition Papers* by Oded Greenberg (Edgar, Chad) (Entered: 07/06/2018) |
| 08/02/2018 | 73 | First MOTION for Extension of Time to File *Reply in further support of motion for Summary Judgment* by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 08/02/2018) |
| 08/02/2018 | | ORDER granting 73 Motion for Extension of Time to File: Defendants' replies shall be served by September 14, 2018. Ordered by Judge Pamela K. Chen on 8/2/2018. (Hess, Alexandra) (Entered: 08/02/2018) |
| 09/11/2018 | 74 | First MOTION for Leave to File Excess Pages *to Reply Memorandum* by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/11/2018) |
| 09/12/2018 | | ORDER granting 74 Motion for Leave to File Excess Pages: The SUNY Defendants shall file their reply brief, maximum length of 18 pages, by September 14, 2018. Ordered by Judge Pamela K. Chen on 9/12/2018. (Hess, Alexandra) (Entered: 09/12/2018) |
| 09/14/2018 | 75 | First MOTION for Summary Judgment by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 76 | MOTION for Summary Judgment by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 77 | RULE 56.1 STATEMENT re 76 MOTION for Summary Judgment filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 78 | MEMORANDUM in Support re 76 MOTION for Summary Judgment filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |

| | | |
|---|---|---|
| 09/14/2018 | 79 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Declaration of Steven Pulitzer, M.D.* filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 80 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Declaration of Deborah L. Reede, M.D.* filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 81 | AFFIDAVIT/DECLARATION in Support re 75 First MOTION for Summary Judgment filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S) (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 82 | RULE 56.1 STATEMENT re 75 First MOTION for Summary Judgment filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 83 | MEMORANDUM in Support re 75 First MOTION for Summary Judgment filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 84 | REPLY in Support re 75 First MOTION for Summary Judgment filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 85 | RULE 56.1 STATEMENT re 75 First MOTION for Summary Judgment *response to plaintiff's counter statement of facts* filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 86 | First MOTION for Summary Judgment by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 87 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Declaration of Christopher Coulston* filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit OO, # 42 Exhibit PP, # 43 Exhibit QQ, # 44 Exhibit RR, # 45 Exhibit SS, # 46 Exhibit TT, # 47 Exhibit UU, # 48 Exhibit VV, # 49 Exhibit WW, # 50 Exhibit XX, # 51 Exhibit YY, # 52 Exhibit ZZ, # 53 Exhibit AAA, # 54 Exhibit BBB, # 55 Exhibit Greenberg Dep. Excerpts Dec. 7, # 56 Exhibit Greenberg Dep. Excerpts Jan. 23, # 57 Exhibit Pulitzer Dep. Excerpts Oct. 26, # 58 Exhibit Pulitzer Dep. Excerpts Jan. 24, # 59 Exhibit Reede Dep. Excerpts Nov. 18, # 60 Exhibit Reede Dep. Excerpts Jan. 26, # 61 Exhibit Jamaleddine Dep. Excerpts, # 62 Exhibit Bernadel Dep. Excerpts, # 63 Exhibit Arabian Dep. Excerpts, # 64 Exhibit Cuiman Dep. Excerpts, # 65 Exhibit Scott Dep. Excerpts) (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 88 | CERTIFICATE OF SERVICE by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center re 76 MOTION for Summary Judgment (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 89 | MEMORANDUM in Opposition re 75 First MOTION for Summary Judgment filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 90 | MEMORANDUM in Opposition re 76 MOTION for Summary Judgment filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |

