# 19-3570-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

≫ ≪

MD ODED GREENBERG,

*Plaintiff-Appellant,*

*v.*

STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL CENTER, AKA THE STATE UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER AT BROOKLYN, AKA STATE UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL CENTER, NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY HOSPITAL CENTER, DEBORAH L. REEDE, STEVEN PULITZER,

*Defendants-Appellees,*

*and*

UNITED UNIVERSITY PROFESSIONS, (UUP), SUNY DOWNSTATE MEDICAL CENTER CHAPTER OF UNITED UNIVERSITY PROFESSIONS, JOHN AND JANE DOES 1-20,

*Defendants.*

―――――――――

*On Appeal from the United States District Court for the Eastern District of New York*

## APPENDIX
## VOLUME I OF VIII
## Pages A1 to A267

Deborah A. Brenner
  Assistant Corporation Counsel
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendant-Appellee*
  *New York City Health and*
  *Hospitals Corporation*
100 Church Street
New York, New York 10007
212-788-1039

CARDI & EDGAR LLP
*Attorneys for Plaintiff-Appellant*
  *MD Oded Greenberg*
99 Madison Avenue, 8th Floor
New York, New York 10016
212-481-7770

*(Additional Counsel on the Reverse)*

Amit Ramnik Vora
NEW YORK STATE OFFICE
  OF THE ATTORNEY GENERAL
*Attorneys for Defendant-Appellee*
  *State University Hospital-Downstate Medical*
  *Center, aka The State University of*
  *New York Health Science Center at*
  *Brooklyn, aka State University of*
  *New York Downstate Medical Center*
28 Liberty Street, 23rd Floor
New York, New York 10005
212-416-6167

# **Table of Contents**

**Page**

## **Volume I**

District Docket Entries .......................................................... A1

Second Amended Complaint and Demand for Jury Trial,
    dated December 23, 2015 ................................................ A18

Answer of Deborah Reede, M.D., Steven Pulitzer, M.D. and
    The State University of New York ("Defendants"),
    dated January 6, 2016 ................................................... A49

Defendants' Local Civil Rule 56.1 Statement in Support of their
    Motion for Summary Judgment, dated March 26, 2018 ................ A72

Declaration of Christopher Coulston, for Defendants,
    in Support of Motion, dated March 26, 2018 ................................ A89

        Exhibit A to Coulston Declaration -
        Accreditation Council for Graduate Medical Education
        Report, dated April 15, 2014 ................................... A98

        Exhibit B to Coulston Declaration -
        Notes between Deborah Reede, M.D. and
        Ghassan Jameleddine, M.D. for the King's County
        Hospital Center, dated April 9, 2014 ....................... A108

        Exhibit C to Coulston Declaration -
        Email from Oded Greenberg, M.D. to Alan Kantor,
        dated June 23, 2014 ............................................... A109

        Exhibit D to Coulston Declaration -
        Emails from Oded Greenberg, M.D.,
        dated October 21, 2014 .......................................... A110

**Table of Contents**
**(Continued)**

                                                                                    **Page**


Exhibit E to Coulston Declaration -
Email from Stephanie Bernadel to Steven Pulitzer, M.D.,
dated October 28, 2014  ............................................................  A114


Exhibit F to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated August 14, 2013 ...............................................................  A116


Exhibit G to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated September 25, 2013  .........................................................  A118


Exhibit H to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated October 9, 2013  ...............................................................  A120


Exhibit I to Coulston Declaration -
Meeting with Dr. Greenberg, dated May 5, 2014  ...................  A122


Exhibit J to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated May 1, 2014 ................................................  A123


Exhibit K to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated May 9, 2014 .....................................................................  A125


Exhibit L to Coulston Declaration -
King County Hospital Center Radiology Department
Faculty Meeting Minutes, dated May 8, 2014  ........................  A126


Exhibit M to Coulston Declaration -
Powerpoint Presentation of KCHC Departmental Meeting,
dated June 26, 2014 ...................................................................  A130

**Table of Contents**
**(Continued)**

**Page**

Exhibit N to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated July 9, 2014 ..................................................... A148

Exhibit O to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated July 21, 2014 ................................................... A149

Exhibit P to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated August 13, 2014 ........................ A151

Exhibit Q to Coulston Declaration -
Email from Oded Greenberg, M.D. to Linda McMurren,
dated September 15, 2014 ........................................... A152

Exhibit R to Coulston Declaration -
Notes from August 22, 2014 Meeting ..................................... A154

Exhibit S to Coulston Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott,
dated September 2, 2014 ........................................... A156

Exhibit T to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated September 15, 2014 ................................... A158

Exhibit U to Coulston Declaration -
(i) Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................... A160
(ii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated August 29, 2014 .............................. A161

Exhibit V to Coulston Declaration -
Email from Rhonda Besunder to Oded Greenberg, M.D.,
dated March 20, 2014, with Attachments ............................... A162

**Table of Contents**
**(Continued)**

Page

Exhibit W to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 5, 2014 ........................................................... A171

Exhibit X to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken September 8, 2014 ........................................................... A173

Exhibit Y to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 3, 2014 ........................................................... A208

Exhibit Z to Coulston Declaration -
Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................................... A209

Exhibit AA to Coulston Declaration -
Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................................... A210

Exhibit BB to Coulston Declaration -
Documents Related to Oded Greenberg, M.D.'s Visit to
City MD, dated September 8, 2014 ........................................... A211

Exhibit CC to Coulston Declaration -
Settlement, dated September 8, 2014 ....................................... A216

Exhibit DD to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken October 20, 2014 ........................................................... A218

**Table of Contents**
**(Continued)**

**Page**

**Volume II**

Exhibit EE to Coulston Declaration -
Memorandum from Michael Arabian to
Steven Pulitzer, M.D., dated September 9, 2014,
with Email ................................................................ A268

Exhibit FF to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated October 7, 2014, with Email .................... A271

Exhibit GG to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 24, 2014 ...................................... A277

Exhibit HH to Coulston Declaration -
Summary of Interview with Jinel Scott, M.D.,
dated October 14, 2014 .......................................... A280

Exhibit II to Coulston Declaration -
Summary of Interview with James Walsh, M.D.,
dated October 14, 2014 .......................................... A281

Exhibit JJ to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated October 1, 2014 ........................ A282

Exhibit KK to Coulston Declaration -
Emails from Oded Greenberg, M.D. to Gautam Agrawal,
dated December 3, 2014 .......................................... A284

Exhibit LL to Coulston Declaration -
Excerpts from the Report, dated September 22, 2014 ............. A288

**Table of Contents**
**(Continued)**

**Page**

Exhibit MM to Coulston Declaration -
Emails from Steven Pulitzer, M.D.,
dated September 26, 2014 ....................................................... A291

Exhibit NN to Coulston Declaration -
Email from Oded Greenberg, M.D. to Steven Pulitzer,
M.D., dated September 22, 2014 ............................................. A293

Exhibit OO to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 .................. A294

Exhibit PP to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 .................. A296

Exhibit QQ to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken October 10, 2014 ........................................................... A297

Exhibit RR to Coulston Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 3, 2014 ............................................................. A327

Exhibit SS to Coulston Declaration -
Statement to be Read and Given to Employees in the
Professional Services Negotiating Unit Prior to a
Disciplinary Interrogation, dated October 10, 2014 ............... A328

Exhibit TT to Coulston Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 15, 2014 ........................................................... A329

Exhibit UU to Coulston Declaration -
Emails from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 10, 2014 ........................................................... A330

**Table of Contents**
**(Continued)**

**Page**

Exhibit VV to Coulston Declaration -
Letter from Leonzo Cuiman to Oded Greenberg, M.D.,
dated October 22, 2014 .............................................................. A335

Exhibit WW to Coulston Declaration -
Email from Steven Pulitzer, M.D., to Gnyana Kompally,
dated November 23, 2014 ........................................................ A336

Exhibit XX to Coulston Declaration -
Letter from Kate Hatlak to Rhonda Osborne, M.D.,
dated August 13, 2015 ............................................................. A338

Exhibit YY to Coulston Declaration -
*Curriculum Vitae* of Oded Greenberg, M.D. ......................... A344

Exhibit ZZ to Coulston Declaration -
*Curriculum Vitae* of Jinel A. Scott, M.D. .............................. A346

Exhibit AAA to Coulston Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 ................. A353

Exhibit BBB to Coulston Declaration -
(i) Email from Oded Greenberg, M.D. to Brian Magee,
dated July 15, 2014, with Attachments ................................... A354
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 7, 2016 .................. A358
(iii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken January 23, 2017 .................... A374
(iv) Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken October 26, 2016 ...................... A381
(v) Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken January 24, 2017 ...................... A410
(vi) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 .................. A415
(vii) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken January 26, 2017 ...................... A432

## Table of Contents
## (Continued)

**Page**

Exhibit BBB to Coulston Declaration - (cont'd)
(viii) Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 ...  A434
(ix) Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 .........................  A438
(x) Excerpts from the Deposition Testimony of
Michael Arabian, taken November 16, 2016 ........................  A441
(xi) Excerpts from the Deposition Testimony of
Leonzo Cuiman, taken December 15, 2016 ...........................  A444
(xii) Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ...........................  A449

Declaration of Steven Pulitzer, M.D., for Defendants,
in Support of Motion, dated March 26, 2018 .................................  A458

## Volume III

Declaration of Deborah L. Reede, M.D., for Defendants,
in Support of Motion, dated March 26, 2018 .................................  A464

Plaintiff's Response to Defendants' Rule 56.1 Statement
in Support of Their Motion for Summary Judgment and
Plaintiff's Rule 56.1 Statement of Additional Material Facts
in Opposition to Defendants' Motion for Summary Judgment,
dated July 6, 2018 ........................................................................  A471

Declaration of Chad L. Edgar, for Plaintiff,
in Opposition to Motion, dated July 6, 2018 ................................  A518

Exhibit 1 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 12, 2016 ................  A527

Exhibit 2 to Edgar Declaration -
Email from David Stark to Oded Greenberg, M.D.,
dated November 18, 2001 .......................................................  A544

**Table of Contents**
**(Continued)**

**Page**

Exhibit 3 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated August 25, 2014 ........................  A547

Exhibit 4 to Edgar Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 .................  A548

Exhibit 5 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken October 26, 2016 ......................  A549

Exhibit 6 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ...........................  A576

Exhibit 7 to Edgar Declaration -
Reading Summary 2013 with Calculated Result of
RVU Value ............................................................................  A598

Exhibit 8 to Edgar Declaration -
Email from Deborah Reede, M.D. to Linda McMurren,
dated April 30, 2014 ...............................................................  A599

Exhibit 9 to Edgar Declaration -
Meeting with Dr. Greenberg, dated May 5, 2014 ..................  A600

Exhibit 10 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ..................  A601

Exhibit 11 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Deborah Reede, M.D., dated May 13, 2014 ...........................  A611

Exhibit 12 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Deborah Reede, M.D., dated July 16, 2014 ...........................  A612

ix

**Table of Contents**
**(Continued)**

**Page**

Exhibit 13 to Edgar Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 .................. A613

Exhibit 14 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated June 23, 2014 ................................................................. A614

Exhibit 15 to Edgar Declaration -
Excerpts from the Daily Logs of Studies Completed by
Oded Greenberg, M.D. ............................................................ A615

Exhibit 16 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated August 20, 2014 ............................................................. A622

Exhibit 17 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott, M.D.,
dated September 2, 2014, with Attachments .......................... A623

Exhibit 18 to Edgar Declaration -
Email from Linda McMurren, dated August 22, 2014,
with Attachments .................................................................... A627

Exhibit 19 to Edgar Declaration -
Email from Linda McMurren, dated August 26, 2014,
with Attachments .................................................................... A630

Exhibit 20 to Edgar Declaration -
Email from Katrina Moltz to Oded Greenberg, M.D., *et al*.,
dated August 29, 2014 ............................................................. A633

Exhibit 21 to Edgar Declaration -
Individualized Education Program (IEP),
dated February 25, 2013, with Attachments .......................... A635

**Table of Contents**
**(Continued)**

**Page**

Exhibit 22 to Edgar Declaration -
(i) Email from Oded Greenberg, M.D. to Linda McMurren,
dated September 5, 2014 .......................................................... A657
(ii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated August 29, 2014 ............................... A658

Exhibit 23 to Edgar Declaration -
Email from Leonzo Cuiman to Deborah Reede, M.D.,
dated September 4, 2014 .......................................................... A659

Exhibit 24 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Michael Arabian,
dated September 5, 2014 .......................................................... A660

Exhibit 25 to Edgar Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 5, 2014 .......................................................... A662

Exhibit 26 to Edgar Declaration -
Document Intentionally Omitted ............................................. A664

Exhibit 27 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Michael Arabian, taken November 16, 2016 .......................... A665

Exhibit 28 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 ......................... A673

Exhibit 29 to Edgar Declaration -
Settlement, dated September 8, 2014 ...................................... A675

Exhibit 30 to Edgar Declaration -
(i) Settlement, dated November 6, 2013 ................................. A677
(ii) Settlement, dated November 12, 2013 .............................. A678
(iii) Settlement, dated March 6, 2014 ..................................... A679
(iv) Settlement, dated April 9, 2014 ....................................... A680

**Table of Contents**
**(Continued)**

**Page**

Exhibit 30 to Edgar Declaration - (cont'd)
(v) Settlement, dated August 18, 2014 .................................... A682
(vi) Settlement, dated January 14, 2015 ................................ A683
(vii) Settlements, dated January 28, 2015 ............................. A685

Exhibit 31 to Edgar Declaration -
Notes Taken by Stephanie Bernadel ....................................... A691

Exhibit 32 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott, M.D.,
dated September 10, 2014 ........................................................ A693

Exhibit 33 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 12, 2014 ........................................................ A694

Exhibit 34 to Edgar Declaration -
Email from Deborah Reede, M.D. to Steven Pulitzer, M.D.,
dated September 15, 2014 ........................................................ A696

Exhibit 35 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 15, 2014 ........................................................ A697

Exhibit 36 to Edgar Declaration -
Email from Oded Greenberg, M.D. to Steven Pulitzer,
M.D., dated September 15, 2014 ............................................. A698

Exhibit 37 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 16, 2014 ........................................................ A700

Exhibit 38 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken January 24, 2017 ...................... A701

**Table of Contents**
**(Continued)**

Exhibit 39 to Edgar Declaration -
(i) Email from Steven Pulitzer, M.D. to Jean Aime, *et al.*,
dated September 24, 2014 ........................................................ A715
(ii) Letter from Steven Pulitzer, M.D.,
dated September 24, 2014 ........................................................ A716

Exhibit 40 to Edgar Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 3, 2014 .............................................................. A719

Exhibit 41 to Edgar Declaration -
Letter from Sade Jemmott, M.D. to Stephanie Bernadel,
dated October 14, 2014 ............................................................ A720

Exhibit 42 to Edgar Declaration -
Powerpoint Presentation of KCHC Departmental Meeting,
dated July 31, 2014 .................................................................. A723

Exhibit 43 to Edgar Declaration -
Email from Stephanie Bernadel to Steven Pulitzer, M.D.,
dated October 28, 2014 ............................................................ A727

Exhibit 44 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ................... A728

Exhibit 45 to Edgar Declaration -
(i) Letter from Deborah Reede, M.D. to
Hyman Shwarzberg, M.D., dated November 7, 2014 ............. A729
(ii) Letter from Deborah Reede, M.D. to Harry Zinn, M.D.,
dated November 7, 2014 .......................................................... A730
(iii) Letter from Deborah Reede, M.D. to
Maria Corsaro, M.D., dated November 7, 2014 ..................... A731

**Table of Contents**
**(Continued)**

Exhibit 46 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated December 15, 2014 ........................................................ A732

Exhibit 47 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 ... A733

Exhibit 48 to Edgar Declaration -
*Curriculum Vitae* of Jinel Moore Scott, M.D. ........................ A735

Exhibit 49 to Edgar Declaration -
Faculty Self Assesment Form of Jinel Moore Scott, M.D.,
dated March 2, 2015 ................................................................ A739

Exhibit 50 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 5, 2014 .......................................................... A748

Exhibit 51 to Edgar Declaration -
Excerpts from the KCHC Departmental Meeting,
dated December 5, 2014 ........................................................... A749

Exhibit 52 to Edgar Declaration -
Excerpts from the Statement of Oded Greenberg, M.D.,
taken October 10, 2014 ........................................................... A751

Exhibit 53 to Edgar Declaration -
Summary of Interview with Jinel Moore Scott, M.D.,
dated October 14, 2014 ........................................................... A753

Exhibit 54 to Edgar Declaration -
Notes Regarding Meeting with Oded Greenberg, M.D.,
dated May 5, 2014 .................................................................. A754

**Table of Contents**
**(Continued)**

**Page**

Exhibit 55 to Edgar Declaration -
(i) Chart Detailing Oded Greenberg, M.D.'s Attendance
Fulfillment ................................................................. A755
(ii) Email from Deborah Reede, M.D. to Linda McMurren,
dated April 30, 2014 ................................................. A756
(iii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated April 21, 2014 .................. A757

Exhibit 56 to Edgar Declaration -
Email from John Amodio to Oded Greenberg, M.D., *et al.*,
dated April 1, 2014 ................................................... A758

Exhibit 57 to Edgar Declaration -
Excerpt from the Deposition Testimony of
Deborah Reede, M.D., taken January 26, 2017 ....... A760

Exhibit 58 to Edgar Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 3, 2014 ... A761

Exhibit 59 to Edgar Declaration -
SUNY Downstate's General Statement of Purpose ... A762

Exhibit 60 to Edgar Declaration -
Document Intentionally Omitted ............................... A763

Exhibit 61 to Edgar Declaration -
Excerpts from the KCHC Medical Staff Bylaws
Rules & Regulations ................................................. A764

Exhibit 62 to Edgar Declaration -
Performance Evaluation of Scott, M.D. by Pulitzer, M.D.,
Acting on Behalf of KCHC as Interim Chief of Service of
the Department of Radiology, dated December 2, 2014 ......... A782

**Table of Contents**
**(Continued)**

                                                                      **Page**

        Exhibit 63 to Edgar Declaration -
        Documents Related to Greenberg, M.D.'s Reappointment
        as a Member of the Medical Staff at KCHC in 2013 .............. A785

        Exhibit 64 to Edgar Declaration -
        Documents Related to Greenberg, M.D.'s Reappointment
        as a Member of the Medical Staff at KCHC in 2009 .............. A800

        Exhibit 65 to Edgar Declaration -
        Summary of Interview with Andre Pyle,
        dated October 14, 2014 ........................................... A804

        Exhibit 66 to Edgar Declaration -
        Monthly Faculty and NTP Individual Report of
        Attendance, dated December 9, 2014 ...................................... A805

Declaration of Oded Greenberg, M.D., Plaintiff,
        in Opposition to Motion, dated July 6, 2018 ................................. A806

Declaration of Esther Neiman, in Opposition to Motion,
        dated June 27, 2018 ....................................................... A815

Reply Declaration of Christopher Coulston, for Defendants,
        in Further Support of Motion, dated September 14, 2018 ............. A817

        Exhibit CCC to Coulston Reply Declaration -
        Plaintiff's 2012-2013 Faculty Review and
        Development Form ................................................. A820

**Volume IV**

        Exhibit DDD to Coulston Reply Declaration -
        2014 Faculty Evaluation of Oded Greenberg, M.D. .............. A822

        Exhibit EEE to Coulston Reply Declaration -
        2015 Faculty Evaluation of Jinel Scott, M.D. ........................ A838

**Table of Contents**
**(Continued)**

**Page**

Exhibit FFF to Coulston Reply Declaration -
(i) Email from Michelle Gilmore Greenberg to
Oded Greenberg, M.D., dated July 17, 2018 .......................... A853
(ii) Email from Karina Moltz to Oded Greenberg, M.D.,
dated August 25, 2014 ............................................. A854

Exhibit GGG to Coulston Reply Declaration -
(i) Slip for CD-Rom ................................................. A855
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 7, 2016 .................. A856
(iii) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ................ A859
(iv) Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ........................ A864
(v) Excerpts from the Deposition Testimony of
Leonzo Cuiman, M.D., taken December 15, 2016 ................. A868

Reply Declaration of Steven Pulitzer, M.D., for Defendants,
in Further Support of Motion, dated September 14, 2018 ............ A871

Reply Declaration of Deborah Reede, M.D., for Defendants,
in Further Support of Motion, dated September 14, 2018 ............ A873

Defendants' Counter-Response to Plaintiff's Response to
Defendants' Rule 56.1 Statement and Plaintiff's
Rule 56.1 Statement of Additional Material Facts,
dated September 14, 2018 ............................................. A876

Health + Hospitals' Defendants' Local Rule 56.1 Statement of
Material Undisputed Facts, filed September 14, 2018 .................. A948

Declaration of Ryan G. Shaffer, for Defendants New York City
Health + Hospitals Corporation and Kings County Hospital
Center, in Support of Motion, filed September 14, 2018 .............. A958

**Table of Contents**
(Continued)

Page

Exhibit A to Shaffer Declaration -
Second Amended Complaint and Demand for Jury Trial,
dated December 23, 2015 ........................................................  A961

Exhibit B to Shaffer Declaration -
Notification of Employee Change of Status,
dated June 28, 2011 ................................................................  A992

Exhibit C to Shaffer Declaration -
Downstate Medical Center Employment File of
Oded Greenberg, M.D..............................................................  A996
*(cont'd in Vol. V)*

**Volume V**

Exhibit D to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 ..  A1245

Exhibit E to Shaffer Declaration -
(i) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 12, 2016.................  A1248
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken January 23, 2017.....................  A1254

Exhibit F to Shaffer Declaration -
Collective Bargaining Agreement between United
University Professions and the State of New York.................  A1260
*(cont'd in Vol. VI)*

**Volume VI**

Exhibit G to Shaffer Declaration -
Time and Attendance Records of Oded Greenberg, M.D. .....  A1389

**Table of Contents**
**(Continued)**

**Page**

Exhibit H to Shaffer Declaration -
Letter from Salvatore JA Sclarani, M.D. to
Oded Greenberg, M.D., dated September 21, 2010 ............... A1453

Exhibit I to Shaffer Declaration -
Plaintiff's Responses to Municipal Defendants' First Set of
Contention Interrogatories, dated May 17, 2017 ................... A1457

Exhibit J to Shaffer Declaration -
Affiliation Agreement between HHC and the
SUNY Health Sciences Center ................................................ A1469

**Volume VII**

Exhibit K to Shaffer Declaration -
Notes from August 22, 2014 Meeting with
Oded Greenberg, M.D., with Attachments ............................. A1504

Exhibit L to Shaffer Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 3, 2014 ................. A1664

Exhibit M to Shaffer Declaration -
Settlement Agreement, dated September 8, 2014 .................. A1665

Exhibit N to Shaffer Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 24, 2014 ............... A1667

**Volume VIII**

Exhibit O to Shaffer Declaration -
Letter from Leonzo Cuiman to Oded Greenberg, M.D.,
dated October 22, 2014 .......................................................... A1670

**Table of Contents**
(Continued)

**Page**

Exhibit P to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Leonzo Cuiman, taken December 15, 2016 .......................... A1671

Exhibit Q to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 ........................ A1676

Exhibit R to Shaffer Declaration -
Report of the Accreditation Council for Graduate
Medical Education, dated April 15, 2014 ............................ A1679

Exhibit S to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ................ A1689

Plaintiff's Response to Defendants' Rule 56.1 Statement in
Support of Their Motion for Summary Judgment and Plaintiff's
Rule 56.1 Statement of Additional Material Facts in Opposition
to Defendants' Motion for Summary Judgment,
filed September 14, 2018 .............................................. A1699

Health + Hospitals' Defendants' Response Plaintiff's Rule
56.1 Statement of Additional Material Facts in Opposition
to Defendants' Motion for Summary Judgment,
filed September 14, 2018 .............................................. A1734

Memorandum and Order of the Honorable Pamela K. Chen,
dated September 29, 2019, Appealed From .................................. A1760

Notice of Appeal, dated October 29, 2019 ......................................... A1815

**Query    Reports    Utilities    Help    Log Out**

APPEAL,NPROSE

## U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:15-cv-02343-PKC-VMS

| | |
|---|---|
| Greenberg v. State University Hospital et al | Date Filed: 04/22/2015 |
| Assigned to: Judge Pamela K. Chen | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Vera M. Scanlon | Nature of Suit: 442 Civil Rights: Jobs |
| Cause: 28:1331 Fed. Question | Jurisdiction: Federal Question |

**Plaintiff**

**MD Oded Greenberg**                              represented by **Chad L. Edgar**
Cardi & Edgar LLP
99 Madison Avenue
8th floor
New York, NY 10016
212-481-7770
Fax: 212-684-3008
Email: cedgar@cardiedgarlaw.com
*ATTORNEY TO BE NOTICED*

**Dawn M. Cardi**
Cardi & Edgar LLP
2 Park Avenue, 19th Floor
New York, NY 10016
212-481-7770
Fax: 212-684-3008
Email: DCardi@CardiEdgarLaw.com
*ATTORNEY TO BE NOTICED*

**Eric M. Nelson**
Eric M. Nelson, Attorney at Law
112 Madison Avenue
Sixth Floor
New York, NY 10016
212-354-3666
Fax: 212-354-2555
Email: emnlegal@gmail.com
*TERMINATED: 08/31/2017*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**State University Hospital - Downstate**                represented by **Christopher Vance Coulston**
**Medical Center**                                                Office of the New York State Attorney
*also known as*                                                   General
The State University of New York Health                           28 Liberty Street

Science Center at Brooklyn
*also known as*
State University of New York Downstate
Medical Center

New York, NY 10005
(212)416-8556
Fax: (212)416-6075
Email: christopher.coulston@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Monica Anne Connell**
Office of the New York State Attorney
General
120 Broadway, 24th Floor
New York, NY 10271
212-416-8965
Fax: 212-416-6009
Email: Monica.Connell@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**United University Professions**
*(UUP)*
*TERMINATED: 12/23/2015*

represented by **Michael James Del Piano**
NEW YORK STATE UNITED
TEACHERS OFFICE OF GENERAL
COUNSEL
52 Broadway
9th Floor
New York, NY 10004
212-533-6300
Fax: 212-228-9253
Email: mdelpian@nysutmail.org
*TERMINATED: 12/23/2015*
*ATTORNEY TO BE NOTICED*

**Defendant**

**New York City Health and Hospitals
Corporation**

represented by **Amanda Blair**
New York City Law Department
Office of the Corporation Counsel
100 Church St
New York, NY 10007
212-356-8767
Fax: 212-356-2089
Email: ablair@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Glenn Shaffer**
New York Law Dept.
100 Church Street
New York, NY 10007
212-356-2549
Fax: 212-356-2439
Email: rshaffer@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tanya N Blocker**

114-23 Inwood Street
Jamaica, NY 11436
917-554-3994
Email: tanya.blocker@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Michael Piercey**
NYC Law Department
100 Church Street, Room 2-303(b)
New York, NY 10007
212-356-2428
Fax: 212-356-2089
Email: epiercey@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kings County Hospital Center**                represented by **Amanda Blair**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Glenn Shaffer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tanya N Blocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan Michael Piercey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SUNY Downstate Medical Center**              represented by **Michael James Del Piano**
**Chapter of United University Professions**   (See above for address)
*TERMINATED: 12/23/2015*                        *TERMINATED: 12/23/2015*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Deborah L Reede**                            represented by **Christopher Vance Coulston**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Monica Anne Connell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**A4**

**Steven Pulitzer**                represented by **Christopher Vance Coulston**
                                   (See above for address)
                                   *LEAD ATTORNEY*
                                   *ATTORNEY TO BE NOTICED*

                                   **Monica Anne Connell**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN AND JANE DOES (1-20)**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/22/2015 | 1 | COMPLAINT against Downstate Medical Center, State University Hospital, United University Professions, filed by Oded Greenberg. (Attachments: # 1 Civil Cover Sheet) (Gillespie, Saudia) (Entered: 04/24/2015) |
| 04/22/2015 | | FILING FEE: $ 400, receipt number 4653087383 (Gillespie, Saudia) (Entered: 04/24/2015) |
| 04/24/2015 | 2 | Summons Issued as to Downstate Medical Center, State University Hospital, United University Professions. (Gillespie, Saudia) (Entered: 04/24/2015) |
| 04/24/2015 | 3 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all parties wish to consent.** The form may also be accessed at the following link:http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences. Do NOT return or file the consent** unless **all parties have signed the consent.** (Gillespie, Saudia) (Entered: 04/24/2015) |
| 04/30/2015 | 4 | ORDER. Plaintiff will serve a copy of the attached Order on Defendants with the Summons and Complaint or, if those documents have already been served, by mail. Chambers mailed a copy of this Order, its attachment, the public docket and the NEF Consent Form to pro se Plaintiff. Ordered by Magistrate Judge Vera M. Scanlon on 4/30/2015. (Rice, Liane) (Entered: 04/30/2015) |
| 08/19/2015 | 5 | Letter MOTION for Extension of Time to File . *Pltff request an extension of time to serve the summons and complaint. Pltff seeks an additional 120 days, through and including 12/18/15 to first amend, and then serve, filed* by Oded Greenberg. (Galeano, Sonia) (Entered: 08/20/2015) |
| 08/26/2015 | | ORDER granting 5 Motion for Extension of Time to File: On April 22, 2015 plaintiff filed the instant complaint setting forth allegations against his union. By letter dated August 19, 2015 5 , plaintiff requests an extension of time to serve the defendants on the grounds that he is currently exhausting his administrative remedies with the EEOC and seeks to amend his complaint with these claims. Plaintiffs request to amend the complaint is granted. He must submit the amended complaint by December 18, 2015. The amended complaint will completely replace the original complaint and the time for service of the amended complaint will run from the date of filing of the amended complaint. Ordered by Judge Pamela K. Chen on 8/26/2015. (Chiang, May) (Entered: 08/26/2015) |

| 10/19/2015 | 6 | AMENDED COMPLAINT *and Demand for Jury Trial* against All Defendants, filed by Oded Greenberg. (Attachments: # 1 Proposed Summons) (Nelson, Eric) (Entered: 10/19/2015) |
| --- | --- | --- |
| 10/20/2015 | 7 | Summons Issued re Amended Complaint as to Kings County Hospital Center, New York City Health and Hospitals Corporation, Steven Pulitzer, Deborah L Reede, SUNY Downstate Medical Center Chapter of United University Professions, State University Hospital - Downstate Medical Center, United University Professions. (Lee, Tiffeny) (Entered: 10/20/2015) |
| 11/03/2015 | 8 | MOTION for Extension of Time to File Answer by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 11/03/2015) |
| 11/03/2015 | 9 | NOTICE of Change of email address by Eric M. Nelson (Nelson, Eric) (Entered: 11/03/2015) |
| 11/04/2015 | 10 | ORDER granting 8 Motion for Extension of Time to Answer until 12/18/2015. SCHEDULING ORDER: As set forth in the attached Order, an Initial Conference is scheduled for 1/5/2016 at 12:00 PM before Magistrate Judge Scanlon in Courtroom 504 North. Plaintiff's counsel is directed to confirm with Defendant's counsel that all necessary participants are aware of this conference. Counsel must complete the attached joint proposed scheduling order and file on ECF no later than 12/30/2015. Ordered by Magistrate Judge Vera M. Scanlon on 11/4/2015. (Quinlan, Krista) (Entered: 11/04/2015) |
| 11/11/2015 | 11 | MOTION for Extension of Time to File Answer by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Blocker, Tanya) (Entered: 11/11/2015) |
| 11/11/2015 | 12 | RESPONSE to Motion re 11 MOTION for Extension of Time to File Answer filed by Oded Greenberg. (Nelson, Eric) (Entered: 11/11/2015) |
| 11/12/2015 | | ORDER granting 11 Motion for Extension of Time to Answer: Defendants Kings County Hospital Center and New York City Health and Hospitals Corporation have until 12/18/2015 to answer. SCHEDULING ORDER: Pursuant to Plaintiff's letter at 12 , the Initial Conference is moved to 1/20/2016 at 10:00 AM. Counsel must complete the joint proposed scheduling order and file on ECF no later than 1/13/2016. Ordered by Magistrate Judge Vera M. Scanlon on 11/12/2015. (Entered: 11/12/2015) |
| 12/08/2015 | 13 | First MOTION for pre motion conference by SUNY Downstate Medical Center Chapter of United University Professions, United University Professions. (Del Piano, Michael) (Entered: 12/08/2015) |
| 12/15/2015 | 14 | Letter *Response to Request for Pre-Motion Conference* by Oded Greenberg (Nelson, Eric) (Entered: 12/15/2015) |
| 12/16/2015 | | ORDER finding as moot 13 Defendants' Motion for Pre Motion Conference: In light of 14 Plaintiff's letter agreeing to withdraw the claims that were the subject of Defendants' letter request for a pre-motion conference, the Court finds Defendants' request to be mooted. Plaintiff shall file an amended complaint by 12/30/2015 reflecting the changes proposed in its 14 12/15/2015 letter. Ordered by Judge Pamela K. Chen on 12/16/2015. (Chan, Grace) (Entered: 12/16/2015) |
| 12/18/2015 | 15 | MOTION for pre motion conference by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Blocker, Tanya) (Entered: 12/18/2015) |
| 12/23/2015 | 16 | Letter *Response to Pre-Motion Conference Request of City Defendants* by Oded Greenberg (Nelson, Eric) (Entered: 12/23/2015) |
| 12/23/2015 | 17 | AMENDED COMPLAINT *Second Amended Complaint* against All Defendants, filed by |

**A6**

| | | |
|---|---|---|
| | | Oded Greenberg. (Nelson, Eric) (Entered: 12/23/2015) |
| 12/28/2015 | | ORDER finding moot Defendants' Motion for a Pre Motion Conference [Dkt. 13]: In light of Plaintiff's letter [Dkt. 14] agreeing to withdraw the claims that were the subject of Defendants United University Professions' and SUNY Downstate Medical Center Chapter of United University Professions' letter request for a pre-motion conference, the Court finds the request to be mooted. Plaintiff also indicated that it is prepared to withdraw his claim under 29 USC 185 against Defendant State University Hospital - Downstate Medical Center. Accordingly, Plaintiff shall file an amended complaint by 12/30/2105 reflecting these changes proposed in his 12/15/2015 letter. Ordered by Judge Pamela K. Chen on 12/28/2015. (Abdallah, Fida) (Entered: 12/28/2015) |
| 12/28/2015 | | ORDER granting 15 Motion for Pre Motion Conference by Kings County Hospital Center, New York City Health and Hospitals Corporation: A Pre-motion conference will be held on January 13, 2016, at 10:00 a.m. Ordered by Judge Pamela K. Chen on 12/28/2015. (Abdallah, Fida) (Entered: 12/28/2015) |
| 01/06/2016 | 18 | ANSWER to 17 Amended Complaint by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 01/06/2016) |
| 01/13/2016 | | Minute Entry for proceedings held before Judge Pamela K. Chen: Pre-Motion Conference held on 1/13/2016. Appearances by Eric Nelson for Plaintiff; Tanya Blocker for Defendants HHC and KCHC; and Christopher Vance Coulston for Defendants SUNY Downstate, Deborah Reede, and Steven Pulitzer. Discussion held. Defendants HHC and KCHC shall file a letter on or before 1/20/2016 informing the Court of their intent to file a motion to dismiss. If Defendants intend to file a motion to dismiss, the letter should also include a proposed briefing schedule agreed upon by the parties. If Defendants decide not to file a motion to dismiss, their Answer shall be filed by 2/3/2016. (Court Reporter Joshua Edwards.) (Chan, Grace) (Entered: 01/13/2016) |
| 01/13/2016 | 19 | Proposed Scheduling Order *Jointly Submitted By All Parties* by Oded Greenberg (Nelson, Eric) (Entered: 01/13/2016) |
| 01/14/2016 | 20 | Letter by Oded Greenberg (Nelson, Eric) (Entered: 01/14/2016) |
| 01/20/2016 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Initial Conference Hearing held on 1/20/2016 in Room 504 North. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #9:55-11:07.) (Quinlan, Krista) Modified on 1/21/2016 (Quinlan, Krista). (Entered: 01/20/2016) |
| 01/20/2016 | 21 | SCHEDULING ORDER: s discussed during the 1/20/2016 conference (see attached order for additional detail and deadlines), all discovery must be completed by 12/22/2016. On or before 1/6/2017, the Parties will file a joint status report letter confirming that discovery is complete. On or before 1/27/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. On or before 2/23/2017, the Parties will file their joint Proposed Pretrial Order. A Telephone Conference is set for 5/17/2016 at 2:30 PM before Magistrate Judge Vera M. Scanlon. Plaintiff's counsel is to organize a conference call, then phone Chambers at (718) 613-2300 with all counsel on the line. On or before 5/10/2016, the Parties will file a joint status report letter, of no more than three pages, identifying any outstanding discovery disputes.Counsel will consult as to an ESI agreement and submit their proposed plan by joint letter by 2/3/2016. Counsel will submit a proposed confidentiality order by 2/3/2016. Plaintiff is to file the complaint under seal (all copies) because they contain home addresses and file publicly a redacted amended complaint. Ordered by Magistrate Judge Vera M. Scanlon on 1/20/2016. (Quinlan, Krista) (Entered: 01/20/2016) |

1/24/2020                    Eastern District of New York - LIVE Database 1.2 (Revision 1.2.0.6)

| 01/20/2016 | 22 | Letter *Re: Anticipated Motion To Dismiss* by Kings County Hospital Center, New York City Health and Hospitals Corporation (Blocker, Tanya) (Entered: 01/20/2016) |
|---|---|---|
| 01/21/2016 | 23 | AMENDED COMPLAINT *Second Amended Complaint (redacted)* against All Defendants, filed by Oded Greenberg. (Nelson, Eric) (Entered: 01/21/2016) |
| 02/03/2016 | 24 | Joint MOTION for Extension of Time to File *Proposed Confidentiality Order and Discovery Plan Letter* by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 02/03/2016) |
| 02/03/2016 | 25 | ANSWER to 23 Amended Complaint by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Blocker, Tanya) (Entered: 02/03/2016) |
| 02/04/2016 |  | ORDER granting 24 Motion for Extension of Time to File; STATUS REPORT ORDER: On or before 2/10/2016 the Parties are to file their discovery plan letter and proposed confidentiality order. Ordered by Magistrate Judge Vera M. Scanlon on 2/4/2016. (Calabrese, Corey) (Entered: 02/04/2016) |
| 02/10/2016 | 26 | Letter *regarding Discovery Plan* by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center (Coulston, Christopher) (Entered: 02/10/2016) |
| 02/10/2016 | 27 | Joint MOTION for Protective Order *under Rule 502(d)* by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 02/10/2016) |
| 02/10/2016 | 28 | Joint MOTION for Protective Order by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 02/10/2016) |
| 02/12/2016 |  | ORDER granting 27 Motion for Protective Order: The protective order is so ordered. Ordered by Magistrate Judge Vera M. Scanlon on 2/12/2016. (Calabrese, Corey) (Entered: 02/12/2016) |
| 02/12/2016 |  | ORDER granting 28 Motion for Protective Order: The protective order is so ordered. Ordered by Magistrate Judge Vera M. Scanlon on 2/12/2016. (Calabrese, Corey) (Entered: 02/12/2016) |
| 05/10/2016 | 29 | Letter *(Joint) Regarding Status of Discovery* by Oded Greenberg (Nelson, Eric) (Entered: 05/10/2016) |
| 05/17/2016 |  | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Telephone Conference held on 5/17/2016 in Room 504 North. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #2:31-2:56.) (Gillespie, Saudia) (Entered: 05/18/2016) |
| 05/17/2016 | 30 | SCHEDULING ORDER: As discussed during the 5/17/2016 conference (see attached order for additional detail and deadlines), on or before 6/27/2016 the Parties are to file their joint status report letter. Status Conference is set for 6/29/2016 at 2:15 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. The municipal defendants expect document discovery to be completed primarily by late June. The State is on a similar schedule. The parties are encouraged to plan their deposition schedules as soon as possible. Counsel are reminded of the 1/20/2016 scheduling order. Counsel should expect to adhere to this schedule. Ordered by Magistrate Judge Vera M. Scanlon on 5/17/2016. (Gillespie, Saudia) (Entered: 05/18/2016) |
| 06/24/2016 |  | SCHEDULING ORDER: Due to a conflict in the Court's schedule, the **TIME** of the 6/29/2016 status conference will be held at **9:30 a.m.** instead of 2:15 p.m. in Courtroom |

|  |  |  |
|---|---|---|
|  |  | 504 North before Magistrate Judge Vera M. Scanlon. Ordered by Magistrate Judge Vera M. Scanlon on 6/24/2016. (Gillespie, Saudia) (Entered: 06/24/2016) |
| 06/27/2016 | 31 | Letter *Joint Submission of the Parties Regarding Discovery Status and Open Issues* by Oded Greenberg (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (Nelson, Eric) (Entered: 06/27/2016) |
| 06/29/2016 |  | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Status Conference held on 6/29/2016 in Room 504 North. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding.(Tape #9:36-9:46; 11:00-11:10.) (Gillespie, Saudia) (Entered: 06/30/2016) |
| 06/29/2016 | 32 | STATUS REPORT ORDER: As discussed during the 6/29/2016 conference (see attached order for additional detail and deadlines). Counsel will continue to confer about outstanding discovery issues. Any remaining issues are to be identified briefly in the 7/20/2016 joint status letter and will be discussed during the conference. Status Conference set for 7/25/2016 at 2:15 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Ordered by Magistrate Judge Vera M. Scanlon on 6/29/2016. (Gillespie, Saudia) Modified: typographical error on 6/30/2016 (Gillespie, Saudia). (Entered: 06/30/2016) |
| 06/30/2016 |  | Set/Reset Hearings (Gillespie, Saudia) (Entered: 06/30/2016) |
| 07/14/2016 |  | SCHEDULING ORDER: Due to a conflict in the Court's schedule, the TIME of the 7/25/2016 status conference will be held at 4:00 p.m. instead of 2:15 p.m. in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Ordered by Magistrate Judge Vera M. Scanlon on 7/14/2016. (Gillespie, Saudia) (Entered: 07/14/2016) |
| 07/19/2016 | 33 | Joint MOTION for Extension of Time to File *Discovery Status Letter, and for Adjournment of Conference* by Oded Greenberg. (Nelson, Eric). Added MOTION to Adjourn Conference on 7/20/2016 (Gillespie, Saudia). (Entered: 07/19/2016) |
| 07/20/2016 |  | ORDER: granting in part and denying in part 33 Motion for Extension of Time to File and Motion to Adjourn Conference. The Status Conference scheduled for 7/25/2016 is adjourned to 8/10/2016 at 11:30 a.m. in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. The discovery status report letter is due by 8/4/2016. Counsel are to confirm amongst themselves that all are aware of this change. Ordered by Magistrate Judge Vera M. Scanlon on 7/20/2016. (Gillespie, Saudia) (Entered: 07/20/2016) |
| 08/04/2016 | 34 | Letter *Regarding Discovery Status (Jointly Submitted)* by Oded Greenberg (Nelson, Eric) (Entered: 08/04/2016) |
| 08/10/2016 |  | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Status Conference held on 8/10/2016 in Room 504 North. Eric Nelson and Christopher Vance Coulston appearing on behalf of Plaintiffs. Tanya N Blocker appearing on behalf of Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #11:38-12:49.) (Gillespie, Saudia) (Entered: 08/10/2016) |
| 08/10/2016 | 35 | SCHEDULING ORDER: As discussed during the 8/10/2016 conference (see attached order for additional detail and deadlines). A Status Conference is set for 8/11/2016 at 10:00 AM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. City Defendant is excused from the conference. Ordered by Magistrate Judge Vera M. Scanlon on 8/10/2016. (Gillespie, Saudia) (Entered: 08/10/2016) |
| 08/11/2016 |  | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Status Conference held on 8/11/2016 in Room 504 North. Eric Nelson appearing for Plaintiff and Christopher Coulston appearing for Defendants. See separate docket entry for Order |

| | | |
|---|---|---|
| | | issuing from this proceeding. (Tape #10:10-11:17.) (Gillespie, Saudia) (Entered: 08/11/2016) |
| 08/11/2016 | 36 | SCHEDULING ORDER: As discussed during the 8/11/2016 conference (see attached order for additional detail and deadlines), a Status Conference is set for 10/20/2016 at 3:00 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Plaintiff's oral request for additional information about compensation is denied as stated on the record, as too burdensome given that defendant does not key records in a way that makes the information accessible. To create files with the requested information would be burdensome. Ordered by Magistrate Judge Vera M. Scanlon on 8/11/2016. (Gillespie, Saudia) (Entered: 08/11/2016) |
| 09/20/2016 | 37 | Letter MOTION to Appoint Expert *Joint Request to Extend Deadline* by Oded Greenberg. (Nelson, Eric) (Entered: 09/20/2016) |
| 09/21/2016 | | ORDER granting 37 Motion to Appoint Expert. The parties must designate experts by 10/31/2016. Ordered by Magistrate Judge Vera M. Scanlon on 9/21/2016. (Gersovitz, Ryan) (Entered: 09/21/2016) |
| 10/11/2016 | | RE-SCHEDULING ORDER: Due to a conflict in the Court's schedule, the Status Conference originally scheduled for 10/20/2016 will be held on 10/18/2016 at 10:30 AM in Courtroom 504 before Magistrate Judge Vera M. Scanlon. Counsel are to confirm amongst themselves that all are aware of this change. Ordered by Magistrate Judge Vera M. Scanlon on 10/11/2016. (Quinlan, Krista) (Entered: 10/11/2016) |
| 10/11/2016 | 38 | MOTION to Adjourn Conference *scheduled for October 18* by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 10/11/2016) |
| 10/12/2016 | | ORDER granting 38 Motion to Adjourn Conference. RE-SCHEDULING ORDER: Counsel are advised that the Status Conference currently scheduled for 10/18/2016 has been rescheduled to 10/24/2016 at 12:00 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Counsel are to confirm amongst themselves that all are aware of this change. Ordered by Magistrate Judge Vera M. Scanlon on 10/12/2016. (Quinlan, Krista) (Entered: 10/12/2016) |
| 10/19/2016 | 39 | Joint MOTION for Extension of Time to Complete Discovery by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 10/19/2016) |
| 10/24/2016 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon: Status Conference held on 10/24/2016 in Room 504 North. Eric Nelson appearing for Plaintiff. Tanya Blocker and Christopher Coulston appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #11:56-12:08.) (Quinlan, Krista) (Entered: 10/24/2016) |
| 10/24/2016 | 40 | ORDER granting 39 Motion for Extension of Time to Complete Discovery; SCHEDULING ORDER: As discussed during the 10/24/2016 conference (see attached order for additional detail and deadlines), all discovery must be completed by 2/13/2017. On or before 2/13/2017, the Parties will file a joint status report letter confirming that discovery is complete. On or before 3/2/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. A Status Conference is set for 2/7/2017 at 3:00 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Counsel are still awaiting DOE materials. Counsel are encouraged to start settlement discussions as soon as it is practical. Ordered by Magistrate Judge Vera M. Scanlon on 10/24/2016. (Quinlan, Krista) (Entered: 10/24/2016) |

| 01/10/2017 | 41 | Letter MOTION for Extension of Time to Complete Discovery by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 01/10/2017) |
|---|---|---|
| 01/11/2017 | | ORDER granting 41 Motion for Extension of Time to Complete Discovery. No further extensions will be granted absent exigent and unforeseen circumstances. Ordered by Magistrate Judge Vera M. Scanlon on 1/11/2017. (Gersovitz, Ryan) (Entered: 01/11/2017) |
| 02/07/2017 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Status Conference held on 2/7/2017 in Room 504 North. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #2:58-3:42.) (Quinlan, Krista) (Entered: 02/07/2017) |
| 02/07/2017 | 42 | SCHEDULING ORDER: As discussed during the 2/7/2017 conference (see attached order for additional detail and deadlines), on or before 3/10/2017, the Parties will file a joint status report letter confirming that discovery is complete. On or before 3/27/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. On or before 5/26/2017, the Parties will file their joint Proposed Pretrial Order. Plaintiff's request for a telephone directory other than Defendants' counsel's search for a 2014 directory is denied as impractical for Defendant to produce. Plaintiff is capable of searching the documents for the information and failed to inquire during depositions such that Defendants should not be required to gather and produce the information at this late date. All Parties are contemplating summary judgment motions. Ordered by Magistrate Judge Vera M. Scanlon on 2/7/2017. (Quinlan, Krista) (Entered: 02/07/2017) |
| 03/10/2017 | 43 | Letter *Regarding Completion of Discovery on Behalf of Plaintiff and State Defendants* by Oded Greenberg (Nelson, Eric) (Entered: 03/10/2017) |
| 03/13/2017 | | ORDER directing the Parties to submit a Status Report on or before 3/17/2017 outlining any outstanding discovery disputes. Otherwise, the Court will mark discovery as having concluded in this matter. Ordered by Magistrate Judge Vera M. Scanlon on 3/13/2017. (Gersovitz, Ryan) (Entered: 03/13/2017) |
| 03/13/2017 | 44 | MOTION to Compel *Local Rule 37.3* by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Blocker, Tanya) (Entered: 03/13/2017) |
| 03/15/2017 | | SCHEDULING ORDER: A Status Conference is set for 4/12/2017 at 04:15 PM in Courtroom 504 North before Magistrate Judge Vera M. Scanlon. Plaintiff is to respond to Defendants' motion at 44 by 3/17/2017. On or before 4/27/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. On or before 6/26/2017, the Parties will file their joint Proposed Pretrial Order. Ordered by Magistrate Judge Vera M. Scanlon on 3/15/2017. (Gersovitz, Ryan) (Entered: 03/15/2017) |
| 03/17/2017 | 45 | RESPONSE to Motion re 44 MOTION to Compel *Local Rule 37.3* filed by Oded Greenberg. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (Nelson, Eric) (Entered: 03/17/2017) |
| 03/23/2017 | 46 | NOTICE of Appearance by Monica Anne Connell on behalf of Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center (aty to be noticed) (Connell, Monica) (Entered: 03/23/2017) |
| 04/12/2017 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon:Motion Hearing held on 4/12/2017 re 44 MOTION to Compel Local Rule 37.3 filed by New |

| | | York City Health and Hospitals Corporation, Kings County Hospital Center. Eric Nelson appearing for Plaintiff. Christopher Coulston and Tanya Blocker appearing for Defendants. See separate docket entry for Order issuing from this proceeding. (Tape #4:22-4:37.) (Quinlan, Krista) (Entered: 04/13/2017) |
|---|---|---|
| 04/12/2017 | 47 | ORDER granting 44 Motion to Compel. SCHEDULING ORDER: As discussed during the 4/12/2017 conference (see attached order for additional detail and deadlines), on or before 5/31/2017, the Parties will file a joint status report letter confirming that discovery is complete. On or before 6/16/2017, the Parties will initiate any dispositive motions in accordance with the Individual Rules of the District Judge. Plaintiff may issue contention interrogatories as to municipal Defendants by 4/19/2017. Plaintiff must respond to the contention interrogatories of Defendant City of New York etc. Ordered by Magistrate Judge Vera M. Scanlon on 4/12/2017. (Quinlan, Krista) (Entered: 04/13/2017) |
| 05/02/2017 | 48 | NOTICE of Appearance by Ryan Glenn Shaffer on behalf of Kings County Hospital Center, New York City Health and Hospitals Corporation (aty to be noticed) (Shaffer, Ryan) (Entered: 05/02/2017) |
| 05/31/2017 | 49 | Letter *Regarding Status of Discovery* by Oded Greenberg (Nelson, Eric) (Entered: 05/31/2017) |
| 06/01/2017 | | Order Certifying Discovery is complete. Per the letter at 49 , discovery is certified as complete. Ordered by Magistrate Judge Vera M. Scanlon on 6/1/2017. (Quinlan, Krista) (Entered: 06/01/2017) |
| 06/06/2017 | 50 | Letter MOTION for Extension of Time to File *Pre-Summary-Judgment-Motion Letters* by Oded Greenberg. (Nelson, Eric) (Entered: 06/06/2017) |
| 06/07/2017 | | ORDER granting 50 Motion for Extension of Time to File: On or before August 15, 2017, the Parties will initiate any dispositive motions. Ordered by Judge Pamela K. Chen on 6/7/2017. (Lee, Helen) (Entered: 06/07/2017) |
| 07/18/2017 | 51 | NOTICE of Appearance by Chad L. Edgar on behalf of Oded Greenberg (aty to be noticed) (Edgar, Chad) (Entered: 07/18/2017) |
| 07/18/2017 | 52 | NOTICE of Appearance by Dawn M. Cardi on behalf of Oded Greenberg (aty to be noticed) (Cardi, Dawn) (Entered: 07/18/2017) |
| 08/03/2017 | 53 | Letter MOTION to Withdraw as Attorney *for Plaintiff, by Eric Nelson* by Oded Greenberg. (Nelson, Eric) (Entered: 08/03/2017) |
| 08/07/2017 | 54 | RESPONSE to Motion re 53 Letter MOTION to Withdraw as Attorney *for Plaintiff, by Eric Nelson* filed by Oded Greenberg. (Edgar, Chad) (Entered: 08/07/2017) |
| 08/08/2017 | | ORDER: By 8/15/2017, Mr. Nelson shall file a letter responding to 54 Plaintiff's August 7, 2017 letter. In light of the fact that Plaintiff has obtained new counsel, the August 15, 2017 deadline for the parties to initiate dispositive motions is adjourned. Ordered by Judge Pamela K. Chen on 8/8/2017. (Lee, Helen) (Entered: 08/08/2017) |
| 08/15/2017 | 55 | REPLY to Response to Motion re 53 Letter MOTION to Withdraw as Attorney *for Plaintiff, by Eric Nelson , As Per 8/8/17 Order (Hon. P.K. Chen, USDJ)* filed by Oded Greenberg. (Nelson, Eric) (Entered: 08/15/2017) |
| 08/17/2017 | 56 | RESPONSE to Motion re 53 Letter MOTION to Withdraw as Attorney *for Plaintiff, by Eric Nelson* filed by Oded Greenberg. (Edgar, Chad) (Entered: 08/17/2017) |
| 08/17/2017 | | SCHEDULING ORDER: A conference regarding the motion to withdraw as attorney for Plaintiff 53 shall be held on August 31, 2017, at 2:00 p.m. in Courtroom 4F North. Mr. |

| | | Eric Nelson and Plaintiff's attorneys at Cardi & Edgar LLP shall attend the conference. Ordered by Judge Pamela K. Chen on 8/17/2017. (Lee, Helen) (Entered: 08/17/2017) |
|---|---|---|
| 08/28/2017 | 57 | First MOTION to Adjourn Conference by Oded Greenberg. (Edgar, Chad) (Entered: 08/28/2017) |
| 08/28/2017 | | ORDER granting 57 Motion to Adjourn Conference: The conference is rescheduled to 8/30/2017, at 3:00 p.m. Ordered by Judge Pamela K. Chen on 8/28/2017. (Abdallah, Fida) (Entered: 08/28/2017) |
| 08/30/2017 | | Minute Entry for proceedings held before Judge Pamela K. Chen:Status Conference held on 8/30/2017. Appearances by Eric Nelson and Chad Edgar. The Court directed Mr. Nelson that he should transfer Dr. Greenberg's files to Mr. Edgar's firm, provided that Dr. Greenberg pays him a transfer fee of $2,500 plus the cost of copying non-electronic portions of the files. The Court did not determine the amount of Mr. Nelson's retaining and/or charging lien and noted that Dr. Greenberg and Mr. Nelson can reach an agreement to resolve that issue on their own or defer that issue for the Court to resolve after a motion for summary judgment is fully briefed. (Court Reporter Anthony Frisolone.) (Lee, Helen) (Entered: 08/30/2017) |
| 08/30/2017 | 58 | Letter *Regarding 8/30/17 Conference and Application to Withdraw* by Oded Greenberg (Nelson, Eric) (Entered: 08/30/2017) |
| 08/31/2017 | | ORDER granting 53 Motion to Withdraw as Attorney. Attorney Eric M. Nelson terminated. Ordered by Judge Pamela K. Chen on 8/31/2017. (Lee, Helen) (Entered: 08/31/2017) |
| 09/05/2017 | | ORDER: By October 2, 2017, Cardi & Edgar LLP shall provide the Court with the status of the transfer of Dr. Greenberg's files. Ordered by Judge Pamela K. Chen on 9/5/2017. (Lee, Helen) (Entered: 09/05/2017) |
| 10/02/2017 | 59 | Letter *re Status of Transfer of Files from Prior Counsel* by Oded Greenberg (Edgar, Chad) (Entered: 10/02/2017) |
| 10/11/2017 | | SCHEDULING ORDER: The Court grants the requested extension (Dkt. 59) and further gives Plaintiff *sua sponte* until October 27, 2017 to file a pre-motion conference request or advise the Court that he does not intend to file a summary judgment motion. In the latter event, the parties shall confer regarding a date by which they can submit a joint pre-trial order, which date will be set forth in Plaintiff's October 27, 2017 letter. Ordered by Judge Pamela K. Chen on 10/11/2017. (Abdallah, Fida) (Entered: 10/11/2017) |
| 10/12/2017 | 60 | MOTION to Continue *Time To File Pre-Motion Letters* by Oded Greenberg. (Edgar, Chad) (Entered: 10/12/2017) |
| 10/16/2017 | | ORDER: The Court grants the parties' motion for an extension of time 60 to submit pre-motion letters. Defendants will file their pre-motion letters by November 17, 2017. Plaintiff will file his answer by November 27, 2017. A pre-motion conference shall be held on January 11, 2018 at 12:30 p.m. in Courtroom 4F before Judge Pamela K. Chen. Ordered by Judge Pamela K. Chen on 10/16/2017.(Hess, Alexandra) (Entered: 10/16/2017) |
| 11/17/2017 | 61 | Letter MOTION for pre motion conference by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 11/17/2017) |
| 11/17/2017 | 62 | MOTION for pre motion conference by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 11/17/2017) |
| 11/27/2017 | 63 | Letter *Response to Defendants' Motions for Pre-Motion Conference* by Oded Greenberg |

| | | |
|---|---|---|
| | | (Edgar, Chad) (Entered: 11/27/2017) |
| 01/03/2018 | | SCHEDULING ORDER: Due to a change in the Court's schedule, a pre-motion conference shall be held on January 11, 2018 at **2:00 p.m.** in Courtroom 4F before Judge Pamela K. Chen. Ordered by Judge Pamela K. Chen on 1/3/2018. (Hess, Alexandra) (Entered: 01/03/2018) |
| 01/11/2018 | | MINUTE ENTRY: Pre Motion Conference held on 1/11/2018. Appearances by Chad L. Edgar for plaintiff; Ryan G. Shaffer for defendants SUNY Downstate, Reede, and Pulitzer and Matthew J. Lawson for defendants KCHC and HCC. Case called. Discussion held. The Court sets the following schedule for Defendants' motion for summary judgment: (1) Defendants' motion shall be served by March 12, 2018; (2) Plaintiff's opposition shall be served by May 11, 2018; and (3) Defendants' reply, if any, shall be served by May 25, 2018. |
| | | As a courtesy to the Court, the parties are encouraged to not file their motion papers until the motion is fully briefed. If the parties follow this practice, the motion and all supporting papers are to be served on the other parties along with a cover letter setting forth whom the movant represents and the papers being served. Only a copy of the cover letter should be filed electronically, as a letter, not as a motion. On the day the motion is fully briefed, in this case May 25, 2018, each party shall electronically file its moving papers, and provide one (1) courtesy copy of their entire submission(s) to the Court. (Court Reporter Annette Montalvo) (Hess, Alexandra) (Entered: 01/11/18) (Entered: 01/11/2018) |
| 02/07/2018 | 64 | NOTICE of Change of Firm Address and Fax Number Changed by Chad L. Edgar (Edgar, Chad) (Entered: 02/07/2018) |
| 03/02/2018 | 65 | First MOTION for Extension of Time to File *Motions for Summary Judgment and Ten Page Extension of Memorandum of Law* by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 03/02/2018) |
| 03/03/2018 | | ORDER: Defendants' motion 65 for extension of time and ten-page extension is granted. The Court sets the following schedule: Defendants' motions shall be served by March 26, 2018; Plaintiff's opposition shall be served by May 25, 2018; and Defendants' replies, if any, shall be served by June 8, 2018. Ordered by Judge Pamela K. Chen on 3/3/2018. (Hess, Alexandra) (Entered: 03/03/2018) |
| 03/26/2018 | 66 | Letter *re: Service of Motion for Summary Judgment* by Kings County Hospital Center, New York City Health and Hospitals Corporation (Shaffer, Ryan) (Entered: 03/26/2018) |
| 03/26/2018 | 67 | Letter *re Service of Motion for Summary Judgment* by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center (Coulston, Christopher) (Entered: 03/26/2018) |
| 04/24/2018 | 68 | NOTICE of Change of Office Address by Christopher Vance Coulston (Coulston, Christopher) (Entered: 04/24/2018) |
| 05/11/2018 | 69 | First MOTION for Extension of Time to File *Opposition to Defendants' Motions for Summary Judgment* by Oded Greenberg. (Edgar, Chad) (Entered: 05/11/2018) |
| 05/11/2018 | | ORDER granting 69 Motion for Extension of Time to File: (1) Plaintiff's opposition shall be served by June 15, 2018 and (2) Defendants' replies, if any, shall be served by July 20, 2018. Ordered by Judge Pamela K. Chen on 5/11/2018. (Hess, Alexandra) (Entered: 05/11/2018) |
| 06/08/2018 | 70 | Second MOTION for Extension of Time to File *Opposition to Defendants' Motions for Summary Judgment* by Oded Greenberg. (Edgar, Chad) (Entered: 06/08/2018) |

**A14**

| | | |
|---|---|---|
| 06/08/2018 | | ORDER granting, on consent, 70 Motion for Extension of Time to File: Plaintiff's opposition shall be served by June 29, 2018, and Defendants' replies, if any, shall be served by August 10, 2018. Ordered by Judge Pamela K. Chen on 6/8/2018. (Abdallah, Fida) (Entered: 06/08/2018) |
| 06/28/2018 | 71 | Third MOTION for Extension of Time to File *Oppositions to Motions for Summary Judgment* by Oded Greenberg. (Edgar, Chad) (Entered: 06/28/2018) |
| 06/28/2018 | | ORDER: Plaintiff's motion for extension of time and leave to file excess pages 71 is granted. The Court sets the following schedule: (1) Plaintiff's opposition (35 pages max) shall be served by July 6, 2018; (2) Defendants' replies, if any, shall be served by August 31, 2018. No further extensions will be granted absent extraordinary circumstances. Ordered by Judge Pamela K. Chen on 6/28/2018. (Hess, Alexandra) (Entered: 06/28/2018) |
| 07/06/2018 | 72 | Letter *re Service of Opposition Papers* by Oded Greenberg (Edgar, Chad) (Entered: 07/06/2018) |
| 08/02/2018 | 73 | First MOTION for Extension of Time to File *Reply in further support of motion for Summary Judgment* by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 08/02/2018) |
| 08/02/2018 | | ORDER granting 73 Motion for Extension of Time to File: Defendants' replies shall be served by September 14, 2018. Ordered by Judge Pamela K. Chen on 8/2/2018. (Hess, Alexandra) (Entered: 08/02/2018) |
| 09/11/2018 | 74 | First MOTION for Leave to File Excess Pages *to Reply Memorandum* by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/11/2018) |
| 09/12/2018 | | ORDER granting 74 Motion for Leave to File Excess Pages: The SUNY Defendants shall file their reply brief, maximum length of 18 pages, by September 14, 2018. Ordered by Judge Pamela K. Chen on 9/12/2018. (Hess, Alexandra) (Entered: 09/12/2018) |
| 09/14/2018 | 75 | First MOTION for Summary Judgment by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 76 | MOTION for Summary Judgment by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 77 | RULE 56.1 STATEMENT re 76 MOTION for Summary Judgment filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 78 | MEMORANDUM in Support re 76 MOTION for Summary Judgment filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 79 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Declaration of Steven Pulitzer, M.D.* filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 80 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Declaration of Deborah L. Reede, M.D.* filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 81 | AFFIDAVIT/DECLARATION in Support re 75 First MOTION for Summary Judgment |

| | | |
|---|---|---|
| | | filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S) (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 82 | RULE 56.1 STATEMENT re 75 First MOTION for Summary Judgment filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 83 | MEMORANDUM in Support re 75 First MOTION for Summary Judgment filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 84 | REPLY in Support re 75 First MOTION for Summary Judgment filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 85 | RULE 56.1 STATEMENT re 75 First MOTION for Summary Judgment *response to plaintiff's counter statement of facts* filed by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 86 | First MOTION for Summary Judgment by Kings County Hospital Center, New York City Health and Hospitals Corporation. (Shaffer, Ryan) (Entered: 09/14/2018) |
| 09/14/2018 | 87 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Declaration of Christopher Coulston* filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit OO, # 42 Exhibit PP, # 43 Exhibit QQ, # 44 Exhibit RR, # 45 Exhibit SS, # 46 Exhibit TT, # 47 Exhibit UU, # 48 Exhibit VV, # 49 Exhibit WW, # 50 Exhibit XX, # 51 Exhibit YY, # 52 Exhibit ZZ, # 53 Exhibit AAA, # 54 Exhibit BBB, # 55 Exhibit Greenberg Dep. Excerpts Dec. 7, # 56 Exhibit Greenberg Dep. Excerpts Jan. 23, # 57 Exhibit Pulitzer Dep. Excerpts Oct. 26, # 58 Exhibit Pulitzer Dep. Excerpts Jan. 24, # 59 Exhibit Reede Dep. Excerpts Nov. 18, # 60 Exhibit Reede Dep. Excerpts Jan. 26, # 61 Exhibit Jamaleddine Dep. Excerpts, # 62 Exhibit Bernadel Dep. Excerpts, # 63 Exhibit Arabian Dep. Excerpts, # 64 Exhibit Cuiman Dep. Excerpts, # 65 Exhibit Scott Dep. Excerpts) (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 88 | CERTIFICATE OF SERVICE by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center re 76 MOTION for Summary Judgment (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 89 | MEMORANDUM in Opposition re 75 First MOTION for Summary Judgment filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 90 | MEMORANDUM in Opposition re 76 MOTION for Summary Judgment filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 91 | RULE 56.1 STATEMENT re 75 First MOTION for Summary Judgment filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |

| 09/14/2018 | 92 | RULE 56.1 STATEMENT re 76 MOTION for Summary Judgment filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
|---|---|---|
| 09/14/2018 | 93 | AFFIDAVIT/DECLARATION in Opposition re 75 First MOTION for Summary Judgment , 76 MOTION for Summary Judgment *Declaration of Esther Neiman* filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 94 | AFFIDAVIT/DECLARATION in Opposition re 75 First MOTION for Summary Judgment , 76 MOTION for Summary Judgment *Declaration of Oded Greenberg* filed by Oded Greenberg. (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 95 | AFFIDAVIT/DECLARATION in Opposition re 75 First MOTION for Summary Judgment , 76 MOTION for Summary Judgment *Declaration of Chad L. Edgar* filed by Oded Greenberg. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15 (Part 1), # 16 Exhibit 15 (Part 2), # 17 Exhibit 15 (Part 3), # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30 Exhibit 28, # 31 Exhibit 29, # 32 Exhibit 30, # 33 Exhibit 31, # 34 Exhibit 32, # 35 Exhibit 33, # 36 Exhibit 34, # 37 Exhibit 35, # 38 Exhibit 36, # 39 Exhibit 37, # 40 Exhibit 38, # 41 Exhibit 39, # 42 Exhibit 40, # 43 Exhibit 41, # 44 Exhibit 42, # 45 Exhibit 43, # 46 Exhibit 44, # 47 Exhibit 45, # 48 Exhibit 46, # 49 Exhibit 47, # 50 Exhibit 48, # 51 Exhibit 49, # 52 Exhibit 50, # 53 Exhibit 51, # 54 Exhibit 52, # 55 Exhibit 53, # 56 Exhibit 54, # 57 Exhibit 55, # 58 Exhibit 56, # 59 Exhibit 57, # 60 Exhibit 58, # 61 Exhibit 59, # 62 Exhibit 60, # 63 Exhibit 61, # 64 Exhibit 62, # 65 Exhibit 63, # 66 Exhibit 64, # 67 Exhibit 65, # 68 Exhibit 66) (Edgar, Chad) (Entered: 09/14/2018) |
| 09/14/2018 | 96 | REPLY in Support re 76 MOTION for Summary Judgment filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 97 | RULE 56.1 STATEMENT re 76 MOTION for Summary Judgment *Counter-Response to Plaintiff's Response to SUNY Defendants Rule 56.1 Statement* filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 98 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Reply Declaration of Deborah L. Reede, M.D.* filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 99 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Reply Declaration of Steven Pulitzer, M.D.* filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/14/2018 | 100 | AFFIDAVIT/DECLARATION in Support re 76 MOTION for Summary Judgment *Reply Declaration of Christopher Coulston* filed by Steven Pulitzer, Deborah L Reede, State University Hospital - Downstate Medical Center. (Attachments: # 1 Exhibit CCC, # 2 Exhibit DDD, # 3 Exhibit EEE, # 4 Exhibit FFF, # 5 Exhibit GGG, # 6 Exhibit Greenberg Dep. Reply Excerpts, # 7 Exhibit Reede Dep. Reply Excerpts, # 8 Exhibit Scott Dep. Reply Excerpts, # 9 Exhibit Cuiman Dep. Reply Excerpts) (Coulston, Christopher) (Entered: 09/14/2018) |
| 09/17/2018 | | Motions terminated, docketed incorrectly: 75 First MOTION for Summary Judgment |

| | | |
|---|---|---|
| | | filed by New York City Health and Hospitals Corporation, Kings County Hospital Center. This is not a motion; it is a memorandum. No further action is needed. Do not re-file this document. The motion is correctly e-filed as doc #86. (Abdallah, Fida) (Entered: 09/17/2018) |
| 04/25/2019 | 101 | NOTICE of Appearance by Evan Michael Piercey on behalf of Kings County Hospital Center, New York City Health and Hospitals Corporation (aty to be noticed) (Piercey, Evan) (Entered: 04/25/2019) |
| 08/01/2019 | 102 | NOTICE of Appearance by Amanda Blair on behalf of Kings County Hospital Center, New York City Health and Hospitals Corporation (aty to be noticed) (Blair, Amanda) (Entered: 08/01/2019) |
| 09/29/2019 | 103 | ORDER: For the reasons stated herein Defendants' 76 86 motions for summary judgment are granted in their entirety. All claims against KCHC are dismissed because it is not a suable entity. Plaintiff's claims against SUNY and SUNY-Employees in their official capacities, seeking damages pursuant to § 1983, and Plaintiff's damages claims against SUNY and SUNY-Employees pursuant to the NYSHRL and NYCHRL, are dismissed under the Eleventh Amendment. Plaintiff's remaining claims for FMLA interference and retaliation, Title VII discrimination and retaliation, § 1981 discrimination and retaliation, and § 1983 discrimination claims are dismissed for failure to establish a *prima facie* case. In light of the Court's dismissal of all of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiffs remaining NYSHRL and NYCHRL claims, which are dismissed without prejudice.<br><br>The Clerk of Court is respectfully directed to enter judgment and close this case accordingly. Ordered by Judge Pamela K. Chen on 9/29/2019. (Wisotsky, Shira) (Entered: 09/29/2019) |
| 10/29/2019 | 104 | NOTICE OF APPEAL as to 103 Order on Motion for Summary Judgment,,,,,,,,, by Oded Greenberg. Filing fee $ 505, receipt number ANYEDC-11991881. (Edgar, Chad) (Entered: 10/29/2019) |
| 10/29/2019 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 104 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 10/29/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2020 12:39:43 | | | |
| **PACER Login:** | phpappeals10east | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:15-cv-02343-PKC-VMS |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

ODED GREENBERG, M.D.,

                    Plaintiff,

          -against-                                         15 CV 2343 (PKC/VMS)

STATE UNIVERSITY HOSPITAL-DOWNSTATE
MEDICAL CENTER a/k/a THE STATE UNIVERSITY OF
NEW YORK HEALTH SCIENCE CENTER AT BROOKLYN           **SECOND**
a/k/a SUNY DOWNSTATE MEDICAL CENTER, NEW             **AMENDED COMPLAINT**
YORK CITY HEALTH AND HOSPITALS CORPORATION,          **AND DEMAND**
KINGS COUNTY HOSPITAL CENTER, DEBORAH L.             **FOR JURY TRIAL**
REEDE, STEVEN PULITZER, and JOHN and JANE DOES        (Redacted)
1-20,

                    Defendants.

--------------------------------------------------------------------X

          Plaintiff Oded Greenberg, M.D. ("Plaintiff"), as and for his second amended

complaint against defendants State University Hospital-Downstate Medical Center a/k/a The State

University of New York Health Science Center at Brooklyn a/k/a SUNY Downstate Medical Center

("Downstate"); New York City Health and Hospitals Corporation ("HHC"); Kings County Hospital

Center ("KCHC"); Deborah L. Reede ("Reede"); Steven Pulitzer ("Pulitzer"), and John and Jane

Does 1 through 20 ("Does 1-20") (collectively, "Defendants"), hereby alleges, upon information and

belief, as follows:

                          **Parties and Jurisdiction**

          1.     Plaintiff is a natural person and a citizen of both the United States of America

and the State of New York, with a residence, as well as his principal place of abode, located in

Brooklyn, New York.  Plaintiff is White (Caucasian) and of the Jewish faith.  At all times relevant

herein, Plaintiff has been a physician, board-certified in both Diagnostic Radiology and Anatomic

Pathology; fellowship-trained in Body Imaging; and duly licensed and authorized to practice

medicine and radiology in the State of New York.  From in or about April 2001 through on or about

October 22, 2014, Plaintiff was employed by Defendants as a physician and radiologist, and held,

2

at various times, certain positions and titles attendant thereupon and/or related thereto including, but not necessarily limited to, Director of ER Radiology at KCHC. At the time of Defendants' wrongful acts as described hereinbelow, Plaintiff was at least fifty-four (54) years of age.

2.      Defendant Downstate is a duly authorized and existing agency and/or instrumentality of the State of New York which is and/or operates a hospital located at 450 Clarkson Avenue, Brooklyn, New York 11203, and maintains its principal place of business at that address. At all times relevant herein, John F. "Skip" Williams has been the President, Pamela Sass has been the Dean, and Michael Lucchesi has been the Chief Medical Officer, of Downstate.

3.      Defendant HHC is a body corporate and politic, created pursuant to Section 7384 of the Unconsolidated Laws of the State of New York, with its principal place of business located at 125 Worth Street, New York, New York 10013. At all relevant times, HHC has been, and continues to be, engaged in the provision of health and medical services to citizens and other persons in the City of New York pursuant to Section 7382 of said Unconsolidated Laws, including through certain hospitals, one of which is, and at all times relevant herein has been, KCHC.

4.      Defendant KCHC is a hospital and agency or instrumentality of HHC, with its principal place of business located at 451 Clarkson Avenue, Brooklyn, New York 11203. At all times relevant herein, KCHC maintained and, upon information and belief, continues to date to maintain, an affiliation agreement with Downstate. Pursuant to that affiliation agreement, Plaintiff was assigned by Defendants to perform, and at all times relevant herein actually principally performed, his daily duties as a radiologist at KCHC.

5.      Defendant Reede is a natural person and a resident of the State of New York with a residence, as well as her principal place of abode, located at **REDACTED**. Reede's office, as well as her principal place of business, is located at 450 Clarkson Avenue, Brooklyn, New York 11203. Reede is Black (African- or Caribbean-American) and not of the Jewish faith. At various times relevant herein, Reede was (and continues to date to be) a professor and the Chairperson of the Department of Radiology at Downstate.

3

6.     Defendant Pulitzer is a natural person and a resident of the State of New York with a residence, as well as his principal place of abode, located at **REDACTED.**  Pulitzer's office, as well as his principal place of business, is located at 451 Clarkson Avenue, S Building, Brooklyn, New York 11203.  At various times relevant herein, Pulitzer was (and continues to date to be) an assistant professor at Downstate and Director of Radiology at KCHC.

7.     Defendants Does 1 through 20 are or were directors, officers, employees, agents, representatives, staff, successors, assigns, aiders and abettors, and/or co-conspirators of Defendants Downstate, HHC, KCHC, Reede and/or Pulitzer in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to Plaintiff.  The true names and capacities of Does 1-20 are presently unknown to Plaintiff, and Plaintiff accordingly sues such defendants by such fictitious names.  Upon discovery of their true names and capacities, Plaintiff will amend this Complaint to add said persons or other entities as additional named defendants herein, or otherwise identify them as per instruction or direction of the Court.

8.     This Court has jurisdiction over the subject matter of this action, which is brought under various federal, state and city enactments including Sections 1331, 1337(a), 1367(a) and 2201 of Title 28, United States Code, 28 U.S.C. §§ 1331, 1337(a), 1367(a) and 2201, as amended; Section 2000e, *et seq.,* of Title 42, U.S. Code ("Title VII" of the Civil Rights Acts of 1964 and 1991), 42 U.S.C. § 2000e, *et seq.,* as amended; Sections 1981 and 1983 of Title 42, United States Code, 42 U.S.C. §§ 1981 and 1983, as amended ("Section 1981" and "Section 1983," respectively); the Fourteenth Amendment to the United States Constitution, and in particular, the Equal Protection Clause thereof; Section 2601, *et seq.,* of Title 29, United States Code, 29 U.S.C. §§ 2601, *et seq.,* as amended (the "FMLA"); Section 290, *et seq.,* of the Executive Law of the State of New York, N.Y. Exec. L. § 290, *et seq.,* as amended, commonly known as the New York State Human Rights Law (the "NYSHRL"); Title 8, Chapter 1, of the Administrative Code of the City of New York, N.Y.C. Admin. Code § 8-101, *et seq.,* as amended, commonly known as the New York

4

City Human Rights Law (the "NYCHRL"); and principles of ancillary, pendent and supplemental jurisdiction.

9.      Defendants are all employers within the meaning of the various statutes identified hereinabove and below, and/or otherwise pursuant to the statutes or common law under which one or more claims are brought herein.

10.      On October 1, 2015, the U.S. Department of Justice issued, and on October 7, 2015, Plaintiff received, Right to Sue letters with respect to charges which he had previously filed with the U.S. Equal Employment Opportunity Commission (the "EEOC") on February 9, 2015, under Charge Nos. 520-2015-01218 and 520-2015-01423.  Plaintiff has accordingly timely and properly fulfilled all statutory and/or other prerequisites, if any, to the bringing of each and all of the claims and causes of action stated hereinbelow with respect to which a prior EEOC, or other administrative agency, filing was or is required.

11.      At all times relevant herein, and with respect to each statute under which one or more claims is brought herein, Defendants employed more than the required minimum number of employees, if any, and Plaintiff had worked for more than the required minimum period of time, and more than the required minimum number of hours within any statutorily relevant period, if any. All other statutory and/or other procedural prerequisites for Plaintiff to be able to sue thereunder, and for each, and all, of the Defendants to be subject to, and liable thereunder, if any, have been met, satisfied and/or otherwise timely and properly fulfilled.

12.      Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b).

**Facts Giving Rise to This Action**

Plaintiff's Early History at Downstate and KCHC

13.      Plaintiff's medical career spans more than thirty (30) years, and includes a spotless employment record with Defendants.  Plaintiff first attended medical school at Downstate, and then worked as a medical resident, first in pathology, then radiology, for Defendants.  After a one-year fellowship in body imaging at Emory University, and several years in private practice,

5

Plaintiff returned to Defendants as a board-certified radiologist and attending physician in April 2001.  Over the course of thirteen-and-one-half (13½) years of service to Defendants thereafter, Plaintiff was assigned to work, and in fact worked, principally at KCHC, in its emergency room (the "ER") and "ER [radiology] reading room."

14.     At all times relevant herein, Plaintiff's responsibilities as an attending physician in KCHC's ER included interpreting imaging studies (*e.g.,* X-rays, CT scans, MRIs and ultrasounds), consulting and otherwise working closely with both resident and attending physicians in a variety of specialties and subspecialties, principally Radiology, Emergency Medicine and Surgery, and often attending rounds and/or discussing with them (and sometimes examining) patients.

15.     Over the course of his employment with Defendants, Plaintiff was highly regarded both by his colleagues and medical residents, and was considered by many to be the most accurate, available and versatile radiologist in KCHC's Department of Radiology.  His expertise included, and continues to include, ER Radiology, Body Imaging, Neuroradiology, Pediatric Radiology, Gastrointestinal Radiology, Musculoskeletal Radiology and Chest Imaging.  Plaintiff served as Director of ER Radiology at KCHC from 2005 to 2009.

16.     Plaintiff's employment with Defendants proceeded without incident from its commencement until at least mid-2013.  At that time, Defendants hired Reede as Chairperson of their Department of Radiology.

The Hiring of Defendant Reede

17.     Almost immediately after assuming the position of Department Chairperson, Reede began an effort to reduce the number of non-Black (principally White/Caucasian), and particularly Jewish, physicians and other personnel in the department, and increase the number who were/are Black (African- or Caribbean American), non-Jewish and largely, if not uniformly, younger. Such actions included the outright discharge of several White, Jewish and/or older physicians and other personnel; the slashing of the compensation of other White (including Jewish) and/or older

6

physicians and other personnel who were not immediately discharged (while the compensation of Black, non-Jewish and/or younger physicians was maintained); and the micro-management of those physicians in the conduct of their daily duties.  Black, non-Jewish and/or younger physicians, in contrast, were permitted greater freedom, and leeway, under applicable rules and policies.

18.     The actions taken against White, Jewish and older physicians and other personnel who were not immediately discharged were, upon information and belief, designed and intended to prompt or pressure those physicians and other personnel into retiring or otherwise resigning their positions, and/or to otherwise prefer Black over White (including Jewish) and/or younger over older physicians and other personnel in compensation and/or cost-cutting decisionmaking.  Upon information and belief, Reede also effectuated each dismissal of a White, Jewish and/or older physician with little or no notice to the affected individual.

19.     Over the period from mid-2013 through October 2014, Reede's actions included the outright dismissal of at least five (5) White (Caucasian), Jewish, older physicians (Plaintiff; Catherine Mason, M.D.; Daphne Roitberg, M.D.; David Areman, M.D., and Alan Kantor, M.D.); three other older, non-Black physicians (Gautam Mirchandani, M.D., Jaya Nath, M.D., and Woo Choi, M.D.); and at least one White, Jewish administrative employee (Esther Neiman). Plaintiff was discharged by Defendants on or about October 22, 2014.  Another White, Jewish radiologist (Hyman Schwarzberg, M.D.) had his compensation substantially reduced.  In contrast, and notwithstanding productivity substantially inferior to most or all of the physicians who were dismissed, Reede retained, among others, Stephen Waite, M.D., a Black radiologist, and also excused certain conduct by Dr. Waite which, had it been committed by a White, Jewish and/or older physician, would have prompted formal discipline.

20.     During said period, Reede also saw to the hiring of several physicians (and, in the case of the discharged administrative employee, a non-Jewish administrative employee replacement) who were/are Black, non-Jewish and younger than their predecessors, including Rhonda Osborne, M.D., who replaced Catherine Mason, M.D., and Jinel Scott-Moore, M.D., who

7

replaced Plaintiff and/or Dr. Areman.  All, or virtually all, of the Black, non-Jewish and/or otherwise younger physicians and other personnel hired by Reede to replace Plaintiff and the other White, Jewish and older physicians and other personnel whom she had discharged were also of substantially lesser experience and/or qualifications than those whom she and the other Defendants had discharged.

Defendant Reede's Racial and Religious Bias

21.     At, or around, the time of this campaign by Reede to materially alter, both racially and religiously, the composition of the Radiology Department, and to make it younger, Reede also made no secret of her unfavorable view of Jews.  Among other things, Reede made statements which disparaged and/or stereotyped Jews, cast them in a negative light, or otherwise made clear her plain and obvious bias against them on the basis of their race and religion.

22.     Among the remarks made by Reede were references to several Orthodox Jewish physicians collectively as "you people" and "those people," as well as open expressions of upset that they, on their lunch hour, would meet on department premises for midday religious prayers.  Upon observing certain Orthodox Jewish physicians' gatherings for prayer, in fact, Reede announced that she would be taking away the room that they had been using therefor, and making it her own office.  Doing so, of course, would, and did, preclude any further use of it for the Orthodox Jewish physicians' prayer services.  Further, Reede separately directed that, from that point forward, said physicians would not be permitted to meet during the workday anywhere on department premises, to pray.

23.     Additionally, when two Orthodox Jewish physicians sought to create a work schedule that would permit them to avoid having to work on the Jewish High Holidays (Rosh Hashanah and Yom Kippur), Reede referred to them as "birds of a feather."  Separately, referring to Martin Luther King Jr. Day, Reede also pointedly stated to several White, Jewish physicians on one or more occasions, in words or substance, that, "I know you don't care, but this is our [i.e., Blacks'] holiday."  Reede was also separately heard to express a dislike for White (Caucasian)

people generally, as well as for, particularly, how many Whites were (then) employed in her (*i.e.,* the radiology) department.

<u>The Unlawfully Biased Denial of Plaintiff's Reappointment as Director of ER Radiology</u>

24.     Reede initially visited her unlawful bias upon Plaintiff in July 2014, by denying his application for reappointment and promotion to the position of Director of ER Radiology.  At that time, Plaintiff already possessed qualifications for the position superior to that of any other candidate, including from having served estimably in it several years earlier.  Plaintiff had voluntarily relinquished the position in 2009 to be able to work from home (performing teleradiology) while he cared for one of his sons, Jayden, a child with special needs.  It had then been assumed by David Areman, M.D., a physician and radiologist who is of the Orthodox Jewish faith.

25.     In or about July 2014, Reede dismissed Dr. Areman.  The position of Director of ER Radiology thus again became available.  Plaintiff requested reinstatement/reappointment to the position.  At the time, he was the radiologist in the department who was, by far, the most experienced, and best qualified, for the post.  Notwithstanding Plaintiff's application, however, Reede denied it to him and, instead, hired Dr. Scott-Moore, a new, much younger, Black, non-Jewish radiologist, whom Plaintiff himself had actually supervised during her residency just a few years earlier, to assume it.

26.     Upon information and belief, at the time of her hiring, Dr. Scott-Moore was eight (8) or fewer years out of residency, and had no publications.  She also lacked Plaintiff's board certification in two specialties, his fifteen (15) years of experience in ER Radiology, and his approximately twenty (20) years of experience in radiology overall (including in academic institutions, private practice, and teleradiology), especially in interpreting acute care imaging – the "stock in trade" of ER Radiology.  Dr. Scott-Moore, however, was (and is) approximately twenty (20) years younger than Plaintiff, Black and, upon information and belief, non-Jewish.

27.     At a meeting with Plaintiff on or about July 22, 2014, Reede stated, in connection with hiring Scott-Moore as Director of ER Radiology, that, regardless of Dr. Scott-

9

Moore's lack of experience or merit, she (Dr. Reede) wanted someone younger and "closer to residency."  Her purported reason was because she believed they would be better able to relate to, and educate, resident (*i.e.,* younger) physicians.

<u>The Events of Early September 2014</u>

28.    Aside from being White, Jewish, and substantially older than his replacement, Plaintiff is a parent of two young children, one of whom (Jayden) has special needs due to disability. At all times relevant herein, Defendants have been aware of this.  In their very first meeting, in fact, shortly after her hiring as department chairperson, Reede and Plaintiff had a conversation about their children in which Plaintiff specifically mentioned Jayden and his condition.

29.    On or about August 28, 2014, Plaintiff had been informed by Jayden's then-current school that, due to difficulties related to his disability, Plaintiff's immediate attention was required to the making of arrangements for Jayden to be cared for and schooled elsewhere.

30.    The very next day, August 29, 2014, Plaintiff informed Defendants both of his emergent need for leave to care for his son, and in particular, that he would be unable to work on two days the following week – September 4 and 5 – for that reason.  Instead of simply planning to "call in sick" on those dates, Plaintiff inquired what the proper steps were for obtaining leave therefor.

31.    Having received no response, on or about September 2, 2014, Plaintiff also spoke with Pulitzer, his immediate superior, to inform him, as well, of his (Plaintiff's) need for leave on September 4 and 5.  Plaintiff did so not only to make sure Pulitzer, too, knew of his need and request for leave, but out of professionalism, and consideration for Defendants (and Pulitzer specifically), as well, including so that Pulitzer would have time to obtain "coverage" for the department during Plaintiff's brief leave.

32.    At that time, as well as at all other times relevant herein, Pulitzer, also, was aware that Plaintiff had a child with special needs.  Regardless, Pulitzer, acting on behalf of Defendants, responded to Plaintiff's notice and request by informing him that the department was

10

short-staffed, and he (Plaintiff) thus could not take the leave he sought.

33.    Plaintiff reiterated his request to Pulitzer on September 3.  Pulitzer then consulted with Reede, and a short while later, presented Plaintiff with a document stating, in writing, that Plaintiff's request for leave on September 4 and 5 had been denied, and that if he failed to appear for work on those days, he, and the matter generally, would be referred to "Labor Relations."

34.    Upon being presented with the document, Plaintiff told Pulitzer that he didn't think that it was fair that Defendants were forcing him to choose between his career and his family, but that he had no alternative except to address his urgent family need.  Pulitzer responded, "I hope you know what you are doing."

35.    Early on the morning of September 4, Plaintiff again reiterated his need for family leave, and a brief absence, in yet another email to Defendants.  He then took that day, and the next, for such leave, notwithstanding Defendants' prior denial.

36.    Unexpectedly and coincidentally, Plaintiff injured his back getting out of bed on the morning of September 4, and was thereupon unable to stand or walk without severe pain.

37.    That same day, September 4, unbeknownst to Plaintiff, Defendants sent Plaintiff a letter (the "September 4 letter") directing him come to their Labor Relations office prior to returning to work, but to not otherwise come on Downstate's or KCHC's premises without first making an appointment with, and reporting to, their Office of Public Safety.  The letter made no mention of discipline, nor gave any notice thereof, nor did it state the time(s) or date(s) of, or even allege that Plaintiff had committed, any offense, much less identify what offense(s), if any, Plaintiff was being alleged to have committed.  Defendants "cc'd" (*i.e.,* copied) Plaintiff's union, United University Professions ("UUP"), on the September 4 letter.

38.    The collective bargaining agreement then in force between one or more of Defendants on the one hand, and UUP on the other, covering Plaintiff and the position in which he was then employed (hereinafter, the "CBA"), required all such information to be included in any notice intended for a disciplinary purpose, or otherwise with respect to any alleged misconduct or

wrongdoing by a covered (*i.e.,* "PSNU") employee.  Upon information and belief, the CBA also required Defendants to contemporaneously (*i.e.,* within five (5) days) notify UUP that a notice of discipline has been sent to a PSNU member.

39.    No meeting addressing possible discipline of a PSNU member may properly take place until both UUP has been given such notice(s), and the period of time prescribed by the CBA therefor has elapsed.  Plaintiff, however, neither heard nor received anything from UUP upon, or otherwise in response to, its receipt of the September 4 letter.

40.    Notwithstanding still suffering substantial back pain and associated difficulty, Plaintiff tried to return to work on Monday, September 8.  That morning, Plaintiff first notified a colleague at his work location – the KCHC ER "reading room" – that he would be late.  He then first accompanied Jayden to his first day at his new school, and then visited an "urgent care" clinic, where he was examined by a physician for his back injury.  Upon examining Plaintiff, the physician there noted that Plaintiff's back muscles were in "spasm," and gave Plaintiff both a prescription for muscle relaxers, and a treatment plan.  Plaintiff then traveled to KCHC, arriving at approximately 11:30 a.m.

41.    Notwithstanding his condition, Plaintiff promptly returned to his duties, reading multiple studies on critically ill patients, and making recommendations for follow-up studies on several.  At or around 1:00 p.m., however, Pulitzer instructed Plaintiff to log off his computer and immediately go to Defendants' Labor Relations office.  Plaintiff did so, though without any time or opportunity to request that a UUP representative join and represent him thereat.

42.    Upon information and belief, Defendants had provided no advance notice of the September 8 meeting to UUP, or any agent or representative thereof.  No agent or representative of UUP attended the meeting, nor did any otherwise in any way participate, assist or represent Plaintiff in connection with it, or any of Defendants' actions against Plaintiff prior to, or on, that date.

43.    At the September 8 meeting, which lasted in excess of four (4) hours, Plaintiff, notwithstanding his continuing back pain, was interrogated, and was kept waiting for several hours

12

without food or an opportunity to either obtain the medicine he had just been prescribed for his back pain, or to take other medication which had previously been prescribed for him (for anxiety and depression).  He was then presented with a document which had already been prepared by Defendants, apparently in anticipation of his attempt to return to work that day (the "Extorted Agreement").  Plaintiff was informed that the Extorted Agreement was his only alternative if he wanted to be able to return to his duties instead of having his pay suspended and suffering other, unspecified disciplinary action for having taken the two days of leave (September 4 and 5) notwithstanding Defendants' denial.

44.     Had Plaintiff been discharged or otherwise prevented from continuing his employment as of September 8, 2014, he would not only have suffered an immediate loss of necessary family income, he also would not have vested in, or otherwise would have lost or suffered an impairment, reduction or other loss with respect to, certain of his retirement/health benefits.

45.     At the time Plaintiff was presented with the Extorted Agreement, he was exhausted after Defendants' lengthy interrogation; still in substantial pain; had had no break for lunch or medication; was without any union representation or advice; and had been allowed no interval, reasonable or otherwise, to either review and consider the Extorted Agreement himself, or obtain legal counsel to advise him regarding it.  The Extorted Agreement specified that, because Plaintiff had taken "unauthorized" leave, as well as because of certain alleged administrative failures (*e.g.,* "switching schedule without authorization of his supervisor"), he: (a) would not be permitted any further days off without prior approval by Defendants; (b) waived any and all other rights he might have or have had (including to whatever process was or would otherwise have been available to him or within his rights as a member of UUP); (c)  could thereafter be discharged at any time and for any reason (or for no reason at all), solely at Defendants' discretion, notwithstanding the CBA or any other rights which he might otherwise have or have had; and (d) would have no right or recourse in such event, or any process available to him to challenge such discharge, or appeal, whether under the CBA, any other extant procedures available to employees of Defendants, or

13

otherwise.

46.     Unaware of his rights (including, but not limited to, under the CBA and the FMLA), and without union representation, but knowing that he needed to be able to return to work to continue to provide for his family, as well as fulfill his immediate duties to several patients with respect to whom he had recommended follow-up examinations earlier that day, Plaintiff signed the Extorted Agreement.  Defendants thereupon permitted him to return to work, and Plaintiff did so.

Plaintiff's Unlawful Discharge

47.     Several weeks later, on or about September 23, 2014, Plaintiff informed Pulitzer that he again needed, on an emergent basis, an extremely brief leave – approximately two hours that afternoon – to attend to his son's care and well-being.  Again Pulitzer, acting for Defendants, denied Plaintiff's request, claiming insufficient staffing.

48.     In light of this second denial, Plaintiff first arranged for another physician to cover for him, and then, instead of taking the brief afternoon leave he had requested, took merely his lunch hour to attend to his family matter.  Upon his return, Plaintiff went directly to the ER to consult with several of his clinical colleagues regarding several patients, and also reviewed a CT scan on one of their monitors.  Only then did he return to the ER reading room.  In total – including his lunch hour away, his consultations and discussions, and his review of the CT scan – Plaintiff had been absent from the ER reading room for approximately ninety (90) minutes.

49.     Nevertheless, Defendants purportedly sent to Plaintiff, on or about October 3, another letter (the "October 3 letter"), this one directing him to report to Labor Relations at 11:00 a.m. on October 8 to "discuss allegations of insubordination, leaving the worksite without authorization and related matters."  Plaintiff, however, did not receive the October 8 letter, nor was he otherwise made aware of it before that date.

50.     That afternoon (October 8), Stephanie Bernadel, a member of Defendants' Labor Relations Department, who is also Black, phoned Plaintiff in the ER, asking why he had not attended the meeting.  Plaintiff responded that he had not received notice of any meeting, and so did

14

not know what she was referring to.  He asked what the meeting was for, and Bernadel responded

that it concerned his (alleged) violation of the terms of the agreement he had signed on September

8 – the Extorted Agreement – by taking unauthorized leave again.

51.    Because Plaintiff had not received notice of the October 8 meeting, it was

postponed until October 10.  In the interim, and until further notice, he was directed by Bernadel to

not return to work.

52.    At the October 10 meeting, Defendants in fact conducted what even they

themselves characterized as an "interrogation" of Plaintiff.  Again, no one from UUP attended.

Instead, in their absence, Plaintiff was again questioned by Bernadel, at length, about his lunch hour

"leave" on September 23.  Defendants also informed Plaintiff that he was being considered for

discharge for a second occasion of unauthorized leave and insubordination.

53.    During the interrogation, Plaintiff complained that he had been, and was

continuing to be, repeatedly denied leave to care for, or otherwise tend to or address the needs of,

his disabled child.  He stated that he believed he was being treated differently from, and less

favorably than, other physicians because of his race, religion and/or age, as well as because he had

a child with special needs.  Plaintiff asked Bernadel if he could file with the EEOC.  In response,

Bernadel stated that Plaintiff had waived that right based upon the agreement he had signed on

September 8 (the Extorted Agreement).

54.    A few days later, Plaintiff sent an email to Bernadel reiterating his complaint

and belief that he was being discriminated against.  In response, Bernadel informed Plaintiff that

such claims were handled by Defendants' "Office of Diversity."

55.    On or about October 20, yet another meeting was held between Defendants'

Labor Relations personnel (Bernadel and Leonzo Cuiman, Assistant Vice-President for Labor

Relations, who is also Black) and Plaintiff.  At this (third) meeting, Plaintiff's discharge was again

discussed, and he was offered the "opportunity" to resign his position in lieu of being discharged.

Plaintiff asked why he was not simply being permitted, under the FMLA, the brief leave he had

15

requested to care for his son.  He received no answer.  He also reiterated his intent to pursue a claim of discrimination with the EEOC, and declined to resign his longstanding position.

56.     Two days later, on or about October 22, 2014, Defendants discharged Plaintiff outright.

57.     Upon being discharged, Plaintiff was also denied any severance or separation pay, notwithstanding his more than thirteen (13) years of loyal and dedicated service.  Defendants further fought (unsuccessfully) his claim for unemployment compensation.  Upon information and belief, they thereafter also sought to prevent him from obtaining a similar position elsewhere.

58.     Each, and all, of Defendants' purported grounds for disciplining Plaintiff, whether on September 8 or any subsequent time; for the Extorted Agreement; and for their subsequent discharge of Plaintiff from his position, were and are pretextual.  Defendants' true bases for their adverse employment actions against Plaintiff were: discrimination against him on the basis of his race, religion and/or age; retaliation against him for complaining thereof and/or openly contemplating pursuit of his rights at the EEOC; retaliation against him for attempting to exercise, and then actually exercising, his FMLA rights; and the various other violations of the various statutes and other laws cited both hereinabove and below.

## AS AND FOR A FIRST CAUSE OF ACTION
(Violation of 29 U.S.C. § 2615(a))
(Against All Defendants)

59.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 58 hereof as if more fully set forth at length herein.

60.     At all times relevant herein, Defendants were all employers within the meaning of Section 101(4) of the FMLA, 29 U.S.C. § 2611(4), as amended.  At all times relevant herein, Plaintiff had worked for more than twelve months, and more than 1,250 hours in the immediately prior twelve months, for Defendants.  Plaintiff thus was an "eligible employee" of Defendants within the meaning of Section 101(2) of the FMLA, 29 U.S.C. § 2611(2), as amended, and an employee of Defendants who was entitled to leave pursuant to Section 102(a)(1)(d) of the

16

FMLA, 29 U.S.C. § 2612(a)(1)(D), as amended.

61.     By their various wrongful actions as described above, including but not limited to denying Plaintiff requested leave for which he was eligible and to which he was entitled under the statute, Defendants violated Section 105 of the FMLA, 29 U.S.C. § 2615, as amended.

62.     Defendants' actions were willful.

63.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A SECOND CAUSE OF ACTION**
(Violation of 29 U.S.C. § 2615(a))
(Against All Defendants)

64.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 63 hereof as if more fully set forth at length herein.

65.     At all times relevant herein, Defendants were all employers within the meaning of Section 101(4) of the FMLA, 29 U.S.C. § 2611(4), as amended.  At all times relevant herein, Plaintiff had worked for more than twelve months, and more than 1,250 hours in the immediately prior twelve months, for Defendants.  Plaintiff thus was an "eligible employee" of Defendants within the meaning of Section 101(2) of the FMLA, 29 U.S.C. § 2611(2), as amended, and an employee of Defendants who was entitled to leave pursuant to Section 102(a)(1)(d) of the FMLA, 29 U.S.C. § 2612(a)(1)(D), as amended.

66.     By their various wrongful actions as described above, including but not limited to discharging Plaintiff for taking leave for which he was eligible and to which he was entitled under the statute, Defendants violated Section 105 of the FMLA, 29 U.S.C. § 2615, as amended.

67.     Defendants' actions were willful.

68.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will

continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
(Retaliation in Violation of 29 U.S.C. § 2615(b))
(Against All Defendants)

69.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 68 hereof as if more fully set forth at length herein.

70.     Defendants' wrongful acts described above, including, but not limited to, their adverse actions taken against Plaintiff for objecting to and opposing their various actions and practices which were in violation of Section 105(a) of the FMLA, 29 U.S.C. § 2615(a), as amended, including but not limited to discharging Plaintiff for protesting their denial of his leave, and taking such leave notwithstanding such denial, constituted unlawful retaliation against Plaintiff in violation of Section 105(b) of the FMLA, 29 U.S.C. § 2615(b), as amended.

71.     Defendants' actions were willful.

72.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
(Discrimination in Violation of 42 U.S.C. § 2000e-2(a)(1))
(Against Downstate, HHC and KCHC)

73.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 72 hereof as if fully set forth at length.

74.     One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken against Plaintiff on the basis of his race, and constituted discrimination against him on the basis thereof with respect to his compensation, terms, conditions and privileges of employment, in violation of Title VII of the Civil

18

Rights Acts of 1964 and 1991, as amended, and particularly 42 U.S.C. § 2000e-2(a)(1).

75.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION
(Discrimination in Violation of 42 U.S.C. § 2000e-2(a)(2))
(Against Downstate, HHC and KCHC)

76.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 75 hereof as if fully set forth at length.

77.    One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken against Plaintiff on the basis of his race, and constituted discrimination against him on the basis thereof with respect to his compensation, terms, conditions and privileges of employment, in violation of Title VII of the Civil Rights Acts of 1964 and 1991, as amended, and particularly 42 U.S.C. § 2000e-2(a)(2).

78.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A SIXTH CAUSE OF ACTION
(Discrimination in Violation of 42 U.S.C. § 2000e-2(a)(1))
(Against Downstate, HHC and KCHC)

79.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 78 hereof as if fully set forth at length.

80.    One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken against Plaintiff on the basis of his religion, and constituted discrimination against him on the basis thereof with respect to his compensation, terms, conditions and privileges of employment, in violation of Title VII of the Civil

19

Rights Acts of 1964 and 1991, as amended, and particularly 42 U.S.C. § 2000e-2-(a)(1).

81.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

<u>AS AND FOR A SEVENTH CAUSE OF ACTION</u>
(Discrimination in Violation of 42 U.S.C. § 2000e-2(a)(2))
(Against Downstate, HHC and KCHC)

82.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 81 hereof as if fully set forth at length.

83.     One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken against Plaintiff on the basis of his religion, and constituted discrimination against him on the basis thereof with respect to his compensation, terms, conditions and privileges of employment, in violation of Title VII of the Civil Rights Acts of 1964 and 1991, as amended, and particularly 42 U.S.C. § 2000e-2(a)(2).

84.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

<u>AS AND FOR AN EIGHTH CAUSE OF ACTION</u>
(Discrimination/Retaliation in Violation of 42 U.S.C. § 2000e-3(a))
(Against Downstate, HHC and KCHC)

85.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 84 hereof as if fully set forth at length.

86.     One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken in retaliation and/or as reprisal for Plaintiff's opposition and/or objection to Defendants' various unlawful employment practices and/or conduct. Said acts, omissions, failures and refusals to act accordingly constituted violations

20

of Title VII, and particularly 42 U.S.C. § 2000e-3(a).

87.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A NINTH CAUSE OF ACTION
(Violation of 42 U.S.C. § 1981)
(Against All Defendants except HHC and KCHC)

88.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 87 hereof as if more fully set forth at length herein.

89.     Plaintiff is Caucasian.

90.     At all times relevant herein, Defendants employed Plaintiff within the meaning of Section 1981.

91.     By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of his race, in violation of Section 1981.

92.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

93.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A TENTH CAUSE OF ACTION
(Retaliation Under 42 U.S.C. § 1981)
(Against All Defendants except HHC and KCHC)

94.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 93 hereof as if more fully set forth at length herein.

95.     Plaintiff is Caucasian.

96.     At all times relevant herein, Defendants employed Plaintiff within the

meaning of Section 1981.

97.     By the acts and practices described above, Defendants retaliated against Plaintiff for complaining of disparate treatment on the basis of his race, in violation of Section 1981.

98.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

99.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
(Deprivation of Rights Under 42 U.S.C. § 1983)
(Against All Defendants)

100.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 99 hereof as if more fully set forth at length herein.

101.     The acts and practices undertaken by Defendants on the basis of Plaintiff's race, as described above, were unreasonable within the meaning of the Fourteenth Amendment to the United States Constitution and, in particular, the Equal Protection Clause thereof, and therefore violated Plaintiff's rights thereunder.

102.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A TWELFTH CAUSE OF ACTION
(Deprivation of Rights Under 42 U.S.C. § 1983)
(Against All Defendants)

103.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 102 hereof as if more fully set forth at length herein.

104.     The acts and practices undertaken by Defendants on the basis of Plaintiff's

22

religion, as described above, were unreasonable within the meaning of the Fourteenth Amendment to the United States Constitution and, in particular, the Equal Protection Clause thereof, and therefore violated Plaintiff's rights thereunder.

105.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
(Discrimination on the Basis of Race in Violation of N.Y. Exec. L. §§ 296(a) and 296(a)3-a(a))
(Against Downstate, HHC and KCHC)

106.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 105 hereof as if more fully set forth at length herein.

107.    Defendants' various wrongful actions as described above were taken against Plaintiff on the basis of his race, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Executive Law of the State of New York, and particularly Sections 296(a) and 296(a)3-a(a) thereof.

108.    Defendants' actions were willful.

109.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
(Discrimination on the Basis of Religion in Violation of N.Y. Exec. L. §§ 296(a) and 296(a)3-a(a))
(Against Downstate, HHC and KCHC)

110.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 109 hereof as if more fully set forth at length herein.

111.    Defendants' various wrongful actions as described above were taken against

23

Plaintiff on the basis of his religion, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Executive Law of the State of New York, and particularly Sections 296(a) and 296(a)3-a(a) thereof.

112.    Defendants' actions were willful.

113.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A FIFTEENTH CAUSE OF ACTION**
(Discrimination on the Basis of Age in Violation of N.Y. Exec. L. §§ 296(a) and 296(a)3-a(a))
(Against Downstate, HHC and KCHC)

114.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 113 hereof as if more fully set forth at length herein.

115.    Defendants' various wrongful actions as described above were taken against Plaintiff on the basis of his age, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Executive Law of the State of New York, and particularly Sections 296(a) and 296(a)3-a(a) thereof.

116.    Defendants' actions were willful.

117.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

24

**AS AND FOR A SIXTEENTH CAUSE OF ACTION**
(Retaliation in Violation of N.Y. Exec. L. § 296(a)7)
(Against Downstate, HHC and KCHC)

118.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 117 hereof as if more fully set forth at length herein.

119.    Defendants' various wrongful actions described above, including, but not limited to, their adverse actions taken against Plaintiff for complaining of their discrimination and otherwise objecting to and opposing their various actions and practices which were in violation of the Executive Law of the State of New York, constituted unlawful retaliation against Plaintiff in violation of the Executive Law of the State of New York, and particularly Section 296(a)7 thereof.

120.    Defendants' actions were willful.

121.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A SEVENTEENTH CAUSE OF ACTION**
(Aiding and Abetting Racial Discrimination in Violation of N.Y. Exec. L. § 296(a)6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

122.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 121 hereof as if more fully set forth at length herein.

123.    By their various wrongful actions as described above, Defendants aided and abetted, or attempted to aid and abet, the doing of various racially discriminatory acts forbidden by the Executive Law of the State of New York, in violation of Section 296(a)6 thereof.

124.    Defendants' actions were willful.

125.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

25

### AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
(Aiding and Abetting Religious Discrimination in Violation of N.Y. Exec. L. § 296(a)6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

126.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 125 hereof as if more fully set forth at length herein.

127.    By their various wrongful actions as described above, Defendants aided and abetted, or attempted to aid and abet, the doing of various religiously discriminatory acts forbidden by the Executive Law of the State of New York, in violation of Section 296(a)6 thereof.

128.    Defendants' actions were willful.

129.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A NINETEENTH CAUSE OF ACTION
(Aiding and Abetting Age Discrimination in Violation of N.Y. Exec. L. § 296(a)6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

130.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 129 hereof as if more fully set forth at length herein.

131.    By their various wrongful actions as described above, Defendants aided and abetted, or attempted to aid and abet, the doing of various age discriminatory acts forbidden by the Executive Law of the State of New York, in violation of Section 296(a)6 thereof.

132.    Defendants' actions were willful.

133.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

26

**AS AND FOR A TWENTIETH CAUSE OF ACTION**
(Aiding and Abetting Retaliation in Violation of N.Y. Exec. L. § 296(a)6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

134.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 133 hereof as if more fully set forth at length herein.

135.    By their various wrongful actions as described above, Defendants aided and abetted, or attempted to aid and abet, the doing of various retaliatory acts forbidden by the Executive Law of the State of New York, in violation of Section 296(a)6 thereof.

136.    Defendants' actions were willful.

137.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A TWENTY-FIRST CAUSE OF ACTION**
(Discrimination on the Basis of Race in Violation of N.Y.C. Admin. Code § 8-107.1(a))
(Against HHC and KCHC)

138.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 137 hereof as if more fully set forth at length.

139.    Defendants' various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, were taken against Plaintiff on the basis of his race, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Administrative Code of the City of New York, and particularly Section 8-107.1(a) thereof.

140.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

27

**AS AND FOR A TWENTY-SECOND CAUSE OF ACTION**
(Discrimination on the Basis of Religion in Violation of N.Y.C. Admin. Code § 8-107.1(a))
(Against HHC and KCHC)

141.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 140 hereof as if more fully set forth at length.

142.    Defendants' various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, were taken against Plaintiff on the basis of his religion, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Administrative Code of the City of New York, and particularly Section 8-107.1(a) thereof.

143.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A TWENTY-THIRD CAUSE OF ACTION**
(Discrimination on the Basis of Age in Violation of N.Y.C. Admin. Code § 8-107.1(a))
(Against HHC and KCHC)

144.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 143 hereof as if more fully set forth at length.

145.    Defendants' various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, were taken against Plaintiff on the basis of his age, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Administrative Code of the City of New York, and particularly Section 8-107.1(a) thereof.

146.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

28

**AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION**
( Retaliation in Violation of  N.Y.C. Admin. Code § 8-107.7)
(Against HHC and KCHC)

147.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 146 hereof as if more fully set forth at length.

148.    Defendants' various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, including, but not limited to, their discharge of Plaintiff, as well as the other adverse actions taken against him for objecting to and/or opposing their various actions and practices which were in violation of the Administrative Code of the City of New York, constituted unlawful retaliation against Plaintiff in violation of said Administrative Code, and particularly Section 8-107.7 thereof.

149.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION**
(Aiding and Abetting Racial Discrimination in Violation of
N.Y.C. Admin. Code § 8-107.6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

150.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 149 hereof as if more fully set forth at length.

151.    By their various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, Defendants aided and abetted, or attempted to aid and abet, the doing of various racially discriminatory acts forbidden by the Administrative Code of the City of New York, and in particular, in violation of Section 8-107.6 thereof.

152.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

29

## AS AND FOR A TWENTY-SIXTH CAUSE OF ACTION
(Aiding and Abetting Religious Discrimination in Violation of
N.Y.C. Admin. Code § 8-107.6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

153.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 152 hereof as if more fully set forth at length.

154.    By their various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, Defendants aided and abetted, or attempted to aid and abet, the doing of various religiously discriminatory acts forbidden by the Administrative Code of the City of New York, and in particular, in violation of Section 8-107.6 thereof.

155.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A TWENTY-SEVENTH CAUSE OF ACTION
(Aiding and Abetting Age Discrimination in Violation of
N.Y.C. Admin. Code § 8-107.6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

156.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 155 hereof as if more fully set forth at length.

157.    By their various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, Defendants aided and abetted, or attempted to aid and abet, the doing of various age discriminatory acts forbidden by the Administrative Code of the City of New York, and in particular, in violation of Section 8-107.6 thereof.

158.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

30

### AS AND FOR A TWENTY-EIGHTH CAUSE OF ACTION
(Aiding and Abetting Retaliation in Violation of
N.Y.C. Admin. Code § 8-107.6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

159.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 158 hereof as if more fully set forth at length.

160.    By their various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, Defendants aided and abetted, or attempted to aid and abet, the doing of various retaliatory acts forbidden by the Administrative Code of the City of New York, and in particular, in violation of Section 8-107.6 thereof.

161.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### PRAYER FOR RELIEF

**WHEREFORE** Plaintiff prays for the following relief:

(a)    actual, compensatory, incidental, consequential, liquidated and all other damages available under applicable law, each and all in amounts to be determined at trial, on each (and all) claim(s) with respect to which, and against each (and all) Defendant(s) against whom, such damages are awardable;

(b)    back pay, back bonuses, back pension and related retirement contributions, benefits, and all other compensation, remuneration and entitlements Plaintiff would have received absent Defendants' wrongful conduct, each and all in amounts to be determined at trial;

(c)    reinstatement, or front pay in lieu thereof, in an amount to be determined at trial;

(d)    punitive damages, in an amount to be determined at trial, as against all Defendants against whom punitive damages are awardable;

(e)    all actual costs, expenses and disbursements recoverable under applicable law and rules of court;

(f)    reasonable attorney's fees;

(g)    fees for experts and professionals;

31

(h)     interest on all of the foregoing amounts;

(i)     all permanent injunctive relief available and appropriate against each, and all, of the Defendants under applicable law including, but not limited to, promotion of Plaintiff to Director of ER Radiology, retroactive to the date of Defendants' denial thereof, with all of the rights, privileges, benefits and perquisites appurtenant thereto, as well as a permanent injunction against any retaliation by all Defendants, or any of them, against Plaintiff;

(j)     all declaratory relief available and appropriate against each, and all, of the Defendants under applicable law including, but not limited to declarations that the Defendants, as hereinabove alleged: violated the various statutes and common law cited herein; unlawfully denied Plaintiff promotion to Director of ER Radiology; unlawfully discharged Plaintiff; denied and/or otherwise interfered with Plaintiff's FMLA rights; discriminated against Plaintiff on the basis of his race, religion and/or age; aided and abetted same; violated Plaintiff's federal Constitutional right to equal protection of the laws; retaliated against Plaintiff for engaging in conduct protected by law; and aided and abetted same; and

(k)     all other relief available under applicable law which this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury upon each and every one of the causes of action asserted herein, and otherwise, with respect to which a trial by jury may be had.

Dated: New York, New York
           December 23, 2015

ERIC M. NELSON (EN-4307)
Attorney at Law


_____\s_____
112 Madison Avenue, Sixth Floor
New York, New York  10016
(212) 354-3666
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ODED GREENBERG, M.D.,

                              Plaintiff,

      - against -

SUNY Downstate et al.,

                              Defendants.

**ANSWER OF
DEFENDANT SUNY**

15-cv-2343 (PKC/VMS)

**ORIGINAL FILED BY
E.C.F.**

Defendants Dr. Deborah Reede, Dr. Steven Pulitzer (the "Individual Defendants"),

and The State University of New York ("SUNY")(together the "Defendants"), by their

attorney ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, answer

the Second Amended Complaint (the "Complaint") as follows:

Defendants deny the allegations contained in each unnumbered paragraph and

heading contained in the Complaint.

The Defendants deny any allegations in the Complaint that are not specifically

addressed herein.

## NATURE OF THE ACTION

1.      Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 1, except admit that Plaintiff is board

certified in Diagnostic Radiology and Anatomic Pathology; fellowship-trained in Body

Imaging; duly licensed and authorized to practice medicine and radiology in the State of

New York; Plaintiff was employed by SUNY Downstate; and Plaintiff was at one point

Director of ER Radiology.

2.      Defendants deny the allegations in Paragraph 2 and refer to N.Y.

Educ. Law §§ 351 and 352 for a more complete and accurate description of SUNY and

its authorization to conduct business in New York, except admit that it is located at 450
Clarkson Ave., Brooklyn, New York 11203 and that Dr. John Williams has been the
President and Dr. Michael Lucchesi has been the Chief Medical Officer of Downstate
since January 1, 2014.  Dr. Pamela Sass was the Interim Dean of the College of Medicine
from September 1, 2014 to July 1, 2015.

       3.     Defendants deny knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 3.

       4.     Defendants deny knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 4, except admit that KCHC is located
at 451 Clarkson Ave. and that Plaintiff worked as a radiologist at KCHC.

       5.     Defendants admit the allegations in Paragraph 5.

       6.     Defendants admit the allegations in Paragraph 6, except denies that
he resides at 141 West 71st Street, Penthouse A, New York, New York 10023.

       7.     Defendants deny knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 7.

       8.     Paragraph 8 states a legal conclusion as to which no response is
required.  To the extent a response is required, Defendants admit that Plaintiff purports to
bring the claims alleged in Paragraph 8, but deny that Plaintiff is entitled to any relief.

       9.     Paragraph 9 states a legal conclusion as to which no response is
required.

       10.     Paragraph 10 states a legal conclusion as to which no response is
required.  To the extent a response is required, Defendants deny the allegations in
Paragraph 10, except admit that Plaintiff filed a complaint with the U.S. Equal

Employment Opportunity Commission and that a right to sue letter was issued but deny

knowledge or information sufficient to form a belief as to when the letter was issued.

11.     Paragraph 11 states a legal conclusion as to which no response is

required.

12.     Paragraph 12 states a legal conclusion as to which no response is

required.

**Alleged Facts**

13.     The Defendants deny knowledge or information sufficient to form

a belief as to the truth of allegations in Paragraph 13, except deny that Plaintiff had a

spotless employment record and admit that Plaintiff worked principally at KCHC in the

emergency room and ER radiology reading room and began working at KCHC in April

2001 and that he worked there until October 2014.

14.     Defendants admit that Plaintiff's duties included but were not

limited to those alleged in Paragraph 14, except deny knowledge or information sufficient

to form a belief as to whether Plaintiff attended rounds and examined patients.

15.     The Defendants deny knowledge or information sufficient to form

a belief as to the truth of allegations in Paragraph 15.

16.     Defendants deny the allegations in Paragraph 16, except admit that

Defendant Reede was hired as the chairperson of the Department of Radiology.

17.     Defendants deny the allegations in Paragraph 17.

18.     Defendants deny the allegations in Paragraph 18.

19.     Defendants SUNY and Reede deny the allegations in Paragraph

19, except admit that Dr. Mason, Dr. Roitberg, Dr. Areman, Dr. Kantor, Dr. Mirchandani,

Dr. Nath, Dr. Choi, and Ms. Neiman were not renewed as employees in 2014, admit that Plaintiff was terminated, and admit that Dr. Waite remains employed by SUNY. Defendant Pulitzer denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, except admits that Dr. Mason, Dr. Roitberg, Dr. Areman, Dr. Kantor, Dr. Mirchandani, Dr. Nath, Dr. Choi, and Ms. Neiman were not renewed as employees in 2014, admit that Plaintiff was terminated, and admits that Dr. Waite remains employed by SUNY.

20.     Defendants SUNY and Reede deny the allegations in Paragraph 20, except admit that Dr. Jinel Scott-Moore replaced Dr. Areman.  Defendant Pulitzer denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20.

21.     Defendants SUNY and Reede deny the allegations in Paragraph 21.  Defendant Pulitzer denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21.

22.     Defendants SUNY and Reede deny the allegations in Paragraph 22.  Defendant Pulitzer denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22.

23.     Defendants SUNY and Reede deny the allegations in Paragraph 23.  Defendant Pulitzer denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23.

24.     Defendants SUNY and Reede deny the allegations in Paragraph 24, except admit that Plaintiff was not appointed as Director of ER Radiology in 2014, admit that Plaintiff was the Director of ER Radiology until 2009, and deny knowledge or

information sufficient to form a belief as to the reasons for Plaintiff relinquishing the position of Director of ER Radiology, whether Dr. Areman was appointed Director in 2009, and of Dr. Areman's religious beliefs.  Defendant Pulitzer denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, except admits that Plaintiff was the Director of ER Radiology until 2009.

25.     Defendants SUNY and Reede deny the allegations in Paragraph 25, except admit that Dr. Areman was dismissed, admit that Plaintiff was not appointed to the position of Director of ER Radiology, admit that Dr. Scott-Moore received the appointment, admit that Dr. Scott-Moore identifies as black and is younger than Plaintiff, admit that Plaintiff supervised Dr. Scott-Moore when he was a resident, and deny knowledge or information sufficient to form a belief as to the religious beliefs of Dr. Scott-Moore.  Defendant Pulitzer denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, except admits that Dr. Areman was dismissed, admit that Plaintiff was not appointed to the position of Director of ER Radiology, admit that Dr. Scott-Moore received the appointment, admit that Dr. Scott-Moore identifies as black and is younger than Plaintiff, and admit that Plaintiff supervised Dr. Scott-Moore when he was a resident

26.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, except admit that Dr. Scott-Moore is younger than Plaintiff, identifies as black, completed her residency in 2006, and has fewer years of experience in ER Radiology and radiology than Plaintiff.

27.     Defendants SUNY and Reede deny the allegations in Paragraph 27.  Defendant Pulitzer denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.

28.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, except admit that Plaintiff identifies as white and that Plaintiff has expressed that he has a child with special needs.

29.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29.

30.     Defendants deny the allegations in Paragraph 30, except admit that Plaintiff stated that he would not show up for work on September 4 and 5, 2014.

31.     Defendants SUNY and Pulitzer deny the allegations in Paragraph 31, except admit that Plaintiff informed Dr. Pulitzer that he would not show up for work on September 4 and 5, 2014.  Defendant Reede denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31.

32.     Defendants SUNY and Pulitzer deny the allegations, except admit that Plaintiff has expressed that he has a child with special needs and that the department was short-staffed at the time Plaintiff requested leave.  Defendants Reede denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32, except admits that the department was short-staffed at the time Plaintiff requested leave.

33.     Defendants deny the allegations in Paragraph 33, except admit that Plaintiff was informed that if he failed to appear for work on September 4 and 5, 2014 the matter would be referred to Labor Relations.

34.     Defendant Pulitzer denies the allegations in Paragraph 34, except admits that he said to Plaintiff "I hope you know what you are doing."  Defendants SUNY and Reede deny knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 34.

34.    35.    Defendants deny the allegations in Paragraph 35, except admit that
Plaintiff was absent from work on September 4 and 5, 2014 and deny knowledge or
information sufficient to form a belief as to whether Plaintiff emailed anyone at SUNY
on September 4.

36.    Defendants deny knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 36.

37.    Defendants respectfully refer the Court to the September 4, 2014
letter to Dr. Greenberg for a true statement of its contents, and deny any allegations in
Paragraph 37 inconsistent with that letter.

38.    Defendants respectfully refer the Court to the Collective
Bargaining Agreement referred to in Paragraph 38 for a true statement of its contents, and
otherwise aver that this Paragraph contains statements of law to which no response is
required.  To the extent a response is required, Defendants deny any allegations in
Paragraph 38 that are inconsistent with that agreement.

39.    Defendants respectfully refer the Court to the Collective
Bargaining Agreement referred for a true statement of its contents, and otherwise deny
any allegations in Paragraph 39 inconsistent with that agreement.  Defendants deny
knowledge or information sufficient to form a belief as to the truth of the allegations in
Paragraph 39 as to whether Plaintiff met with the UUP.

40.    Defendants deny knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 40, except admit that Plaintiff
returned to KCHC on September 8, 2015.

41.     Defendant SUNY denies the allegations in Paragraph 41, except admits that Plaintiff was told to report to the Labor Relations office and Plaintiff did so. Defendants Reede and Pulitzer deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, except admit that Plaintiff attended a meeting in the Labor Relations office.

42.     Defendant SUNY denies the allegations in Paragraph 42, except admits that no agent or representative of the Union Defendants was present at the meeting.  Defendants Reede and Pulitzer deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42.

43.     Defendant SUNY denies the allegations Paragraph 43, except admits that Plaintiff signed a settlement agreement and respectfully refers the Court to that agreement for a true statement of its contents.  Defendants Reede and Pulitzer deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, except admit that Plaintiff signed a settlement agreement and that agreement speaks for itself.

44.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45.     Defendant SUNY denies the allegations in Paragraph 45, except admits that Plaintiff signed a settlement agreement and respectfully refers the Court to the agreement for a true statement of its contents.  Defendants Reede and Pulitzer deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45, except admit that Plaintiff signed a settlement agreement respectfully refers the Court to the agreement for a true statement of its contents.

46.     Defendant SUNY denies the allegations in Paragraph 46, except admits that Plaintiff signed a settlement agreement and returned to work.  Defendants Reede and Pulitzer deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46, except admit that Plaintiff signed a settlement agreement and returned to work.

47.     Defendants SUNY and Pulitzer deny the allegations in Paragraph 47, except admit that Plaintiff requested additional leave from Defendant Pulitzer and that Defendant Pulitzer denied the request.  Defendant Reede denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47.

48.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48.

49.     Defendant SUNY denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49, except admits that Plaintiff was sent a letter on October 3 directing him to report to Labor Relations on October 8, 2014 at 11:00 a.m.  Defendants Reede and Pulitzer deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49.

50.     Defendant SUNY admits the allegations in Paragraph 50, except denies knowledge or information sufficient to form a belief as Plaintiff's contention that he did not receive notice of the meeting and denies Plaintiff's characterization of the September 8 agreement. Defendants Reede and Pulitzer deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50.

51.     Defendant SUNY denies the allegations in Paragraph 51, except admits that the meeting was postponed until October 10 and that Plaintiff was directed by

Ms. Bernadel not to return to work.  Defendants Reede and Pulitzer deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51.

52.     In response to the allegations in Paragraph 53, Defendant SUNY respectfully refers the Court to the transcript of the October 10 meeting, and denies any allegations in Paragraph 53 inconsistent with that transcript.  Defendants Pulitzer and Reede deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52.

53.     In response to the allegations in Paragraph 53, Defendant SUNY respectfully refers the Court to the transcript of the October 10 meeting, and denies any allegations in Paragraph 53 inconsistent with that transcript.  Defendants Pulitzer and Reede deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.

54.     Defendant SUNY denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54, except admits that Ms. Bernadel informed Plaintiff that claims of discrimination were handled by the Office of Diversity and she directed him to that office.  Defendants Pulitzer and Reede deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54.

55.     Defendant SUNY denies the allegations in Paragraph 55, except admits that a meeting was held on October 20 with Plaintiff, Ms. Bernadel and Mr. Cuiman present and that Plaintiff was informed that he would be terminated.  Defendants Pulitzer and Reede deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55.

56.     Defendants deny the allegations in Paragraph 56, except admit that Plaintiff was terminated on October 22, 2014.

57.     Defendant SUNY denies the allegations in Paragraph 57, except admit that Plaintiff did not receive severance or separation pay and deny knowledge or information sufficient to form a belief regarding the outcome of Plaintiff's unemployment claim.  Defendants Pulitzer and Reede deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57, except deny that they tried to prevent him from obtaining a similar position elsewhere.

58.     Defendants deny the allegations in Paragraph 58.

## ALLEGED FIRST CAUSE OF ACTION

59.     In response to the allegations incorporated in Paragraph 59, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 58.

60.     Paragraph 60 states a legal conclusion as to which no response is required.  To the extent a response is required, Defendants admit that Plaintiff purports to proceed on the legal bases asserted therein but denies that he states a claim or is entitled to recovery thereunder.

61.     Defendants deny the allegations in Paragraph 61.

62.     Defendants deny the allegations in Paragraph 62.

63.     Defendants deny the allegations in Paragraph 63.

## ALLEGED SECOND CAUSE OF ACTION

64.     In response to the allegations incorporated in Paragraph 64,

Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 63.

65.     Paragraph 65 states a legal conclusion as to which no response is required.  To the extent a response is required, Defendants admit that Plaintiff purports to proceed on the legal bases asserted therein but denies that he states a claim or is entitled to recovery thereunder.

66.     Defendants deny the allegations in Paragraph 66.

67.     Defendants deny the allegations in Paragraph 67.

68.     Defendants deny the allegations in Paragraph 68.

## ALLEGED THIRD CAUSE OF ACTION

69.     In response to the allegations incorporated in Paragraph 69, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 68.

70.     Defendants deny the allegations in Paragraph 70.

71.     Defendants deny the allegations in Paragraph 71.

72.     Defendants deny the allegations in Paragraph 72.

## ALLEGED FOURTH CAUSE OF ACTION

73.     In response to the allegations incorporated in Paragraph 73, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 72.

74.     Defendants deny the allegations in Paragraph 74.

75.     Defendants deny the allegations in Paragraph 75.

## ALLEGED FIFTH CAUSE OF ACTION

76.      In response to the allegations incorporated in Paragraph 76, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 75.

77.      Defendants deny the allegations in Paragraph 77.

78.      Defendants deny the allegations in Paragraph 78.

## ALLEGED SIXTH CAUSE OF ACTION

79.      In response to the allegations incorporated in Paragraph 79, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 78.

80.      Defendants deny the allegations in Paragraph 80.

81.      Defendants deny the allegations in Paragraph 81.

## ALLEGED SEVENTH CAUSE OF ACTION

82.      In response to the allegations incorporated in Paragraph 82, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 81.

83.      Defendants deny the allegations in Paragraph 83.

84.      Defendants deny the allegations in Paragraph 84.

## ALLEGED EIGHTH CAUSE OF ACTION

85.      In response to the allegations incorporated in Paragraph 85, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 84.

86.    Defendants deny the allegations in Paragraph 86.

87.    Defendants deny the allegations in Paragraph 87.

**ALLEGED NINTH CAUSE OF ACTION**

88.    In response to the allegations incorporated in Paragraph 88, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 87.

89.    Defendants admit that Plaintiff identifies as Caucasian.

90.    Paragraph 90 states a legal conclusion as to which no response is required.

91.    Defendants deny the allegations in Paragraph 91.

92.    Defendants deny the allegations in Paragraph 92.

93.    Defendants deny the allegations in Paragraph 93.

**ALLEGED TENTH CAUSE OF ACTION**

94.    In response to the allegations incorporated in Paragraph 94, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 93.

95.    Defendants admit that Plaintiff identifies as Caucasian.

96.    Paragraph 96 states a legal conclusion as to which no response is required.

97.    Defendants deny the allegations in Paragraph 97.

98.    Defendants deny the allegations in Paragraph 98.

99.    Defendants deny the allegations in Paragraph 99.

## ALLEGED ELEVENTH CAUSE OF ACTION

100.    In response to the allegations incorporated in Paragraph 100, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 99.

101.    Defendants deny the allegations in Paragraph 101.

102.    Defendants deny the allegations in Paragraph 102.

## ALLEGED TWELFTH CAUSE OF ACTION

103.    In response to the allegations incorporated in Paragraph 103, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 102.

104.    Defendants deny the allegations in Paragraph 104.

105.    Defendants deny the allegations in Paragraph 105.

## ALLEGED THIRTEENTH CAUSE OF ACTION

106.    In response to the allegations incorporated in Paragraph 106, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 105.

107.    Defendants deny the allegations in Paragraph 107.

108.    Defendants deny the allegations in Paragraph 108.

109.    Defendants deny the allegations in Paragraph 109.

## ALLEGED FOURTEENTH CAUSE OF ACTION

110.    In response to the allegations incorporated in Paragraph 110, Defendants repeat and incorporate by reference their responses to the allegations asserted

in Paragraphs 1 to 109.

111.    Defendants deny the allegations in Paragraph 111.

112.    Defendants deny the allegations in Paragraph 112.

113.    Defendants deny the allegations in Paragraph 113.

### ALLEGED FIFTEENTH CAUSE OF ACTION

114.    In response to the allegations incorporated in Paragraph 114, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 113.

115.    Defendants deny the allegations in Paragraph 115.

116.    Defendants deny the allegations in Paragraph 116.

117.    Defendants deny the allegations in Paragraph 117.

### ALLEGED SIXTEENTH CAUSE OF ACTION

118.    In response to the allegations incorporated in Paragraph 118, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 117.

119.    Defendants deny the allegations in Paragraph 119.

120.    Defendants deny the allegations in Paragraph 120.

121.    Defendants deny the allegations in Paragraph 121.

### ALLEGED SEVENTEENTH CAUSE OF ACTION

122.    In response to the allegations incorporated in Paragraph 122, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 121.

123.   Defendants deny the allegations in Paragraph 123.

124.   Defendants deny the allegations in Paragraph 124.

125.   Defendants deny the allegations in Paragraph 125.

**ALLEGED EIGHTEENTH CAUSE OF ACTION**

126.   In response to the allegations incorporated in Paragraph 126, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 125.

127.   Defendants deny the allegations in Paragraph 127.

128.   Defendants deny the allegations in Paragraph 128.

129.   Defendants deny the allegations in Paragraph 129.

**ALLEGED NINETEENTH CAUSE OF ACTION**

130.   In response to the allegations incorporated in Paragraph 130, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 129.

131.   Defendants deny the allegations in Paragraph 131.

132.   Defendants deny the allegations in Paragraph 132.

133.   Defendants deny the allegations in Paragraph 133.

**ALLEGED TWENTIETH CAUSE OF ACTION**

134.   In response to the allegations incorporated in Paragraph 140, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 133.

135.   Defendants deny the allegations in Paragraph 135.

136.   Defendants deny the allegations in Paragraph 136.

137.   Defendants deny the allegations in Paragraph 137.

## ALLEGED TWENTY-FIRST CAUSE OF ACTION

138.   In response to the allegations incorporated in Paragraph 138, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 137.

139.   Defendants deny the allegations in Paragraph 139.

140.   Defendants deny the allegations in Paragraph 140.

## ALLEGED TWENTY-SECOND CAUSE OF ACTION

141.   In response to the allegations incorporated in Paragraph 141, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 140.

142.   Defendants deny the allegations in Paragraph 142.

143.   Defendants deny the allegations in Paragraph 143.

## ALLEGED TWENTY-THIRD CAUSE OF ACTION

144.   In response to the allegations incorporated in Paragraph 144, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 143.

145.   Defendants deny the allegations in Paragraph 145.

146.   Defendants deny the allegations in Paragraph 146.

**ALLEGED TWENTY-FOURTH CAUSE OF ACTION**

147.    In response to the allegations incorporated in Paragraph 147, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 146.

148.    Defendants deny the allegations in Paragraph 148.

149.    Defendants deny the allegations in Paragraph 149.

**ALLEGED TWENTY-FIFTH CAUSE OF ACTION**

150.    In response to the allegations incorporated in Paragraph 150, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 149.

151.    Defendants deny the allegations in Paragraph 151.

152.    Defendants deny the allegations in Paragraph 152.

**ALLEGED TWENTY-SIXTH CAUSE OF ACTION**

153.    In response to the allegations incorporated in Paragraph 153, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 152.

154.    Defendants deny the allegations in Paragraph 154.

155.    Defendants deny the allegations in Paragraph 155.

**ALLEGED TWENTY-SEVENTH CAUSE OF ACTION**

156.    In response to the allegations incorporated in Paragraph 156, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 155.

157.    Defendants deny the allegations in Paragraph 157.

158.    Defendants deny the allegations in Paragraph 158.

### ALLEGED TWENTY-EIGHTH CAUSE OF ACTION

159.    In response to the allegations incorporated in Paragraph 159, Defendants repeat and incorporate by reference their responses to the allegations asserted in Paragraphs 1 to 158.

160.    Defendants deny the allegations in Paragraph 160.

161.    Defendants deny the allegations in Paragraph 161.

### ALLEGED PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to the relief sought in this section as against Defendants.

### ALLEGED JURY TRIAL DEMAND

Defendants deny that Plaintiff is entitled to a jury trial.

### AFFIRMATIVE AND ADDITIONAL DEFENSES

For further and separate defenses to the causes of action alleged by Plaintiff in the Complaint, and without admitting that Defendants have the burden of proof on any fact, issue, element of a cause of action, or any of these matters, or that anything stated herein is intended or shall be construed as an acknowledgment that any particular issue or subject matter is relevant to Plaintiff's allegations, Defendants allege as follows. Defendants reserve the right to amend these defenses and to assert additional defenses to the full extent permitted by law.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff has failed to exhaust his available administrative remedies with respect to some or all of his claims.

### THIRD AFFIRMATIVE DEFENSE

This Court lacks subject matter jurisdiction over some or all of Plaintiff's claims.

### FOURTH AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims against Defendant are barred by sovereign immunity and/or under the Eleventh Amendment to the United States Constitution.

### FIFTH AFFIRMATIVE DEFENSE

Some or all of Plaintiff's claims are barred by the applicable statute of limitations.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate his damages.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's alleged injuries are the result of his own conduct or the conduct of his agents, representative or consultants.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff breached the terms of the settlement agreement, dated September 8, 2014.

### NINTH AFFIRMATIVE DEFENSE

All employment decisions and actions were made for legitimate, non-discriminatory and non-retaliatory reasons.

## TENTH AFFIRMATIVE DEFENSE

Punitive damages are not available against Defendants.

## ELEVENTH AFFIRMATIVE DEFENSE

The Individual Defendants acted under the objectively reasonable belief that their actions were proper and in accord with clearly established law, and, therefore Plaintiff's claims for monetary relief against them are barred by the doctrine of qualified immunity.

## TWELFTH AFFIRMATIVE DEFENSE

The Individual Defendants were not Plaintiff's employer for purposes of the New York Human Rights Law or the New York City Human Rights Law.

## THIRTEENTH AFFIRMATIVE DEFENSE

With respect to all of Plaintiff's purported claims and to the extent that Plaintiff is successful in recovering any damages, Defendants are entitled to a setoff of, inter alia, the total amounts Plaintiff has received from other employers, other individuals, other third parties, unemployment compensation insurance, and /or workers' compensation payments.

WHEREFORE, Defendants request judgment dismissing the Complaint with prejudice, together with costs and disbursements and such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      January 6, 2016

                                 ERIC T. SCHNEIDERMAN
                                 Attorney General of the State of New York
                                 *Attorney for Defendant*

                                 BY: *[s] Christopher Coulston*
                                 CHRISTOPHER COULSTON
                                 Assistant Attorney General
                                 120 Broadway, 24th Floor
                                 New York, New York 10271
                                 (212) 416-8556
                                 email: christopher.coulston@ag.ny.gov

TO:    *(via ECF)*
          ERIC M. NELSON
          112 Madison Ave., Sixth Floor
          New York, New York 10016

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ODED GREENBERG, M.D., | 15-cv-2343 (PKC/VMS) |
| Plaintiff, | **DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| - against - | |
| SUNY DOWNSTATE ET AL., | |
| Defendants. | |

Pursuant to Local Civil Rule 56.1 of the United States District Court for the

Southern and Eastern Districts of New York, Defendants Dr. Deborah Reede, Dr. Steven

Pulitzer (the "Individual Defendants"), and The State University of New York ("SUNY")

(together the "SUNY Defendants"), by their attorney ERIC SCHNEIDERMAN, the

Attorney General of the State of New York, contend that there are no genuine issues as to

the following material facts and that they are entitled to summary judgment based

thereupon:

**I.        The Parties**

1.        Plaintiff, who self-identifies as White (Caucasian) and of the Jewish faith,

was at least 54 years of age at the time of his termination.  Second Amended Complaint

("Compl."), ¶ 1.  He began his employment at SUNY Downstate in or about April 2001,

and he was assigned to the Kings County Hospital Center ("KCHC") emergency room

("ER") pursuant to an affiliation agreement. Id., ¶¶ 4, 13.  Besides a hiatus from 2008 to

2010, Plaintiff remained employed by SUNY Downstate until his termination in October

2014.  Compl., ¶ 1; Greenberg Dep., p. 13:7-10.[1]

   2.  Defendant Dr. Deborah Reede self-identifies as African-American, not

Jewish, and is 67 years old.  Reede Decl., ¶ 2.  She was appointed Chair of Radiology at

SUNY Downstate Medical Center in 2013, a position she holds to this day.  Id., ¶ 3.

   3.  Defendant Dr. Stephen Pulitzer self identifies as White and Jewish and is

51 years old.  Pulitzer Decl., ¶ 2.  Dr. Pulitzer was a SUNY employee working at KCHC

as part of an affiliation agreement at the time of the events described herein.  Id.  In July

2014, he became the Interim Chair of Radiology at KCHC, and eventually the full Chair

in January 2015.  Id.  In November 2016, he was named the Chief Medical Officer at

KCHC.  Id.

   4.  Defendant SUNY is a legal entity constituted under N.Y. Educ. Law § 351

et seq.  As subdivisions of SUNY, the Downstate Medical Center is not a legally-

cognizable entity separate from SUNY.  See N.Y. Educ. Law §§ 351 and 352.

   **II.**  **Facts Regarding ACGME Accreditation**

   5.  The Accreditation Council for Graduate Medical Education (the

"ACGME") is the body responsible for accrediting the majority of graduate medical

training programs for physicians in the United States. Reede Decl., ¶ 6.  The ACGME

visited SUNY Downstate in 2013. Reede Dep., p. 96:2-11; Reede Decl., ¶ 6.

   6.  Following its visit in 2013, the ACGME conferred the adverse designation

of "Probationary Accreditation" on SUNY's Radiology Department. Ex. A.  The

ACGME noted in its findings that "'some faculty' do not 'show up' for their scheduled

---

[1]  For ease of reference, citations to exhibits and deposition transcripts herein are to the documents
attached to the Declaration of Christopher Coulston, dated March 26, 2018.

supervision assignments and the program has not enforced adherence to the schedule." Id., SUNY000683. The Department was also criticized for not demonstrating that "an appropriate level of supervision is in place for all residents," and it was noted that "faculty do not demonstrate a strong interest in the education of the residents." Id., SUNY000684.

7.      The SUNY Radiology Department was the only department in the country on probation in 2014 out of 201 radiology departments. Reede Decl., ¶ 7; Ex. B.

8.      Dr. Reede, along with Dr. Ross Clinchy, from the Dean's Office at SUNY, met with the KCHC Chief Medical Officer, Dr. Jamaleddine, on April 9, 2014 to discuss the ACGME review. Reede Decl., ¶ 9.

9.      During the meeting, Dr. Reede discussed changes that she believed were required to fix the issues in the department. Id. As part of the changes, Dr. Reede proposed replacing a number of faculty members, primarily based on teaching evaluations, and providing short term extensions for several others. Reede Dep., p. 67: 15-69:8; Jamaleddine Dep., p. 101:11-17. She also emphasized the need for monitoring of faculty member performance, increased work performance for physicians, productivity monitoring, and monitoring of teaching and scholarly activity. Ex. B.

10.     Dr. Jamaleddine recommended that Dr. Kantor should also be non-renewed, due to the unfavorable accreditation decision. Reede Dep., p. 31:18-25; Jamaleddine Dep., p. 109:6-110:17. Dr. Pulitzer replaced Dr. Kantor as Interim Chief in July 2014. Pulitzer Decl., ¶ 4.

**III.    Facts Regarding Appointment of Dr. Jinell Scott-Moore**

11.    Dr. Jinel Scott-Moore was a radiologist at LICH, and therefore a SUNY Downstate employee as of 2014, following SUNY Downstate's merger with LICH, who had worked with Dr. Reede.  Scott Dep., p. 73:23-74:8.  She is also Black, younger than Plaintiff, and not Jewish.  Compl., ¶ 25.

12.    Dr. Scott's resume showed more academic accomplishments than Plaintiff's.  Ex. YY, ZZ.   Plaintiff's resume listed two publications without a date.  Ex. YY.  During his deposition, he admitted that one of them was never published, and the other was published in 1993 or 1994.  Greenberg Dep., 10:23-12:4. Plaintiff had also let his membership lapse in the radiological professional societies.  Id., 6:23-5.  Dr. Scott on the other hand was a member of three professional societies in 2014, she had a number of recent scientific posters and education exhibits, and was actively engaged in research for publication.  Ex. ZZ.  Plaintiff had also submitted a summary of his scholarly activity in 2013-2104 to provide an update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with residents" and no scholarly activity in the prior year.  Ex. BBB.

13.    There is no evidence that Dr. Scott had any time and attendance issues.

**IV.    Plaintiff's Problems with Time and Attendance**

14.    On May 5, 2014, following the ACGME report, Dr. Reede met with Plaintiff to discuss an incorrect time entry from April 21, 2014.  Ex. I.  Dr. Reede reminded Plaintiff that "his job responsibilities require him to be present for consultations as well as resident supervision and education."  Id.  He was told to report his time correctly going forward.  Id.

15.     On May 8, 2014, Dr. Reede reminded all of the attending radiologists in the department that "everyone documents accurate information on their timesheets." Ex. L. This was repeated during the KCHC Department Meeting on June 26, 2014 led by Dr. Pulitzer, who noted that time and attendance will be monitored and that time sheets should reflect the actual time a physician was in the hospital.  Ex. M, SUNY002458.

16.     Dr. Pulitzer, who oversaw the schedule at KCHC, testified that, beginning in late July or August 2014, Plaintiff was "coming in late, he was on occasion leaving early.  I…often didn't know what time he was going to be in that day…. I couldn't reliably plan the schedule."  Pulitzer Dep., p. 305:23-306:9.  Dr. Reede testified that she received reports that Plaintiff was sometimes not in the emergency room when "residents would be looking for him."  Reede Dep., p. 142:22-143:9.  Plaintiff's Talk Station data from the time showed that he was often not reading his first case until 10:30 or later.  Ex. R.

17.     The general expectation at KCHC is that radiologists spent most of their workday reading films.  Pulitzer Decl., ¶ 6.  Time spent reading film gets reflected, if only approximately, in "talk station" data.  Id. Talk Station data comprises information about a particular film, including which radiologist read the film, and when the film was opened and signed for by a radiologist.  Id.  By reviewing the data for one day, an approximation of when a radiologist started reading film and when he or she stopped can be discerned. Id.

18.     Dr. Scott, who worked in the same room as Plaintiff, testified that "[Plaintiff] was sometimes very erratic about his hours."  Scott Dep., p. 137:19-25. She

noted that Plaintiff "would often come late to work.  It could vary from like half an hour late to an hour to an hour and a half, to two."  Id., p. 153:21-25.

19.     In August 2014, Plaintiff originally requested vacation for August 11-August 22.  Ex. O.  On August 13, 2014, Plaintiff emailed Dr. Pulitzer while on vacation, and asked if he could return the following week, and then instead take off the week of August 25th.  Ex. P.

20.     On August 22, 2014, Dr. Pulitzer counseled Plaintiff in person on issues of time and attendance.  Ex. R.  Dr. Pulitzer addressed specific time entries with Plaintiff during this meeting that appeared to be inaccurate based on his Talk Station dictation system entries.  Id.  Dr. Pulitzer reminded him of the need to be at the hospital for set hours of 9:30-5:30.  Id.

21.     Despite his scheduled vacation the week of August 25th, Plaintiff returned to work on August 26. Ex. S; Pulitzer Dep., p. 334:8-21.  Dr. Pulitzer received reports that Plaintiff was working "erratic" hours.  Pulitzer Dep., p. 334:8-21.  Plaintiff's time sheet indicates that, instead of 9:30 am to 5:30 pm, he claimed to have worked from 11 am to 7 pm on three days that week and 10 am to 6 pm on the other day he was in the office.  Ex. T.

**V.      Facts Regarding the September 4th and 5th Absences**

22.     On August 29, 2014, the Friday before Labor Day weekend, Plaintiff e-mailed Linda McMurren asking how he could get approval for days off the following week "on an emergent basis."  Ex. U, SUNYESI000994.  Ms. McMurren was not authorized to approve vacation requests; the site director – Dr. Pulitzer – was the appropriate person to contact.  Reede Dep., p. 290:9-15.

23.     Plaintiff requested this "emergent" leave five days before he intended to

take it, and he did not submit the approved form, which he had received on a number of

occasions, to Dr. Pulitzer indicating who would provide coverage, the reason for the

leave, and how much time he intended to take off.  Ex. V, SUNYESI000805-6; Pulitzer

Decl. ¶ 9.

24.     The following Tuesday, September 2, 2014, Plaintiff asked Dr. Pulitzer to

take the remainder of the week off.  Ex. W, SUNY 827.  This was the first time Dr.

Pulitzer had heard of this request.  Pulitzer Dep., 349:23-350:3.

25.     Dr. Pulitzer denied his request, due to the operational needs of the

department, since Dr. Patrick Hammil, the only other body imager, was scheduled to be

off that same week. Ex. S; Ex. X, SUNY001289-1290; Reede Dep., p. 303:25-304:12.

26.     Dr. Pulitzer testified that he does not recall Plaintiff specifying the reason

he wanted to take the leave.  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22.  Dr.

Pulitzer did not tell Dr. Reede that there was a specific reason for the request, and

Plaintiff did not speak to her at all regarding his request.  Reede Dep., 282:13-23.  There

is no written evidence of Plaintiff specifying the reason for his request prior to taking

leave.

27.     On September 3, Plaintiff returned to Dr. Pulitzer and informed him that

he would be absent on September 4 and September 5.  Pulitzer Dep., p. 351:9-24.  After

consulting with Dr. Reede, Dr. Pulitzer drafted a letter to Plaintiff that specifically

denied his request for time off on September 4th and 5th, and Plaintiff was directed to

report for duty or the matter would be referred to the Labor Relations Department.  Ex.

Y; Pulitzer Dep. 355:18-356:7.

28.     On September 4, 2014, Plaintiff e-mailed Linda McMurren to confirm that he was not coming in "due to important family issues," the nature of which he did not specify.  Ex. Z.  Short on staff, Dr. Pulitzer arranged for multiple radiologists to cover Plaintiff's shifts those days.  Pulitzer Dep., p. 354:3-23.

29.     On September 5, 2014, however, Plaintiff e-mailed Ms. McMurren again and cc'd Dr. Pulitzer, writing that he "was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out."  Ex. U.  Plaintiff was absent from work on Thursday, September 4 and Friday, September 5.  Ex. FF, SUNYESI001401.

30.     Plaintiff called Ms. McMurren the following Monday, September 8, at 10:40 am (nearly two hours after his shift began) to inform her that he would be in late because he had to go to Urgent Care for his back.  Ex. AA.  Plaintiff arrived for work at about 12:30 pm and provided documentation from Premier Care of Park Slope, indicating that he received treatment for back pain that morning.  Exs. BB; X, SUNY001291.

**VI.     Facts Regarding Plaintiff's First Interrogation**

31.     Upon his arrival on September 8, Plaintiff was directed to Labor Relations, where he met with Michael Arabian.  Ex. X.  After reading the Statement of Rights Letter regarding his rights to representation by a union attorney or counsel of his choice during the hearing, Plaintiff elected to represent himself.  Id., SUNY001280. Plaintiff was also advised by Mr. Arabian that he must respond truthfully to the questions asked during the interrogation or he could be subject to further discipline.  Id.,

SUNY001281.  The investigation was into Plaintiff's absences and failure to follow supervisors' directives regarding time and attendance.  Id.

32.     During the interrogation, Plaintiff stated that he was "on the [department's] schedule as 9 to 5," but he would occasionally "come in later and stayed later," sometimes arriving at 10-10:30 or even "a little bit later."  Id., SUNY001283. Plaintiff further stated that "if I come in late it doesn't make any difference.  I stay a little bit later.  I've been keep—adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening."  Id., SUNY001284.  When Plaintiff was asked whether he had the authority to make his own schedule, he replied that he felt that he had the "moral authority to do so if I feel the department is failing to – to take care of their patients." Id., SUNY001284.  Plaintiff admitted that he had recently been told by Dr. Pulitzer to adhere to set hours, which he assumed were "9 to 5 as written on the schedule."  Id., SUNY001284.

33.     When discussing the September 4 and 5 absences, Plaintiff stated that "I have a child with special needs and he was kicked out of his school and he was to attend a new school and I had to spend time with him," but he said that was not the reason he did not appear for work on September 4 and 5.  Id., SUNY001290-1291.  Plaintiff's mother-in-law came from out of town to help with his son, and while Plaintiff "had initially planned to take the day off, but I-I-I was gonna come in, I rolled out of bed and I – and I stretched my back out and I've been in pain and not able to be mobile since then."  Id., SUNY001291.  Plaintiff stated that he knew "that [his] son would have appropriate support" after his mother-in-law arrived.  Id., SUNY001292.

34.     Following the interrogation, Mr. Arabian consulted with Leonzo Cuiman, the Assistant Vice President for Labor Relations, and prepared a Settlement Agreement, which Plaintiff signed.  Cuiman Dep., p. 237:22-238:6; Ex. CC.  Dr. Reede and Dr. Pulitzer had no role in preparing the agreement, nor were they informed that Mr. Arabian was preparing such a document.  Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11.

35.     The Settlement Agreement, covered Plaintiff's September 4 and 5 absences as well as his time and attendance issues in July and August.  Ex. CC.  The Settlement Agreement stated that in lieu of a Notice of Discipline for: "(1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department, (4) insubordination and (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, [and] switching schedule without authorization of his supervisor" a penalty ranging from a letter of reprimand to termination would be held in abeyance for one year provided Plaintiff could abide by its terms.  Id.

36.     The language included was standard for a settlement agreement from Labor Relations department.  Ex. CC; Arabian Dep., p. 209:7-21.  It called for Plaintiff to work his scheduled shift of 9:00 a.m. to 5:00 p.m., accurately list the hours he works, seek approval for any leave, and adhere to all Departmental policies and procedures.  Id.  The Agreement provided that if Plaintiff failed to abide by its terms, he could be punished with discipline ranging from a letter of reprimand to termination.  Id.  This language was subject to negotiation when it was presented to Plaintiff, who, having turned down assistance of counsel from his union, did not request for any of the terms to be changed; subsequently stating that he did not even read the agreement.  Cuiman Dep., p. 255-257:4; Ex. DD, SUNY001353; Greenberg Dep., 274:12-275:18.  The

agreement also waived any claims Plaintiff had related to any incidents occurring up to

and including September 8, 2014.  Ex. CC.

    **VII.**   **Plaintiff's Use of Unapproved Attestations**

    37.    An attestation is a written statement made by an attending physician to

certify that he or she had reviewed a patient's report and that the report is now final.

Pulitzer Decl., ¶ 12.  Attestations are legal documents that are vital to hospital billing,

and non-conforming ones could trigger an investigation by the Centers for Medicare &

Medicaid Services ("CMS"), as well as potential financial liability.  Id.  Risk

Management approved the use of three attestations and, beginning in July 2014, staff

were informed at numerous meetings on how to use them.  GG, SUNY001270.

    38.    Phycare, which handles the billing for the department, gave a presentation

on September 15, 2014 on the attestations.  Id.

    39.    All Radiology Department staff, including Plaintiff, were personally

instructed by Dr. Pulitzer to use the approved attestations during a staff meeting on

September 22, 2014.  Pulitzer Decl., ¶ 1; Ex. HH.  The approved language was as

follows:

        "I, _____, MD, have personally reviewed the images and concur with the
        preliminary report and the interpretation as stated and signed by the resident.  This
        report now represents the FINAL REPORT for this patient."  Ex. GG.

    40.    Shortly after the meeting, Plaintiff attached to patients' records

approximately 180 unapproved attestations that were filled with sarcastic language,

stating the following:

"I, Oded Greenberg M.D., Board Certified Diagnostic attending Radiologist and Board Certified Pathologist, have personally, painstakingly reviewed each and every one of the provided images and reviewed the available clinical information. The above report, based on my own extensive knowledge and skill as well as meticulous observation and careful interpretation now represents the final report."

Ex. LL, SUNY00506-659.

41.     Dr. Pulitzer was informed that Plaintiff subsequently had asked Jayan

Kurian, an employee in the IT Department, to "take off" or "erase" the incorrect

attestations, which would have been tampering with a legal medical file.   Pulitzer Dep.,

p. 143:13-144:11.  Dr. Pulitzer was extremely concerned by the number of reports,

which he believed indicated a more severe "malicious" act, as well as posing problems

for managing the data for all of the cases with the unauthorized language, which would

need to be tracked.  Id., p. 147:7-148:4.

42.     After collecting and reviewing the attestations, Dr. Pulitzer then escalated

the issue to Dr. Jamaleddine at KCHC, and scheduled a meeting with Risk Management

at KCHC at his recommendation.  Pulitzer Dep., p. 155:3-156:11.  Risk Management

believed the conduct was at least insubordinate, and told Dr. Pulitzer to consider a

Medical Board Hearing.  Ex. MM, HHC_ESI_001344; Pulitzer Decl., ¶ 16.  Risk

Management also told Dr. Pulitzer to have a "second reader" add a new, proper

attestation to each file, and they were concerned that "if any of these cases became a

medical legal case that there could be potential exposure to the hospital."  Pulitzer Dep.,

p. 287:8-20; Pulitzer Dep. II, p. 108:23-109:3.

43.     Dr. Pulitzer again conferred with Dr. Jamaleddine and they agreed that

Plaintiff should be referred to Labor Relations.  Dr. Pulitzer again conferred with Dr.

Jamaleddine and they agreed that Plaintiff should be referred to Labor Relations, as well

as a possible referral to the Office of Professional Medical Conduct, which investigates complaints against physicians.  Pulitzer Dep., p. 289:8-23; 290:20-291:17.  Dr. Reede was consulted and agreed with referring the matter to Labor Relations at SUNY Downstate.  Pulitzer Decl., ¶ 16; Reede Decl., ¶ 15.

**VIII.   Facts Regarding Plaintiff's September 23 Absence**

44.     After taking off part of the morning of September 23, 2014, Plaintiff asked for two hours of additional leave that afternoon.  Pulitzer Dep., p. 389:22-390:6; Ex. GG.  Defendant Pulitzer denied this request, because there was no one available to adequately cover for Plaintiff.  Id.

45.     That afternoon, Dr. Pulitzer learned that, in spite of the denied request for leave, Plaintiff "had left the building," and Dr. Pulitzer was unable to locate him for a number of hours.  Pulitzer Dep., p. 402:20-403:6; 413:15-20.   According to Talk Station data there was a gap of approximately two hours from 2:50 to 4:52.  Ex. QQ, SUNY001326.  Dr. Pulitzer learned that Dr. Greenberg had asked Dr. Amiram Samin to cover for him during that period, but Dr. Samin was not able to read neuroradiology cases, leaving the ER inadequately covered.  Id. p. 401:24-403:6; 413:15-20.  This issue was referred to Labor Relations as well.  Ex. GG.

**IX.    Facts Regarding Plaintff's Second Visit to Labor Relation**

46.     On October 3, 2014, Plaintiff was notified that he was to report to Labor Relations "to discuss allegations of insubordination, leaving the worksite without authorization and related matters."  Ex. RR.  This new case was handled by Stephanie Bernadel.  Bernadel Dep., 11:22-12:6.  After a delay so Plaintiff could attempt to locate

an outside attorney, an interrogation was held on October 10, 2014.  Ex. QQ.  Plaintiff

was accompanied by his wife who is an attorney, and again waived his right to union

representation.  Ex. SS.

47.     During the interrogation, Plaintiff was asked about the two hour gap in his

Talk Station data on September 23.  Ex. QQ, SUNY001323-1328.  Plaintiff admitted

that he left his desk during this period, and claimed it was only to talk to colleagues, his

wife and eat lunch across the street at SUNY Downstate.  Id., SUNY001326.

48.     During the interrogation, Plaintiff described the attestations as "a

Medicare and insurance hoop to jump through." Id., SUNY001329.  He admitted the

purpose of the attestations was explained to him, and that it was important to the

hospital.  Id.  But he also admitted that he "thought it was ridiculous."  Id.,

SUNY001329-30.  He admitted that he complained about the forms during the meeting,

and he continued to complain about the attestations during the interrogation, stating "I

don't see why signing the document isn't attesting to me checking his work."  Id.,

SUNY001330, 1340, 1337-8.  Plaintiff admitted that he wrote the unapproved

attestations, and he admitted that he thought the language was "playful."  Id.,

SUNY001339.

49.     At the interrogation, Plaintiff mentioned possible allegations of

discrimination for the first time.  Ex. QQ, SUNY001335.  In response, Ms. Bernadel

sent Plaintiff a letter directing him to contact The Office of Diversity & Inclusion

regarding any complaints of discrimination.  Ex. TT.

50.     Shortly after the interrogation, it was reported to Labor Relations that

Plaintiff "harassed" employees outside of KCHC.  Ex. UU, SUNYESI000101.  As a

result, Plaintiff was informed that he was not allowed to be on the hospital premises pending the outcome of the disciplinary action.  Id.

51.    On October 20, 2014, Ms. Bernadel and Mr. Cuiman met with Plaintiff again, who this time was accompanied by counsel from the New York State United Teachers, as well as his wife.  Ex. DD, SUNY001345.  Plaintiff continued to complain about the use of the required attestations during this meeting, repeating his view that the "purpose of the attestation" was "so that insurance companies make you jump through another hoop before they pay you" or, he added, "so that you can get sued better….there's no real good reason for it."  Id., SUNY001364.  He went on to say that "[i]t just adds more work to my day."  Id., SUNY001365.  Despite admitting he did not use the approved attestations, Plaintiff blamed Dr. Reede for his situation, and stated that her character was "really piss-poor."  Id., SUNY001393.  Plaintiff concluded the meeting by stating that "I expect to get my job back.  I expect an apology from [Dr. Reede] and I expect a raise."  Id., SUNY001394.

52.    As part of her investigation, Stephanie Bernadel interviewed a number of employees regarding Plaintiff's use of the unapproved attestations.  Dr. Scott told Ms. Bernadel that Plaintiff complained during that meeting about the use of attestations, telling her that "this is the beginning of the end of medicine, this is the corporatization of medicine."  Ex. HH.

53.    Dr. James Walsh told Ms. Bernaded that Plaintiff told him after the meeting that "I can't believe I have to write an attestation."  Ex. II.

**X.     Facts Regarding Other Statements Made by Plaintiff**

54.    On September 30, Plaintiff sent a letter to Dr. Pulitzer complaining that

"[t]he hyper-vigilance and micromanagement is often insulting and I no longer look

forward to coming to works as a result of the corporatization of medicine." Ex. JJ.

Plaintiff repeated this concern about the "corporatization" of medicine in an email

following his termination, saying that "the new administrations [sic] polices have

negatively affected morale and patient care in the name of corporatization." Ex. KK.

Plaintiff believed this "corporatization of medicine" began at SUNY Downstate when

Dr. Reede became chairwoman. Greenberg Dep., p. 42:9-13.

## XI.     Facts Regarding Plaintiff's Termination

55.     On October 22, 2014, Plaintiff was terminated for violations of the

September 8 disciplinary settlement by the Labor Relations Department, in consultation

with Drs. Pulitzer and Reede, following "allegations of insubordination, leaving the

worksite without authorization and related matters." Ex. VV; Bernadel Dep., p. 5:12-18;

Pulitzer Dep., p. 420:23-421:2. Dr. Pulitzer also conferred with Dr. Jamaleddine prior

to Plaintiff's termination, and he agreed with the decision. Pulitzer Dep., p. 439:12-24.

56.     Dr. Pulitzer himself ultimately had to correct the approximately 180

attestations by re-reading each study, confirming that he agreed or disagreed, and

affixing a new counter-attestation. Ex. WW; Pulitzer Dep., 207:19-208:15.

## XII.     Facts Regarding the ACGME Reassessment

57.     Following the changes in personnel and the new standards put in place for

all physicians in the department, the ACGME restored the Radiology Department's

"Continued Accreditation" in August 2015. Ex. XX. The department was taken off

probation at that time, and it remains accredited today. Reede Decl., ¶ 17. The ACGME

**A88**

report in 2015 commended the department "for a quick turnaround and implementing

significant changes that have greatly improved the educational program."  Ex. XX,

SUNY00697.

Dated: New York, New York
      March 26, 2018

                ERIC T. SCHNEIDERMAN
                Attorney General of the State of New York
                *Attorney for SUNY Defendants*

                BY: **/s/ Christopher Coulston**
                CHRISTOPHER COULSTON
                Assistant Attorney General
                120 Broadway, 24th Floor
                New York, New York 10271
                (212) 416-8556
                email: christopher.coulston@ag.ny.gov

TO:    *(via First Class Mail)*

    Chad L. Edgar
    Cardi & Edgar LLP
    99 Madison Avenue, 8th Floor
    New York, NY 10016
    212.481.7770 (tel.)

    Ryan Shaffer
    Senior Counsel
    New York City Law Department
    100 Church St.
    New York, New York 10007
    (212) 356-5037

SUNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ODED GREENBERG, M.D.,

                              Plaintiff,                    15-CV-2343 (PKC/VMS)

              -against-
                                                    **DECLARATION OF**
                                                **CHRISTOPHER COULSTON**
SUNY DOWNSTATE ET AL.,

                              Defendants.
-------------------------------------------------------X

CHRISTOPHER COULSTON, an attorney admitted to practice in the courts of

the State of New York and in this Court, declares under penalty of perjury, pursuant to 28

U.S.C. § 1746, as follows:

1.      I am an Assistant Attorney General in the office of ERIC T.

SCHNEIDERMAN, Attorney General of the State of New York, attorney for Defendants Dr.

Deborah Reede, Dr. Steven Pulitzer (the "Individual Defendants"), and The State University

of New York ("SUNY") (together the "SUNY Defendants").

2.      I submit this declaration in support of the SUNY Defendants' motion for

summary judgment for the limited purpose of providing the Court with true and accurate

copies of the exhibits cited in the SUNY Defendant's accompanying memorandum of law,

which were maintained in the ordinary course of business, as well as deposition testimony

transcripts from this matter, which are now contained in the accompanying volume entitled

"Exhibits and Deposition Transcript Excerpts to the 56.1 Statement, Declarations and

Memorandum of Law Submitted in Support of the SUNY Defendants' Motion for Summary

Judgment," dated March 26, 2018, and referenced in the Defendants' Local Civil Rule 56.1

Statement, the Declaration of Dr. Deborah L. Reede, the Declaration of Dr. Stephen Pulitzer, and the Memorandum of Law in Support of the SUNY Defendants' Motion for Summary Judgment..

3. A true and accurate copy of the Accreditation Council for Graduate Medical Education ("ACGME") Report, dated April 15, 2014, with the bates stamp SUNY000682-691, is attached as **Exhibit A**.

4. A true and accurate copy of Dr. Reede's notes for the Kings County Hospital Center ("KCHC") Meeting with Dr. Ghassan Jamaleddine, dated April 9, 2014, with the bates stamp SUNY002806, is attached as **Exhibit B**.

5. A true and accurate copy of the email from Plaintiff regarding Dr. Alan Kantor's termination, dated June 23, 2014, with the bates stamp SUNYESI000632, is attached as **Exhibit C**.

6. A true and accurate copy of the email from Plaintiff regarding Possible Referral, dated October 21, 2014, with the bates stamp SUNYESI000733-6, is attached as **Exhibit D**.

7. A true and accurate copy of the email from Ms. Stephanie Bernadel regarding emails from Dr. Kantor, dated October 28, 2014, with the bates stamp SUNY000273-4, is attached as **Exhibit E**.

8. A true and accurate copy of the e-mail thread between Plaintiff and Dr. Kantor regarding Dr. Greenberg's hours, dated August 14, 2013, with the bates stamp SUNY000275-6, is attached as **Exhibit F**.

9. A true and accurate copy of the e-mail thread between Plaintiff and Dr. Kantor regarding Plaintiff's complaints, dated September 25, 2013, with the bates stamp SUNY000283-4, is attached as **Exhibit G**.

10.     A true and accurate copy of the e-mail thread between Dr. Greenberg and Dr. Kantor regarding Staff Meeting, dated October 9, 2013, with the bates stamp SUNY000281-2, is attached as **Exhibit H**.

11.     A true and accurate copy of the summary of Dr. Reede's Meeting with Dr. Greenberg, dated May 5, 2014, with the bates stamp SUNY000478, is attached as **Exhibit I**.

12.     A true and accurate copy of Plaintiff's Time and Attendance report, dated May 1, 2014, with the bates stamp SUNYESI001500-1, is attached as **Exhibit J**.

13.     A true and accurate copy of the e-mail from Linda McMurren regarding Plaintiff's April Time Sheet, dated May 9, 2014, with the bates stamp SUNYESI001499, is attached as **Exhibit K**.

14.     A true and accurate copy of the Radiology Department Faculty Meeting Minutes, dated May 8, 2014, with the bates stamp HHC_ESI_000170-3, is attached as **Exhibit L**.

15.     A true and accurate copy of the presentation for the KCHC Departmental Meeting, dated June 26, 2014, with the bates stamp SUNY002454-71, is attached as **Exhibit M**.

16.     A true and accurate copy of the e-mail from Dr. Greenberg regarding Change of Day Off, dated July 9, 2014, with the bates stamp SUNYESI00850, is attached as **Exhibit N**.

17.     A true and accurate copy of the e-mail from Linda McMurren regarding the August Time Away Calendar, dated July 21, 2014, with the bates stamp SUNYESI00864-5, is attached as **Exhibit O**.

18.    A true and accurate copy of the e-mail from Dr. Greenberg regarding Vacation change, dated August 13, 2014, with the bates stamp SUNYESI000650, is attached as **Exhibit P**.

19.    A true and accurate copy of the e-mail from Dr. Greenberg regarding the August Time Away Calendar, dated September 15, 2014, with the bates stamp SUNYESI000664-5, is attached as **Exhibit Q**.

20.    A true and accurate copy of the summary of Dr. Pulitzer's Meeting with Dr. Greenberg, dated August 22, 2014, with the bates stamp HHC_ESI_001092-3, is attached as **Exhibit R**.

21.    A true and accurate copy of the e-mail from Dr. Pulitzer attaching the summary of time and attendance issues with Dr. Greenberg, dated September 2, 2014, with the bates stamp HHC_ESI_001062-3, is attached as **Exhibit S**.

22.    A true and accurate copy of Plaintiff's Time and Attendance report, dated September 9, 2014, with the bates stamp SUNYESI001806-7, is attached as **Exhibit T**.

23.    A true and accurate copy of the e-mail thread regarding Plaintiff's request for leave the week of September 1, 2014, dated September 8, 2014, with the bates stamp SUNYESI000993-4, is attached as **Exhibit U**.

24.    A true and accurate copy of the email from Rhonda Besunder attaching the forms for faculty leave and time and attendance policies, with the bates stamp SUNYESI000805-813, is attached as **Exhibit V**.

25.    A true and accurate copy of Dr. Pulitzer's summary of time and attendance issues with Dr. Greenberg, dated September 5, 2014, with the bates stamp SUNY000827-8, is attached as **Exhibit W**.

26.     A true and accurate copy of the transcript from Dr. Greenberg's September 8, 2014 Interrogation, with the bates stamp SUNY001280-1314, is attached as **Exhibit X.**

27.     A true and accurate copy of the letter from Dr. Pulitzer to Dr. Greenberg, dated September 3, 2014, with the bates stamp SUNYESI000006, is attached as **Exhibit Y.**

28.     A true and accurate copy of the e-mail from Linda McMurren forwarding Dr. Greenberg's email regarding "sick days," dated September 8, 2014, with the bates stamp SUNYESI000995, is attached as **Exhibit Z**.

29.     A true and accurate copy of the e-mail from Linda McMurren regarding Dr. Greenberg's visit to Urgent Care, dated September 8, 2014, with the bates stamp SUNYESI000996, is attached as **Exhibit AA.**

30.     A true and accurate copy of the documents related to Dr. Greenberg's September 8, 2014 visit to City MD, with the bates stamp SUNY000485-9, are attached as **Exhibit BB.**

31.     A true and accurate copy of the Settlement Agreement, dated September 8, 2014, with the bates stamp SUNY000012-3, is attached as **Exhibit CC.**

32.     A true and accurate copy of the transcript from Dr. Greenberg's October 20, 2014 meeting with Labor Relations, with the bates stamp SUNY001345-94 is attached as **Exhibit DD.**

33.     A true and accurate copy of the e-mail from Michael Arabian attaching the Memorandum regarding the Settlement Notification – Dr. Oded Greenberg, dated September 9, 2014, with the bates stamp SUNYESI000038-40, is attached as **Exhibit EE**.

34.     A true and accurate copy of the e-mail from Stephanie Bernadel attaching Dr. Greenberg's September and October 2014 time and attendance reports, dated December 9, 2014, with the bates stamp SUNYESI001399-1404, is attached as **Exhibit FF.**

35.     A true and accurate copy of the letter from Dr. Pulitzer reporting two incidents involving Dr. Greenberg, dated September 24, 2014, with the bates stamp SUNY001269-71, is attached as **Exhibit GG**.

36.     A true and accurate copy of the summary of the interview of Dr. Jinel Scott-Moore by Stephanie Bernadel, with the bates stamp SUNY001251, is attached as **Exhibit HH**.

37.     A true and accurate copy of the summary of the interview of Dr. James Walsh by Stephanie Bernadel, with the bates stamp SUNY000449, is attached as **Exhibit II**.

38.     A true and accurate copy of the e-mail from Dr. Greenberg regarding coverage issues in the Radiology Department, dated October 1, 2014, with the bates stamp SUNYESI000677-8, is attached as **Exhibit JJ**.

39.     A true and accurate copy of the e-mail thread between Dr. Greenberg and Dr. Gautam Agrawal, dated December 3, 2014, with the bates stamp SUNYESI001450-3, is attached as **Exhibit KK**.

40.     A true and accurate copy of the patient reports with Dr. Greenberg's unauthorized attestations, dated September 22, 2014, with the bates stamp SUNY000506-659, is attached as **Exhibit LL**.

41.     A true and accurate copy of the e-mail thread between Dr. Pulitzer and Mr. Arabian regarding Dr. Greenberg, dated September 26, 2014, with the bates stamp HHC_ESI__001344-5, is attached as **Exhibit MM.**

42.      A true and accurate copy of the e-mail from Dr. Greenberg to Dr. Pulitzer regarding time off, dated September 22, 2014, with the bates stamp SUNYESI000669, is attached as **Exhibit NN.**

43.      A true and accurate copy of the e-mail thread between Dr. Greenberg and Dr. Pulitzer regarding time off, dated September 23, 2014, with the bates stamp SUNYESI000670-1, is attached as **Exhibit OO.**

44.      A true and accurate copy of the e-mail from Dr. Greenberg to Dr. Pulitzer regarding time off, dated September 23, 2014, with the bates stamp SUNYESI000672, is attached as **Exhibit PP.**

45.      A true and accurate copy of the transcript from Dr. Greenberg's October 10, 2014 Interrogation, with the bates stamp SUNY001315-44 is attached as **Exhibit QQ.**

46.      A true and accurate copy of the letter from Ms. Bernadel to Dr. Greenberg regarding the Investigation of Possible Disciplinary Charges, dated October 3, 2014, with the bates stamp SUNYESI000054, is attached as **Exhibit RR**.

47.      A true and accurate copy of the Statement to be Read and Given to Employees in the Professional Services Negotiating Unit Prior to a Disciplinary Interrogation , dated October 10, 2014, with the bates stamp SUNY000431, is attached as **Exhibit SS**.

48.      A true and accurate copy of the letter from Ms. Bernadel to Dr. Greenberg regarding possible allegations of discrimination, dated October 15, 2014, with the bates stamp SUNY000010, is attached as **Exhibit TT.**

49.     A true and accurate copy of the e-mail thread between Ms. Bernadel and Dr. Greenberg regarding persona non grata status, dated October 10, 2014, with the bates stamp SUNYESI000101-5, is attached as **Exhibit UU.**

50.     A true and accurate copy of the termination letter from Mr. Cuiman to Dr. Greenberg, dated October 22, 2014, with the bates stamp SUNYESI001392, is attached as **Exhibit VV.**

51.     A true and accurate copy of the e-mail thread between Dr. Pulitzer and Gnyana Kompally regarding counter attestations, dated November 23, 2014, with the bates stamp HHC_ESI_002251-2, is attached as **Exhibit WW.**

52.     A true and accurate copy of the Accreditation Council for Graduate Medical Education ("ACGME") Report, dated August 13, 2015, with the bates stamp SUNY000692-, is attached as **Exhibit XX**.

53.     A true and accurate copy of the resume of Dr. Oded Greenberg with the bates stamp SUNY001004-5 is attached as **Exhibit YY.**

54.     A true and accurate copy of the resume of Dr. Jinel Scott-Moore with the bates stamp SUNY001004-5 is attached as **Exhibit ZZ.**

55.     A true and accurate copy of notes from the Meeting with Dr. Greenberg, dated July 23, 2014, with the bates stamp SUNY001224, is attached as **Exhibit AAA**.

56.     A true and accurate copy of the e-mail from Dr. Greenberg attaching a summary of Dr. Greenberg's scholarly activity for the ACGME program update, with the bates stamp SUNYESI000638-641, is attached as **Exhibit BBB**.

57.     A true and accurate copy of excerpts from Dr. Oded Greenberg's deposition, dated December 7, 2016 and January 23, 2017, is attached as **Greenberg Dep. Excerpts.**

58.     A true and accurate copy of excerpts from Dr. Stephen Pulitzer's deposition, dated October 26, 2016 and January 24, 2017, is attached as **Pulitzer Dep. Excerpts.**

59.     A true and accurate copy of excerpts from Dr. Deborah Reede's deposition, dated November 18, 2016 and January 26, 2017, is attached as **Reede Dep. Excerpts.**

60.     A true and accurate copy of excerpts from Dr. Ghassan Jamaleddine's deposition, dated December 19, 2016, is attached as **Jamaleddine Dep. Excerpts.**

61.     A true and accurate copy of excerpts from Stephanie Bernadel's deposition, dated October 21, 2016, is attached as **Bernadel Dep. Excerpts.**

62.     A true and accurate copy of excerpts from Michael Arabian's deposition, dated November 16, 2016, is attached as **Arabian Dep. Excerpts.**

63.     A true and accurate copy of excerpts from Leonzo Cuiman's deposition, dated December 15, 2016, is attached as **Cuiman Dep. Excerpts.**

64.     A true and accurate copy of excerpts from Dr. Jinel Scott's deposition, dated November 3, 2016, is attached as **Scott Dep. Excerpts.**

Dated: New York, New York
       March 26, 2018

CHRISTOPHER V. COULSTON

9

ACGME

Accreditation Council for
Graduate Medical
Education

515 North State Street
Suite 2000
Chicago, IL 60654

Phone 312.755.5000
Fax 312.755.7498
www.acgme.org

April 15, 2014

Rhonda Osborne, MD
Residency Program Director
S U N Y Health Science Ctr at Brooklyn, Dept of Radiology
Box 45
450 Clarkson Avenue
Brooklyn, NY  11203

Dear Dr. Osborne,

The Residency Review Committee for Radiology-Diagnostic, functioning in accordance with
the policies and procedures of the Accreditation Council for Graduate Medical Education
(ACGME), has reviewed the information submitted regarding the following program:

Radiology-diagnostic

SUNY Health Science Center at Brooklyn Program
SUNY Health Science Center at Brooklyn
Brooklyn, NY

Program 4203521143

Based on all of the information available to it at the time of its recent meeting, the Review
Committee conferred the following adverse action:

Status: Probationary Accreditation
Maximum Number of Residents: 32
Effective Date: 02/03/2014
Approximate Next Site Visit: 03/02/2015

The decision to take an adverse accreditation action is based on the failure of the program to
be in substantial compliance with the ACGME's Institutional and/or Program Requirements for
Graduate Medical Education.

**AREAS NOT IN COMPLIANCE (Citations)**

The Committee cited the following areas as not in substantial compliance with the
requirements as the basis for the adverse action.

**EXTENDED CITATIONS**

**Resources | Since: 11/12/2009 | Status: Extended**

Resources:  The program must provide adequate space, equipment, and other pertinent
facilities to ensure an effective educational experience for residents in diagnostic
radiology.  The program must also provide the modern facilities and equipment required in all
of the subspecialty rotations (Program Requirement: II.D.1).

The information technology staff support and computer access is inadequate.  The residents
Identified the need for additional computers, improved software, and more workstations in the

**SUNY 000682**

Rhonda Osborne, MD
Page 2

clinical areas (SVR: 16, 48).

Continued Non-Compliance: 02/03/2014
- The Review Committee determined that the program has not corrected this previously cited area of noncompliance. At the time of the site visit, the program indicated that all of the systems and software were up-to-date at both the University Hospital of Brooklyn and the Kings County Hospital sites. The site visitor confirmed that although some updates have been made, the "PACS" system at the University Hospital of Brooklyn had not been updated due to the lack of a compatible EMR system in the hospital. At the time of the site visit, the hospital's plans to implement a new EMR were scheduled for the "near future".
(Site Visit Report pages 3-5, ADS Program Summary – Response to Previous Citations)

**NEW CITATIONS**

**Responsibilities of Faculty | Since: 02/03/2014 | Status: New**

Faculty Supervision Time
Program Requirement: II.B.1.a)
The faculty must devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; and to demonstrate a strong interest in the education of residents

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the faculty do not devote sufficient time to fulfill their supervisory responsibilities. At the time of the site visit, it was noted that faculty supervision has been inconsistent as a result of the lack of time devoted by the faculty to their supervisory responsibilities. During the site visit interviews, there was consensus that "some faculty" do not "show up" for their scheduled supervision assignments and the program has not enforced adherence to the schedule. Subsequently, this inconsistent faculty supervision has prevented on-call residents from getting feedback on their cases because faculty members do not show up the next day for post-call film review. It has also caused other residents to "look for an attending" to review and sign-out their cases. Resident concerns regarding faculty supervision were substantiated by the program's 2013 Resident Survey results which showed a significantly low compliance rate for the questions related to sufficient faculty supervision.
(Site Visit Report pages 19-20, 2013 ACGME Resident Survey results)

**Responsibilities of Faculty | Since: 02/03/2014 | Status: New**

Adequate Faculty Supervision
Program Requirement: VI.D.2.
The program must demonstrate that the appropriate level of supervision is in place for all residents who care for patients.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the Review Committee was unable to determine whether an appropriate level of supervision is in place for all residents. The site visitor confirmed that overnight on-call shifts at both the University Hospital and the Kings County Hospital sites employ the use of remote supervision methods such as a tele-radiology service or at-home review of the radiology studies by the attendings. The site visitor noted that some residents indicated that "an in-house attending would be preferable at both sites" and that the lack of in-house supervision limits their education. Resident concerns regarding faculty supervision were substantiated by the program's 2013 Resident Survey results which showed a significantly low compliance rate for the questions related to sufficient faculty supervision.
(Site Visit Report pages 19-20, 2013 ACGME Resident Survey results)

**SUNY 000683**

Rhonda Osborne, MD
Page 3

**Responsibilities of Faculty | Since: 02/03/2014 | Status: New**

Faculty Interest in Education
Program Requirement: II.B.1.a)
The faculty must devote sufficient time to the educational program to fulfill their supervisory
and teaching responsibilities; and to demonstrate a strong interest in the education of
residents.

The information provided to the Review Committee did not demonstrate substantial
compliance with the requirement in that faculty do not demonstrate a strong interest in the
education of the residents. The site visitor noted that there is disparity with regards to the
faculty's interest in resident education and the quality of the didactic sessions they
provide.  The faculty within the subspecialty sections were noted to have a lack of
coordination in their lecture topics and do not present the material as an organized
curriculum.  The site visitor also noted that resident opinions confirmed the disparity in faculty
interest in education as some faculty members were deemed "excellent and dedicated to
education", while other faculty members were deemed to "not care about teaching at all".  This
lack of interest has resulted in the cancellation of scheduled lectures. Resident concerns
regarding faculty interest and dedication to education were substantiated by the program's
2013 Resident Survey results which showed a significantly low compliance rate for the
questions related to faculty and staff interest in resident education. (Site Visit Report pages 19
-20, 2013 ACGME Resident Survey results)

**Other Program Personnel | Since: 02/03/2014 | Status: New**

IT Support/Other Program Personnel
Program Requirement: II.C.
The institution and the program must jointly ensure the availability of all necessary
professional, technical, and clerical personnel for the effective administration of the program.

The information provided to the Review Committee did not demonstrate substantial
compliance with the requirement in that the technical support from information technology (IT)
personnel is inadequate to facilitate the effective administration of the program. The site visitor
confirmed that faculty and residents agree that IT support is inadequate and equipment repair
is slow.  At the University Hospital site, the number of IT staff is insufficient and at the Kings
County Hospital site, the IT staff are often limited in their ability to resolve technical problems.
(Site Visit Report page 5, ADS Program Summary – Response to Previous Citations)

**Other Program Personnel | Since: 02/03/2014 | Status: New**

Clerical Support/Non-Physician Service Obligations
Program Requirement: II.C.
The institution and the program must jointly ensure the availability of all necessary
professional, technical, and clerical personnel for the effective administration of the program.
Program Requirement: VI.A.4.b)
The learning objectives of the program must not be compromised by excessive reliance on
residents to fulfill non-physician service obligations.

The information provided to the Review Committee did not demonstrate substantial
compliance with the requirement in that there is a lack of clerical support overnight.  At the
time of the site visit, it was confirmed with the residents that there is very limited clerical
support provided overnight which has resulted in the on-call resident(s) performing non-
physician, clerical duties such as faxing reports. (Site Visit Report page 22-23)

**SUNY 000684**

Rhonda Osborne, MD
Page 4

**Responsibilities of Program Director | Since: 02/03/2014 | Status: New**

Procedure Volume/Case Log Reporting
Program Requirement: II.A.4.p)
The program director must participate in the ACGME case log system. The logs must be submitted annually to the Review Committee office in accordance with the format and the due date specified by the Review Committee. The record must be reviewed by the program director at least annually; for residents beginning training in diagnostic radiology on July 1, 2010 or thereafter, data must be submitted for each resident only for the years of training preceding the ABR Core Examination (at end of PGY-4);
Program Requirement: II.D.4.
The program must provide a sufficient volume and variety of patients to ensure that residents gain experience in the full range of radiologic examinations, procedures, and interpretations. The number and variety of examinations and the length of rotations in each subspecialty area must be sufficient to ensure an adequate training experience. The program's volume must be no fewer than 7,000 radiologic examinations per year per resident. The number of examinations in each of the nine subspecialty areas must be of sufficient volume to ensure adequate training experience.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the resident case log data did not demonstrate whether residents are provided a sufficient patient volume to obtain the procedural experience necessary to meet the minimum number of radiologic procedures required by the Review Committee. At the time of the site visit, the site visitor reviewed the case log data for "the most recent graduates" and found that they all reported numbers below the 25th or 50th percentile in every procedure category except Chest X-ray and CTA/MRA. Additionally, a review of the program's most recent 2013 graduate data submitted in the Case Log system for the August 15, 2013 reporting deadline indicated that procedural minimums were not met for Dr. Gonzalez-Pons and Dr. Raissi. Dr. Gonzalez-Pons did not meet the procedure minimums in the following five categories (listed as the "Total number reported/Category minimum"): Chest X-ray 1887/1900, CT Abdomen Pelvic 334/600, US Abdomen Pelvic 320/350, MRI Brain 76/110, and PET 15/30.  Dr. Raissi did not meet the procedure minimum in the category of US Abdomen Pelvic 332/350.  The program is advised to review the required Diagnostic Radiology Case Log Minimums currently posted on the Review Committee's webpage at: http://www.acgme.org/acgmeweb/Portals/0/PFAssets/ProgramResources/420 _DR_Case_Log_Minimums.pdf.
(Site Visit Report page 28, Annual Program Data - Case Log Minimums Report)

**ACGME Competencies | Since: 02/03/2014 | Status: New**

Timely Communication of Procedure Results
Program Requirement: IV.A.5.a).(1)
Residents should provide patient care through safe, efficient, appropriately utilized, quality-controlled diagnostic and/or interventional radiology techniques. The resident must communicate effectively and in a timely manner the results of procedures, studies, and examinations to the referring physician and/or other appropriate individuals.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that residents are unable to communicate results in a timely manner. At the time of the site visit, both residents and faculty agreed that the communication of procedure, study, and examination results to the referring physician and/or other appropriate individual(s) does not occur in a timely manner. The site visitor confirmed that while a remedy to improve this communication in the emergency department has been implemented, it remains a problem in other clinical areas since the only means of communicating back to the referring physician is a pager number and this limited communication is further complicated when the referring physician has left for the day. (Site Visit Report page 27-28)

**SUNY 000685**

Rhonda Osborne, MD
Page 5

**ACGME Competencies | Since: 02/03/2014 | Status: New**

Resident Competence/Communication Skills
Program Requirement: IV.A.5.d).(6)
Residents are expected to communicate effectively with patients, colleagues, referring
physicians, and other members of the health care team concerning imaging appropriateness,
informed consent, safety issues, and the results of imaging tests or procedures. Competence
in oral communication must be judged through direct observation. Competence in written
communication must be judged on the basis of the quality and timeliness of dictated reports

The information provided to the Review Committee did not demonstrate substantial
compliance with the requirement.  At the time of the site visit, there was no documentation
provided to demonstrate whether the program had evaluated the residents' competence in
oral communication skills using direct observation.  There was also no documentation
provided to demonstrate whether the program had evaluated the residents' competence in
written communication skills based on the quality of dictated reports. (Site Visit Report page
32)

**Evaluation of Residents | Since: 02/03/2014 | Status: New**

Timely Resident Evaluations
Program Requirement: V.A.1.a)
The faculty must evaluate resident performance in a timely manner during each rotation or
similar educational assignment, and document this evaluation at completion of the
assignment.

The information provided to the Review Committee did not demonstrate substantial
compliance with the requirement in that faculty evaluations of the residents either do not occur
or are not completed in a timely manner.  At the time of the site visit, it was noted that
although it is required by the program, not all faculty members complete resident evaluations
and of those that are completed, many of them are not completed in a timely manner.  The
lack of evaluation and feedback after assignments was substantiated by the program's results
on the 2013 Resident Survey that indicated significantly low compliance on the question
related to feedback after assignments. (Site Visit Report page 36, 2013 ACGME Resident
Survey results)

**Evaluation of Program | Since: 02/03/2014 | Status: New**

Resident Evaluations for Program Improvement
Program Requirement: V.C.1.d).(2)
The program must use the results of residents' assessments of the program together with
other program evaluation results to improve the program.

The information provided to the Review Committee did not demonstrate substantial
compliance with the requirement in that the Review Committee was unable to determine
whether the program uses the residents' assessments of the program to make improvements.
The results of the 2013 Resident Survey showed significantly low compliance on the question
related to satisfaction with the program's use of evaluations to improve the program. The site
visitor confirmed that residents agree that the program director listens to their comments and
some changes have been made, but it was also confirmed that the low compliance rating on
the survey was directly related to the "lack of a permanent Department Chair who can provide

**SUNY 000686**

Rhonda Osborne, MD
Page 6

leadership and effect meaningful change." (Site Visit Report page 38, 2013 ACGME Resident Survey results)

**RESOLVED CITATIONS**

The Review Committee determined that the following citations have been resolved:

**Responsibilities of Program Director | Since: 11/12/2009 | Status: Resolved**

Program Information Form: The program director must prepare and submit all information required and requested by the ACGME, including but not limited to the program information forms and annual program resident updates to the ADS, and ensure that the information submitted is accurate and complete (Program Requirement: II.A.4.f).

The PIF was inadequately prepared and included differing versions and omissions especially in the faculty roster and curriculum vitae.  Twenty-three changes were required during the site visit (SVR: 3-6, 48).

**Service to Education Imbalance | Since: 11/12/2009 | Status: Resolved**

Service and Education:  The learning objectives of the program must not be compromised by excessive reliance on residents to fulfill service obligations (Program Requirement: VI.A.2).

Service needs take priority over education, especially when the residents are on-call.  The burden of call requires better monitoring (SVR: 16, 49).

**Resident Appointment Issues | Since: 11/12/2009 | Status: Resolved**

Residents Appointments: A program director must provide timely verification of residency education and summative performance evaluations for residents who leave the program prior to completion (Program Requirement: II.C.2.A).

A number of residents transferred from this program to other diagnostic radiology programs. In addition to concerns related to attrition from the program, one resident, who transferred to another program, left without his records being forwarded to his new program director (SVR: 48).

**Institutional Support-Sponsoring Institution | Since: 11/12/2009 | Status: Resolved**

Sponsoring Institution:  One sponsoring institution must assume ultimate responsibility for the program, as described in the Institutional Requirements, and this responsibility extends to resident assignments at all participating sites. The sponsoring institution and the program must ensure that the program director has sufficient protected time and financial support for his or her educational and administrative responsibilities to the program (Program Requirement: I.A).

Many citations from the previous Institutional Review have not been answered, even during

**SUNY 000687**

Rhonda Osborne, MD
Page 7

the radiology site visit (SVR: 19-21).

**Qualifications of Faculty | Since: 11/12/2009 | Status: Resolved**

Faculty Qualifications: The physician faculty must have current certification in the specialty by the American Board of Radiology, or possess qualifications judged to be acceptable by the Review Committee (Program Requirement: I.B.2).

Dr. Carsaro is not certified by the ABR in spite of his having completed training in 1998 in the United States. Please identify when he plans to take the certification examination (PIF: 6; SVR: 25).

**Responsibilities of Faculty | Since: 11/12/2009 | Status: Resolved**

Faculty Responsibilities: The program must designate one physician faculty member to be responsible for the educational content of each of the nine subspecialty areas. This individual must practice at least 50% of his or her time in the subspecialty area, and must demonstrate a commitment to the subspecialty (Program Requirement: II.B.2.c).

According to the PIF, Dr. Waite, the chief of cardiothoracic radiology, spends only 30% of his time in the subspecialty area (PIF: 8).

**Institutional Support-Participating Institution | Since: 11/12/2009 | Status: Resolved**

Participating Institutions: There must be a program letter of agreement (PLA) between the program and each participating site providing a required assignment. The PLA must be renewed at least every five years (Program Requirement: I.B.1).

Lutheran Hospital is listed as a training site for vascular interventional radiology; however, it is not included in the list of participating sites (PIF: 4, 47).

**Subspecialty Programs**
**The following is a list of subspecialty programs associated with your program. Subspecialty programs with ** preceding the program number were not reviewed at the most recent RC meeting. Subspecialty programs with LTR preceding the program number will be issued a separate Letter of Notification.**

LTR-4233531103 - Neuroradiology
Probationary Accreditation, Administrative - Effective: 02/03/2014
Citations: New - 0   Extended - 8   Resolved - 0

LTR-4273512109 - Vascular and interventional radiology
Probationary Accreditation, Administrative - Effective: 02/03/2014
Citations: New - 0   Extended - 3   Resolved - 0

All current residents and applicants (those invited for interviews) to the program must be

Rhonda Osborne, MD
Page 8

advised in writing of the program's status, and a copy of the appropriate written notification must be submitted to this office within fifty (50) days of the date of this letter, whether or not the action is appealed.

For information concerning appeal of this action, please see the document entitled "Procedures for Appeal of Adverse Actions", which immediately follows this letter.

This office must be notified of any major changes in the organization of the program. When corresponding with this office, please identify the program by name and number as indicated above. Changes in participating institutions and changes in leadership must be reported to the Review Committee using the ACGME Accreditation Data System.

Sincerely,

Felicia Davis, MHA
Executive Director
Residency Review Committee for Radiology-Diagnostic
3127557445
fdavis@acgme.org

CC:
    Ian L. Taylor, MD,PhD
    James P. Walsh, MD
    Jaya Nath, MD,MBBS
    Stephen Wadowski, MD

Participating Site(s):
    Kings County Hospital Center
    Lutheran Medical Center
    SUNY Health Science Center at Brooklyn
    University Hospital-SUNY Health Science Center at Brooklyn
    Veterans Affairs Medical Center (Brooklyn)

## ACGME PROCEDURES FOR APPEAL OF ADVERSE ACTIONS EFFECTIVE DATE: JULY 1, 2013

1.  If the Review Committee confers an adverse action, the program or institution may request a hearing before an Appeals Panel. If a written request for such a hearing is not received by the Chief Executive Officer of the ACGME within 30 days following receipt by the program or institution of the notice of adverse action, the action of the Review Committee shall be deemed final and not subject to further appeal.

2.  If a hearing is requested, a panel shall be appointed according to the following procedures:

    i.   The ACGME shall maintain a list of qualified persons as potential appeals panel members to review programs.

    ii.  For a given hearing, the program or institution shall receive a copy of the list of potential appeals panel members and shall have an opportunity to delete a maximum of one-third of the names from the list. Within 15 days of receipt of the list, the program or institution shall submit its revised list to the Chief Executive Officer of the ACGME.

    iii. A three-member Appeals Panel will be constituted by the ACGME from among the remaining names on the list.

3.  When a hearing is requested, the following policies and procedures shall apply:

    i.   When a program or institution requests a hearing before an Appeals Panel, the program or institution holds the accreditation status determined by the Review Committee with the addition of the term "under appeal". This accreditation status shall remain in effect until the ACGME makes a final determination on the accreditation status of the program or institution following the appeal process.

    Nonetheless, upon receipt of a notice of adverse action, residents and any applicants who have been invited to interview with the sponsoring institution must be informed in writing as to the adverse action conferred by the Review Committee.

    ii.  Hearings conducted in conformity with these procedures shall be held at a time and place to be determined by the ACGME. At least 25 days prior to the hearing, the program or institution shall be notified of the time and place of the hearing.

    iii. The program or institution shall be given the documents comprising the program file and the record of the Review Committee's action.

    iv.  The documents comprising the program or institutional file and the record of the Review Committee's action, together with oral and written presentations to the Appeals Panel, shall be the basis for the recommendations of the appeals panel.

    v.   The Appeals Panel shall meet to review the written record and receive the presentations. The applicable Review Committee shall be notified of the hearing, and a representative of the Review Committee may attend the hearing in order to be available to the appeals panel to provide clarification of the record.

    vi.  Proceedings before an appeals panel are not of an adversary nature as typical in a court of law, but rather provide an administrative mechanism for peer review of an accreditation decision about an educational program. The appeals panel shall not be bound by technical rules of evidence usually employed in legal proceedings.

    vii. The Appellant may be represented by no more than five individuals at the

**SUNY 000690**

Rhonda Osborne, MD
Page 10

hearing.

viii.  The Appeals Panel shall not consider any changes in the program or institution or descriptions of the program or institution that were not in the record at the time when the Review Committee reviewed it and conferred the adverse action.

ix.  Presentations shall be limited to clarifications of the record and to information which addresses compliance by the program or institution with the published standards for accreditation and the review of the program or institution according to the administrative procedures which govern accreditation of GME programs. Presentations may include written and oral elements. The appellant may make an oral presentation to the Appeals Panel, but the presentation shall be limited to two hours. Any information, including presentations and audio-visual and written materials must be provided to the ACGME two weeks prior to the hearing.

x.  The appellant shall communicate with the appeals panel only at the hearing or in writing through the Chief Executive Officer of the ACGME.

xi.  The appeals panel shall make recommendations to the ACGME Board as to whether substantial, credible, and relevant evidence exists to support the action taken by the Review Committee in the matter under appeal. The appeals panel, shall, in addition, make recommendations as to whether there has been substantial compliance with the administrative procedures which govern the process of accreditation of GME programs.

xii.  The appeals panel may recommend either upholding the Review Committee's decision or restoring the program or sponsoring institution to its previous status.

xiii.  The appeals panel shall submit its recommendation to the ACGME Board within 20 days of the hearing. The ACGME Board shall act on the appeal at its next regularly-scheduled meeting.

xiv.  The decision of the ACGME Board in this matter shall be final. There is no provision for further appeal.

xv.  The Chief Executive Officer of the ACGME shall, within 15 days of the final decision, notify the program/institution under appeal of the decision of the ACGME Board.

xvi.  The appellant is fully responsible for the Appeal Fee as set yearly by the ACGME.  Expenses of the appeals panel members and the associated administrative costs shall be shared equally by the appellant and the ACGME.

SUNY 000691

KCHC Meeting with Dr. Jamaleddine
April 9, 2014

I.    **Residency**
  A.  Probation – will have a return site visit within the year
    -  Only radiology program in the country on probation (201 programs)
    -  Poor board pass rate
  B.  RRC Non-compliance
    -  Program Director  (salary)
    -  Program Coordinator – out since the end of October
  C.  Increase resident involvement in department and institutional activities
    -  QA and PI Projects,
    -  Patient Safety Committees
    -  RCA's
    -  Interdepartmental Conferences
    -  Workplace Violence Project
    -  ACR Appropriateness Criteria (clinician education)
    -  Increase resident scholarly activities

II.   **Faculty**
    -  Increase work requirements as part of base pay
    -  Mammographers will be asked to provide extra service without additional pay equivalent to call requirements of the other physicians
    -  Change 3 faculty members and short term extensions for several others – need to fast tract new hires
    -  Productivity monitoring
    -  Monitoring of unread studies
    -  Faculty Development
    -  Close monitoring of teaching and scholarly activity to ensure that we meet the benchmarks as outlined by the RRC

III   **Future Coverage**
    -  After the new Pacs and talk technology are in place  would like to discuss cross covering between institutions day and night to enhance the quality of service and reduce physician cost

**SUNY 002806**

**A109**

| | |
|---|---|
| **From:** | CN=Oded Greenberg/O=Downstate |
| **Sent:** | Monday, June 23, 2014 1:53 PM |
| **To:** | CN=Alan Kantor/O=Downstate@Downstate |
| **Subject:** | Sorry you have to go thru this |

Hi Alan, was at the staff meeting today and heard the news. I am so sorry this happened and most of all I am angry that they are treating really good people this way. I have known you a long time and through all of our time together, I have always thought highly of you and genuinely liked and respected you despite probably giving you a grey hair or three. There is no excuse for treating you and Dave so disrespectfully after all of your hard work and dedication. I hope, given the circumstances these past few years, that there is a backup plan. As horrible as it is, it would at least have been professional to give both of you reasonable notice. There is a special place in Hell for the administration and the powers that be for what has happened here. You can throw Deblasio in there as well for forcing LICH to stay open.

I hope it all works out for the better in the end for you and your family. If there is anything I could possibly do to help, please dont hesitate to contact me. Hopefully I will remain employed at least long enough to make a certain someones life miserable.

Thanks for all that you have done here for all of us,

Oded

Confidential

SUNYESI00000632

**A110**

| | |
|---|---|
| **From:** | CN=Oded Greenberg/O=Downstate |
| **Sent:** | Tuesday, October 21, 2014 9:19 AM |
| **To:** | Odedgreenberg@msn.com |
| **Subject:** | Fw: Re: possible referral |

---

-----Forwarded by Oded Greenberg/Downstate on 10/21/2014 09:19AM -----

======================To: Michael Garrett/Downstate@Downstate
From: Oded Greenberg/Downstate@Downstate
Date: 06/27/2014 12:25PM
Subject: Re: possible referral
======================Dr. Garrett, I understand the limitations within your department and I appreciate your response, its just been a difficult and ultimately fruitless experience.  It would have been better to find out at the outset that there are essentially no services for physicians within our institution.  The numerous dead ends and lack of followthrough has worn me out and I will seek help elsewhere.  I must say that I always felt that Downstate was a pretty horrible hospital, now with this experience, the LICH fiasco, bringing in Stalin as our new chairperson and numerous agregious firings later, I am convinced that this is the new face of medicine playing out at its worst here in Brooklyn.  Why anyone would risk a career in Medicine at this point is beyond me. God help us all in the new mellinium.  I hope things are better for you.

Oded

-----Michael Garrett/Downstate wrote: -----
To: Oded Greenberg/Downstate@Downstate
From: Michael Garrett/Downstate
Date: 06/26/2014 10:34AM
Cc: Jeffrey Feola/Downstate@Downstate
Subject: Re: possible referral

Dr Greenberg

I  am very sorry (really, very sorry) that things did not work out with Dr Feola.  It is clear you do not want another round with him, or with our Department, but I will speak with him in any case.  When we first talked on the phone I asked you if you wanted to be seen privately outside SUNY, or at SUNY.  You said at SUNY.  I know people in Brooklyn to whom I could have referred you had you wanted an outside referral, but the preference to be seen at SUNY (understandable) constrained the options.  Unlike some other Departments at SUNY we are a small Department in which faculty practice focuses on teaching medical students and residents.   There are only two attendings in our Department who have outpatient hours.  Dr Feola was the only one who had available time when you called.  The student health service has limited resources which are devoted to medical students in need of counseling.  The employee health service does not have a psychiatrist on staff.

If I have misunderstood you, and you would like me to assist with a private referral outside SUNY, we can try again.  If I have understood you correctly that you will proceed to obtain a referral on your own, please accept my sincere apology for this turn of events.

Confidential

SUNYESI00000733

Michael Garrett, MD
Vice Chairman and Professor of Clinical Psychiatry
Department of Psychiatry
SUNY Downstate Medical Center
Tel 718-270-2022

CONFIDENTIALITY NOTICE:  This e-mail transmission, including any attachments to
it, may contain confidential information or protected health information
subject to privacy regulations such as the Health Insurance Portability and
Accountability Act of 1996 (HIPAA).  This transmission is intended only for the
use of the recipient(s) named above.  If you are not the intended recipient, or
a person responsible for delivering it to the intended recipient, you are
hereby notified that any disclosure, copying, distribution or use of any of the
information contained in this transmission is STRICTLY PROHIBITED.  If you have
received this transmission in error, please immediately notify me by reply
e-mail and destroy the original transmission in its entirety without saving it
in any manner. Thank you.

Oded Greenberg---06/26/2014 10:12:12 AM---Dr. Garrett, thank you for the
initial referral, however I must say that I am gravely dissapointed.

From:     Oded Greenberg/Downstate
To:       Michael Garrett/Downstate@Downstate,
Date:     06/26/2014 10:12 AM
Subject:     Re: possible referral

--------------------------------------------------

Dr. Garrett, thank you for the initial referral, however I must say that I am
gravely dissapointed.  Having met with Dr. Feola now weeks ago, I had expected
a followup appointment which was promised.  I havent heard a thing.  I have
literally spent months trying to find someone at our institution who could see
me and have come up with a dead end each time. I called student health at both
institutions and was given the run around numerous times.  I was finally told
about you by a colleague and yet again the ball was dropped.  I am in volatile
situations both at work and at home, everyone around me is getting fired and I
am stressed beyond belief.  You owe it to those of us who are practicing under
difficult circumstances to provide some sort of counseling. It is
incomprehensible that it should be so difficult.  As a fellow professional, I
am appalled that there is essentially no support.  Dont bother having Dr. Feola
or his staff call me, I will seek help elsewhere.

Oded Greenberg MD

-----Michael Garrett/Downstate wrote: -----
To: Oded Greenberg/Downstate@Downstate
From: Michael Garrett/Downstate
Date: 04/28/2014 02:44PM
Subject: Re: possible referral

Dr Feola has an opening.  You can reach him at x2022.  Sorry for the delay in

making this referral.

********************
Michael Garrett, MD
Vice Chairman and Professor of Clinical Psychiatry
Department of Psychiatry
SUNY Downstate Medical Center
Tel 718-270-2022

CONFIDENTIALITY NOTICE:  This e-mail transmission, including any attachments to
it, may contain confidential information or protected health information
subject to privacy regulations such as the Health Insurance Portability and
Accountability Act of 1996 (HIPAA).  This transmission is intended only for the
use of the recipient(s) named above.  If you are not the intended recipient, or
a person responsible for delivering it to the intended recipient, you are
hereby notified that any disclosure, copying, distribution or use of any of the
information contained in this transmission is STRICTLY PROHIBITED.  If you have
received this transmission in error, please immediately notify me by reply
e-mail and destroy the original transmission in its entirety without saving it
in any manner. Thank you.

Oded Greenberg---04/28/2014 02:04:42 PM---Thanks Michael  -----Michael
Garrett/Downstate wrote: ----- To: "Jean Tropnas" <jt1420@aol.com>, Jef

From: Oded Greenberg/Downstate
To: Michael Garrett/Downstate@Downstate,
Date: 04/28/2014 02:04 PM
Subject: Re: possible referral

---------------------------------------------------

Thanks Michael

-----Michael Garrett/Downstate wrote: -----
To: "Jean Tropnas" <jt1420@aol.com>, Jeffrey Feola/Downstate@Downstate, Chana
Greenberg/Downstate@Downstate
From: Michael Garrett/Downstate
Date: 04/28/2014 01:06PM
Subject: possible referral

I got a call from one of the attendings in another department who is seeking
treatment.  This person would prefer to be seen at SUNY, and by one of our
attendings.  Do either of you have an opening?  I have cc\ed blind copy the
person who called me so that person can reach out to either of you if you have
time.

********************
Michael Garrett, MD
Vice Chairman and Professor of Clinical Psychiatry
Department of Psychiatry
SUNY Downstate Medical Center

Confidential

SUNYESI00000735

**A113**

Tel 718-270-2022

CONFIDENTIALITY NOTICE:  This e-mail transmission, including any attachments to
it, may contain confidential information or protected health information
subject to privacy regulations such as the Health Insurance Portability and
Accountability Act of 1996 (HIPAA).  This transmission is intended only for the
use of the recipient(s) named above.  If you are not the intended recipient, or
a person responsible for delivering it to the intended recipient, you are
hereby notified that any disclosure, copying, distribution or use of any of the
information contained in this transmission is STRICTLY PROHIBITED.  If you have
received this transmission in error, please immediately notify me by reply
e-mail and destroy the original transmission in its entirety without saving it
in any manner. Thank you.

Confidential

SUNYESI00000736

 **Re: Oded Greenberg**
Stephanie Bernadel   to: Steven Pulitzer                    10/28/2014 05:20 PM
Cc:   "Sade Jemmott", "Leonzo Cuiman", Adriana Conde-billy, Deborah
      Reede

Good Afternoon Dr. Pulitzer,

During our conversations over the course of my investigation on Dr. Greenberg, you referenced several
emails sent by Dr. Greenberg wherein he was unprofessional and used profane language towards Dr.
Kantor.  Inasmuch as we factored this information into our decision to implement the penalty held in
abeyance, I am writing to request copies of said emails for our files.

Regards,
Stephanie

*★*★*★*★*★*★*★*★*★*★*★*★*★*

*Stephanie Bernadel, MPA*
*Personnel Associate, Labor Relations*
*SUNY Downstate Medical Center*
*450 Clarkson Avenue, Box 1224*
*Brooklyn , NY 11203*
*work: 718-270-1972*
*cell: 347-578-4689*
*fax: 718-270-4684*
*E-mail: stephanie.bernadel@downstate.edu*

*Confidentiality Notice:  The information contained in this e-mail and any attachments may be legally
privileged and confidential.  If you are not an intended recipient, you are hereby notified that any
dissemination, distribution, or copying of this e-mail is strictly prohibited.  If you have received this e-mail
in error, please notify the sender and permanently delete the e-mail and any attachments immediately.
You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any
part of the contents to any other person.*

---

"Sade Jemmott"   Good Morning Stephanie.                    10/27/2014 11:44:39 AM

| | |
|---|---|
| From: | "Sade Jemmott" <Sade.Jemmott@nychhc.org> |
| To: | <stephanie.bernadel@downstate.edu>, |
| Date: | 10/27/2014 11:44 AM |
| Subject: | Oded Greenberg |

Good Morning Stephanie.

Is it possible for you to forward Dr. Pulitzer a formal email requesting copies of the emails sent
to Dr. Kantor from Dr. Greenberg?  Dr. Pulitzer needs it in order to send the request to Central
Office.

**SUNY 000273**

## Sade Jemmott
Clerical Associate Level IV
Radiology Administration
718-245-4446 (O)
718-245-4473 (F)

*"One becomes a critic when one cannot be an artist, just as a man becomes a stool pigeon when he cannot be a soldier." - Gustave Flaubust 1821- 1880*
Pray * Live * Love * Laugh

Visit www.nyc.gov/hhc

CONFIDENTIALITY NOTICE: The information in this E-Mail may be confidential and may be legally privileged. It is intended solely for the addressee(s). If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on this e-mail, is prohibited and may be unlawful. If you have received this E-Mail message in error, notify the sender by reply E-Mail and delete the message.

**SUNY 000274**

**MAIL**

| | |
|---|---|
| **From:** | Oded.Greenberg@nychhc.org |
| **To:** | Alan.Kantor@nychhc.org |
| **Subject:** | Re: Hi Alan, sorry forgot you wanted to talk to me an Qi.  I didnt see him this am and only spoke to him a short while ago which reminded me.  He told me that you spoke to him and it concerned the 12 to 8 shift.  I would be glad to talk to you in detail a |
| **Deliver Date:** | 14-Aug-2013 13:40 |
| **Creation Date:** | 14-Aug-2013 13:40 |
| **Store Date:** | 16-Aug-2013 10:43 |
| **Status:** | accepted,opened,read |
| **Box Type:** | sent |
| **Folder:** | Oded Greenberg Home > Sent Items |
| **Message Id:** | 520B88B9.kings-dom2.kings-po2.200.20000EB.1.3BA6F.1 |

Alan, I worked 8 hours each of those days and all of the work got done.  ER and Neuroradiology were fully covered and our responsibilities were completely fulfilled.  Job moral is important and it only serves the department when we are feel valued. Why so black and white?  Why is there no reasonable middle ground?  How would you feel if you were the only one (other than Qi) to cover until 8 pm 25% of the year and not see your kids.  I will be glad to talk to you in person next week when I get back. I am simply trying to protect my quality of life while maintaining complete professionalism.  I don't feel that I am being unreasonable.

As for Friday, I made sure Qi covered the ER while I attended my sons graduation from a special summer camp.  I returned at 5pm and stayed until around 7:30.  We used to have some flexibility amongst professionals and now it's gone, making for a difficult work environment where our every move is watched and critiqued.  I assure you I am fulfilling my responsibilities towards our patients and then some.

Oded

>>> Alan Kantor 08/09/13 5:04 PM >>>
Oded,
   These are ED shifts and you are an ED radiologist. I have divided the work hours fairly. The week you were assigned to cover the ED until 8:00pm you unilaterally decided to leave early every day. Not once did you stay until 7:00pm. This is unacceptable.I wanted to speak to you about this in person but you have away from the ER since 2:30  and have not returned.

Alan Kantor, MD
Chief of Service
Department of Radiology
Kings County Hospital Center
Office: 718-245-4447
Pager: 917-760-1591
Cell:  917-747-5989
>>> Oded Greenberg 8/9/2013 1:56 PM >>>
Hi Alan, sorry forgot you wanted to talk to me an Qi.  I didnt see him this am and only spoke to him a short while ago which reminded me.  He told me that you spoke to him and it concerned the 12 to 8 shift.  I would be glad to talk to you in detail about this but feel I can elaborate more clearly here; 1) I dont see why Qi and I have to do the lions share of this

**SUNY 000275**

rotation which severely impacts my home life for 1 week every month and no one else has to do more than 2 days.  2) I never signed on for this and in the real world people get compensated for working less desirable hours.  3) I am perfectly willing to read more Neuro so that Vin doesnt have to spend a full 4 hours of his shift doing it.  In fact when I was scheduled for 12 to 8, I made sure that Neuro was relatively caught up and Vin had little to do other than cover the ER.

If there is another reason we need to stay until 8 please let me know, because otherwise I feel it is unfair and in my opinion unnecessary.  I would be glad to work until 6pm or whenever Neuro is caught up.  Working until 8pm significantly degrades the quality of my life 25% of the year, impacting no one else other than Qi this way.  I have offered a reasonable alternative, given the parameters.  Unless you can give me another reason that the schedule must be this way or you can make it fair, I dont see why I should agree.

Please understand that I am not trying to be unreasonable.  I am simply trying to keep a balance between my work and home life that works and I would be and have been willing to do anything within reason to help the department.  I get that there are administrative pressures upon you, but it doesnt mean that work distribution need be unfair to make the administration happy when other alternatives exist.

Oded

**SUNY 000276**

**MAIL**

| | |
|---|---|
| **From:** | Oded.Greenberg@nychhc.org |
| **To:** | Alan.Kantor@nychhc.org |
| **CC:** | odedgreenberg@msn.com |
| **Subject:** | This week |
| **Deliver Date:** | 25-Sep-2013 09:53 |
| **Attachments:** | TEXT.htm [Save]  [Open] |
| **Creation Date:** | 25-Sep-2013 09:53 |
| **Store Date:** | 26-Sep-2013 02:57 |
| **Status:** | accepted,opened,read |
| **Box Type:** | sent |
| **Folder:** | Oded Greenberg Home > Sent Items |
| **Message Id:** | 5242B2A2.kings-dom2.kings-po2.200.20000EB.1.3D7B6.1 |

Alan, this week was another example of poor communication and even poorer coverage in our department. Those scheduled to cover 6 to 2 and 12 to 8 have been out for 3 days now. Neuroradiology and Ultrasound have been essentially uncovered for 3 days as well except for Vins help late in the day. We are bombarded with calls from the ER to sign off emergent ultrasounds which we have been doing and have also attempted to help out with Neuro. There has been zero Body Imaging support for the ultrasound department. Every morning we have to check the lists to see who is here and wether we have to read the overnights. Short of Linda calling me to tell me people are out (my initiative) I am left to figure this out myself. By the way 6 to 2 is often not covered when Dave is out. Once again it was a veritable call day in the ER with Qi out and 5 attendings short.

My point in saying all of this is that it would be kind and professional to give me a heads up on the situation, instead of the usual assumption that 'Dr. Greenberg will handle it' or 'I was sent here to see Dr. Greenberg because there is no one upstairs to read this case'.

Truthfully, it pisses me off that there is so much attention being paid to data analysis as to when I read my first and last cases (an inaccurate measure of the time I arrive and leave) when there are egregious holes in our coverage during the day and others disappear for hours. I would rather punch a card. I dont need to be lauded for filling in where necessary, it is my duty and honor to do so. I do deserve some professional courtesy and appropriate communication when necessary.

Also, I remain unhappy with the 12 to 8 shift. Again I would be glad to read more neuro during the day and would consider staying til 6, but 8 pm is too late at this point in my career with two young children at home. I hope you will give some consideration to revise this schedule for me. I would prefer to keep UUP out of this.

Alan, I know that it is extremely stressful on your end, and I appreciate your kindness when it comes to time off and vacation, but my career and working conditions shouldnt be getting worse as I get older, especially when others are given more leeway. I often dont get lunch and I am on call 2 weekends almost every month. I have given alot and I would like a break and a modicum of respect.

Thanks

Oded

**SUNY 000283**

| TEXT htm | **ATTACHMENT** |
|---|---|

Alan, this week was another example of poor communication and even poorer coverage in our department.  Those scheduled to cover 6 to 2 and 12 to 8 have been out for 3 days now.  Neuroradiology and Ultrasound have been essentially uncovered for 3 days as well except for Vins help late in the day.  We are bombarded with calls from the ER to sign off emergent ultrasounds which we have been doing and have also attempted to help out with Neuro.  There has been zero Body Imaging support for the ultrasound department.  Every morning we have to check the lists to see who is here and wether we have to read the overnights.  Short of Linda calling me to tell me people are out (my initiative) I am left to figure this out myself.  By the way 6 to 2 is often not covered when Dave is out.  Once again it was a veritable call day in the ER with Qi out and 5 attendings short.

My point in saying all of this is that it would be kind and professional to give me a heads up on the situation, instead of the usual assumption that 'Dr. Greenberg will handle it' or 'I was sent here to see Dr. Greenberg because there is no one upstairs to read this case'.

Truthfully, it pisses me off that there is so much attention being paid to data analysis as to when I read my first and last cases (an inaccurate measure of the time I arrive and leave) when there are egregious holes in our coverage during the day and others disappear for hours. I would rather punch a card.  I dont need to be lauded for filling in where necessary, it is my duty and honor to do so.  I do deserve some professional courtesy and appropriate communication when necessary.

Also, I remain unhappy with the 12 to 8 shift.  Again I would be glad to read more neuro during the day and would consider staying til 6, but 8 pm is too late at this point in my career with two young children at home.  I hope you will give some consideration to revise this schedule for me.  I would prefer to keep UUP out of this.

Alan, I know that it is extremely stressful on your end, and I appreciate your kindness when it comes to time off and vacation, but my career and working conditions shouldnt be getting worse as I get older, especially when others are given more leeway.  I often dont get lunch and I am on call 2 weekends almost every month.  I have given alot and I would like a break and a modicum of respect.

Thanks

Oded

**SUNY 000284**

**MAIL**

| | |
|---|---|
| **From:** | Oded.Greenberg@nychhc.org |
| **To:** | Alan.Kantor@nychhc.org |
| **CC:** | gilmoregreenberg@msn.com |
| **Subject:** | Alan, I was just informed about what was said at todays staff meeting in front of our whole department prior to me arriving.  i was told that Patrick Hammil (He who reads 10 cases a day) said that there is routinely no one in the ER reading room between 4 |
| **Deliver Date:** | 09-Oct-2013 17:09 |
| **Attachments:** | TEXT.htm  [Save]   [Open] |
| **Creation Date:** | 09-Oct-2013 17:09 |
| **Store Date:** | 10-Oct-2013 02:35 |
| **Status:** | accepted,opened,read |
| **Box Type:** | sent |
| **Folder:** | Oded Greenberg Home > Sent Items |
| **Message Id:** | 52558DC9.kings-dom2.kings-po2.200.20000EB.1.3E48A.1 |

Alan, I was just informed about what was said at todays staff meeting in front of our whole department prior to me arriving. I was told that Patrick Hammil (He who reads 10 cases a day) said that there is routinely no one in the ER reading room between 4 and 5 PM. I understand that you supported him in that in front of Dr. Reade no less.  That is utter bullshit.  I am livid at the degree of disrespect we get down here.  I am here every day alone between 4 and 5 every fucking day! He claims he filled out 9 protocols yesterday.  I was here till 8 pm.  At around 4:30  I got out of my seat for the first time that day to consult with Dr. Schwatzbard for about 15 minutes.  Sorry I didnt have the opportunity to do all the protocoling and answer every bullshit phonecall while I am here alone getting slammed all day when Qi is out and Dave gone at 2:30 pm. And by the way whenever Dave has been out.  No one covers the 6 to 2 shift, leaving it for me.  That includes today.  So if you are wondering why the turnaround time for CR is over 3 hours look no further.  I got in at 9 today and read all of the overnights.

You all have some nerve.  I am sorry I wasnt there to defend the ER.  I am dedicated to my craft and all I get is shit on by those 'upstairs'.  I am not going to be nice about this anymore.  I'm pissed.  Next time have Patrick say this shit to my face.  The nerve.  I read more in an hour than he reads in a day.

You call that a full time job?

I no longer give a fuck

Oded

TEXT.htm                                                                    **ATTACHMENT**

Alan, I was just informed about what was said at todays staff meeting in
front of our whole department prior to me arriving.  I was told that
Patrick Hammil (He who reads 10 cases a day) said that there is routinely
no one in the ER reading room between 4 and 5 PM. I understand that you
supported him in that in front of Dr. Reade no less.  That is utter
bullshit.  I am livid at the degree of disrespect we get down here.  I am
here every day alone between 4 and 5 every fucking day!  He claims he
filled out 9 protocols yesterday.  I was here till 8 pm.  At around 4:30  I
got out of my seat for the first time that day to consult with Dr.
Schwatzbard for about 15 minutes.  Sorry I didnt have the opportunity to do
all the protocoling and answer every bullshit phonecall while I am here
alone getting slammed all day when Qi is out and Dave gone at 2:30 pm.  And
by the way whenever Dave has been out.  No one covers the 6 to 2 shift,
leaving it for me.  That includes today.  So if you are wondering why the
turnaround time for CR is over 3 hours look no further.  I got in at 9
today and read all of the overnights.

·     You all have some nerve.  I am sorry I wasnt there to defend the ER.  I am
dedicated to my craft and all I get is shit on by those 'upstairs'.  I am
not going to be nice about this anymore.  I'm pissed.  Next time have
Patrick say this shit to my face.   The nerve.  I read more in an hour than
he reads in a day.

You call that a full time job?

I no longer give a fuck

Oded

**SUNY 000282**

Meeting with Dr. Greenberg

May 5.2014

**Reason for the meeting**: Time and attendance

**What initiated the meeting:** Incorrect reporting of time and attendance

I requested the meeting to discuss an incorrect entry on his time sheet. The administrative assistant responsible for monitoring the time sheets reported a discrepancy in his April time sheet for time worked on April 21, 2014. Dr Greenberg reported that he worked from 9 am to 5 pm. On the day in question he sent an e mail to the time keeper stating that he would be arriving around 11 am and had notified the resident on call at KCHC at 6am that he would be late. A review of the case dictation logs showed that he did not dictate a case till 12:07 pm.

Dr. Greenberg said he did not see what the problem was because he read all the films. I informed him that his job responsibilities require him to be present for consultations as well as resident supervision and education. I also reminded him that we had a Grand Rounds on time and attendance from DMC HR on Oct 15, 2013 and although he works at KCHC he is paid by DMC and is therefore subject to our rules and regulations.

He was also informed that after discussions with Leo Johnson and a review of his records it was determined that he could leave the time as reported because there were several days where he worked more than 8 hours. In the future however he should report his time correctly.

The meeting ended with a reminder that random audits can be performed to monitor attendance.

SUNY DOWNSTATE MEDICAL CENTER
(Please type or print, using ball point pen)

## MONTHLY FACULTY AND NTP INDIVIDUAL REPORT OF ATTENDANCE

FOR THE PERIOD   FROM: 4/1   TO: 4/30

NAME: Oded Greenberg   DEPARTMENT: Radiology   TITLE: Clinical Asst Prof

SOCIAL SECURITY NO: [Redacted]   FT____ PT____ If PT, % of FT: _____

CHECK BOX AT RIGHT IF YOU ARE AN FLSA NON-EXEMPT (COVERED) EMPLOYEE ☐   REGULAR SHIFT FROM: ____ AM/PM   TO: ____ AM/PM

**SECTION 1:** To be completed by all Faculty and NTP, including FLSA Non-Exempt (covered) employees, as applicable. I certify that I have been present and have met my professional obligation, as required, except for the absences indicated below:

### ABSENCES (IF ANY):

| | | | CHARGE TO: | | | | | |
|---|---|---|---|---|---|---|---|---|
| DATE FROM OR ON | TO | NUMBER OF DAYS | ANNUAL LEAVE | SICK LEAVE | FAMILY SICK LEAVE | IN LIEU OF HOLIDAY | FMLA LEAVE | DRL | OTHER |
| 4/22 | | 1 | | ✓ | | | | | |

REMARKS: Calendar Year Employees should list here a day prescribed by law for the observance of a HOLIDAY on which they were required to be present:

**SECTION 2:**   TO BE COMPLETED BY FLSA NON-EXEMPT (COVERED) EMPLOYEES ONLY
REPORT OF ACTUAL HOURS WORKED IN EXCESS OF 40 HOURS/WEEKLY FOR FLSA NON-EXEMPT PROFESSIONAL EMPLOYEES
I certify that, pursuant to the provisions of the Fair Labor Standards Act Amendment of 1985, I am FLSA Non-Exempt Professional employee and, as indicated below, I have worked in excess of 40 hours per week to meet my professional obligation. (See back for additional instructions.)

| | | TIME | | |
|---|---|---|---|---|
| DAY OF WEEK | DATE | FROM | TO | ACTUAL # HOURS |
| | | | | |

TOTAL:
X 1.5   = PREMIUM HOURS:

**SECTION 3:**
5/1/14
DATE

O Greenberg MD
SIGNATURE OF PROFESSIONAL STAFF MEMBER

I verify that with the exceptions noted, the leave and/or record of actual hours worked in excess of 40 hrs/weekly as indicated above are, to the best of my knowledge, accurate and complete:

_____
DATE

_____
SIGNATURE OF SUPERVISOR/ CHAIR/ DIRECTOR

**SECTION 4:**
NOTE:   The Official Record of Accrual Summary of Leave Credits is the record maintained by the Time & Attendance Unit. The space provided below is for recording your applicable accruals. The Supervisor is responsible for certifying the accuracy of the period of accrual activity before it is submitted to the Time & Attendance Unit.

### ACCRUAL SUMMARY OF LEAVE CREDIT

| | ANN. LV | SICK LV. | IN LIEU OF HOLIDAY | DRL | PREMIUM HRS. REPORTED IN SECTION 2 | | FMLA LEAVE TAKEN DURING CAL. YEAR | ACCUM. EMP. ORG. LEAVE |
|---|---|---|---|---|---|---|---|---|
| 1. BAL BROUGHT FWD | .75 | 17.75 | | | | TOTAL PREV. USED | | |
| 2. TIME USED (-) | 0 | 1 | | | | | | |
| 3. SUB-TOTAL: | .75 | 16.75 | | | | | | |
| 4. TIME EARNED (+) | 1.75 | 1.75 | | | | USED THIS PERIOD (+) | | |
| 5. NEW BALANCE | 2.5 | 18.5 | | | | NEW TOTAL | | |

(-7.)

DMC-0128 F467 R4 (12/11)

SUNYESI00001500

Case 1:15-cv-02343-PKC-VMS   Document 87-10   Filed 09/14/18   Page 3 of 3 PageID #: 1403

## HHC-ANNEX G



Affiliate Institution: **SUNY Health Science Center at Brooklyn**

Name _Oded Greenberg_   Month _April_

Title _Clinical Asst Prof._   Dept./Div. _Radiology_

In accordance with the terms of my aggreement with SUNY/ Health Science Center at Brooklyn I hereby
certify that I have fulfilled my commitment at the Kings County Hospital as follows:

| | Week of: 3/30 | | Week of: 4/7 | | Week of: 4/14 | | Week of: 4/21 | | Week of: 4/28 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Date | Hours | Date | Hours | Date | Hours | Date | Hours | Date | Hours |
| Mon | 3/30 | | 4/7 | 9A-5P 8 | 4/14 | 8-3 7 | 4/21 | 9A-5P 8 | 4/28 | 9A-5P 8 |
| Tues | 4/1 | 9A-5 8 | 4/8 | 9A-5P 8 | 4/15 | 8-3 7 | 4/22 | SL | 4/29 | 9A-5P 8 |
| Wed | 4/2 | 9A-5 8 | 4/9 | 9A-5P 8 | 4/16 | 9A-5P 8 | 4/23 | 9A-5P 8 | 4/30 | 9A-5P 8 |
| Thurs | 4/3 | 9A-5 8 | 4/10 | 9A-5P 8 | 4/17 | 9A-5P 9 | 4/24 | 8-5 9 | | |
| Fri | 4/4 | 9A-5 8 | 4/11 | 9A-5P 8 | 4/18 | 9A-5P 9 | 4/25 | 8-5 9 | | |
| Sat | 4/5 | 6A-2P 8 | | | | | | | | |
| Sun | | | | | | | | | | |
| Total | | 40 | | 40 | | 38 | | 34 | | 24 |

_Took comp days on 4/17 and 4/18_   Total Hours _176_
_From 4/10/13 (½day) 4/30/13 (½day) and 4/17/13 (Full day)_

Title _Oded Greenberg_ MD   Date _5/1/14_

Approved by _____
                    Chief of Service

| INDICATED ABSENCES: |
|---|
| H = Holiday |
| SL = Sick Leave |
| AL = Annual Leave |
| EL = Educational Leave |

SUNYESI00001501

# A125

**From:** CN=Linda McMurren/O=Downstate
**Sent:** Friday, May 9, 2014 10:39 AM
**To:** CN=Oded Greenberg/O=Downstate@Downstate
**Subject:** April Time Sheet
**Attach:** SKMBT_36314050910200.pdf

---

Good morning Dr. Greenberg,

Please revise your time sheets to include April 3, 4, and fax back to me.

Thanks,

Linda

Linda McMurren
Administrative Assistant
Dept. of Radiology Chair's Office
Linda.McMurren@downstate.edu (email)
718-270-1603 (phone)
718-270-2667 (fax)


Confidentiality Notice:  The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers.


----- Forwarded by Linda McMurren/Downstate on 05/09/2014 10:29 AM -----

From: biz363@downstate.edu
To: linda.mcmurren@downstate.edu,
Date: 05/09/2014 10:25 AM
Subject: biz363@downstate.edu

SUNYESI00001499



### Kings County Hospital Center
### Radiology Department
### Faculty Meeting Minutes
### <u>May 08, 2014</u>



The meeting was called to order at **1:38pm** on May 8, 2014 in the S2 Conference Room

by Dr. Alan Kantor.

**Present:**

| | | |
|---|---|---|
| *Dr. Alan Kantor* | *Dr. Deborah Reede* | *Dr. Rachelle Goldfisher* |
| *Dr. Arnold Strashun* | *Mr. Jean Aime* | *Dr. Riffat Chaudary* |
| *Dr. Daniel Zinn* | *Dr. John Amodio* | *Dr. Stephen Waite* |
| *Dr. Daphne Roitberg* | *Dr. Oded Greenberg* | *Dr. Steven Pulitzer* |
| *Dr. David Areman* | *Dr. Patrick Hammil* | |

**Approval of Previous Minutes**

The minutes of the previous meeting were unanimously approved.

**PART A:** **OLD / RECURRING BUSINESS**

1. **GME Timesheets**

Dr. Kantor stated the importance of completing the GME timesheets in a timely fashion.

He reminded everyone to complete their GME timesheets. The most recent (4th qtr.) time

sheet covered 4/6/2014 – 4/19/2014

2. **Peer Reviews**

Dr. Kantor requested the return of all Peer Review forms that were submitted for

completion. This includes the in-house reviews sent via E-mail from Ms. Green and the

VRC peer review lists and forms distributed at this meeting.

3. **M & M Conference**

1

HHC_ESI_000170

Five Residents attended the last M&M Conference.   Four cases were presented by Radiology.  The M & M Conference is a primary Quality Assurance and educational tool. Attendance is mandatory.  Everyone is encouraged to submit cases for presentation.  Dr. Pulitzer explained the format for preparing cases for presentations.   He offered his availability to review cases for presentations.   All cases should be anonymized for presentation.

4.   **Protocols**

For legibility purposes, Attendings were asked to print and sign or use stamps when protocolling procedures.

5.   **Resident Supervision**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

6.   **QA**

**(a) MOC / PI Projects / Breakthrough**

Breakthrough is the HHC adaptation of the Toyota "lean" program for quality assurance and Performance Improvement. It is the mechanism employed by HHC for organizing and implementing PI initiatives. The hospital provides extensive training resources towards this initiative. These workshops and programs are open to anyone who is interested in attending. It is strongly recommended that the staff take advantage of these resources which will also help meet PI criteria for MOC.

**(b) Issues**

2

HHC_ESI_000171

Dr. Pulitzer informed the group of a recent technical issue which occurred with a Cervical Spine case. Attendings and Residents are expected to report all QA issues that have occurred under their respective tours. All issues are to be reported to Dr. Kantor and Dr. Pulitzer.

**(c) Associate Director for Quality**

The appointed Associated Director will be required to attend Residency Education meetings and perform Quality Assurance tasks.

Once again, Dr. Hammill was nominated for the Associate Director for QA.

7.   **Equipment**

**(a) 3T MRI**

Mr. Jean Aime informed the group of a delay in the final stages of Radiology receiving the MRI machine. This is due to a language issue with the contract between HHC and GE Healthcare.

**(b) Ultrasound**

The final stages of receiving the Ultrasound machine is also delayed due to changes in the Mayor's office. Mr. Aime stated he has been communicating with the Comptroller's office and answering and necessary questions.

**(c) PET / CT (Now and when)**

No updates.

8.   **Communication and Coding**

Dr. Kantor urged everyone to document communications with other departments. Coding is also necessary to provide efficient follow ups. The report coding serves as a database for case follow-up by the Associate Medical Director. Attendings were reminded to escalate to the level of the respective Service Chiefs if a provider was unavailable.

3

HHC_ESI_000172

9.    **Overnight / VRC**

   **(a) Peer Review**

     See topic number two.

   **(b) Thoughts on In – House Coverage**

     Dr. Kantor mentioned his interest in hiring two Radiologist for coverage on tour one (overnight).


**PART B:     NEW BUSINESS**

**New Contracts: Dr. Reede**

- ❖ It is required that everyone documents accurate information on their timesheets.
- ❖ Attendings are required to notify the office for punctuality and attendance reasons.  This should be done before the start of the individual's respective tours / shift.
- ❖ Residents will be allowed to evaluate their professors and lectures, in the near future.  This will enhance the quality of lectures provided.
- ❖ Dr. Reede informed the staff that she is still communicating with HR on the new contracts.  She has not received any final wording.
- ❖ Dr. Reede stated the importance of reporting cases to Risk Management.  The staff was informed that Risk Management needs to be notified of all questionable cases.  When received, such notifications will be documented in the respective Attending's files.


**PART C:     OPEN**

There were no further issues to be discussed.


**Adjournment:** Meeting was adjourned at **2:38** pm by Dr. Kantor.

**Minutes Submitted By:**      Sade Jemmott

**Minutes Approved By:**      **Alan Kantor, MD**

4

HHC_ESI_000173

Case 19-3570, Document 41, 02/11/2020, 2775383, Page152 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 2 of 19 PageID #: 1412

# KCHC Departmental Meeting

June 26, 2014

SUNY 002454

Case 19-3570, Document 41, 02/11/2020, 2775383, Page153 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 3 of 19 PageID #: 1413

# New Iterim Chief of Service

- KCHC senior leadership has decided not to renew Dr. Alan Kantor as the Chief of Service of the Department of Radiology at Kings County Hospital Center

- **Interim Chief of Service:**

- **Steven Pulitzer, MD**

- Cell phone 212-828-2978

- Pager 917-218-5720

SUNY 002455

Case 19-3570, Document 41, 02/11/2020, 2775383, Page154 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 4 of 19 PageID #: 1414

# Integration to one Department of Radiology

- We will work to become one integrated department with SUNY Downstate Medical Center Department of Radiology

- **We will work together to have continuity in the following areas:**

- Standardized reports

- Attestations

- CT/MRI/US and X-ray protocols

- Resident responsibilities

SUNY 002456

Case 19-3570, Document 41, 02/11/2020, 2775383, Page155 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 5 of 19 PageID #: 1415

# Zero Backlog.......

- Goal is zero backlog

- How?

- Will change how each service is covered during the day time shifts (to be announced)

- Weekend shifts will continue to address backlog by the second reader (8 am-4 pm shift)

SUNY 002457

Case 19-3570, Document 41, 02/11/2020, 2775383, Page156 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 6 of 19 PageID #: 1416

# Time and Attendance

- Time and attendance will be monitored
- Make sure you accurately fill out your time sheets to reflect the actual time you were physically here in the hospital both daily and when on call on the weekends

SUNY 002458

Case 19-3570, Document 41, 02/11/2020, 2775383, Page157 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 7 of 19 PageID #: 1417

# Vacation......

- The vacation schedule will be put out quarterly

- For August – September 2014

  -all vacation/CME requests are due on July 10, 2014

- For October – December

  -All requests are due by August 10

SUNY 002459

Case 19-3570, Document 41, 02/11/2020, 2775383, Page158 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 8 of 19 PageID #: 1418

# Sick Day Policy for KCHC

- In addition to calling and e-mailing Linda McMurren at SUNY:

- Call Sade Jemmott at 718-245-4447

  Calls must be made BEFORE 7:30 am on the day you will be out

Email Sade.Jemmott@nychhc.org before 7:30 am on the day you will be out

**SUNY 002460**

Case 19-3570, Document 41, 02/11/2020, 2775383, Page159 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 9 of 19 PageID #: 1419

# Shifts...

- We will continue with the current shifts as follows:
- ED coverage: 6 am–2 pm –

  12 pm – 8 pm – Rotating schedule

  4 pm – Midnight – Vin

Weekends: 3 shifts – 6am – 2 pm

  8 am – 4 pm

  4 pm – midnight

**for the monthe of July, we will suspend the 12-8pm KCHC shift. Will resume in August 2014

*Will work with Brian Gale to coordinate KCHC staff DX call to coincide with weekend Call

SUNY 002461

Case 19-3570, Document 41, 02/11/2020, 2775383, Page160 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 10 of 19 PageID #: 1420

# Monday Morning Meeting

- There will be a short staff meeting every Monday morning at 10:00- 10:30 A.M. in the S2 conference room: Attendance is Mandatory

- This meeting will cover:

  - Coverage schedule for people with scheduled days off
  - Review backlog from the weekend – assign coverage
  - Discuss any pertinent issues related to the department
  - Discuss any problems from staff
  - Follow-up to problems raised in prior weeks

SUNY 002462

# 12 noon – 1 Pm coverage at KCHC

- Goal – Nurse to inject intravenous contrast throughout the day will include 12pm – 1 pm.

- Now, nurses are not certified for contrast injection.

- Working to get nurses trained within 3 months

- **Patch:**

- Rotating attending coverage schedule

SUNY 002463

Case 19-3570, Document 41, 02/11/2020, 2775383, Page162 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 12 of 19 PageID #: 1422

# Perinatal Imaging

- Rachelle Goldfisher – Director of Perinatal Imaging
- Service will cover OB second trimester ultrasound, Fetal MRI
- Timeline:
- Will begin by July 1, 2014

SUNY 002464

Case 19-3570, Document 41, 02/11/2020, 2775383, Page163 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 13 of 19 PageID #: 1423

# Assigned rooms

- Assigned reading rooms by modality for resident

- Phone numbers to these rooms will be made available to the referring services

- Technologists will be able to find residents to check cases

- At least one resident must be in this room during working hours with the exception of scheduled lectures

- At the start of each work day, resident must give pager to the CT/MRI/US staff so they know how to reach you

SUNY 002465

Case 19-3570, Document 41, 02/11/2020, 2775383, Page164 of 290

Case 1:15-cv-02343-PKC-VMS  Document 87-13  Filed 09/14/18  Page 14 of 19 PageID #: 1424

# All cases timed 3:30

- All cases timed 3:30 pm must be prelimed by resident in their section before they may leave for the day.

- Resident must return to work station after lecture if these cases are not completed before the 4 pm lecture

- All cases will be reviewed with the resident that day or in the morning of the next day if the case was signed by the attending while the resident is in conference

SUNY 002466

Case 19-3570, Document 41, 02/11/2020, 2775383, Page165 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 15 of 19 PageID #: 1425

# Checking cases

- With the exception of CT Brain, all cases must be checked by the radiololgy resident before the patient is taken off the table.

- Policy and procedure for cases to be checked will be discussed in the Section Chief meeting

- All outpatient scans must be cleared by an upper year resident or attending physician before the patient can leave the department

SUNY 002467

Case 19-3570, Document 41, 02/11/2020, 2775383, Page166 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 16 of 19 PageID #: 1426

# Attestations

- New format for resident cases
- Attestations will be made available by early next week

SUNY 002468

Case 19-3570, Document 41, 02/11/2020, 2775383, Page167 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 17 of 19 PageID #: 1427

# Ultrasound orders

- Ultrasound orders will be protocoled by the resident on ultrasound or the CT supervision resident at least 24 hours prior to outpatient exams and if available, inpatient exams

- Any order changes must be made prior to the patient arriving in the radiology department

SUNY 002469

Case 19-3570, Document 41, 02/11/2020, 2775383, Page168 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 18 of 19 PageID #: 1428

# GME Timesheet....

- All KCHC attendings must complete HHC GME time sheets

- All 2013/2014 GME time sheets are due by Friday June 26, 2014

- **If you have not completed your time sheet, then please see Jayan Kurian immediately following this meeting to avoid diciplinery action**

SUNY 002470

Case 19-3570, Document 41, 02/11/2020, 2775383, Page169 of 290

Case 1:15-cv-02343-PKC-VMS   Document 87-13   Filed 09/14/18   Page 19 of 19 PageID #: 1429

# Thank you

**SUNY 002471**

**A148**

| | |
|---|---|
| **From:** | CN=Linda McMurren/O=Downstate |
| **Sent:** | Wednesday, July 9, 2014 6:59 PM |
| **To:** | CN=Oded Greenberg/O=Downstate@Downstate |
| **Cc:** | CN=Rhonda Besunder/O=Downstate@Downstate |
| **Subject:** | Change of Day Off |

Hi Dr. Greenberg,

Any time away requires the forms that Rhonda Besunder and I sent to you. The forms must be filled out and faxed/scannedor broughtto me. Once I receive the forms, I will give to Dr. Reede for approval.

Please scroll through your emails for the Policy and forms (all in the same email).

Thanks,

Linda


-----Oded Greenberg/Downstate wrote: -----
To: steven.pulitzer@nychhc.org, Steven Pulitzer/Downstate@Downstate
From: Oded Greenberg/Downstate
Date: 07/09/2014 01:44PM
Cc: Linda McMurren/Downstate@Downstate
Subject: (Untitled)

Hi Steve, I need to make a change with regards to the day I needed off and I havent been able to get hold of you. I am here today, despite requesting the day off but must leave at around 2:15 PM. I need to take tomorrow off instead. Qi is on the schedule again tomorrow. Hope this is OK, my plans changed at the last moment and I have to revise. Just giving you a heads up. Linda is cc'd.

Oded

**A149**

| | |
|---|---|
| **From:** | CN=Linda McMurren/O=Downstate |
| **Sent:** | Monday, July 21, 2014 3:46 PM |
| **To:** | CN=Oded Greenberg/O=Downstate@Downstate |
| **Subject:** | Re: August Time Away Calendar |

Hi Dr. Greenberg,

It's signed, but the dates are 8/11-8/22.

Linda

Linda McMurren
Administrative Assistant
Dept. of Radiology Chair's Office
Linda.McMurren@downstate.edu (email)
718-270-1603 (phone)
718-270-2667 (fax)

Confidentiality Notice:  The information contained in this transmission is
intended only for the person or entity to which it is addressed and may contain
confidential and/or privileged material. If you are not the intended recipient
of this information, do not review, retransmit, disclose, disseminate, use, or
take any action in reliance upon, this information. If you received this
transmission in error, please contact the sender and destroy all printed copies
and delete the material from all computers.

From: Oded Greenberg/Downstate
To: Linda McMurren/Downstate@Downstate,
Date: 07/21/2014 02:11 PM
Subject: Re: August Time Away Calendar

Hi Linda, I requested the two weeks in August off starting 8/10.  Confirmed
with Dr. Pulitzer.

-----Linda McMurren/Downstate wrote: -----
To: Alicja Goracy/Downstate@DOWNSTATE, Amiram.Samin@downstate.edu,
Arnold.Strashun@downstate.edu, Brian.Gale@downstate.edu,
Brian.Magee@downstate.edu, Claire.Hanley@downstate.edu, Craig
Linden/Downstate@DOWNSTATE, Dan.Zinn@downstate.edu,
Deborah.Reede/Downstate@DOWNSTATE, Harry.Zinn@downstate.edu,
Huntz.Liu/Downstate@Downstate, Hyman.Shwarzberg@downstate.edu,
James.Walsh@downstate.edu, Jinel Scott/Downstate@DOWNSTATE, John
Amodio@downstate.edu, Maria.Corsaro@downstate.edu,
Michael.Herskowitz/Downstate@Downstate, Oded.Greenberg@downstate.edu,
Patrick.Hammill@downstate.edu, Qi.Chen@downstate.edu,
Rachelle.Goldfisher@downstate.edu, Rhonda.Osborne/Downstate@DOWNSTATE,
Riffat.Chaudary@downstate.edu, Robert.Leonardo@downstate.edu,
Scott.Lehto@downstate.edu, Srinivas.Kolla@downstate.edu,

# A150

Stephen.Waite/Downstate@Downstate, Steven.Ostrow@downstate.edu,
Steven.Pulitzer@downstate.edu, Sundeep.Mangla@downstate.edu,
Vinodkumar.Velayudhan/Downstate@Downstate, William.Kwon/Downstate@Downstate,
Woo Choi/Downstate@Downstate
From: Linda McMurren/Downstate
Date: 07/17/2014 12:53PM
Subject: August Time Away Calendar


Good afternoon All,

Please see attached time away calendar for the month of August.

If you are scheduled for time away in August and it is not listed, please email
me.

Thank you.

Linda McMurren
Administrative Assistant
Dept. of Radiology Chair's Office
Linda.McMurren@downstate.edu (email)
718-270-1603 (phone)
718-270-2667 (fax)

Confidentiality Notice:  The information contained in this transmission is
intended only for the person or entity to which it is addressed and may contain
confidential and/or privileged material. If you are not the intended recipient
of this information, do not review, retransmit, disclose, disseminate, use, or
take any action in reliance upon, this information. If you received this
transmission in error, please contact the sender and destroy all printed copies
and delete the material from all computers.

(See attached file: August Time Away.pdf)


[attachment "August Time Away.pdf" removed by Oded Greenberg/Downstate]

SUNYESI00000865

**A151**

| | |
|---|---|
| **From:** | CN=Oded Greenberg/O=Downstate |
| **Sent:** | Wednesday, August 13, 2014 2:31 PM |
| **To:** | CN=Steven Pulitzer/O=Downstate@Downstate; steven.pulitzer@nychhc.org |
| **Subject:** | Vacation change |

Hi Steve, I was wondering if I can change my vacation week. I will continue taking this week off, but would like to return next week and be off the week after (last week of August) I looked at the schedule for that week and it seems everyone is here. Let me know if that will work.

Thanks

Oded

SUNYESI00000650

# A152

**From:**      CN=Oded Greenberg/O=Downstate
**Sent:**      Monday, September 15, 2014 2:00 PM
**To:**        CN=Linda McMurren/O=Downstate@Downstate
**Subject:**   Fw: Re: August Time Away Calendar

---

Hi Linda, this was the original request for 8/11 thru 8/22. I took off the week
of 8/11 thru 8/15, then worked the week of the 18th instead of taking it off.
On Thursday, 8/21 I only worked from 10 am to 1:30 pm, but I submitted that as
a comp day. So there are a total of 6 comp days used, 8/11 thru 8/15 and 8/21.
I hope this clarifies things. By the way I am scheduled to be off on 9/26
but will be making a formal request to have 9/25 off as well for Rosh Hashana.
Is there special paperwork to get this scheduled so late or do I just submit
the usual paperwork?

Thanks

Oded

-----Forwarded by Oded Greenberg/Downstate on 09/15/2014 01:53PM -----
To: Linda McMurren/Downstate@Downstate
From: Oded Greenberg/Downstate
Date: 07/21/2014 02:11PM
Subject: Re: August Time Away Calendar

Hi Linda, I requested the two weeks in August off starting 8/10. Confirmed
with Dr. Pulitzer.

-----Linda McMurren/Downstate wrote: -----
To: Alicja Goracy/Downstate@DOWNSTATE, Amiram.Samin@downstate.edu,
Arnold.Strashun@downstate.edu, Brian.Gale@downstate.edu,
Brian.Magee@downstate.edu, Claire.Hanley@downstate.edu, Craig
Linden/Downstate@DOWNSTATE, Dan.Zinn@downstate.edu,
Deborah.Reede/Downstate@DOWNSTATE, Harry.Zinn@downstate.edu,
Huntz.Liu/Downstate@Downstate, Hyman.Shwarzberg@downstate.edu,
James.Walsh@downstate.edu, Jinel Scott/Downstate@DOWNSTATE, John
Amodio@downstate.edu, Maria.Corsaro@downstate.edu,
Michael.Herskowitz/Downstate@Downstate, Oded.Greenberg@downstate.edu,
Patrick.Hammill@downstate.edu, Qi.Chen@downstate.edu,
Rachelle.Goldfisher@downstate.edu, Rhonda.Osborne/Downstate@DOWNSTATE,
Riffat.Chaudary@downstate.edu, Robert.Leonardo@downstate.edu,
Scott.Lehto@downstate.edu, Srinivas.Kolla@downstate.edu,
Stephen.Waite/Downstate@Downstate, Steven.Ostrow@downstate.edu,
Steven.Pulitzer@downstate.edu, Sundeep.Mangla@downstate.edu,
Vinodkumar.Velayudhan/Downstate@Downstate, William.Kwon/Downstate@Downstate,
Woo Choi/Downstate@Downstate
From: Linda McMurren/Downstate
Date: 07/17/2014 12:53PM
Subject: August Time Away Calendar

Good afternoon All,

Please see attached time away calendar for the month of August.

SUNYESI00000664

**A153**

If you are scheduled for time away in August and it is not listed, please email me.

Thank you.

Linda McMurren
Administrative Assistant
Dept. of Radiology Chair's Office
Linda.McMurren@downstate.edu (email)
718-270-1603 (phone)
718-270-2667 (fax)

Confidentiality Notice: The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers.

(See attached file: August Time Away.pdf)

[attachment "August Time Away.pdf" removed by Oded Greenberg/Downstate]

SUNYESI00000665

 

# KINGS COUNTY
# HOSPITAL CENTER

Steven Pulitzer, M.D.
Interim Chief of Service
Department of Radiology
Kings County Hospital Center
Tel: 718-245-4447
Fax: 718-245-4473

August 22, 2014

RE: Oded Greenberg, MD

Notes from August 22, 2014 meeting with Oded Greenberg, MD:

Time and attendance.  Dr. Greenberg had been previously warned by Dr. Reede on May 5, 2014 about accurate reporting of time and attendance and of the necessity to follow the policy and procedures of the SUNY Downstate Department of Radiology regarding scheduling time off.  In addition, there is a protocol for late arrival or absence due to sickness.

I became the Interim Chief of Service in July 2014.  I reviewed Dr. Greenberg's time and attendance from records archived in the Talk Station dictation system.  It gives an estimate of the time of arrival and departure based on the time of the first and last case read on a particular day.  There were a number of days in which Dr. Greenberg arrived after 9 am.  In particular:

| Date | Time sheet | Talk station time |
|------|------------|-------------------|
| 7/28/2014 | 9-5 | 10:40 – 5:30 |
| 7/31/2014 | 9-5 | 10:30 – 5:00 |
| 8/4/2014 | N/A | 10:25 – 4:30 |
| 8/6/2014 | N/A | 10:40 – 5:15 |
| 8/7/2014 | N/A | 11:04 – 4:30 |

We discussed the need for him to be here for set hours of 9:30 – 5:30 pm daily.

I informed him that he will be put on time and attendance monitoring if the pattern persists.  He acknowleged.

HHC_ESI_001093

**Steven Pulitzer**

| | |
|---|---|
| **From:** | Steven Pulitzer |
| **Sent:** | Tuesday, September 02, 2014 3:57 PM |
| **To:** | Sade Jemmott |
| **Subject:** | Sade please file this document in Oded's file. |
| **Attachments:** | Oded Greenberg 1.docx |

Sade please file this document in Oded's file.

HHC_ESI_001062

Oded Greenberg: September 2, 2014

Oded was counseled in person on time and attendance on August 23, 2014.  Oded was scheduled for vacation the week of August 25-29[th].  He took off Monday August 25 and reported to work the remainder of the week.  His hours were at his choosing and were not his standard hours of 9:30-5:30.  This schedule switch was not authorized by either me or Dr. Reede.  None of the required documentation was submitted to request this schedule change.

Today, Oded came to my office to request the remainder of this week off.  His request was denied as the operational needs of the department would not permit him be off this week.  The other body imager, Dr. Hammill is scheduled to be off this week.  Therefore, Oded must report for work this week.

Oded asked me to relieve him of the 12-8 shift.  I said I could not.  I informed him that every attending in the department with the exception of Janelle Scott-More who covers the 6 am – 2 pm shift and Vindokumar  Velayudhan who covers the 4 pm – 12 pm will rotate through this position.

HHC_ESI_001063

**SUNY Health Science Center at Brooklyn**
(Please type or print, using ball point pen)

## MONTHLY FACULTY AND NTP INDIVIDUAL REPORT OF ATTENDANCE

FOR THE PERIOD  FROM: 8/1  TO: 8/30

NAME: Oded Greenberg   DEPARTMENT: Radiology   TITLE: Clinical Asst Professor

SOCIAL SECURITY NO: ███████   LINE NO. _____   ACCOUNT CODE: _____   FT ☑  PT ☐  If PT, % of FT _____

CHECK BOX AT RIGHT IF YOU ARE AN FLSA NON-EXEMPT (COVERED) EMPLOYEE ☐   REGULAR SHIFT FROM: ___ AM / PM   TO: ___ AM / PM

**SECTION 1:**   (To be completed by all Faculty and NTP employees, including FLSA Non-Exempt (covered) employees, as applicable).
I certify that I have been present and have met my professional obligation, as required, except for the absences indicated below:

**ABSENCES (IF ANY):**                                                              **CHARGE TO:**

| FROM OR ON | TO | NO. OF DAYS | ANNUAL LEAVE | SICK LEAVE | FAMILY SICK LEAVE | OTHER | IN LIEU OF HOLIDAY | FMLA LEAVE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

REMARKS:   (CALENDAR YEAR EMPLOYEES SHOULD NOTE HERE A DAY PRESCRIBED BY LAW FOR THE OBSERVANCE OF A HOLIDAY ON WHICH THEY WERE REQUIRED TO BE PRESENT):

**SECTION 2:**   (TO BE COMPLETED BY FLSA NON-EXEMPT (COVERED) EMPLOYEES ONLY)
-REPORT OF ACTUAL HOURS WORKED IN EXCESS OF 40 HOURS/WEEKLY FOR FLSA NON-EXEMPT PROFESSIONAL EMPLOYEES-

I certify that, pursuant to the provisions of the Fair Labor Standards Act Amendment of 1985, I am an FLSA Non-Exempt Professional employee and, as indicated below, I have worked in excess of 40 hours per week to meet my professional obligation. (See back for additional instructions.)

| DAY OF WEEK | DATE | TIME: FROM-TO | ACTUAL HOURS |
|---|---|---|---|
| | | | |

TOTAL: _____

PREMIUM HOURS:   ____ X 1.5

**SECTION 3:**

9/9/14
DATE                        SIGNATURE OF PROFESSIONAL STAFF MEMBER

I verify that with the exceptions noted, the leave and/or record of actual hours worked in excess of 40 hrs/weekly as indicated above are, to the best of my knowledge, accurate and complete:

9/15/14
DATE                        SIGNATURE OF SUPERVISOR/CHAIRMAN/DIRECTOR

**SECTION 4:**
(NOTE:   The Official Record of Accrual Summary of Leave Credits is the record maintained by the Time & Attendance Unit. The space provided below is for recording your applicable accruals. The Supervisor is responsible for certifying the accuracy of the period of accrual activity before it is submitted to the Time & Attendance Unit.)

| ACCRUAL SUMMARY OF LEAVE CREDITS | | | | | | FMLA LEAVE TAKEN DURING CAL. YEAR | ACCUM. EMP. ORG. LEAVE |
|---|---|---|---|---|---|---|---|
| | ANN. LV. | SICK LV. | IN LIEU OF HOLIDAY | PREMIUM HRS. REPORTED IN SECTION 2 | | | |
| 1. BAL BROUGHT FWD | 7.75 | 22.75 | | | TOTAL PREV. USED | | |
| 2. TIME USED ( - ) | 0 | 0 | | | | | |
| 3. SUB-TOTAL: | 7.75 | 22.75 | | | | | |
| 4. TIME EARNED (+) | 1.75 | 1.75 | | | USED THIS PERIOD (+) | | |
| 5. NEW BALANCE | 9.5 | 24.5 | | | NEW TOTAL | | |

HSCB-0128 F468 R3 (4/94) formerly PR 105 Rev.

**SUNY 001806**

**HHC-ANNEX G**

Affiliate Institution:  **SUNY Health Science Center at Brooklyn**

Name _Odd Greenberg_      Month _August_

Title _Clinical Asst Professor_   Dept. / Div. _Radiology_

In accordance with the terms of my aggreement with SUNY/ Health Science Center at Brooklyn I hereby certify that I have fulfilled my commitment at the Kings County Hospital as follows:

| | Week of: 7/28 | | Week of: 8/4 | | Week of: 8/11 | | Week of: 8/18 | | Week of: 8/25 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Date | Hours | Date | Hours | Date | Hours | Date | Hours | Date | Hours |
| Mon | 7/27 | | 8/4 | 9-5 | 8/11 | 9-5 C | 8/18 | 11⁵⁵ 7³⁰ | 8/25 | 9-5 8 |
| Tues | 7/25 | | 8/5 | 5-4 7 | 8/12 | 9-5 7 C | 8/15 | 10-7 9 | 8/26 | 11-7 8 |
| Wed | 7/30 | | 8/6 | 10⁵⁵ 5-7 | 8/13 | 9-5 7 C | 8/20 | 1-8 7 | 8/27 | 11-7 8 |
| Thurs | 7/31 | | 8/7 | 10⁸⁵ 5-7 | 8/14 | 9-5 7 C | 8/21 | 10-12 3±C | 8/28 | 10-6 8 |
| Fri | 8/1 | 8³⁰-4³⁰ | 8/8 | 9-7 10 | 8/15 | 9-5 7 C | 8/22 | 10-12 7 8± | 8/29 | 11-7 8 |
| Sat | 8/2 | 7-3 8 | | | | | 8/23 | 8-4 8 | | |
| Sun | | | | | | | | | | |
| Total | | 16 | | 39 | | 40 | | 44 | | 40 |

used comp days from 8/25/13, 9/14/13, 9/29/13, 10/19/13, 10/22/13
11/2/13 and 11/9/13

Total Hours (179)

Title _Clinical Asst. Professor_  MD   Date _9/9/14_

Approved by _Linda Snell_
Chief of Service

> For: 8/11, 8/12, 8/13, 8/14, 8/15
8/21 and 8/25 respectively

✱ See attached for 8/21/14

INDICATED ABSENCES:
H = Holiday
SL = Sick Leave
AL = Annual Leave
EL = Educational Leave

**SUNY 001807**

| | |
|---|---|
| **From:** | CN=Linda McMurren/O=Downstate |
| **Sent:** | Monday, September 8, 2014 10:32 AM |
| **To:** | CN=Deborah Reede/O=Downstate@DOWNSTATE |
| **Subject:** | Fw: Next week |

---

----- Forwarded by Linda McMurren/Downstate on 09/08/2014 10:30 AM -----

From: Oded Greenberg/Downstate
To: Linda McMurren/Downstate@Downstate,
Cc: "Steven Pulitzer" <Steven.Pulitzer@nychhc.org>
Date: 09/05/2014 12:21 PM
Subject: Re: Next week

As it turns out I was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out. My mobility has been severely limited since.  Please forgive the confusion.

-----Linda McMurren/Downstate@Downstate wrote: -----

====================== To: Oded Greenberg/Downstate@Downstate
From: Linda McMurren/Downstate@Downstate
Date: 09/04/2014 02:00PM
Subject: Re: Next week
====================== Hi Dr. Greenberg,

Please refer to the Policies sent by Rhonda Besunder for any information regarding time away.  The same policy applies to all time away.

Thanks,

Linda McMurren
Administrative Assistant
Dept. of Radiology Chair's Office
Linda.McMurren@downstate.edu (email)
718-270-1603 (phone)
718-270-2667 (fax)

Confidentiality Notice:  The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers.

SUNYESI00000993

# A161

From:  Oded Greenberg/Downstate
To:  Linda McMurren/Downstate@Downstate,
Date:  08/29/2014 02:33 PM
Subject:  Next week


Hi Linda, how do I go about taking days off next week on an emergent basis?  I
know that this is short notice and Dr. Pulitzer is out, how do I get approval?
Drs. Chen and Scott will be here most of next week to cover.  Let me know how
to proceed.

Thanks

Oded

SUNYESI00000994

**A162**

| | |
|---|---|
| **From:** | CN=Rhonda Besunder/O=Downstate |
| **Sent:** | Thursday, March 20, 2014 3:52 PM |
| **To:** | CN=Oded Greenberg/O=Downstate@Downstate |
| **Cc:** | CN=Linda McMurren/O=Downstate@Downstate |
| **Subject:** | Re: Vacation, comp day request forms |
| **Attach:** | Appendix A - Request for Leave (Nov. 21- 13).pdf; Appendix B- Faculty Request to Travel (Nov. 21-13).pdf; CME Addendum ###.pdf; CME policy forms minus addendum.pdf; Time off- away from campus policy.pdf; Unexpected Absence policy.pdf |

Dr. Greenberg:

This is the 3rd time, I've sent these to you!   Please print them or save in a
safe place.  Thanks.

Rhonda S. Besunder, MPH
Administrator
Department of Radiology
and Radiation Oncology
Phone: 718- 270- 3146
Fax:     718- 270- 4601
rhonda.besunder@downstate.edu

From: Oded Greenberg/Downstate
To: Rhonda Besunder/Downstate@Downstate,
Date: 03/19/2014 11:15 AM
Subject: Vacation, comp day request forms

Hi Rhonda, can you kindly forward me the forms required for vacation time off
as I have apparently deleted your original email.

Thanks

Oded

Confidential

**Appendix A**

Department of Radiology

## FACULTY REQUEST FOR LEAVE

It is recommended all requests for days off (vacation, conference time, make-up days for holidays worked and compensatory time) be submitted in advance to the Chair using this form, preferably 30 days in advance for leaves of 2 weeks or longer.  Any request for Emergency Leave should be cleared with Dr. Reede prior to leaving campus.

Is this a change of leave request?   Yes _____        No _____

NAME: _____       DATE: _____

REQUESTED TIME OFF: _____

VACATION: _____    CONFERENCE: _____    LECTURER: _____

MAKE-UP HOLIDAY: _____    COMPENSATORY TIME: _____

FURLOUGH DAYS  (valid until 3/31/2014): _____

PERSON COVERING IN YOUR ABSENCE: _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FOR CONFERENCES:
NAME, LOCATION, DATE OF MEETING: _____

_____

(a) PRESENT PAPER:      YES _____     NO _____     DATE: _____

(b) PRESENT LECTURE:  YES _____     NO _____     TITLE: _____

APPROVED:          NOT APPROVED:

---

**Faculty Signature**                                                   **Date**

**Deborah L. Reede, M.D.** _____
Chair

**Hyman Shwarzberg, M.D.** _____
Director, UHB

**Alan Kantor, M.D.** _____
Director, KCHC

                                                                                     SUNYESI00000806

Appendix B

**Department of Radiology**

## FACULTY REQUEST FOR TRAVEL

Date

TRAVELER NAME: _____   TELEPHONE: _____

TRAVELER TITLE: _____   BEEPER: _____

DIVISION: _____

DATES OF TRAVEL:   From _____   To _____

MODE OF TRAVEL:   ☐ AIR      ☐ RAIL      ☐ AUTOMOBILE

ESTIMATED COST:

　　　　　REGISTRATION　　$ _____

　　　　　MEALS　　$ _____

　　　　　HOTEL　　$ _____

　　　　　OTHER (describe)　　$ _____

　　　　　TOTAL:　　$ _____   SOURCE OF FUNDS: _____

PURPOSE OF TRIP:

_____
_____
_____
_____
_____
_____
_____

DESTINATION: _____

_____
_____
_____

CHECK ONE:　　☐ OUT-OF-STATE-MEETING　　　　☐ NEW YORK STATE

APPROVAL SIGNATURES:

_____
Hyman Shwarzberg, M.D., Director, UHB

_____　　　_____
Deborah L. Reede, M.D.,  Chair　　　Alan Kantor, M.D.,  Director , KCHC

Confidential　　　　　　　　　　　　　　　　　　　　　SUNYESI00000807

**A165**

# Addendum/ CME Policy

CME reimbursements and time off from work to attend conferences are major direct and indirect departmental expenses. Therefore, you should maximize the benefits for this endeavor.

### Reasons for CME Time

- To assist you in obtaining 50 annual credits required to maintain your hospital staff privileges;
- To keep current with changes in your sub-speciality and/or refresh your skills in other areas;
- To network with other physicians in the hopes of collaborating on academic projects; to be asked  to present a lecture (at a national meeting or Grand Rounds at another institution);  and /or to be invited to become a standing or board member on a committee in a local, state or national professional society;
**Networking also affords you the opportunity to meet colleagues who can provide a recommendation to support an academic promotion at SUNY.**

The previous departmental CME policy has changed. A new policy was distributed on 11/25/2013.   If you did not receive a copy of the policy, contact Rhonda Besunder.

**It appears that several points regarding CME activities need to be further defined.**

- The department is no longer allowing CME days at home. You must be physically present at a conference, if you request days off for CME.

- The department will no longer pay for international meetings outside of Canada.  If  you do attend a meeting that does not met the appropriate CME criteria for reimbursement for any reason;  CME time will be deducted from your yearly 10 day allowances for the conference days that occur between Monday and Friday. Travel time will be subtracted from your annual leave and you will be personally responsible for all costs associated with the meeting.

- Conferences held in vacation destinations (ski or beach resorts etc,) will not be paid for by the department.  If you choose to attend, the same rules apply as outlined above.  Please note, **major society meetings held in these locations maybe supported by the department with the Chair's prior written approval.**

- Compensatory days will not be granted for attending a conference held on either Saturday or Sunday.

- **Increased costs incurred for late fees (registration, hotel bookings and/or transportation) will not be paid by the department.**

- A copy of the CME certificate (indicating the number of credits earned for the course) must be provided in order to receive reimbursement and credit for time off.

12/23/13

SUNYESI00000808



**UNIVERSITY PHYSICIANS**
BROOKLYN, INC.

## DEPARTMENT OF RADIOLOGY

| | |
|---|---|
| **SUBJECT:** Off-Campus Continuing Medical Education (CME) Policy | |
| **EFFECTIVE:** November 15, 2013 | |

### GENERAL STATEMENT OF PURPOSE:

**To establish a standard policy for faculty off-campus CME, and to delineate the reimbursement process.**

### POLICY STATEMENT:

1. You are allowed a maximum of 10 days per calendar year (Jan.-Dec.) for off-campus CME meetings.

2. Additional off-campus days for CME must be approved by the department Chair.

3. All requests for off-campus CME days must be submitted on departmental forms *(see Appendix A and B )* and be pre-approved by the departmental Chair. **A copy of the course brochure must be attached to the form.**

4. If departmental funds allow, there will be a $5,000 reimbursement limit for CME per calendar year for full-time faculty. Proportional amounts will be disbursed to part-time faculty. Reimbursement is for acceptable out-of-pocket and documented CME educational expenses *(See Note below)*.

5. Only meetings held in the continental US will be reimbursable.

6. **Original receipts and CME certificate must be provided as a prerequisite for reimbursement.**

7. No advanced payments are allowed.

8. There will be no accrual/rollover of unused CME time or monies into the following calendar year.

9. Individual reimbursement will be made semi-annually (Jan. 1-July 1 submission deadlines).

**Note:** **CME educational expenses can include: advanced meeting registration fee (late fees will not be paid), society dues, books, and travel expenses (customary coach airfare, taxi fare upon arrival / departure from hotel, standard hotel room, $75/day meal allowance, and ground transportation including: tolls, parking and the current IRS mileage rate when personal auto is used). Rental cars will not be reimbursed. Please request government employee discount where available.**

**Any variance by staff from this CME policy must be sanctioned in writing by the Chair.**

APPROVAL SIGNATURES:

**Deborah L. Reede, M.D.** _____
Chair

**Arnold Strashun, M.D.** _____
Vice Chair

Confidential

**Appendix A**

**Department of Radiology**

## FACULTY REQUEST FOR LEAVE

It is recommended all requests for days off (vacation, conference time, make-up days for holidays worked and compensatory time) be submitted in advance to the Chair using this form, preferably 30 days in advance for leaves of 2 weeks or longer.  Any request for Emergency Leave should be cleared with Dr. Reede prior to leaving campus.

Is this a change of leave request?   Yes _____        No _____

NAME: _____   DATE: _____

REQUESTED TIME OFF: _____

VACATION: _____   CONFERENCE: _____        LECTURER: _____

MAKE-UP HOLIDAY: _____        COMPENSATORY TIME: _____

FURLOUGH DAYS  (valid until 3/31/2014): _____

PERSON COVERING IN YOUR ABSENCE: _____

*****************************************************************************

FOR CONFERENCES:
NAME, LOCATION, DATE OF MEETING: _____

_____

(a) PRESENT PAPER:       YES _____     NO _____     DATE: _____

(b) PRESENT LECTURE:  YES _____     NO _____     TITLE: _____

                           APPROVED: ☐        NOT APPROVED: ☐

**Faculty Signature**                                                        **Date**

**Deborah L. Reede, M.D.**       _____
Chair

**Hyman Shwarzberg, M.D.**   _____
Director, UHB

**Alan Kantor, M.D.**            _____
Director, KCHC

# A168

**Appendix B**

**Department of Radiology**

## FACULTY REQUEST FOR TRAVEL

**Date**

TRAVELER NAME: _____   TELEPHONE: _____

TRAVELER TITLE: _____   BEEPER: _____

DIVISION: _____

DATES OF TRAVEL:   From _____   To _____

MODE OF TRAVEL:   ☐ AIR        ☐ RAIL        ☐ AUTOMOBILE

ESTIMATED COST:

        REGISTRATION     $ _____

        MEALS     $ _____

        HOTEL     $ _____

        OTHER (describe)   $ _____

        TOTAL:     $ _____   SOURCE OF FUNDS: _____

PURPOSE OF TRIP: _____

_____

_____

_____

_____

_____

DESTINATION: _____

_____

_____

CHECK ONE:     ☐ OUT-OF-STATE-MEETING               ☐ NEW YORK STATE

APPROVAL SIGNATURES:

                                    Hyman Shwarzberg, M.D., Director, UHB

_____

Deborah L. Reede, M.D.,  Chair               Alan Kantor, M.D.,  Director , KCHC



SUNY
**D**OWNSTATE
Medical Center

## DEPARTMENT OF RADIOLOGY

| SUBJECT: Time off/ away from campus |
|---|
| EFFECTIVE:  November 15, 2013 |

### GENERAL STATEMENT OF PURPOSE:

 To establish a standard policy for all non-emergency faculty requests for time off/ away from campus.

### POLICY STATEMENT:

1.  It is recommended all non-emergency requests must be submitted in advance to the Chair using the "Faculty Request for Leave" form preferably 30 days in advance for leaves of 2 weeks or longer *(see Appendix A)*.

2.  Leave requests include vacation, CME, compensatory time, and other SUNY Downstate authorized scheduled absences (refer to SUNY/UUP faculty handbook).

3.  Requests must include an arrangement for cross coverage of clinical and administrative duties of the "leave-taker" during the requested leave.

4.  Requests must be approved in writing by the Chair or her designee in consultation with hospital radiology Directors involved.

5.  Administrative assistants in the Chair's office will maintain records and coordinate notification of published scheduling changes once leave is approved.

6.  Cross coverage must be confirmed by "leave-taker" on the departmental clinical schedule prior to beginning approved leave.

**Note:**  **Remember that it is the responsibility of all personnel to conform with this written policy and to document accurately their exact time off campus.**

 **If there is a change in the use of accruals from the time of the original submission, faculty should submit the change in advance of departure.**

APPROVAL SIGNATURES:

**Deborah L. Reede, M.D.** _____
Chair

**Arnold Strashun, M.D.** _____
Vice Chair



**SUNY**
**DOWNSTATE**
Medical Center

# DEPARTMENT OF RADIOLOGY

| SUBJECT: Unexpected Absence |
|---|
| EFFECTIVE:          November 15, 2013 |

## GENERAL STATEMENT OF PURPOSE:

**To establish a standard policy for faculty notification and reporting of unexpected absence (sick leave, family emergency, etc).**

## POLICY STATEMENT:

1. Department Chair's office must be promptly notified using phone # 718-270-1603. Messaging is available 24 hours every day. Additional daily email notification to Chair and Chair's staff is also expected where possible.

2. Cross coverage service arrangements will be made by the Chair and hospital Directors.

3. The Chair's administrative staff will make all necessary hospital and radiology division notifications of an unexpected absence once made aware of absence.

4. All SUNY employees must adhere to SUNY guidelines for accurate and verifiable time and attendance reporting  (see SUNY/UUP Handbook).

APPROVAL SIGNATURES:

**Deborah L. Reede, M.D.**     _____
Chair

**Arnold Strashun, M.D.**     _____
Vice Chair



## KINGS COUNTY HOSPITAL CENTER



Steven Pulitzer, M.D.
Interim Chief of Service
Department of Radiology
Kings County Hospital Center
Tel: 718-245-4447
Fax: 718-245-4473

September 5, 2014

RE: Oded Greenberg, MD

To whom it may concern:

Dr. Greenberg was scheduled for 2 weeks of vacation in August (August 11-22, 2014). Dr. Greenberg contacted me during the week of August 11, 2014 to request a change in his vacation schedule. He requested to return to work the week of August 18-22 and take the following week, August 25-29 for vacation. I agreed. I instructed him to complete the necessary paperwork for the change.

I was on vacation the week of August 25-29, 2014. Dr. Hammill, who was in charge in my absence informed me that Dr. Greenberg was absent on Monday August 25 but reported to work on Tuesday – Friday, August 26-29. His hours were not his standard hours of 9 am – 5 pm. He did not discuss this schedule change with me at any time. At no time did I give permission to Dr. Greenberg to create his own schedule during that week.

On Tuesday, September 2, 2014, Dr. Greenberg came to my office and requested to time off September 3-5, 2014. Due to the operational needs of the department, I denied his request.

On Wednesday, September 3, 2014, Dr. Greenberg came to my Neuroradiology reading room and informed me that he would not be reporting for duty on Thursday and Friday, September 4-5, 2014. He stated that out of respect for me, he wanted to let me know that he would not be in so that I can arrange coverage in his absence. I informed him that I cannot authorize his time off. He acknowledged, stating that he will take full responsibility for his actions.

On Wednesday, September 3, 2014, shortly after my discussion with Dr. Greenberg, I informed the Department Chair, Dr. Deborah Reede, of my conversation with Dr. Greenberg. She instructed me to draft an official letter to Dr. Greenberg stating that his request for time off had been denied. I completed the letter and sent an electronic copy to Dr. Greenberg with cc to Dr. Reede. I then hand delivered the document to Dr. Greenberg in the ED reading room on Wednesday September 3, 2014. He opened the letter and read it with me standing before him.

Dr. Greenberg did not report for duty on September 4-5, 2014.

Please let me know If I can be of any further assistance.

Sincerely,

Steven Pulitzer, MD

1

---

2

## STATEMENT OF ODED GREENBERG

3

### Taken on September 8, 2014

4

**Present:  Michael Arabian - Senior Personnel Associate, Labor Relations (MA)**
**Oded Greenberg – Clinical Assistant Professor of Radiology (OG)**

5

---

6

MA:   Good afternoon.  Today is Monday, September 8, 2014.  This is the interrogation

7

of Dr. Oded Greenberg.  Interrogation is being recorded.  My name is Michael

8

Arabian, Senior Personnel Associate, Labor Relations.  Also in the room is?

9

OG:   Oded Greenberg, MD.

10

MA:   Okay.  And, Dr. Greenberg, have you ever been interrogated before?

11

OG:   No.

12

MA:   Okay.  I—I provide you the Statement of Rights Letter, Article 19 of the UUP

13

Contract.  You had the opportunity to review and read that?

14

OG:   Yes, I did.

15

MA:   Okay.  And you are electing to represent yourself, is that correct?

16

OG:   Yes, I am.

17

MA:   Okay.  So if at any time—as I mentioned before, you certainly have the right to

18

represent yourself, but at any time you decide you do want to have a

19

representative, just let me know, we'll stop the interrogation at that point and go

20

forward.

21

OG:   Okay.

22

MA:   You did read and sign the Statement of Rights Letter where you're electing to

23

represent yourself, correct?

24

OG:   I did.

25

Page 2 of 35

| | | |
|---|---|---|
| MA: | And your signature is there on September 8, 2014, today. | 1 |
| OG: | Correct. | 2 |
| MA: | Okay.  I will be asking you a series of questions that you're required to respond | 3 |
| | truthfully to.  Questions that I'll be asking you may subject you to disciplinary | 4 |
| | charges.  This is an investigation into absence—absences, failure to follow | 5 |
| | supervisors' directives, the outcome of those absences and the impact, et cetera. | 6 |
| | Again, your failure to cooperate with the investigation, meaning provide truthful | 7 |
| | responses, may result in your being charged with failing to cooperate with an | 8 |
| | administrative investigation with possible penalties ranging from a letter of | 9 |
| | reprimand to termination from state service.  That's separate from what we're here | 10 |
| | initially about.  Meaning, if you're asked a question, you need to respond | 11 |
| | truthfully. | 12 |
| OG: | Okay. | 13 |
| MA: | If—if you don't, then there's other charges that can be filed besides what the | 14 |
| | investigation is about with the absences. | 15 |
| OG: | Okay. | 16 |
| MA: | Okay.  So interrogations are done in question-answer; I will ask you the | 17 |
| | questions.  Provide the answers.  At times, if you feel that there's important part | 18 |
| | that question doesn't entail, raise it.  If we can stay on track, we will. | 19 |
| OG: | Okay. | 20 |
| MA: | If it gets off to a tangent, I'll try to focus on the questions that I have and then | 21 |
| | you'll have the opportunity to say what you'd like at the end. | 22 |
| OG: | Okay. | 23 |
| MA: | Okay.  So, just for the record, please give your name, title and department. | 24 |
| OG: | My name is Oded Greenberg, MD.  I am a clinical assistant professor of | 25 |

**SUNY 001281**

Case 1:15-cv-02343-PKC-VMS   Document 87-24   Filed 09/14/18   Page 4 of 36 PageID #: 1468

Page 3 of 35

| | | |
|---|---|---|
| | radiology. | 1 |
| MA: | Okay. How long have you been employed at Downstate? | 2 |
| OG: | With residency and— | 3 |
| MA: | Yeah. Your—your initial start date at Downstate. | 4 |
| OG: | Well, I went to medical school here, started in 1981. | 5 |
| MA: | Okay. And then you became an employee at Downstate? | 6 |
| OG: | I was a resident in both pathology and radiology for approximately 10 years. | 7 |
| MA: | Okay. | 8 |
| OG: | And then I came back here as an attending in 2001. | 9 |
| MA: | Okay. | 10 |
| OG: | And I've been an attending physician here for most of that time. I took a two-year | 11 |
| | hiatus— | 12 |
| MA: | Okay. | 13 |
| OG: | —and worked at teleradiology. | 14 |
| MA: | Okay. And how long have you worked in your department now? | 15 |
| OG: | At least 11 years now, I think. | 16 |
| MA: | Okay. Who is your immediate supervisor? | 17 |
| OG: | Currently, the acting director is Steven Pulitzer, MD. | 18 |
| MA: | Okay. And how long has he been your supervisor for? | 19 |
| OG: | He's only recently become the acting supervisor after Alan Kantor was fired. | 20 |
| MA: | Okay. And what is your schedule? | 21 |
| OG: | My schedule has varied over time. It's not been the same set of hours— | 22 |
| MA: | Okay. | 23 |
| OG: | —all the time. | 24 |
| MA: | What is it currently? | 25 |

SUNY 001282

Page 4 of 35

| | | |
|---|---|---|
| OG: | It's not been told to me actually. | 1 |
| MA: | So your schedule has not been told to you. | 2 |
| OG: | I, originally, was supposed to have a schedule between 9:30 and 5:30— | 3 |
| MA: | Okay. | 4 |
| OG: | —but things have changed.  We have a new chairman, a new director and I'm not sure what the schedule is.  I think I'm on our schedule as 9 to 5. | 5 6 |
| MA: | Okay. | 7 |
| OG: | I occasionally have, to the benefit of the department, have come in later and stayed later, always working at least eight hours a day. | 8 9 |
| MA: | Okay. | 10 |
| OG: | I've stayed later because the person who's on between 4 and 12 is being asked to read too many cases and I've stayed later to help him out. | 11 12 |
| MA: | So is— | 13 |
| OG: | So, in recent weeks, over the summer, when my kids are at school—or my kids are not at school, I've been coming in somewheres around 10-10:30 and staying 'til 6:30. | 14 15 16 |
| MA: | Okay. | 17 |
| OG: | Or 7 if I've come in a little bit later than that. | 18 |
| MA: | And your understanding is that you do not have a start time or an hours that you should— | 19 20 |
| OG: | It hasn't been discussed specifically with me.  I know that in the past they wanted me to come in later, specifically for this reason, and that's the schedule that I've adhered to.  Except during the school year when I have to leave earlier for my kids, so I come in earlier and leave by 5. | 21 22 23 24 |
| MA: | So, during the school year, you work—you leave at 5? | 25 |

**SUNY 001283**

| | | |
|---|---|---|
| OG: | Essentially, I leave at 5, yes. | 1 |
| MA: | Okay. And the summer you change your— | 2 |
| OG: | In the summer I have taken it upon myself to come in a little bit later because we | 3 |
| | need help later on in the day. | 4 |
| MA: | Okay. Has anyone authorized that or told you to do so? You said you took it | 5 |
| | upon yourself. | 6 |
| OG: | Nobody told me to do so. The department's covered otherwise, if I come in late it | 7 |
| | really doesn't make any difference. I stay a little bit later. I've been keep— | 8 |
| | adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening. | 9 |
| MA: | Okay. Do you think that you have the authority to make that schedule or is there | 10 |
| | any— | 11 |
| OG: | Well, do I have the authority? I don't believe I have the authority, but my primary | 12 |
| | responsibility is patient care and I feel that I have the moral authority to do so if I | 13 |
| | feel the department is failing to—to take care of their patients. | 14 |
| MA: | Have you expressed that concern to your supervisor or director? | 15 |
| OG: | I've discussed this with my director, yes. | 16 |
| MA: | And who is that? | 17 |
| OG: | Steven Pulitzer, MD. | 18 |
| MA: | Okay. And what was his response? | 19 |
| OG: | Well, he's recently told me that the chairperson wants me to adhere to set hours. | 20 |
| MA: | Okay. And what are those set hours? | 21 |
| OG: | And that is—again, they didn't specify, but I'm assuming it's 9 to 5 as written on | 22 |
| | the schedule. | 23 |
| MA: | Okay. And you said he recently told you, when was that? | 24 |
| OG: | That the chairperson was concerned about my hours varying and coming in later. | 25 |

**SUNY 001284**

Case 1:15-cv-02343-PKC-VMS   Document 87-24   Filed 09/14/18   Page 7 of 36 PageID #: 1471

Page 6 of 35

|  |  |  |
|---|---|---|
|  | So I was told that I needed to come in at regular hours and keep to those hours. | 1 |
| MA: | And when did he tell you that? | 2 |
| OG: | That was about a week ago, I believe. | 3 |
| MA: | Okay.  And, in the last week, did you adhere to those hours? | 4 |
| OG: | In the last week, I wrote back to the chairperson and to him telling him the reasons that I was doing that and there was only a couple of days in between after Labor Day.  So, those two days, I did—I didn't come in earlier.  I came in around 10:30 I think, or something like that, and I stayed a little bit later. | 5 6 7 8 |
| MA: | Okay.  And you think Mister—or Dr. Pulitzer— | 9 |
| OG: | Mm-hm. | 10 |
| MA: | —told you the—this hour schedule when?  You said a week or so— | 11 |
| OG: | It was about a week ago.  So I think there may have been three or four days in between then. | 12 13 |
| MA: | Okay. | 14 |
| OG: | I—I promised him that I would return to a regular schedule as the school year started, which is this week. | 15 16 |
| MA: | And did he say that that was okay or did he give— | 17 |
| OG: | He never responded to my e-mail about it.  I wrote him an e-mail. | 18 |
| MA: | Okay. So— | 19 |
| OG: | So— | 20 |
| MA: | —it was an e-mail that you sent. | 21 |
| OG: | Mm-hm. | 22 |
| MA: | And that was directly to him or was there anyone else on the— | 23 |
| OG: | To him and the chairperson was cc'd on that. | 24 |
| MA: | Okay.  And neither party responded? | 25 |

| | | |
|---|---|---|
| OG: | No. | 1 |
| MA: | Okay.  Now, confirm for the record your mailing address, please. | 2 |
| OG: | My mailing address is 150 Myrtle Avenue, Brooklyn, New York 11201. | 3 |
| MA: | And you did receive paperwork from Labor Relations? | 4 |
| OG: | I did not receive it 'cause I didn't— | 5 |
| MA: | Okay. | 6 |
| OG: | I—I didn't check the mail today.  I wasn't notified that I had received any mail by | 7 |
| | our desk person, so I didn't—I received this from Steve Pulitzer today. | 8 |
| MA: | Okay.  So you received nothing in your—through the mail? | 9 |
| OG: | Not that I know of. | 10 |
| MA: | At your home? | 11 |
| OG: | It might be there, at home, but I didn't know anything about it. | 12 |
| MA: | Okay.  But on that letter, that is the correct address? | 13 |
| OG: | It is the correct—yes, that is the correct address. | 14 |
| MA: | Okay.  And your responsibilities here? | 15 |
| OG: | My responsibilities are primarily to read various X-rays, CTs, sonos, MRIs in the | 16 |
| | emergency room for emergent patients and occasionally cover other services such | 17 |
| | as body imaging.  My secondary responsibility is to provide education to our | 18 |
| | residents. | 19 |
| MA: | Okay.  So when was the last day that you worked? | 20 |
| OG: | Last Wednesday.  Well, I actually worked today, before I knew anything about | 21 |
| | this.  I was actually at Kings County in the emergency room. | 22 |
| MA: | Okay. | 23 |
| OG: | And then I was told by Steve Pulitzer that I wasn't supposed to and I signed off | 24 |
| | and I came over here. | 25 |

| | | |
|---|---|---|
| MA: | Okay. | 1 |
| OG: | Prior to that, it was last Wednesday. | 2 |
| MA: | Okay.  So Dr. Pulitzer wrote a letter.  It's dated—actually, he wrote two letters.  I'll read the one that's dated September 5th first and then I'll read the one that's dated September 3rd.  The one on September 5th says; "regarding Oded Greenberg, MD, to whom it may concern, Dr. Greenberg was scheduled for two weeks of vacation in August, August 11th-22nd 2014."  Was that correct? | 3<br>4<br>5<br>6<br>7 |
| OG: | Yes.  Originally, I was scheduled for that. | 8 |
| MA: | Okay.  "Dr. Greenberg contacted me during the week of August 11, 2014 to request a change in his vacation schedule." | 9<br>10 |
| OG: | That's correct. | 11 |
| MA: | Okay.  "He requested to return to work the week of August 18th-22nd and take the following week, August 25th-29th, for vacation." | 12<br>13 |
| OG: | Correct. | 14 |
| MA: | And Dr. Pulitzer said that "I agreed."  So he agreed to that? | 15 |
| OG: | Yes. | 16 |
| MA: | Okay.  "I instructed him to complete necessary paperwork for the change."  That's what Dr. Pulitzer said. | 17<br>18 |
| OG: | He might have.  I don't recall. | 19 |
| MA: | Okay.  Then he's saying that he—"I was on vacation the week of August 25th-29th.  Dr. Hammill," H-A-M-M-I-L-L, "who was in charge of my absence, informed me that Dr. Greenberg was absent on Monday, August 25th."  Were you absent on August 25th? | 20<br>21<br>22<br>23 |
| OG: | Was that the week that I had asked to take off? | 24 |
| MA: | Yes. | 25 |

| OG: | Yes, I was absent on that Monday and then I worked the rest of the week because my vacation plans didn't work out. | 1 |
| | | 2 |
| MA: | Okay.  But you requested to work the 25th.  You requested to be off the 25th to 29th. | 3 |
| | | 4 |
| OG: | Right. | 5 |
| MA: | So you— | 6 |
| OG: | I took off the one day and then I worked the rest of the week. | 7 |
| MA: | Okay.  And why did you report to work—you—from what I'm reading, you were scheduled on vacation that week? | 8 |
| | | 9 |
| OG: | Right.  I was scheduled on the vacation that week. | 10 |
| MA: | Okay. | 11 |
| OG: | But, my vacation plans didn't work out, so there was no point to me taking the time off and just sitting at home.  So I came back to work. | 12 |
| | | 13 |
| MA: | Okay.  Did you contact anyone or get approval to come back to work or—'cause, again, what most—most—I can speak for myself; if you're scheduled off, they're not expecting you in— | 14 |
| | | 15 |
| | | 16 |
| OG: | Mm-hm. | 17 |
| MA: | —and then if you come in there's—in essence, should be someone there that was going to do the job that you were going to do 'cause you weren't going to be there.  So it actually can make two people there or can—it's a possibility of that and just, if they're not thinking that you're to be there, to come to work on a day that is supposed to be a day off for your vacation. | 18 |
| | | 19 |
| | | 20 |
| | | 21 |
| | | 22 |
| OG: | I informed Dr. Hammill—was informed that I was there so that he can tell the person coming in later from 4-12 not to come in early.  In other words, that person was supposed to come in early 'cause I wasn't around. | 23 |
| | | 24 |
| | | 25 |

| | | |
|---|---|---|
| MA: | Mm-hm. | 1 |
| OG: | And so I had him inform this person to not come in early, to come in at his regular | 2 |
| | time. | 3 |
| MA: | Okay.  But the—again, "he reported to work on Tuesday to Friday, August 26th- | 4 |
| | 29th," and you agree that that occurred? | 5 |
| OG: | Yes. | 6 |
| MA: | You reported the 26th to the 29th? | 7 |
| OG: | Yeah, I did. | 8 |
| MA: | "His hours were not his standard hours of 9AM-5PM."  So I guess Dr. Pulitzer is | 9 |
| | under the impression those are your standard hours? | 10 |
| OG: | I guess those are the standard hours on the schedule, yes, and I probably worked | 11 |
| | those—the hours that I told you earlier. | 12 |
| MA: | Okay. | 13 |
| OG: | 10:30-6:30, or something like that. | 14 |
| MA: | He also said "he did not"—this is Dr. Pulitzer, "he did not discuss the schedule | 15 |
| | change with me at any time.  At no time did I give permission to Dr. Greenberg to | 16 |
| | create his own schedule during that week." | 17 |
| OG: | That's probably true. | 18 |
| MA: | Okay. | 19 |
| OG: | I might have e-mailed him about it.  I don't recall right now. | 20 |
| MA: | Okay. | 21 |
| OG: | I didn't think that that was disruptive in any way to the department for me to work | 22 |
| | a week that I was supposed to take off, but I realize that, you know, perhaps I | 23 |
| | probably should have been more communicative about it. | 24 |
| MA: | Okay.   Then, still the same letter, "on Tuesday September 2nd 2014, Dr. | 25 |

**SUNY 001289**

|  |  |  |
|--|--|--|
| | Greenberg came to my office and requested time off, September 3rd to the 5th | 1 |
| | 2014.  Due to the operational needs of the department, I denied his request." | 2 |
| OG: | That's true. | 3 |
| MA: | Okay.  "And then on Wednesday September 3rd 2014, Dr. Greenberg came to my | 4 |
| | neuroradiology reading room and informed me that he would not be reporting for | 5 |
| | duty on Thursday and Friday, September 4th and 5th 2014."  Did you do that? | 6 |
| OG: | That is true. | 7 |
| MA: | Okay. | 8 |
| OG: | I had to choose my family over the hospital.  I have a child with special needs and | 9 |
| | he was kicked out of his school and he was to attend a new school and I had to | 10 |
| | spend time with him. | 11 |
| MA: | Okay.  He—this is what, again—"he stated out of respect for me, he wanted to let | 12 |
| | me know that he could not be in so that I could arrange coverage in his absence." | 13 |
| | And then Dr. Pulitzer said "I informed him that I cannot authorize his time off. | 14 |
| | He acknowledged stating that he will take full responsibility for his actions." | 15 |
| OG: | That's absolutely true. | 16 |
| MA: | Okay. | 17 |
| OG: | I could well have just called in sick the next day.  I chose to think of the | 18 |
| | department and the patients before my own needs and I wanted to inform him in | 19 |
| | advance that I wouldn't be there.  And so that he could make preparations ahead | 20 |
| | of time so the department could be covered. | 21 |
| MA: | Okay.  And then "on Wednesday September 3rd, shortly after his discussion, he | 22 |
| | informed the department chair and then they prepared a letter." | 23 |
| OG: | Mm-hm. | 24 |
| MA: | For you? | 25 |

**SUNY 001290**

| | | |
|---|---|---|
| OG: | Yes. | 1 |
| MA: | And you did receive a letter? | 2 |
| OG: | Yes, I did. | 3 |
| MA: | Okay.  And you did not report to work on September 4th and 5th. | 4 |
| OG: | I did not, however, circumstances had changed that—that morning.  My mother-in-law came from out of town to be with my son and I had initially planned to take the day off, but I—I—I was gonna come in, I rolled out of bed and I—and I stretched my back out and I've been in pain and not able to be mobile since then.  I—it did get better over this weekend and I thought I could come in today and as I was heading into to work I hurt it again and I went to urgent care and I subsequently came to work at around 12:30. | 5<br>6<br>7<br>8<br>9<br>10<br>11 |
| MA: | Okay.  So you said your mother-in-law came? | 12 |
| OG: | My mother-in-law came to town to help support my son. | 13 |
| MA: | Okay. | 14 |
| OG: | My son has special needs. | 15 |
| MA: | Mm-hm. | 16 |
| OG: | He has an autism spectrum diagnosis, in the past.  And she came into town to help him out and I didn't anticipate that she would.  And so, at that point, I felt like I could go to work, but in the process of getting ready to go to work I threw out my back. | 17<br>18<br>19<br>20 |
| MA: | Mm-hm. | 21 |
| OG: | I know how that sounds, but it really did happen that way. | 22 |
| MA: | Okay.  Did you contact your employer on Thursday to say that— | 23 |
| OG: | I—I initially contacted my employer to say that I wasn't coming in, but then I wrote a subsequent e-mail saying that I had intended to come in, but actually | 24<br>25 |

**SUNY 001291**

|     |                                                                                          |    |
|-----|------------------------------------------------------------------------------------------|----|
|     | injured my back so I couldn't come in.                                                   | 1  |
| MA: | And this was on Thursday?                                                                 | 2  |
| OG: | I believe that was on Thursday.  Yeah, that e-mail was Thursday morning.  The—            | 3  |
|     | both of those e-mails were on Thursday, I believe.                                        | 4  |
| MA: | Okay.  And, again, what time did you plan on coming in on Thursday?                       | 5  |
| OG: | I was gonna come in around 10 o'clock probably I would've been in.  I had to take         | 6  |
|     | care of some things at home and then I was gonna come in around 10.                       | 7  |
| MA: | Okay.  And then your mother-in-law came at what time?                                     | 8  |
| OG: | She was on her way over.  My wife was still at home, but I knew that my son               | 9  |
|     | would have appropriate support and I thought I could just come into work at that          | 10 |
|     | point.                                                                                    | 11 |
| MA: | Okay.  And you said you sent an e-mail to your employer that you weren't coming           | 12 |
|     | in Thursday.                                                                              | 13 |
| OG: | Initially, yeah, before I knew this information.                                          | 14 |
| MA: | And what time was—did you send the e-mail?                                                | 15 |
| OG: | I think probably around 8 o'clock, something like that.  I—I don't remember the           | 16 |
|     | exact time.                                                                               | 17 |
| MA: | So between 8 and 10, that's when you—all the information came about your                  | 18 |
|     | mother-in-law coming—                                                                     | 19 |
| OG: | Yep.                                                                                      | 20 |
| MA: | You getting injured?                                                                      | 21 |
| OG: | Yes.  Believe it or not, that's what happened.                                            | 22 |
| MA: | Okay.                                                                                     | 23 |
| OG: | As strange as it seems, I initially wanted to take that time off for one reason and it    | 24 |
|     | turned out I had to take the time off for another.                                        | 25 |

Page 14 of 35

| | | |
|---|---|---|
| MA: | Okay. And you believe you contacted your employer Thursday—so, again, we're | 1 |
| | trying to— | 2 |
| OG: | This is an e-mail. It's—it's on the record. | 3 |
| MA: | Okay. | 4 |
| OG: | Yeah | 5 |
| MA: | About both situations, your— | 6 |
| OG: | The initial—yeah. The initial e-mail was that I was going to take off— | 7 |
| MA: | Okay. | 8 |
| OG: | —due to personal reasons, family reasons. And the subsequent e-mail was that I | 9 |
| | had hurt myself and that I was gonna come in and now I couldn't come in. So | 10 |
| | that's exactly the way it happened, strange as it seems. | 11 |
| MA: | Okay. So I do have an e-mail, somewhere in here, that, I guess, it's—it was a | 12 |
| | lean—Linda—is that— | 13 |
| OG: | Linda McMurren. | 14 |
| MA: | Yes. So give me a moment. Okay. So we have at, I guess, 9—9—where are we? | 15 |
| | 9/4/2014, which is Thursday— | 16 |
| OG: | Mm-hm. | 17 |
| MA: | —at 8:24AM. | 18 |
| OG: | Mm-hm. | 19 |
| MA: | It says—the subject sick days. "Hi Linda. I unfortunately must take today and | 20 |
| | tomorrow off due to important family issues. Dr. Pulitzer is away, just making it | 21 |
| | official." | 22 |
| OG: | Is that—that's my e-mail. | 23 |
| MA: | Okay. | 24 |
| OG: | Mm-hm. | 25 |

**SUNY 001293**

Page 15 of 35

MA:   And then there's another email that says—again this is at—on 9/5/2014 at 12:21PM.                                                                                          1

                                                                                                  2

OG:   Okay.  So it was the next—                                                                  3

MA:   So this is the following day.                                                               4

OG:   Yeah.                                                                                        5

MA:   And, again, it's from—from you to Linda and, I guess, Steven Pulitzer.                       6

OG:   Mm-hm.                                                                                       7

MA:   It says "as it turns out, I was going to come in regardless of my last e-mail               8

      Thursday.   The family issues have been resolved Thursday morning.   I then                 9

      managed to throw my back out.   My mobility has been severely limited since.                10

      Please forgive the confusion."                                                              11

OG:   Yes.                                                                                         12

MA:   Okay.  So that was on Friday?                                                               13

OG:   Okay.                                                                                        14

MA:   At 12—                                                                                       15

OG:   Yeah.  I forgot—yeah, that makes sense.  Maybe I did do it the next day.                     16

MA:   Okay.  So is—again, from the situation, you smiled and laughed and thought it                17

      didn't sound right when we first talked between 8 and 10 where you were gonna                18

      take off and then your mother-in-law came and then you said you hurt your back.              19

OG:   Right.                                                                                       20

MA:   Is there any reason why you didn't contact your employer that day?                           21

OG:   I didn't really think at the time that it made that much difference because they             22

      already knew that I wasn't coming in.   And I just didn't think it made any                  23

      difference at that point.  They knew I wasn't gonna be there anyway.  And I—you              24

      know, I didn't think to write them, but the next day I thought better of it and I            25

|       |                                                                                                          |     |
|-------|----------------------------------------------------------------------------------------------------------|-----|
|       | wrote, you know?                                                                                          | 1   |
| MA:   | Right, 'cause they knew from your e-mail that you weren't coming in the                                  | 2   |
|       | following day as well.                                                                                    | 3   |
| OG:   | Right.                                                                                                    | 4   |
| MA:   | But you thought that you should write something on Friday?  Okay.  And, again,                           | 5   |
|       | just rethinking it or—what—why—what was the change?                                                       | 6   |
| OG:   | There was a lot going on, on Thursday and I didn't get around to writing another                         | 7   |
|       | e-mail and then I thought about it the next day and I thought that I should                              | 8   |
|       | elaborate further and let them know exactly what happened, just for the record.                          | 9   |
| MA:   | Okay.  Now, Dr. Reede has—I spoke with Dr. Reede and she said that she had a                             | 10  |
|       | meeting with you regarding time and attendance.  She said it was back in May?                            | 11  |
| OG:   | Yes.                                                                                                      | 12  |
| MA:   | Do you remember meeting with Dr. Reede?                                                                   | 13  |
| OG:   | Mm-hm.  Yes, I did.                                                                                       | 14  |
| MA:   | Okay.  And, again, this is what she wrote; "meeting with Dr. Greenberg, May 5th                          | 15  |
|       | 2014, time and attendance, incorrect reporting of time and attendance.  I requested                      | 16  |
|       | a meeting to discuss an incorrect entry on his timesheet.  The administrative                            | 17  |
|       | assistant responsible for monitoring timesheets reported a discrepancy in his April                      | 18  |
|       | timesheet, the time worked on April 21st 2014.  Dr. Greenberg reported that he                          | 19  |
|       | worked from 9AM to 5PM.  On the day in question, he sent an e-mail to the                               | 20  |
|       | timekeeper stating that he would be arriving around 11AM and had notified the                            | 21  |
|       | resident on-call at KCHC at 6AM that he would be late.  A review of the case                            | 22  |
|       | dictation log showed that he did not take"—"dictate a case 'til 12:07PM.  Dr.                           | 23  |
|       | Greenberg said he did not see what the problem was because he" read all the                              | 24  |
|       | films."  For—"I informed him that his job responsibilities require him to be                             | 25  |

**SUNY 001295**

Case 19-3570, Document 41, 02/11/2020, 2775383, Page211 of 290
**A189**

Case 1:15-cv-02343-PKC-VMS   Document 87-24   Filed 09/14/18   Page 18 of 36 PageID #: 1482

|     |     |     |
| --- | --- | --- |
|  | present for consultations as well as resident supervision and education.  I also | 1 |
|  | reminded him that we had grand rounds on time and attendance from DMCHR on | 2 |
|  | October 15, 2013, and although that he works at KCHC, he is paid by DMC and, | 3 |
|  | therefore, subject to our rules and regulations.   He was informed that after | 4 |
|  | discussion with Leo Johnson and"—"and a review of his records it was | 5 |
|  | determined that he could leave the time as reported because there were several | 6 |
|  | days where he worked more than eight hours.  In the future, however, he should | 7 |
|  | report his time correctly.  The meeting ended with a reminder that random audits | 8 |
|  | can be performed to monitor attendance."  Okay. | 9 |
| OG: | Mm-hm. | 10 |
| MA: | So, again, since that time, how have you been reporting your hours? | 11 |
| OG: | Well, up until recently, nobody's been monitoring my time to the exact minute. | 12 |
|  | Now, when I start reading a case is not necessarily the time I arrive.  I sometimes | 13 |
|  | come in and there're consultations, there's teaching moments, there's times I have | 14 |
|  | to speak to clinicians.  So it's not an accurate measure of when I'm in or when I | 15 |
|  | leave. | 16 |
| MA: | Okay. | 17 |
| OG: | Having said that, in the past when I filled out timesheets, I didn't keep track of my | 18 |
|  | exact times.  So I always wrote 9 o'clock because I was there for eight hours every | 19 |
|  | day and I didn't realize that it was that important for me to, you know, punch a | 20 |
|  | clock as a professional. | 21 |
| MA: | Well, again, the department, again, is—it's not punching a clock, it's—you know, | 22 |
|  | documenting the hours that you were working. | 23 |
| OG: | Okay. | 24 |
| MA: | So if you are supposed to work from 9-5 or, that is, your hours and, again, if you | 25 |

SUNY 001296

|  |  |  |
|---|---|---|
|  | worked from 11-7 and that's approved or whatever on the paperwork— | 1 |
| OG: | Mm-hm. | 2 |
| MA: | —in my view, it should show 11-7. | 3 |
| OG: | Okay. | 4 |
| MA: | It's shouldn't show 9-5 because there could be reasons that, again, for audit purposes or for other issues, Dr. Greenberg says he's here at 9:30, but he's not here 'till 11— | 5 6 7 |
| OG: | Right. | 8 |
| MA: | —that could be— | 9 |
| OG: | So I got the memo.  I understood that and from that time on, I started documenting my exact time in a book. | 10 11 |
| MA: | Okay. | 12 |
| OG: | And, so, when the time comes at the end of the month to do the timesheet, I put the exact time that I was there. | 13 14 |
| MA: | Okay. | 15 |
| OG: | But, prior to that, I hadn't been doing that. | 16 |
| MA: | So since May—so, June-July all the times are what you— | 17 |
| OG: | I have a booklet.  I write every time down, when I come in and when I leave. | 18 |
| MA: | Okay. | 19 |
| OG: | And I've been trying to be more accurate.  Prior to that time, I certainly wasn't. | 20 |
| MA: | So on these timesheets, is—there was a timesheet that I have.  I don't have the most recent one.  I did have—they provided it.  Is this something that gets filled out—this is the month of April.  I guess that was the day in question, April 21st. As you see— | 21 22 23 24 |
| OG: | And as you see, I always wrote 9-5. | 25 |

| | | |
|---|---|---|
| MA: | Right. | 1 |
| OG: | Because I just didn't think, you know, I did—I felt like I was doing my job and, | 2 |
| | you know, but I understand. | 3 |
| MA: | Does that sheet get filled out—did you fill out— | 4 |
| OG: | Every— | 5 |
| MA: | So June, July— | 6 |
| OG: | Correct. | 7 |
| MA: | Every month it's filled out. | 8 |
| OG: | Yeah. | 9 |
| MA: | And what you're saying is, in June-July, it will show the exact times that you | 10 |
| | worked? | 11 |
| OG: | It should, yes. | 12 |
| MA: | It won't show 9-5, like this? | 13 |
| OG: | I think after my meeting I started to change that.  Now, I don't know exactly—I | 14 |
| | mean, I—I don't know.  I would have to look at the next— | 15 |
| MA: | 'Cause I only have April, so it's the same— | 16 |
| OG: | Okay. | 17 |
| MA: | I don't have— | 18 |
| OG: | I think from May on I probably did, like, the exact time— | 19 |
| MA: | Okay. | 20 |
| OG: | —that I was there, because that's what we discussed. | 21 |
| MA: | Okay.  And will you—are you sure of that?  Do you—or do you think you did | 22 |
| | or— | 23 |
| OG: | I think I did.  I don't know, like—like I said, I don't know exactly when I started, | 24 |
| | but if we had the meeting then, I'm pretty sure the next month— | 25 |

**SUNY 001298**

| | | |
|---|---|---|
| MA: | Okay. | 1 |
| OG: | —I put the accurate times in. | 2 |
| MA: | Okay.  And those times, did any supervisor or anyone discuss that you—you were | 3 |
| | supposed to work from 9-5 and you came in 11-7.  Did anyone discuss that with | 4 |
| | you during that time period? | 5 |
| OG: | My times during that time period up until the summer were pretty regular.  There | 6 |
| | may have been a day here and there where I came in a little bit later, for whatever | 7 |
| | reason, but I tried to keep it reasonably between 9 and 5 or around then. | 8 |
| MA: | Okay. | 9 |
| OG: | During the—it was only recently, during the summer, that I started to come in late | 10 |
| | for a couple weeks to help out in the evening. | 11 |
| MA: | Okay.  And there's also some questions on filling out—I know that, I guess, Linda | 12 |
| | McMurrin— | 13 |
| OG: | Mm-hm. | 14 |
| MA: | —I guess, requests for timesheets—time off.  She has sent you the forms that | 15 |
| | need to be filled out. | 16 |
| OG: | Mm-hm.  Yes. | 17 |
| MA: | Do you fill them out when you take days off? | 18 |
| OG: | Yes, yes, we have to. | 19 |
| MA: | Okay.  Okay.  And—'cause it's my understanding that when you ask for time off, | 20 |
| | they constantly send you the form.  Like, you ask for a time and then they'll say | 21 |
| | the form needs to be filled out. | 22 |
| OG: | Right.  Well, there's a form that they told us a while back, and this is a new policy | 23 |
| | this past year.  There are forms that are available online that I can print out and | 24 |
| | then fill out and I have to have my supervisor sign—sign them and then they go to | 25 |

**SUNY 001299**

|       |                                                                                      |    |
|-------|--------------------------------------------------------------------------------------|----|
|       | the chairperson.                                                                     | 1  |
| MA:   | Okay.  So do you understand that the department is expecting you to work from 9-      | 2  |
|       | 5?                                                                                   | 3  |
| OG:   | Okay.  Yeah, I do.                                                                   | 4  |
| MA:   | Okay.                                                                                 | 5  |
| OG:   | And I know that they're serious about it.                                             | 6  |
| MA:   | Okay.                                                                                 | 7  |
| OG:   | So I'm gonna adhere to those hours come hell or high water.                           | 8  |
| MA:   | Okay.  Well, again, someone's schedule is—you know, when you say you'll               | 9  |
|       | adhere to that—in my—my belief is if you're scheduled between 9-5, that's the         | 10 |
|       | time.  Now, if an event comes up or you're running late, you should send an e-        | 11 |
|       | mail that I'm running late 'cause the belief is that you will be here at 9.           | 12 |
| OG:   | Mm-hm.  Okay.                                                                         | 13 |
| MA:   | And then, you know, the belief is that you're gonna leave at 5.  Obviously, if        | 14 |
|       | you're in the middle of something I don't think you're gonna say it's 4:59 I gotta    | 15 |
|       | leave, but, you know, you're probably not gonna get assigned work at 7 if you're      | 16 |
|       | supposed to be leaving at 5.                                                          | 17 |
| OG:   | Okay.                                                                                 | 18 |
| MA:   | Hopefully.  I mean, I don't—I don't know how the department works, I would            | 19 |
|       | assume that the person that's there at the—that scheduled time will receive the       | 20 |
|       | work at the time.                                                                     | 21 |
| OG:   | Mm-hm.                                                                                | 22 |
| MA:   | Correct?                                                                              | 23 |
| OG:   | Well, it's a constant flow of work.  It's not like it's chopped up—                   | 24 |
| MA:   | Right.                                                                                | 25 |

**SUNY 001300**

| | | |
|---|---|---|
| OG: | —in any way, but yeah. | 1 |
| MA: | Okay.  And then the—that, again, the concern and the issue of the—the first, the | 2 |
| | switching of the vacation from—so you were scheduled for two weeks— | 3 |
| OG: | Mm-hm. | 4 |
| MA: | —and then you asked for a change— | 5 |
| OG: | Right. | 6 |
| MA: | —and then you didn't adhere to that schedule. | 7 |
| OG: | Yeah. | 8 |
| MA: | And then came in one—took off one day, which would make people believe | 9 |
| | you're gonna take off the whole week 'cause they didn't expect you there Monday | 10 |
| | 'cause that was the week you were on vacation. | 11 |
| OG: | Correct. | 12 |
| MA: | And then you came Tuesday to Friday. | 13 |
| OG: | Mm-hm. | 14 |
| MA: | At hours that the department didn't believe was your schedule. | 15 |
| OG: | Right.  I didn't do a good job of communicating there.  And I will, in the future, | 16 |
| | do a much better job of doing that 'cause it clearly created problems. | 17 |
| MA: | Okay.  And then the—the, I don't know—what Dr. Pulitzer said, which certainly | 18 |
| | when, you know, I read it.  It didn't sound good when I heard it.  That you were | 19 |
| | aware and they can—you know, you'll take whatever consequences there are or | 20 |
| | something— | 21 |
| OG: | Well, sometimes you have to make decisions for your family that go against the | 22 |
| | grain.  I have made many, many sacrifices for—for Kings County.  In fact, my | 23 |
| | wife was nine-months pregnant with the flu and I had to come back here from | 24 |
| | Pennsylvania to do a shift Friday and a call— | 25 |

**SUNY 001301**

Page 23 of 35

| | | |
|---|---|---|
| MA: | Mm-hm. | 1 |
| OG: | —and I missed the birth of my son because I was being responsible.  And I've | 2 |
| | done that many times before, much to the consternation of my wife. | 3 |
| MA: | Okay.  And I have the letter that we talked about, just to let you see, September | 4 |
| | 3rd.  I mentioned there was two letters.  Is there September 3rd there? | 5 |
| OG: | Yes, I have this.  I have a copy of this. | 6 |
| MA: | Okay.  And Dr. Pulitzer gave you that letter? | 7 |
| OG: | Yes, he did. | 8 |
| MA: | Okay.  Was there any conversation when he handed you that letter or do you | 9 |
| | remember the conversation? | 10 |
| OG: | He said that, after our conversation, he had to present this to the chairman, | 11 |
| | chairperson, and that he wrote up that letter and that's it.  I don't think that there | 12 |
| | was any further discussion about it.  I said— | 13 |
| MA: | Okay.  I— | 14 |
| OG: | —I understand and I accept that. | 15 |
| MA: | Okay.  So he—Dr. Pulitzer wrote an e-mail as I ask more questions about the | 16 |
| | letter. | 17 |
| OG: | Mm-hm. | 18 |
| MA: | So this is what Dr. Pulitzer said; "I handed him the letter on Wednesday | 19 |
| | September 13, 2014, at approximately 4PM while he was at his workstation in the | 20 |
| | S Building at KCHC." | 21 |
| OG: | Mm-hm. | 22 |
| MA: | That's—you remember that? | 23 |
| OG: | Yeah. | 24 |
| MA: | Okay.  "I informed him that I had given him a written denial of his requested time | 25 |

**SUNY 001302**

|     |                                                                                      |    |
|-----|--------------------------------------------------------------------------------------|----|
|     | off" and I—that I—"and that I sent him an electronic copy in addition to the          | 1  |
|     | physical copy I was hand delivering. He read the letter." You read the letter in     | 2  |
|     | front of Dr. Pulitzer?                                                                | 3  |
| OG: | Mm-hm. Yeah.                                                                          | 4  |
| MA: | Dr. Pulitzer said "I advised him to show up for work on September 4th and to          | 5  |
|     | revise his pans or this matter would be referred to Labor Relations." Remember        | 6  |
|     | him—                                                                                  | 7  |
| OG: | Yeah. I'm pretty sure he said that, yeah.                                             | 8  |
| MA: | "He thanked me for my recommendation and said that he intended to continue            | 9  |
|     | with his original plan."                                                              | 10 |
| OG: | Yes.                                                                                  | 11 |
| MA: | Okay. And then he said he stayed an additional five minutes and had some small        | 12 |
|     | talk about family and I" left—"then left his reading room."                           | 13 |
| OG: | That sounds about right.                                                              | 14 |
| MA: | Okay. So, again, the—reading it on paper and, again, you mentioned family             | 15 |
|     | issues, personal issues and so forth, the—on paper how it sounds; "I'm staying        | 16 |
|     | with my original plan" and "I'm going to take off."                                   | 17 |
| OG: | I know how that sounds.                                                               | 18 |
| MA: | Okay.                                                                                 | 19 |
| OG: | But if you had a child with special needs who's starting a new school and had a lot   | 20 |
|     | of trouble with transitions, you probably would've done the same.                    | 21 |
| MA: | Well, I don't know what I would've done. I don't have a child with special needs.     | 22 |
| OG: | I understand.                                                                         | 23 |
| MA: | And, again, you know, the situation, ultimately, was handled, from what you're        | 24 |
|     | saying, by your mother-in-law anyways. So—                                            | 25 |

**SUNY 001303**

OG: Well, I didn't know that that was gonna happen. I didn't know that I was gonna 1

have additional support that day. That sort of transpired and, at the same time, I 2

threw out my back. 3

MA: Right. 4

OG: So it's interesting the way things turned out. I had, I guess, what you might 5

consider a more legitimate reason to be out, but that's just the way it happened. 6

MA: So, again, you mentioned you have a child that has special needs and there's a 7

balance of work responsibilities and family responsibilities. 8

OG: And most of the time—most of the time stuff like this has come up, I've—I've 9

gone to work and I've done what I had to do professionally, despite my wife being 10

upset with me about it. So this is really, perhaps, the first time that I've actually, 11

you know, supported my family over—over work. So this is actually an unusual 12

circumstance for me. I usually don't do this, but I felt it was important. 13

MA: Well, from what you said on the recording, and please correct me if I'm wrong, 14

July and August you changed your schedule because of your family. 15

OG: July and August, you mean the vacation schedule? 16

MA: No, I mean the hours that you come to work. 17

OG: Oh, no. Those—I didn't change those hours because of my family. I changed 18

those hours because the patients in—in the ER required my services. In other 19

words, there's a person who comes in later in the evening who's being overworked 20

and I feared that he was gonna start missing things. He was reading far too many 21

cases and in the past we've had a 12-8 shift and, for some reason, that shift 22

disappeared. So he didn't have that support anymore. That's now been reinstated. 23

Now, there's a 12-8 shift. All of a sudden, it just started again. So I felt that the 24

department needed me to do this. Now, should I have communicated it better to 25

|  |  |  |
|---|---|---|
| | others?  Yeah.  I didn't feel like it made any difference to anybody, but clearly it | 1 |
| | does, so— | 2 |
| MA: | Did you—'cause, again, we have, and again you certainly, you know, can have a | 3 |
| | copy of the tape, it's your right to have. | 4 |
| OG: | Mm-hm. | 5 |
| MA: | I recall you saying in—during the—your change of the hours during the summer | 6 |
| | for your— | 7 |
| OG: | Oh.  No, no, no.  What I meant was that I was able to work those hours during the | 8 |
| | summer to help out the department because my kids were not at school.  During | 9 |
| | the year, I wouldn't be able to do that because I need to be at home at 5 or 5:30— | 10 |
| | 5:30. | 11 |
| MA: | Mm-hm. | 12 |
| OG: | So during the summer, my kids are off, school isn't an issue.  They're off doing | 13 |
| | whatever vacations stuff their doing.  So my hours are more flexible and I felt that | 14 |
| | the patients at Kings County deserve my—my—my work and my strong work | 15 |
| | ethic. | 16 |
| MA: | Now, the other members of your department; do they adhere to a schedule or are | 17 |
| | they—did—so you use—you made it—you know, you stated you didn't really | 18 |
| | know your schedule or things change. | 19 |
| OG: | There wasn't a defined schedule.  There's been lots of changes in our department. | 20 |
| | I wasn't told to come a specific hour.  I guess it was assumed that I'd be working | 21 |
| | 9-5.  And, you know, the schedule does say 9-5 on it, but, in the past, that's been | 22 |
| | modified to—to cover the needs of the hospital. | 23 |
| MA: | So there's—there is a schedule posted that says 9— | 24 |
| OG: | There is a schedule posted that says 9-5, however, in the past, when we—we had | 25 |

|  |  |  |
|---|---|---|
|  | a different director then, he wanted me to come in later.  So, despite the schedule | 1 |
|  | saying 9-5, I had slightly different hours.  So I—you know, my priorities are | 2 |
|  | patient care and I feel like I do what is necessary to take care of the patients at | 3 |
|  | Kings County.  And that's a higher purpose and I'm sorry it doesn't fit in with the | 4 |
|  | cookie cutter hours that they require, but, you know, that's okay.  I'll do the hours | 5 |
|  | that they want, you know, and that's from now on. | 6 |
| MA: | Well, I think—again, I think the key that I'm hearing is communication.  So if | 7 |
|  | you—if the other director, whoever that was.  I mean, you mentioned his name, I | 8 |
|  | forgot. | 9 |
| OG: | Alan Kantor | 10 |
| MA: | Okay.  If Dr. Kantor agreed to a modification of the hours, that was a | 11 |
|  | conversation that was had with Dr. Kantor.  Now the new director comes in, I | 12 |
|  | don't know if—I mean, he—my understanding is he expected you from Point A to | 13 |
|  | Point B, as I would.  If it says on the schedule, people see that, that's what they | 14 |
|  | would expect.  Now, if you have reasons why you think it's best that you would | 15 |
|  | be there from a different schedule, you know, I think, to me, the key is to raise | 16 |
|  | that issue with your director and get a—get authority to change the hours if that | 17 |
|  | so—if he agrees or she agrees.  Then, that's—that's a different conversation, | 18 |
|  | which, again, you may be 100 percent right, I don't know the needs of the | 19 |
|  | department.  What—what I do know is that the directors really have the authority | 20 |
|  | to make the decision of what time they expect the workers to come in, the, you | 21 |
|  | know, the employees to come in. | 22 |
| OG: | Right.  Well, I was informed of that through the chairperson that she was | 23 |
|  | concerned that my hours varied or fluctuated between say 10 and 10:30 to 6 and | 24 |
|  | 6:30 and that she had an issue with that. | 25 |

| | | |
|---|---|---|
| MA: | Right. | 1 |
| OG: | I had that conversation with Steve Pulitzer and I forget now, a week or two ago. | 2 |
| MA: | Right. | 3 |
| OG: | Subsequent to that conversation I e-mailed him and I said look, the reason I'm doing this is to help Vin out.  Vin is the person who works from 4-12.  He needed some support during that time and I took it upon myself to—to do that.  Now, that clearly doesn't—nobody responded to that e-mail and that was—and the chairperson was also cc'd.  So I never heard otherwise after that point, but I did say that, look, the school year is right around the corner, I'm gonna be working 9-5, you know?  So, in the future, I'll make it clear what I'm doing. | 4<br>5<br>6<br>7<br>8<br>9<br>10 |
| MA: | Yeah.  I mean, to me, from dealing—in the labor relations field, making it clear and getting authority to do it is—is really an important factor.  And, again, I'm not saying—'cause a lot of times, the person on the direct line might really have the best input to make a decision, but that decision really needs to be approved or done by the director, the supervisor, whatever and not the employee, or the—I call the worker making that decision.  Even though it might make 100 percent sense to that person, but the ultimate decision is made—you know, the scheduling, the director and so forth.  So I'm not saying not to have that conversation because that conversation might really warrant—be warranted and might need to be, you know, looked at and evaluated— | 11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20 |
| OG: | Mm-hm. | 21 |
| MA: | —but, when you said you sent an e-mail and no one really responded differently, so that means I can come in, and now I'm paraphrasing; so I just came in when—when I thought was the most appropriate can be— | 22<br>23<br>24 |
| OG: | I had—I had intended to correct that.  I was just explaining my—my purpose in | 25 |

|     |     |     |
|-----|-----|-----|
|     | the past.  And yes, there were a couple of days after that where I did—there was | 1 |
|     | only maybe another three or four days since that.  But I did come in a little bit | 2 |
|     | later on those days.  So yes, I didn't adhere to it right then and I should've made | 3 |
|     | that clearer and I understand and I'll, you know, I'll—I'll keep to whatever hours | 4 |
|     | they want me to keep to.  By the way, I do have a—I did go to urgent care today. | 5 |
| MA: | Okay. | 6 |
| OG: | I don't know if this is important or not.  If you want to see this document, I have | 7 |
|     | prescriptions as well. | 8 |
| MA: | Okay. | 9 |
| OG: | And I was just diagnosed with—with back spasms on my (inaudible) side. | 10 |
| MA: | Now, did they release you to come to work? | 11 |
| OG: | Yes.  Well, they gave me a prescription for muscle relaxers. | 12 |
| MA: | Okay.  And this is September 8th?  That was— | 13 |
| OG: | That was today.  That was this morning. | 14 |
| MA: | You were in today.  Yes.  I will make a copy and give you your original back. | 15 |
| OG: | Right.  Do you want the prescriptions as well or does that make any— | 16 |
| MA: | Sure, sure, I might as well take everything.  So I will—I will do that.  Is there | 17 |
|     | anything else that you wanna say on the record or anything that I didn't bring up? | 18 |
|     | 'Cause, again, I asked the questions, you gave the answers.  Is there anything that | 19 |
|     | is relative to what we were talking about that you feel is important to be included? | 20 |
| OG: | I think we covered it, but just to summarize, I—it's a—it's a—it's a careful | 21 |
|     | balance to do what's best for your family and best for your career.  It's not always | 22 |
|     | possible for me to fulfill every detail of my schedule when there are serious issues | 23 |
|     | at home.  For the most part, I have erred on the side of my professional career in | 24 |
|     | lieu of my family.  In this instance, I really didn't feel like I could do that. | 25 |

**SUNY 001308**

MA:   Okay.  And, going forward, you know, there are going—there are going to be   1

issues that—   2

(Phone ringing)   3

MA:   Hang on one second.   4

OG:   Okay.   5

MA:   Michael Arabian.  I'm meeting with Dr. Greenberg right now.  Yes, hang on one   6

second.  We're going to go off the record right now.  It is 3:34PM.   7

OG:   Okay.   8

MA:   Okay.   9

OFF THE RECORD   10

MA:   Okay.  We are back on the record.  It is now 3:36PM.  I apologize I had to take   11

that phone call.  You were saying—well, actually, I was—   12

OG:   You were actually asking, yes.   13

MA:   Right.  In the future, there may be this type of situation that happens again where   14

you're expected at work and there's a, what you believe, a pressing family issue   15

and you can't be in two places at once, et cetera.  How would you handle it   16

differently, if at all?   17

OG:   I, perhaps, should do a better job of communicating and presenting issues to the   18

department.  However, if there is a serious issue with my family, I will have to   19

choose my family over my work if—if I deem it important enough.  I'm gonna try   20

not to do that, obviously, but I'd be lying if I said that I wouldn't choose my   21

family.   22

MA:   When—so, your—you said your—your child needed—started a new school or   23

something?   24

   25

**A203**

Page 31 of 35

| | | |
|---|---|---|
| OG: | Yes.  He's—it's very difficult for him to handle transitions.  He needs a lot of | 1 |
| | emotional support— | 2 |
| MA: | Mm-hm. | 3 |
| OG: | —and I am the most important person in his life. | 4 |
| MA: | And, I guess, the—the—the next question is when were you aware that your child | 5 |
| | was starting this new school? | 6 |
| OG: | This all transpired recently.  We were—he was sort of forced out of his previous | 7 |
| | school.  We were trying to keep him in there— | 8 |
| MA: | Mm-hm. | 9 |
| OG: | —and we had to make a decision over the last week or so as to where he was | 10 |
| | gonna go.  So it was—the decision was just made for him to go to that school this | 11 |
| | past week. | 12 |
| MA: | Okay. | 13 |
| OG: | So it was only very recently. | 14 |
| MA: | Okay.  And he—does he go to school from September to—the regular school | 15 |
| | year? | 16 |
| OG: | It's a regular school year.  It's a special school where he now goes to Mary | 17 |
| | McDowell and today—well, Friday he was there for an hour.  Today he was there | 18 |
| | for a half a day.  Tomorrow is his first full day. | 19 |
| MA: | So I guess, you know, what makes sense to me, and again not having—as I | 20 |
| | mentioned, I don't have a special needs child, but if the school issue might have | 21 |
| | been a problem or an issue and you did request for vacation August 11th to the | 22 |
| | 22nd—and one of the things I would take away is well maybe I will plan better to | 23 |
| | maybe be off the week initially because I don't know if you requested the week of | 24 |
| | Labor Day and you were denied it initially or if it was that— | 25 |

OG:     No, no, no that's not what happened.  I requested those original two weeks—     1

MA:     Right.     2

OG:     —thinking that that was the time we were gonna take off and things had changed.     3
It had nothing to do with his school year per se.  The stuff that happened at the     4
end was different.     5

MA:     Mm-hm.     6

OG:     We just found out that he had to go to a new school and I had to spend time with     7
him.     8

MA:     So I didn't get your full answer or I interrupted.  I don't know how you want to     9
phrase it.  So if the situation comes up again, which it probably will—     10

OG:     Oh, I—I will—     11

MA:     I mean—     12

OG:     I will—I will do my best to plan it differently and to—to communicate better and     13
to let everybody know what's going on as soon as I know it.     14

MA:     Okay.     15

OG:     Yeah.   I—I, you know, I admit that I didn't do the best job I could with     16
communication this time around.     17

MA:     Okay.  And so that we clarify so everyone understands on the record, so you     18
understand your work hours are 9AM-5PM?     19

OG:     I sure do now, yup.     20

MA:     Okay.  And that's Monday-Friday?     21

OG:     Monday-Friday.  And I do call as well and we're occasionally requested now to do     22
12-8, but that's part of the schedule.     23

MA:     Okay.  Now, did you—     24

(Knocking)     25

**SUNY 001311**

Page 33 of 35

| | | |
|---|---|---|
| MA: | Yes?  Thank you, Carol.  Were you on call Saturday? | 1 |
| OG: | Which Saturday? | 2 |
| MA: | Saturday the 6th? | 3 |
| OG: | I was scheduled to be on call and I switched with somebody, which is something we routinely do. | 4<br>5 |
| MA: | Okay. | 6 |
| OG: | So somebody else covered that call and I'm gonna cover that person's call. | 7 |
| MA: | So you were scheduled to be on call September 6th? | 8 |
| OG: | Correct. | 9 |
| MA: | So how far in advance does that come out? | 10 |
| OG: | On the schedule? | 11 |
| MA: | Like, does it—yes. | 12 |
| OG: | It just came out last week.  I didn't know I was on call September 6th until September 1st, maybe. | 13<br>14 |
| MA: | Okay.  And when did you ask to switch? | 15 |
| OG: | During the course of this week, early—early last week?  I e-mailed somebody who was on call two Saturdays hence— | 16<br>17 |
| MA: | Mm-hm. | 18 |
| OG: | —and she agreed to switch with me and I made it official by, you know, by cc'ing Linda McMurren or writing her an e-mail about it. | 19<br>20 |
| MA: | Okay. | 21 |
| OG: | I think I cc'd her on it. | 22 |
| MA: | Okay.  And, again, the perception, and I don't know the reason why you couldn't—you said it's common that people switch, but the perception was I want Wednesday, Thursday and Friday off.  You came in Wednesday and you said I'm | 23<br>24<br>25 |

|   |   |   |
|---|---|---|
|   | not coming in Thursday and Friday.  They said you need to come in Thursday and | 1 |
|   | Friday. | 2 |
| OG: | Mm-hm. | 3 |
| MA: | And you had Saturday scheduled and switched Saturday. | 4 |
| OG: | Yeah.  I don't see the problem with that.  That happens all the time.  People switch | 5 |
|   | their calls all the time. | 6 |
| MA: | Okay.  And you're saying— | 7 |
| OG: | You're saying that the perception of that is that I'm taking a bunch of days off | 8 |
|   | or— | 9 |
| MA: | Well, again, I'm asking questions 'cause I didn't realize that the schedule came | 10 |
|   | out, you're saying,—initially so there wasn't— | 11 |
| OG: | Yeah. | 12 |
| MA: | I mean, I think if it was a month in advance, maybe it looks different than a week | 13 |
|   | in advance. | 14 |
| OG: | Well, the schedule comes at—at—either at the very end of the month before at | 15 |
|   | the—or at the very beginning of the new month. | 16 |
| MA: | Okay. | 17 |
| OG: | So the first week or so you—you know, you have very short notice.  Yeah, I know | 18 |
|   | the schedule for the end of the month now. | 19 |
| MA: | Right. | 20 |
| OG: | Four weeks in advance, essentially. | 21 |
| MA: | Okay. | 22 |
| OG: | But I didn't have much notice for that day. | 23 |
| MA: | And that schedule just dictates the Saturday cover or is that every— | 24 |
|   |   | 25 |

OG:    It is the whole schedule, yeah.  The whole schedule, all the hours, all the different, you know, parts of the department and what their hours are, yeah.

MA:    Okay.  And that's where 9-5 would be listed?  That's the schedule we're—we're talking about?

OG:    Yes.

MA:    Okay.  Anything else that you would do differently?  Anything comes to mind?

OG:    Well, like I said, I have to do a better job of communicating.  And, you know, and adhering to the schedule that they want me to—you know, to adhere to and if I feel that it requires some changes to benefit the department, I should have a discussion with the director about that before I choose to do it on my own.

MA:    Okay.  All right.  So what I'd like to say is that this will end the interrogation for now.  We always have the—the opportunity to reopen it and ask you additional questions if we—

OG:    Okay.

MA:    —so desire.  Gonna go off the record now.  It is now 3:44PM.

OFF THE RECORD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**SUNY 001314**





# KINGS COUNTY
# HOSPITAL CENTER

Steven Pulitzer, M.D.
Interim Chief of Service
Department of Radiology
Kings County Hospital Center
Tel: 718-245-4447
Fax: 718-245-4473

September 3, 2014

RE:  Time off

Dear Dr. Greenberg,

Your request for time off on September 4th and 5th, 2014 (this Thursday and Friday) has been denied.  You are directed to report for duty tomorrow at 9:00 a.m.

Failure to do so will result in this matter being referred to Labor Relations.

Sincerely,

Steven Pulitzer, M.D.
Interim Chief of Service
Department of Radiology
Kings County Hospital Center

SUNYESI00000006

**A209**

Case 1:15-cv-02343-PKC-VMS   Document 87-26   Filed 09/14/18   Page 2 of 2 PageID #: 1504

**From:**      CN=Linda McMurren/O=Downstate
**Sent:**      Monday, September 8, 2014 10:33 AM
**To:**        CN=Deborah Reede/O=Downstate@DOWNSTATE
**Subject:**   Fw: Sick days

---

----- Forwarded by Linda McMurren/Downstate on 09/08/2014 10:32 AM -----

From: Oded Greenberg/Downstate
To: Linda McMurren/Downstate@Downstate,
Date: 09/04/2014 08:24 AM
Subject: Sick days


Hi Linda, I unfortunately must take today and tomorrow off due to important
family issues.  Dr. Pulitzer is aware, just making it official

Thanks

Oded

SUNYESI00000995

**A210**

| | |
|---|---|
| **From:** | CN=Linda McMurren/O=Downstate |
| **Sent:** | Monday, September 8, 2014 10:51 AM |
| **To:** | CN=Deborah Reede/O=Downstate@DOWNSTATE |
| **Subject:** | Dr. Greenberg |

Dr. Reede,

Dr. Greenberg called in at 10:4a.m. this morning.  He indicated that he had to go to Urgent Care for his back and he would be in late.

He mentioned that there is only a resident in the ER.  However, I have since been informed that Dr. Scott is headed back to the ER from a meeting.

Linda

Linda McMurren
Administrative Assistant
Dept. of Radiology Chair's Office
Linda.McMurren@downstate.edu (email)
718-270-1603 (phone)
718-270-2667 (fax)

Confidentiality Notice:  The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers.

Confidential

Visit Receipt

City Medical of Upper East Side, PLLC

1345 RXR Plaza Uniondale, NY 11556

(646) 524-5175

**Patient**
Greenberg, Oded

BROOKLYN, NY 11201
ID:    512850
MRN:    512850

**Service Site**
PC Park Slope

418-420 5th Avenue
BROOKLYN, NY 11215
(718) 965-2273

**Insurance**
United Healthcare/THE EMPIRE PLAN
- 992XX

**Payment Summary**

| Visit Payment | Cash | COPAY | 09/08/2014 | $20.00 |
|---|---|---|---|---|
| | Total | | | $20.00 |

Responsible Party: Greenberg, Oded          Due: $.00

**SUNY 000485**

Premier Care of Park Slope
418-420 5th Avenue
BROOKLYN, NY 11215

---

**Oded Greenberg    Medical Record#512850    DOB:** ▮▮▮▮    **1959    Phone: (718)902-3466**

**Date of Service: September 08, 2014**

**Diagnosis**
Muscle spasm of back.
**Prescriptions**
Physical Therapy - Back, TOP and start on September 08, 2014.
Robaxin 500 mg tablet, 1-2 Tablet(s), PO, Q6H PRN, 14 days, for a total of 40, start on September 08,
2014 and end on September 21, 2014.
**Services Ordered:**

**Plan**
Stay well hydrated. Return for worsening or persistent symptoms.  Call (718)965-2273 for any questions
or concerns.

John Kahoun M.D., CityMD

600mg of Motrin every 6 hours - take with food.

**Patient Instructions**
Back Pain (Lumbosacral Strain)

Back pain is one of the most common causes of pain. There are many causes of back pain. Most are not
serious conditions.

CAUSES
Your backbone (spinal column) is made up of 24 main vertebral bodies, the sacrum, and the coccyx.
These are held together by muscles and tough, fibrous tissue (ligaments). Nerve roots pass through the
openings between the vertebrae. A sudden move or injury to the back may cause injury to, or pressure
on, these nerves. This may result in localized back pain or pain movement (radiation) into the buttocks,
down the leg, and into the foot. Sharp, shooting pain from the buttock down the back of the leg (sciatica)
is frequently associated with a ruptured (herniated) disc. Pain may be caused by muscle spasm alone.

Your caregiver can often find the cause of your pain by the details of your symptoms and an exam. In
some cases, you may need tests (such as X-rays). Your caregiver will work with you to decide if any
tests are needed based on your specific exam.

HOME CARE INSTRUCTIONS
Avoid an underactive lifestyle. Active exercise, as directed by your caregiver, is your greatest weapon
against back pain.
Avoid hard physical activities (tennis, racquetball, water-skiing) if you are not in proper physical condition
for it. This may aggravate and/or create problems.
If you have a back problem, avoid sports requiring sudden body movements. Swimming and walking are
generally safer activities.
Maintain good posture.

**SUNY 000486**

Avoid becoming overweight (obese).
Use bed rest for only the most extreme, sudden (acute) episode. Your caregiver will help you determine
how much bed rest is necessary.
For acute conditions, you may put ice on the injured area.
Put ice in a plastic bag.
Place a towel between your skin and the bag.
Leave the ice on for 30 minutes at a time, every 2 hours, or as needed.
After you are improved and more active, it may help to apply heat for 30 minutes before activities.

See your caregiver if you are having pain that lasts longer than expected. Your caregiver can advise
appropriate exercises and/or therapy if needed. With conditioning, most back problems can be avoided.

SEEK IMMEDIATE MEDICAL CARE IF:
You have numbness, tingling, weakness, or problems with the use of your arms or legs.
You experience severe back pain not relieved with medicines.
There is a change in bowel or bladder control.
You have increasing pain in any area of the body, including your belly (abdomen).
You notice shortness of breath, dizziness, or feel faint.
You feel sick to your stomach (nauseous), are throwing up (vomiting), or become sweaty.
You notice discoloration of your toes or legs, or your feet get very cold.
Your back pain is getting worse.
You have an oral temperature above 102° F (38.9° C), not controlled by medicine.

MAKE SURE YOU:
Understand these instructions.
Will watch your condition.
Will get help right away if you are not doing well or get worse.

_____

John Kahoun M.D.

SUNY 000487

Case 19-3570, Document 41, 02/11/2020, 2775383, Page236 of 290

## ::CITYMD

## ⊕PREMIERCARE
A CITYMD COMPANY ::

**MANHATTAN**

E86th (1st & 2nd Ave) – CityMD
336 East 86th St.
212.772.3627

W88th (Broadway) – CityMD
2398 Broadway
212.721.2111

E57th (3rd Ave) – CityMD
1150 3rd Avenue
212.933.0007

W57th (8th & 9th Ave) – CityMD
315 West 57th Street
212.315.2330

E37th (3rd Ave) – CityMD
561 3rd Avenue
212.729.4668

W23rd (5th & 6th Ave) – CityMD
37 West 23rd Street
646.596.9267

W14th (5th & 6th Ave) – CityMD
14 West 14th Street
212.390.0558

**QUEENS**

Astoria – CityMD
31-11 Steinway Street
718.475.2345

Forest Hills – CityMD
70-49 Austin Street.
718.260.1245

Maspeth - Premier Care
74-25 Grand Avenue
718.803.2273

**BROOKLYN**

Bay Ridge – CityMD
8712 4th Avenue
718.530.1155

Boerum Hill – CityMD
457 Atlantic Avenue
718.530.1144

Park Slope – CityMD
416-420 5th Avenue
718.965.2273

SUNY 000466

Case 19-3570, Document 41, 02/11/2020, 2775383, Page237 of 290

**LONG ISLAND**

Bellmore – Premier Care
2459 Merrick Road
516-826-2273

Carle Place – Premier Care
235 Glen Cove Road
516-877-2273

Commack – Premier Care
6500 Jericho Turnpike
631-858-2273

East Meadow – Premier Care
1919 Hempstead Turnpike
516-227-2273

Great Neck – Premier Care
415 Northern Boulevard
516-829-2273

Lake Grove – CityMD
1995 Nesconset Highway
631-731-4449

Lindenhurst – Premier Care
855 North Wellwood Avenue
631-225-4227

Levittown – Premier Care
3276 Hempstead Turnpike
516-796-2273

Long Beach – CityMD
904 West Beech Street
516-272-4353

Lynbrook – Premier Care
585 Merrick Road
516-764-2273

Massapequa – Premier Care
4410 Sunrise Highway
516-998-1024

Merrick – Premier Care
1989 Merrick Road
516-584-4448

Mineola – Premier Care
292 Herricks Road
516-748-2273

Syosset – Premier Care
358 Jericho Turnpike
516-677-9200

**WESTCHESTER**

Yonkers – CityMD
2393 Central Park Ave
914.219.0393

**ROCKLAND**

Nanuet – Palisades
256 East Route 59
845.624.2273

**SUNY 000489**

# A216

### SETTLEMENT ███

**State of New York – State University of New York Downstate Medical Center (SUNY-DMC)**

**Ms. Oded Greenberg Clinical Associate Professor**

1. In lieu of Dr. Oded Greenberg, Clinical Associate Professor being served a Notice of Discipline for: (1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department (4) insubordination and (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, switching schedule without authorization of his supervisor, all parties agree that Dr. Greenberg shall have a fine ranging from a letter of reprimand to termination from state service held in abeyance until one year from the signing of this agreement.

2. Dr. Greenberg understands that his current work schedule is from 9:00 A.M. to 5:00 P.M. Monday thru Friday. Dr Greenberg understands that he is expected to work those scheduled hours. Dr. Greenberg understands that he must accurately list the hours that he works. Dr. Greenberg understands that day's off/vacation/changes to vacation need to be approved by his supervisor.

3. Dr Greenberg shall be placed on Time and Attendance Watch. Dr. Greenberg will be required to submit verifiable documentation for each unscheduled absence; including non-medical absences. Each unscheduled absence/lateness due to personal or family illness, injury, etc. must be accompanied by a doctor's note signed by a qualified health care professional that specifies the date seen by the doctor, medical facts supporting the leave, and expected date of return. In each case documentation is due on the date of return to duty and must be submitted directly to Dr. Greenberg's supervisor or the appointed designee. Medical certification which you wish to keep confidential may be submitted to Stephanie Bernadel, Personnel Associate, Labor Relations located at 420 Lenox Road, Brooklyn, NY 11203 (Mailing address 450 Clarkson Ave, Box 1224, Brooklyn, NY 11203, tel 718-270-1193, fax 718-270-4684).

4. The probationary period referred to in paragraph one (1) shall be extended for every day taken by Dr. Greenberg during that period, whether scheduled or unscheduled. Should Dr. Greenberg engage in any misconduct the same or similar to that described above as determined by the Director of Labor Relations or her designee, the penalty will be imposed. The Director of Labor Relations' or her designee's decision to implement this penalty cannot be appealed in any legal or administrative forum by Dr. Greenberg, UUP, or anyone on her behalf.

5. Effective immediately Dr. Greenberg agrees to adhere to all Departmental policies and procedures.

**SUNY 000012**

# A217

Case 19-3570, Document 41, 02/11/2020, 2775383, Page239 of 290

6. This settlement represents the entire resolution of all known or unknown claims and grievances that Dr. Oded Greenberg has or would have arising out of Dr. Greenberg's employment at SUNY Downstate Medical Center (SUNY-DMC) arising prior to the date of this settlement agreement. Dr. Oded Greenberg waives his right to bring any suit, civil action, legal claim or, to otherwise attempt to impose any liability in any forum (including the EEOC and New York State Division of Human Rights) on SUNY, SUNY-DMC and/or the State government or any of their officers or employees in relation to her employment with SUNY-DMC. This settlement is not a precedent, but it shall be admissible by either party in future proceedings between Dr. Oded Greenberg and SUNY Downstate Medical Center.

**Dr. Greenberg voluntarily waived his right to legal or union representation.**
**Dr. Greenberg represented himself in this matter.**

_____        9/8/14
Employer                                    Date

_____        9/8/14
Employee                                   Date

_____        _____
UUP Representative                       Date

cc:   Personnel File
      Case File

**SUNY 000013**

1

## STATEMENT OF ODED GREENBERG

2

### Taken on October 20, 2014

3

**Present:  Stephanie Bernadel – Personnel Associate, Office of Labor Relations (SB)**
       **Leonzo Cuiman, Assistant Vice President for Labor Relations – (LC)**

4

       **Lisa Willis – Labor Relations Specialist (LW)**

5

       **Oded Greenberg – Clinical Assistant Professor of Radiology (OG)**
       **Michelle Gilmore-Greenberg – Wife of Oded Greenberg (MG)**

6

7

OG:    —on her head, but I think you need to hear this.

8

LC:    Okay.

9

OG:    So—

10

SB:    So wait, before we start, let me just set it up.  So today is Monday, October 20th.

11

The time is now approximately 1:45 PM.  We're here for a meeting with Dr.

12

Greenberg and Mrs. Greenberg regarding his disciplinary issue.  Present at the

13

meeting are myself, Stephanie Bernadel, Personnel Associate with the Office of

14

Labor Relations.

15

LC:    Leonso Cuiman, AVP for Labor Relations.

16

LW:    Lisa Willis, Labor Relations Specialist with New York State United Teachers.

17

MG:    Michelle Gilmore-Greenberg (phonetic), I'm here for moral support for my

18

husband.

19

OG:    I'm Oded Greenberg, and I'm the person that this is all about.

20

SB:    Okay.  So, Dr. Greenberg, we met the other day and the purpose of the meeting

21

today is to give you an opportunity to explain why the penalty upheld in abeyance

22

should not be implemented.

23

OG:    Correct.

24

SB:    Okay.

25

Page 2 of 50

| | | |
|---|---|---|
| OG: | So, let me—let me just begin by saying that this here marks the 30th year since I | 1 |
| | graduated from Downstate. I started Downstate in 1981 and I graduated in 1985. | 2 |
| | I have since that time done two residencies here; one in anatomic pathology, of | 3 |
| | which I'm board certified, and one in diagnostic radiology. I have also worked in | 4 |
| | private practice, I have done a fellowship in body imaging, I worked in | 5 |
| | teleradiology, and I've worked here in the ER as the ED radiologist for the last 12 | 6 |
| | years. I am certainly the most versatile radiologist in the department. I am also | 7 |
| | the most productive and efficient and accurate. My services are— | 8 |
| LC: | And modest. | 9 |
| OG: | What's that? | 10 |
| LC: | And modest. | 11 |
| OG: | And truthful. | 12 |
| MG: | Usually, usually—about— | 13 |
| OG: | I'm generally actually very modest, this is very hard for me to actually toot my | 14 |
| | own horn. | 15 |
| MG: | Usually. This is actually stepping outside of his character. | 16 |
| OG: | This is not my comfort zone to toot my own horn, I don't tell anybody I'm a | 17 |
| | physician. | 18 |
| LW: | I'm proud of him that he's (inaudible). They're all true. | 19 |
| OG: | This is unusual for me to say all of that. I—I'm saying it because it is in fact the | 20 |
| | truth, and I can line up 100 people who will tell you that. I have been a champion | 21 |
| | of patient—patient care during this time. And I'm very sensitive to changes in— | 22 |
| | in the way we deal with patients. And I will not back down with regards to how | 23 |
| | our patients are treated and whether they are getting the right diagnosis, whether | 24 |
| | they are getting an accurate diagnosis, whether the correct thing is done for them. | 25 |

**SUNY 001346**

|       |                                                                                          |    |
|-------|------------------------------------------------------------------------------------------|----|
|       | I have a very close relationship with the ED staff, of which a few of them wrote          | 1  |
|       | letters I'm sure you—you've received them.                                               | 2  |
| LC:   | I read them.                                                                              | 3  |
| SB:   | Mm-hm.                                                                                    | 4  |
| OG:   | And I'm here to tell you that I have been misrepresented—                                 | 5  |
| M3:   | By whom?                                                                                  | 6  |
| OG:   | What's that?                                                                              | 7  |
| M3:   | By whom?                                                                                  | 8  |
| OG:   | By Dr. Steve Pulitzer and Dr. Deborah Reede.                                              | 9  |
| M3:   | Okay.                                                                                     | 10 |

OG:   I am being treated differently from others.  I have not done the things that they've      11
took leave off I specifically wrote the department the week before, I asked Linda            13
McMurren, who is Dr. Reede's secretary, what is the procedure for taking                     14
emergent time off.  She didn't respond 'til the following Thursday when I was                15
already off.  That Wednesday morning, I spoke to Steve Pulitzer.  Steve Pulitzer            16
is very well aware of the fact that my son has special needs.  His own son has              17
special needs, we've discussed this at length.  He's well aware.  I said I have to         18
take time off to deal with my son's issues, he is the closest—I'm the closest person        19
to him.  He needs me.  I need to take this time off.  And late—and I said to him            20
the reason I'm telling you this is I need you to protect yourself just in case there's      21
a problem with this.  I didn't at the time know anything about FMLA or any of              22
that.  And I said you need to call people and make sure that the department is              23
covered.  It's not—I'm not gonna be here.  I want you to be able to cover the               24
department.  When I'm out, things are not what they should be, generally.  I'm              25

I am being treated differently from others. I have not done the things that they've said I've done. I've asked—to begin with, the first so-called offense was when I

|   |   |   |
|---|---|---|
|   | quite a force in the emergency room.  So rather than just call in sick the next day, | 1 |
|   | Thursday and Friday, which is what everybody else does, and what everybody | 2 |
|   | else has told me that I should have done, I prepared the department for my | 3 |
|   | absence.  He then came back with a letter saying you either show up tomorrow or | 4 |
|   | you have to go to Labor Relations.  And I said I'm sorry, but I have to choose my | 5 |
|   | family.  This is a serious matter.  My child, when he was under two years of age, | 6 |
|   | lost his words.  We didn't know whether he would ever speak again.  He's been | 7 |
|   | through a lot of treatment and a lot of services in the State of New York and the | 8 |
|   | City of New York.  His education and his welfare is of upmost importance to me | 9 |
|   | and it supersedes my relationship with the hospital, if it has to.  That's what I | 10 |
|   | answered him.  And it turns out, the next morning, I got out of bed and I threw out | 11 |
|   | my back.  So I physically, even if I wanted to, couldn't come to the hospital.  I | 12 |
|   | relayed this information to Dr.—to Mr. Arabian, and he didn't believe me.  But | 13 |
|   | that's what happened.  I couldn't—I couldn't physically make it to the hospital, | 14 |
|   | and I had to deal with my son's issues.  He's the most important thing in the world | 15 |
|   | to me. | 16 |
| LW: | So apparently—let me just jump in for one second.  So when—I—that was the | 17 |
|   | first time that I heard—well, I had initially heard that, you know, he had a | 18 |
|   | meeting with the Board of Ed but, you know, then his wife came in Thursday and | 19 |
|   | she was explaining to me that they have to be at this meeting together, they had to | 20 |
|   | show a united front because there are several families waiting for a particular | 21 |
|   | service that they really needed.  So they both had to present—you know, it's not— | 22 |
|   | she could not go alone.  They had to be there together. | 23 |
| MG: | I actually did go back in the afternoon alone. | 24 |
| LW: | Okay.  So mom—mom— | 25 |

Page 5 of 50

| | | |
|---|---|---|
| OG: | Well, (inaudible) the story—that particular instance wasn't specifically about the | 1 |
| | Board of Ed. | 2 |
| SB: | Okay. | 3 |
| OG: | That was about being— | 4 |
| MG: | That was the first— | 5 |
| OG: | That was the first time, yeah. | 6 |
| MG: | That was the first day for the class that we were asking the Board of Ed. to | 7 |
| | approve. | 8 |
| SB: | Okay.  Alright. | 9 |
| MG: | He started a new school— | 10 |
| OG: | And this all happened at the last moment. | 11 |
| SB: | Okay. | 12 |
| OG: | It wasn't something we were prepared for, but we had to be there. | 13 |
| SB: | Okay.  Okay. | 14 |
| OG: | And we had to—I had to be there for him.  This is emotionally very difficult for | 15 |
| | him. | 16 |
| MG: | My mother came in from Pennsylvania, we really got a—a team of people that | 17 |
| | makes my son comfortable.  And we wanted to, you know, get him off on a good | 18 |
| | start.  And it's been nothing but a blessing, this school.  He goes to Mary | 19 |
| | McDowell School here in Brooklyn.  There are 10 kids, two teachers, and | 20 |
| | everyone's pulling for my little boy.  Without this chance, you know, he's not | 21 |
| | afforded the same—he would not have been afforded this opportunity had we not | 22 |
| | showed them that we were all on board.  And, in fact, that—that Thursday and | 23 |
| | Friday we did, and we got accepted into the school.  And then, the subsequent | 24 |
| | meeting, which I'm sure Oded will talk about, we had to go to Harlem to get | 25 |

**SUNY 001349**

|  | |  |
|---|---|---|
| | everything transferred.  This happened very, very quickly.  There are tons of | 1 |
| | parents hoping to get in to these very, very wonderful schools.  And we went to | 2 |
| | Harlem, he got approved to go, and that afternoon he was not able to go.  I | 3 |
| | spoke—we spoke to you about this.  He didn't come to the afternoon meeting in | 4 |
| | Brooklyn, I went by myself.  It's the first time in eight years that I have ever | 5 |
| | appealed to the Department of Education alone.  And, you know, Oded was on the | 6 |
| | phone and he spoke to us, but that's all.  I just—I'm here because I—I partly feel | 7 |
| | responsible; Oded not being at work for those days was a direct result of my | 8 |
| | family, and I wish that it didn't have to be that way, but it's a cross we bear and we | 9 |
| | wouldn't have it any other way. | 10 |
| OG: | So just to continue, that Monday morning I wasn't aware that I had to go to Labor | 11 |
| | Relations.  I completely forgot about it actually.  I didn't feel like I had done | 12 |
| | anything wrong, I felt like I had stood up for my family.  But I went to—I came in | 13 |
| | to work and I started reading cases that morning in the ED and— | 14 |
| MG: | We went to Urgent Care first, your back was— | 15 |
| OG: | Oh yeah, I went—yeah, I did go to Urgent Care.  I went to Urgent Care that | 16 |
| | morning 'cause I wasn't able to walk most of the weekend. | 17 |
| MG: | No coincidence.  There's no coincidence that he could not walk and he had back | 18 |
| | spasms; couldn't walk, couldn't sit, couldn't do anything.  There's no coincidence | 19 |
| | that the stress of choosing between our family and going to work had a profound | 20 |
| | effect on his body.  There's—there's—it's not unrelated.  In fact, I think it was | 21 |
| | gone on Tuesday.  I don't know, I don't remember, I'm just saying. | 22 |
| OG: | I think 'til Wednesday or Thursday it was still hurting me. | 23 |
| MG: | It was very acute, and he did—and he did come in with a—I know they gave you | 24 |
| | medicine, but he—I don't think you took it before you came to work. | 25 |

**SUNY 001350**

Case 1:15-cv-02343-PKC-VMS   Document 87-30   Filed 09/14/18   Page 8 of 51 PageID #: 1523

OG:   No, I didn't take it.  Yeah, 'cause I wanted to work.                                              1

SB:   Are you—are you referring to absences prior to the settlement agreement?                          2

OG:   No, no, no.  I started off talking about the settlement agreement.  That Monday is                 3

        when we had the settlement agreement.                                                            4

MG:   This was—                                                                                          5

OG:   The Monday after that Thursday- Friday that I took off.                                            6

SB:   So the absence you were referring to was—was prior to the settlement agreement?                   7

OG:   Yes.                                                                                               8

SB:   Okay.                                                                                              9

OG:   So on Monday—                                                                                      10

MG:   It's what resulted in the settlement agreement.                                                   11

OG:   Correct.  So that Monday I came into work, despite having back problems.                           12

        And—                                                                                             13

SB:   Okay.  So this incident occurred, and then you entered into the settlement                        14

        agreement.                                                                                       15

OG:   Correct.                                                                                           16

SB:   Okay.  As a result of this incident, okay.                                                         17

OG:   So I came into—                                                                                    18

LC:   The last incident was what?                                                                        19

OG:   That was September 4th and 5th.  That was the first incident.                                      20

SB:   And the settlement was September 8th.                                                              21

LC:   Okay.                                                                                              22

OG:   And that was that Monday, yes.  I was told by the director or the acting director of               23

        radiology at Kings County that I had to turn off—like, I had to log off the                      24

        computer and go to Labor Relations.  I had active patients.  I had patients that I               25

SUNY 001351

|     |                                                                                                          |    |
|-----|----------------------------------------------------------------------------------------------------------|----|
|     | was following.  I had—you know, it's hard for me to just leave in the middle of                          | 1  |
|     | the day when things are going on and there are multiple CAT Scans, there are—                            | 2  |
|     | you know, I follow-up on these patients.  If it's an interesting case or it's a difficult                | 3  |
|     | case, I put it in a folder and follow up on it later and make sure the right thing was                   | 4  |
|     | done.  So I was asked to log off, which I did.  I came to Labor Relations and met                        | 5  |
|     | with Mr. Arabian.  He told me all this stuff about me taking unauthorized leave.  I                      | 6  |
|     | tried to explain what had happened.  I also told him that I hurt my back.  He didn't                     | 7  |
|     | believe me.  I don't think he did anyway, but—                                                           | 8  |
| MG: | Tell them what you said when you called me; where you were and what—what he                              | 9  |
|     | would—he wasn't believing you, that he—he's sort of rolling his eyes, that this is                       | 10 |
|     | all made up, and where—                                                                                  | 11 |
| OG: | Mm-hm.                                                                                                    | 12 |
| MG: | I don't—we have not seen this room, but you said you were in a room with boxes.                          | 13 |
| OG: | Oh, well, right.  So after I—after we had our interrogation, first off he did—                           | 14 |
| LC: | The interrogation took place in—in his office?                                                           | 15 |
| OG: | Yes, yes.  And I did not have representation.  I felt I had done—                                        | 16 |
| LC: | Were you offered the—were you offered the opportunity to have representation?                            | 17 |
| OG: | I was offered the opportunity to have representation.  I felt that I had done nothing                    | 18 |
|     | wrong.  I didn't feel like there's anything I needed to be protected from.                               | 19 |
| LC: | Okay.                                                                                                     | 20 |
| OG: | The facts were what they were.                                                                            | 21 |
| SB: | So you declined representation?                                                                           | 22 |
| OG: | I declined representation.  However, so he—he's now going back and he has me                             | 23 |
|     | sit in this room with a bunch of boxes, a very uncomfortable room, with my back                          | 24 |
|     | hurting, for hours, literally.  I was there for hours.  And eventually he had this                       | 25 |

|  |  |  |
|---|---|---|
| | settlement agreement and I said I need to get back to work.  I have patients that | 1 |
| | I'm taking care of.  He made it clear that if I didn't sign the settlement agreement, | 2 |
| | that I couldn't go back to work.  I said look, you know what, I didn't do anything | 3 |
| | wrong.  I didn't read—I barely read it.  I flew through it.  I didn't even think about | 4 |
| | it.  I was like, I need to get out of here; I need to go back to work.  I signed the | 5 |
| | agreement and, in retrospect, it was an egregious agreement.  And I didn't know— | 6 |
| SB: | Did you read it prior to signing it? | 7 |
| OG: | What's that? | 8 |
| SB: | Did you read it prior to signing it? | 9 |
| LC: | He said he just barely read it. | 10 |
| OG: | I barely—I flew through it.  I barely read it.  I barely read it. | 11 |
| MG: | I know you didn't read it because when I was here with Stephanie for the first | 12 |
| | time I pointed things out to you and I said how would you ever agree to this, and | 13 |
| | that's when— | 14 |
| OG: | Yeah, I know.  I mean, in retrospect I was, like, horrified that I agreed to all that. | 15 |
| MG: | Have you had the opportunity to read the agreement? | 16 |
| LC: | Yes.  And, just for the record, I've been doing this a number of years and it's | 17 |
| | pretty standard. | 18 |
| OG: | It's a pretty standard agreement? | 19 |
| LC: | Yeah. | 20 |
| MG: | There—there's some—I'm here to represent—here to support my husband, you | 21 |
| | know, just to support him.  But that agreement had some—you know, some | 22 |
| | language in it that is almost prohibited by State Law. | 23 |
| LC: | You think so? | 24 |
| MG: | I'm pretty certain. | 25 |

**SUNY 001353**

| | | |
|---|---|---|
| LC: | Okay. | 1 |
| MG: | I would—I would find it hard to believe that a fact finder would rule in favor of | 2 |
| | the originator of that agreement.  I mean, it says things like you have waived your | 3 |
| | right to the EUC. | 4 |
| LC: | Mm-hm. | 5 |
| MG: | No one is allowed to—to do that.  There's no consideration given for that | 6 |
| | agreement, but that's not the issue that we're here.  It's a pretty—if I were here, or | 7 |
| | if my husband had the opportunity to take that home and that was presented at | 8 |
| | dinner, there's no way that I would have said please sign that.  I don't think Miss | 9 |
| | Willis would have advised— | 10 |
| LC: | Just so— | 11 |
| MG: | —him to sign it either. | 12 |
| LC: | Just -so—just so we kind of stay focused— | 13 |
| MG: | Sure. | 14 |
| LC: | The purpose of this meeting is for your husband to explain the reason why the | 15 |
| | penalty shouldn't be implemented.  A discussion as to the veracity or validity of | 16 |
| | the agreement could be another discussion in another form, but for the purposes of | 17 |
| | what we're here for now, if we can focus on that, as to—and, Stephanie, just | 18 |
| | briefly, how was the agreement violated? | 19 |
| LW: | Yes, that's what I want to know. | 20 |
| OG: | I haven't gotten to that yet, but okay. | 21 |
| LW: | Let her—let Stephanie tell us why. | 22 |
| MG: | (Inaudible) the agreement part of it— | 23 |
| OG: | What's that? | 24 |
| SB: | Okay.  We discussed the— | 25 |

SUNY 001354

| | | |
|---|---|---|
| LC: | In 1,000 words or less. | 1 |
| SB: | Sorry.  Well, it says here if he engages in subordination and we discuss the whole piece about the attestation and the fact that Dr. Greenberg basically rewrote the attestation to, I guess he claimed it was a joke, but his department says that it was very insubordinate conduct.  And so his department feels that his—has violated the agreement. | 2<br>3<br>4<br>5<br>6 |
| LC: | Interfered with the operations of the department? | 7 |
| SB: | Correct. | 8 |
| LC: | What's the attestation agreement? | 9 |
| SB: | An attestation— | 10 |
| LC: | Or whatever, attestation statement. | 11 |
| SB: | Basically, when there's a report filed, the patient is evaluated, the resident, basically, evaluates the patient.  The attestation is when the attending attests that he either agrees or disagrees with the report of the resident and if he disagrees how so.  And then he basically signs off on it, and it's for Medicare purposes. | 12<br>13<br>14<br>15 |
| LC: | Okay.  Just so I'm clear— | 16 |
| SB: | (Crosstalk). | 17 |
| LC: | —what's the date of the settlement agreement? | 18 |
| SB: | September 8, 2014. | 19 |
| LC: | And what's the date of this attestation agreement? | 20 |
| SB: | Let me see here. | 21 |
| LC: | What's the date of the settlement? | 22 |
| SB: | September 8, 2014.  What's the date of this? | 23 |
| LC: | And what date was the violation allegedly occurred? | 24 |
| | | 25 |

SUNY 001355

SB:     Okay.  They had a weekly huddle on September 22, 2014, and I believe it was    1

        right after the weekly huddle that the (inaudible) signed off on.    2

LC:     So we're talking it was brought to management's attention on the 22nd?    3

SB:     It was brought—well, to Dr. Pulitzer's attention on the 22nd.    4

LC:     Dr. who?    5

SB:     Dr. Pulitzer.    6

LC:     Okay.    7

OG:     Does it say who brought it to his attention?    8

SB:     Hang on.    9

MG:     Because it was reported back to Oded that there was some mockery about the—    10

        the change.  That there—that on its face it was not, you know, written in a way    11

        that could be offensive, but it was sort of brought to light by some people that    12

        were mocking it.  The words that Oded used, although they were not the template,    13

        they didn't change.    14

LC:     When was it referred to us?    15

SB:     On September 24th.    16

LC:     Put that on pause.  Let me see it.    17

SB:     I'm going off the record.  The time is now 2:05.    18

                        OFF THE RECORD    19

SB:     Alright.  We're back on the record.  The time is now 2:08 PM.    20

MG:     Stephanie, at our last meeting, I—when I was present you said that Oded was told    21

        that he had to use one of three or four of the templates—    22

SB:     Correct.    23

MG:     —and I said that that is not the case.    24

        25

| | | |
|---|---|---|
| OG: | Well that's not the way I interpreted it.  I thought that we were supposed to put in | 1 |
| | some of the things in each template—or in one of the templates.   There were | 2 |
| | certain facts that needed to be in our attestation.  I didn't know that it had to be the | 3 |
| | exact attestation.  I didn't know that.  I was led to believe that it just needed to | 4 |
| | have these requirements in it, and that it could be open to my own, you know, | 5 |
| | way of writing it. | 6 |
| SB: | Well, I actually have spoken to several of your colleagues that were present at that | 7 |
| | meeting, and they stated that they were—it was their understanding that these are | 8 |
| | the attestations we're supposed to use, it's already been approved by a legal, it's | 9 |
| | been approved by administration. | 10 |
| OG: | I might have missed that part, I didn't—I wasn't there initially.  So I heard— | 11 |
| LC: | I don't want to—I don't want to redo the investigation.  But, in sum, if I am not | 12 |
| | mistaken, Stephanie, you told me that during the interrogation they said basically | 13 |
| | he created his own attestation template or form as a joke? | 14 |
| SB: | Correct. | 15 |
| LC: | Is that true? | 16 |
| OG: | It was perhaps a little playful.  I don't think it was a joke.  I—I felt that they—the | 17 |
| | whole— | 18 |
| LC: | What's the difference? | 19 |
| OG: | Well, we never used to put an attestation in.  If—if I write a resident's report, we | 20 |
| | simply signed it off.  This is just an added hoop to jump through for insurance | 21 |
| | companies and Medicare.  I felt that it was ridiculous. | 22 |
| LW: | I mean, other than the word painstakingly, which I think was probably meant to | 23 |
| | be a little, you know— | 24 |
| MG: | Hateful, at best. | 25 |

| | | |
|---|---|---|
| LW: | You know, it— | 1 |
| OG: | It adds 30 minutes of work to my day to do that (inaudible) the department. | 2 |
| LW: | But I mean, I just don't see that rising to the level of termination. | 3 |
| MG: | There's an issue that as soon as—as we mentioned before, as soon as Oded was told about this, he immediately took it off.  To act in the face of direct orders would qualify as insubordination.  To interpret something at a meeting where no one is giving you explicit instructions, and saying do not do X, Y, or Z, I'm not so sure that that rises to the level of insubordination.  And, also, this is taken out of context and not considered in the scope of who Oded is and what he has done for the department.  He has no record of being insubordinate in 30 years.  To choose an attestation and get—to lose your job over your choice of words in 30 years, did—he did not— | 4 5 6 7 8 9 10 11 12 |
| SB: | One other reason why he's on the settlement—I don't mean to cut you off. | 13 |
| MG: | Sure. | 14 |
| SB: | But on the settlement was because he, you know, by his own admission was told not to take a certain day off and he took it off anyway, but he said it's because of his family.  But that's an example of subordination.  So I mean, like, again— | 15 16 17 |
| OG: | I, at the time, did not know anything about FMLA rights.  I am guaranteed by the federal government to be able to take time off for my own health and the health of my family.  I believe that I am—I am being fired for following my own rights. | 18 19 20 |
| LC: | Okay. | 21 |
| OG: | So now, let me—let me go further.  The—I spoke to IT, I did speak to them.  I said, look, I found out that my attestation isn't appropriate and that it needs to be changed.  Before they go out to whoever ordered the study, is it possible to modify them back to the correct attestation?  That's all I asked.  I didn't ask them | 22 23 24 25 |

**SUNY 001358**

| | | |
|---|---|---|
| | to change anything.  I said to him—they said to me no, we can't do that, that | 1 |
| | wouldn't be the right thing to do, I will get in trouble. | 2 |
| LC: | Let me see—let me see if I got this straight.  Just for my own sake—I'm a simple | 3 |
| | guy.  If I logged in to my computer database 1234 and it should have been 6789, | 4 |
| | and I ask it—the question that comes over at that point is it appropriate to ask IT | 5 |
| | to either to change it as if it never happened; is that what you were asking them to | 6 |
| | do? | 7 |
| OG: | No.  I was saying that it happened, is it—is there some way—I wasn't asking him | 8 |
| | to change it.  I said is there some way to modify the reports so that we could be in | 9 |
| | compliance. | 10 |
| LC: | What—I guess that's what—I didn't want to get into the—the details, but now that | 11 |
| | you brought it up I'm trying to clarify what the issues are.  When you say modify | 12 |
| | the original report, to me and in our world, if you have a document and you want | 13 |
| | to change it, you can't just change it. | 14 |
| OG: | Right, right. | 15 |
| LC: | You know, if the original document— | 16 |
| OG: | And he told me that and I said fine, I don't—I don't want to do any of that. | 17 |
| LC: | The original document remained the same.  You create an additional document— | 18 |
| OG: | Right, we could have added— | 19 |
| LC: | —and an amendment or an addendum. | 20 |
| OG: | —an addendum, yeah.  Right.  But when he said— | 21 |
| MG: | But isn't this a computer question, not an integrity question, or you're trying to | 22 |
| | usurp something?  When you explained this to me, this was like how do I do this? | 23 |
| | Like, how is it possible? | 24 |
| | | 25 |

**SUNY 001359**

| | | |
|---|---|---|
| OG: | Right.  And he explained to me that we couldn't modify documents and I would | 1 |
| | get—he goes I would get into a lot of trouble.  I said no, I don't want to do that. | 2 |
| | I—no, don't modify it— | 3 |
| LC: | Just by based on his response and looking at it this whole—just that isolated | 4 |
| | theory—there are several theories actually coming up as to the violation of the | 5 |
| | agreement.  But just in that particular instance, the mere fact that he—his first | 6 |
| | initial reaction was no, I can't do that, it's wrong— | 7 |
| MG: | He said he said—tell him what you told me; that he said that he couldn't do it, this | 8 |
| | is how you do it. | 9 |
| LC: | That must be quadruple hearsay what she just said. | 10 |
| MG: | What's that? | 11 |
| LC: | You know, tell me what he told you. | 12 |
| MG: | Yeah, I know, right, talk about inadmissible. | 13 |
| LC: | Well, I mean, talking about inadmissibility or not, I'm just—we're here to talk to | 14 |
| | find out what happened. | 15 |
| MG: | Right. | 16 |
| LC: | The point is that the IT guy obviously referenced this to somebody because it | 17 |
| | brought to management's attention.  'Cause I wasn't there, you wasn't there. | 18 |
| MG: | That's not what happened, IT didn't send this information. | 19 |
| LC: | How did management find out that he asked that person to change it? | 20 |
| OG: | Oh, I have no idea. | 21 |
| MG: | Patrick—Patrick Hammill.  I mean, you're not like telling that—you're trying to | 22 |
| | protect people who aren't protecting you.  Your resident said that they overheard | 23 |
| | Dr. Hammill in the hallway making fun of this attestation and then it went to | 24 |
| | Steve Pulitzer.  And then you saw the e-mail. | 25 |

| | | |
|---|---|---|
| OG: | Right. | 1 |
| MG: | This is—nobody made—nobody thought that there was anything wrong until a | 2 |
| | colleague made a mockery of this and made a big deal.  That's what happened. | 3 |
| OG: | That's true. | 4 |
| MG: | Now, my husband's not willing to throw anyone under the bus, but for the sake of | 5 |
| | his career I'm here to tell the truth.  That's exactly what happened. | 6 |
| LC: | Except that you're not in a position to represent what the truth is because you don't | 7 |
| | have firsthand knowledge. | 8 |
| MG: | Well I'm just telling you what my husband would—did not— | 9 |
| OG: | Well, that is what I tell her. | 10 |
| MG: | Did not want to say about his colleague.  That's all.  He can—if he's comfortable | 11 |
| | saying it, he's welcome to. | 12 |
| LC: | Right.  I'm going to move on from that point. | 13 |
| OG: | Okay. | 14 |
| MG: | Because what I'm hearing now is that that's not what your husband's representing | 15 |
| | what happened, it's what you represented your husband told you what happened, | 16 |
| | but didn't want to tell me what happened, but you want to tell me— | 17 |
| MG: | I also am telling you why my husband didn't want to tell you. | 18 |
| LC: | I appreciate that. | 19 |
| LW: | Well, I mean—I mean, you know, it's interesting, because sometimes I think | 20 |
| | when, you know, someone is telling a story they may leave pieces of the story | 21 |
| | out; maybe they don't think it's relevant, maybe they don't think it's important. | 22 |
| LC: | Mm-hm. | 23 |
| | | 24 |
| | | 25 |

**SUNY 001361**

Page 18 of 50

| | | |
|---|---|---|
| LW: | I think, you know, she's kind of, like, trying to fill in some of the pieces to the | 1 |
| | story 'cause that's what happened when I met with them on Thursday for the first | 2 |
| | time. | 3 |
| LC: | That's true. | 4 |
| LW: | You know, he would tell me something and she would go well, you didn't tell | 5 |
| | them this part, you know, so—and that happens.  You know, you're telling a | 6 |
| | story— | 7 |
| LC: | Yeah. | 8 |
| LW: | Some people are better at telling a story than others.  You know, and the | 9 |
| | (crosstalk)— | 10 |
| OG: | She's also the smarter and more astute member of our marriage. | 11 |
| MG: | Enough with the flattery.  But what I was—what the thing is, that they're—as | 12 |
| | Oded spoke earlier, since the beginning of this he has maintained I haven't done | 13 |
| | anything wrong and I do not think that I— | 14 |
| LC: | Before we go into that— | 15 |
| MG: | Okay. | 16 |
| LW: | Mm-hm. | 17 |
| LC: | Just before we get off this point— | 18 |
| MG: | Sure. | 19 |
| LC: | It was just a matter, the way I think—I like to connect all the dots so I can get a | 20 |
| | clear picture as to how IT found out or how did management find out from IT that | 21 |
| | this occurred.  The fact that it occurred is a problem, you know, and— | 22 |
| MG: | The fact that what occurred? | 23 |
| LC: | That the attestation that was altered.  But that's not— | 24 |
| OG: | It wasn't altered ever.  Oh, I altered—I put in my own attestation. | 25 |

Page 19 of 50

| | | |
|---|---|---|
| LC: | Right. | 1 |
| OG: | I didn't ask IT to change anything.  I asked them if it were possible— | 2 |
| LC: | To modify it. | 3 |
| OG: | —to modify it because I— | 4 |
| LC: | What you already had put in. | 5 |
| OG: | I had already put it in, that is true.  I wasn't asking him to do it, I was asking—I | 6 |
| | was saying that apparently this is the wrong attestation.  It's not the actual report. | 7 |
| | It has nothing to do with the patient and what I wrote.  It's simply an attestation.  I | 8 |
| | thought that was no big deal to just change that to the correct attestation. | 9 |
| LC: | See but— | 10 |
| OG: | I didn't feel like I had done anything wrong. | 11 |
| LC: | When you hear—when you hear this tape back, at the beginning of this | 12 |
| | conversation your position was that during the orientation that you guys were | 13 |
| | given with respect to attestation— | 14 |
| OG: | Mm-hm. | 15 |
| LC: | —there was some confusion as to the exact format or template— | 16 |
| OG: | Right, correct. | 17 |
| LC: | —to be used and blah, blah, blah.  But, independent of anybody's input, | 18 |
| | immediately—and since you did whatever you did because you thought it might | 19 |
| | be funny, or it might be— | 20 |
| OG: | Right. | 21 |
| LC: | —you know, amusing, to put it in the wrong template; from the onset, you knew | 22 |
| | that what you were doing was inappropriate. | 23 |
| OG: | No, that's not—no, so there's a detail missing, I'm sorry.  I was informed by one of | 24 |
| | my colleagues, and this is what Michelle was referring to, that she—that he—he | 25 |

**SUNY 001363**

|  | | |
|---|---|---|
|  | was—he was supporting me, and he said these two other jokers, who he thinks | 1 |
|  | don't work at all, were referring to my attestation and laughing at it or making fun | 2 |
|  | of it or whatever.  And he felt—he said, you know, I don't think management is | 3 |
|  | gonna like this attestation.  I think that you need to change your attestation to the | 4 |
|  | one that they requested.  I said I thought that I—I don't know, I didn't think there | 5 |
|  | was anything really wrong with it.  He said look, I'm just trying to support you | 6 |
|  | here and I don't want you to get in trouble. | 7 |
| MG: | Mm-hm, that's it.  That is— | 8 |
| OG: | I came to find out that it wasn't, you know, the right attestation. | 9 |
| MG: | Mm-hm. | 10 |
| OG: | And that's when later on I went to IT and I said can we change the attestation?  I | 11 |
|  | know that—now I know that there's an attestation that they require, that I can't | 12 |
|  | modify it.  I didn't know that before that. | 13 |
| LC: | In—in— | 14 |
| MG: | Yeah. | 15 |
| LC: | —in 25 words or less, what's the purpose of the attestation? | 16 |
| OG: | The real purpose?  The real purpose is so that insurance companies make you | 17 |
|  | jump through another hoop before they pay you. | 18 |
| LC: | And it— | 19 |
| OG: | There's no real—or so that you can get sued better, you know, so that your name | 20 |
|  | is—I don't know what it—there's no real good reason for it. | 21 |
| MG: | Stephanie, you're shaking your head, what is the—what is the real reason? | 22 |
| SB: | It's just his attitude is very—I mean, he asked you what was the purpose, not what | 23 |
|  | you think the purpose is or what your— | 24 |
| MG: | I actually can— | 25 |

| | | |
|---|---|---|
| SB: | —opinion of the purpose is.  What is the actual purpose of the attestation? | 1 |
| OG: | What is the purpose of the attestation?   Why does Medicare and insurance companies require it, why? | 2<br>3 |
| MG: | I mean, that—I would concur with that.  What is the purpose then? | 4 |
| OG: | It just adds more work to my day. | 5 |
| SB: | I'm pretty sure if you looked up what was the—you know, why is there an attestation, it wouldn't say another— | 6<br>7 |
| LC: | In order to get— | 8 |
| SB: | —hoop to jump through. | 9 |
| OG: | No, of course they're gonna say that, but that—that is the purpose of it. | 10 |
| LC: | From—from a managerial perspective, looking at it through a managerial prism, in order to get reimbursed from Medicaid, Medicare, you have to have the attestation.  And if it's not correct, we don't get reimbursed. | 11<br>12<br>13 |
| OG: | Well, why do they require it?  What is the purpose of the attestation?  What does—how does that change the report?  How does that change— | 14<br>15 |
| LC: | Let the record reflect, what's the purpose of ObamaCare?  I don't know. | 16 |
| SB: | Right, yeah.  This is all—all because of ObamaCare. | 17 |
| OG: | Well but no, but there is a reason behind it. | 18 |
| LC: | No, no.  What we're dealing with now, even though it's an isolated—somebody could view it as relatively compared to all the things going on in the world minor with the Ebola outbreak— | 19<br>20<br>21 |
| LW: | Absolutely, absolutely. | 22 |
| LC: | —going on.  And another—going back to another prism, we're in a bureaucracy.  It's almost like a paramilitary organization here. | 23<br>24 |
| OG: | Mm-hm. | 25 |

| | | |
|---|---|---|
| LC: | There's a lot of—there's a million policies and protocols that— | 1 |
| OG: | Right.  And they're all—they're hurting patient care. | 2 |
| LC: | Probably do. | 3 |
| LW: | Yeah. | 4 |
| OG: | Probably?  Absolutely. | 5 |
| LC: | But in order to function, we all have to be marching to the same tune.  And so, if | 6 |
| | I'm supposed to put in—to give my bad example earlier, if I'm supposed to put in | 7 |
| | 1234 and for whatever reason I feel oh, want to be kind of funny and put in A, B, | 8 |
| | C and D, that's a problem. | 9 |
| OG: | I understand that now.  I didn't understand it at the time.  I understand that now | 10 |
| | attorneys and, you know— | 11 |
| MG: | I mean, you— | 12 |
| OG: | —risk management goes over this with a fine-tooth comb. | 13 |
| MG: | But I mean— | 14 |
| OG: | I didn't understand that. | 15 |
| SB: | But the problem—the problem is that your department supervisor and your | 16 |
| | colleagues are saying that at the meeting, that you were present, that this was | 17 |
| | explained, this was told to you that you had to do X, Y and Z.  And then you turn | 18 |
| | around and don't do X, Y and Z. | 19 |
| OG: | We had to put these details in the attestation, that's the way I understood it. | 20 |
| | Now— | 21 |
| MG: | More than a dozen times that has been Oded's, you know, interpretation of events, | 22 |
| | and yet— | 23 |
| OG: | I might have missed the beginning of the meeting, besides that. | 24 |
| | | 25 |

| | | |
|---|---|---|
| MG: | Well, it seems very—it seems clear as though that is not believed to be true. And | 1 |
| | I said this to you before that, you know, my husband's character speaks for itself. | 2 |
| | Dishonesty is not what he's known for. | 3 |
| LC: | We're not— | 4 |
| SB: | We're not saying that he's not dishonest. | 5 |
| LC: | —going to go back and forth. | 6 |
| MG: | There's no—but there's no—he's never changed this. He—you keep bringing this | 7 |
| | up, but he's never changed. | 8 |
| LC: | I've heard—I've heard a few theories so far as to why the penalty shouldn't be | 9 |
| | imposed. | 10 |
| MG: | The penalty—the settlement, I don't—it's your meeting and I don't wish to cut you | 11 |
| | off, but I—I think it's— | 12 |
| LC: | No, it's our meeting. | 13 |
| MG: | Thank you, I appreciate that. I think that it's important that the settlement | 14 |
| | agreement says that anything from a warning to termination can be implemented. | 15 |
| LW: | Right. | 16 |
| MG: | I find it very difficult that this rises to the level of immediate termination, | 17 |
| | especially as soon as he was given the opportunity of knowing what the rules | 18 |
| | were, he followed suit and, not only in this case, for 30 years. There—there is | 19 |
| | nothing on the record of my husband not being a rule follower at Kings County. | 20 |
| | He was not present at the birth of my child. Do you know why? Because he | 21 |
| | called and he asked to have that time off, and at that time the acting chair said | 22 |
| | there was no one in the department. He put his scrubs on and he left the ER; 104 | 23 |
| | degree temperature, baby born 12 hours later. | 24 |
| OG: | I missed it. | 25 |

MG:   That's not someone who is insubordinate.  And the reason why I'm here is so that that makes the record.  Because only one side of my husband is being presented and it's not accurate and it's blatantly made up and fabricated, from people who do not wish him well.  And I wish that you would see through that.

OG:   Can I continue?  Thank you, Michelle, by the way.

MG:   The birth of my child.

LW:   That's why—

MG:   He left me, 104 degree temperature, to come back here.  Asked and begged Alan to have someone cover him.  He didn't get coverage.  That's dedication to the department.

LW:   Leonso, unlike other cases that we've had—we've had people say, you know, if you had to do this all over again, would you have done it?  We had an interrogation of a person; like, I wouldn't change a thing.  I would continue to do this, you know what I mean?

MG:   It's an excellent point.

LW:   You know, he, you know, like you said, you know, you took everything—you took all my words out of my mouth, but one thing that you didn't say was that you know, like—you said this too.  She said that when he was told that okay, this is inappropriate, not cool, he immediately fixed it.  So was it a joke that maybe even you know, wasn't funny?  They didn't—they didn't think it was funny, but it doesn't rise to the level of a termination.  And as you know, you always say, the— when we entities we have an agreements, you always say, hey it's a range.  It doesn't mean termination; it starts from a fine, you know, a penalty, suspension, to termination.  Why are we going to terminate this person who's been here 30 years, graduated from Downstate, never had an issue.  And I'll admit, you know, maybe

|  |  |  |
|---|---|---|
|  | comes across a little too strong, you know, at times; it was inappropriate.  Now he | 1 |
|  | knows the deal.  So, you know, I think that he's done enough at Downstate to | 2 |
|  | warrant another opportunity.  And also, you know, just for your record, you know, | 3 |
|  | he did say that when he came here with Michael Arabian, he didn't really | 4 |
|  | understand the full fledge of what was going on and now he does.  Would it be | 5 |
|  | possible to enter into a new document, you know, allowing him a chance to | 6 |
|  | review it so there's no misunderstanding in the future?  You know— | 7 |
| MG: | That's the real—that's the real issue.  The things—some of the things that are on | 8 |
|  | the document are, you know, borderline character assassination that I—if you | 9 |
|  | were to ask Oded whether or not he agrees to those terms, he does not.  Signing | 10 |
|  | them under what I think could be— | 11 |
| OG: | There's no previous insubordination even though I signed to it.  There's no, you | 12 |
|  | know— | 13 |
| LC: | Michelle, what was—you want to finish that thought? | 14 |
| OG: | I'm sorry. | 15 |
| LC: | You said he signed them under what? | 16 |
| MG: | I would—I think that there was a little bit of coercion and duress.  You know | 17 |
|  | why?  Because this is—do you know what my husband said to me, and also | 18 |
|  | during this time— | 19 |
| OG: | I never even showed it to her, by the way. | 20 |
| MG: | No, you didn't.  When I met Stephanie that's the first time I saw it.  He—he just— | 21 |
|  | unfortunately, he's a practicing physician.  He—you know, he didn't think that this | 22 |
|  | had— | 23 |
| LW: | Ramifications. | 24 |
|  |  | 25 |

MG:     Yeah, you know, not—yes.  But I think that what was on his mind, and what is     1

always on his mind, and this is the part that's really frustrating—it's never been     2

brought up in any of these meetings.  What's always on his mind is patient care.     3

And, Stephanie, during this whole time, while all of this is going on, I don't know     4

the order of events, but I do know that there was—there is a woman who has, I     5

think I told you when I came to your office, who Oded was in the middle of a film     6

or doing something, during losing his job he was trying to contact, to make sure     7

that—figure out a way to—you have to talk about this, 'cause I don't even know.     8

There's films on—     9

OG:     There's a CAT scan where she had what I thought was a breast mass and I wanted     10

to make sure that the appropriate thing was done for her; that the sonogram was     11

done or a mammogram was done.     12

MG:     This is after this.  This is during—this—     13

OG:     This is a finding, by the way, that nobody else would have made, I assure you.     14

MG:     But the point that I—but I—they're talking about insubordination and I want to     15

say that you do not have a history of insubordination, and you continue—to this     16

moment, you are not being insubordinate.  You're saying to them that you     17

understand what the rules are and you're willing to work within them.  But I think     18

the point that keeps getting overlooked is that he's gone to great lengths for     19

patient care, and that's not being brought up.  His job is to provide medicine and     20

to treat patients.  He's the one who goes in to the ER and says to patients—now, if     21

you want to talk about being playful or maybe not—he says to patients, you     22

know, if you don't give us the correct contact information, you might die.  That's     23

what he says, right?  Because there are patients who, for better or worse, may not     24

give information for billing or whatever.  And he says to them—he looks them in     25

the eye and he says if we can't find you, you might die.  So if someone were going       1

to write him up for being—for using words or terminology that is inappropriate, I       2

don't think that the attestation would be the first thing that you would go after.       3

You would look to his history; that he has always done what is best for patient       4

care, and continues to do.  Even through this whole thing.  For the last week, what       5

have we talked about?  The woman who has breast cancer and he doesn't have       6

access to those films.       7

OG:    And there are multiple cases like that.       8

MG:    Never once has that made it to the record.  An attestation, losing his job for this,       9

and to appear for the Department of Ed. for my child, I cannot believe that human       10

beings would enforce this right now.  It's that—       11

LC:    Just—just—       12

MG:    —it's that egregious.       13

LC:    Just so it's clear that Stephanie and I aren't the judge, jury, or executioner.       14

OG:    We understand.       15

LC:    We—we're the conduits through which this process flows.       16

OG:    Yes.       17

LC:    Everything you've said to us we will share with people we need to share it with,       18

and during—       19

MG:    But we need—       20

OG:    We understand that.       21

LC:    During the whole course of this investigation, we are in collaboration with your       22

department—       23

OG:    Mm-hm.       24

        25

SUNY 001371

| | | |
|---|---|---|
| LC: | —your colleagues, your peers, your chairperson.  And I don't know an attestation | 1 |
| | from a protestation, you know what I'm saying?  I don't know if it's serious or not | 2 |
| | serious, I don't—I don't know.  I just don't know. | 3 |
| MG: | Well, if you don't—if you don't— | 4 |
| LC: | I'm—I'm— | 5 |
| MG: | —as a manger, do you think that a physician who is— | 6 |
| LW: | It doesn't—it doesn't rise to the level of a termination, you know? | 7 |
| MG: | And also, I think you need to speak to the—the retaliation—(crosstalk). | 8 |
| OG: | Well, let me get to all that.  Can I—can I—can I continue? | 9 |
| MG: | Sure.  I mean, we're just here to support you. | 10 |
| OG: | So the other supposed, you know, rule that I broke from the settlement agreement | 11 |
| | was on September 23rd.  This is when we went to the Board of Ed.  I had asked | 12 |
| | Steve Pulitzer for time off in the morning to go. | 13 |
| SB: | This is after the settlement agreement? | 14 |
| OG: | Yes. | 15 |
| SB: | Okay. | 16 |
| OG: | I asked him for time off, he approved it.  He approved it in the morning, and I | 17 |
| | went—we ended up going all the way up to Harlem to the Board of Ed. to argue | 18 |
| | for our son.  I came back around noon, I worked for two-and-a-half hours, we | 19 |
| | were supposed to have a meeting, but— | 20 |
| MG: | That letter says that you were gone for two-and-a-half hours, that e-mail that was | 21 |
| | sent. | 22 |
| OG: | Oh, no, no, no— | 23 |
| MG: | Yes, it does. | 24 |
| OG: | Oh, that's not true, but— | 25 |

| | | |
|---|---|---|
| MG: | But I'm saying—I'm telling you that that's what—it was just passed around this | 1 |
| | table. | 2 |
| OG: | Okay.  Well, let me—let me speak to that.  So around 2:30 or so, or 2 o'clock, I | 3 |
| | called Steve Pulitzer and Michelle had told me that we had to meet with the Board | 4 |
| | of Ed. in downtown Brooklyn.  I asked Steve Pulitzer for the time off.  I needed to | 5 |
| | do this.  This was important.  I needed a couple more hours.  He said no, there's | 6 |
| | nobody to cover.  I was like, okay, I guess I can't go. | 7 |
| LC: | Let me cut you off for one second.  Just to put it in the proper perspective that you | 8 |
| | keep going back to, which I'm not agreeing or disagreeing with, is that it seems to | 9 |
| | be just so I might become familiarized with these issues; a sequence of—or a | 10 |
| | history of your asking for time off, their denying it and then there's an issue. | 11 |
| | Whether it's coincidence or not a coincidence— | 12 |
| MG: | That's only two. | 13 |
| OG: | There's only that one time, actually, 'cause this wasn't—well, I asked for time off | 14 |
| | and the first time it was denied, when I took the Thursday and Friday off.  This | 15 |
| | was granted for the morning, but in the afternoon I had to—I didn't know this. | 16 |
| | And this is all stuff that's emerging.  It's all popping up at the moment, it's not like | 17 |
| | I can plan this in advance. | 18 |
| LC: | I understand. | 19 |
| OG: | She—she told me— | 20 |
| LC: | But can you—can you see how their—they—when I say they, your department | 21 |
| | administrators and managers, are processing it? | 22 |
| MG: | This is one time in 30 years— | 23 |
| OG: | It's deliberate.  Wait, wait, let me get to all that. | 24 |
| | | 25 |

**SUNY 001373**

Page 30 of 50

| | | |
|---|---|---|
| MG: | It's one meeting.  Oh, it's only emergent because the seat was open in the school. | 1 |
| | This is one time—all the—I—what needs to be on the record are the other times | 2 |
| | that—this—there's no pattern here.  It's just one day.  I think that— | 3 |
| OG: | The other times when I had to choose between my family and the department, I | 4 |
| | actually chose the department.   Much to the, you know, problems in our | 5 |
| | relationship because of that; arguments as a result of me choosing the department | 6 |
| | over, you know, our family issues.  This is the first time that I've done this. | 7 |
| MG: | This is just one—it's all—it's one time.  It's just it was on— | 8 |
| LW: | Close in proximity. | 9 |
| MG: | That's it. | 10 |
| OG: | Right, so— | 11 |
| MG: | And it's also one issue.  It's an issue that had to played out over, you know, the | 12 |
| | beginning of the school year.  It's just one issue; one time you asked for time off | 13 |
| | you didn't get it, the second time you were granted, the third time you asked for | 14 |
| | time off and you didn't get it.  That's it.  There's no more. | 15 |
| OG: | I didn't get it and I didn't leave.   Well, I did leave, I went to lunch.  I asked | 16 |
| | somebody to cover me and I went to lunch.  Before I went to lunch, I spoke to | 17 |
| | some colleagues in the ER and when I came back I spoke to some colleagues in | 18 |
| | the ER.  The only way they know what time I did anything is when I sign off a | 19 |
| | report.  That's not my whole job.  I consult with people, I teach residents, I go to | 20 |
| | the ER, I examine patients, I speak to my colleagues. | 21 |
| MG: | He wasn't there—he never came. | 22 |
| OG: | So that's not a good representation of whether I'm there or not.  I'm there a lot of | 23 |
| | the time and it's not on record. | 24 |
| MG: | Also you never take lunch. | 25 |

| | | |
|---|---|---|
| LC: | Well, I'm saying when we met you, Dr. Greenberg, we meaning Stephanie, my | 1 |
| | office (inaudible) to you, there seemed to be things happening in a close | 2 |
| | proximity of time. | 3 |
| OG: | Yes. | 4 |
| LC: | And it—it came across to your department, not to us; we don't know you, I never | 5 |
| | knew you, you know? | 6 |
| OG: | Mm-hm. | 7 |
| LC: | That okay, they referred you to Labor Relations and then something else | 8 |
| | happened. | 9 |
| LW: | You know what?  You know what I think, Leonso?  I think this is one of those | 10 |
| | cases where you have new administrators in the area that you know, that—that, | 11 |
| | you know, something— | 12 |
| LC: | I don't know they're all new. | 13 |
| LW: | Well, there's one— | 14 |
| LC: | Reede is new, but Pulitzer has been there for awhile. | 15 |
| LW: | Okay.  Well— | 16 |
| OG: | There's the issue right there. | 17 |
| MG: | But, also everyone— | 18 |
| LW: | She may be filing—she may be—he may be walking to the sound of her drums, | 19 |
| | you know what I mean?  If she decides she's targeting certain people that she | 20 |
| | wants out, the first thing that they do wrong she's gonna make a big deal out of. | 21 |
| | 'Cause I got to tell you, honestly— | 22 |
| OG: | She set it up so that I would trip over it. | 23 |
| LW: | You know, I mean, I'll be honest with you; you know what, I got in trouble.  I got | 24 |
| | three tickets—three tickets—like within a week of each other.  I mean, sometimes | 25 |

**SUNY 001375**

|  | a series of events happen in close proximity and you can't help it.  You just—you | 1 |
|---|---|---|
|  | know, three tickets.  I have—well, yeah, three.  So, you know, apparently, they | 2 |
|  | put little speeding—you can't speed in a school zone.  I didn't see it.  So, literally, | 3 |
|  | three tickets within three-week period.  So I think what I'm trying to say is, you | 4 |
|  | know, instead of—you know, even the first one, I don't—if I had to represent him, | 5 |
|  | I would have absolutely not let him sign that document, you know? | 6 |
| MG: | Nobody would have let him sign the document. | 7 |
| LW: | You know, so he signed it, which was a mistake on his part and then, you know, | 8 |
|  | two weeks later, especially if you know you have this issue at home with your | 9 |
|  | child, it may happen again; so why put yourself in that situation?  And sure | 10 |
|  | enough it did happen again.  It was the beginning of the school year, this is what | 11 |
|  | happens to parents in the beginning of the school year.  We've had cases where, | 12 |
|  | you know, people have moved and they can't get their kid in school and they're | 13 |
|  | out, but I mean, when you look at the actual situation, does it really rise to the | 14 |
|  | level of termination?  Would they consider a suspension, you know, put this | 15 |
|  | person on notice, this cannot happen again?  And if it does happen again, how | 16 |
|  | should we handle it?  Because I know what these—I used to work for the Board | 17 |
|  | of Ed.  So you know these days, you know, next year, when they renew and look | 18 |
|  | at the facts of the situation, there may be different, you know, criteria.  They may | 19 |
|  | have to go up there again, what does he do? | 20 |
| MG: | I think another issue that is very important is—and I just lost my train of thought | 21 |
|  | there, what you were saying.  You were saying that you confer with colleagues | 22 |
|  | and, Stephanie, I—I'm glad that you're part of this meeting, and by no means did | 23 |
|  | we not want you part of the meeting.  I just—I kept saying—I asked you if you | 24 |
|  | knew my husband and, again, we may—you may be the only three people in the | 25 |

|    |                                                                              |    |
|----|------------------------------------------------------------------------------|----|
|    | whole world who see a strong side of my husband like this.  This is not who he is. | 1  |
|    | And I'm actually very proud that he is standing up for himself.  This is not | 2  |
|    | anyone's perception of my husband.  And I asked you if you knew my husband's | 3  |
|    | character because—                                                           | 4  |
| LC: | Was that a nice way of calling you a wimp?                                   | 5  |
| MG: | Not at all.                                                                  | 6  |
| LC: | I'm not sure what she's saying (laughter).                                   | 7  |
| MG: | No, no.  Real strength doesn't have to flex.  He doesn't do that.  No, no, he's a—he | 8  |
|    | is a—he's wonderful and amazing in every way.  He doesn't tout his own horn, but | 9  |
|    | I am glad that he's not taking this thing down.  But I asked you if you knew his | 10 |
|    | character 'cause in 15 years I have never heard anyone accuse my husband of | 11 |
|    | dishonesty or anything.  It's to a fault, to a fault, his honesty.  I—I would—that's | 12 |
|    | the only reason I asked you.  It's just not who he is.                       | 13 |
| LC: | Does—does—                                                                   | 14 |
| SB: | No.  No one here knows who he is.                                            | 15 |
| MG: | And when you're—I get it.  I get it.                                         | 16 |
| SB: | Right.  Right.                                                               | 17 |
| MG: | But I promise, if you walk out of here, everyone from—I have not walked through | 18 |
|    | the hospital without anyone from security officers, custodians, administrators and | 19 |
|    | personnel saying to me, unsolicited, what a great guy my husband is.  I kid you | 20 |
|    | not.  I—really, he's like the likeable guy.  I'm the one that people don't like.  Like, | 21 |
|    | nobody dislikes my husband.  I'm making a joke—I'm—just for the record.     | 22 |
| LC: | Right, right.                                                                | 23 |
| SB: | I'm just saying that, but my point is, when you speak to colleagues, you have to | 24 |
|    | understand the environment to which they're responding.  Everyone is so fearful | 25 |

of losing their position, and the reason why I say that is because people have  1

distanced themselves from my husband, friends of 15-20 years, because they are  2

afraid of losing their job, not because of anything that my husband has done to  3

them.  People have said things through the grapevine about how scared they are  4

working.  It is a very, very scary place—  5

OG:  It's a toxic environment.  6

MG:  —in the radiology.  The ER department comments about how scared they are.  7

Outside of the hospital, people have commented about oh, wow, you work in that  8

department.  So if those are the people you're getting information from, I would  9

take that with a grain of salt.  If people want to keep their livelihood, they will say  10

what—what's best for them.  I'm just saying that.  11

OG:  Can I just—can I finish?  Thank you, Michelle, by the way.  I took lunch that day,  12

and that's what I'm being put up on.  13

MG:  And Stephanie didn't seem to believe you, or about the attestation.  That's what I  14

thought was very ironic, ironic that you didn't believe that.  15

OG:  I took lunch, and I never take lunch; I take 20 minute lunches at best, if I take  16

lunch at all.  That day I had to talk to her on the phone, we had to connect on this  17

issue with our son.  I left for about an hour, I came back, I spoke to some  18

colleagues in the ER and then I sat down and dictate some cases.  I had somebody  19

cover for me, they read all the cases that they were capable of reading.  I don't  20

know what issue they're claiming that happened because I was gone, but I'm  21

entitled to take lunchtime, and I never do.  The people upstairs who have issues  22

with me because I don't do any work, take an hour lunch every day.  So this is  23

all—I have complained about patient care and the fact that Dr. Reede has fired  24

seven people in our department has left us bare bones at Kings County Hospital.  25

SUNY 001378

# A252

Page 35 of 50

|   |   |   |
|---|---|---|
|   | We have to do an extra call—we have to do a call every other weekend, she's | 1 |
|   | added academic responsibilities.  We already do pride or practice level work | 2 |
|   | there, in terms of volume.  I am one of the highest readers in the whole | 3 |
|   | department.  I read more than almost anybody. | 4 |
| MG: | And second-lowest paid. | 5 |
| OG: | And second-lowest paid.  I—this is a deliberate action on Dr. Reede's part to | 6 |
|   | replace me with people from her own institution from LICH.  She's done this | 7 |
|   | repeatedly.  She's fired seven people from our department; five of who were | 8 |
|   | Jewish, all of whom were white.  She's replaced—and I don't have any issue with | 9 |
|   | them replacing people with African-American or Caribbean-Americans, that's | 10 |
|   | fine.  But there's a pattern here, and I'm being treated differently; despite the fact | 11 |
|   | that I am the best producer in the department, I'm the most important person, the | 12 |
|   | most important cog in the wheel, at Kings County Hospital.  The letters that you | 13 |
|   | received from my colleagues are an accurate representation of who I am.  They're | 14 |
|   | not lying.  They're not making it up just to help me out.  This is who I am and this | 15 |
|   | is what I do there.  I've complained in the past— | 16 |
| SB: | In writing? | 17 |
| OG: | In writing.  To Dr. Pulitzer and cc'd Dr. Reede. | 18 |
| LW: | So he's not liked?  Clearly he's not liked. | 19 |
| OG: | Prior to all of this— | 20 |
| MG: | So he— | 21 |
| OG: | Prior to all of this— | 22 |
| MG: | But after— | 23 |
| LW: | He's clearly not liked.  You—when you put your— | 24 |
| OG: | This is retaliation. | 25 |

SUNY 001379

Page 36 of 50

| | | |
|---|---|---|
| LC: | I thought you said clearly not white? | 1 |
| LW: | No, clearly he's not liked. | 2 |
| MG: | No, no, no. | 3 |
| LW: | When you put your superiors on notice that there is a patient relation— | 4 |
| MG: | There's a clear—there seems to be a clear retaliation for Oded voicing his concern | 5 |
| | about patient care and his paid salary and his—you know, there's a colleague— | 6 |
| SB: | He raised a pay salary (inaudible)? | 7 |
| MG: | Absolutely. | 8 |
| OG: | Yes. | 9 |
| MG: | There's a colleague that reads 25 films a day.  Oded could stand on his head doing | 10 |
| | that work. | 11 |
| OG: | I do his job routinely, as well as my job. | 12 |
| MG: | He does it, he just does it.  And he's made—he makes $100,000 more than my | 13 |
| | husband.  He was a resident after my husband.  That doesn't make any sense. | 14 |
| OG: | I trained him. | 15 |
| MG: | That makes no sense. | 16 |
| OG: |  She hired one of my residents to be the director of ER radiology. | 17 |
| LC: | Okay.  I'm not going to get into those issues. | 18 |
| LW: | That's a whole— | 19 |
| OG: | Well, I'm just trying to— | 20 |
| MG: | Yeah, but that— | 21 |
| OG: | I'm just trying to paint a picture. | 22 |
| MG: | No, but that isn't—no, but that's part of the issue. | 23 |
| OG: | This is the issue.  She is deliberately trying to get rid of me and she is putting all | 24 |
| | this stuff in front of me to trip me up deliberately so that she can fire me. | 25 |

| | | |
|---|---|---|
| LC: | What's that? | 1 |
| SB: | Well, last time we met, Dr. Greenberg raised a number of issues regarding | 2 |
| | discrimination— | 3 |
| LC: | Mm-hm. | 4 |
| SB: | —and I did tell him about the Office of Diversity and I actually have a letter | 5 |
| | basically informing you that, if you wish, you can always contact them and their | 6 |
| | contact information is in here. | 7 |
| OG: | Okay.  That's fair.  And I know you don't deal with that, and that's fine. | 8 |
| SB: | Yeah, mm-hm. | 9 |
| OG: | But I just—this is just to point to her character and to point to the fact that there's | 10 |
| | a deliberate attempt to get rid of me.  Deliberate attempt to get rid of me for | 11 |
| | complaining about patient care issues; she's fired half our department. | 12 |
| MG: | But you also—Steve Pulitzer is the acting— | 13 |
| OG: | He's the acting director who was put in place after she fired the previous director. | 14 |
| MG: | So of course he's going to do anything— | 15 |
| LW: | Goes with what she ays, right. | 16 |
| OG: | He's afraid of losing his job. | 17 |
| MG: | —and Oded—Oded actually said to him I—don't—I—you could say it yourself, | 18 |
| | that he does not want to get him into any trouble about Thursday or Friday. | 19 |
| OG: | That's why I told him on Wednesday. | 20 |
| MG: | Oded has sick leave, he could have called in sick and we wouldn't be here. | 21 |
| LC: | When we said—just you stated the odd terms, brining this to some closure, by the | 22 |
| | way— | 23 |
| MG: | You're not having fun? | 24 |
| LC: | No, no (laughter).  Dr. Reede isn't in power to fire anyone. | 25 |

Page 38 of 50

| OG: | She's not? | 1 |

LC:  I'm not sure what the circumstance is that causes people to be out of the state service, but no person—I'm not even in power to fire anyone.

SB:  Well she—okay.  Let's just clarify that.

OG:  She used a loophole—

LC:  (Inaudible) state, but—

OG:  She used a loophole in the Affiliation Agreement to get rid of people without notice, that's what she did.

MG:  And that's the settlement agreement which we keep passing over which I think is important before we leave the meeting we do come to some conclusion on the settlement agreement.  The settlement agreement voids my husband's contract, which would give him a year's notice for this very offense.  That—I think that is the issue that needs to be addressed in addition to—

LC:  I suggest then, that you address that interpretation of the settlement agreement with your union representative or your attorney or whoever.  But I've been doing this over 20 years and employees and management can waive their rights if it's mutually agreed upon to do so.  For instance, are employees required to work eight hours a day?  If both parties mutually agree, they can work four hours a day at the job and four hours at home.  I mean, as long—that—if—that's the whole purpose of the agreement.  And speaking of which, the settlement, I'm looking at this; it jumps out at me, is that you signed the settlement agreement on September 8th.

SB:  Mm-hm.

MG:  Correct.

Line numbers: 1–25

| | | |
|---|---|---|
| OG: | And from September 8 up until the time it was brought to your attention you that you may have violated it, you never challenged the veracity or the legitimacy— | 1<br>2 |
| OG: | I didn't think it was— | 3 |
| MG: | We never spoke to that.  We haven't— | 4 |
| OG: | I never told anybody about it.  I thought that this was just a formality.  I didn't speak to anybody— | 5<br>6 |
| MG: | I never saw that it was there. | 7 |
| OG: | —because I didn't do anything wrong and I don't—and for me to sign an agreement that says don't do anything wrong was like sure, I didn't do anything wrong to begin with. | 8<br>9<br>10 |
| LC: | I have to look in my notes, but I believe Mike told me that in the negotiated settlement with you, that you actually asked for time to review it and call your wife. | 11<br>12<br>13 |
| MG: | Not true. | 14 |
| OG: | I don't recall saying that. | 15 |
| MG: | I have never—Stephanie, you saw my eyes in that meeting.  You—there's—you were—that's the first time I saw that settlement agreement. | 16<br>17 |
| SB: | Well, he's just saying that he asked for time; he's not saying you saw it. | 18 |
| MG: | Oh. | 19 |
| LC: | Or that you spoke to him.  'Cause I at one point in time during the negotiation, I asked Mike what was going on. | 20<br>21 |
| MG: | Well, where is that gentleman that my husband was complaining about who stuck him in a room with boxes?  Who does that? | 22<br>23 |
| OG: | With a bad back.  I mean, it was just miserable. | 24 |
| MG: | Who does that?  Where is he?  Why isn't he here to support himself? | 25 |

**SUNY 001383**

| | | |
|---|---|---|
| SB: | Well, he wasn't sitting on the boxes.  He was sitting in a chair. | 1 |
| OG: | I know, but the room was crowded. | 2 |
| MG: | Is that your statement?  If that's your statement— | 3 |
| SB: | I'm just saying. | 4 |
| OG: | The boxes would have been more comfortable than the chair I was sitting on. | 5 |
| MG: | I mean, but for several hours. | 6 |
| SB: | The same—same difference. | 7 |
| MG: | Who's not going to just get anyone off their back?  Several hours, but where is he? | 8 |
| OG: | I just wanted to go back to work, that's all I wanted. | 9 |
| MG: | That's not—why is he not defending his position, this man who said it was— | 10 |
| LC: | Assuming he needs to defend it. | 11 |
| MG: | Well— | 12 |
| OG: | I was coerced into signing that document. | 13 |
| MG: | —it would be nice to hear, you know, the other side what—how he represented | 14 |
| | that settlement agreement. | 15 |
| LW: | Can—can I just— | 16 |
| LC: | Okay.  I think we're past the settlement agreement, give him a copy of the letter. | 17 |
| SB: | This is the letter to— | 18 |
| OG: | Can I just say a couple of things real quick? | 19 |
| MG: | (Crosstalk) settlement agreement. | 20 |
| SB: | Could you sign for receipt of that document? | 21 |
| OG: | I'm seeking to annul the settlement agreement.  I was—I signed that under duress, | 22 |
| | I just wanted to go back and see my patients.   Furthermore, I have been | 23 |
| | deliberately put in this position by Dr. Reede, who has clearly wanted to fire me. | 24 |
| | She put in a junior resident, a resident of mine, to be my director; somebody I | 25 |

**SUNY 001384**

|     |                                                                                                      |    |
|-----|------------------------------------------------------------------------------------------------------|----|
|     | trained, while I've been there for 12 years.  I asked her specifically to make me                    | 1  |
|     | director and she said oh no, I want to go in a different direction.  So you're gonna                  | 2  |
|     | put my former resident, somebody who has no ER radiology experience to be my                         | 3  |
|     | director.  That, to me, was a shot across the bow.  I was deterred—                                   | 4  |
| SB: | When did that happen?                                                                                 | 5  |
| OG: | What's that?                                                                                          | 6  |
| SB: | When did that happen?                                                                                 | 7  |
| OG: | What do you mean, where did that happen?                                                              | 8  |
| MG: | When.                                                                                                 | 9  |
| SB: | When.                                                                                                 | 10 |
| OG: | When did that happen; the end of July, maybe.                                                         | 11 |
| LC: | What you just said, to be honest with you, and, again, I've got to objectify this to                 | 12 |
|     | an extent I can, 'cause I do represent management; when management imposes                            | 13 |
|     | people who—which are employees.  What you just said to me is, like, you want to                       | 14 |
|     | lay the foundation as to why you were being insubordinate and rebellious against                      | 15 |
|     | Dr. Reede, because she passed you over for a promotion.                                               | 16 |
| MG: | But he wasn't insubordinate.                                                                          | 17 |
| LC: | No, no, I'm just—no, I'm just—                                                                        | 18 |
| MG: | Right, right, okay, right.                                                                            | 19 |
| LC: | I'm saying, he just laid it—if I was to make that argument as to why would he—                        | 20 |
|     | because the attestation, as how I understand it; correct me if I'm wrong, Stephanie                  | 21 |
|     | or Dr. Greenberg, is that, as the attendant, when a resident do whatever they do,                    | 22 |
|     | he's supposed to review it.                                                                           | 23 |
| MG: | And he did.                                                                                           | 24 |
| OG: | And I did.                                                                                            | 25 |

| | | |
|---|---|---|
| MG: | I painstakingly reviewed it. | 1 |
| LC: | Listen to me carefully. | 2 |
| MG: | Okay.  Alright. | 3 |
| LC: | And attest to the fact that it's accurate. | 4 |
| MG: | Right. | 5 |
| LC: | So of all the 25— | 6 |
| LW: | That's what I'm saying. | 7 |
| MG: | All the criteria— | 8 |
| LW: | Were there. | 9 |
| MG: | All the criteria was there. | 10 |
| LW: | All the criteria, yeah. | 11 |
| MG: | No meaningful— | 12 |
| LC: | I can't answer what you're saying, because I ain't finished my sentence. | 13 |
| MG: | Oh, you're right. | 14 |
| LC: | I forgot what I was about to say. | 15 |
| MG: | That's not—fine.  You were gonna say about the attestation. | 16 |
| LC: | I was gonna say something.  I forgot what it was. | 17 |
| MG: | No, you were saying that it had the appearance of insubordination because he was— | 18 19 |
| LW: | Right, it would because we both— | 20 |
| MG: | —be— | 21 |
| LW: | What's the (crosstalk) at the same time. | 22 |
| MG: | I—I'm following you. | 23 |
| LW: | Because it's like— | 24 |
| MG: | Because it—it's just, on its face, you have to—this—but you were— | 25 |

Page 43 of 50

LC:    What's today, Monday or Tuesday?   1

LW:    Monday.   2

LC:    Monday?   3

MG:    What you were saying, you were saying that it could be seen as insubordination   4

    for being passed up for the promotion.  I was following you.   5

LC:    No, that's not what I was saying.   6

MG:    Oh, excuse me.   7

LC:    I was saying that if I'm not mistaken, each at—how many attestations were there?   8

SB:    Over 50.   9

LC:    Fifty.  These are 50 readings that residents did that were basically rendered null   10

    and void based on his—   11

OG:    Why?  Why would it be that they had to be null and void?  What was wrong with   12

    my attestation that would make them null and void?   13

LC:    Isn't the purpose of your, as an attendant, reviewing or attesting to the accuracy of   14

    the readings?   15

OG:    Well, that's what—that's what's said in my attestation.   16

LC:    Right, but your attestation is to attest to the veracity of the tests is flawed, then it   17

    has to be redone, correct?   18

OG:    I don't know that it's flawed.   19

MG:    Yeah, I wouldn't argue with that.   20

OG:    Did anybody—did Medicare not accept them?  I have no idea.  I don't know that   21

    they're flawed at all.  I know that they—   22

LC:    So then they—   23

OG:    —don't like that attestation and they want me to do it a certain way now.   24

    25

**SUNY 001387**

SB:     It's not they don't like it.  These attestations, as—in their forms, are approved by      1

        risk management, they're approved by legal—      2

OG:     Okay.  I didn't know that.      3

MG:     Stephanie, can I—      4

LC:     And no—and none of them were approved—      5

MG:     —say—Mr. Cuiman.      6

LC:     —the way it's written.      7

MG:     Mr. Cuiman, if—if the attestation—      8

LC:     Which would be a interference of the operation of the department—      9

MG:     Right.      10

LC:     —not just insubordination.      11

MG:     Mr. Cuiman, if the attestation is that powerful and it carries that much weight for      12

        the department and for the financial aspect of radiology, if it's that important,      13

        wouldn't it be prudent for the managers to spell it out in a way that no one could      14

        interpret it?  Because a reasonable mind certainly interpreted that as long as the      15

        information was there, there was no harm done.  If it's that important, how about a      16

        letter explaining it in writing?  Oded—      17

OG:     This has to be the attestation—      18

MG:     Wait—Oded often misses these meetings because he can't leave the ER.  He's      19

        already said that he wasn't there for some or part of it, right?      20

OG:     I got there late.      21

MG:     So if he was not there during that part and now we are penalizing him to the      22

        extent that he is losing not only his job, but 30 years of working at the same place,      23

        because he interpreted the set of facts as laid out differently than they should have      24

        25

|       | been.  When—isn't there some responsibility on the part of management to make | 1 |
|       | that clear? | 2 |
| LC:   | Let me ask you something. | 3 |
| MG:   | What if somebody wasn't in attendance? | 4 |
| LC:   | Did you hear the part where Oded said he wrote that attestation, when he wrote it | 5 |
|       | as a joke? | 6 |
| MG:   | I—no. | 7 |
| OG:   | I didn't say that. | 8 |
| MG:   | I heard other people say joke, I never heard my husband say joke. | 9 |
| LC:   | What'd you hear your husband say during this meeting? | 10 |
| MG:   | He said I—I heard him say that— | 11 |
| OG:   | I said—I said maybe it was a little playful, that's all I said. | 12 |
| MG:   | Right. | 13 |
| LC:   | And I think at that point I said what's the difference? | 14 |
| LW:   | Well, I think it's a big—there's a big difference.  I mean, it's one thing to be told | 15 |
|       | you have to have these three forms, this is the only way it could be.  Then there's | 16 |
|       | no joking, you know? | 17 |
| MG:   | Right. | 18 |
| LW:   | But if you say this is the reason why we do this and you still provide something | 19 |
|       | that's, in content, the same message, then I—you know, when I read that | 20 |
|       | document, honestly, I don't see—you know, other than the word painstakingly, he | 21 |
|       | has fulfilled the mission of the attestation, you know what I mean?  You know, | 22 |
|       | but if you're looking to get somebody out— | 23 |
| LC:   | Well, as—well, not even getting somebody out. | 24 |
| LW:   | Right. | 25 |

SUNY 001389

| | | |
|---|---|---|
| LC: | The person, and I forgot the person's name, I can review the tape— | 1 |
| LW: | Mm-hm. | 2 |
| LC: | Who as soon as they saw the attestation, approached him and said no, you | 3 |
| | shouldn't have done that. | 4 |
| MG: | Who?  Did someone approach you? | 5 |
| LC: | You need to change it.  Yeah, he said— | 6 |
| SB: | You said one of your friends. | 7 |
| LC: | —somebody said management is not going to like— | 8 |
| SB: | I'm just looking out for you. | 9 |
| LC: | —the way— | 10 |
| SB: | Okay. | 11 |
| MG: | No, that's not true. | 12 |
| OG: | Nobody approached me. | 13 |
| MG: | You—he said that he overheard his colleagues talking in the hallway about the | 14 |
| | attestation. | 15 |
| OG: | No, no, no, no.  My friend—one of the other attendings who I'm friendly with told | 16 |
| | me he overheard— | 17 |
| LW: | Right, someone. | 18 |
| LC: | Right. | 19 |
| OG: | —other people in the department talking about it, that's the— | 20 |
| SB: | Right. | 21 |
| MG: | The one who reads 25 films a day and makes $100,000 more than my husband.  I | 22 |
| | would want him gone too if people were getting cut off, right?  There would be | 23 |
| | a—there would be a reason to get rid of my husband. | 24 |
| | | 25 |

**SUNY 001390**

| | | |
|---|---|---|
| SB: | Again, according to your supervisor and several other people who were at that | 1 |
| | meeting, they're saying that it was clearly spelled out these are the attestations that | 2 |
| | you have to use, these are your specific ones you have to use, this is the language. | 3 |
| | It was approved by risk management, it was approved by a legal, it was for | 4 |
| | Medicare purposes for billing purposes. | 5 |
| OG: | I might have missed that part of it. | 6 |
| SB: | You have to use these attestations. | 7 |
| OG: | What I heard—what I heard was oh yeah, maybe, you know—my—I use a | 8 |
| | different attestation, maybe I'll have to change it.  It was sort of like, oh we can— | 9 |
| | you know, this is the example, but I don't know if mine fits it. | 10 |
| MG: | There were three.  There's three prototypes.  It's not even one—one attestation. | 11 |
| | There's three prototypes. | 12 |
| OG: | Look, I—look, I just want one last thing to say, please.  I—I have worked here a | 13 |
| | long time.  I've been given the option to either be fired or to resign.  I don't wish | 14 |
| | to be fired.  I only want my job back.  If I am fired, I have many causes of action. | 15 |
| | I don't want to go that route.  I don't want to go to an attorney and pay them | 16 |
| | $100,000 so that I can sue the place where I went to school.  That doesn't sit well | 17 |
| | with me, but if I have to do it, that's what I'm gonna do.  If I get my job back, and | 18 |
| | I need to get my job back, it'll be better for all the people I work with; the staff, | 19 |
| | the—the other radiologists, my medical students, residents and, most importantly, | 20 |
| | the people and patients of Brooklyn for me to be back.  'Cause if I'm not there, | 21 |
| | people are gonna die.  And that's what's gonna happen, and I assure you that that's | 22 |
| | the case. | 23 |
| LC: | Okay.  Thank you.  I'd like to speak to you, Lisa, for a moment. | 24 |
| | | 25 |

**SUNY 001391**

| | | |
|---|---|---|
| LW: | Yes, one more thing.  You know, I got to say, you know, he doesn't strike me as | 1 |
| | someone that would purposely break a policy, rule or a regulation.  Even the fact | 2 |
| | that he told his supervisor the day before I'm telling you now I'm not gonna be | 3 |
| | here, I don't want you to get in trouble. | 4 |
| MG: | That's a great point. | 5 |
| LW: | I'm just really—just making sure everything flows and goes right.  I'm letting | 6 |
| | you—giving you the heads up. | 7 |
| OG: | I could've just called in sick the next day. | 8 |
| LW: | You know—right.  So I'm just saying that this is someone who, you know, clearly | 9 |
| | even the fact that he signed the document, like I don't—I don't—he's not the kind | 10 |
| | of person, a repetitive offender that's constantly here.  In his mind he's thinking, | 11 |
| | this is bullshit, let me sign this and get back to work, you know? | 12 |
| OG: | This is a deliberate attempt by Dr. Reede to fire me. | 13 |
| LW: | So— | 14 |
| OG: | She's fired multiple people in our department.  Some may have deserved it, and | 15 |
| | others haven't.  This is her agenda, this is—and everybody else is marching to her | 16 |
| | tune.  Steve Pulitzer, he used to be a friend of mine before he was acting director. | 17 |
| | Now, he's just marching in tune to her— | 18 |
| LW: | He's trying to save his job. | 19 |
| LC: | How long has he been—how long has he been acting director? | 20 |
| OG: | For like a month. | 21 |
| MG: | Of course, I would too. | 22 |
| LW: | Right, right. | 23 |
| MG: | I would do the same exact thing if—it's reasonable. | 24 |
| LW: | Right.  He doesn't have a choice, yeah. | 25 |

**SUNY 001392**

| | | |
|---|---|---|
| MG: | You have a family.  You have, you know, a life to live. | 1 |
| OG: | I understand what he's doing, I get it— | 2 |
| LW: | Right. | 3 |
| OG: | —but I'm just saying— | 4 |
| LW: | I mean, you know— | 5 |
| OG: | —he's not somebody who's gonna be reliable in this.  He's doing what he has to | 6 |
| | do and he's marching— | 7 |
| LW: | To keep his job. | 8 |
| OG: | —to the tune of Dr. Reede— | 9 |
| LW: | Right. | 10 |
| OG: | —who is deliberately trying to fire me and has hurt the department severely.  We | 11 |
| | don't have enough staff to read all the cases that we have.  People are being forced | 12 |
| | to read more than they are comfortable with.  I see the mistakes they're making, | 13 |
| | and they're making a lot. | 14 |
| MG: | That was pointed out all before the settlement agreement came to the table. | 15 |
| LW: | In writing, true. | 16 |
| MG: | I mean, that—these were several e-mails— | 17 |
| OG: | It's been—this is retaliation to me doing that. | 18 |
| MG: | How would—how would someone not do that? | 19 |
| OG: | Plus, she's violating my FMLA rights, and plus I think it's racist, what she's done. | 20 |
| LC: | That's why we gave you— | 21 |
| OG: | I understand that— | 22 |
| LC: | —notification to contact the— | 23 |
| OG: | —I'm just attesting to her character, which is really piss-poor, if you ask me. | 24 |
| | | 25 |

**SUNY 001393**

Page 50 of 50

MG:     Nobody wants to go down that—that road of dealing with that.  We—we want      1

people like yourself and Stephanie to make a reasonable case that this is not the—      2

the person who is being presented or painted to you is not the person who you've      3

met.  And I—I still, I can't forget that you just don't seem to believe the assertions      4

that my husband's making and you keep pointing about to the meeting, when he's      5

said over and over that that was not his understanding.  I don't—that's not a hard      6

thing to believe, or that's not—that's not a big lie.  It's just—it's the truth as it      7

happened.  That's—      8

LC:     Okay.      9

OG:     Look, I just want my job back.  I also deserve to be paid appropriately.  They're      10

getting big bang for their buck with me.  If they have to replace me, they have to      11

hire three people; that's gonna cost them a lot of money.  They're also paying      12

VRC, a teleradiology service, who charges a ton of money, in my absence.  I      13

wasn't able to do a call this weekend, a double call, because of this.  So I don't      14

know how they're covering the department, but it's really, really flawed.  I've      15

complained about it in the past and nothing's been done about it.  No responses to      16

my e-mails; this is retaliatory.  I expect to get my job back, I expect an apology      17

from her and I expect a raise.  And that's what I'm asking for.      18

LC:     Okay.  We'll pass that on.  Thank you.      19

OG:     Thank you.      20

MG:     (Inaudible).      21

OG:     Thank you.      22

LC:     Stephanie?      23

SB:     Okay.  We're going off the record.  The time is now 3 o'clock.      24

OFF THE RECORD      25

**SUNY 001394**

APPENDIX CONTINUED
IN FOLLOWING VOLUME