# 19-3570-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

————➤➤◄◄————

MD ODED GREENBERG,

*Plaintiff-Appellant,*

*v.*

STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL CENTER, AKA THE STATE UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER AT BROOKLYN, AKA STATE UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL CENTER, NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY HOSPITAL CENTER, DEBORAH L. REEDE, STEVEN PULITZER,

*Defendants-Appellees,*

*and*

UNITED UNIVERSITY PROFESSIONS, (UUP), SUNY DOWNSTATE MEDICAL CENTER CHAPTER OF UNITED UNIVERSITY PROFESSIONS, JOHN AND JANE DOES 1-20,

*Defendants.*

————————

*On Appeal from the United States District Court
for the Eastern District of New York*

**APPENDIX
VOLUME II OF VIII
Pages A268 to A463**

Deborah A. Brenner
  Assistant Corporation Counsel
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendant-Appellee
  New York City Health and
  Hospitals Corporation*
100 Church Street
New York, New York 10007
212-788-1039

CARDI & EDGAR LLP
*Attorneys for Plaintiff-Appellant
  MD Oded Greenberg*
99 Madison Avenue, 8th Floor
New York, New York 10016
212-481-7770

*(Additional Counsel on the Reverse)*

Amit Ramnik Vora
NEW YORK STATE OFFICE
 OF THE ATTORNEY GENERAL
*Attorneys for Defendant-Appellee*
 *State University Hospital-Downstate Medical*
 *Center, aka The State University of*
 *New York Health Science Center at*
 *Brooklyn, aka State University of*
 *New York Downstate Medical Center*
28 Liberty Street, 23rd Floor
New York, New York 10005
212-416-6167

# **Table of Contents**

**Page**

## **Volume I**

District Docket Entries ............................................................ A1

Second Amended Complaint and Demand for Jury Trial,
   dated December 23, 2015 .................................................. A18

Answer of Deborah Reede, M.D., Steven Pulitzer, M.D. and
   The State University of New York ("Defendants"),
   dated January 6, 2016 ....................................................... A49

Defendants' Local Civil Rule 56.1 Statement in Support of their
   Motion for Summary Judgment, dated March 26, 2018 ................. A72

Declaration of Christopher Coulston, for Defendants,
   in Support of Motion, dated March 26, 2018 ................................. A89

      Exhibit A to Coulston Declaration -
      Accreditation Council for Graduate Medical Education
      Report, dated April 15, 2014 ..................................................... A98

      Exhibit B to Coulston Declaration -
      Notes between Deborah Reede, M.D. and
      Ghassan Jameleddine, M.D. for the King's County
      Hospital Center, dated April 9, 2014 ....................................... A108

      Exhibit C to Coulston Declaration -
      Email from Oded Greenberg, M.D. to Alan Kantor,
      dated June 23, 2014 ................................................................. A109

      Exhibit D to Coulston Declaration -
      Emails from Oded Greenberg, M.D.,
      dated October 21, 2014 ........................................................... A110

**Table of Contents**
**(Continued)**

**Page**

Exhibit E to Coulston Declaration -
Email from Stephanie Bernadel to Steven Pulitzer, M.D.,
dated October 28, 2014 ............................................................ A114

Exhibit F to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated August 14, 2013 .............................................................. A116

Exhibit G to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated September 25, 2013 ......................................................... A118

Exhibit H to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated October 9, 2013 ............................................................... A120

Exhibit I to Coulston Declaration -
Meeting with Dr. Greenberg, dated May 5, 2014 .................... A122

Exhibit J to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated May 1, 2014 ............................................... A123

Exhibit K to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated May 9, 2014 .................................................................... A125

Exhibit L to Coulston Declaration -
King County Hospital Center Radiology Department
Faculty Meeting Minutes, dated May 8, 2014 ........................ A126

Exhibit M to Coulston Declaration -
Powerpoint Presentation of KCHC Departmental Meeting,
dated June 26, 2014 .................................................................. A130

**Table of Contents**
**(Continued)**

**Page**

Exhibit N to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated July 9, 2014 ................................................................... A148

Exhibit O to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated July 21, 2014 ................................................................. A149

Exhibit P to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated August 13, 2014 ........................ A151

Exhibit Q to Coulston Declaration -
Email from Oded Greenberg, M.D. to Linda McMurren,
dated September 15, 2014 ........................................................ A152

Exhibit R to Coulston Declaration -
Notes from August 22, 2014 Meeting ..................................... A154

Exhibit S to Coulston Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott,
dated September 2, 2014 .......................................................... A156

Exhibit T to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated September 15, 2014 ................................... A158

Exhibit U to Coulston Declaration -
(i) Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 .......................................................... A160
(ii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated August 29, 2014 ............................... A161

Exhibit V to Coulston Declaration -
Email from Rhonda Besunder to Oded Greenberg, M.D.,
dated March 20, 2014, with Attachments ............................... A162

iii

**Table of Contents**
**(Continued)**

**Page**

Exhibit W to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 5, 2014 ........................................................ A171

Exhibit X to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken September 8, 2014 ........................................................ A173

Exhibit Y to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 3, 2014 ........................................................ A208

Exhibit Z to Coulston Declaration -
Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................................ A209

Exhibit AA to Coulston Declaration -
Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................................ A210

Exhibit BB to Coulston Declaration -
Documents Related to Oded Greenberg, M.D.'s Visit to
City MD, dated September 8, 2014 ........................................ A211

Exhibit CC to Coulston Declaration -
Settlement, dated September 8, 2014 ..................................... A216

Exhibit DD to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken October 20, 2014 .......................................................... A218

iv

**Table of Contents**
**(Continued)**

**Page**

**Volume II**

Exhibit EE to Coulston Declaration -
Memorandum from Michael Arabian to
Steven Pulitzer, M.D., dated September 9, 2014,
with Email .................................................................................. A268

Exhibit FF to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated October 7, 2014, with Email ...................... A271

Exhibit GG to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 24, 2014 ........................................................ A277

Exhibit HH to Coulston Declaration -
Summary of Interview with Jinel Scott, M.D.,
dated October 14, 2014 ........................................................... A280

Exhibit II to Coulston Declaration -
Summary of Interview with James Walsh, M.D.,
dated October 14, 2014 ........................................................... A281

Exhibit JJ to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated October 1, 2014 ........................ A282

Exhibit KK to Coulston Declaration -
Emails from Oded Greenberg, M.D. to Gautam Agrawal,
dated December 3, 2014 ........................................................... A284

Exhibit LL to Coulston Declaration -
Excerpts from the Report, dated September 22, 2014 ............. A288

v

**Table of Contents**
**(Continued)**

**Page**

Exhibit MM to Coulston Declaration -
Emails from Steven Pulitzer, M.D.,
dated September 26, 2014 ........................................................ A291

Exhibit NN to Coulston Declaration -
Email from Oded Greenberg, M.D. to Steven Pulitzer,
M.D., dated September 22, 2014 .............................................. A293

Exhibit OO to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ................... A294

Exhibit PP to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ................... A296

Exhibit QQ to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken October 10, 2014 ........................................................... A297

Exhibit RR to Coulston Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 3, 2014 .............................................................. A327

Exhibit SS to Coulston Declaration -
Statement to be Read and Given to Employees in the
Professional Services Negotiating Unit Prior to a
Disciplinary Interrogation, dated October 10, 2014 ................ A328

Exhibit TT to Coulston Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 15, 2014 ............................................................ A329

Exhibit UU to Coulston Declaration -
Emails from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 10, 2014 ............................................................ A330

vi

**Table of Contents**
**(Continued)**

**Page**

Exhibit VV to Coulston Declaration -
Letter from Leonzo Cuiman to Oded Greenberg, M.D.,
dated October 22, 2014 ............................................................  A335

Exhibit WW to Coulston Declaration -
Email from Steven Pulitzer, M.D., to Gnyana Kompally,
dated November 23, 2014 ..........................................................  A336

Exhibit XX to Coulston Declaration -
Letter from Kate Hatlak to Rhonda Osborne, M.D.,
dated August 13, 2015 ...............................................................  A338

Exhibit YY to Coulston Declaration -
*Curriculum Vitae* of Oded Greenberg, M.D. ...........................  A344

Exhibit ZZ to Coulston Declaration -
*Curriculum Vitae* of Jinel A. Scott, M.D. ...............................  A346

Exhibit AAA to Coulston Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 ...................  A353

Exhibit BBB to Coulston Declaration -
(i) Email from Oded Greenberg, M.D. to Brian Magee,
dated July 15, 2014, with Attachments ....................................  A354
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 7, 2016 ....................  A358
(iii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken January 23, 2017 ......................  A374
(iv) Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken October 26, 2016 .......................  A381
(v) Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken January 24, 2017 .......................  A410
(vi) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ...................  A415
(vii) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken January 26, 2017 .......................  A432

**Table of Contents**
**(Continued)**

**Page**

Exhibit BBB to Coulston Declaration - (cont'd)
(viii) Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 ...    A434
(ix) Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 ..........................    A438
(x) Excerpts from the Deposition Testimony of
Michael Arabian, taken November 16, 2016 ..........................    A441
(xi) Excerpts from the Deposition Testimony of
Leonzo Cuiman, taken December 15, 2016 ...........................    A444
(xii) Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ...........................    A449

Declaration of Steven Pulitzer, M.D., for Defendants,
     in Support of Motion, dated March 26, 2018 ..................................    A458

**Volume III**

Declaration of Deborah L. Reede, M.D., for Defendants,
     in Support of Motion, dated March 26, 2018 ..................................    A464

Plaintiff's Response to Defendants' Rule 56.1 Statement
     in Support of Their Motion for Summary Judgment and
     Plaintiff's Rule 56.1 Statement of Additional Material Facts
     in Opposition to Defendants' Motion for Summary Judgment,
     dated July 6, 2018 ........................................................................    A471

Declaration of Chad L. Edgar, for Plaintiff,
     in Opposition to Motion, dated July 6, 2018 ................................    A518

     Exhibit 1 to Edgar Declaration -
     Excerpts from the Deposition Testimony of
     Oded Greenberg, M.D., taken December 12, 2016 .................    A527

     Exhibit 2 to Edgar Declaration -
     Email from David Stark to Oded Greenberg, M.D.,
     dated November 18, 2001 ......................................................    A544

# Table of Contents
## (Continued)

**Page**

Exhibit 3 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated August 25, 2014 ........................ A547

Exhibit 4 to Edgar Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 .................. A548

Exhibit 5 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken October 26, 2016 ....................... A549

Exhibit 6 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ............................ A576

Exhibit 7 to Edgar Declaration -
Reading Summary 2013 with Calculated Result of
RVU Value ............................................................................. A598

Exhibit 8 to Edgar Declaration -
Email from Deborah Reede, M.D. to Linda McMurren,
dated April 30, 2014 .............................................................. A599

Exhibit 9 to Edgar Declaration -
Meeting with Dr. Greenberg, dated May 5, 2014 ................... A600

Exhibit 10 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 .................. A601

Exhibit 11 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Deborah Reede, M.D., dated May 13, 2014 ............................ A611

Exhibit 12 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Deborah Reede, M.D., dated July 16, 2014 ........................... A612

ix

**Table of Contents**
**(Continued)**

                                                                        **Page**

Exhibit 13 to Edgar Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 .................. A613

Exhibit 14 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated June 23, 2014 ................................................................ A614

Exhibit 15 to Edgar Declaration -
Excerpts from the Daily Logs of Studies Completed by
Oded Greenberg, M.D. ........................................................... A615

Exhibit 16 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated August 20, 2014 ............................................................ A622

Exhibit 17 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott, M.D.,
dated September 2, 2014, with Attachments ........................... A623

Exhibit 18 to Edgar Declaration -
Email from Linda McMurren, dated August 22, 2014,
with Attachments .................................................................... A627

Exhibit 19 to Edgar Declaration -
Email from Linda McMurren, dated August 26, 2014,
with Attachments .................................................................... A630

Exhibit 20 to Edgar Declaration -
Email from Katrina Moltz to Oded Greenberg, M.D., *et al.*,
dated August 29, 2014 ............................................................ A633

Exhibit 21 to Edgar Declaration -
Individualized Education Program (IEP),
dated February 25, 2013, with Attachments ........................... A635

x

## Table of Contents
### (Continued)

**Page**

Exhibit 22 to Edgar Declaration -
(i) Email from Oded Greenberg, M.D. to Linda McMurren,
dated September 5, 2014 ........................................................ A657
(ii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated August 29, 2014 .............................. A658

Exhibit 23 to Edgar Declaration -
Email from Leonzo Cuiman to Deborah Reede, M.D.,
dated September 4, 2014 ........................................................ A659

Exhibit 24 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Michael Arabian,
dated September 5, 2014 ........................................................ A660

Exhibit 25 to Edgar Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 5, 2014 ........................................................ A662

Exhibit 26 to Edgar Declaration -
Document Intentionally Omitted ............................................ A664

Exhibit 27 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Michael Arabian, taken November 16, 2016 ......................... A665

Exhibit 28 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 ......................... A673

Exhibit 29 to Edgar Declaration -
Settlement, dated September 8, 2014 ...................................... A675

Exhibit 30 to Edgar Declaration -
(i) Settlement, dated November 6, 2013 ................................. A677
(ii) Settlement, dated November 12, 2013 .............................. A678
(iii) Settlement, dated March 6, 2014 ..................................... A679
(iv) Settlement, dated April 9, 2014 ....................................... A680

## Table of Contents
### (Continued)

**Page**

Exhibit 30 to Edgar Declaration - (cont'd)
(v) Settlement, dated August 18, 2014 .................................... A682
(vi) Settlement, dated January 14, 2015 ................................. A683
(vii) Settlements, dated January 28, 2015 .............................. A685

Exhibit 31 to Edgar Declaration -
Notes Taken by Stephanie Bernadel ...................................... A691

Exhibit 32 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott, M.D.,
dated September 10, 2014 ....................................................... A693

Exhibit 33 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 12, 2014 ....................................................... A694

Exhibit 34 to Edgar Declaration -
Email from Deborah Reede, M.D. to Steven Pulitzer, M.D.,
dated September 15, 2014 ....................................................... A696

Exhibit 35 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 15, 2014 ....................................................... A697

Exhibit 36 to Edgar Declaration -
Email from Oded Greenberg, M.D. to Steven Pulitzer,
M.D., dated September 15, 2014 ............................................. A698

Exhibit 37 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 16, 2014 ....................................................... A700

Exhibit 38 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken January 24, 2017 ...................... A701

**Table of Contents**
**(Continued)**

**Page**

Exhibit 39 to Edgar Declaration -
(i) Email from Steven Pulitzer, M.D. to Jean Aime, *et al.*,
dated September 24, 2014 ........................................................ A715
(ii) Letter from Steven Pulitzer, M.D.,
dated September 24, 2014 ........................................................ A716

Exhibit 40 to Edgar Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 3, 2014 ............................................................. A719

Exhibit 41 to Edgar Declaration -
Letter from Sade Jemmott, M.D. to Stephanie Bernadel,
dated October 14, 2014 ............................................................ A720

Exhibit 42 to Edgar Declaration -
Powerpoint Presentation of KCHC Departmental Meeting,
dated July 31, 2014 ................................................................. A723

Exhibit 43 to Edgar Declaration -
Email from Stephanie Bernadel to Steven Pulitzer, M.D.,
dated October 28, 2014 ............................................................ A727

Exhibit 44 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ................... A728

Exhibit 45 to Edgar Declaration -
(i) Letter from Deborah Reede, M.D. to
Hyman Shwarzberg, M.D., dated November 7, 2014 ............. A729
(ii) Letter from Deborah Reede, M.D. to Harry Zinn, M.D.,
dated November 7, 2014 ........................................................ A730
(iii) Letter from Deborah Reede, M.D. to
Maria Corsaro, M.D., dated November 7, 2014 ...................... A731

xiii

**Table of Contents**
**(Continued)**

**Page**

Exhibit 46 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated December 15, 2014 ....................................................... A732

Exhibit 47 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 ... A733

Exhibit 48 to Edgar Declaration -
*Curriculum Vitae* of Jinel Moore Scott, M.D. ......................... A735

Exhibit 49 to Edgar Declaration -
Faculty Self Assesment Form of Jinel Moore Scott, M.D.,
dated March 2, 2015 ................................................................ A739

Exhibit 50 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 5, 2014 ......................................................... A748

Exhibit 51 to Edgar Declaration -
Excerpts from the KCHC Departmental Meeting,
dated December 5, 2014 ......................................................... A749

Exhibit 52 to Edgar Declaration -
Excerpts from the Statement of Oded Greenberg, M.D.,
taken October 10, 2014 .......................................................... A751

Exhibit 53 to Edgar Declaration -
Summary of Interview with Jinel Moore Scott, M.D.,
dated October 14, 2014 .......................................................... A753

Exhibit 54 to Edgar Declaration -
Notes Regarding Meeting with Oded Greenberg, M.D.,
dated May 5, 2014 .................................................................. A754

**Table of Contents**
**(Continued)**

**Page**

Exhibit 55 to Edgar Declaration -
(i) Chart Detailing Oded Greenberg, M.D.'s Attendance
Fulfillment .............................................................. A755
(ii) Email from Deborah Reede, M.D. to Linda McMurren,
dated April 30, 2014 ............................................... A756
(iii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated April 21, 2014 .................................. A757

Exhibit 56 to Edgar Declaration -
Email from John Amodio to Oded Greenberg, M.D., *et al.*,
dated April 1, 2014 ................................................... A758

Exhibit 57 to Edgar Declaration -
Excerpt from the Deposition Testimony of
Deborah Reede, M.D., taken January 26, 2017 ........................ A760

Exhibit 58 to Edgar Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 3, 2014 .................. A761

Exhibit 59 to Edgar Declaration -
SUNY Downstate's General Statement of Purpose ................ A762

Exhibit 60 to Edgar Declaration -
Document Intentionally Omitted ............................................ A763

Exhibit 61 to Edgar Declaration -
Excerpts from the KCHC Medical Staff Bylaws
Rules & Regulations ................................................. A764

Exhibit 62 to Edgar Declaration -
Performance Evaluation of Scott, M.D. by Pulitzer, M.D.,
Acting on Behalf of KCHC as Interim Chief of Service of
the Department of Radiology, dated December 2, 2014 .......... A782

xv

**Table of Contents**
**(Continued)**

**Page**

Exhibit 63 to Edgar Declaration -
Documents Related to Greenberg, M.D.'s Reappointment
as a Member of the Medical Staff at KCHC in 2013 .............. A785

Exhibit 64 to Edgar Declaration -
Documents Related to Greenberg, M.D.'s Reappointment
as a Member of the Medical Staff at KCHC in 2009 .............. A800

Exhibit 65 to Edgar Declaration -
Summary of Interview with Andre Pyle,
dated October 14, 2014 ............................................ A804

Exhibit 66 to Edgar Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated December 9, 2014 ...................................... A805

Declaration of Oded Greenberg, M.D., Plaintiff,
in Opposition to Motion, dated July 6, 2018 ................................ A806

Declaration of Esther Neiman, in Opposition to Motion,
dated June 27, 2018 ....................................................... A815

Reply Declaration of Christopher Coulston, for Defendants,
in Further Support of Motion, dated September 14, 2018 ............. A817

Exhibit CCC to Coulston Reply Declaration -
Plaintiff's 2012-2013 Faculty Review and
Development Form .................................................... A820

**Volume IV**

Exhibit DDD to Coulston Reply Declaration -
2014 Faculty Evaluation of Oded Greenberg, M.D. ............... A822

Exhibit EEE to Coulston Reply Declaration -
2015 Faculty Evaluation of Jinel Scott, M.D. ........................ A838

xvi

**Table of Contents**
**(Continued)**

**Page**

Exhibit FFF to Coulston Reply Declaration -
(i) Email from Michelle Gilmore Greenberg to
Oded Greenberg, M.D., dated July 17, 2018 ........................... A853
(ii) Email from Karina Moltz to Oded Greenberg, M.D.,
dated August 25, 2014 ............................................. A854

Exhibit GGG to Coulston Reply Declaration -
(i) Slip for CD-Rom .................................................. A855
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 7, 2016 ................... A856
(iii) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ................. A859
(iv) Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ......................... A864
(v) Excerpts from the Deposition Testimony of
Leonzo Cuiman, M.D., taken December 15, 2016 ................. A868

Reply Declaration of Steven Pulitzer, M.D., for Defendants,
in Further Support of Motion, dated September 14, 2018 ............. A871

Reply Declaration of Deborah Reede, M.D., for Defendants,
in Further Support of Motion, dated September 14, 2018 ............. A873

Defendants' Counter-Response to Plaintiff's Response to
Defendants' Rule 56.1 Statement and Plaintiff's
Rule 56.1 Statement of Additional Material Facts,
dated September 14, 2018 ............................................. A876

Health + Hospitals' Defendants' Local Rule 56.1 Statement of
Material Undisputed Facts, filed September 14, 2018 ................... A948

Declaration of Ryan G. Shaffer, for Defendants New York City
Health + Hospitals Corporation and Kings County Hospital
Center, in Support of Motion, filed September 14, 2018 .............. A958

xvii

**Table of Contents**
**(Continued)**

**Page**

Exhibit A to Shaffer Declaration -
Second Amended Complaint and Demand for Jury Trial,
dated December 23, 2015 ......................................................... A961

Exhibit B to Shaffer Declaration -
Notification of Employee Change of Status,
dated June 28, 2011 ................................................................. A992

Exhibit C to Shaffer Declaration -
Downstate Medical Center Employment File of
Oded Greenberg, M.D............................................................. A996
*(cont'd in Vol. V)*

### Volume V

Exhibit D to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 .. A1245

Exhibit E to Shaffer Declaration -
(i) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 12, 2016................. A1248
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken January 23, 2017.................... A1254

Exhibit F to Shaffer Declaration -
Collective Bargaining Agreement between United
University Professions and the State of New York................. A1260
*(cont'd in Vol. VI)*

### Volume VI

Exhibit G to Shaffer Declaration -
Time and Attendance Records of Oded Greenberg, M.D. ..... A1389

**Table of Contents**
**(Continued)**

**Page**

Exhibit H to Shaffer Declaration -
Letter from Salvatore JA Sclarani, M.D. to
Oded Greenberg, M.D., dated September 21, 2010 ...............  A1453

Exhibit I to Shaffer Declaration -
Plaintiff's Responses to Municipal Defendants' First Set of
Contention Interrogatories, dated May 17, 2017 ....................  A1457

Exhibit J to Shaffer Declaration -
Affiliation Agreement between HHC and the
SUNY Health Sciences Center ...............................................  A1469

**Volume VII**

Exhibit K to Shaffer Declaration -
Notes from August 22, 2014 Meeting with
Oded Greenberg, M.D., with Attachments ............................  A1504

Exhibit L to Shaffer Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 3, 2014 .................  A1664

Exhibit M to Shaffer Declaration -
Settlement Agreement, dated September 8, 2014 ..................  A1665

Exhibit N to Shaffer Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 24, 2014 ...............  A1667

**Volume VIII**

Exhibit O to Shaffer Declaration -
Letter from Leonzo Cuiman to Oded Greenberg, M.D.,
dated October 22, 2014 .........................................................  A1670

xix

**Table of Contents**
**(Continued)**

**Page**

Exhibit P to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Leonzo Cuiman, taken December 15, 2016 ........................... A1671

Exhibit Q to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 ........................ A1676

Exhibit R to Shaffer Declaration -
Report of the Accreditation Council for Graduate
Medical Education, dated April 15, 2014 .............................. A1679

Exhibit S to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ................. A1689

Plaintiff's Response to Defendants' Rule 56.1 Statement in
Support of Their Motion for Summary Judgment and Plaintiff's
Rule 56.1 Statement of Additional Material Facts in Opposition
to Defendants' Motion for Summary Judgment,
filed September 14, 2018 ................................................. A1699

Health + Hospitals' Defendants' Response Plaintiff's Rule
56.1 Statement of Additional Material Facts in Opposition
to Defendants' Motion for Summary Judgment,
filed September 14, 2018 ................................................. A1734

Memorandum and Order of the Honorable Pamela K. Chen,
dated September 29, 2019, Appealed From .................................. A1760

Notice of Appeal, dated October 29, 2019 ......................................... A1815

**A268**

| | |
|---|---|
| **From:** | CN=Michael Arabian/O=Downstate |
| **Sent:** | Tuesday, September 9, 2014 3:39 PM |
| **To:** | CN=Steven Pulitzer/O=Downstate@Downstate |
| **Cc:** | CN=Leonzo Cuiman/O=Downstate@Downstate; CN=Adriana Conde-billy/O=Downstate@Downstate; CN=Deborah Reede/O=Downstate@DOWNSTATE; CN=Joseph Merlino/O=Downstate@Downstate |
| **Subject:** | Dr. Oded Greenberg Settlement |
| **Attach:** | Dr. Oded Greenberg supervisor settlement notification.doc |

---

Good Afternoon Dr. Pulitzer,

Attached is the settlement agreement details between Dr. Oded Greenberg and
Downstate Medical Center.

If you have any questions, please contact me at extension 3024.

Thank You for your assistance in this matter.

Sincerely,
Michael Arabian
Senior Personnel Associate, Labor Relations
718-270-3024

Confidential                                                                                 SUNYESI00000038

THIS PAGE INTENTIONALLY LEFT BLANK

CONFIDENTIAL

# M E M O R A N D U M

**TO:**         Dr. Steven Pulitzer
Interim Chief of Service, Department of Radiology

**FROM:**    Michael Arabian
Sr. Personnel Associate, Labor Relations

**DATE:**     9/9/14

**SUBJECT:**    **Settlement Notification – Dr. Oded Greenberg**

===========================================================================

This serves to inform you of the agreement reached between Dr. Oded Greenberg, Clinical Associate Professor and SUNY Downstate Medical Center. In lieu of Dr. Greenberg being served with a notice of discipline for (1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department, (4) insubordination and (5) misrepresenting hours worked on time sheets, all parties agree that he will be placed on probation. A penalty ranging up to termination of employment is held in abeyance for one year.

Dr. Greenberg understands that he is expected to work from 9:00 A.M. to 5:00 P.M. (current work schedule), that requests/changes for time off need to be approved by his supervisor.

It is extremely important that Dr. Greenberg's behavior is monitored to ensure that he fulfills his obligation regarding the above reference matter. Labor Relations should be contacted immediately if Dr. Greenberg should engage in any act of misconduct.

Should you have any questions with regard to the above-referenced matter, please contact me at Extension 3024.


cc:     Leonzo Cuiman
        Adriana Conde-billy
        Dr. Deborah Reede
        Dr. Joseph Merlino
        Personnel File

Case File

Confidential

SUNYESI00000040

**A271**

| | |
|---|---|
| **From:** | CN=Stephanie Bernadel/O=Downstate |
| **Sent:** | Tuesday, December 9, 2014 5:29 PM |
| **To:** | CN=Linda McMurren/O=Downstate@Downstate |
| **Cc:** | CN=Adriana Conde-billy/O=Downstate@Downstate |
| **Subject:** | Re: Oded Greenberg, MD |
| **Attach:** | SKMBT_36314100714340.pdf; SKMBT_50114120916400.pdf |

Good Afternoon Linda,

Sherma provided me with Dr. Greenberg's Sept 2014 time sheets on 10/7/14 (see below).  As such, I was able to determine his accrual balances for the beginning of Oct 2014.

Dr. Greenberg was sent off duty effective mid-day October 8, 2014 and reassigned to Labor Relations.  This reassignment lasted through 10/22/14.  He will be paid for his regular work hours on these dates; he does not have to charge any accruals.  His termination is effective close of business 10/22/14.

As such, please revise the your time sheets as indicated in my attachment.

Regards,
Stephanie

**************************
Stephanie Bernadel, MPA
Personnel Associate, Labor Relations
SUNY Downstate Medical Center
450 Clarkson Avenue, Box 1224
Brooklyn , NY 11203
work: 718-270-1972
cell: 347-578-4689
fax: 718-270-4684
E-mail: stephanie.bernadel@downstate.edu

Confidentiality Notice:  The information contained in this e-mail and any attachments may be legally privileged and confidential.  If you are not an intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail is strictly prohibited.  If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately.  You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person.

----- Forwarded by Sherma Bekoe/Downstate on 10/07/2014 02:43 PM -----

From: biz363@downstate.edu
To: sherma.bekoe@downstate.edu,
Date: 10/07/2014 02:41 PM
Subject: biz363@downstate.edu

CONFIDENTIAL                                                                          SUNYESI00001399

**A272**

biz363@downstate.edu

From: Linda McMurren/Downstate
To: Stephanie Bernadel/Downstate@Downstate,
Date: 12/09/2014 03:17 PM
Subject: Oded Greenberg, MD

Good Afternoon Stephanie,

I am in the process of signing off and submitting Dr. Greenberg's final time
sheet to Payroll and the Office of Affiliation.  Please review the time sheet
and let me know if the "LR" dates are correct.

Thank you.

Linda

Linda McMurren
Administrative Assistant
Dept. of Radiology Chair's Office
Linda.McMurren@downstate.edu (email)
718-270-1603 (phone)
718-270-2667 (fax)

Confidentiality Notice:  The information contained in this transmission is
intended only for the person or entity to which it is addressed and may contain
confidential and/or privileged material. If you are not the intended recipient
of this information, do not review, retransmit, disclose, disseminate, use, or
take any action in reliance upon, this information. If you received this
transmission in error, please contact the sender and destroy all printed copies
and delete the material from all computers.

[attachment "timesheet.pdf" deleted by Stephanie Bernadel/Downstate]

CONFIDENTIAL

SUNYESI00001400

**A273**

Case 1:15-cv-02343-PKC-VMS   Document 87-32   Filed 09/14/18   Page 4 of 7 PageID #: 1574

SUNY DOWNSTATE MEDICAL CENTER
(Please type or print, using ball point pen)

## MONTHLY FACULTY AND NTP INDIVIDUAL REPORT OF ATTENDANCE

FOR THE PERIOD   FROM: 9/1   TO: 9/30

NAME: Osed Greenberg   DEPARTMENT Radiology   TITLE: Clinical Asst Prof

SOCIAL SECURITY NO: [Redacted]   FT   PT   If PT, % of FT: _____

CHECK BOX AT RIGHT IF YOU ARE AN FLSA NON-EXEMPT (COVERED) EMPLOYEE   REGULAR SHIFT FROM: _____ AM/PM   TO: _____ AM/PM

**SECTION 1:** To be completed by all Faculty and NTP employees, including FLSA Non-Exempt (covered) employees, as applicable. I certify that I have been present and have met my professional obligation, as required, except for the absences indicated below:

ABSENCES (IF ANY): · CHARGE TO:

| DATE FROM OR ON | TO | NUMBER OF DAYS | ANNUAL LEAVE | SICK LEAVE | FAMILY SICK LEAVE | IN LIEU OF HOLIDAY | FMLA LEAVE | DRL | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| 9/4 -9/5 | | 2 | | 2 | | | | | |

REMARKS: Calendar Year Employees should list here a day prescribed by law for the observance of a HOLIDAY on which they were required to be present:

**SECTION 2:** TO BE COMPLETED BY FLSA NON-EXEMPT (COVERED) EMPLOYEES ONLY

REPORT OF ACTUAL HOURS WORKED IN EXCESS OF 40 HOURS/WEEKLY FOR FLSA NON-EXEMPT PROFESSIONAL EMPLOYEES
I certify that, pursuant to the provisions of the Fair Labor Standards Act Amendment of 1985, I am FLSA Non-Exempt Professional employee and, as indicated below, I have worked in excess of 40 hours per week to meet my professional obligation. (See back for additional instructions.)

| DAY OF WEEK | DATE | TIME FROM | TO | ACTUAL # HOURS |
|---|---|---|---|---|
| | | | | |

TOTAL:
X 1.5   = PREMIUM HOURS:

**SECTION 3:**

10/7/14
DATE

O Cer ____ mo
SIGNATURE OF PROFESSIONAL STAFF MEMBER

I verify that with the exceptions noted, the leave and/or record of actual hours worked in excess of 40 hrs/weekly as indicated above are, to the best of my knowledge, accurate and complete:

DATE   SIGNATURE OF SUPERVISOR/ CHAIR/ DIRECTOR

**SECTION 4:**
NOTE: The Official Record of Accrual Summary of Leave Credits is the record maintained by the Time & Attendance Unit. The space provided below is for recording your applicable accruals. The Supervisor is responsible for certifying the accuracy of the period of accrual activity before it is submitted to the Time & Attendance Unit.

ACCRUAL SUMMARY OF LEAVE CREDIT

| | ANN. LV | SICK LV. | IN LIEU OF HOLIDAY | DRL | PREMIUM HRS. REPORTED IN SECTION 2 | | FMLA LEAVE TAKEN DURING CAL. YEAR | ACCUM. EMP. ORG. LEAVE |
|---|---|---|---|---|---|---|---|---|
| 1. BAL BROUGHT FWD | 9.5 | 24.5 | | | | TOTAL PREV. USED | | |
| 2. TIME USED (-) | O | 2 | | | | | | |
| 3. SUB-TOTAL: | 9.5 | 22.5 | | | | | | |
| 4. TIME EARNED (+) | 1.75 | 1.75 | | | | USED THIS PERIOD (+) | | |
| 5. NEW BALANCE | 11.25 | 24.25 | | | | NEW TOTAL | | |

DMC-0128 F467 R4 (12/11)

CONFIDENTIAL                                                                                                                    SUNYESI00001401

**A274**

## HHC-ANNEX G

Affiliate Institution: **SUNY Health Science Center at Brooklyn**

Name _O ded Greenberg_    Month _September_

Title _Clinical Asst. Professor_ Dept. / Div. _Radiology_

In accordance with the terms of my aggreement with SUNY/ Health Science Center at Brooklyn I hereby certify that I have fulfilled my commitment at the Kings County Hospital as follows:

| | Week of: 9/1 | | Week of: 9/8 | | Week of: 9/15 | | Week of: 9/22 | | Week of: 9/29 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Date | Hours | Date | Hours | Date | Hours | Date | Hours | Date | Hours |
| Mon | 9/1 | H | 9/8 | 9-5 8 | 9/15 | 12-8 8 | 9/22 | 8-8 8 | 6/29 | 9²⁴-5² 8 |
| Tues | 9/2 | 1050A 8 630P | 9/9 | 9-5 8 | 9/16 | 934-533 8 | 9/23 | 6 | 9/30 | 9 20-540 8 |
| Wed | 9/3 | 9 022 63ⁱ 8 | 9/10 | 9²¹-5²¹ 8 | 9/17 | 5²⁴ 5²⁴ 8 | 9/24 | 980-530 8 | | |
| Thurs | 9/4 | SL | 9/11 | 9¹¹-5²⁴ 8 | 9/18 | 9²⁵ 5²⁵ 8 | 9/25 | CD | | |
| Fri | 9/5 | SL | 9/12 | 9⁰⁵-5²² 8 | 9/19 | 9²⁴ 5²⁴ 8 | 9/26 | CD | | |
| Sat | | | | | 9/20 | 637-237 8 | | | | |
| Sun | | | 9/14 | 6²⁰-2²⁰ 8 | | | | | | |
| Total | | 16 | | 48 | | 48 | | 22 | | 16 |

9/23 worked 6 hours - left twice 7Am-7Pm    Total Hours _150_
during day

Title _Oded Greenberg_ MD    Date _10/7/14_

Approved by _____
Chief of Service

9/25 comp day from 12/7/13
9/26 comp day from 1/12/14

| INDICATED ABSENCES: |
|---|
| H = Holiday |
| SL = Sick Leave |
| AL = Annual Leave |
| EL = Educational Leave |

CONFIDENTIAL

SUNYESI00001402

SUNY DOWNSTATE MEDICAL CENTER
(Please type or print, using ball point pen)

## MONTHLY FACULTY AND NTP INDIVIDUAL REPORT OF ATTENDANCE

FOR THIS PERIOD FROM: 10/1/14 TO: 10/22/14

NAME: Oded Greenberg   DEPARTMENT Radiology   TITLE:

SOCIAL SECURITY NO:   ☐ FT ☐ PT   If PT, % of FT:

CHECK BOX AT RIGHT IF YOU ARE AN FLSA NON-EXEMPT (COVERED) EMPLOYEE ☐   REGULAR SHIFT FROM: _____ ☐ AM / ☐ PM TO: _____ ☐ AM / ☐ PM

**SECTION 1:** To be completed by all Faculty and NTP employees, including FLSA Non-Exempt (covered) employees, as applicable. I certify that I have been present and have met my professional obligation, as required, except for the absences indicated below:

ABSENCES (IF ANY):   CHARGE TO:

| DATE FROM OR ON | TO | NUMBER OF DAYS | ANNUAL LEAVE | SICK LEAVE | FAMILY SICK LEAVE | IN LIEU OF HOLIDAY | FMLA LEAVE | DRL | OTHER |
|---|---|---|---|---|---|---|---|---|---|

Reassigned to Labor Relations 10/8/14 - 10/22/14

Terminated close of business 10/22/14

REMARKS: Calendar Year Employees should list here a day prescribed by law for the observance of a HOLIDAY on which they were required to be present:

**SECTION 2:** TO BE COMPLETED BY FLSA NON-EXEMPT (COVERED) EMPLOYEES ONLY

REPORT OF ACTUAL HOURS WORKED IN EXCESS OF 40 HOURS/WEEKLY FOR FLSA NON-EXEMPT PROFESSIONAL EMPLOYEES
I certify that, pursuant to the provisions of the Fair Labor Standards Act Amendment of 1985, I am FLSA Non-Exempt Professional employee and, as indicated below, I have worked in excess of 40 hours per week to meet my professional obligation. (See back for additional instructions.)

| DAY OF WEEK | DATE | TIME FROM | TO | ACTUAL # HOURS |
|---|---|---|---|---|

TOTAL:
X 1.5   = PREMIUM HOURS:

**SECTION 3:**

_____   _Oded Greenberg MD_ (signature)
DATE   SIGNATURE OF PROFESSIONAL STAFF MEMBER

I verify that with the exceptions noted, the leave and/or record of actual hours worked in excess of 40 hrs/weekly as indicated above are, to the best of my knowledge, accurate and complete:

_____   _____
DATE   SIGNATURE OF SUPERVISOR/ CHAIR/ DIRECTOR

**SECTION 4:**
NOTE: The Official Record of Accrual Summary of Leave Credits is the record maintained by the Time & Attendance Unit. The space provided below is for recording your applicable accruals. The Supervisor is responsible for certifying the accuracy of the period of accrual activity before it is submitted to the Time & Attendance Unit.

### ACCRUAL SUMMARY OF LEAVE CREDIT

| | ANN. LV. | SICK LV. | IN LIEU OF HOLIDAY | DRL | PREMIUM HRS. REPORTED IN SECTION 2 | | FMLA LEAVE TAKEN DURING CAL. YEAR | ACCUM. EMP. ORG. LEAVE |
|---|---|---|---|---|---|---|---|---|
| 1. BAL BROUGHT FWD | 11.25 | 24.25 | | | | TOTAL PREV. USED | | |
| 2. TIME USED (-) | 0 | 0.00 | | | | | | |
| 3. SUB-TOTAL: | 11.25 | 24.25 | | | | | | |
| 4. TIME EARNED (+) | 1.75 | 1.75 | | | | USED THIS PERIOD (+) | | |
| 5. NEW BALANCE | 13.00 | 26.00 | | | | NEW TOTAL | | |

DMC-0128 F467 R4 (12/11)

CONFIDENTIAL                                                                     SUNYESI00001403

## HHC-ANNEX G

Affiliate Institution:  **SUNY Health Science Center at Brooklyn**

Name ___Oded Greenberg___    Month ___October 2014___

Title _____    Dept. / Div. ___Radiology___

In accordance with the terms of my aggreement with SUNY/ Health Science Center at Brooklyn I hereby certify that I have fulfilled my commitment at the Kings County Hospital as follows:

| | Week of: Sept 29 Date | Hours | Week of: Oct 6 Date | Hours | Week of: Oct 13 Date | Hours | Week of: Oct 20 Date | Hours | Week of: Date | Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| Mon | ( | | 10/6 | 9A-5P 8 | 10/13 | 9A-5P LR | 10/20 | 9A5P LR | | |
| Tues | | | 10/7 | 9A-5P 8 | 10/14 | 9A-5P LR | 10/21 | 9A-5P LR | | |
| Wed | 10/1 | 9A-5P 8 | 10/8 | 9A-5P LR ½ | 10/15 | 9A-5P LR | 10/22 | 9A-5P LR | | |
| Thurs | 10/2 | 9A-5P 8 | 10/9 | 9A-5P LR | 10/16 | 9A-5P LR | | | | |
| Fri | 10/3 | 9A-5P 8 | 10/10 | 9A-5P LR | 10/17 | 9A-5P LR | | | | |
| Sat | | | | | | | | | | |
| Sun | | | | | | | | | | |
| Total | | | | | | | | | | |

Total Hours ___96.00___

Title ___Oded Greenberg MD___ MD    Date _____

Approved by _____
Chief of Service

| INDICATED ABSENCES: |
|---|
| H  = Holiday |
| SL = Sick Leave |
| AL = Annual Leave |
| EL = Educational Leave |

CONFIDENTIAL

SUNYESI00001404

**A277**

Case 1:15-cv-02343-PKC-VMS   Document 87-33   Filed 09/14/18   Page 2 of 4 PageID #: 1579



# KINGS COUNTY HOSPITAL CENTER



Steven Pulitzer, M.D.
Interim Chief of Service
Department of Radiology
Kings County Hospital Center
Tel: 718-245-4447
Fax: 718-245-4473

September 24, 2014

RE: Oded Greenberg, MD

To whom it may concern:

I would like to report two incidents regarding Oded Greenberg, M.D.. They are as follows:

Incident 1:

Dr. Greenberg was approved to have a shift in his schedule on September 23, 2014. He asked to come in early and leave for 2 hours in the morning. I approved this leave of absence. From Talkstation data (speech recognition software in which our reports are generated), his first report was generated at 7:21am. His next report was at 12:20.

At approximately 2 p.m. on Wednesday September 23, 2014 I received a phone call from Dr. Greenberg requesting to leave the hospital for 2 hours to attend to personal business. He asked me to cover him on his tour of duty in the Emergency Radiology section. I told Dr. Greenberg that I denied his request and that I personally could not cover him during the requested hours.

Dr. Greenberg asked another physician in our department, Dr. Amiram Samin to cover him in is absence. Dr. Samin agreed to cover the non-Neuroradiology cases. Dr. Samin is not qualified to cover the Emergency Department independently as he does not read neuroradiology cases.

According to Talkstation data there was a gap of approximately two hours from 2:43 pm to 4:52 pm. Dr. Greenberg left the building for this time period.

**SUNY 001269**

This was an unauthorized leave of absence.


Incident 2:

Dr. Greenberg added the following Addendum to approximately 50 reports. This is not a standard attestation. Our department has three attestations which were approved by Risk Management and and all of the staff were instructed on how to use them at numerous staff meetings beginning July 2014 and a presentation from Phycare on September, 15 2014 in our radiology department conference room. I instructed Dr. Greenberg to use these three attestations at a staff meeting on September 22, 2014. As a final note, it was reported to me verbally by my administrative staff that Dr. Greenberg asked out IT department to erase this attestation from the reports. The request was denied.

Dr. Greenberg's attestation:

---

Addendum(F)

Attending radiologist:    Oded Greenberg MD                    Date: Monday, September 22, 2014
Resident radiologist(s): Travis Meyer MD

Addenda:

Addenda:
I, Oded Greenberg M.D., Board Certified Diagnostic attending Radiologist and Board Certified Pathologist, have personally, painstakingly reviewed each and every one of the provided images and reviewed the available clinical information. The above report, based on my own extensive knowledge and skill as well as meticulous observation and careful interpretation now represents the final report.

Electronically signed by:    Oded Greenberg MD
Date:                        09/22/14
Time:                        10:51

---


Approved Attestations:

### *Radiology Report Attestations*

#### 1. **Attending Concur**

I, _____ , MD, have personally reviewed the images and concur with the preliminary report and the interpretation as stated and signed by the resident. This report now represents the FINAL REPORT for this patient.

#### 2. **Minor Addendum**

451 Clarkson Avenue, Brooklyn, NY 11203
New York City Health and Hospitals Corporation

**A279**

I, _____, MD, have personally reviewed the images and interpretation as stated and signed by the resident and wish to add to the preliminary report in the following manner. This report now represents the FINAL REPORT for this patient.

### 3. Major Addendum

I, _____, MD, have personally reviewed the images and interpretation as stated and signed by the resident and wish to modify the preliminary report in the following manner. The information that follows the preliminary report now represents the FINAL REPORT for this patient.

### 4. Personal communication attestation (for both attendings and residents when we discuss important finding/s with clinicians)

I, _____, MD, discussed the findings of this report and addenda <by phone/in person> with (clinician name) @ (date/time) with readback.

### 5. When residents communicate findings to clinicians (independently OR at our request)

The resident _____ discussed the findings including addenda of this report <by phone/in person> with (Clinician name) @ (date/time) with readback.

Please let me know if I can be of any further assistance.

Sincerely,

Steven Pulitzer, MD

SUNY 001271

**A280**

718—245—4473          Admin Radio                                                  10:53:23 a.m.    10—15—2014       1/1

270  4084

Summary of interview with Dr. Jinel Scott, Radiologist, taken on October 14, 2014 by Stephanie Bernadel, Personnel Associate, Labor Relations.

My name is Dr. Jinel Scott and I am an Attending in the Department of Radiology. I am employed by SUNY Downstate but my work site is Kings County Hospital Center. I am have been employed by Downstate since 2011.

Dr. Pulitzer chairs a weekly meeting where we usually discuss issues within our sections and/or things that we need to know. I was present at the weekly meeting held on Monday, September 22, 2014. About a week or so before, there was a presentation done by a billing company where it was discussed what we as Attendings need to put in our reports to show that we participated in the interpretation of patient studies. On September 22, 2014, Dr. Pulitzer brought to our attention a number of reports that did not have the attestations as requested and explained that the company cannot bill without the attestations. He gave each person present a list which demonstrated the reports that were deficient and showed which Attendings were responsible for the reports. Dr. Pulitzer explained that the attestations were important for medical billing purposes. He told us that as per the billing company, the Radiologist would not get credit and could not bill if it did not have the accurate attestation. Prior to that day, we were told to copy the attestations that were devised by the VP for Education and cleared by the legal department. This was reiterated at the meeting. There were two versions, one that said we agree with the residents report and one that said we disagree with their report, with a space to correct the report. We were told to use those exact words because they had been cleared by legal. We were supposed to use those attestations and none other. It was very clear that we were supposed to use these attestations. At no point did Dr. Pulitzer or anyone else say anything about using this language to create our own attestation. At the meeting, Dr. Greenberg made statements about the extra time it would take to fill out these attestations and asked if the attestations could be generated automatically within the report instead of manually. At one point, he stated "this is the beginning of the end of medicine, this is the corporatization of medicine, mark my words" or words to that effect.

Directly after the meeting, Dr. Greenberg composed his own attestation. He read it to me and he was laughing. I thought he was joking, as he read it to me in a jovial way. I didn't think he would actually use it. Afterwards, I heard that a clinician had called down and asked "what was the meaning of this" after they saw his modified attestation on an actual patient report. I didn't know he had actually used it.

I understand that I am not to speak to anyone about this statement and it should be kept confidential. There is nothing I would like to add to this statement at this time. The aforementioned statement as told to Stephanie Bernadel, Personnel Associate, Labor Relations, is true and accurate. I have read it and made changes to have it conform to the truth, and signed it. I understand that I may be required to testify in a legal or administrative forum regarding this matter.

_____                              _____
SIGNATURE                                                        DATE

SUNY 001251

Case 1:15-cv-02343-PKC-VMS   Document 87-35   Filed 09/14/18   Page 2 of 2 PageID #: 1585

Summary of interview with Dr. James Walsh, Radiologist, taken on October 14, 2014 by Stephanie Bernadel, Personnel Associate, Labor Relations.

My name is Dr. James Walsh and I am an Attending in the Department of Radiology. I am employed by SUNY Downstate Medical Center but my work site is Kings County Hospital Center. I have been at Downstate for eight years, from Residency through Attending.

Dr. Pulitzer held a meeting on Monday, September 22, 2014. It may have been part of our regularly scheduled staff or education meetings; I don't recall. During the meeting we discussed attestation forms. Attestations are where Attendings affirm that they have reviewed a Resident's work. The topic had come up during previous meetings, as we wanted to adopt a form that would comply with national standards. The attestation is really a few sentences that state that we reviewed the work and that we either agree with it or choose to make an addendum. At the meeting, Dr. Pulitzer identified two attestations that we should use, one when we agreed and one when we disagreed. Dr. Amodio concurred. We were told that certain Attendings already had the approved language in their dictations. There was discussion about the attestation having been reviewed by legal department and others in Administration. Legal was mainly involved because we had to differentiate between minor and major addendums.

Dr. Pulitzer explained that attestations have to be done because you can't get compensated for Resident work without them. In the past, it was implied that we reviewed them. I think that's why Dr. Greenberg seemed to not like the fact that we had to do an attestation. He was upset because he found it offensive to have to explain himself. After the meeting, we were in the hallway and he said to me "I can't believe I have to write an attestation. I am a professional, I am a physician, I wouldn't even think of signing off a report until I have reviewed it" or words to that effect. Others were around but I don't know if they heard.

I understand that I am not to speak to anyone about this statement and it should be kept confidential. There is nothing I would like to add to this statement at this time. The aforementioned statement as told to Stephanie Bernadel, Personnel Associate, Labor Relations, is true and accurate. I have read it and made changes to have it conform to the truth, and signed it. I understand that I may be required to testify in a legal or administrative forum regarding this matter.

_____                    _____
SIGNATURE                                     DATE

SUNY 000449

**A282**

| | |
|---|---|
| **From:** | CN=Oded Greenberg/O=Downstate |
| **Sent:** | Wednesday, October 1, 2014 11:21 AM |
| **To:** | Steven Pulitzer <Steven.Pulitzer@nychhc.org> |
| **Bcc:** | CN=Deborah Reede/O=Downstate@DOWNSTATE |
| **Subject:** | Re: Covering Body Imaging, Chest Imaging, ER |

---

Steve, there is no such thing as not covering the ER when no one, I mean no one other than myself and Jinel (until 2 pm) sits down here while actually covering the ER. Virtually no one sits down here on call either. Its nice that others help out reading ER, but they are not here and present in the ER, teaching residents and medical students, answering phones, and dealing with consults and protocoling studies. That is left to me entirely from 2 to 5pm. It is also nearly impossible for me to attend conferences, grand rounds, etc. since the ER would not be covered. I only have a junior resident who is not yet ready to cover on her own.

Look, I know your job is difficult and I am sorry if I am making it harder. Youre a good man and I think you are doing a great job. The constraints and limitations here are overwhelming being short staffed with added responsibilities, requirements, assessments, rules and regulations every day making it all the harder. I just want it known that my position here is unique and requires intense attention to detail, versatility, efficiency and responsibility at levels not required for most others in this department. The disparity between my qualifications, experience and respect from clinicians and the way I am perceived in my own department is immense. The hyper-vigilance and micromanagement is often insulting and I no longer look forward to coming to work as a result of the 'corporatization of medicine. It is not a recipe for collegiality, open discourse or education.

The realities of covering the ER especially when other services have to be covered is not as simple as it is perceived from my perspective. It only seems that way because of my ability which I feel is taken for granted. We need to make some changes for this to be fair and reasonable. I am open to any ideas to help change this culture.

Sincerely

Oded

-----"Steven Pulitzer" <Steven.Pulitzer@nychhc.org> wrote: -----
To: "Oded Greenberg" <Oded.Greenberg@downstate.edu>
From: "Steven Pulitzer" <Steven.Pulitzer@nychhc.org>
Date: 09/30/2014 02:23PM
Subject: Re: Covering Body Imaging, Chest Imaging, ER

Hi Oded,

I understand your frustration. I thought you were not covering the ED this week while Patrick and Stephen were away. I apologize if there was a miscommunication. I will speak to ami and I will cover the ED Neuro this afternoon.

Sincerlely,

SUNYESI00000677

Steven

>>> Oded Greenberg <Oded.Greenberg@downstate.edu> 9/30/2014 1:33 PM >>>
Steve, I am currently in the ER and missing Grand Rounds. I am alone with a
rotating medical student while presumably everyone else in the department is
either out or at Grand Rounds. I think it is ridiculous to expect me to teach
residents, answer phones, protocol all ER and Body Imaging reports, attend the
Multidisciplinary Trauma conference, cover the Interdepartmental chest
conference tomorrow, prepare conferences every other week and be on call every
other weekend while covering the ER alone for several hours each day and read
all of the Chest and Body Imaging. Not to mention the multiple consultations
related to the ER and Body Imaging. No one else would be expected to do all of
this, I am simply more capable and am stuck with it. I am obligated to cover
the ER rather than sit in a reading room alone covering Chest and Body since no
one else sits down here when they are helping to read ER films. I am left to
answer all questions, consults and phone calls about ER radiology as well as
teach residents and medical students, all while covering two other services.
Jinel leaves at 2 pm and the ER radiology resident is gone from 12 to 1 and 4
to 5 every day. If I am to do this than I deserve the respect and salary that
goes with it. I get neither. It used to like working here now I hate it. I
used to be director of ER radiology and covered Chest, Body, Musculoskeletal,
Neuro and Peds before others were hired to help. I got paid appropriately to
do so. Now I am the second lowest paid radiologist in the department and still
have among the highest RVUs. We need to rethink this, distribute the work more
evenly and I should be compensated appropriately. If not I will have to
reconsider working here.

Sincerely,

Oded Greenberg MD

Visit www.nyc.gov/hhc

CONFIDENTIALITY NOTICE: The information in this E-Mail may be confidential and
may be legally privileged. It is intended solely for the addressee(s). If you
are not the intended recipient, any disclosure, copying, distribution or any
action taken or omitted to be taken in reliance on this e-mail, is prohibited
and may be unlawful. If you have received this E-Mail message in error, notify
the sender by reply E-Mail and delete the message.

SUNYESI00000678

**A284**

| | |
|---|---|
| **From:** | CN=Oded Greenberg/O=Downstate |
| **Sent:** | Wednesday, December 3, 2014 2:11 PM |
| **To:** | Gautam Agrawal <doctoragrawal@yahoo.com> |
| **Subject:** | Re: Followup |

---

Hi Gautam, I had the pleasure of speaking to Ray last night and got a good sense of what is involved. I understand that I would have to personally meet and take a test so I am working on taking a trip to San Francisco. I am certain I will be interested in joining your group, do you pay for airfare or is that my responsibility? Either way I am looking forward to meeting with Ray.

One clarification, when I spoke with Ray my son was in the car and I didnt want him to know about my current job status. As such I told Ray I was currently employed at Kings County Hospital. I am not currently employed there to be honest and I might have mentioned that to you. A new administration came in and fired half of the staff due to the hospitals poor financial state and secondary to the new chairpersons agenda. This included me, so I am no longer employed there. Sorry to mislead, but my son is very sensitive to this. Having said that, the new administrations policies have negatively affected morale and patient care in the name of corporatization. The policies obviously affected the way I practice medicine where patient care is paramount. This is largely why your philosophy appealed to me so much, its not VRC and not a metric sensitive corporate hospital treating physicians as cogs in the machine. Your philosophy clearly holds patient care and the proper practice of medicine in high regard.

I will try to get a flight out as soon as possible. Please forward this to Ray as I dont have his email address. He can let me know what dates work best. Can you also send me any info you have regarding the typical types of cases and modalities one sees in a given evening and how you value/weigh each type of study. I remember VRC had a complex formula for types of studies and reimbursement. This was confusing and frankly misleading. I am just trying to get an idea of what I am getting into in terms of time, productivity etc. It might also be useful when I meet with Ray to do a mock work hour so I can get a sense.

Sorry for going on, I know you are busy this time of year.

Thanks for the opportunity and looking forward to getting to know you guys as well as the clinicians you work with.

Oded

-----Gautam Agrawal <doctoragrawal@yahoo.com> wrote: -----
To: Oded Greenberg <Oded.Greenberg@downstate.edu>
From: Gautam Agrawal <doctoragrawal@yahoo.com>
Date: 12/01/2014 04:57PM
Subject: Re: Followup
No worries.

SUNYESI00001450

**A285**

I emailed ray, and he'll reach out to you either this week or next week hopefully. We both have a lot of time sensitive year end issues that we need to take care of for work/business, etc. This is always a mad rush period for us.

-g


From: Oded Greenberg <Oded.Greenberg@downstate.edu>
To: Gautam Agrawal <doctoragrawal@yahoo.com>
Sent: Monday, December 1, 2014 3:07 PM
Subject: Followup


Sorry for the misspell Gautam

-----Gautam Agrawal <doctoragrawal@yahoo.com> wrote: -----


To: Oded Greenberg <Oded.Greenberg@downstate.edu>
From: Gautam Agrawal <doctoragrawal@yahoo.com>
Date: 11/20/2014 03:10PM
Subject: Re: Can't find your emails for some reason
Hi Oded,

Thanks for your note. As we progress with this, we will reach out to Dr. Fradin and get few additional references.

-gautam


  From: Oded Greenberg <Oded.Greenberg@downstate.edu>
To: Gautam Agrawal <doctoragrawal@yahoo.com>
Sent: Thursday, November 20, 2014 9:10 AM
Subject: Re: Can't find your emails for some reason



Thanks Gautam, hopefully we can work together in the future. If Joel thinks highly of you you must be good people. Despite my 'red flag' questions, I assure you that your business principles resonate deeply with me given my recent experiences with VRC and recent changes in the practice/ corporatization of medicine and specifically Radiology. Those questions although not the priority are necessary given the realities of life and in the current environment with employers taking advantage of the paucity of jobs. I share your philosophy and cherish the beauty of our profession and especially agree about the importance and fun related to our interactions with clinicians. Feel free to reach out to Joel who has been a close friend for 30 years. I can also provide numerous excellent letters of reference as needed.

Thanks again

Oded

SUNYESI00001451

**A286**

-----Gautam Agrawal < doctoragrawal@yahoo.com> wrote: -----

=======================z


To: Oded Greenberg < Oded.Greenberg@downstate.edu>
From: Gautam Agrawal < doctoragrawal@yahoo.com>
Date: 11/20/2014 01:35AM
Subject: Re: Can't find your emails for some reason
======================= Thanks much. It was good talking to you. I've passed it on to Ray, our
director. Ray is still in the process of interviewing, and we're actively in
the process of hiring for summer 2015 (lead time due to licenses and
credentials). Let's keep communication channels open.
-g

From: Oded Greenberg < Oded.Greenberg@downstate.edu>
To: Gautam Agrawal < doctoragrawal@yahoo.com>
Sent: Wednesday, November 19, 2014 1:23 PM
Subject: Re: Can't find your emails for some reason

Here it is. Let me know if you have any questions. I can flesh it out for you
o

-----Gautam Agrawal < doctoragrawal@yahoo.com> wrote: -----

To: Oded Greenberg < Oded.Greenberg@downstate.edu>
From: Gautam Agrawal < doctoragrawal@yahoo.com>
Date: 11/17/2014 03:36PM
Subject: Re: Can't find your emails for some reason

do you by any chance have CV/cover letter?

-g

From: Oded Greenberg < Oded.Greenberg@downstate.edu>
To: Gautam Agrawal < doctoragrawal@yahoo.com>
Sent: Monday, November 17, 2014 9:06 AM
Subject: Re: Can't find your emails for some reason


That should be fine just give me a few extra minutes as I will be taking my son
in for a dental appointment at 4 pm


-----Gautam Agrawal < doctoragrawal@yahoo.com> wrote: -----

=======================

To: Oded Greenberg < Oded.Greenberg@downstate.edu>
From: Gautam Agrawal < doctoragrawal@yahoo.com>
Date: 11/15/2014 01:45PM
Subject: Re: Can't find your emails for some reason
======================= Let's plan tuesday 1 pm PST (4 pm ET). I will give you a call on your cell
phone.

SUNYESI00001452

**A287**

-gautam

From: Oded Greenberg < Oded.Greenberg@downstate.edu>
To: Gautam Agrawal < doctoragrawal@yahoo.com>
Sent: Saturday, November 15, 2014 9:46 AM
Subject: Re: Can't find your emails for some reason


Perfect, just give me a time that works for you. I am mostly free

**Redacted**


-----Gautam Agrawal < doctoragrawal@yahoo.com> wrote: -----

=======================

To: " oded.greenberg@downstate.edu" < oded.greenberg@downstate.edu>
From: Gautam Agrawal < doctoragrawal@yahoo.com>
Date: 11/15/2014 03:49AM
Cc: Joel Fradin < joelfradin@hotmail.com>
Subject: Re: Can't find your emails for some reason
====================== Sorry we've had such difficulty connecting. If you're interested, maybe we
can chat in the afternoons (after 3 or 4 pm ET, noon or 1 pm PST) sometime this
week? I have times on Tuesday and Wednesday if either would work for you?
-gautam

From: Oded < odedgreenberg@msn.com>
To: " doctoragrawal@yahoo.com" < doctoragrawal@yahoo.com>
Sent: Saturday, November 15, 2014 12:03 AM
Subject: Can't find your emails for some reason

You can try  oded.greenberg@downstate.edu

Sent from my iPad

SUNYESI00001453

Excerpted

# Report

Patient:
Date of birth:
Accession number:     **22067788KI**
Examinations:          **0**
Preliminary signature:
Final signature:      **Greenberg, Oded, Dr (843581)**

Report created 9/22/2014, 11:27 AM by Greenberg, Oded, Dr
Printed from Sectra IDS7 on 9/24/2014, 9:08 AM by James, Shana RAD TECH 7480

BEGINNING OF RESIDENT PRELIMINARY REPORT
NOT REVIEWED BY ATTENDING
PA and lateral views of the chest are reviewed.
History: screening cxr
Comparison: 7/2/09
Findings: No focal consolidation. Cardiomediastinal structures are
unchanged. The bony thorax demonstrates no acute abnormalities. There is no
evidence of pneumothorax or pleural effusion.
Impression:
No focal consolidation.
Stable cardiomegaly.
END OF RESIDENT PRELIMINARY REPORT

_____
Electronically signed by resident: Andrew Cortes MD
Date: 07/26/14
Time: 06:29

_____
Electronically signed by: Oded Greenberg MD
Date: 07/26/14
Time: 08:53
I, Oded Greenberg M.D., Board Certified Diagnostic attending Radiologist and
Board Certified Pathologist, have personally, painstakingly reviewed each and
every one of the provided images and reviewed the available clinical
information. The above report, based on my own extensive knowledge and skill as
well as meticulous observation and careful interpretation now represents the
final report.

_____
Electronically signed by: Oded Greenberg MD
Date: 09/22/14
Time: 11:27

1(1)

SUNY 000506

# Report

Patient:
Date of birth:
Accession number:     **22067788KI**
Examinations:         **0**
Preliminary signature:
Final signature:      **Greenberg, Oded, Dr (843581)**

Report created 9/22/2014, 11:27 AM by Greenberg, Oded, Dr
Printed from Sectra IDS7 on 9/24/2014, 9:08 AM by James, Shana RAD TECH 7480

BEGINNING OF RESIDENT PRELIMINARY REPORT
NOT REVIEWED BY ATTENDING
PA and lateral views of the chest are reviewed.
History: screening cxr
Comparison: 7/2/09
Findings: No focal consolidation. Cardiomediastinal structures are
unchanged. The bony thorax demonstrates no acute abnormalities. There is no
evidence of pneumothorax or pleural effusion.
Impression:
No focal consolidation.
Stable cardiomegaly.
END OF RESIDENT PRELIMINARY REPORT

_____

Electronically signed by resident: Andrew Cortes MD
Date: 07/26/14
Time: 06:29

_____

Electronically signed by: Oded Greenberg MD
Date: 07/26/14
Time: 08:53
I, Oded Greenberg M.D., Board Certified Diagnostic attending Radiologist and
Board Certified Pathologist, have personally, painstakingly reviewed each and
every one of the provided images and reviewed the available clinical
information. The above report, based on my own extensive knowledge and skill as
well as meticulous observation and careful interpretation now represents the
final report.

_____

Electronically signed by: Oded Greenberg MD
Date: 09/22/14
Time: 11:27

1(1)

**SUNY 000659**

**Steven Pulitzer**

---

| | |
|---|---|
| **From:** | Steven Pulitzer |
| **Sent:** | Friday, September 26, 2014 2:50 PM |
| **To:** | steven.pulitzer@nychhc.org |
| **Subject:** | Fw: Oded Greenberg |

Steven Pulitzer, M.D.
Division of Neuroradiology
SUNY Downstate Medical Center
Kings County Hospital
451 Clarkson Avenue
Brooklyn, NY 11203
(718) -245 -5075 (o)

----- Forwarded by Steven Pulitzer/Downstate on 09/26/2014 02:49PM -----
To: Michael Arabian/Downstate@Downstate
From: Steven Pulitzer/Downstate
Date: 09/26/2014 02:49PM
Cc: Deborah Reede/Downstate@DOWNSTATE, sade.jemmott@nychhc.org, jean.aime@nychhc.org
Subject: Oded Greenberg

HI Michael,

I spoke with Risk Management here at KCHC.  They will give a more formal list of charges on Monday. At the very least, this qualifies as insubordination.

They also suggested I look into a Medical Board Hearing.

Will follow up on Monday.

Sincerely,

Steven Pulitzer, MD

Steven Pulitzer, M.D.
Interim Chief of Service, Department of Radiology
Kings County Hospital
451 Clarkson Avenue
Brooklyn, NY 11203
(718) -245 -5075 (o)

----- Michael Arabian/Downstate wrote: -----
To: Steven Pulitzer/Downstate@Downstate
From: Michael Arabian/Downstate
Date: 09/16/2014 12:33PM
Subject: Re: Owrk hours for attending physician at KCHC policy

HHC_ESI_001344

Dr. Pulitzer,

I have forwarded e-mail to my supervisors to review and provide any feedback.

I will keep you updated.

Thank You
Michael Arabian
Senior Personnel Associate, Labor Relations
718-270-3024

    Steven Pulitzer--- 09/15/2014 05:07:17 PM--- Hi Mr. Arabian,   I have drafted a policy on
work hours for inidividual attendings and would like to

From: Steven Pulitzer/Downstate
To: Michael Arabian/Downstate@Downstate, steven.pulitzer@nychhc.org,
Cc: Deborah Reede/Downstate@DOWNSTATE, sade.jemmott@nychhc.org,
jean.aime@nychhc.org, Linda McMurren/Downstate@Downstate
Date: 09/15/2014 05:07 PM
Subject: Owrk hours for attending physician at KCHC policy

Hi Mr. Arabian,

I have drafted a policy on work hours for inidividual attendings and would like to you to review it
to make sure it is in compliance with SUNY Downstate rules and regulations.  If you could let me
know If or how it needs to be revised, I will make the necessary changes.

Thank you for your assistance with this matter.

Sincerely,

Steven Pulitzer, M.D.
Division of Neuroradiology
SUNY Downstate Medical Center
Kings County Hospital
451 Clarkson Avenue
Brooklyn, NY 11203
(718) -245-5075 (o)

*(See attached file: Work hours policy KCHC.docx)*

[attachment "Work hours policy KCHC.docx" removed by Steven Pulitzer/Downstate]

HHC_ESI_001345

**A293**

| | |
|---|---|
| **From:** | CN=Oded Greenberg/O=Downstate |
| **Sent:** | Monday, September 22, 2014 11:38 AM |
| **To:** | CN=Steven Pulitzer/O=Downstate@Downstate |
| **Cc:** | CN=Qi Chen/O=Downstate@Downstate; CN=Jinel Scott/O=Downstate@DOWNSTATE |
| **Subject:** | |

---

Hi Steve, I have to attend to some family matters between 9am and 11am Tuesday and Wednesday. I will come in earlier and/or stay later to compensate. Let me know if this will work.

Thanks

Oded

SUNYESI00000669

| From: | CN=Oded Greenberg/O=Downstate |
|-------|-------------------------------|
| Sent: | Tuesday, September 23, 2014 8:10 AM |
| To: | CN=Steven Pulitzer/O=Downstate@Downstate |
| Cc: | CN=Deborah Reede/O=Downstate@DOWNSTATE |
| Subject: | Re: 12 to 8 |

Thanks Steve, sorry for the short notice on the request for time off, its just that both of these circumstances were last moment requirements. The first was about the Board of Ed requesting a meeting concerning my sons education funding. The Board of Ed gave us no lead time, having received the letter on Monday. If we dont attend we can lose funding for his education totaling 200K over four years education. The second involves a closing on a much needed Home Equity Loan which was just scheduled. Please accept my apologies for the short notice. I have come in early today and will tomorrow as well and will make up for any lost time.

Thanks again

Oded

-----Steven Pulitzer/Downstate wrote: -----
To: Oded Greenberg/Downstate@Downstate
From: Steven Pulitzer/Downstate
Date: 09/22/2014 05:31PM
Subject: Re: 12 to 8

HI Oded, Yes it is still possible to claim a constant day. The only issue is that the friday slot it mostly going to be filled by the person on call on Saturday so that we can just loose one weekend.

I will schedule you for Monday's otherwise.

It is ok about your request for time off in the mornings this week. My apologies for the delay in getting back to you.

Sincerely,

Steven

Steven Pulitzer, M.D.

Division of Neuroradiology

SUNY Downstate Medical Center

Kings County Hospital

451 Clarkson Avenue

Brooklyn, NY 11203
(718)-245-5075 (o)

Confidential                                                                                   SUNYESI00000670

**A295**

-----Oded Greenberg/Downstate wrote: -----
To: Steven Pulitzer/Downstate@Downstate
From: Oded Greenberg/Downstate
Date: 09/22/2014 01:38PM
Subject: 12 to 8

Hi Steve, is it still possible to claim a constant day for 12 to 8? How about
Monday?

Confidential

SUNYESI00000671

**A296**

Case 1:15-cv-02343-PKC-VMS Document 87-42 Filed 09/14/18 Page 2 of 2 PageID #: 1758

| | |
|---|---|
| **From:** | CN=Oded Greenberg/O=Downstate |
| **Sent:** | Tuesday, September 23, 2014 5:46 PM |
| **To:** | CN=Steven Pulitzer/O=Downstate@Downstate |
| **Subject:** | Did you approve day off Thurs? |

---

Hi Steve, just following up, left a form for day off this Thursday, Rosh Hashanah. Approved?

SUNYESI00000672

**A297**

Page 1 of 30

**STATEMENT OF ODED GREENBERG**

**Taken on October 10, 2014**

**Present:  Stephanie Bernadel – Personnel Associate, Office of Labor Relations (SB)**
**Oded Greenberg – Clinical Assistant Professor of Radiology (OG)**
**Michelle Gilmore-Greenberg – Wife of Oded Greenberg (MG)**

SB:   Alright.  Good morning.  Today is Friday October 10th, right, 2014.  My name is Stephanie Bernadel.  I'm a personal associate here with the Office of labor relations.  The time is approximately 11:30 and we're here for the interrogation of Dr. Oded Greenberg.  If everyone in the room could please state their name by name and title.

OG:   I'm Oded Greenberg, Dr. Oded Greenberg.

MG:   My name is Michelle Gilmore-Greenberg.  I'm here as Oded's wife.

OG:   Okay.  And I have to ask you, you don't have any problems with your wife sitting in on this proceeding?

OG:   Absolutely not.

SB:   Okay.  Alright.  So Dr. Greenberg is representing himself.  So we're gonna have him read a copy of his rights under the UUP agreement.  Right now, the time is approximately 11:32.  We're going off the record.

OFF THE RECORD

SB:   Alright.  We're back on the record.  The time now is approximately 11:45AM.  We are—we've gone back on the record because Dr. Greenberg has read his rights under the UUP agreement.  Do you understand your rights?

OG:   I do.

SB:   Okay.  Have you ever been interrogated before?

**SUNY 001315**

**A298**

Page 2 of 30

OG:   I have.

SB:   Okay.  So let me just reiterate for your wife; an interrogation is where there have been some allegations against you.  This is your opportunity to respond to those allegations in a question-answer format.  I'll be asking questions and telling you what you're here for and you'll be giving responses.

OG:   Mm-hm.

SB:   It's being tape recorded for accuracy, so at the end of this interrogation or at some point in the future you can always request a copy of the tape and we will give it to you gladly.  You are required to tell the truth to the best of your ability and lying could lead to the issuance of a notice of discipline for failure to cooperate with an administrative investigation.  So, for example, if I ask you what color is your shirt?  You say red, that's not the truth, obviously, 'cause your shirt is not red.  And you can be brought up on further charges.  And, just for the record, again, Dr. Greenberg is representing himself.  He was offered the opportunity for union representation on Wednesday when he came in.  He declined union representation.  He stated he wanted to get an attorney and was given, actually, almost two days, to find an attorney, but could not procure one, correct?

OG:   In the time constraints provided.

SB:   Yes, yes.  And I—as I informed Dr. Greenberg, as per Article, what was it, 19.8, of the contract, if you don't—if you're not able to procure a representative within six hours from the date of notification, you can—we can go forward with the interrogation, which is what's going on right now.  Okay.  So if you could, for the record, please state your name and title again.

OG:   My name is Dr. Oded Greenberg.

SB:   Okay.

**A299**

Page 3 of 30

OG:  I am a clinical assistant professor of radiology.

SB:  How long have you been employed by Downstate?

OG:  I graduated medical school here 30 years ago.  I have been employed as a resident and as an attending for 25 years.

SB:  Wow.  Okay.  What are your normal hours of work?

OG:  My normal hours of work are 9-5 and, occasionally, 12-8 during the week.

SB:  Mm-hm.

OG:  And every other weekend on call.

SB:  Okay.  And who is your immediate supervisor?

OG:  My immediate supervisor at Kings County is Steven Pulitzer, Dr. Steven Pulitzer.

SB:  Okay.

OG:  He's the acting director.

SB:  And what—basically and briefly, what are your duties and responsibilities?

OG:  My duties and responsibilities are to provide the very best medical care to the patients that I am provided imaging of.

SB:  Mm-hm.

OG:  To interpret to the best of my ability, to follow up on patient care, to make sure the appropriate things are done for the patients—

SB:  Mm-hm.

OG:  —and to teach residents and medicals students and other staff.

SB:  Okay.  So you mentioned before that you were here for a previous interrogation with my colleague.

OG:  I was.  Can I say something for the record?

SB:  Sure, sure, sure.

OG:  I—I feel that this meeting is insulting to my reputation and my—and my

character.

SB:    Why so?

OG:    Why so?  Because the findings, the—

MG:    Allegations.

OG:    The allegations are completely false.

SB:    Well, you don't know what they are yet.

OG:    Well, I have an idea.  I've spoken to the union rep the other day.

SB:    Okay.  Alright.  So you mentioned that you were here before.  I—your statement is noted.

OG:    Okay.

SB:    You mentioned that you were here before and you have an existing settlement, which was fined on September 8, 2014.

OG:    Correct.  Under duress and I'm not an attorney; I simply wanted to get back to work to treat my patients.

SB:    Well, it says here at the bottom that you voluntarily waived your right to legal or union representation.

OG:    That's true.

SB:    And that you represented yourself.

OG:    That's true.

SB:    Were you given the opportunity to represent yourself?

OG:    I was given the opportunity to have representation.  I declined it because I felt I had done nothing wrong.

SB:    So that was your decision to decline representation at the time?

OG:    That was my representation to decline because I had done nothing wrong and I didn't feel that signing a statement that is telling me not to do anything wrong

**A301**

Page 5 of 30

meant anything.

SB: Okay.  But you did have the opportunity to get representation and you declined.

OG: Yes, and I thought it was informal.

SB: Okay.  So this rep—this document here, again, is dated September 8, 2014.  Is this your signature?

OG: Yes, it is.

SB: So it states as follows.  "In lieu of Dr. Oded Greenberg, Clinical Associate Professor, being served a notice of discipline for unscheduled absences, tardiness, interfering with the operations of the department, insubordination and misrepresenting hours worked on timesheets as a result of" abstinence— abstinence.  "Absences and tardiness", sorry, "switching schedules without authorization of a supervisor, all parties agree that Dr. Greenberg shall have a fine ranging from letter of reprimand to termination from state service held in abeyance for one year from the signing of this agreement.  Dr. Greenberg understands that his current work schedule is from 9AM to 5PM, Monday through Friday.  Dr. Greenberg"—

OG: Which I've adhered to.

SB: "Dr. Greenberg understands that he was expected to" re—"to work", I'm sorry, "those scheduled hours.  Dr. Greenberg understands that he must accurately list the hours that he works.  Dr. Greenberg understands that his days off/vacation/changes to his vacation need to be approved by his supervisor.  Dr. Greenberg shall be placed on time and attendance watch.  Dr. Greenberg will be required to submit verifiable documentation for each unscheduled absence, including non-medical absences.  Each unscheduled absence/lateness due to personal or family illness, injury, et cetera, must be accompanied by a doctor's

**A302**

Page 6 of 30

note signed by a qualified health," where am I, "healthcare professional that specifies the date seen by the doctor, medical facts supporting the leave and expected date of return.  In each case documentation is due on the date of return to duty and must be submitted directly to Dr. Greenberg's supervisor or the appointed designee.  Medical" documentation—"certification", sorry,  "which you wish to keep confidential may be submitted to Stephanie Bernadel, Personnel Associate, Labor Relations, located at 420 Lenox Road , Brooklyn, New York," and it lists our address.  The provisionary period referred to in Paragraph 1 shall be extended for every day taken by Dr. Greenberg during that period, whether scheduled or unscheduled.  Should Dr. Greenberg engage in any misconduct, the same or similar to that described above, as determined of the director of labor relations or her designee, the penalty will be imposed.  The director of labor relations' or her designee's decision to implement this penalty cannot be appealed in a legal or administrative form by Dr. Greenberg, UUP or anyone on"—it should say his "behalf.  Effective immediately, Dr. Greenberg agrees to adhere to all departmental policies and procedures."  And then the last paragraph is boilerplate, basically advising you of what this settlement represents.  And at the—the very last statement says, "Dr. Greenberg voluntarily waived his right to legal or union representation.  Dr. Greenberg represented himself in the matter."

OG:   I have to say that I do not agree with many of the terms in the agreement.

SB:   So why did you sign it?

OG:   I signed it because I wanted to get back to work, taking care of patients and because I felt that I had done nothing wrong.

SB:   Mm-hm.  But you didn't have to sign it.

OG:   I also presented documentation in accordance with Paragraph 3 in the document.

SUNY 001320

**A303**

Page 7 of 30

SB:   Okay.

OG:   Settlement for my back injury.

SB:   But, again, going back to why you signed it; you didn't have to sign it.

OG:   I didn't realize that I didn't have to sign it.

SB:   You didn't realize.

OG:   I wasn't told that. I was—it—it was implied to me that if I didn't sign it, I couldn't go back to work.

SB:   I don't know who implied that to you or how—what the—

OG:   That's the way it was presented to me.

SB:   —statement was. Was—but I, again, you were afforded union representation twice now. You declined it. The union is aware of every and all things related to the contract. So, again, you—you keep declining the union representation, I don't know why. You think that you can—

OG:   I declined the union representation last time.

SB:   Mm-hm.

OG:   However, this time, I declined because I was going to bring my own counsel. And due to the short notice I wasn't able to bring somebody today to represent me.

SB:   Okay. Alright. So let me go through the—

OG:   You can't get an attorney—a top attorney to come in six hours.

MG:   I think it's worth noting that Dr. Greenberg is not an attorney. There're some—there's definite legal language in here that's not reasonably interpreted by a non-practicing attorney. I think that should be duly noted.

SB:   Well, as per the union contract, you can—you can either A, get the union to represent you; B, get a representative—an attorney to represent you; or C,

**SUNY 001321**

represent yourself.  Twice now he's represented himself.  I mean, he—the first time around you declined it.  And then the second time we gave you ample opportunity, again, and you still don't have anyone.

OG:  I don't have anyone because I was expecting to find somebody to represent me, but in the six hours or the two days that you gave me it wasn't possible—

SB:  Well, I gave you even longer than six hours.

MG:  It's just not reasonable—

OG:  It's not reasonable.

MG:  —to get an attorney in New York City on two-days notice to come to this—

SB:  Which is why the union is available, but you declined them.

MG:  We—

OG:  I don't trust the union, number one.  Number two, they have not done me good service in the time I've been here.  They simply take my money and they don't do anything.

SB:  I think they probably would have done better than this.

OG:  They are not responsible.  Well, they might have, but I didn't know that.

SB:  Well, the fact of the matter remains now that you have this hanging over your head, basically.  That you signed and you claim it was under duress, but it—I mean, it—

OG:  Well, it was under duress.

SB:  I—

MG:  I think that an impartial party or judge, if you will, would find that anybody reading this and agreeing to the settlement, I don't think that they would—I don't think that they would say that this is fairly written.  It's not a fairly written document.

**SUNY 001322**

**A305**

Page 9 of 30

SB:   It's very—I mean, all of our settlements are written this way.

MG:   I agree.  I—what I'm saying is—

OG:   Yeah.  And it's only fair to Downstate.  It's not fair to me.

MG:   What I'm saying is it—the terms of this settlement are—show disportionally (sic) weighed in favor of the hospital that it's pretty injurious for Oded to have signed this document.  Essentially, it's a matter of time until he violates this document.

SB:   Not necessarily.  He just has to adhere to the terms, which are not—

OG:   And I did.

SB:   Which are not extraordinary.  You come to work on time regularly.  Don't leave work unless you have permission.

OG:   I did all those things.  I did all those things.  Everything, I'll prove that to you.

SB:   Okay.  Alright.  So let me get this—

MG:   The scopes are—I just wanna—the scopes are very broad.  Interfering with operation of the department, insubordination, misrepresenting hours on timesheets, those are very generally written and they can be broadly interpreted.  It's—

OG:   It's a very flawed document.

MG:   On its face it's very, very suspicious.  This is not a very evenly keeled document.  If—if Oded was represented by counsel, no one would advise him to sign this agreement.  That—that should be noted.  Moving on.

OG:   Okay.

SB:   Okay.  Your objection's are noted.  Okay.  So I'm going to read a referral that we received on September 24th.  This document was sent to Labor Relations by Dr. Pulitzer.  Alright.  It reads as follows.  "Regarding Oded Greenberg, MD, to whom it may concern.  I would like to report two incidents involving Oded

SUNY 001323

**A306**

Page 10 of 30

Greenberg, MD.  They are as follows.  Incident 1, Dr. Greenberg was approved to have a shift on his schedule on September 23rd 2014.  He asked to come in early and leave for two hours in the morning.  I approved his leave of absence.  From talk station data, speech recognition software, in which our reports are generated, his first report was generated at 7:21AM, his next report was at 12:20."  Were you at work on September—

OG:  Yes, I was.

SB:  —23rd?

OG:  I absolutely was.

SB:  Okay.  Did you request to come in late?

OG:  I didn't request to come in late.  I told him I would come in early so—

SB:  Okay.

OG:  —that I can help the department.

SB:  You came in early?

OG:  Yes.  My regular hours are 9-5, as I stated earlier.

SB:  And after you came in early, what time did you leave?

OG:  I left at 8AM.

SB:  The next day?

OG:  No, the same day.

SB:  8AM the same day.

OG:  Yes.  I came in, worked for an hour and left at 8AM to attend a meeting that he had agreed that I could do.

SB:  Which was?

OG:  Going to the Board of Ed. to deal with my son's education.

SB:  And then you—what time did you come back?

SUNY 001324

**A307**

Page 11 of 30

OG:   I came back around 11:30 or so.  And I—I spoke to the clinical staff in the ER for about a half-hour.  I have to say that the records on the computer are not indicative of times I am actually there.  It's indicative of the time when I sign off a report.  I do a lot of other things that don't require me to use the computer and prove—I don't have a card to punch or anything like that.

SB:   Mm-hm.

OG:   So if I am performing my clinical responsibilities by speaking to clinicians and finding out about patients or teaching residents or doing a consult, that time isn't registered on the PAC system or on the talk station.

SB:   Okay.  But going back to that day—

OG:   Mm-hm.

SB:   You're saying you came in early.

OG:   Yes.  Worked an hour, left from—at 8 o'clock and returned around 11:15-11:30.  I don't remember the exact time.  I didn't then dictate another case until whatever time they say it was.

SB:   Mm-hm.  And then after that?

OG:   And then after that what?

SB:   What did you do with the remainder of your day?

OG:   I worked.

SB:   You didn't leave at all?

OG:   I left for lunch.

SB:   And that's it?

OG:   That's it.

SB:   Okay.  So it says here "at approximately 2PM on Wednesday September 23rd, I received a phone call from Dr. Greenberg requesting to leave the hospital for two

**SUNY 001325**

Page 12 of 30

hours to attend to a personal business.  He asked me to cover him on his tour of duty in the emergency radiology section.  I told Dr. Greenberg that I denied his request and that I personally could not cover him during the requested hours.  Dr. Greenberg asked another physician in our department, Dr. Amiram Samin, to cover him in his absence.  Dr. Samin agreed to cover the non-neuro radiology cases.   Dr. Samin is not qualified to cover the emergency department independently, as he does not read neuroradiology"—neuroradiology.

OG:   Dr. Steven Pulitzer is a neuroradiologist whose responsibility it is to read the neuroradiology cases.

SB:   Mm-hm.  "According to talk station data, there is a gap of approximately two hours, from 2:43PM-"2:50—"to 4:52PM", sorry.  "Dr. Greenberg left the building during this time period."

OG:   Yes.  I went to—I went to have lunch for an hour.  I had a conversation with my wife at the time about the events of the day.  I came back about an hour later.  I again went to the clinical staff in the ER, who I am friendly with and who respect me.  I discussed several patients' cases from earlier in the day.  I then went to my workstation—I then went to my workstation and started reading again.  I called Dr. Samin, he said there was—there were no issues whatsoever and that others had covered all the other stuff that he wasn't able to cover.

SB:   Did you request from Dr. Pulitzer to leave the hospital for two hours?

OG:   I requested—

SB:   To attend to—for personal business.

OG:   I did, but when I was denied I just went and had lunch.  That's what happened.

SB:   So you—you didn't—you're just saying—

OG:   I didn't even leave the hospital.  I—I—I actually left Kings County to go to

**SUNY 001326**

**A309**

Page 13 of 30

Downstate, where I usually eat.

SB: Mm-hm. So then, why would you ask Dr. Samin to cover for you if you weren't—if you were—if you were—

OG: Because—because I am alone in the ER with a resident, alone, somebody who I am training. And whenever I leave, somebody has to cover the ER in case something comes up. The resident can also call me on my cell or page me, but the more immediate response would be somebody who is actually there. I am entitled to leave for lunch.

SB: Mm-hm.

OG: And the reason that I'm there alone is because of Dr. Reede's policies and who she hired to work from 12—from 6-2PM. That person leaves at 2 o'clock, leaving me alone in the ER with only a resident. So if I have to go to meeting, which I can't do, I have to—I have to get somebody to cover the emergency room for me.

SB: So you're maintaining that you did not leave the premises at all for those two hours?

OG: I didn't leave the premises. I walked across the street to Downstate and then I had lunch.

SB: For an hour and then you came back.

OG: For an hour.

MG: I spoke to him during that time about the meeting. I—actually—actually, there's records at the Department of Education. Later on in the day, I went to that meeting alone. He was—I was hoping that he could come. We went to 125th Street to the Department of Ed., uptown, earlier in the day. They transferred our case to Brooklyn. He called and I don't know what happened. He called and asked for permission or whatever happened. I went to that case alone. I spoke to

**SUNY 001327**

him in the afternoon. He was never at the afternoon appointment. I was there by myself and that's—that doesn't happen. Like, it is really bad for, you know, one parent to go to the Department of Ed. by yourself.

OG: These are emergent meetings. This is not something that I planned for that day.

MG: The child has special needs and we're fighting the Department of Education, but I went by myself; wasn't there, in Brooklyn.

OG: I wanted to go—

MG: That's all.

OG: —and that's why I asked—that's why I asked for the time off. He refused to give it to me. So I then went to lunch and talked to her on the phone.

MG: And he has bad cell phone reception inside the—the hospital, so I needed him to, like, be available and talk to me while this was going on. I don't know where he was, I was not here, but he wasn't at the meeting. I was there. It's evidence that—actually, I might even have a notice of that meeting and who was there 'cause we—I signed in, but he wasn't.

SB: Okay. So that's the first incident. There's a second incident. It states as follows. "Dr. Greenberg added the following addendum to approximately 50 reports." Okay. So before I get into that, so one—the second issue that your department is complaining about—that's before Dr. Pulitzer actually, regarding what precipitated this. Dr. Pulitzer—were you present at a weekly huddle on September 22nd?

OG: Yes. Usually we have a meeting on Monday.

SB: Okay. So it says here that there—as per Dr. Pulitzer, they received a number of Medicare reports stating that the reports weren't done correctly and they didn't have attestations. Do you remember this meeting?

Case 19-3570, Document 42, 02/11/2020, 2775386, Page67 of 220

**A311**

Page 15 of 30

OG:   Yes.

SB:   What was your—what was discussed at this meeting?

OG:   That we had to add attestations to the end of our reports.  Instead of me reading a resident's report and simply signing my name after I read it and corrected it and duly noting any changes and calling the appropriate people, we used to just sign the report and that was it.  Now, there is a Medicare and insurance hoop to jump through to write an attestation, which further—I don't know the purpose of it.  I have no idea why—

SB:   It wasn't explained to you at the meeting?

OG:   No.  It's just a requirement for Medicare, that's all it is.

SB:   Mm-hm.

OG:   It's a requirement to get reimbursed.  It's just another hoop that they want us to jump through.  That's all it is.

SB:   So they did explain the purpose behind it.

OG:   They did.

SB:   Which is the reimbursement from Medicare.

OG:    Yup.

SB:   Which is important, correct?

OG:   Sure.

SB:   From the hospital's perspective.

OG:   Yep.  Mm-hm.

SB:   Also probably form yours as a doctor who gets paid—

OG:   Mm-hm.

SB:   —I would think that that's important.

OG:   Right.  So they add—so they gave us some—I disagreed with the policy and I

SUNY 001329

**A312**

Page 16 of 30

thought it was ridiculous.  However, they gave us some templates—possible templates for attestations.  They did not tell us specifically how to write it.  We could personalize it, I assumed—

SB:   Mm-hm.

OG:   —and so I did.

SB:   So they told—they just gave you these templates as samples?

OG:   As a sample of what needed to go into the attestation and all of that is in my attestation.  All the—all the requirements they set forth are in there.

SB:   Okay.  Dr. Pulitzer explained to us that during the meeting you were complaining about doing the attestations.  And he informed you that everyone had to do it for reimbursement purposes.  Is that not correct?

OG:   Yeah.

SB:   Okay.

OG:   But this is a new policy.

SB:   Okay.  So now, he—in his complaint—

OG:   I'm frustrated because I'm being treated differently from others in the department.

SB:   Mm-hm.

OG:   Nobody else has to go through this.  Nobody else has—you know, has somebody looking at everything they do.  Nobody else has, you know, gone to lunch and had—you know, had been called to the carpet for it.  Why is this going on with me?

SB:   Well, to go back to that first issue, it's coincidental that you asked for two hours off to attend to personal business—

OG:   Mm-hm.

SB:   —and then you disappeared during that same two-hour period.

**SUNY 001330**

**A313**

Page 17 of 30

OG:   What do you mean I disappeared during that same two—

SB:   They didn't know where you were.

OG:   What do you mean?

SB:   Just what I said.

OG:   Which two hour—I asked for two hours off.  I took those hours in the morning.  I came back to work—

SB:   No, no, no.   He—I'm referring to the two hours in the afternoon that you requested.

MG:   He went to lunch.

OG:   I went to lunch.

SB:   That's what you say you did, but I'm just saying—

OG:   That's what I say—that's what I say I did?  That's what happened.

SB:   I'm just—I'm just—I wasn't there.  I wasn't there.  I'm just saying that's what you—that's your statement, but the department's statement—

OG:   Okay.  So I find this insulting that I'm being questioned.  I'm a professional and I've done my job quite well for many years.  I usually don't take lunch that long.  I usually only take—

SB:   No one is saying you don't do your job.

OG:   What's that?

MG:   You don't take lunch.

SB:   No one is saying you don't do your job and—

OG:   Yes, they are.

SB:   —I'm just saying what was reported to us was that you asked for a specific period of time off.

OG:   Mm-hm.

**SUNY 001331**

# A314

Page 18 of 30

SB:   During that specific period of time, they didn't know where you were.  There's no record of what you were doing.  You're saying that you went to lunch and that afterwards that you—

OG:   I don't tell people what I'm doing when I go to lunch.

SB:   Again, I'm not making a judgment.  I'm just saying—

OG:   I simply have them cover me.

SB:   Okay.  Well, I'm just saying this is what the referral is and that's what your—basically, your alibi is, for the—that period of time.

OG:   Fine.

SB:   That's all I'm saying.

OG:   Mm-hm.

MG:   She's just reporting the information.

OG:   I got it.  I got it.  It's not personal.

MG:   She's not—she's not angry with you.

OG:   It's just frustrating for me.

SB:   Yeah.  Yeah.

MG:   This has just—this has been a lot for our family.  The last time he was called in here for the interrogation, he—I don't remember the events that happened before the weekend, but I believe it was about getting time off.  We had some medical issues with my son we had to attend to.  And Oded's back locked up; incapable of walking, incapable of moving.

OG:   Almost two days I took off.

MG:   There's no coincidence—there's no coincidence that that happened, like—

OG:   We're under a lot of stress.

MG:   There's physical, you know, happenings to his body.  It's not—he didn't play

basketball or do anything out of the sorts.  It was completely stress related.  I know that in my heart.  You know, my husband couldn't—he couldn't drive, he couldn't move, you can't sneeze, you can't lift your arm.  That's—that's a lot for—for a man who has dedicated his life to this institution.  I don't think you'd get—and I know his work and his profession, you know, his work—and his work ethic isn't in question here, but I do think that it should be noted that, you know, this scrutiny is really taking a toll on his physical person, his emotional state.  You know, that's why I told him to not be angry with you so much, but it's a lot.  I—

OG:  By the way—

MG:  Mm-hm.

OG:  —before I took those two days off I spoke to Steve Pulitzer on that Wednesday evening.  This is before I hurt my back the next day.

SB:  You're talking about the last incident.

OG:  The last incidents.  I spoke to him; I said I have to take leave.  I have to take these two days off for my son's health.  He knows very well about my son's condition.  He has a child with special needs.  We've discussed it personally on many occasions.  So he completely understands what was going on.  This—the department was short staffed, partly because Dr. Reede fired so many people and he refused to let me take leave.  I said—

SB:  Well, for operational needs perhaps.  I mean, I was—I don't know the circumstances, but—

OG:  Well, I—in this instance I have to choose my family.  I don't think I have a choice.

SB:  Well—

OG:  Under the Family Leave Act, I'm entitled to take that time off.

SB:   Have you applied for the FMLA?

OG:   What do you mean have I applied for FMLA?

SB:   You have to apply for FMLA in order to have it.

OG:   Apply for it?

SB:   Correct.

OG:   What does that mean?

SB:   There are forms and every—as a matter of a fact, it's administered through this office.  There are forms you have to fill out; the doctor has to fill out.  There are—

OG:   I wasn't aware of that and nobody made me aware of it.  I specifically asked for time of in an emergent basis, on short notice.

SB:   Mm-hm.

OG:   So I didn't, you know—I know that I—

MG:   Even without the application, the denial of it for emergency reasons is a bit unreasonable.  Even without the application.

SB:   In the past, have they granted you time off for emergent situations relating to your son?

MG:   Over the years, sure.

OG:   Yeah, over the years.  Yeah.

SB:   Well, if one or two times they could not, I don't think it was personal.  I think that, perhaps, operationally they just couldn't do it.

OG:   Well, that's because I'm such an important cog in the wheel of the department—

SB:   So then, you understand that it's not personal.  That it's—operationally, they could not do it.

OG:   Well, that's—that's—that's fine, but I have a responsibility to my family first.

SB:   I understand and that's your decision.  I'm just saying, it's—you're making it

**SUNY 001334**

Page 21 of 30

sound like it's a personal—like, that they're attacking you—

OG:   Well, I feel that it's personal because other people aren't treated this way.

SB:   Well, I can personally tell you you're not the only one in your department that is here for disciplinary reasons.  You know, whenever a new administrator takes over and tries to enforce policies that were previously lax, there are generally gonna be push-backs—

OG:   No.  I feel that this is a deliberate attempt.  I don't think that other people are treated the way I am, under the same kind of scrutiny.

SB:   I beg to differ.

OG:   And, I feel like, perhaps, it's related to my Jewish heritage.  I—I've seen five of my colleagues who are Jewish get fired.  And none of them were replaced.  No Jews were brought back in, only African-Americans.  Our—our—our chairperson is African-American.

SB:   Well, we do have an affirmative—Office of Diversity and if you feel that there is some sort of complaint of disparate treatment, you are free to file a complaint there.

OG:   Oh, I'll see what I can do.

SB:   But I don't hand that—handle that here.

MG:   Do you wanna—

SB:   Let me go forward with this referral.  "So Dr. Greenberg added"—I'm reading again from Dr. Pulitzer's referral from Dr. Greenberg.  "Dr. Greenberg added the following addendum to approximately 50 reports.  This is not a standard attestation.  Our department has three attestations which were approved by risk management and all the staff were instructed on how to use them at numerous staff meetings beginning July 2014 and a presentation from FICare (phonetic) on

**A318**

Page 22 of 30

September 15, 2014 in our radiology department conference room.  I instructed Dr. Greenberg to use these three attestations at a staff meeting on September 22nd 2014.  As a final note, it was reported to me verbally by my administrative staff that Dr. Greenberg asked our IT department to erase his attestation from the report.  The request was denied."  So—

OG:  I didn't ask.  That's not true.

SB:  Mm-hm.

OG:  That's absolutely not true

SB:  Did you speak to IT at all?

OG:  Did I speak to IT?

SB:  Regarding the attestation or—

OG:  I asked them about the attestations and I asked them about the reports—they gave me 50 reports to add attestations to.  I didn't ask them to erase them.

SB:  What did you ask them?

OG:  I asked them about—oh, I didn't know it had to be verbatim according to their— according to what Dr. Pulitzer spoke of, the three types of attestations.  I didn't realize it had to be verbatim.  That wasn't made clear to me.

SB:  So what did you ask IT for?

OG:  What did I ask IT for?  I asked them to look into how many attestations I had and how many I was required to fill out.

SB:  That's it?

OG:  Yeah.

SB:  And you didn't say anything about erasing or changing the attestations.

OG:  No, I didn't.

MG:  Are you sure?  I would just say—

SUNY 001336

Case 19-3570, Document 42, 02/11/2020, 2775386, Page75 of 220

**A319**

Case 1:15-cv-02343-PKC-VMS   Document 87-43   Filed 09/14/18   Page 24 of 31 PageID #: 1782

OG:     What's that?

MG:     (Inaudible) not true.  Are you sure?  Are you?  Did you ask them?

OG:     I asked them about the attestations.  I don't remember exactly what I said to them. I didn't ask to erase them.  I said—'cause I found out that somebody had some issue with the attestations I had and I asked if they could be modified, if there was a—if there was a way to modify them into the type of attestation that was required.

SB:     Why did you ask IT and not Dr. Pulitzer?

OG:     Because IT knows how to do those sort of things.  They know how to—

SB:     To modify the—but the actual language; was it explained to you that these attestations were approved by risk management, that they, you know—

OG:     I don't recall those exact words.  I don't recall.  I recall seeing the type of stuff that needed to be in the attestation and I included it in the attestation that I wrote.

SB:     Do you think that IT would have the—I mean, their function is technical, correct?

OG:     Right.

SB:     Do you think that they would have the authority to approve the wording of an attestation?

OG:     That wasn't what I asked for.

SB:     Okay.

OG:     And I didn't know it had to be verbatim according to Dr. Pulitzer.  And as soon as I was told it was an issue I—you know, I thought—I changed my attestation to the required one.  I didn't know that I had to write a specific attestation.

SB:     So this—there is a specific—there are apparently three or four approved attestations and I'm gonna to read the wording from each one.  I—from what I understand, a patient is seen, a resident—a residence (sic) reviews it, whatever,

**SUNY 001337**

Page 24 of 30

writes something.  You as the attending will have to check, I guess, the work and then attest that you checked that person's work.

OG:   I don't see why signing the document isn't attesting to me checking his work.

SB:   Okay.  But that's what's supposed to happen.

OG:   But, yes, I understand.  I get it.

SB:   So this is one of the attestations.  It says, "I, MD, have personally reviewed the images and concur with the preliminary report and the interpretation as stated and signed by the resident.  The report now presents the final report for this patient."

OG:   I think that information was in my attestation.

SB:   There, there's another one that says minor addendum.  "I, MD, have personally reviewed the images and interpretation as stated and signed by the resident and I wish to add to the preliminary report in" following—"in the following manner.  This now represents the final report for this patient."  And it goes on—I mean, there's—

OG:   Right.  And that attestation I did use.

SB:   But these are—these are specific approved wording, approved by risk management and approved the Medicare people.

OG:   Mm-hm.

SB:   You know, these are specific things for legal purposes.  There's a—it's very important that these words are in there as they are written.

OG:   If I was—if I was told specifically not to change it, I wouldn't have, but I wasn't.

SB:   So Dr. Greenberg (sic) forwarded copies of your report.  I actually have a bunch of them.  I don't have to read all 50, but let me just read the actual—the words that were—

MG:   Can I have a copy?

**SUNY 001338**

**A321**

Page 25 of 30

SB:   Here's a copy.   So the patient name may be different, but it says "I, Oded Greenberg, MD,"—first of all, did you write this?

OG:   Yeah.

SB:   Okay.  "I, Oded Greenberg, MD, board certified diagnostic attending radiologist and board certified pathologist, have personally painstakingly reviewed each and every one of the provided images and reviewed the available clinical information. The above report, based on my own extensive knowledge and skill as well as meticulous observation and careful interpretation, now represent the final report."

OG:   I don't see what the problem is with that.

SB:   That is, first of all, not approved.

OG:   Well, I didn't know that we had to do a specific one.  All the information in the approved ones is included in this.

SB:   Correct.

OG:   And, yes, it's perhaps a little playful, but—

SB:   It's also very sarcastic.

OG:   I don't—I don't—that's your interpretation.  I don't think it's sarcastic.

SB:   That's not only my interpretation.  It's the interpretation of your supervisor and his supervisor, Dr. Reede.

OG:   As soon as I was told it was an issue, I changed it.

SB:   That may very well be, but you wrote it on over 50 documents.

OG:   This did not hurt anybody.  What's that?

SB:   I said you wrote it on 50 documents.

OG:   Yes?

SB:   So—

**A322**

Page 26 of 30

OG:     But I didn't know that.  I was given those 50 documents all at once and I signed them off.  And then when I was told that it was not appropriate or not the type of attestation they wanted, I immediately changed it back.

SB:     So this is—let me just tell you how this was interpreted by your supervisors.

OG:     Who I don't trust.

SB:     You had a meeting on September 22nd with the staff, correct?

OG:     Mm-hm.

SB:     You were present where they told you, you know, this is for Medicare purposes. The attestations have to be attached to reports—

OG:     Fine.

SB:     —so that we can be reimbursed.  You have to use the approved attestations.

OG:     That wasn't—that wasn't clear to me.

SB:     They said that—

OG:     They gave us examples and that was all I understood.

SB:     They said that during the meeting you complained about why do I have to do this. You know, like—

OG:     I am—I—I—

SB:     And then they explained to you that everyone has to do it for reimbursement purposes.  So in response, now they see these type of attestations.

OG:     Look, you know, these sort of things that are added are simply another hoop to jump through for insurance companies and I saw that clearly.  Now, I have a right to—to—to say and—this is a meeting, it's a discussion.  It's not an interrogation. It's not any of that stuff.

MG:     It is an interrogation.

OG:     What?  Well, this is an interrogation—

**SUNY 001340**

**A323**

Page 27 of 30

SB:    You're talking about this meeting or you're talking about that meeting?

OG:    I'm talking about the meeting that I was at with them. I—I disagreed with the policy, and—but I didn't say that I wasn't gonna do it.

SB:    Okay. But how it was interpreted by your supervisors is that you were, basically, venting and pissed off at the meeting that you had to do this and then you come with this—

OG:    I wasn't venting. I simply said that I didn't agree with it.

SB:    Okay. I'm—Okay. And then, now, they didn't even notice this until another person said did you see these attestations?

OG:    Who is the other person?

SB:    It was brought to their—I don't have the name of the person, but someone conducted an audit and then they said did you see these attestations?

OG:    Was it somebody in administration or another physician?

SB:    I couldn't tell you the name, but that's what Dr. Pulitzer expressed to me, that it was brought to his attention.

OG:    Mm-hm.

SB:    And—do I have the name in here? No. And then, now, when they reviewed these 50 attestations, they see this and they took it as a complete—you're being sarcastic, you're trying to be a smartass, basically, that your conduct was insubordinate.

OG:    Look, I understand how it appears, but my—but my actions were playful at best and not intentionally going against authority. I included everything that was required in the attestations. If it was seen as whatever, you know, that's their business, but it was playful. And as soon as I was told that that wasn't the appropriate type of attestation, then I changed it.

SUNY 001341

**A324**

Page 28 of 30

SB:   Okay.

OG:   Immediately.

SB:   Do you have anything else that you would like to add?

OG:   I am very, very frustrated that I'm being treated differently.  Others are not treated this way.  I—

SB:   Are you—are you reading or are you talking?

OG:   No, I'm talking.

SB:   Okay.

OG:   I read more films and more studies than almost anybody in the department and I get paid close to the least.  I've been given more work and more responsibilities than anybody else.  I can—I am very diverse and I'm very versatile in what I can do and I'm given more work and more responsibilities because of that.

SB:   Probably because you're so good.

OG:   What's that?

SB:   I said probably because you're so good.  Like you said—you say you're good.

OG:   I'm being singled out.  And, to me, it doesn't seem like it makes sense that all of this is happening because of something I did.  I mean, it's clear to me that I'm being singled out and, I don't know, I mean, is someone trying to fire me?  Is it 'cause I'm Jewish?  Is it because of some other reason?  I don't know.  Is it for some economic reason?  I have no idea, but it doesn't make any sense to me.

SB:   Okay.  Again, I'm going to just reiterate that if you feel that you're being singled out for any sort of discrimination reason or disparate treatment, we do have an Office of Diversity that handles all of that.  That's not the forum for this.  I'm just putting—letting you know your—your rights.

SUNY 001342

**A325**

Page 29 of 30

OG:   To me it seems like there's clearly something different about the way I'm being treated.  I don't know exactly what it is, but on the face of it, it could be something like that.  I don't know.

SB:   Okay.  Alright.

OG:   Oh, by the way, my production in this department is among the highest of all the people in the department.  I am—I am the most versatile, the most efficient and the most accurate radiologist in the whole department and I read among the most films and I get paid next to the least.

SB:   It's funny you should mention that.

OG:   So I'm just saying that if you think that, you know, I'm being treated the same as everybody else, it's clear that I'm not.

SB:   Well, it's funny you should mention that because your—Dr. Reede has mentioned to us, which I didn't even get into, that since you have this whole disciplinary issue she has noticed your production has gone down.

OG:   My production has gone down only because—my production has gone down?

SB:   That's what she—I mean, I don't—that's what she stated.

OG:   What—my production has gone down because she has replaced my former colleague who was older and very good at what he did with one of my former residents and made her director of ER radiology.  I have—I'm 55-years old, she's 30.  I have a lot more experience than her and she has no experience in the ER.  That's clearly—oh, the other thing is oh, that's true; I'm reading less because other people are scared in the department because they have been called to the carpet about how little they read and so they're all grabbing cases from the ER.  Furthermore, she has somebody who's working from 6AM-2PM.  She does the lion's work—lion's share of the work because she reads all the overnight cases so

**SUNY 001343**

she comes in to 60 or 70 cases in the morning. So I've read less? Oh really, I read less. So I've been covering three services. In fact, today I'm scheduled to cover three services. Nobody's covering those services. Somebody else might be, but I'm so important to the department that I have to cover three services. I've had days where Dr.—Dr. Hammill, who is a body imager, I have to cover his service when he's out. That's 15 or 20 CTs and MRIs—and Dr. Waite, who is the—who's the pulmonary radiologist, I have to read all his cases; another 10 to 15 CT scans as well as cover the ER. I want her to look at that schedule when I cover more than one service and tell me that I'm reading less. Patrick normally reads, like, 20 films a day. That's all he reads and makes—what? Oh, and makes a lot more money. He makes about $100,000 more than I do. And Steve—oh, Steve Waite also reads very few films, by the way. I can do both of their jobs and I have done both of their jobs. I was here before three or four of the other hires in the past and I used to do all their jobs.

SB:   Okay. Have you got anything else to add?

OG:   I think I've said my piece.

SB:   Okay. We're gonna go off the record. The time is now 12:30.

OFF THE RECORD



**SUNY**
# DOWNSTATE
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

**Department of Human Resources**
**Labor Relations**

**CERTIFIED MAIL # 7012 3460 0000 6957 4576**
**RETURN RECEIPT REQUESTED**

October 3, 2014

Dr. Oded Greenberg
1650 Myrtle Ave, PH #3401
Brooklyn, NY 11201

**Re:**          **INVESTIGATION OF POSSIBLE DISCIPLINARY CHARGES**

Dear Dr. Greenberg:

You are directed to report to the Office of Labor Relations located at 420 Lenox Road, Brooklyn, NY 11226 on **Wednesday, October 8, 2014 at 11:00 a.m.** At that time, I will meet with you to discuss allegations of insubordination, leaving the worksite without authorization and related matters.

As per Article 19 of the UUP Agreement, you are entitled to be represented by UUP or by an attorney at this meeting. If you want to be represented by UUP, it is your responsibility to contact the UUP office at (718) 270-1519 to arrange for representation. If you are unable to attend for good cause, you must speak with me at (718) 270-1972 to determine when the appointment may be rescheduled.

For your information, a copy of Article 19 of the United University Professions Agreement, which provides the procedure for discipline, is attached.

Regards,

Stephanie Bernadel
Personnel Associate, Labor Relations

Attch:     Article 19
cc:        Leonzo Cuiman
           Adriana Conde-Billy
           Deborah Reede, MD
           Steven Pulitzer, MD
           UUP
           First Class Mail
           Personnel File
           Case file

**State University of New York Downstate Medical Center**
450 Clarkson Avenue, MSC 1224, Brooklyn, NY 11203  •  Phone 718 270-3094  Fax 718 270-4684

Confidential                                                                                                    SUNYESI00000054

STATEMENT TO BE READ AND GIVEN TO EMPLOYEES IN THE
PROFESSIONAL SERVICES NEGOTIATING UNIT
PRIOR TO A DISCIPLINARY INTERROGATION

Subsection 19.8 of the State-UUP Agreement requires management to provide an
employee with notification prior to commencement of an interrogation that he/she may have
representation at such interrogation. If an interrogation is conducted without such notification
having been given, statements or admissions made by the employee during the course of such
interrrogation may not be used in a disciplinary proceeding against that employee. An employee
may elect to participate in an interrogation without representation. If an employee elects to have
representation at an interrogation, it is solely employee's responsibility to obtain a representative
and insure that such representation is present for the interrogation as scheduled by management.
The Agreement also provides that if the employee requests representation, and such
representation is not available within six hours' time following such request, the State may
proceed with the interrogation and there shall be no limitation on the use of statements or
admissions made by the employee.

AFFIRMATIONS:

(1) I, ~Stephanie Dermedy~ have read the above statement to ~Oded Greenberg~
    management rep. name                                         employee's name

at __11:30__ o'clock (am)/pm on __10/10/14__ .
    time                circle            date

(2) I, ~Oded Greenberg~ have been advised of my right to representation according
    employee's name

to the above statement. It is my decision to :

        voluntarily waive such right and agree to be interrogated without a
        representative being present. __~Oded Greenberg~ MD__ __10/10/14__
                                 signature of employee          date

        request representation and decline to be interrogated without a
        representative being present. _____
                                 signature of employee          date

odedgreenberg@msn.com
cpm@ottengolden.com

**SUNY 000431**

# A329

Case 19-3570, Document 42, 02/11/2020, 2775386, Page85 of 220



SUNY
**D**OWNSTATE
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

**Department of Human Resources**
**Labor Relations**

Certified Mail #7012 3460 0000 6957 4750
Return Receipt Requested

October 15, 2014

Dr. Oded Greenberg

Brooklyn, NY 11201

Dear Dr. Greenberg:

During your interrogation on Friday, October 10, 2014, you alluded to possible allegations of discrimination. As stated during the interrogation and afterwards, you are advised that you have the right to consult with the Office of Diversity & Inclusion regarding these matters.

The Office of Diversity & Inclusion (ODI) is responsible for is responsible for ensuring Downstate's compliance with the State University of New York's employment policies and federal and state civil rights laws and regulations, which includes New York State's Human Rights Law. You can reach the **Office of Diversity and Inclusion** at:

SUNY Downstate Medical Center
450 Clarkson Avenue, Box 1220
Brooklyn, NY 11203

phone: (718) 270-1738
fax: (718) 270-2276

Sincerely,

Stephanie Bernadel
Personnel Associate, Labor Relations

cc:     Leonzo Cuiman
        Adriana Conde-Billy
        Liesl Zwickelbauer
        Kevin Antoine
        Lisa Willis
        Personnel File
        Case File

**State University of New York Downstate Medical Center**
450 Clarkson Avenue, MSC 1224, Brooklyn, NY 11203   •   Phone 718 270-3094   Fax 718 270-4684

**SUNY 000010**

**A330**

| | |
|---|---|
| **From:** | CN=Stephanie Bernadel/O=Downstate |
| **Sent:** | Friday, October 10, 2014 10:21 PM |
| **To:** | CN=Oded Greenberg/O=Downstate@Downstate; odedgreenberg@msn.com |
| **Cc:** | Leonzo Cuiman <lcuiman@downstate.edu>; CN=Adriana Conde-billy/O=Downstate@Downstate; CN=Deborah Reede/O=Downstate@DOWNSTATE; CN=Steven Pulitzer/O=Downstate@Downstate; CN=Thomas Dugan/O=Downstate@Downstate; CN=Vincent Cardozo/O=Downstate@Downstate; CN=Paul Alleyne/O=Downstate@Downstate; CN=Angelbert Balmir/O=Downstate@Downstate; brooklyn@uupmail.org |
| **Subject:** | Oded Greenberg - Persona Non Grata |
| **Attach:** | Letter to LR_10-10-14.pdf |

Good Evening Dr. Greenberg,

It has been reported to the Office of Labor Relations that you harassed employees outside of Kings County this afternoon subsequent to leaving our offices.  As such, effective immediately, you are directed not to be on the premises of the SUNY Downstate Medical Center (SUNY-DMC), including your worksite, the Department of Radiology.  If any reasons necessitate your coming to SUNY-DMC or Kings County Hospital Center, you are directed to first make an appointment with the SUNY-DMC Office of Public Safety, at telephone number (718) 270-2626.  When appearing on the premises pursuant to such an appointment, you are directed to first go to the Office of Public Safety and notify officers there that you are present.  The Office of Public Safety is located in the main lobby of University Hospital.

As stated in the email below, you are directed to report to my office at 420 Lenox Rd., Bklyn, N.Y. 11203 on Wednesday, October 15, 2014 at 12:00 p.m.  Prior to our meeting, you are directed not to report to SUNY-DMC, Kings County Hospital to perform your job duties.

Failure to adhere to these directives will result in other actions deemed appropriate by SUNY-DMC.

Regards,
Stephanie


**************************
Stephanie Bernadel, MPA
Personnel Associate, Labor Relations
450 Clarkson Avenue, Box 1224
Brooklyn , NY 11203
work: 718-270-1972
cell: 347-578-4689
fax: 718-270-4684
E-mail: stephanie.bernadel@downstate.edu

Confidentiality Notice:  The information contained in this e-mail and any attachments may be legally privileged and confidential.  If you are not an intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail is strictly prohibited.  If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately.  You should not retain, copy or use

Confidential

SUNYESI00000101

**A331**

this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person.

----- Forwarded by Stephanie Bernadel/Downstate on 10/10/2014 10:03 PM -----

From: Stephanie Bernadel/Downstate
To: odedgreenberg@msn.com, Oded Greenberg/Downstate@Downstate,
Cc: "Leonzo Cuiman" <lcuiman@downstate.edu>, Adriana
Conde-billy/Downstate@Downstate, Deborah Reede/Downstate@DOWNSTATE, Steven
Pulitzer/Downstate@Downstate
Date: 10/10/2014 03:30 PM
Subject: Oded Greenberg - Report to Labor Relations - Wed 10/15 @ 12PM


Good Afternoon Dr. Greenberg,

After today's interrogation hearing, you requested time to think over the
options before you.  You also asked for permission to go to the UUP office,
despite having declined their representation on Wednesday, October 8, 2014.
Subsequently, I was informed by UUP that you provided them with a hand-written
letter requesting union representation (attached).

As discussed prior to your departure from Labor Relations this afternoon, I
will give you the opportunity to review the options before you.  As such, you
have until Wednesday, October 15, 2014 to respond to me with your decision.
Please be advised that you are directed to report to the Office of Labor
Relations on Wednesday, October 15, 2014 at 12:00PM so that we can conclude the
matter.  UUP has been informed of the date and time of the meeting.  During the
interim, you remain reassigned to the Office of Labor Relations and should not
report to work.

Please be advised that if you do not respond and/or do not report to Labor
Relations as directed, SUNY-DMC will make a decision regarding implementation
the penalty held in abeyance by close of business on said date.

If you have any questions, I can be reached at extension 1972.

Regards,
Stephanie




**************************
Stephanie Bernadel, MPA
Personnel Associate, Labor Relations
450 Clarkson Avenue, Box 1224
Brooklyn , NY 11203
work: 718-270-1972
cell: 347-578-4689
fax: 718-270-4684
E-mail: stephanie.bernadel@downstate.edu

Confidentiality Notice:  The information contained in this e-mail and any
attachments may be legally privileged and confidential.  If you are not an
intended recipient, you are hereby notified that any dissemination,

Confidential                                                                    SUNYESI00000102

distribution, or copying of this e-mail is strictly prohibited. If you have

received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person.

----- Forwarded by Stephanie Bernadel/Downstate on 10/10/2014 02:14 PM -----

From: Stephanie Bernadel/Downstate
To: Oded Greenberg/Downstate@Downstate,
Cc: "Leonzo Cuiman" <lcuiman@downstate.edu>, Adriana Conde-billy/Downstate@Downstate, Deborah Reede/Downstate@DOWNSTATE, Steven Pulitzer/Downstate@Downstate
Date: 10/09/2014 04:25 PM
Subject: Re: Oded Greenberg - Reassigned to Labor Relations Until Further Notice


Good Afternoon Dr. Greenberg,

In response to your email below, please be advised of the following:

An interrogation is a fact-finding proceeding. There have been some allegations against you regarding your leaving the work site without authorization, insubordination and related matters. These reported incidents occurred after the resolution of your first disciplinary issue and may be in violation of the terms of that agreement. However, inasmuch as you elected to be represented by an attorney, I cannot provide you with any more information on the matter until we meet in person at the interrogation. I would, however, be happy to speak to your representative regarding the issues. UUP is not involved, as you declined their representation.

As previously discussed, the notice for yesterday's interrogation was mailed via first class and certified mail to your address of record on Friday, October 3, 2014. While in my office yesterday you stated that you had not been by your residence to pick up your mail. The onus falls on you to retrieve your mail from the address you provided to the State, as that is the address that we use for official communication.

Inasmuch as you are reassigned to Labor Relations, you will be paid for the dates in question. However, your leave credits may or may not be charged, depending on the outcome of the interrogation.

The UUP collective bargaining agreement can be found at www.uupinfo.org, or by clicking here.

Inasmuch as I have provided you with more than the requisite six (6) hours to procure a representative, as per Article 19.8 of the CBA, you are still expected to comply with my previous directive and appear for the interrogation scheduled for Friday, October 10, 2014 @ 11AM.

See you tomorrow.

Regards,
Stephanie

Confidential                                                                                          SUNYESI00000103

***************************

Stephanie Bernadel, MPA
Personnel Associate, Labor Relations
450 Clarkson Avenue, Box 1224
Brooklyn , NY 11203
work: 718-270-1972
cell: 347-578-4689
fax: 718-270-4684
E-mail: stephanie.bernadel@downstate.edu

Confidentiality Notice:  The information contained in this e-mail and any
attachments may be legally privileged and confidential.  If you are not an
intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this e-mail is strictly prohibited.  If you have
received this e-mail in error, please notify the sender and permanently delete
the e-mail and any attachments immediately.  You should not retain, copy or use
this e-mail or any attachment for any purpose, nor disclose all or any part of
the contents to any other person.

From: Oded Greenberg/Downstate
To: Stephanie Bernadel/Downstate@Downstate,
Date: 10/09/2014 03:28 PM
Subject: Re: Oded Greenberg - Reassigned to Labor Relations Until Further Notice

Hello Stephanie,  could you please answer the following questions:

What is entailed in an interrogation?  Also I had no notice about our initial
meeting and would like more time to prepare including engaging representation.
I would greatly appreciate additional time.   Can we adjourn until next week?

Also please confirm that the time I am away will not be counted as leave since
it wasn't initiated by me and confirm that I will be paid.

I would also appreciate if you can provide any additional information as to
what is prompting this interrogation.  I provided advance notice in both
instances. If the information is only available through UUP please have them
send it to me.

Kindly email me any and all documentation pertaining to this matter and the
previous instance.  Please also send me a copy of the CBA.

Thank you

Oded Greenberg MD

-----Stephanie Bernadel/Downstate@Downstate wrote: -----

Confidential

SUNYESI00000104

===================== To: Oded Greenberg/Downstate@Downstate
From: Stephanie Bernadel/Downstate@Downstate
Date: 10/08/2014 02:16PM
Cc: "Leonzo Cuiman" <lcuiman@downstate.edu>, Adriana
Conde-billy/Downstate@Downstate, Deborah Reede/Downstate@DOWNSTATE, Steven
Pulitzer/Downstate@Downstate
Subject: Oded Greenberg - Reassigned to Labor Relations Until Further Notice
=====================  Good Afternoon Dr. Greenberg,

As per our conversation, inasmuch as you indicated that you will be hiring a
private attorney to represent you in your disciplinary matter, your
interrogation has been postponed.  Please be advised that as per Article 19.8
of the Agreement between the State of New York and United University
Professions, if representation is requested by an employee and such
representation is not available within six (6) hours' time following such
request, the State may proceed with interrogation.  As such, the interrogation
will proceed on Friday, October 10, 2014 at 11AM with or without your
representative.

As discussed, you are reassigned to the Office of Labor Relations effective
immediately through the resolution of your disciplinary matter.  You are
relieved of your work and should not report to and/or perform any duties at
Kings County Hospital or SUNY Downstate Medical Center until further notice.

If you have any questions, I can be reached at 718-270-1972.

Regards,
Stephanie

***************************
Stephanie Bernadel, MPA
Personnel Associate, Labor Relations
450 Clarkson Avenue, Box 1224
Brooklyn , NY 11203
work: 718-270-1972
cell: 347-578-4689
fax: 718-270-4684
E-mail: stephanie.bernadel@downstate.edu

Confidentiality Notice:  The information contained in this e-mail and any
attachments may be legally privileged and confidential.  If you are not an
intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this e-mail is strictly prohibited.  If you have
received this e-mail in error, please notify the sender and permanently delete
the e-mail and any attachments immediately.  You should not retain, copy or use
this e-mail or any attachment for any purpose, nor disclose all or any part of
the contents to any other person.

Confidential                                                                    SUNYESI00000105



**D**SUNY
**OWNSTATE**
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

**Leonzo A. Cuiman**
**Assistant Vice President for Labor Relations**

**CERTIFIED # 7013 1710 0002 2475 3720**
**RETURN RECEIPT REQUESTED**

October 22, 2014

Dr. Oded Greenberg
<span style="background:black">Redacted</span>
Brooklyn, NY 11201

Dear Dr. Greenberg:

On October 10, 2014, you met with Stephanie Bernadel, Personnel Associate in the SUNY Downstate Medical Center – Office of Labor Relations, for an interrogation regarding allegations of insubordination, leaving the worksite without authorization and related matters. On October 20, 2014, you met with myself, Ms. Bernadel and Lisa Wills, NYSUT/UUP Labor Relations Specialist. The purpose of the meeting was to afford you the opportunity to explain why the penalty of termination from State service held in abeyance should not be implemented for violating your September 8, 2014 disciplinary settlement agreement (attached).

Based on your violation of your September 8, 2014 disciplinary settlement, please be advised that your appointment as a Clinical Assistant Professor TCL is hereby terminated, effective immediately.

Sincerely,

Leonzo Cuiman
Assistant Vice President for Labor Relations

LC/sb
cc:   Adriana Conde-Billy
      Deborah Reede, M.D.
      Steven Pulitzer, M.D.
      First Class Mail
      Personnel File
      Case File

**State University of New York Downstate Medical Center**
450 Clarkson Avenue, Box 1224, Brooklyn, NY 11203 • Phone 718 270-3019 Fax 718 270-4684

CONFIDENTIAL

**Steven Pulitzer**

| | |
|---|---|
| **From:** | Steven Pulitzer |
| **Sent:** | Sunday, November 23, 2014 7:32 AM |
| **To:** | Gnyana Kompally |
| **Cc:** | Jean Aime; Santoshlaxmi Ananthoju; Sudha Pentyala; Karen Pettit |
| **Subject:** | Re: MISSING ATTENDING ATTESTATION - OUTSTANDING CHARGES |

Yes, will do. Thanks

>>> Gnyana Kompally 11/21/14 2:29 PM >>>
Dear Dr. Pulitzer/Mr. Aime,

We went into Quadramed to reconcile the last list I sent you and found 103 of them had attestations, so took care are of them. Thanks for the corrections.

Attached are the remaining. I have split them into multiple sheets by provider, for easy printing. Could you please review and let me know when they are done.

Thanks
Rekha



Thanks and Best Regards!
Rekha K.
Coding Manager
PhyCARE Solutions
(631) 675-9300
>>> Gnyana Kompally 11/21/14 9:32 AM >>>
Sure Dr. Pulitzer.

Thanks and Have a Good Day!
Rekha



Thanks and Best Regards!
Rekha K.
Coding Manager
PhyCARE Solutions
(631) 675-9300


>>> Steven Pulitzer 11/21/14 8:44 AM >>>
H Rekha, you can keep them under Dr. Greenberg for billing purposes.

HHC_ESI_002251

**A337**

Case 1:15-cv-02343-PKC-VMS   Document 87-49   Filed 09/14/18   Page 3 of 3 PageID #: 1806

Sincerely,

Steven

>>> Gnyana Kompally 11/19/2014 5:16 PM >>>

Dear Dr. Pulitzer,

We have observed that some interpretations with initial attestation from Dr. Oded Greenberg were counter-attested by you. Please suggest who should we be sending professional bills for these interpretations, you or Dr. Greenberg. Want to make sure before I send anything out.

Thanks
Rekha


Thanks and Best Regards!
Rekha K.
Coding Manager
PhyCARE Solutions
(631) 675-9300

HHC_ESI_002252

Case 1:15-cv-02343-PKC-VMS   Document 87-50   Filed 09/14/18   Page 2 of 7 PageID #: 1808

Accreditation Council for
Graduate Medical
Education

515 North State Street
Suite 2000
Chicago, IL 60654

Phone 312.755.5000
Fax 312.755.7498
www.acgme.org

August 13, 2015

Rhonda Osborne, MD
Residency Program Director
S U N Y Health Science Ctr at Brooklyn, Dept of Radiology
Box 45
450 Clarkson Avenue
Brooklyn, NY  11203

Dear Dr. Osborne,

The Residency Review Committee for Radiology-Diagnostic, functioning in accordance with
the policies and procedures of the Accreditation Council for Graduate Medical Education
(ACGME), has reviewed the information submitted regarding the following program:

Radiology-diagnostic

SUNY Health Science Center at Brooklyn Program
    SUNY Health Science Center at Brooklyn
Brooklyn, NY

Program 4203521143

Based on the information available to it at its recent meeting, the Review Committee
accredited the program as follows:

Status: Continued Accreditation
Maximum Number of Residents: 32
Effective Date: 06/16/2015

**RESOLVED CITATIONS**

The Review Committee determined that the following citations have been resolved:

**Resources | Since: 11/12/2009 | Status: Resolved**

Resources:  The program must provide adequate space, equipment, and other pertinent
facilities to ensure an effective educational experience for residents in diagnostic
radiology.  The program must also provide the modern facilities and equipment required in all
of the subspecialty rotations (Program Requirement: II.D.1).

The information technology staff support and computer access is inadequate.  The residents
identified the need for additional computers, improved software, and more workstations in the
clinical areas (SVR: 16, 48).

**Responsibilities of Faculty | Since: 02/03/2014 | Status: Resolved**

Faculty Supervision Time

**SUNY 000692**

Rhonda Osborne, MD
Page 2

Program Requirement: II.B.1.a)
The faculty must devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; and to demonstrate a strong interest in the education of residents

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the faculty do not devote sufficient time to fulfill their supervisory responsibilities. At the time of the site visit, it was noted that faculty supervision has been inconsistent as a result of the lack of time devoted by the faculty to their supervisory responsibilities.  During the site visit interviews, there was consensus that "some faculty" do not "show up" for their scheduled supervision assignments and the program has not enforced adherence to the schedule.  Subsequently, this inconsistent faculty supervision has prevented on-call residents from getting feedback on their cases because faculty members do not show up the next day for post-call film review.  It has also caused other residents to "look for an attending" to review and sign-out their cases. Resident concerns regarding faculty supervision were substantiated by the program's 2013 Resident Survey results which showed a significantly low compliance rate for the questions related to sufficient faculty supervision. (Site Visit Report pages 19-20, 2013 ACGME Resident Survey results)

**Responsibilities of Faculty | Since: 02/03/2014 | Status: Resolved**

Adequate Faculty Supervision
Program Requirement: VI.D.2.
The program must demonstrate that the appropriate level of supervision is in place for all residents who care for patients.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the Review Committee was unable to determine whether an appropriate level of supervision is in place for all residents. The site visitor confirmed that overnight on-call shifts at both the University Hospital and the Kings County Hospital sites employ the use of remote supervision methods such as a tele-radiology service or at-home review of the radiology studies by the attendings.  The site visitor noted that some residents indicated that "an in-house attending would be preferable at both sites" and that the lack of in-house supervision limits their education.  Resident concerns regarding faculty supervision were substantiated by the program's 2013 Resident Survey results which showed a significantly low compliance rate for the questions related to sufficient faculty supervision. (Site Visit Report pages 19-20, 2013 ACGME Resident Survey results)

**Responsibilities of Faculty | Since: 02/03/2014 | Status: Resolved**

Faculty Interest in Education
Program Requirement: II.B.1.a)
The faculty must devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; and to demonstrate a strong interest in the education of residents.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that faculty do not demonstrate a strong interest in the education of the residents. The site visitor noted that there is disparity with regards to the faculty's interest in resident education and the quality of the didactic sessions they provide.  The faculty within the subspecialty sections were noted to have a lack of coordination in their lecture topics and do not present the material as an organized curriculum.  The site visitor also noted that resident opinions confirmed the disparity in faculty interest in education as some faculty members were deemed "excellent and dedicated to education", while other faculty members were deemed to "not care about teaching at all".  This lack of interest has resulted in the cancellation of scheduled lectures. Resident concerns regarding faculty interest and dedication to education were substantiated by the program's 2013 Resident Survey results which showed a significantly low compliance rate for the

**SUNY 000693**

Case 1:15-cv-02343-PKC-VMS   Document 87-50   Filed 09/14/18   Page 4 of 7 PageID #: 1810

Rhonda Osborne, MD
Page 3

questions related to faculty and staff interest in resident education. (Site Visit Report pages 19-20, 2013 ACGME Resident Survey results)


**Other Program Personnel | Since: 02/03/2014 | Status: Resolved**

IT Support/Other Program Personnel
Program Requirement: II.C.
The institution and the program must jointly ensure the availability of all necessary professional, technical, and clerical personnel for the effective administration of the program.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the technical support from information technology (IT) personnel is inadequate to facilitate the effective administration of the program. The site visitor confirmed that faculty and residents agree that IT support is inadequate and equipment repair is slow. At the University Hospital site, the number of IT staff is insufficient and at the Kings County Hospital site, the IT staff are often limited in their ability to resolve technical problems. (Site Visit Report page 5, ADS Program Summary – Response to Previous Citations)


**Other Program Personnel | Since: 02/03/2014 | Status: Resolved**

Clerical Support/Non-Physician Service Obligations
Program Requirement: II.C.
The institution and the program must jointly ensure the availability of all necessary professional, technical, and clerical personnel for the effective administration of the program.
Program Requirement: VI.A.4.b)
The learning objectives of the program must not be compromised by excessive reliance on residents to fulfill non-physician service obligations.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that there is a lack of clerical support overnight. At the time of the site visit, it was confirmed with the residents that there is very limited clerical support provided overnight which has resulted in the on-call resident(s) performing non-physician, clerical duties such as faxing reports. (Site Visit Report page 22-23)


**Responsibilities of Program Director | Since: 02/03/2014 | Status: Resolved**

Procedure Volume/Case Log Reporting
Program Requirement: II.A.4.p)
The program director must participate in the ACGME case log system. The logs must be submitted annually to the Review Committee office in accordance with the format and the due date specified by the Review Committee. The record must be reviewed by the program director at least annually; for residents beginning training in diagnostic radiology on July 1, 2010 or thereafter, data must be submitted for each resident only for the years of training preceding the ABR Core Examination (at end of PGY-4);
Program Requirement: II.D.4.
The program must provide a sufficient volume and variety of patients to ensure that residents gain experience in the full range of radiologic examinations, procedures, and interpretations. The number and variety of examinations and the length of rotations in each subspecialty area must be sufficient to ensure an adequate training experience. The program's volume must be no fewer than 7,000 radiologic examinations per year per resident. The number of examinations in each of the nine subspecialty areas must be of sufficient volume to ensure adequate training experience.


**SUNY 000694**

Rhonda Osborne, MD
Page 4

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the resident case log data did not demonstrate whether residents are provided a sufficient patient volume to obtain the procedural experience necessary to meet the minimum number of radiologic procedures required by the Review Committee. At the time of the site visit, the site visitor reviewed the case log data for "the most recent graduates" and found that they all reported numbers below the 25th or 50th percentile in every procedure category except Chest X-ray and CTA/MRA. Additionally, a review of the program's most recent 2013 graduate data submitted in the Case Log system for the August 15, 2013 reporting deadline indicated that procedural minimums were not met for Dr. Gonzalez-Pons and Dr. Raissi. Dr. Gonzalez-Pons did not meet the procedure minimums in the following five categories (listed as the "Total number reported/Category minimum"): Chest X-ray 1887/1900, CT Abdomen Pelvic 334/600, US Abdomen Pelvic 320/350, MRI Brain 76/110, and PET 15/30.  Dr. Raissi did not meet the procedure minimum in the category of US Abdomen Pelvic 332/350.  The program is advised to review the required Diagnostic Radiology Case Log Minimums currently posted on the Review Committee's webpage at: http://www.acgme.org/acgmeweb/Portals/0/PFAssets/ProgramResources/420 _DR_Case_Log_Minimums.pdf.
(Site Visit Report page 28, Annual Program Data - Case Log Minimums Report)

**ACGME Competencies | Since: 02/03/2014 | Status: Resolved**

Timely Communication of Procedure Results
Program Requirement: IV.A.5.a).(1)
Residents should provide patient care through safe, efficient, appropriately utilized, quality-controlled diagnostic and/or interventional radiology techniques. The resident must communicate effectively and in a timely manner the results of procedures, studies, and examinations to the referring physician and/or other appropriate individuals.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that residents are unable to communicate results in a timely manner. At the time of the site visit, both residents and faculty agreed that the communication of procedure, study, and examination results to the referring physician and/or other appropriate individual(s) does not occur in a timely manner. The site visitor confirmed that while a remedy to improve this communication in the emergency department has been implemented, it remains a problem in other clinical areas since the only means of communicating back to the referring physician is a pager number and this limited communication is further complicated when the referring physician has left for the day. (Site Visit Report page 27-28)

**ACGME Competencies | Since: 02/03/2014 | Status: Resolved**

Resident Competence/Communication Skills
Program Requirement: IV.A.5.d).(6)
Residents are expected to communicate effectively with patients, colleagues, referring physicians, and other members of the health care team concerning imaging appropriateness, informed consent, safety issues, and the results of imaging tests or procedures. Competence in oral communication must be judged through direct observation. Competence in written communication must be judged on the basis of the quality and timeliness of dictated reports

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement.  At the time of the site visit, there was no documentation provided to demonstrate whether the program had evaluated the residents' competence in oral communication skills using direct observation.  There was also no documentation provided to demonstrate whether the program had evaluated the residents' competence in written communication skills based on the quality of dictated reports. (Site Visit Report page

**SUNY 000695**

**A342**

Rhonda Osborne, MD
Page 5

32)

**Evaluation of Residents | Since: 02/03/2014 | Status: Resolved**

Timely Resident Evaluations
Program Requirement: V.A.1.a)
The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that faculty evaluations of the residents either do not occur or are not completed in a timely manner.  At the time of the site visit, it was noted that although it is required by the program, not all faculty members complete resident evaluations and of those that are completed, many of them are not completed in a timely manner.  The lack of evaluation and feedback after assignments was substantiated by the program's results on the 2013 Resident Survey that indicated significantly low compliance on the question related to feedback after assignments. (Site Visit Report page 36, 2013 ACGME Resident Survey results)

**Evaluation of Program | Since: 02/03/2014 | Status: Resolved**

Resident Evaluations for Program Improvement
Program Requirement: V.C.1.d).(2)
The program must use the results of residents' assessments of the program together with other program evaluation results to improve the program.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the Review Committee was unable to determine whether the program uses the residents' assessments of the program to make improvements. The results of the 2013 Resident Survey showed significantly low compliance on the question related to satisfaction with the program's use of evaluations to improve the program. The site visitor confirmed that residents agree that the program director listens to their comments and some changes have been made, but it was also confirmed that the low compliance rating on the survey was directly related to the "lack of a permanent Department Chair who can provide leadership and effect meaningful change." (Site Visit Report page 38, 2013 ACGME Resident Survey results)

**AREAS FOR IMPROVEMENT / CONCERNING TRENDS**

The Review Committee identified the following areas for program improvement and/or concerning trends:

Procedural Volume
Based on a review of the program's 2014 Case Log data, it appears that not all of the graduating residents met the minimum procedural volume in mammography, image guided biopsy/drainage, and MRI of the body.  The program is advised to monitor resident Case Log reporting on an annual basis and ensure that all residents meet the minimum procedural requirements.

**SUNY 000696**

Rhonda Osborne, MD
Page 6

**OTHER COMMENTS**

The program administration is commended for a quick turnaround and implementing significant changes that have greatly improved the educational program.

**Subspecialty Programs**
**The following is a list of subspecialty programs associated with your program. Subspecialty programs with ** preceding the program number were not reviewed at the most recent RC meeting.  Subspecialty programs with LTR preceding the program number will be issued a separate Letter of Notification.**

4273512109 - Vascular and interventional radiology
Continued Accreditation - Effective: 06/16/2015

The ACGME must be notified of any major changes in the organization of the program. When corresponding with the ACGME, please identify the program by name and number as indicated above. Changes in participating sites and changes in leadership must be reported to the Review Committee using the ACGME Accreditation Data System.

Sincerely,

*Kate E. Hatlak*

Kate Hatlak, MSEd
Associate Executive Director
Residency Review Committee for Radiology-Diagnostic
(312) 755-7416
khatlak@acgme.org

CC:
    James P. Walsh, MD
    Pamela Sass, MD, MPH
    Stephen Wadowski, MD

Participating Site(s):
    Kings County Hospital Center
    Memorial Sloan Kettering Cancer Center
    NYU Lutheran Medical Center
    SUNY Health Science Center at Brooklyn
    University Hospital-SUNY Health Science Center at Brooklyn
    Veterans Affairs Medical Center (Brooklyn)

**SUNY 000697**

**A344**

 , Brooklyn, New York ●

# Oded Greenberg M.D.

## Experience

| September 1995 to September 1996 | Radiology Associates of North Georgia | Atlanta, GA |

**Attending Radiologist**

- Hospital and Outpatient Based Radiology Practice. Responsibilities included reading multiple imaging modalities including MRI, CT, Ultrasound, Plain Films and Mammography. Also performed Flouroscopic procedures as well as Interventional procedures such as abcess drainage and biopsies.

| May 1997 to November 1999 | Doshi Diagnostic Imaging Services | New York, NY |

**Attending Radiologist**

- Outpatient Radiology Practice. Responsibilities included interpretation of MRI, CT, Ultrasound, Plain Films and Mammography. Performed GI related Flouroscopic procedures.

| April 2000 to December 2008 | SUNY Downstate Medical Center, Kings County Hospital and the Brooklyn VA Medical Center | Brooklyn, NY |

**Clinical Assistant Professor of Radiology : Director of ER Radiology**

- Interpret Multiple Modalities within the subspecialties of ER Radiology, Body Imaging and Musculoskeletal Imaging
- Educate Residents and Medical Students in Radiology Techniques and Image Interpretation via ER rotations and Lectures

| February 2009 to October 2010 | Virtual Radiologic | Licensed in multiple states, interpretations remotely from home |

**Radiologist**

- Interpreted Multiple Modalities including CT, MRI, Ultrasound and Plain Films sent from multiple facilities in several states. Interpretation occurred remotely from my home.

January 2011 to the present: Attending Radiologist (Clinical Assistant Professor)

Returned to work at SUNY Downstate and Kings County Hospital

Responsibilities included Interpreting Multimodality Imaging primarily from the Kings County ER. Also occasionally covered the Body Imaging Service

**SUNY 001004**

[Phone number]•[E-mail address]

# [Your Name]

Other Responsibilities included teaching Medical Students and Residents and Administrative Responsibilities. Teaching took place in real time in the ER as well as monthly lectures.

## Education

| 1976 to 1980 | Queens College C.U.N.Y. | Queens, NY Received BA in Biology |
|---|---|---|
| 1981 to 1985 Received MD degree May 1985 | SUNY Downstate Medical Center | Brooklyn, NY |

## Postgraduate Training

1985 to 1990     Downstate Medical Center and Kings County Hospital

Anatomic Pathology Resident

Board Certified in Anatomic Pathology

1990 to 1994     Downstate Medical Center and Kings County Hospital

Diagnostic Radiology Resident

Board Certified in Diagnostic Radiology

1994 to 1995     Emory University Hospital

Body Imaging Fellowship

## Research and Publications

Malakiplakia of the Lung in AIDS. A Case Report and Review of the Literature. Oded Greenberg MD, Joseph Carter MD and William Thelmo MD

Detection of Acute Cholecystitis on Tc-99m-RBC Scintiimages for Hemangioma. Salil D. Sarkar, MD, Cornelius McCarthy, MD and Oded Greenberg, MD

**SUNY 001005**

**A346**

**Jinel A. Scott, MD**
Curriculum Vitae

## DEMOGRAPHICS

Office: SUNY Downstate Medical Center     Home: 6▮▮▮▮▮▮▮▮
    Department of Radiology     Brooklyn, NY 11210
    450 Clarkson Ave     917-2▮▮▮▮▮▮
    Brooklyn, NY 11203     jinel▮▮▮▮▮▮
    718-270-1603
    jinel.scott@downstate.edu

## EDUCATION

1997-2001    Howard University College of Medicine, Washington, DC
     Doctor of Medicine

1995-1997    Howard University, Washington, DC
     Bachelor of Science; Biology

## POST GRADUATE EDUCATION

2006-2007    Maimonides Medical Center, Brooklyn, NY
     Musculoskeletal Radiology - *Fellow*

2005-2006    State University of New York, Downstate Medical Center, Brooklyn, NY
     Diagnostic Radiology - *Chief Resident*

2003-2006    State University of New York, Downstate Medical Center, Brooklyn, NY
     Diagnostic Radiology - *Resident*

2002-2003    Monmouth Medical Center, Long Branch, NJ
     Diagnostic Radiology - *Resident*

2001-2002    Washington Hospital Center, Washington, DC
     Internal Medicine - *Intern*

## ACADEMIC APPOINTMENTS

2014-present   Clinical Assistant Professor of Radiology
     SUNY Downstate Medical Center, Brooklyn, NY

**SUNY 002743**

**A347**

Case 1:15-cv-02343-PKC-VMS   Document 87-52   Filed 09/14/18   Page 3 of 8 PageID #: 1819

Jinel A Scott, MD<br>
Page 2

| | |
|---|---|
| 2011-2014 | Clinical Assistant Professor of Radiology<br>Long Island College of Medicine, Brooklyn, NY |
| 2003-2006 | Clinical Assistant Instructor of Radiology<br>SUNY Downstate Medical Center, Brooklyn, NY |

## HOSPITAL APPOINTMENTS

2014-present   Attending Radiologist, University Hospital of Brooklyn, Brooklyn, NY

2014-present   Attending Radiologist, King's County Hospital Center, Brooklyn, NY

2011-2014      Attending Radiologist, Long Island College Hospital, Brooklyn, NY

2007-2011      Teleradiologist, Radisphere, Beachwood, OH

## LICENSURE

2006           New York State Medical License # 237071

## CERTIFICATIONS

2014           American College of Radiology Emergency Imaging

2006           American Board of Radiology

## HOSPITAL AND MEDICAL SCHOOL COMMITTEES

2015-present   Faculty Development Committee - *Member*
               Department of Radiology, SUNY Downstate Medical Center

2015-present   Research Committee - *Member*
               Department of Radiology, SUNY Downstate Medical Center

2015-present   Medical School Admissions Committee - *Interviewer*
               Department of Radiology, SUNY Downstate Medical Center

**SUNY 002744**

Jinel A Scott, MD<br>Page 3

2014-present   Clinical Competency Committee - *Member*
Department of Radiology, SUNY Downstate Medical Center

2014-present   Education Committee - *Member*
Department of Radiology, SUNY Downstate Medical Center

2014-present   Residency Applicant Committee - *Interviewer*
Department of Radiology, SUNY Downstate Medical Center

2014-present   Radiology Liaison Emergency Medicine Council - *Member*
King's County Hospital Center

2014-present   Radiology Liaison Trauma Multidisciplinary Committee - *Member*
King's County Hospital Center

2014-present   Radiology Liaison Trauma Performance Improvement Committee - *Member*
King's County Hospital Center

## MAJOR ADMINISTRATIVE RESPONSIBILITIES

2014-present   Director of Emergency Radiology
King's County Hospital Center
*Responsibilities include updating trauma protocols to current national standards, radiology representative for the emergency department council, trauma multidisciplinary and trauma performance improvement committees.*

## EDUCATIONAL RESPONSIBILITIES

2015, 2016   Annual Resident Emergency Call Prep Conference  - *Course Director*
Phillips Ambulatory Care Center, Mount Sinai Beth Israel, New York, NY

2015-present   Bimonthly emergency medicine resident lectures
SUNY Downstate Medical Center; King's County Hospital Center

2014-present   Monthly radiology resident teaching conferences
SUNY Downstate Medical Center; King's County Hospital Center

2012-2014   Annual Resident Emergency Call Prep Conference - *Faculty*
Phillips Ambulatory Care Center, Mount Sinai Beth Israel, New York, NY

Jinel A Scott, MD
Page 4

2011-2014     Biweekly radiology resident teaching conferences
              Long Island College Hospital, Brooklyn, NY

2011–2013     Weekly MRI orthopedic resident teaching conferences
              Long Island College Hospital, Brooklyn, NY

## PROFESSIONAL SOCIETIES

2014 – present    American Society of Emergency Radiology

2012 – present    Society of Skeletal Radiology

2002 – present    Radiology Society of North America

## AWARDS AND HONORS

2001          Alpha Omega Alpha Honor Medical Society

2001          American Society of Clinical Pathologists Award

2001          Dr. Madison Spencer Briscoe Memorial Award for Microbiology

2001          Dr. Merton B. Anderson Award for Pathology

2001          American Medical Women's Association, Janet M. Glasgow Memorial
              Achievement Citation

2001          Sylvia Julian Veal Memorial Award for Pharmacology

2001          Edward E. Rickman, MD Award for Psychiatry

2001          Drew-Syphax Award for Surgery

2000          Aventis Pharmaceutical Award for Neurology

2000          Joseph Collins Foundation Scholarship for Neurosurgery

1999          Joseph Collins Foundation Scholarship for Neurosurgery

SUNY 002746

Case 1:15-cv-02343-PKC-VMS   Document 87-52   Filed 09/14/18   Page 6 of 8 PageID #: 1822

Jinel A Scott, MD
Page 5

## VISITING PROFESSORSHIPS, GRAND ROUNDS AND INVITED LECTURES

1. Invited Lecturer. Introduction to NeuroImaging. Department of Emergency Medicine, SUNY Downstate Medical Center, Brooklyn, NY.  May 2016.

2. Invited Lecturer.  Introduction to Orthopedic Imaging.  Department of Emergency Medicine, SUNY Downstate Medical Center, Brooklyn, NY.  February 2016.

3. Grand Rounds.  Imaging Dilemmas in Trauma. Department of Radiology, Maimonides Medical Center, Brooklyn, NY.  January 2016.

4. Invited Lecturer.  Vertebral Body: in Sickness and in Health. Department of Radiology, Maimonides Medical Center, Brooklyn, NY.  January 2016.

5. Invited Lecturer. Imaging Dilemmas in Trauma.  Department of Emergency Medicine, SUNY Downstate Medical Center, Brooklyn, NY.   December 2015.

6. Invited Lecturer. Introduction to Emergency Chest Imaging.  Department of Emergency Medicine, SUNY Downstate Medical Center, Brooklyn, NY.  September 2015.

7. Invited Lecturer. When to Order Cross-sectional Imaging in Skeletal Trauma. Department of Emergency Medicine, SUNY Downstate Medical Center, Brooklyn, NY. December 2014.

8. Faculty. When to Order Cross-sectional Imaging in Skeletal Trauma. Annual Resident Emergency Call Prep Conference. Mount Sinai Beth Israel, New York, NY.  March 2014.

9. Faculty.  Case Review: Emergency Skeletal Imaging. Annual Resident Emergency Call Prep Conference. Mount Sinai Beth Israel, New York, NY.  April 2013.

10. Faculty.  Case Review: Emergency Skeletal Imaging. Annual Resident Emergency Call Prep Conference. Mount Sinai Beth Israel, New York, NY.  April 2012.

## RESEARCH

2015–2016   *Radiology and the Assessment of Elder Abuse*
The objective of this study is to determine if radiology played a role in the diagnosis of elder abuse over the last 20 years at King's County Hospital.
Role:  Researcher.

**SUNY 002747**

**A351**

Jinel A Scott, MD
Page 6

2014-2015      *CT Imaging in the Evaluation of Acute Pancreatitis in the Emergency Department*.
The objective of this study was to determine the appropriateness of abdominal
CT's performed in the emergency department for suspected cases of acute
pancreatitis.
Role: Researcher.


**SCIENTIFIC POSTERS/EDUCATION EXHIBITS**

1. *Salem A, Cortes A, Chill M, **Scott J**, Legasto A, Waite S:  I Can't Breathe: Acute and Chronic Cardiopulmonary Manifestations of Sickle Cell Disease. American Roentgen Ray Society  Scientific Assembly and Annual Meeting; 2016; Los Angeles, CA.

2.  *Kurz E, Velayudhan V, **Scott J**:  The Aching Tooth: CT Diagnosis of Dental Pathology. American Roentgen Ray Society Scientific Assembly and Annual Meeting; 2016; Los Angeles, CA.

3.  *Holder J, Cort K, **Scott J**: Acute Abdominal Pain in the Elderly. American Roentgen Ray Society  Scientific Assembly and Annual Meeting; 2016; Los Angeles, CA.

4.  Fuchs T, Waite S, Gale B, **Scott J**, Reede D: Interpretative Errors in Radiology. Association of University Radiologists 64th Annual Meeting; 2016; San Diego, CA.

5.  *Osei-Bonsu S, Osborne R, Cortes A, Chaudhry Z, **Scott J**: CT Imaging in the Evaluation of Acute Pancreatitis in the Emergency Department.  American Society of Emergency Radiology Annual Meeting; 2015; Key Biscayne, FL.

6.  *Osei-Bonsu S; Seit R; Kolla, S; Lehto S; Uribe J; **Scott J**:  I Am Losing My Arch and It Hurts: Posterior Tibialis Dysfunction and Acquired Flatfoot Deformity. RSNA 101st Scientific Assembly and Annual Meeting; 2015; Chicago, IL.

7.  **Scott J,** Lehto S, Uribe, J, Kolla S: Need a Quick Fix? Current Trends in Syndesmotic Fixation. RSNA  99th Scientific Assembly and Annual Meeting; 2013; Chicago, IL.

8.  *Patel J, Ropp A, **Scott J**: Vertebral Body: in Sickness and in Health. RSNA  99th Scientific Assembly and Annual Meeting; 2013; Chicago, IL.

9.  *Ledermann E, **Scott J**: Feet Don't Fail Me Now: Radiographic and Pictorial Review of Common Osseous Abnormalities in the Lesser Digits of the Foot. RSNA  98th Scientific Assembly and Annual Meeting; 2012; Chicago, IL.

10.  *Shmukler A, Ledermann E, **Scott J**: Red Light Green Light: Imaging of Subchondral Signal Alterations in the Knee. RSNA 98th Scientific Assembly and Annual Meeting; 2012; Chicago, IL.

**A352**

Jinel A Scott, MD

Page 7

11. **Scott J**, Ostrow S, Eisner S:  Spine Rotating Radiology Exhibit – Teaching Module, First Year Curriculum.  State University of New York,  Downstate Medical Center, College of Medicine.

*First author is radiology resident in training.  Served as a senior/supervising   author.

## WORK IN PROGRESS

1.  Waite S, **Scott J**, Gale B, Fuchs T, Kolla S, Reede D:  Interpretative Error in Radiology: How We Search, Why We Make Mistakes.  Editorial.  American Journal of Radiology.

2.  Holder J, Cort K, **Scott J:** Acute Abdominal Pain in the Elderly.  Invited for publication by Contemporary Diagnostic Radiology.  ARRS Scientific Assembly and Annual Meeting; 2016.

**SUNY 002749**

**A353**

Case 1:15-cv-02343-PKC-VMS   Document 87-53   Filed 09/14/18   Page 2 of 2 PageID #: 1826

Meeting with Dr. Greenberg

July 23,2014

*Reason for Meeting*: Discuss request to be made Director of ER at KCHC

I shared with him the positive experience reported by residents from LICH when they rotated with him years ago.

We discussed the fact that being an excellent radiologist does not necessarily mean that you are an ideal candidate for section chief. Reasons for not being offered the position were discussed:

- Lack of participation in major administrative and educational meetings in the department (Education Committee Meetings, KCHC Staff Meetings, Grand Rounds etc.)
- Resident evaluations showed deficiencies in several areas
- No significant scholarly activity
- Need someone that is more interested in academics because we want to explore the possibility of starting an ER Fellowship

The meeting ended with me expressing my desire that he work with the person designated as section chief and that perhaps in the future they could share some of the administrative responsibilities.

**SUNY 001224**

**A354**

| | |
|---|---|
| **From:** | CN=Oded Greenberg/O=Downstate |
| **Sent:** | Tuesday, July 15, 2014 12:43 PM |
| **To:** | CN=Brian Magee/O=Downstate@Downstate |
| **Subject:** | Re: Scholarly Activity |
| **Attach:** | Faculty supervision.pdf; Faculty Scholarly Activity (1).pdf |

Here they are

-----Brian Magee/Downstate wrote: -----
To: Alan Kantor@downstate.edu, Amiram Samin@downstate.edu, Arnold Strashun@downstate.edu, Brian Gale@downstate.edu, Brian Magee/Downstate@Downstate, Catherine Mason@downstate.edu, Claire Hanley@downstate.edu, Dan Zinn@downstate.edu, Daniel Levin/Downstate@Downstate, Daphne Roitberg@downstate.edu, David Areman@downstate.edu, Deborah Reede/Downstate@DOWNSTATE, Harry Zinn@downstate.edu, Huntz Liu/Downstate@Downstate, Hyman Shwarzberg@downstate.edu, James Walsh/Downstate@Downstate, Jaya Nath@downstate.edu, John Amodio@downstate.edu, Maria Corsaro@downstate.edu, Michael Herskowitz/Downstate@Downstate, Oded Greenberg/Downstate@Downstate, Patrick Hammill@downstate.edu, Qi Chen/Downstate@Downstate, Rachelle Goldfisher/Downstate@Downstate, Riffat Chaudary@downstate.edu, Scott Lehto@downstate.edu, Srinivas Kolla@downstate.edu, Stephen Waite/Downstate@Downstate, Steven Ostrow@downstate.edu, Steven Pulitzer/Downstate@Downstate, Sundeep Mangla@downstate.edu, Vinodkumar Velayudhan/Downstate@Downstate, William Kwon/Downstate@Downstate, Woo Choi@downstate.edu, Kopresh Gudi/Downstate@Downstate, Ron Maimon/Downstate@Downstate, Yevgeniy Margulis/Downstate@Downstate, William Nguyen/Downstate@Downstate, Salvatore Raccuia/Downstate@Downstate, "Jayanth Rao" <jrao@lmcmc.com>, Hemalatha Rao/Downstate@Downstate, Jen-Fong Shen/Downstate@Downstate, Alexander Vidershayn/Downstate@Downstate, interventionalneurorad@gmail.com
From: Brian Magee/Downstate
Date: 07/14/2014 01:26PM
Subject: Scholarly Activity


To all,

We are preparing the annual residency program update to the ACGME. This report requires documentation of all resident and faculty scholarly activity. Please complete the attached academic activity form (xls or pdf format) and return either by email or fax (718-270-2667) by Monday, July 21, 2014. If you have no scholarly activity to report, indicate such on the form and return.

Also please complete and return the attached resident supervision form to document average number of hours per week interacting with residents. This information also is required by the ACGME.

Thank you,

Brian Magee


[attachment "Faculty Scholarly Activity.xlsx" removed by Oded Greenberg/Downstate]

SUNYESI00000638

**A355**

[attachment "Faculty Scholarly Activity.pdf" removed by Oded Greenberg/Downstate]

[attachment "Faculty supervision.xls" removed by Oded Greenberg/Downstate]

[attachment "Faculty supervision.pdf" removed by Oded Greenberg/Downstate] -

Faculty supervision.pdf - Faculty Scholarly Activity (1).pdf

SUNYESI00000639

Case 1:15-cv-02343-PKC-VMS   Document 87-54   Filed 09/14/18   Page 4 of 5 PageID #: 1830

**Faculty Member:**

| Activity | Description | Number of hours per week |
|---|---|---|
| Clinical supervision of residents | Time spent supervising/watching residents during patient care activities | 25 |
| Administration of Program | Program oversight; curriculum development; faculty, resident & program evaluation; career counseling | 2 |
| Research/scholarly activity with residents | Mentoring and/or working with residents/fellows, peer-reviewed funding; publication of original research or review articles in peer-reviewed journal or chapters in textbooks; publication or presentation of case reports or clinical series at local, regional, or national professional and scientific society meetings, participation in national committees or educational organizations | 0 |
| Didactics/teaching with residents | Lectures, simulation, case discussion, preparation time for and participation in: journal clubs, conferences, lectures, simulation, case discussions, and manuscript editing with resident | 2 |

Return by email to brian.magee@downstate.edu or by fax 718-270-2667 by Monday, July 21, 2014

**A356**

SUNYESI00000640

**Faculty Member:** Oded Greenberg

Template for Faculty Scholarly Activity that occurred during the previous academic year between 7/1/2013-6/30/2014

| Faculty Scholarly Activity | Definitions: | Pub Med Ids (assigned by PubMed) for articles published in the previous academic year. List up to 4. Pub Med ID (PMID) is an unique number assigned to each PubMed record. This is generally an 8 character numeric number. The PubMed Central reference number (PMCID) is different from the PubMed reference number (PMID). PubMed Central is an index of full-text papers, while PubMed is an index of abstracts. | | | | Number of abstracts, posters, and presentations given at international, national, or regional meetings in the previous academic year | Number of other presentations given (grand rounds, invited professorships), materials developed (such as computer-based modules), or work presented in non-peer review publications in the previous academic year. Articles without PMIDs should be counted in this section. This will include publication which are peer reviewed but not recognized by the National Library of Medicine. | Number of chapters or textbooks published in the previous academic year | Number of grants for which faculty member had a leadership role (PI, Co-PI, or site director) in the previous academic year | Had an active leadership role (such as serving on committees or governing boards) in national medical organizations or served as reviewer or editorial board member for a peer-reviewed journal in the previous academic year | In the previous academic year, held responsibility for seminars, conference series, or course coordination (such as arrangement of presentations and speakers, organization of materials, assessment of participants' performance) for any didactic training within the sponsoring institution or program. This includes training modules for medical students, residents, fellows and other health professionals. This does not include single presentations such as individual lectures or conferences. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Faculty Member | PMID 1 | PMID 2 | PMID 3 | PMID 4 | Conference Presentations (#) | Other Presentations (#) | Chapters / Textbooks (#) | Grant Leadership (#) | Leadership or Peer-Review Role (Y/N) | Teaching Formal Courses (Y/N) |
| | OG | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | N |

Return by email to brian.magee@downstate.edu or by fax 718-270-2667 by Monday, July 21, 2014

A357

SUNYESI00000641

A358

Case 19-3570, Document 42, 02/11/2020, 2775386, Page114 of 220

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Case No. 15 CV 2343(PKC/VMS)
- - - - - - - - - - - - - - - - - - - - -x
ODED GREENBERG, M.D.,

                              Plaintiff,

              -against-

STATE UNIVERSITY HOSPITAL-DOWNSTATE
MEDICAL CENTER a/k/a THE STATE
UNIVERSITY OF NEW YORK HEALTH SCIENCE
CENTER AT BROOKLYN a/k/a SUNY DOWNSTATE
MEDICAL CENTER, NEW YORK CITY HEALTH
AND HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, DEBORAH L. REEDE,
STEVEN PULITZER, and JOHN and JANE
DOES 1-20,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - -x

                    120 Broadway
                    New York, New York

                    December 7, 2016
                    9:20 a.m.

      DEPOSITION of ODED GREENBERG, M.D.,
the Plaintiff in the above-entitled
action, held at the above time and place,
taken before Arthur Hecht, a Shorthand
Reporter and Notary Public of the State of
New York, pursuant to the Federal Rules of
Civil Procedure, and stipulations between
Counsel.

**A359**

Page 2

APPEARANCES:

ERIC M. NELSON, ESQ.
Attorney for Plaintiff
112 Madison Avenue
New York, New York 10016

ERIC T. SCHNEIDERMAN, ESQ.
Attorney General of the State of New York
Attorney for Defendants STATE UNIVERSITY
HOSPITAL-DOWNSTATE MEDICAL CENTER a/k/a
THE STATE UNIVERSITY OF NEW YORK HEALTH
SCIENCE CENTER AT BROOKLYN a/k/a SUNY
DOWNSTATE MEDICAL CENTER
120 Broadway
New York, New York 10271
BY: CHRISTOPHER V. COULSTON, ESQ.

ZACHARY W. CARTER, ESQ.
CORPORATION COUNSEL, THE CITY OF NEW YORK
Attorney for Defendants NEW YORK CITY
HEALTH AND HOSPITALS CORPORATION and KINGS
COUNTY HOSPITAL CENTER
100 Church Street
New York, New York  10007
BY: TANYA N. BLOCKER, ESQ.

ALSO PRESENT: WILLIAM VERSFELT, ESQ.
          MICHELLE GREENBERG

*   *   *

Page 3

Greenberg

O D E D   G R E E N B E R G, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY
MR. COULSTON:

Q.   What is your name?
A.   Oded Greenberg.
Q.   What is your address?
A.   (Address redacted.)
MR. NELSON:  First, I just want to say that we're exercising our rule 30(E) right to review and sign.

I also want to note that I have conveyed a couple of deposition transcripts on CDs to opposing Counsel this morning.

We're appearing here pursuant to notice and the witness is going to appear for seven hours, and however Counsel decide to divide that time is up to them, and that there's no stipulations other than the Federal rules apply.

Page 4

Greenberg

MR. COULSTON:  I'll just put on the record, this is the State's notice of deposition.

MS. BLOCKER:  For the City, I'll note for the municipal defendants, that we will be noticing the deposition.  Plaintiff's Counsel was aware that the City would be deposing Plaintiff and we will notice the deposition.  Should we need to make an application concerning that deposition for purposes if this deposition is beyond the seven hours, we will do so.

MR. NELSON:  And this witness is appearing once for seven hours like any other witness in the case.  There's no agreement or understanding to have the witness appear for more than one day.

The Defendants can inquire however they wish for up to seven hours, and unless a further agreement between Counsel is reached or an order of the Court's issued, the witness

Page 5

Greenberg

won't be appearing again.
MS. BLOCKER:  The municipal Defendants will make an application to the Court if that's the Plaintiff's position.
MR. COULSTON:  And if we don't conclude the questioning today, we will also make an application for additional time on behalf of the State's Defendants.

Can we mark this as Greenberg Exhibit 1.

[Whereupon, at this time, the reporter marked as Greenberg Exhibit 1 the above-mentioned witness' CV for identification.]

Q.   I'm handing you what's been marked as Greenberg 1, it also has the Bates stamp G352 through G354, do you recognize that document, Dr. Greenberg?
A.   Yes, I do.
Q.   What is that document?
A.   This is my CV.
Q.   Is this your current CV?

2 (Pages 2 - 5)

Page 6

Greenberg

A. This is my latest CV.

Q. The last employment here shows November 2015, are you still employed at New York Methodist Hospital?

A. I am not.

Q. And where are you employed now?

A. I'm employed at Maimonides Hospital.

Q. And when did your employment at Maimonides Hospital start?

A. November of 2015.

Q. And that's continued through the present with no interruption?

A. Correct.

Q. Besides Maimonides Hospital, is there any information missing from this CV? And you can take a moment to flip through it.

MR. NELSON: I object to the form.

A. No.

Q. Are you a member of any radiological societies?

A. I am not currently.

Page 7

Greenberg

Q. Were you a member in the past of any radiological societies?

A. I believe I was a member of the RSNA.

Q. That's the Radiology Society of North America?

A. That's correct.

Q. Do you know when your membership lapsed in the RSNA?

A. I don't recall.

MR. NELSON: I object to the form.

Q. Was it around 2012?

A. I don't recall.

Q. Not sure? You think it was earlier than 2012, later than 2012?

A. It was probably earlier.

Q. Are there any publications that are missing from the CV?

A. There are a few -- a few cases were written up by me and one of my residents on a website.

Q. When were those cases written up?

Page 8

Greenberg

A. 2014, they were two or three.

Q. What was the website where they were written up?

A. It's called auntminnie.com.

Q. Is that a radiology publication?

A. It's a radiology website. People post cases on there. There's all sorts of radiology stuff. There's, you know, message board, things like that.

Q. Do you have a log-in for the Aunt Minnie website?

A. I do.

Q. What's your log-in, not the password, but what's your ID for the Aunt Minnie website?

A. It might be my e-mail address, I don't -- I can't remember right now, I haven't really been on there in a while.

Q. Have you posted on the forum at the Aunt Minnie page?

A. I have.

Q. Have you ever posted anything that concerns this litigation?

A. I have posted in general terms

Page 9

Greenberg

on that site, yes.

Q. About this litigation?

A. Not specifically about the litigation.

Q. How about your termination from SUNY Downstate?

A. No institutions were ever included, they had no names.

Q. Did you speak in general terms?

A. In general terms.

Q. Would you be able to collect those posts?

A. Would I be able to collect them and print them?

Q. Yes.

A. Yes.

MR. COULSTON: We would ask you to do so at the end of the deposition, anything that's relevant, even speaking in general terms about your termination from SUNY Downstate or anything that touches on this case.

MR. NELSON: Okay, I believe what we have we've already produced,

3 (Pages 6 - 9)

Page 10

Greenberg
and any requests for documents can be made to me in an appropriate form, not to the witness.

MR. COULSTON: Are you going to produce them or not produce them?

MR. NELSON: When you notice my deposition, that's a question I'll answer on the record. Otherwise, we'll have a conversation like lawyers normally do.

MR. COULSTON: You made requests for documents on the depositions --

MR. NELSON: Yes, you can make the request on the record. You can make the request on the record, what I'm saying is the request will be addressed between Counsel. The witness won't answer questions as to whether he will produce a document on the record because that's not an appropriate question for the witness.

Q.   Let's go back to your publications, Dr. Greenberg.

The journal names and dates are

Page 11

Greenberg
not included with the publications, do you know, we can start with the first one, and I'll do my best to pronounce this correctly, but Malakiplakia of the Lung in AIDS, a case report of review and literature, do you recall when that was published?

A.   It was actually not published, it was a paper that I wrote and it was submitted for publication.

Q.   So you submitted it to journals, but it wasn't ever published?

A.   Yes.

Q.   When did you submit it to journals?

A.   That would have been, I don't know, '88 or '89.

Q.   And what about Detection of Acute Cholecystitis on Tc-99mm-RBC Scintiimages for Hemangioma?

A.   I don't recall the journal.

Q.   Do you recall when it was published?

A.   So it was probably 1993 or 1994.

Page 12

Greenberg
Q.   And it was published in a journal?

A.   Yes, that one was.

Q.   And what about the next one, Delayed Pneumothorax After Stab Wound to Thorax and Upper Abdomen, Truth Or Myth?

A.   I don't recall the exact journal. I don't recall the journal.

Q.   Was this published in a journal?

A.   Yes, it was.

Q.   Do you recall when it was published?

A.   2014.

Q.   Who is Shahriar Zehtabchia?

A.   He is an ER clinician, an ER doctor.

Q.   At what hospital?

A.   At Kings County Hospital.

Q.   I'm sorry, I may have asked, do you know what journal this is published in?

A.   I'm not sure now.

Q.   Okay. If you go back to the first page of Greenberg 1, so you've

Page 13

Greenberg
listed your dates for SUNY Downstate Medical Center as April of 2001 to October 2014, was there a gap at some point during your tenure at SUNY Downstate?

A.   Yes, there was.

Q.   What was that period of time when you were not employed by SUNY Downstate?

A.   It was between 2008 and 2010.

Q.   And why did you leave SUNY Downstate in 2008?

A.   My son, who was -- he was born in 2006, he was two around then, we had determined that he had an autism spectrum disorder, and he was getting services of all sorts, and it was overwhelming for my wife, so I decided to work from home and help her out with him.

Q.   And this is your son Jayden, correct?

A.   Right.

Q.   You have two sons?

A.   Yes.

Q.   What were you doing for

4 (Pages 10 - 13)

Page 38

Greenberg

A. Correct.

Q. And there's the heading research scholarly activity with residents, which you said you did more than zero hours per week?

A. Yes, I was in fact working on a paper with somebody.

Q. How many hours per week do you think you were spending on that?

A. About two hours a week, I would say, but in general -- actually, to answer that whole question, mentoring and/or working with residents/fellows is very broad, and I would say 40 hours a week, I mean, because basically most of what I did involved that.

Q. I think that it's mentoring and/or working with residents, fellows, peer reviewed funding.

A. Okay, then that would be zero.

Q. And then publication of original research review arms and peer reviewed --

A. Sorry.

Q. I think you stopped at the

Page 39

Greenberg

comma, but if you keep reading, it's related to peer reviewed funding, so should it actually be zero for that entry?

A. I was working with a resident on a particular study and I was collecting cases, so I would say an hour or two a week.

Q. And when had you started working on that particular project?

A. Probably in June of 2014.

Q. And had you worked on any similar projects at any other point in 2014?

A. I did not.

Q. And how about in 2013?

A. I did not.

Q. Besides that issue, are there any other inaccuracies in this document?

A. Yes, the didactics teaching with residents, I would say at least ten hours a week.

Q. And that refers to lectures, simulation case discussion, preparation time for and participation in?

Page 40

Greenberg

A. Correct.

Q. And you think you were doing ten hours of time?

A. Yes. Because simulation and case discussion occurred every day.

Q. So part of your reviewing of cases, if there was a resident, you would be discussing the case --

A. Yes.

Q. -- with the resident?

A. Yes. I think I misread the question when I answered it.

Q. Any other inaccuracies?

A. Not on that page.

Q. How about the next page, SUNY ESI 641?

A. The third box, number of other presentations given, grand rounds, materials developed, I did -- I did participate in one paper which you saw in there, so I should have one -- one publication.

Q. Which publication is that?

A. That's the pneumothorax one.

Page 41

Greenberg

Q. Anything else?

A. Yeah, that would be it.

Q. Dr. Greenberg, have you ever used the phrase the corporatization of medicine?

A. I have.

Q. What do you mean by that?

MR. NELSON: I object to the form.

A. Medicine is being run like a business, and professionals are being treated like factory line workers.

Q. How are they being treated like factory line workers?

A. A lot of attention is being paid to metrics and productivity and things of that matter.

Q. What metrics are being paid attention to?

A. Number of studies you read, when you read them, you know, hours you spend doing various things. Essentially the bottom line has become much more important as opposed to the quality of your work.

11 (Pages 38 - 41)

Page 42

Greenberg

Q.   And did you think that this was a change that was occurring at SUNY Downstate or KCHC?

A.   I definitely think it was something that was occurring at Downstate and KCHC, I think it's occurring in medicine in general.

Q.   And you've had a long career, was there a point where you sort of saw this change coming?

A.   Yeah, when Deborah Reede became chairman.

Q.   Nationally that's when it started?

A.   Nationally is when it started, I wasn't aware of what was going on nationally until it happened to me.

Q.   Now that you know more about the national story, when do you think this did start nationally?

A.   Probably before -- even before the introduction of Obama care, but Obama care is one of the major drivers of that.

Q.   And what impact did it have on

Page 43

Greenberg

physicians caring for patients nationally?

MR. NELSON:  What's it?

Q.   The corporatization of medicine.

A.   It's driving doctors out of practice and forcing them to retire early.

Q.   How is it doing that?

A.   It's taking control of what they do as physicians and how they take care of patients away from them, and those things are being governed by nonphysicians, insurers, administrators.

Again, there's a lot of focus on metrics and productivity and physicians are being forced to see more patients than they can deal with, and they're being forced to spend much more time documenting as opposed to caring for patients.

I think a lot of physicians feel that they're just cogs in a machine now rather than being independent professionals making decisions for their patients that they feel are appropriate.

Q.   Is the use of attestations part of the corporatization of medicine?

Page 44

Greenberg

A.   I believe so.

Q.   Who was your supervisor at the time of your termination in October 2014?

A.   My direct supervisor was Steven Pulitzer.

Q.   Who was your supervisor prior to --

A.   Alan Kantor.

MR. NELSON:  Let him finish his question.

THE WITNESS:  Sorry.

Q.   Who was your supervisor before Dr. Pulitzer?

A.   Dr. Alan Kantor.

Q.   When did Dr. Kantor first become your supervisor?

A.   When I came back in 2010.

Q.   And what was his position?

A.   He was the director of radiology at Kings County Hospital.

Q.   Was he the director of radiology before you left SUNY Downstate in 2008?

A.   I don't believe so.

Q.   Do you know who was the director

Page 45

Greenberg

before Dr. Kantor?

MR. NELSON:  I object to the form.

A.   Salvatore Sclafani.

Q.   And I think before you had said Dr. Sclafani was the one who hired you back to SUNY Downstate?

A.   Uh-hum.

Q.   Does that refresh your recollection he still had that position when you returned to SUNY Downstate?

A.   He had the position as chairman as well as chief of service at Kings County.

Q.   Okay.

A.   So he had dual roles.

Q.   Understood.  So he did have, you believe he did have the position of director of radiology in 2010 at KCHC?

A.   No, at that point I believe he was just the chairman, and he had made Alan Kantor the director.

Q.   Did Dr. Kantor have anything to do with your hiring in 2010 --

12 (Pages 42 - 45)

Page 62

Greenberg

to install a twelve to eight shift, and he was asking me and one other person to do much more coverage of that twelve to eight shift than anybody else, and in addition, I had discussed with him the issues with my son, he was well aware of my child, and I specifically requested that I cannot work till eight o'clock, I have a special needs child and I have to attend to him.

Q.   Did you work the twelve to eight shift when it was assigned to you?

MR. NELSON:  I object to the form.

A.   I don't think I stayed till eight o'clock that week, because I had family responsibilities.

Q.   Did you apply for leave for any portion of that shift due to family responsibilities?

A.   I didn't apply for leave, I made it clear to Dr. Kantor that I couldn't work those hours.

Q.   In what conversation, was it by e-mail, in person?

Page 63

Greenberg

A.   There is an e-mail to that effect, and probably in person as well.

Q.   If you go down to the second paragraph of the first e-mail, the e-mail from you to Dr. Kantor, the second sentence says we used to have some flexibility amongst professionals and now it's gone, making for it a difficult work environment where every move is watched and critiqued, do you see that?

A.   Uh-hum.

Q.   What are you referring to there?

A.   Well, as of the arrival of Dr. Reede, all of these metrics were being carefully watched, including our hours, and it made it very difficult to deal with things on a professional level with my colleagues.

MR. NELSON:  When you get to a convenient point in the next few minutes, can we take a break?

MR. COULSTON:  Sure.

Q.   When you say we used to have some flexibility, what period of time were

Page 64

Greenberg

you referring to when there was flexibility?

A.   Every year before Dr. Reede arrived.

Q.   So you didn't like the changes that had been instituted by Dr. Reede?

A.   I didn't think we were being treated as professionals.

Q.   And is this again going back to that point about the corporatization of medicine, did you feel that this was part of that process, this attention to metrics and the lack of flexibility for professionals?

A.   I had those thoughts much later on, but in retrospect, that would fit that.

Q.   And these changes, they weren't just applied to you, correct?  Everyone was subject to the new metrics and being critiqued and monitored, or watched and critiqued as you said, after Dr. Reede arrived, is that correct?

A.   To one degree or another, yeah.

Page 65

Greenberg

Q.   What do you mean by that?

A.   I don't know that it was applied across the board very fairly.

Q.   Who were treated differently?

A.   There were people in the department who were not pulling their weight.

Q.   Who were those people?

A.   Patrick Hammil, Steve Waite, Qi Chen.

Q.   Anyone else?

A.   That's it, as far as I knew.

MR. COULSTON:  Let's take a break.

[A recess was taken.]

MR. COULSTON:  Mark this.

[Whereupon, at this time, the reporter marked as Greenberg Exhibits 6 & 7 the above-mentioned documents Bates stamped HHC ESI 84 and HHC ESI 102 respectively for identification.]

Q.   Dr. Greenberg, I'm handing you what's been marked as Greenberg 6, and this is an e-mail from you to Dr. Kantor,

17 (Pages 62 - 65)

Page 130

Greenberg

discrimination --

A. That is my feeling, yes.

Q. Why is that your feeling?

A. Because I was much more qualified than she was.

Q. Do you believe she was hired because she was black?

A. Yes.

Q. And why do you believe that?

A. Because she was black, and Deborah Reede was black, and I was much more qualified than Jinel Scott, so I see no other reason.

Q. You were more qualified why?

A. I had 20 years more experience than her, I was fellowship trained, I was doubly boarded, I had been in the ER for 14 years, I trained her.

Q. Any other reasons you were more qualified?

A. I think that says it all right there.

Q. So you were more qualified than Dr. Reede and Dr. Scott-Moore were both

Page 131

Greenberg

black?

MR. NELSON: Well, they still are.

Q. Do you believe Dr. Scott-Moore is not qualified to be the director of ER radiology at KCHC?

A. I don't know how to -- how to judge that. That's a matter of opinion.

Q. What is your opinion?

A. I don't really have an opinion.

Q. So you have no opinion on whether or not Dr. Scott-Moore is qualified to be the director of ER radiology?

MR. NELSON: That's what he just said. Asked and answered.

MR. COULSTON: Okay.

Q. During your meeting on July 23rd with Dr. Reede, did you discuss your interest in future publications or future scholarly activity?

A. Yes, I did.

Q. And what did you say?

A. I said that I was working on a

Page 132

Greenberg

paper, and that I wanted to write other papers, but I also wanted to have academic time to do so.

Q. Did you ask her for academic time at that point?

A. I mentioned it.

Q. Did you tell her you needed the academic time to be able to work on papers?

A. Yes.

Q. And when you say academic time, what does that mean?

A. That means time off from your normal responsibilities to just work on a paper, on your publication and on your research.

Q. And so it's part of your normal, regularly scheduled hours, you'd have time dedicated to working on scholarly activity?

A. Exactly.

Q. Do you know if Dr. Scott gets academic time?

A. Dr. Scott --

Page 133

Greenberg

MR. NELSON: Presently or at some other point in time?

Q. Do you know if Dr. Scott has ever received academic time while employed --

A. I have no --

Q. -- at KCHC?

A. -- no clue.

Q. Do you know if she requested academic time from Dr. Reede?

A. I don't know.

Q. Did Dr. Reede talk to you about the possibility of you having some administrative responsibilities along with Dr. Scott in the ER radiology department?

A. She mentioned that.

Q. What did she say?

A. She said that she had hoped that we would work together.

Q. What do you mean work together, work together in a director role?

A. She never said anything about me being a director, but she said that -- that I could work on administrative

34 (Pages 130 - 133)

Page 154

Greenberg

of the period, the end of the month?

A. Like early the next month.

Q. Who did you send the timesheets to when they were completed?

A. I filled them out and I handed them to Linda McMurren.

Q. Were they due at a certain point in the following month?

A. She would remind us, but it was usually early the following month.

Q. How did you reconstruct what hours you had worked when you filled it out retroactively?

A. I had -- I had started to keep a log, but for whatever reason, I didn't have that day in my log.

Q. When did you start keeping a log?

A. Probably around that time.

Q. What prompted you to start keeping a log?

A. I don't recall.

Q. Had you kept a log before this time?

Page 155

Greenberg

A. I don't remember when I started keeping a log.

Q. Did you keep a log in 2013?

A. I'm not sure.

Q. In timesheets from 2013 and before, would you just put in nine to five for the days you worked or would you list your hours based upon when you arrived and when you left?

A. My hours every day were approximately nine to five, whether I arrived at 9:30 because I was late and stayed till 5:30, I didn't feel that it was relevant. I worked eight hours every day. We're professionals, we don't punch a clock.

Q. What did you think about this type of oversight of your hours? Were you upset about this?

MR. NELSON: I object to the form.

A. It was an administrative thing, you know, I did what I had to do.

Q. Was this part of the

Page 156

Greenberg

corporatization of medicine?

A. I don't know. What do you think?

Q. I get to ask the questions. Do you think it was part of the corporatization of medicine?

MR. NELSON: He said he didn't know.

A. It could be, I don't know.

Q. It could be, you don't know?

A. Yeah.

Q. Are there any other inaccuracies on this timesheet that you're aware of?

A. Not that I'm aware of.

Q. The time entry for April 8th, what does that indicate?

A. April 8th says nine to five on here.

Q. And does that mean you worked eight hours that day?

A. I worked at least eight hours every day, if I could.

Q. So you worked at least eight hours on April 8th?

Page 157

Greenberg

A. As far as I can recall based on this.

MR. COULSTON: Can you mark this as Greenberg 17.

[Whereupon, at this time, the reporter marked as Greenberg Exhibit 17 the above-mentioned document Bates stamped SUNY ESI 605 for identification.]

Q. Handing you what's been marked as Greenberg 17. Take a moment to take a look at that. It's SUNY ESI 605.

And you see in this e-mail in the first sentence, it says just for the record, hi, Linda, just for the record, I am documenting that I took an emergent half day off last Tuesday for a family issue, and this week due to Passover, I'll be leaving early Monday and Tuesday, do you see that?

A. Uh-hum.

Q. Did you, as far as you know, take off, take an emergent half day on Tuesday, 4/8, April 8th?

40 (Pages 154 - 157)

**A367**

Page 158

Greenberg

A.   According to this e-mail, correct.

Q.   And you did not enter that into your timesheet, correct?

A.   If we took a comp. day off, we were told to still write nine to five.

Q.   You indicate at the bottom of the e-mail that you did take some comp. days, but you don't list April 8th.  It says took comp. days on 4/17 and 4/18, do you see that?

A.   Uh-hum.

Q.   You don't list taking comp. days for April 8th.

A.   Well, again, we're professionals, and if I have to take emergent time off, then I let them know about it, and that time that I took off would be made up later on, and that's what the e-mail's about.  So I'm not quite sure why I wrote nine to five, but again, it could just be a clerical error and I just forgot and didn't write it down.

Bottom line is we worked eight

Page 159

Greenberg

hours every day and if we came in late, we stayed late or we made up time later on.

Q.   So for April 8th, you're saying you would have made the time up later on?

A.   Yes, I in fact did.

Q.   Did you get approval from Dr. Kantor to make up the time later on?

A.   I don't recall.

Q.   For April 22nd, you indicate, it's written SL, do you see that?

A.   Uh-hum.

Q.   What does that mean?

A.   Sick leave.

Q.   When are you eligible to take sick leave?

A.   Any time I'm sick.

Q.   What about for any other reasons?

A.   I don't know.  I've only taken sick leave for being sick.

MR. COULSTON:  This is Greenberg 18.

[Whereupon, at this time, the reporter marked as Greenberg Exhibit

Page 160

Greenberg

18 the above-mentioned document Bates stamped SUNY ESI 609 for identification.]

Q.   Handing you what's been marked Greenberg 18.  This is an e-mail from you to Linda McMurren on April 22, 2014, SUNY ESI 609.

Is this an e-mail that you sent to Ms. McMurren?

A.   Yes.

Q.   And you'll see in the e-mail the first sentence says hi, I had to go back to PA last night to pick up my family, planning to drive them back early this a.m.  Unfortunately our car wouldn't cooperate.  Do you see that?

A.   Uh-hum.

Q.   Is a car not working a valid reason to take sick leave?

A.   There's no other option here for that.  It says either holiday, sick leave, annual leave, educational leave.

Q.   What's annual leave?

A.   I guess that's vacation.

Page 161

Greenberg

Q.   Why didn't you use your vacation time?

A.   I didn't see how it mattered.

Q.   How are you assigned leave time, is it one bucket, do you have separate buckets for different categories --

A.   Yes.

Q.   -- of leave?

A.   Sick leave and annual leave, you accrue them every month.

Q.   You thought it didn't matter whether or not you put sick leave or annual leave for your car not cooperating on April 22nd?

A.   Annual leave you have to apply for and fill out a form, I wasn't sure, clearly, what to put in there, I had to put something in there.

Q.   Did you ask anyone what you should put in there?

A.   I didn't think it mattered.  I made it clear that I wasn't coming in for a reasonable reason.

Q.   What was wrong with your car

41 (Pages 158 - 161)

**A368**

Page 178

Greenberg

A.   I have no idea, you'd have to ask her.

Q.   Did it have anything to do with your race, religion or age?

MR. NELSON:  He just said he had no idea.

A.   Yeah, I don't know.

Q.   So as far as you know, it was not because of your race, religion or age?

A.   I didn't say that, but I just don't know.

Q.   Right, and the question was as far as you know, it wasn't because of your race, religion or age?

A.   I started to believe that that was the case.

Q.   Based on what?

A.   Based on the fact that she was singling me out and fired five Jewish attendings and hired somebody who was much less qualified than me to be my director.

Q.   There's a lot in that answer. Were you the only one whose time and attendance was being monitored at this

Page 179

Greenberg

point in time or you thought was being monitored at this point in time?

A.   I didn't know.

Q.   Do you know why Qi Chen was terminated by SUNY Downstate?

A.   I have no idea.

Q.   Let's talk about the firing of the five attendings, who are you referring to there?

A.   I think I'm counting myself as one of the five, so it should be four attendings.  It'll be David Areman, Alan Kantor, Daphne Roitberg and Cathy Mason.

Q.   Do you know if Dr. Reede decided to fire Dr. Kantor?

A.   Do I know what?

Q.   Do you know whether it was Dr. Reede's decision to fire Dr. Kantor?

A.   I don't know.

Q.   Do you know whether it was Dr. Reede's decision to non-renew Dr. Areman?

A.   I don't know.  I wasn't privy to the conversation on the date Areman told me that she fired him.

Page 180

Greenberg

Q.   Did Dr. Areman say why he was fired?

A.   No.

Q.   Did you ever receive a letter of non-renewal in or around June of 2013 from SUNY Downstate?

A.   Probably, that was their routine.

Q.   Do you know what the purpose of that letter was?

A.   The purpose of the letter?

Q.   Yes.

A.   The purpose of the letter was to give us a year's notice as to when we were going to be renewed or not renewed.

Q.   Were you renewed around July 2014?

A.   I was.

Q.   And Dr. Areman, Dr. Kantor, Dr. Roitberg and Dr. Mason were not renewed at that time as far as you know?

A.   They were not renewed, but -- yeah, they were not renewed.

Q.   And you had said that Dr. Reede

Page 181

Greenberg

had fired the four attendings, not five, what is your knowledge of the circumstances leading to the non-renewal of Dr. Areman?

A.   I don't know what the circumstance is, I don't know why he was non-renewed, he was an excellent physician.

Q.   How do you know it was Dr. Reede's decision?

A.   I know that he met with her, and she told him.

Q.   Do you know anything about her basis for not renewing Dr. Areman to the extent it was her decision?

A.   I have no idea.

Q.   Did you ever talk to her about her basis for the non-renewal of --

A.   No.

Q.   -- Dr. Areman?

A.   No.

Q.   As a general matter, you had a meeting in May with Dr. Reede, correct?

A.   Uh-hum.

46 (Pages 178 - 181)

**A369**

Page 182

Greenberg

Q.   And you had a meeting in July 2014 with Dr. Reede, correct?

A.   Correct.

Q.   Did you have any other meetings in the 2013-2014 time period with Dr. Reede?

A.   I don't think so, I think those are the only two times I met with her.

Q.   What interactions did you have with Dr. Reede in the 2013-2014 time period?

A.   I saw her at some faculty meetings.

Q.   Anything else?

A.   No.

Q.   Did you ever talk to her about any issues in the department informally?

A.   Via e-mail, yeah.

Q.   What do you know about the reasons for Dr. Kantor's non-renewal?

A.   I don't know anything specific.

Q.   Do you think it was on the basis of his race, religion or age?

MR. NELSON:  I object to the

Page 183

Greenberg

form.

Q.   You can answer.

A.   Yeah, I think so.

Q.   And why do you think that?

A.   Because she fired Jewish attendings, didn't hire a single one, and brought in African American, black attendings to fill their positions.

Q.   How many African American radiologists were there before Dr. Reede arrived?

A.   There was Steve Waite, and that's about it.  There were -- there were many residents who were African American or Caribbean American.

Q.   How many African American attending physicians were hired or brought into SUNY Downstate by Dr. Reede?

A.   At least two.

Q.   Who are those two?

A.   Jinel Scott and Rhonda Osborne.

Q.   Do you know of any other African American attending physicians who were hired by Dr. Reede?

Page 184

Greenberg

A.   I didn't meet all the people that she hired, and she may have hired people after I left, so I don't know.

Q.   You filed a complaint in this matter asserting that she was getting rid of white Jewish doctors and hiring black doctors --

A.   Uh-hum.

Q.   -- correct?

A.   Yes.

Q.   But you're saying the only black doctors you know of who were hired were Dr. Scott and Dr. Rhonda Osborne, is that correct, is that your testimony?

A.   Yes, and they replaced at least three of the people that she fired.

Q.   Do you know if she's hired any other --

A.   I'm not aware of --

Q.   Hold on.

MR. NELSON:  Let him finish --

THE WITNESS:  I'm sorry.

MR. NELSON:  -- his questions.

Q.   Do you know Dr. Craig Linden?

Page 185

Greenberg

A.   I don't know him personally.

Q.   Do you know what religion he is?

A.   I don't.

Q.   Do you know if Dr. Reede hired him?

A.   I believe so.

Q.   Do you know if he's Jewish?

A.   I believe he's not.

Q.   You believe he's not Jewish?

A.   Yes.

Q.   What about Dr. Alicja Goracy, do you know --

A.   I don't know anything about her.

Q.   And Dr. Robert Leonardo?

A.   I don't know him either.

Q.   Dr. Samir Jethwal?

A.   Don't know them.

Q.   Are any of those doctors black?

A.   I don't -- I've never met them.

Q.   How many attending physicians are there in the radiology department?

MR. NELSON:  Are you asking about any particular period of time?

Q.   Let's say as of 2014, July/

47 (Pages 182 - 185)

**A370**

Page 242

Greenberg

Dr. Pulitzer?

A.   I don't know.

Q.   What happened on September 4th?

A.   On September 4th, I stayed home with my son to care for him, to talk with him, to try to get him to understand what was going on.

When I got out of bed that morning, I injured my back. I remained home with him, my mother-in-law had come, and between all of us, we were there to support him.

Q.   When you woke up, did you plan to go to work that day?

A.   The truth of the matter is I didn't plan to go to work that day.

Q.   Okay. You never planned to go to work on September 4th?

MR. NELSON:  I object to the form. That's not his testimony.

A.   I planned to stay home and take care of my son.

MR. COULLSTON:  Okay. Twenty-nine.

Page 243

Greenberg

[Whereupon, at this time, the reporter marked as Greenberg Exhibit 29 the above-mentioned e-mail from the witness' Downstate e-mail account to CTM@Outtengolden.com for identification.]

Q.   Handing you what's been marked Greenberg 29, this is an e-mail you sent from your Downstate e-mail account to CTM@Outtengolden.com, do you see that?

A.   Uh-hum.

Q.   Who is CTM@Outtengolden.com?

A.   That's Carmelyn, I forgot her last name. It's a law firm, Outten & Golden, I'm sure you know.

Q.   You sent this on October 9th, and you wrote I didn't know my mother-in-law would be coming from PA to help out. I'd hurt my back. I thought initially that I could make it and subsequently decided against it.

Does this mean, at least does the e-mail state that you had intended to go to work that day --

Page 244

Greenberg

MR. NELSON:  I'm directing --

Q.   -- but after you hurt your back you decided not to, is that correct?

MR. NELSON:  I direct you not to answer anything further.

MR. COULSTON:  This was sent on a Downstate e-mail account, there's no expectation of privacy, it is not a privileged communication.

MR. NELSON:  That's a conversation you and I can have --

MR. COULSTON:  It is.

MR. NELSON:  -- or we can have before a judge, but he's not going to testify any further about a communication --

MR. COULSTON:  Eric.

MR. NELSON:  -- that appears to be directly between him and an attorney whether he used a server thinking that it was secure or he used a server not thinking it was secure. You might as well move on, because I'm going to direct him on this document.

Page 245

Greenberg

MR. COULSTON:  Well, we might have to return to it on another occasion.

MR. NELSON:  Okay.

MR. COULSTON:  I mark for the record that we reserve our rights to continue questioning on this.

MR. NELSON:  You sure do.

MR. COULSTON:  This is Greenberg 30.

[Whereupon, at this time, the reporter marked as Greenberg Exhibit 30 the above-mentioned document Bates stamped SUNY EIS 752 to 753 for identification.]

MR. NELSON:  And we'll just assert for the record that any arguable waiver of privilege as it was inadvertent with respect to Exhibit 29, SUNY ESI 710.

MR. COULSTON:  It was our document.

MR. NELSON:  It's only your document because you took it down off

62 (Pages 242 - 245)

**A371**

Page 274

Greenberg

Q.   Isn't that right?

A.   Yes.

Q.   And you'd had a meeting on May 5th with Dr. Reede regarding time and attendance issues, isn't that right?

A.   Yes.

Q.   Did you discuss issues besides the September 4th and 5th absences during your interrogation on September 8, 2014?

A.   Yes, it's all in the document.

Q.   Did you have time to review the settlement agreement prior to signing it?

A.   No.

Q.   You did not have time to review it?

A.   I barely reviewed it.

Q.   How long would you need to read this document?

MR. NELSON:  I object to the form.  Today?

Q.   How long would you need to read this document?

MR. NELSON:  I object to the form.

Page 275

Greenberg

Q.   You can answer.

A.   I don't know, ten -- five, ten minutes.

Q.   Were you not given five to ten minutes to review it?

A.   There's a lot of legal terms here that I didn't understand, and I didn't understand the nature of the document.

Q.   But did you read it?

A.   I flew through it, I didn't read every word of it.

Q.   So you're saying you skimmed this agreement before signing it?

A.   Yes.

Q.   And then you did sign it?

A.   Yes.

Q.   What is an attestation?

A.   An attestation is something that is added to a radiology report to attest that I reviewed the study with the resident and that I agreed or disagreed.

Q.   And why do hospitals use attestations?

Page 276

Greenberg

MR. NELSON:  I object to the form as to why somebody else does something.

A.   I don't know.

Q.   You have no idea why?

A.   I don't know of any good reason.

Q.   Do you know of any reasons that the hospital uses, though?

A.   It's a requirement by certain insurance agencies and Medicare to -- in order to get reimbursed.

Q.   And did you know that as of September 22, 2014?

A.   September 22nd, I believe I did.

Q.   Do you recall a meeting the morning of September 22, 2014 where attestations were discussed?

A.   I recall coming late to a meeting at the very end.

Q.   So you missed most of the meeting?

A.   I did.

Q.   And if others were to testify that you were there for the meeting, they

Page 277

Greenberg

would not be telling the truth?

A.   If they were to -- I was at the meeting.

Q.   You were not there for the entire meeting?

A.   That's true.

Q.   How much of the meeting were you there for?

A.   Probably the end of it or half of it.

Q.   How long?

A.   I do not recall.

Q.   What do you recall being discussed regarding attestations in that meeting?

A.   I recall some templates being presented to us, and I was led to believe that they were examples of what to use as an attestation.

Q.   What lead you to believe that they were examples?

A.   Dr. Pulitzer.

Q.   And what words did he use to convey that?

70 (Pages 274 - 277)

Page 314

Greenberg

Q. They do, I've been there, and --
A. Okay.
Q. -- and you worked there, so did they ask you for your ID when you showed up to serve Dr. Reede?
A. Nobody asked me for my ID.
Q. Did you just walk right past the security guard?
A. I know the security guard.
Q. So you didn't show the security guard any official ID?
A. Not that I remember.
Q. Have you ever referred to Dr. Reede as a cunt?
A. I don't recall saying that.
        MR. COULSTON: This can be Greenberg 35.
        [Whereupon, at this time, the reporter marked as Greenberg Exhibit 35 the above-mentioned e-mail for identification.]
Q. I've handed you Greenberg 35. You can flip through the entire document, but I'm going to focus on the first e-mail

Page 315

Greenberg

at the top of the first page.
A. Uh-hum.
Q. Who is Michael Garrett?
A. I think he's a psychiatrist.
Q. You see five or six lines down you said bringing in Stalin as our new chairperson?
A. Yes, I see that.
Q. Are you referring to Dr. Reede there?
A. She doesn't much look like him, but yeah.
Q. Well, why were you comparing her to Stalin?
A. Because she acted like Stalin.
Q. How did she act like Stalin?
A. I felt her behavior was tyranny.
Q. In what way?
A. She disrespected a lot of the staff, she indiscriminately terminated people, she hired whoever she felt like and she made discriminatory comments, and the morale in the department sank to an all-time low.

Page 316

Greenberg

Q. Anything else?
A. Isn't that enough?
Q. You did not like her as a supervisor?
A. I didn't like her as a person or a human.
Q. And as a supervisor?
A. Okay.
Q. I'm asking.
A. No, I didn't like her.
Q. What's your opinion of Dr. Pulitzer?
A. Not trustworthy, dishonest, trying to save his own ass.
Q. Did you feel that way about him at the time of your termination?
A. Yes.
Q. And did you feel that way about him in August/September 2014 as well?
A. No, I had been very friendly with him.
Q. So why did your opinion of him then change?
A. He's the father of a child with

Page 317

Greenberg

autism, and he denied me leave to spend time and care for my son who has an autism spectrum disorder, I think that's despicable.
Q. Anything else?
A. He lied during his deposition.
Q. What did he lie about?
A. He lied about having a meeting with me and telling me that I could have any hours I wanted or whatever hours I wanted to work, I've never had that discussion with him. He lied about not saying that Dr. Reede is like a cop, and she's looking to get me. And he lied about me not telling him the reasons for my leave.
Q. Anything else that he lied about during the deposition?
A. Not that I can remember right now.
Q. Do you think Dr. Pulitzer is a racist?
A. No.
Q. You brought a discrimination

80 (Pages 314 - 317)

Page 326

Greenberg

Samin, correct?

A.   I have no idea what they specifically tried to do.

Q.   And it's possible that Pitts Management made recommendations regarding the reductions in salary and Dr. Reede had nothing to do with --

A.   Anything's possible.

MR. NELSON:  I object to the form.  Let him finish and let me object if I need to before you answer.

THE WITNESS:  Okay.

Q.   Why do you think Dr. Reede did not begin the process of orchestrating your termination until May 2014?

A.   You'll have to ask her.

Q.   Do you know why?

A.   No.

Q.   But to your knowledge, she did nothing prior to May 2014?

A.   She could have been doing stuff behind the scenes, I don't know.

Q.   You're not aware of anything as you sit here?

Page 327

Greenberg

A.   No, I'm not.

Q.   So your termination had nothing to do with irregularities in your time and attendance and your use of unapproved attestations?

A.   I felt that those were really trumped up charges and pretext.

Q.   When the physicians were not renewed at the end of June 2014, were they given any reason as to why they were not renewed?

A.   I'm not aware of the reasons.

Q.   Do you know if a reason was required for their non-renewal at that point in time?

A.   I believe that they were entitled to a reason.

Q.   I understand that, under the collective bargaining agreement, do you know if they could be fired for no cause at that point in time?

A.   I'm not aware of the specific details of the CBA with regards to that.

Q.   Before you had said that, and

Page 328

Greenberg

you can correct me if I'm mischaracterizing your testimony, that there was no basis to get rid of you in June 2014, July 2014 when the other doctors were not renewed, do you recall that testimony?

A.   Yes.

Q.   Do you know if she required a basis to terminate you at that point?

A.   I don't know.  I don't know what the -- I don't know.

Q.   Would it change your view on her decision to terminate you if you knew she could have fired you for any reason at that point in time, she could have non-renewed you for any reason at that point in time?

MR. NELSON:  Let me have that question read back, please.

[The requested portion of the record was read.]

MR. NELSON:  I object to the form.  You can answer.

(Ms. Greenberg left the room.)

Page 329

Greenberg

A.   Would it have changed my opinion?

Q.   Yes.

MR. NELSON:  I think the word was view, but close enough.

A.   No.

Q.   Why doesn't it change your view?

MR. NELSON:  I object to the form.

Q.   And your view here is that she needed some basis to get rid of you.

MR. NELSON:  I object to the form.  I'm not sure that's exactly what he said, but that's fine.  My objection's noted.

A.   Why would it have not changed my view -- can you read the whole question over again, I'm sorry?

Q.   Yes, we'll take a step back, I'll do it again.

You believe Dr. Reede terminated you based on trumped up charges --

A.   Yes.

Q.   -- correct?

83 (Pages 326 - 329)

362

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ODED GREENBERG, M.D.,

                                        PLAINTIFF,
                    -against-           Case No.:
                                        15 CV 2343
                                        (PKC/VMS)

STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL CENTER a/k/a
THE STATE UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER AT
BROOKLYN a/k/a SUNY DOWNSTATE MEDICAL CENTER, NEW YORK CITY
HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY HOSPITAL
CENTER, DEBORAH L. REEDE, STEVEN PULITZER and JOHN AND JANE
DOES 1-20,

                                        DEFENDANTS.
------------------------------------------------------------X


                    DATE:   January 23, 2017

                    TIME:   9:45 A.M.


          CONTINUED DEPOSITION of the Plaintiff,

ODED GREENBERG, M.D., taken by the Defendants, pursuant to

Stipulation between Counsel and to the Federal Rules of

Civil Procedure, held at the offices of New York City Law

Department, 100 Church Street, New York, New York 10007,

before Gary Merola and Carolyn Crescio, Notaries Public of

the State of New York.

363

A P P E A R A N C E S:


ERIC M. NELSON, ESQ.
          Attorney for the Plaintiff
          ODED GREENBERG, M.D.
          112 Madison Avenue
          New York, New York 10016
          BY:  ERIC M. NELSON, ESQ.
          emnlegal@gmail.com


ERIC T. SCHNEIDERMAN, ESQ.
ATTORNEY GENERAL OF THE STATE OF NEW YORK
          Attorney for the Defendants
          STATE UNIVERSITY HOSPITAL-DOWNSTATE
          MEDICAL CENTER a/k/a THE STATE UNIVERSITY OF NEW
          YORK HEALTH SCIENCE CENTER AT BROOKLYN a/k/a SUNY
          DOWNSTATE MEDICAL CENTER
          120 Broadway
          New York, New York 10271
          BY:  CHRISTOPHER V. COULSTON, ESQ.
          christophercoulston@ag.ny.gov

                - AND -

THE STATE UNIVERSITY OF NEW YORK
          450 Clarkson Avenue
          P.O. Box 1258
          Brooklyn, New York 11203
          BY:  WILLIAM S. VERSFELT, ESQ.
          william.versfelt@downstate.edu


ZACHARY W. CARTER, ESQ.
CORPORATION COUNSEL
NEW YORK CITY LAW DEPARTMENT
          Attorneys for the Defendant
          NEW YORK CITY HEALTH AND HOSPITALS
          CORPORATION and KINGS COUNTY HOSPITAL CENTER
          100 Church Street
          New York, New York 10007
          BY:  TANYA N. BLOCKER, ESQ.
          File #:  2015-047890
          Control #:  164420
                    *          *          *

**A376**

463

O. GREENBERG

Do you recall that testimony?

A.    Yes.

Q.    I believe you testified that was Dr. Reede, Dr. Pulitzer, labor relations and Dr. Jamaleddine?

A.    Correct.

Q.    Did Dr. Jamaleddine agree with the decision to discharge you as far as you know?

MR. NELSON:  Object to the form.

A.    I don't know.

Q.    Do you believe Dr. Jamaleddine discriminated against you on the basis of your age, race or religion?

A.    I believe Dr. Jamaleddine participated in the process which allowed for that to happen, yes.

Q.    Do you have any reason to believe that he himself discriminated against you on the basis of your age, race or religion as part of the process that culminated in your discharge?

MR. NELSON:  Object to the form.

A.    I believe he was part of the machinery of what happened.

Q.    I understand that.

Did you think that he personally discriminated against you based on your age, race or religion?

A.    I don't have any reason to believe that he personally discriminated against me.

464

O. GREENBERG

Q.    And that is with respect to your age, race or religion?

A.    Correct.

Q.    Who were the individuals from labor relations who participated in the decision-making that culminated in your discharge?

MR. NELSON:  Object to the form.

A.    The individuals that I am familiar with as part of this litigation and through my experience with them are Cuiman Leonzo, Stephanie Bernadel, Michael Arabian and Conde-Billy.  I don't remember her first name.

Q.    Is it Areman?

A.    Areman Conde-Billy.

Q.    With respect to Mr. Cuiman, do you know if Mr. Cuiman felt that you should be discharged as of October 2014?

MR. NELSON:  Let me just object.

Are you asking him what he knew as of October 14th or whether Cuiman felt that way as of October 2014.

Q.    Cuiman felt that way as of October 2014.

A.    Again Mr. Cuiman was part of the decision-making process.

Q.    Do you know if he did agree that you should be terminated?

**A378**

476

O. GREENBERG

amended complainant and demand for jury trial was

marked as Greenberg's Exhibit 41 for

identification as of this date by the Reporter.)

Q.    Dr. Greenberg, do you recognize this document?

A.    Yes.

Q.    What is this document?

A.    It's the second amended complaint and demand for jury trial.

MR. COULSTON:  I also note this is the

redacted version for the record.

Q.    If you can turn to page six and this is the most recent version of your Complaint in this litigation; is that correct?

A.    I'm not sure, I think.

Q.    I can represent to you there has been no additional version of your Complaint filed on the documents in this case.

If you look at paragraph 19, do you see that?

A.    Yes.

Q.    I want to look at some of the physicians here.

You allege that a number of physicians were terminated on account of them being white, Jewish and/or older, do you see that?

A.    Yes, I do.

Q.    What do you know about the circumstances

DIAMOND REPORTING  (877) 624-3287  info@diamondreporting.com
476

**A379**

477

O. GREENBERG

surrounding the termination of Catherine Mason?

A.    I don't have any specifics with regard to her termination.

Q.    Did you work with Dr. Mason?

A.    Not directly.

Q.    Did you have an opinion of her as a physician?

A.    Not really.

Q.    What do you know about the termination, the circumstances leading up to the termination of Daphne Roitberg?

A.    I don't know the circumstances.

Q.    Did you work with Dr. Roitberg?

A.    Not at all.

Q.    And I assume you don't have an opinion of her as a physician?

A.    No, I don't.

Q.    What do you know about the circumstances leading to the termination of Dr. Areman?

A.    I don't know about the circumstances leading to his termination.

Q.    You did work with Dr. Areman; is that correct?

A.    Yes.

Q.    What did you think of Dr. Areman as a physician at the hospital?

A.    I thought he was a fine radiologist and a good

519

O. GREENBERG

Q.    Anything else for Dr. Goldfisher?

A.    No.

Q.    And besides what you previously testified to regarding Esther Neiman, any other incidents or any other knowledge she has of bias or discriminatory statements and conduct by Dr. Reede?

A.    No. I think I covered that.

Q.    Were you angry with Dr. Reede following the non-renewals in June of 2014?

A.    Yes.

Q.    Were you paid for your leave on September 4th and September 5th of 2014?

A.    I'm not sure.

Q.    Did you ever file a grievance regarding your pay for the days, September 4th and September 5th, 2014?

A.    I did not file a grievance.

Q.    Did you talk to the union once -- after your leave was denied by Dr. Pulitzer on September 3rd, 2014?

MR. NELSON:  Object to the form.

A.    I did not talk to the union on September 3rd, 2014.

Q.    You testified earlier about the hiatus and service at SUNY Downstate, which I believe was 2008 to 2010; is that correct?

A.    Yes.

[Page 1]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------X

 ODED GREENBERG, M.D.,


                                          15-cv-2343(PKC/VMS)



                Plaintiff,


        -against-


   SUNY DOWNSTATE ET AL.,


                Defendants.

--------------------------------X



                                   112 Madison Avenue

                                   Sixth Floor

                                   New York, New York 10016

                                   October 26, 2016

                                   9:43 a.m.




            EXAMINATION BEFORE TRIAL OF

              STEVEN PULITZER, M.D.

**A382**

EXAMINATION BEFORE TRIAL of STEVEN PULITZER, M.D., a witness on behalf of the Defendant herein, Pursuant to the Federal Rules of Civil Procedure, and Court Order, taken on behalf of the Plaintiff, held at the above-mentioned time and place, before Elisheva Moskowitz, a Certified Court Reporter and Notary Public for and within the State of New York.

[Page 2]

A P P E A R A N C E S:

LAW OFFICES OF ERIC M. NELSON
Attorneys for Plaintiff
ODED GREENBERG, M.D.
112 Madison Avenue
Sixth Floor
New York, New York 10016
Tel: (212) 354-3666
BY: ERIC M. NELSON, ESQ.

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
Attorneys for Defendant
KINGS COUNTY HOSPITAL
100 Church Street
New York, New York 10007
Tel: (212) 356-3177
BY: TANYA N. BLOCKER, ESQ.
E-mail: tblocker@law.nyc.gov

[Page 3]

A P P E A R A N C E S:

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
ERIC T. SCHNEIDERMAN
Attorneys for Defendants
STEVEN PULITZER, M.D., DEBORAH L. REEDE, M.D. and SUNY DOWNSTATE
120 Broadway
New York, New York 10271
Tel: (212) 416-8556
BY: CHRISTOPHER V. COULSTON, ESQ.
E-mail: christopher.coulston@ag.ny.gov

THE STATE UNIVERSITY OF NEW YORK
Assistant Counsel to Defendant
SUNY DOWNSTATE MEDICAL CENTER
State University Plaza
Albany, New York 12246
Tel: (718) 270-3319
BY: WILLIAM S. VERSFELT, ESQ.
E-mail: william.versfelt@downstate.edu

[Page 4]

A P P E A R A N C E S:

ALSO PRESENT:

ODED GREENBERG, M.D.,
The Plaintiff

[Page 5]

[2] (Pages 2 to 5)

Steven Pulitzer, MD
October 26, 2016                          110 to 113

Page 110

S. PULITZER, M.D.

and she has a veto.

Is that a fair way to put it?

A. Yes.

Q. Okay. Who fired Dr. Greenberg?

A. Labor Relations.

Q. What role did you have in that?

A. I was consulted.

Q. Okay. And did you give advice, opinion or recommendation in that regard?

A. Yes, I did.

Q. And what was that?

A. It -- for termination.

Q. And when did you -- when did you give that recommendation?

A. Sometime in October.

Q. Okay. At any time prior to October, did you recommend Dr. Greenberg's termination?

A. No, I did not.

Q. When did you come to the conclusion that Dr. Greenberg should be fired?

A. There was a series of disruptive behavior, insubordination and issues with time and attendance that were not only disruptive on an -- on a specific individual level but were

Page 111

S. PULITZER, M.D.

disruptive to the entire department and to the hospital, and at that time the decision was made to make a suggestion to Labor Relations for termination.

Q. Okay. I appreciate that, but I was asking for a -- time, a date or a time period in my last question.

Can you tell me when it was that you first made the recommendation to Labor Relations that Dr. Greenberg be fired?

A. I don't have an exact date.

Q. How specific can you be?

A. Sometime in October.

Q. Okay.

A. Sometime -- I don't know, sometime between the middle to the -- whenever his ultimate date of termination was.

Q. When you say "the middle", middle of what?

A. October.

Q. And when did the behaviors that you were referring to as insubordination and time and attendance issue arise?

A. There have been time and attendance issues with Dr. Greenberg for many years. When

Page 112

S. PULITZER, M.D.

I took over there was a -- time and attendance issues in terms of start of the day and end of the day, which I had tried to accommodate him with multiple times, and so that's basically it. It's just when I started there were issues.

Q. But those issues didn't prompt you to want him fired at that time; it wasn't until October that you decided you wanted him fired?

A. It was not until October that I was one of a number of people that made the recommendation for him to be terminated.

Q. Okay. Let's leave other people aside for the moment and talk just about you.

A. Yes.

Q. Is it true that -- that notwithstanding these issues, apparently as you say existing from the time you first became Chairman, is it the case that it was not -- notwithstanding that your recommendation that he be fired until October?

A. Can you say that again? I'm not following the notwithstanding.

Q. Okay. I believe you said that there had been time and attendance issues with

Page 113

S. PULITZER, M.D.

Dr. Greenberg for several years and that -- that there were time and attendance issues after you took over, meaning you became Chairman of Radiology at KCH.

A. Yes.

Q. Is that correct?

A. That is correct.

Q. Okay. You took over as Chairman of Radiology at KCH in July of 2014.

Correct?

A. Yes.

Q. Okay. Is it your testimony that notwithstanding the fact that there were issues, as you put it, when you took over -- meaning in July of 2014 -- it was not your recommendation to Labor Relations that he be fired until October?

A. Yes.

Q. Okay. During that period from July until October --

A. Yes.

Q. -- when you made that recommendation, was there a point at which you came to the conclusion that Dr. Greenberg should be fired?

Steven Pulitzer, MD
October 26, 2016                              114 to 117

Page 114

S. PULITZER, M.D.

A. Yes.

Q. How long before you made the recommendation to Labor Relations?

A. Almost concurrently.

Q. Okay.  So not until sometime in October?

A. Yes.

Q. Okay.  And what changed between say September and October of 2014 that prompted you to come to the conclusion that Dr. Greenberg had been fired -- should be fired?

MR. COULSTON:  Should.

MR. NELSON:  Sorry.

A. Continued disruptive and insubordinate behavior, continued problems with time and attendance, and that was it.

Q. What continued behavior or problems occurred between say September and October that caused you to come to this conclusion that Dr. Greenberg should be fired?

And I'm trying to narrow your focus to that immediately prior time frame.

A. Mm hmm.

Q. You said that there were continued problems.

Page 115

S. PULITZER, M.D.

A. Yes.

Q. What were those?

A. There were issues with time and attendance, there were issues with a disruptive attitude that was causing other staff members to become difficult to manage, and there was a number of -- or I guess the straw that -- that broke the camel's back would probably be the attestations that were -- which there were 150 -- that were inappropriate and improper placed in the patients' medical records that made it to the attention of the ultimate hospital administration.

Q. Okay.

A. And that signalled to me at that time that the egregiousness of placing something like that in a patient's record, and putting not only himself but colleagues in medical-legal jeopardy and the reputation of the hospital in jeopardy, that something had changed in him.

Q. All right.  Let's see if we can unpack that a little bit.

You made reference to the hospital's reputation.  What's your understanding of what

Page 116

S. PULITZER, M.D.

the hospital's reputation was at that time?

MR. COULSTON:  I object to the form.

A. The hospital is a long-standing institution that provides safety-net coverage for uninsured patients or patients who have no other means to pay for their insurance.  Within the system of HHC it's viewed as equivalent to their flagship hospital of Bellevue Hospital.  It has a very good reputation within the system itself.

The quality of physicians at that hospital is excellent, and the care that people receive there and the community's view of that hospital is a place where they can go to get safe, professional care.

Q. And what's the basis for your statements with -- in that regard as to the hospital's reputation?  Is that your personal observation or something else?

A. I'm not sure I understand your question.

Q. Well, how do you know that that's the hospital's reputation?

A. That is not my personal view.  It's from

Page 117

S. PULITZER, M.D.

having worked there and being at the level of leadership that I am and having conversations with, you know, decision-makers in Central Office and what their opinions are of the services we provide.

That is how I view our hospital.  It's through those eyes.

Q. Okay.  Is it based on any outside source or just the people that -- in management and others that you've talked to inside the hospital?

A. That is the latter.

Q. Okay.  And sir, you made reference to something you referred to as medical-legal jeopardy.  What did you mean by that?

A. I mean that if one of those cases went to a legal mis -- you know, a malpractice case and there was a sarcastic mockery of -- of a -- of something on a chart and then all the sudden there was -- there was something medically-legally wrong, that that does not -- that that does -- that that gives the plaintiff an advantage by saying, you know, what is -- who are these people, what is the creditability of the people reading this, and why is your

Steven Pulitzer, MD
October 26, 2016                          138 to 141

Page 138

S. PULITZER, M.D.

because I had to gather all the attestations, I had to find out specifically how many there were where they were, and it took me a little bit of time to do that.

And then I also had to find -- so then I presented it to him. Then I also over the next couple of weeks had to present to him what -- what happened with Risk Management, how do we correct it, what do we do about it, how does this work. So there was a series of conversations at that time.

Q. Between you and Dr. Jameladdine?

A. Between me and Dr. Jameladdine --

Q. Was anyone else --

A. -- because I was --

Q. -- a party to any of those conversations?

A. No.

Q. And how many in total were there?

A. I don't recall that.

Q. All right. And when you say that "when the attestations came out", what do you mean?

A. I mean that I received a call from one of my staff members, physicians, saying: "I just read a report by Dr. Greenberg and there

Page 139

S. PULITZER, M.D.

is an attestation on the bottom which is completely inappropriate. You need to see this."

I don't know exactly where I was and on the campus, if I was -- I wasn't in the department at the time and I came back to the department and I looked at it, and -- and then I didn't know how many there were, what -- what the number was or what was -- you know, I didn't know anything really about it except that it had been reported to me at that moment, so it took me a little bit of time to investigate it and figure out what it was.

Q. And who was the staff member who brought it to your attention?

A. John Amodio.

Q. John?

A. Amodio.

Q. Amodio?

A. Yes.

Q. And who is -- is Amodio -- John Amodio a physician?

A. Yes, he was the Chief of Pediatric Radiology who -- he's not working there currently.

Page 140

S. PULITZER, M.D.

Q. Okay. So, Dr. Amodio told you that he read an attestation by Dr. Greenberg that in your -- in his words to you was totally inappropriate.

Is that the way he put it?

A. It was something to that effect, yes.

Q. Well, I'm asking you specifically what you recall.

A. Specifically I don't recall the exact words, but the implication was -- yes, that was the implication.

Q. Okay. And how soon after that did he convey that attestation to you?

A. How soon after what?

Q. The conversation or communication that he found it totally inappropriate?

A. How soon after what did he have that conversation? I'm not following your timeline or question.

Q. You learned of a -- an issue with an attestation from Dr. Amodio.

Correct?

A. That is correct.

Q. How long after you learned of that did

Page 141

S. PULITZER, M.D.

you see the attestation itself from Dr. Amodio?

A. Within hours of it.

Q. Okay. And how long after that did you bring it to Dr. Jameladdine's attention?

A. Within days.

Q. When you say within days, you mean less than a week?

A. Yes.

Q. Okay. Can you be any more specific?

A. No.

Q. And how did Dr. Amodio communicate his issue to you? Did he do it by phone, e-mail, face-to-face?

A. Phone.

Q. And how did you -- how did he convey the attestation he was referring to to you? Did he e-mail it to you, bring it to you? How did he do that?

A. He read part of it to me on the phone and then I got a copy of it. We printed it out after.

Q. Yeah, I'm asking you: How did you get --

A. It wasn't directly from him.

Q. How did you print that copy out? Where

U.S. LEGAL SUPPORT
(877) 479-2484

Steven Pulitzer, MD
October 26, 2016                                      142 to 145

Page 142

S. PULITZER, M.D.

did you get it from?

A. I got the medical record number from Dr. Amodio.

Q. Okay. The medical record number meaning the patient's chart?

A. Mm hmm.

Q. That's -- is that a yes?

A. Yes, that is a yes.

Q. And how long did it take you to get the chart and get the actual attestation in front of you?

A. I don't remember. It was within hours.

Q. Okay.

A. But I don't remember.

Q. And what was the first thing you did after you reviewed the attestation yourself?

A. I went to our -- I don't know what you call him; he's our IT guy -- and I said: "Is there any way we can find out how many of these there are; how many reports this attestation has been put on?"

Q. How did you know that there was more than one?

A. I didn't.

Page 143

S. PULITZER, M.D.

Q. Well, what prompted you to think that there was more than one?

A. It's my job to know what the full extent of anything is, so I -- that's part of my job.

Q. Well, you say you went to your IT person and asked him how you could find out how many there were.

A. If -- if there were any others, how many; if there were, how many there were; can we print out a log of all the cases that he's read and checked them. This is my job.

Q. I see.

And how long after you reviewed the attestation that Dr. Amodio had brought to your attention did you ask your IT person if there were more how would you find that out?

A. Again, it was within hours. And it was also reported to me by that IT person that Dr. Greenberg came to that IT person and said, "Please erase them" or "Take them off" or something to that effect.

So with that information in mind there was an assumption that there were more.

Q. So, the communication that the IT -- well

Page 144

S. PULITZER, M.D.

first of all: Who is the IT person?

A. Jayan Kurian.

Q. Okay. Is that a male or a female?

A. Male.

Q. Okay. So Mr. Kurian at some point told you that Dr. Greenberg had come to him and asked whether they could be taken -- the attestations could be taken off or erased.

Is that correct?

A. Something to that effect, yes.

Q. Yet he said that to you when you first asked him about how many -- how you would find out if there were more or how many more, or is this a separate conversation?

A. This is a separate conversation. I don't remember the course of events; if I had had that conversation with him first or after.

Q. Okay. So, you had an initial conversation with Mr. Kurian inquiring how you would find out if -- if there were more and how many more.

Correct?

A. Yes.

Q. And either at that time or at some subsequent time Mr. Kurian told you that

Page 145

S. PULITZER, M.D.

Dr. Greenberg had asked him how the attestations might be removed.

Is that correct?

A. Removed, changed; something to that effect.

Q. Okay. To the best of your recollection, was that one or more than one conversation?

A. I actually don't remember.

Q. What did Mr. Kurian tell you when you asked him how you -- whether you -- how you would find out if there were more and how many more? What was his answer?

A. He said we could.

Q. Okay. Did you ask him at that time to do so?

A. I did.

Q. And did he in fact do so?

A. He did.

Q. And did he report back the results to you?

A. Yes.

Q. And how long after you asked him to do so did he report back the results to you?

A. I don't remember if it was that same day or within -- or within the next day. I don't

Steven Pulitzer, MD
October 26, 2016                                    146 to 149

Page 146

S. PULITZER, M.D.

know.

Q. Okay. By that time, to the best of your recollection, had you brought this to Dr. Jameladdine's attention or did you wait until you had Mr. Kurian's results before you did so?

A. I waited until I had the total number that were there and if they were all the same, if there was any variation. I had to review them. I needed to know exactly what I was doing with that information and if it needed to be escalated or not.

Q. Okay. And what was going to determine whether or not it needed to be escalated?

A. The number of reports that this was placed on, and it was mostly the number of reports.

Q. Okay. And how did you decide that the number was going to be the determining factor of whether or not you were going to escalate this matter?

A. That was not a pre-determined thought. There was no algorithm.

Q. Well, at some point you decided that

Page 147

S. PULITZER, M.D.

that was the criterion on which you were going to decide whether or not to escalate.

Correct?

MR. COULSTON: I object to the form.

A. If somebody puts a sarcastic comment in one or two reports and then realizes that they've made an error and then goes to try and correct that error, I think that's very different than putting it in over 100 reports and continuing to do it for however long it takes you to do those 100 reports.

So, the magnitude of the discovery of how many reports there were was -- was -- you know, then how do you manage that data, how do you manage those patients' charts? How do you manage those 150 or so patients who now have this in their charts and how do you follow them to see if there's litigation or -- or whatever that -- that's a large number.

Two -- two is different than 150, and -- and I think there's -- there's no guideline for that. That's part of being a manager and trying to determine what is the severity of -- of an

Page 148

S. PULITZER, M.D.

error or what is the severity of a malicious act, or is it a malicious act or is it acting out?

These are not questions that are simple answered with (indicating), a snap of a finger.

Q. Did you ask Dr. Greenberg about these attestations immediately after Dr. Amodio brought it to your attention or after you had spoken to Mr. Kurian?

A. I do not recall when I spoke to Dr. Greenberg about them.

Q. Do you recall that you ever spoke to Dr. Greenberg about them?

A. I don't know if I did speak to him directly. I -- I don't recall.

Q. Sitting here today you don't recall speaking to him about it at any time.

Is that correct?

A. I don't recall the exact time that I had spoken to him about it or what that conversation would be. It was not a very clear -- it's not a common thing to walk into. It's not something that, you know, you image the patient's right arm instead of the left

Page 149

S. PULITZER, M.D.

arm; and that's happened, you know, over the -- one of the things that's happened in the Radiology Department.

And you know, how to deal with this is a very unusual circumstance, and how to deal with that and how to -- there's -- there's no guideline for that.

So, I don't know when I spoke with him and I don't remember the conversation with him about it, but I do remember the damage-control and the investigation around it more than I do any specific conversation with him.

Q. Well I appreciate that answer, sir, but let me ask you this:

Leaving aside what might have been said and when it might have been said, if you spoke to Dr. Greenberg about the attestations, all I'm asking now is whether sitting here today you are able to tell me yes or no, you spoke to Dr. Greenberg about it at all.

A. I can't --

Q. If you're not able please say so, but if you are I'm going to ask you more specifically. So --

Steven Pulitzer, MD
October 26, 2016                          154 to 157

Page 154

S. PULITZER, M.D.

MR. NELSON:

Q. Okay.

A. -- are you asking me that?

MR. COULSTON:  I'm

thinking --

A. No, I -- I mean no one's ever asked me
that.  I don't know.

Q. I'm sure no one's ever asked you a fair
minimum of what we're asking you today.

A. Yeah.

Q. Okay.  So sir, you were -- you were
testifying a few minutes ago that you assembled
information as to how many other attestations
there were, etcetera.

Do you recall doing that before you spoke
to Dr. Jameladdine about it or after you had
an initial conversation at least with him about
it?

A. I have -- after.

Q. Afterward?

A. I believe it was after.

Q. So you brought it to his attention before
you asked your IT guy to find out whether there
were more, and if so how many?

Page 155

S. PULITZER, M.D.

A. Brought it to whose attention?

Q. Dr. Jameladdine.

A. No, I had waited.  What I remember is
that I had waited until I collected all of the
data as to how many there were, what they were
and what to do about it and then took it to him.

Q. I'm sorry, you say you collected data
about what to do about it.

What do you mean?

A. No, my own analysis.  My own analysis of
what to do about it.

Q. And what was your analysis of what to do
about it?

A. To take it to Dr. Jameladdine and to ask
him what to do about it.

Q. Okay.  Now, you say that at some point
you were sent to Risk Management, or you went to
Risk Management.

Do you recall that, saying that?

A. Mm hmm.

Q. Okay.  Now, was that your idea,
Dr. Jameladdine's idea or someone else's idea?

A. Dr. Jameladdine's recommendation.

Q. So after you checked the data, went to

Page 156

S. PULITZER, M.D.

Dr. Jameladdine and informed him of it, he said
you should go to Risk Management?

A. (Indicating).

Q. Tell me yes or no.

A. Yes.

Q. Okay.  Tell me to the best of your
recollection what specifically Dr. Jameladdine
told you to do.

A. To take these to Risk Management and find
out what our exposure is.

Q. Okay.  Is this the same conversation in
which he asked in words or substance, "Why is
this person still working here?"

A. Yes.

MS. BLOCKER:  Objection.

A. And I do believe that was more sarcastic
than -- than an actual sentiment.

Q. What was more sarcastic than an actual --

A. I -- I believe it was a phrase of -- of
-- it was a -- it wasn't a de -- it wasn't a
determination of hiring or firing this person.
It was just a -- a response to what was put in
front of him, and I don't believe it -- it was
not something that said, "Fire this guy right

Page 157

S. PULITZER, M.D.

away."  It was just what -- it's a very unusual
thing, and so it was a what-is-this-and-why.
You know?

Q. Okay.  You're telling me what your
impression was of what Dr. Jameladdine said in
that regard?

MS. BLOCKER:  Objection.

A. My --

Q. That's what you're telling me now?

A. This -- this is what -- what my impression
of the interaction I had with Dr. Jameladdine
was, at that time was.

Q. Okay.  He didn't say, "I'm only being
sarcastic", did he?

A. No, he didn't.

Q. Okay.  And your impression of the
attestation language itself was also that it
was sarcastic, I believe you referred to earlier.

That was also your impression, correct?

A. My impression was that that was
inappropriate, yes.

Q. Okay.  You used the term "sarcastic"
earlier.  Was that also your impression of --

A. I believe --

Steven Pulitzer, MD
October 26, 2016                                          206 to 209

Page 206

S. PULITZER, M.D.

A. I'm still unclear on the question.

Q. Okay. I'm asking about correcting or amending or revising the attestations that Dr. Greenberg had put on these reports.

Okay? Now, I believe you said that to do that you needed to put a new attestation over the old.

A. Right.

Q. And what I assume you mean is along with, or instead of.

Is that correct?

A. In addition to, yes.

Q. In addition to. Okay.

And where did the language of that additional attestation come from?

A. That there were three attestations that were approved by the billing company and by the hospital's Risk Management that we were able to use for the billing -- for the purposes of billing, and I -- those -- I used that, one of those three attestations.

Q. Okay. Who made the corrections to these various reports --

A. Me.

Page 207

S. PULITZER, M.D.

Q. -- that had Dr. Greenberg's attestations on them that you thought were a problem?

A. I did.

Q. Okay. And you did it for all of them?

A. Yes.

Q. And did you use the same attestation language in addition to the prior attestation for all of the reports?

A. I'm not sure I'm following your question.

Q. You said that there was attestation language that you had that you used for this purpose, and I'm asking: Was that language the same for all of the reports you corrected or amended?

A. Yes, I put the correct attestation that was approved by the hospital and the billing company on each report.

Q. Okay. And to do that -- well, to correct or amend the attestations, was anything else required other than simply adding the -- as you say, language -- that had been approved --

A. Yes.

Q. -- to it? What else was required?

A. I had to read each study, because if I

Page 208

S. PULITZER, M.D.

attest that I've read the study and that I agree with what is written then I'm liable for it in court.

Q. I see. So you signed the attestation, and in order to do so you were attesting to the correctness of the report.

A. Yes.

Q. Correct?

A. That is correct.

Q. Okay. And to do that you needed to read the report first.

Correct?

A. I needed to look at the image and read the report and see if I agreed.

Q. Okay. And prior to you doing that report review --

A. Yes.

Q. -- and adding your attestation --

A. Yes.

Q. -- who else had reviewed that report? Anyone?

A. We can do a search for that kind of information, but that's not readily available to me. I don't know who or who has not read those

Page 209

S. PULITZER, M.D.

reports in the interim between when they were written and I went back and did my attestation.

Q. Okay.

A. There's no way for me to know that.

Q. But you did know that, for example, the resident -- a resident may have done the report initially --

A. Yes.

Q. -- and Dr. Greenberg also had read the report because his attestation was on it.

Correct?

A. Right.

Q. Okay. So, prior to you putting the additional attestation on the report --

A. Yes.

Q. -- after reviewing the report yourself --

A. Yes.

Q. -- the persons we know for sure had reviewed the report, the scan and whatever might have been written included the resident and Dr. Greenberg.

Correct?

A. Are you saying who saw his attestation or who read the report? I'm not sure --

Steven Pulitzer, MD
October 26, 2016                                        262 to 265

Page 262

S. PULITZER, M.D.

A. Yes.

Q. And they were all hired as staff radiologists?

A. Yes.

Q. And they were all hired to work at Kings County Hospital?

A. Yes.

Q. Okay. Can you tell me how many of these individuals were over age 40 at the time of their hire?

A. Bernard Istria was over age 40.

Q. Okay.

A. And that's it -- Robert Sullivan. And Robert Sullivan.

Q. Okay. And when was Dr. Sullivan hired?

A. Dr. Sullivan was hired -- he started in July of this year.

Q. When was Dr. Istria hired?

A. He was hired last year.

Q. All right.

A. And the spring, potentially.

Q. So spring of 2015?

A. I'm trying to think if he's been there that long. No, he -- he was -- he came in the

Page 263

S. PULITZER, M.D.

beginning of this year, so in the beginning of 2016.

Q. Okay. So the beginning --

A. He came right after Jethwa left and Jethwa left right in 2016, so he came in the -- he's been there just a couple of months.

Q. Okay. So early 2016 for Dr. Istria.

A. Yeah.

Q. July of 2016 for Dr. Sullivan.

A. Right.

Q. If you recall, when was Dr. Jethwa hired?

A. Dr. Jethwa started in 2015, like around January 1st.

Q. Okay. And he -- you say he was -- he left approximately a year later?

A. Mm hmm.

Q. Dr. Bell?

A. Dr. Bell started in July of this year.

Q. Okay. Dr. Dubay -- Dubey?

A. July of this year.

Q. Dr. Ling -- Dr. Leung? Is it Leung?

A. Yes.

Q. Is that the correct --

A. Yes.

Page 264

S. PULITZER, M.D.

Q. -- pronunciation?

A. Yeah, Kevin Leung. His start date is December 1st this year.

Q. He hasn't started yet. Is that right?

A. He hasn't started, no.

Q. Okay. And Dr. Loona?

A. Dr. Loona started in -- I don't remember if it was in the fall of 2015 or a little earlier. I'm not sure.

Q. Okay. Was Dr. Istria hired specifically to replace Dr. Jethwa?

A. Yes.

Q. Okay. And it seems that Doctors Bell, Dubey and Sullivan were all -- all came onboard at the same time.

A. Yes.

Q. Can you tell me what event prompted you to have three radiologists all join at about the same time?

A. Yes. Dr. Bell is a neurointerventional radiologist, and so we started a -- the stroke guidelines changed for the treatment of stroke, so the hospital invested in a neuroscience program, and he is an interventional

Page 265

S. PULITZER, M.D.

neuroradiologist which we did not have on-staff before.

We've gone to 24-hour for coverage for the Emergency Department, so we hired three individuals to rotate into the 8:00 p.m. to 6:00 a.m. shift.

Q. Doctors Dubey, Sullivan and --

A. Leung.

Q. Okay. Going back to the attestation discussion we had earlier for a moment, I believe you said that at some point in time within a month of discovering this issue you had corrected all the attestations.

Is that correct?

A. That's what I remember.

Q. Okay. And when you corrected them you added an attestation; one of the approved attestations at the bottom of the -- each of the reports you were reviewing.

Is that correct?

A. Yes.

Q. What happened to the old attestation? Was that deleted?

A. You can't delete it from the medical

Steven Pulitzer MD
October 26, 2016                                                266 to 269

Page 266

S. PULITZER, M.D.

record.

Q. I see.  So now those reports all appear with Dr. Greenberg's attestation followed by yours.

Is that the way it would actually appear if I were reviewing the report?

A. Yes.

Q. Okay.  By the way, when we talk about -- when you talk about films and I talk about scans, you understand that I'm talking about the same thing --

A. Yes.

Q. -- as you are.  Correct?

A. Yes, I do.

Q. Okay.  So, in each of Dr. -- of the attestations with which you took issue, your attestation now appears below Dr. Greenberg's. Correct?

A. Yes.

Q. Okay.  Did anyone else participate in the amendment or correction of the attestations? I mean --

A. No.

Q. -- does any other doctor have a signed

Page 267

S. PULITZER, M.D.

attestation below Dr. Greenberg's?

A. Not that I'm aware of, no.

Q. All right.  You also testified this morning that Dr. Greenberg had had issues with time and attendance for years, I believe was your expression.

Can you tell me what you meant?

A. Dr. Greenberg -- again, I think I'm going more into the referencing of the 12:00 to 8:00 shift and not being able to fulfill that shift.

Q. Okay.

A. Also, just generally starting later than the nons; and for whatever reasons these were accommodated in the department and so that's sort of the -- those were there.

Q. Well sir, I -- I appreciate that they may have been accommodated by the department, but I believe you testified that Dr. Greenberg had had -- that there had been issues or problems with respect to Dr. Greenberg's time and attendance for years.

Was that not a correct understanding of your testimony?

A. It was not -- there -- there was no

Page 268

S. PULITZER, M.D.

punitive or disciplinary action to it, no.

Q. Okay.  Well thank you for that, but let me ask you this.  Was there there some issue with Dr. Greenberg's time and attendance -- as you put it, for years -- prior to 2014?

A. Yes, there was.

Q. Okay.  What was that issue and when?

A. So, there were issues of times of when he started and when he was, you know, coming late. And when exactly those days that they were I don't know, but it was periodic.  I was not in a position at that point to monitor those things, and that's my statement.

Q. You say that he was coming late periodically.

DR. GREENBERG:  No, that's not correct.

MR. NELSON:

Q. Was there a point in time that you understood that to be an issue for someone other than you, since you say you weren't in a position to monitor that or address it at the time?

A. It was an issue for the prior chairman.

Page 269

S. PULITZER, M.D.

Q. That would be Dr. Kantor?

A. Yes.

Q. Okay.  And what kind of issue was it for Dr. Kantor, if you know?

A. When you staff the ER --

Q. Okay.

A. -- that's the one area where somebody has to be there at a certain time and someone has to be sitting there.  And so, you rely on the person who's doing the ER rotation to be there at a specified time so that you know that there's specified coverage; the hospital is depending on it.

And if that person is not there at the same time, or reliably at the same time, then as the administrator you're responsible for that.  So you need to make sure that that happens and --

Q. Yeah, I'm asking you:  Specifically what issue did Dr. Kantor have with Dr. Greenberg's time and attendance and when?

A. I can't recall a specific issue that has a specific time to it on a specific date, if that's what you're asking, but there was -- in general in conversations with Dr. Kantor there

Steven Pulitzer, MD
October 26, 2016                                            286 to 289

Page 286

S. PULITZER, M.D.

A. Yes.

Q. Okay.  And you did that face-to-face.  Correct?

A. I did, yes.

Q. And you did it in her office.  Is that correct?

A. Yes.

Q. Okay.  Sir, tell me what you said or -- said to or asked of Ms. Welcome and what she said or responded to you in the course of that conversation.

THE WITNESS:  Before I answer that, can I just ask what I'm -- what am I supposed to --

MS. BLOCKER:  You can --

MR. COULSTON:  There's no privilege.

MS. BLOCKER:  There's no privilege.  You can discuss it.

MR. COULSTON:  They're not asserting -- they're not asserting a privilege,

Page 287

S. PULITZER, M.D.

so you can answer --

THE WITNESS:  So I can say everything?

MR. COULSTON:  -- it freely.

THE WITNESS:  Okay.

A. I showed the attestation to Ms. Welcome and I asked:  What is the liability that we have as for the hospital with these attestations on these cases and what do we do?  What do we need to do to decrease any liability that we have or correct the situation, and I asked her what her recommendations were.

She called somebody in Central Office to find out, you know, what happens in a case like this, and the recommendation was to have a second reader put in an -- an attestation over it so that the case was read and the proper attestation was put on it.

Q. Did she make that recommendation to you before you left her office?

A. Yes.

Q. Do you know who she spoke to before -- on the phone during your meeting?

Page 288

S. PULITZER, M.D.

A. I do not know that.

Q. Okay.  Do you know whether or not that recommendation came from that person?  Did she say, "So-and-so says to do this", or did she make the recommendation on her own?

A. I don't remember whose, you know, recommendation it is; if it was hers and it got confirmed or if it was theirs.  I don't know.

Q. Okay.  Now, I believe you said that after you met with Ms. Welcome you spoke again with Dr. Jameladdine.

A. Right.

Q. Correct?

A. Correct.

Q. And did you report this recommendation to Dr. Jameladdine?

A. Yes, I did.

Q. Did he agree with it?

A. Yes, he did.

Q. And did you in fact proceed to do that at some subsequent time?

A. Yes.

Q. Was there any other recommendation that -- that Ms. Welcome made other than to have an

Page 289

S. PULITZER, M.D.

additional attestation put on the reports?

A. No.

Q. Was there any additional recommendation that Dr. Jameladdine had in -- beyond putting an additional attestation on the reports?

A. Not that I recall.

Q. Okay.  Did either one of them tell you to fire Dr. Greenberg because of that?

A. Not directly, but the conversation came up.

Q. Okay.  And what do you mean "the conversation came up"?  With whom and --

A. So --

Q. -- what was said?

A. With -- with Dr. Jameladdine about the -- this is inappropriate behavior for one of the staff physicians and that it should be referred to Labor Relations, it should be disciplined, and it should be looked at as to what the next step is to do this; does this need to go to Office of Professional Medical Misconduct and what do we need to do about this situation.

Q. Okay.

A. So --

Steven Pulitzer, MD
October 26, 2016                                    290 to 293

Page 290

S. PULITZER, M.D.

Q. What do you mean by "Office of Professional Medical Misconduct"?  What is that?

A. So, that's called a OPMC and it's a -- it's for our physicians who are not behaving in a standard way that you can report them to that.

Q. So, you mean the Office of Professional Medical Conduct?

A. Conduct.

Q. Correct?

A. Yes.

Q. Okay.  That's an office that exists outside the hospital.

 Correct?

A. Yes, it is.

Q. Okay.

A. It's an H --

Q. It's essentially a -- an entity or organization that -- that regulates and/or disciplines physicians?

A. Yes.

Q. Okay.  And that was Dr. Jameladdine's suggestion or recommendation?

Page 291

S. PULITZER, M.D.

A. That was -- Dr. Jameladdine asked me to find those things out and figure out how to -- what we should do with this situation, and that was it.

Q. I'm sorry.  Okay.  I want to make a distinction here.

 Can you please tell me what Dr. Jameladdine told you to do as distinguished from what Dr. Jameladdine asked you to do?

A. Dr. Jameladdine told me to find out what the legal implications were of this, if this needs to be reported to the Office of Professional Conduct -- Medical Conduct, and to refer this to Labor Relations and to see what -- what kind of disciplinary action needs to happen with this physician.

 And I don't know in what order he said that, but that was what he said, so --

Q. And he did all of this in the same conversation after you came back from Ms. Welcome?

A. Yes.

Q. Okay.  And you say that meeting occurred on the same day that you met with Ms. Welcome?

Page 292

S. PULITZER, M.D.

A. Yes.

Q. Had you gone -- had you brought this issue to the attention of Labor Relations before Dr. Jameladdine told you to do so?

A. I don't -- I don't know.  I don't remember.

Q. Did you do so after he told you to do so?

A. Yes.

Q. And whom did you contact in Labor Relations and when?

A. I don't recall exactly the day or -- or if I had spoke with Stephanie Bernadel or if Michael was still there.  I don't remember exactly who my contact was if there -- you know, I don't know.

Q. How long after this meeting with Dr. Jameladdine in which he directed that you bring this to the attention of Labor Relations did you bring it to the attention of Labor Relations?

A. Within 24 hours.

Q. And did you do that by phone, e-mail, face-to-face or otherwise?

A. I don't recall.  It may have been a

Page 293

S. PULITZER, M.D.

combination.

Q. What do you mean a combination?

A. It may have been a phone call and an e-mail.  I don't -- I don't remember.

Q. Okay.  Whom did you try to reach there? Did you try to reach Mr. Arabian?

A. I don't remember.

Q. But sitting here today, the referral to Labor Relations was prompted by a direction from Dr. Jameladdine.

 Is that correct?

 MS. BLOCKER:  Objection.

A. It -- yes, it was prompted by Dr. Jameladdine.

Q. Okay.  Where was Dr. Reede, if anywhere, in the course of addressing what you had been told by or recommended to you by Ms. Welcome? Did she have any role?

A. No, not in that.

Q. Did you tell her, meaning Dr. Reede, what Ms. Welcome had told you?

A. Yes.

Q. When?

A. At some time, again, within 24 hours of

U.S. LEGAL SUPPORT
(877) 479-2484

Steven Pulitzer, MD
October 26, 2016                                              302 to 305

Page 302

S. PULITZER, M.D.

Q. Did you have any occasion to speak with Dr. Jameladdine further about the attestation issue at any time after coming back to him with the substance of what had been discussed between you and Ms. Welcome?

A. My job is to give him updates as to when these things are getting done and how they're getting done, so at some point yes, I did tell him that the attestations were done.

Q. I see. So, other than telling him at some subsequent time that the attestations had been corrected --

A. Yes.

Q. -- was there any other discussion between the two of you regarding the attestations after the one at which he said: Bring this to the attention of Labor Relations?

A. I don't recall a specific -- there were conversations that this -- this was something that was talked about because it was a problem.

Q. Okay.

A. So I really don't recall the number or the nature of the exact conversations, but the gist of it was that it -- it needed correction

Page 303

S. PULITZER, M.D.

and it needed disciplinary action.

Q. Have you now told me all that you recall of your discussion with Ms. Welcome --

A. Yes.

Q. -- or is there something additional?

A. I don't remember anything else.

Q. Have you now told me all that you recall of your discussions with Dr. Reede up to this point in time regarding the attestation issue --

A. Yes.

Q. -- or is there something additional?

A. No, that's it.

Q. No, what?

A. That was all I remember.

Q. Okay. And have you now told me all that you recall of your discussions with Dr. Jameladdine on these occasions before and after you spoke with Ms. Welcome?

A. Yes. Yes.

Q. Yes to which? Yes, you've told me everything or yes, there's something additional?

A. Can you ask me the question again, please?

Q. Yeah.

Page 304

S. PULITZER, M.D.

Have you now told me everything that you recall discussing with Dr. Jameladdine regarding the attestation issue both before and after speaking to Ms. Welcome?

A. I have told you everything I remember.

Q. Okay. Sir, you've made a reference when we were talking about time and attendance a few minutes ago to something in the spring of 2014. Can you tell me specifically when you recall that occurrence?

A. When I recall what about it?

Q. In other words: Do you recall whether it was in March or early June or any -- be any more specific?

A. It was sometime between March and April, May. Like, you know --

Q. Okay. And what do you recall occurring at that time?

A. I recall that there was a question of where Dr. Greenberg was at certain times and that his timesheet didn't reflect whether he was in or out of the hospital and that he was counseled on having more accurate reporting.

Q. And who was he counseled by?

Page 305

S. PULITZER, M.D.

A. Dr. Reede.

Q. And how are you aware of what went on between Dr. Greenberg and Dr. Reede?

A. I became aware of that after I became the Interim --

Q. And how did you --

A. -- Chairman.

Q. -- become aware of it?

A. From Dr. Reede.

Q. And in what way did you become aware of it from Dr. Reede?

A. When we started to have attendance issues with Dr. Greenberg it was brought to my attention that this was something in the past that happened.

Q. Okay. And when did you start to have attendance issues with Dr. Reede (sic) that prompted Dr. Reede to bring it to your attention?

MR. COULSTON: With Dr. Greenberg?

MR. NELSON: Yes.

A. We started to have attendance issues with Dr. Greenberg in August. Maybe late July, in August.

U.S. LEGAL SUPPORT
(877) 479-2484

Steven Pulitzer, MD
October 26, 2016                                    306 to 309

Page 306

S. PULITZER, M.D.

Q. And what were the issues that you started to have in late July or early August?

A. Dr. Greenberg was coming in late, he was on occasion leaving early. I never knew when -- often -- I don't want to say never, but often didn't know what time he was going to be in that day. I didn't know -- I couldn't reliably plan the schedule.

And I had talked to him about it and said: "Well, what hours can you work? How can I work with you?" That was my thing.

I was coming in new, I was new, and I wanted to be able to work with staff, and I know staff had different needs. And if people can not have to think about those needs they're more productive, so as a general philosophy of running a department I extended this to Dr. Greenberg and tried to get hours that would be reasonable for him.

Q. And what did he tell you when you asked him this?

A. He said reasonably for him 9:30 to 5:30 would work.

Q. And did he say why?

Page 307

S. PULITZER, M.D.

A. I don't remember the exact reason why. He said he has to -- family things to do.

Q. I'm sorry. He said he has family things to do, was that before or after work?

A. Just responsibilities in the morning for his family.

Q. I see. So he didn't want to start before 9:30. Is that what you're saying?

A. That he could reliably be there by 9:30 and take care of the issues that he needs to take care of in his personal life.

Q. Was there any issue or concern raised by Dr. Greenberg with respect to the time at which he would finish work?

A. I -- yes. So, he said for him what would work best would be 9:30 to 5:30, and so I accommodated that.

Q. And why did he say 5:30 was a time that would work best for him?

A. I don't recall.

Q. Okay. Did Dr. Greenberg ever mention family?

A. As the reason to leave at 5:30?

Q. Either to come in at 9:30 or to leave at

Page 308

S. PULITZER, M.D.

5:30?

A. Yes, he did.

Q. Okay. Did he mention any particular member of his family?

A. Not that I recall. I don't know if I probed.

Q. Did he say what the reason -- what the family-related reason was?

A. Not that I recall.

Q. Now, when you had this conversation with him, you recall it being in late July or early August.

Is that correct?

A. Sometime in July --

Q. Can you be --

A. -- or August.

Q. -- any more specific?

A. I cannot.

Q. Did the two of you come to an agreement or understanding as to what Dr. Greenberg's hours would be henceforth?

A. Yes, that was my understanding.

Q. And what was the understanding that you reached, as you recall it?

Page 309

S. PULITZER, M.D.

A. That he could reliably be there from 9:30 to 5:30 and that I could count on him to be sitting there and reading cases.

Q. Okay. And prior to that, what had Dr. Greenberg's hours been?

A. What were his assigned hours?

Q. As you understood them, yes.

A. 9:00 to 5:00.

Q. Okay. And so, the only adjustment needed as a result of your conversation with him was him coming in a half an hour later and working a half an hour later.

Is that correct?

A. Yes.

Q. Did you ever raise with him your desire that he work from 12:00 to 8:00?

A. Had I ever talked to him about working 12:00 to 8:00?

Q. At that time during that time period or during that conversation, did you raise your desire to have him work 12:00 to 8:00?

A. No.

Q. Had you ever --

A. I don't recall at the time.

Steven Pulitzer, MD
October 26, 2016                                    310 to 313

Page 310

S. PULITZER, M.D.

Q. -- raised with him a desire to have him work 12:00 to 8:00?

A. Not that I recall specifically, no.

Q. Did he ever express to you an issue with working 12:00 to 8:00?

A. He had expressed it to my previous boss.

Q. And what, to your knowledge, did he express to your previous boss?

A. That he couldn't work those hours, those hours didn't work for him, and it was not something he could do.

Q. Do you know why?

A. I do not.

Q. Do you know what reason he expressed to your boss -- your prior boss?

A. I do not.

Q. When we're referring to your prior boss, are we referring to Dr. Kantor?

A. Yes.

Q. Okay. Now sir, on this occasion that you had this conversation with him regarding him working reliably 9:30 to 5:30, was this a disciplinary counseling?

A. No, it was not.

Page 311

S. PULITZER, M.D.

Q. Was it disciplinary at all?

A. He was -- it was an attempt to engage an employee who was having problems with attendance and with being someplace at a certain time, and it was a negotiation to try and see:

Well, I can bend. You can come in later. If you want to work 10:00 to 6:00, if you want to work 11:00 to 7:00, that's fine. Whatever hours -- whatever eight hours you want to do I'll work around you, but what's going to make your life better because if I can -- I just need to know the exact hours you're here so I can plan around you.

That -- that was the nature of that conversation.

Q. Okay. So you were pretty -- you were -- you're saying that you were willing to accommodate any eight hours Dr. Greenberg would say he could work.

A. I was, yes.

Q. Even if it meant 11:00 to 7:00 or --

A. If that -- if that would reliably have him there from 11:00 to 7:00, yes, because then I could schedule around him.

Page 312

S. PULITZER, M.D.

Q. Okay. Was there any disciplinary aspect to this counseling you say that Dr. Greenberg received from Dr. Reede in the spring of 2014?

A. I don't know. You'd have to ask Dr. Reede.

Q. Did she ever say she disciplined Dr. Greenberg for some time and attendance violation in the spring of 2014?

A. Well, when I was having issues with time and attendance with Dr. Greenberg she said that she had spoken with him. I don't know what the counseling -- I don't know.

There's different degrees of counseling and -- and stuff for the union, so I don't know if -- technically what it was but that there -- he had -- she had spoken to him about his time and attendance and about his timesheets, and that is what I knew from that time.

Q. Sir, are you familiar with the term "progressive discipline"?

A. No.

Q. Okay. Are you aware that in a corporate environment there is a progression of discipline from say a verbal warning to a written warning

Page 313

S. PULITZER, M.D.

to a counseling to a suspension to a termination? Is that of any familiarity to you?

A. Yes, that is.

Q. Okay. Sir, are you aware of whether or not a progressive discipline policy exists either at Kings County Hospital or at Downstate?

A. Yes, it does.

Q. Okay. At which, or does it exist at both?

A. At both.

Q. All right. Sir, do you know of any occasion on which any step in a progressive discipline occurred with respect to Dr. Greenberg?

A. Can you repeat that?

Q. Let me rephrase.

Are you aware of any occasion on which a step in progressive discipline was administered to Dr. Greenberg?

A. The only occasion I am aware of in -- with respect to time and attendance is his meeting with Dr. Reede, but I do not know what level of progressive discipline -- to use your term -- that was done -- that was taken, or if that was in fact documented in such a way. I

Steven Pulitzer, MD
October 26, 2016                                      334 to 337

Page 334

S. PULITZER, M.D.

Q. And what's --

A. A ballpark.

Q. -- the basis of that?

A. By a report and -- by physical reports by Dr. Hammil and by the cross-referencing with the dictation data.

Q. And when -- when was it reported to you that Dr. Greenberg was coming to work that week?

A. I got a call pretty much every day, except for Monday, that: "Dr. Greenberg is here, he's coming at erratic hours, why is he here, he's not on the schedule, what's going on." And I said: "I don't know. I'm on vacation."

Q. Okay. And who were those calls from?

A. Dr. Hammil.

Q. In each instance?

A. Yes.

Q. And do you recall Dr. Hammil calling you each day?

A. Yes.

Q. Do you recall telling Dr. -- Dr. Hammil what he should do about that?

A. No.

Q. Okay. Well, what did you -- did you

Page 335

S. PULITZER, M.D.

instruct anybody else to do anything with regard to Dr. Greenberg coming in that week?

A. No.

Q. Did you talk to Dr. Greenberg --

A. No.

Q. -- that week?

A. I did not.

Q. To your knowledge, did Dr. Greenberg perform his ordinary, regular duties that week other than attending that committee meeting?

A. He read cases from the ER, yes.

Q. Okay. And what did you say to Dr. Hammil other than, "I'm on -- I don't know; I'm on vacation", when he brought this to your attention, if anything?

A. I said: "Ask him why he's here, what -- what -- what he's doing and find out what's going on."

Q. Okay. And did Dr. Hammil, to your knowledge, do that?

A. I don't know if -- if he got a straight answer. I think he asked him one day, but I -- it wasn't clear to either of us what was happening.

Page 336

S. PULITZER, M.D.

Q. Okay. Did Dr. Hammil ever report back to you that he had had such a conversation with Dr. Greenberg?

A. I don't recall specifically the conversation, but I -- I remember asking him to find out why he's there.

Q. Yes.

A. And --

Q. No, I get that part but I'm --

A. I don't remember the conversations.

Q. But I'm asking whether or not you ever --

A. Right.

Q. -- learned of a result --

A. I never --

Q. -- of that --

A. I never got a good answer.

Q. Okay. And when did you return to work?

A. The Tuesday after Labor Day.

Q. So that would have been the 2nd of September or the 9th of September?

A. 2nd.

Q. All right.

A. Yes.

Q. And then, did you speak to Dr. Greenberg

Page 337

S. PULITZER, M.D.

at any time from the 2nd on about his having come to work that prior week?

A. Yes.

Q. When?

A. Dr. Greenberg and I had a conversation on September 2nd.

Q. And what was the conversation that you had?

A. Dr. Greenberg came to my office and asked me if he could have a -- the Thursday and Friday of that week off, and I said: "I can't cover you that week. I don't have any staff. No, I can't approve that. I just worked with you for the last month trying to adjust the vacation schedule so that you could have any days that you want off."

I gave him two consecutive weeks in a row with one week notice and was -- was almost four physicians down at that point. I got a call at the end of that week saying that he needed to change his schedule.

And I reiterated this to Dr. -- to Dr. Greenberg and that I was able to accommodate it, and that I could not accommodate this

Steven Pulitzer, MD
October 26, 2016                                                338 to 341

Page 338

S. PULITZER, M.D.

request; that I've been very flexible, but this particular week on this particular time I don't have staff to cover you.

Q. You're referring to not having staff on the 4th and the 5th when he had asked to have those days off?

A. Yes.

Q. And that was in a conversation on the 2nd?

A. Yes.

Q. Face-to-face?

A. Yes, in my office.

Q. Where did this conversation take place?

A. In the S Building on the second floor in my office.

Q. And who in fact was off that Thursday and Friday that -- that made you, as I think you put it, four physicians down?

A. We were -- we had just had four physicians non-renewed and we were -- we had people on vacation, so we were just running a very skeleton crew to begin with.

And I don't recall -- I don't remember exactly who was off that day or that week, but I do remember that people -- I did not have

Page 339

S. PULITZER, M.D.

the people, the personnel, to cover anyone else's absence and I was relying on Dr. Greenberg to be there because I had given other people time off.

Q. Yeah, and I'm asking you not with regard to who had been non-renewed.

A. Mm hmm.

Q. Okay? Well, but let's talk about that for a moment. When you said you just had four physicians non-renewed --

A. Right.

Q. -- you're referring to Drs. Areman, Kantor, Roitberg and someone else?

A. Well, Cathy Mason had been part of that crew, so we were -- we still hadn't replaced that line.

Q. Okay. So those --

A. We were down.

Q. -- were the four you were referring to?

A. Yeah.

Q. Okay. Apart from those who were no longer working at the hospital any day --

A. Yes.

Q. -- okay, who was out or on vacation on the 4th and the 5th?

Page 340

S. PULITZER, M.D.

A. I would have to check the records and the schedule.

Q. Okay. Sitting here now, are you able to identify anyone who was out that -- that -- on either of those two days?

A. I'd have to check the schedule.

Q. And you referred --

A. It was a long time ago.

Q. When you referred to being four physicians down, you're referring to the four physicians who were --

A. Mm hmm.

Q. -- non-renewed?

A. Yes, I am.

Q. Okay. So let's leave aside the four physicians who were non-renewed.

A. Okay.

Q. Okay? Are you able at all sitting here today to tell me who was out on the 4th and the 5th that precluded you from being able to give Dr. Greenberg those days off?

A. I need to look at the schedule.

Q. Okay.

A. I don't remember.

Page 341

S. PULITZER, M.D.

Q. All right. So the answer is: You can't tell me without looking at the schedule.

Is that right?

A. That's correct.

Q. Now sir, when he came to you on the 2nd and asked you for those days off, did he tell you why he needed the time off?

A. Not that I recall, no.

Q. Sir, do you have children?

A. Yes, I do.

Q. Do you know if Dr. Greenberg has children?

A. Yes, I do.

Q. And what do you know about Dr. Greenberg having children? Do you know how many he has?

A. As far as I know, two.

Q. Okay. And do you know their names?

A. One is named Jaden. I don't know the other.

Q. Okay. And did you and Dr. Greenberg during the time you worked at the hospital together ever talk about your kids to each other?

A. Yes.

Q. And in the course of those discussions,

Steven Pulitzer, MD
October 26, 2016                                                      342 to 345

Page 342

S. PULITZER, M.D.

did you ever learn that Dr. Greenberg's son Jaden was a child with special needs?

A. Yes.

Q. And what was it that you -- you were -- you understood Jaden's special needs to be or his condition to be?

A. My understanding of his condition was that there was a learning disability and with something -- you know, some sort of sensitivity along the spectrum of -- with sensitivity issues.

Q. Okay. When you say --

A. But I don't know all the --

Q. -- "along the spectrum", what spectrum are you referring to?

A. The spectrum to autism. Sensitivity to autism.

Q. Sensitivity to autism, did you say?

A. Mm hmm.

Q. Okay. Is that what a layperson like me would refer to as the autism spectrum?

A. Perhaps.

Q. Okay. And when did you learn that Dr. Greenberg's son Jaden was on the autism spectrum?

Page 343

S. PULITZER, M.D.

A. I don't know. It was shortly after I met him.

Q. Okay. And that was in August or in 2010 or thereabouts?

A. Mm hmm, and so it was sometime within the next couple of years. I knew that it was --

Q. Okay. And when --

A. Or the next year or two.

Q. -- you say "mm hmm", you mean yes?

A. Yes.

Q. Okay. So sir, you had known for several years at that point that Dr. Greenberg had a son with -- who was -- who is on the autism spectrum.

Correct?

A. Yes.

Q. Okay. Did you know in particular what Jaden had been diagnosed with?

A. No, I don't know.

Q. Did you know whether or not Jaden had any special needs as a result of being on the autism spectrum?

A. I do not know what those needs are, no.

Q. I see. How many children do you have?

A. I have two.

Page 344

S. PULITZER, M.D.

Q. Two. Do you also have a child with special needs?

A. Yes.

Q. Okay. And what's the -- if you don't mind -- the nature of your child's special needs?

A. He's got sensitivity special needs. He's, as you would say, on the sensitivity spectrum.

Q. I see. And then, you shared that information with Dr. Greenberg at some point during the time that you worked together?

A. Yes, I did.

Q. Okay. So, you basically shared some of the issues that you faced as parents of children with special needs.

Correct?

A. Yes.

Q. And you, as a parent of a child with special needs yourself, would understand some of the demands that that makes upon a parent.

Correct?

MR. COULSTON: I object to the form.

A. Yes.

Page 345

S. PULITZER, M.D.

Q. Sir, at any point in time during this discussion on the 2nd, did Dr. Greenberg reference his family or anything about his family as a basis for the -- for him needing the days September 4th and 5th off?

A. Not that I recall.

Q. Okay. Did you ask him what the reason was why he needed those days off?

A. No, I don't remember.

Q. I'm sorry. No, you don't remember?

A. I -- I don't remember asking him the specific reason --

Q. Okay.

A. -- why he needed the days off.

Q. Okay. And when you say you don't recall him telling you, are you saying that he definitely did not tell you or you just don't recall whether or not he told you?

A. I don't recall any conversations saying that: "I need the time off to tend to my special needs child on these two days."

Q. Okay.

A. Having have my own child with special needs I am very sensitive to that.

Steven Pulitzer, MD
October 26, 2016                                           346 to 349

Page 346

S. PULITZER, M.D.

Q. Okay. Well, let me ask you the question again that I just asked.

Are you saying that you don't recall him saying that or you don't recall whether or not he said that?

A. I don't recall the context of which he asked for the time off to be related to anything to do with Jaden.

Q. What do you recall it being related to?

A. I don't -- I -- it was not specific. It wasn't specified to me.

Q. So, Dr. Greenberg came to you and asked for two days off and to your recollection didn't tell you why and you didn't ask.

Is that correct?

A. It's my recollection I don't -- yeah, I don't remember.

Q. And when you told him that you could not accommodate him for those two days off --

A. Mm hmm.

Q. -- what, as specifically as you can recall, did you say in that regard?

MR. COULSTON: I object to the form.

Page 347

S. PULITZER, M.D.

A. I said: "I don't have the staff to cover you. People are out; I need you here. I just worked with you for the past couple of weeks, and I need you to be here this week because I -- I don't have anyone who can do what you do in the ER."

Q. And what did Dr. Greenberg say in response to that, if anything?

A. He was angry. He was angry because he felt that he had come in the week before on his vacation on his own volition to help the department, and that therefore I should give him the time off. And that he felt entitled to it and he was angry that he didn't get it.

Q. Okay. You're saying that he said these things or was that -- that was the overall impression you had?

A. He told me that he had come in the week before and that he was, you know, helping the department as best he can and that he needs these days off, and I said: "I can't, I just can't. There's so much I can do."

I have just done the best that I can. I even tried to adjust -- adjust his schedule for

Page 348

S. PULITZER, M.D.

him so that he can get to work on time. I mean, so I don't --

Q. So you specifically recall him being angry and you specifically recall him referencing having worked the prior week, but you don't recall whether or not he gave you a reason why he needed the time off, nor that you asked him what his reason was.

Is that correct?

A. Yes, that's correct.

Q. Okay. And what else, if you can recall anything, was said between the two of you in that conversation? And I mean other than you've already testified.

A. I don't remember.

Q. You don't remember anything else is what --

A. I don't remember --

Q. -- you're saying?

A. -- anything.

Q. Was anything else said and you just don't remember it or was nothing else said?

A. I don't remember anything else, but that's what it --

Page 349

S. PULITZER, M.D.

Q. Okay.

A. Those highlights of those conversations are were what I remember.

Q. Okay. You don't remember anything else that Dr. Greenberg said to you in that conversation?

A. I do not.

Q. And sir, as of the time that Dr. Greenberg left your office, what was your understanding about what was going to happen? Was it your understanding he was going to be coming into work on the 4th and the 5th?

A. Yes, it was.

Q. Okay. And what was the basis for you understanding that? Did he say he would be coming in even though he had wanted the time off?

A. I think -- I don't remember exactly if he said he's coming in, but the time was not approved to be off so in my mind he was coming in.

Q. Okay. Sir, had you known prior to Dr. Greenberg coming to you that he was seeking that time off? In other words, did you learn

Steven Pulitzer, MD
October 26, 2016                          350 to 353

Page 350

S. PULITZER, M.D.

it from some other source?

A. No, I didn't.

Q. Do you know who Linda McMurran is?

A. Yes, I do.

Q. Who is Linda McMurran?

A. She's the secretary for the department, or Dr. Reede.

Q. Is it fair to call her Dr. Reede's secretary?

A. Sure.

Q. And was she in that role at that time?

A. Yes.

Q. August of -- and early September of 2014?

A. Mm hmm.

Q. Yes?

A. Yes.

Q. By the way, was Ms. McMurran essentially the -- the manager or custodian of time and attendance records, like timesheets --

A. Yes.

Q. -- during that period of time?

A. Yes.

Q. Is that correct?

A. That's correct.

Page 351

S. PULITZER, M.D.

Q. Okay. Sir, what happened after this encounter with Dr. Greenberg with regard to his request for time off? Did you report his request to someone else?

A. No.

Q. Did you discuss it with Dr. Reede?

A. I don't -- I don't remember doing that.

Q. Okay. And did Dr. Greenberg subsequently notify you or anyone else that he was going to be taking the time off notwithstanding?

A. Yes, he did.

Q. And whom did he inform of that?

A. Me.

Q. And when did he inform you of that?

A. On the next day Wednesday, the 3rd.

Q. And on the 3rd what did he say to you?

A. He came to my neuroradiology reading room, which is on the second floor of the S Building at Kings County Hospital, and he said: "I'm just letting you know that I won't be here tomorrow and Thursday. Out of respect to you I'm giving you time -- you know, I'm giving you notice now to -- to cover me."

And I said: "All right. I -- you know, I

Page 352

S. PULITZER, M.D.

can't. I can't cover you", or something to that effect; and he said he's going to take the time off anyway.

Q. Okay.

A. And I --

Q. Did you say anything to him on that occasion?

A. I said to him I don't -- you know, I don't want him to take the time off.

Q. Did you tell him there would be any consequences if he did take the time off?

A. Not at that conversation, I did not.

Q. Did you tell him not to take the time off?

A. Not in that conversation.

Q. Okay. And what else did you say to him in that conversation or did he say to you in that conversation that you have not already testified to?

A. In that one I don't remember anything else.

Q. Okay. Did the reason why he needed the time off come up in that conversation?

A. Not that I recall, no.

Page 353

S. PULITZER, M.D.

Q. So, you don't recall him telling you why he needed the time off nor did you ask in that second conversation.

Is that correct?

A. Well I mean, Dr. Greenberg came into my office and -- and he told me in a blanket statement: I will not be in; end of story. See ya. That's basically what he said. "I do respect you; that's why I'm telling you now." And I appreciated that, but it still left me in the same position; and then left my office.

DR. GREENBERG:

(Indicating).

MR. NELSON:  Why?

DR. GREENBERG:  Okay.

MR. NELSON:

Q. At that point or at any prior point, did you try to cover Dr. Greenberg's position or schedule since he had said he wouldn't be in?

A. Prior to him coming to my office and telling me he's not coming in?

Q. Yeah. I mean at any time from the first conversation on, had you made any effort to cover him?

Steven Pulitzer, MD
October 26, 2016                                        354 to 357

Page 354

S. PULITZER, M.D.

A. No.

Q. Did you make any effort to cover him after the second conversation, the one you've just testified to that occurred on the 3rd?

A. Yes, I did.

Q. And did you manage to cover --

A. Yes.

Q. -- him?

A. Yes, we covered the service.

Q. How did you manage to do that?

A. I don't remember exactly. You'll have to look at the schedule.

Q. Okay. You were able to get another radiologist to stand in for Dr. Greenberg?

A. There was a -- we divided the work.

Q. Okay. So, you're saying multiple people covered Dr. Greenberg's --

A. Yes.

Q. -- position that day?

A. Yes.

Q. Those two days?

A. Yes.

Q. And did Dr. Greenberg in fact not come to work on the 4th?

Page 355

S. PULITZER, M.D.

A. He did not.

Q. And did he in fact not come to work on the 5th?

A. No, he did not.

Q. Did you have any further discussion -- discussions with him other than the one on the 2nd and the one on the 3rd that week --

A. Yes --

Q. -- regarding him --

A. -- I spoke to him.

Q. -- and/or his absences on the 4th or the 5th?

A. Yes, I did.

Q. When was the next one after the one you've just recounted on the 3rd?

A. On the 3rd also, later in the day.

Q. And what happened? And -- and tell me about that conversation now.

A. So, I had to -- I had an employee come and tell me that he wasn't going to be in the next day, and I reported that to Dr. Reede because I am the one who is ultimately responsible for the work not getting done if it doesn't get done or if people don't show up

Page 356

S. PULITZER, M.D.

and for how it works.

I went, I -- I asked her how to handle this situation, and she advised me to write a letter saying that I officially deny his time off, and that if he takes the time off he'll be refer -- referred to Labor Relations.

Q. And when did you have this conversation with Dr. Reede?

A. Right after Dr. Greenberg left my office.

Q. Okay. Did you talk to Dr. Greenberg at all on the 4th or the 5th?

A. No.

Q. Did you talk to Dr. Greenberg more than the one time you've now testified to on the 3rd?

A. Yes.

Q. Okay. And how many more times that day did you talk to Dr. Greenberg?

A. Once.

Q. So, in total there were three conversations with Dr. Greenberg regarding his need for time off on the 4th and the 5th?

A. Mm hmm.

Q. One on the 2nd and two on the 3rd. Is that correct?

Page 357

S. PULITZER, M.D.

A. Yes.

Q. What was the -- when -- did you have the conversation that you've just recounted with Dr. Reede before or after the third conversation with Dr. Greenberg?

A. It's after the second conversation.

Q. Okay. So the first one was on the 2nd.

A. Yes.

Q. Then you had a conversation with Dr. Greenberg on the 3rd.

A. Yes.

Q. Then you had a conversation with Dr. Reede.

A. Yes.

Q. And then you had another conversation with Dr. Greenberg.

Is that correct?

A. That's correct, yes.

Q. Okay. Have you told me everything that was said between you and Dr. Reede during your conversation with her regarding Dr. Greenberg on the 3rd?

A. Yes, as far as I can recall.

MR. COULSTON: I object

Steven Pulitzer, MD
October 26, 2016                                    358 to 361

Page 358

S. PULITZER, M.D.

to the form.

A. Yes.

Q. Is there anything else sitting here now that you recall saying to her or that you recall her saying to you in that conversation?

A. No.

Q. How long after talking to Dr. Reede did you speak again with Dr. Greenberg?

A. It took me about 15, 20 minutes to type a letter, so within a half hour of that conversation with Dr. Reede.  So everything took place within an hour, I think.

Q. Okay.  And once you finished the letter, what did you do then?

A. I walked downstairs to Dr. Greenberg's reading room.  I went into his reading room and I said, "Oded, I have to give you this letter. I can't approve your time off", and I read him what the letter said; you know, "If you can't -- if you don't come in you're going to be referred to Labor Relations".

And I then said -- you know, advised him not to do it.  I -- just as a -- I -- you know, he and I go back a long way and I -- I like him

Page 359

S. PULITZER, M.D.

and just don't want to refer him to Labor Relations.  And you know, I just said:  "Please don't do this."

Q. And what did he say?

A. He said:  "I'm -- I'm doing it.  I have to do it."

Q. Did he say why he had to do it?

A. Not that I recall, no.

Q. So, it's your testimony that you had three separate conversations with Dr. Greenberg on the 2nd and the 3rd --

A. Mm hmm.

Q. -- collectively?

A. Yes.

Q. And at no time during that -- any of those three conversations did he say why he needed that -- those days off.

That's your testimony?

A. Yes, that was -- that is my testimony. I don't know what the exact reason is that he needed those days off.

Q. And it's also your testimony that in none of those three conversations did you ever ask him why he needed that time off.

Page 360

S. PULITZER, M.D.

Is that correct?

A. I don't recall.

Q. Did you ever ask him, if not for the actual reason why he was needing the time off, why he was so insistent that he was going to have to take it off notwithstanding?

A. No, I just said to him -- I mean I said, "I hope you know what you're doing", and that was the end of it.

Q. Do you recall him saying anything else to you in the context of you saying, "I hope you know what you're doing?"

A. He said to me:  "Well, you're making me choose between my job and my family."  And I said:  "I'm not making that choice"; and that was the end of that conversation.

Q. Did you ask him what he meant by that?

A. I don't re -- I don't think I did.  I'm not sure.

Q. Did you ask him what he meant by "choosing between his job and his family"?  Did you understand that in any particular way?

A. I didn't.

Q. Did you inquire any further what he meant

Page 361

S. PULITZER, M.D.

by "family" in that context?

A. I don't remember inquiring, but I do remember that had I known or had this been presented to me in the context of his child, Jaden, on Tuesday or on Monday or whenever it was that I would have tried to work with him to accommodate him, so that did not come into my purview.

Q. When you -- you said you came back on Tuesday, the 2nd.

Correct?

A. Yes.

Q. Okay.  So it couldn't have happened on Monday.

A. Did I say Monday?

Q. Yes.

A. All right.  Tuesday.

Q. Okay.  Tuesday was the 2nd; Wednesday was the 3rd?

A. Yes.

Q. Are you saying sitting here today that he definitely did not mention Jaden or his -- one of his children as a reason why he needed the time off?

Steven Pulitzer, MD
October 26, 2016                                     386 to 389

Page 386

S. PULITZER, M.D.

I don't -- I don't have specific names, I did not act on it.  This is just information that made it to me.

Q. So, this is kind of like those -- like that majority of radiologists you testified to earlier; you don't know who it was, when it occurred or what was said but you still think that that was how you -- that was something you learned --

MR. COULSTON:  Objection.

MR. NELSON:

Q. -- from those -- from people you can't identify now.

Is that correct?

MR. COULSTON:  I object.

I object to the form.

A. I don't recall specifically which person told me about this, but multiple people had told me, so -- and when you hear multiple things from multiple people over the course of a day for many days in a row, that's another way to monitor him.

And if you asking me, you know --

Q. So, you heard from multiple people for

Page 387

S. PULITZER, M.D.

multiple days in a row that Dr. Greenberg was angry and thought that somehow some retribution was being taken against him.

A. Mm hmm.

Q. Is that correct?

A. Yes.

Q. But sitting here now you can't identify a single one of those conversations or a single one of the people who said that to you.

Is that correct?

A. I don't remember if anyone specifically, no.

Q. Okay.  So that's a yes?

A. That's a yes.

Q. Were you reporting to Dr. Reede anything with regard to the monitoring you were doing on Dr. Greenberg during this period?

A. Just the timekeeping.

Q. Okay.  And was there any point in time at which timekeeping again became an issue for you?

A. The process of timekeeping, no.

Q. Well, what I'm saying is:

To your observation, did -- did Dr. Greenberg

Page 388

S. PULITZER, M.D.

continue to comply with whatever conditions you understood him to be under?

A. For the most part, yes.

Q. When you say "for the most part", in what part were -- was he not complying?

A. There may have been a couple of days of fluctuation, but it wasn't anything egregious and so it wasn't reported.

Q. Okay.  I'm saying --

A. So --

Q. -- was there anything that you learned or observed regarding Dr. Greenberg during your monitoring that you did report to Labor Relations?

A. Yes.

Q. What?

A. I reported that Dr. Greenberg had left the building without my authority, he had abandoned his station, and I referred that to Labor Relations.

Q. And when was that?

A. September -- around the end of September.
The 23rd, 24th or something.

Q. Okay.  And so, you reported to Labor

Page 389

S. PULITZER, M.D.

Relations that Dr. Greenberg had left without your authorization on the 23rd, or you reported on the 23rd that at some other date Dr. Greenberg had left his station without your permission?

A. I reported on a date around the 23rd that Dr. Greenberg had left the building and left his station unattended without my permission sometime -- the incident was the 23rd, but I reported it on the 24th or the 25th.

Well the 25th was probably a Saturday, but somewhere around there.

Q. So, is it correct to say that Dr. Greenberg during this period was not permitted to leave the building without your permission?

MR. COULSTON:  Objection.

Mischaracterizes his

testimony.

MR. NELSON:  That's why

I'm asking.

A. Dr. Greenberg that morning was given permission to be out of the hospital for two hours, and that was pre-arranged prior to that date.  Dr. Greenberg returned after five or

Steven Pulitzer, MD
October 26, 2016                                                  390 to 393

Page 390

S. PULITZER, M.D.

five and a half hours to the hospital, and then within an hour or two called me to say -- ask if he could leave again; and I said no because I can't cover you.  I don't have anyone to cover you.  And that was where I left it.

Q. Okay.  And did he say why he needed to be out of the building again?

A. No.

Q. Did you ask?

A. I didn't -- I don't recall.

Q. Now, you're saying that he had asked to be out of the building for two hours on the 23rd?

A. Mm hmm.

Q. You recall him making a specific request for -- just to be out for two hours?

A. It was told to me that he needed a -- a couple of hours, like 2:00 in the morning, and that he would come in early, read cases, leave, go do his thing and come back and be there for the rest of the day, and that's it.

Q. And I'm sorry, who reported that to you?

A. The conversation I had with Dr. Greenberg when I gave him permission to take that morning

Page 391

S. PULITZER, M.D.

off.

Q. Yes.  And what I'm asking is:

What did Dr. Greenberg ask -- ask for for that morning in the way of time off?

A. To me it was implied that it was about two hours, a couple of hours.  I -- I don't remember the exact language.

Q. Did he ask for a specific amount of time or just did he express a need to be out that morning?

A. He expressed a need to be out that morning, and he gave a time frame of two hours around.

Q. Two hours --

A. A couple --

Q. -- around?

A. -- of hours.  I don't know if -- you know, it wasn't a normal -- it wasn't a large amount of time, so --

Q. Okay.  And when was it that he had asked for this time off?

A. I don't remember the exact day, if it was -- if it was within a couple of days of when he needed it.  It wasn't within weeks, but it

Page 392

S. PULITZER, M.D.

wasn't --

Q. Was it a verbal request, an e-mail request, a written request or something else?

A. I remember it verbal, but I don't remember it specifically.

Q. Okay.  And sitting here now, are you able to say whether or not Dr. Greenberg specified either a minimum or a maximum amount of time that he needed off that morning?

A. The implication to me was around two hours.

Q. Okay.  I understand the implication.  I'm not sure what you mean by it, but let's --

A. Dr. Greenberg --

Q. I'm asking you now --

A. Yeah.

Q. -- about what's -- what was actually said.

Do you recall Dr. Greenberg specifying either a -- a minimum or a maximum amount of time that he needed to be out that morning?

A. I remember Dr. Greenberg saying he needed to be out about two hours in the morning of the 23rd, can I accommodate that, and I said yes.

Did he say, "I'm going to be out two hours

Page 393

S. PULITZER, M.D.

and 15 minutes", no.

Q. Did he say he needed to be out for a couple of hours, did he say he needed to be out for four hours, did he say he needed to be out for the morning; any of those things?

A. My recollection is around two hours.

Q. Okay.  And sir, you approved that time. Correct?

A. Yes.

Q. And Dr. Greenberg took that time?

A. Yes.

Q. And in fact, I think you said you believe with he took longer than -- than the two hours you had understood he was needing.

A. Yes.

Q. Is that correct?

A. Yes.

Q. And what was the reason Dr. Greenberg asked for that time off?

A. He had a personal issue he needed to attend to.

Q. What was that personal issue?

A. I don't recall.

Q. Do you recall him telling you and you

Steven Pulitzer, MD
October 26, 2016                                          402 to 405

Page 402

S. PULITZER, M.D.

afternoon?

A. Yes, I did.

Q. And how long did he take off?  Do you know?

A. Approximately two hours.

Q. How --

A. Somewhere around there.

Q. -- do you know that?

A. Again, from the talk station data.

Q. Okay.  And the talk station data is an approximation, as you've said a few times today.  Correct?

A. It's an approximation.

Q. So it could have been more than two hours, but it also could have been less?

A. It could have been less, but the main point is it that I had denied his leave and he left without my knowing and my ER was uncovered.

And the person who sat there -- he did try to get coverage -- couldn't read all the studies, so it was not covered in a way that was safe for the patients, and I am responsible for that.

And I mean, the main problem is not the length of time that he had left the building;

Page 403

S. PULITZER, M.D.

it's that I didn't know that he was leaving the building and I didn't know that there was a problem.  And if something happened during that problem, that would have been a very large problem for the department.  That's the problem.

Q. Sir --

A. That's the issue.

Q. -- in the wake of learning of these conditions that had been placed on Dr. Greenberg around the 8th or 9th --

MR. COULSTON:  Oh, Eric.  I'm sorry.

THE WITNESS:  I just need -- I'm supposed to pick up my kids in about 20 minutes.  I just need to call them and tell them I won't be there.

MR. COULSTON:  Okay.  So let's take a two or three-minute break so you can make this call.

MR. NELSON:  Okay.  Just let me get an

Page 404

S. PULITZER, M.D.

answer to this question.  Would you re-pose it?

(Whereupon, a portion of the record was read back by the court reporter.)

MR. NELSON:

Q. Did --

MR. NELSON:  All right.  You know what --

MR. COULSTON:  Let's take a break.

MR. NELSON:  Let's just take a break.  Let just let him make the call.

MR. COULSTON:  Okay.

MR. NELSON:  Okay.  Off the record, please.

(Whereupon, an off the record discussion was held.)

(Whereupon, at 5:23 p.m., a brief recess was taken.)

Page 405

S. PULITZER, M.D.

(Whereupon, at 5:32 p.m., the deposition continued.)

MR. NELSON:

Q. Dr. Pulitzer, were there any issues of time and attendance or insubordination or other matters with respect to which you understood the conditions to have been imposed in September of 2014 that you haven't told me about?

MR. COULSTON:  I'm going to object to the form.

MR. NELSON:

Q. Or have you mentioned them in the course of our discussion here today?

A. I think I've mentioned them.

Q. All right.

MR. NELSON:  May I have my last question before the break?  The last full question and answer, and then the question I started but didn't finish.

Steven Pulitzer, MD
October 26, 2016                                    410 to 413

Page 410

S. PULITZER, M.D.

Q. And you don't know for how long he was out of the building that afternoon.

Is that correct?

A. I know how long he was away from his station, but I don't know where he was during that time.

Q. But you -- okay. And so you don't know how long he was out of the building that afternoon.

Correct?

A. If you're telling me he was out of the building then he was out of the building. I don't know.

Q. Okay. And when you say you know how long he was away from his station, is that because of the talk station data?

A. I know how long he had between the reports, and when somebody came to me and told me that Dr. Greenberg left the building and that another physician is covering for him.

Q. Is it because of the talk station data that you say you know how long Dr. Greenberg was away from his station; yes or no?

MR. COULSTON: Object

Page 411

S. PULITZER, M.D.

to the form.

A. Yes.

Q. Okay. Even though had he dictated a report immediately upon returning, it still would have taken him several minutes to do so, so the time on that report would still have been a few minutes after he had returned.

Correct?

A. Well, there's a way to cheat the system where you pick up a case that was done hours before and you sign it, and when you sign it it dates back to the time that you were there. So I actually don't know if -- what he did in that situation.

Q. All right. But you testified earlier that the only way to know for sure when a physician enters or leaves the building is to check the video.

A. Correct.

Q. Did you check the video with regard to Dr. Greenberg on the afternoon -- for the afternoon of the 23rd of September?

A. Did Dr. Greenberg deny that he was out of the building?

Page 412

S. PULITZER, M.D.

MR. COULSTON: No --

MR. NELSON:

Q. Sir, I don't really want to get into a debate with you. I would just want to -- I appreciate you answering my question.

Did you check the video with respect to Dr. Greenberg leaving the building on the afternoon of September 23rd?

MR. COULSTON: Objection.

MR. NELSON:

Q. It's a yes or no.

MR. COULSTON: I object to the form. He has already testified he didn't know if he left the building; he says he wasn't at the talk station.

Right? That's the issue.

MR. NELSON: Fair enough.

MR. NELSON:

Q. Did you check the video with respect to

Page 413

S. PULITZER, M.D.

Dr. Greenberg for September the 23rd?

A. No.

Q. Did anyone else do so, to your knowledge?

A. No.

Q. See how easy that was?

MR. COULSTON: Objection.

MR. NELSON:

Q. Okay. Now sir, after Dr. -- and who was it that told you that Dr. Greenberg was away that afternoon, out of the building?

A. Dr. Hammil.

Q. And --

A. And Dr. Samin.

Q. Okay. And once you heard this from Dr. Hammil and Dr. Samin, what did you do?

A. I called Dr. Samin who was covering for Dr. Greenberg to see if this was true and what he knew, and then I tried to find somebody who could read the neuroradiology cases.

Q. So, Dr. Samin told you this while Dr. Greenberg was still out of the building?

A. Yes.

Q. And you --

A. Or away from his station. I don't know

Steven Pulitzer, MD
October 26, 2016                                    418 to 421

Page 418

S. PULITZER, M.D.

decided upon, if anything, would be done to or with Dr. Greenberg as a result of that interrogation?

MR. COULSTON: I object to the form.

A. I was told that there would be another meeting; that you know, it was adjourned for that day and that there was going to be another meeting.

Q. Okay. And in the course of these events --

A. Yeah.

Q. -- you reporting the September 23rd incident, you learning that Dr. Greenberg had had an interrogation again at Labor Relations, etcetera -- did you have occasion to speak with Leonzo Cuiman?

A. I don't remember if I spoke to him directly.

Q. Do you recall attending any meeting at which he was also present in this time frame regarding Dr. Greenberg?

A. I don't remember that.

Q. Do you recall any -- do you recall any

Page 419

S. PULITZER, M.D.

meeting with Mr. Arabian, Ms. Bernadel, Mr. Cuiman or anyone else regarding Dr. Greenberg in this time frame? And I'm talking late September early October of 2014.

A. I don't recall a meeting specifically, no.

Q. Do you recall speaking on the phone with Mr. Cuiman, Ms. Bernadel, Mr. Arabian or anyone else regarding Dr. Greenberg's second interrogation or anyone else during this time frame?

A. I recall speaking with Stephanie Bernadel.

Q. Okay. How many times?

A. At least once. I don't know.

Q. And when was that?

A. It was around the time between the interrogations.

Q. So, between Mr. Arabian's interrogation and Ms. Bernadel's you spoke with Ms. Bernadel on the phone?

A. It was around the time of the two in October.

Q. Oh, the two in October. Okay. So between those two --

Page 420

S. PULITZER, M.D.

A. Yeah.

Q. -- as you recall?

A. That is what I recall.

Q. So, after Ms. Bernadel had done the interrogation of Dr. Greenberg and some subsequent occasion on which there was also a meeting with Dr. Greenberg you recall speaking with Ms. Bernadel on the telephone.

Is that correct?

A. Yes.

Q. And what was said between the two of you on that occasion?

A. Well, I don't remember the exacts of what was said, but she asked -- they were trying to decide of what to do in terms of an -- a negotiation or bargaining or whatever they're going to do with them and what do we want to do; do we want to go with suspension, do we want to go with termination, how far we want to take this; and the decision was made to -- to go with the termination.

Q. Okay. So Ms. Bernadel asked you what you wanted to do and you responded with termination.

Page 421

S. PULITZER, M.D.

A. I said that, yes.

Q. Okay. And was Dr. Reede part of this conversation?

A. I don't remember this being a three-way conversation, but all of this was happening simultaneously. Like it -- it wasn't one thing. I don't remember it being a -- like a phone in the middle of the room conversation (indicating), but I just don't exactly remember it.

Q. Okay. Going back to the afternoon of the 23rd, did you know before Dr. Greenberg took that time out of the building that afternoon why he was taking that time out of the building that afternoon?

A. No.

Q. Do you know why he wanted to take that time that afternoon?

A. All I knew is that he needed the time and I gave it to him.

Q. In the afternoon?

A. Oh, no, I'm sorry. In the morning.

Q. No, I'm asking about the afternoon now.

A. No, I didn't know why he needed it.

Q. Did you ever ask?

Steven Pulitzer, MD
October 26, 2016                                    438 to 441

Page 438

S. PULITZER, M.D.

determine that?

MR. COULSTON: This is --

A. No.

Q. Are you aware of anyone else at either Downstate or Kings County Hospital --

A. Mm mm.

Q. -- who did so?

A. No.

Q. Okay. Sir, what role did Dr. Jameladdine play, if any, in the immediate -- the period of days immediately preceding Dr. Greenberg's termination? Was he someone also consulted as to whether or not Dr. Greenberg should be terminated?

A. Separately by who? Who would consult him?

Q. I'm asking. Do you know whether or not he was consulted?

A. I don't know.

Q. Okay. To this day, have you had any conversation with Dr. Jameladdine regarding whether Dr. Greenberg should be terminated?

A. Yes.

Q. When?

A. Around that same time of (indicating) --

Page 439

S. PULITZER, M.D.

between the two. In October between the two things when I was asked.

Q. Okay. So, between the interrogation and the final meeting you had a conversation with Dr. Jameladdine?

A. Yes.

Q. Okay. And what was the substance of your conversation with Dr. Jameladdine? First: Was it by phone or face-to-face?

A. Face-to-face.

Q. And what was it that you said to Dr. Jameladdine and he said to you during that conversation?

A. What I remember from that conversation was giving him an update on the -- what I knew of the case and saying that the question was asked whether we wanted to go for termination -- if we wanted to go as far as termination or -- or a suspension, and that my recommendation would be for termination. And he said: "Okay, I agree."

Q. He said: "Okay, I agree?"

A. Yes.

Q. What else did he say?

Page 440

S. PULITZER, M.D.

A. That's all I remember.

Q. Did he tell you before you told him that you were in favor of termination that he was in favor of termination?

MS. BLOCKER: Objection. You can answer it.

THE WITNESS: Oh.

A. Not that I'm aware of.

Q. Sir, did you prepare or propose or submit to Labor Relations during this period of September, October 2014 a policy or a proposed policy for physician work hours?

A. Yes.

Q. Why?

A. That was actually in the works before this happened, but in light of the events that were happening as well when I took over I was told by my administration at my hospital that there were a few things that I needed to correct.

What I needed to correct was that there were many, many, many unread cases that were unacceptable, there were many physicians with time and attendance issues and unruly -- you

Page 441

S. PULITZER, M.D.

know, not unruly but unscheduled absences, there were too many, and that I -- I needed -- in order to not end up like my boss who I had just seen terminated -- correct these things.

So, when I took over the first thing I did was have a zero backlog policy and try and make sure that we covered our stuff; and the second thing that I worked on was time and attendance, and it happened to coincide with the events that were happening here.

Q. Well, when you proposed the policy you did so in writing. Correct?

A. I would -- I proposed it for approval from Labor Relations.

Q. Okay. In writing. You submitted something to them in writing.

A. Mm hmm.

Q. And when you did that, was that because there was no existing written policy for work hours for physicians at that time?

A. There was a policy from SUNY, from the SUNY -- from Dr. Reede's office which I had mentioned earlier; 8:00 to 4:00 and 9:00 to

A410

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ODED GREENBERG, M.D.,

PLAINTIFF,

-against-          Case No.:
15-CV-2343(PKC)(VMS)
STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL CENTER a/k/a
THE STATE UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER AT
BROOKLYN a/k/a SUNY DOWNSTATE MEDICAL CENTER, NEW YORK CITY
HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY HOSPITAL
CENTER, DEBORAH L. REEDE, STEVEN PULITZER, and JOHN and
JANE DOES,

DEFENDANTS.
-----------------------------------------------------------X

DATE: January 24, 2017
TIME: 9:40 A.M.

CONTINUED DEPOSITION of the Defendant, STEVEN PULITZER, taken by the respective parties, pursuant to a Notice and to the Federal Rules of Civil Procedure, held at the offices of the New York City Law Department, 100 Church Street, New York, New York 10007, before Joanne Capparelli, a Notary Public of the State of New York.

**Page 2**

APPEARANCES:

ERIC M. NELSON, ESQ.
Attorney for the Plaintiff
ODED GREENBERG, M.D.
112 Madison Avenue, 6th Floor
New York, New York 10016
BY: ERIC M. NELSON, ESQ.

STATE OF NEW YORK
Attorneys for the Defendants
120 Broadway
New York, New York 10271-0332
STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL
CENTER a/k/a THE STATE UNIVERSITY OF NEW YORK
HEALTH SCIENCE CENTER AT BROOKLYN a/k/a SUNY
DOWNSTATE MEDICAL CENTER, DEBORAH L. REEDE,
STEVEN PULITZER and JOHN and JANE DOES 1-20
BY: CHRISTOPHER COULSTON, ESQ.

ZACHARY W. CARTER, ESQ.
CORPORATION COUNSEL
NEW YORK CITY LAW DEPARTMENT
Attorneys for the Defendants
NEW YORK CITY HEALTH AND HOSPITALS CORPORATION,
KINGS COUNTY HOSPITAL CENTER
100 Church Street
New York, New York 10007
BY: TANYA M. BLOCKER, ESQ.
File #: 2015-047890
Control #: 164431

THE STATE UNIVERSITY OF NEW YORK
Assistant Counsel to Defendants
SUNY DOWNSTATE MEDICAL CENTER
450 Clarkson Avenue
Brooklyn, New York  11203
BY: WILLIAM VERSFELT, ESQ.

ALSO PRESENT
ODED GREENBERG

*    *    *

**Page 3**

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*    *    *    *

**Page 4**

S T E V E N  P U L I T Z E R, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

CONTINUED EXAMINATION BY
MS. BLOCKER:

Q.    Good morning, Dr. Pulitzer, good to see you again.

A.    Same.

Q.    I will be asking you some questions and also following up on some of your testimony that you gave at your prior deposition which was held on October 26, 2016.

MR. NELSON: I'm sorry to interrupt. Are we consecutively paging?

MS. BLOCKER: Off the record.

(Whereupon, an off-the-record discussion was held.)

Q.    I'm going to give you a few instructions for purposes of this deposition. I'll ask that all your responses to my questions be verbal so the reporter can take down those responses. I'm going to also ask you allow me to finish my question before you respond and then I will do the same for you so that we have a clear record. If at any time during the deposition you need to take a break to speak with your counsel I have no problem with you doing that. I just ask you respond to the pending question that

1 (Pages 1 to 4)

105

for the physicians in your department?

A.   Yes.

Q.   What document or documents did you draft or create that said that?

A.   There was a PowerPoint presentation at the monthly meetings that I'm required to have as the chairman.

Q.   And you prepared that PowerPoint presentation in connection with presenting these attestations that had now been vetted to your attendings, correct?

A.   Yes.

Q.   And you indicated you say on this PowerPoint presentation that these attestations were required?

A.   I don't remember the exact language.

Q.   Well, I'm asking you to be very specific here.

Was there ever a document including PowerPoint presentations that ever said that any or all of these attestations were required?

MR. COULSTON:  Objection.  Asked and answered.

A.   I don't know the specific language that I have in the documents referenced.

Q.   But if there is a document that so states it is a PowerPoint presentation you used to present the attestations to attendings, correct?

A.   Correct.

106

Q.   That is the one document you are aware of if there are any; is that correct?

MR. COULSTON:  As you sit here today.

A.   As I sit here today, yes.

(Whereupon, the aforementioned Document was marked as Pulitzer's Exhibit 1 for identification as of this date by the Reporter.)

Q.   Dr. Pulitzer, I'm placing in front of you what's been marked HHC 1367 as a Bates number.  Do you recognize that document?

MR. COULSTON:  I will note for the record that this is a page from a larger document but it's 1367, HHC 1367.

A.   Yes, I do.

Q.   Is this the document you were referring to a few minutes ago as a paper rep of a PowerPoint presentation?

A.   Yes.

Q.   Was this something you authored?

A.   Yes.

Q.   The document says attestations with five dots and a handwritten asterisk.  Then the first bullet says must be on all exams or we will not get paid.  That's something you wrote?

A.   Yes.

Q.   Other than this page, this document, are you

107

aware of any other document that reflects any requirement with respect to the use of the attestations we've been discussing?

A.   No.

Q.   In your testimony earlier today in response to questions from Ms. Blocker you made reference to a need to correct attestations that Dr. Greenberg had put on reports; do you recall that?

A.   Something to that effect, yes.

Q.   Sir, I believe you said you first learned of this attestation or these attestations.

First, let's clarify.

Are you aware of one or more than one attestation Dr. Greenberg used that was different from the three you had presented?

A.   Yes.

Q.   My question was either/or.

Were you aware of one or more than one that was different?

A.   I'm aware of one.

Q.   You learned of that attestation from Dr. Amodio, I believe you said; is that correct?

A.   Yes.

Q.   When did you first see the attestation itself, the actual text?

108

A.   Sometime the same day that I learned of it.

Q.   Sir, did you submit that attestation to risk management?

A.   Yes.

Q.   When?

A.   Within the days following.

Q.   When you did so, what did you ask them?

A.   To review it.

Q.   Is that all you asked of them?

A.   No.

Q.   What else did you ask of them?

A.   I asked them what is the exposure that the hospital has.  What do we need to do to correct it.  If there's anything we need to do to decrease that exposure. That's what I remember.

Q.   What were you told by risk management?

A.   To adden (sic), put my own addendum or put another addendum on the report below his.

MR. NELSON:  Can I have the witness's second-to-last answer read back?

(Whereupon, the referred-to testimony was read back by the Reporter.)

Q.   What was risk management's answer to your question of whether or not there was exposure?

A.   Their answer was that they didn't know what the

27 (Pages 105 to 108)

109

exact exposure would be but if any of these cases became a medical legal case that there could be potential exposure to the hospital.

Q.   And the other question you asked them what to do if anything was needed to do to correct them or address this issue; is that correct?

A.   Yes.

Q.   In response to that they told you to add an additional attestation after Dr. Greenberg's; is that correct?

A.   Yes.

Q.   Is there anything else that risk management told you either about the exposure question or the what to do question?

A.   Not that I remember.

Q.   Who did you speak to in risk management?

A.   Michelle Welcome.

Q.   Anyone else?

A.   No.

Q.   Was this one conversation or more than one?

MR. COULSTON:  These conversations were discussed in the first deposition.  This is asked and answered.

MR. NELSON:  Okay.  Forgive me, I'm not meaning to repeat all the testimony.

110

MR. COULSTON:  He's here for a second day.  Let's not repeat anything that was already discussed.

MR. NELSON:  May I have the answer to the question I asked now.  Would you read it back.

(Whereupon, the referred-to question was read back by the Reporter.)

A.   There was one conversation that I had with Michelle Welcome regarding the questions you asked.

Q.   It's your testimony you didn't speak to anyone else in risk management in connection with this, correct?

A.   Not directly, no.

Q.   What does that mean?

A.   I didn't speak with anyone else.

Q.   Are you aware of Ms. Welcome speaking with anyone else?

A.   Yes.

Q.   Who did Ms. Welcome speak with?

A.   Legal counsel and central office.

Q.   Central office in Albany?

A.   I'm sorry, no, central office for New York Health and Hospitals.

Q.   I see.  Who is the attorney that Ms. Welcome spoke with there?

A.   I don't know.

111

Q.   Did Ms. Welcome told you she had done that?

A.   Yes.

Q.   But she didn't identify the attorney?

A.   Not that I remember.

Q.   Did she tell you what had been discussed between the two of them?

MS. BLOCKER:  Objection to the extent you disclosed --

MR. NELSON:  The answer is yes or know.

MS. BLOCKER:  If you are asking that I have a problem.  Please note my objection to the question.

A.   Yes.

Q.   What was it she said between the two of them?

MS. BLOCKER:  Objection.  I'm objecting because it's potentially privileged information that the attorney at Kings County Hospital may have communicated to Dr. Pulitzer.

MR. NELSON:  Yes.  I'm specifically asking.

Q.   What did Ms. Welcome tell you she discussed with the attorney from Health & Hospitals?

MS. BLOCKER:  That would all be privileged.

MR. NELSON:  That's fine.  You are relying on advice of counsel?  Defense privilege is no longer a legitimate basis to preclude a witness

112

from answering.  So you can choose.  Either invoke the privilege and waive the defense or waive the privilege and reserve the defense.  One or the other but you can't have it both ways.

MS. BLOCKER:  We discussed this previously.  We had a long conversation with this at the first deposition.  We absolutely did and, in fact, at the first deposition you stopped at the conversations that Dr. Pulitzer may have had or risk management may have had with counsel at Kings County Hospital.  I would advise maybe you review the transcript concerning that.

MR. NELSON:  We did not.  At this point I won't inquire further out of respect for you even though you are not representing the witness if you invoke the privilege but what I'm giving you notice of now if you invoke the privilege we will seek to preclude you from making an advice of counsel defense in this case.  So one way or the other, Tanya, just tell me what you want to do.

MS. BLOCKER:  I just noted my objection for the record.  To the extent you are inquiring as to what an employee of Kings County Hospital Ms. Welcome spoke with and employee of Kings County Hospital being a legal individual at Kings County

28 (Pages 109 to 112)

157

MR. COULSTON: Objection. Sorry. Objection to form. Assumes facts not in evidence. You can answer.

A.   I became aware that there was a problem of omission with regard to Dr. Greenberg's attestations.

Q.   Was that when you were given a stack of reports as we were talking about earlier?

A.   Yes.

Q.   And you were given a stack of reports for each of the other physicians in the department for whom there were issues with their reports?

A.   Correct.

Q.   The issue with Dr. Greenberg's reports at that point was that they needed attestations that had not yet been added to them, correct?

A.   I'm not sure if there was a blank, a standard attestation that had been on the report from a prior iteration or if there was no attestation at all but the attestation that was agreed upon with Flicare was not on his report.

Q.   I see. But when you were given this stack both for Dr. Greenberg and other physicians in the department, there was no issue of Dr. Greenberg having used his own attestation, correct?

A.   I was not aware, no.

158

Q.   Sorry.

A.   No.

Q.   That's not correct?

A.   There was -- I had -- Can you repeat your question.

Q.   When you were given the stack of reports that either needed attestations or needed corrections for Dr. Greenberg and any number of other physicians in the department, you were not aware of any other attestations Dr. Greenberg had done or was using, correct?

A.   Correct.

Q.   And it was, in fact, in response to giving to the physicians in the department their respective stacks of reports that either needed attestation or re attestation that Dr. Greenberg composed his attestation that became an issue, correct?

A.   I don't know when Dr. Greenberg composed that attestation.

Q.   The one that came to your attention as an issue?

A.   Yes.

Q.   Came to your attention because it had been affixed to reports that were among those in the stack he had been given on the occasion we've just been talking about, correct?

A.   Yes.

159

Q.   So now stepping back from the attestations that Dr. Greenberg added to the reports from that stack and defining the time period as July 21st until that date, are you aware of any issues with Dr. Greenberg's attestations?

A.   I'm not sure I really understand your question.

Q.   Between -- I believe the date was September 22nd of 2014, but it may have been a day or two earlier or later? Between July 21st of 2014 and September 20-something of 2014, did any issue come to your attention with regard to the attestations Dr. Greenberg was affixing to the reports, the studies he had read, the attestations, not other issues?

A.   If I understand your question correctly, you are asking me up until the time of September 22nd, had anyone brought to my attention that Dr. Greenberg was -- a problem with an attestation that Dr. Greenberg was currently using; is that your question?

Q.   That will do.

A.   No.

Q.   Had radiologists been utilizing the new attestations from the July date to the September date?

A.   Yes.

Q.   I'm sorry.

A.   Yes.

Q.   Prior to that, had they been adding attestations

160

that were somewhat different in form but attestations nevertheless?

A.   Yes.

Q.   Expanding the time period backwards, at any time prior to September 20-something of 2014, were you aware of any issues with Dr. Greenberg's attestations?

A.   At any time prior to the?

Q.   Date in September that we've been discussing on which the issue of his self-made attestation came to your attention?

A.   Nothing had been brought to my attention.

Q.   If you go down a little further three items further down, starts out "Surveillance. I now have daily reports of unwritten cases I am honoring timing and attendance and productivity daily." Do you see that?

A.   Yes.

Q.   Tell me what you meant when you wrote those two things?

A.   That I have daily reports of all the cases that were unread in the department. And that I was monitoring as best I could people's attendance and how many cases they read per day.

Q.   Why were you doing that?

A.   I was doing that for two reasons. One, I was told by Dr. Reede that I needed to do that. And I was also

40 (Pages 157 to 160)

161

told by Dr. Jamaleddine that there were reports of problems with attendance, productivity, and backlogs and other issues which had led to the dismissal of Dr. Kantor.

Q.   When had Dr. Jamaleddine told you that?

A.   I don't know the exact date.

Q.   Was it prior or subsequent to you becoming the interim director?

A.   Subsequent.

Q.   Sometime after the latter part of June of 2014, correct?

A.   Yes.

Q.   What was the occasion for him telling you that? Was that a meeting you had? Was it a phone call? Was it an encounter in the hallway? How did that come about?

A.   I don't remember the exact location. It was a meeting and it was basically an introduction to my job, his expectations, and what the problems were as he knew them in the department.

Q.   Sir, do you know who Dr. Strashun is?

A.   Yes.

Q.   Who is Dr. Strashun, S-T-R-A-S-H-U-N?

A.   He is a nuclear medicine physician employed by SUNY Downstate as an the affiliation contract. He provides services at both campuses for the nuclear med department.

Q.   Was he a 50/50 or someone who worked exclusively

162

at Kings County?

A.   I don't know his exact FTAE at each place but he was split. I don't know if it's 50/50.

Q.   At this time, July of 2014, was consideration being given to dismissing Dr. Strashun?

A.   I'm not sure. Dr. Jamaleddine had expressed concern that Dr. Strashun's salary was not commensurate with the productivity of the nuclear medicine department because trends in radiology were less nuclear medicine studies being billed.

Q.   In other words, Dr. Strashun was making too much for what he was producing?

A.   Correct.

Q.   Is Dr. Strashun still employed by the hospital today?

A.   Yes.

Q.   Has he been continuously employed since 2014?

A.   Yes.

Q.   Does he make less today than he was making in 2014?

A.   Not that I'm aware of.

Q.   Do you recall any period of time during which his salary was reduced as a result of or in connection with anything Dr. Jamaleddine had said that you just mentioned?

A.   There was no reduction in the portion of his

163

salary that was on the affiliation contract which I would have access to. I don't know his other details.

Q.   Turn to the second page of the exhibit, would you please.

A.   (Complies.)

Q.   Look about five or six lines down; you'll see it says NUC med, which I assume means nuclear medicine?

A.   Yes.

Q.   It says working with Jean A-I-M-E-E and Dr. Reede for solution to Dr. Strashun. If we replace him we will need to hire an FHE with multi-modality capability. Do you see that?

A.   Yes.

Q.   What was the solution to Dr. Strashun being referred to there?

A.   The decreased total number of exams in the nuclear medicine department did not support the salary for a full physician.

Q.   Have Dr. Strashun's responsibilities changed since this time period?

A.   No.

Q.   In other words, has he been given any other responsibilities to make him more productive?

A.   No. Dr. Strashun is not a radiologist.

Q.   He's not a --

164

A.   Radiologist.

Q.   What is he?

A.   He is an internal medicine physician with added credentials in nuclear medicine. He cannot read any cases outside of his subspecialty.

Q.   I see he's a member of your department though, correct?

A.   Yes.

Q.   Your department being radiology, I mean?

A.   Yes.

Q.   Now you are the chief medical officer so I want to make sure we're clear.

Does the reference in your note that says if we replace him refresh your recollection as to whether or not Dr. Strashun's discharge was being considered at this time?

A.   Yes.

Q.   Does it confirm that, in fact, it was?

A.   Being considered?

Q.   Yes.

A.   Yes.

Q.   Were you a party to those discussions?

A.   Yes.

Q.   Was there a decision made at some point to not discharge Dr. Strashun?

A.   There was no decision made either way.

41 (Pages 161 to 164)

| ODED GREENBERG, M.D. VS. SUNY DOWNSTATE ET AL. | DEBORAH REEDE, MD November 18, 2016 |

**Page 1**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------------X

ODED GREENBERG, M.D.,

          Plaintiff,

     - against -

SUNY DOWNSTATE ET AL.,

        Defendants.

Index No.:  15-cv-2343 (PKC/VMS)

------------------------------------------------X

               112 Madison Avenue
               New York, New York

               November 18, 2016
               9:15 a.m.

     Deposition of Defendant, by DEBORAH REEDE, MD, taken pursuant to Subpoena, before Rita Persichetty, a Notary Public of the State of New York.

        ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
        New York, New York 10022
        212-750-6434
        REF:  113737

**Page 2**

A P P E A R A N C E S:

ERIC M. NELSON, ESQ.

Attorneys for Plaintiff

     112 Madison Avenue

     New York, New York 10016

     PHONE:  212.354.3666

     FAX:  212.354.2555

     EMAIL:  Emnlegal@gmail.com

STATE OF NEW YORK

OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN

Attorneys for Defendant

     The Equitable Building

     120 Broadway

     New York, New York 10271-0332

BY:  CHRISTOPHER V. COULSTON, ESQ.

     PHONE:  212.416.8556

     FAX:  212.416.6009

     EMAIL:  Christopher.coulston@ag.ny.gov

**Page 3**

A P P E A R A N C E S: (Cont'd)

NEW YORK CITY LAW DEPARTMENT

OFFICE OF THE CORPORATION COUNSEL

Attorneys for Defendants Kings County Hospital

100 Church Street

New York, New York 10007

  BY: TANYA N. BLOCKER, ESQ.

  PHONE: 212.356.3177

  FAX: 212.356.3770

  EMAIL: Tblocker@law.nyc.gov

  ALSO PRESENT:

WILLIAM VERSFELT, Assistant Counsel,

  SUNY Downstate Medical Center

ODED GREENBERG

MICHELLE GILMORE-GREENBERG

**Page 4**

------------------ I N D E X ------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| DEBORAH REEDE, MD | MR. NELSON | 7 |

-------- INFORMATION/DOCUMENTS REQUESTED --------

PAGE    136   Dr. Areman's annual review

--------------- E X H I B I T S ----------------

| REEDE | DESCRIPTION | FOR I.D. |
|---|---|---|
| Exhibit 1 | Document Bates stamped SUNY ESI 588 | 209 |
| Exhibit 2 | Document Bates stamped 1249 to 1252 | 219 |
| Exhibit 2A | Time Off Away from Campus Policy Bates stamped G 164 | 219 |
| Exhibit 2B | Unexpected Absence Policy that you implemented in November of 2013 | 219 |
| Exhibit 2C | A document | 219 |
| Exhibit 3 | Document Bates stamped SUNY 3488 | 223 |

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 29

REEDE

you meet with them subsequent to that?

A   The only one that I met with was Dr. Jamaleddine.

Q   And when did you meet with Dr. Jamaleddine?

A   It was maybe -- I don't know.  I had been at Downstate probably -- I don't know -- more than six months.

Q   Now, part of your responsibilities as chair of the department of radiology is to have under your management or supervision the radiologists employed by Downstate, correct?

A   Yes.

Q   And that includes the radiologists employed by Downstate who worked at Kings County Hospital, correct?

A   Yes.

Q   Was there someone with whom you liaised or otherwise dealt in connection with the day-to-day conduct of the practice by the physicians employed at Downstate but working at Kings County?

A   Yes.

Q   Who?

Page 30

REEDE

A   Dr. Kantor.

Q   Okay.  Is that Dr. Alan Kantor?

A   Yes.

Q   And what was Dr. Kantor's position?

A   He was the chief of service.

Q   What do you mean?  Chief of what service?

A   Chief of the radiology service at Kings County Hospital.

Q   Okay.  And in what way did you interact with Dr. Kantor regarding the radiologists employed by Downstate working at Kings County?

A   I mean he -- I mean, I would come to staff meetings, you know, to let -- you know, let them know when -- we would let them know when there were grand rounds.  They were also making arrangements for various meetings for the faculty to attend, you know, maybe some discussions about service coverage.

Q   And at the time, Dr. Kantor was the chief of radiology at Kings County; is that correct?

A   Yes.

Page 31

REEDE

Q   Did he report to you?

A   Yes.

Q   Was there anybody between the two of you or were -- was -- were you his direct supervisor?

A   I'm his direct supervisor.

Q   Okay.  And did that change at some point?

A   No.

Q   Is Dr. Kantor still chief of service at Kings County?

A   No.

Q   When did he cease to be the chief of service at Kings County?

A   On or around July of -- what is it?  2014, I believe.

Q   And what were the circumstances of that?

A   Administration at Kings County Hospital said that they would prefer that -- they would prefer that -- to have him replaced.

Q   And who do you mean by administration at Kings County Hospital?

A   Dr. Jamaleddine.

Page 32

REEDE

Q   And when did Dr. Jamaleddine convey that sentiment to you?

A   During a meeting when we were discussing staffing.

Q   And when was that meeting?

A   Sometime in the spring of 2014.

Q   And who attended that meeting other than you and Dr. Jamaleddine?

A   Dr. Clinchy.

Q   Anyone else?

A   No.

Q   And as best you can recall, what did Dr. Jamaleddine specifically say in that regard?

A   He said that he didn't think that the -- that the radiology department was run as good as it could be.  They -- he felt they needed new leadership.

Q   Did he tell you in particular why he thought it wasn't being as run as good as it could be?

A   I don't remember the particulars.

Q   So you're saying you don't recall if he said that?

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 57

REEDE

A No.

Q Okay. The other four: Mason, Roitberg, Areman, and Mirchandani, you had meetings with individually without anyone else present, correct?

A Yes.

Q Okay. Were any of the five informed in writing that they were being nonrenewed?

A That would come from HR I would imagine.

Q When did you inform HR that these five physicians were being nonrenewed?

A I don't recall the exact date.

Q Had you done that before the Jamaleddine meeting?

A No.

Q Did you do that before you met with Dr. Kantor? And what I mean is, the Kantor meeting that followed the Jamaleddine meeting by about a week or less.

A I don't recall.

Q Did you make the notifications to HR?

A Yes.

Q Was there anyone else nonrenewed at

Page 58

REEDE

the time you nonrenewed these five?

A No.

Q Between July of 2013 and the time when you nonrenewed these five physicians, had you either fired or discharged or nonrenewed or otherwise ended the employment of any other radiologists in your department?

A No.

Q Subsequent to nonrenewing these five, did you fire or terminate or discharge or otherwise end the employment of any radiologist in your department?

A No.

Q Is that true up to the present today?

A The only people -- Dr. Nath was -- left. So that was an HR issue. And Dr. Levin, Dan Levin, resigned. Dr. Goldfisher resigned. Who else until now? Dr. Amodio resigned and Dr. Que Chen resigned and Dr. Wu Choy had a nonrenewal, and then it was not renewed.

Q Anyone else?

A That's it.

Q All right. So you say Dr. Nath. Is that Jaya Nath?

Page 59

REEDE

A Yes.

Q Okay. Dr. Levin's first name, please.

A Daniel.

Q So Dr. Levin, Dr. Goldfisher, Amodio, and Dr. Chen all resigned?

A No. It's Dr. Goldfisher resigned, Dr. Amodio resigned, Dr. Levin resigned.

Q Dr. Chen, Que Chen?

A Que Chen, yes, he resigned.

Q And Dr. Choy was nonrenewed?

A Yes.

Q When was Dr. Choy nonrenewed?

A I don't remember. That was later after the other people. I don't remember when his nonrenewal went out.

Q Do you have an understanding as to whether nonrenewals all began and ended -- I'm sorry -- whether or not the term appointments all began and ended on the same dates for physicians in your department? Were they all, for example, the end of June or the end of July in a given year?

A Well, I think the ones that I had --

Page 60

REEDE

the ones when I came, yes, everything was ending at the same time.

Q Okay. So did Dr. Choy get nonrenewed at the same time as Drs. Kantor, Roitberg, et cetera?

A No. That was -- that came later.

Q Do you know if it came a year later?

A I don't recall.

Q And what was the reason for Dr. Choy's nonrenewal?

A Pitts Management said that we should nonrenew two people. The two people -- they gave us the names of two people to nonrenew.

Q And who was the other one besides Dr. Choy?

A Dr. Shwarzberg.

Q And was Dr. Shwarzberg nonrenewed?

A Yes.

Q And does Dr. Shwarzberg still work there?

A Yes.

Q So if he was nonrenewed, why is it that he still works there?

A Because I went to administration and

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 61

REEDE

told them that I wanted to keep him.

Q   And when did you do that?

A   I can't remember.

Q   Why did you want to keep him?

A   Because he's a good radiologist.

Q   Are you saying that the people you nonrenewed were not good radiologists?

A   I'm saying he's a good radiologist. You know, I -- you know, they are the ones that recommended that for their reasons, and I felt that, you know, he fulfilled the job, that I needed somebody at University Hospital.  He did a good job.  He's a reliable worker.  And so I had to fight to keep him.

Q   I see.  And when you say, "They recommended," you mean Pitts Management?

A   Pitts Management recommended that these people be nonrenewed.

Q   When you say "These people," did they make specific recommendations?

A   Two people.

Q   They didn't specify to whom?

A   Yes.  They did specify.

Q   And they specified Dr. Choy and

Page 62

REEDE

Dr. Shwarzberg?

A   Yes.

Q   Did they say why?

A   Because they felt that -- because they wanted to renegotiate the terms of their contract.

Q   Who is the "they" who wanted to renegotiate?

A   That Pitts Management felt that the people that were in charge of compensation wanted to renegotiate the terms of the contract.

Q   All right.  I'm sorry.  I'm not following.  Pitts Management -- first of all, who's Pitts Management to your understanding?

A   Pitts Management is a consultant firm that was hired by Downstate to do restructuring of the departments, restructuring of the hospital.  And I would gather that their primary concern was to reduce costs.

Q   But they made specific recommendations, not just that, say, two radiologist should be let go?

A   No.

Page 63

REEDE

Q   They specified who the particular radiologists were that should be let go, correct?

A   Yes.

Q   Okay.  And with regard -- let's take them one at a time.  With regard to Dr. Choy, what did Pitts Management say was the reason why they thought Dr. Choy should be nonrenewed?

A   They want to renegotiate the terms -- they want to renegotiate the terms of the contract.

Q   But renegotiating the terms would just mean continuing someone's employment on different terms?

A   Not if they were still -- not if they were working under the current contract.

Q   Okay.  Maybe we should talk about what the contract is that you're referring to.

A   Well, their memorandum of agreement.

Q   So are you saying that Pitts Management wanted to renegotiate, say, the salary and work responsibilities of Dr. Choy?

A   Yes.

Q   Why would that necessarily have

Page 64

REEDE

precluded him from continuing in employment? Why wouldn't he just have continued on different terms?

A   Because they wanted us to have the ability to restructure the department as well.

Q   Are you saying they were recommending he be nonrenewed and then continued on different terms under a new agreement?

A   Until we could decide -- they could decide how they wanted to restructure the departments.

Q   Okay.  And are you saying that they also were saying that whatever the terms were under which Dr. Shwarzberg was then working should be nonrenewed and new terms should be negotiated with Dr. Shwarzberg?

A   Yes.

Q   So they weren't actually recommending these two people's dismissal.  They were simply saying, let's essentially get out of the agreement we have with them now and have a different agreement with each of them; is that right?

A   Well, also, they were looking at the

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 65

REEDE

RVUs and how the work is apportioned. So maybe I don't need two physicians that do this. Maybe I need one that does this and one that does something else. And so that was the reason they chose those two.

I mean, to be honest, the reason I think they chose those two people was because they were the only two that were not tenure overdue.

Q   What is tenure overdue?

A   If someone is tenure overdue, you really -- I don't think you can issue them a nonrenew -- a nonrenewal.

Q   Well, can you tell me what "tenure overdue" actually means?

A   I mean, I don't know how they exactly describe it in HR. But it's like if you're hired under a certain -- you know, I don't know. But if you're hired as a -- if you're hired on a tenured versus a nontenured track -- or I think even any track maybe. If you're there over X amount of years, you have to get -- you really should be promoted within seven years. So if you're not, those people --

Page 66

REEDE

I don't believe they can issue them a nonrenewal.

Q   When you say "tenure overdue," are you saying overdue to be accorded tenure?

A   Yes.

Q   Okay. So you're saying Dr. Choy and Dr. Shwarzberg were both overdue to gain tenure?

A   No, were not overdue.

Q   Were not overdue? I see.

A   Right.

Q   So, in other words, they were the only ones who weren't due to get tenure?

A   Correct.

Q   So there was more flexibility with them than there would be with others?

A   Yes.

Q   So they were the ones who were the most easily nonrenewed and renegotiated with; is that correct?

A   Yes.

Q   And the remainder of the radiologists were either tenured or overdue for tenure; is that right?

Page 67

REEDE

A   Correct.

Q   And "overdue for tenure" means they had worked more than seven years without getting tenure, so they were past due for when they should have been accorded tenure?

A   Right. It's either that or they were working on both sides of the street.

Q   Which -- by which you mean both at Downstate and at Kings County?

A   Yes.

Q   Okay. Now, earlier when you were talking about your list of nonrenewal -- withdrawn.

Earlier when you were talking about the list of physicians who you were planning to nonrenew and communicating that at the Jamaleddine meeting, you made reference to an ACGME report. Was that the basis upon which you had decided those four physicians would be nonrenewed?

A   That was one of the primary considerations for looking at the staffing in the department.

Q   What do you mean "looking at the

Page 68

REEDE

staffing"?

A   Looking at the staffing in the department with reference to resident education.

Q   Okay. I need you to tell me what you mean by that.

A   Well, the residency program had received a probation status. The ACGME came in in May of -- would be the May before I arrived. So they came in, and they do their residency review. And when the report came out, it basically -- the report was -- said that the staff was not really interested -- did not appear to be interested in resident education.

And when I spoke to the lady at the ACGME -- actually before I got the report even, the written copy of it, when I saw her at a meeting, and I said, "Oh, you know, I'm from Downstate. I'm waiting, it seems, a mighty long time for us to get our report."

And I was informed that, "Well, you should be getting the letter like next week, and you're going to be on probationary status."

And then I said, "Why?"

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 69

REEDE

And then -- I don't know.  She went to her cell phone and looked, and she said, "Because the primary thing that tipped it over the edge to do that -- to give you that -- that status was because the faculty are not perceived to be interested in resident education."

Q   Now, at that time, how many radiologists were under your supervision?

A   I don't recall the exact number.

Q   Was it the 25 you mentioned, or is it --

A   It's like 30 something.

Q   Okay.  I was using the number, I think, that you gave me for how many radiologists were employed by Downstate but working at Kings County.

But there were additional radiologists under your supervision who worked at Downstate, correct?

A   Yes.

Q   Were most of the radiologists in the department working at Kings County?

A   Yes.

Page 70

REEDE

Q   So there were only a handful at Downstate; is that correct?

A   Yes.

Q   In total, approximately 30 radiologists?

A   A little more.

Q   Okay.  So between 30 and 35?

A   Uh-huh.

Q   Yes?

A   Yes.

Q   Okay.  Can you tell me why if the ACGME report reflected that the radiologists in your department didn't seem interested in resident education you chose the four that you chose in particular for nonrenewal rather than any of the other 25 or 30?

A   Well, this is based on the resident evaluations, also on discussion -- the residents do a survey -- the resident surveys, discussions individually with the residents, and also discussions with the staff members.

Q   When you say "staff members," who are you referring to?

A   Other faculty members.

Page 71

REEDE

Q   Are you talking about other faculty members in the department or outside the department?

A   In and outside.

Q   Okay.  And when you refer to "other faculty members in the department," whom are you referring to?

A   Oh, it would be a number of people. I would say that people like Dr. Chaudhry, Dr. Hammil, Dr. Waite, Dr. Walsh, Dr. Kolla, Dr. Lehto.  So a good number of the faculty members.

Q   And what were the nature of the discussions you're just referring to with those half-dozen who you named?

A   Basically, you know, how they -- how they -- you know, the quality of the work, you know, how their -- the level of professionalism.

Q   Their own or others?  Their own professionalism or others' professionalism?

A   Others' professionalism.

Q   Can you tell me why you consulted with those six rather than all of the

Page 72

REEDE

radiologists in your department?

A   Well, those are people that I knew, was most familiar with.  And that's -- you know, I wanted to get the opinion of people that work with somebody.

Q   Okay.  Now, I think I caught the first four names correctly.  Can you tell me Dr. Kolla, can you tell me how that's spelled?

A   K-o-l-l-a.

Q   And Doctor -- I think you said Alito?

A   Lehto.

Q   Lehto.  Can you spell that for me?

A   Oh, I don't know how he spells it. L-e-i-t-h-o [sic], I think.

Q   Okay.  And then the other four were Drs. Walsh, Waite, Hammil, and Chaudhry?

A   Yes.

Q   Chaudhry, C-h-a-u-d-r-y [sic] perhaps?

A   I believe that's how it's spelled.

Q   Okay.  All six of those are or were radiologists in the department?

A   Yes.

Q   Can you tell me which of those worked

Case 1:15-cv-02343-PKC-VMS   Document 87-59   Filed 09/14/18   Page 7 of 17 PageID #: 1895

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 77

REEDE

A  They review them --

Q  Who is "they"?

A  You know, the mammography people have to review that data, and they have to review it for -- you know, for their accreditation.  So as chairman -- as section chief, she should have been -- I'm sure she had to look at that.

Q  Yes.  But what I'm asking is, when did the issue of her unusually high recall rate get brought by you to Dr. Roitberg's attention?

MR. COULSTON: Object to the form.

A  I don't remember exactly when it was mentioned.

Q  Okay.  But you definitely mentioned it to Dr. Roitberg?

MR. COULSTON: Object to the form.

You can answer.

A  It was mentioned, and I don't know if it was mentioned by somebody else as well.

Q  Well, okay.  Let me just ask you the question straight out.  Did you raise as an issue with Dr. Roitberg at some point her high recall rate?

A  Yes, I did.

Page 78

REEDE

Q  When did you do that?

A  I can't recall.

Q  Was that at the time you informed her of her nonrenewal?

A  I know I mentioned it then.

Q  Okay.  Can you tell me, do you recall mentioning it prior to that occasion?

A  I don't recall.

Q  Now, you've made a number of references to resident evaluations and consulting with residents.  Knowing about certain radiologists from residents, even from when you were at LICH, et cetera, how much of a decision as to whom to renew and nonrenew depended on residents' views and opinions on that subject?

MR. COULSTON: Object to the form.

You can answer.

A  Well, I think it has a major impact because the residents do annual surveys for the ACGME, and, you know, that's one of the things that they look at when they're evaluating the programs.  So, you know, the residents will know whether or not somebody is teaching them

Page 79

REEDE

the way they feel is appropriate.

I mean, we did have other people that would sit in on lectures also and look and see how people were teaching, but I put a major emphasis on resident evaluations.

Q  Okay.  How about -- now, by the way, have you told me what the reasons were for Dr. Roitberg's nonrenewal, or were there other reasons besides what you mentioned?

A  I told you.

Q  Okay.  And going back to Dr. Areman, who we spoke about just prior to Dr. Roitberg, have you told me what the reasons were for Dr. Areman's nonrenewal, or were there other reasons?

A  I told you.

Q  All right.  So tell me about Dr. Mirchandani now.  What were the reasons for Dr. Mirchandani's nonrenewal?

A  Dr. Mirchandani was the program director and also a neuroradiologist.

Q  Program director of what program?

A  The radiology residency.

Q  Okay.  Go on.

Page 80

REEDE

A  So the issues with Dr. Mirchandani, one was a problem with the quality of the reports, so much so that it triggered a focus review.  And so there were problems with the quality of his readings.

And then, as the program director, as evidenced by the fact that the program was on probation, then, that would be the reason why -- you know, that would be another reason -- I mean, if I'm looking at somebody that they are not good at teaching, they have problems with their reports so much so that referring physicians had complained to the point that they had to conduct a focus review, the focus review found irregularities, which they said that they must -- I can't remember the number of cases that the person reviewed.  But the person -- if -- I think it was like -- I don't know if it was 50 or a hundred cases, but when -- in their discussion, they said that if I was looking at these mistakes over, let's say, thousands of reports, I would say, "Okay."  But when you're reading a small number of cases, and you're seeing these kinds of

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 93

REEDE

Q  You're talking about individual performance reviews?

A  **Individual reviews of the faculty. You know, after we review with them, you know, "What are you doing as far as scholarly activity," you might at that point discuss with them things that they could do if they're considering advancement for promotion, you know, like that.**

Q  Do you recall when those reviews were submitted?

A  **I don't recall.**

Q  So sitting here now, are you able to tell me when it was that you had this discussion with Dr. Mason?

A  **I don't recall.**

Q  Can you tell me the season?

A  **I don't recall.**

Q  Can you tell me how long it was before you informed Dr. Mason of her nonrenewal?

A  **I don't recall.**

Q  Okay.  Going back now, the ACGME report, was that limited to addressing issues

Page 94

REEDE

regarding resident education?

A  **Yes.**

Q  Because the ACGME is the monitoring or supervisory body for graduate medical education, correct?

A  **Yes.**

Q  Okay.  So the matters with which ACGME is concerned are exclusively related to what's happening with residents at the institution, correct?

MR. COULSTON: Object to the form.

A  **It has to do, yes, with resident education, yes, primarily resident education.**

Q  Okay.  And I believe that you've testified that with regard to each and all of those four physicians you recommended nonrenewal for, there were issues with regard to resident education, or was that not the case for -- withdrawn.

Was there an issue with resident education with respect to Dr. Roitberg?  I know you said there was with Areman.

A  **Yes.**

Q  Was there an issue with resident

Page 95

REEDE

education with regard to Dr. Mason?

A  **Yes.**

Q  And I think you said that Dr. Mirchandani was the program director, so there were obviously issues with resident education that involved him; is that correct?

A  **Yes.**

Q  Okay.  Can you tell me, were any of those four mentioned in the ACGME report specifically?

A  **They never mention physicians in the ACGME report.**

Q  I see.  So, in other words, no physician was mentioned in the ACGME report individually?

A  **Correct.**

Q  Okay.  And that ACGME report is the one that placed the program at Downstate under probation, correct?

A  **Yes.**

Q  It had not been under probation previously?

A  **I don't know if it was ever on probation before.**

Page 96

REEDE

Q  Okay.  When you arrived as the chairman of the department at Downstate, to your knowledge, was the department's resident education program under probation by the ACGME?

A  **On my arrival, they had not received the report yet.  They had -- yes.**

Q  I see.  So the report had actually -- the observations had been done, but the report had not been issued; is that right?

A  **Correct.**

Q  So the actual observations were done prior to you beginning as chair of the department at Downstate, correct?

A  **Yes.**

Q  And then the report came sometime after you took on that post?

A  **Yes.**

Q  And that was the report that placed the program on probation, correct?

A  **Yes.**

Q  So as of the time you began work in the position of department chair, to your knowledge, was the program as of then already on probation or not on probation yet?

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 117

REEDE

A   Dr. Sri Kolla.

Q   Interventional radiology, again, when you arrived?

A   That's Dr. Huntz Liu.

Q   Spell that.

A   H-u-n-t-z L-i-u.

Q   Is that one word or a hyphenated?

A   No.  First and last name.

Q   Okay.  So Dr. Liu.
Chest when you arrived?

A   Dr. Steven Waite.

Q   And ultrasound when you arrived?

A   Really would be Dr. Dan Zinn.

Q   Okay.  Now, those were all of the chiefs of the subspecialties when you arrived.  Have any of them changed other than, I assume, Dr. Areman?  I'm asking about the others now.  Have any of those changed?

A   Neuroradiology is Dr. Lindin.

Q   Okay.  Are the other six the same?

A   Yes.

Q   All right.  And who replaced -- so Dr. Lindin replaced Dr. Nath when she left or resigned?

Page 118

REEDE

A   Yes.

Q   And who replaced Dr. Areman?

A   Dr. Janelle Scott.

Q   Okay.  And she serves in that position today?

A   Yes.

Q   Is that the same as Dr. Scott Moore?

A   Yes.

Q   We can refer to her as Dr. Scott, and we'll be talking about the same person?

A   Yes.

Q   Okay.  Good.  When did Dr. Scott take over for Dr. Areman as chief of ER radiology?

A   I don't know if it was July or August of 2014.

Q   And what were the circumstances of that?  I mean, how did Dr. Scott become the ER radiology chief?

A   She was working at Long Island College Hospital, and so I decided to move her into that position.

Q   When did you decide to do that?

A   I don't know.  Maybe it was, like, in July of 2014.

Page 119

REEDE

Q   Is Long Island College Hospital still open?

A   No.

Q   When did it close?

A   I don't recall.

Q   Do you recall what year it closed?

A   I don't recall.

Q   Had Dr. Scott worked with you at Long Island College Hospital?

A   Yes.

Q   And when I say "worked with you," she worked as a radiologist in the department when you were the chair of the department at LICH, correct?

A   Yes.

Q   How long had Dr. Scott worked for you as a radiologist at LICH?

A   Maybe approximately three years.

Q   And when was it that you just decided to appoint her to be director of ER radiology?  I'm not asking when she started work.  I'm asking when you decided you wanted her as the ER radiology chief.

A   You already asked me that question.

Page 120

REEDE

Q   Okay.  Forgive me.  I'm sorry.  I thought I asked a different question.  What was the answer?

A   On or around July of 2014.

Q   Is that because you had determined to nonrenew Dr. Areman?

MR. COULSTON: Object to the form.

A   Well, when I decided to nonrenew Dr. Areman, I had to put somebody in that position.

Q   So that's a yes?

A   Yes.

Q   And when did you decide not to renew Dr. Areman?

A   I don't remember the exact date.

Q   Tell me how you went about replacing Dr. Areman with Dr. Scott.  What did you do?

A   I looked at the people that were available for the position already on staff, and it basically boiled down to the two possibilities would either be Dr. Greenberg or Dr. Que Chen.

Q   Okay.  And then what did you do?

A   Then I had to look at, you know,

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 121

REEDE

their -- you know, their CV's and also if their -- and also look at their job performance.

Q   Okay.  When you say that you looked at the people who were available and it was either Dr. Chen or Dr. Greenberg, what made you decide that those were the two possibilities?

A   Because those were the two that had a good reputation for reading high volume films and being very accurate.

Q   Were there others that you considered and eliminated to arrive at Dr. Chen and Dr. Greenberg?

A   No.  There was one person at LICH, Dr. Resnick, but then he was retiring.

Q   Okay.  So tell me what you did.  Tell me how you went about this.  So you had Dr. Greenberg and Dr. Chen as the possibilities.  You looked at their CV's.  They had reputations for being able to read high volume of cases accurately.  What did you -- how did you proceed from there?

A   Well, taking into account my ACGME report, I also had to consider the academic

Page 122

REEDE

profile of the people.  So if I look at the academic profile of both people, the academic -- the academic profile vis-a-vis scholarly activity, involvement in various things that have to do with education, was limited.  And I have to put somebody in charge that's going to be able to go in and revamp the emergency department.

So at that point, I decided that it would be best if I took somebody that had a real interest in an academic career, that would be willing to put in the time and energy to revamp the department and to integrate the teaching services with the emergency room department as well.

Q   You said that you needed someone who would be willing to or interested in revamping the department.  Why was that a necessary consideration?

A   Because the way that the protocols and things were set up, they weren't set up to the standards that are currently used in ER radiology.

Q   What standards are you referring to

Page 123

REEDE

that weren't up to whatever standard?

A   Standards that would be recommended by the Society of ER Radiology.

Q   And how did you know that the standards at KCH were not up to the standards of the society?

A   Because you could ask people how the studies were being done, and they weren't done the way that they do them for trauma cases.

Q   How did you know that?

A   I could ask the residents.

MR. NELSON:  Let's go off the record for just a moment.

(Discussion held off the record.)

Q   When was the first time you approached Dr. Scott about taking that position?

A   Sometime in July of 2014.

Q   Are you sure it wasn't earlier than that?

A   I'm not sure.

Q   What's the earliest it could have been?

A   I'm not sure.

Page 124

REEDE

Q   Could it have been January?

A   Definitely not that early.

Q   Could it have been March?

A   I don't think so.

Q   Could it have been May?

A   Not sure.

Q   How about sometime in the spring?

A   Not sure.

Q   And what prompted you to choose Dr. Scott over both Dr. Chen and Dr. Greenberg?

A   Because she had a -- because she had expressed a strong interest in academics.  She had already volunteered to work on some projects with Dr. Ostro, which she had completed while she was working at Downstate.  She worked with him on three of the modules, the teaching modules, for the spine, and also she had very good reports from the residents regarding her teaching.  She's regarded as an excellent teacher by the orthopedic residents, by podiatry, by surgery, and radiology.

MR. NELSON:  Off the record.

(Discussion held off the record.)

Q   Dr. Reede, you said that Dr. Scott

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 129

REEDE
interested in academics.
Q   Did you ask him about that?
A   I had mentioned to him in a meeting
that he should increase his scholarly activity.
Q   And what meeting was that?
A   When I meet with the faculty
annually.
Q   You're talking about his annual
review?
A   Yes.
Q   Do you recall when that occurred?
A   I do not.
Q   Do you recall whether that occurred
before or after you decided to nonrenew
Dr. Areman?
A   I believe it was before.
Q   And when you mentioned that he should
increase his scholarly activity, what did he
say to you?
A   He was collecting cases to write
about trauma -- something about trauma.
Q   Okay.  So did you understand that he
actually had a paper in preparation?
A   I don't know if that means you have a

Page 130

REEDE
paper in preparation.
Q   Okay.  Did it suggest to you that he
was gathering data to prepare or publish a
paper?
A   Yes.
Q   And what other scholarly activity did
you suggest he engage in besides the paper he
was collecting data for?
A   I told all of the attendings that
they could do exhibits with the residents.
Q   What are "exhibits," as you refer to
it?
A   It's a little short of writing a
paper, but still it counts as scholarly
activity.  So let's say you're collecting
cases.  So instead of writing a paper on it,
some people would opt to do an exhibit on it
first.  And then after they've gathered that
data and put it in an exhibit, they have --
that's considered still counts as scholarly
activity.  And then you can decide at that
point if you want to proceed and write a paper
on it.
Q   When you say "counts as scholarly

Page 131

REEDE
activity" counts as to whom or in whose
consideration?
A   So the ACGME also takes into
consideration the scholarly activity of the
faculty when they're evaluating the program.
Q   As of the time that you decided on
Dr. Scott to be the new director of ER
radiology, who had more scholarly activity,
Dr. Chen or Dr. Greenberg?
A   That, I don't recall.
Q   Who had more scholarly activity,
Dr. Chen or Dr. Scott?
A   I don't recall.
Q   Who had more scholarly activity,
Dr. Scott or Dr. Greenberg?
A   Dr. Scott.
Q   And the scholarly activity that
Dr. Scott had, of what nature was that?
A   There were -- so scholarly activity
also counts presentations at local and national
meetings.  So she had had presentations at the
combined meeting that we have with BI.  So I
believe maybe one or two lectures she had given
there.

Page 132

REEDE
Q   What's BI?
A   Beth Israel Hospital.
Q   Okay.
A   She had worked on the three modules
with Dr. Ostro, which also counts as scholarly
activity, and I believe she had several
exhibits at the RS&A or RS&A and/or ARRS.
Q   What's RS&A?
A   Radiology Society of North America.
Q   And ARRS?
A   American Roentgen and Ray Society.
Q   I'm sorry.  Again?
A   American Roentgen Ray Society.
Q   Roentgen and Ray, are those people's
names?
A   Roentgen is a name, yeah.
Q   Okay.  What is ARRS?
A   They're one of the radiology national
societies.
Q   You're saying that she had all of
this as of the time you were considering her
for the position?
A   Yes, either had them or they were in
progress.

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 137

REEDE

Dr. Scott is at a different hospital?

A   Because she attended all of those meetings that we had with reference to the radiology residents at LICH.

Q   I see.  So, in other words, she had had a good attendance record while you were at LICH?

A   Yes.

Q   And when you were at Downstate, but she was still at LICH, you didn't know what her attendance was like at LICH.  But you did see Dr. Chen and Dr. Greenberg occasionally at education committee meetings, but you don't know how frequently or infrequently they attended; is that correct?

A   Yes.

Q   Have you now told me all the considerations that -- all the things that you considered in determining who to make ER radiology chief in replacement of Dr. Areman, or are there other criteria you used?

A   I think also for Dr. Greenberg the same as with Dr. Que Chen, there was the issue of time and attendance as well as availability.

Page 138

REEDE

Q   Anything else?

A   That's it.

Q   Okay.  Now, I think you told me about the time and attendance matter with Dr. Chen.  Were there other time and attendance issues other than, I think you said, he disappeared for periods of time?  Was that the time and attendance issue you are referring to with regard to him?

A   He had that.  Also, you know, sick calls; and, again, when you're supposed to be someplace, you're not there.

Q   When you say "sick calls," what do you mean?

A   Excessive absenteeism.

Q   Had Dr. Chen's excessive absenteeism or sick calls been raised with him by you at some point prior to that?

A   Yes.

Q   When?

A   During my meetings.

Q   What meetings?

A   Annual meetings.

Q   So you had raised with Dr. Chen that

Page 139

REEDE

he was taking excessive sick time when you did his annual review?

A   I remember at one point he came, and I showed him -- because I had, you know, looked at the sick times that people had, and I pointed out to him that he had excessive days off.  You know, why did you have such high number of sick days in comparison -- looking at it in comparison to the rest of the staff, so it's kind of out of -- you know, out of the norm?  And he gave me various explanations for it.

Q   When you say excessive absence -- "excessive days off," are you saying that he actually was taking time off in excess of the time he was permitted under his terms of employment?

MR. COULSTON: Object to the form.

A   No, because I don't -- I think people have sick days.  You use them as needed.  So, I mean, you would look and see what is the average number of days somebody is out in a year.

Q   Okay.  But let me go back a step.

Page 140

REEDE

State employees, of which you are one and Dr. Chen and Dr. Greenberg were two others at the time, are allocated a certain amount of time off in a given year, correct?

A   Yes.

Q   Part of that is a certain number of sick days per year, correct?

A   Yes.

Q   Do you know what that is?

A   I don't recall.  It's calculated differently.

Q   All right.  And to your knowledge, at any point in time, did Dr. Chen have sick absences on a sick basis in excess of what he was permitted under whatever state rules applied to that?

A   No.

Q   Okay.  It was just that under the limit he was permitted, he still had more than others; is that correct?

A   Yes.

Q   Now, were there time and attendance issues with Dr. Chen apart from this excessive sick days off and disappearance point that you

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 141

REEDE
made earlier?
A  I don't recall.
Q  When you say "availability," are you
referring to the same things as I just
mentioned with Dr. Chen, or was there something
different than I've just described that you
mean by "availability"?
A  You would have to explain that.
Q  There were also issues with time and
attendance by Dr. Chen and Dr. Greenberg?
A  Right.
Q  So now we've talked about Dr. Chen.
We've talked about time and attendance.  I'm
asking, since you distinguish between time and
attendance and availability, I'm asking, did
you mean something different when you said
"availability" from what you meant when you
said "time and attendance"?
A  So I would say availability refers to
if you were scheduled to be at a place on the
schedule, and you're supposed to work during
that time period, that you should be available
unless there are other -- unless you're at --
let's say doing a conference, either in another

Page 142

REEDE
department, you're teaching the residents or if
you went to get lunch.
Q  And you're saying that was the not
the case for Dr. Chen?  He was not available
except for those reasons?
A  There were other instances when he
was not available.
Q  Okay.  And is that the same thing as
you were referring to in terms of him
disappearing?
A  Yes.
Q  Okay.  Now, let's talk about
Dr. Greenberg.  Did you mean to say there were
time and attendance and availability issues for
Dr. Greenberg as well?
A  Yes.
Q  And that those entered into your
consideration when you were determining who to
make ER radiology chief?
A  Yes.
Q  What were the time and attendance
issues with Dr. Greenberg?
A  Not reporting to work on time.
Again, availability, sometimes not being

Page 143

REEDE
available when they -- when he was supposed to
be in the emergency room and the residents
would be looking for him, and they didn't know
where he was.
Q  Anything else?
A  Time and attendance.  Also, one time
I spoke to him about the recording on his time
sheets to make sure they were accurate.
Q  Anything else?
A  I believe that's it.
Q  Okay.  Let's take these one at a
time.  You said you spoke to Dr. Greenberg once
about time sheet accuracy.  Was that a
disciplinary conversation?
A  No.  It was just noted that there was
a discrepancy on the time sheet, and I just
wanted to bring it to his attention.
Q  Okay.  And what prompted you to
notice that and to want to bring it to his
attention?
A  There's an employee that is the
timekeeper that is in charge of all of the time
sheets to ensure accuracy that people are --
that people are reporting the time correctly.

Page 144

REEDE
Like, if you were on vacation, you put it down
as vacation; if it's a comp time, you put it as
comp time; if it's sick time, you put it as
sick time; and then if you -- if you're
supposed to be there from a certain time, and
you put down some time other than that.  So
there was a discrepancy.
Q  Right.  And how did that come to your
attention?
A  Linda McMurren brought it to my
attention.
Q  Is she the timekeeper you were
referring to?
A  Yes.
Q  Miss McMurren, what is her position?
A  She's one of the clerical staff in
the department.
Q  Is she your secretary?
A  She's one of my assistants.
Q  One of your assistants.  Okay.  But
she works directly for you?
A  Yes.
Q  Okay.  And is she in the same
position now as she was during this time frame

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 281

REEDE

Q   How were you involved in all of that?

A   I received a phone call from Dr. Pulitzer telling me about the situation and that when he told Dr. Greenberg that he couldn't cover, that he could not -- he could not take the time because he didn't have the coverage available.  Then Dr. Greenberg told him that he was going to take the time and that he was going to do what he was going to do and that Dr. Pulitzer could do what he wanted to do.

Q   This is what was reported to you by Dr. Pulitzer?

A   Yes.

Q   And when was this reported to you by Dr. Pulitzer?

A   I don't recall exactly what time.

Q   Well, was it on the same day that this issue arose, or was it some subsequent day?

A   Same day.

Q   What did doctor -- why was Dr. Pulitzer involving you?  Was he asking you to do something, or was he asking whether he

Page 282

REEDE

should do something?  Why did he involve you?

A   Well, as the chairman of the department, I guess he was seeking my advice, "What do I do if I have an employee that's being outright insubordinate?"

Q   I see.  And is that how Dr. Pulitzer characterized Dr. Greenberg, as being outright insubordinate?

A   No.  But, I mean, based on what I'm told, that's how I would see it, as insubordination.

Q   Did Dr. Pulitzer tell you why Dr. Greenberg wanted that time off?

A   No.

Q   Did you ask him that question?

A   No.

Q   Why not?

A   Because if he had told me what it was for -- if it was anything other than, you know, a day off to -- you know just a routine day off, I would assume he would have mentioned it to me, but he did not.

Q   Who, Dr. Pulitzer?

A   Yes.

Page 283

REEDE

Q   Okay.  But what I'm saying is, did you have -- did you -- in this -- when doctor -- withdrawn.

When Dr. Pulitzer informed you of this, did he do it by phone or face-to-face or some other way?

A   Phone.

Q   Okay.  So he called you.  Where were you, and where was he when he called you?

A   I was in my office.  I don't know where he was.

Q   Was he working or was he on vacation or was he calling you from outside the hospital or --

A   I don't recall.

Q   Okay.  And when you say he was seeking your advice, what did he ask you?

A   "What should I do?"

Q   And what did you tell him?

A   I told him I would call HR and find out what they're going to recommend that you do in this case.

Q   So you referred him to HR?

A   Yes.

Page 284

REEDE

Q   Okay.  Did you ask him if he had asked Dr. Greenberg why he, meaning Dr. Greenberg, needed the time off?

A   No.

Q   Did you consider that to be relevant?

MR. COULSTON: Object to the form.

A   There are forms that we've asked people to fill out if they want time off.  So if you fill out the forms and you indicate on the form why you need the time off, then there is no question at any date as to why you were asking for the time.

No one said anything about it was needed for anything other than what I would call a routine day off.  So if it was anything that was more than that, I would assume that somebody would have brought that to my attention.

Q   Okay.  Now, you say there was a form to fill out when you were requesting time off that provided for you to indicate the reason, correct?

A   Yes.

Q   Would you recognize that document if

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 289

REEDE

ahead of time that if you're telling them, no, they can't have the time off, and they're telling you, "I'm not coming. You do what you want to do. I'm going to do what I got to do. I'm telling you so you can make other arrangements," I think at that point, it is a labor relations issue.

Q  Had, to your knowledge, there ever been a prior occasion on which Dr. Greenberg had been refused time off and taken it anyway?

A  Not to my knowledge.

Q  Had there ever been a prior occasion on which Dr. Greenberg had requested time off and taken it regardless of what his superiors, whether it be Dr. Pulitzer or, for that matter, Dr. Areman or Kantor, might have said?

A  I can't recall.

Q  Was Dr. Pulitzer's call to you with regard to this matter the first you heard of it?

A  Yes.

Q  Do you know whether or not Dr. Greenberg had made a request for the time other than to Dr. Pulitzer?

Page 290

REEDE

A  No.

Q  So he might have? You just weren't aware?

A  Who would he make it to?

Q  Well, I'm asking you.

A  I mean, most of the requests would come to Dr. Pulitzer.

Q  Okay. Are you aware of an inquiry made to Miss McMurren in connection with Dr. Greenberg's requested time off that week?

A  She's not the one that approves it. You have to talk to the person that is the site director. She's the timekeeper, not the permission giver.

Q  Fair enough. But are you aware of an inquiry that Dr. Greenberg made to Ms. McMurren in connection with those days we were talking about?

A  No.

Q  Dr. Reede, Miss McMurren works for you, correct?

A  Yes.

Q  And she works in the Downstate side of the street?

Page 291

REEDE

A  Yes.

Q  She doesn't work for Dr. Pulitzer, correct?

A  What do you mean "work for him"?

Q  Meaning reports to him, responsible to him, answerable to him.

A  No.

Q  Okay. Does she work actually within the physical office that you occupy, meaning the outer office of your -- of wherever your office is?

A  Yes.

Q  Okay. What else was said between you and Dr. Pulitzer on -- in that conversation over the phone that you were testifying about over the last several minutes?

A  I told him he needed to discuss the issue with labor relations and see if Dr. Greenberg needed to be provided with some sort of document before he left for the day.

Q  Okay. And did, to your knowledge, Dr. Pulitzer -- well, have you now told me everything that was said between you and Dr. Pulitzer in that conversation that you

Page 292

REEDE

recall?

A  To the best of my knowledge.

Q  Okay. And to your knowledge, what happened next?

A  Dr. Pulitzer called labor relations, had a discussion with them about what documents Dr. Greenberg should be provided with before he left work that day.

Q  And what was labor relations instructions or advice to Dr. Pulitzer, if you know?

A  I don't recall the exact -- what the exact recommendations were.

Q  Okay. Do you recall that labor relations did indicate that some documents should be provided to Dr. Greenberg?

A  Yes.

Q  And are you aware of whether or not such a document was, in fact, thereafter provided to Dr. Greenberg?

A  To the best of my knowledge, yes.

Q  Would you recognize that document if you saw it?

A  I don't know.

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 301

REEDE

go to labor relations.

Q   Okay.  What, if anything, did you do after you learned that Dr. Greenberg had, notwithstanding receiving the letter, not shown up for work on the 4th of September?

A   Nothing.  I had to wait for him to show up.

Q   Did you talk any further with Dr. Pulitzer about Dr. Greenberg appearing or not appearing for work?

A   He -- just telling me that he did not show up for work.

Q   Okay.  And he knew that because he was at KCH, and he was informing you because you were across the street, correct?

A   Yes.

Q   And so the next morning, the 4th, Dr. Greenberg was supposed to come to work; he didn't.  Dr. Pulitzer told you that.  Is that how it happened?

A   Yes.

Q   And did you do anything once you knew that from Dr. Pulitzer?

A   No.

Page 302

REEDE

Q   Did you instruct Dr. Pulitzer to do anything?

A   No.

Q   Did you have any further interaction with labor relations in connection with that matter, other than referring Dr. Pulitzer to labor relations?

A   No, not at that time, no.

Q   Do you know who Leonzo Cuiman is?

A   He's the director of labor relations.

Q   Did you know Mr. Cuiman at that time?

A   Yes.

Q   Did you have any interaction with Mr. Cuiman on or -- on that day, the 3rd, or on that day, the 4th, of September?

A   Not to my recollection.

Q   Now, going back to the original request that Dr. Greenberg had made of Dr. Pulitzer for those two days off, did you understand those days to be September 4th and September 5th, the Thursday and the Friday of that week?

A   That's what it says.

Q   Okay.  So you're referring now back

Page 303

REEDE

to Exhibit 14.  Is that the basis for your recollection?

A   Yes.

Q   Do you not have a recollection as to what the days were other than by reference to Exhibit 14?

A   Correct.

Q   Okay.  So if I asked you the question and hadn't shown you the document, you wouldn't be able to tell me what days they were, correct?

A   Correct.

Q   When is it that you understand Dr. Greenberg to have first asked Dr. Pulitzer for that time off?

A   I believe the 3rd.

Q   Okay.  Do you know whether Dr. Greenberg had a discussion or had informed Dr. Pulitzer prior to the 3rd?

A   Not to my knowledge.

Q   Okay.  So it could have happened?  You just don't know?

A   Correct.

Q   All right.  Now, when Dr. Pulitzer

Page 304

REEDE

first informed you about Dr. Greenberg's request and his denial, did he tell why he had denied Dr. Greenberg the time off?

A   He didn't have coverage.

Q   What does that mean?

A   He didn't have sufficient staffing to cover the area at short notice.

Q   Meaning whatever it was Dr. Greenberg was supposed to do on those days, he didn't have someone else to do?

A   Correct.

Q   Did he tell you there was any other reason why he had denied the leave?

A   Not to my knowledge.

MR. NELSON:  Can I have my last question and answer back, please?

(Record read.)

Q   Now, you said that after Dr. Greenberg failed to appear for work on the 4th, the next thing you were aware of was that he had to report to labor relations upon returning to the hospital; is that correct?

A   Yes.

Q   Okay.  At whose direction was

A431

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 313

REEDE

the 22nd of August at some subsequent time?

A  I don't recall.

Q  So you might have, but you don't recall whether or not you did?

A  Correct.

Q  Is it possible that -- withdrawn.

Do you have any doubt that Dr. Pulitzer was the one that created this document?

A  It's not signed or anything.  No.  He said, "I became the interim chief of service," so that means that it has to be him.

Q  And if you look in the upper right-hand corner --

A  It has his -- yeah.  It has his.

Q  -- it has his -- this is his letterhead, if you will?

A  Yes.

Q  Okay.  But sitting here today, you don't recall -- you don't know or recall why this document was created, if you ever did know, correct?

A  Correct.

Q  Do you recall what occurred or came

Page 314

REEDE

out of or resulted from the investigation that Mr. Arabian did by interviewing or interrogating Dr. Greenberg?

A  Dr. Greenberg received a letter -- no.  He signed a letter, you know, which kind of outlined what the consequences would be if he had other -- continued to have problems.

Q  Was that letter, as you call it, shared with you?

A  I received a copy from Mr. Arabian.

Q  Did you have any input in to the content of that letter?

A  No.

Q  Was it prepared at all -- withdrawn.

You didn't have any hand in preparing the document, did you?

A  No.

Q  Did Mr. Arabian consult with you prior to having Dr. Greenberg sign that letter?

A  No.

Q  Did he, meaning Mr. Arabian, ever inform you that he was going to prepare and present such a letter to Dr. Greenberg?

A  Not to my recollection.

Page 315

REEDE

Q  I know that you already testified that you and Dr. Pulitzer were in regular communication regarding this incident.  On how many -- withdrawn.

Were you also in communication directly with Mr. Arabian regarding the matter?

A  I don't think so.

Q  Other than receiving a copy of this letter from Mr. Arabian, do you recall any other interaction with him during this period of days?

A  I don't recall.

Q  Would you recognize the letter that you were referring to a moment ago if you saw it again?

A  Yes.

MR. NELSON: Would you mark this as 16?

(Reede Exhibit 16, Document Bates stamped SUNY 12-13, marked for identification.)

Q  Is this -- I'm sorry.

Dr. Reede, the reporter has placed in front of you what has been marked as Exhibit

Page 316

REEDE

16.  This is SUNY 12 and SUNY 13.  Do you have that?

A  Yes.

Q  And is this the letter that you were referring to a moment ago?

A  Let me just read because --

Q  Okay.

A  I believe that's the letter.

Q  Okay.  And you say this document was shared with you by doctor -- by Mr. Arabian?

A  Yes.

Q  Do you know when?  And I'll just call your attention to the signatures on the second page, which are dated the 8th.

A  I mean, I can't say exactly when.  But it has to be on or about the time of the signing or shortly after the signing of the document.

Q  You've now had a chance to review this document?

A  I mean, I didn't get to read it entirely, you know.  Yes, I've seen it before, yes.

Q  Okay.  Is anything contained in this

A432

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X
ODED GREENBERG, M.D.,

PLAINTIFF,

-against-          Case No.:
                  1:2015 CV 02343

STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL CENTER a/k/a
THE STATE UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER
AT BROOKLYN a/k/a SUNY DOWNSTATE MEDICAL CENTER, NEW
YORK CITY HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, DEBORAH L. REEDE, STEVEN PULITZER, and
JOHN and JANE DOES 1-12,

DEFENDANT.
------------------------------------------X

        DATE:  January 26, 2017
        TIME:  9:37 A.M.


        DEPOSITION of the Defendant,
DEBORAH REEDE b/s/h/a DEBORAH L. REEDE, taken by the
Plaintiff, pursuant to a Notice and to the Federal Rules
of Civil Procedure, held at the offices of the New York
City Law Department, 100 Church Street, New York, New
York 10007, before Kimberlin Frazier, a Notary Public of
the State of New York.

**2**

APPEARANCES:

ERIC M. NELSON ESQ.
    Attorneys for the Plaintiff
    ODED GREENBERG
    112 Madison Avenue, 6th Floor
    New York, New York 10016
    BY: ERIC NELSON, ESQ.
    File #: n/a
    emnlegal@gmail.com

ZACHARY W. CARTER, ESQ.
CORPORATION COUNSEL
NEW YORK CITY LAW DEPARTMENT
    Attorneys for the Defendants
    NEW YORK CITY HEALTH AND HOSPITALS CORPORATION
    100 Church Street
    New York, New York 10007
    BY: TANYA N. BLOCKER, ESQ.
    File #: 2015-047890
    Control #: 164468
    tblocker@law.nyc.gov

OFFICE OF THE ATTORNEY GENERAL - STATE OF NEW YORK
    Attorneys for the Defendants
    SUNY DOWNSTATE MEDICAL CENTER, DEBORAH L. REEDE,
    STEVEN PULITZER
    120 Broadway, 24th Floor
    New York, New York 10271-0332
    BY: CHRISTOPHER V. COULSTON, ESQ.
    File #: n/a
    Christopher.Coulston@ag.ny.gov

ALSO PRESENT:
    WILLIAM VERSFELT, Assistant Counsel,
    SUNY Downstate Medical Center

        *      *      *

**3**

        F E D E R A L   S T I P U L A T I O N S

    IT IS HEREBY STIPULATED AND AGREED by and between
the counsel for the respective parties herein that the
sealing, filing and certification of the within
deposition be waived; that the original of the
deposition may be signed and sworn to by the witness
before anyone authorized to administer an oath, with the
same effect as if signed before a Judge of the Court;
that an unsigned copy of the deposition may be used with
the same force and effect as if signed by the witness,
30 days after service of the original & 1 copy of same
upon counsel for the witness.

    IT IS FURTHER STIPULATED AND AGREED that all
objections except as to form, are reserved to the time
of trial.

        *      *      *          *

**4**

D E B O R A H   R E E D E, called as a witness, having
been first duly sworn by a Notary Public of the State of
New York, was examined and testified as follows:
EXAMINATION BY
MS. BLOCKER:
    Q.  Please state your name for the record.
    A.  Deborah Reede.
    Q.  Where do you reside?
    A.  235 Adams Street --
        MS. BLOCKER:  We're going to redact the
    address for the record.
    Q.  Good morning, Dr. Reede.
    A.  Good morning.
    Q.  As you know, my name is Tanya Blocker.  I
represent the New York City Health and Hospitals
Corporation, specifically Kings County Hospital Center
in this particular litigation of Dr. Oded Greenberg
versus SUNY Downstate and several other individually
named defendants including yourself.  I'm just going to
ask you some questions about this particular litigation.
I'm going to ask that all of your responses be verbal so
that the court reporter can take down your responses
accurately.
        I'm just going t ask that you allow me to
finish my question before you respond and I will do the

                              1 (Pages 1 to 4)

121

scores were in the twos.  And so she did ask me what does that mean, and I told her well, I didn't think it was very good because most of the physicians in the department when they receive the scores from the residents in the various categories were scoring in the range of at least a four.  So if your score is in the twos, then you're way below average.

Q.  Is that when you told her she was being non-renewed?

A.  No, I didn't tell her then.

Q.  Do you recall speaking to Dr. Roitberg about her teaching at any point?

A.  I'm pretty sure we spoke a little bit about that as well as that fact that she had also on the clinical side that she had very high recall rates for mammo.

Q.  When you say recall rates, what does that mean?

A.  That's one of the parameters that's monitored again, also by the federal government for MQSA, where they look at the recall rates for the radiologists.  And the recall rate is if I'm reading a screening study, what percentage of my screening studies am I asking to come back to have additional films done.  So the average rate I would say -- I think most people would accept up

122

to like in the low teens, but hers were very high.  And so just what it means is that maybe you're not very sure of yourself when you're reading the cases, so that could mean if I have a recall rate of -- if I read a hundred cases but my recall rate is 25, 25 cases are now going to come back to be reimaged again, and whether or not that's indicated or not is always a question. So people always look at the recall rates.

Q.  When was it that you think you may have discussed this with Dr. Roitberg?

A.  I don't recall.

Q.  Did you ever discuss with Dr. Areman issues with his teaching?

A.  I don't recall.

Q.  Do you recall discussing issues with teaching with any other members of your department?

A.  No, I don't recall.

Q.  At the time you appointed Dr. Scott as director of ER radiology, had she had any experience as a director or a section chief previously, whether an ER or anywhere else?

A.  She was a section chief at LICH.

Q.  In what?

A.  Musculoskeletal radiology.

Q.  At the time you appointed her as director of

123

ER radiology, did she have any experience in ER radiology?

A.  Well, she trained me at Downstate Medical Center, it was a level-one trauma center.

Q.  Other than that?

A.  I'm sure she read cases at Maimonides as well.

Q.  When you say you're sure, how do you know that?

A.  Because most of the people that do the fellowships over there do cover the ER at Maimonides also.

Q.  So you're making that assumption?

A.  Yes.

Q.  At LICH, had Dr. Scott done any ER radiology?

A.  Everybody at Long Island College Hospital read ER films.

Q.  So what you're saying is -- was there anyone who was actually assigned to the ER at LICH?

A.  No.

Q.  So basically it was spread among everyone?

A.  Yes.

Q.  Are courses given in subspecialties of radiology to existing attending radiologists as part of I guess you called it CME?

A.  Yes.

124

Q.  Are attending radiologists in your department required to take those courses?

A.  They have to have a certain number of CME credits, I believe it's fifty over two years.  And those can be remotely, you don't have to go to a course, you can do them remotely, or you can do them through a number of the journals have articles, after you read the articles, you answer the questions.  If you get the appropriate number right, you're issued the CME credits.

Q.  Who decides what courses individual attendings take for their CME credits?

A.  The attendings.

Q.  So the institution doesn't have any role in what courses attendings in the department take?

A.  Occasionally I will say to somebody I want them to take a specific course.

Q.  Have you ever done that at Downstate or Kings County?

A.  Yes.

Q.  With whom have you done that?

A.  I had Dr. Scott take the ACR ER certification course.  I'm trying to think, the other one, I have somebody now that's scheduled to take the MR safety course in March and take the certification exam.

Q.  What is MR?

31 (Pages 121 to 124)

| ODED GREENBERG, M.D. VS.<br>SUNY DOWNSTATE ET AL. | GHASSAN W. JAMALEDDINE, M.D.<br>December 19, 2016 |
|---|---|

**Page 1**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------------------X

ODED GREENBERG, M.D.

          Plaintiff,

   - against -

SUNY DOWNSTATE ET AL.,

          Defendants.

Index No:  15-cv-2343 (PKC/VMS)

-----------------------------------------------X

          2890 North Main Street
          Walnut Creek, California

          December 19, 2016
          8:34 a.m.

     Deposition of GHASSAN W. JAMALEDDINE, M.D.,

taken pursuant to Subpoena, before Carol S. Nygard,

California Certified Shorthand Reporter Number 4018.

         ELLEN GRAUER COURT REPORTING CO., LLC
         126 East 56th Street, Fifty Floor
         New York, New York 10022
         212-750-6434
         Ref:  113777

**Page 2**

A P P E A R A N C E S:

(Via VideoConference)

ERIC M. NELSON, ESQ.

Attorneys for Plaintiff

    112 Madison Avenue

    New York, New York  10016

    PHONE:  212.354.3666

    FAX:    212.354.2555

    EMAIL:  Emnlegal@gmail.com

(Via Video Conference)

STATE OF NEW YORK

OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN

Attorneys for Defendant

    The Equitable Building

    120 Broadway

    New York, New York  10271-0332

BY:  CHRISTOPHER V. COULSTON, ESQ.

    PHONE: 212.416.8556

    FAX:  212.416.6009

    EMAIL:  Christopher.coulston@ag.ny.gov

**Page 3**

A P P E A R A N C E S: (Cont'd)

(Via Video Conference)

NEW YORK CITY LAW DEPARTMENT

OFFICE OF THE CORPORATION COUNSEL

Attorneys for Defendants Kings County Hospital

100 Church Street

New York, New York  10007

  PHONE: 212.356.3177

  FAX: 212.356.3770

  EMAIL: Tblocker@law.nyc.gov

  ALSO PRESENT VIA VIDEO CONFERENCE:

WILLIAM VERSFELT, Assistant Counsel

  SUNY Downstate Medical Center

ODED GREENBERG

**Page 4**

-------------------- I N D E X --------------------

WITNESS                              EXAMINATION BY    PAGE

GHASSAN W. JAMALEDDINE, M.D.   MR. NELSON          5

                     MS. BLOCKER         186

INFORMATION/DOCUMENTS REQUESTED: PAGES 45, 61

----------------- E X H I B I T S -----------------

JAMALEDDINE    DESCRIPTION                 FOR I.D.

Exhibit 1     E-Mail Dated 9-4-13 to Prabash    139

          Koneru From Ghassan Jamaleddine

          Bates Stamped HHC_ESI_000080

          (EXHIBIT TO BE PRODUCED)

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

GHASSAN W. JAMALEDDINE, M.D.
December 19, 2016

Page 97

JAMALEDDINE

A. I cannot really recall whether I knew at that time, whether I knew at that time whether it was Dr. Areman or not.

Q. Okay. All right.

Going back now to your meeting, your initial meeting with Dr. Reede, the one that was also attended by Dr. Clinchy, I believe you mentioned --

A. Yes.

Q. Did --

Do you recall anything that Dr. Reede said regarding renewing Dr. Areman or nonrenewing him?

A. I can't recall the details of that meeting to that extent.

Q. So your answer would be "no"?

A. No.

Q. Doctor, do you have an understanding of what "nonrenewal" meant?

A. "Nonrenewal," that means not renewing the contract.

Q. And do you understand the circumstances under which a contract could be renewed or nonrenewed?

A. No.

Q. Did you have an understanding while you were serving as Chief Medical Officer at Kings County whether

Page 98

JAMALEDDINE

any particular amount of notice was required if a physician, an attending physician, was not going to have their appointment renewed?

A. That's concerning the affiliate radiologist with SUNY, you're asking?

Q. I'm asking if you know that of anyone.

A. Well, at Kings County our physicians were employed. We are not contracted.

So they were employed. There is no contract involved in that situation.

So the Human Resource and Labor Department under the Human Resource was handled in a different way than a contracting physician.

In this situation that you're asking me about, the contracted physician and under the affiliate agreement, my answer is no, I didn't know how much time they are supposed to be given.

Q. Okay. And you're saying that you did not know how much notice they were to be given, at any time during the time you were Chief Medical Officer at Kings County?

A. Not that I remember.

Q. Sir, do you recall Dr. Reede discussing at this initial meeting with you anything regarding

Page 99

JAMALEDDINE

Dr. Mason or Dr. Roytberg?

A. Not specifics.

Q. Again, to be clear, you don't recall anything specifically being mentioned about Dr. Greenberg either; is that correct?

A. That's correct.

Q. On how many subsequent occasions did you meet with Dr. Reede?

A. I can't recall the exact number, but we would meet maybe every like five weeks, four weeks -- five weeks initially, and then maybe every two months.

Q. And what was the reason for these periodic meetings?

Was it the same reason each time or different reasons?

A. The main reason was really the residency programs, that was under probation, and we were under threat of losing the residency program at SUNY, so it was sort of like a crisis situation.

Q. Okay. At some point in time did Dr. Reede inform you of plans she had or recommendations she had for which of the radiologists working at Kings County would be renewed and which would not be renewed?

A. Yes.

Page 100

JAMALEDDINE

Q. When --

Was that on one occasion or more than one occasion?

A. It could have been more than one occasion.

Q. All right. Tell me about the first occasion on which you remember Dr. Reede mentioning that.

When did that occur?

A. I can't recall the exact time.

Q. Tell me as specifically as you can, month, season, whatever you can do.

A. Probably in the middle of 2013, after our initial meeting, on the second or third meeting.

Q. And what was discussed about that subject on that occasion?

A. I can't recall the specifics, but it was mainly around the performance of those attendings as related to their reporting and their teaching.

Q. And do you recall who was mentioned specifically in that regard?

A. I do not recall.

Q. Do you recall anything else said either by Dr. Reede or by you on that occasion?

A. I recall that I was okay with her plan. I don't recall disagreeing with the plan that she had.

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

GHASSAN W. JAMALEDDINE, M.D.
December 19, 2016

Page 101

JAMALEDDINE

Q. Was it a plan to nonrenew certain physicians?

A. That's correct.

Q. And, again, sitting here now, are you able to identify any of the physicians it was her plan to nonrenew?

A. I cannot recall the names.

Q. Okay. And she said that she was because of their performance?

A. That's correct.

Q. Did she say what aspect of her performance -- of their -- I'm sorry -- what aspect of their performance or -- was the reason why she was proposing to nonrenew them?

A. I recall two aspects.

One is their teaching evaluations, two is the quality of their reporting.

Q. "Reporting" meaning what they would do upon reviewing a scan or reading a case?

A. That's correct.

Q. Did she tell you that they had been -- that these matters had been brought to their attention, the attention of the radiologist in question?

A. I can't recall.

Q. Do you recall whether she said that they had

Page 102

JAMALEDDINE

been disciplined in any way towards these performance issues?

A. I cannot recall.

Q. Did she say whether or not these physicians had been given the opportunity upon being informed of these issues to improve their performance?

A. I cannot recall.

Q. Do you recall how many physicians she proposed to nonrenew?

A. I cannot recall.

Q. Did you talk at all or do you recall Dr. Reede mentioning at all a plan to hire anyone to replace any of those physicians that she was proposing to nonrenew?

A. She might have mentioned some names that I cannot recall right now.

Q. Do you recall her saying anything about, for example --

Withdrawn.

Sir, do you know where Dr. Reede came from before she was at Downstate?

A. Yes.

Q. Where?

A. I learned she was at Long Island College Hospital.

Page 103

JAMALEDDINE

Q. Okay. And can we adopt the convention of using the word "LICH," L-I-C-H, to refer to that going forward?

A. Yes.

Q. So you'll know that if I say "LITCH," that's what I'm referring to, and I'll know that, if you say "LICH," that's what you're referring to?

A. Yes.

Q. Okay. Did Dr. Reede ever mention anyone who she had worked with or who had worked for her at LICH being brought to Downstate to replace any of the physicians she was proposing to nonrenew?

A. I cannot recall.

Q. When was --

Was there anything else in that conversation that you said or that Dr. Reede said that you recall but have not told me yet today in your testimony?

A. In a subsequent meeting I discussed with her the leadership at Kings County.

Q. Okay. Before we get to a subsequent meeting, I'm still talking about this second meeting with Dr. Reede or second or third meeting, I think you might have said, in which you discussed or the first time with her the nonrenewal plan she had.

Page 104

JAMALEDDINE

Do you recall anything else being said between the two of you in that meeting beyond what you've already testified?

A. I might have brought up the leadership at Kings County in the third meeting, but I cannot recall exactly when.

Q. Okay. Other than that is there anything that you recall Dr. Reede saying or you saying in that meeting?

A. No.

Q. All right. Let's talk about this reference to "leadership."

Tell me what you mean by that.

A. I mean the position of Dr. Allen Cantor and his leadership.

Q. And what do you mean about Cantor's leadership?

What did you bring up about that?

A. I brought up the fact that from my perspective he was a weak leader.

Q. And what was the basis for you believing that?

A. The residency program going on probation and issues in performance sometimes escalated to me.

I cannot recall the specifics right now.

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

GHASSAN W. JAMALEDDINE, M.D.
December 19, 2016

Page 109

JAMALEDDINE

actions either lacking or otherwise indicating weak leadership?

MS. BLOCKER: Objection.

You can answer.

THE WITNESS: The fact that this has been going on for a long time indicated to me that I wanted to have a different leadership in the Department of Radiology.

BY MR. NELSON:

Q.  I see.

So you were basically of the view that Dr. Cantor should no longer continue as Chief of Service, of Radiology?

A.  That's correct.

Q.  And what about him as a continuing attending radiologist in the department?

Did you have issues with his performance as a radiologist?

A.  I did not have issues with his performance as a radiologist.

Q.  So you simply wanted someone else to take over Chief of Service; is that correct?

A.  That's correct.

MS. BLOCKER: Objection.  You can answer.

Page 110

JAMALEDDINE

MR. NELSON: I'm sorry.

Say it again.

(Record read)

THE WITNESS: That's correct.

MS. BLOCKER: Note my objection.

BY MR. NELSON:

Q.  And you so stated to Dr. Reede?

A.  Yes, I did.

Q.  Did you ever tell Dr. Reede that you wanted Dr. Cantor removed from Kings County Hospital?

A.  Yes.

Q.  And what did you tell her in that regard?

A.  I told her that he cannot continue to be the Chief, my recommendation is to look into a different direction, and I would rather him not work as an attending.

Q.  And why was it that you didn't want him to work as an attending?

A.  I mean, as a principle I found it would be better for him to work in a different location after having been the Chief at Kings County.

Q.  I thought you said a moment ago you didn't have any issues with him as an attending radiologist, as a practicing radiologist.

Page 111

JAMALEDDINE

Is that not correct?

A.  That's correct.

Q.  So, even though you found him to be a perfectly satisfactory attending radiologist, you still wanted him removed from the institution?

A.  I preferred that he changes institutions.

Q.  And when you say you preferred, is that something that you instructed or directed Dr. Reede to accomplish?

A.  I suggested.

Q.  Okay.  And what was your understanding of the -- of how your suggestion would be taken?

A.  I think it would be taken seriously.

Q.  Well, I understand that.

But was it your expectation that, because you wanted Dr. Cantor removed, he would be removed, or was there -- was -- did you still leave the option open for Dr. Reede to keep him at Kings County?

A.  As I stated, I recommended for him to be removed.

Q.  I understand that, and I'm trying to understand the import of the suggestion or recommendation that he be removed.

Were you leaving the opportunity for Dr. Reede

Page 112

JAMALEDDINE

to keep him at Kings County notwithstanding your suggestion or were you essentially telling her that she did not have that discretion and she needed to remove him?

MS. BLOCKER: Objection.  Asked and answered.

THE WITNESS: So I suggested for him to be removed.

I did not want to have the option to keep him working at Kings County, even though technically he had no issue as an attending.

BY MR. NELSON:

Q.  So when you say you suggested or recommended that he be removed, you fully expected that that suggestion or recommendation would be honored; correct?

A.  She can oppose it if she can, because the appointments and all labor issues, HR issues are handled by SUNY.

Q.  What do you mean, "She can oppose it"?

A.  Well, if she -- if she did not agree, she would tell me she wouldn't agree.

Q.  But she didn't disagree; did she?

A.  She did not disagree.

Q.  How long after that was Dr. Cantor removed?

A.  I cannot recall exact time.

**A438**

2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------x
ODED GREENBERG, M.D.,

               Plaintiff,

        vs.

SUNY DOWNSTATE, ET AL.,

               Defendant.
-----------------------------------------x

DEPOSITION OF STEPHANIE BERNADEL
Friday, October 21, 2016
9:30 a.m.


Reported by:
Elizabeth Santamaria

               * * *

     Deposition of STEPHANIE BERNADEL,
held at the offices of ERIC M. NELSON, ESQ.,
112 Madison Avenue, New York, New York
pursuant to Notice, before Elizabeth
Santamaria, Court Reporter and Notary Public.

               * * *

3

A P P E A R A N C E S
ATTORNEYS FOR THE PLAINTIFF:
   ERIC M. NELSON, ESQ.
   112 Madison Avenue - Sixth Floor
   New York, New York 10016
   212.354.3666

ATTORNEYS FOR THE DEFENDANTS:
STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
   120 Broadway
   New York, New York 10271-0332
   212.416.8556
   BY: CHRISTOPHER V. COULSTON, ESQ.
       Christopher.Coulston@ag.ny.gov

4

A P P E A R A N C E S (c o n t'd):

ATTORNEYS FOR THE DEFENDANTS:
KINGS COUNTY HOSPITAL and NEW YORK CITY HEALTH
and HOSPITALS CORPORATION
    NEW YORK CITY LAW DEPARTMENT
    OFFICE OF THE CORPORATION COUNSEL
    100 Church Street
    New York, New York 10007
    212.356.3177
BY:   TANYA N. BLOCKER, ESQ.
    tblocker@law.nyc.gov

ALSO PRESENT:
William Versfelt, Esq.
Assistant Counsel
SUNY Downstate Medical Center
Dr. Oded Greenberg

1 (Pages 1 to 4)

**A439**

5

Bernadel

STEPHANIE BERNADEL, having been first duly sworn according to law by the Officer, testifies as follows:

EXAMINATION BY
MR. NELSON:

Q.   Please state your name for the record.

A.   Stephanie Bernadel.

Q.   Good morning.

A.   Good morning.  How are you?

Q.   Ms. Bernadel, why was Dr. Greenberg fired?

A.   Dr. Greenberg was terminated because of incorrect attestations that were submitted in regards to Medicare reimbursement pursuant to a violation of his settlement agreement.

Q.   And who made the decision to fire him for that?

A.   The decision was made by the Office of Labor Relations, myself and Mr. Cuiman, C-U-I-M-A-N, L-E-O-N-Z-O.  He is the assistant vice president for labor relations at SUNY Downstate Medical Center.

6

Bernadel

And we made the decision after conferring with the department; Dr. Deborah Reede, who is the chair of radiology, and Stephen Pulitzer, who was Dr. Greenberg's supervisor, immediate supervisor.

Q.   And you have the power to hire and fire?

MR. COULSTON:  Object to the form.

Q.   You can answer.

A.   No one person at SUNY Downstate has the power to hire and/or fire an individual.  Pursuant to the collective bargaining agreement, if there is a disciplinary action we can vet the matter and we can enter into either a settlement agreement or we go into arbitration.  If there is a settlement agreement and it's a probation for termination we can enforce the settlement agreement, and this is what we did here.

Q.   When you say "we," who's the "we" who can enforce the settlement agreement?

A.   The Office of Labor Relations.

Q.   Okay.

And when was that decision made?

7

Bernadel

A.   The decision was made on October 22nd, I believe, 2014.  That was when the letter was sent out.

Q.   So the decision and the letter -- excuse me.  Withdrawn.

The decision was made on the same day the letter was sent?

A.   I don't recall.  Around the same time, but I don't recall.

Q.   That's what I'm asking.

When you say around the same time, I understand that there was a letter dated October 22nd.

A.   Correct.

Q.   That was the letter informing Dr. Greenberg that he was discharged?

A.   Correct.

Q.   When was the decision made that's reflected in that letter?

A.   The decision was made after the meeting on October 20, 2014.

Q.   So as of the meeting on October 20th, the decision to discharge Dr. Greenberg from state service had not been

8

Bernadel

made; that's your testimony?

A.   Correct.

Q.   Okay.  And it's also your testimony that neither Dr. Pulitzer nor Dr. Reede made the decision?

A.   When you say "made the decision" you mean?

Q.   I'm not sure how I can be clearer.  Tell me what you don't understand and I'll try and do better.

A.   Well, I've already informed you how the decision was made.

Q.   Yes.  I understand that people are consulted.

A.   Correct.

Q.   But somebody has to be the one to say, "Okay, then we're firing him" or "Then he's fired."  Who made that decision?

A.   Again, it wasn't made by any one person.  Labor Relations enforces the decision after consulting with the department.

Q.   Okay.  So let me ask the question again.

Neither Dr. Pulitzer nor Dr. Reede

2 (Pages 5 to 8)

9

Bernadel

made the decision to enforce the settlement agreement? And by enforce the settlement agreement, I mean to terminate Dr. Greenberg.

A. After reviewing the facts and the result of the investigation, we discussed it with the department, with Dr. Greenberg -- I'm sorry -- with Dr. Pulitzer and with Dr. Reede. We presented our findings from our various meetings with Dr. Greenberg. We presented them to the department, and Dr. Reede and Dr. Pulitzer both together and separately felt that he had violated his agreement and so he, you know, should be terminated.

Q. And how do you know that they felt that way?

A. Because we all decided that the agreement should be enforced, he should be terminated.

Q. That wasn't my question. I'm asking --

You used the expression both Dr. Reede and Dr. Pulitzer together and separately felt that the agreement had been violated and Dr. Greenberg should be

10

Bernadel

terminated, and I'm asking you: How do you know that?

A. I don't recall specifically if they stated he should be terminated, but the decision was made after consulting with the department.

Q. Let's leave aside, as you put it, the decision that was made in consultation with. Okay? I'm asking you how you know -- let's take them one at a time -- how you know Dr. Pulitzer wanted Dr. Greenberg to be fired.

A. Well, the department felt that Dr. Greenberg --

Q. I'm going to ask you to refer to people. The department is not something that thinks anything, if you understand what I mean. Okay? So please refer to people.

A. After consulting with Dr. Pulitzer and Dr. Reede, they both felt that Dr. Greenberg had been insubordinate and had violated the terms of his agreement, and so we all discussed it and we all decided that he was in violation of his agreement.

Q. And when you say you all discussed

11

Bernadel

it and decided, who is "all" in that answer?

A. Mr. Cuiman, myself, Dr. Reede and Dr. Pulitzer.

Q. Anyone else?

A. No.

Q. Where was Mr. Arabian in this process?

A. Mr. Arabian no longer works at SUNY Downstate.

Q. As of the time the decision was made?

A. Correct.

Q. And when did Mr. Arabian leave the department?

A. Mr. Arabian left I believe in September 2014, sometime between the time he conducted Dr. Greenberg's interrogation and the time I took over his second case. I took over his second case as a result of his departure.

Q. What do you mean, his second case?

A. Dr. Greenberg's second case.

Q. I'm not sure what you mean by second case.

12

Bernadel

A. There were two cases with Dr. Greenberg. The first one resulted in his settlement agreement. The second case was when he violated the agreement, and that's where I stepped in.

Q. Okay. So you're saying you took over the matter of Dr. Greenberg from Mr. Arabian?

A. Correct.

Q. And what were the circumstances of Mr. Arabian's departure?

A. I don't know.

Q. Do you know whether he was fired, left voluntarily? That's what I'm looking for.

A. I believe he left voluntarily.

Q. And do you know why?

A. No.

Q. Do you know the date?

A. I don't recall.

Q. Now, you say that Dr. Pulitzer and Dr. Reede -- and by the way, for the record, Reede has an "e" at the end of it -- separately and together believed that

3 (Pages 9 to 12)

**A441**

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

MICHAEL ARABIAN
November 16, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X
ODED GREENBERG, M.D.,

        Plaintiff,

     - against -

SUNY DOWNSTATE ET AL.,

        Defendants.

Index No.:  15-cv-2343 (PKC/VMS)
-------------------------------------------X

                  112 Madison Avenue
                  New York, New York

                  November 16, 2016
                  9:35 a.m.

    Deposition of Defendant, by MICHAEL ARABIAN, taken pursuant to Subpoena, before Rita Persichetty, a Notary Public of the State of New York.

        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
           New York, New York 10022
             212-750-6434
             REF:  113736

Page 2

A P P E A R A N C E S:

ERIC M. NELSON, ESQ.
Attorneys for Plaintiff
    112 Madison Avenue
    New York, New York 10016
    PHONE:  212.354.3666
    FAX:  212.354.2555
    EMAIL:  Emnlegal@gmail.com

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
ERIC T. SCHNEIDERMAN
Attorneys for Defendant
    The Equitable Building
    120 Broadway
    New York, New York 10271-0332
BY:  CHRISTOPHER V. COULSTON, ESQ.
    PHONE:  212.416.8556
    FAX:  212.416.6009
    EMAIL:  Christopher.coulston@ag.ny.gov

Page 3

  A P P E A R A N C E S: (Cont'd)

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
Attorneys for Defendants Kings County Hospital
100 Church Street
New York, New York 10007
  BY: TANYA N. BLOCKER, ESQ.
  PHONE: 212.356.3177
  FAX: 212.356.3770
  EMAIL: Tblocker@law.nyc.gov

  ALSO PRESENT:
WILLIAM VERSFELT, Assistant Counsel,
  SUNY Downstate Medical Center
ODED GREENBERG

Page 4

------------------ I N D E X -------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| MICHAEL ARABIAN | MR. NELSON | 7 |

-------- INFORMATION/DOCUMENTS REQUESTED --------

| PAGE | | |
|---|---|---|
| 85 | Written warning letter | |
| 162 | Attachment with account of events | |

--------------- E X H I B I T S ----------------

| ARABIAN | DESCRIPTION | FOR I.D. |
|---|---|---|
| Exhibit 1 | Letter dated September 3rd | 127 |
| Exhibit 2 | E-mail dated September 3rd | 127 |
| Exhibit 3 | SUNY ESI 28 | 132 |
| Exhibit 4 | E-mail Bates stamped SUNY ESI 3 | 133 |
| Exhibit 5 | E-mail Bates stamped SUNY ESI 4 and 5 | 136 |
| Exhibit 6 | Letter Bates stamped HHC 1231 | 147 |
| Exhibit 7 | Letter Bates stamped SUNY 479 | 156 |

Page 185

ARABIAN

through it and then I spoke to Mr. Coulston.

Q. I see. Okay. Did you discuss this transcript after seeing it with if anyone other than Mr. Coulston?

A. No.

Q. How about any of the other documents that Mr. Coulston shared with you, did you discuss them with anyone?

A. No.

Q. Did you have occasion, for example, to speak with Mr. Cuiman or Miss Bernadel or anyone else at Downstate?

A. No.

Q. Did you contact anyone either by phone or E-mail or otherwise to ask any questions about anything once you saw any of these documents?

A. No.

Q. Okay. This would be a good time for a lunch.

(Luncheon recess taken at 1:05 p.m.)

Page 186

ARABIAN

AFTERNOON SESSION

(Time noted: 1:50 p.m.)

MICHAEL ARABIAN, resumed and testified as follows:

CONTINUED EXAMINATION

BY MR. NELSON:

Q. Mr. Arabian, I just want to remind you you're still under oath.

Sir, when we were talking earlier we were discussing the interrogation. The transcript of which is Exhibit 9 in front of you. Sir, how much impact does what an employee says during one of your interrogations have on the decisions that are made in your department as to what discipline, if any, to impose?

A. Well, it's important that, you know, the employee have their opportunity to speak and explain and answer the issues at hand, so it's an important part of the investigation and what's said and so forth, so...

Q. What I'm asking is: You had 13 months of doing a couple of these a week, how much bearing did it have in the discussions you

Page 187

ARABIAN

would have after the interrogations in the determination of what, if any, discipline to impose, did it matter much what they said?

A. Yes.

Q. How about in Dr. Greenberg's case, did it matter much what he said?

A. It did, yes. Everything is taken into a picture and the evaluation is made, so what he said was important.

Q. In the course of this examination which looks like it went on for 30, 40 minutes.

A. Okay.

Q. Well, I believe he was supposed to report at 3:00. And according to the transcript, you went off the record at 3:44. I'm not sure whether you went on the record precisely at 3:00, but it looks like it was in the ballpark of 30, 40 minutes.

Did you at any point doubt or question the honesty of any answers you were receiving from Dr. Greenberg?

A. So I read this, right. So there was follow-up questions that I asked, it seemed like Dr. Greenberg realized in some of this he

Page 188

ARABIAN

said, I realize how it sounds, it doesn't sound correct, you know, it sounds strange, it sounds different. So, you know, all I'm trying to do is put a puzzle together and see what I had, documents that I had. And then hear what the person is saying and try to see where that fits.

Q. Yes -- no, I'm asking: Did you have any reason to doubt the voracity, the truthfulness of anything that Dr. Greenberg told you that day?

A. Well, there's part of this that says that not telling the truth, not answering the questions can bring you up on additional charges, yes.

Q. I'm aware of that as well. I'm asking you: Did you as you went through your questioning that day, which of course you were able to read in this transcript marked as Exhibit 9, have any reason to think that Dr. Greenberg was at any point not telling you the truth?

A. No. I asked questions and got answers to questions and then followed up with

Case 19-3570, Document 42, 02/11/2020, 2775386, Page199 of 220

**A443**

Case 1:15-cv-02343-PKC-VMS   Document 87-63   Filed 09/14/18   Page 3 of 3 PageID #: 1917

Page 209

ARABIAN

Q. Okay. So it wasn't really saying, what would happen if he engaged in the misconduct again, just that something in that range would occur, correct?

A. That's my understanding, yes.

Q. Okay. So in the event that he engaged as it says here, in misconduct the same or similar to that described above, he could get a letter of reprimand and he could be fired or anything in between; is that correct?

A. Yes.

Q. So it wasn't specified what would happen in the event of misconduct, it would be in the discretion of the director; is that right?

A. That's the way I read it, that's my understanding.

Q. Is that fairly standard language for these types of agreements?

A. Yes.

Q. Now did you say a little earlier that Paragraph 6 is essentially boilerplate, something that appears in all of these agreements except for the names being changed?

Page 210

ARABIAN

A. I believe so, yes.

Q. Okay. Can you tell me what, if any of the other paragraphs are also boilerplate or appear in these agreements each time one is signed up with an employee?

A. So generally, number -- so parts of one are there -- so the held in abeyance part was, in my experience that was what was there.
     If somebody's being placed on time and attendance watch, parts of that are there.

Q. That's Paragraph 3?

A. Paragraph 3. Paragraph 4 is the probationary period is there, six months to a year. So that language is consistent.
     Five is consistent with others, that the person needs to adhere to the policies. And six is contained in the settlements I've been with.

Q. Okay. Now, sir, when you prepared this, did you prepare this while Dr. Greenberg waited or was this sent to him at some subsequent point in that day after he had already left your office?

A. I -- so I don't remember the events

Page 211

ARABIAN

of that day. So after showing me what you've shown me, I would say it was prepared that day but I don't remember that.

Q. No, I understand it was prepared that day. What I'm asking is, was it prepared while Dr. Greenberg remained in your offices or was it he left at the end of the interrogation, you went and prepared this and then sent it to him or had him come back for it?

A. Again, I don't specifically remember what occurred. What I can tell you is what our past practice was what we did. What I see from the dates, you know, what it appears to me happened is something but what I specifically remember, I can't tell you.

Q. Okay. Tell me, were any of the terms of this agreement, I'm referring to Exhibit 10, negotiated between you and Dr. Greenberg that day?

A. Again, specifically I don't remember. Generally, I can answer if you'd like, but specifically --

Q. Yes.

A. Generally when I speak to somebody I

Page 212

ARABIAN

present them this settlement. And then if they have discussions questions, if there's something in there that they do not believe is accurate or they don't agree applies or if they have questions about it, like you had a question, what does this mean, I would explain and get into that. But what happened with Dr. Greenberg, I do not recall.

Q. Well, have you ever had occasion to actually negotiate the terms of a settlement agreement like this --
     MR. COULSTON: Object to the form.

Q. With the person?

A. That had happened so there is, the person's input is considered and evaluated in that, yes.

Q. Okay. Let's take Dr. Greenberg's case. Do you recall presenting this to him as a finished document or discussing and negotiating with him what would be in the agreement, then going and preparing it and then coming back to him for signature?
     MR. COULSTON: Object to the form.

A. I don't recall. I don't recall

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
ODED GREENBERG, M.D.,

                    Plaintiff,

    -against-

SUNY DOWNSTATE ET AL.,

                    Defendants.

Index No. 15-cv-2343 (PKC/VMS)
--------------------------------------------------x


                        112 Madison Avenue
                        New York, New York


                        December 15, 2016
                        9:39 a.m.



          DEPOSITION of LEONZO CUIMAN, taken before
Marianne Witkowski-Smith, a Shorthand Reporter and
Notary Public of the State of New York.




          ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
               New York, New York 10022
                    212.750.6434
                    REF:  113872

Page 2

A P P E A R A N C E S:


LAW OFFICE OF ERIC M. NELSON

Attorneys for Plaintiff.

     112 Madison Avenue

     Sixth Floor

     New York, New York 10016

BY:  ERIC M. NELSON, ESQ.

     PHONE:  212.354.3666

     FAX:    212.354.2555

     E-MAIL: emnlegal@gmail.com




STATE OF NEW YORK

OFFICE OF THE ATTORNEY GENERAL

Attorneys for Defendants State University of

New York, Dr. Steven Pulitzer, Dr. Deborah Reede.

     120 Broadway

     New York, New York  10271

BY:  CHRISTOPHER V. COULSTON, ESQ.

     PHONE:  212.416.8556

     FAX:    212.416.6009

     E-MAIL: christopher.coulston@ag.ny.gov

Page 3

A P P E A R A N C E S (Cont'd):


NEW YORK CITY LAW DEPARTMENT

OFFICE OF THE CORPORATION COUNSEL

Attorneys for Defendants New York City Health

and Hospitals Corp., Kings County Hospital.

100 Church Street

New York, New York  10007

BY: TANYA N. BLOCKER, ESQ.

PHONE: 212.356.3177

FAX: 212.356.3770

E-MAIL: tblocker@law.nyc.gov



ALSO PRESENT:

ODED GREENBERG, M.D.

WILLIAM VERSFELT, ESQ.

Page 4

------------------ I N D E X ------------------

WITNESS              EXAMINATION BY          PAGE

LEONZO CUIMAN    MR. NELSON                   6


--------------- DOCUMENT REQUESTS ---------------

PAGE: 21    Resume of Leonzo Cuiman.


--------------- E X H I B I T S ---------------

| CUIMAN | DESCRIPTION | FOR I.D. |
|---|---|---|
| Exhibit 1 | FMLA Document | 190 |
| Exhibit 2 | Emails | 315 |
|  | SUNY ESI 278 |  |
| Exhibit 3 | Emails | 317 |
|  | SUNY ESI 26 |  |
| Exhibit 4 | Correspondence | 320 |
|  | HHC 1137 |  |
| Exhibit 5 | Emails | 322 |
|  | SUNY ESI 28 |  |
| Exhibit 6 | Emails | 323 |
|  | SUNY ESI 4 - 5 |  |
| Exhibit 7 | Emails | 328 |
|  | SUNY ESI 3 |  |
| Exhibit 8 | 9/4/14 Correspondence | 331 |
| Exhibit 9 | Document | 333 |
|  | HHC 1135 - 6 |  |

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 237

CUIMAN

A.  Right, or I talked to him.

Q.  Okay.  And after that, a settlement agreement was presented to Dr. Greenberg, correct?

A.  Correct.

Q.  Okay.  And this all happened on the same day?

A.  Correct.

Q.  Okay.  And what was said between you and Mr. Arabian on that occasion?

A.  I can't give you a verbatim accounting, what was said, but generally what was discussed was we reviewed the case, the facts, the relevancy of whatever facts were gleaned from the investigation and what, if any, administrative response was necessary.  And we agreed that one was.  And he was instructed then to draft, for my review, a copy of a proposed settlement that we would try to negotiate with Dr. Greenberg.

Q.  And did he in fact draft such an agreement?

A.  Yeah.

Q.  And you in fact reviewed the draft

Page 238

CUIMAN

after he prepared it?

A.  Yes.

Q.  But before it was presented to Dr. Greenberg, correct?

A.  Correct.

Q.  Okay.  So let me see.  Correct me if I'm wrong.  First there was an assignment of Mr. Arabian to the matter that had been presented to Labor Relations regarding Dr. Greenberg; Mr. Arabian then did whatever investigation he did, then there was an interrogation by Mr. Arabian of Dr. Greenberg; then there was a discussion between you and Mr. Arabian, then there was his preparation of and then your review of a settlement agreement, and then the settlement agreement was presented to Dr. Greenberg, correct?

A.  Correct.

Q.  Okay.  And the settlement agreement that was presented to Dr. Greenberg was a document you had approved, correct?

A.  Correct.

Q.  All right.  Other than as you've already testified, do you recall saying anything

Page 239

CUIMAN

to Mr. Arabian or him saying anything to you during the meeting you had just prior to him preparing the settlement agreement?

A.  Like what?

Q.  Like anything he said.

A.  He said a lot of things.  He reviewed the case with me.

Q.  Okay.  I'd like to know what you recall him saying and what you recall saying to him.

A.  I recall him saying that Dr. Greenberg, in effect, acknowledged the fact that he left work without authorization, failed to follow his supervisor's directive to remain on duty.  And he seemed to be committed to, going forward, not engaging in that kind of behavior, which led Michael to meet with me to say, well, maybe we can try to resolve this matter since he did take some ownership of his misconduct.

Q.  Okay.  And by misconduct, you mean leaving his workstation without permission and defying the orders of his supervisor not to leave, correct?

Page 240

CUIMAN

A.  And --

MR. COULSTON:  Object to the form.
You can answer.

A.  And interfering with the operations of the department.

Q.  What do you mean by interfering with operations of the department?

A.  Because he had mandated responsibilities that he was supposed to accomplish that day that weren't accomplished because he left, and that interfered with them meeting their operational objective for that day, as to what input he was supposed to have provided.

Q.  Do you recall specifically what he was supposed to do that day that he didn't do?

A.  No.  I know that whatever it was, he didn't do it.

Q.  Okay.  So he was absent without authorization, he defied his supervisor's direction to appear for work.  And by absenting himself, he didn't get the work done that he was supposed to have done; is that correct?

A.  Correct.

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 253

CUIMAN

Dr. Greenberg, correct?

A.  That's correct.

Q.  Okay.  But it's your understanding that as of the time you approved it, it was ready for presentation to Dr. Greenberg?

A.  Correct.

Q.  Did you and Mr. Arabian discuss, when he came back to you with the draft agreement, what could or should be negotiated between Mr. Arabian and Dr. Greenberg?

A.  Yes.

Q.  What did you discuss?

A.  Discussed the parameters of what we were willing to accept.

Q.  Okay.  And what did you say and what did he say in that regard?

A.  I don't remember verbatim what he said and what I said.  But in sum, based on the agreement, the agreement was that since we weren't going to discipline him, that we will just follow the parameters of the contract and he'd be subject to - if he did it again - anything ranging from a letter of reprimand to termination of state service.

Page 254

CUIMAN

Q.  Okay.  So as of the time you approved the agreement, was there anything that the agreement reflected that was still negotiable between Mr. Arabian and Dr. Greenberg?  Was there any adjustment that you were prepared to make to the settlement agreement?

MR. COULSTON: Object to the form.
You can answer.

A.  Like I testified previously, the preparation of the settlement agreement and when we meet with the employee or the employee's representative, that is a negotiation.

Q.  That's what I'm asking.

A.  Right, we --

Q.  You proposed a settlement agreement to Dr. Greenberg, correct?

A.  Correct.

Q.  Mr. Arabian drafted it, you approved it, correct?

A.  Correct.

Q.  Okay.  Was there anything that was in that agreement when it was proposed to Dr. Greenberg that you, in Labor Relations, were

Page 255

CUIMAN

prepared to negotiate about?

A.  Yes.

Q.  What particular terms of the settlement agreement were you willing to negotiate?

A.  Like I said, like I testified before, everything is negotiable.  You know, we propose a settlement and an employee or their representative look at the proposed specifications, and just like in the used car dealership, you decide to negotiate whether it's acceptable or unacceptable --

Q.  I understand.

A.  -- but everything is negotiable.
The answer is yes, we were prepared to negotiate.

Q.  Were you prepared, for example, to negotiate what the penalty would be if he committed a further violation?

A.  Absolutely.

Q.  And so you were willing to basically change the language as to what the penalty would be?

A.  Yes, that's what negotiation is.

Page 256

CUIMAN

Q.  Okay.  And what were you -- how far were you willing to go to reduce the penalty in the event of a subsequent violation?

A.  Short of him wanting an agreement that he would receive a commendation -- you know, I'm not being frivolous.  The scope of what discipline can be imposed by an arbitrator is from a letter of reprimand to termination.
We were prepared to negotiate anything in between or just stick with the parameters; which includes the lowest penalty, a letter of reprimand, to the highest, termination of service.  Everything was negotiable.

Q.  You're saying if he looked at the agreement and said, I'm not willing to sign this if the penalty could be termination, you were willing to take termination off the table?

A.  Right.  We do negotiations like that and make those adjustments every week.

Q.  Okay.  And you would have been willing to do that here?

A.  Here, in this forum or --

Q.  No.  Here, with regard to Dr. Greenberg.

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 257

CUIMAN

A.  Yes.

Q.  Okay.

A.  Of course.

Q.  Now, would you have been willing to take suspension off the table, suspension without pay?

A.  **During the negotiation for settling the case?**

Q.  Okay.  We're talking about the settlement of --

A.  **You said --**

Q.  We're talking about the settlement agreement you proposed --

A.  **Right.**

Q.  -- okay?

A.  **Right.**

Q.  Okay.  You said that the presentation of a settlement agreement begins a negotiation.

A.  **Right.**

Q.  Okay.  And I'm asking you, as of the time that you presented the settlement agreement -- you and Mr. Arabian drafted the settlement agreement yourselves, correct?

Page 258

CUIMAN

A.  Correct.

Q.  Okay.  There was no consultation with Dr. Greenberg about what was going to be in the settlement agreement before you presented it, correct?

A.  Correct.

MR. COULSTON: Objection --

Q.  Were you --

(Simultaneous speaking)

(Brief off-record discussion.)

MR. COULSTON: Okay.  Object to the form.

BY MR. NELSON:

Q.  Okay.  Were you willing to limit the penalty for a violation of the settlement agreement to, say, a verbal warning?

A.  I -- no.

Q.  Were you willing to limit the penalty for a violation of the settlement agreement to a written warning?

A.  No.

Q.  Were you willing to limit the penalty for a violation of the settlement agreement to any other type of suspension?

Page 259

CUIMAN

A.  **We never discussed suspension.**

Q.  Okay.  And I believe you said you were willing to take termination off the table for a violation of the settlement agreement; is that right?

A.  **I said we would consider it, if he raised it as an issue.**

Q.  I see, okay.  And you're saying he didn't raise that as an issue?

A.  Correct.

Q.  Okay.  So had he said to Mr. Arabian upon being presented with the settlement agreement, I won't sign this if the penalty includes termination, that's something you would have considered taking off the table for a violation of the settlement agreement?

A.  Correct.

Q.  Notwithstanding what you say was the seriousness of what he had done?

A.  Correct.

Q.  And without regard for whatever violation there might have been of the settlement agreement, regardless of its seriousness?

Page 260

CUIMAN

A.  Yes.

Q.  Okay.  Was there anything else in the settlement agreement that you were willing to negotiate about?

A.  **I think I previously testified that every proposal in a settlement agreement is negotiable.**

Q.  Would you, for example, have been willing to take out of the settlement Dr. Greenberg waiving his right to appeal?

A.  **Any counter-proposal would be given due consideration.**

Q.  What does that mean?

A.  **Meaning that if he -- when we gave our proposal how to resolve this, and he came back and said - I think you're telling me a counter-proposal - that he would like something taken out and modified, we would discuss it and negotiate and see if we're willing to do it.**

Q.  Okay.  So specifically with regard to the waiver of appeal -- I think you testified this morning the reason for a settlement agreement being that you wanted to resolve the matter before you.  And so as part of that,

Case 1:15-cv-02343-PKC-VMS   Document 87-64   Filed 09/14/18   Page 5 of 5 PageID #: 1922

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 293

CUIMAN

Q. Okay. So tell me, how would you characterize what she said regarding termination of Dr. Greenberg?

A. We reiterated to Dr. Reede what the parameters of the settlement agreement was, what our administrative options were and that -- and is there anything in Dr. Greenberg's interrogation statement that would mitigate the penalty of termination being implemented. And the consensus and agreement of everyone was, no, there was nothing that he said to explain his insubordination and misconduct that would mitigate the determination to terminate his services.

Q. Was Dr. Reede provided with a transcript of what Dr. Greenberg had said during his interrogation by Ms. Bernadel?

A. No.

Q. Was she provided with a recording, a tape-recording, of that?

A. No.

Q. Was she told by someone what Dr. Greenberg had said during that interrogation?

Page 294

CUIMAN

A. A summary, yes.

Q. Who told her, in summary form, what he had said?

A. Stephanie and myself.

Q. But you hadn't been present for the interrogation?

A. Correct.

Q. So to the extent you were telling Dr. Reede what Dr. Greenberg said during his interrogation, that was based on what Ms. Bernadel told you, correct?

A. And my having heard the tape.

Q. Oh, you had heard the tape by that time?

A. Correct.

Q. Okay. So you and Ms. Bernadel summarized for Dr. Reede what Dr. Greenberg had said during the interrogation?

A. Correct.

Q. What do you recall telling Dr. Reede in that regard?

A. Again, I don't have a verbatim recollection of who said what, but what stands out in my memory is that Dr. Greenberg didn't

Page 295

CUIMAN

think -- didn't take the directive to follow the prescribed protocols for preparing these forms seriously and elected and made a conscious decision not to cooperate.

Q. You're saying to "repair" the forms or "prepare"?

A. Prepare.

Q. Prepare?

A. Prepare.

Q. Okay. So basically you were conveying to Dr. Reede that Dr. Greenberg was uncooperative with regard to the attestations even at his interrogation; is that correct?

A. Correct.

Q. And that was based on your having heard the tape and having spoken with Ms. Bernadel?

A. Correct.

Q. What do you recall Ms. Bernadel informing Dr. Reede about what Dr. Greenberg said at the interrogation?

A. Other than that, the piece that stands out that I recall, I don't recall what was communicated from Stephanie at that point.

Page 296

CUIMAN

Q. At any point during the meeting you had with Ms. Bernadel and Dr. Reede between the 10th and the 15th, did the subject of whether or not Dr. Greenberg could or should redo his attestations come up?

MR. COULSTON: Object to the form. You can answer.

A. No, I don't recall any discussion like that.

Q. Okay. Do you recall anyone asking whether Dr. Greenberg either should redo his attestations or whether he should be asked to redo his attestations?

MR. COULSTON: Object to the form. You can answer.

A. I don't recall having that conversation.

Q. Okay. You didn't ask or suggest that that be done, correct?

A. No.

MR. COULSTON: Object to the form.

Q. Did you ask whether or not it could be done?

MR. COULSTON: Object to the form.

Case 1:15-cv-02343-PKC-VMS   Document 87-65   Filed 09/14/18   Page 1 of 9 PageID #: 1923

[Page 1]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------x

ODED GREENBERG, M.D.,


                                  Plaintiff,  :


              - against -


SUNY DOWNSTATE, ET AL.,


                                  Defendants.  :

------------------------------------------x

                        112 Madison Avenue

                        New York, New York


                        November 3, 2016

                        9:15 a.m.



           EXAMINATION BEFORE TRIAL of SUNY

DOWNSTATE, one of the Defendants herein, by

JINEL SCOTT, M.D., taken by the Plaintiff and

Co-Defendants, pursuant to Court Order, held at

the above-mentioned time and place, before

Michelle Lemberger, a Notary Public of the State

of New York.

APPEARANCES:

ERIC M. NELSON, ESQ.
Attorneys for Plaintiff
    112 Madison Avenue, 6th Floor
    New York, New York 10016

ERIC T. SCHNEIDERMAN, ESQ.
Attorney General for the State of New York
Attorney for Defendants
SUNY DOWNSTATE, DR. DEBRA REEDE and DR. STEVEN PULITZER
    120 Broadway, 24th Floor
    New York, New York 10271
BY:  CHRISTOPHER V. COULSTON, ESQ.

TANYA N. BLOCKER, ESQ.
Assistant Corporation Counsel
Attorneys for Defendant
THE CITY OF NEW YORK
    100 Church Street
    New York, New York 10007

ALSO PRESENT:

    STATE UNIVERSITY OF NEW YORK
    William S. Versfelt, Esq.

        *   *   *   *   *

[Page 2]

INDEX

WITNESS        EXAMINATION BY      PAGE

Jinel Scott      Mr. Nelson        5

            EXHIBITS

SCOTT      DESCRIPTION          PAGE

1      Curriculum vitae          225

2      Course documentation      230

3      E-mail                    223

4      Letter                    237

5      Letter dated 6/25/15      241

6      Statement                259

        REQUESTS FOR PRODUCTION

DESCRIPTION                PAGE LINE

Most current curriculum vitae    226  17

[Page 4]

STIPULATIONS

        IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

        IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

        IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court and that a copy of this examination shall be furnished without charge to the attorney representing the witness testifying herein.

[Page 3]

J I N E L   S C O T T, M.D.  having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

BY THE REPORTER:

Q   Please state your name for the record.

A   Jinel Scott.

Q   What is your present business address?

A   451 Clarkson Avenue, Brooklyn, New York 11203.

EXAMINATION BY
MR. NELSON:

Q   Good morning.

A   Good morning.

Q   As we talked about off the record before we got started, I'm going to refer to you today as Dr. Scott; is that all right?

A   That's fine.

Q   Dr. Scott, tell me if you're presently employed and if so by whom?

A   I'm employed, yes.  I'm employed, presently by SUNY Downstate.

[Page 5]

[2] (Pages 2 to 5)

Scott, M.D.

Q   I'm sorry, you were a Downstate employee or LICH employee?

A   Downstate employee.

Q   So were LICH employees all Downstate employees?

A   Yes.

Q   I see. Okay. So there was the first occasion on which she asked you if you were interested in the director of E.R. radiology position, and then there was a subsequent conversation in which she asked you if you were still interested; is that correct?

A   Something -- I can't -- listen, I cannot know exactly, you know, how those conversations -- how that went. But something like that.

Q   Okay. Well, staying with that for the moment, about how long was it from the time she first told you that she was looking for someone for director of E.R. radiology, until either that conversation, if that was the next -- that second conversation, if that was the next step, or some other affirmative step was taken or event occurred toward you becoming the

[Page 70]

Scott, M.D.

director of E.R. radiology at Downstate?

A   Can she read the question back, please?

MR. NELSON:  Sure.

(Whereupon, at this time, the requested portion was read by the reporter.)

A   I don't know.

Q   Do you recall when either of those two conversations occurred?

A   No.

Q   Do you recall doing anything to advance your prospect of getting a position at Downstate?

MR. COULSTON:  Object to the form.

A   What do you mean?

Q   You have applied for jobs before?

A   Of course.

Q   Okay. Did you do anything toward applying for the job at Downstate after the first time Dr. Reede told you there was a position available?

MR. COULSTON:  Object to the form.

A   What do you mean by did I do anything? I don't understand what you mean.

[Page 71]

Scott, M.D.

Q   Toward applying.

A   What do you mean toward applying?

Q   Did you file an application, did you go for an interview, did you call somebody else? Did you submit your credentials? Anything? Anything that you would do to get a job, did you do anything after she said there was a position available and she was looking for a director of E.R. radiology?

A   No, I was a Downstate employee.

MR. COULSTON:  Object to the form.

Q   Yes, I understand that. I'm asking you, did you do anything to get the job at Downstate as opposed to the job at LICH?

MR. COULSTON:  Object to the form.

A   I don't understand what you are trying to say.

Q   Okay. Let's go back.

You were working at LICH at the time Dr. Reede told you this, correct?

A   Correct.

Q   She said she was looking for a director of E.R. radiology, correct?

A   Correct.

[Page 72]

Scott, M.D.

Q   You said you were interested, correct?

A   Correct.

Q   What happened next?

A   Just like I told you. Sometime after she asked me if I was still interested.

Q   And you said, yes?

A   And I said yes.

Q   And then?

A   And then I started working there in August 2014.

Q   I see. So there was no need for interviews or applications or any of that?

A   No.

MR. COULSTON:  Object to the form.

A   I mean, that's what you're saying is like asking me if I were to get promoted now within my department, do I need to fill out an application? We are Downstate employees. If you're getting promoted within your job, you don't fill out an application for that.

Q   Well, let me ask you that. Was there a point in time that Dr. Reede told you that you were hired at Downstate as director of E.R.

[Page 73]

[19] (Pages 70 to 73)

Scott, M.D.

radiology?

A   I was already hired at Downstate. I was a Downstate employee.

Q   I understand that you were a Downstate employee, but you were working at LICH?

A   Yes, but it is a Downstate hospital.

Q   Okay. So then maybe the problem we're having is with nomenclature. Is there a point at which you stopped -- you did something that would cause your actual employment at LICH to end and your employment at Downstate to begin?

MR. COULSTON: Object to the form.

A   My agreeing to become director of emergency radiology.

Q   Okay. So an offer was made to you of the position at some point?

A   Like I said before, she asked me if I was still interested, yes, I'm still interested.

Q   And did she say in that conversation, I'm offering you the position or did you understand that to be an offer of the position?

A   I don't know exactly what words she

[Page 74]

Scott, M.D.

used. I mean, I just don't remember the details of that conversation.

Q   Okay. Let me ask the question this way.

Was there a point at which you understood that you would now be the director of E.R. radiology at Downstate?

A   Yes.

Q   How long before you actually began working in that position did you understand that you had been offered and had accepted that position?

A   I don't know.

Q   Okay. Was it more than a month before you began?

A   I don't know.

Q   Three months, six months?

A   I don't know, I can't remember.

Q   A year?

A   Well, you know, probably not a year.

Q   Okay. So as best you can tell me, how long was it before you actually began working that you understood that you had that position?

[Page 75]

Scott, M.D.

A   I couldn't tell you. I can't remember.

Q   All right. Was there a transfer of any kind involved in you going from working at LICH to working at Downstate?

A   I, you know, just drove to a different address. I was a Downstate employee.

Q   Well, at some point you were supposed to come to work at a different place, correct?

A   Correct.

Q   How did you know that?

A   Like I said, Dr. Reede offered the position to me, I accepted the position and I started working at Kings County.

Q   Okay. Let's try and focus on that.

A   Um-hum.

Q   When do you recall Dr. Reede offering you the position?

A   I don't remember.

Q   Did she do it verbally, in writing or in some other way?

A   I can't remember.

Q   If she did it verbally, do you recall there being any writing reflecting that at any

[Page 76]

Scott, M.D.

time prior to when you began working there?

A   I don't remember.

Q   Okay. Do you recall what the last day was that you worked at LICH?

A   No, I don't.

Q   Do you recall whether you took time off between working at LICH and beginning at Downstate?

A   Yes, I did.

Q   A week or longer?

A   I don't remember.

Q   Can you give me any idea?

A   I mean, I don't know. Maybe more than a week. I can't remember.

Q   More than a month?

A   I don't know, probably not.

Q   All right. So if you began on August the 4th, I think you said of 2014?

A   I don't know exactly. Sometime in August.

Q   Okay. Early August?

A   I can't remember.

Q   Do you recall sitting here today, do you recall being off work from LICH not having

[Page 77]

**[20] (Pages 74 to 77)**

**A453**

Scott, M.D.

A   No.  What do you mean evaluate, I'm sorry?

Q   Evaluate, review or --

A   That's not something I would have done.  That's something Dr. Pulitzer would do.

Q   Tell me what a peer review is then.

A   A peer review is basically something that's mandated by JCAHO and/or hospital and several other governing bodies that says you need to randomly select about ten cases -- I think most people do, from different radiologists and another radiologist would read it to see if they agree with the interpretation.  If they do not agree with the interpretation, they have to then sort of rank the discrepancy; was it significant, was it just a minor discrepancy, no clinical significance.

So it ranges from like one being I agree, to four, meaning this is a significant miss, and should not be missed and potentially significant for a patient.

Q   Did you ever have occasion to do a peer review on Dr. Greenberg's cases?

A   No, I never peer reviewed

[Page 134]

Scott, M.D.

Dr. Greenberg.

Q   Do you ever recall him peer reviewing you?

A   No.

Q   To your recollection, do you recall anyone else ever peer reviewing Dr. Greenberg and having any issue with any of the work that he had done?

A   I wouldn't be privy to that information.  Again, that's something Dr. Pulitzer would know.

Q   So the answer is no?

A   No, I don't know.

Q   Okay.  And you were never in a position to evaluate Dr. Greenberg as say a manager or supervisor, correct?

A   No.

Q   No, that's not correct?

A   I'm sorry, can you repeat that question?

MR. NELSON:  Read it back, please.

(Whereupon, at this time, the requested portion was read by the reporter.)

A   Well, I would answer this way.  I

[Page 135]

Scott, M.D.

never sat with Dr. Greenberg and said, this is what I think.  But I was observing him and I had my own opinion and evaluation, but I didn't necessarily share it with him.

Q   Okay.  Did you share it with anybody else?

A   Well, there were several occasions when I was asked an opinion so I had to render an opinion.

Q   Okay.  Let's talk about those.  How many occasions were there?

A   I don't know.

Q   More than five?

A   I mean, there were various things that would occur.  Complaints about lateness, absences or something like that.  And I mean, I'm in the room that he works in.  So, obviously, I have a sort of like a first-hand knowledge as to what time he gets there or whatever.  So I would be asked and I would have to say what I know.

Q   Other than that?

A   Other than that, there was one occasion when -- there was one occasion when it

[Page 136]

Scott, M.D.

was brought to my attention that he had a very -- quite frankly a very ridiculous attestation in a report, and that was brought to my attention and I was asked about that, and I also had to say what I knew about that.

Q   Okay.  Have you now told me about all of the circumstances in which you were -- you had an opinion about Dr. Greenberg that you shared with someone else?

A   As far as I can remember.

Q   Okay.  So let's take them one at a time.

On how many occasions were you asked your opinion or inquired of regarding Dr. Greenberg's lateness?

A   I was never -- let me think about this.

This is what would occur.  Because unfortunately Dr. Greenberg was sometimes very erratic about his hours.  It would leave the department and the radiology section in particular in a very awkward position, to put it at best, in a disadvantageous position where coverage is concerned.

[Page 137]

[35]  (Pages 134 to 137)

Scott, M.D.

I think we spent a lot of time speaking about the shifts and I'll tell you why the shifts are the way they are. It's because we have to make sure the E.R. is adequately covered 24/7. So it's not a matter of when you want to work eight hours, it's a matter of the departmental needs at certain times of the day.

So there was at least one time, could have been two, when Dr. Greenberg came in at 6 a.m. Now, I think you can understand the problem is if we are both working from 6 a.m. to 2 p.m., there is an issue with coverage, who is going to cover the E.D. after 2 p.m.?

So the problem is not, you know, you're working eight hours, the problem is when are those eight hours? The schedule is set to cover the departmental needs. And if you decide to come in at 6 a.m. and work until 2:00, then what -- then it leaves the department in a precarious situation. And that's what I'm talking about.

Or sometimes -- that was that time. That's when I get involved. Because then I have to make a call and say, well, okay,

[Page 138]

Scott, M.D.

Dr. Pulitzer, we are both here, this is the time, who is going to cover the E.D. after this time?

And then that's when it becomes a problem, because now he has to figure that out. And that's what I'm talking about. Or I know there were some times when there was one incident when, if I remember carefully, he was supposed to take vacation one particular week, and I was expecting him to be out that week, coverage had been designed with the intent that he was going to be out that week, and then he showed up to work. That's very disruptive.

Because when we're approving time, we're approving time off based on the fact that we have people to cover and meet departmental needs at a specific time. So if you come in when you say you're going to be out, and then stay out when you're supposed to be coming in, then that sets up a very precarious situation.

Q   Well, was there an occasion -- was there a week that Dr. Greenberg was supposed to be in and didn't come to work? You said there was a week that he was on vacation and came to

[Page 139]

Scott, M.D.

work?

A   After that time, I don't know if he spoke to Dr. Pulitzer and got it switched appropriately or whatever, but from my perspective, what I saw was that he was definitely off, was supposed to be off a particular week, and he came in anyway.

Q   Yes. I understand that.

A   What I'm trying to say is that the week that followed that, I don't know if   he -- I don't know if he worked it out with Dr. Pulitzer and it was approved that he could eventually switch the weeks, I don't know about that communication, what happened after that, but I know that the week that he was supposed to be off, he came in.

Q   Okay. So the answer to my question is, no, you're not aware of a week that he was supposed to be in that he didn't come in?

A   He didn't come in, but like I said, I don't know if it was approved or not by Dr. Pulitzer; I don't know.

Q   Okay. So sitting here now, you're not aware of any week that you knew he was

[Page 140]

Scott, M.D.

supposed to be in that he did not come in; is that correct?

MR. COULSTON:  Object to the form.

A   Yes, I don't -- like I said, I don't have any -- I didn't have any role in approving times or switching or anything like that. All I can say is that there was a week he was supposed to be off that he did not take off. And there was another week when he was supposed to be there that he was not there.

So I mean, I don't know if, you know, even within that week that he came in when he was supposed to be off, the attendance at that time was erratic.

Q   How many weeks were there that he was supposed to be on vacation that he came in to work that you're aware of?

A   I only remember that one time.

Q   Okay. During that week, did you tell him at any point to not come in?

A   I don't have any authority to tell somebody do or not come in, that's not my purview.

Q   Did you discuss with Dr. Pulitzer,

[Page 141]

**[36] (Pages 138 to 141)**

Scott, M.D.

telling Dr. Greenberg to stay home that week?

A   Dr. Pulitzer and I discussed it because it was very disruptive to the department. The departmental needs were not being met, particularly in the evening. And I will tell you this as well, that even during that week when he came in, he was not working. I remember him telling me very clearly, I can't remember exactly what if he was closing on a house or something in the Hamptons. It was something to do with a house in the Hamptons, I think so. Something like that, vaguely.

And then he would come in early one day and it was just -- it was -- and then he was telling me I'm not sure if I'm going to be in tomorrow, I don't know what's going on, it depends on something. I don't know. That's just what happened that week. It was just really a mess. That's what I remember.

MR. NELSON:  Would you read my question back to the witness?

(Whereupon, at this time, the requested portion was read by the reporter.)

Q   Yes or no?

[Page 142]

Scott, M.D.

A   I discussed with Dr. Pulitzer the situation and he discussed with Dr. Greenberg what he -- whatever it is that he -- I didn't have anything to do with that situation. That was not for me to say.

Q   There was a week that Dr. Greenberg came in that you understood he was otherwise supposed to be on vacation, correct?

A   Correct.

Q   Okay. At any time during that week, did you and Dr. Pulitzer discuss sending Dr. Greenberg home or telling him to not come in, yes or no?

A   I can't remember.

Q   Okay. So sitting here today, you're not able to tell me that you did discuss it with Dr. Pulitzer?

A   I don't remember. We discussed the situation. I don't remember if we specifically discussed demanding that he stays home, no.

Q   And you don't recall when that discussion occurred, correct?

A   It occurred during that week.

Q   Do you know if Dr. Pulitzer was

[Page 143]

Scott, M.D.

working that week?

A   Yes, he was, because that's when -- actually, you know, I don't know, I don't know for sure. I'm assuming he was because I remember we talked about it.

Q   And if I were to tell you that Dr. Pulitzer was also on vacation that week, would that change your answer as to whether or not you discussed the matter with him during that week?

A   We discussed it. Even if he was not on campus, he calls, he's still the director of radiology, it's still his responsibility.

Q   If I were to say to you that Dr. Pulitzer was on vacation that week, are you saying that it's still your recollection that you discussed the matter of Dr. Greenberg coming to work that week with Dr. Pulitzer during that week, rather than after that week?

A   We discussed it during and after.

Q   Okay. So both times?

A   Yes.

Q   Now, during that week, did Dr. Greenberg read cases?

[Page 144]

Scott, M.D.

A   Yes, he came to work.

Q   Okay. And so Dr. Greenberg was there in addition to whomever else was scheduled to be there, correct?

A   Correct.

Q   Can you tell me how that made things more difficult rather than less difficult to have an additional radiologist there that week?

A   No. The problem is not the week that he came in when he should be off, the problem is when you take off when you should be there.

Q   I'm asking you then, are you aware of any occasion when Dr. Greenberg was not there and was supposed to be there?

MR. COULSTON:  Objection. Asked and answered.

A   What he said?

Q   Well, you can answer. His is a formal objection. It's lawyer speak. You can answer the question.

A   What I'm saying is this: During the week that Dr. Greenberg came when he wasn't supposed to be there, is that the week you're referring to?

[Page 145]

[37] (Pages 142 to 145)

**A456**

Scott, M.D.

disruption, that's why it stands out to me and I don't really have very detailed -- very detailed memories about that particular situation. I don't remember.

Q When you say understaffed, you mean not just in the E.R., you mean the department generally was understaffed?

A Right, as you know, because people had been approved for vacation, again, based on the fact of who was supposed to be there. So if someone does not show up when they are supposed to be there and other people are approved for vacation, then we are really understaffed.

Q Could that also be because Dr. Reede had fired several radiologists immediately prior to that period?

MR. COULSTON: Objection to the form.

Q That that was the reason there was understaffing?

A There was -- I don't know.

Q Okay. Are you able to tell me about any other occasions that you are aware of when Dr. Greenberg was supposed to be in but was not in, other than that day or two that you say you

[Page 150]

Scott, M.D.

recall without specificity?

A For the entire day?

Q For anything.

MR. COULSTON: Object to the form.

Q For anything. Tell me what you were referring to.

A Well, like I said, work starts at 9:00; there were moments when he wasn't getting there until significantly later. Does that count as not being where he's supposed to be --

Q Let's talk about absences as distinguished from what you might call lateness.

A That's what I was trying to get from you.

Q Let's talk about absences first.

Are you aware of any occasion on which Dr. Greenberg was absent when he was supposed to be in, other than, as you've already testified?

A I can't recall, the moments that I gave to you, those are -- that's what stands out in my memory.

Q Do you recall when that incident of the day or two that you were referring to

[Page 151]

Scott, M.D.

occurred?

A No. I don't remember exactly when.

Q Was there any occasion other than that day or two that you recall sitting here today?

A Not that stands out to me for an entire day.

Q All right. Let's talk about partial days, not latenesses but partial days. Are there any occasions that you recall in which Dr. Greenberg was supposed to be in but was absent for a part of a day, and I don't mean latenesses?

MR. COULSTON: Object to the form.

A I don't -- I mean, if someone comes in to work at 11 a.m. or 10 a.m. or whatever, 11 a.m. and if they need to be there at 9:00, would you consider that lateness or partial absence? I mean, you know, what would you consider that?

Q Okay. Well, you tell me if that's what you're referring to. I'm not asking you -- I'm asking you to tell me what you remember.

MR. COULSTON: You came up with lateness, partial absence, you need to tell her

[Page 152]

Scott, M.D.

what you're talking about. It's confusing.

Q Why don't you just be clear about what you mean when you talk about lateness or partial absence?

A That's your terminology.

MR. COULSTON: Those are your words.

Q So you tell me using your words what you mean and I'll work with that.

A I don't know what I mean. Because I don't know what you're --

Q All right. How about this. Do you recall any occasion that Dr. Greenberg was not in when he was supposed to be in other than an occasion you would characterize as a lateness?

MR. COULSTON: Object to the form.

A I'll just tell you what I'm saying and you can pick up what you want because I think we're going to get stuck here for a while.

Q Go ahead.

A Dr. Greenberg would often come late to work. It could vary from like half an hour late to an hour to an hour and a half, to two. I don't know about what time he left, so I can't say that he didn't necessarily work eight hours

[Page 153]

[39] (Pages 150 to 153)

**A457**

Scott, M.D.

because I leave at 2:00.

So I don't know if he stayed later that time, I don't know, but all I can tell you is that the arrival time, that's something that I could directly observe and that's what I observed.

Q   Okay.  Other than that, are you aware of any absences for less than a full day?

A   If you come in to work at 11 that's absence for less than a full day.

Q   I said other than that, are you aware of any absences for less than a full day?

A   Not that I could remember.

Q   Okay.  So, now, with regard to those, did you keep any record of Dr. Greenberg's latenesses?

A   I didn't have to.

Q   Why was that?

A   Because, first of all, it was clearly evident.  I could look at the time, I could see what time he's getting there.  Second of all, if I really needed documentation, then I could just look at the talk station and see what time he read the first case.

[Page 154]

Scott, M.D.

Q   I'm not asking you how you would determine that he was late, I'm asking you, did you keep a record of his latenesses?

A   And I'm telling you I didn't have to.  Because if I really needed to have that documentation, then I would just consult talk station.

Q   And talk station is when you record your report on the reading of a case, correct?

A   Correct.

Q   Okay.  Is that all that you do in the course of a day in the E.R.?

A   What do you mean?

Q   You come in, you immediately get on talk station and you're on talk station?

A   Yes, I do.

Q   Until you leave and you do nothing else?

A   No, no, remember I told you 40 percent of what I do versus 60 percent.  The first thing I do is come in and read cases.

Q   Is the last thing you do is to read cases?

A   90 percent of the time.

[Page 155]

Scott, M.D.

Q   And is that true of all the other radiologists who read in the E.R.?

A   Yes.

Q   And so literally the time that you come in is reflected by the first talk station?

A   Give or take about ten minutes, depending on how long it takes the computer to boot up and whatever.

Q   Do you ever have occasion in your work to consult with other physicians about particular cases in the E.R.?

MR. COULSTON:  Do you need a break?

THE WITNESS:  In about ten minutes.

MR. COULSTON:  In about ten minutes, the witness has requested a break.

A   Say it again?

MR. NELSON:  Let's read the question back.

(Whereupon, at this time, the requested portion was read by the reporter.)

A   What is that?  I mean, you mean separate to what we talked about earlier about consulting other radiologists?

MR. NELSON:  I'm sorry, let's have

[Page 156]

Scott, M.D.

the question read back one more time.

(Whereupon, at this time, the requested portion was read by the reporter.)

A   If I have a question on a case, I will call upstairs if, you know, is that what you're referring to?  Like other radiologists?

MR. NELSON:  One more time with the question, please?

MR. COULSTON:  No, no, stop.

MR. NELSON:  One more time with the question, please.

MR. COULSTON:  Eric, you're wasting time.  This is wasting time.  But that's fine.  You want to read it back for the third time, even though she has answered and asked a follow-up question for you to clarify, you can go ahead and read the question for the third time.

MR. NELSON:  Go ahead.

(Whereupon, at this time, the requested portion was read by the reporter.)

A   If I have a question on a case and there is a radiologist that it's their specialty, then I would ask them.

[Page 157]

[40] (Pages 154 to 157)

A458

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ODED GREENBERG, M.D.,

                              Plaintiff,

        -against-                                              15-CV-2343 (PKC/VMS)

SUNY DOWNSTATE ET AL.,                                  **DECLARATION OF**
                                                        **STEVEN PULITZER, M.D.**
                              Defendants.
----------------------------------------------------------X

STEVEN PULITZER, M.D. affirms under penalty of perjury, pursuant to 28
U.S.C. § 1746, as follows:

1.       I am currently the Chief Medical Officer for Kings County Hospital
Center ("KCHC"), a major affiliate of Defendant State University of New York
Downstate Medical Center ("SUNY DMC" or "Downstate"). I submit this declaration in
support of Defendants' motion for summary judgment. In my former position of
Chairman of Radiology at Kings County Hospital Center, I became and was fully familiar
with Plaintiff's termination in 2014 and the reasons therefor.

2.       I self-identify as White and am Jewish. I am 51 years old. I earned my
MD degree from Drexel University College of Medicine and completed my residency in
Diagnostic Radiology at the Icahn School of Medicine at Mount Sinai. I served as a
Neuroradiology Fellow at NYU Langone Medical Center and later became Clinical
Director of Radiology at KCHC in July 2013. In July 2014, I became the Interim Chair
of Radiology at KCHC, and eventually the full Chair in January 2015. In November
2016, I was named the Chief Medical Officer at KCHC. Throughout my employment at
KCHC, I have served as an affiliate employed by SUNY Downstate under the affiliation
agreement between SUNY Downstate and KCHC.

1

3.      In my role as Chair of Radiology at KCHC, I was responsible for the day-to-day operations of the Radiology Department.  I supervised approximately 22 radiologists who were employed by SUNY Downstate and completed their clinical work at KCHC under the Downstate-KCHC affiliation.  Before his termination, Plaintiff was one such radiologist.   In my role, I did not hire or fire radiologists, determine the rate of their pay, or maintain employment records.

4.      Prior to July 2014, in my role as Clinical Director of Radiology, I reported to Dr. Alan Kantor, then the Chair of Radiology.  When Dr. Kantor left KCHC and I assumed the position as Interim Chair of Radiology in July 2014, the Radiology department was in disarray.  As Chair, I would be responsible for improving the performance of the department, especially with respect to time and attendance abuse by radiologists, and rectifying the backlogs that resulted from inefficient review of patients' films.  One of my first duties as Chair was to institute a "zero backlog" policy to ensure that patients' films were read in a timely fashion.

5.      As Interim Chair of the department, I also assumed a supervisory role with respect to managing radiologists' schedules and ensuring adequate coverage for the department.  Before my chairmanship, supervision of radiologists' schedules could be lax, and along with Dr. Deborah Reede (then the Academic Chair of the Radiology Department at Downstate), I took on responsibility for ensuring coverage of the department during several daily shifts.

6.      The general expectation at KCHC is that radiologists spend most of their workday reading films.  Time spent reading film is reflected, if only approximately, in "Talk Station" data. Talk Station data comprises information about a particular film,

2

including which radiologist read the film, and when the film was opened and signed for by a radiologist. By reviewing the data for one day, an approximation of when a radiologist started reading films and when he or she stopped can be discerned. As Chair, I monitored Talk Station data for all of the radiologists in the department to ensure that the physicians were working their scheduled shifts.

7.    In my role as Chair, I also reviewed requests for time off. In order for a radiologist to request time off, he or she would first complete a form and submit it for my initial review. Radiologists were encouraged to submit their request forms with as much advance notice as possible, given that adequate coverage would necessarily need to be arranged.

8.    August is a very challenging month to schedule given the number of vacation days taken by the department. The Department was usually short-staffed and so adherence to the schedule was critical to provide adequate care throughout the radiology department.

9.    On September 2, 2014, Plaintiff approached me to inform me that he would be unavailable to work for the rest of the week. I advised Plaintiff that I could not approve his proposed absence that same week, due to the fact that the department would not have adequate coverage. On the following day, September 3, Plaintiff approached me to notify me that, notwithstanding the fact that I had not approved his request, he would be taking the next two days off anyway. Plaintiff indeed did not report to work on either September 4 or September 5. Plaintiff never submitted the appropriate forms to request leave. Although I understand that he contests this, Plaintiff did not inform me why he wanted to take leave on those days.

**A461**

10.     In light of Plaintiff's insistence that he would not report to work on September 4 and September 5, despite not receiving approval for such absence, I contacted Dr. Reede.  Dr. Reede advised me to draft a letter to Plaintiff outlining my position.  I did so and handed Plaintiff the letter on September 3. Ex. Y.  When Plaintiff did not report to work on September 4 and September 5, Dr. Reede and I referred the issue to SUNY Downstate's Labor Relations Department.  My hope was that Plaintiff would be counseled, agree to a particular schedule and then abide by it.  My intention was not to terminate Plaintiff.

11.     It is my understanding that Plaintiff signed a Settlement Agreement on September 8 following an interrogation by Michael Arabian of Labor Relations.  I had no role in preparing that agreement and was not consulted by Mr. Arabian regarding the agreement.

12.     An attestation is a written statement made by an attending physician to certify that he or she had reviewed a patient's report and that the report was now final. Attestations are legal documents that are vital to hospital billing and they also help to verify and ensure good patient care, and non-conforming ones could trigger a full investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well as potential financial liability.  For this reason, I had been part of the Radiology Department's recent efforts to standardize our attestations.  All Radiology Department staff were instructed on which standard attestations to append to patient reports, and I personally instructed Plaintiff to use the agreed-upon standard attestations during a staff meeting on September 22, 2014.

4

13.    In or around late September 2014 after the September 22 staff meeting, Dr. John Amodio (then the Chief of Pediatric Radiology) notified me of a completely inappropriate attestation that had been affixed by Plaintiff to a patient report.  In the radiology context, attestations are a notation added by an attending radiologist that essentially confirms that such attending radiologist has reviewed a patient's images that to that point had only been reviewed by a resident.   Whether that reviewing attending radiologist concurs or finds something to change in the resident's interpretation of the images will be reflected in the attending's attestation.

14.    Within hours of hearing from Dr. Amodio about the inappropriate attestation, I was able to review the attestation myself on the patient's chart.  I promptly contacted a colleague in KCHC's Information Technology department, Jayan Kurian, in an effort to learn the full extent of the non-standard attestations.  I eventually learned that Plaintiff had placed non-standard attestation on approximately 180 patient studies.  I considered Plaintiff's use of the unapproved attestation to be insubordinate.

15.    Upon learning the extent of Plaintiff's use of the non-standard attestations, I brought the issue to the attention of Dr. Ghassan Jameladdine, then the Chief Medical Officer of KCHC.  Dr. Jameladdine, in turn, advised me to contact KCHC's Risk Management Department in an effort to determine KCHC's potential legal exposure.

16.    I met with Michelle Welcome in KCHC's Office of Risk Management, who agreed that the conduct was at least insubordinate and that I should consider a Medical Board Hearing.  The Medical Board is a committee, comprised of approximately eight member physicians, which can be convened to approve, or to revoke, the medical credentials of a provider physician.  A Hearing of the Medical Board can determine

5

whether a physician's conduct is inappropriate such that his or her credentials should be revoked.  Shortly after meeting with Risk Management, I notified Dr. Reede of the situation, and Dr. Reede and I agreed to refer the issue to SUNY Downstate's Department of Labor Relations.  Following the investigation by Labor Relations, I conferred with Labor Relations and Dr. Reede, and we ultimately concluded that Plaintiff should be terminated.

17.     None of my dealings with Plaintiff had anything to do with Plaintiff's age, race, or religion.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: New York, New York
           March 26, 2018

_Steven Pulitzer MD_
STEVEN PULITZER

APPENDIX CONTINUED
IN FOLLOWING VOLUME