# 19-3570-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤◄◄

MD ODED GREENBERG,

*Plaintiff-Appellant,*

*v.*

STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL CENTER, AKA THE STATE UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER AT BROOKLYN, AKA STATE UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL CENTER, NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY HOSPITAL CENTER, DEBORAH L. REEDE, STEVEN PULITZER,

*Defendants-Appellees,*

*and*

UNITED UNIVERSITY PROFESSIONS, (UUP), SUNY DOWNSTATE MEDICAL CENTER CHAPTER OF UNITED UNIVERSITY PROFESSIONS, JOHN AND JANE DOES 1-20,

*Defendants.*

―――――――――

*On Appeal from the United States District Court
for the Eastern District of New York*

## APPENDIX
## VOLUME IV OF VIII
## Pages A822 to A1052

Deborah A. Brenner
  Assistant Corporation Counsel
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendant-Appellee
  New York City Health and
  Hospitals Corporation*
100 Church Street
New York, New York 10007
212-788-1039

CARDI & EDGAR LLP
*Attorneys for Plaintiff-Appellant
  MD Oded Greenberg*
99 Madison Avenue, 8th Floor
New York, New York 10016
212-481-7770

*(Additional Counsel on the Reverse)*

Amit Ramnik Vora
NEW YORK STATE OFFICE
  OF THE ATTORNEY GENERAL
*Attorneys for Defendant-Appellee*
  *State University Hospital-Downstate Medical*
  *Center, aka The State University of*
  *New York Health Science Center at*
  *Brooklyn, aka State University of*
  *New York Downstate Medical Center*
28 Liberty Street, 23rd Floor
New York, New York 10005
212-416-6167

**Table of Contents**

**Page**

**Volume I**

District Docket Entries ............................................................... A1

Second Amended Complaint and Demand for Jury Trial,
    dated December 23, 2015 .................................................. A18

Answer of Deborah Reede, M.D., Steven Pulitzer, M.D. and
    The State University of New York ("Defendants"),
    dated January 6, 2016 ....................................................... A49

Defendants' Local Civil Rule 56.1 Statement in Support of their
    Motion for Summary Judgment, dated March 26, 2018 ................. A72

Declaration of Christopher Coulston, for Defendants,
    in Support of Motion, dated March 26, 2018 ................................. A89

        Exhibit A to Coulston Declaration -
        Accreditation Council for Graduate Medical Education
        Report, dated April 15, 2014 .................................................... A98

        Exhibit B to Coulston Declaration -
        Notes between Deborah Reede, M.D. and
        Ghassan Jameleddine, M.D. for the King's County
        Hospital Center, dated April 9, 2014 ....................................... A108

        Exhibit C to Coulston Declaration -
        Email from Oded Greenberg, M.D. to Alan Kantor,
        dated June 23, 2014 ............................................................... A109

        Exhibit D to Coulston Declaration -
        Emails from Oded Greenberg, M.D.,
        dated October 21, 2014 ......................................................... A110

**Table of Contents**
**(Continued)**

**Page**

Exhibit E to Coulston Declaration -
Email from Stephanie Bernadel to Steven Pulitzer, M.D.,
dated October 28, 2014 ............................................................ A114

Exhibit F to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated August 14, 2013 .............................................................. A116

Exhibit G to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated September 25, 2013 ......................................................... A118

Exhibit H to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated October 9, 2013 .............................................................. A120

Exhibit I to Coulston Declaration -
Meeting with Dr. Greenberg, dated May 5, 2014 ................... A122

Exhibit J to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated May 1, 2014 ............................................... A123

Exhibit K to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated May 9, 2014 ................................................................... A125

Exhibit L to Coulston Declaration -
King County Hospital Center Radiology Department
Faculty Meeting Minutes, dated May 8, 2014 ........................ A126

Exhibit M to Coulston Declaration -
Powerpoint Presentation of KCHC Departmental Meeting,
dated June 26, 2014 ................................................................. A130

ii

**Table of Contents**
**(Continued)**

**Page**

Exhibit N to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated July 9, 2014 .................................................................... A148

Exhibit O to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated July 21, 2014 .................................................................. A149

Exhibit P to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated August 13, 2014 ........................ A151

Exhibit Q to Coulston Declaration -
Email from Oded Greenberg, M.D. to Linda McMurren,
dated September 15, 2014 ......................................................... A152

Exhibit R to Coulston Declaration -
Notes from August 22, 2014 Meeting ..................................... A154

Exhibit S to Coulston Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott,
dated September 2, 2014 ........................................................... A156

Exhibit T to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated September 15, 2014 ................................... A158

Exhibit U to Coulston Declaration -
(i) Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................................... A160
(ii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated August 29, 2014 ............................... A161

Exhibit V to Coulston Declaration -
Email from Rhonda Besunder to Oded Greenberg, M.D.,
dated March 20, 2014, with Attachments ............................... A162

iii

**Table of Contents**
**(Continued)**

**Page**

Exhibit W to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 5, 2014 ........................................................ A171

Exhibit X to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken September 8, 2014 ........................................................ A173

Exhibit Y to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 3, 2014 ........................................................ A208

Exhibit Z to Coulston Declaration -
Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................................ A209

Exhibit AA to Coulston Declaration -
Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................................ A210

Exhibit BB to Coulston Declaration -
Documents Related to Oded Greenberg, M.D.'s Visit to
City MD, dated September 8, 2014 ......................................... A211

Exhibit CC to Coulston Declaration -
Settlement, dated September 8, 2014 ...................................... A216

Exhibit DD to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken October 20, 2014 ........................................................ A218

iv

**Table of Contents**
**(Continued)**

**Page**

**Volume II**

Exhibit EE to Coulston Declaration -
Memorandum from Michael Arabian to
Steven Pulitzer, M.D., dated September 9, 2014,
with Email ................................................................................. A268

Exhibit FF to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated October 7, 2014, with Email ...................... A271

Exhibit GG to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 24, 2014 ........................................................ A277

Exhibit HH to Coulston Declaration -
Summary of Interview with Jinel Scott, M.D.,
dated October 14, 2014 ........................................................... A280

Exhibit II to Coulston Declaration -
Summary of Interview with James Walsh, M.D.,
dated October 14, 2014 ........................................................... A281

Exhibit JJ to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated October 1, 2014 ........................ A282

Exhibit KK to Coulston Declaration -
Emails from Oded Greenberg, M.D. to Gautam Agrawal,
dated December 3, 2014 ........................................................... A284

Exhibit LL to Coulston Declaration -
Excerpts from the Report, dated September 22, 2014 ............. A288

**Table of Contents**
**(Continued)**

                                                                    **Page**

Exhibit MM to Coulston Declaration -
Emails from Steven Pulitzer, M.D.,
dated September 26, 2014 ......................................................    A291

Exhibit NN to Coulston Declaration -
Email from Oded Greenberg, M.D. to Steven Pulitzer,
M.D., dated September 22, 2014 .............................................    A293

Exhibit OO to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ..................    A294

Exhibit PP to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ..................    A296

Exhibit QQ to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken October 10, 2014 ..........................................................    A297

Exhibit RR to Coulston Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 3, 2014 ............................................................    A327

Exhibit SS to Coulston Declaration -
Statement to be Read and Given to Employees in the
Professional Services Negotiating Unit Prior to a
Disciplinary Interrogation, dated October 10, 2014 ................    A328

Exhibit TT to Coulston Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 15, 2014 ..........................................................    A329

Exhibit UU to Coulston Declaration -
Emails from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 10, 2014 ..........................................................    A330

**Table of Contents**
**(Continued)**

**Page**

Exhibit VV to Coulston Declaration -
Letter from Leonzo Cuiman to Oded Greenberg, M.D.,
dated October 22, 2014 ............................................................ A335

Exhibit WW to Coulston Declaration -
Email from Steven Pulitzer, M.D., to Gnyana Kompally,
dated November 23, 2014 .......................................................... A336

Exhibit XX to Coulston Declaration -
Letter from Kate Hatlak to Rhonda Osborne, M.D.,
dated August 13, 2015 .............................................................. A338

Exhibit YY to Coulston Declaration -
*Curriculum Vitae* of Oded Greenberg, M.D. ......................... A344

Exhibit ZZ to Coulston Declaration -
*Curriculum Vitae* of Jinel A. Scott, M.D. .............................. A346

Exhibit AAA to Coulston Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 ................. A353

Exhibit BBB to Coulston Declaration -
(i) Email from Oded Greenberg, M.D. to Brian Magee,
dated July 15, 2014, with Attachments .................................... A354
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 7, 2016 ................... A358
(iii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken January 23, 2017 .................... A374
(iv) Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken October 26, 2016 ...................... A381
(v) Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken January 24, 2017 ...................... A410
(vi) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 .................. A415
(vii) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken January 26, 2017 ...................... A432

vii

**Table of Contents**
**(Continued)**

**Page**

Exhibit BBB to Coulston Declaration - (cont'd)
(viii) Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 ...　A434
(ix) Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 .........................　A438
(x) Excerpts from the Deposition Testimony of
Michael Arabian, taken November 16, 2016 ........................　A441
(xi) Excerpts from the Deposition Testimony of
Leonzo Cuiman, taken December 15, 2016 ...........................　A444
(xii) Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ...........................　A449

Declaration of Steven Pulitzer, M.D., for Defendants,
in Support of Motion, dated March 26, 2018 ................................　A458

**Volume III**

Declaration of Deborah L. Reede, M.D., for Defendants,
in Support of Motion, dated March 26, 2018 ................................　A464

Plaintiff's Response to Defendants' Rule 56.1 Statement
in Support of Their Motion for Summary Judgment and
Plaintiff's Rule 56.1 Statement of Additional Material Facts
in Opposition to Defendants' Motion for Summary Judgment,
dated July 6, 2018 .......................................................................　A471

Declaration of Chad L. Edgar, for Plaintiff,
in Opposition to Motion, dated July 6, 2018 ................................　A518

Exhibit 1 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 12, 2016 .................　A527

Exhibit 2 to Edgar Declaration -
Email from David Stark to Oded Greenberg, M.D.,
dated November 18, 2001 .....................................................　A544

**Table of Contents**
**(Continued)**

**Page**

Exhibit 3 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated August 25, 2014 ........................ A547

Exhibit 4 to Edgar Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 .................. A548

Exhibit 5 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken October 26, 2016 ....................... A549

Exhibit 6 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ............................ A576

Exhibit 7 to Edgar Declaration -
Reading Summary 2013 with Calculated Result of
RVU Value .............................................................................. A598

Exhibit 8 to Edgar Declaration -
Email from Deborah Reede, M.D. to Linda McMurren,
dated April 30, 2014 ............................................................... A599

Exhibit 9 to Edgar Declaration -
Meeting with Dr. Greenberg, dated May 5, 2014 ................... A600

Exhibit 10 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 .................. A601

Exhibit 11 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Deborah Reede, M.D., dated May 13, 2014 ............................ A611

Exhibit 12 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Deborah Reede, M.D., dated July 16, 2014 ........................... A612

ix

**Table of Contents**
**(Continued)**

**Page**

Exhibit 13 to Edgar Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 ..................  A613

Exhibit 14 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated June 23, 2014 ................................................................  A614

Exhibit 15 to Edgar Declaration -
Excerpts from the Daily Logs of Studies Completed by
Oded Greenberg, M.D. ..........................................................  A615

Exhibit 16 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated August 20, 2014 ............................................................  A622

Exhibit 17 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott, M.D.,
dated September 2, 2014, with Attachments ...........................  A623

Exhibit 18 to Edgar Declaration -
Email from Linda McMurren, dated August 22, 2014,
with Attachments ...................................................................  A627

Exhibit 19 to Edgar Declaration -
Email from Linda McMurren, dated August 26, 2014,
with Attachments ...................................................................  A630

Exhibit 20 to Edgar Declaration -
Email from Katrina Moltz to Oded Greenberg, M.D., *et al*.,
dated August 29, 2014 ............................................................  A633

Exhibit 21 to Edgar Declaration -
Individualized Education Program (IEP),
dated February 25, 2013, with Attachments ...........................  A635

x

**Table of Contents**
**(Continued)**

**Page**

Exhibit 22 to Edgar Declaration -
(i) Email from Oded Greenberg, M.D. to Linda McMurren,
dated September 5, 2014 ........................................................ A657
(ii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated August 29, 2014 .............................. A658

Exhibit 23 to Edgar Declaration -
Email from Leonzo Cuiman to Deborah Reede, M.D.,
dated September 4, 2014 ........................................................ A659

Exhibit 24 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Michael Arabian,
dated September 5, 2014 ........................................................ A660

Exhibit 25 to Edgar Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 5, 2014 ........................................................ A662

Exhibit 26 to Edgar Declaration -
Document Intentionally Omitted ............................................ A664

Exhibit 27 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Michael Arabian, taken November 16, 2016 ......................... A665

Exhibit 28 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 ......................... A673

Exhibit 29 to Edgar Declaration -
Settlement, dated September 8, 2014 ..................................... A675

Exhibit 30 to Edgar Declaration -
(i) Settlement, dated November 6, 2013 ................................ A677
(ii) Settlement, dated November 12, 2013 ............................. A678
(iii) Settlement, dated March 6, 2014 .................................... A679
(iv) Settlement, dated April 9, 2014 ...................................... A680

xi

**Table of Contents**
**(Continued)**

**Page**

Exhibit 30 to Edgar Declaration - (cont'd)
(v) Settlement, dated August 18, 2014 ................................... A682
(vi) Settlement, dated January 14, 2015 ................................ A683
(vii) Settlements, dated January 28, 2015 ............................. A685

Exhibit 31 to Edgar Declaration -
Notes Taken by Stephanie Bernadel ..................................... A691

Exhibit 32 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott, M.D.,
dated September 10, 2014 ....................................................... A693

Exhibit 33 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 12, 2014 ....................................................... A694

Exhibit 34 to Edgar Declaration -
Email from Deborah Reede, M.D. to Steven Pulitzer, M.D.,
dated September 15, 2014 ....................................................... A696

Exhibit 35 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 15, 2014 ....................................................... A697

Exhibit 36 to Edgar Declaration -
Email from Oded Greenberg, M.D. to Steven Pulitzer,
M.D., dated September 15, 2014 ............................................ A698

Exhibit 37 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 16, 2014 ....................................................... A700

Exhibit 38 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken January 24, 2017 ...................... A701

**Table of Contents**
**(Continued)**

**Page**

Exhibit 39 to Edgar Declaration -
(i) Email from Steven Pulitzer, M.D. to Jean Aime, *et al.*,
dated September 24, 2014 ........................................................ A715
(ii) Letter from Steven Pulitzer, M.D.,
dated September 24, 2014 ........................................................ A716

Exhibit 40 to Edgar Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 3, 2014 ............................................................. A719

Exhibit 41 to Edgar Declaration -
Letter from Sade Jemmott, M.D. to Stephanie Bernadel,
dated October 14, 2014 ............................................................ A720

Exhibit 42 to Edgar Declaration -
Powerpoint Presentation of KCHC Departmental Meeting,
dated July 31, 2014 ................................................................. A723

Exhibit 43 to Edgar Declaration -
Email from Stephanie Bernadel to Steven Pulitzer, M.D.,
dated October 28, 2014 ........................................................... A727

Exhibit 44 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ................... A728

Exhibit 45 to Edgar Declaration -
(i) Letter from Deborah Reede, M.D. to
Hyman Shwarzberg, M.D., dated November 7, 2014 ............. A729
(ii) Letter from Deborah Reede, M.D. to Harry Zinn, M.D.,
dated November 7, 2014 .......................................................... A730
(iii) Letter from Deborah Reede, M.D. to
Maria Corsaro, M.D., dated November 7, 2014 ...................... A731

**Table of Contents**
**(Continued)**

**Page**

Exhibit 46 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated December 15, 2014 ......................................................... A732

Exhibit 47 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 ... A733

Exhibit 48 to Edgar Declaration -
*Curriculum Vitae* of Jinel Moore Scott, M.D. ......................... A735

Exhibit 49 to Edgar Declaration -
Faculty Self Assesment Form of Jinel Moore Scott, M.D.,
dated March 2, 2015 ................................................................. A739

Exhibit 50 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 5, 2014 ........................................................... A748

Exhibit 51 to Edgar Declaration -
Excerpts from the KCHC Departmental Meeting,
dated December 5, 2014 ........................................................... A749

Exhibit 52 to Edgar Declaration -
Excerpts from the Statement of Oded Greenberg, M.D.,
taken October 10, 2014 ............................................................ A751

Exhibit 53 to Edgar Declaration -
Summary of Interview with Jinel Moore Scott, M.D.,
dated October 14, 2014 ............................................................ A753

Exhibit 54 to Edgar Declaration -
Notes Regarding Meeting with Oded Greenberg, M.D.,
dated May 5, 2014 ................................................................... A754

**Table of Contents**
**(Continued)**

**Page**

Exhibit 55 to Edgar Declaration -
(i) Chart Detailing Oded Greenberg, M.D.'s Attendance
Fulfillment ................................................................ A755
(ii) Email from Deborah Reede, M.D. to Linda McMurren,
dated April 30, 2014 ............................................... A756
(iii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated April 21, 2014 .................. A757

Exhibit 56 to Edgar Declaration -
Email from John Amodio to Oded Greenberg, M.D., *et al.*,
dated April 1, 2014 .................................................. A758

Exhibit 57 to Edgar Declaration -
Excerpt from the Deposition Testimony of
Deborah Reede, M.D., taken January 26, 2017 ....... A760

Exhibit 58 to Edgar Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 3, 2014 ... A761

Exhibit 59 to Edgar Declaration -
SUNY Downstate's General Statement of Purpose ... A762

Exhibit 60 to Edgar Declaration -
Document Intentionally Omitted ............................. A763

Exhibit 61 to Edgar Declaration -
Excerpts from the KCHC Medical Staff Bylaws
Rules & Regulations ................................................ A764

Exhibit 62 to Edgar Declaration -
Performance Evaluation of Scott, M.D. by Pulitzer, M.D.,
Acting on Behalf of KCHC as Interim Chief of Service of
the Department of Radiology, dated December 2, 2014 .......... A782

xv

**Table of Contents**
**(Continued)**

Page

Exhibit 63 to Edgar Declaration -
Documents Related to Greenberg, M.D.'s Reappointment
as a Member of the Medical Staff at KCHC in 2013 .............. A785

Exhibit 64 to Edgar Declaration -
Documents Related to Greenberg, M.D.'s Reappointment
as a Member of the Medical Staff at KCHC in 2009 .............. A800

Exhibit 65 to Edgar Declaration -
Summary of Interview with Andre Pyle,
dated October 14, 2014 ........................................... A804

Exhibit 66 to Edgar Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated December 9, 2014 ..................................... A805

Declaration of Oded Greenberg, M.D., Plaintiff,
in Opposition to Motion, dated July 6, 2018 ................................ A806

Declaration of Esther Neiman, in Opposition to Motion,
dated June 27, 2018 ..................................................... A815

Reply Declaration of Christopher Coulston, for Defendants,
in Further Support of Motion, dated September 14, 2018 ............. A817

Exhibit CCC to Coulston Reply Declaration -
Plaintiff's 2012-2013 Faculty Review and
Development Form ................................................. A820

**Volume IV**

Exhibit DDD to Coulston Reply Declaration -
2014 Faculty Evaluation of Oded Greenberg, M.D. ............... A822

Exhibit EEE to Coulston Reply Declaration -
2015 Faculty Evaluation of Jinel Scott, M.D. ........................ A838

**Table of Contents**
**(Continued)**

**Page**

Exhibit FFF to Coulston Reply Declaration -
(i) Email from Michelle Gilmore Greenberg to
Oded Greenberg, M.D., dated July 17, 2018 ........................... A853
(ii) Email from Karina Moltz to Oded Greenberg, M.D.,
dated August 25, 2014 ............................................................ A854

Exhibit GGG to Coulston Reply Declaration -
(i) Slip for CD-Rom ................................................................ A855
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 7, 2016 ................... A856
(iii) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ................... A859
(iv) Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ........................... A864
(v) Excerpts from the Deposition Testimony of
Leonzo Cuiman, M.D., taken December 15, 2016 ................. A868

Reply Declaration of Steven Pulitzer, M.D., for Defendants,
in Further Support of Motion, dated September 14, 2018 ............. A871

Reply Declaration of Deborah Reede, M.D., for Defendants,
in Further Support of Motion, dated September 14, 2018 ............. A873

Defendants' Counter-Response to Plaintiff's Response to
Defendants' Rule 56.1 Statement and Plaintiff's
Rule 56.1 Statement of Additional Material Facts,
dated September 14, 2018 ............................................................ A876

Health + Hospitals' Defendants' Local Rule 56.1 Statement of
Material Undisputed Facts, filed September 14, 2018 ................... A948

Declaration of Ryan G. Shaffer, for Defendants New York City
Health + Hospitals Corporation and Kings County Hospital
Center, in Support of Motion, filed September 14, 2018 .............. A958

**Table of Contents**
**(Continued)**

**Page**

Exhibit A to Shaffer Declaration -
Second Amended Complaint and Demand for Jury Trial,
dated December 23, 2015 ........................................................  A961

Exhibit B to Shaffer Declaration -
Notification of Employee Change of Status,
dated June 28, 2011 .................................................................  A992

Exhibit C to Shaffer Declaration -
Downstate Medical Center Employment File of
Oded Greenberg, M.D. .............................................................  A996
*(cont'd in Vol. V)*

**Volume V**

Exhibit D to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016  ..  A1245

Exhibit E to Shaffer Declaration -
(i) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 12, 2016.................  A1248
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken January 23, 2017.....................  A1254

Exhibit F to Shaffer Declaration -
Collective Bargaining Agreement between United
University Professions and the State of New York.................  A1260
*(cont'd in Vol. VI)*

**Volume VI**

Exhibit G to Shaffer Declaration -
Time and Attendance Records of Oded Greenberg, M.D.  .....  A1389

**Table of Contents**
**(Continued)**

**Page**

Exhibit H to Shaffer Declaration -
Letter from Salvatore JA Sclarani, M.D. to
Oded Greenberg, M.D., dated September 21, 2010 ...............  A1453

Exhibit I to Shaffer Declaration -
Plaintiff's Responses to Municipal Defendants' First Set of
Contention Interrogatories, dated May 17, 2017 ....................  A1457

Exhibit J to Shaffer Declaration -
Affiliation Agreement between HHC and the
SUNY Health Sciences Center ...............................................  A1469

**Volume VII**

Exhibit K to Shaffer Declaration -
Notes from August 22, 2014 Meeting with
Oded Greenberg, M.D., with Attachments .............................  A1504

Exhibit L to Shaffer Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 3, 2014 .................  A1664

Exhibit M to Shaffer Declaration -
Settlement Agreement, dated September 8, 2014 ..................  A1665

Exhibit N to Shaffer Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 24, 2014 ...............  A1667

**Volume VIII**

Exhibit O to Shaffer Declaration -
Letter from Leonzo Cuiman to Oded Greenberg, M.D.,
dated October 22, 2014 ........................................................  A1670

**Table of Contents**
**(Continued)**

**Page**

Exhibit P to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Leonzo Cuiman, taken December 15, 2016 ........................... A1671

Exhibit Q to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 ........................ A1676

Exhibit R to Shaffer Declaration -
Report of the Accreditation Council for Graduate
Medical Education, dated April 15, 2014 .............................. A1679

Exhibit S to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ................. A1689

Plaintiff's Response to Defendants' Rule 56.1 Statement in
Support of Their Motion for Summary Judgment and Plaintiff's
Rule 56.1 Statement of Additional Material Facts in Opposition
to Defendants' Motion for Summary Judgment,
filed September 14, 2018 ................................................. A1699

Health + Hospitals' Defendants' Response Plaintiff's Rule
56.1 Statement of Additional Material Facts in Opposition
to Defendants' Motion for Summary Judgment,
filed September 14, 2018 ................................................. A1734

Memorandum and Order of the Honorable Pamela K. Chen,
dated September 29, 2019, Appealed From .................................. A1760

Notice of Appeal, dated October 29, 2019 ......................................... A1815

**A822**

SUNY DOWNSTATE Radiology Faculty Evaluation    *Greenberg*

## Q1 Reviews studies early enough so that resident dictations can be completed by the end of the workday.

Answered: 22    Skipped: 0

(no label)

| | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 9.09% | 4.55% | 9.09% | 31.82% | 40.91% | 4.55% | | |
| | 2 | 1 | 2 | 7 | 9 | 1 | 22 | 3.95 |

*(signature)* mD

1 / 16

**SUNY 000461**

**CONFIDENTIAL**

THIS PAGE INTENTIONALLY LEFT BLANK

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q2 Works efficiently, without complaining about the workload, and is considerate by attempting to avoid putting all the work on the resident.

Answered: 22   Skipped: 0

(no label)

| 0 | 1 | 2 | 3 | 4 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 4.55% | 4.55% | 13.64% | 36.36% | 36.36% | 4.55% | | |
| | 1 | 1 | 3 | 8 | 8 | 1 | 22 | 4.00 |

SUNY 000462

CONFIDENTIAL

**A824**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q3 Provide adequate time to teach resident how to make a diagnosis on imaging studies.

Answered: 22   Skipped: 0

(no label)

| | 0 | 1 | 2 | 3 | 4 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 4.55% | 0% | 31.82% | 22.73% | 31.82% | 9.09% | | |
| | 1 | 0 | 7 | 5 | 7 | 2 | 22 | 3.85 |

3 / 16

**SUNY 000463**

**CONFIDENTIAL**

**A825**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q4 Gives regularly scheduled conferences/lectures.

Answered: 22   Skipped: 0

(no label)

| | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 13.64% | 0% | 40.91% | 13.64% | 22.73% | 9.09% | | |
| | 3 | 0 | 9 | 3 | 5 | 2 | 22 | 3.35 |

4 / 16

**SUNY 000464**

**CONFIDENTIAL**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q5 Conferences, provide a high-quality teaching experience.

Answered: 22   Skipped: 0

**(no label)**

| 0 | 1 | 2 | 3 | 4 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0% | 4.55% | 45.45% | 9.09% | 31.82% | 9.09% | | |
| | 0 | 1 | 10 | 2 | 7 | 2 | 22 | 3.75 |

5 / 16

**SUNY 000465**

**CONFIDENTIAL**

**A827**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q6 Varies teaching methods (lectures, case presentations, slides, films, video, etc.).

Answered: 22   Skipped: 0

(no label)

| | 0 | 1 | 2 | 3 | 4 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 13.64% | 13.64% | 27.27% | 0% | 31.82% | 13.64% | | |
| | 3 | 3 | 6 | 0 | 7 | 3 | 22 | 3.26 |

6 / 16

**SUNY 000466**

**CONFIDENTIAL**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q7 AVAILABILITY: He/she is available to consult with referring clinicians.

Answered: 22   Skipped: 0

(no label)

| | 0 | 1 | 2 | 3 | 4 | 5 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0% | 4.55% | 22.73% | 22.73% | 40.91% | 9.09% | | |
| | 0 | 1 | 5 | 5 | 9 | 2 | 22 | 4.10 |

SUNY 000467

CONFIDENTIAL

**A829**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q8 FEEDBACK: Gives residents feedback during the rotation about how he/she is performing.

Answered: 22   Skipped: 0



(no label)

| | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0% | 9.09% | 27.27% | 18.18% | 31.82% | 13.64% | | |
| | 0 | 2 | 6 | 4 | 7 | 3 | 22 | 3.84 |

8 / 16

SUNY 000468

CONFIDENTIAL

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q9 EXPERTISE/CLINICAL SKILLS:
## Maintains updated expertise by citing
## recent literature and new technology to
## resident (e.g. new radiological procedures,
## alternative imaging studies and methods).

Answered: 22   Skipped: 1

(no label)

|  | 0 | 1 | 2 | 3 | 4 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 4.55% | 9.09% | 27.27% | 13.64% | 31.82% | 13.64% | | |
| | 1 | 2 | 6 | 3 | 7 | 3 | 22 | 3.68 |

9 / 16

SUNY 000469

CONFIDENTIAL

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q10 Integrates imaging findings and clinical history to correlate with the diagnosis.

Answered: 22   Skipped: 0

**(no label)**

| 0 | 1 | 2 | 3 | 4 | 5 |

| (no label) | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| | 0% | 0% | 9.09% | 36.36% | 45.45% | 9.09% | | |
| | 0 | 0 | 2 | 8 | 10 | 2 | 22 | 4.40 |

10 / 16

**SUNY 000470**

**CONFIDENTIAL**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q11 When he/she disagrees with a resident's interpretation provide meaningful feedback in a positive manner.

Answered: 22   Skipped: 0

(no label)

| 0 | 1 | 2 | 3 | 4 | 5 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 4.55% | 0% | 9.09% | 31.82% | 45.45% | 9.09% | | |
| | 1 | 0 | 2 | 7 | 10 | 2 | 22 | 4.25 |

11 / 16

**SUNY 000471**

**CONFIDENTIAL**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q12 RESEARCH: Helps residents design and overcome problems in pursuing resident research projects.

Answered: 22   Skipped: 0

(no label)

| | 0 | 1 | 2 | 3 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 4.55% | 4.55% | 22.73% | 4.55% | 4.55% | 59.09% | | |
| | 1 | 1 | 5 | 1 | 1 | 13 | 22 | 3.00 |

12 / 16

**SUNY 000472**

**CONFIDENTIAL**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q13 He/she is available to assist residents in writing manuscripts for publication or preparing oral/electronic presentations for local or national meetings.

Answered: 22   Skipped: 0

(no label)

| 0 | 1 | 2 | 3 | 4 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 4.55% | 4.55% | 18.18% | 9.09% | 4.55% | 59.09% | | |
| | 1 | 1 | 4 | 2 | 1 | 13 | 22 | 3.11 |

13 / 16

SUNY 000473

CONFIDENTIAL

**A835**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q14 PROFESSIONALISM: Speaks well of other attendings in front of colleagues and residents.

Answered: 22   Skipped: 0

(no label)

| | 0 | 1 | 2 | 3 | 4 |

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Average Rating |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0% | 4.55% | 31.82% | 31.82% | 13.64% | 18.18% | | |
| | 0 | 1 | 7 | 7 | 3 | 4 | 22 | 3.67 |

14 / 16

**SUNY 000474**

**CONFIDENTIAL**

SUNY DOWNSTATE Radiology Faculty Evaluation

## Q15 Would you like to work with him/her as a colleague?

Answered: 22   Skipped: 0

(no label)

| | 0 | 1 | 2 |
|---|---|---|---|

| | Yes | No | Not sure | Total | Average Rating |
|---|---|---|---|---|---|
| (no label) | 59.09% | 13.64% | 27.27% | | |
| | 13 | 3 | 6 | 22 | 1.68 |

| # | COMMENTS: | Date |
|---|---|---|
| 1 | Dr. Greenberg is a nice guy to know but not to work with as a resident. In the past when i was on call with him, he would disappear for hours at a time. I would leave at 10 pm and many times he wasn't back and didn't go over my studies. This happened at least three times. Later, I found out that he goes home to eat dinner with his family. Clearly, extremely unprofessional behavior. He is extremely disinterested in teaching and while at work often deals with personal matters. His wife has called the ER reading room many times when i have worked with him. Its just all very inappropriate behavior. He needs to realize that work is work and he needs to treat it as a priority. Dr. Greenberg used to do Virtual radiology and I think that that is a better position for him. His lectures are frankly embarrassing and very insulting to the residents. His lecture on 1/16/2014 was a typical example. He started off by showing a case of off PACS. This already shows his lack of interest and effort. He couldn't even copy and paste select images into powerpoint. It took a while to get to the right patient, the right images etc. You can image what a waste of time that is...the residents just sitting there as he tries pulling cases open, looking for the history (which he didn't know) etc. Finally after showing the case, a junior resident answered that the humeral fracture he was shown was compatible with child abuse. Dr. Greenberg agreed with him. This is obviously incorrect information bc long bone fractures have a low sensitivity for child abuse. He doesn't even know anything about the topic he is presenting. Finally to make matters worse he proceeds to open a powerpoint that he states he stole of the Internet. It was some random persons powerpoint from some random institution. He went on to show and discuss this stolen powerpoint. He stated to the class that using someone elses powerpoint "made my life easier". At that point i got up and walked out of the lecture as did two other people. Its insulting and someone needs to deal with him appropriately. | 1/17/2014 10:34 AM |
| 2 | Dr. Greenberg is an asset to have in the ER. He works efficiently, is very approachable, and has a lot to teach young residents. I was happy to work with him during my ED rotations. The only suggestion I have is that he be more available and sign off resident reports in a quicker fashion. | 1/6/2014 11:11 PM |
| 3 | A strong attending who works well with residents and colleagues. Good lectures and good real-time feedback when reading cases in ER. An asset to the program. | 1/6/2014 8:45 AM |
| 4 | I have not rotated with Dr. Greenberg. | 1/6/2014 1:48 AM |
| 5 | Overall a pleasure to work with. | 1/5/2014 6:17 PM |

15 / 16

SUNY 000475

CONFIDENTIAL

### SUNY DOWNSTATE Radiology Faculty Evaluation

6     Excellent Radiologist. Well versed in multiple modalities - not much time for 1 on 1 teaching or lectures given high volume, but is always available for questions/feedback.     1/4/2014 11:47 PM

SUNY 000476

CONFIDENTIAL

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q1 Reviews studies early enough so that resident dictations can be completed by the end of the workday.

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0.00% | 0.00% | 8.33% | 8.33% | 66.67% | 16.67% | | |
| | 0 | 0 | 1 | 1 | 8 | 2 | 12 | 4.70 |

**SUNY 003853**          **-CONFIDENTIAL-**

**A839**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q2 Works efficiently, without complaining about the workload, and is considerate by attempting to avoid putting all the work on the resident.

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 8.33% | 0.00% | 0.00% | 0.00% | 75.00% | 16.67% | | |
| | 1 | 0 | 0 | 0 | 9 | 2 | 12 | 4.60 |

2 / 15

**SUNY 003854**          **-CONFIDENTIAL-**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q3 Provide adequate time to teach resident how to make a diagnosis on imaging studies.

Answered: 12   Skipped: 0



|  | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0.00% | 0.00% | 8.33% | 16.67% | 58.33% | 16.67% | | |
| | 0 | 0 | 1 | 2 | 7 | 2 | 12 | 4.60 |

3 / 15

**SUNY 003855**          **-CONFIDENTIAL-**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q4 Gives regularly scheduled conferences/lectures.

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0.00% | 0.00% | 16.67% | 25.00% | 50.00% | 8.33% | | |
| | 0 | 0 | 2 | 3 | 6 | 1 | 12 | 4.36 |

**SUNY 003856**          **-CONFIDENTIAL-**

**A842**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q5 Conferences, provide a high-quality teaching experience.

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 8.33% | 0.00% | 8.33% | 8.33% | 66.67% | 8.33% | | |
| | 1 | 0 | 1 | 1 | 8 | 1 | 12 | 4.36 |

5 / 15

**SUNY 003857**          **-CONFIDENTIAL-**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q6 Varies teaching methods (lectures, case presentations, slides, films, video, etc.).

Answered: 12   Skipped: 0



|  | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 8.33% | 0.00% | 16.67% | 8.33% | 50.00% | 16.67% | | |
| | 1 | 0 | 2 | 1 | 6 | 2 | 12 | 4.10 |

**SUNY 003858**          **-CONFIDENTIAL-**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q7 AVAILABILITY: He/she is available to consult with referring clinicians.

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0.00% | 0.00% | 0.00% | 8.33% | 75.00% | 16.67% | | |
| | 0 | 0 | 0 | 1 | 9 | 2 | 12 | 4.90 |

7 / 15

**SUNY 003859**          **-CONFIDENTIAL-**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q8 FEEDBACK: Gives residents constructive timely feedback during the rotation about how he/she is performing.

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0.00% | 0.00% | 8.33% | 0.00% | 75.00% | 16.67% | | |
| | 0 | 0 | 1 | 0 | 9 | 2 | 12 | 4.80 |

**SUNY 003860**          **-CONFIDENTIAL-**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q9 EXPERTISE/CLINICAL SKILLS:Maintains updated expertise by citing recent literature and new technology to resident (e.g. new radiological procedures, alternative imaging studies and methods).

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 8.33% | 0.00% | 0.00% | 8.33% | 66.67% | 16.67% | | |
| | 1 | 0 | 0 | 1 | 8 | 2 | 12 | 4.50 |

**SUNY 003861**          **-CONFIDENTIAL-**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q10 Integrates imaging findings and clinical history to correlate with the diagnosis.

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 8.33% | 0.00% | 0.00% | 0.00% | 75.00% | 16.67% | | |
| | 1 | 0 | 0 | 0 | 9 | 2 | 12 | 4.60 |

10 / 15

**SUNY 003862**          **-CONFIDENTIAL-**

**A848**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q11 When he/she disagrees with a resident's interpretation provide meaningful feedback in a positive manner.

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 8.33% | 0.00% | 0.00% | 0.00% | 75.00% | 16.67% | | |
| | 1 | 0 | 0 | 0 | 9 | 2 | 12 | 4.60 |

**SUNY 003863**          **-CONFIDENTIAL-**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q12 RESEARCH: Helps residents design and overcome problems in pursuing resident research projects.

Answered: 12   Skipped: 0



| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0.00%<br>0 | 0.00%<br>0 | 0.00%<br>0 | 0.00%<br>0 | 50.00%<br>6 | 50.00%<br>6 | 12 | 5.00 |

12 / 15

**SUNY 003864**          **-CONFIDENTIAL-**

**A850**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)



## Q13 He/she is available to assist residents in writing manuscripts for publication or preparing oral/electronic presentations for local or national meetings.

Answered: 12   Skipped: 0

| | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0.00% | 0.00% | 0.00% | 0.00% | 50.00% | 50.00% | | |
| | 0 | 0 | 0 | 0 | 6 | 6 | 12 | 5.00 |

13 / 15

**-CONFIDENTIAL-**

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q14 PROFESSIONALISM: Maintains a professional demeanor.

Answered 12   Skipped: 0



|  | Almost Never | Never | Sometimes | Almost Always | Always | N/A | Total | Weighted Average |
|---|---|---|---|---|---|---|---|---|
| (no label) | 0.00% | 0.00% | 0.00% | 16.67% | 66.67% | 16.67% | | |
| | 0 | 0 | 0 | 2 | 8 | 2 | 12 | 4.80 |

SUNY 003866          -CONFIDENTIAL-

Radiology Resident Faculty Evaluation - JINEL SCOTT, MD (5-6-15)

## Q15 Would you like to work with him/her as a colleague?

Answered: 12   Skipped: 0



| | Yes | No | Not sure | Total | Weighted Average |
|---|---|---|---|---|---|
| (no label) | 75.00% | 8.33% | 16.67% | | |
| | 9 | 1 | 2 | 12 | 1.42 |

| # | COMMENTS: | Date |
|---|---|---|
| 1 | Responsible and 100% approachable. | 5/12/2015 3:38 PM |
| 2 | Dr. Scott is great. She gives residents enough autonomy by letting us read and prelim studies, and provides informative feedback and corrections. Even when the ED is slow, she will supplement our rotation with lectures and videos in the reading room. Dr. Scott serves as a great role model through her interactions with clinicians in the ED and trauma services. The residents appreciate that Dr. Scott is being proactive in trying to establish a new trauma protocol that will help Kings County meet the standard of care set by multiple trauma centers. We understand how difficult it can be to implement new protocols, and we applaud her noble efforts. She also includes residents in many educational exhibits and projects. The only difficulties arose when Dr. Scott was covering the MSK and ED sections concurrently, where she would sometimes be too busy to adequately teach, but this is understandable given how busy these sections are, and Dr. Scott was always apologetic and made time for residents when feasible. I also wish Dr. Scott was able to give more lectures, because when she does they are always very helpful and informative. Dr. Scott seems to genuinely care about resident education and the integrity of the Emergency Imaging section. | 5/11/2015 12:33 PM |
| 3 | Her lectures are not high-quality teaching experiences because they are often just scattered cases and the residents (besides the one taking the case) don't get much out of it. | 5/8/2015 8:40 AM |

**SUNY 003867**          **-CONFIDENTIAL-**

**A853**

Fw: Jayden Greenberg - Chad Edgar                                                                    7/18/18, 9:53 AM

# Fw: Jayden Greenberg

Tue 7/17/2018 10:11 AM

Inbox

To:Chad Edgar <cedgar@CardiEdgarlaw.com>;

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**From:** Michelle Gilmore Greenberg <gilmoregreenberg@msn.com>
**Sent:** Tuesday, July 17, 2018 10:09 AM
**To:** Oded Greenberg
**Subject:** Fw: Jayden Greenberg

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Oded

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**From:** Michelle Gilmore Greenberg <gilmoregreenberg@msn.com>
**Sent:** Monday, August 25, 2014 4:09 PM
**To:** Karina Moltz; Oded
**Subject:** RE: Jayden Greenberg

thank you.

~ *Love Michelle*

*...We are spiritual beings having a human moment*

G02000

**A854**

> From: kmoltz@gatewayschool.org
> To: odedgreenberg@msn.com; gilmoregreenberg@msn.com
> Subject: RE: Jayden Greenberg
> Date: Mon, 25 Aug 2014 20:07:35 +0000
>
> Dear Oded and Michelle,
>
> Attached please find a copy of the letter that was sent to your home last week. As stated in the letter, in order for Jayden to return to Gateway, we will need an order from an Impartial Hearing Officer. I am providing a link to the Impartial Hearing Office which remains open during times when school personnel are on vacation:
>
>
http://schools.nyc.gov/Offices/EnterpriseOperations/ChiefFinancialOfficer/DFO/ImpartialHearingOffice/default.htm
>
> Regards,
> Karina
>
>
> -----Original Message-----
> From: Oded [mailto:odedgreenberg@msn.com]
> Sent: Monday, August 25, 2014 1:32 PM
> To: Karina Moltz
> Subject: Jayden Greenberg
>
> During pendency Jayden will return to Gateway. The DOE is unreachable.
>
> Sent from my iPhone

G02001

**A855**

Exhibit GGG is an audio file.  A CD-Rom will be provided to the Court with the courtesy copy of the summary judgment papers.

**REPLY EXCERPTS TO GREENBERG'S**

**DEPOSITION TRANSCRIPTS IN SUPPORT OF THE SUNY**

**DEFENDANTS' REPLY  SUMMARY JUDGMENT PAPERS**

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Case No. 15 CV 2343(PKC/VMS)

- - - - - - - - - - - - - - - - - -x

ODED GREENBERG, M.D.,

                              Plaintiff,

          -against-

STATE UNIVERSITY HOSPITAL-DOWNSTATE

MEDICAL CENTER a/k/a THE STATE

UNIVERSITY OF NEW YORK HEALTH SCIENCE

CENTER AT BROOKLYN a/k/a SUNY DOWNSTATE

MEDICAL CENTER, NEW YORK CITY HEALTH

AND HOSPITALS CORPORATION, KINGS COUNTY

HOSPITAL CENTER, DEBORAH L. REEDE,

STEVEN PULITZER, and JOHN and JANE

DOES 1-20,

                              Defendants.

- - - - - - - - - - - - - - - - - - -x

                    120 Broadway

                    New York, New York

                    December 7, 2016

                    9:20 a.m.

     DEPOSITION of ODED GREENBERG, M.D.,

the Plaintiff in the above-entitled

action, held at the above time and place,

taken before Arthur Hecht, a Shorthand

Reporter and Notary Public of the State of

New York, pursuant to the Federal Rules of

Civil Procedure, and stipulations between

Counsel.

**A858**

Greenberg

identification.]

Q.    I'm showing you what's been marked as Greenberg 13, Bates stamped G207 to 208.  Can you tell me what this document is?

A.    I think it's a document related to my yearly review.

Q.    And whose handwriting is it in box number one on the first page, the one that says progress and the development of a distinctive area of expertise, whose handwriting is that?

A.    That's my handwriting.

Q.    And besides box number three and box number eight, is it your handwriting in the other boxes?

A.    Yes.

Q.    And what was the purpose of this review?

MR. NELSON:  I object to the form.

A.    I think that as a matter of course, they have to review us yearly.

Q.    Did you do this every year you

**A859**

REPLY EXCERPTS TO REEDE'S

DEPOSITION TRANSCRIPTS IN SUPPORT OF THE SUNY

DEFENDANTS' REPLY  SUMMARY JUDGMENT PAPERS

*ODED GREENBERG, M.D. VS.*
*SUNY DOWNSTATE ET AL.*

*DEBORAH REEDE, MD*
*November 18, 2016*



# ELLEN GRAUER

## COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 113737.TXT*
*Min-U-Script® with Word Index*

Case 1:15-cv-02343-PKC-VMS   Document 100-7   Filed 09/14/18   Page 3 of 5 PageID #: 2732

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

**Page 145**

REEDE

we're talking about: 2013, 2014?

A  Yes.

Q  Now, when you say she's the timekeeper, is she responsible for -- well, let me not ask it that way.

What is her responsibility as timekeeper?

A  She -- you know, when the chief of staff at the County and the chief of staff at University Hospital give her the work schedules, she's responsible for making sure they're all imported into the schedule correctly; all of the requests for time off, you know, the permission slips, after they're signed, are given to her; if you call in sick -- if you're going to call in sick, you have to notify her; if it was on the Downstate side, it would be me; and send her either -- usually most people will send her an E-mail or call in and let her know that they're not coming.  So she just makes sure that everything matches.

Q  Is she somehow an official timekeeper, or is that sort of an informal

**Page 146**

REEDE

function she has?

A  I guess that's an informal function.

Q  Do you rely on what she does in terms of keeping time-related records?

A  Yes.  They go to the State.

Q  Well, I'm asking you, do you personally rely on what she tells you as being accurate reflections of what, in fact, was going on with time and attendance?

MR. COULSTON: Object to the form.

A  She would present documentation to verify whatever she is saying.

Q  And have you had occasion to doubt the accuracy of what she has told you or presented to you in terms of time and attendance on any occasion?

A  No.

Q  So, since you've been at Downstate, has she been in that role?

A  Yes.

Q  And from the time you first came to Downstate to today, you're saying you've not had occasion to question either what she told you or what she was -- records she -- the

**Page 147**

REEDE

accuracy of records she was keeping regarding time and attendance?

MR. COULSTON: Object to the form.

A  Can you repeat that?

MR. NELSON: Would you read it back?

(Record read.)

A  No problems.

Q  Was there anyone else who performs that function, or is she the person exclusively responsible for it?

A  She's the person.

Q  And has she reported directly to you since you came to Downstate?

A  Yes.

Q  Now, when you spoke to Dr. Greenberg about whatever his time sheet reflected on that, was that one occasion or more than one occasion?

A  That was one occasion.

Q  And was it with regard to one time sheet or more than one time sheet?

A  One time sheet.

Q  And how did that issue with that time sheet come to your attention?  Was that

**Page 148**

REEDE

Ms. McMurren brought it to your attention, or did you learn of it some other way?

A  Miss McMurren brought it to my attention.

Q  Did she tell you why she was bringing it to your attention?

A  She said, "I just want you to see that Dr. Greenberg has this notation in his time sheet that's not correct."

Q  Okay.  So you then met with Dr. Greenberg?

A  Yes.

Q  Okay.  And when you did that, tell me what you said to him and what he said to you.

A  He was receptive.  I told him, you know, just to be careful about the accuracy and reporting of your time, because you don't want it to be perceived as, you know, theft of service.  So just make sure that you keep your time sheets correctly.

And I -- we had -- I had spoken to the person in charge of the affiliation agreement, because he had already signed it and everything, and I just spoke to Leo Johnson and

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 149

REEDE

said, "Would it be okay if I just leave it as it is so that -- you know, that there would be no problems in the future?" And I said, "I know that there are some times when he might stay late, so I'm really not going to penalize somebody for this. I'm not going to report them to HR. I'd just like to, you know, just bring it to somebody's attention."

And we did have HR come in and speak to the faculty -- I can't remember exactly when -- on this whole issue of time and attendance and truth in reporting. So it was something that had been discussed with the entire department by HR.

His comment to me at one point was, "Well, all of the films are read."

And I said, "Well, that is not really the issue, all of the films are read, because you're also supposed to be there for other reasons other than to read films. You know, we're supposed to be there to supervise residents, to have consultations with the clinicians. And so I really need you to be there when you're supposed to be there."

Page 150

REEDE

Q  How would you characterize the nature of this conversation? Was it friendly? Was it formal? Was it disciplinary? How would you characterize it?

A  No. I think it was, just, you know, formal, just to make note that there was a problem on the time sheets. I just wanted to bring it to his attention and also just to say, again, that, you know, "Just be mindful of the fact that we have to be where we're supposed to be."

I did also mention that, you know, we are -- we could potentially have audits from the County. Sometimes the County can send people up to make sure people are where they're supposed to be. And so if I have a number of staff members that are not where they're supposed to be, we might have problems with our affiliation agreement.

Q  Did you bring this occasion that you spoke to Dr. Greenberg about to the attention of HR --

A  No.

Q  -- or labor relations?

Page 151

REEDE

A  No.

Q  If it had been disciplinary in nature, would you have been obliged to do that?

A  Well, I think that, you know, when you're dealing with faculty, you would like first to inform somebody of what a problem is besides just taking them straight over to HR. I mean, otherwise, I'd be inundating them with people every time I call in somebody to tell them a little of this or that.

I mean, it was just a case of -- you know, I mean, you could fill out your time sheet, and we just want to say, "Just be mindful of the time that you're putting down, be honest about the time, because, you know, if there's some sort of an audit, I don't want it to be a problem."

So, I mean, if it -- you know, this is the first time I had called him in about anything.

Q  Okay. And was this the -- was this one of several times that you spoke to him about a time sheet issue, or were there more than one?

Page 152

REEDE

A  This is the only time sheet issue I had.

Q  Okay. You also, I think, mentioned with regard to Dr. Greenberg a few minutes ago that he was not available, that at some point he was not available when he was supposed to be in the ER. Can you tell me what you meant by that?

A  Like when you're the person that's on covering, you should be in the emergency room available to the ER physicians and to the residents working there. And, you know, residents had complained that sometimes he's not there. One resident even said that, "Oh, he goes home to eat dinner with his family and then comes back."

Q  And who was that?

A  I can't recall, but that was one of the comments that was made.

Q  When was it that that resident made that comment?

A  I can't recall.

Q  Was it before or after you had this conversation with Dr. Greenberg about his time

Page 385

REEDE

office.

Q   I understand from an administrative standpoint you might want to recover missing files.

I'm asking why after you had already fired Dr. Greenberg you needed to recover E-mails that he had supposedly sent or received in prior years?

A   We just wanted the information.

Q   Were you involved at all in responding to the claim for unemployment insurance compensation that Dr. Greenberg made after being terminated?

A   That, I would assume, would go through HR.

Q   So the answer is, no, you were not involved?

A   I'm not involved.

Q   Tell me, Dr. Reede, did you ever -- withdrawn.

Since you've come to Downstate, you've had under your supervision these 30 or 35 radiologists, correct?

A   Yes.

Page 386

REEDE

Q   And how much additional staff, non-physician staff?

A   I don't know the exact number.

Q   Okay.  Did you ever refer to one or more than one of the Jewish physicians under your supervision as "you people" or "those people"?

A   Not to my knowledge.

Q   In other words, you don't recall doing so?

A   I do not recall doing so.

Q   Do you recall upon seeing -- do you recall any occasion on which Jewish physicians, particularly Orthodox Jewish physicians, were conducting prayers on the premises of the hospital or any part of the radiology department?

A   They conduct prayers every day.

Q   And do you recall observing that -- when was the first time you observed that?

A   The first day I came to Downstate.

Q   And were they doing that in a room that subsequently become your office?

A   Yes.

Page 387

REEDE

Q   And were they -- did you direct that that activity not occur in that office any longer?

A   The person --

MR. COULSTON: Object to the form.

You can answer.

A   The person that was in the office at the time I arrived was occupying the chairman's office. I'm now the chairman. I want to use the office. His office was moved two doors down. The prayers are conducted now in that office.

Q   And when you say that it's conducted now in a different location, where is that different location?

A   Two doors down from my office.

Q   Okay.  And what room or office is that?

A   Dr. Shwarzberg's office.

Q   Did you ever refer to one or more of the Jewish physicians under your supervision as "birds of a feather"?

A   Not to my knowledge.

Q   So, in other words, you may have?

Page 388

REEDE

You just don't recall doing so?

A   I do not recall making that statement.

Q   Did you ever say to anyone that Martin Luther King, Jr., day was "our holiday," meaning an African American holiday?

A   I don't recall making that statement.

Q   Or saying in words or substance, "I know you don't care, but this is our holiday"?

A   I don't recall making that statement.

Q   So you may have?  You just don't remember?

A   I did not make that statement.

Q   You're saying without qualifications you know you never said that?

A   I did not say that.

Q   Yes, that's correct, you're saying you never said that?

A   Yes.

Q   Anyone who says that you did is lying; is that correct?

A   Yes.

Q   Did you ever express to anyone in the department a dislike for Caucasians -- for

**A864**

Case 1:15-cv-02343-PKC-VMS   Document 100-8   Filed 09/14/18   Page 1 of 4 PageID #: 2735

# REPLY EXCERPTS TO SCOTT'S

# DEPOSITION TRANSCRIPT IN SUPPORT OF THE SUNY

# DEFENDANTS' REPLY  SUMMARY JUDGMENT PAPERS

JINEL SCOTT
11/03/2016                                              1

                                                   Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x
ODED GREENBERG, M.D.,

                                   Plaintiff,   :

             - against -

SUNY DOWNSTATE, ET AL.,

                                   Defendants.  :
-------------------------------------------x

                     112 Madison Avenue
                     New York, New York

                     November 3, 2016
                     9:15 a.m.




        EXAMINATION BEFORE TRIAL of SUNY

DOWNSTATE, one of the Defendants herein, by

JINEL SCOTT, M.D., taken by the Plaintiff and

Co-Defendants, pursuant to Court Order, held

at the above-mentioned time and place, before

Michelle Lemberger, a Notary Public of the

State of New York.

**A866**

Scott, M.D.

Q   No. Would you like the question read back?

A   Yes, please.

MR. NELSON:  May we have the question read back, please?

(Whereupon, at this time, the requested portion was read by the reporter.)

A   Yes.

Q   How many occasions?

A   I'm going to get kind of technical here. Are you talking about for the entire day or periods of time?

Q   I'm asking whatever it is you're referring to.

A   Several.

Q   How many is several?

A   I don't know. Several. More than five.

Q   More than five. All right. Let's take them one at a time. What is the first one that you recall?

A   They are instances, the workday starts at 9:00.

Q   I'm asking about the first instance

[Page 146]

Scott, M.D.

that you recall.

A   I don't know the first instance. I'm telling you the context of what I'm saying.

Q   Yes. I'm asking you now about specifics. You said that there were more than five. I'm asking you about the first one that you recall. Tell me what you recall specifically about that occasion.

A   And I'm telling you that I'm breaking this down into absent for days and absent, meaning not being where he was supposed to be at the time. Is that what you are referring to? Am I answering your question?

Q   Well, let's take those in two parts. Okay?

Are you aware of any days that Dr. Greenberg was supposed to be in and was not in?

A   Yes.

Q   How many?

A   I can't remember exactly how many.

Q   Fewer than five or more than five?

A   Probably less than -- I mean, around five. I don't know.

[Page 147]

Scott, M.D.

Q   Okay.

A   Not more than -- I don't think more than five.

Q   Tell me about the first one that you recall.

A   Not including like sick or whatever?

Q   We're talking about occasions that he was supposed to be in that he was not in. Supposed to be in, but was not in.

A   I think, I don't know, he may have -- I don't know if he called in sick once when I was there, something with the back. I don't know. I can't remember but there was something like that.

And then there was a time -- there was some time when -- there was a particular time when he was not where he was -- he was not showing up to work. I think it was a day or two or three. I can't remember exactly how many days.

Like I said, I am not privy to scheduling approvals, to any of that stuff. All I know is that he was expected and he wasn't there.

[Page 148]

Scott, M.D.

Q   Dr. Scott, I'm not asking you about things that you weren't privy to. And I'm not asking you about things that are outside your purview as you've described. I'm asking you only about the things that you, yourself, have referred to in your testimony here today.

You say there were occasions when Dr. Greenberg was supposed to be in and was not in. And you said you think that there were five or fewer than five. Now I'm asking you to tell me about each of those.

Tell me about the first one.

MR. COULSTON: Objection. Asked and answered.

You can answer.

A   I don't remember in exact detail the occasions. All I remember is that there was one particular time because the department was -- we were really understaffed and him not being there when he was supposed to be there created even more stress in the department.

And that was, I think, maybe two days. I can't remember exactly how long, but I remember it as a period of significant

[Page 149]

[38]  (Pages 146 to 149)

Scott, M.D.

disruption, that's why it stands out to me and I don't really have very detailed -- very detailed memories about that particular situation. I don't remember.

Q   When you say understaffed, you mean not just in the E.R., you mean the department generally was understaffed?

A   Right, as you know, because people had been approved for vacation, again, based on the fact of who was supposed to be there. So if someone does not show up when they are supposed to be there and other people are approved for vacation, then we are really understaffed.

Q   Could that also be because Dr. Reede had fired several radiologists immediately prior to that period?

MR. COULSTON:  Objection to the form.

Q   That that was the reason there was understaffing?

A   There was -- I don't know.

Q   Okay.  Are you able to tell me about any other occasions that you are aware of when Dr. Greenberg was supposed to be in but was not in, other than that day or two that you say you

[Page 150]

Scott, M.D.

recall without specificity?

A   For the entire day?

Q   For anything.

MR. COULSTON:  Object to the form.

Q   For anything.  Tell me what you were referring to.

A   Well, like I said, work starts at 9:00; there were moments when he wasn't getting there until significantly later.  Does that count as not being where he's supposed to be --

Q   Let's talk about absences as distinguished from what you might call lateness.

A   That's what I was trying to get from you.

Q   Let's talk about absences first.

Are you aware of any occasion on which Dr. Greenberg was absent when he was supposed to be in, other than, as you've already testified?

A   I can't recall, the moments that I gave to you, those are -- that's what stands out in my memory.

Q   Do you recall when that incident of the day or two that you were referring to

[Page 151]

Scott, M.D.

occurred?

A   No.  I don't remember exactly when.

Q   Was there any occasion other than that day or two that you recall sitting here today?

A   Not that stands out to me for an entire day.

Q   All right.  Let's talk about partial days, not latenesses but partial days.  Are there any occasions that you recall in which Dr. Greenberg was supposed to be in but was absent for a part of a day, and I don't mean latenesses?

MR. COULSTON:  Object to the form.

A   I don't -- I mean, if someone comes in to work at 11 a.m. or 10 a.m. or whatever, 11 a.m. and if they need to be there at 9:00, would you consider that lateness or partial absence? I mean, you know, what would you consider that?

Q   Okay.  Well, you tell me if that's what you're referring to.  I'm not asking you -- I'm asking you to tell me what you remember.

MR. COULSTON:  You came up with lateness, partial absence, you need to tell her

[Page 152]

Scott, M.D.

what you're talking about.  It's confusing.

Q   Why don't you just be clear about what you mean when you talk about lateness or partial absence?

A   That's your terminology.

MR. COULSTON:  Those are your words.

Q   So you tell me using your words what you mean and I'll work with that.

A   I don't know what I mean.  Because I don't know what you're --

Q   All right.  How about this.  Do you recall any occasion that Dr. Greenberg was not in when he was supposed to be in other than an occasion you would characterize as a lateness?

MR. COULSTON:  Object to the form.

A   I'll just tell you what I'm saying and you can pick up what you want because I think we're going to get stuck here for a while.

Q   Go ahead.

A   Dr. Greenberg would often come late to work.  It could vary from like half an hour late to an hour to an hour and a half, to two. I don't know about what time he left, so I can't say that he didn't necessarily work eight hours

[Page 153]

[39]  (Pages 150 to 153)

Case 1:15-cv-02343-PKC-VMS   Document 100-9   Filed 09/14/18   Page 1 of 3 PageID #: 2739

**REPLY EXCERPTS TO CUIMAN'S**

**DEPOSITION TRANSCRIPT IN SUPPORT OF THE SUNY**

**DEFENDANTS' REPLY  SUMMARY JUDGMENT PAPERS**

*ODED GREENBERG, M.D. VS.*
*SUNY DOWNSTATE ET AL.*

*LEONZO CUIMAN*
*December 15, 2016*



ELLEN GRAUER
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 113872.TXT*
*Min-U-Script®*

Case 1:15-cv-02343-PKC-VMS   Document 100-9   Filed 09/14/18   Page 3 of 3 PageID #: 2741

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 137

CUIMAN

your personnel associate has done their investigation and the interrogation, they can proceed on any number of paths. They can send the employee back to work and either conclude the investigation or recommend that it be closed without further action; they can pursue formal charges; they can present a settlement agreement. And there may have been other things you testified to. Do you recall that testimony?

A. Yes.

Q. Okay. When they present the settlement agreement to an employee who is representing themselves, is it "take it or leave it" to the employee or is there a negotiation that could then begin?

A. There can be a negotiation that can -- always it's negotiable.

Q. Well, the reason I ask that is usually negotiations occur before there's a document to be signed reflecting an agreement. I think I heard you say earlier that your personnel associate, after the interrogation, will determine whether a settlement agreement is appropriate and maybe get the necessary

Page 138

CUIMAN

approvals from you or Ms. Conde-Billy and then present that agreement.

What I'm trying to find out is, when there's no lawyer and there's no union representative, is there a point at which there's a negotiation with the employee or isn't there?

MR. COULSTON: Object to the form, mischaracterizes prior testimony.

You can answer.

A. Yeah, because I don't -- based on that objection, I don't even understand the question. I never testified or stipulated to usually we negotiate before anything is memorialized in writing.

I said that depending on the investigation, depending on the situation, sometimes that may occur, sometimes it may be written ahead of time. There's no template for when the negotiations will begin, when the settlement agreement will be generated. Each case is done individually.

Q. Are there situations where your personnel associates prepare a settlement

Page 139

CUIMAN

agreement and present it to the employee without a negotiation?

A. Yes.

Q. And in those situations, is the employee given the choice between signing the settlement agreement or not as-is and without entering into negotiation?

A. Once the settlement agreement was entered [sic] to the employee, it's at that point that negotiation is actually taking place and the employee has the option of signing or not signing, or agreeing or not agreeing. We don't take him in a dark room and beat him over the head with a rubber hose and say "sign it" or whatever.

In that hypothetical that you've just described, if the employee's presented with a settlement agreement - this is what management proposes - they have the option to say, well, I think this is a little Draconian, let's try to modify it. And that's what I call a form of negotiation.

And at the end of that discussion with the employee who elected to represent

Page 140

CUIMAN

himself and management, if there's a breakdown, then the employee has a right to get up, obviously, out of the chair and say, no, this is totally unacceptable, and leave.

Q. Okay. And can the employee go back to work at that point?

A. It depends on -- I can't answer that definitively on a hypothetical. You have to give me the specifics of an incident.

In some incidents it may be acceptable to go back to work, but say if an employee is accused of sexually harassing a patient and there's no agreement as to how it's going to be resolved, in that singular incident, no, they're not going to go back to work.

Q. Okay. Let's take the situation that you've just outlined, where a settlement agreement is presented to an employee and the employee does not want to sign it.

A. Right.

Q. Okay. Is it up to Labor Relations whether that employee can go back to work?

A. I'm not sure I understand that question. You mean determine he can go back to

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ODED GREENBERG, M.D.,

                        Plaintiff,

         -against-                          15-CV-2343 (PKC/VMS)

SUNY DOWNSTATE ET AL.,               **REPLY DECLARATION OF**
                                           **STEVEN PULITZER, M.D.**

                     Defendants.
-----------------------------------------------------------X

STEVEN PULITZER, M.D. affirms under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

I am currently the Chief Medical Officer for Kings County Hospital Center ("KCHC"), a major affiliate of Defendant State University of New York Downstate Medical Center ("SUNY DMC" or "Downstate"). I submit this declaration in further support of Defendants' motion for summary judgment. In my former position of Chairman of Radiology at Kings County Hospital Center, I became and was fully familiar with Plaintiff's termination in 2014 and the reasons therefor.

1.     I regularly checked my SUNY Downstate and KCHC email while I was on vacation the week of August 22, 2014, and my personal cell phone number was circulated to all physicians in the department.

2.     I denied Dr. Greenberg's request for leave the week of September 1, 2014 due to the operational needs of the Department. The Radiology Department was severely understaffed that week, and there were not enough radiologists available to adequately cover the work. Specifically, I set the schedule for that week with the expectation that Dr. Oded Greenberg would cover for Dr. Patrick Hammil, who is a specialist in complex Body Imaging cases.

1

**A872**

I declare under penalty of perjury that the foregoing is true and correct.


Dated: New York, New York
　　　　September 14, 2018

_____
STEVEN PULITZER

**A873**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
ODED GREENBERG, M.D.,

                                        Plaintiff,

           -against-                                              15-CV-2343 (PKC/VMS)

SUNY DOWNSTATE ET AL.,                              **REPLY DECLARATION OF**
                                                                  **DEBORAH REEDE, M.D.**

                                        Defendants.
---------------------------------------------------------X

DEBORAH REEDE, M.D. affirms under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.       I am currently the Chair of the Department Radiology at Defendant State University of New York Downstate Medical Center ("SUNY DMC" or "Downstate"). I submit this declaration in further support of Defendants' motion for summary judgment. As the Chair of Radiology at Downstate, I am fully familiar with Plaintiff's termination in 2014 and the reasons therefor.

2.       Following the ACGME accreditation decision in 2014, all radiologists in the department were monitored to ensure they were complying with the schedule, spending their days reading film and available to consult with residents.  Linda McMurren reviewed all timesheets during this period, not just Dr. Greenberg's, for irregularities, and brought any issues to my attention. This monitoring continues today, ensuring that physicians are complying with the schedule, spending their days reading film and available to consult with residents.

3.       Dr. Qi Chen and Dr. Oded Greenberg were both known for time and attendance abuse, and I was aware of specific issues relating to time and attendance for both physicians in 2014.  Dr. Chen, who is not White or Jewish and was 39 years old at

1

the time of the ACGME report, ultimately resigned as a result of time and attendance problems, when he was threatened with termination.

4.     I made the decision to renew Dr. Greenberg in June 2014 at the time that five radiologists were non-renewed, and I was aware of his race and age at the time of the decision to renew him.

5.     Esther Neiman is a former employee of University Physicians of Brooklyn, who was terminated in 2013.  I never asked Ms. Neiman "what are your people doing here at this time of day," or said to her that "[I] wished [I was] Jewish because then [I] would get lots of holidays from work too" or words to that effect.  The latter statement does not even make sense, since Jewish physicians must use leave time for Jewish holidays.

6.     During my meeting with Dr. Greenberg on July 22, 2014, I did express that I wanted a candidate who would be engaged with residents and had an interest in academics.  I did not say that I wanted someone "close to residency."

7.     I regularly check my SUNY Downstate email during non-office hours, and my personal cell phone number was circulated to all physicians in the department.

8.     "Academic time," meaning time away from other duties in order to focus on scholarly or academic pursuits, is paid time during regular work hours and no one in the Radiology Department at SUNY Downstate has received academic time during my tenure. Those interested in doing academic work usually did so on their own time.  This includes Dr. Jinel Scott.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      September 14, 2018

DEBORAH REEDE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

ODED GREENBERG, M.D.,

                              Plaintiff,              15 Civ. 2343 (PKC)(VMS)

              - against -

SUNY DOWNSTATE et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

**SUNY DEFENDANTS' COUNTER-RESPONSE TO PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT AND PLAINTIFF'S RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS**

Defendants Dr. Deborah Reede, Dr. Steven Pulitzer (the "Individual Defendants"), and The State University of New York ("SUNY") (together the "SUNY Defendants"), by their attorney BARBARA D. UNDERWOOD, the Attorney General of the State of New York, submit the following objections and counter-responses to Plaintiff's Response to their Rule 56.1 Statement and Plaintiff's Rule 56.1 Statement of Additional Material Facts.

**Objections**

The SUNY Defendants object to the Plaintiff's responses to the SUNY Defendants' 56.1 Statement, in its entirety, as improper. Plaintiff's responses to the SUNY Defendants' statements of undisputed facts are largely noncompliant with Rule 56.1(c) and (d) of the Local Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York. Pursuant to Local Civil Rule 56.1(a), "[u]pon any motion for summary judgment … there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."

Plaintiff's statement of Local Civil Rule 56.1(b) provides that "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

Local Civil Rule 56.1(c) provides that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."

Accordingly, the Court's rules provide that the summary judgment movant must set forth a concise statement of facts as to which it is asserted that there is no dispute, and the failure to respond to such facts with admissible evidence demonstrating a material dispute will be deemed an admission by the opponent of the summary judgment motion. There is no provision under the rules for the service of such a 56.1(a) statement by the summary judgment opponent. Plaintiff was required to respond to the 56.1(a) statement by correspondingly numbered paragraphs, which specifically admit or dispute the contents of the paragraph, supported by a citation to admissible evidence.

Instead, Plaintiff served a voluminous and lengthy response that is noncompliant in that where Plaintiff controverts the facts asserted by the SUNY Defendants, he largely does not do so by citation to admissible facts, as he is required to do. Plaintiff repeatedly notes paragraphs as "disputed" but then refers only to argument, speculation, and citation to other, irrelevant and immaterial facts that he believes are true. Where Plaintiff does not contest the specific contents of a paragraph in the SUNY Defendant's 56.1(a) statement by citation to responsive, admissible evidence, the statement should be deemed admitted. Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are

deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005).   Further, where Plaintiff's response consists of argument, it should be disregarded and the facts asserted by the SUNY Defendants deemed admitted. Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011)(disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

To the extent that Plaintiff's counter statements and Plaintiff's Rule 56.1 Statement of Additional Material Facts in Opposition to Defendants' Motion For Summary Judgment contain new, irrelevant factual assertions and arguments, rather than alleged disputed issues of material facts supported by citations to admissible evidence, they should be disregarded.   Plaintiff has not moved for summary judgment.   The Court's Rules thus do not make provision for Plaintiff's inappropriate statements of fact and the SUNY Defendants' are thus not required to respond to the same under the Local Civil Rules.   There is no rule that any failure to respond thereto constitutes an admission.

**SUNY Defendants' Responses to Plaintiff's Counter Statements**

**I.      The Parties**

1.   Plaintiff, who self-identifies as White (Caucasian) and of the Jewish faith, was at least 54 years of age at the time of his termination.  Second Amended Complaint ("Compl."), ¶ 1. He began his employment at SUNY Downstate in or about April 2001, and he was assigned to the Kings County Hospital Center ("KCHC") emergency room ("ER") pursuant to an affiliation agreement.  Id., ¶¶ 4, 13.  Besides a hiatus from 2008 to 2010, Plaintiff remained employed by SUNY Downstate until his termination in October 2014.  Compl., ¶ 1; Greenberg Dep., p. 13:7-10.

**Response**: Disputed only to the time period to which Dr. Greenberg's hiatus occurred, which he believes was from 2009 to 2010.[1]

**Counter-Response:** The disputed fact is immaterial.

2.   Defendant Dr. Reede self-identifies as African-American, not Jewish, and is 67 years old.  Reede Decl., ¶ 2.  She was appointed Chair of Radiology at SUNY Downstate Medical Center in 2013, a position she holds to this day.  Id., ¶ 3.

**Response**: Undisputed.

**Counter-Response:** No response.

3.   Defendant Dr. Stephen Pulitzer self identifies as White and Jewish and is 51 years old.  Pulitzer Decl., ¶ 2.  Dr. Pulitzer was a SUNY employee working at KCHC as part of an affiliation agreement at the time of the events described herein.  Id.  In July 2014, he became the Interim Chair of Radiology at KCHC, and eventually the full Chair in January 2015.  Id.  In November 2016, he was named the Chief Medical Officer at KCHC.  Id.

**Response**: Disputed only to the extent that Dr. Pulitzer was also an employee of KCHC or NYCHHC operating through KCHC.  See supra, n.2.  Also, it is our understanding that Dr. Pulitzer's official title as to KCHC was first Interim then Chief of Service, Department of Radiology, as such is the nomenclature used in the relevant affiliation agreement between SUNY and NYCHHC referenced by the SUNY Defendants.  Edgar Decl., Ex. 60 (HHC 0158 & 164).[2]

**Counter-Response:** The disputed facts are immaterial to the SUNY Defendants' motion.

---

[1] While Dr. Greenberg does not contest he was an employee at SUNY Downstate (hereafter, "SUNY"), he reserves the right to contend that both he and Dr. Steven Pulitzer were joint employees of SUNY and New York City Health and Hospitals Corporation (NYCHHC) (operating through KCHC) for the purpose of opposing defendant NYCHCC's motion for summary judgment.  For the purposes of defending the claims that the SUNY Defendants seek to dismiss here, Dr. Greenberg does not need to press the material factual disputes regarding joint employment status.

[2] All subsequent references to exhibits will be those annexed to the Declaration of Chad L. Edgar dated July 6, 2018 submitted in opposition to SUNY Defendants' Motion for Summary Judgment.

4.   Defendant SUNY is a legal entity constituted under N.Y. Educ. Law § 351 et seq.  As subdivisions of SUNY, the Downstate Medical Center is not a legally-cognizable entity separate from SUNY.  See N.Y. Educ. Law §§ 351 and 352.

**Response**:  Undisputed.

**Counter-Response:** No response.

## II.    Facts Regarding ACGME Accreditation

5.   The Accreditation Council for Graduate Medical Education (the "ACGME") is the body responsible for accrediting the majority of graduate medical training programs for physicians in the United States.  Reede Decl., ¶ 6.  The ACGME visited SUNY Downstate in 2013. Reede Dep., p. 96:2-11; Reede Decl., ¶ 6.

**Response**:  Undisputed.

**Counter-Response:** No response.

6.   Following its visit in 2013, the ACGME conferred the adverse designation of "Probationary Accreditation" on SUNY's Radiology Department.  Ex A.  The ACGME noted in its findings that "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule."  Id., SUNY000683.  The Department was also criticized for not demonstrating that "an appropriate level of supervision is in place for all residents," and it was noted that "faculty do not demonstrate a strong interest in the education of the residents."  Id., SUNY000684.

**Response**:      Undisputed as to what ACGME noted in its findings in the document referenced, as it speaks for itself.  To expand upon what SUNY Defendants described as the content of that document, there were 10 areas cited for improvement: (1) inadequate resources of space and facilities; (2) insufficient time devoted by faculty to supervision of residents; (3) faculty showing insufficient interest in educating residents; (4) inadequate IT support; (5) inadequate clerical

**A881**

support; (6) inadequate range of radiologic cases for residents; (7) inadequate procedures for residents and attending residents to communicate results to clinicians; (8) inadequate records to support that residents were learning to communicate in written or oral form the results of their studies; (9) untimely completion of evaluations of residents by faculty; (10) and no demonstrated incorporation of residents' reviews of program in order to improve it.  Notably, of the 10 discrete areas for which the program was cited, only 3 of the areas could arguably be attributable to faculty shortcomings (areas (2), (3) & (9)).

> **Counter-Response:** No response.

7.   The SUNY Radiology Department was the only department in the country on probation in 2014 out of 201 radiology departments.  Reede Decl., ¶ 7; Ex. B.

> **Response**:      Undisputed.

> **Counter-Response:** No response.

8.   Dr. Reede, along with Dr. Ross Clinchy, from the Dean's Office at SUNY, met with the KCHC Chief Medical Officer, Dr. Jamaleddine, on April 9, 2014 to discuss the ACGME review.  Reede Decl., ¶ 9.

> **Response**:      Undisputed.

> **Counter-Response:** No response.

9.   During the meeting, Dr. Reede discussed changes that she believed were required to fix the issues in the department.  Id.  As part of the changes, Dr. Reede proposed replacing a number of faculty members, primarily based on teaching evaluations, and providing short term extensions for several others.  Reede Dep., p. 67:15-69:8; Jamaleddine Dep., p. 101:11-17.  She also emphasized the need for monitoring of faculty member performance, increased work performance for physicians, productivity monitoring, and monitoring of teaching and scholarly activity.  Ex. B.

**Response**:      Undisputed as to what Dr. Reede memorialized and then recalled at her deposition as to what was said during the aforesaid meeting.

**Counter-Response:** To the extent that Plaintiff has failed to support his response with citation to admissible contradictory evidence, this paragraph should be deemed admitted pursuant to Local Civil Rule 56.1(c) and (d).

10.      Dr. Jamaleddine recommended that Dr. Kantor should also be nonrenewed, due to the unfavorable accreditation decision.  Reede Dep., p. 31:18-25; Jamaleddine Dep., p. 109:6-110:17.  Dr. Pulitzer replaced Dr. Kantor as Interim Chief in July 2014.  Pulitzer Decl., ¶ 4.

**Response**:      Disputed.  According to Dr. Jamaleddine, his decision to replace Dr. Kantor was based on a perception that he was a weak leader and let problems linger.  Edgar Decl., Ex. 47 (Jamaleddine Dep.) at 106-09.  While one of the lingering problems that Dr. Jamaleddine identified as caused by Dr. Kantor's allegedly weak leadership was failure to assess the needs of the residency program, it was only one problem among others.  He also cited ongoing issues with one of the radiologists whose competence was in question, delays in reading studies and the questionable quality of those readings.  Id. at 107-08.  Notably, Dr. Reede did not cite and/or recall that Dr. Jamaleddine removed Dr. Kantor because of the residency program being placed on probation.  Edgar Decl., Ex. 10 (Reede Dep.) at 32.

**Counter-Response:** Dr. Jamaleddine referred to two "really major issues" in his testimony: the ongoing issues with one of the radiologists and the residency program going on probation, which he described as a "crisis situation."  He further testified that the basis for his belief that Dr. Kantor was a weak leader who should be removed was "[t]he residency program going on probation and issues in performance sometimes escalated to me."  Jamaleddine Dep., p. 106:18-25; 107:12-17; 184:12-20 (Reply Excerpts); 99:8-20; 104:17-24.  It is immaterial that the ongoing issue with one radiologist was also considered by Dr. Jamaleddine in replacing Dr. Kantor.  Dr.

Jamaleddine testified that the probation was a "really major issue" that led to Dr. Kantor's removal and the decision was made shortly after the accreditation decision.

### III.    Facts Regarding Appointment of Dr. Jinell Scott-Moore

11.    Dr. Jinel Scott-Moore was a radiologist at LICH, and therefore a SUNY Downstate employee as of 2014, following SUNY Downstate's merger with LICH, who had worked with Dr. Reede.  Scott Dep., p. 73:23-74:8.  She is also Black, younger than Plaintiff, and not Jewish. Compl., ¶ 25.

**Response**:    Undisputed.

**Counter-Response:** No response.

12.    Dr. Scott's resume showed more academic accomplishments than Plaintiff's. Ex YY, ZZ.  Plaintiff's resume listed two publications without a date.  Ex. YY.  During his deposition, he admitted that one of them was never published, and the other was published in 1993 or 1994.  Greenberg Dep., 10:23-12:4.  Plaintiff had also let his membership lapse in the radiological professional societies.  Id., 6:23-5.  Dr. Scott on the other hand was a member of three professional societies in 2014, she had a number of recent scientific posters and education exhibits, and was actively engaged in research for publication.  Ex. ZZ.  Plaintiff had also submitted a summary of his scholarly activity in 2013-2104 [sic] to provide an update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with residents" and no scholarly activity in the prior year.  Ex. BBB.

**Response**:  Disputed.  To be clear, Dr. Scott had no actual publications at the time of her appointment to the role of Director of ER Radiology.  Ex. 48 (HHC 1787-88) (indicating only posters in the Bibliography section of her resume).  In addition, in Dr. Scott's Faculty Self Assessment form for 2013 – 2014, in or around April of 2015, Dr. Reede handwrites on the evaluation that Dr. Scott needs to get published in addition to needing to "get on committees."

Edgar Decl., Ex. 49 (SUNY 003844-52) (handwriting on the final page of the assessment).  As for

Dr. Greenberg's summary of his scholarly activity submitted in or around July 2014, he admits that

he indicated zero hours spent engaging in "Research/scholarly activity with residents," but states

that he was in a hurry to submit the form where he indicated zero hours, and was unclear as to what

was meant by this category.  Oded Greenberg Decl., ¶ 14.  In 2013, Dr. Greenberg, fellow

radiologists and residents published two case reports.  Id.  Dr. Greenberg was also actively engaged

in research projects with residents at the time of his termination.  Id., ¶ 6.

> **Counter-Response:** Plainitff does not contradict any of the factual allegations in
>
> paragraph 12, which should therefore be deemed admitted.  As to Plaintiff's alleged interest in
>
> academic research and scholarship, Plaintiff did not list these "case reports" or research projects on
>
> his resume, state that he ever told Dr. Reede about them, or provide citations to them in his
>
> declaration.  Greenberg Decl., ¶ 14.

13.     There is no evidence that Dr. Scott had any time and attendance issues.

> **Response**:     Undisputed but notably Dr. Scott did not have the long-term tenure
>
> at KCHC that Dr. Greenberg had and therefore the lack of evidence of any time and attendance
>
> issues is of little significance.

> **Counter-Response:**  The factual assertion is undisputed, and Plaintiff's argument
>
> should be disregarded.  In any event, Dr. Reede had supervised Dr. Scott at SUNY at Long Island
>
> College Hospital from 2011-2013, and she was therefore very familiar with Dr. Scott's time and
>
> attendance history.  See Ex. ZZ; Reede Decl., ¶ 3.

**IV.     Plaintiff's Problems with Time and Attendance**

14.     On May 5, 2014, following the ACGME report, Dr. Reede met with Plaintiff

to discuss an incorrect time entry from April 21, 2014.  Ex. I.  Dr. Reede reminded Plaintiff that "his

job responsibilities require him to be present for consultations as well as resident supervision and education." Id.  He was told to report his time correctly going forward. Id.

      **Response**:    Undisputed that a meeting occurred between Dr. Reede and Dr. Greenberg on this date.  To the extent that SUNY Defendants hope to suggest that this was a disciplinary meeting, such is disputed as Dr. Reede testified it was not.  Ex. 10 (Reede Dep.) at 143.  This meeting marked the commencement of Dr. Reede's scrutiny of Dr. Greenberg with an eye to his termination.  While she testified at her deposition that her assistant caught Dr. Greenberg's timesheet error, she, in fact, caught it.  Id. at 143-44.  In advance of Dr. Greenberg submitting his April timesheet, Dr. Reede apparently asked Dr. Pulitzer to review Dr. Greenberg's so-called Talk Station data in order to establish when he first completed a study and the time of his last completed study from April 14 to April 22, 2014.  Ex. 8 (SUNY 003486).  He obeyed her instruction and sent the information.  Id.  She is the one who must have spotted the timesheet entry error for April 21, 2014 but at her deposition she deflected responsibility for the catch to her assistant.

      **Counter-Response:** Paragraph 14 should be deemed admitted as Plaintiff does not contest the meeting occurred or the contents of the meeting.  Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005).  The remainder of Plaintiff's response is improper argument which should be disregarded.  Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011)(disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996).  Further, as to that argument, it is immaterial as to who located the time and attendance issue, but Plaintiff has offered only speculation, not admissible evidence, in support of his argument that Dr.

Reede found the timesheet error, as opposed to the timekeeper Linda McMurren.  Reede Dep., p. 147:24-148:10 (Reply excerpts); Reede Reply Decl., ¶ 2.  Plaintiff has not contested that his time and attendance problems were brought to his attention, in a meeting that Dr. Reede described as "formal," and that he had made misrepresentations on his timesheets and improperly reported that he was present at the hospital when he was not.  Reede Dep., p. 150:6-8 (Reply Excerpts).  The SUNY Defendants do not dispute that there was increased scrutiny on time and attendance after the ACGME report.

15. On May 8, 2014, Dr. Reede reminded all of the attending radiologists in the department that "everyone documents accurate information on their timesheets."  Ex. L.  This was repeated during the KCHC Department Meeting on June 26, 2014 led by Dr. Pulitzer, who noted that time and attendance will be monitored and that time sheets should reflect the actual time a physician was in the hospital.  Ex. M, SUNY002458.

**Response**: Undisputed.

**Counter-Response:** No response.

16. Dr. Pulitzer, who oversaw the schedule at KCHC, testified that, beginning in late July or August 2014, Plaintiff was "coming in late, he was on occasion leaving early.  I ... often didn't know what time he was going to be in that day .... I couldn't reliably plan the schedule." Pulitzer Dep., p. 305:23-306:9.  Dr. Reede testified that she received reports that Plaintiff was sometimes not in the emergency room when "residents would be looking for him."  Reede Dep., p. 142:22-143:9.  Plaintiff's Talk Station data from the time showed that he was often not reading his first case until 10:30 or later.  Ex. R.

**Response**: Disputed.  Notably, in her memo to the file dated July 23, 2014 about a meeting with Dr. Greenberg as to why he was not going to be made Director of ER Radiology at KCHC, Dr. Reede did not cite as a reason for not getting the promotion that he had attendance

issues.  Ex. 4 (SUNY 000498).  During this period when Dr. Greenberg was allegedly working erratic hours, on July 31, 2014, Dr. Pulitzer stated at a Departmental meeting that radiologists were expected to arrive at KCHC by 9 a.m.  Ex. 42 (HHC 1335 & 1349).  It was not until August 22, 2014, however, that Dr. Pulitzer allegedly approached Dr. Greenberg and requested that he arrive at KCHC at 9 or 9:30 a.m.  Ex. 17 (HHC_ESI_001091-92; HHC_ESI_001062-63).  This delay in applying the requirement to Dr. Greenberg suggests that the set, earlier schedule did not apply to him, which it did not historically.  Greenberg Decl., ¶ 7; Ex. 3 ("Hi Steve, following up on our discussion, I just want to reiterate that prior to recent changes in the schedule I was asked by Alan to change my hours to 10 to 6 to help cover Vin during the early evening").  According to Dr. Greenberg, Alan Kantor, the previous Chief of Service, always pushed him to come in later in order to stay later to assist with the crush of cases that came into ER Radiology between 4 p.m. and 8 p.m. Greenberg Decl., ¶ 7.  According to Dr. Greenberg's account of his discussion with Dr. Pulitzer about a set schedule in late August, Dr. Pulitzer knew that Dr. Kantor historically wanted Dr. Greenberg to come in later but Dr. Reede was insisting that he come in earlier.  Greenberg Decl., ¶ 7.  Thus, the notion that Dr. Greenberg was working erratic hours in July and August by coming in late does not accord with Dr. Greenberg's account that Dr. Pulitzer knew that in the past he was asked to work a later schedule and his work hours continued to reflect it.

   **Counter-Response:** Paragraph 16 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence.  Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005).  Plaintiff's response is improper argument, which should be disregarded.  Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011)(disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or

which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996).

On those grounds alone, Plaintiff's response should be disregarded.  But as to his arguments, they are either irrelevant, not supported by admissible evidence, or both.  Whether or not a specific memo stated that Plaintiff's time and attendance was a problem is irrelevant to this motion.  But in any event, Dr. Reede's July 23, 2014 memo, to which Plaintiff refers, *did* include information about Plaintiff's time and attendance problems in that it cited resident evaluations of Plaintiff which complained of Plaintiff's lack of availability, noting that Plaintiff "would disappear for hours at a time" to "go[] home to eat dinner with his family" during his shift.. Exs. AAA, DDD, SUNY000475. Another resident suggested that Plaintiff "be more available," and Plaintiff received poor feedback in response to whether he provided feedback to residents during his rotation (SUNY000468), whether he was available to assist residents with academic work (SUNY000473), and whether he provided a high-quality teaching experience (SUNY000465).  Id.  Plaintiff's alleged arrangements with his previous supervisor, Dr. Kantor, are irrelevant.  But even so, the evidence shows that Dr. Kantor had problems with Plaintiff and, in regard to Dr. Kantor's issues with Plaintiff's time and attendance, Plaintiff actual avers in his own declaration that he "compromised" with Dr. Kantor on a schedule to which Plaintiff only "tended to adhere."  Greenberg Decl. ¶ 7; Exs. F, G, H.  The SUNY Defendants do not dispute that Plaintiff acted as if the "schedule did not apply to him," but the admissible evidence shows that he knew he was supposed to be present during his scheduled hours based upon his long history of escalating time and attendance problems that had been brought to his attention and ultimately led to his referral to Labor Relations in September 2014.[3]  Further, whether characterized as "formal" or informal, a counseling or a

---

[3] Plaintiff carefully parses his statements in his 56.1(c) response to make it sound like he was unaware of his longterm and escalating time and attendance problems, but does not actually state that he did not have time and attendance problems or that he was unaware of time and attendance problems.  This he could not do in light of the incontestable

discussion, Plaintiff cannot contest the record showing that he was spoken to by Dr. Kantor, Dr. Reede, Dr. Pulitzer and Labor Relations about his time and attendance. See, e.g., Ex. R; Reede Dep., p. 150; Pls. Exs. 9 (noting the May 2014 meeting with Dr. Reede and the discussion of time and attendance requirements at Grand Rounds the previous October) and 17.   In fact, when confronted, Plaintiff disregarded a resident's criticism that Plaintiff was not around to supervise the residents, claiming the "inmates are running the asylum." Pls. Ex. 11.

17.     The general expectation at KCHC is that radiologists spent most of their workday reading films. Pulitzer Decl., ¶ 6.  Time spent reading film gets reflected, if only approximately, in "talk station" data.  Id.  Talk Station data comprises information about a particular film, including which radiologist read the film, and when the film was opened and signed for by a

---

admissible evidence here.  There had "been time and attendance issues with Dr. Greenberg for many years." Pulitzer Dep., 111:24-25; Ex. E.  In August 2013, Dr. Kantor noted that Plaintiff failed to follow his scheduled work time and "unilaterally decided to leave early every day." Ex. F.  On September 25, 2013, Plaintiff emailed Dr. Kantor and complained that "it pisses me off that there is so much attention being paid to data analysis as to when I read my first and last cases (an inaccurate measure of the time I arrive and leave)…" Ex. G.  Plaintiff's time and attendance problems continued and worsened.  On October 9, 2013, Plaintiff was informed about another doctor's complaint that there "is routinely no one in the ER reading room between 4 and 5 pm" (Plaintiff's then-scheduled shift), and responded that he thought this was "bullshit" and saying that he "no longer give[s] a fuck."  Ex. H.  In his resident evaluations for 2013, one resident noted that Plaintiff "would disappear for hours at a time" to "go[] home to eat dinner with his family." Ex. DDD, SUNY000475.  On May 5, 2014, following the ACGME report, Dr. Reede met with Plaintiff to discuss an incorrect time entry from April 21, 2014 which Plaintiff admitted; he incorrectly entered his time on other occasions as well. Exs. I, J, K; Greenberg Dep., p. 157:11-159:9.  During this period, Dr. Reede received reports that Plaintiff was sometimes not in the emergency room when "residents would be looking for him."  Reede Dep., p. 142:22-143:9.  Plaintiff scheduled a day off on July 9, only to appear for work that day, state that he had to leave by 2:15 pm, and state he would take July 10 off instead.  Ex. N.  Dr. Pulitzer testified that  beginning in late July or August, Plaintiff was "coming in late, he was on occasion leaving early.  I…often didn't know what time he was going to be in that day…. I couldn't reliably plan the schedule."  Pulitzer Dep., p. 305:23-306:9.  Dr. Scott, who worked in the same room as Plaintiff, saw firsthand that "[Plaintiff] was sometimes very erratic about his hours."  Scott Dep., p. 137:19-25. She noted that Plaintiff "would often come late to work.  It could vary from like half an hour late to an hour to an hour and a half, to two."  Id., p. 153:21-25.  In August 2014, Plaintiff originally requested vacation for August 11-August 22. Ex. O.  On August 13, 2014, Plaintiff emailed Dr. Pulitzer while on vacation, and asked if he could return the following week, and then instead take off the week of August 25th.  Ex. P.  During the week of August 18, Plaintiff maintained erratic hours, only working from 10 am to 1:30 pm on Thursday, August 21.  Ex. Q.  On August 22, 2014, Dr. Pulitzer confronted Plaintiff in person on issues of time and attendance.  Ex. R.  Dr. Pulitzer addressed specific time entries with Plaintiff during this meeting that appeared to be inaccurate based on Plaintiff's Talk Station dictation system.  Id.  Dr. Pulitzer reminded him of the need to be at the hospital for his set hours of 9:30-5:30.  Id.  These hours were decided upon after Dr. Pulitzer asked Plaintiff what hours would be most convenient for him, and made it clear that he would try to accommodate his schedule.  Pulitzer Dep., p. 310:21-311:14.  Despite his scheduled vacation the week of August 25th, Plaintiff returned to work on August 26, again working erratic hours "at his choosing."  Ex. S; Pulitzer Dep., p. 334:8-21.

radiologist.  Id.  By reviewing the data for one day, an approximation of when a radiologist started reading film and when he or she stopped can be discerned.  Id.

**Response**:     Disputed.  According to Dr. Greenberg, Talk Station data is a poor proxy for the hours that he worked.  See Greenberg Decl., ¶ 5.  Talk Station data does not capture when film is first opened for review by a radiologist but when he or she closes out of the study, usually after completion of review.  Id.  Thus, the time first captured by Talk Station on any given day is when the radiologist completes his or her first study.  Id.  During the time that Dr. Reede threatened closer scrutiny of each radiologist's productivity by examining Talk Station data, around the spring of 2014, many of Dr. Greenberg's colleagues "gamed" the system by choosing a very easy study to review when they first arrived at work thereby memorializing the earliest possible time for a so-called "clock in."  Id.  Dr. Greenberg refused to play that game.  Id.  Rather, he always read whatever film he viewed in his professional opinion as the most pressing after consulting with his ER colleagues, even if it was complicated and meant that he would have a later "clock in" time than would otherwise be indicated.  Id.  Also, with respect to Dr. Greenberg, when he came into the reading room at or around 9 or 9:30 a.m., his colleague had usually been reviewing film for three hours ahead of him and therefore there might not be any cases to read immediately.  Id.  Further, the computer he used was frequently turned off and could take as long as 20 minutes to boot up and be available to start reading cases.  Id.  Also, it was Dr. Greenberg's habit upon arriving at work to take a tour of ER to see if there were any pending issues that needed to be addressed and to confer with multiple colleagues, if necessary.  Id.  All of these factors and circumstances made the time of the completion of his first study upon arriving at work a poor proxy as to what time exactly he arrived there.  Id.

**Counter-Response:**   Irrelevant.  Plaintiff fails to raise a disputed issue of material fact.  Plaintiff's subjective view of Talk Station data is immaterial as it was used to monitor time and

attendance of all radiologists, and it was within the business judgment of the SUNY Defendants to rely on it.  Further, Plaintiff does not assert that he adhered to his scheduled time (see Response to ¶ 16).  Plaintiff did not arrive in the "reading room at or around 9 or 9:30 a.m." in July and August 2014 even according to his own timesheets.  Ex. T.

18.     Dr. Scott, who worked in the same room as Plaintiff, testified that "[Plaintiff] was sometimes very erratic about his hours."  Scott Dep., p. 137:19-25.  She noted that Plaintiff "would often come late to work.  It could vary from like half an hour late to an hour to an hour and a half, to two."  Id., p. 153:21-25.

**Response**:     Disputed.  Dr. Scott initially testified that she did not really know to which shift exactly Dr. Greenberg was assigned when she first began working at KCHC, which she characterizes as in August of 2014.  Ex. 6 (Scott Dep.) at 127.  Therefore, since she did not know the hours of his shift, her testimony that he would arrive late is lacking in credibility.  Further, Dr. Scott's sample size of Dr. Greenberg's allegedly erratic hours is limited to the month of August since by September he was being closely monitored for time and attendance by Dr. Reede and Dr. Pulitzer and he had only one alleged misstep.  Ex. 37 (HHC_ESI_001274) (example of the close monitoring by Dr. Reede and Dr. Pulitzer).  The only time and attendance issue that they caught was an alleged unauthorized absence from the building for approximately two hours in the afternoon of September 23, 2014.  Ex. 39 (SUNY 000863-64).  It is likely that Dr. Scott is referring to Dr. Greenberg's erratic hours during the week that he was supposed to be on vacation and volunteered to pitch in.

**Counter-Response:**  The cited testimony does not contradict paragraph 18. Paragraph 18 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence.  Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted");

Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4

(E.D.N.Y.2005).  Plaintiff's response is improper argument, which should be disregarded.  Costello

v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011) (disregarding 56.1(c)

responses that did not specifically dispute Defendants' statements or which consisted of argument,

conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.),

citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996).  Whatever his scheduled hours,

showing up "like half an hour late to an hour to an hour and a half, to two" is not showing up in

accordance with a schedule.  Plaintiff does not even allege, let alone provide admissible evidence

demonstrating, that Dr. Scott is wrong and that he worked in accordance with his schedule.

SUNY Defendants do not dispute that Plaintiff worked erratic hours during the week of August 25,

2014.

> 19.     In August 2014, Plaintiff originally requested vacation for August 11-August

22.  Ex. O.  On August 13, 2014, Plaintiff emailed Dr. Pulitzer while on vacation, and asked if he

could return the following week, and then instead take off the week of August 25th.  Ex. P.

> **Response**:     Undisputed.

> **Counter-Response:**   No response.

> 20.     On August 22, 2014, Dr. Pulitzer counseled Plaintiff in person on issues of

time and attendance.  Ex. R.  Dr. Pulitzer addressed specific time entries with Plaintiff during this

meeting that appeared to be inaccurate based on his Talk Station dictation system entries.  Id.  Dr.

Pulitzer reminded him of the need to be at the hospital for set hours of 9:30-5:30.  Id.

> **Response**:     Disputed.  Dr. Pulitzer testified that this discussion with Dr.

Greenberg was not a "disciplinary counseling."  Ex. 5 (Pulitzer Dep.) at 310.  Rather it was an

attempt to find what schedule would work for Dr. Greenberg, given his personal circumstances.  Id.

at 311.  Pulitzer testified that his intent in going into this discussion was to work with whatever

schedule was manageable for Dr. Greenberg.  Id.  It is only Dr. Pulitzer's memos regarding this meeting, which were written after Dr. Greenberg's request for family leave on September 2, 2014, that characterize or suggest that this discussion had a counseling component to it.[4]  Ex. 17 (HHC_ESI_001062-63 & 001091-92).  In Dr. Greenberg's version of the discussion, Dr. Pulitzer approached him in a "Don't shoot the messenger" fashion and shared that Dr. Reede wanted Dr. Greenberg to work an earlier set shift of 9 to 5.  Greenberg Decl. ¶ 7.  To which Dr. Greenberg questioned why since Dr. Kantor always wanted him to start work later to help out with the high volume of cases in the late afternoon.  Id.  According to Dr. Greenberg, Dr. Pulitzer replied that Dr. Reede was like a cop and wanted to catch Dr. Greenberg in order to get rid of him.  Id.

**Counter-Response:**  The cited evidence does not contradict paragraph 20. Paragraph 20 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence.  Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005).  Plaintiff's response is improper argument, which should be disregarded.  Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011) (disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.),

---

[4] The first mention Dr. Pulitzer makes of a meeting or discussion with Dr. Greenberg in late August in personnel paperwork or email traffic is on September 2, 2014 when he wrote a brief memo to the file dated that day without using KCHC letterhead memorializing his conversation with Dr. Greenberg about the additional leave that he sought on September 2, 2014.  Edgar Decl., Ex. 17 (HHC_ESI_1062-63).  In this memo, Dr. Pulitzer references an earlier conversation with Dr. Greenberg that he erroneously dates as August 23, 2014.  Id.  he states that "Oded was counseled in person on time and attendance."  Dr. Pulitzer's habit after writing a memo dealing with a personnel issue was to send it immediately to his assistant; he did so with respect to the memo without letterhead dated September 2, 2014.  Id.  On September 5, 2014, Dr. Pulitzer sent to his assistant and Dr. Reede a more formal memo of his encounter with Dr. Greenberg on August 22, 2014 bearing a date of August 22, 2014.  Edgar Decl., Ex. 17 (HHC_ESI_001092).  There is no evidence via a cover email that this memo was sent to his assistant on August 22, 2014.  Therefore, it is a safe assumption that this memo dated August 22, 2014 was actually written after that date, which means Dr. Pulitzer pre-dated a memo dealing with what he believed was a serious personnel issue.

citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996).  It is also immaterial whether

Plaintiff's August 22 meeting is characterized as "disciplinary" or not and when the notes from the

meeting were drafted with formal letterhead, but the SUNY Defendants note that Plaintiff's theory

regarding the drafting of the memos is improper speculation.

21.     Despite his scheduled vacation the week of August 25th, Plaintiff returned to

work on August 26.  Ex. S; Pulitzer Dep., p:334:8-21.  Dr. Pulitzer received reports that Plaintiff

was working "erratic" hours.  Pulitzer Dep., p. 334:8-21.  Plaintiff's time sheet indicates that, instead

of 9:30 am to 5:30 pm, he claimed to have worked from 11 am to 7 pm on three days that week and

10 am to 6 pm on the other day he was in the office.  Ex. T.

**Response**:     Disputed.  As Dr. Greenberg was scheduled to be off the week of

August 25th but instead decided to work both because his vacation plans fell through and the

Department appeared to need the assistance, we strain to understand how his schedule could be

criticized as erratic since he was not supposed to be working in the first instance.  In any event, if

Dr. Greenberg's account is to be credited, he worked the week of August 25, 2014 because the

Radiology department appeared short-staffed and he wanted to help out.  Greenberg Decl., ¶ 8.

Further, it appears undisputed that the busiest time in ER Radiology was between 4 p.m. and 8 p.m.

Ex. 6 (Scott Dep.) at 128.  Dr. Greenberg's schedule in encompassing those busiest hours was in

conformity with the department's most acute need.  Further, during the week of August 25, 2015,

Dr. Greenberg received no complaints from Dr. Hammil about erratic hours he was working; rather,

Dr. Hammil appeared to be appreciative of Dr. Greenberg's willingness to help when they were

short of staff.  Greenberg Decl., ¶ 8.

**Counter-Response:**   Plaintiff's response does not contradict paragraph 21.  To the

extent that Plaintiff wanted to cancel his scheduled time off and work, he was not working during

his scheduled times.  Talk Station data from the time confirms that Plaintiff was not working the

shift assigned to him on the revised schedule, and his timesheets, which show him arriving at 10 or 11 am each day he was there, were also likely incorrect (first case read at 3:33 pm on August 26; 12:29 on August 27; 3:31 pm on August 28; 11:59 am on August 29).  Ex. T; Pl. Exs. 9, 15, 19. Plaintiff's response also includes argument and unrelated references to evidence that are improper and should be disregarded.  Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

**V.      Facts Regarding the September 4th and 5th Absences**

22.      On August 29, 2014, the Friday before Labor Day weekend, Plaintiff emailed Linda McMurren asking how he could get approval for days off the following week "on an emergent basis."  Ex. U, SUNYESI000994.  Ms. McMurren was not authorized to approve vacation requests; the site director - Dr. Pulitzer - was the appropriate person to contact.  Reede Dep., p. 290:9-15.

**Response**:      Disputed.  This account does not tell the entire story of Dr. Greenberg's attempts to notify his various employers of his need for an unexpected leave of absence.  While it is true that Dr. Greenberg emailed Linda McMurren on August 29, 2014 requesting guidance as to how to seek approval for days off the following week for an emergency, he first attempted to notify Dr. Reede via telephone but her voicemail was too full to accept another message because she was on vacation.  Greenberg Decl., ¶ 9.  Dr. Pulitzer could not be notified because he too was on vacation.  Id.  Dr. Greenberg then resorted to emailing Linda McMurren in order to get guidance about how he best should proceed in taking the leave of absence.  Notably, according to relevant policy at SUNY, the protocol for notifying management when an employee had to take an unexpected leave was to notify the Department Chair, which would be Dr. Reede. Ex. 59 (SUNY 000677).  That is exactly what Dr. Greenberg attempted to do.  Dr. Greenberg made

his request to the first available manager on September 2, 2014, which was the date that Dr. Pulitzer finally returned from his vacation the previous week.

**Counter-Response:**   Plaintiff's response does not contradict paragraph 22. Paragraph 22 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence.  Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005).  Plaintiff's response is improper argument, which should be disregarded.  Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011) (disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996).  Plaintiff's response also includes argument and unrelated references to evidence that are improper and should be disregarded. Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

And, addressing Plaintiff's argument, even if Plaintiff did call Dr. Reede, and this is the first time he has made such a claim, he did not email Dr. Pulitzer or Dr. Reede to give them notice, nor did he reach out to them on their cell phones, although their numbers had been given to all physicians in the Department.  Reede Reply Decl. ¶ 7; Pulitzer Reply Decl. ¶ 1.

23.       Plaintiff requested this "emergent" leave five days before he intended to take it, and he did not submit the approved form, which he had received on a number of occasions, to Dr. Pulitzer indicating who would provide coverage, the reason for the leave, and how much time he intended to take off.  Ex. V, SUNYESI000805-6; Pulitzer Decl. ¶ 9.

**Response**:      Disputed.  Dr. Greenberg contends that his request constituted an "Unexpected Absence" for which he followed governing policy by immediately attempting to direct his request to the Department Chair.  Ex. 59 (SUNY 000677).  Even if for the sake of argument, Dr. Greenberg's request was not an "Unexpected Absence," and he was required to submit an approved leave form to Dr. Pulitzer as SUNY Defendants appear to contend, Dr. Pulitzer was on vacation at the time Dr. Greenberg became aware of the need on August 29, 2014.  Ex. 5 (Pulitzer Dep.) at 333.  Immediately upon Dr. Pulitzer's return from vacation, Dr. Greenberg posed to him his request, which was immediately denied.  Id.  Once Dr. Pulitzer immediately denied Dr. Greenberg's request for an emergency family leave, it would have been futile for Dr. Greenberg to present Dr. Pulitzer with the proper paperwork for the leave request.

**Counter-Response:**   Plaintiff's response does not contradict paragraph 23. Paragraph 23 should be deemed admitted, as Plaintiff does not contest the specific contents thereof by citation to admissible evidence.  Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F.Supp.2d 248, 255 n. 4 (E.D.N.Y.2005).  Plaintiff's response is improper argument, which should be disregarded.  Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011) (disregarding 56.1(c) responses that did not specifically dispute Defendants' statements or which consisted of argument, conclusory allegations, speculation or conjecture, and deeming those paragraphs to be admitted.), citing Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996).  Plaintiff's response also includes argument and unrelated references to evidence that are improper and should be disregarded. Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

A898

And, addressing Plaintiff's argument, Plaintiff has now provided evidence, which he himself does not cite here, that he was also aware of the need for leave as early as August 18, 2014, and no later than August 25, 2014.  Ex. FFF.  In any event, he cannot and does not contest the contents of the paragraph.

24.     The following Tuesday, September 2, 2014, Plaintiff asked Dr. Pulitzer to take the remainder of the week off.  Ex. W, SUNY 827.  This was the first time Dr. Pulitzer had heard of this request.  Pulitzer Dep. 349:23-350:3.

**Response**:     Disputed to the extent that Dr. Greenberg does not remember whether he asked for the rest of the week off or just September 4 and 5, 2014.  Ex. 1 (Greenberg Dep.) at 227-28.

**Counter-Response:**   No response.  This dispute is not material.

25.     Dr. Pulitzer denied his request, due to the operational needs of the department, since Dr. Patrick Hammil, the only other body imager, was scheduled to be off that same week.  Ex. S; Ex. X, SUNY001289-1290; Reede Dep., p. 303:25-304:12.

**Response**:     Undisputed that Dr. Pulitzer denied the request and that he stated that the reasons for the denial was because the only other radiologist who could read body images, Dr. Hammil, was scheduled to be on vacation the week for which Dr. Greenberg sought an absence. Disputed as to whether his statement that Dr. Hammil was the only other body imager in the Department is accurate, as there were many other radiologists available that week and who worked on the days at issue who could read body images.  Greenberg Decl., ¶ 9.

**Counter-Response:**   Plaintiff's response does not contradict paragraph 25.  The Department was severely understaffed the week of September 1, 2014, and there were not enough radiologists available to adequately cover the work.  Pulitzer Reply Decl., ¶ 2.  Dr. Pulitzer set the schedule for that week with the expectation that Plaintiff would cover for Dr. Patrick Hammil, who

is a specialist in complex Body Imaging cases.  Id.  Dr. Scott testified that the department was "really understaffed" on those two days and Plaintiff's absence created "even more stress in the department."  Scott Dep., p. 149:17-150:14 (Reply Excerpts).

26.     Dr. Pulitzer testified that he does not recall Plaintiff specifying the reason he wanted to take the leave.  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22.  Dr. Pulitzer did not tell Dr. Reede that there was a specific reason for the request, and Plaintiff did not speak to her at all regarding his request.  Reede Dep., 282:13-23.  There is no written evidence of Plaintiff specifying the reason for his request prior to taking leave.

**Response**:     Undisputed that Dr. Pulitzer testified that he does not recall Dr. Greenberg's stated reason for needing the leave.  Disputed that his testimony is credible.  See, infra, Plaintiff's Statement of Material Facts That Preclude Summary Judgment, ¶¶ 17, 19 & 21.  Undisputed that Dr. Reede did not ask Dr. Pulitzer why Dr. Greenberg was being so obstinate about taking the leave nor did she request that he inquire of Dr. Greenberg the reason for the leave.  Edgar Ex. 10 (Reede Dep.) at 282-84.

**Counter-Response:**   See responses to Plaintiff's Statement of Material Facts That Preclude Summary Judgment, ¶¶ 17, 19 & 21.  Plaintiff's response also includes argument and unrelated references to evidence, i.e., Plaintiff's assertion that Dr. Reede should have but did not ask why Plaintiff was being obstinate, that are improper and should be disregarded.  Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

27.     On September 3, Plaintiff returned to Dr. Pulitzer and informed him that he would be absent on September 4 and September 5.  Pulitzer Dep., p. 351:9-24.  After consulting with Dr. Reede, Dr. Pulitzer drafted a letter to Plaintiff that specifically denied his request for time off on September 4th and 5th, and Plaintiff was directed to report for duty or the matter would be referred to the Labor Relations Department.  Ex. Y; Pulitzer Dep. 355:18-356:7.

**A900**

**Response**:      Undisputed to the extent that Dr. Pulitzer and Dr. Greenberg spoke on September 3, 2014 about the September 4th and 5th absences but note that they spoke twice about those absences.  According to Dr. Pulitzer, their first discussion was initiated by Dr. Greenberg who related to Dr. Pulitzer that he still intended to take those days off.  Ex. 5 (Pulitzer Dep. at 351-52.  To which Dr. Pulitzer responded that he did not want Dr. Greenberg to take those days off.  Id. at 352.  Dr. Pulitzer admitted that at this point he did not warn Dr. Greenberg that there would be consequences if he proceeded to take those days off.  Id.  After relating to Dr. Reede what just took place, Dr. Reede "advised" Dr. Pulitzer to write a letter denying Dr. Greenberg's request and state therein that if he proceeded to take the days off in any event he would be referred to Labor Relations.  Id. at 356.  Again, according to Dr. Pulitzer's own account, the second discussion about the leave on September 3, 2014 occurred when Dr. Pulitzer hand-delivered this letter to Dr. Greenberg himself and read its contents aloud to him.  Id. at 358.  To which Dr. Greenberg responded according to Dr. Pulitzer's paraphrase, "Well, you're making me choose between my job and my family."  Id. at 360.  To which Dr. Pulitzer replied, according to his own testimony, "I'm not making that choice."  Id.  Dr. Pulitzer admitted that he did not ask Dr. Greenberg any follow-up questions as to why Dr. Greenberg stated to him that he was making him decide between his job and his family.  Id. at 360-61.  In an email that he wrote to Mr. Arabian, the representative of Labor Relations who investigated Dr. Greenberg's case once it was referred there when Dr. Greenberg did not show up for work on September 4, 2014, Dr. Pulitzer stated that he and Dr. Greenberg talked a few minutes about each other's family towards the end of their third discussion about the leave (or the second discussion on September 3, 2014).  Ex. 50 (HHC_ESI_1087).

**Counter-Response:**  Plaintiff's response does not contradict paragraph 27 and to the extent that Plaintiff is representing Dr. Pulitzer's testimony about their conversations on

**A901**

September 2nd, Dr. Pulitzer testified that Plaintiff did not tell him he needed the time to care for his son. Ex. 5, Pulitzer Dep. p. 361. Plaintiff's response also includes argument and unrelated references to evidence that are improper and should be disregarded. Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

28.     On September 4, 2014, Plaintiff e-mailed Linda McMurren to confirm that he was not coming in "due to important family issues," the nature of which he did not specify. Ex. Z. Short on staff, Dr. Pulitzer arranged for multiple radiologists to cover Plaintiff's shifts those days. Pulitzer Dep., p. 354:3-23.

**Response**:     Undisputed that Dr. Greenberg emailed Linda McMurren on September 4, 2014. Disputed that the Radiology Department at KCH was short on staff, as there were multiple radiologists that were available on these days to cover for Dr. Hammil who was on vacation and the so-called body imager. Greenberg Decl., ¶ 9.

**Counter-Response:**     Plaintiff fails to cite to relevant admissible evidence supporting his counter-statement of fact. The Department was severely understaffed the week of September 1, 2014, and there were not enough radiologists available to adequately cover the work. Pulitzer Reply Decl., ¶ 2. Dr. Pulitzer set the schedule for that week with the expectation that Plainitff would cover for Dr. Patrick Hammil, who is a specialist in complex Body Imaging cases. Id. Dr. Scott testified that the department was "really understaffed" on those two days and Plaintiff's absence created "even more stress in the department." Scott Dep., p. 149:17-150:14 (Reply Excerpts). Plaintiff's cited evidence, Greenberg Decl., ¶ 9, does not provide admissible evidence that the Department was not short-staffed on that day. It merely references that three of the four radiologists who had been laid off had been replaced. Plaintiff's response also includes argument that should be disregarded. Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 WL 5542919, at *3 (S.D.N.Y. Aug. 12, 2015).

29.      On September 5, 2014, however, Plaintiff e-mailed Ms. McMurren again and cc'd Dr. Pulitzer, writing that he "was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out."  Ex. U.  Plaintiff was absent from work on Thursday, September 4 and Friday, September 5.  Ex. FF, SUNYESI001401.

**Response:**      Undisputed that Dr. Greenberg wrote the above-referenced email but disputed as to its purport.  According to Dr. Greenberg, he never intended to come in on September 4th but stated otherwise in the email in order to protect his job, which he thought was in jeopardy.  Ex. 1 (Greenberg Dep. at 242, 246-47).

**Counter-Response:**   Plaintiff's response does not contradict paragraph 29.

30.      Plaintiff called Ms. McMurren the following Monday, September 8, at 10:40 a.m. (nearly two hours after his shift began) to inform her that he would be in late because he had to go to Urgent Care for his back.  Ex. AA.  Plaintiff arrived for work at about 12:30 p.m. and provided documentation from Premier Care of Park Slope, indicating that he received treatment for back pain that morning.  Exs. BB; X, SUNY001291.

**Response:**      Undisputed.

**Counter-Response:** No response.

## VI.    Facts Regarding Plaintiff's First Interrogation

31.      Upon his arrival on September 8, Plaintiff was directed to Labor Relations, where he met with Michael Arabian.  Ex. X.  After reading the Statement of Rights Letter regarding his rights to representation by a union attorney or counsel of his choice during the hearing, Plaintiff elected to represent himself.  Id., SUNY001280.  Plaintiff was also advised by Mr. Arabian that he must respond truthfully to the questions asked during the interrogation or he could be subject to

further discipline.  Id., SUNY001281.  The investigation was into Plaintiff's absences and failure to follow supervisors' directives regarding time and attendance.  Id.

> **Response**:  Undisputed as to Dr. Greenberg being directed to Labor Relations by Dr. Pulitzer and what occurred at the interrogation as the transcript thereof speaks for itself. Disputed as to the merits of the claim that Dr. Greenberg had any issues with time, attendance and absences other than his insistence that he be allowed to take a leave covered by the Family Medical Leave Act.

> **Counter-Response:** Plaintiff does not cite any admissible evidence to contradict paragraph 31, which should be deemed admitted in its entirety.

32.      During the interrogation, Plaintiff stated that he was "on the [department's] schedule as 9 to 5," but he would occasionally "come in later and stayed later," sometimes arriving at 10-10:30 or even "a little bit later."  Id., SUNY001283.  Plaintiff further stated that "if I come in late it doesn't make a difference.  I stay a little bit later.  I've been keep - adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening."  Id., SUNY001284.  When Plaintiff was asked whether he had the authority to make his own schedule, he replied that he felt he had the "moral authority to do so if I feel the department is failing to -- to take care of their patients."  Id., SUNY001284. Plaintiff admitted that he had recently been told by Dr. Pulitzer to adhere to set hours, which he assumed were "9 to 5 as written on the schedule."  Id., SUNY001284.

> **Response**:  Undisputed to the extent that such was said at the interrogation, which otherwise speaks for itself.

> **Counter-Response:** No response.

33.      When discussing the September 4 and 5 absences, Plaintiff stated that "I have a child with special needs and he was kicked out of his school and he was to attend a new school and I had to spend time with him," but he said that was not the reason he did not appear for

**A904**

work on September 4 and 5.  Id., SUNY001290-1291.  Plaintiff's mother-in-law came from out of town to help with his son, and while Plaintiff "had initially planned to take the day off, but I-I-I was gonna come in, I rolled out of bed and I - and I stretched my back out and I've been in pain and not able to be mobile since then."  Id., SUNY001291.  Plaintiff stated that he knew "that [his] son would have appropriate support" after his mother-in-law arrived.  Id., SUNY001292.

**Response**:    Undisputed as to what Dr. Greenberg stated at his interrogation, as the transcript thereof speaks for itself.

**Counter-Response:** No response.

34.    Following the interrogation, Mr. Arabian consulted with Leonzo Cuiman, the Assistant Vice President for Labor Relations, and prepared a Settlement Agreement, which Plaintiff signed.  Cuiman Dep., p. 237:22-238:6; Ex. CC.  Dr. Reede and Dr. Pulitzer had no role in preparing the agreement, nor were they informed that Mr. Arabian was preparing such a document.  Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11.

**Response**:    Disputed.  While Mr. Arabian had no specific recollection of the interrogation of Dr. Greenberg and entering into the settlement agreement with him, he said it was standard operating procedure to confer with department heads that supervised the employee referred to Labor Relations about the terms of a settlement agreement before presenting it to an employee.  Ex. 27 (Arabian Dep.) at 224-25.  Therefore, it is likely that Dr. Reede and Dr. Pulitzer weighed in on or ratified the terms of the settlement agreement.

**Counter-Response:** The cited testimony does not contradict paragraph 34.  Because Plaintiff has failed to cite admissible evidence disputing the facts alleged, Paragraph 34 should be deemed admitted in its entirety.  Mr. Arabian did not testify that it was "standard operating procedure to confer with department heads that supervised the employee referred to Labor Relations about the terms of a settlement agreement before presenting it to an employee."  Mr.

Arabian testified that "sometimes my superiors had conversations or at least a heads-up to certain departments of what was happening" (Ex. 27, 223:2-5), but he had no recollection of that happening on September 8, 2014 (Id., p. 222:12-7).  Dr. Pulitzer and Dr. Reede have stated that they were not consulted regarding the terms of the agreement (Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11), and there is no admissible evidence to contradict these statements.

35.     The Settlement Agreement, covered Plaintiff's September 4 and 5 absences as well as his time and attendance issues in July and August.  Ex. CC.  The Settlement Agreement stated that in lieu of a Notice of Discipline for: "(1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department, (4) insubordination and (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, [and] switching schedule without authorization of his supervisor" a penalty ranging from a letter of reprimand to termination would be held in abeyance for one year provided Plaintiff could abide by its terms.  Id.

**Response**:     Undisputed as to the terms of the Settlement Agreement and what it sought to address in terms of disciplinary issues, as the document speaks for itself.  Disputed as to whether Dr. Greenberg had time and attendance issues in July and August.

**Counter-Response:** Plaintiff has not cited admissible evidence to dispute that he had time and attendance issues in July and August.  Paragraph 35 should be deemed admitted in its entirety.

36.     The language included was standard for a settlement agreement from Labor Relations Department.  Ex. CC; Arabian Dep., p. 209:7-21.  It called for Plaintiff to work his scheduled shift of 9:00 a.m. to 5:00 p.m., accurately list the hours he works, seek approval for any leave, and adhere to all Departmental policies and procedures.  Id.  The Agreement provided that if Plaintiff failed to abide by its terms, he could be punished with discipline ranging from a letter of reprimand to termination.  Id.  This language was subject to negotiation when it was presented to

**A906**

Plaintiff, who, having turned down assistance of counsel from his union, did not request for any of the terms to be changed; subsequently stating that he did not even read the agreement. Cuiman Dep., p. 255-257:4; Ex. DD, SUNY001353; Greenberg Dep., 274:12-275:18. The agreement also waived any claims Plaintiff had related to any incidents occurring up to and including September 8, 2014. Ex. CC.

**Response**:     Undisputed as to the terms of the Settlement Agreement, which document speaks for itself. Disputed as to the "language" being "standard" for a "settlement agreement," to the extent that the terms of probation meted out to Dr. Greenberg were more onerous than the terms of probation of Radiology Department employees referred to Labor Relations around the same time. Ex. 30 (SUNY 6601-03, 6582-83, 6625, 6652-53, 6621-22, 6654-57). Undisputed that during the course of his interrogation and executing the Settlement Agreement, Dr. Greenberg waived the right to counsel, did not negotiate the terms of the Settlement Agreement and signed it without reviewing it carefully. Notably, Dr. Greenberg was in acute pain from back spasms during the time that he sat through the Interrogation, awaited the presentation of the Settlement Agreement and signed same - a time period spanning approximately 4-5 hours. Ex. 1 (Greenberg Dep. at 268-71); Greenberg Decl., ¶ 10.

**Counter-Response:**   Plaintiff does not dispute that he waived representation, the terms of the agreement, that he signed the agreement, and other allegations, which should be deemed admitted. To the extent that he contests the nature of the agreement, he chose to sign it and Plaintiff's Settlement Agreement is similar to the one cited agreement that was signed by another unrepresented employee. See Ex. 30, SUNY006625. The rest of the response does not contradict paragraph 36. SUNY Defendants further note that the recording of the Interrogation is 55 minutes long, and at no point in the recording does Plaintiff complain of his back pain. Ex. X. Coulston Decl., ¶ 7.

VII.   **Plaintiff's Use of Unapproved Attestations**

37.   An attestation is a written statement made by an attending physician to certify that he or she had reviewed a patient's report and that the report is now final.  Pulitzer Decl., ¶ 12. Attestations are legal documents that are vital to hospital billing, and non-conforming ones could trigger an investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well as potential financial liability.  Id.  Risk Management approved the use of three attestations and, beginning in July 2014, staff were informed at numerous meetings on how to use them.  GG, SUNY001270.

**Response**:      Undisputed as to what an attestation is.  Disputed as to its significance in terms of triggering investigations and any financial liability other than the hospital not being paid for the service performed if a non-conforming attestation is submitted.  See, e.g., Ex. 42 (HHC 1367) ("Attestations ..... Must be on ALL exams or we will not get paid") see also Ex. 51 (SUNY 2537) ("Missing Attestations ..... We need to be compliant so we can show we are a revenue generating department").  Disputed as to the status of the acceptable form of different attestations during the summer and fall of 2014 as it appears that they were a work in progress as evidenced by the statement of Dr. Rhonda Osborne, one of Dr. Greenberg's colleagues and a radiologist at KCHC, who stated that even after the September 22, 2014 departmental meeting where the attestations were once again discussed the form of same was not yet finalized.  Ex. 41 (SUNY 1252) ("However, I believe that they were still working on it because there was major and a minor, meaning if you had a major disagreement versus a minor disagreement").  Disputed as to whether Dr. Greenberg was fully informed as to the form of the attestation to be used.  With respect to the September 22, 2014 Departmental meeting where the form of attestations was discussed by Dr. Pulitzer and the other radiologists in the department, Dr. Greenberg was late in arriving to the meeting.  Ex. 1 (Greenberg Dep. at 276-77); Greenberg Decl. ¶ 11.  In addition, Dr. Greenberg

missed the departmental meeting where KCHC's billing vendor explained the attestations.  See

Greenberg Decl., ¶ 11.

    **Counter-Response:**The cited evidence does not contradict paragraph 37.  Dr.

Osborne stated that they were "told to use these specific [attestations]" and "it was important for us

to use these specific attestations for either billing or legal purposes."  Ex. 41, SUNY001252.  Dr.

James Walsh provided a statement saying that "two attestations that we should use" were identified

during the meeting.  Id., SUNY000449.  Dr. Scott was even more clear: "We were told to use those

exact words because that had been cleared by legal.  We were supposed to use those attestations and

none other."  Ex. HH, SUNY001251.  Although it is not a plausible excuse, Plaintiff's knowledge of

the form of the attestation is also immaterial, as he was terminated not for simply departing from the

approved language, but for using sarcastic language that was completely unacceptable in a patient's

file.

    Further, Plaintiff's dispute as to how important the attestations were is immaterial.

He admits that they were necessary for the hospital to receive payment and presents no admissible

evidence that non-conforming attestations could not trigger an investigation by the Centers for

Medicare & Medicaid Services or potential financial liability.

    38.  Phycare, which handles the billing for the department, gave a presentation on

September 15, 2014 on the attestations.  Id.

    **Response**:  Undisputed.  Notably, Dr. Greenberg was not able to attend this

presentation because he had to cover the ER on that day.  Greenberg Decl., ¶ 11.

    **Counter-Response:** The cited evidence does not contradict paragraph 38.  The

cited evidence also does not state that Plaintiff missed the meeting on September 15 "because he

had to cover the ER."

39.      All Radiology Department staff, including Plaintiff, were personally instructed by Dr. Pulitzer to use the approved attestations during a staff meeting on September 22, 2014.  Pulitzer Decl., ¶ 1; Ex. HH.  The approved language was as follows:

> "I, _____, MD, have personally reviewed the images and concur with the preliminary report and the interpretation as stated and signed by the resident.  This report now represents the FINAL REPORT for this patient."  Ex. GG.

**Response**:      Disputed.  First, Dr. Osborne's statement referenced above clarifies that she at least believed that even after the September 22, 2014 meeting the issue surrounding the form of attestations to be used by herself and her colleagues was still evolving.  Ex. 41 (SUNY 1252).  Second, Dr. Greenberg arrived late to the meeting and missed portions of the discussion regarding the form and use of attestations.  Ex. 1 (Greenberg Dep. at 276-77); Greenberg Decl., ¶ 11.  Dr. Greenberg left the meeting believing that the attestations that Dr. Pulitzer presented were examples from which he had to tailor his own attestations rather than available to him as a macro that he could easily copy and incorporate into his studies with a simple click.  Greenberg Decl., ¶ 11.

**Counter-Response:**   The cited evidence does not contradict paragraph 39.  Dr. Osborne stated that they were "told to use these specific [attestations]" and "it was important for us to use these specific attestations for either billing or legal purposes."  Ex. 41, SUNY001252.  Dr. James Walsh provided a statement saying that "two attestations that we should use" were identified during the meeting.  Id., SUNY000449.  Dr. Scott was even more clear: "We were told to use those exact words because they had been cleared by legal.  We were supposed to use those attestations and none other."  Ex. HH, SUNY001251.  Although it is not a plausible excuse, it is also immaterial whether Plaintiff was late to a scheduled meeting or his understanding of what was required.  Plaintiff did not simply depart from the approved language, but he used sarcastic language that was completely unacceptable in a patient's file.

40.     Shortly after the meeting, Plaintiff attached to patients' records approximately 180 unapproved attestations that were filled with sarcastic language, stating the following:

> "I, Oded Greenberg M.D., Board Certified Diagnostic attending Radiologist and Board Certified Pathologist, have personally, painstakingly reviewed each and every one of the provided images and reviewed the available clinical information.  The above report, based on my own extensive knowledge and skill as well as meticulous observation and careful interpretation now represents the final report."

Ex. LL, SUNY00506-659.

**Response**:     Undisputed only to the extent that Dr. Greenberg attached the attestation above to the records of patients around September 22, 2014.

**Counter-Response:**   No response.

41.     Dr. Pulitzer was informed that Plaintiff subsequently had asked Jayan Kurian, an employee in the IT Department, to "take off" or "erase" the incorrect attestations, which would have been tampering with a legal medical file.  Pulitzer Dep., p. 143:13-144:11.  Dr. Pulitzer was extremely concerned by the number of reports, which he believed indicated a more severe "malicious" act, as well as posing problems for managing the data for all of the cases with the unauthorized language, which would need to be tracked.  Id., p. 147:7-148:4.

**Response**:     Disputed as to what Plaintiff asked Jayan Kurian.  Dr. Greenberg merely asked Mr. Kurian whether it was possible to modify or change these attestations.  Ex. 1 (Greenberg Dep. at 292-93).  When Mr. Kurian related to Dr. Greenberg that he could but that it would not be appropriate for him to do so, Dr. Greenberg reassured him that he did not want to get him into any trouble.  Id. at 293.

**Counter-Response:**   Plaintiff's dispute is not material; he inquired about changing the attestations.  The remainder of the facts alleged in paragraph 41 should be deemed admitted.

42.      After collecting and reviewing the attestations, Dr. Pulitzer then escalated the issue to Dr. Jamaleddine at KCHC, and scheduled a meeting with Risk Management at KCHC at his recommendation.  Pulitzer Dep., p. 155:3-156:11.  Risk Management believed the conduct was at least insubordinate, and told Dr. Pulitzer to consider a Medical Board Hearing.  Ex. MM, HHC_ESI_001344; Pulitzer Decl., ¶ 16.  Risk Management also told Dr. Pulitzer to have a "second reader" add a new, proper attestation to each file, and they were concerned that "if any of these cases became a medical legal case that there could be potential exposure to the hospital."  Pulitzer Dep., p. 287:8-20; Pulitzer Dep. II, p. 108:23-109:3.

**Response**:      Undisputed as to what Dr. Pulitzer did and the recommendations of Risk Management with respect to the attestations.

**Counter-Response:**   No response.

43.      Dr. Pulitzer again conferred with Dr. Jamaleddine and they agreed that Plaintiff should be referred to Labor Relations, as well as a possible referral to the Office of Professional Medical Conduct, which investigates complaints against physicians.  Pulitzer Dep., p. 289:8-23; 290:20-291:17.  Dr. Reede was consulted and agreed with referring the matter to Labor Relations at SUNY Downstate.  Pulitzer Decl., ¶ 16; Reede Decl., ¶ 15.

**Response**:      Disputed.  Dr. Pulitzer's testimony was that Dr. Jamaleddine told him rather than merely agreeing with him to refer Dr. Greenberg to Labor Relations.  Ex. 5 (Pulitzer Dep. at 291).  ("Dr. Jameladdine told me to find out what the legal implications were of this, if this needs to be reported to the Office of Professional Conduct - Medical Conduct, and to refer this to Labor Relations ....").

**Counter-Response:**   No response.  Plaintiff's dispute as to whether Dr. Jamaleddine agreed to or ordered Dr. Pulitzer to go to Labor Relations is not a material issue of fact.

and, if anything, assuming his version as true, it demonstrates the seriousness of Plaintiff's admitted conduct.

## VIII.    Facts Regarding Plaintiff's September 23 Absence

44.    After taking off part of the morning of September 23, 2014, Plaintiff asked for two hours of additional leave that afternoon.  Pulitzer Dep., p. 389:22-390:6; Ex. GG. Defendant Pulitzer denied this request, because there was no one available to adequately cover for Plaintiff.  Id.

**Response**:    Undisputed that Dr. Greenberg asked for two hours of additional leave the afternoon of September 23, 2014 and that Dr. Pulitzer denied the request and cited as the reason that there was no one to cover Dr. Greenberg.  Notably, Dr. Greenberg asked for the additional leave in order to attend further meetings related to the funding for the education of his special needs son, Jayden.  Ex. 44 (HHC 1526).

**Counter-Response:**    The cited evidence does not contradict paragraph 44, and it should be admitted in its entirety.  The email cited only refers to Plaintiff's request for leave during the morning of September 23, 2014, which Dr. Pulitzer granted.

45.    That afternoon, Dr. Pulitzer learned that, in spite of the denied request for leave, Plaintiff "had left the building," and Dr. Pulitzer was unable to locate him for a number of hours.  Pulitzer Dep., p. 402:20-403:6; 413:15-20.  According to Talk Station data there was a gap of approximately two hours from 2:50 to 4:52.  Ex. QQ, SUNY001326.  Dr. Pulitzer learned that Dr. Greenberg had asked Dr. Amiram Samin to cover for him during that period, but Dr. Samin was not able to read neuroradiology cases, leaving the ER inadequately covered.  Id. p. 401:24-403:6; 413:15-20.  This issue was referred to Labor Relations as well.  Ex. GG.

**Response**:  Disputed.  Dr. Greenberg did not leave the hospital in the afternoon of September 23, 2014 in any sort of unauthorized fashion.  Dr. Greenberg testified that in the

**A913**

afternoon on that day, he left the reading room either to confer with clinicians in the Emergency Room about patients or to take a lunch break (which he was allowed to do across the street at SUNY Downstate Hospital).  Ex. 1 (Greenberg Dep. at 300-05; 308-09).  Dr. Greenberg had a cell phone and pager that his colleagues could use in the event that he was needed and it is not disputed that neither Dr. Pulitzer nor any of Dr. Greenberg's colleagues attempted to locate him by calling or paging him during the afternoon of September 23, 2014.  Greenberg Decl., ¶ 13.

> **Counter-Response:**   The cited evidence does not contradict paragraph 45, specifically that Dr. Pulitzer was told that Plaintiff had left the building and could not find him in the Department, that Plaintiff had asked a colleague to cover for him, and that there was a two hour gap in Plaintiff's Talk Station data shortly after a request for him to leave the hospital for two hours was denied.

**IX.     Facts Regarding Plaintiff's Second Visit to Labor Relation**

> 46.     On October 3, 2014, Plaintiff was notified that he was to report to Labor Relations "to discuss allegations of insubordination, leaving the worksite without authorization and related matters." Ex. RR.       This new case was handled by Stephanie Bernadel.  Bernadel Dep., 11:22-12:6.  After a delay so Plaintiff could attempt to locate an outside attorney, an interrogation was held on October 10, 2014.  Ex. QQ.  Plaintiff was accompanied by his wife who is an attorney, and again waived his right to union representation.  Ex. SS.

> **Response**:     Undisputed.

> **Counter-Response:**   No response.

> 47.     During the interrogation, Plaintiff was asked about the two hour gap in his Talk Station data on September 23. Ex. QQ, SUNY001323-1328.  Plaintiff admitted that he left his desk during this period, and claimed it was only to talk to colleagues, his wife and eat lunch across the street at SUNY Downstate.  Id., SUNY001326.

**Response**:      Disputed.  Dr. Greenberg's testimony at the interrogation with respect to the two-hour gap was that he went to lunch for an hour, during which time he spoke with his wife about the day's events concerning his special-needs son, and the rest of the time was spent conferring with clinical staff in the ER to discuss several patients' cases from earlier in the day.  Ex. 52 (SUNY 001326).

**Counter-Response:**   The cited evidence does not contradict paragraph 47.

48.      During the interrogation, Plaintiff described the attestations as "a Medicare and insurance hoop to jump through."  Id., SUNY001329.  He admitted the purpose of the attestations was explained to him, and that it was important to the hospital.  Id.  But he also admitted that he "thought it was ridiculous."  Id., SUNY001329-30.  He admitted that he complained about the forms during the meeting, and he continued to complain about the attestations during the interrogation, stating "I don't see why signing the document isn't attesting to me checking his work."  Id., SUNY001330, 1340, 1337-8.  Plaintiff admitted that he wrote the unapproved attestations, and he admitted that he thought the language was "playful."  Id., SUNY001339.

**Response**:      Undisputed as to what Dr. Greenberg said at his interrogation, as the transcript speaks for itself.

**Counter-Response:**   No response.

49.      At the interrogation, Plaintiff mentioned possible allegations of discrimination for the first time.  Ex. QQ, SUNY001335.  In response, Ms. Bernadel sent Plaintiff a letter directing him to contact The Office of Diversity & Inclusion regarding any complaints of discrimination.  Ex. TT.

**Response**:      Undisputed only to the extent that Dr. Greenberg alleged a formal complaint of discrimination to Labor Relations for the first time in the context of the interrogation

on October 10, 2014.  Undisputed that Ms. Bernadel sent the above-referenced letter subsequent to the interrogation on October 10, 2014.

> **Counter-Response:**   No response.

50.      Shortly after the interrogation, it was reported to Labor Relations that Plaintiff "harassed" employees outside of KCHC.  Ex. UU, SUNYESI000101.  As a result, Plaintiff was informed that he was not allowed to be on the hospital premises pending the outcome of the disciplinary action.  Id.

> **Response**:      Undisputed that Labor Relations alleged that Dr. Greenberg "harassed" employees outside of KCHC shortly after the interrogation but dispute that such actually occurred.   Rather, Dr. Greenberg merely chatted with a KCHC employee with whom he thought he was friendly about the fact that he was frustrated with his employer and it looked like he was going to be terminated.  Ex. 1 (Greenberg Dep. at 346).

> **Counter-Response:**   The cited evidence does not contradict paragraph 50.

51.      On October 20, 2014, Ms. Bernadel and Mr. Cuiman met with Plaintiff again, who this time was accompanied by counsel from the New York State Unified Teachers, as well as his wife.  Ex. DD, SUNY001345.  Plaintiff continued to complain about the use of the required attestations during this meeting, repeating his view that the "purpose of the attestation" was "so that insurance companies make you jump through another hoop before they pay you" or, he added, "so that you can get sued better … there's no real good reason for it."  Id., SUNY001364.  He went on to say that "[i]t just adds more work to my day."  Id., SUNY001365.  Despite admitting he did not use the approved attestations, Plaintiff blamed Dr. Reede for his situation, and stated that her character was "really piss-poor."  Id., SUNY001393.  Plaintiff concluded the meeting by stating that "I expect to get my job back.  I expect an apology from [Dr. Reede] and I expect a raise."  Id., SUNY001394.

**Response**:    Disputed to the extent that the statement indicates that Mr. Cuiman met with Dr. Greenberg for a second time, as he was not present at either the initial interrogation with Mr. Arabian nor the second interrogation with Stephanie Bernadel.  Undisputed as to what Dr. Greenberg said at the interrogation, as the transcript thereof speaks for itself.

**Counter-Response:**   Undisputed that Mr. Cuiman was only present for the October 20, 2014 meeting with Plaintiff but this dispute is not material.

52.    As part of her investigation, Stephanie Bernadel interviewed a number of employees regarding Plaintiff's use of the unapproved attestations.  Dr. Scott told Ms. Bernadel that Plaintiff complained during that meeting about the use of the attestations, telling her that "this is the beginning of the end of medicine, this is the corporatization of medicine."  Ex. HH.

**Response**:    Undisputed as to what Dr. Scott's witness statement says.

**Counter-Response:**   No response.

53.    Dr. James Walsh told Ms. Bernadel that Plaintiff told him after the meeting that "I can't believe I have to write an attestation."  Ex. II.

**Response**:    Undisputed.  Notably, this statement attributed to Dr. Greenberg supports the contention that he misunderstood the mandate - that he had to write an attestation to every report rather than merely adopt a macro and with one click add it to a patient's report.

**Counter-Response:**   Plaintiff mischaracterizes the use of attestations.  He did not "write an attestation to every report."  He wrote one sarcastic version and attached the same attestation to approximately 180 patient files.

**X.      Facts Regarding Other Statements Made by Plaintiff**

54.    On September 30, Plaintiff sent a letter to Dr. Pulitzer complaining that "[t]he hyper-vigilance and micromanagement is often insulting and I no longer look forward to coming to works [sic] as a result of the corporatization of medicine."  Ex. JJ.  Plaintiff repeated this

concern about the "corporatization" of medicine in an email following his termination, saying that "the new administrations [sic] polices have negatively affected morale and patient care in the name of corporatization."  Ex. KK.  Plaintiff believed this "corporatization of medicine" began at SUNY Downstate when Dr. Reede became chairwoman.  Greenberg Dep., p. 42:9-13.

> **Response**:      Undisputed to the extent of noting that the emails referenced above speak for themselves.  Undisputed to the extent that it is a fair characterization that Dr. Greenberg's concern has always been primarily focused on the delivery of quality patient care above all else.

> **Counter-Response:**   No response.

## XI.      Facts Regarding Plaintiff's Termination

55.      On October 22, 2014, Plaintiff was terminated for violations of the September 8 disciplinary settlement by the Labor Relations Department, in consultation with Drs. Pulitzer and Reede, following "allegations of insubordination, leaving the worksite without authorization and related matters."  Ex. VV; Bernadel Dep., p. 5:12-18; Pulitzer Dep., p. 420:23-421:2.  Dr. Pulitzer also conferred with Dr. Jamaleddine prior to Plaintiff's termination, and he agreed with the decision.  Pulitzer Dep., p. 439:12-24.

> **Response**:      Disputed.  It was Dr. Reede and Dr. Pulitzer who decided to terminate Dr. Greenberg.  Ex. 28 (Bernadel Dep. at 9).  According to Ms. Bernadel, after interrogating Dr. Greenberg about the allegations that prompted his referral in October of 2014 and investigating the allegations by interviewing other witnesses to his conduct, Ms. Bernadel and Mr. Cuiman presented their findings to Dr. Reede and Dr. Pulitzer and together and separately it was his two supervisors who decided that Dr. Greenberg should be terminated.  Id.; Ex. 5 (Pulitzer Dep., 420-21).  Ms. Bernadel and Mr. Cuiman apparently were in agreement with that decision.  Ex. 28 (Bernadel Dep. at 9).  According to Dr. Pulitzer, Dr. Jamaleddine made it known that he would not

allow Dr. Greenberg to continue to practice at KCHC and therefore, in effect, he was saying that Dr. Greenberg had to be terminated.  Ex. 38 (Pulitzer Dep. (2d)) at 42.

**Counter-Response:**   The cited testimony does not contradict the factual statements in paragraph 55 regarding who terminated Plaintiff.  Dr. Reede and Dr. Pulitzer both were consulted and stated that they believed he should be terminated, as stated in paragraph 55, but Labor Relations was in agreement (see Ex. 28, 9:15-19) and issued the termination letter.  Ex. VV; Cuiman Dep., p. 220:9-221:12. Plaintiff's  Opp., p. 14.  Defendants do not dispute that Dr. Jamaleddine would not allow Plaintiff to continue to practice at KCHC.

56.     Dr. Pulitzer himself ultimately had to correct the approximately 180 attestations by re-reading each study, confirming that he agreed or disagreed, and affixing a new counter-attestation.  Ex. WW; Pulitzer Dep., 207:19-208:15.

**Response**:     Uncontested that Dr. Pulitzer decided, along with Risk Management, that he would re-read each study and after confirming or disagreeing with the report, affix an appropriate attestation to the report.

**Counter-Response:**   No response.

## XII.     Facts Regarding the ACGME Reassessment

57.     Following the changes in personnel and the new standards put in place for all physicians in the department, the ACGME restored the Radiology Department's "Continued Accreditation" in August 2015.  Ex. XX.  The department was taken off probation at that time, and it remains accredited today.  Reede Decl., ¶ 17.  The ACGME report in 2015 commended the department "for a quick turnaround and implementing significant changes that have greatly improved the educational program."  Ex. SS, SUNY00697.

**Response**:     Undisputed.

**Counter-Response:**   No response.

**Plaintiff's Rule 56.1 Statement of Additional Material Facts
In Opposition to Defendants' Motion For Summary Judgment**

**Dr. Greenberg's Qualifications as a Competent and Caring Professional**

1.       Throughout his employment at SUNY and KCHC, Dr. Greenberg was a fierce advocate for quality assurance and patient care.  When he first arrived at KCHC, he wrote to David Stark, then Chief of Radiology and his supervisor, to draw attention to deficiencies both in patient care, especially during after hours, and resident teaching.  Ex. 2 (SUNY 003388-90).  Notably, Dr. Greenberg offered to take over supervision of emergent cases during off hours.  Id.  During the period in which Dr. Greenberg was supposedly "acting out" as the SUNY Defendants would have it, the summer of 2014, he took on the daunting administrative task of researching the causes for lapses in care attributable to the Radiology Department at KCHC as his contribution to a multi-departmental longitudinal study on quality assurance with participants from various departments in the hospital, even going so far as to attend one of the study's meetings during his scheduled vacation.  Ex. 3 (HHC_ESI_001006).

**Response:**      Plaintiff's statement of material facts in paragraph 1 relies on improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  The alleged facts are also immaterial and are insufficient to create a genuinely disputed fact. Plaintiff's Statement of Additional Material Facts in Opposition to Defendants' Motion For Summary Judgment is additionally not in compliance with Local Civil Rule 56.1(b).

2.       According to his colleagues, even those who played a pivotal role in terminating his employment, Dr. Greenberg was a highly competent radiologist.  Ex. 4 (SUNY000498); Ex. 5 (Pulitzer Dep.) at 426 ("Dr. Greenberg was a very well respected radiologist in our department.  I mean, he was one of the best radiologists we've ever had and people look up

to him"); Ex. 6 (Scott Dep.) at 90.  During 2013, according to departmental metrics that counted all studies completed by radiologists and then weighted those studies according to their complexity, out of 24 radiologists, Dr. Greenberg was the fifth highest in terms of productivity.  Ex. 7 (SUNY 002439) (14,954 studies completed and weighted at 10,160.1).  According to other colleagues, Dr. Greenberg was not only a highly capable radiologist but he was also a "good teacher."  Ex. 6 (Scott Dep. at 90).

         **Response:** The alleged facts are immaterial and are insufficient to create a genuinely disputed fact for trial.  Further, Plaintiff's Statement of Additional Material Facts In Opposition to Defendants' Motion For Summary Judgment is additionally not in compliance with Local Civil Rule 56.1(b).  The SUNY Defendants dispute Plaintiff's reputation as a teacher; although Dr. Scott said she thought he was a "good teacher" during her residency (but qualified that by saying it was a hard year for everyone at the Hospital), Plaintiff had received unfavorable evaluations from the residents in the program in 2014.  Pl. Ex. 4; Ex. DDD.  Further, he was criticized by residents in relation to his attendance and academic preparation; problems cited by the ACGME.  Id.

### Evidence Of Dr. Reede and Dr. Pulitzer's Surreptitious Scrutiny Of Dr. Greenberg And Fabricating Issues In His Personnel File

        3.      On May 5, 2014, Dr. Greenberg and Dr. Reede met.  Ex. 54 (SUNY 3469). In anticipation of that meeting, Dr. Reede had a pre-printed agenda with bullet points.  Id.  She also had carefully prepared data to confront Dr. Greenberg with the fact that while on his timesheet he had written that he worked 9 to 5 p.m. on April 21, 2014, in fact an email that he had written on April 21, 2014 to Linda McMurren indicated that he was running late and Talk Station data indicated that he did not start work until about noon.  Ex. 55 (SUNY 003485-86 & 88).  Notably, it was Dr. Pulitzer who provided Dr. Reede with an analysis of Talk Station data about Dr. Greenberg on the day in question.  Id. (SUNY 003486).  At this point, Dr. Pulitzer had not yet been appointed Interim Section Chief of Radiology - that role still belonged to Dr. Kantor.  Ex. 5 (Pulitzer Dep.) at 13.

While she handwrote notes of the meeting, there is no indication in those notes that the meeting was disciplinary or involved counseling about performance issues or anything of grave concern.  Ex 54 (SUNY 3469).   Dr. Reede did type a memo to the file about this meeting and stated in that memo that the occasion of the meeting was "incorrect reporting of time and attendance."  Ex. 9 (SUNY 003511).  In this memo, she focused on the issue of time and attendance and added nuggets like her summary of Dr. Greenberg's response to arriving late for work: "he did not see what the problem was because he read all the films.  <u>See</u> <u>id.</u>  In a follow-up email to this meeting, Dr. Greenberg wrote to Dr. Reede about the issue that he believed was the focus of their meeting - a negative resident evaluation.  Ex. 11 (SUNY 000477).  In this email, Dr. Greenberg does not even mention the time and attendance issue, which Dr. Reede suggests was the focus of their meeting.  <u>See</u> <u>id.</u>  At her deposition and in contrast to the negative tone of her typed memo to the file about this meeting, Dr. Reede characterized it as informal and almost friendly.  Ex. 10 (Reede Dep. at 148-151).

   **Response:** Plaintiff's statement of material facts in paragraph 3 relies on improper argument and conclusory allegations.  <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir.1998); <u>Watson v. Grady</u>, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), <u>aff'd sub nom.</u> <u>Watson v. Sims</u>, 648 F. App'x 49 (2d Cir. 2016).  SUNY Defendants dispute Plaintiff's characterization of the alleged facts in this paragraph, but do not dispute that Dr. Reede and Dr. Pulitzer were monitoring the attendance and availability of the physicians within the Department, or that Plaintiff met with Dr. Reede on April 21, 2014 to discuss his time and attendance.  Reede Reply Decl., ¶ 2; Ex. B, I; Reede Dep., p. 149:10-25 (Reply Excerpts)

   4. In a memo that Dr. Pulitzer authored, apparently on September 2, 2014, he stated that he had "counseled in person [Dr. Greenberg] on time and attendance" on August 23, 2014.  Ex. 17 (HHC_ESI_1063).  In another memo, one that was more formalized by being placed on KCHC letterhead and dated August 22, 2014, Dr. Pulitzer stated that the "counseling" took place

on August 22, 2014.  Ex. 17 (HHC_ESI_001092).  Dr. Pulitzer's first memo to the file about the alleged counseling of Dr. Greenberg on August 22, 2014, which he inaccurately dates as August 23, 2014, was likely generated on September 2, 2014, as that is the date of the cover email to his administrative assistant instructing her to file the memo in Dr. Greenberg's personnel file.  Ex. 17 (HHC_ESI_001062).  The second, more formal memo was likely "pre-dated" as the date it bears is August 22, 2014, yet there is no evidence that he instructed his assistant to file any memos on that date, which was his usual habit.  Notably, it was on September 2, 2014 that Dr. Greenberg approached Dr. Pulitzer about taking two days off under the Family Medical Leave Act.  Ex. 5 (Pulitzer Dep.) at 337.  At his deposition, Dr. Pulitzer characterized his August 22, 2014 meeting with Dr. Greenberg as a friendly attempt to get Dr. Greenberg to commit to a shift that he could reliably maintain, given his constraints.  Id. at 311.  Dr. Greenberg recalls a far different conversation in which Dr. Pulitzer told him that Dr. Reede was the person who wanted Dr. Greenberg to work an early, set shift, that he knew that historically Dr. Greenberg was asked to come in later and work later and that, finally, Dr. Reede was out to get rid of him.  Greenberg Decl., ¶ 7.

   **Response:**  Plaintiff's statement of material facts in paragraph 4 relies on improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  Most of the allegations, especially those relating to the alleged "pre-dating" are speculative and not supported by admissible evidence.  SUNY Defendants dispute Plaintiff's characterization of the alleged facts in this paragraph and dispute Plaintiff's recounting of the conversation with Dr. Pulitzer.  Ex. R.  The parties agree that Plaintiff's time and attendance were monitored, that Dr. Pulitzer identified problems with the same, that Dr. Reede had identified problems with the same, and that both raised

**A923**

the issue with Plaintiff.  Any additional alleged facts are immaterial and insufficient to create a genuinely disputed fact.

#### Dr. Reede and Dr. Pulitzer's Continued Surveillance Of Dr. Greenberg

5.      On August 20, 2014, Jayan Kurian, an IT administrator at KCHC, sent to Dr. Pulitzer a daily log indicating when Dr. Greenberg completed review of films while at work from July 1, 2014 to August 8, 2014.  Ex. 15 (HHC_ESI_000777-872).  Later that same day, Dr. Pulitzer forwarded this log to Dr. Reede without a cover email, implying that they were in an ongoing conversation about Dr. Greenberg's time and attendance and/or productivity.  Ex. 16 (HHC_ESI_873).  Discovery has indicated that no other radiologist was singled out for scrutiny in this manner at this point in time.

**Response:**      Plaintiff's statement of material facts in paragraph 5 relies on speculation, improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).   SUNY Defendants dispute Plaintiff's characterization of the alleged facts in this paragraph. The SUNY Defendants do not dispute that Dr. Pulitzer monitored this data for all of the radiologists in the department at the time he was appointed Director of Radiology in part due to time and attendance abuse by physicians. Pulitzer Decl., ¶¶ 4, 6; Pulitzer Dep. II, p. 160:17-161:3.   Dr. Qi Chen ultimately resigned as a result of time and attendance problems, when he was threatened with termination.  Reede Reply Decl., ¶ 3. The alleged facts are also immaterial and insufficient to create a genuinely disputed fact.

6.      At her deposition, Dr. Scott admitted that Dr. Pulitzer would reach out to her in July and August of 2014 to get details about Dr. Greenberg's work hours.  Ex. 6 (Scott Dep. at 136-39, 141-43 & 187).

**Response:** SUNY Defendants dispute Plaintiff's characterization of the alleged facts in this paragraph. The cited testimony does not state that Dr. Pulitzer reached out to Dr. Scott to get details about Plaintiff's work hours. It does state that Dr. Scott and Dr. Pulitzer discussed Plaintiff's absences when they created coverage problems. Ex. 6, Scott Dep., p. 137-139. The alleged facts are also immaterial and insufficient to create a genuinely disputed fact.

### The Promotion Of Dr. Scott Rather Than Dr. Greenberg To The Directorship

7. The position of Director of ER was never officially posted. Greenberg Decl., ¶ 6. By the time Dr. Greenberg requested to be considered for the position and he attended a meeting to discuss his request with Dr. Reede, she had already decided he would not get the position and apparently already offered it to Dr. Scott. Ex. 6 (Scott Dep. at 68-73).

**Response:** Not disputed for the purposes of the motion that the position was not officially posted or that Dr. Greenberg asked to be considered for the position. The alleged facts are immaterial and insufficient to create a genuinely disputed fact. Even before the position of Director of ER Radiology became available, Dr. Reede had made clear that scholarly activity was connected to promotion, and that without such activity, Plaintiff should not expect a promotion. During Plaintiff's annual review in February 2014, well before the decision was made to promote Dr. Scott in July, Dr. Reede made clear that promotion should not be expected without academic accomplishments. Plaintiff was asked to fill out a form indicating his accomplishments during the prior year. Ex. CCC; Greenberg Dep., p. 138:9-18. Plaintiff left two boxes completely blank: "scholarly distinction and accomplishment" and "mutual expectations regarding promotion." Id. In the blank box for "mutual expectations regarding promotion," Dr. Reede wrote "No scholarly activity to support promotion." Id. As Dr. Reede summarized in her notes regarding her meeting with him in July 2014, Plaintiff had "[n]o significant scholarly activity" and primarily for that reason, Dr. Scott was selected. Ex. AAA. Plaintiff acknowledged at the time that a key part of the position

was to "provide[] the best academic experience for our residents" and that "academics" had "been somewhat stunted" in the Department.  Pl. Opp., Ex. 12.   In his email applying for the promotion, Plaintiff acknowledged that the Program was "recalibrating" its academic goals and tried to explain away his lack of scholarship by saying it had been a "tough year," without explaining the absence of scholarship in his previous years.  Pls. Ex. 12.  Plaintiff's CV, which was provided to Dr. Reede at the time of the decision to hire Dr. Scott, listed two publications, both undated and without the name of any journal where they were published.  Ex. YY.  During his deposition, Plaintiff admitted that one of the listed articles, which he wrote in 1988 or 1989, was never published.  Greenberg Dep., p. 10:23-11:18.  Plaintiff was not a member of any radiological societies and did not list any academic accomplishments beyond the two articles.  Ex. YY.  Plaintiff had also submitted a summary of his scholarly activity to provide an update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with residents" and no scholarly activity in the prior year.  Ex. BBB.  Dr. Reede's July 23, 2014 memo regarding Plaintiff's request for a promotion reflected the numerous reasons she did not think Plaintiff should be promoted, including information about Plaintiff's time and attendance problems, in that it cited resident evaluations of Plaintiff which complained of Plaintiff's lack of availability, noting that Plaintiff "would disappear for hours at a time" to "go[] home to eat dinner with his family" during his shift.  Ex. AAA Ex. DDD, SUNY000475. Another resident suggested that Plaintiff "be more available," and Plaintiff received poor feedback in response to whether he provided feedback to residents during his rotation (SUNY000468), whether he was available to assist residents with academic work (SUNY000473), and whether he provided a high-quality teaching experience (SUNY000465).  Id.

8.      Dr. Scott testified that her mission as Director of ER as far as she understood it (and which must have been conveyed by Dr. Reede who hired her for the position) was to get the department running more smoothly rather than focus on her own research and

publications.  Ex. 6 (Scott Dep. at 272-73).  At the time that Dr. Scott was appointed Director of

ER, she had no peer-reviewed journal publications listed in the bibliography section of her resume.

Ex. 48 (HHC 1787).

      **Response:**     Plaintiff's statement of material facts in paragraph 8 relies on improper

speculation, argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d

Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7,

2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  SUNY Defendants also

dispute Plaintiff's characterization of the alleged facts in this paragraph.  Dr. Scott went on to testify

that she still "did scholarly activity" when she started, and in fact she had published two papers in

her first two years, planned to publish two more, and put together several academic posters.  Scott

Dep., p. 264:2-7.  Undisputed that Dr. Scott did not have any publications as of July 2014, but she

was a member of three professional societies, she had a number of recent scientific posters and

education exhibits, and was actively engaged in research for publication.  Ex. ZZ.  Dr. Reede also

testified that Dr. Scott "expressed a strong interest in academics" to her prior to the decision, and

she had already volunteered to work on some teaching module projects.  Reede Dep., p. 124:10-18.

       9.     As previous Director of ER Radiology at KCHC, Dr. Greenberg had run a

service in a department that was not placed on probation by ACGME.  Also, at the time that Dr.

Greenberg sought to become the Director of ER Radiology he had twice as much clinical experience

as Dr. Scott with the majority of it at an institution categorized as a Level One trauma ER, as

opposed to Dr. Scott's experience which was not at a Level One trauma ER.  Greenberg Decl., at ¶

6.  Dr. Greenberg was also board certified in both anatomic pathology and diagnostic radiology,

which is unusual and not the case with Dr. Scott.  Complaint ¶ 1.  He also completed an ACGME-

approved fellowship in radiology while Dr. Scott had not.  Id.

**Response:**     The alleged facts pertain to Plaintiff's subjective belief as to why he was better qualified for the position than Dr. Scott and are immaterial and insufficient to create a genuinely disputed fact. Further, none of the alleged facts concern Dr. Reede's reason for choosing Dr. Scott instead of Dr. Greenberg.  Ex. AAA.  Plaintiff was an attending physician in the Program when it was placed on probation.  He had time and attendance problems, which raised particular concern given the ACGME report.  See Response to ¶ 16, supra.

10.     At the meeting on July 23, 2014, where Dr. Reede and Dr. Greenberg discussed the latter's request to be made Director of ER Radiology, Dr. Reede said in sum and substance that she believed Dr. Scott was the better candidate because she was closer to her residency and therefore would be a more effective mentor to residents.  See Greenberg Decl., ¶ 6.  Dr. Greenberg understood this comment to mean that he would be a less effective teacher of residents because he was older.  Id.

**Response:**     Plaintiff does not identify what Dr. Reede is alleged to have said.  The allegation that she stated that she sought someone closer to residency, which Dr. Reede denies making, is nevertheless neutral as to age, and instead refers to the experience of having been a resident.  It is therefore immaterial and insufficient to create a genuinely disputed fact.

11.     According to Dr. Reede's memo to the file of the July 23, 2014 meeting between Dr. Greenberg and herself to discuss why he would not become Director of ER Radiology under her watch, (Ex. 13 (SUNY 000498)), Dr. Greenberg (1) lacked participation in administrative functions in the department; (2) his resident evaluations showed deficiencies; (3) he had no significant scholarly activity; and (4) he did not demonstrate an interest in academic pursuits.  Id.  None of these reasons was credible.  First, Dr. Greenberg's day-time schedule and duties required that he remain in the ER at all times so attending administrative meetings posed tremendous challenges.  Ex. 56 (HHC_ESI_000144-45).  Second, Dr. Greenberg's resident evaluations were well

above average, except for one resident who had an ax to grind, which Dr. Greenberg had explained to Dr. Reede in great detail previously.  Ex. 11 (SUNY 000477).  Third, Dr. Reede never gave Dr. Greenberg a chance to explain that he had been engaged in academic research during the past year and remained interested in pursuing such.  Greenberg Aff., ¶ 6.  Notably, at her deposition, Dr. Scott made clear that her mission as the new Director of ER Radiology, as must have been explained to her by Dr. Reede, was not to focus on academic and scholarly activity but to render more efficient clinical processes and staffing so that films of patients would be read more quickly and in a timely fashion, an issue that had been Dr. Greenberg's hobbyhorse during his entire tenure at KCHC.[5]  Ex. 6 (Scott Dep. 272-73).  Finally, at the meeting and not memorialized in the memo to the file, Dr. Reede told Dr. Greenberg that one of the reasons she had chosen Dr. Scott rather than he to be Director was that she was closer to her residency and therefore would be a more effective mentor to them, which Dr. Greenberg understood her to mean that Dr. Scott was younger than he was and therefore more able to relate to them.  Greenberg Aff., ¶ 6.

**Response:**     Plaintiff's statement of material facts in paragraph 11 relies on speculation, improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).   The alleged facts are not supported by admissible evidence.  Plaintiff's evaluations were not "well above average" and noted significant issues with his availability and his interest in teaching.  Ex. DDD, compare with Dr. Scott's evaluations from the following year, Ex. EEE.  Plaintiff had a number of opportunities to inform Dr. Reede of his interest in scholarly work.  He submitted a resume to Dr. Reede that

---

[5] In Dr. Reede's memo of the July 23, 2014 meeting with Dr. Greenberg, she noted that she was seeking a Director with an academic predisposition because "we want to explore the possibility of starting an ER Fellowship." Ex. 4 (SUNY 000498)  This note is pretextual to the extent that we can believe Dr. Scott's testimony that Dr. Reede told her to focus on administrative tasks; furthermore, the Department of Radiology has yet to implement any such ER Fellowship.

showed two undated articles, one of which was never published; he filled out a February 2014 form that asked him to list any "scholarly distinction and accomplishment," which he left blank (Ex. CCC; Greenberg Dep., p. 138:9-18); and he submitted a summary of his scholarly activity to provide an update to the ACGME that showed zero hours spent engaging in "Research/scholarly activity with residents" and no scholarly activity in the prior year.  Ex. BBB.  Plaintiff mischaracterizes Dr. Scott's testimony.  Dr. Scott went on to testify that she still "did scholarly activity" when she started, and in fact she had published two papers in her first two years, planned to publish two more, and put together several academic posters.  Scott Dep., p. 264:2-7.  Plaintiff does not identify what Dr. Reede is alleged to have said.  The allegation that she stated that she sought someone closer to residency, which Dr. Reede denies making, is neutral as to age, and instead refers to the experience of having been a resident  It is therefore immaterial and insufficient to create a genuinely disputed fact.

12. Dr. Scott testified that as a resident supervised by Dr. Greenberg she could state that he was "a good teacher ... an excellent radiologist." Ex. 6 (Scott Dep.) at 90.  Even Dr. Reede admitted at her deposition that Dr. Greenberg had a reputation as a highly productive and accurate radiologist and good teacher.  Ex. 10 (Reede Dep) at 264; Ex. 57 (Reede (Second) Dep.) at 118.

**Response:** Defendants do not dispute that Plaintiff is a good radiologist and that Dr., Scott testified that he was a good teacher and excellent radiologist during her residency. Scott Dep. p. 90. The alleged facts are immaterial and insufficient to create a genuinely disputed fact.  SUNY Defendants do not assert that any action was taken against Plaintiff because of his skills or lack thereof as a radiologist.  As to his teaching, resident evaluations of Plaintiff in 2014 complained of Plaintiff's lack of availability, noting that Plaintiff "would disappear for hours at a time" to "go[] home to eat dinner with his family" during his shift.. Ex. AAA, Ex. DDD.  Another resident

suggested that Plaintiff "be more available," and Plaintiff received poor feedback in response to whether he provided feedback to residents during his rotation (SUNY000468), whether he was available to assist residents with academic work (SUNY000473), and whether he provided a high-quality teaching experience (SUNY000465).

13.    Dr. Pulitzer admitted that Dr. Greenberg was an admired ER radiologist: "[he] was a very well respected radiologist in our department.  I mean, he was one of the best radiologists we've ever had and people look up to him.  People looked to him to model what he's doing, just like a Michael Jordan or whomever."  Ex. 5 (Pulitzer Dep. at 426-27).

**Response:**    Undisputed. The alleged facts are immaterial and insufficient to create a genuinely disputed fact.

### The Shifts For ER Radiologists At KCHC

14.    Dr. Scott testified that when she began working at KCH the 9 to 5 shift was for non-ER radiologists "upstairs." Ex. 6 (Scott Dep. at 127).  She believed that Dr. Greenberg worked the 9 to 5 shift but she was unsure.  Id.  After he left, the 9-5 shift in ER Radiology was eradicated.  Id.  Dr. Scott testified that the 9-5 shift assigned to Dr. Greenberg did not conform well to the needs of the ER since the volume of film from 9 to 2 did not justify two people being there. Id. at 128.

**Response:**    The alleged facts are immaterial and insufficient to create a genuinely disputed fact.  Plaintiff has not alleged or provided admissible evidence showing that whatever his shift hours were, he complied with them.  So whether Dr. Scott knew his hours and the best way to arrange shifts is immaterial.  Plaintiff also mischaracterizes Dr. Scott's testimony, which does not state that "she was unsure" Dr. Greenberg worked 9:00 to 5:00, but rather that she believed he worked the 9:00 to 5:00 shift.

15.     In fact, in the past, what shift Dr. Greenberg worked was a topic of continued discussion when he was supervised by Dr. Alan Kantor, Chief of Service in the Radiology at KCHC before Dr. Pulitzer.  Dr. Kantor wanted Dr. Greenberg routinely to work from noon to 8 p.m.  Ex. 5 (Pulitzer Dep. at 255-56); Greenberg Decl, ¶ 7.  Dr. Greenberg found the noon to 8 p.m. shift very difficult to balance with his family obligations, which included care of a special needs son. Ex. 58 (HHC_ESI_00068).  Eventually, Dr. Greenberg accepted a compromise position with Dr. Kantor - he would come in between 10 and 11 a.m. and work 8 hours from his start time - until approximately 6 or 7 p.m.  Greenberg Decl., ¶ 7.  Dr. Greenberg worked the modified 12 to 8 p.m. shift up to the point that Dr. Pulitzer conveyed to him that Dr. Reede was demanding that Dr. Greenberg work a 9 to 5 p.m. schedule in or around August 22, 2014.  Greenberg Decl., ¶ 7.  Dr. Greenberg agreed to work the 9 to 5 p.m. schedule commencing in September of 2014 when his children were established in their school routines.  Id.

**Response:**     Plaintiff's allegation that he reached a "compromise position" with a former supervisor in regard to his hours, which Plaintiff alleges he "tended to adhere" (Greenberg Decl. ¶ 7), is immaterial even if true.  At all times relevant to this action, Plaintiff had an assigned shift and he was told his hours were being monitored.  Dr, Kantor also had problems with Plaintiff's time and attendance.  Exs. F, G, H.  The remaining alleged facts are immaterial and insufficient to create a genuinely disputed fact.  Also see Counter Response, ¶ 16, fn. 3 supra.

### Dr. Greenberg's Request for FMLA Leave

16.     On August 29, 2014, Dr. Greenberg and his wife received an email from a representative of the school where their special needs son, Jayden, had been matriculated notifying them that it was likely that their son would have to be transferred to another school.  Ex. 20 (G212); Ex. 1 (Greenberg Dep. at 224-26).  Jayden has a serious condition (i.e., has been diagnosed as on the autism spectrum) and throughout his lifetime has received extensive support from health and

mental-health professionals and during the relevant period attended school with the assistance of an Individualized Education Plan (IEP).  Greenberg Decl., ¶ 4; Ex. 1 (Greenberg Dep.) at 225-26; Ex. 21 (SUNY 007281-7302).  At the time relevant to this case, he was unable to perform regular life activities, unless he received assistance from his parents.  Greenberg Decl., ¶ 4.  In light of the news about Jayden, Dr. Greenberg wanted to take a leave of a few days to assist in the necessary arrangements for Jayden's transfer and to provide him with love, support and care during what was likely to be a difficult period for Jayden, which was likely to lead to depression, anxiety and incapacitation.  Greenberg Decl., ¶ 9.  In light of his son's situation, on August 29, 2014, Dr. Greenberg attempted to call Dr. Reede at her office because he understood that what he was requesting was on short notice.  Greenberg Decl., ¶ 9.  Dr. Reede's voicemail was full because she was on vacation and therefore he was unable to leave a message.  See id.  Knowing that Dr. Pulitzer was on vacation too, Dr. Greenberg reached out to the only other person that might be able to guide him as to how to proceed - Linda McMurren who was Dr. Reede's administrative assistant. Ex. 22 (HHC_ESI_001090).  Dr. Greenberg did not realize that Ms. McMurren was also on vacation, as she did not reply to his email until September 4, 2014.  Id. (HHC_ESI_001089).  In contacting Dr. Reede immediately upon learning of his need to take time off for an emergency family matter that related to the care of his son who has a serious condition, Dr. Greenberg followed relevant policy regarding unexpected absences.  Ex. 59 (SUNY 000677).

  **Response:**  The alleged facts regarding Plaintiff's son's condition are undisputed but immaterial and are insufficient to create a genuinely disputed fact.  Plaintiff's allegations about trying to reach Drs. Reede and Pulitzer do not create a triable issue of material fact.  Plaintiff does not in fact point to admissible evidence indicating that he "immediately contacted Dr. Reede upon learning" of the need to take time off.  Plaintiff has submitted uncontroverted evidence that a letter was sent to him during the week of August 18, 2014, and an email on August 25, 2014 indicating

that Plaintiff's son would not be able to return to his school, the alleged reason for his original need for leave.  Ex. FFF.  Plaintiff now claims, for the first time, that he called Dr. Reede on August 29th to ask for time to care for his son, but was unable to leave a message because her voice mail was full. He did not "reach" her or make any real attempt to do so.  Plaintiff further alleges that he could not reach Dr. Pulitzer because he was on vacation.  But these allegations are immaterial because both doctors regularly checked their emails and their cell phone numbers were circulated to all physicians. Reede Reply Decl., ¶ 7; Pulitzer Reply Decl. ¶ 1.  Plaintiff could have and should have used either method.  The admissible evidence demonstrates that he did not immediately reach out to any of his supervisors upon learning, by August 25th at the latest, of his alleged need for leave.  SUNY Defendants have no knowledge of Plaintiff's attempt to call Dr. Reede on August 29, 2014, at least four days after receiving notice that he may need leave time, but he did not email either doctor or include the alleged reason for his leave in any written communication with Linda McMurren, Dr. Pulitzer or Dr. Reede at any time.  Plaintiff does not even allege that he notified Dr. Pulitzer of his need for leave until September 2, 2014.   Further, Plaintiff's alleged notice to SUNY Downstate of an FMLA qualifying condition is immaterial since Plaintiff actually took leave on September 4 and ,5 and in any event repeatedly told SUNY, and stated on the record during his Interrogation, that he did not actually have to take that time off for his son (as his mother-in-law and wife could provide "appropriate support"), but missed work due to a non-qualifying back injury.  Ex. X, SUNY001292.

17.     Not hearing back from Linda McMurren, on September 2, 2014, Dr. Greenberg approached Dr. Pulitzer about taking off September 4th and 5th later that week.  Ex. 1 (Greenberg Dep. at 228); Ex. 5 (Pulitzer Dep. at 337).  Dr. Greenberg provided the reason why he needed the leave: "I told him that I had to care for my son, that he had to transition to a new school, and that I needed the time off to be with him."  Ex. 1 (Greenberg Dep.) at 228).  Dr. Pulitzer knew that Dr. Greenberg had a special-needs son.  Ex. 5 (Pulitzer Dep.) at 341-42.  He denied that Dr.

Greenberg mentioned that he needed the time off to take care of Jayden during any of their conversations about the leave. Id. at 341 & 345. He admitted that he never asked Dr. Greenberg why he needed the time off in spite of three conversations about the request, including one conversation in which he admitted that Dr. Greenberg told him in sum and substance that you are making me choose between my job and my family. Id. at 360. To all of Dr. Greenberg's requests for a leave, Dr. Pulitzer responded verbally and finally in writing that he could not allow Dr. Greenberg to take the days off because of staffing deficiencies and departmental operational needs. Ex. 1 (Greenberg Dep. at 232); Ex. 5 (Pulitzer Dep. at 337-38); Ex 58 (SUNY 000482).

**Response:** The SUNY Defendants do not dispute that Plaintiff's leave request was denied due to staffing deficiencies and departmental operational needs. SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pulitzer regarding his need for leave. Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22. However, the allegations regarding Plaintiff's alleged notice to SUNY Downstate of an FMLA qualifying condition are immaterial, since the admissible evidence demonstrates that Plaintiff did not in fact notify his supervisors of the need for leave as soon as he knew he may need it, see Ex. FFF and the SUNY Defendants' response to Plaintiff's ¶ 16, supra; took leave on September 4 and 5 anyway; testified that his mother-in-law and wife were available to take care of his son, and stated in an email to SUNY and during his interrogation that he missed work due to a back injury, rather than for any family purpose. Ex. X, SUNY001292.

18. At his deposition, Dr. Pulitzer stated that he could not grant Dr. Greenberg leave on September 4 and 5, 2014 because he was down four radiologists from recent non-renewals and other radiologists were on vacation. Ex. 5 (Pulitzer Dep. at 338-39). In fact, at the time, the department had replaced three of the four of the radiologists that had been let go. Greenberg Decl., ¶ 9. Dr. Greenberg also remembers Dr. Pulitzer stating as another reason he could not permit his leave is that the department lacked someone who could do body imaging, if Dr. Greenberg was not

around.  Id.  As for the lack of body imagers on the days in question, according to Dr. Greenberg, any radiologist who did weekend call, such as Drs. Scott, Chen, Samin, Zinn, Pulitzer and Waite, could have done body imaging and each of whom was working the days in question.  Id.

**Response:**     The alleged facts do not contradict Dr. Pulitzer's reason for denying leave based on the operational needs of the department.  Plaintiff mischaracterizes Dr. Pulitzer's cited testimony.  Dr. Pulitzer testified that because of the lay offs *and vacation schedules*, the Radiology Department was working on a "skeleton crew."  Pl. Ex. 5, Pulitzer Dep. at 338-39.  The Radiology Department was severely understaffed the week of September 1, 2014, and there were not enough radiologists available to adequately cover the work.  Pulitzer Reply Decl., ¶ 2.  Plaintiff has cited no admissible evidence otherwise.  Dr. Pulitzer set the schedule for that week with the expectation that Plaintiff would cover for Dr. Patrick Hammil, who is a specialist in complex Body Imaging cases.  Id.  Plaintiff does not cite any evidence showing that any of the doctors he names have such a specialization or that moving them to cover Dr. Hammil would not create additional coverage problems in the department.  Dr. Scott testified that the department was "really understaffed" on those two days and Plaintiff's absence created "even more stress in the department."  Scott Dep., p. 149:17-150:14.

19.     On September 3, 2014, Dr. Greenberg approached Dr. Pulitzer once again about the two days that he needed to take off in order to care for his special needs son.  Ex. 5 (Pulitzer Dep. at 351); Ex. 1 (Greenberg Dep. at 231-32).  According to Dr. Greenberg, he said to Pulitzer amongst other statements about his need for the leave to take care of his son: "I must have this time off to care for my son.  This is a difficult transition for him."  Id., Ex. 1 (Greenberg Dep. at 232).  Again, Dr. Pulitzer denied the request in sum and substance by stating: "due to the operational needs of the department, I can't let you have the time off."  Id.

**Response:**     SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pultizer regarding his need for leave.  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22.  But even if true, the alleged facts regarding Plaintiff's claimed notice to SUNY Downstate of an FMLA qualifying condition are immaterial, since Plaintiff delayed in seeking the leave, see Ex. FFF and the SUNY Defendants' response to Plaintiff's ¶ 16, supra; took leave on September 4 and 5 anyway; testified that his mother-in-law and wife were available to take care of his son obviating the need for his leave; and stated in an email to SUNY and during his interrogation that he missed work due to a back injury, rather than for any family purpose.  Ex. X, SUNY001292.

20.     After Dr. Greenberg approached Dr. Pulitzer the second time to request two days off to take care of his special-needs son, Dr. Pulitzer sought Dr. Reede's assistance as to how to handle the situation.  Ex. 5 (Pulitzer Dep. at 355-56).  She advised him to write a letter to Dr. Greenberg officially denying the time off, ordering him to report for work and warning him that if he were to disobey the command he would be referred to Labor Relations.  Id. at 356.  Dr. Pulitzer followed Dr. Reede's recommendation and generated the letter described above.

**Response:**     SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pultizer regarding his need for leave.  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22.  But even if true, the alleged facts regarding Plaintiff's alleged notice to SUNY Downstate of an FMLA qualifying condition are immaterial since Plaintiff delayed in seeking the leave, see Ex. FFF and the SUNY Defendants' response to Plaintiff's ¶ 16, supra; took leave on September 4 and 5 anyway; testified that his mother-in-law and wife were available to take care of his son obviating the need for his leave; and stated in an email to SUNY and during his interrogation that he missed work due to a back injury, rather than for any family purpose.  Ex. X, SUNY001292.  The remaining alleged facts are immaterial and insufficient to create a genuinely disputed fact.

21.     Dr. Pulitzer delivered the letter recommended by Dr. Reede to Dr. Greenberg within 30 minutes of discussing the matter with Dr. Reede.  Ex. 5 (Pulitzer Dep. at 358). He went to the reading room where Dr. Greenberg was working and said: "Oded, I have to give you this letter. I can't approve your time off."  Id.  He then read the contents of the letter to Dr. Greenberg and after doing so told him not to take the time off.  Id.  Dr. Pulitzer admitted that Dr. Greenberg said to him at this juncture, "Well, you're making me choose between my job and my family," to which he responded "I'm not making that choice."  Id. at 360.  Dr. Pulitzer admitted that he did not inquire as to what Dr. Greenberg meant by stating that he was making Dr. Greenberg choose between his job and family.  Id. at 360-61.  In an email that Dr. Pulitzer wrote to Michael Arabian, the Labor Relations representative who was assigned to Dr. Greenberg's case after the "insubordination" of September 4, 2014, he stated that during the third discussion, after he had read the official letter that he wrote to Dr. Greenberg officially denying his request for leave and warning him that he would be referred to Labor Relations if he did not show up (and presumably after he had heard Dr. Greenberg state, "you're making me choose between my job and my family"), he and Dr. Greenberg talked for a few minutes about each other's mutual families.  Ex. 50 (HHC_ESI_1087).  At his deposition, Dr. Pulitzer testified that if he had known that the leave of absence was to take care of Dr. Greenberg's special-needs son Jayden he would have made every attempt to accommodate the request.  Id. at 361.

**Response:**     SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pulitzer regarding his need for leave.  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22. Nevertheless, the alleged facts are immaterial and insufficient to create a genuinely disputed fact, since Plaintiff delayed in seeking the leave, see Ex. FFF and the SUNY Defendants' response to Plaintiff's ¶ 16, supra; took leave on September 4 and 5 anyway; testified that his mother-in-law and wife were available to take care of his son obviating the need for his leave; and stated in an email to

SUNY and during his interrogation that he missed work due to a back injury, rather than for any family purpose.  Ex. X, SUNY001292.   SUNY Defendants dispute Plaintiff's characterization of what he said to Dr. Pultizer regarding his need for leave.  Pulitzer Dep., 344:5-9; 345:16-346:12; 359:16-22.  The remaining alleged facts are immaterial and insufficient to create a genuinely disputed fact.

22.     Dr. Greenberg did not go to work on September 4 and 5 of 2014.  In fact, on the schedule for this week were sufficient radiologists to cover for Dr. Greenberg's absence on these two days.  Greenberg Decl., ¶ 9.  The services that Dr. Greenberg would have covered were covered on these two days.  Ex. 5 (Pulitzer Dep. at 354).  Dr. Greenberg never filled out forms to request his FMLA leave because his supervisor, Dr. Pulitzer, made it clear through discussion and the September 3, 2014 letter ordering him to work that he would not approve the request.

**Response:**     SUNY Defendants do not dispute that multiple people covered for Plaintiff during those two days.  Ex. 5, p. 354:17-23.  The alleged facts do not contradict Dr. Pulitzer's reason for denying leave based on the operational needs of the department.  The Radiology Department was severely understaffed the week of September 1, 2014, Pulitzer Reply Decl., ¶ 2, but had no option except to continue to operate.   Dr. Scott testified that the department was "really understaffed" on those two days and Plaintiff's absence created "even more stress in the department."  Scott Dep., p. 149:17-150:14.  The SUNY Defendants do not contest that Plaintiff did not complete FMLA request forms, state that Plaintiff has failed to identify admissible evidence showing that Dr. Pulitzer made it clear that such request would be futile,  and state that the other facts alleged are immaterial.

23.     On September 4, 2014 at 2:48 p.m., Dr. Reede notified Labor Relations that Dr. Greenberg did not come into work as ordered; therefore, a case regarding him that was already "opened" at Labor Relations and assigned to Michael Arabian was set to be pursued.  Ex. 23

(SUNYESI0000278).  Later that day, Arabian reached out to Dr. Pulitzer by email and asked for the details as to what occurred when he hand-delivered the letter dated September 3, 2014 that denied Dr. Greenberg's request for two days off.  At 10:57 a.m. the next morning, Dr. Pulitzer emailed Arabian an attachment that described his interactions with Dr. Greenberg in detail.  Ex. 24 (SUNY 000494); Ex. 25 (HHC 1135-36) (the memo that Dr. Pulitzer sent to Mr. Arabian).  In his memo to Labor Relations, Dr. Pulitzer described Dr. Greenberg's conduct the week of August 25th, coming into work rather than staying out on vacation, in a manner to suggest that it was a problem, even though Dr. Hammil, according to Dr. Greenberg, welcomed Dr. Greenberg's help.  Ex. 25 (HHC 1135); Greenberg Decl., ¶ 8.  Arabian responded to this memo about 10 minutes later by asking for more details as to what happened when Dr. Pulitzer handed to Dr. Greenberg the September 3, 2014 letter denying his request.  Ex. 24 (SUNY 000493).  Dr. Pulitzer responded 20 minutes later and stated in pertinent part: "I advised him to show up for work on September 4 and to revise his plans or this matter would be referred to labor relation.  He thanked me for my recommendation and said that he intended to continue with his original plan.  I stayed an additional five minutes and had small talk about his family."  Ex. 24 (SUNY 000493).  Later this same day, Dr. Pulitzer sent to Dr. Reede the "pre-dated" memo discussed above.  Ex. 17 (HHC_ESI_001091-92).

     **Response:**    Plaintiff's statement of material facts in paragraph 23 relies on speculation, improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  The SUNY Defendants dispute Plaintiff's characterization of the facts in paragraph 23, but the alleged facts are immaterial and insufficient to create a genuinely disputed fact.

       24.    On September 5, 2015, Dr. Reede, Dr. Pulitzer and Michael Arabian from SUNY Labor Relations met to talk about what would happen, i.e., the process now that Dr.

Greenberg had been referred to Labor Relations.  Ex. 5 (Pulitzer Dep. 363-72).  Dr. Pulitzer noted that the meeting was arranged through Dr. Reede's office because she was familiar with Labor Relations and he was "a very, very new administrator."  Id. at 364.

**Response:**     The alleged facts are immaterial and insufficient to create a genuinely disputed fact.

25.     On September 5, 2014, Dr. Greenberg wrote an email to Linda McMurren and cc'd Dr. Pulitzer to provide an explanation of his absence.  Ex. 22 (HHC_ESI_001089).  Therein, he wrote, "[a]s it turns out I was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning.  I then managed to throw my back out.  My mobility has been severely limited since.  Please forgive the confusion."  Id.  At his deposition, Dr. Greenberg made clear that this email was an attempt to save his job by misrepresenting that he had intended to come to work on the two days that he missed but he threw his back out on the morning of the 4th; he always intended to take his leave in order to be available for Jayden and assist in his transfer from one school to another.  Ex. 1 (Greenberg Dep. at 246-47).

**Response:**     The SUNY Defendants do not dispute that Plaintiff notified Ms. McMurren and Dr. Pulitzer that he was out as a result of his back, and he did not state that the reason for his leave was to care for his son until his deposition, almost two years later. The alleged facts regarding Plaintiff's intent are immaterial and insufficient to create a genuinely disputed fact.

The Settlement Agreement that Dr. Greenberg Signed Under Duress

26.     When Dr. Greenberg returned to work on his next scheduled work day, September 8, 2014, he went to the reading room where he began reading cases.  Edgar Decl., Ex. 5 (Pulitzer Dep. at 373).  Shortly after arriving, Dr. Pulitzer approached him and instructed him to cease working immediately and report to Labor Relations.  Id.  After being interrogated for a few hours and having to wait another few hours for Labor Relations to draft and present to him a

Settlement Agreement, all the while suffering from back spasms, Dr. Greenberg signed a draconian Settlement Agreement.  Ex. 29 (SUNY 006626-27).  By its terms, in lieu of any immediate discipline, the Settlement Agreement provided that Dr. Greenberg would be on probation for a year and any subsequent infraction posed the real possibility that he could be terminated immediately.  Id.  (¶ 4).  This settlement agreement, the terms of which were likely discussed between Mr. Arabian and Dr. Reede and Dr. Pulitzer because that was the standard operating procedure, was especially severe in light of the fact that of the nine other settlement agreements presented to employees during this time period by SUNY Labor Relations only one other stripped the employee of his or her job security.  Ex. 27 (Arabian Dep. at 224-25) (conferring with those supervisors affected by the agreement would routinely occur); Ex. 30 (nine other settlement agreements).  In the cover email to the Settlement Agreement, Mr. Arabian instructed Dr. Pulitzer to keep a close eye on Dr. Greenberg to confirm that he did not stray from its strict terms.

**Response:**     Plaintiff's response relies on speculation, improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  Plaintiff's interrogation was 55 minutes long.  Ex. GGG; Coulston Decl., ¶ 7.  There is no admissible evidence that Mr. Arabian conferred with Dr. Pulitzer or Dr. Reede regarding the terms of the settlement agreement.  Mr. Arabian testified that "sometimes my superiors had conversations or at least a heads-up to certain departments of what was happening" (Ex. 27, 223:2-5), but he had no recollection of that happening on September 8, 2014 (Id., p. 222:12-7).  Dr. Pulitzer and Dr. Reede have stated that they were not consulted (Reede Dep., 314:12-25; Pulitzer Decl., ¶ 11).  Plaintiff chose to decline representation, and received the same agreement as the other unrepresented individual in the agreements cited by Plaintiff.  See Ex. 30, SUNY006625.  Plaintiff admits he did not read the agreement, let alone try to negotiate better terms.  Ex. DD,

SUNY01353; 56.1 Response, ¶ 36. The remaining alleged facts are unsupported, immaterial and insufficient to create a genuinely disputed fact.

### The Heightened Surveillance of Dr. Greenberg and His Alleged Violations of the Settlement Agreement

27.     Dr. Greenberg was subject to unremitting scrutiny by Dr. Reede and Dr. Pulitzer upon his return to work after signing the Settlement Agreement.  On September 9, 2014, Dr. Greenberg wrote an email to Dr. Pulitzer wherein he complained about the slow speed in which archived images were made accessible due to computer issues.  Ex. 32 (HHC_ESI_001238).  In response to this email, Dr. Pulitzer sent it to his assistant to file in his personnel folder.  Id.  On September 12, 2014, Dr. Pulitzer wrote an email to Dr. Reede with the subject line of "week in review September 12, 2013."  Ex. 33 (HHC_ESI_001243-44).  The first item addressed is Dr. Greenberg and in relation to him, Dr. Pulitzer wrote: "Will monitor time and attendance and number of cases read per day."  Id.  On September 15, 2014 at 8:52 a.m., Dr. Reede emailed Dr. Pulitzer and posed the question: "is Dr. Greenberg reading films?"  Ex. 34 (HHC_ESI_1259).  Dr. Pulitzer responded within 35 minutes with the answer, "Yes. He is."  Ex. 35 (HHC_ESI_1262).

**Response:**     Plaintiff's response relies on speculation, improper argument and conclusory allegations.  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998); Watson v. Grady, No. 09-CV-3055 NSR, 2015 WL 2168189, at *17 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016).  The alleged facts are also immaterial and are insufficient to create a genuinely disputed fact.

28.     On September 15, 2014 at around 2:47 p.m., Dr. Greenberg wrote to Dr. Pulitzer while carbon copying Dr. Reede in which he gave his account of what occurred leading up to his absences on September 4 and 5, 2014, emphasizing the fact that he emailed Dr. Pulitzer and Dr. Reede about coming in the week of August 25th and emailed Linda McMurren about the need to take off days the following week.  Ex. 36 (HHC 1529 & 1531).  In response to this email, Dr.

**A943**

Reede wrote to Dr. Pulitzer: "Dr. Greenberg is trying to cover his tracts [sic]."  Ex. 37

(HHC_ESI_001274).  To which Dr. Pulitzer responded, "Yes I have filed his email in his file.  he is

really all over the map."  Id.

**Response:**     The SUNY Defendants do not dispute that the writings referred to were sent

and speak for themselves.  The alleged facts are immaterial and are insufficient to create a genuinely

disputed fact.

29.     On September 22, 2014, Dr. Greenberg attended a departmental meeting but

arrived late.  Greenberg Decl., ¶ 11.  During the departmental meeting, the use of attestation clauses

was discussed but because he arrived late Dr. Greenberg was not there for the whole discussion.

According to Dr. Greenberg, he left the meeting thinking that he had to draft an attestation clause

that met the criteria discussed at the meeting.  Greenberg Decl., ¶ 11.  He had no idea that the

clauses were available as macro templates from a colleague and they could therefore be easily placed

onto reports.  Id.  Out of frustration and in a fit of pique about this additional bureaucratic hurdle

that would slow down reading times and be an impediment to timely turnaround of radiological

studies for patient care and not realizing that what was required of him was simply copying a macro

template from a colleague, Dr. Greenberg wrote an attestation clause that was playful or sarcastic at

worse.  Id.  Soon after his studies started circulating with the attestation, colleagues in the ER were

talking about them.  One of Dr. Greenberg's colleagues approached him, told him about the stir that

the attestations were creating and advised him to modify or revise them.  Id., ¶ 12.  Dr. Greenberg

approached an employee in the IT department and asked whether it was possible to change the

attestations that he had included in his studies.  Ex. 1 (Greenberg Dep. at 291-93).  When the

employee expressed discomfort in involving himself in such, Dr. Greenberg immediately clarified

that he was not asking that the attestations be changed or to do anything wrongful.  Id. at 293.

**Response:**     It is undisputed that Plaintiff authored unapproved attestations, and he inquired about improperly modifying them.  Although it is not a plausible excuse, Plaintiff's knowledge of the form of the attestation is also immaterial, as he was terminated not for simply departing from the approved language, but for using unprofessional sarcastic language that was completely unacceptable in a patient's file.  Pulitzer Decl., ¶ 13; Exs. HH, GG, II, LL, MM; Pulitzer Dep., 143:13-144:11; 138:21-139:25; 147:7-148:4; 155:3-156:11; 265:23-266:2; 287:8-20; 289:8-23; 290:20-291:17; Pulitzer Dep. II, p. 108:23-109:3.  The remaining alleged facts are immaterial and insufficient to create a genuinely disputed fact.

30.     On September 23, 2014, Dr. Greenberg took off time in the morning in order to attend a meeting related to his special-needs son's IEP.  Ex. 1 (Greenberg Dep. at 297-98).  After returning to work, Dr. Greenberg asked Dr. Pulitzer for additional time off in the afternoon in order to attend another such meeting.  Id. at 298.  His request was denied.  Id.  That afternoon, he left the reading room from 2:50 to 4:30 p.m.  Part of that time was spent consulting with colleagues in ER and another part was spent taking lunch at the SUNY campus across the street from KCHC, which he was allowed to do, and he used part of the lunch break to talk to his wife about the IEP meeting that he missed.  Id. at 302-03.

**Response:**     SUNY Defendants admit that Plaintiff requested two hours off that afternoon and that Dr. Pulitzer denied this request, because there was no one available to adequately cover for Plaintiff.   Pultizer Dep., p. 389:22-390:6; Ex. GG.  According to Talk Station data there was a gap of approximately two hours from 2:50 to 4:52.  Ex. QQ, SUNY001326. It is uncontested that Dr. Pulitzer became alarmed by this because he was unable to locate Plaintiff, and he was concerned that the ER was not adequately covered.  Id., p. 402:20-403:6; 413:15-20.  It is uncontested that Dr. Pulitzer learned that Dr. Greenberg had asked Dr. Amiram Samin to cover for him during that period, but Dr. Samin was not able to read neuroradiology cases.  Id. p. 401:24-

403:6; 413:15-20.  This issue was referred to Labor Relations as well.  Ex. GG.  The remaining

alleged facts are contested but immaterial and insufficient to create a genuinely disputed fact.

31.     On October 3, 2014, Labor Relations sent a letter to Dr. Greenberg

instructing him to report to Labor Relations to be interrogated as to alleged violations of the

Settlement Agreement.  Ex. 40 (SUNY 000014).  Dr. Greenberg was eventually terminated from

employment in or around October 22, 2014.

**Response:**     Undisputed.

**Dr. Reede's Anti-Semitic Remarks**

32.     During the relevant period, in 2013, Esther Neiman sat in a room adjacent to

Dr. Reede.  Declaration of Esther Neiman dated June 27, 2018, ¶ 3.  She also frequently interacted

with Dr. Reede.  Id.  She testified that when Dr. Reede first arrived at SUNY to assume the position

of Department Chair of Radiology she was taken aback and showed evident disapproval that

observant Jews from all over the hospital were coming to the Radiology Department to participate

in midday prayers.  In this context, she asked Ms. Neiman, "What are your people doing here at this

time of day?"  Id., ¶ 4.  To which Ms. Neiman responded, after being shocked that Dr. Reede would

use the phrase "your people" something to the effect of I believe they are doing their daily prayers.

Id.  Ms. Neiman also heard Dr. Reede state to other administrative staff that she was going to put an

end to the midday prayers because it was disruptive to her department's operations.  Id. ¶ 5.  Ms.

Neiman also heard Dr. Reede state sarcastically that she wished she were Jewish because then she

too could have a lot of holidays from work and express frustration with observant Jews who she

could not reach or find on Friday afternoons because they left work early to observe Shabbat.  Id. ¶

6.

**Response:**     SUNY Defendants dispute the alleged facts in paragraph 32, state

that some of the allegations are not supported by admissible evidence, and aver that the disputed

**A946**

facts are, nevertheless, immaterial and insufficient to create a triable issue of fact.   When Dr. Reede began at SUNY Downstate, the office traditionally used by the Department Chair of the Department of Radiology was used by another radiologist, Dr. Hyman Schwarzberg and Orthodox Jewish physicians from throughout the hospital met there for daily prayers.  Reede Dep., p. 387:2-20 (Reply Excerpts).  When Dr. Reede assumed the position of Department Chair, she wanted to use the office traditionally used by the Department Chair.  Id.  Dr. Schwarzberg's office was moved two doors down, and Orthodox Jewish physicians continue to meet there.  Id.

Dr. Reede specifically denies ever asking Ms. Neiman "what are your people doing here at this time of day," and that she ever said "she wished she were Jewish because then she would get lots of holidays from work too."  Reede Reply Decl., ¶ 5.  Even assuming their truth for the purposes of the motion, the alleged facts are also immaterial and insufficient to create a genuinely disputed fact, as the alleged statements are not directed at Plaintiff or connected to any of the alleged adverse acts at issue in this litigation and predated SUNY Defendants' renewal of Plaintiff's contract and the adverse actions.

Dated: New York, New York
        September 14, 2018

BARBARA D. UNDERWOOD
Attorney General of the State of New York
*Attorney for SUNY Defendants*

BY: */s/ Christopher Coulston*
CHRISTOPHER COULSTON
Assistant Attorney General
28 Liberty Street
New York, New York 10005
(212) 416-8556
email: christopher.coulston@ag.ny.gov

TO:   *(via ECF)*
      Chad L. Edgar
      Cardi & Edgar LLP
      99 Madison Avenue, 8th Floor
      New York, NY 10016
      212.481.7770 (tel.)

Ryan Shaffer
Senior Counsel
New York City Law Department
100 Church St.
New York, New York 10007
(212) 356-5037

A948

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

ODED GREENBERG,

                                          Plaintiff,

               -against-

STATE UNIVERSITY HOSPITAL-DOWNSTATE
MEDICAL CENTER a/ka/ THE STATE UNIVERSITY
OF NEW YORK HEALTH SCIENCE CENTER AT
BROOKLYN aka SUNY DOWNSTATE MEDICAL
CENTER, NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, UNITED UNIVERSITY
PROFESSIONALS, SUNY DOWNSTATE MEDICAL
CENTER CHAPTER OF UNITED UNIVERSITY
PROFESSIONALS, DEBORAH L. REEDE, STEVEN
PULITZER, and JOHN and JANE DOES 1-20,

                                    Defendants.

--------------------------------------------------------------------------X

**HEALTH + HOSPITALS
DEFENDANTS' LOCAL
RULE 56.1 STATEMENT
OF MATERIAL
<u>UNDISPUTED FACTS</u>**

15-CV-2343 (PKC)(VMS)

        Pursuant to Local Rule 56.1 of the Civil Rules of the United States District Court

for the Eastern District of New York, defendants, New York City Health + Hospitals Corporation

("HHC") and Kings County Hospital Center ("KCHC") (hereinafter collectively "Health +

Hospitals defendants"), submit this Statement of Undisputed Material Facts.

**A.    Background**

        1.  Plaintiff Oded Greenberg is a board-certified radiologist authorized to practice

in the State of New York who was formerly employed as a physician and radiologist by

defendant State University of New York, Downstate Medical Center ("Downstate"), and

assigned (at times) via an affiliation agreement to KCHC. *See* Dkt. No. 17 Second Amended Complaint, May 11, 2016 ("SAC"), Ex. "A," *passim*.[1]

2. Defendant Deborah Reede ("Reede") is employed by Downstate as a professor and Chairperson of the Department of Radiology. Id. at ¶5.

3. Defendant Stephen Pulitzer ("Pulitzer") is employed by Downstate as an assistant professor, and assigned via an affiliation agreement to KCHC. Id. at ¶6.

4. Alan Kantor is a radiologist formerly employed by Downstate as a Clinical Assistant Professor in the Department of Radiology at Downstate. *See* Kantor employee change status form, Ex. "B," SUNY001849.

5. Plaintiff responded to a job posting by Downstate and was hired in early 2001. Plaintiff was hired via a letter from Dr. David Stark ("Stark"), then Professor and Chairman of the Downstate Department of Radiology. The letter from Dr. Stark was printed on SUNY Downstate letterhead and does not reference Health + Hospitals defendants other than citing an affiliation agreement. *See* Plaintiff's Downstate Medical Center Personnel File ("Personnel File"), Ex. "C," at SUNY000218 & SUNY000207.

6. Plaintiff's was hired as an "Assistant Professor of Clinical Radiology" pursuant to an affiliation agreement between Downstate and Defendant HHC. Id. at SUNY000207 and SUNY000219.

7. Plaintiff's employment eligibility was verified to the United States Department of Justice on March 16, 2001 and his employer was listed as Downstate. Id. at SUNY000223.

---

[1] Unless otherwise indicated, references to "Ex." are to the exhibits which are annexed to the Declaration of Ryan G. Shaffer, dated March 26, 2018 ("Shaffer Decl."), submitted in support of Health + Hospitals defendants' Motion for Summary Judgment.

**A950**

8. Plaintiff's employment was verified by Downstate when he applied for a mortgage with Citibank. Id. at SUNY000001-000002 and SUNY000025.

9. Defendants HHC and KCHC were not involved in the hiring of plaintiff, and his Downstate personnel file is replete with indications that he was hired by Downstate. Id. *passim*, *see also* Deposition of Ghassan Jamaleddine ("Jamaleddine Tr."), Ex. "D," at 94:16-23.

10. As an employee of Downstate, plaintiff was a member of United University Professions ("UUP"), a union representing nearly all of the physicians employed by Defendant SUNY, and was subject to the terms of the collective bargaining agreement between UUP and the State of New York. *See* Deposition of Oded Greenberg ("Pl. Tr."), Ex. "E," at 370:4-9 *see also* Union Agreement, Ex. "F," at SUNY 001620-001748.

11. As a member of UUP, plaintiff was only subject to discipline pursuant to article 19 of the agreement between UUP and the State of New York, which states "discipline shall be imposed upon employees only pursuant to this article." Health + Hospitals defendants were not a party to the agreement between UUP and the State of New York. *See* Union Agreement, Ex. "F," at SUNY001637-001638.

12. Plaintiff was paid by the State of New York and received pay increases pursuant to the agreement between UUP and the State of New York. *See* Personnel File, Ex. "C," at SUNY000050, SUNY000056 and SUNY000060.

13. Plaintiff's health insurance and related benefits were provided by virtue of his employment at Downstate. Id. at SUNY000092-93 and SUNY000105-106.

14. Plaintiff's time and attendance records were maintained by Downstate. *See* Time and Attendance Records, Ex. "G," at SUNY001750-001813.

15. Plaintiff temporarily resigned from his employment in April 2008, via letter to Dr. Salvatore Scalfani, then the Chairman of the Department of Radiology at Downstate. *See* Personnel File, Ex. "C," at SUNY000070.

16. On October 19, 2009, while plaintiff was working part-time as an hourly employee, Dr. Scalfani unilaterally reassigned plaintiff from KCHC to University Hospital, a facility maintained by the State University of New York. Id. at SUNY000075.

17. In 2010, plaintiff was rehired to a full time position by Dr. Scalfani via letter written on Downstate letterhead. Plaintiff was re-hired as a "clinical assistant professor of radiology" in the College of Medicine of the State University of New York Downstate Medical Center. The position was subject to the approval of the Dean and President of SUNY Downstate Medical Center, Ian Taylor, M.D., and required only funding approval from HHC. *See* September 21, 2010 rehire letter, Ex. "H".

18. Throughout his employment plaintiff was supervised by defendant Pulitzer, Dr. Alan Kantor, and Dr. Scalfani. *See* Pl. Tr., Ex. "E," at 44:3-45:5.

19. Plaintiff acknowledges that his employer was Downstate, but nevertheless contends that Health + Hospitals defendants were "joint/co-employers" with Downstate, Reede, and Pulitzer (hereinafter "Downstate defendants"). *See* Plaintiff's Responses and Objections to Health + Hospitals Defendants' First Set of Contention Interrogatories ("cont. rog. resp.), Ex. "I," *passim, see also* Pl. Tr., Ex "E," at 373:10-375:4.

**B.    Affiliation Agreement**

20. The affiliation agreement ("the agreement") under which plaintiff was assigned to work at KCHC classifies plaintiff as a "physician provider", refers to HHC as "the

**A952**

Corporation", and to Downstate as "the Affiliate". *See* Affiliation Agreement, Ex. "J," at SUNY001011 and SUNY001015.

21. The agreement provides that "[Downstate] may follow its own internal personnel policies and procedures with respect to hiring Physician Providers." Id. at SUNY001022.

22. The agreement provides no mechanism for Health + Hospitals defendants to terminate a Physician Provider. Id. at *passim*.

23. The agreement only allows HHC to "request in writing that the affiliate no longer assign such person to the facility." Additionally, upon making such a request to have a Physician Provider reassigned, Health + Hospitals defendants must "provide a written justification for such a request . . . and a reasonable opportunity to cure if the issue does not involve a threat to patient health or safety." Id. at SUNY001056-001057.

24. The agreement requires Downstate to maintain the time and attendance records of physician providers. Id. at SUNY001057-001558.

25. The agreement requires Downstate to ensure that physician providers are qualified for employment. Id. at SUNY001025-001029.

26. The agreement contemplates that in the performance of duties pursuant to the agreement, physician providers are considered employees of Downstate. Id. at SUNY001079.

27. The agreement clearly establishes that Health + Hospitals and Downstate defendants have separate management, ownership, and control. Id. *passim.*

C.     **Plaintiff's Termination**

28. On May 5, 2014, and again on August 22, 2014, plaintiff was warned about the need to accurately report his time and attendance, as well as the need to report on time for his scheduled shift of 9:30 a.m. to 5:30 p.m. *See* August 22, 2014 Letter, Ex. "K," HHC1241.

29. On September 3, 2014, plaintiff was informed via letter by defendant Pulitzer that he was not authorized to take leave from September 4, 2014 through September 5, 2014. The letter directed plaintiff to report to work on those dates, and that a failure to do so would result in a referral to Downstate Labor Relations. *See* September 3, 2014 Letter, Ex. "L," HHC1206.

30. Plaintiff did not appear for work on September 4, 2014 or September 5, 2014, and as a result was directed to appear at the Downstate Labor Relations Office. *See* Pl. Tr. Ex. "E," at 242:4-250:22.

31. On or about September 8, 2014, plaintiff entered into a settlement with Downstate to resolve allegations of 1) unscheduled absences, 2) tardiness, 3) interfering with departmental operations, 4) insubordination, and 5) misrepresenting hours worked on his timesheets. A penalty up to and including termination was held in abeyance so long as plaintiff did not engage in any similar conduct. Additionally, pursuant to the settlement agreed to with Downstate, plaintiff was placed on "time and attendance watch". Health + Hospitals defendants were not a party to the settlement agreement nor did they participate in any of the proceeding or negotiations leading to it. *See* Settlement Agreement, Ex. "M," SUNY000012-000013.

32. On or about September 24, 2014, defendant Pulitzer reported two incidents involving plaintiff. The first incident involved an unauthorized leave of absence in violation of the September 8, 2014 agreement. The second involved the use of unauthorized attestations on patient medical records. *See* September 24, 2014 Letter, Ex. "N," HHC1522-1524.

33. On October 10, 2014, plaintiff was questioned by the Downstate Labor Relations Office in regards to the issues referenced in the September 24, 2014 letter. At that time it was determined that plaintiff had violated the terms of the September 8, 2014 settlement agreement. On October 20, 2014, plaintiff was afforded an opportunity to explain why he should not be terminated as a result of the incidents described in the September 2014 letter. By letter dated October 22, 2014, plaintiff was informed by Downstate Labor Relations' Assistant Vice President, Leonzo Cuiman that he was being terminated effective immediately. *See* October 22, 2014 Letter, Ex. "O," SUNY001275.

34. The decision to terminate plaintiff was made jointly by Leonzo Cuiman, Assistant Vice President of Downstate Labor Relations, and Stephanie Bernadel, Senior Personnel Associate in the Downstate Labor Relations Office, along with Adriana Conde-Billy, Director of Downstate Labor Relations, and defendant Reede. without input from any HHC or KCHC employee. *See* Deposition Leonzo Cuiman, ("Cuiman Tr."), Ex. "P," at 6:25-7:4; 63:20-64:4; 221:8-222:14; and 231:7-9;

35. Ms. Bernadel did not speak with any HHC employees in connection with the investigation into Plaintiff's behavior, nor was anyone from KCHC notified when plaintiff was terminated. *See* Deposition of Stephanie Bernadel ("Bernadel Tr."), Ex. "Q," at 214:2-6 and 305:8-21, *see also* Cuiman Tr., Ex. "P," at 222:17-19.

36. Dr. Ghassan Jamaleddine, then the Chief Medical Officer of KCHC, was never told by anyone that they wanted plaintiff fired, never asked anyone himself to see to it that plaintiff would be fired, or even indicated that he himself wanted plaintiff to be fired. *See* Jamaleddine Tr., Ex. "D," at 179:18-180:6.

- 7 -

C.    **Alleged Discrimination**

37. Plaintiff alleges that his termination was part of an effort by defendant Reede to "reduce the number of non-black (principally White/Caucasian), and particularly Jewish, physicians and other personnel in the department [of radiology], and increase the number who were/are Black (African-or Caribbean American), non-Jewish and largely, if not uniformly, younger." *See* SAC, Ex "A," at ¶17.

38. Plaintiff alleges that the alleged discriminatory effort by defendant Reede included such actions as "the outright discharge of several White, Jewish and/or older physicians and other personnel; the slashing of the compensation of other White (including Jewish) and/or older physicians and other personnel who were not immediately discharged (while the compensation of Black, non-Jewish and/or younger physicians was maintained); and the micro-management of those physicians in the conduct of their daily duties." Id at ¶¶17-20.

39. Plaintiff alleges that defendant Reede "made statements which disparaged and/or stereotyped Jews, cast them in a negative light, or otherwise made clear her plain and obvious bias against them on the basis of their race and religion. Id. at ¶21.

40. Plaintiff's only support for the aforementioned allegations is inadmissible hearsay. *See* Pl. Tr., Ex. "E," 510:20-519:7.

41. The termination of other non-parties was for legitimate non-discriminatory reasons. Specifically, upon information and belief as set forth in the record, a restructuring of the Downstate Radiology Department took place following a report by the Accreditation Council for Graduate Medical Education ("ACGME"), that placed the department on probation. *See* ACGME Report, Ex. "R", *passim, see also* Deposition of Dr. Deborah Reede ("Reede Tr."), Ex. "S," 67:12-97:12.

42. Plaintiff does not believe that Dr. Jamaleddine discriminated against him. *See*

Pl. Tr., Ex. "E", at 463:10-25.

Dated:      New York, New York
            March 26, 2018

                            **ZACHARY W. CARTER**
                            Corporation Counsel of the
                              City of New York
                            Attorney for Defendant
                            100 Church Street, Room 2-146
                            New York, New York 10007-2601
                            (212) 356-5037
                            rshaffer@law.nyc.gov

By:          /s/ Ryan G. Shaffer
                            Ryan G. Shaffer
                            Assistant Corporation Counsel

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ODED GREENBERG,

Plaintiff,

- against -

STATE UNIVERSITY HOSPITAL-DOWNSTATE
MEDICAL CENTER a/ka/ THE STATE UNIVERSITY OF
NEW YORK HEALTH SCIENCE CENTER AT
BROOKLYN aka SUNY DOWNSTATE MEDICAL
CENTER, NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, UNITED UNIVERSITY
PROFESSIONALS, SUNY DOWNSTATE MEDICAL
CENTER CHAPTER OF UNITED UNIVERSITY
PROFESSIONALS, DEBORAH L. REEDE, STEVEN
PULITZER, and JOHN and JANE DOES 1-20,

Defendants.

**HEALTH + HOSPITALS DEFENDANTS'
LOCAL RULE 56.1 STATEMENT OF
MATERIAL
UNDISPUTED FACTS**

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
Attorney for Defendant
100 Church Street, Room 2-146
New York, NY 10007-2601

Of Counsel: Ryan G. Shaffer
Tel: (212) 356-5037
rshaffer@law.nyc.gov
Our No. 2015-047890

*Due and timely service is hereby admitted.*

New York, N.Y....…………………………............, 2018

Case 19-3570, Document 44, 02/11/2020, 2775400, Page159 of 254

A957

**A958**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

ODED GREENBERG,

                                                         Plaintiff,

                    -against-                              **DECLARATION**

STATE UNIVERSITY HOSPITAL-DOWNSTATE           15-CV-2343 (PKC)(VMS)
MEDICAL CENTER a/ka/ THE STATE UNIVERSITY
OF NEW YORK HEALTH SCIENCE CENTER AT
BROOKLYN aka SUNY DOWNSTATE MEDICAL
CENTER, NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, UNITED UNIVERSITY
PROFESSIONALS, SUNY DOWNSTATE MEDICAL
CENTER CHAPTER OF UNITED UNIVERSITY
PROFESSIONALS, DEBORAH L. REEDE, STEVEN
PULITZER, and JOHN and JANE DOES 1-20,

                                                         Defendants.

--------------------------------------------------------------------------x

        **RYAN G. SHAFFER,** declares, under penalty of perjury and pursuant to 28

U.S.C. § 1746, that the following is true and correct:

        1.       I am an Assistant Corporation Counsel in the office of Zachary W. Carter,

Corporation Counsel of the City of New York, attorney for defendants New York City Health +

Hospitals Corporation and Kings County Hospital Center (collectively "City Health + Hospitals

Defendants") in this matter.

        2.       I submit this declaration in support of Health + Hospitals Defendants'

motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, to

place before the Court excerpts from deposition testimony, and documents produced during

discovery in this case.   These materials are relied upon and cited in Health + Hospitals

**A959**

Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts and Health + Hospitals Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment.  Such materials are:

A. Annexed hereto as Exhibit "A" is a copy of the Second Amended Complaint in this action, filed December 23, 2015.

B. Annexed hereto as Exhibit "B" is a copy of Alan Kantor's employee change status form.

C. Annexed hereto as Exhibit "C" is a copy of plaintiff's Downstate Medical Center employment file.

D. Annexed hereto as Exhibit "D" is a copy of excerpts from Dr. Ghassan Jamaleddine's deposition, taken December 19, 2016.

E. Annexed hereto as Exhibit "E" is a copy of excerpts from plaintiff's deposition, taken December 12, 2016 and January 23, 2017.

F. Annexed hereto as Exhibit "F" is a copy of the collective bargaining agreement between United University Professionals and the State of New York.

G. Annexed hereto as Exhibit "G" is a copy of plaintiff's time and attendance records.

H. Annexed hereto as Exhibit "H" is a copy of a letter dated September 21, 2010, wherein plaintiff was re-hired as a clinical assistant professor of radiology in the College of Medicine of the State University of New York Downstate Medical Center.

I. Annexed hereto as Exhibit "I" is a copy of plaintiff's responses to Health + Hospitals Defendants' contention interrogatories, dated May 17, 2017.

J. Annexed hereto as Exhibit "J" is a copy of the affiliation agreement between HHC and the SUNY Health Sciences Center.

K. Annexed hereto as Exhibit "K" is a copy of a letter dated August 22, 2014, counseling plaintiff about the need to accurately report his time and attendance, as well as the need to report on time for his scheduled shift.

L. Annexed hereto as Exhibit "L" is a copy of a letter dated September 3, 2014 from Stephen Pulitzer informing plaintiff that he was not authorized to take leave from September 4, 2014 through September 4, 2014.

**A960**

M. Annexed hereto as Exhibit "M" is a copy of a settlement agreement entered into by plaintiff resolving charges of misconduct, dated September 8, 2014.

N. Annexed hereto as Exhibit "N" is a copy of a letter dated September 24, 2014, wherein defendant Pulitzer documented two incidents of misconduct involving plaintiff.

O. Annexed hereto as Exhibit "O" is a copy of a letter dated October 22, 2014, informing plaintiff of his termination.

P. Annexed hereto as Exhibit "P" is a copy of excerpts from the deposition of Leonzo Cuiman, taken December 15, 2016.

Q. Annexed hereto as Exhibit "Q" is a copy of excerpts from the deposition of Stephanie Bernadel, taken October 21, 2016.

R. Annexed hereto as Exhibit "R" is a copy of a report by the Accreditation Council for Graduate Medical Education, dated April 15, 2014.

S. Annexed hereto as Exhibit "S" is a copy of excerpts from the deposition of defendant Deborah Reede, taken November 18, 2016 and January 26, 2017.

Dated:   New York, New York
         March 26, 2018

By: _____
              RYAN G. SHAFFER

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

ODED GREENBERG, M.D.,

                        Plaintiff,

             -against-

STATE UNIVERSITY HOSPITAL-DOWNSTATE
MEDICAL CENTER a/k/a THE STATE UNIVERSITY OF
NEW YORK HEALTH SCIENCE CENTER AT BROOKLYN
a/k/a SUNY DOWNSTATE MEDICAL CENTER, NEW
YORK CITY HEALTH AND HOSPITALS CORPORATION,
KINGS COUNTY HOSPITAL CENTER, DEBORAH L.
REEDE, STEVEN PULITZER, and JOHN and JANE DOES
1-20,

                        Defendants.

-----------------------------------------------------------------------X

15 CV 2343 (PKC/VMS)

**SECOND
AMENDED COMPLAINT
AND DEMAND
FOR JURY TRIAL**

        Plaintiff Oded Greenberg, M.D. ("Plaintiff"), as and for his second amended complaint against defendants State University Hospital-Downstate Medical Center a/k/a The State University of New York Health Science Center at Brooklyn a/k/a SUNY Downstate Medical Center ("Downstate"); New York City Health and Hospitals Corporation ("HHC"); Kings County Hospital Center ("KCHC"); Deborah L. Reede ("Reede"); Steven Pulitzer ("Pulitzer"), and John and Jane Does 1 through 20 ("Does 1-20") (collectively, "Defendants"), hereby alleges, upon information and belief, as follows:

## Parties and Jurisdiction

    1.    Plaintiff is a natural person and a citizen of both the United States of America and the State of New York, with a residence, as well as his principal place of abode, located in Brooklyn, New York. Plaintiff is White (Caucasian) and of the Jewish faith. At all times relevant herein, Plaintiff has been a physician, board-certified in both Diagnostic Radiology and Anatomic Pathology; fellowship-trained in Body Imaging; and duly licensed and authorized to practice medicine and radiology in the State of New York. From in or about April 2001 through on or about October 22, 2014, Plaintiff was employed by Defendants as a physician and radiologist, and held,

2

at various times, certain positions and titles attendant thereupon and/or related thereto including, but not necessarily limited to, Director of ER Radiology at KCHC. At the time of Defendants' wrongful acts as described hereinbelow, Plaintiff was at least fifty-four (54) years of age.

2.      Defendant Downstate is a duly authorized and existing agency and/or instrumentality of the State of New York which is and/or operates a hospital located at 450 Clarkson Avenue, Brooklyn, New York 11203, and maintains its principal place of business at that address. At all times relevant herein, John F. "Skip" Williams has been the President, Pamela Sass has been the Dean, and Michael Lucchesi has been the Chief Medical Officer, of Downstate.

3.      Defendant HHC is a body corporate and politic, created pursuant to Section 7384 of the Unconsolidated Laws of the State of New York, with its principal place of business located at 125 Worth Street, New York, New York 10013. At all relevant times, HHC has been, and continues to be, engaged in the provision of health and medical services to citizens and other persons in the City of New York pursuant to Section 7382 of said Unconsolidated Laws, including through certain hospitals, one of which is, and at all times relevant herein has been, KCHC.

4.      Defendant KCHC is a hospital and agency or instrumentality of HHC, with its principal place of business located at 451 Clarkson Avenue, Brooklyn, New York 11203. At all times relevant herein, KCHC maintained and, upon information and belief, continues to date to maintain, an affiliation agreement with Downstate. Pursuant to that affiliation agreement, Plaintiff was assigned by Defendants to perform, and at all times relevant herein actually principally performed, his daily duties as a radiologist at KCHC.

5.      Defendant Reede is a natural person and a resident of the State of New York with a residence, as well as her principal place of abode, located at 235 Adams Street, Apartment 6D, Brooklyn, New York 11201. Reede's office, as well as her principal place of business, is located at 450 Clarkson Avenue, Brooklyn, New York 11203. Reede is Black (African- or Caribbean-American) and not of the Jewish faith. At various times relevant herein, Reede was (and continues to date to be) a professor and the Chairperson of the Department of Radiology at Downstate.

3

6.      Defendant Pulitzer is a natural person and a resident of the State of New York with a residence, as well as his principal place of abode, located at 141 West 71st Street, Penthouse A, New York, New York 10023.  Pulitzer's office, as well as his principal place of business, is located at 451 Clarkson Avenue, S Building, Brooklyn, New York 11203.  At various times relevant herein, Pulitzer was (and continues to date to be) an assistant professor at Downstate and Director of Radiology at KCHC.

7.      Defendants Does 1 through 20 are or were directors, officers, employees, agents, representatives, staff, successors, assigns, aiders and abettors, and/or co-conspirators of Defendants Downstate, HHC, KCHC, Reede and/or Pulitzer in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to Plaintiff.  The true names and capacities of Does 1-20 are presently unknown to Plaintiff, and Plaintiff accordingly sues such defendants by such fictitious names.  Upon discovery of their true names and capacities, Plaintiff will amend this Complaint to add said persons or other entities as additional named defendants herein, or otherwise identify them as per instruction or direction of the Court.

8.      This Court has jurisdiction over the subject matter of this action, which is brought under various federal, state and city enactments including Sections 1331, 1337(a), 1367(a) and 2201 of Title 28, United States Code, 28 U.S.C. §§ 1331, 1337(a), 1367(a) and 2201, as amended; Section 2000e, *et seq.,* of Title 42, U.S. Code ("Title VII" of the Civil Rights Acts of 1964 and 1991), 42 U.S.C. § 2000e, *et seq.,* as amended; Sections 1981 and 1983 of Title 42, United States Code, 42 U.S.C. §§ 1981 and 1983, as amended ("Section 1981" and "Section 1983," respectively); the Fourteenth Amendment to the United States Constitution, and in particular, the Equal Protection Clause thereof; Section 2601, *et seq.,* of Title 29, United States Code, 29 U.S.C. §§ 2601, *et seq.,* as amended (the "FMLA"); Section 290, *et seq.,* of the Executive Law of the State of New York, N.Y. Exec. L. § 290, *et seq.,* as amended, commonly known as the New York State Human Rights Law (the "NYSHRL"); Title 8, Chapter 1, of the Administrative Code of the City of

4

New York, N.Y.C. Admin. Code § 8-101, *et seq.,* as amended, commonly known as the New York City Human Rights Law (the "NYCHRL"); and principles of ancillary, pendent and supplemental jurisdiction.

9.   Defendants are all employers within the meaning of the various statutes identified hereinabove and below, and/or otherwise pursuant to the statutes or common law under which one or more claims are brought herein.

10.   On October 1, 2015, the U.S. Department of Justice issued, and on October 7, 2015, Plaintiff received, Right to Sue letters with respect to charges which he had previously filed with the U.S. Equal Employment Opportunity Commission (the "EEOC") on February 9, 2015, under Charge Nos. 520-2015-01218 and 520-2015-01423.   Plaintiff has accordingly timely and properly fulfilled all statutory and/or other prerequisites, if any, to the bringing of each and all of the claims and causes of action stated hereinbelow with respect to which a prior EEOC, or other administrative agency, filing was or is required.

11.   At all times relevant herein, and with respect to each statute under which one or more claims is brought herein, Defendants employed more than the required minimum number of employees, if any, and Plaintiff had worked for more than the required minimum period of time, and more than the required minimum number of hours within any statutorily relevant period, if any. All other statutory and/or other procedural prerequisites for Plaintiff to be able to sue thereunder, and for each, and all, of the Defendants to be subject to, and liable thereunder, if any, have been met, satisfied and/or otherwise timely and properly fulfilled.

12.   Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b).

**Facts Giving Rise to This Action**

Plaintiff's Early History at Downstate and KCHC

13.   Plaintiff's medical career spans more than thirty (30) years, and includes a spotless employment record with Defendants.   Plaintiff first attended medical school at Downstate, and then worked as a medical resident, first in pathology, then radiology, for Defendants.   After a

5

one-year fellowship in body imaging at Emory University, and several years in private practice, Plaintiff returned to Defendants as a board-certified radiologist and attending physician in April 2001.  Over the course of thirteen-and-one-half (13½) years of service to Defendants thereafter, Plaintiff was assigned to work, and in fact worked, principally at KCHC, in its emergency room (the "ER") and "ER [radiology] reading room."

14.    At all times relevant herein, Plaintiff's responsibilities as an attending physician in KCHC's ER included interpreting imaging studies (*e.g.,* X-rays, CT scans, MRIs and ultrasounds), consulting and otherwise working closely with both resident and attending physicians in a variety of specialties and subspecialties, principally Radiology, Emergency Medicine and Surgery, and often attending rounds and/or discussing with them (and sometimes examining) patients.

15.    Over the course of his employment with Defendants, Plaintiff was highly regarded both by his colleagues and medical residents, and was considered by many to be the most accurate, available and versatile radiologist in KCHC's Department of Radiology.  His expertise included, and continues to include, ER Radiology, Body Imaging, Neuroradiology, Pediatric Radiology, Gastrointestinal Radiology, Musculoskeletal Radiology and Chest Imaging.  Plaintiff served as Director of ER Radiology at KCHC from 2005 to 2009.

16.    Plaintiff's employment with Defendants proceeded without incident from its commencement until at least mid-2013.  At that time, Defendants hired Reede as Chairperson of their Department of Radiology.

The Hiring of Defendant Reede

17.    Almost immediately after assuming the position of Department Chairperson, Reede began an effort to reduce the number of non-Black (principally White/Caucasian), and particularly Jewish, physicians and other personnel in the department, and increase the number who were/are Black (African- or Caribbean American), non-Jewish and largely, if not uniformly, younger.  Such actions included the outright discharge of several White, Jewish and/or older physicians and

6

other personnel; the slashing of the compensation of other White (including Jewish) and/or older physicians and other personnel who were not immediately discharged (while the compensation of Black, non-Jewish and/or younger physicians was maintained); and the micro-management of those physicians in the conduct of their daily duties.  Black, non-Jewish and/or younger physicians, in contrast, were permitted greater freedom, and leeway, under applicable rules and policies.

18.     The actions taken against White, Jewish and older physicians and other personnel who were not immediately discharged were, upon information and belief, designed and intended to prompt or pressure those physicians and other personnel into retiring or otherwise resigning their positions, and/or to otherwise prefer Black over White (including Jewish) and/or younger over older physicians and other personnel in compensation and/or cost-cutting decisionmaking.  Upon information and belief, Reede also effectuated each dismissal of a White, Jewish and/or older physician with little or no notice to the affected individual.

19.     Over the period from mid-2013 through October 2014, Reede's actions included the outright dismissal of at least five (5) White (Caucasian), Jewish, older physicians (Plaintiff; Catherine Mason, M.D.; Daphne Roitberg, M.D.; David Areman, M.D., and Alan Kantor, M.D.); three other older, non-Black physicians (Gautam Mirchandani, M.D., Jaya Nath, M.D., and Woo Choi, M.D.); and at least one White, Jewish administrative employee (Esther Neiman). Plaintiff was discharged by Defendants on or about October 22, 2014.  Another White, Jewish radiologist (Hyman Schwarzberg, M.D.) had his compensation substantially reduced.  In contrast, and notwithstanding productivity substantially inferior to most or all of the physicians who were dismissed, Reede retained, among others, Stephen Waite, M.D., a Black radiologist, and also excused certain conduct by Dr. Waite which, had it been committed by a White, Jewish and/or older physician, would have prompted formal discipline.

20.     During said period, Reede also saw to the hiring of several physicians (and, in the case of the discharged administrative employee, a non-Jewish administrative employee replacement) who were/are Black, non-Jewish and younger than their predecessors, including

7

Rhonda Osborne, M.D., who replaced Catherine Mason, M.D., and Jinel Scott-Moore, M.D., who replaced Plaintiff and/or Dr. Areman. All, or virtually all, of the Black, non-Jewish and/or otherwise younger physicians and other personnel hired by Reede to replace Plaintiff and the other White, Jewish and older physicians and other personnel whom she had discharged were also of substantially lesser experience and/or qualifications than those whom she and the other Defendants had discharged.

Defendant Reede's Racial and Religious Bias

21.     At, or around, the time of this campaign by Reede to materially alter, both racially and religiously, the composition of the Radiology Department, and to make it younger, Reede also made no secret of her unfavorable view of Jews. Among other things, Reede made statements which disparaged and/or stereotyped Jews, cast them in a negative light, or otherwise made clear her plain and obvious bias against them on the basis of their race and religion.

22.     Among the remarks made by Reede were references to several Orthodox Jewish physicians collectively as "you people" and "those people," as well as open expressions of upset that they, on their lunch hour, would meet on department premises for midday religious prayers. Upon observing certain Orthodox Jewish physicians' gatherings for prayer, in fact, Reede announced that she would be taking away the room that they had been using therefor, and making it her own office. Doing so, of course, would, and did, preclude any further use of it for the Orthodox Jewish physicians' prayer services. Further, Reede separately directed that, from that point forward, said physicians would not be permitted to meet during the workday anywhere on department premises, to pray.

23.     Additionally, when two Orthodox Jewish physicians sought to create a work schedule that would permit them to avoid having to work on the Jewish High Holidays (Rosh Hashanah and Yom Kippur), Reede referred to them as "birds of a feather." Separately, referring to Martin Luther King Jr. Day, Reede also pointedly stated to several White, Jewish physicians on one or more occasions, in words or substance, that, "I know you don't care, but this is our [i.e.,

8

Blacks'] holiday." Reede was also separately heard to express a dislike for White (Caucasian) people generally, as well as for, particularly, how many Whites were (then) employed in her (*i.e.,* the radiology) department.

The Unlawfully Biased Denial of Plaintiff's Reappointment as Director of ER Radiology

24.     Reede initially visited her unlawful bias upon Plaintiff in July 2014, by denying his application for reappointment and promotion to the position of Director of ER Radiology. At that time, Plaintiff already possessed qualifications for the position superior to that of any other candidate, including from having served estimably in it several years earlier. Plaintiff had voluntarily relinquished the position in 2009 to be able to work from home (performing teleradiology) while he cared for one of his sons, Jayden, a child with special needs. It had then been assumed by David Areman, M.D., a physician and radiologist who is of the Orthodox Jewish faith.

25.     In or about July 2014, Reede dismissed Dr. Areman. The position of Director of ER Radiology thus again became available. Plaintiff requested reinstatement/reappointment to the position. At the time, he was the radiologist in the department who was, by far, the most experienced, and best qualified, for the post. Notwithstanding Plaintiff's application, however, Reede denied it to him and, instead, hired Dr. Scott-Moore, a new, much younger, Black, non-Jewish radiologist, whom Plaintiff himself had actually supervised during her residency just a few years earlier, to assume it.

26.     Upon information and belief, at the time of her hiring, Dr. Scott-Moore was eight (8) or fewer years out of residency, and had no publications. She also lacked Plaintiff's board certification in two specialties, his fifteen (15) years of experience in ER Radiology, and his approximately twenty (20) years of experience in radiology overall (including in academic institutions, private practice, and teleradiology), especially in interpreting acute care imaging – the "stock in trade" of ER Radiology. Dr. Scott-Moore, however, was (and is) approximately twenty (20) years younger than Plaintiff, Black and, upon information and belief, non-Jewish.

27.     At a meeting with Plaintiff on or about July 22, 2014, Reede stated, in

9

connection with hiring Scott-Moore as Director of ER Radiology, that, regardless of Dr. Scott-Moore's lack of experience or merit, she (Dr. Reede) wanted someone younger and "closer to residency." Her purported reason was because she believed they would be better able to relate to, and educate, resident (*i.e.,* younger) physicians.

The Events of Early September 2014

28.    Aside from being White, Jewish, and substantially older than his replacement, Plaintiff is a parent of two young children, one of whom (Jayden) has special needs due to disability. At all times relevant herein, Defendants have been aware of this. In their very first meeting, in fact, shortly after her hiring as department chairperson, Reede and Plaintiff had a conversation about their children in which Plaintiff specifically mentioned Jayden and his condition.

29.    On or about August 28, 2014, Plaintiff had been informed by Jayden's then-current school that, due to difficulties related to his disability, Plaintiff's immediate attention was required to the making of arrangements for Jayden to be cared for and schooled elsewhere.

30.    The very next day, August 29, 2014, Plaintiff informed Defendants both of his emergent need for leave to care for his son, and in particular, that he would be unable to work on two days the following week -- September 4 and 5 -- for that reason. Instead of simply planning to "call in sick" on those dates, Plaintiff inquired what the proper steps were for obtaining leave therefor.

31.    Having received no response, on or about September 2, 2014, Plaintiff also spoke with Pulitzer, his immediate superior, to inform him, as well, of his (Plaintiff's) need for leave on September 4 and 5. Plaintiff did so not only to make sure Pulitzer, too, knew of his need and request for leave, but out of professionalism, and consideration for Defendants (and Pulitzer specifically), as well, including so that Pulitzer would have time to obtain "coverage" for the department during Plaintiff's brief leave.

32.    At that time, as well as at all other times relevant herein, Pulitzer, also, was aware that Plaintiff had a child with special needs. Regardless, Pulitzer, acting on behalf of

10

Defendants, responded to Plaintiff's notice and request by informing him that the department was short-staffed, and he (Plaintiff) thus could not take the leave he sought.

33.    Plaintiff reiterated his request to Pulitzer on September 3.  Pulitzer then consulted with Reede, and a short while later, presented Plaintiff with a document stating, in writing, that Plaintiff's request for leave on September 4 and 5 had been denied, and that if he failed to appear for work on those days, he, and the matter generally, would be referred to "Labor Relations."

34.    Upon being presented with the document, Plaintiff told Pulitzer that he didn't think that it was fair that Defendants were forcing him to choose between his career and his family, but that he had no alternative except to address his urgent family need.  Pulitzer responded, "I hope you know what you are doing."

35.    Early on the morning of September 4, Plaintiff again reiterated his need for family leave, and a brief absence, in yet another email to Defendants.  He then took that day, and the next, for such leave, notwithstanding Defendants' prior denial.

36.    Unexpectedly and coincidentally, Plaintiff injured his back getting out of bed on the morning of September 4, and was thereupon unable to stand or walk without severe pain.

37.    That same day, September 4, unbeknownst to Plaintiff, Defendants sent Plaintiff a letter (the "September 4 letter") directing him come to their Labor Relations office prior to returning to work, but to not otherwise come on Downstate's or KCHC's premises without first making an appointment with, and reporting to, their Office of Public Safety.  The letter made no mention of discipline, nor gave any notice thereof, nor did it state the time(s) or date(s) of, or even allege that Plaintiff had committed, any offense, much less identify what offense(s), if any, Plaintiff was being alleged to have committed.  Defendants "cc'd" (*i.e.,* copied) Plaintiff's union, United University Professions ("UUP"), on the September 4 letter.

38.    The collective bargaining agreement then in force between one or more of Defendants on the one hand, and UUP on the other, covering Plaintiff and the position in which he was then employed (hereinafter, the "CBA"), required all such information to be included in any

11

notice intended for a disciplinary purpose, or otherwise with respect to any alleged misconduct or wrongdoing by a covered (*i.e.,* "PSNU") employee. Upon information and belief, the CBA also required Defendants to contemporaneously (*i.e.,* within five (5) days) notify UUP that a notice of discipline has been sent to a PSNU member.

39.     No meeting addressing possible discipline of a PSNU member may properly take place until both UUP has been given such notice(s), and the period of time prescribed by the CBA therefor has elapsed. Plaintiff, however, neither heard nor received anything from UUP upon, or otherwise in response to, its receipt of the September 4 letter.

40.     Notwithstanding still suffering substantial back pain and associated difficulty, Plaintiff tried to return to work on Monday, September 8. That morning, Plaintiff first notified a colleague at his work location – the KCHC ER "reading room" – that he would be late. He then first accompanied Jayden to his first day at his new school, and then visited an "urgent care" clinic, where he was examined by a physician for his back injury. Upon examining Plaintiff, the physician there noted that Plaintiff's back muscles were in "spasm," and gave Plaintiff both a prescription for muscle relaxers, and a treatment plan. Plaintiff then traveled to KCHC, arriving at approximately 11:30 a.m.

41.     Notwithstanding his condition, Plaintiff promptly returned to his duties, reading multiple studies on critically ill patients, and making recommendations for follow-up studies on several. At or around 1:00 p.m., however, Pulitzer instructed Plaintiff to log off his computer and immediately go to Defendants' Labor Relations office. Plaintiff did so, though without any time or opportunity to request that a UUP representative join and represent him thereat.

42.     Upon information and belief, Defendants had provided no advance notice of the September 8 meeting to UUP, or any agent or representative thereof. No agent or representative of UUP attended the meeting, nor did any otherwise in any way participate, assist or represent Plaintiff in connection with it, or any of Defendants' actions against Plaintiff prior to, or on, that date.

43.     At the September 8 meeting, which lasted in excess of four (4) hours, Plaintiff,

12

notwithstanding his continuing back pain, was interrogated, and was kept waiting for several hours without food or an opportunity to either obtain the medicine he had just been prescribed for his back pain, or to take other medication which had previously been prescribed for him (for anxiety and depression). He was then presented with a document which had already been prepared by Defendants, apparently in anticipation of his attempt to return to work that day (the "Extorted Agreement"). Plaintiff was informed that the Extorted Agreement was his only alternative if he wanted to be able to return to his duties instead of having his pay suspended and suffering other, unspecified disciplinary action for having taken the two days of leave (September 4 and 5) notwithstanding Defendants' denial.

44. Had Plaintiff been discharged or otherwise prevented from continuing his employment as of September 8, 2014, he would not only have suffered an immediate loss of necessary family income, he also would not have vested in, or otherwise would have lost or suffered an impairment, reduction or other loss with respect to, certain of his retirement/health benefits.

45. At the time Plaintiff was presented with the Extorted Agreement, he was exhausted after Defendants' lengthy interrogation; still in substantial pain; had had no break for lunch or medication; was without any union representation or advice; and had been allowed no interval, reasonable or otherwise, to either review and consider the Extorted Agreement himself, or obtain legal counsel to advise him regarding it. The Extorted Agreement specified that, because Plaintiff had taken "unauthorized" leave, as well as because of certain alleged administrative failures (*e.g.,* "switching schedule without authorization of his supervisor"), he: (a) would not be permitted any further days off without prior approval by Defendants; (b) waived any and all other rights he might have or have had (including to whatever process was or would otherwise have been available to him or within his rights as a member of UUP); (c) could thereafter be discharged at any time and for any reason (or for no reason at all), solely at Defendants' discretion, notwithstanding the CBA or any other rights which he might otherwise have or have had; and (d) would have no right or recourse in such event, or any process available to him to challenge such discharge, or appeal,

13

whether under the CBA, any other extant procedures available to employees of Defendants, or otherwise.

46.     Unaware of his rights (including, but not limited to, under the CBA and the FMLA), and without union representation, but knowing that he needed to be able to return to work to continue to provide for his family, as well as fulfill his immediate duties to several patients with respect to whom he had recommended follow-up examinations earlier that day, Plaintiff signed the Extorted Agreement.  Defendants thereupon permitted him to return to work, and Plaintiff did so.

Plaintiff's Unlawful Discharge

47.     Several weeks later, on or about September 23, 2014, Plaintiff informed Pulitzer that he again needed, on an emergent basis, an extremely brief leave – approximately two hours that afternoon – to attend to his son's care and well-being.  Again Pulitzer, acting for Defendants, denied Plaintiff's request, claiming insufficient staffing.

48.     In light of this second denial, Plaintiff first arranged for another physician to cover for him, and then, instead of taking the brief afternoon leave he had requested, took merely his lunch hour to attend to his family matter.  Upon his return, Plaintiff went directly to the ER to consult with several of his clinical colleagues regarding several patients, and also reviewed a CT scan on one of their monitors.  Only then did he return to the ER reading room.  In total – including his lunch hour away, his consultations and discussions, and his review of the CT scan – Plaintiff had been absent from the ER reading room for approximately ninety (90) minutes.

49.     Nevertheless, Defendants purportedly sent to Plaintiff, on or about October 3, another letter (the "October 3 letter"), this one directing him to report to Labor Relations at 11:00 a.m. on October 8 to "discuss allegations of insubordination, leaving the worksite without authorization and related matters."  Plaintiff, however, did not receive the October 8 letter, nor was he otherwise made aware of it before that date.

50.     That afternoon (October 8), Stephanie Bernadel, a member of Defendants' Labor Relations Department, who is also Black, phoned Plaintiff in the ER, asking why he had not

**A974**

14

attended the meeting. Plaintiff responded that he had not received notice of any meeting, and so did not know what she was referring to. He asked what the meeting was for, and Bernadel responded that it concerned his (alleged) violation of the terms of the agreement he had signed on September 8 -- the Extorted Agreement – by taking unauthorized leave again.

51.     Because Plaintiff had not received notice of the October 8 meeting, it was postponed until October 10. In the interim, and until further notice, he was directed by Bernadel to not return to work.

52.     At the October 10 meeting, Defendants in fact conducted what even they themselves characterized as an "interrogation" of Plaintiff. Again, no one from UUP attended. Instead, in their absence, Plaintiff was again questioned by Bernadel, at length, about his lunch hour "leave" on September 23. Defendants also informed Plaintiff that he was being considered for discharge for a second occasion of unauthorized leave and insubordination.

53.     During the interrogation, Plaintiff complained that he had been, and was continuing to be, repeatedly denied leave to care for, or otherwise tend to or address the needs of, his disabled child. He stated that he believed he was being treated differently from, and less favorably than, other physicians because of his race, religion and/or age, as well as because he had a child with special needs. Plaintiff asked Bernadel if he could file with the EEOC. In response, Bernadel stated that Plaintiff had waived that right based upon the agreement he had signed on September 8 (the Extorted Agreement).

54.     A few days later, Plaintiff sent an email to Bernadel reiterating his complaint and belief that he was being discriminated against. In response, Bernadel informed Plaintiff that such claims were handled by Defendants' "Office of Diversity."

55.     On or about October 20, yet another meeting was held between Defendants' Labor Relations personnel (Bernadel and Leonzo Cuiman, Assistant Vice-President for Labor Relations, who is also Black) and Plaintiff. At this (third) meeting, Plaintiff's discharge was again discussed, and he was offered the "opportunity" to resign his position in lieu of being discharged.

15

Plaintiff asked why he was not simply being permitted, under the FMLA, the brief leave he had requested to care for his son. He received no answer. He also reiterated his intent to pursue a claim of discrimination with the EEOC, and declined to resign his longstanding position.

56. Two days later, on or about October 22, 2014, Defendants discharged Plaintiff outright.

57. Upon being discharged, Plaintiff was also denied any severance or separation pay, notwithstanding his more than thirteen (13) years of loyal and dedicated service. Defendants further fought (unsuccessfully) his claim for unemployment compensation. Upon information and belief, they thereafter also sought to prevent him from obtaining a similar position elsewhere.

58. Each, and all, of Defendants' purported grounds for disciplining Plaintiff, whether on September 8 or any subsequent time; for the Extorted Agreement; and for their subsequent discharge of Plaintiff from his position, were and are pretextual. Defendants' true bases for their adverse employment actions against Plaintiff were: discrimination against him on the basis of his race, religion and/or age; retaliation against him for complaining thereof and/or openly contemplating pursuit of his rights at the EEOC; retaliation against him for attempting to exercise, and then actually exercising, his FMLA rights; and the various other violations of the various statutes and other laws cited both hereinabove and below.

**AS AND FOR A FIRST CAUSE OF ACTION**
(Violation of 29 U.S.C. § 2615(a))
(Against All Defendants)

59. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 58 hereof as if more fully set forth at length herein.

60. At all times relevant herein, Defendants were all employers within the meaning of Section 101(4) of the FMLA, 29 U.S.C. § 2611(4), as amended. At all times relevant herein, Plaintiff had worked for more than twelve months, and more than 1,250 hours in the immediately prior twelve months, for Defendants. Plaintiff thus was an "eligible employee" of Defendants within the meaning of Section 101(2) of the FMLA, 29 U.S.C. § 2611(2), as amended,

**A976**

16

and an employee of Defendants who was entitled to leave pursuant to Section 102(a)(1)(d) of the FMLA, 29 U.S.C. § 2612(a)(1)(D), as amended.

61.     By their various wrongful actions as described above, including but not limited to denying Plaintiff requested leave for which he was eligible and to which he was entitled under the statute, Defendants violated Section 105 of the FMLA, 29 U.S.C. § 2615, as amended.

62.     Defendants' actions were willful.

63.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
(Violation of 29 U.S.C. § 2615(a))
(Against All Defendants)

64.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 63 hereof as if more fully set forth at length herein.

65.     At all times relevant herein, Defendants were all employers within the meaning of Section 101(4) of the FMLA, 29 U.S.C. § 2611(4), as amended.  At all times relevant herein, Plaintiff had worked for more than twelve months, and more than 1,250 hours in the immediately prior twelve months, for Defendants.  Plaintiff thus was an "eligible employee" of Defendants within the meaning of Section 101(2) of the FMLA, 29 U.S.C. § 2611(2), as amended, and an employee of Defendants who was entitled to leave pursuant to Section 102(a)(1)(d) of the FMLA, 29 U.S.C. § 2612(a)(1)(D), as amended.

66.     By their various wrongful actions as described above, including but not limited to discharging Plaintiff for taking leave for which he was eligible and to which he was entitled under the statute, Defendants violated Section 105 of the FMLA, 29 U.S.C. § 2615, as amended.

67.     Defendants' actions were willful.

17

68.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION**
(Retaliation in Violation of 29 U.S.C. § 2615(b))
(Against All Defendants)

69.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 68 hereof as if more fully set forth at length herein.

70.     Defendants' wrongful acts described above, including, but not limited to, their adverse actions taken against Plaintiff for objecting to and opposing their various actions and practices which were in violation of Section 105(a) of the FMLA, 29 U.S.C. § 2615(a), as amended, including but not limited to discharging Plaintiff for protesting their denial of his leave, and taking such leave notwithstanding such denial, constituted unlawful retaliation against Plaintiff in violation of Section 105(b) of the FMLA, 29 U.S.C. § 2615(b), as amended.

71.     Defendants' actions were willful.

72.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
(Discrimination in Violation of 42 U.S.C. § 2000e-2(a)(1))
(Against Downstate, HHC and KCHC)

73.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 72 hereof as if fully set forth at length.

74.     One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken against Plaintiff on the basis of his race, and constituted discrimination against him on the basis thereof with respect to his

**A978**

18

compensation, terms, conditions and privileges of employment, in violation of Title VII of the Civil Rights Acts of 1964 and 1991, as amended, and particularly 42 U.S.C. § 2000e-2(a)(1).

75.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
(Discrimination in Violation of 42 U.S.C. § 2000e-2(a)(2))
(Against Downstate, HHC and KCHC)

76.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 75 hereof as if fully set forth at length.

77.     One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken against Plaintiff on the basis of his race, and constituted discrimination against him on the basis thereof with respect to his compensation, terms, conditions and privileges of employment, in violation of Title VII of the Civil Rights Acts of 1964 and 1991, as amended, and particularly 42 U.S.C. § 2000e-2(a)(2).

78.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A SIXTH CAUSE OF ACTION**
(Discrimination in Violation of 42 U.S.C. § 2000e-2(a)(1))
(Against Downstate, HHC and KCHC)

79.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 78 hereof as if fully set forth at length.

80.     One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken against Plaintiff on the basis of his religion, and constituted discrimination against him on the basis thereof with respect to his

19

compensation, terms, conditions and privileges of employment, in violation of Title VII of the Civil Rights Acts of 1964 and 1991, as amended, and particularly 42 U.S.C. § 2000e-2(a)(1).

81.   As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A SEVENTH CAUSE OF ACTION
(Discrimination in Violation of 42 U.S.C. § 2000e-2(a)(2))
(Against Downstate, HHC and KCHC)

82.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 81 hereof as if fully set forth at length.

83.   One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken against Plaintiff on the basis of his religion, and constituted discrimination against him on the basis thereof with respect to his compensation, terms, conditions and privileges of employment, in violation of Title VII of the Civil Rights Acts of 1964 and 1991, as amended, and particularly 42 U.S.C. § 2000e-2(a)(2).

84.   As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
(Discrimination/Retaliation in Violation of 42 U.S.C. § 2000e-3(a))
(Against Downstate, HHC and KCHC)

85.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 84 hereof as if fully set forth at length.

86.   One or more of Defendants' various wrongful acts, omissions, failures and refusals to act, as described hereinabove, or otherwise, were taken in retaliation and/or as reprisal for Plaintiff's opposition and/or objection to Defendants' various unlawful employment practices

**A980**

20

and/or conduct. Said acts, omissions, failures and refusals to act accordingly constituted violations of Title VII, and particularly 42 U.S.C. § 2000e-3(a).

87. As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Violation of 42 U.S.C. § 1981)
### (Against All Defendants except HHC and KCHC)

88. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 87 hereof as if more fully set forth at length herein.

89. Plaintiff is Caucasian.

90. At all times relevant herein, Defendants employed Plaintiff within the meaning of Section 1981.

91. By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of his race, in violation of Section 1981.

92. Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

93. As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Retaliation Under 42 U.S.C. § 1981)
### (Against All Defendants except HHC and KCHC)

94. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 93 hereof as if more fully set forth at length herein.

95. Plaintiff is Caucasian.

21

96.     At all times relevant herein, Defendants employed Plaintiff within the meaning of Section 1981.

97.     By the acts and practices described above, Defendants retaliated against Plaintiff for complaining of disparate treatment on the basis of his race, in violation of Section 1981.

98.     Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

99.     As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
(Deprivation of Rights Under 42 U.S.C. § 1983)
(Against All Defendants)

100.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 99 hereof as if more fully set forth at length herein.

101.    The acts and practices undertaken by Defendants on the basis of Plaintiff's race, as described above, were unreasonable within the meaning of the Fourteenth Amendment to the United States Constitution and, in particular, the Equal Protection Clause thereof, and therefore violated Plaintiff's rights thereunder.

102.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A TWELFTH CAUSE OF ACTION
(Deprivation of Rights Under 42 U.S.C. § 1983)
(Against All Defendants)

103.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 102 hereof as if more fully set forth at length herein.

22

104.    The acts and practices undertaken by Defendants on the basis of Plaintiff's religion, as described above, were unreasonable within the meaning of the Fourteenth Amendment to the United States Constitution and, in particular, the Equal Protection Clause thereof, and therefore violated Plaintiff's rights thereunder.

105.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
(Discrimination on the Basis of Race in Violation of N.Y. Exec. L. §§ 296(a) and 296(a)3-a(a))
(Against Downstate, HHC and KCHC)

106.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 105 hereof as if more fully set forth at length herein.

107.    Defendants' various wrongful actions as described above were taken against Plaintiff on the basis of his race, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Executive Law of the State of New York, and particularly Sections 296(a) and 296(a)3-a(a) thereof.

108.    Defendants' actions were willful.

109.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
(Discrimination on the Basis of Religion in Violation of N.Y. Exec. L. §§ 296(a) and 296(a)3-a(a))
(Against Downstate, HHC and KCHC)

110.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 109 hereof as if more fully set forth at length herein.

23

111.    Defendants' various wrongful actions as described above were taken against Plaintiff on the basis of his religion, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Executive Law of the State of New York, and particularly Sections 296(a) and 296(a)3-a(a) thereof.

112.    Defendants' actions were willful.

113.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**AS AND FOR A FIFTEENTH CAUSE OF ACTION**
(Discrimination on the Basis of Age in Violation of N.Y. Exec. L. §§ 296(a) and 296(a)3-a(a))
(Against Downstate, HHC and KCHC)

114.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 113 hereof as if more fully set forth at length herein.

115.    Defendants' various wrongful actions as described above were taken against Plaintiff on the basis of his age, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Executive Law of the State of New York, and particularly Sections 296(a) and 296(a)3-a(a) thereof.

116.    Defendants' actions were willful.

117.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

24

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
(Retaliation in Violation of N.Y. Exec. L. § 296(a)7)
(Against Downstate, HHC and KCHC)

118.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 117 hereof as if more fully set forth at length herein.

119.    Defendants' various wrongful actions described above, including, but not limited to, their adverse actions taken against Plaintiff for complaining of their discrimination and otherwise objecting to and opposing their various actions and practices which were in violation of the Executive Law of the State of New York, constituted unlawful retaliation against Plaintiff in violation of the Executive Law of the State of New York, and particularly Section 296(a)7 thereof.

120.    Defendants' actions were willful.

121.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
(Aiding and Abetting Racial Discrimination in Violation of N.Y. Exec. L. § 296(a)6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

122.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 121 hereof as if more fully set forth at length herein.

123.    By their various wrongful actions as described above, Defendants aided and abetted, or attempted to aid and abet, the doing of various racially discriminatory acts forbidden by the Executive Law of the State of New York, in violation of Section 296(a)6 thereof.

124.    Defendants' actions were willful.

125.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

25

### AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
(Aiding and Abetting Religious Discrimination in Violation of N.Y. Exec. L. § 296(a)6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

126.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 125 hereof as if more fully set forth at length herein.

127.    By their various wrongful actions as described above, Defendants aided and abetted, or attempted to aid and abet, the doing of various religiously discriminatory acts forbidden by the Executive Law of the State of New York, in violation of Section 296(a)6 thereof.

128.    Defendants' actions were willful.

129.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A NINETEENTH CAUSE OF ACTION
(Aiding and Abetting Age Discrimination in Violation of N.Y. Exec. L. § 296(a)6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

130.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 129 hereof as if more fully set forth at length herein.

131.    By their various wrongful actions as described above, Defendants aided and abetted, or attempted to aid and abet, the doing of various age discriminatory acts forbidden by the Executive Law of the State of New York, in violation of Section 296(a)6 thereof.

132.    Defendants' actions were willful.

133.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

26

## AS AND FOR A TWENTIETH CAUSE OF ACTION
(Aiding and Abetting Retaliation in Violation of N.Y. Exec. L. § 296(a)6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

134.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 133 hereof as if more fully set forth at length herein.

135.   By their various wrongful actions as described above, Defendants aided and abetted, or attempted to aid and abet, the doing of various retaliatory acts forbidden by the Executive Law of the State of New York, in violation of Section 296(a)6 thereof.

136.   Defendants' actions were willful.

137.   As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
(Discrimination on the Basis of Race in Violation of N.Y.C. Admin. Code § 8-107.1(a))
(Against HHC and KCHC)

138.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 137 hereof as if more fully set forth at length.

139.   Defendants' various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, were taken against Plaintiff on the basis of his race, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Administrative Code of the City of New York, and particularly Section 8-107.1(a) thereof.

140.   As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

**A987**

27

## AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
(Discrimination on the Basis of Religion in Violation of N.Y.C. Admin. Code § 8-107.1(a))
(Against HHC and KCHC)

141.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 140 hereof as if more fully set forth at length.

142.    Defendants' various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, were taken against Plaintiff on the basis of his religion, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Administrative Code of the City of New York, and particularly Section 8-107.1(a) thereof.

143.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A TWENTY-THIRD CAUSE OF ACTION
(Discrimination on the Basis of Age in Violation of N.Y.C. Admin. Code § 8-107.1(a))
(Against HHC and KCHC)

144.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 143 hereof as if more fully set forth at length.

145.    Defendants' various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, were taken against Plaintiff on the basis of his age, and constituted discrimination against him with respect to his compensation, terms, conditions, and privileges of employment on the basis thereof, in violation of the Administrative Code of the City of New York, and particularly Section 8-107.1(a) thereof.

146.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

28

## AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION
( Retaliation in Violation of  N.Y.C. Admin. Code § 8-107.7)
(Against HHC and KCHC)

147.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 146 hereof as if more fully set forth at length.

148.    Defendants' various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, including, but not limited to, their discharge of Plaintiff, as well as the other adverse actions taken against him for objecting to and/or opposing their various actions and practices which were in violation of the Administrative Code of the City of New York, constituted unlawful retaliation against Plaintiff in violation of said Administrative Code, and particularly Section 8-107.7 thereof.

149.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

## AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION
(Aiding and Abetting Racial Discrimination in Violation of
N.Y.C. Admin. Code § 8-107.6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

150.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 149 hereof as if more fully set forth at length.

151.    By their various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, Defendants aided and abetted, or attempted to aid and abet, the doing of various racially discriminatory acts forbidden by the Administrative Code of the City of New York, and in particular, in violation of Section 8-107.6 thereof.

152.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

29

### AS AND FOR A TWENTY-SIXTH CAUSE OF ACTION
(Aiding and Abetting Religious Discrimination in Violation of
N.Y.C. Admin. Code § 8-107.6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

153.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 152 hereof as if more fully set forth at length.

154.    By their various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, Defendants aided and abetted, or attempted to aid and abet, the doing of various religiously discriminatory acts forbidden by the Administrative Code of the City of New York, and in particular, in violation of Section 8-107.6 thereof.

155.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### AS AND FOR A TWENTY-SEVENTH CAUSE OF ACTION
(Aiding and Abetting Age Discrimination in Violation of
N.Y.C. Admin. Code § 8-107.6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

156.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 155 hereof as if more fully set forth at length.

157.    By their various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, Defendants aided and abetted, or attempted to aid and abet, the doing of various age discriminatory acts forbidden by the Administrative Code of the City of New York, and in particular, in violation of Section 8-107.6 thereof.

158.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

30

### AS AND FOR A TWENTY-EIGHTH CAUSE OF ACTION
(Aiding and Abetting Retaliation in Violation of
N.Y.C. Admin. Code § 8-107.6)
(Against Reede, Pulitzer and John and Jane Does 1-20)

159.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 158 hereof as if more fully set forth at length.

160.    By their various wrongful acts, omissions, failures and refusals to act, as described or referred to hereinabove, or otherwise, Defendants aided and abetted, or attempted to aid and abet, the doing of various retaliatory acts forbidden by the Administrative Code of the City of New York, and in particular, in violation of Section 8-107.6 thereof.

161.    As a result of Defendants' wrongful conduct, Plaintiff has suffered, and will continue to suffer, irreparable injury, lost wages and benefits, other monetary damages, mental anguish, emotional distress, humiliation and other compensable damages, all in amounts to be determined at trial.

### PRAYER FOR RELIEF

**WHEREFORE** Plaintiff prays for the following relief:

(a)    actual, compensatory, incidental, consequential, liquidated and all other damages available under applicable law, each and all in amounts to be determined at trial, on each (and all) claim(s) with respect to which, and against each (and all) Defendant(s) against whom, such damages are awardable;

(b)    back pay, back bonuses, back pension and related retirement contributions, benefits, and all other compensation, remuneration and entitlements Plaintiff would have received absent Defendants' wrongful conduct, each and all in amounts to be determined at trial;

(c)    reinstatement, or front pay in lieu thereof, in an amount to be determined at trial;

(d)    punitive damages, in an amount to be determined at trial, as against all Defendants against whom punitive damages are awardable;

(e)    all actual costs, expenses and disbursements recoverable under applicable law and rules of court;

(f)    reasonable attorney's fees;

(g)    fees for experts and professionals;

31

(h)    interest on all of the foregoing amounts;

(i)    all permanent injunctive relief available and appropriate against each, and all, of the Defendants under applicable law including, but not limited to, promotion of Plaintiff to Director of ER Radiology, retroactive to the date of Defendants' denial thereof, with all of the rights, privileges, benefits and perquisites appurtenant thereto, as well as a permanent injunction against any retaliation by all Defendants, or any of them, against Plaintiff;

(j)    all declaratory relief available and appropriate against each, and all, of the Defendants under applicable law including, but not limited to declarations that the Defendants, as hereinabove alleged: violated the various statutes and common law cited herein; unlawfully denied Plaintiff promotion to Director of ER Radiology; unlawfully discharged Plaintiff; denied and/or otherwise interfered with Plaintiff's FMLA rights; discriminated against Plaintiff on the basis of his race, religion and/or age; aided and abetted same; violated Plaintiff's federal Constitutional right to equal protection of the laws; retaliated against Plaintiff for engaging in conduct protected by law; and aided and abetted same; and

(k)    all other relief available under applicable law which this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury upon each and every one of the causes of action asserted herein, and otherwise, with respect to which a trial by jury may be had.

Dated: New York, New York
December 23, 2015

ERIC M. NELSON (EN-4307)
Attorney at Law


\s\
112 Madison Avenue, Sixth Floor
New York, New York  10016
(212) 354-3666
Attorney for Plaintiff

JJP-2/C-Form
(Rev. 01/10)

## STATE UNIVERSITY OF NEW YORK
### ENTERED NOTIFICATION OF EMPLOYEE CHANGE OF STATUS
(All Bargaining Units - Classified and Unclassified Service Positions)

**Bargaining Unit**
- ☐ CSEA (02,03,04)
- ☐ PEF (05)
- ☑ UUP (06)
- ☐ MC (13)
- ☐ COUNCIL 82 (31)
- ☐ NYSCOPBA (21)
- ☐ GSEU
- ☐ Voluntary/Unpaid

**Pre-Employment Checklist**
- ☐ Oath of Office
- ☐ Ofc. of Inspector Gen'l
- ☐ Background Check
- ☐ I9 Verification
- ☐ Health Clearance
- ☐ Credentials Verification
- ☐ Qualifications: _____
- ☐ Med. Board/Lic. Date: _____
- ☐ Orientation Dates: _____
- ☐ FLSA Status: (E / I)
- ☐ Benefits: (E / I)
- ☐ C.S. List#: _____
- ☐ C.S. Cert#: _____
- ☐ Exam Score: _____
- ☐ Accrual Rate: _____
- ☐ Oncall/Recall Eligible
- ☐ To Affirmative Action: _____

Payroll Processing
DHR Letter #: CTR AITX
Payroll #: 7
Processed By: IRJ
NXStep Date: 6/30/14
Payserv Date: 7/1/14
Suny/HR Date: 7/1/14
Processed By: MBS

**1.** ☑ Dr. ☐ Mr. ☐ Mrs./Ms.
First: **Alan**   Middle: _____   Last: ☑ **Kantor**

**2.** Social Security Number: [redacted] N 0122905

**3.** (See SUNY-HR/PayServ/Payroll Synchronization Calendar)
Department's Requested Effective Date: **6/30/12**

**4.** SUNY HR/PayServ Effective Date: 6/30/2014 CAB

**5.** ☐ ACTION: STATUS CHANGE
☐ Continuing  ☐ Other _____  ☐ Term  ☐ Probationary  ☐ Temporary  ☐ Status End Date _____
☐ Term Renewal From _____ To _____

**6.** ☐ ACTION: SHIFT CHANGE   FROM   TO☐ Complete Boxes 11a & b)
FROM: ☐ Days ☐ Eves ☐ Nights  From ___ (am/pm) To ___ (am/pm) ☐☐☐☐☐☐☐ S M T W T F S
TO: ☐ Days ☐ Eves ☐ Nights  From ___ (am/pm) To ___ (am/pm) ☐☐☐☐☐☐☐ S M T W T F S

**7.** ☐ ACTION: LEAVES
☐ Sabbatical ☐ Dock ☐ Leave Without Pay ☐ ½ Pay Leave ☐ Sick Leave ☐ Worker's Comp. Leave (Date of Accident _____)
☐ Military ☐ Maternity ☐ Education ☐ Other  Reason For Leave: _____
☐ Labor Relations Actions _____  ☐ Period of Leave From _____ To _____
☐ Return From Leave To Full Pay Status, Effective: _____

**8.** ☑ ACTION: SEPARATIONS  Date of scheduled Exit Interview _____  Reason For Leaving _____
☐ Resignation ☐ Expiration of Term ☐ End of Temp ☐ Retired ☐ Deceased ☐ Transfer to other State agency
☑ Other **Non-Renewal**  ☐ Labor Relations Actions _____

**9.** ☐ ACTION: SALARY CHANGES
☐ Promotion  ☐ Demotion  ☐ Salary Increase  ☐ Salary Decrease  ☐ Title Change  ☐ Other

| PRESENT POSITION DETAILS | NEW POSITION DETAILS |
|---|---|
| **10a.** Line # **44883**  Position # _____  SOP # _____ | **10b.** Line # _____  Position # _____  SOP # _____ |
| Budget Title/Grade: **Clinical Asst. Professor (HS)** | Budget Title/Grade: _____ |
| Local Title: _____ | Local Title: _____ |
| Department/Unit: **Radiology**  VP Area: _____ | Department/Unit: _____  VP Area: _____ |

| 11a. SALARY COMPONENTS | Funding Source | FTE | % | 11b. SALARY COMPONENTS | Funding Source | FTE | % |
|---|---|---|---|---|---|---|---|
| Base Salary: $ 17,745 | 92137625 | .96 | | Base Salary: $ _____ | | | |
| Base * $ 17,745 | 67008001 | .4 | | $ _____ | | | |
| Total Base: $ 17,784 / 17,804 | | | | Total Base: $ _____ | | | |
| Also Receives: $ _____ | | | | Also Receives: $ _____ | | | |
| $ _____ | | | | $ _____ | | | |
| Total ALR: $ 444,003 | | | | Total ALR: $ _____ | | | |
| Total Salary: $ 443,638 / 445,103 | | 1.00 | | Total Salary: $ _____ | | | |

| 12a. Additional Salary Components: (If Applicable) | 12b. Additional Salary Components: (If Applicable) |
|---|---|
| ☑ Location Pay: $ 3026  ☐ Adv. Quals (131-1a.): $ _____ | ☐ Location Pay: $ _____  ☐ Adv. Quals (131-1a.): $ _____ |
| ☐ Geo. Diff.: $ _____  ☐ Shift Diff.: $ _____ | ☐ Geo. Diff.: $ _____  ☐ Shift Diff.: $ _____ |
| ☐ Inconv. Pay: $ _____  ☐ Security Diff.: $ _____ | ☐ Inconv. Pay: $ _____  ☐ Security Diff.: $ _____ |

**Remarks**   TOT - Salary $ 448,729
**Recommending Non-Renewal effective: 6/30/12**
# includes discretionary eff. 7/1/11 for # 970

☐ Justification Letter Attached

| Supervisor (Print): | Responsible Departmental Designee (RDD) (Print): |
|---|---|
| Affirmative Action Review/Approval: | Date: |

| BUDGETARY APPROVALS | ADMINISTRATIVE APPROVALS |
|---|---|
| Budget Office/IFR: _____ Date _____ | Department Head/Chairman: _____ Date _____ |
| Hospital Finance: _____ Date _____ | Dean: _____ Date _____ |
| CFO: _____ Date _____ | Vice President/CEO-UHB: _____ Date _____ |
| | President: _____ Date 6/28/11 |

DO NOT WRITE ALONG BORDER

Case 19-3570, Document 44, 02/11/2020, 2775400, Page195 of 254

**A993**

Case 1:15-cv-02343-PKC-VMS  Document 81-3  Filed 09/14/18  Page 1 of 252 PageID #: 573

09/10/2014 08:28 FAX 6362618035

@001/002

2 PAGES

## citi

**Date:** 09/10/2014

Reference #: 4(                    )
Applicant Name: Oded Greenberg
Employer Name: SUNY
Phone: 718-270-1000
Fax: 718-270-1815

**ATTN:** **Employment Verification**

**FROM:** Debora Thole
Citibank N.A.
Shared Services VOE
1000 Technology Drive
Mail Stop 520
O'Fallon, MO 63368
Phone: 1-636-261-8963
Fax: **1-866-940-8573** Email: **Debora.t.thole@citi.com**

**PLEASE RUSH**

### Verification of Employment

The above individual has applied for an account with our institution and has indicated your organization as their employer.

Please complete the following information as verification of his/her current employment status and return via fax to 866-940-8573.

Verification:

Is the above named applicant currently employed?   [X] Yes   [ ] No

Is the above named applicant active or on leave?   [X] Active   [ ] Leave

Hire Date: 7/1/90                                    End Date (if applicable): N/A

Position Held by Applicant: Clinical Assistant Professor (TCU)

Form completed by (Employer Contact Information):

Print name: P Burns

Signature: _____
(Please be advised that you may be contacted upon receipt of this fax to confirm validity of information provided)

Position: Clerk IV

Date: _____                    Contact Phone: _____

©2011 Citibank, N. A. equal housing lender member FDIC. Citi, Citibank, Arc Design and Citi with Arc Design are registered service marks of Citigroup Inc.
This communication (including any attachments) contains privileged or confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should destroy the materials and any attachments and are hereby notified that any disclosure, copy of distribution of this communication, or the taking of any action based on it, is strictly prohibited.

09/10/2014 08:29 FAX  6362618035 ☑002/002

REFERENCE NUMBER: ___/_____

## BORROWER'S AUTHORIZATION TO RELEASE INFORMATION

TO WHOM IT MAY CONCERN:

1.  I/We have applied for a mortgage loan from Citibank.  As part of the application process, Citibank may verify information contained in my/our loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program.

2.  I/We authorize you to provide Citibank, and to any investor to whom Citibank may sell my mortgage, any and all information and documentation that they request.  Such information includes, but is not limited to, employment history and income; bank, money market, and similar account balances; credit history; copies of income tax returns, and payoff/beneficiary statements.  I/We understand I/we will be responsible for any payoff/beneficiary statement charges and/or reconveyance fees.

3.  I/We also understand that if I/we am/are refinancing an existing line of credit, Citibank may "freeze" my existing line at time of loan approval and thus I/we will be unable to make any additional advances until the time at which my existing account is paid off or the application is cancelled, withdrawn or rescinded. In the event that I/we cancel, withdraw or rescind my/our application to refinance, my/our existing line will be re-activated.

4.  Citibank or any investor that purchases the mortgage may address this authorization to any party named in the loan application.

5.  A copy of this authorization may be accepted as an original.

6.  Your prompt reply to Citibank or the investor that purchased the mortgage is appreciated.

| Complete Name and Account Number for existing Second Mortgage Payoff: | | |
|---|---|---|
| Lenders Name | Phone | Account Number |

Oded Greenberg
Borrower' Name Printed                          (Social Security Number)

_[signature]_                    9/9/14
Borrower's Signature                 Date

Borrower's Name Printed                          (Social Security Number)

Borrower's Signature              (Date)

**citi**

Case 19-3570, Document 44, 02/11/2020, 2775400, Page197 of 254

OK
PAYSERV

UP-2/C-Form
(Rev. 01/10)

**STATE UNIVERSITY OF NEW YORK**
NOTIFICATION OF EMPLOYEE CHANGE OF STATUS
(All Bargaining Units - Classified and Unclassified Service Positions)

ENTERED

**Bargaining Unit**
- ☐ CSEA (02,03,04)
- ☐ BEF (05)
- ☑ UUP (08)
- ☐ MC (13)
- ☐ COUNCIL 82 (31)
- ☐ NYSCOPBA (21)
- ☐ GSEU
- ☐ Voluntary/Unpaid

1. First ☑ Dr. ☐ Mr. ☐ Mrs./Ms.   **Oded**   Middle   Last **Greenberg**   2. Social Security Number

3. (See SUNY-HR/PayServ/Payroll Synchronization Calendar)
Department's Requested Effective Date: _____

4. SUNY HR/PayServ Effective Date: 10/22/14 COB

5. ☐ ACTION: STATUS CHANGE
☐ Continuing ☐ Other _____ ☐ Term ☐ Probationary ☐ Temporary ☐ Status End Date _____
☐ Term Renewal From _____ To _____

**Pre-Employment Checklist**
- ☐ Oath of Office
- ☐ Cfc. of Inspector Gen'l
- ☐ Background Check
- ☐ I9 Verification
- ☐ Health Clearance
- ☐ Credentials Verification
- ☐ Qualifications: _____
- ☐ Med. Board/Lic. Date:
- ☐ Orientation Dates:
  I _____ II _____

6. ☐ ACTION: SHIFT CHANGE   FROM   TO   Complete Boxes 11a & b)
☐ Days ☐ Eves ☐ Nights
From ___ (am/pm) To ___ (am/pm) ☐☐☐☐☐☐☐ S M T W T F S
From ___ (am/pm) To ___ (am/pm) ☐ Days ☐ Eves ☐ Nights ☐☐☐☐☐☐☐ S M T W T F S

7. ☐ ACTION: LEAVES
☐ Sabbatical ☐ Dock ☐ Leave Without Pay ☐ ½ Pay Leave ☐ Sick Leave ☐ Worker's Comp. Leave (Date of Accident _____)
☐ Military ☐ Maternity ☐ Education ☐ Other _____ ☐ Reason For Leave: _____
☐ Labor Relations Actions _____ ☐ Period of Leave From _____ To _____
☐ Return From Leave To Full Pay Status, Effective:

8. ☑ ACTION: SEPARATIONS   Date of scheduled Exit Interview _____ Reason For Leaving _____
☐ Resignation ☐ Expiration of Term ☐ End of Temp ☐ Retired ☐ Deceased ☐ Transfer to other State agency
☐ Other _____ ☑ Labor Relations Actions **Terminated**

9. ☐ ACTION: TITLE AND SALARY CHANGES
☐ Promotion ☐ Demotion ☐ Salary Increase ☐ Salary Decrease ☐ Title Change ☐ Other _____

**PRESENT POSITION DETAILS**

10a. Line # 44849  Position # 9508563  SOP #
Budget Title/Grade: CLINICAL ASST PROF (TCL)
Local Title: Clin Asst Prof (TCL)
Department/Unit: Radiology   VP Area: 2

11a. SALARY COMPONENTS   Funding Source   FTE   %
Base Salary: $307,748   92137625   1.00
_____ $
Total Base: $307,748
Also Receives: $50,000

Total ALR: $50,000
Total Salary: $357,748

**NEW POSITION DETAILS**

10b. Line # _____ Position # _____ SOP # _____
Budget Title/Grade: _____
Local Title: _____
Department/Unit: _____   VP Area: _____

11b. SALARY COMPONENTS   Funding Source   FTE   %
Base Salary: $ _____
_____ $ _____
Total Base: $ _____
Also Receives: $ _____
_____ $ _____
Total ALR: $ _____
Total Salary: $ _____

12a. Additional Salary Components: (If Applicable)
☑ Location Pay: $3,026 ☐ Adv. Quals (131-1a. CSL): $_____
☐ Geo. Diff.: $_____ ☐ Shift Diff.: $_____
☐ Inconv. Pay: $_____ ☐ Security Diff.: $_____
13a. ☑ FINAL TOTAL SALARY: $360,774

12b. Additional Salary Components: (If Applicable)
☐ Location Pay: $_____ ☐ Adv. Quals (131-1a. CSL): $_____
☐ Geo. Diff.: $_____ ☐ Shift Diff.: $_____
☐ Inconv. Pay: $_____ ☐ Security Diff.: $_____
13b. ☐ FINAL TOTAL SALARY: $_____

**Payroll Processing**
DHR Letter # No Letter
Payroll #: 18
Processed By: MBS
Approval Date: 10/30/14
Payserv Date: _____
Suny/HR Date: 10/31/14
Processed By: AS

☐ FLSA Status: (E/I)
☐ Benefits: (E/I)
☐ C.S. List#: _____
☐ C.S. Cert#: _____
☐ Exam Score: _____
☐ Accrual Rate: _____
☐ Oncall/Recall Eligible
☐ To Affirmative Action:

**Remarks**

☑ Justification Letter Attached   See attached  ✗ INCLUDES UUP $250 Power Of Suny Incentive

✗ INCLUDES UUP $250 Power OF Suny Incentive

Supervisor (Print): _____
Responsible Departmental Designee (RDD) (Print): S. Bernade

Affirmative Action Review/Approval: _____   Date: 10/22/14

**BUDGETARY APPROVALS**
Budget Office/IFR: _____ Date _____
Hospital Finance: _____ Date _____
CFO: _____ Date _____

**ADMINISTRATIVE APPROVALS**
Department Head/Chairman: Thomas Cuiman/sb   Date 10/22/14
Dean: _____ Date _____
Vice President/CEO-UHB: _____ Date _____
President: _____ Date _____

— DO NOT WRITE ALONG BORDER —



SUNY
DOWNSTATE
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

Leonzo A. Cuiman
**Assistant Vice President for Labor Relations**

<u>CERTIFIED # 7013 1710 0002 2475 3720</u>
<u>**RETURN RECEIPT REQUESTED**</u>

October 22, 2014

Dr. Oded Greenberg
~~150 Montana Avenue PH# 3401~~
Brooklyn, NY 11201

Dear Dr. Greenberg:

On October 10, 2014, you met with Stephanie Bernadel, Personnel Associate in the SUNY Downstate Medical Center -- Office of Labor Relations, for an interrogation regarding allegations of insubordination, leaving the worksite without authorization and related matters. On October 20, 2014, you met with myself, Ms. Bernadel and Lisa Wills, NYSUT/UUP Labor Relations Specialist. The purpose of the meeting was to afford you the opportunity to explain why the penalty of termination from State service held in abeyance should not be implemented for violating your September 8, 2014 disciplinary settlement agreement (attached).

Based on your violation of your September 8, 2014 disciplinary settlement, please be advised that your appointment as a Clinical Assistant Professor TCL is hereby terminated, effective immediately.

Sincerely,

Leonzo A. Cuiman /SB

Leonzo Cuiman
Assistant Vice President for Labor Relations

LC/sb
cc:    Adriana Conde-Billy
      Deborah Reede, M.D.
      Steven Pulitzer, M.D.
      First Class Mail
      Personnel File
      Case File

# A997



**Oded Greenberg - Termination**

Stephanie Bernadel   to: HRTransactions                    10/22/2014 05:39 PM

Cc: Adriana Conde-billy, Carol McDonald, Deborah Reede, Steven Pulitzer

Good Afternoon,

Attached please find documentation concerning Oded Greenberg's termination from State service effective close of business October 22, 2014, including a <u>UP2-Change of Status form and termination letter</u>.

If you have any questions, please do not hesitate to contact me at the number listed below.  Thank you in advance for your time and effort.

Regards,
Stephanie



Greenberg_Oded_UP2 Termination_10-22-14.pdf

*****************************

*Stephanie Bernadel, MPA*
*Personnel Associate, Labor Relations*
*450 Clarkson Avenue, Box 1224*
*Brooklyn , NY 11203*
*work: 718-270-1972*
*cell: 347-578-4689*
*fax: 718-270-4684*
*E-mail: stephanie.bernadel@downstate.edu*

*Confidentiality Notice:  The information contained in this e-mail and any attachments may be legally privileged and confidential.  If you are not an intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail is strictly prohibited.  If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person.*

# A998

Case 19-3570, Document 44, 02/11/2020, 2775400, Page200 of 254

## Acknowledge of Receipt for Personnel File

As per my request, I received a copy of my Personnel File from the Department of Human Resources.

_____
Dr. Oded Greenberg

12/11/14
Date

_____
Prepared By     N 5

12/11/14
Date

Case 19-3570, Document 44, 02/11/2020, 2775400, Page201 of 254



Dr. Oded Greenberg

Personnel File Review

1.  Letter from Deputy Director 10-19-06
2.  Letter from Senior Vice President and Dean of College 6-28-07
3.  Personnel Data Update Form 5-26-05
4.  Letter from the Office of the Chairman 5-6-04
5.  Letter from the Office of the Chairman 5-6-04
6.  Letter from the Vice President for Human Resources 1-14-05
7.  Letter from the Office of the Chairman 5-9-03
8.  Letter from Chairperson and Dean of College of Medicine 9-24-02
9.  Letter from the Vice President for Human Resources 4-3-03
10. Letter from Professor and Chairman Department of Radiology 2-14-02
11. Letter from the Office of the Chairman 2-15-02
12. Letter from Downstate Imaging P.C. President 2-14-02
13. Letter from Vice President for Human Resources 10-01-02
14. Resume
15. Letter from Vice President for Human Resources 12-14-01
16. Pre-Employment Attestation Form 4-16-01
17. Letter from Professor and Chairman Department of Radiology  3-15-01
18. Passport
19. Employee Data Sheet
20. Letter from Assistant Vice President for Human Resources 5-3-01
21. Letter from Acting Assistant Vice President for Human Resources 6-6-94
22. Letter from Acting Assistant Vice President for Human Resources 6-9-93
23. Sexual Harassment Prevention Training Seminar 11-5-92
24. Letter from Acting Assistant Vice President for Human Resources 7-1-92
25. Letter from Acting Assistant Vice President for Human Resources 7-22-91
26. Employment Eligibility Verification I-9 Form
27. Letter from Acting Assistant Vice President for Human Resources 11-12-90
28. Emergency Reference Card (2)
29. Statement Upon Original Appointment 6-22-90
30. Letter from Deputy Director 8-23-07
31. Resume
32. Letter from Chairman Department of Radiology, Dean College of Medicine 1-15-09
33. Employment Eligibility Verification I-9 form 3-17-09
34. Pre-Appointment Data Sheet 3-17-09
35. Emergency Reference Card
36. Letter from Deputy Director 3-27-09
37. Pre-Employment Attestation Form 4-2-09
38. Letter from Oded Greenberg 7-31-08
39. Letter from Deputy Director 12-15-08
40. Employment Health Service Pre-Employment Exam Referral Form 3-17-09
41. Employment Verification 12-10-09
42. Employment Verification 8-31-09

Case 19-3570, Document 44, 02/11/2020, 2775400, Page203 of 254

43. Letter from Assistant Vice President for Personnel Administration 12-4-09
44. The American Board of Radiology 11-25-94
45. The American Board of Pathology 08-30-90
46. Letter from Assistant Vice President for Personnel Administration 11-23-11
47. Employment Verification 5-30-12
48. Employment Verification 6-11-12
49. Letter from the Office of the President 6-11-12
50. Personnel Data Update Form 12-17-12
51. Employment Verification 6-13-13
52. Employment Verification 7-2-13
53. Letter from the President 4-14-13
54. Letter from the President 7-29-13
55. Letter from the President 6-30-11
56. Letter from the Appointments Manager for Personnel Administration 1-23-14
57. Letter from the President 6-24-14
58. Letter from the Labor Relations 10-3-14
59. Settlement letter from Labor Relations 9-8-14
60. Letter from Labor Relations 10-22-14
61. Letter from Labor Relations 10-15-14
62. Letter from Labor Relations 9-04-14
63. Employment Verification 7-19-12

Case 19-3570, Document 44, 02/11/2020, 2775400, Page204 of 254



**SUNY**
**DOWNSTATE**
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

**Department of Human Resources**
**Labor Relations**

Certified Mail #7012 3460 0000 6957 4750
Return Receipt Requested

October 15, 2014

Dr. Oded Greenberg

Brooklyn, NY 11201

Dear Dr. Greenberg:

During your interrogation on Friday, October 10, 2014, you alluded to possible allegations of discrimination. As stated during the interrogation and afterwards, you are advised that you have the right to consult with the Office of Diversity & Inclusion regarding these matters.

The Office of Diversity & Inclusion (ODI) is responsible for is responsible for ensuring Downstate's compliance with the State University of New York's employment policies and federal and state civil rights laws and regulations, which includes New York State's Human Rights Law. You can reach the **Office of Diversity and Inclusion at:**

SUNY Downstate Medical Center
450 Clarkson Avenue, Box 1220
Brooklyn, NY 11203

phone: (718) 270-1738
fax: (718) 270-2276

Sincerely,

Stephanie Bernadel
Personnel Associate, Labor Relations

cc:   Leonzo Cuiman
      Adriana Conde-Billy
      Liesl Zwickelbauer
      Kevin Antoine
      Lisa Willis
      Personnel File
      Case File

RECEIVED
2014 OCT 31   A   11: 31
HUMAN RESOURCES
MEDICAL CENTER

# A1003



SUNY
**DOWNSTATE**
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

Leonzo A. Cuiman
**Assistant Vice President for Labor Relations**

CERTIFIED # 7013 1710 0002 2475 3720
**RETURN RECEIPT REQUESTED**

October 22, 2014

Dr. Oded Greenberg

Brooklyn, NY 11201

Dear Dr. Greenberg:

On October 10, 2014, you met with Stephanie Bernadel, Personnel Associate in the SUNY Downstate Medical Center – Office of Labor Relations, for an interrogation regarding allegations of insubordination, leaving the worksite without authorization and related matters. On October 20, 2014, you met with myself, Ms. Bernadel and Lisa Wills, NYSUT/UUP Labor Relations Specialist. The purpose of the meeting was to afford you the opportunity to explain why the penalty of termination from State service held in abeyance should not be implemented for violating your September 8, 2014 disciplinary settlement agreement (attached).

Based on your violation of your September 8, 2014 disciplinary settlement, please be advised that your appointment as a Clinical Assistant Professor TCL is hereby terminated, effective immediately.

Sincerely

*Leonzo A. Cuiman/*SB

Leonzo Cuiman
Assistant Vice President for Labor Relations

LC/sb
cc:     Adriana Conde-Billy
        Deborah Reede, M.D.
        Steven Pulitzer, M.D.
        First Class Mail
        Personnel File
        Case File

**State University of New York Downstate Medical Center**
450 Clarkson Avenue, Box 1224, Brooklyn, NY 11203   •   Phone 718 270-3019   Fax 718 270-4684

Case 19-3570, Document 44, 02/11/2020, 2775400, Page206 of 254

## SETTLEMENT

**State of New York   State University of New York Downstate Medical Center (SUNY-DMC)**
**vs.**
**Ms. Oded Greenberg Clinical Associate Professor**

1. In lieu of Dr. Oded Greenberg, Clinical Associate Professor being served a Notice of Discipline for: (1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department (4) insubordination and (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, switching schedule without authorization of his supervisor, all parties agree that Dr. Greenberg shall have a fine ranging from a letter of reprimand to termination from state service held in abeyance until one year from the signing of this agreement.

2. Dr. Greenberg understands that his current work schedule is from 9:00 A.M. to 5:00 P.M. Monday thru Friday. Dr Greenberg understands that he is expected to work those scheduled hours. Dr. Greenberg understands that he must accurately list the hours that he works. Dr. Greenberg understands that day's off/vacation/changes to vacation need to be approved by his supervisor.

3. Dr Greenberg shall be placed on Time and Attendance Watch. Dr. Greenberg will be required to submit verifiable documentation for each unscheduled absence; including non-medical absences. Each unscheduled absence/lateness due to personal or family illness, injury, etc. must be accompanied by a doctor's note signed by a qualified health care professional that specifies the date seen by the doctor, medical facts supporting the leave, and expected date of return. In each case documentation is due on the date of return to duty and must be submitted directly to Dr. Greenberg's supervisor or the appointed designee. Medical certification which you wish to keep confidential may be submitted to Stephanie Bernadel, Personnel Associate, Labor Relations located at 420 Lenox Road, Brooklyn, NY 11203 (Mailing address 450 Clarkson Ave, Box 1224, Brooklyn, NY 11203, tel 718-270-1193, fax 718-270-4684).

4. The probationary period referred to in paragraph one (1) shall be extended for every day taken by Dr. Greenberg during that period, whether scheduled or unscheduled. Should Dr. Greenberg engage in any misconduct the same or similar to that described above as determined by the Director of Labor Relations or her designee, the penalty will be imposed. The Director of Labor Relations' or her designee's decision to implement this penalty cannot be appealed in any legal or administrative forum by Dr. Greenberg, UUP, or anyone on her behalf.

5. Effective immediately Dr. Greenberg agrees to adhere to all Departmental policies and procedures.

# A1005

Case 19-3570, Document 44, 02/11/2020, 2775400, Page207 of 254

6. This settlement represents the entire resolution of all known or unknown claims and grievances that Dr. Oded Greenberg has or would have arising out of Dr. Greenberg's employment at SUNY Downstate Medical Center (SUNY-DMC) arising prior to the date of this settlement agreement. Dr. Oded Greenberg waives his right to bring any suit, civil action, legal claim or, to otherwise attempt to impose any liability in any forum (including the EEOC and New York State Division of Human Rights) on SUNY, SUNY-DMC and/or the State government or any of their officers or employees in relation to her employment with SUNY-DMC. This settlement is not a precedent, but it shall be admissible by either party in future proceedings between Dr. Oded Greenberg and SUNY Downstate Medical Center.

**Dr. Greenberg voluntarily waived his right to legal or union representation.**
**Dr. Greenberg represented himself in this matter.**

_____
Employer

9/8/14
Date

_____
Employee

9/8/14
Date

_____
UUP Representative

_____
Date

cc:   Personnel File
      Case File



SUNY
**DOWNSTATE**
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

**Department of Human Resources**
**Labor Relations**

CERTIFIED MAIL # 7012 3460 0000 6957 4576
RETURN RECEIPT REQUESTED

October 3, 2014

Dr. Oded Greenberg
~~1650 North Ave PH #2401~~
Brooklyn, NY 11201

Re:     INVESTIGATION OF POSSIBLE DISCIPLINARY CHARGES

Dear Dr. Greenberg:

You are directed to report to the Office of Labor Relations located at 420 Lenox Road, Brooklyn, NY 11226 on **Wednesday, October 8, 2014 at 11:00 a.m.** At that time, I will meet with you to discuss allegations of insubordination, leaving the worksite without authorization and related matters.

As per Article 19 of the UUP Agreement, you are entitled to be represented by UUP or by an attorney at this meeting. If you want to be represented by UUP, it is your responsibility to contact the UUP office at (718) 270-1519 to arrange for representation. If you are unable to attend for good cause, you must speak with me at (718) 270-1972 to determine when the appointment may be rescheduled.

For your information, a copy of Article 19 of the United University Professions Agreement, which provides the procedure for discipline, is attached.

Regards,

Stephanie Bernadel
Personnel Associate, Labor Relations

Attch:   Article 19
cc:      Leonzo Cuiman
         Adriana Conde-Billy
         Deborah Reede, MD
         Steven Pulitzer, MD
         UUP
         First Class Mail
         Personnel File
         Case file

**State University of New York Downstate Medical Center**
450 Clarkson Avenue, MSC 1224, Brooklyn, NY 11203   •   Phone 718 270-3094   Fax 718 270-4684

Case 1:15-cv-02343-PKC-VMS   Document 81-3   Filed 09/14/18   Page 15 of 252 PageID #: 587

Case 19-3570, Document 44, 02/11/2020, 2775400, Page209 of 254


**SUNY DOWNSTATE**
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

John F. Williams, Jr., MD, EdD, MPH, FCCM
President

CERTIFIED MAIL #7012 3460 0000 7005 7990
RETURN RECEIPT REQUESTED

June 24, 2014

Dr. Oded Greenberg

Brooklyn, NY 11201

Dear Dr. Greenberg:

This is to inform you that the notice of the termination of your temporary appointment as Clinical Assistant Professor (TCL) in the Department of Radiology at the State University of New York Downstate Medical Center is hereby rescinded.

Sincerely,

John F. Williams, Jr., MD, EdD, MPH, FCCM

cc:     Ms. A. Bain-Dowell
        Dr. I. Taylor
        Mr. M. Miller
        Dr. D. Reede
        First Class Mail
        Personnel File

State University of New York Downstate Medical Center
450 Clarkson Avenue, Box 1, Brooklyn, NY 11203 -2098 · Phone 718 270-2611  Fax 718 270-4732
www.downstate.edu

# A1008

Case 19-3570, Document 44, 02/11/2020, 2775400, Page210 of 254

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

# OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To: Dr. Oded Greenberg
Street, Apt. No.; or PO Box No.
City, State, ZIP+4: B'klyn, NY 11201

PS Form 3800, August 2006          See Reverse for Instructions

7012 3460 0000 7005 7990

---

**SENDER: COMPLETE THIS SECTION**

- Complete Items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dr. Oded Greenberg

Brooklyn, NY 11201

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
MARK ITGRINE

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

2014 JUL 29  P 12: 33

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7012 3460 0000 7005 7990

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540



**SUNY**
**DOWNSTATE**
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

John F. Williams, Jr., MD, EdD, MPH, FCCM
President

<u>CERTIFIED MAIL #7012 3460 0000 7005 7990</u>
<u>RETURN RECEIPT REQUESTED</u>

June 24, 2014

Dr. Oded Greenberg

Brooklyn, NY 11201

Dear Dr. Greenberg:

This is to inform you that the notice of the termination of your temporary appointment as Clinical Assistant Professor (TCL) in the Department of Radiology at the State University of New York Downstate Medical Center is hereby rescinded.

Sincerely,

John F. Williams, Jr., MD, EdD, MPH, FCCM

cc:   Ms. A. Bain-Dowell
      Dr. I. Taylor
      Mr. M. Miller
      Dr. D. Reede
      First Class Mail
      Personnel File

**State University of New York Downstate Medical Center**
450 Clarkson Avenue, Box 1, Brooklyn, NY 11203 -2098 · Phone 718 270-2611 Fax 718 270-4732
**www.downstate.edu**

# A1010

Case 19-3570, Document 44, 02/11/2020, 2775400, Page212 of 254



SUNY
DOWNSTATE
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions

Department of Human Resources

SS#: (

January 23, 2014

Oded Greenberg
Brooklyn, NY 11201

Dear Dr. Greenberg:

I am pleased to inform you that pursuant to the 2011-2016 Agreement between the State of New York and United University Professions (UUP), you were eligible to receive the 2013 Chancellor's Power of SUNY Performance Incentive Payment of $500 added to your annual base salary. This payment was reflected in your November 6, 2013 paycheck, retroactive to July 1, 2013.

Additionally, pursuant to Article 20.5 of the 2011 - 2016 Agreement between the State of New York and UUP, President Williams has authorized you to receive a Discretionary lump sum payment of $397. This payment was reflected in your December 18, 2013 paycheck.

Sincerely,

Maria Silas
Appointments Manager
for Personnel Administration

cc: Personnel File

State University of New York Downstate Medical Center
450 Clarkson Avenue, Box 53, Brooklyn, NY 11203-2098 • Phone 718 270-3018

# A1011

Case 19-3570, Document 44, 02/11/2020, 2775400, Page213 of 254

SUNY-
DOWNSTATE | University
Medical Center | Hospital of
Brooklyn

page 4 of 5 — University Hospital of Brooklyn

College of Medicine

School of Graduate Studies

College of Nursing

College of Health Related Professions

*Student/Employee Heath Service*

TO: Department of Human Resources/Administrators
Medical Board Office

FROM: Dr. Sigrid Ulrich
Director of Employee Health Service

SUBJECT: HEALTH ASSESSMENT

This will certify that  GREENBERG M.D., ODED          SID # XXX-XX- 0486

Pay Source     State

Department     RADIOLOGY                    Title     MBP Attending

Work Ext#     1603                          Box#     1208

## has received Clearance for:

**New Employment/Service**

☐  Preliminary Pre-employment Clearance

_____     _____
Authorized Signature/EHS          Date

**Continued Employment/Service**

☐  Annual Assessment

☐  Return to Duty Assessment

**Employee is requested to return to the EHS on**

_____
Date

*Reason for follow-up:*   ☑ 2nd PPD   ☐ Missing Titre(s)   ☐ Need Vaccine(s)   ☐ Needs Mask Fit

*additional information:* _____

**Miscellaneous**

☐  Health Clearance for Credentialing by Medical Board

☐  Other  _____

**Final Employee Clearance**

☑ Acceptable        ☐  Not Acceptable

Lauretta M Joseph, ANP-BC
F305436 NY
NPI # 1124823387 12
Date 1/29/14

In accordance with the New York State Health Department 405 regulations and the regulations of the University Hospital of Brooklyn, the health care worker named above has been assessed by the Employee Health Service either by direct examination and laboratory studies or by submission of appropriate documentation from another institution or physician. In addition, the Employee Health Service consults the Ad Hoc Subcommittee of the Infection Control Committee in cases of possible risk of transmission of a bloodborne pathogen from health care worker to patient. All medical documents are maintained in confidential files in accordance with HIPAA regulations at the Employee Health Service at 440 Lenox Road.

cc: Employee Health Service Chart
    Credential File/Personnel File
    Department Head/Administrator/Nursing Services (if applicable)
    Medical Board Office (if applicable)
    GME Office (if applicable)

## State University of New York/Downstate Medical Center

450 Clarkson Avenue, Box 33, Brooklyn, NY 11203 - 2098          Phone 718-270-1995 / 1969          Fax 718-270-2477

Case 19-3570, Document 44, 02/11/2020, 2775400, Page214 of 254



**SUNY**
**D**OWNSTATE
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions

John C. LaRosa, MD, FACP
President

**CERTIFIED MAIL # 7011 1150 0001 4595 6855**
**RETURN RECEIPT REQUESTED**

June 30, 2011

Oded Greenberg, M.D.

Brooklyn, NY 11215

Dear Dr. Greenberg:

This is to inform you that your temporary appointment as a Clinical Assistant Professor(TCL) in the Department of Radiology at the State University of New York Downstate Medical Center will be terminated effective June 30, 2012, close of business.

Sincerely,

John C. LaRosa, M.D.
President

cc:     Dr. Taylor
        Ms. Carey
        Dr. Rotman
        UUP Chapter President
        First Class Mail
        Personnel File

# A1013

Case 19-3570, Document 44, 02/11/2020, 2775400, Page215 of 254

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dr. Oded Greenberg
Brooklyn, ny

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Stello_   ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

STELLA

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

2013 JUL 11   A 10:37

TE MEDICAL CENTER
HUMAN RESOURCES
RECEIVED

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7012 1010 0002 9310 4278

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

O F F I C I A L   U S E

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | Postmark Here |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To   _ODed Greenberg_

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

PS Form 3800, August 2006   See Reverse for Instructions

7012 1010 0002 9310 4278

# A1014

Case 19-3570, Document 44, 02/11/2020, 2775400, Page216 of 254

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dr. Oded Greenberg

Brooklyn, NY  11201

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)

7012 0470 0001 0592 9144

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

Postage  $
Certified Fee
Return Receipt Fee (Endorsement Required)
Restricted Delivery Fee (Endorsement Required)
Postmark Here
Total Postage & Fees  $

Sent To  Oded Greenberg
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

PS Form 3800, August 2006       See Reverse for Instructions

7012 0470 0001 0592 9144

Case 1:15-cv-02343-PKC-VMS   Document 81-3   Filed 09/14/18   Page 23 of 252 PageID #: 595

Case 19-3570, Document 44, 02/11/2020, 2775400, Page217 of 254



**SUNY DOWNSTATE** Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

**John F. Williams, Jr., MD, EdD, MPH, FCCM**
President

Certified Mail #7012 0470 0001 0592 9144
**Return Receipt Requested**

July 29, 2013

Dr. Oded Greenberg

Brooklyn, NY   11201

Dear Dr. Greenberg:

The non-renewal of your term appointment as a Clinical Assistant Professor (TCL) in the Department of Radiology at the State University of New York Downstate Medical Center has been extended until June, 30, 2014.

Sincerely,

John F. Williams, Jr., MD, EdD, MPH FCCM

cc:  Dr. Taylor
    Mr. Caralis
    Dr. M. Rotman
    UUP Chapter President
    First Class Mail
    Personnel File

**State University of New York Downstate Medical Center**
450 Clarkson Avenue, Box 1, Brooklyn, NY 11203 -2098  ·  Phone 718 270 - 2611  Fax 718 270 - 4732
**www.downstate.edu**

**A1016**

Fax Server BS2-1      6/25/2013 10:49:48 AM  PAGE   3/003   Fax Server

Reference No. 7922279339

## Verification Of Employment                          Request Form

| 1. To (Name and address of employer)<br>NY State University / Suny Downstate Medical Center<br>450 Clarkson Ave<br>Brooklyn, NY 11203 | 2. From (Name and address of lender)<br>CitiMortgage Production Oversight |
|---|---|

My signature below authorizes verification of this information.

| 3. Name and Address of Applicant (include employee or badge number)<br><br>Oded Greenberg<br>SSN: XXX-XX-486 | 4. Signature of Applicant<br><br>See Attached |
|---|---|

**Verification of Employment – Employers, please complete this section.**

| 5. Applicant's Date of Employment<br>4/16/01 | 6. Date Terminated (if applicable)<br>N/A | 7. Position/Title<br>Clinical Assistant Professor | 8. Employment Status<br>☒ Currently Employed<br>☐ Previously Employed |
|---|---|---|---|
| 9. Remarks (if applicable) | | | 10. Probability of continued employment<br>☒ Yes   ☐ No |

Employer Authorized Signature – Federal Statutes provide severe penalties for any fraud, intentional misrepresentation, or criminal connivance or conspiracy purposed to influence the issuance of any guaranty or insurance by the V.A Secretary, the U.S.D.A., FmHA / FHA Commissioner, or the HUD / CPD Assistant Secretary

| 11. Signature of Employer<br><br>Shelly Meyer | 12. Position/Title (Please print or type)<br>Personnel Associate | 13. Date<br>7/2/13 |
|---|---|---|
| 14. Print or type name signed in item 11<br>SHELLY MEYERS | 15. Phone No.<br>718-270-2185 | 16. Work Location (Address)<br>SUNY DOWNSTATE MEDICAL CENTER<br>DEPT. OF HUMAN RESOURCES<br>450 CLARKSON AVE., BOX 53<br>BROOKLYN, NY 11203-2098 |

**Please fax this completed request form to The Work Number at 1-888-549-5690.**

If you have any questions please call 1-866-662-3339.

# A1017

Case 19-3570, Document 44, 02/11/2020, 2775400, Page219 of 254

Fax Server BS2-1        6/25/2013 10:49:48 AM  PAGE   2/003   Fax Server



## BORROWER'S AUTHORIZATION TO RELEASE INFORMATION
## AND CONFIRMATION OF APPLICATION

Borrower(s):    Oded Greenberg

Dear Borrower,

This document confirms that you have applied for a mortgage and gives Citibank, N.A. ("Lender"), any mortgage insurer, subordinate lien holder, title company providing services related to your transaction, investor to whom Lender sells your mortgage, or any of their designated agents or subcontractors permission to obtain, review and share the information and documents indicated below and any additional documents as needed. Please take a few minutes to review and then sign and return this document to us. Should you have any questions, just let us know.

Sincerely,
Citibank, N.A.

**Please review the following information and sign at the bottom, indicating that you have read and understand the information.**

- I confirm that I have applied for a mortgage loan from Lender. I understand that certain information from my application and loan-related documents may need to be verified - either before the loan is closed or as part of its quality control program.

- This authorization may be addressed to and applies to any party named in the loan application, Lender, subordinate lien-holder(s), the title company providing services related to my transaction, the mortgage insurer, any investor that purchases the mortgage loan or any of their designated agents or subcontractors.

- As needed, you may provide Lender, or potential mortgage insurers or potential investors that may purchase my mortgage, any and all information that they request. This may include (but is not limited to):

  - Employment History and Income
  - Bank, Money Market, and Similar Account Balances
  - Credit History/Underwriting Information
  - Copies of Signed Income Tax Returns
  - Payoff/Beneficiary statements (borrower is responsible for statement charges and/or reconveyance fees)
  - Property/Appraisal Information

- A copy of this authorization may be accepted as an original.

- If more than one person is identified above as a Borrower, I confirm that we intend to apply for joint credit and I authorize each of the persons identified above as a Borrower to deal with Lender on my behalf in connection with this application.

**Please sign below. We appreciate your prompt response.**

Oded Greenberg

Loan No.: 001123678059
M031/09                                    Page 1 of 2                          Rev. 01/2010

Fax Server BS2-1        6/25/2013 10:49:48 AM  PAGE   1/003   Fax Server

# FAX

*From*

**To: Bobbie  Nemley**

Company: NY State University / Suny Downstate Medical Center
Fax: 7182701407
Phone: 7182701844

**From: The Work Number**

Fax: (888)549-5690
Phone: (866)662-3339

## Notes:

Dear Bobbie  Nemley

Thank you for your assistance regarding this Verification of
Employment request.  Please complete the form provided, including
most-recent hire date, title and status of employment.  (Sections 5-8
and 10-15)

Please fax all information, to **888/549-5690**.

Again, thank you for your assistance in verification of this information.

Best Regards,
The Work Number

 **SUNY** **DOWNSTATE** Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

**John F. Williams, M.D., Ed.D., MPH, FCCM**
President

**Certified Mail #7012 1010 0002 9310 4278**
**Return Receipt Requested**

June 14, 2013

Dr. Oded Greenberg

Brooklyn, NY   11201

Dear Dr. O. Greenberg:

The non-renewal of your term appointment as a Clinical Assistant Professor (TCL) in the Department of Radiology at the State University of New York Downstate Medical Center has been extended until July 31, 2013.

Sincerely,

John F. Williams, MD, EdD, MPH FCCM

cc: Dr. Taylor
    Mr. Caralis
    Dr. M. Rotman
    UUP Chapter President
    First Class Mail
    Personnel File

**State University of New York Downstate Medical Center**
450 Clarkson Avenue, Box 1, Brooklyn, NY 11203 -2098 · Phone 718 270 - 2611  Fax 718 270 - 4732

JUN-05-2013 14:08 From:                                      To:17182701815          Page:4/4

Loan #:001123628659

**VERBAL
VERIFICATION OF EMPLOYMENT**

Borrower Name _Oded Greenberg_

Employer Name _SUNY_

Employer Contact: _____

Employer Contact Title: _____

Date Called _____

Phone Number: _____

Third-party source used to obtain the phone number: _____

Dates of Employment: _4/14/01 - Present_

Borrower's Title: Physician - _Clinical Assistant Professor_

Is the Borrower currently employed? (check one)          ☒ Yes          ☐ No

Is the Borrower/employee active or on leave (check one)   ☒ Active        ☐ On-leave

Additional Information: _____

_____

_____

Verified By: _Shelly Meyers_

Title: _Personnel Associate_

Company: _Downstate Medical Center_

Date: _6/13/13_

MB4897 - Borrower 1                    Page 1                    Rev 09/2009

JUN-05-2013 14:07 From:                                          To:17182701815           Page:1/4

CitiBank, N.A.
1000 Technology Drive
O'Fallon, MO 63368
Fax 866-583-9461

# FAX

FROM

To: Suny                                    From:

Fax: 718270.1815                            Pages:

Phone:                                      Date:

Re:                                         CC:

☐ Urgent    ☐ For Review  | ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Comments:

9.21.2012

JUN-05-2013 14:07 From:                                          To:17182701815            Page:2/4

## Brown, Tiffany T [NCB-GCM]

*Good Afternoon,*

*Please complete the attached verification of employment for Oded Greenberg SS# [          ].*
*Please either email to 866-583-9461 using 001123628659 as the reference # or email to me at*
*tiffany.t.brown@citi.com. I have also sent the borrowers authorization.*

*Thank you,*

*Tiffany T. Brown*
*MLC Retail Partnership - East*
*Credit Specialist 3*
*NMLS License # 963693*
*Citibank, N.A. 14000 Citi Cards Way*
*Jacksonville, FL 32258*
*tiffany.t.brown@citi.com*
*904-954-0613 Ext.*
*866-583-9461 Fax*
*Retail Customer Service:   800-667-8424*

1

JUN-05-2013 14:07 From:                                                     To:17182701815          Page:3/4

# citi

## BORROWER'S AUTHORIZATION TO RELEASE INFORMATION
## AND CONFIRMATION OF APPLICATION

Borrower(s):      Oded Greenberg

Dear Borrower,

This document confirms that you have applied for a mortgage and gives Citibank, N.A. ("Lender"), any mortgage insurer, subordinate lien holder, title company providing services related to your transaction, investor to whom Lender sells your mortgage, or any of their designated agents or subcontractors permission to obtain, review and share the information and documents indicated below and any additional documents as needed. Please take a few minutes to review and then sign and return this document to us. Should you have any questions, just let us know.

Sincerely,
Citibank, N.A.

**Please review the following information and sign at the bottom, indicating that you have read and understand the information.**

- I confirm that I have applied for a mortgage loan from Lender. I understand that certain information from my application and loan-related documents may need to be verified - either before the loan is closed or as part of its quality control program.

- This authorization may be addressed to and applies to any party named in the loan application, Lender, subordinate lien-holder(s), the title company providing services related to my transaction, the mortgage insurer, any investor that purchases the mortgage loan, or any of their designated agents or subcontractors.

- As needed, you may provide Lender, or potential mortgage insurers or potential investors that may purchase my mortgage, any and all information that they request. This may include (but is not limited to):

    - Employment History and Income
    - Bank, Money Market, and Similar Account Balances
    - Credit History/Underwriting Information
    - Copies of Signed Income Tax Returns
    - Payoff/Beneficiary statements (*borrower is responsible for statement charges and/or reconveyance fees*)
    - Property/Appraisal Information

- A copy of this authorization may be accepted as an original.

- If more than one person is identified above as a Borrower, I confirm that we intend to apply for joint credit and I authorize each of the persons identified above as a Borrower to deal with Lender on my behalf in connection with this application.

Please sign below. We appreciate your prompt response.

Oded Greenberg

Loan No.: 001123628659
MB4153                                          Page 1 of 1                               Rev. 06/2010

# A1024

Case 19-3570, Document 44, 02/11/2020, 2775400, Page226 of 254

12/6/10

**UP-2/C-Form** (Rev. 01/10)

## STATE UNIVERSITY OF NEW YORK
### NOTIFICATION OF EMPLOYEE CHANGE OF STATUS
### (All Bargaining Units - Classified and Unclassified Service Positions)

RECEIVED  OCT - 8 2010  DEAN'S OFFICE  COLLEGE OF MEDICINE

**Bargaining Unit**
- ☐ CSEA (02,03,04)
- ☐ PEF (05)
- ☐ UUP (08)
- ☐ MC (13)
- ☐ COUNCIL 82 (31)
- ☐ NYSCOPBA (21)
- ☐ GSEU
- ☐ Voluntary/Unpaid

**Pre-Employment Checklist**
- ☐ Oath of Office
- ☐ Ofc. of Inspector Gen'l
- ☐ Background Check
- ☐ I9 Verification
- ☐ Health Clearance
- ☐ Credentials Verification
- ☐ Qualifications: _____
- ☐ Med. Board/Lic. Date:
- ☐ Orientation Dates:

- ☐ FLSA Status: (E / I)
- ☐ Benefits: (E / I)
- ☐ C.S. List#: _____
- ☐ C.S. Cert#: _____
- ☐ Exam Score: _____
- ☐ Accrual Rate: _____
- ☐ Oncall/Recall Eligible
- ☐ To Affirmative Action:

**Payroll Processing**
DHR Letter #: N1728
Payroll #: 18
Processed By: DK 11/29/10
NYStep Date:
Payserv Date: WH 12/0/10
Suny/HR Date: 12/2/10
Processed By: AS

1. ☑ Dr. / ☐ Mr. / ☐ Mrs./Ms.
First **Oded**   Middle   Last **GREENBERG**

2. Social Security Number _____

3. *(See SUNY-HR/PayServ/Payroll Synchronization Calendar)*
Department's Requested Effective Date:

4. SUNY HR/PayServ Effective Date:  RECEIVED

**5. ☐ ACTION: STATUS CHANGE**
☐ Probationary  ☐ Temporary  ☐ Continuing _____  ☐ Other Status To Term Ending _____
☐ Term Renewal From _____ To _____

**6. ☐ ACTION: SHIFT CHANGE**
FROM  ☐ Days  ☐ Eves  ☐ Nights  ☐ ☐ ☐ ☐ ☐ ☐ ☐  S M T W T F S
From ____ (am/pm) To ____ (am/pm)
TO  Complete Boxes (1a & b)  From ____ (am/pm) To ____  ☐ Days  ☐ Eves  ☐ Nights  ☐ ☐ ☐ ☐ ☐ ☐ ☐  S M T W T F S

**7. ☐ ACTION: LEAVES**
☐ Sabbatical  ☐ Dock  ☐ Leave Without Pay  ☐ ½ Pay Leave  ☐ Sick Leave  ☐ Worker's Comp. Leave (Date of Accident _____)
☐ Military  ☐ Maternity  ☐ Education  ☐ Other  Reason For Leave: _____
☐ Labor Relations Actions _____  ☐ Period of Leave From _____ To _____
☐ Return From Leave To Full Pay Status, Effective: _____

**8. ☐ ACTION: SEPARATIONS**  Date of scheduled Exit Interview _____  Reason For Leaving **11·28·10. COB**
☒ Resignation  ☐ Expiration of Term  ☐ End of Temp  ☐ Retired  ☐ Deceased  ☐ Transfer to other State agency
☐ Other _____  ☐ Labor Relations Actions

**9. ☐ ACTION: TITLE AND SALARY CHANGES**
☐ Promotion  ☐ Demotion  ☐ Salary Increase  ☐ Salary Decrease  ☐ Other _____

| PRESENT POSITION DETAILS | NEW POSITION DETAILS |
|---|---|
| **10a.** Line # **51602** Position # _____ SOP # _____ | **10b.** Line # _____ Position # _____ SOP # _____ |
| Budget Title/Grade: **Clin Asst Prof. HS/PT** | Budget Title/Grade: _____ |
| Local Title: **SAME** | Local Title: _____ |
| Department/Unit: **Radiology** | Department/Unit: _____ |

**11a. SALARY COMPONENTS**  Funding Source  FTE  %
Base Salary: $ **268·05**  **35136005**
Total Base: $ **268.05**
Also Receives: $ **0**
Total ALR: $ **0**
Total Salary: $ **260 Hourly  35/360-05**

**11b. SALARY COMPONENTS**  Funding Source  FTE  %
Base Salary: $ _____
Total Base: $ _____
Also Receives: $ _____
Total ALR: $ _____
Total Salary: $ _____

**12a. Additional Salary Components:** *(If Applicable)*
☐ Location Pay: $ _____  ☐ Adv. Quals (131-1a. CSL): $ _____
☐ Geo. Diff.: $ _____  ☐ Shift Diff: $ _____
☐ Inconv. Pay: $ _____  ☐ Security Diff.: $ _____

**12b. Additional Salary Components:** *(If Applicable)*
☐ Location Pay: $ _____  ☐ Adv. Quals (131-1a. CSL): $ _____
☐ Geo. Diff.: $ _____  ☐ Shift Diff: $ _____
☐ Inconv. Pay: $ _____  ☐ Security Diff.: $ _____

**Remarks**
Delia D. Corry 10/26/10
AVP for Hospital Finance  SUNY Finance

☐ Justification Letter Attached

**Supervisor (Print):**

**Affirmative Action Review/Approval:** ☐  2010 OCT 29 D

Responsible Departmental Designee (RDD) (Print): **SHERMA BELOE**  10/18/10

Date: _____

| BUDGETARY APPROVALS | ADMINISTRATIVE APPROVALS |
|---|---|
| Budget Office/IFR: _____ Date _____ | Department Head/Chairman _____ Date 10/8/10 |
| Hospital Finance: _____ Date _____ | Dean: _____ Date _____ |
| CFO: _____ Date _____ | Vice President/CEO-UHB: _____ Date _____ |
|  | President: _____ Date _____ |

DO NOT WRITE ALONG BORDER

Case 19-3570, Document 44, 02/11/2020, 2775400, Page227 of 254

UP-2IC-Form
(Rev. 01/10)

RECEIVED SEP 2 2 2010

**STATE UNIVERSITY OF NEW YORK**
NOTIFICATION OF EMPLOYEE CHANGE OF STATUS
(All Bargaining Units - Classified and Unclassified Service Positions)
OFFICE
COLLEGE OF MEDICINE

**Bargaining Unit**
- ☐ CSEA (02,03,04)
- ☐ PEF (05)
- ☒ UUP (08)
- ☐ MC (13)
- ☐ COUNCIL 82 (31)
- ☐ NYSCOPBA (21)
- ☐ GSEU
- ☐ Voluntary/Unpaid

**Pre-Employment Checklist**
- ☐ Oath of Office
- ☐ Ofc. of Inspector Gen'l
- ☐ Background Check
- ☐ I9 Verification
- ☐ Health Clearance
- ☐ Credentials Verification
- ☐ Qualifications: ___
- ☐ Med. Board/Lic. Date:
- ☐ Orientation Dates: ___

- ☐ FLSA Status: (E / I)
- ☐ Benefits: (E / I)
- ☐ C.S. List#: ___
- ☐ C.S. Cert#: ___
- ☐ Exam Score: ___
- ☐ Accrual Rate: ___
- ☐ Oncall/Recall Eligible
- ☐ To Affirmative Action:

**Payroll Processing**
DHR Letter #: TCL/3
Payroll #: 18
Processed By: 11-29-10
NYStep Date: ___
Payserv Date: 12/2/10
Suny/HR Date: NO OSC
Processed By: AS

1. First: Oded   Middle: ___   Last: GREENBERG   ☒ Dr. ☐ Mr. ☐ Mrs./Ms.
2. Social Security Number: ___

3. (See SUNY-HR/PayServ/Payroll Synchronization Calendar)
Department's Requested Effective Date: 10-28/2010

4. SUNY HR/PayServ Effective Date: 10/28/2010

5. ☐ ACTION: STATUS CHANGE ☐ Probationary ☒ Temporary ☐ Continuing — thru 10/28/11 ☐ Other Status To Term Ending ___
☐ Term Renewal From ___ To ___

6. ☐ ACTION: SHIFT CHANGE   FROM   TO   Complete Boxes 11a & b)
From ___ (am/pm) To ___ (am/pm)   ☐ Days ☐ Eves ☐ Nights   S M T W T F S
From ___ (am/pm) To ___ (am/pm)   ☐ Days ☐ Eves ☐ Nights   S M T W T F S

7. ☐ ACTION: LEAVES
☐ Sabbatical ☐ Dock ☐ Leave Without Pay ☐ ½ Pay Leave ☐ Sick Leave ☐ Worker's Comp. Leave (Date of Accident ___)
☐ Military ☐ Maternity ☐ Education ☐ Other Reason For Leave: ___
☐ Labor Relations Actions ___   ☐ Period of Leave From ___ To ___
☐ Return From Leave To Full Pay Status, Effective: ___

8. ☐ ACTION: SEPARATIONS   Date of scheduled Exit Interview ___   Reason For Leaving ___
☐ Resignation ☐ Expiration of Term ☐ End of Temp ☐ Retired ☐ Deceased ☐ Transfer to other State agency
☐ Other ___   ☐ Labor Relations Actions ___

9. ☐ ACTION: TITLE AND SALARY CHANGES
☐ Promotion ☐ Demotion ☐ Salary Increase ☐ Salary Decrease ☐ Other ___

| PRESENT POSITION DETAILS | NEW POSITION DETAILS |
|---|---|
| 10a. Line # 51602 Position # ___ SOP # ___ | 10b. Line # 44849 Position # 95088563 SOP # ___ |
| Budget Title/Grade: Clin. Ass. Prof. HS/PT | Budget Title/Grade: Clin. Asst. Prof. (TCL) |
| Local Title: SAME | Local Title: SAME |
| Department/Unit: Radiology | Department/Unit: Radiology |

| 11a. SALARY COMPONENTS | Funding Source | FTE | % | 11b. SALARY COMPONENTS | Funding Source | FTE | % |
|---|---|---|---|---|---|---|---|
| Base Salary: $ | | | | Base Salary: $ 300,000 | 921376.25 | | |
| Total Base: $ | | | | Total Base: $ 300,000 | | | |
| Also Receives: $ | | | | Also Receives: $ 50,000 | 921376.25 | | |
| Total ALR: $ | | | | Total ALR: $ 50,000 | | | |
| Total Salary: $ 250 Hourly 351360 | | | | Total Salary: $ 350,000 | 921376.25 | | |

12a. Additional Salary Components: (If Applicable)
☐ Location Pay: $___ ☐ Adv. Quals (131-1a. CSL): $___
☐ Geo. Diff.: $___ ☐ Shift Diff: $___
☐ Inconv. Pay: $___ ☐ Security Diff.: $___

12b. Additional Salary Components: (If Applicable)
☐ Location Pay: $___ ☐ Adv. Quals (131-1a. CSL): $___
☐ Geo. Diff.: $___ ☐ Shift Diff: $___
☐ Inconv. Pay: $___ ☐ Security Diff.: $___

**Remarks** DHR - Please conduct a background check and drug test charged to EFR Acct 900760-01

*OVER The max Salary!

☐ Justification Letter Attached

Supervisor (Print): ___
Affirmative Action Review/Approval: Kevin Antine

Responsible Departmental Designee (RDD) (Print): Sherma Bekoe   Date: 12/2/10

**BUDGETARY APPROVALS**
Budget Office/IFR: ___ Date: 9-23-10
Hospital Finance: ___ Date: ___
CFO: ___ Date: ___

**ADMINISTRATIVE APPROVALS**
Department Head/Chairman: ___ Date: 9/21/10
Dean: ___ Date: 10/7/10
Vice President/CEO-UHB: ___ Date: ___
President: ___ Date: 10/13/10

DO NOT WRITE ALONG BORDER

° PID TO CEC 10-20-10.
° PER SHERMA BEKOE DR GREENBERG RESIGNED FROM HOURLY POSITION TO ACCEPT FULL TIME APPT - SHERMA WILL SUBMIT THE LETTER 10/20/10.

# A1026

Case 19-3570, Document 44, 02/11/2020, 2775400, Page228 of 254

page 4 of 5

**SUNY DOWNSTATE Medical Center**  University Hospital of Brooklyn

University Hospital of Brooklyn

College of Medicine

School of Graduate Studies

College of Nursing

College of Health Related Professions

*Student/Employee Heath Service*

TO:   Department of Human Resources/Administrators
      Medical Board Office

FROM:   Dr. Sigrid Ulrich
        Director of Employee Health Service

SUBJECT:   HEALTH ASSESSMENT

**This will certify that**   GREENBERG M.D., ODED        SID #  ███████

| | | | |
|---|---|---|---|
| Pay Source | State | | |
| Department | RADIOLOGY | Title | MBP Attending |
| Work Ext# | 1603 | Box# | 1208 |

## has received Clearance for:

**New Employment/Service**

☒  Preliminary Pre-employment Clearance

_____     _____
Authorized Signature/EHS          Date

**Continued Employment/Service**

☒  Annual Assessment
☒  Return to Duty Assessment

**Employee is requested to return to the EHS on**

_____
Date

*Reason for follow-up:*   ☒ 2nd PPD   ☒ Missing Titre(s)   ☒ Need Vaccine(s)   ☒ Needs Mask Fit

*additional information:*   _____

**Miscellaneous**

☒  Health Clearance for Credentialing by Medical Board
☒  Other   _____

**Final Employee Clearance**

☒ Acceptable      ☒  Not Acceptable    *D. Sigrid Ulrich*   3/1/13
                                        Authorized Signature/EHS       Date

In accordance with the New York State Health Department 405 regulations and the regulations of the University Hospital of Brooklyn, the health care worker named above has been assessed by the Employee Health Service either by direct examination and laboratory studies or by submission of appropriate documentation from another institution or physician. If necessary, the Employee Health Service consults the Ad Hoc Subcommittee of the Infection Control Committee in cases of possible risk of transmission of a bloodborne pathogen from health care worker to patient. All medical documents are maintained in confidential files in accordance with HIPAA regulations at the Employee Health Service at 440 Lenox Road.

*cc: Employee Health Service Chart*
    *Credential File/Personnel File*
    *Department Head/Administrator/Nursing Services (if applicable)*
    *Medical Board Office (if applicable)*
    *GME Office (if applicable)*

### State University of New York/Downstate Medical Center

450 Clarkson Avenue, Box 33, Brooklyn, NY 11203 - 2098          Phone 718-270-1995 / 1969          Fax 718-270-2477



# A1027

12-18-12.11.04AM.                                                  7182454473        # 1/ 1

## State University of New York
### Downstate Medical Center
### Department of Human Resources

## PERSONNEL DATA UPDATE FORM
### Please print all information in blue or black ink

NAME: Oded Greenberg mD     TITLE: Clinical Ass. Professor

☐ Check if you are a Resident or a Fellow.

SOCIAL SECURITY NUMBER ON FILE:_____

*Please check **ONLY** those items requiring revision and insert correct information.*

☐     NEW NAME *:_____

☐     NEW/CORRECT SSN #*:_____

*Federal and State Law require that Social Security earnings be reported under the correct name and social Security Number (SSN). Accordingly, you must notify the Social Security Administration (SSA) of you name/SSN change as reported above. The toll free number for the SSA is (800) 772-1213*

☑     HOME ADDRESS**:

From: ▮▮▮▮▮▮ Street     To: ▮▮▮▮▮▮
       Brklyn - NY 11215           ▮▮▮▮▮▮▮▮▮▮
                                    Brklyn, NY 11201

** Proof of identity required i.e. DMC ID, Drivers License

☐     HOME TELEPHONE NUMBER:

From:_____     To:_____

### CAMPUS INFORMATION

|                   | FROM | TO |
|-------------------|------|-----|
| Building/Room #   |      |     |
| Box #             |      |     |
| Local Tele #      |      |     |
| Department        |      |     |
| Local Title       |      |     |

Signature _____ mD         Date 12/17/12

                                     12/21/12 NS

### FOR OFFICIAL USE ONLY

☐ Benefits     ☐ GME     ☐ Nursing     ☐ NYSTEP

☐ Payroll     ☐ PDS     ☐ Personnel File     ☐ DHR Approval

PSN_DATA_UPDTE_REV1212

PAGE 01/01          DHR          1718-270-1815     15:13  12/17/2012

RECEIVED DEC 21 P 12: 55 HUMAN RESOURCES STATE MEDICAL CENTER

# A1028

Case 19-3570, Document 44, 02/11/2020, 2775400, Page230 of 254

12-18-12;11:06AM;                                           ;7182454473          #  2/  2

## State University of New York
### Downstate Medical Center
### Department of Human Resources

## PERSONNEL DATA UPDATE FORM
### Please print all information in blue or black ink

NAME: _Odd Greenberg md_     TITLE: _Clinical Asst. Professor_

☐ **Check if you are a Resident or a Fellow.**

SOCIAL SECURITY NUMBER ON FILE: _____

*Please check **ONLY** those items requiring revision and insert correct information.*

☐   **NEW NAME** *: _____

☐   **NEW/CORRECT SSN #** *: _____

*Federal and State Law require that Social Security earnings be reported under the correct name and social Security Number (SSN). Accordingly, you must notify the Social Security Administration (SSA) of your name/SSN change as reported above. The toll free number for the SSA is (800) 772-1213*

☑   **HOME ADDRESS** **:

A   From: _____  Closest  ✻  To: ▮▮▮▮▮▮▮

Correction   _Bklyn  NY 11201_                        _Bklyn, NY 11201)_

** *Proof of identity required i.e. DMC ID, Drivers License*

☐   **HOME TELEPHONE NUMBER:**

From: _____   To: _____

### CAMPUS INFORMATION

|                   | FROM | TO |
|-------------------|------|-----|
| Building/Room #   |      |     |
| Box #             |      |     |
| Local Tele #      |      |     |
| Department        |      |     |
| Local Title       |      |     |

_____ md                    _12/17/12_
Signature                        Date

---

### FOR OFFICIAL USE ONLY

☐ Benefits    ☐ GME    ☐ Nursing    ☐ NYSTEP

☐ Payroll    ☐ PDS    ☐ Personnel File    ☐DHR Approval_____

PSN DATA_UPDTE_REV1212

12-18-12;11.06AM;                                              ;7182454473              #   1/  2

Note; RE: Oded Greenberg
change of address

Correction made

to new zip code

Correct zip 11201

page 4 of 5

iversity Hospital of Brooklyn

College of Medicine

School of Graduate Studies

College of Nursing

*Student/Employee Heath Service*

College of Health Related Professions

TO:  Department of Human Resources/Administrators

' - 5

NOV 10 2010

FROM:  Dr. Sigrid Ulrich
Director of Employee Health Service

SUBJECT:  HEALTH ASSESSMENT

This will certify that   GREENBERG M.D., ODED          SID # XXX-XX- 0486

| | | | |
|---|---|---|---|
| Pay Source | State | | |
| Department | RADIOLOGY | Title | CLINICAL ASST PROFESSOR |
| Work Ext# | 1603 | Box# | 1208 |

has received Clearance for:

New Employment/Service

☐  Preliminary Pre-employment Clearance

_____ _____
Authorized Signature/EHS          Date

Continued Employment/Service

☒  Annual Assessment

☐  Return to Duty Assessment

Employee is requested to return to the EHS on

_____
Date

*Reason for follow-up:*   ☐ 2nd PPD   ☐ Missing Titre(s)   ☐ Need Vaccine(s)   ☐ Needs Mask Fit

*additional information:*

Miscellaneous

☒  Health Clearance for Credentialing by Medical Board

☐  Other _____

Final Employee Clearance

☒ Acceptable     ☐   Not Acceptable   *Danielle Cauenaue*   11-03-10
                                    Authorized Signature/EHS          Date

In accordance with the New York State Health Department 405 regulations and the regulations of the University Hospital of Brooklyn, the health care worker named above has been assessed by the Employee Health Service either by direct examination and laboratory studies or by submission of appropriate documentation from another institution or physician. If necessary, the Employee Health Service consults the Ad Hoc Subcommittee of the Infection Control Committee in cases of possible risk of transmission of a bloodborne pathogen from health care worker to patient. All medical documents are maintained in confidential files in accordance with HIPAA regulations at the Employee Health Service at 440 Lenox Road.

cc:  *Employee Health Service Chart*
     *Credential File/Personnel File*
     *Department Head/Administrator/Nursing Services (if applicable)*
     *Medical Board Office (if applicable)*
     *GME Office (if applicable)*

State University of New York/Downstate Medical Center

450 Clarkson Avenue, Box 33, Brooklyn, NY 11203 - 2098          Phone 718-270-1995 / 1969          Fax 718-270-2477

page 4 of 5                        ●niversity Hospital of Brooklyn

SUNY DOWNSTATE University Hospital of Medical Center Brooklyn

College of Medicine

School of Graduate Studies

College of Nursing

*Student/Employee Heath Service*

College of Health Related Professions

TO:    Department of Human Resources/Administrators

NOV 10 2010

FROM:   Dr. Sigrid Ulrich
        Director of Employee Health Service

SUBJECT:   HEALTH ASSESSMENT

This will certify that   GREENBERG M.D., ODED          SID # XXX-XX- 0486

Pay Source    State

Department    RADIOLOGY          Title     CLINICAL ASST PROFESSOR

Work Ext#     1603               Box#      1208

**has received Clearance for:**

New Employment/Service

☐  Preliminary Pre-employment Clearance

_____     _____
Authorized Signature/EHS        Date

Continued Employment/Service

☒  Annual Assessment

☐  Return to Duty Assessment

Employee is requested to return to the EHS on

_____
Date

*Reason for follow-up:*  ☐ 2nd PPD  ☐ Missing Titre(s)  ☐ Need Vaccine(s)  ☐ Needs Mask Fit

*additional information:*  _____

Miscellaneous

☒  Health Clearance for Credentialing by Medical Board

☐  Other   _____

Final Employee Clearance

☒ Acceptable      ☐  Not Acceptable   *Danielle Canuceael*      11-03-10

Authorized Signature/EHS                Date

In accordance with the New York State Health Department 405 regulations and the regulations of the University Hospital of Brooklyn, the health care worker named above has been assessed by the Employee Health Service either by direct examination and laboratory studies or by submission of appropriate documentation from another institution or physician.  If necessary, the Employee Health Service consults the Ad Hoc Subcommittee of the Infection Control Committee in cases of possible risk of transmission of a bloodborne pathogen from health care worker to patient. All medical documents are maintained in confidential files in accordance with HIPAA regulations at the Employee Health Service at 440 Lenox Road.

cc: *Employee Health Service Chart*
    *Credential File/Personnel File*
    *Department Head/Administrator/Nursing Services (if applicable)*
    *Medical Board Office (if applicable)*
    *GME Office (if applicable)*

State **University of New York/Downstate Medical Center**

450 Clarkson Avenue, Box 33, Brooklyn, NY 11203 - 2098          Phone 718-270-1995 / 1969          Fax 718-270-2477



SUNY
**D**OWNSTATE
Medical Center

Office of the President

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions

CERTIFIED MAIL #7011 1150 4595 9085
RETURN RECEIPT REQUESTED

June 11, 2012

Dr. Oded Greenberg

Brooklyn, NY 11215

Dear Dr. Greenberg:

The New York City Health and Hospitals Corporation ("HHC") has advised SUNY Downstate Medical Center of its decision to extend for one (1) year the affiliation agreement relating to the physician services provided by Downstate to Kings County Hospital Center ("KCHC"). Accordingly, the non-renewal of your term appointment as a Clinical Assistant Professor (TCL) in the Department of Radiology at the State University of New York Downstate Medical Center has been extended until June 30, 2013.

Sincerely,

John C. LaRosa, M.D.

cc:    Dr. Taylor
       Ms. Carey
       Dr. Rotman
       UUP Chapter President
       First Class Mail
       Personnel File

State University of New York Downstate Medical Center
450 Clarkson Avenue, Box 1, Brooklyn, NY 11203-2098 • Phone 718 270 - 2611    Fax 718 270 - 4732

Fax Server BS2-2      6/29/2012 10:03:40 AM  PAGE    3/003   Fax Server

Reference No. 5747743715

## Verification Of Employment                                        Request Form

| 1. To (Name and address of employer) | 2. From (Name and address of lender) |
|---|---|
| State University Of NY | CitiMortgage Production Oversight |
| 450 Clarkson Ave | |
| Brooklyn, NY 11203 | |

My signature below authorizes verification of this information.

| 3. Name and Address of Applicant (include employee or badge number) | 4. Signature of Applicant |
|---|---|
| Oded Greenberg | |
| SSN: XXX-XX- 486 | See Attached |

### Verification of Employment – Employers, please complete this section.

| 5. Applicant's Date of Employment | 6. Date Terminated (if applicable) | 7. Position/Title | 8. Employment Status |
|---|---|---|---|
| 4-16-01 | | Clinical Assistant Professor | ☑ Currently Employed<br>☐ Previously Employed |

| 9. Remarks (if applicable) | 10. Probability of continued employment |
|---|---|
| | ☐ Yes   ☐ No |

**Employer Authorized Signature** – Federal Statutes provide severe penalties for any fraud, intentional misrepresentation, or criminal connivance or conspiracy purposed to influence the issuance of any guaranty or insurance by the VA Secretary, the U.S.D.A., FmHA / FHA Commissioner, or the HUD / CPD Assistant Secretary.

| 11. Signature of Employer | 12. Position/Title (Please print or type) | 13. Date |
|---|---|---|
| | Personnel Assoc. | 7/19/12 |

| 14. Print or type name signed in item 11 | 15. Phone No. | 16. Work Location (Address) |
|---|---|---|
| Ann McLeod | 718 270-3057 | SUNY DOWNSTATE MEDICAL CEN<br>DEPT. OF HUMAN RESOURCES<br>450 CLARKSON AVE., BOX 53<br>BROOKLYN, NY 11203-2098 |

**Please fax this completed request form to The Work Number at 1-888-549-5690.**

If you have any questions please call 1-866-662-3339.

Fax Server BS2-2        6/29/2012 10:03:40 AM   PAGE   2/003   Fax Server
(Page 1 of 1)

05/31/2012 10:40 FAX                          CITI                                    @003

Mar.05.2012  07:33 AM Oded Greenberg              17187839027        PAGE.  6/ 11

## citi

## BORROWER'S AUTHORIZATION TO RELEASE INFORMATION
## AND CONFIRMATION OF APPLICATION

Borrower(s):    Oded Greenberg

Dear Borrower,

This document confirms that you have applied for a mortgage and gives  Citibank, N.A.
                    ("Lender"), my mortgage insurer, subordinate lien holder, title company
providing services related to your transaction, investor to whom Lender sells your mortgage, or any of their
designated agents or subcontractors permission to obtain, review and share the information and documents
indicated below and any additional documents as needed.  Please take a few minutes to review and then sign and
return this document to us. Should you have any questions, just let us know.

Sincerely,
Citibank, N.A.

Please review the following information and sign at the bottom, indicating that you have read and
understand the information.

- I confirm that I have applied for a mortgage loan from Lender.  I understand that certain
  information from my application and loan-related documents may need to be verified -
  either before the loan is closed or as part of its quality control program.

- This authorization may be addressed to and applies to any party named in the loan
  application, Lender, subordinate lien holder(s), the title company providing services related
  to my transaction, the mortgage insurer, any investor that purchases the mortgage loan or
  any of their designated agents or subcontractors.

- As needed, you may provide Lender, or potential mortgage insurers or potential investors
  that may purchase my mortgage, any and all information that they request. This may
  include (but is not limited to):

    - Employment History and Income
    - Bank, Money Market, and Similar Account Balances
    - Credit History/Underwriting Information
    - Copies of Signed Income Tax Returns
    - Payoff/Beneficiary statements (borrower is responsible for
      statement charges and/or recording/recordation fees)
    - Property/Appraisal Information

- A copy of this authorization may be accepted as an original.

- If more than one person is identified above as a Borrower, I confirm that we intend to apply
  for joint credit and I authorize each of the persons identified above as a Borrower to deal
  with Lender on my behalf in connection with this application.

Please sign below.  We appreciate your prompt response.

*[signature]*  md

Oded Greenberg

Loan No.: 0021330976845

M041783                                        Page 1 of 1                        Rev. 08/2010

Fax Server BS2-2          6/29/2012 10:03:40 AM  PAGE   1/003   Fax Server

# FAX

## To: Ann  McLead
Company: State University Of NY
Fax: 7182701815
Phone: 7182703057

## From: The Work Number
Fax: (888)549-5690
Phone: (866)662-3339

_____

## Notes:

Dear Ann  McLead

Thank you for your assistance regarding this Verification of
Employment request.  Please complete the form provided, including
most-recent hire date, title and status of employment.  (Sections 5-8
and 10-15)

Please fax all information to **888/549-5690**.

Again, thank you for your assistance in verification of this information.

Best Regards,
The Work Number

Case 19-3570, Document 44, 02/11/2020, 2775400, Page238 of 254

**A1036**

Case 1:15-cv-02343-PKC-VMS   Document 81-3   Filed 09/14/18   Page 44 of 252 PageID #: 616

Fax Server BS1-1          6/8/2012 9:42:20 AM  PAGE    3/003    Fax Server

Reference No. 5633858451

## Verification Of Employment                                    Request Form

**Privacy Act Notice:** This information is to be used by the agency collecting it or its assignees in determining whether you qualify as a prospective mortgagor under its program. It will not be disclosed outside this agency except as required and permitted by law. You do not have to provide this information, but if you do not your application for approval as a prospective mortgagor or borrower may be delayed or rejected. The information requested in this form is authorized by Title 38, USC, Chapter 37 (if VA); by 12 USC, Section 1701 et. Seq. (if HUD / FHA); by 42 USC, Section 1452b (if HUD / CPD); and Title 42 USC, 1471 et. Seq., or 7 USC, 1921 et. Seq. (if USDA / FmHA).

| 1. To (Name and address of employer) | 2. From (Name and address of lender) |
|---|---|
| State University Of NY | CitiMortgage Production Oversight |
| 450 Clarkson Ave | |
| Brooklyn, NY 11203 | |

My signature below authorizes verification of this information.

| 3. Name and Address of Applicant (include employee or badge number) | 4. Signature of Applicant |
|---|---|
| Oded Greenberg | |
| SSN: XXX-XX- 0486 | See Attached |

### Verification of Employment – Employers, please complete this section.

| 5. Applicant's Date of Employment | 6. Date Terminated (if applicable) | 7. Position/Title | 8. Employment Status |
|---|---|---|---|
| 4 -16 -01 – | | Clinical Asst Prof. | ☑ Currently Employed<br>☐ Previously Employed |

| 9. Remarks (if applicable) | 10. Probability of continued employment |
|---|---|
| | ☐ Yes    ☐ No |

**Employer Authorized Signature** – Federal Statutes provide severe penalties for any fraud, intentional misrepresentation, or criminal connivance or conspiracy purposed to influence the issuance of any guaranty or insurance by the VA Secretary, the U.S.D.A., FmHA / FHA Commissioner, or the HUD / CPD Assistant Secretary.

| 11. Signature of Employer | 12. Position/Title (Please print or type) | 13. Date |
|---|---|---|
| | Personnel Assoc. | 6/11/12 |

| 14. Print or type name signed in item 11 | 15. Phone No. | 16. Work Location (Address) |
|---|---|---|
| Ann McLeod | 718 - 270 - 3057 | SUNY DOWNSTATE MEDICAL CEN<br>DEPT. OF HUMAN RESOURCES<br>450 CLARKSON AVE., BOX 53<br>BROOKLYN, NY 11203-2098 |

**Please fax this completed request form to The Work Number at 1-888-549-5690.**

If you have any questions please call 1-866-662-3339.

Fax Server BS1-1      6/8/2012 9:42:20 AM  PAGE   2/003   Fax Server

Mar.05.2012  07:33 AM Oded Greenberg               17187839027           PAGE.  6/ 11



## BORROWER'S AUTHORIZATION TO RELEASE INFORMATION AND CONFIRMATION OF APPLICATION

Borrower(s):   Oded Greenberg

Dear Borrower,

This document confirms that you have applied for a mortgage and gives  Citibank, N.A.
                        ("Lender"), any mortgage insurer, subordinate lien holder, title company providing services related to your transaction, investor to whom Lender sells your mortgage, or any of their designated agents or subcontractors permission to obtain, review and share the information and documents indicated below and any additional documents as needed.  Please take a few minutes to review and then sign and return this document to us.  Should you have any questions, just let us know.

Sincerely,
Citibank, N.A.

**Please review the following information and sign at the bottom, indicating that you have read and understand the information.**

-   I confirm that I have applied for a mortgage loan from Lender.  I understand that certain information from my application and loan-related documents may need to be verified - either before the loan is closed or as part of its quality control program.

-   This authorization may be addressed to and applies to any party named in the loan application, Lender, subordinate lien-holder(s), the title company providing services related to my transaction, the mortgage insurer, any investor that purchases the mortgage loan or any of their designated agents or subcontractors.

-   As needed, you may provide Lender, or potential mortgage insurers or potential investors that may purchase my mortgage, any and all information that they request.  This may include (but is not limited to):

    *   Employment History and Income
    *   Bank, Money Market, and Similar Account Balances
    *   Credit History/Underwriting Information
    *   Copies of Signed Income Tax Returns
    *   Payoff/Beneficiary statements (borrower is responsible for statement charges and/or reconveyance fee)
    *   Property/Appraisal Information

-   A copy of this authorization may be accepted as an original.

-   If more than one person is identified above as a Borrower, I confirm that we intend to apply for joint credit and I authorize each of the persons identified above as a Borrower to deal with Lender on my behalf in connection with this application.

Please sign below.  We appreciate your prompt response.

_____
Oded Greenberg

_____


_____

_____

Loan No.: 001122978365

MB4150                          Page 1 of 3                     Rev. 05/2010

Fax Server BS1-1        6/8/2012 9:42:20 AM  PAGE   1/003   Fax Server

$6/11/12$ faxed

# FAX

## To: Human Resources
Company: State University Of NY
Fax: 7182701815
Phone: 7182701000

## From: The Work Number
Fax: (888)549-5690
Phone: (866)662-3339

---

## Notes:

Dear Human Resources

Thank you for your assistance regarding this Verification of
Employment request. Please complete the form provided, including
most-recent hire date, title and status of employment. (Sections 5-8
and 10-15)

Please fax all information to **888/549-5690**.

Again, thank you for your assistance in verification of this information.

Best Regards,
The Work Number

Fax Server BS2-2        5/24/2012 8:03:31 AM   PAGE   3/003   Fax Server

Reference No. 6582342303

## Verification Of Employment

**Request Form**

Privacy Act Notice: This information is to be used by the agency collecting it or its assignees in determining whether you qualify as a prospective mortgagor under its program. It will not be disclosed outside the agency except as required and permitted by law. You do not have to provide this information, but if you do not your application for approval as a prospective mortgagor or borrower may be delayed or rejected. The information requested in this form is authorized by Title 38, USC, Chapter 37 (if VA); by 12 USC, Section 1701 et. Seq. (if HUD / FHA); by 42 USC, Section 1452b (if HUD / CPD); and Title 42 USC, 1471 et. Seq., or 7 USC, 1921 et. Seq. (if USDA / FmHA).

| 1. To (Name and address of employer) University Hospital of Brooklyn 450 Clarkson Ave Brooklyn, NY 11203 | 2. From (Name and address of lender) CitiMortgage Production Oversight |
|---|---|

My signature below authorizes verification of this information.

| 3. Name and Address of Applicant (include employee or badge number) Oded Greenberg SSN: XXX-XX-0486 | 4. Signature of Applicant See Attached |
|---|---|

**Verification of Employment – Employers, please complete this section.**

| 5. Applicant's Date of Employment 7/1/90 4/16/01 4/2/09 | 6. Date Terminated (if applicable) 6/30/91 11/1/08 12/10/09 | 7. Position/Title Clin Asst Inst. Asst Prof Clin Asst Prof. | 8. Employment Status ☒ Currently Employed ☐ Previously Employed |
|---|---|---|---|
| 9. Remarks (if applicable) 11/29/10 - Present | | Clin Asst. Prof | 10. Probability of continued employment ☒ Yes   ☐ No |

Employer Authorized Signature – Federal Statutes provide severe penalties for any fraud, intentional misrepresentation, or criminal connivance or conspiracy purposed to influence the issuance of any guaranty or insurance by the VA Secretary, the U.S.D.A., FmHA / FHA Commissioner, or the HUD / CPD Assistant Secretary.

| 11. Signature of Employer *Shelly Meyer* | 12. Position/Title (Please print or type) Personnel Associate | 13. Date 6/30/12 |
|---|---|---|
| 14. Print or type name signed in item 11 Shelly Meyers | 15. Phone No. 718/270-2199 | 16. Work Location (Address) 450 Clarkson Ave Bklyn NY 11203 |

**Please fax this completed request form to The Work Number at 1-888-549-5690.**

If you have any questions please call 1-866-662-3339.

Fax Server BS2-2     5/24/2012 8:03:31 AM  PAGE   2/003   Fax Server

    Mar.05.2012  07:33 AM Oded Greenberg          17187839027        PAGE.  6/ 11



### BORROWER'S AUTHORIZATION TO RELEASE INFORMATION
### AND CONFIRMATION OF APPLICATION

Borrower(s):    Oded Greenberg

Dear Borrower,

This document confirms that you have applied for a mortgage and gives Citibank, N.A.
                     ("Lender"), any mortgage insurer, subordinate lien holder, title company
providing services related to your transaction, investor to whom Lender sells your mortgage, or any of their
designated agents or subcontractors permission to obtain, review and share the information and documents
indicated below and any additional documents as needed. Please take a few minutes to review and then sign and
return this document to us. Should you have any questions, just let us know.

Sincerely,
Citibank, N.A.

Please review the following information and sign at the bottom, indicating that you have read and
understand the information.

•   I confirm that I have applied for a mortgage loan from Lender. I understand that certain
    information from my application and loan-related documents may need to be verified -
    either before the loan is closed or as part of its quality control program.

•   This authorization may be addressed to and applies to any party named in the loan
    application, Lender, subordinate lien-holder(s), the title company providing services related
    to my transaction, the mortgage insurer, any investor that purchases the mortgage loan or
    any of their designated agents or subcontractors.

•   As needed, you may provide Lender, or potential mortgage insurers or potential investors
    that may purchase my mortgage, any and all information that they request. This may
    include (but is not limited to):

        •   Employment History and Income
        •   Bank, Money Market, and Similar Account Balances
        •   Credit History/Underwriting Information
        •   Copies of Signed Income Tax Returns
        •   Payoff/Beneficiary statements (borrower is responsible for
            statement charges and/or reconveyance fees)
        •   Property/Appraisal Information

•   A copy of this authorization may be accepted as an original.

•   If more than one person is identified above as a Borrower, I confirm that we intend to apply
    for joint credit and I authorize each of the persons identified above as a Borrower to deal
    with Lender on my behalf in connection with this application.

Please sign below. We appreciate your prompt response.

_____          _____
Oded Greenberg

_____          _____


Loan No.: 061122978345

MB4150                            Page 1 of 1                        Rev. 05/2010

Fax Server BS2-2       5/24/2012 8:03:31 AM  PAGE   1/003   Fax Server

# FAX

## To: Ann Marie  Cullen
Company: University Hospital of Brooklyn
Fax: 7182701815
Phone: 7182701191

## From: The Work Number
Fax: (888)549-5690
Phone: (866)662-3339

## Notes:
Dear Ann Marie  Cullen

Thank you for your assistance regarding this Verification of
Employment request.  Please complete the form provided, including
most-recent hire date, title and status of employment.  (Sections 5-8
and 10-15)

Please fax all information to **888/549-5690**.

Again, thank you for your assistance in verification of this information.

Best Regards,
The Work Number



SUNY **DOWNSTATE** Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions

**Department of Human Resources**

**SSN:** `[redacted]`

November 23, 2011

Oded Greenberg
`[redacted]`
Brooklyn, NY 11215

Dear Dr. Greenberg:

I am pleased to inform you that, pursuant to Article 20.3 of the 2007 - 2011 Agreement between the State of New York and UUP, President LaRosa has authorized that your annual salary be increased by $969.

This Discretionary Salary Increase is expected to be paid in the paycheck of December 7, 2011, retroactive to July 1, 2011.

Sincerely,

Hendrina Goeloe-Alston
Assistant Vice President
for Personnel Administration

cc: Personnel File

State University of New York Downstate Medical Center
450 Clarkson Avenue, Box 53, Brooklyn, NY 11203-2098 • Phone 718 270-3018

page 4 of 5          ●versity Hospital of Brooklyn

● SUNY
**DOWNSTATE** | University Hospital of Brooklyn
Medical Center | Brooklyn

**College of Medicine**

**School of Graduate Studies**

**College of Nursing**

*Student/Employee Heath Service*

**College of Health Related Professions**

TO:   **Department of Human Resources/Administrators**
      **Medical Board Office**

FROM:   Dr. Sigrid Ulrich
        **Director of Employee Health Service**

SUBJECT:   **HEALTH ASSESSMENT**

This will certify that   GREENBERG M.D., ODED          SID #XXX-XX- 0486

| | | |
|---|---|---|
| **Pay Source** | State | |
| **Department** | RADIOLOGY | **Title** MBP Attending |
| **Work Ext#** | 1603 | **Box#** 1208 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**has received Clearance for:**

**New Employment/Service**

☐   **Preliminary Pre-employment Clearance**

_____          _____
Authorized Signature/EHS              Date

**Continued Employment/Service**

✖   **Annual Assessment**

☐   **Return to Duty Assessment**

**Employee is requested to return to the EHS on**

_____
Date

*Reason for follow-up:*     2nd PPD    ⊑ **Missing Titre(s)** ▫ **Need Vaccine(s)**     **Needs Mask Fit**

*additional information:*   _____

**Miscellaneous**

✖ **Health Clearance for Credentialing by Medical Board**

☐   **Other**   _____

**Final Employee Clearance**

✖ **Acceptable**          **Not Acceptable** *D^r Sigrid Ulrich* [signature]   12/2/11
                                    Authorized Signature/EHS          Date

In accordance with the New York State Health Department 405 regulations and the regulations of the University Hospital of Brooklyn,
the health care worker named above has been assessed by the Employee Health Service either by direct examination and laboratory studies
or by submission of appropriate documentation from another institution or physician.  If necessary, the Employee Health Service consults the
Ad Hoc Subcommittee of the Infection Control Committee in cases of possible risk of transmission of a bloodborne pathogen from health care
worker to patient. All medical documents are maintained in confidential files in accordance with HIPAA regulations at the Employee Health
Service at 440 Lenox Road.

cc:  *Employee Health Service Chart*
     *Credential File/Personnel File*
     *Department Head/Administrator/Nursing Services (if applicable)*
     *Medical Board Office (if applicable)*
     *GME Office (if applicable)*

**State University of New York/Downstate Medical Center**

450 Clarkson Avenue, Box 33, Brooklyn, NY 11203 - 2098          Phone 718-270-1995 / 1969          Fax 718-270-2477

*Jeff Kozen : line:*

ENTERED

# STATE UNIVERSITY OF NEW YORK

FORM UP-2
rev. 12/77)

*to Letter*

NOTIFICATION OF PROFESSIONAL CHANGE OF STATUS
(STATUS CHANGES SUBJECT TO UNIT AUTHORITY ONLY)

RECEIVED

OCT 2 1 2009

12/17/09

INSTRUCTIONS:  1. Complete this form to indicate the new status of staff currently employed.
2. Forward white copy to the Vice Chancellor for Faculty and Staff Relations.

CAMPUS  19

HEALTH SCIENCE CENTER AT BROOKLYN  DEAN'S OFFICE COLLEGE OF MEDICINE

| EMPLOYEE | | | | | |
|---|---|---|---|---|---|
| | ☑ Mr. / ☐ Ms. | First: Odéd | Middle | Last: Greenberg | Social Security Number: 2 [redacted] |

| NATURE OF CHANGES | | | | |
|---|---|---|---|---|
| New 3 Status | a. ☐ PROBATIONARY | | | Effective Date for New Status: 10/29/09  12/10/09 |
| | b. ☐ TEMPORARY | | | |
| | c. ☐ OTHER STATUS TO TERM ENDING ____ | | | Professional Obligation  Confirmed |
| | d. ☐ RENEWAL OF TERM FROM ____ TO ____ | | | 5. ☐ Academic Year  ☐ Calendar Year  S. Bekoe  ☐ College Year |
| | e. ☐ MANAGEMENT/CONFIDENTIAL | | | |
| Leave 6 | a. ☐ SABBATICAL | | f. ☐ RETURN FROM LEAVE TO FULL PAY STATUS, EFFECTIVE ____ | |
| | b. ☐ LEAVE WITHOUT PAY | | | |
| | c. ☐ SICK LEAVE | | | |
| | d. ☐ MATERNITY LEAVE | | g. ☐ PERIOD OF LEAVE FROM ____ TO ____ | |
| | e. ☐ OTHER ____ | | | |
| Termination 7 | a. ☐ RESIGNED | | | Effective Date 8. |
| | b. ☐ EXPIRATION OF TERM | | NOV 16 2009 | |
| | c. ☐ RETIRED | | | |
| | d. ☐ DECEASED | | ST # 950513711 | |
| | e. ☐ TRANSFERRED TO SUNY AT ____ | | | |
| | f. ☐ OTHER | | | |

| APPOINTMENT 08 | | | | |
|---|---|---|---|---|
| Salary Plan (Check One) | a. ☐ NO CHANGE (Omit items below) | b. ☐ PROMOTION | c. ☑ Funding Change (Other) | |
| TFT / OFT / SFT | Present Title: 9 Clin. Assistant Prof. HS/PT | | New Title: 13 Clin. Assistant, Prof HS/PT | |
| | Present Budget Title: 10 Same  .53 FTE | | New Budget Title: 14 Same  .53 FTE | |
| | Present Line No. 11 42620  11A. 921376-25 | Position Function Code | New Line No. 15 51602  15A. 351369 | Position Function Code |
| | Present Rank and Salary: 257.74  12 $250 Per Hour | | New Rank and Salary: $257.74  16 $250 Per Hour | |

| REMARKS | |
|---|---|
| | *Seo john 10-31-09* |
| Dept. Chairman ____ Radiology  Date 10-29-09 | |
| and/or | |
| Dean ____  11/10/09  11/10/09 | |
| /15/09 | |
| Signature President ____ | |

DISTRIBUTION:  WHITE COPY  ) To the Vice Chancellor for Faculty and Staff Relations — Central Administration

12/14/09
H.14P

YELLOW COPY  )
PINK COPY  )  Campus Use  *Poser PR19*
GOLDENROD COPY  )

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _clear Perz_  ☐ Agent ☐ Addressee<br>B. Received by ( Printed Name)  C. Date of Delivery |
| 1. Article Addressed to:<br><br>Dr. abed Greenberg<br>9<br>Brooklyn ny 11215 | D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No<br><br>3. Service Type<br>☐ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label)  7011 1150 0001 4595 6855 | |
| PS Form 3811, February 2004  Domestic Return Receipt  102595-02-M-1540 | |

The American Board of Pathology

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

*Herewith certifies that*

## Oded Greenberg, M.D.

*Has pursued an accepted course of graduate study and clinical work and was demonstrated proficiency to the satisfaction of the Board of Trustees.*

*Therefore on the thirtieth day of August, 1990.*

The American Board of Pathology

*has granted this certificate of qualification for the practice of*

Anatomic Pathology

90-276

# The American Board of Radiology

Organized through the cooperation of the
American College of Radiology, the American Roentgen Ray Society,
the American Radium Society, the Radiological Society of North America,
the Section on Radiology of the American Medical Association,
the American Society for Therapeutic Radiology and Oncology, the Association of
University Radiologists, and American Association of Physicists in Medicine
Hereby certifies that

## Oded Greenberg, M.D.

Has pursued an accepted course of graduate study
and clinical work, has met certain standards and qualifications and
has passed the examinations conducted under the authority of
The American Board of Radiology

On this twenty-first day of November, 1994

Thereby demonstrating to the satisfaction of the Board
that he is qualified to practice the specialty of

### Diagnostic Radiology





SUNY
**D**OWNSTATE
Medical Center

Department of Human Resources

University Hospital of Brooklyn

College of Medicine

School of Graduate Studies

College of Nursing

College of Health Related Professions

December 4, 2009

Oded Greenberg

Brooklyn, NY 11215

Dear Dr. Greenberg:

I am pleased to inform you that, pursuant to Article 20.3 of the 2007 - 2011 Agreement between the State of New York and UUP, President LaRosa has authorized that your annual salary be increased by $496.

This Discretionary Salary Increase is expected to be paid in the paycheck of December 9, 2009, retroactive to July 1, 2009.

Sincerely,

Hendrina Goeloe-Alston
Assistant Vice President
for Personnel Administration

cc: Personnel File

State University of New York Downstate Medical Center
450 Clarkson Avenue, Box 53, Brooklyn, NY 11203-2098 • Phone 718 270-3018

page 4 of 5

SUNY University Hospital of Brooklyn
DOWNSTATE Medical Center Brooklyn

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions

NOV 10 2010

*Student/Employee Heath Service*

TO:   Department of Human Resources/Administrators

FROM:   Dr. Sigrid Ulrich
Director of Employee Health Service

SUBJECT:   HEALTH ASSESSMENT

This will certify that   GREENBERG M.D., ODED        SID # XXX-XX- 0486

Pay Source   State

Department   RADIOLOGY               Title   CLINICAL ASST PROFESSOR

Work Ext#   1603                  Box#   1208

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

has received Clearance for:

**New Employment/Service**

☐   Preliminary Pre-employment Clearance

_____        _____
Authorized Signature/EHS              Date

**Continued Employment/Service**

☒   Annual Assessment

☐   Return to Duty Assessment

**Employee is requested to return to the EHS on**

_____
Date

*Reason for follow-up:*   ☐ 2nd PPD   ☐ Missing Titre(s)   ☐ Need Vaccine(s)   ☐ Needs Mask Fit

*additional information:*   _____

**Miscellaneous**

☒   Health Clearance for Credentialing by Medical Board

☐   Other   _____

**Final Employee Clearance**

☒ Acceptable      ☐   Not Acceptable   *Danielle Vanenael*      11-03-10

                                Authorized Signature/EHS      Date

In accordance with the New York State Health Department 405 regulations and the regulations of the University Hospital of Brooklyn, the health care worker named above has been assessed by the Employee Health Service either by direct examination and laboratory studies or by submission of appropriate documentation from another institution or physician. If necessary, the Employee Health Service consults the Ad Hoc Subcommittee of the Infection Control Committee in cases of possible risk of transmission of a bloodborne pathogen from health care worker to patient. All medical documents are maintained in confidential files in accordance with HIPAA regulations at the Employee Health Service at 440 Lenox Road.

cc: *Employee Health Service Chart*
*Credential File/Personnel File*
*Department Head/Administrator/Nursing Services (if applicable)*
*Medical Board Office (if applicable)*
*GME Office (if applicable)*

State University of New York/Downstate Medical Center

450 Clarkson Avenue, Box 33, Brooklyn, NY 11203 - 2098        Phone 718-270-1995 / 1969        Fax 718-270-2477

SUNY
DOWNSTATE   University
Medical Center   Hospital of
Brooklyn

page 4 of 5

University Hospital of Brooklyn

College of Medicine

School of Graduate Studies

College of Nursing

College of Health Related Professions

*Student/Employee Heath Service*

TO:   Department of Human Resources/Administrators
Medical Board Office

FROM:   Dr. Sigrid Ulrich
Director of Employee Health Service

SUBJECT:   HEALTH ASSESSMENT

This will certify that   GREENBERG M.D., ODED          SID # XXX-XX- 0486

| | | | |
|---|---|---|---|
| Pay Source | State | | |
| Department | RADIOLOGY | Title | MBP Attending |
| Work Ext# | 1603 | Box# | -1208 |

**has received Clearance for:**

New Employment/Service

☐   Preliminary Pre-employment Clearance

_____      _____
Authorized Signature/EHS            Date

Continued Employment/Service

☐   Annual Assessment

☐   Return to Duty Assessment

Employee is requested to return to the EHS on

_____
Date

*Reason for follow-up:*      2nd PPD      Missing Titre(s)      Need Vaccine(s)      Needs Mask Fit

*additional information:*

Miscellaneous

☒   Health Clearance for Credentialing by Medical Board

Other   _____

Final Employee Clearance

☒   Acceptable      ☐   Not Acceptable   *A. Ulrich*      3/21/09
                                    Authorized Signature/EHS   *Ulrich*   Date

In accordance with the New York State Health Department 405 regulations and the regulations of the University Hospital of Brooklyn, the health care worker named above has been assessed by the Employee Health Service either by direct examination and laboratory studies or by submission of appropriate documentation from another institution or physician. If necessary, the Employee Health Service consults the Ad Hoc Subcommittee of the Infection Control Committee in cases of possible risk of transmission of a bloodborne pathogen from health care worker to patient. All medical documents are maintained in confidential files in accordance with HIPAA regulations at the Employee Health Service at 440 Lenox Road.

cc:  *Employee Health Service Chart*
 *Credential File/Personnel File*
 *Department Head/Administrator/Nursing Services (if applicable)*
 *Medical Board Office (if applicable)*
 *GME Office (if applicable)*

State University of New York/Downstate Medical Center

450 Clarkson Avenue, Box 33, Brooklyn, NY 11203 - 2098          Phone 718-270-1995 / 1969          Fax 718-270-2477

*Clin Asst Prof (HS)*

page 4 of 5

University Hospital of Brooklyn

College of Medicine

School of Graduate Studies

College of Nursing

College of Health Related Professions

SUNY DOWNSTATE Medical Center | University Hospital of Brooklyn

*Student/Employee Heath Service*

TO:   Department of Human Resources/Administrators

FROM:   Dr. Sigrid Ulrich
        Director of Employee Health Service

SUBJECT:   HEALTH ASSESSMENT

**This will certify that**   GREENBERG M.D., ODED          SID # XXX-XX- 0486

| | | | |
|---|---|---|---|
| Pay Source | State | | |
| Department | RADIOLOGY | Title | CLINICAL ASST PROFESSOR |
| Work Ext# | 1603 | Box# | 1208 |

**has received Clearance for:**

**New Employment/Service**

☐   Preliminary Pre-employment Clearance

_____     _____
Authorized Signature/EHS              Date

**Continued Employment/Service**

☒   Annual Assessment
☐   Return to Duty Assessment

**Employee is requested to return to the EHS on**

_____
Date

*Reason for follow-up:*   ☐ 2nd PPD   ☐ Missing Titre(s)   ☐ Need Vaccine(s)   ☐ Needs Mask Fit

*additional information:*   _____

**Miscellaneous**

☒   Health Clearance for Credentialing by Medical Board
☐   Other   _____

**Final Employee Clearance**

☒   Acceptable      ☐   Not Acceptable   DR Sigrid Ulrich          3/10/10
                                          Authorized Signature/EHS     Date

In accordance with the New York State Health Department 405 regulations and the regulations of the University Hospital of Brooklyn, the health care worker named above has been assessed by the Employee Health Service either by direct examination and laboratory studies or by submission of appropriate documentation from another institution or physician. If necessary, the Employee Health Service consults the Ad Hoc Subcommittee of the Infection Control Committee in cases of possible risk of transmission of a bloodborne pathogen from health care worker to patient. All medical documents are maintained in confidential files in accordance with HIPAA regulations at the Employee Health Service at 440 Lenox Road.

cc: *Employee Health Service Chart*
    *Credential File/Personnel File*
    *Department Head/Administrator/Nursing Services (if applicable)*
    *Medical Board Office (if applicable)*
    *GME Office (if applicable)*

**State University of New York/Downstate Medical Center**

SSN 070 540 486

450 Clarkson Avenue, Box 33, Brooklyn, NY 11203 - 2098          Phone 718-270-1995 / 1969          Fax 718-270-2477

Clin Ass Prof 1+