| | | |
|---|---|---|
| 09/14/2018 | 91 | RULE 56.1 STATEMENT re 75 First MOTION for Summary Judgment filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 92 | RULE 56.1 STATEMENT re 76 MOTION for Summary Judgment filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 93 | AFFIDAVIT/DECLARATION in Opposition re 75 First MOTION for Summary Judgment , 76 MOTION for Summary Judgment *Declaration of Esther Neiman* filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 94 | AFFIDAVIT/DECLARATION in Opposition re 75 First MOTION for Summary Judgment , 76 MOTION for Summary Judgment *Declaration of Oded Greenberg* filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 95 | AFFIDAVIT/DECLARATION in Opposition re 75 First MOTION for Summary Judgment , 76 MOTION for Summary Judgment *Declaration of Chad L. Edgar* filed by Oded Greenberg. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15 (Part 1), # 16 Exhibit 15 (Part 2), # 17 Exhibit 15 (Part 3), # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30 Exhibit 28, # 31 Exhibit 29, # 32 Exhibit 30, # 33 Exhibit 31, # 34 Exhibit 32, # 35 Exhibit 33, # 36 Exhibit 34, # 37 Exhibit 35, # 38 Exhibit 36, # 39 Exhibit 37, # 40 Exhibit 38, # 41 Exhibit 39, # 42 Exhibit 40, # 43 Exhibit 41, # 44 Exhibit 42, # 45 Exhibit 43, # 46 Exhibit 44, # 47 Exhibit 45, # 48 Exhibit 46, # 49 Exhibit 47, # 50 Exhibit 48, # 51 Exhibit 49, # 52 Exhibit 50, # 53 Exhibit 51, # 54 Exhibit 52, # 55 Exhibit 53, # 56 Exhibit 54, # 57 Exhibit 55, # 58 Exhibit 56, # 59 Exhibit 57, # 60 Exhibit 58, # 61 Exhibit 59, # 62 Exhibit 60, # 63 Exhibit 61, # 64 Exhibit 62, # 65 Exhibit 63, # 66 Exhibit 64, # 67 Exhibit 65, # 68 Exhibit 66) (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 96 | REPLY in Support re 76 MOTION for Summary Judgment filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 97 | RULE 56.1 STATEMENT re 76 MOTION for Summary Judgment *Counter–Response to Plaintiff's Response to SUNY Defendants Rule 56.1 Statement* filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 98 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Reply Declaration of Deborah L. Reede, M.D.* filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 99 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Reply Declaration of Steven Pulitzer, M.D.* filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 100 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Reply Declaration of Christopher Coulston* filed by Steven Pulitzer, Deborah L Reede, State University Hospital – Downstate Medical Center. (Attachments: # 1 Exhibit CCC, # 2 Exhibit DDD, # 3 Exhibit EEE, # 4 Exhibit FFF, # 5 Exhibit GGG, # 6 Exhibit Greenberg Dep. Reply Excerpts, # 7 Exhibit Reede Dep. Reply Excerpts, # 8 Exhibit Scott Dep. Reply Excerpts, # 9 Exhibit Cuiman Dep. Reply Excerpts) (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/17/2018 | | Motions terminated, docketed incorrectly: 75 First MOTION for Summary Judgment filed by New York City Health and Hospitals Corporation, Kings County Hospital Center. This is not a motion; it is a memorandum. No further action is needed. Do not re–file this document. The motion is correctly e–filed as doc #86. (Abdallah, Fida) (Entered: 09/17/2018) |
| 04/25/2019 | 101 | NOTICE of Appearance by Evan Michael Piercey on behalf of Kings County Hospital Center, New York City Health and Hospitals Corporation (aty to be noticed) (Piercey, Evan) (Entered: 04/25/2019) |

| 08/01/2019 | 102 | NOTICE of Appearance by Amanda Blair on behalf of Kings County Hospital Center, New York City Health and Hospitals Corporation (aty to be noticed) (Blair, Amanda) (Entered: 08/01/2019) |
|---|---|---|
| 09/29/2019 | 103 | ORDER: For the reasons stated herein Defendants' 76 86 motions for summary judgment are granted in their entirety. All claims against KCHC are dismissed because it is not a suable entity. Plaintiff's claims against SUNY and SUNY–Employees in their official capacities, seeking damages pursuant to § 1983, and Plaintiff's damages claims against SUNY and SUNY–Employees pursuant to the NYSHRL and NYCHRL, are dismissed under the Eleventh Amendment. Plaintiff's remaining claims for FMLA interference and retaliation, Title VII discrimination and retaliation, § 1981 discrimination and retaliation, and § 1983 discrimination claims are dismissed for failure to establish a *prima facie* case. In light of the Court's dismissal of all of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiffs remaining NYSHRL and NYCHRL claims, which are dismissed without prejudice. The Clerk of Court is respectfully directed to enter judgment and close this case accordingly. Ordered by Judge Pamela K. Chen on 9/29/2019. (Wisotsky, Shira) (Entered: 09/29/2019) |
| 10/29/2019 | 104 | NOTICE OF APPEAL as to 103 Order on Motion for Summary Judgment,,,,,,,,, by Oded Greenberg. Filing fee $ 505, receipt number ANYEDC–11991881. (Edgar, Chad) (Entered: 10/29/2019) |
| 10/29/2019 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 104 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 10/29/2019) |