# 19-3570-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

>>◄◄

MD ODED GREENBERG,

*Plaintiff-Appellant,*

*v.*

STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL CENTER, AKA THE STATE UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER AT BROOKLYN, AKA STATE UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL CENTER, NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY HOSPITAL CENTER, DEBORAH L. REEDE, STEVEN PULITZER,

*Defendants-Appellees,*

*and*

UNITED UNIVERSITY PROFESSIONS, (UUP), SUNY DOWNSTATE MEDICAL CENTER CHAPTER OF UNITED UNIVERSITY PROFESSIONS, JOHN AND JANE DOES 1-20,

*Defendants.*

―――――――――

*On Appeal from the United States District Court
for the Eastern District of New York*

## APPENDIX
## VOLUME VIII OF VIII
## Pages A1670 to A1817

Deborah A. Brenner
  Assistant Corporation Counsel
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendant-Appellee
  New York City Health and
  Hospitals Corporation*
100 Church Street
New York, New York 10007
212-788-1039

CARDI & EDGAR LLP
*Attorneys for Plaintiff-Appellant
  MD Oded Greenberg*
99 Madison Avenue, 8th Floor
New York, New York 10016
212-481-7770

*(Additional Counsel on the Reverse)*

Amit Ramnik Vora
NEW YORK STATE OFFICE
  OF THE ATTORNEY GENERAL
*Attorneys for Defendant-Appellee*
  *State University Hospital-Downstate Medical*
  *Center, aka The State University of*
  *New York Health Science Center at*
  *Brooklyn, aka State University of*
  *New York Downstate Medical Center*
28 Liberty Street, 23rd Floor
New York, New York 10005
212-416-6167

**Table of Contents**

**Page**

**Volume I**

District Docket Entries .......................................................... A1

Second Amended Complaint and Demand for Jury Trial,
dated December 23, 2015 ................................................ A18

Answer of Deborah Reede, M.D., Steven Pulitzer, M.D. and
The State University of New York ("Defendants"),
dated January 6, 2016 ...................................................... A49

Defendants' Local Civil Rule 56.1 Statement in Support of their
Motion for Summary Judgment, dated March 26, 2018 ................. A72

Declaration of Christopher Coulston, for Defendants,
in Support of Motion, dated March 26, 2018 ................................. A89

Exhibit A to Coulston Declaration -
Accreditation Council for Graduate Medical Education
Report, dated April 15, 2014 ..................................................... A98

Exhibit B to Coulston Declaration -
Notes between Deborah Reede, M.D. and
Ghassan Jameleddine, M.D. for the King's County
Hospital Center, dated April 9, 2014 ....................................... A108

Exhibit C to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated June 23, 2014 ................................................................ A109

Exhibit D to Coulston Declaration -
Emails from Oded Greenberg, M.D.,
dated October 21, 2014 ........................................................... A110

**Table of Contents**
**(Continued)**

**Page**

Exhibit E to Coulston Declaration -
Email from Stephanie Bernadel to Steven Pulitzer, M.D.,
dated October 28, 2014 ............................................................ A114

Exhibit F to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated August 14, 2013 .............................................................. A116

Exhibit G to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated September 25, 2013 ......................................................... A118

Exhibit H to Coulston Declaration -
Email from Oded Greenberg, M.D. to Alan Kantor,
dated October 9, 2013 .............................................................. A120

Exhibit I to Coulston Declaration -
Meeting with Dr. Greenberg, dated May 5, 2014 .................... A122

Exhibit J to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated May 1, 2014 ............................................... A123

Exhibit K to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated May 9, 2014 ................................................................... A125

Exhibit L to Coulston Declaration -
King County Hospital Center Radiology Department
Faculty Meeting Minutes, dated May 8, 2014 ........................ A126

Exhibit M to Coulston Declaration -
Powerpoint Presentation of KCHC Departmental Meeting,
dated June 26, 2014 ................................................................. A130

ii

**Table of Contents**
**(Continued)**

**Page**

Exhibit N to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated July 9, 2014 ................................................................... A148

Exhibit O to Coulston Declaration -
Email from Linda McMurren to Oded Greenberg, M.D.,
dated July 21, 2014 ................................................................. A149

Exhibit P to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated August 13, 2014 ........................ A151

Exhibit Q to Coulston Declaration -
Email from Oded Greenberg, M.D. to Linda McMurren,
dated September 15, 2014 ........................................................ A152

Exhibit R to Coulston Declaration -
Notes from August 22, 2014 Meeting ..................................... A154

Exhibit S to Coulston Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott,
dated September 2, 2014 .......................................................... A156

Exhibit T to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated September 15, 2014 ................................... A158

Exhibit U to Coulston Declaration -
(i) Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 .......................................................... A160
(ii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated August 29, 2014 ............................... A161

Exhibit V to Coulston Declaration -
Email from Rhonda Besunder to Oded Greenberg, M.D.,
dated March 20, 2014, with Attachments ............................... A162

iii

**Table of Contents**
**(Continued)**

**Page**

Exhibit W to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 5, 2014 ........................................................ A171

Exhibit X to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken September 8, 2014 ........................................................ A173

Exhibit Y to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 3, 2014 ........................................................ A208

Exhibit Z to Coulston Declaration -
Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................................ A209

Exhibit AA to Coulston Declaration -
Email from Linda McMurren to Deborah Reede, M.D.,
dated September 8, 2014 ........................................................ A210

Exhibit BB to Coulston Declaration -
Documents Related to Oded Greenberg, M.D.'s Visit to
City MD, dated September 8, 2014 ........................................ A211

Exhibit CC to Coulston Declaration -
Settlement, dated September 8, 2014 ..................................... A216

Exhibit DD to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken October 20, 2014 .......................................................... A218

iv

**Table of Contents**
**(Continued)**

**Page**

**Volume II**

Exhibit EE to Coulston Declaration -
Memorandum from Michael Arabian to
Steven Pulitzer, M.D., dated September 9, 2014,
with Email .................................................................................... A268

Exhibit FF to Coulston Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated October 7, 2014, with Email ...................... A271

Exhibit GG to Coulston Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 24, 2014 ........................................................ A277

Exhibit HH to Coulston Declaration -
Summary of Interview with Jinel Scott, M.D.,
dated October 14, 2014 ........................................................... A280

Exhibit II to Coulston Declaration -
Summary of Interview with James Walsh, M.D.,
dated October 14, 2014 ........................................................... A281

Exhibit JJ to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated October 1, 2014 ........................ A282

Exhibit KK to Coulston Declaration -
Emails from Oded Greenberg, M.D. to Gautam Agrawal,
dated December 3, 2014 ........................................................... A284

Exhibit LL to Coulston Declaration -
Excerpts from the Report, dated September 22, 2014 ............. A288

**Table of Contents**
**(Continued)**

**Page**

Exhibit MM to Coulston Declaration -
Emails from Steven Pulitzer, M.D.,
dated September 26, 2014 ........................................................ A291

Exhibit NN to Coulston Declaration -
Email from Oded Greenberg, M.D. to Steven Pulitzer,
M.D., dated September 22, 2014 .............................................. A293

Exhibit OO to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ................... A294

Exhibit PP to Coulston Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ................... A296

Exhibit QQ to Coulston Declaration -
Statement of Oded Greenberg, M.D.,
taken October 10, 2014 ........................................................... A297

Exhibit RR to Coulston Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 3, 2014 ............................................................. A327

Exhibit SS to Coulston Declaration -
Statement to be Read and Given to Employees in the
Professional Services Negotiating Unit Prior to a
Disciplinary Interrogation, dated October 10, 2014 ................ A328

Exhibit TT to Coulston Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 15, 2014 ........................................................... A329

Exhibit UU to Coulston Declaration -
Emails from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 10, 2014 ........................................................... A330

vi

**Table of Contents**
**(Continued)**

**Page**

Exhibit VV to Coulston Declaration -
Letter from Leonzo Cuiman to Oded Greenberg, M.D.,
dated October 22, 2014 ........................................................... A335

Exhibit WW to Coulston Declaration -
Email from Steven Pulitzer, M.D., to Gnyana Kompally,
dated November 23, 2014 ....................................................... A336

Exhibit XX to Coulston Declaration -
Letter from Kate Hatlak to Rhonda Osborne, M.D.,
dated August 13, 2015 ............................................................ A338

Exhibit YY to Coulston Declaration -
*Curriculum Vitae* of Oded Greenberg, M.D. ......................... A344

Exhibit ZZ to Coulston Declaration -
*Curriculum Vitae* of Jinel A. Scott, M.D. .............................. A346

Exhibit AAA to Coulston Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 .................. A353

Exhibit BBB to Coulston Declaration -
(i) Email from Oded Greenberg, M.D. to Brian Magee,
dated July 15, 2014, with Attachments .................................. A354
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 7, 2016 ................... A358
(iii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken January 23, 2017 ..................... A374
(iv) Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken October 26, 2016 ...................... A381
(v) Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken January 24, 2017 ...................... A410
(vi) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 .................. A415
(vii) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken January 26, 2017 ...................... A432

**Table of Contents**
**(Continued)**

**Page**

Exhibit BBB to Coulston Declaration - (cont'd)
(viii) Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 ...   A434
(ix) Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 .........................   A438
(x) Excerpts from the Deposition Testimony of
Michael Arabian, taken November 16, 2016 ........................   A441
(xi) Excerpts from the Deposition Testimony of
Leonzo Cuiman, taken December 15, 2016 ..........................   A444
(xii) Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ..........................   A449

Declaration of Steven Pulitzer, M.D., for Defendants,
in Support of Motion, dated March 26, 2018 ................................   A458

## Volume III

Declaration of Deborah L. Reede, M.D., for Defendants,
in Support of Motion, dated March 26, 2018 ................................   A464

Plaintiff's Response to Defendants' Rule 56.1 Statement
in Support of Their Motion for Summary Judgment and
Plaintiff's Rule 56.1 Statement of Additional Material Facts
in Opposition to Defendants' Motion for Summary Judgment,
dated July 6, 2018 ........................................................................   A471

Declaration of Chad L. Edgar, for Plaintiff,
in Opposition to Motion, dated July 6, 2018 ................................   A518

Exhibit 1 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 12, 2016 .................   A527

Exhibit 2 to Edgar Declaration -
Email from David Stark to Oded Greenberg, M.D.,
dated November 18, 2001 .......................................................   A544

**Table of Contents**
**(Continued)**

**Page**

Exhibit 3 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated August 25, 2014 ........................  A547

Exhibit 4 to Edgar Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 ..................  A548

Exhibit 5 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken October 26, 2016 .......................  A549

Exhibit 6 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ............................  A576

Exhibit 7 to Edgar Declaration -
Reading Summary 2013 with Calculated Result of
RVU Value ............................................................................  A598

Exhibit 8 to Edgar Declaration -
Email from Deborah Reede, M.D. to Linda McMurren,
dated April 30, 2014 ..............................................................  A599

Exhibit 9 to Edgar Declaration -
Meeting with Dr. Greenberg, dated May 5, 2014 ...................  A600

Exhibit 10 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ..................  A601

Exhibit 11 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Deborah Reede, M.D., dated May 13, 2014 ...........................  A611

Exhibit 12 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Deborah Reede, M.D., dated July 16, 2014 ...........................  A612

**Table of Contents**
**(Continued)**

**Page**

Exhibit 13 to Edgar Declaration -
Meeting with Dr. Greenberg, dated July 23, 2014 .................. A613

Exhibit 14 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated June 23, 2014 ................................................ A614

Exhibit 15 to Edgar Declaration -
Excerpts from the Daily Logs of Studies Completed by
Oded Greenberg, M.D. ............................................ A615

Exhibit 16 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated August 20, 2014 ............................................ A622

Exhibit 17 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott, M.D.,
dated September 2, 2014, with Attachments .......................... A623

Exhibit 18 to Edgar Declaration -
Email from Linda McMurren, dated August 22, 2014,
with Attachments ................................................. A627

Exhibit 19 to Edgar Declaration -
Email from Linda McMurren, dated August 26, 2014,
with Attachments ................................................. A630

Exhibit 20 to Edgar Declaration -
Email from Katrina Moltz to Oded Greenberg, M.D., *et al.*,
dated August 29, 2014 ............................................ A633

Exhibit 21 to Edgar Declaration -
Individualized Education Program (IEP),
dated February 25, 2013, with Attachments .......................... A635

## Table of Contents
### (Continued)

**Page**

Exhibit 22 to Edgar Declaration -
(i) Email from Oded Greenberg, M.D. to Linda McMurren,
dated September 5, 2014 ........................................................ A657
(ii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated August 29, 2014 ............................... A658

Exhibit 23 to Edgar Declaration -
Email from Leonzo Cuiman to Deborah Reede, M.D.,
dated September 4, 2014 ........................................................ A659

Exhibit 24 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Michael Arabian,
dated September 5, 2014 ........................................................ A660

Exhibit 25 to Edgar Declaration -
Letter from Steven Pulitzer, M.D.,
dated September 5, 2014 ........................................................ A662

Exhibit 26 to Edgar Declaration -
Document Intentionally Omitted ............................................. A664

Exhibit 27 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Michael Arabian, taken November 16, 2016 .......................... A665

Exhibit 28 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 ......................... A673

Exhibit 29 to Edgar Declaration -
Settlement, dated September 8, 2014 ...................................... A675

Exhibit 30 to Edgar Declaration -
(i) Settlement, dated November 6, 2013 ................................. A677
(ii) Settlement, dated November 12, 2013 .............................. A678
(iii) Settlement, dated March 6, 2014 .................................... A679
(iv) Settlement, dated April 9, 2014 ...................................... A680

**Table of Contents**
**(Continued)**

**Page**

Exhibit 30 to Edgar Declaration - (cont'd)
(v) Settlement, dated August 18, 2014 ................................... A682
(vi) Settlement, dated January 14, 2015 ................................ A683
(vii) Settlements, dated January 28, 2015 ............................. A685

Exhibit 31 to Edgar Declaration -
Notes Taken by Stephanie Bernadel ..................................... A691

Exhibit 32 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Sade Jemmott, M.D.,
dated September 10, 2014 ....................................................... A693

Exhibit 33 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 12, 2014 ....................................................... A694

Exhibit 34 to Edgar Declaration -
Email from Deborah Reede, M.D. to Steven Pulitzer, M.D.,
dated September 15, 2014 ....................................................... A696

Exhibit 35 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 15, 2014 ....................................................... A697

Exhibit 36 to Edgar Declaration -
Email from Oded Greenberg, M.D. to Steven Pulitzer,
M.D., dated September 15, 2014 ........................................... A698

Exhibit 37 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 16, 2014 ....................................................... A700

Exhibit 38 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Steven Pulitzer, M.D., taken January 24, 2017 ...................... A701

**Table of Contents**
**(Continued)**

**Page**

Exhibit 39 to Edgar Declaration -
(i) Email from Steven Pulitzer, M.D. to Jean Aime, *et al.*,
dated September 24, 2014 ......................................................... A715
(ii) Letter from Steven Pulitzer, M.D.,
dated September 24, 2014 ......................................................... A716

Exhibit 40 to Edgar Declaration -
Letter from Stephanie Bernadel to Oded Greenberg, M.D.,
dated October 3, 2014 .............................................................. A719

Exhibit 41 to Edgar Declaration -
Letter from Sade Jemmott, M.D. to Stephanie Bernadel,
dated October 14, 2014 ............................................................ A720

Exhibit 42 to Edgar Declaration -
Powerpoint Presentation of KCHC Departmental Meeting,
dated July 31, 2014 ................................................................. A723

Exhibit 43 to Edgar Declaration -
Email from Stephanie Bernadel to Steven Pulitzer, M.D.,
dated October 28, 2014 ............................................................ A727

Exhibit 44 to Edgar Declaration -
Email from Oded Greenberg, M.D. to
Steven Pulitzer, M.D., dated September 23, 2014 ................... A728

Exhibit 45 to Edgar Declaration -
(i) Letter from Deborah Reede, M.D. to
Hyman Shwarzberg, M.D., dated November 7, 2014 ............. A729
(ii) Letter from Deborah Reede, M.D. to Harry Zinn, M.D.,
dated November 7, 2014 .......................................................... A730
(iii) Letter from Deborah Reede, M.D. to
Maria Corsaro, M.D., dated November 7, 2014 ...................... A731

xiii

**Table of Contents**
**(Continued)**

**Page**

Exhibit 46 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated December 15, 2014 ...................................................... A732

Exhibit 47 to Edgar Declaration -
Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 ... A733

Exhibit 48 to Edgar Declaration -
*Curriculum Vitae* of Jinel Moore Scott, M.D. ......................... A735

Exhibit 49 to Edgar Declaration -
Faculty Self Assesment Form of Jinel Moore Scott, M.D.,
dated March 2, 2015 ................................................ A739

Exhibit 50 to Edgar Declaration -
Email from Steven Pulitzer, M.D. to Deborah Reede, M.D.,
dated September 5, 2014 ........................................... A748

Exhibit 51 to Edgar Declaration -
Excerpts from the KCHC Departmental Meeting,
dated December 5, 2014 ............................................ A749

Exhibit 52 to Edgar Declaration -
Excerpts from the Statement of Oded Greenberg, M.D.,
taken October 10, 2014 ............................................ A751

Exhibit 53 to Edgar Declaration -
Summary of Interview with Jinel Moore Scott, M.D.,
dated October 14, 2014 ............................................ A753

Exhibit 54 to Edgar Declaration -
Notes Regarding Meeting with Oded Greenberg, M.D.,
dated May 5, 2014 ................................................. A754

xiv

**Table of Contents**
**(Continued)**

**Page**

Exhibit 55 to Edgar Declaration -
(i) Chart Detailing Oded Greenberg, M.D.'s Attendance
Fulfillment ............................................................................. A755
(ii) Email from Deborah Reede, M.D. to Linda McMurren,
dated April 30, 2014 ............................................................. A756
(iii) Email from Oded Greenberg, M.D. to
Linda McMurren, dated April 21, 2014 ................................. A757

Exhibit 56 to Edgar Declaration -
Email from John Amodio to Oded Greenberg, M.D., *et al.*,
dated April 1, 2014 ............................................................... A758

Exhibit 57 to Edgar Declaration -
Excerpt from the Deposition Testimony of
Deborah Reede, M.D., taken January 26, 2017 ...................... A760

Exhibit 58 to Edgar Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 3, 2014 ................... A761

Exhibit 59 to Edgar Declaration -
SUNY Downstate's General Statement of Purpose ................ A762

Exhibit 60 to Edgar Declaration -
Document Intentionally Omitted ............................................ A763

Exhibit 61 to Edgar Declaration -
Excerpts from the KCHC Medical Staff Bylaws
Rules & Regulations .............................................................. A764

Exhibit 62 to Edgar Declaration -
Performance Evaluation of Scott, M.D. by Pulitzer, M.D.,
Acting on Behalf of KCHC as Interim Chief of Service of
the Department of Radiology, dated December 2, 2014 .......... A782

xv

## Table of Contents
### (Continued)

**Page**

Exhibit 63 to Edgar Declaration -
Documents Related to Greenberg, M.D.'s Reappointment
as a Member of the Medical Staff at KCHC in 2013 .............. A785

Exhibit 64 to Edgar Declaration -
Documents Related to Greenberg, M.D.'s Reappointment
as a Member of the Medical Staff at KCHC in 2009 .............. A800

Exhibit 65 to Edgar Declaration -
Summary of Interview with Andre Pyle,
dated October 14, 2014 ........................................... A804

Exhibit 66 to Edgar Declaration -
Monthly Faculty and NTP Individual Report of
Attendance, dated December 9, 2014 ...................................... A805

Declaration of Oded Greenberg, M.D., Plaintiff,
in Opposition to Motion, dated July 6, 2018 ................................ A806

Declaration of Esther Neiman, in Opposition to Motion,
dated June 27, 2018 ...................................................... A815

Reply Declaration of Christopher Coulston, for Defendants,
in Further Support of Motion, dated September 14, 2018 ............. A817

Exhibit CCC to Coulston Reply Declaration -
Plaintiff's 2012-2013 Faculty Review and
Development Form .................................................... A820

### Volume IV

Exhibit DDD to Coulston Reply Declaration -
2014 Faculty Evaluation of Oded Greenberg, M.D. ............... A822

Exhibit EEE to Coulston Reply Declaration -
2015 Faculty Evaluation of Jinel Scott, M.D. ........................ A838

**Table of Contents**
**(Continued)**

**Page**

Exhibit FFF to Coulston Reply Declaration -
(i) Email from Michelle Gilmore Greenberg to
Oded Greenberg, M.D., dated July 17, 2018 ........................... A853
(ii) Email from Karina Moltz to Oded Greenberg, M.D.,
dated August 25, 2014 ............................................. A854

Exhibit GGG to Coulston Reply Declaration -
(i) Slip for CD-Rom .................................................. A855
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 7, 2016 ................... A856
(iii) Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 .................. A859
(iv) Excerpts from the Deposition Testimony of
Jinel Scott, M.D., taken November 3, 2016 ........................ A864
(v) Excerpts from the Deposition Testimony of
Leonzo Cuiman, M.D., taken December 15, 2016 ................. A868

Reply Declaration of Steven Pulitzer, M.D., for Defendants,
in Further Support of Motion, dated September 14, 2018 ............. A871

Reply Declaration of Deborah Reede, M.D., for Defendants,
in Further Support of Motion, dated September 14, 2018 ............. A873

Defendants' Counter-Response to Plaintiff's Response to
Defendants' Rule 56.1 Statement and Plaintiff's
Rule 56.1 Statement of Additional Material Facts,
dated September 14, 2018 ............................................ A876

Health + Hospitals' Defendants' Local Rule 56.1 Statement of
Material Undisputed Facts, filed September 14, 2018 .................. A948

Declaration of Ryan G. Shaffer, for Defendants New York City
Health + Hospitals Corporation and Kings County Hospital
Center, in Support of Motion, filed September 14, 2018 .............. A958

**Table of Contents**
**(Continued)**

**Page**

Exhibit A to Shaffer Declaration -
Second Amended Complaint and Demand for Jury Trial,
dated December 23, 2015 ......................................................... A961

Exhibit B to Shaffer Declaration -
Notification of Employee Change of Status,
dated June 28, 2011 ................................................................. A992

Exhibit C to Shaffer Declaration -
Downstate Medical Center Employment File of
Oded Greenberg, M.D.............................................................. A996
*(cont'd in Vol. V)*

**Volume V**

Exhibit D to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Ghassan W. Jamaleddine, M.D., taken December 19, 2016 .. A1245

Exhibit E to Shaffer Declaration -
(i) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken December 12, 2016................. A1248
(ii) Excerpts from the Deposition Testimony of
Oded Greenberg, M.D., taken January 23, 2017..................... A1254

Exhibit F to Shaffer Declaration -
Collective Bargaining Agreement between United
University Professions and the State of New York................. A1260
*(cont'd in Vol. VI)*

**Volume VI**

Exhibit G to Shaffer Declaration -
Time and Attendance Records of Oded Greenberg, M.D. ..... A1389

xviii

**Table of Contents**
**(Continued)**

                                                                              **Page**

Exhibit H to Shaffer Declaration -
Letter from Salvatore JA Sclarani, M.D. to
Oded Greenberg, M.D., dated September 21, 2010 ...............   A1453

Exhibit I to Shaffer Declaration -
Plaintiff's Responses to Municipal Defendants' First Set of
Contention Interrogatories, dated May 17, 2017 ....................   A1457

Exhibit J to Shaffer Declaration -
Affiliation Agreement between HHC and the
SUNY Health Sciences Center ...............................................   A1469

**Volume VII**

Exhibit K to Shaffer Declaration -
Notes from August 22, 2014 Meeting with
Oded Greenberg, M.D., with Attachments ............................   A1504

Exhibit L to Shaffer Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 3, 2014 .................   A1664

Exhibit M to Shaffer Declaration -
Settlement Agreement, dated September 8, 2014 ..................   A1665

Exhibit N to Shaffer Declaration -
Letter from Steven Pulitzer, M.D. to
Oded Greenberg, M.D., dated September 24, 2014 ...............   A1667

**Volume VIII**

Exhibit O to Shaffer Declaration -
Letter from Leonzo Cuiman to Oded Greenberg, M.D.,
dated October 22, 2014 .........................................................   A1670

**Table of Contents**
**(Continued)**

**Page**

Exhibit P to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Leonzo Cuiman, taken December 15, 2016 ........................... A1671

Exhibit Q to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Stephanie Bernadel, taken October 21, 2016 ........................ A1676

Exhibit R to Shaffer Declaration -
Report of the Accreditation Council for Graduate
Medical Education, dated April 15, 2014 .............................. A1679

Exhibit S to Shaffer Declaration -
Excerpts from the Deposition Testimony of
Deborah Reede, M.D., taken November 18, 2016 ................. A1689

Plaintiff's Response to Defendants' Rule 56.1 Statement in
Support of Their Motion for Summary Judgment and Plaintiff's
Rule 56.1 Statement of Additional Material Facts in Opposition
to Defendants' Motion for Summary Judgment,
filed September 14, 2018 ............................................... A1699

Health + Hospitals' Defendants' Response Plaintiff's Rule
56.1 Statement of Additional Material Facts in Opposition
to Defendants' Motion for Summary Judgment,
filed September 14, 2018 ............................................... A1734

Memorandum and Order of the Honorable Pamela K. Chen,
dated September 29, 2019, Appealed From .................................. A1760

Notice of Appeal, dated October 29, 2019 ......................................... A1815



SUNY
**D**OWNSTATE
Medical Center

University Hospital of Brooklyn
College of Medicine
School of Graduate Studies
College of Nursing
College of Health Related Professions
School of Public Health

Leonzo A. Cuiman
**Assistant Vice President for Labor Relations**

<u>CERTIFIED # 7013 1710 0002 2475 3720</u>
<u>RETURN RECEIPT REQUESTED</u>

October 22, 2014

Dr. Oded Greenberg
~~159 Myrtle Avenue, PH# 3401~~
Brooklyn, NY 11201

Dear Dr. Greenberg:

On October 10, 2014, you met with Stephanie Bernadel, Personnel Associate in the SUNY Downstate Medical Center – Office of Labor Relations, for an interrogation regarding allegations of insubordination, leaving the worksite without authorization and related matters. On October 20, 2014, you met with myself, Ms. Bernadel and Lisa Wills, NYSUT/UUP Labor Relations Specialist. The purpose of the meeting was to afford you the opportunity to explain why the penalty of termination from State service held in abeyance should not be implemented for violating your September 8, 2014 disciplinary settlement agreement (attached).

Based on your violation of your September 8, 2014 disciplinary settlement, please be advised that your appointment as a Clinical Assistant Professor TCL is hereby terminated, effective immediately.

Sincerely,

Leonzo A. Cuiman/SB

Leonzo Cuiman
Assistant Vice President for Labor Relations

LC/sb
cc:   Adriana Conde-Billy
       Deborah Reede, M.D.
       Steven Pulitzer, M.D.
       First Class Mail
       Personnel File
       Case File

State University of New York Downstate Medical Center
450 Clarkson Avenue, Box 1224, Brooklyn, NY 11203  •  Phone 718 270-3019  Fax 718 270-4684

THIS PAGE INTENTIONALLY LEFT BLANK

**ODED GREENBERG, M.D. VS.**
**SUNY DOWNSTATE ET AL.**

**LEONZO CUIMAN**
**December 15, 2016**

---

Page 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
ODED GREENBERG, M.D.,

                    Plaintiff,

    -against-

SUNY DOWNSTATE ET AL.,

                    Defendants.

Index No. 15-cv-2343 (PKC/VMS)
-----------------------------------------------------x


                        112 Madison Avenue
                        New York, New York

                        December 15, 2016
                        9:39 a.m.



          DEPOSITION of LEONZO CUIMAN, taken before
Marianne Witkowski-Smith, a Shorthand Reporter and
Notary Public of the State of New York.




          ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
               New York, New York 10022
                   212.750.6434
                   REF:  113872

---

Page 2

A P P E A R A N C E S:

LAW OFFICE OF ERIC M. NELSON

Attorneys for Plaintiff.

      112 Madison Avenue

      Sixth Floor

      New York, New York 10016

BY:  ERIC M. NELSON, ESQ.

      PHONE:  212.354.3666

      FAX:    212.354.2555

      E-MAIL: emnlegal@gmail.com



STATE OF NEW YORK

OFFICE OF THE ATTORNEY GENERAL

Attorneys for Defendants State University of

New York, Dr. Steven Pulitzer, Dr. Deborah Reede.

      120 Broadway

      New York, New York  10271

BY:  CHRISTOPHER V. COULSTON, ESQ.

      PHONE:  212.416.8556

      FAX:    212.416.6009

      E-MAIL: christopher.coulston@ag.ny.gov

---

Page 3

  A P P E A R A N C E S (Cont'd):


NEW YORK CITY LAW DEPARTMENT

OFFICE OF THE CORPORATION COUNSEL

Attorneys for Defendants New York City Health

and Hospitals Corp., Kings County Hospital.

100 Church Street

New York, New York  10007

  BY: TANYA N. BLOCKER, ESQ.

  PHONE: 212.356.3177

  FAX: 212.356.3770

  E-MAIL: tblocker@law.nyc.gov


  ALSO PRESENT:

ODED GREENBERG, M.D.

WILLIAM VERSFELT, ESQ.

---

Page 4

------------------ I N D E X -------------------

WITNESS                 EXAMINATION BY              PAGE

LEONZO CUIMAN     MR. NELSON                        6


--------------- DOCUMENT REQUESTS ----------------

PAGE: 21    Resume of Leonzo Cuiman.


--------------- E X H I B I T S ----------------

CUIMAN            DESCRIPTION            FOR I.D.

Exhibit 1        FMLA Document              190

Exhibit 2        Emails                     315

                 SUNY ESI 278

Exhibit 3        Emails                     317

                 SUNY ESI 26

Exhibit 4        Correspondence             320

                 HHC 1137

Exhibit 5        Emails                     322

                 SUNY ESI 28

Exhibit 6        Emails                     323

                 SUNY ESI 4 - 5

Exhibit 7        Emails                     328

                 SUNY ESI 3

Exhibit 8        9/4/14 Correspondence      331

Exhibit 9        Document                   333

                 HHC 1135 - 6

---

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 5

```
------------ E X H I B I T S (Cont'd)------------
CUIMAN           DESCRIPTION         FOR I.D
Exhibit 10       Document                334
                 HHC ESI 1067
Exhibit 11       Settlement Agreement    335
                 SUNY 12 - 13
Exhibit 12       Emails                  336
                 SUNY ESI 41 - 43
Exhibit 13       Document                341
                 HHC ESI 1625
Exhibit 14       Correspondence          344
                 SUNY 10
Exhibit 15       Transcript Excerpt      345
                 SUNY 1535
Exhibit 16       Correspondence          346
                 SUNY 4
Exhibit 17       Emails                  348
                 HHC ESI 1707 - 8
Exhibit 18       Emails                  353
                 HHC ESI 1753 - 5
Exhibit 19       Emails                  360
                 HHC ESI 2251 - 2
Exhibit 20       DOL Notice              365
                 SUNY 1749
        (EXHIBITS RETAINED BY MR. NELSON)
```

Page 6

L E O N Z O   C U I M A N,
the witness herein, having first been duly
sworn by the Notary Public, was examined and
testified as follows:
    (Dr. Greenberg not present.)

**EXAMINATION**

**BY MR. NELSON:**

Q.  Mr. Cuiman, are you still employed
by Downstate Medical Center?

A.  Yes, I am.

Q.  Okay.  What's your office address
there?

A.  420 Lenox Road, Brooklyn, New York.

Q.  Really?  Okay.  I thought that --
that sounds like a different address than the
hospital.  Do you not work in the hospital
building?

A.  No, I do not.

Q.  I see.  And what's the facility
where you do work?  Is that a Downstate
building, is that a private office building, is
it something else?

A.  It's owned by Downstate, but it's a
separate trailer.

Q.  Oh, okay.  All right.  Mr. Cuiman,

Page 7

CUIMAN

what's your present position?

A.  Assistant vice president, Labor
Relations.

Q.  And how long have you held that job?

A.  Approximately six years.

Q.  So that would take us back to 2010?

A.  Correct.

Q.  Okay.  And were you employed by
Downstate prior to being AVP of Labor Relations?

A.  Yes.

Q.  Okay.  How long have you been
employed by Downstate in total?

A.  Approximately twenty-six years.

Q.  So now that takes us back to about
1990?

A.  Right.

Q.  All right.  Where were you employed
before Downstate?

A.  Oh, wow, going back a way.
    Kingsboro Psychiatric Center.

Q.  I'll tell you what.  Instead of
doing this backwards, let's do it forwards.

A.  Okay.

Q.  Tell me briefly what your

Page 8

CUIMAN

educational background is.

    You have a college degree?

A.  Yes, I have a master's in public
administration.

Q.  Okay.  You have a bachelor's degree
as well?

A.  Yes.

Q.  Where did you get your bachelor's?

A.  York College.

Q.  Here in the City of New York?

A.  Yes.

Q.  What degree is it that you received
from there?

A.  Education.

Q.  Bachelor's of -- a BA in education?

A.  Correct.

Q.  And what year was that?

A.  I don't remember.

Q.  You have an advanced degree?

A.  Yes.

Q.  And what is that?

A.  Master's in public administration.

Q.  And from what institution did you
receive that?

Case 1:15-cv-02343-PKC-VMS   Document 81-16   Filed 09/14/18   Page 3 of 5 PageID #: 1253

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 61

CUIMAN

Q. which any of those promotions occurred?

A. No.

Q. As you were promoted, did you receive more money each time?

A. Yes.

Q. And did your responsibilities increase or become higher-level as you rose in the labor relations function?

MR. COULSTON: Object to the form.

You can answer.

A. Yes, they increased.

Q. Okay. Which of those was the first managerial-level position?

A. Assistant director.

Q. And what managerial responsibilities did you have as assistant director?

A. The personnel associates would report directly to me in some instances, to help supervise and work with them in developing a strategy when they're doing investigations. They would work with me, I would -- basically, I was supervising the personnel associates.

Q. Okay. And at the time you became assistant director, who were the personnel

Page 62

CUIMAN

Q. associates?

A. Jason Nambu (phonetic), Stuart Waxman, Irma Martinez.

Q. Okay. Do you know who --

MR. COULSTON: Are you done with your answer; is that it?

THE WITNESS: Yes.

Q. Do you know who Michael Arabian is?

A. Yes.

Q. Is Mr. Arabian someone who worked in Labor Relations at SUNY Downstate?

A. Yes.

Q. Who hired him?

A. Office of Labor Relations.

Q. And whose decision -- who made the final decision to hire him?

A. It was a collaborative decision, and the majority of us felt he was appropriate for the -- candidate for the position.

Q. At the time he was hired, what position did you hold?

A. AVP of Labor Relations.

Q. So then he was hired sometime between 2010 and 2000- -- and the present,

Page 63

CUIMAN

Q. correct?

A. Correct.

Q. Okay. Do you recall when he was hired?

A. No, I don't remember the exact date.

Q. Do you recall why he was hired? Was he replacing someone, were you adding a function? Tell me what the reason was for his hiring.

MR. COULSTON: Object to the form.

A. Okay. We were adding -- we were expanding our staffing.

Q. Okay. So, in other words, you were increasing your headcount?

A. Correct.

Q. And what position was Mr. Arabian hired into?

A. Personnel associate.

Q. Okay. Was there a position called senior personnel associate at any time in Labor Relations?

A. Yes.

Q. And does that position still exist today?

Page 64

CUIMAN

A. Yes.

Q. Who holds it?

A. Stephanie Bernadel.

Q. Did that position exist before Ms. Bernadel held it?

A. Yes.

Q. Who held it before Ms. Bernadel?

A. I'm not sure.

Q. Did Mr. Arabian ever hold that position?

A. I believe so.

Q. Do you know if anyone held it between the time Mr. Arabian held it and Ms. Bernadel held it?

A. I'm sorry, can you repeat that?

(Read by the reporter):

"QUESTION: Do you know if anyone held it between the time Mr. Arabian held it and Ms. Bernadel held it?"

A. No, I don't recall.

Q. Well, let me ask this, so that we make sure we've covered the possibilities: Has there ever been more than one senior personnel associate in Labor Relations?

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 221

CUIMAN
there wasn't.  His representation as to why he failed to follow supervisory directive was totally unacceptable and we couldn't trust him to work cooperatively with her and Dr. Pulitzer in the future, so a determination was made to implement the penalty.

Q.   When you say "a determination was made to implement the penalty," who made that determination?

A.   Dr. Reede, myself, Adriana Conde-Billy, Stephanie Bernadel.

Q.   Okay.  And who met with Dr. Reede on that -- during that meeting you were just testifying about?  I know you were present and Dr. Reede was present.  Who else was present?

A.   Stephanie Bernadel.

Q.   Anyone else?

A.   I believe Adriana Conde-Billy.

Q.   So after the interrogation of Dr. Greenberg on the 20th that you were present for, you, Ms. Conde-Billy, Ms. Bernadel and Dr. Reede met; is that correct?

A.   Correct.

Q.   And were those all the attendees at

Page 222

CUIMAN
the meeting?

A.   I believe so.

Q.   Where was that meeting held?

A.   In my office.

Q.   Okay.  And was it at that meeting that the decision was made to implement the penalty?

A.   Correct.

Q.   And what happened after that?

A.   The penalty was implemented.

Q.   So you simply had a letter prepared and notified Dr. Greenberg of his discharge?

A.   Correct.

Q.   Okay.  Was anything else done?

A.   Not that I'm aware of.

Q.   Okay.  Did anyone, for example, inform anyone at Kings County Hospital?

A.   Not from my office.

Q.   Okay.  That you're aware of?

A.   That I'm aware of.

Q.   Okay.  During the meeting that you had with Dr. Reede between the 20th and -- well, let's see if we can pin that down.

How long after the interrogation on

Page 223

CUIMAN
the 20th did you meet with Dr. Reede?

A.   I don't recall.

Q.   Was it the same day?

A.   I don't recall.  I'd be guessing if I said yes or no.

Q.   So you don't know if it was the same day, the next day or the 22nd, correct?

A.   Correct.

Q.   Okay.  Are there any notes of what was said or done at that meeting?

A.   No.

Q.   Was a written report ever prepared by anyone with respect to any of the matters or issues that had arisen regarding Dr. Greenberg?

A.   No.

Q.   So Mr. Arabian never prepared anything in writing as a report or summary of what had gone on?

A.   No.

Q.   Was there any written report or summary or anything in writing at all that summarized what Mr. Arabian had done as part of his investigation of that matter?

A.   Of what matter?

Page 224

CUIMAN
Q.   The matter involving Dr. Greenberg.

A.   Which one?  There were two.

Q.   Okay.  Was Mr. Arabian involved in both?

A.   No.

Q.   Okay.  So then let's talk about the one that he was involved in.

A.   Okay.

Q.   He was involved with one of them, correct?

A.   Correct.

Q.   So with regard to the one that he was involved in, was there ever anything in writing reflecting the investigation that Mr. Arabian had done?

A.   As in was it -- I'm not sure I understand the question.

MR. NELSON: Read it back, please.

(Read by the reporter):

"QUESTION: So with regard to the one that he was involved in, was there ever anything in writing reflecting the investigation that Mr. Arabian had done?"

A.   That's what I'm confused about, the

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

LEONZO CUIMAN
December 15, 2016

Page 229

CUIMAN

Q. Yes, I mean other than that meeting and other than any meeting or discussions you may have had regarding scheduling your appearance at deposition.

A. Right.

Q. Other than those things, have you have you ever had any discussions with Mr. Coulston or Mr. Versfelt regarding this matter?

A. Yes.

Q. Okay. On how many occasions?

A. Yesterday, one.

Q. Other than yesterday?

A. None.

Q. All right. So at the meeting you had with the two of them yesterday, was anyone else present?

A. No.

Q. Did anyone else come and go from the meeting?

A. Nope.

Q. Were you asked to supply documents at any point in this case?

A. To who?

Page 230

CUIMAN

Q. To anyone.

A. Supply documents? Yes.

Q. Okay. Who asked you to supply documents?

A. Counsel's office.

Q. When you say "counsel's office," what are you referring to?

A. Once this case was starting to be adjudicated, we were asked to provide copies of our documents from our file to counsel's office in preparation for --

Q. Right. I'm asking, what counsel's office are you referring to?

A. Oh, at SUNY Downstate.

Q. I see. Was that Mr. Versfelt's office?

A. Correct.

Q. Okay. And did you have interaction with Mr. Versfelt in connection with that request for documents?

A. No.

Q. Was it with someone else from his office?

A. No.

Page 231

CUIMAN

Q. Well, how do you know that it came from his office then?

A. Because my director was charged with making sure they got whatever documents they needed or requested.

Q. So when you say "my director," you're referring to Ms. Conde-Billy?

A. Yes.

Q. So you're saying she's the one that interacted with counsel's office?

A. Yes.

Q. Did you have any interactions with counsel's office in connection with this matter other than the meeting yesterday?

A. No.

Q. Okay. So any interaction that your office had with counsel's office at Downstate - other than meeting yesterday - did not involve you, correct?

A. Correct.

Q. Okay. Sir, did you -- withdrawn.
Have you had any communications with Dr. Reede regarding Dr. Greenberg since the meeting just prior to his discharge?

Page 232

CUIMAN

A. Did I ever have any contact with Dr. Reede prior to him being --

MR. NELSON: No. Let's have the question read back, please.

(Read by the reporter):

"QUESTION: Sir, have you had any communications with Dr. Reede regarding Dr. Greenberg since the meeting just prior to his discharge?"

A. I'm not sure what meeting you're referencing.

Q. Okay.

A. You said "prior to." What meeting are you talking about?

Q. Fair enough. You said that you met with Dr. Reede just prior to Dr. Greenberg being terminated, correct?

A. Correct.

Q. Okay. From the time of that meeting up through today, have you had any communication with Dr. Reede regarding Dr. Greenberg or this matter?

A. No.

Q. How about with Dr. Pulitzer?

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
ODED GREENBERG, M.D.,

                              Plaintiff,

              vs.

SUNY DOWNSTATE, ET AL.,

                              Defendant.
----------------------------------------x

DEPOSITION OF STEPHANIE BERNADEL
Friday, October 21, 2016
9:30 a.m.


Reported by:
Elizabeth Santamaria

                                                    2

                            * * *

        Deposition of STEPHANIE BERNADEL,
held at the offices of ERIC M. NELSON, ESQ.,
112 Madison Avenue, New York, New York
pursuant to Notice, before Elizabeth
Santamaria, Court Reporter and Notary Public.
                            * * *

                                                    3

    A P P E A R A N C E S
ATTORNEYS FOR THE PLAINTIFF:
    ERIC M. NELSON, ESQ.
    112 Madison Avenue - Sixth Floor
    New York, New York 10016
    212.354.3666

ATTORNEYS FOR THE DEFENDANTS:
STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
    120 Broadway
    New York, New York 10271-0332
    212.416.8556
    BY: CHRISTOPHER V. COULSTON, ESQ.
        Christopher.Coulston@ag.ny.gov

                                                    4

A P P E A R A N C E S (c o n t'd):


ATTORNEYS FOR THE DEFENDANTS:
KINGS COUNTY HOSPITAL and NEW YORK CITY HEALTH
and HOSPITALS CORPORATION
    NEW YORK CITY LAW DEPARTMENT
    OFFICE OF THE CORPORATION COUNSEL
    100 Church Street
    New York, New York 10007
    212.356.3177
BY:    TANYA N. BLOCKER, ESQ.
    tblocker@law.nyc.gov

ALSO PRESENT:
William Versfelt, Esq.
Assistant Counsel
SUNY Downstate Medical Center
Dr. Oded Greenberg

                                    1  (Pages 1 to 4)

213

Bernadel

assist you or assume tasks instead of you in connection with investigating the matters that had been raised by Dr. Pulitzer?

A. What do you mean, assist and/or assume matters?

Q. Did you basically say to somebody else, "Can you help me with this investigation?" or ask somebody else to do something for you?

A. I don't believe so.

Q. And in the course of this investigation did you ask Dr. Pulitzer to do anything for you other than to perhaps furnish you with the attestations as you testified earlier?

A. I don't believe so. I don't remember.

Q. How about Dr. Reede; did you ask Dr. Reede to do anything for you?

A. I don't think so.

Q. Anyone else on the staff at Labor Relations also participate in whatever you did as your investigation of the referral?

A. No, I don't think so.

214

Bernadel

Q. Tell me. Did you have any interaction with anyone at Kings County Hospital in connection with your investigation?

A. No.

Q. At any time from the time you first picked up the Greenberg file until the time that Dr. Greenberg was terminated, did you have any occasion to speak with or interview anyone at Kings County Hospital?

A. I don't remember. Dr. Greenberg and Dr. Pulitzer were stationed at Kings County so, for example, the IT person or the admin may have been there, but I don't know if they were employed by Kings County.

Q. Okay. I believe you said that you spoke to the person -- the person we have been referring to as Person A, who may be Mr. Pyle, and Pyle is P-Y-L-E, and I believe you said that you also spoke with people who attended the meeting that Dr. Pulitzer held on the 22nd of September.

Did you also speak with the IT person whom Dr. Greenberg had inquired of

215

Bernadel

regarding correcting the attestations?

A. I don't remember.

Q. Okay. Is there anyone else who you spoke with in the course of your investigation who might have been a KCH person as distinguished from a Downstate person?

A. I don't remember. I don't think so.

Q. Do you know who Dennis Chansky is?

A. No.

Q. How about Sade Jeamott?

A. I've seen the name. I don't remember who she is, but I've seen her name.

Q. How about anyone in Risk Management; did you talk to anyone in Risk Management during the course of your investigation?

A. I think you asked that already and I think I said I don't remember.

Q. Do you know whether Dr. Reede or Dr. Pulitzer did?

A. I don't know.

Q. As of the time that you began your work on the Greenberg matter, do you know

216

Bernadel

whether or not there was a policy regarding work hours for physicians in the radiology department?

A. Policy regarding work hours?

Q. Yes.

A. I don't know.

Q. At any point in time while you were handling this matter did you see any written policy regarding work hours --

A. I don't recall.

Q. -- for attendings or, for that matter, any physicians in the radiology department?

A. I don't recall seeing that, no.

Q. Do you recall anyone ever telling you that any policy existed?

A. I don't think so.

Q. Did it ever come to your attention that a policy was being developed?

A. No. Not at the time, no.

Q. Do you know who Michelle Welcome is?

A. No.

Q. By the way, do you know how long

54 (Pages 213 to 216)

305

Bernadel
those interrogations?

A.   No, I did not.

Q.   Would there be a need for you to consult with anyone at Kings County Hospital in connection with those interrogations?

A.   No, there would not.

Q.   In making the determination, which I believe you testified earlier, with SUNY Downstate's Labor Relations division's decision to terminate Dr. Greenberg, did you discuss that termination with anyone at Kings County Hospital?

A.   No.

Q.   Would there be a reason for you to discuss the termination with anyone at Kings County Hospital?

A.   No.

Q.   Why is that?

A.   Because he is a SUNY Downstate employee.

Q.   There were some exhibits that actually had -- I'll just refer quickly to Exhibit 1 -- that actually has Kings County Hospital Center letterhead.  Do you know why,

306

Bernadel
although this exhibit is Exhibit 1 and it is a --

It's signed by Stephen Pulitzer?

A.   Yes.

Q.   And you testified earlier this was sent to you or to your office in Labor Relations as a referral for discipline.  Do you have any knowledge as to why it was on Kings County Hospital letterhead?

A.   I don't know.

Q.   Has there been any instances in which you have seen doctors -- withdrawn.

Have any of the doctors at Kings County Hospital that have communicated with Labor Relations at SUNY Downstate, have they used Kings County Hospital letterhead to communicate with you?

A.   I don't recall.  It's possible.

Q.   But do you communicate with any of the doctors assigned to Kings County Hospital by e-mail through the Kings County Hospital e-mail?

A.   No.  They all have Downstate e-mail addresses.

307

Q.   Is it your understanding that they have Kings County Hospital e-mail addresses as well or only Downstate?

A.   I don't know.

MS. BLOCKER:  I have no further questions.

Off the record.

(Whereupon, the proceedings were adjourned at 4:27 p.m.)

308

STATE OF _____ )

                                  ) :ss

COUNTY OF _____)

I, STEPHANIE BERNADEL, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

                    _____

                    STEPHANIE BERNADEL

Sworn and subscribed to before me this    day of            , 2016.

_____

       Notary Public

77 (Pages 305 to 308)

Accreditation Council for
Graduate Medical
Education

515 North State Street
Suite 2000
Chicago, IL 60654

Phone 312.755.5000
Fax 312.755 7498
www.acgme.org

April 15, 2014

ACGME

Rhonda Osborne, MD
Residency Program Director
S U N Y Health Science Ctr at Brooklyn, Dept of Radiology
Box 45
450 Clarkson Avenue
Brooklyn, NY  11203

Dear Dr. Osborne,

The Residency Review Committee for Radiology-Diagnostic, functioning in accordance with the policies and procedures of the Accreditation Council for Graduate Medical Education (ACGME), has reviewed the information submitted regarding the following program:

Radiology-diagnostic

SUNY Health Science Center at Brooklyn Program
SUNY Health Science Center at Brooklyn
Brooklyn, NY

Program 4203521143

Based on all of the information available to it at the time of its recent meeting, the Review Committee conferred the following adverse action:

Status: Probationary Accreditation
Maximum Number of Residents: 32
Effective Date: 02/03/2014
Approximate Next Site Visit: 03/02/2015

The decision to take an adverse accreditation action is based on the failure of the program to be in substantial compliance with the ACGME's Institutional and/or Program Requirements for Graduate Medical Education.

**AREAS NOT IN COMPLIANCE (Citations)**

The Committee cited the following areas as not in substantial compliance with the requirements as the basis for the adverse action.

**EXTENDED CITATIONS**

**Resources | Since: 11/12/2009 | Status: Extended**

Resources:  The program must provide adequate space, equipment, and other pertinent facilities to ensure an effective educational experience for residents in diagnostic radiology.  The program must also provide the modern facilities and equipment required in all of the subspecialty rotations (Program Requirement: II.D.1).

The information technology staff support and computer access is inadequate.  The residents identified the need for additional computers, improved software, and more workstations in the

Rhonda Osborne, MD
Page 2

clinical areas (SVR: 16, 48).

Continued Non-Compliance: 02/03/2014
- The Review Committee determined that the program has not corrected this previously cited area of noncompliance.  At the time of the site visit, the program indicated that all of the systems and software were up-to-date at both the University Hospital of Brooklyn and the Kings County Hospital sites.  The site visitor confirmed that although some updates have been made, the "PACS" system at the University Hospital of Brooklyn had not been updated due to the lack of a compatible EMR system in the hospital.  At the time of the site visit, the hospital's plans to implement a new EMR were scheduled for the "near future".
(Site Visit Report pages 3-5, ADS Program Summary – Response to Previous Citations)

**NEW CITATIONS**

**Responsibilities of Faculty | Since: 02/03/2014 | Status: New**

Faculty Supervision Time
Program Requirement: II.B.1.a)
The faculty must devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; and to demonstrate a strong interest in the education of residents

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the faculty do not devote sufficient time to fulfill their supervisory responsibilities. At the time of the site visit, it was noted that faculty supervision has been inconsistent as a result of the lack of time devoted by the faculty to their supervisory responsibilities.  During the site visit interviews, there was consensus that "some faculty" do not "show up" for their scheduled supervision assignments and the program has not enforced adherence to the schedule.  Subsequently, this inconsistent faculty supervision has prevented on-call residents from getting feedback on their cases because faculty members do not show up the next day for post-call film review.  It has also caused other residents to "look for an attending" to review and sign-out their cases. Resident concerns regarding faculty supervision were substantiated by the program's 2013 Resident Survey results which showed a significantly low compliance rate for the questions related to sufficient faculty supervision.
(Site Visit Report pages 19-20, 2013 ACGME Resident Survey results)

**Responsibilities of Faculty | Since: 02/03/2014 | Status: New**

Adequate Faculty Supervision
Program Requirement: VI.D.2.
The program must demonstrate that the appropriate level of supervision is in place for all residents who care for patients.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the Review Committee was unable to determine whether an appropriate level of supervision is in place for all residents. The site visitor confirmed that overnight on-call shifts at both the University Hospital and the Kings County Hospital sites employ the use of remote supervision methods such as a tele-radiology service or at-home review of the radiology studies by the attendings.  The site visitor noted that some residents indicated that "an in-house attending would be preferable at both sites" and that the lack of in-house supervision limits their education.  Resident concerns regarding faculty supervision were substantiated by the program's 2013 Resident Survey results which showed a significantly low compliance rate for the questions related to sufficient faculty supervision.
(Site Visit Report pages 19-20, 2013 ACGME Resident Survey results)

Rhonda Osborne, MD
Page 3

**Responsibilities of Faculty | Since: 02/03/2014 | Status: New**

Faculty Interest in Education
Program Requirement: II.B.1.a)
The faculty must devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; and to demonstrate a strong interest in the education of residents.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that faculty do not demonstrate a strong interest in the education of the residents. The site visitor noted that there is disparity with regards to the faculty's interest in resident education and the quality of the didactic sessions they provide. The faculty within the subspecialty sections were noted to have a lack of coordination in their lecture topics and do not present the material as an organized curriculum. The site visitor also noted that resident opinions confirmed the disparity in faculty interest in education as some faculty members were deemed "excellent and dedicated to education", while other faculty members were deemed "not care about teaching at all". This lack of interest has resulted in the cancellation of scheduled lectures. Resident concerns regarding faculty interest and dedication to education were substantiated by the program's 2013 Resident Survey results which showed a significantly low compliance rate for the questions related to faculty and staff interest in resident education. (Site Visit Report pages 19-20, 2013 ACGME Resident Survey results)

**Other Program Personnel | Since: 02/03/2014 | Status: New**

IT Support/Other Program Personnel
Program Requirement: II.C.
The institution and the program must jointly ensure the availability of all necessary professional, technical, and clerical personnel for the effective administration of the program.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the technical support from information technology (IT) personnel is inadequate to facilitate the effective administration of the program. The site visitor confirmed that faculty and residents agree that IT support is inadequate and equipment repair is slow. At the University Hospital site, the number of IT staff is insufficient and at the Kings County Hospital site, the IT staff are often limited in their ability to resolve technical problems. (Site Visit Report page 5, ADS Program Summary – Response to Previous Citations)

**Other Program Personnel | Since: 02/03/2014 | Status: New**

Clerical Support/Non-Physician Service Obligations
Program Requirement: II.C.
The institution and the program must jointly ensure the availability of all necessary professional, technical, and clerical personnel for the effective administration of the program.
Program Requirement: VI.A.4.b)
The learning objectives of the program must not be compromised by excessive reliance on residents to fulfill non-physician service obligations.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that there is a lack of clerical support overnight. At the time of the site visit, it was confirmed with the residents that there is very limited clerical support provided overnight which has resulted in the on-call resident(s) performing non-physician, clerical duties such as faxing reports. (Site Visit Report page 22-23)

Rhonda Osborne, MD
Page 4

**Responsibilities of Program Director | Since: 02/03/2014 | Status: New**

Procedure Volume/Case Log Reporting
Program Requirement: II.A.4.p)
The program director must participate in the ACGME case log system. The logs must be
submitted annually to the Review Committee office in accordance with the format and the due
date specified by the Review Committee. The record must be reviewed by the program
director at least annually; for residents beginning training in diagnostic radiology on July 1,
2010 or thereafter, data must be submitted for each resident only for the years of training
preceding the ABR Core Examination (at end of PGY-4);
Program Requirement: II.D.4.
The program must provide a sufficient volume and variety of patients to ensure that residents
gain experience in the full range of radiologic examinations, procedures, and interpretations.
The number and variety of examinations and the length of rotations in each subspecialty area
must be sufficient to ensure an adequate training experience. The program's volume must be
no fewer than 7,000 radiologic examinations per year per resident. The number of
examinations in each of the nine subspecialty areas must be of sufficient volume to ensure
adequate training experience.

The information provided to the Review Committee did not demonstrate substantial
compliance with the requirement in that the resident case log data did not demonstrate
whether residents are provided a sufficient patient volume to obtain the procedural experience
necessary to meet the minimum number of radiologic procedures required by the Review
Committee. At the time of the site visit, the site visitor reviewed the case log data for "the most
recent graduates" and found that they all reported numbers below the 25th or 50th percentile
in every procedure category except Chest X-ray and CTA/MRA. Additionally, a review of the
program's most recent 2013 graduate data submitted in the Case Log system for the August
15, 2013 reporting deadline indicated that procedural minimums were not met for Dr.
Gonzalez-Pons and Dr. Raissi. Dr. Gonzalez-Pons did not meet the procedure minimums in
the following five categories (listed as the "Total number reported/Category minimum"): Chest
X-ray 1887/1900, CT Abdomen Pelvic 334/600, US Abdomen Pelvic 320/350, MRI Brain
76/110, and PET 15/30. Dr. Raissi did not meet the procedure minimum in the category of
US Abdomen Pelvic 332/350. The program is advised to review the required Diagnostic
Radiology Case Log Minimums currently posted on the Review Committee's webpage at:
http://www.acgme.org/acgmeweb/Portals/0/PFAssets/ProgramResources/420
_DR_Case_Log_Minimums.pdf.
(Site Visit Report page 28, Annual Program Data - Case Log Minimums Report)


**ACGME Competencies | Since: 02/03/2014 | Status: New**

Timely Communication of Procedure Results
Program Requirement: IV.A.5.a).(1)
Residents should provide patient care through safe, efficient, appropriately utilized, quality-
controlled diagnostic and/or interventional radiology techniques. The resident must
communicate effectively and in a timely manner the results of procedures, studies, and
examinations to the referring physician and/or other appropriate individuals.

The information provided to the Review Committee did not demonstrate substantial
compliance with the requirement in that residents are unable to communicate results in a
timely manner. At the time of the site visit, both residents and faculty agreed that the
communication of procedure, study, and examination results to the referring physician and/or
other appropriate individual(s) does not occur in a timely manner. The site visitor confirmed
that while a remedy to improve this communication in the emergency department has been
implemented, it remains a problem in other clinical areas since the only means of
communicating back to the referring physician is a pager number and this limited
communication is further complicated when the referring physician has left for the day. (Site
Visit Report page 27-28)

**A1683**

Rhonda Osborne, MD
Page 5

**ACGME Competencies | Since: 02/03/2014 | Status: New**

Resident Competence/Communication Skills
Program Requirement: IV.A.5.d).(6)
Residents are expected to communicate effectively with patients, colleagues, referring physicians, and other members of the health care team concerning imaging appropriateness, informed consent, safety issues, and the results of imaging tests or procedures. Competence in oral communication must be judged through direct observation. Competence in written communication must be judged on the basis of the quality and timeliness of dictated reports

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement. At the time of the site visit, there was no documentation provided to demonstrate whether the program had evaluated the residents' competence in oral communication skills using direct observation. There was also no documentation provided to demonstrate whether the program had evaluated the residents' competence in written communication skills based on the quality of dictated reports. (Site Visit Report page 32)

**Evaluation of Residents | Since: 02/03/2014 | Status: New**

Timely Resident Evaluations
Program Requirement: V.A.1.a)
The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that faculty evaluations of the residents either do not occur or are not completed in a timely manner. At the time of the site visit, it was noted that although it is required by the program, not all faculty members complete resident evaluations and of those that are completed, many of them are not completed in a timely manner. The lack of evaluation and feedback after assignments was substantiated by the program's results on the 2013 Resident Survey that indicated significantly low compliance on the question related to feedback after assignments. (Site Visit Report page 36, 2013 ACGME Resident Survey results)

**Evaluation of Program | Since: 02/03/2014 | Status: New**

Resident Evaluations for Program Improvement
Program Requirement: V.C.1.d).(2)
The program must use the results of residents' assessments of the program together with other program evaluation results to improve the program.

The information provided to the Review Committee did not demonstrate substantial compliance with the requirement in that the Review Committee was unable to determine whether the program uses the residents' assessments of the program to make improvements. The results of the 2013 Resident Survey showed significantly low compliance on the question related to satisfaction with the program's use of evaluations to improve the program. The site visitor confirmed that residents agree that the program director listens to their comments and some changes have been made, but it was also confirmed that the low compliance rating on the survey was directly related to the "lack of a permanent Department Chair who can provide

Rhonda Osborne, MD
Page 6

leadership and effect meaningful change." (Site Visit Report page 38, 2013 ACGME Resident Survey results)

**RESOLVED CITATIONS**

The Review Committee determined that the following citations have been resolved:

**Responsibilities of Program Director | Since: 11/12/2009 | Status: Resolved**

Program Information Form: The program director must prepare and submit all information required and requested by the ACGME, including but not limited to the program information forms and annual program resident updates to the ADS, and ensure that the information submitted is accurate and complete (Program Requirement: II.A.4.f).

The PIF was inadequately prepared and included differing versions and omissions especially in the faculty roster and curriculum vitae. Twenty-three changes were required during the site visit (SVR: 3-6, 48).

**Service to Education Imbalance | Since: 11/12/2009 | Status: Resolved**

Service and Education: The learning objectives of the program must not be compromised by excessive reliance on residents to fulfill service obligations (Program Requirement: VI.A.2).

Service needs take priority over education, especially when the residents are on-call. The burden of call requires better monitoring (SVR: 16, 49).

**Resident Appointment Issues | Since: 11/12/2009 | Status: Resolved**

Residents Appointments: A program director must provide timely verification of residency education and summative performance evaluations for residents who leave the program prior to completion (Program Requirement: II.C.2.A).

A number of residents transferred from this program to other diagnostic radiology programs. In addition to concerns related to attrition from the program, one resident, who transferred to another program, left without his records being forwarded to his new program director (SVR: 48).

**Institutional Support-Sponsoring Institution | Since: 11/12/2009 | Status: Resolved**

Sponsoring Institution: One sponsoring institution must assume ultimate responsibility for the program, as described in the Institutional Requirements, and this responsibility extends to resident assignments at all participating sites. The sponsoring institution and the program must ensure that the program director has sufficient protected time and financial support for his or her educational and administrative responsibilities to the program (Program Requirement: I.A).

Many citations from the previous Institutional Review have not been answered, even during

**A1685**

Rhonda Osborne, MD
Page 7

the radiology site visit (SVR: 19-21).

**Qualifications of Faculty | Since: 11/12/2009 | Status: Resolved**

Faculty Qualifications: The physician faculty must have current certification in the specialty by the American Board of Radiology, or possess qualifications judged to be acceptable by the Review Committee (Program Requirement: I.B.2).

Dr. Carsaro is not certified by the ABR in spite of his having completed training in 1998 in the United States. Please identify when he plans to take the certification examination (PIF: 6; SVR: 25).

**Responsibilities of Faculty | Since: 11/12/2009 | Status: Resolved**

Faculty Responsibilities: The program must designate one physician faculty member to be responsible for the educational content of each of the nine subspecialty areas. This individual must practice at least 50% of his or her time in the subspecialty area, and must demonstrate a commitment to the subspecialty (Program Requirement: II.B.2.c).

According to the PIF, Dr. Waite, the chief of cardiothoracic radiology, spends only 30% of his time in the subspecialty area (PIF: 8).

**Institutional Support-Participating Institution | Since: 11/12/2009 | Status: Resolved**

Participating Institutions: There must be a program letter of agreement (PLA) between the program and each participating site providing a required assignment. The PLA must be renewed at least every five years (Program Requirement: I.B.1).

Lutheran Hospital is listed as a training site for vascular interventional radiology; however, it is not included in the list of participating sites (PIF: 4, 47).

**Subspecialty Programs**
**The following is a list of subspecialty programs associated with your program.**
**Subspecialty programs with ** preceding the program number were not reviewed at**
**the most recent RC meeting. Subspecialty programs with LTR preceding the program**
**number will be issued a separate Letter of Notification.**

LTR-4233531103 - Neuroradiology
Probationary Accreditation, Administrative - Effective: 02/03/2014
Citations: New - 0   Extended - 8   Resolved - 0

LTR-4273512109 - Vascular and interventional radiology
Probationary Accreditation, Administrative - Effective: 02/03/2014
Citations: New - 0   Extended - 3   Resolved - 0

All current residents and applicants (those invited for interviews) to the program must be

**A1686**

Rhonda Osborne, MD
Page 8

advised in writing of the program's status, and a copy of the appropriate written notification must be submitted to this office within fifty (50) days of the date of this letter, whether or not the action is appealed.

For information concerning appeal of this action, please see the document entitled "Procedures for Appeal of Adverse Actions", which immediately follows this letter.

This office must be notified of any major changes in the organization of the program. When corresponding with this office, please identify the program by name and number as indicated above. Changes in participating institutions and changes in leadership must be reported to the Review Committee using the ACGME Accreditation Data System.

Sincerely,

Felicia Davis, MHA
Executive Director
Residency Review Committee for Radiology-Diagnostic
3127557445
fdavis@acgme.org

CC:
    Ian L. Taylor, MD,PhD
    James P. Walsh, MD
    Jaya Nath, MD,MBBS
    Stephen Wadowski, MD

Participating Site(s):
    Kings County Hospital Center
    Lutheran Medical Center
    SUNY Health Science Center at Brooklyn
    University Hospital-SUNY Health Science Center at Brooklyn
    Veterans Affairs Medical Center (Brooklyn)

**A1687**

Rhonda Osborne, MD
Page 9

## ACGME PROCEDURES FOR APPEAL OF ADVERSE ACTIONS EFFECTIVE DATE: JULY 1, 2013

1.  If the Review Committee confers an adverse action, the program or institution may request a hearing before an Appeals Panel. If a written request for such a hearing is not received by the Chief Executive Officer of the ACGME within 30 days following receipt by the program or institution of the notice of adverse action, the action of the Review Committee shall be deemed final and not subject to further appeal.

2.  If a hearing is requested, a panel shall be appointed according to the following procedures:

    i.   The ACGME shall maintain a list of qualified persons as potential appeals panel members to review programs.

    ii.  For a given hearing, the program or institution shall receive a copy of the list of potential appeals panel members and shall have an opportunity to delete a maximum of one-third of the names from the list. Within 15 days of receipt of the list, the program or institution shall submit its revised list to the Chief Executive Officer of the ACGME.

    iii. A three-member Appeals Panel will be constituted by the ACGME from among the remaining names on the list.

3.  When a hearing is requested, the following policies and procedures shall apply:

    i.   When a program or institution requests a hearing before an Appeals Panel, the program or institution holds the accreditation status determined by the Review Committee with the addition of the term "under appeal". This accreditation status shall remain in effect until the ACGME makes a final determination on the accreditation status of the program or institution following the appeal process.

         Nonetheless, upon receipt of a notice of adverse action, residents and any applicants who have been invited to interview with the sponsoring institution must be informed in writing as to the adverse action conferred by the Review Committee.

    ii.  Hearings conducted in conformity with these procedures shall be held at a time and place to be determined by the ACGME. At least 25 days prior to the hearing, the program or institution shall be notified of the time and place of the hearing.

    iii. The program or institution shall be given the documents comprising the program file and the record of the Review Committee's action.

    iv.  The documents comprising the program or institutional file and the record of the Review Committee's action, together with oral and written presentations to the Appeals Panel, shall be the basis for the recommendations of the appeals panel.

    v.   The Appeals Panel shall meet to review the written record and receive the presentations. The applicable Review Committee shall be notified of the hearing, and a representative of the Review Committee may attend the hearing in order to be available to the appeals panel to provide clarification of the record.

    vi.  Proceedings before an appeals panel are not of an adversary nature as typical in a court of law, but rather provide an administrative mechanism for peer review of an accreditation decision about an educational program. The appeals panel shall not be bound by technical rules of evidence usually employed in legal proceedings.

    vii. The Appellant may be represented by no more than five individuals at the

**A1688**

Rhonda Osborne, MD
Page 10

hearing.

viii. The Appeals Panel shall not consider any changes in the program or institution or descriptions of the program or institution that were not in the record at the time when the Review Committee reviewed it and conferred the adverse action.

ix. Presentations shall be limited to clarifications of the record and to information which addresses compliance by the program or institution with the published standards for accreditation and the review of the program or institution according to the administrative procedures which govern accreditation of GME programs. Presentations may include written and oral elements. The appellant may make an oral presentation to the Appeals Panel, but the presentation shall be limited to two hours. Any information, including presentations and audio-visual and written materials must be provided to the ACGME two weeks prior to the hearing.

x. The appellant shall communicate with the appeals panel only at the hearing or in writing through the Chief Executive Officer of the ACGME.

xi. The appeals panel shall make recommendations to the ACGME Board as to whether substantial, credible, and relevant evidence exists to support the action taken by the Review Committee in the matter under appeal. The appeals panel, shall, in addition, make recommendations as to whether there has been substantial compliance with the administrative procedures which govern the process of accreditation of GME programs.

xii. The appeals panel may recommend either upholding the Review Committee's decision or restoring the program or sponsoring institution to its previous status.

xiii. The appeals panel shall submit its recommendation to the ACGME Board within 20 days of the hearing. The ACGME Board shall act on the appeal at its next regularly-scheduled meeting.

xiv. The decision of the ACGME Board in this matter shall be final. There is no provision for further appeal.

xv. The Chief Executive Officer of the ACGME shall, within 15 days of the final decision, notify the program/institution under appeal of the decision of the ACGME Board.

xvi. The appellant is fully responsible for the Appeal Fee as set yearly by the ACGME. Expenses of the appeals panel members and the associated administrative costs shall be shared equally by the appellant and the ACGME.

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
ODED GREENBERG, M.D.,

            Plaintiff,

        - against -

SUNY DOWNSTATE ET AL.,

            Defendants.

Index No.:  15-cv-2343 (PKC/VMS)
-------------------------------------------------X

                        112 Madison Avenue
                        New York, New York

                        November 18, 2016
                        9:15 a.m.


    Deposition of Defendant, by DEBORAH REEDE,

MD, taken pursuant to Subpoena, before Rita

Persichetty, a Notary Public of the State of New

York.








            ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
                 New York, New York 10022
                      212-750-6434
                      REF:  113737

Page 2

A P P E A R A N C E S:


ERIC M. NELSON, ESQ.

Attorneys for Plaintiff

    112 Madison Avenue

    New York, New York 10016

    PHONE:  212.354.3666

    FAX:  212.354.2555

    EMAIL:  Emnlegal@gmail.com


STATE OF NEW YORK

OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN

Attorneys for Defendant

    The Equitable Building

    120 Broadway

    New York, New York 10271-0332

BY:  CHRISTOPHER V. COULSTON, ESQ.

    PHONE:  212.416.8556

    FAX:  212.416.6009

    EMAIL:  Christopher.coulston@ag.ny.gov

Page 3

A P P E A R A N C E S: (Cont'd)


NEW YORK CITY LAW DEPARTMENT

OFFICE OF THE CORPORATION COUNSEL

Attorneys for Defendants Kings County Hospital

100 Church Street

New York, New York 10007

  BY: TANYA N. BLOCKER, ESQ.

  PHONE: 212.356.3177

  FAX: 212.356.3770

  EMAIL: Tblocker@law.nyc.gov


  ALSO PRESENT:

WILLIAM VERSFELT, Assistant Counsel,

  SUNY Downstate Medical Center

ODED GREENBERG

MICHELLE GILMORE-GREENBERG

Page 4

------------------ I N D E X ------------------

WITNESS                    EXAMINATION BY        PAGE

DEBORAH REEDE, MD     MR. NELSON               7




-------- INFORMATION/DOCUMENTS REQUESTED --------

PAGE    136   Dr. Areman's annual review




--------------- E X H I B I T S ---------------

REEDE           DESCRIPTION              FOR I.D.

Exhibit 1       Document Bates stamped        209

                SUNY ESI 588

Exhibit 2       Document Bates stamped        219

                1249 to 1252

Exhibit 2A      Time Off Away from            219

                Campus Policy Bates

                stamped G 164

Exhibit 2B      Unexpected Absence            219

                Policy that you

                implemented in

                November of 2013

Exhibit 2C      A document                    219

Exhibit 3       Document Bates stamped        223

                SUNY 3488

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 65

REEDE

RVUs and how the work is apportioned.  So maybe I don't need two physicians that do this.  Maybe I need one that does this and one that does something else.  And so that was the reason they chose those two.

I mean, to be honest, the reason I think they chose those two people was because they were the only two that were not tenure overdue.

Q   What is tenure overdue?

A   If someone is tenure overdue, you really -- I don't think you can issue them a nonrenew -- a nonrenewal.

Q   Well, can you tell me what "tenure overdue" actually means?

A   I mean, I don't know how they exactly describe it in HR.  But it's like if you're hired under a certain -- you know, I don't know.  But if you're hired as a -- if you're hired on a tenured versus a nontenured track -- or I think even any track maybe.  If you're there over X amount of years, you have to get -- you really should be promoted within seven years.  So if you're not, those people --

Page 66

REEDE

I don't believe they can issue them a nonrenewal.

Q   When you say "tenure overdue," are you saying overdue to be accorded tenure?

A   Yes.

Q   Okay.  So you're saying Dr. Choy and Dr. Shwarzberg were both overdue to gain tenure?

A   No, were not overdue.

Q   Were not overdue?  I see.

A   Right.

Q   So, in other words, they were the only ones who weren't due to get tenure?

A   Correct.

Q   So there was more flexibility with them than there would be with others?

A   Yes.

Q   So they were the ones who were the most easily nonrenewed and renegotiated with; is that correct?

A   Yes.

Q   And the remainder of the radiologists were either tenured or overdue for tenure; is that right?

Page 67

REEDE

A   Correct.

Q   And "overdue for tenure" means they had worked more than seven years without getting tenure, so they were past due for when they should have been accorded tenure?

A   Right.  It's either that or they were working on both sides of the street.

Q   Which -- by which you mean both at Downstate and at Kings County?

A   Yes.

Q   Okay.  Now, earlier when you were talking about your list of nonrenewal -- withdrawn.

Earlier when you were talking about the list of physicians who you were planning to nonrenew and communicating that at the Jamaleddine meeting, you made reference to an ACGME report.  Was that the basis upon which you had decided those four physicians would be nonrenewed?

A   That was one of the primary considerations for looking at the staffing in the department.

Q   What do you mean "looking at the

Page 68

REEDE

staffing"?

A   Looking at the staffing in the department with reference to resident education.

Q   Okay.  I need you to tell me what you mean by that.

A   Well, the residency program had received a probation status.  The ACGME came in in May of -- would be the May before I arrived.  So they came in, and they do their residency review.  And when the report came out, it basically -- the report was -- said that the staff was not really interested -- did not appear to be interested in resident education.

And when I spoke to the lady at the ACGME -- actually before I got the report even, the written copy of it, when I saw her at a meeting, and I said, "Oh, you know, I'm from Downstate.  I'm waiting, it seems, a mighty long time for us to get our report."

And I was informed that, "Well, you should be getting the letter like next week, and you're going to be on probationary status."

And then I said, "Why?"

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 69

REEDE

And then -- I don't know.  She went to her cell phone and looked, and she said, "Because the primary thing that tipped it over the edge to do that -- to give you that -- that status was because the faculty are not perceived to be interested in resident education."

Q  Now, at that time, how many radiologists were under your supervision?

A  I don't recall the exact number.

Q  Was it the 25 you mentioned, or is it --

A  It's like 30 something.

Q  Okay.  I was using the number, I think, that you gave me for how many radiologists were employed by Downstate but working at Kings County.

But there were additional radiologists under your supervision who worked at Downstate, correct?

A  Yes.

Q  Were most of the radiologists in the department working at Kings County?

A  Yes.

Page 70

REEDE

Q  So there were only a handful at Downstate; is that correct?

A  Yes.

Q  In total, approximately 30 radiologists?

A  A little more.

Q  Okay.  So between 30 and 35?

A  Uh-huh.

Q  Yes?

A  Yes.

Q  Okay.  Can you tell me why if the ACGME report reflected that the radiologists in your department didn't seem interested in resident education you chose the four that you chose in particular for nonrenewal rather than any of the other 25 or 30?

A  Well, this is based on the resident evaluations, also on discussion -- the residents do a survey -- the resident surveys, discussions individually with the residents, and also discussions with the staff members.

Q  When you say "staff members," who are you referring to?

A  Other faculty members.

Page 71

REEDE

Q  Are you talking about other faculty members in the department or outside the department?

A  In and outside.

Q  Okay.  And when you refer to "other faculty members in the department," whom are you referring to?

A  Oh, it would be a number of people.  I would say that people like Dr. Chaudhry, Dr. Hammil, Dr. Waite, Dr. Walsh, Dr. Kolla, Dr. Lehto.  So a good number of the faculty members.

Q  And what were the nature of the discussions you're just referring to with those half-dozen who you named?

A  Basically, you know, how they -- how they -- you know, the quality of the work, you know, how their -- the level of professionalism.

Q  Their own or others?  Their own professionalism or others' professionalism?

A  Others' professionalism.

Q  Can you tell me why you consulted with those six rather than all of the

Page 72

REEDE

radiologists in your department?

A  Well, those are people that I knew, was most familiar with.  And that's -- you know, I wanted to get the opinion of people that work with somebody.

Q  Okay.  Now, I think I caught the first four names correctly.  Can you tell me Dr. Kolla, can you tell me how that's spelled?

A  K-o-l-l-a.

Q  And Doctor -- I think you said Alito?

A  Lehto.

Q  Lehto.  Can you spell that for me?

A  Oh, I don't know how he spells it.  L-e-i-t-h-o [sic], I think.

Q  Okay.  And then the other four were Drs. Walsh, Waite, Hammil, and Chaudhry?

A  Yes.

Q  Chaudhry, C-h-a-u-d-r-y [sic] perhaps?

A  I believe that's how it's spelled.

Q  Okay.  All six of those are or were radiologists in the department?

A  Yes.

Q  Can you tell me which of those worked

Case 19-3570, Document 48, 02/11/2020, 2775431, Page46 of 171

**A1692**

Case 1:15-cv-02343-PKC-VMS   Document 81-19   Filed 09/14/18   Page 4 of 10 PageID #: 1272

Page 73

REEDE

at Kings County and which worked at Downstate at that time?

A   Chaudhry is at the County, Walsh is at the County, Hammil is at the County, Waite and Kolla work at the County and Downstate.

Q   And Lehto?

A   County and Downstate.

Q   Okay.  So essentially these were the half dozen that you consulted about who should be nonrenewed?

A   No.  I didn't ask him about who should be nonrenewed.  I just asked general questions about how somebody works, the quality of their work, et cetera.

Q   And these six were the ones who pointed to Drs. Areman, Roitberg, Mason, and Mirchandani as the ones with whom there were issues?

A   I wouldn't say they pointed to them. I just took collectively what people said and formed my own opinion.

Q   Okay.  And whom did you speak with outside the department, and I mean on the faculty, with regard to this?

Page 74

REEDE

A   Well, I mean, sometimes you didn't have to speak to somebody because people would come up to you and make comments about, "Oh, so and so is very good," et cetera.

So, I mean, you know, a number of people -- I can't remember -- people would come up and talk to you about, you know, the quality of the work, et cetera.

Q   Okay.  Well, tell me who it was that commented to you with regard to Dr. Areman.

A   Okay.  So Dr. Areman, the primary concern with him was the teaching of the residents, and I had knowledge of -- most of the staff I actually had knowledge of before I even came, because my residence rotated -- my LICH resident rotated through Downstate for their pediatric rotation.  So they were actually at Kings County and at Downstate working with Dr. Amodio and Dr. Goldfisher. And, you know, they attended conferences.  So they were -- you know, they were well aware of what -- you know, what the staff was like.

So I could ask my residents that had rotated through there, "Well, what do you think

Page 75

REEDE

of the faculty there?"  And then they could give me an opinion.  Then I also had the residents' evaluation forms of what the residents said about them, and then that in conjunction with what other people felt about the quality of the readings.

Q   Okay.  Tell me now -- let's leave Dr. Areman aside.  Let's talk about Dr. Roitberg.

A   Dr. Roitberg, the issues with her were she was -- that she was supposed to be in charge of the -- or she was in charge of a mammography, but there were problems with the turnaround time in mammography.  The films weren't being read in a timely fashion.  So that would speak to the fact that from an administrative point of view, she was not capable of doing her job as far as administration is concerned.  Also, for -- the evaluations for teaching were not very good, and then, finally, her recall rates were exceptionally high.

Q   What is a recall rate?

A   So a recall rate is the rate -- the

Page 76

REEDE

number of mammographies that you read, how many of them do you recommend that the patients come back for additional studies.  So if your recall rates are anywhere -- I think most people would accept up to probably -- you know, most people it's eight to 10.  I usually have eight to 10 percent.  Usually, I would even bump it up a little higher and give somebody the benefit of the doubt and maybe have it up to about 15 percent.  But hers were much higher than that.

Q   What do you mean by "much higher"?

A   I can't remember the exact numbers, but it was in the high twenties.

Q   So you're saying that Dr. Roitberg was recommending further mammography for something in the high 20 percent range of studies she had viewed?

A   Yes.

Q   And that that was much higher than it should have been?

A   Yes.

Q   And when was this brought to Dr. Roitberg's attention?

Case 19-3570, Document 48, 02/11/2020, 2775431, Page47 of 171

A1693

Case 1:15-cv-02343-PKC-VMS   Document 81-19   Filed 09/14/18   Page 5 of 10 PageID #: 1273

Page 77

REEDE

A   They review them --

Q   Who is "they"?

A   You know, the mammography people have to review that data, and they have to review it for -- you know, for their accreditation. So as chairman -- as section chief, she should have been -- I'm sure she had to look at that.

Q   Yes. But what I'm asking is, when did the issue of her unusually high recall rate get brought by you to Dr. Roitberg's attention?

MR. COULSTON: Object to the form.

A   I don't remember exactly when it was mentioned.

Q   Okay. But you definitely mentioned it to Dr. Roitberg?

MR. COULSTON: Object to the form.

You can answer.

A   It was mentioned, and I don't know if it was mentioned by somebody else as well.

Q   Well, okay. Let me just ask you the question straight out. Did you raise as an issue with Dr. Roitberg at some point her high recall rate?

A   Yes, I did.

Page 78

REEDE

Q   When did you do that?

A   I can't recall.

Q   Was that at the time you informed her of her nonrenewal?

A   I know I mentioned it then.

Q   Okay. Can you tell me, do you recall mentioning it prior to that occasion?

A   I don't recall.

Q   Now, you've made a number of references to resident evaluations and consulting with residents. Knowing about certain radiologists from residents, even from when you were at LICH, et cetera, how much of a decision as to whom to renew and nonrenew depended on residents' views and opinions on that subject?

MR. COULSTON: Object to the form.

You can answer.

A   Well, I think it has a major impact because the residents do annual surveys for the ACGME, and, you know, that's one of the things that they look at when they're evaluating the programs. So, you know, the residents will know whether or not somebody is teaching them

Page 79

REEDE

the way they feel is appropriate.

I mean, we did have other people that would sit in on lectures also and look and see how people were teaching, but I put a major emphasis on resident evaluations.

Q   Okay. How about -- now, by the way, have you told me what the reasons were for Dr. Roitberg's nonrenewal, or were there other reasons besides what you mentioned?

A   I told you.

Q   Okay. And going back to Dr. Areman, who we spoke about just prior to Dr. Roitberg, have you told me what the reasons were for Dr. Areman's nonrenewal, or were there other reasons?

A   I told you.

Q   All right. So tell me about Dr. Mirchandani now. What were the reasons for Dr. Mirchandani's nonrenewal?

A   Dr. Mirchandani was the program director and also a neuroradiologist.

Q   Program director of what program?

A   The radiology residency.

Q   Okay. Go on.

Page 80

REEDE

A   So the issues with Dr. Mirchandani, one was a problem with the quality of the reports, so much so that it triggered a focus review. And so there were problems with the quality of his readings.

And then, as the program director, as evidenced by the fact that the program was on probation, then, that would be the reason why -- you know, that would be another reason -- I mean, if I'm looking at somebody that they are not good at teaching, they have problems with their reports so much so that referring physicians had complained to the point that they had to conduct a focus review, the focus review found irregularities, which they said that they must -- I can't remember the number of cases that the person reviewed. But the person -- if -- I think it was like -- I don't know if it was 50 or a hundred cases, but when -- in their discussion, they said that if I was looking at these mistakes over, let's say, thousands of reports, I would say, "Okay." But when you're reading a small number of cases, and you're seeing these kinds of

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 81

REEDE

mistakes, it's a problem.  So those were the reasons why Dr. Mirchandani was not renewed.

Q   What's a focus review?

A   A focus review is that for some reason, somebody maybe makes a claim about somebody's -- the quality of somebody's reports.  Usually -- a lot of times they may be triggered by either outside people, when somebody -- like, if somebody calls me and says, "Someones reports are not very good," then I would have to say, "Oh, well, I'm not aware of that.  You know, I personally am not aware of it."  And then I would have to look at or have somebody review a number of their cases.

Q   Now, is it focus review or focused review with an "e-d"?

A   I don't know which way you spell it.

Q   Okay.  When was it that the focus review of Dr. Mirchandani was conducted?

A   I don't remember the exact date.

Q   Was he involved in that?

A   The attending is not involved.  Somebody comes in and just looks at your

Page 82

REEDE

readings.

Q   I see.

A   Looks at the films.

Q   Did Dr. Mirchandani know that a focus review was occurring with respect to him?

A   I believe so.

Q   Okay.  And sitting here now, you're not able to tell me how long before his nonrenewal that occurred?

A   No.

Q   Can you give me a ballpark idea?

A   Not really.  I don't remember.

Q   How about by season, was it in that spring or was it in the winter prior or a year earlier?  Can you give me any idea?

A   I can't remember exactly.

Q   What was the conclusion from the focus review?

A   That there were problems with the readings.

Q   And was the conclusion of the focus review brought to your attention?  Is that the way it works?  That somebody reviews it, and it comes to you?

Page 83

REEDE

A   Right.

Q   Okay.  And what did you do once they came to you and told you the results of the focus review?

A   Well, I mean, Dr. Kantor is the doctor that is in charge of -- that's in charge of -- was the direct supervisor of Dr. Mirchandani, and I believe he met with him to discuss the focus review.

Q   Did you meet with Dr. Mirchandani to discuss the focus review?

A   No.

Q   But it's your understanding that Dr. Kantor may have done so?

A   Dr. Kantor did meet with him.

Q   You know that for a fact?

A   Yes.

Q   Do you know when Dr. Kantor met with Dr. Mirchandani?

A   I don't know the exact date.

Q   Okay.  Do you know whether or not that meeting occurred before or after your meeting with Dr. Jamaleddine?

A   Before.

Page 84

REEDE

Q   Do you know how long before?

A   No.

Q   Okay.  And you say that there were also problems with reports for Dr. Mirchandani.  Is that the same thing as what the focus review was about?

A   Yes.

Q   Okay.  So we're really talking about a different way of phrasing the same issue?

A   Yes.

Q   Okay.  Going back to Dr. Areman for a minute, you said that there was an issue with Dr. Areman with regard to the teaching of residents?

A   Yes.

Q   Okay.  When did you bring that to Dr. Areman's attention?

A   When I met with him.

Q   The meeting to inform him of his nonrenewal?

A   Yes.

Q   Okay.  I think the last of the four that we were talking about is Dr. Mason?

A   Yes.

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 85

REEDE

Q   Okay.  What were the issues -- what was the issue or what were the issues with Dr. Mason?

A   Dr. Mason, again, had -- actually, of all of the attendings, had the poorest resident evaluations.

Q   Anything else?

A   Again, people complained, again, about some of her reports as well, and there were also complaints about, you know, that the ultrasound studies were not being read in a timely fashion and that also that there were constant bickering between her and Dr. Zinn.

Q   Going back for a moment to these focus reviews.  Is a focus review something that is done when issues with reports get to, say, a certain level of concern or complaint?

A   Yes.

Q   Okay.  What's the threshold or the standard for when something goes from being not warranting a focus review to warranting a focus review?

A   Well, I mean, I guess it can vary from department to department, but I would say

Page 86

REEDE

when you have problems that are having a major impact on patient care.

Q   Yeah.  But I'm asking, do you have a standard or a metric for that?

A   No.  I don't think that there's a metric for it.

Q   It's just a matter of judgment?

A   Right.  I mean, we do peer reviews as well.  So, I mean, if you see any trends on the peer reviews, that also you would call somebody in and say, "Hey, you know, you have a lot of misses or whatever, you know, let's talk about it."

Q   Okay.  But the judgment that we were just talking about in determining when a focus review is warranted, that's your judgment, correct, as the department chair?

A   Yes.

Q   Okay.  So when there was a focus review of Dr. Mirchandani, that was your determination that there should be one, correct?

A   No.  I think that was from the administration.  I think administration

Page 87

REEDE

actually asked for that.

Q   I see.  So you hadn't, but they had; is that correct?

A   I hadn't, but I had informed Dr. Kantor even before I came to Downstate that there were problems with Dr. Mirchandani's reports.

Q   How did you know that when you weren't at Downstate yet?

A   Because they do ENT tumor board at -- they did ENT tumor board at LICH.

Q   What is ENT tumor board?

A   So that means they look at cases of pathology -- you know, look at cases of patients that they're going to do surgery on that have tumors, and they review the images.  They talk about the chemotherapy and the radiation therapy when they're at those meetings.

So we get to see images that were done at the VA, the images that were done -- if they were done at Methodist Hospital, at the County and at Downstate.  So there were several cases at several tumor boards in a row where,

Page 88

REEDE

when the resident went to present the imaging studies, the presentation was prefaced with, "Dr. Reede, you won't believe how this one was read."  And then the images were presented where there was a gross obvious finding that he had missed.

Q   Okay.  Now, you also made a reference to peer review --

A   Uh-huh.

Q   -- that sometimes an issue would be triggered by what you saw in peer reviews.

Can you tell me whether there were issues with the peer reviews of Drs. Areman, Roitberg, or Mirchandani that you were aware of?

A   I don't -- as I said, Dr. Kantor managed those.  On that side, I'm more familiar with what goes on on the Downstate side, because I actively participate in the peer reviews over there.

Q   Okay.

A   I'm on the committee.

Q   Right.  So peer -- to your knowledge, were there any peer review issues with

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 89

REEDE

Drs. Areman, Roitberg or Mirchandani?

A  I don't recall.

Q  How about Dr. Mason?

A  Dr. Mason, I don't know if they had gotten to that point.  But I know that somebody -- that it was mentioned that -- about the quality of her reports.

Q  Okay.  Well, I'm asking specifically about peer reviews now.

A  I do not review the peer reviews at the County hospital.

Q  Okay.

A  That's --

Q  So is it fair to say that whether there were issues or not with peer reviews regarding those four physicians, you weren't aware of them?

A  No.

Q  That's not correct?

A  I was not aware of them.

Q  I see.  Okay.  Now, did Dr. Kantor recommend the nonrenewal of any of these four physicians?

A  No.

Page 90

REEDE

Q  Now, let's go back to Dr. Mason.  You say she received the poorest resident evaluations.  Poorest as compared to whom?

A  The rest of the faculty.

Q  When you say "the rest of the faculty," do you mean the rest of the radiologists in your department?

A  Yes.

Q  Okay.  And you said there was also an issue of the timeliness of ultrasound readings?

A  Right.  That the turnaround times in ultrasound were very bad.

Q  Okay.  You also said there was something about bickering with Dr. Zinn.  Tell me what you mean by that.

A  Well, there were random reports that would come in that, I guess, Dr. Zinn would bring to her attention that there were these films that needed to be read, and this would trigger some sort of, you know, non-professional interaction in the hallway.

Q  And how did you learn of those?

A  I received phone calls.

Q  From?

Page 91

REEDE

A  Various residents would tell me.  Primarily residents would tell me that.  And then I might call over and say to somebody, "Is this true?"  And they said, "Oh, yes," you know.

Q  About how many occasions of that do you recall?

A  I don't remember the total number of occasions.

Q  More or less than five?

A  More.

Q  More or less than 10?

A  That, I don't recall.

Q  Okay.  So perhaps between five and 10?

A  Yes.

Q  And over what period of time were these five or ten issues brought to your attention -- or I shouldn't say five or ten issues.  I should say five or 10 occasions or incidents brought to your attention?

A  I don't recall.

Q  When did you bring these issues, the poor resident evaluations, the issue of

Page 92

REEDE

ultrasound reading timeliness, the issue of the interactions with Dr. Zinn, et cetera, to Dr. Mason's attention?

MR. COULSTON: Object to the form.

You can answer.

A  We discussed those just before I handed in the reviews to the Dean's office.  I talked to her about her poor evaluations.  And I don't remember exactly all of the details.  And, you know, I told her -- I remember her asking about one of the particular categories.  She said "oh, I only got a 2.7 -- is that bad -- out of five?"

And I said -- and I told her that, "Well, by and large, most of the attendings, you know, a good majority of the attendings, their scores are in the high fours."

Q  So this was an occasion that you met with her prior to submitting some review to the Dean.  What review are you referring to?

A  Every year we have to hand in a review, an annual review, to the Dean's office.

Q  An annual review of what?

A  The faculty.

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 93

REEDE

Q   You're talking about individual performance reviews?

A   **Individual reviews of the faculty. You know, after we review with them, you know, "What are you doing as far as scholarly activity," you might at that point discuss with them things that they could do if they're considering advancement for promotion, you know, like that.**

Q   Do you recall when those reviews were submitted?

A   **I don't recall.**

Q   So sitting here now, are you able to tell me when it was that you had this discussion with Dr. Mason?

A   **I don't recall.**

Q   Can you tell me the season?

A   **I don't recall.**

Q   Can you tell me how long it was before you informed Dr. Mason of her nonrenewal?

A   **I don't recall.**

Q   Okay.  Going back now, the ACGME report, was that limited to addressing issues

Page 94

REEDE

regarding resident education?

A   **Yes.**

Q   Because the ACGME is the monitoring or supervisory body for graduate medical education, correct?

A   **Yes.**

Q   Okay.  So the matters with which ACGME is concerned are exclusively related to what's happening with residents at the institution, correct?

MR. COULSTON: Object to the form.

A   **It has to do, yes, with resident education, yes, primarily resident education.**

Q   Okay.  And I believe that you've testified that with regard to each and all of those four physicians you recommended nonrenewal for, there were issues with regard to resident education, or was that not the case for -- withdrawn.

Was there an issue with resident education with respect to Dr. Roitberg?  I know you said there was with Areman.

A   **Yes.**

Q   Was there an issue with resident

Page 95

REEDE

education with regard to Dr. Mason?

A   **Yes.**

Q   And I think you said that Dr. Mirchandani was the program director, so there were obviously issues with resident education that involved him; is that correct?

A   **Yes.**

Q   Okay.  Can you tell me, were any of those four mentioned in the ACGME report specifically?

A   **They never mention physicians in the ACGME report.**

Q   I see.  So, in other words, no physician was mentioned in the ACGME report individually?

A   **Correct.**

Q   Okay.  And that ACGME report is the one that placed the program at Downstate under probation, correct?

A   **Yes.**

Q   It had not been under probation previously?

A   **I don't know if it was ever on probation before.**

Page 96

REEDE

Q   Okay.  When you arrived as the chairman of the department at Downstate, to your knowledge, was the department's resident education program under probation by the ACGME?

A   **On my arrival, they had not received the report yet.  They had -- yes.**

Q   I see.  So the report had actually -- the observations had been done, but the report had not been issued; is that right?

A   **Correct.**

Q   So the actual observations were done prior to you beginning as chair of the department at Downstate, correct?

A   **Yes.**

Q   And then the report came sometime after you took on that post?

A   **Yes.**

Q   And that was the report that placed the program on probation, correct?

A   **Yes.**

Q   So as of the time you began work in the position of department chair, to your knowledge, was the program as of then already on probation or not on probation yet?

ODED GREENBERG, M.D. VS.
SUNY DOWNSTATE ET AL.

DEBORAH REEDE, MD
November 18, 2016

Page 97

REEDE

A   Not on probation yet.

Q   Okay.  And has the program come off probation since?

A   Yes.

Q   When?

A   I can't remember.  I think -- I don't know if it was last year.

Q   When you say "last year," you mean 2015 or earlier this year in 2016?

A   I believe 2015.

Q   Okay.

MR. COULSTON: Do you need a break?

THE WITNESS: Yeah.

MR. COULSTON: Can we take a break? Is this a good time?

MR. NELSON: Why not.  Let's go off the record.

(Discussion held off the record.)

Q   Dr. Reede, I think you told me a moment ago that you had about 30 to 35 radiologists under your supervision at Downstate, correct?

A   Yes.

Q   And only a handful of them were at

Page 98

REEDE

Downstate; most of them were at KCH?

A   Yes.

Q   Can you tell me the ones that are at Downstate?

A   The names of the doctors at Downstate?

Q   Yes.

A   Currently Dr. Harry Zinn, Dr. Shwarzberg, Dr. Leonardo.

Q   Spell.

A   L-e-o-n-a-r-d-o.

Q   Okay.

A   Dr. Magee.

Q   M-c-g or M-a-g?

A   M-a.

Who else?  Dr. Lindin.

Q   L-i-n --

A   -- d-i-n, Lindin.

Q   Okay.

A   Dr. Mangla.

Q   M-a-n-g-l-e-r?

A   G-l-a I think it is.  Mangla.

Q   Mangla?

A   Yeah.

Page 99

REEDE

Q   Okay.

A   And then the people that are halftime at each place.

Q   Okay.

A   So Dr. Strashun, Dr. Waite, Dr. Kolla, Dr. Lehto.

Q   All right.  So those exclusively at Downstate are Drs. Zinn, Shwarzberg, Leonardo, McGee, Lindin, and Mangla.  And those that are half time, or give or take, at both:  Strashun, Waite, Kolla and Lehto?

A   And then also Dr. Hirschkowitz.

Q   Which category?

A   Both.

Q   Okay.  That's presently, correct?

A   Yes.

Q   Okay.  Let me take you back, then, to the 2014 time frame.  Were the names of the people at Downstate and who were at both the same or did they differ at all?

A   I don't know when Dr. Levin left.  I think they're basically the same.

Q   Okay.

A   Yeah.

Page 100

REEDE

Q   All right.  So with the possible exception of Dr. Levin, all the radiologists under your supervision were at -- were or are at Kings County other than these; and with regard to five of them, they're at both, correct?

A   Yes.

Q   Okay.  Have you now told me about all of the issues with each of Drs. Areman, Roitberg, Mirchandani and Mason that lead to your decision to nonrenew them, or are there other reasons you have not had the opportunity to mention yet?

A   No.  I've told you.

Q   Okay.  I'm sorry.  You have told me?

A   Yes, yes.

Q   Okay.  And apart from whatever Dr. Jamaleddine may have said at the -- what we're calling the Jamaleddine meeting, did you have issues with Dr. Kantor?

A   No.

Q   Did you have issues with Dr. Choy?

A   That's did I have issues with him?

Q   Yeah.  I'm asking, particularly when

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

ODED GREENBERG,

                                Plaintiff,

                -against-

STATE UNIVERSITY HOSPITAL-DOWNSTATE
MEDICAL CENTER a/ka/ THE STATE UNIVERSITY
OF NEW YORK HEALTH SCIENCE CENTER AT
BROOKLYN aka SUNY DOWNSTATE MEDICAL
CENTER, NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, UNITED UNIVERSITY
PROFESSIONALS, SUNY DOWNSTATE MEDICAL
CENTER CHAPTER OF UNITED UNIVERSITY
PROFESSIONALS, DEBORAH L. REEDE, STEVEN
PULITZER, and JOHN and JANE DOES 1-20,

                                Defendants.

15-CV-2343 (PKC)(VMS)

-------------------------------------------------------------------------X

## PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Oded Greenberg, M.D. ("Greenberg" or "Dr. Greenberg"), by his attorneys,

Cardi & Edgar LLP, pursuant to Local Civil Rule 56.1 of the United States District Court,

Eastern District of New York, hereby submits the following responses to the statement of

material facts as to which defendants New York City Health + Hospitals Corporation ("HHC")

and Kings County Hospital Center ("KCHC") (collectively, the "Health + Hospitals defendants")

allege there are no genuine issues to be tried. In addition, in accordance with Local Rule 56.1(b),

Dr. Greenberg includes a Statement of Additional Material Facts as to which he contends there exists a genuine issue to be resolved.[1]

## A.    Background

1.    Plaintiff Oded Greenberg is a board-certified radiologist authorized to practice in the State of New York who was formerly employed as a physician and radiologist by defendant State University of New York, Downstate Medical Center ("Downstate"), and assigned (at times) via an affiliation agreement to KCHC. *See* Dkt. No. 17 Second Amended Complaint, May 11, 2016 ("SAC"), Ex. "A," *passim.*

**Response**:    Disputed.  Plaintiff Oded Greenberg ("Dr. Greenberg") was also jointly employed as a physician and radiologist by defendants HHC and KCHC.  As support for the contention that HHC and KCHC were Dr. Greenberg's joint employer, the following can be supported by admissible evidence: (a) under the affiliation agreement between Downstate and HHC, Dr. Greenberg and his colleagues in the Radiology Department were obliged to observe and follow KCHC's policies, procedures, rules and regulations in the course of performing their duties; Declaration of Chad L. Edgar dated July 5, 2018 ("Edgar Decl."), Ex. 61 (HHC 0001-15)[2]; Declaration of Oded Greenberg, M.D. dated July 5, 2018 ("Greenberg Decl."), ¶ 2; (b) at all relevant times, Dr. Greenberg and his fellow radiologists were supervised by Dr. Steve Pulitzer whose KCHC title was Chief of Service, Department of Radiology and he was appointed to that title by the Chief of Executive of HHC; Ex. 25 (HHC 1135-36); Ex. 39 (SUNY000863-65); Ex. 60 (HHC 0158, 0163-64, 0174-75); Ex. 62 (HHC 2549-51); Greenberg Decl., ¶ 2; (c)

---

[1] In the event that that this case goes to trial, Dr. Greenberg reserves the right to contest facts stated herein, which are offered for the purposes of opposing defendants' motion for summary judgment.

[2] Subsequently, exhibits to the Edgar Decl. will be merely referenced as "Ex."

Case 19-3570, Document 48, 02/11/2020, 2775431, Page55 of 171

**A1701**

Case 1:15-cv-02343-PKC-VMS   Document 91   Filed 09/14/18   Page 3 of 35 PageID #: 2003

for a total of approximately 11 years, including during the relevant time period, Dr. Greenberg worked full time and exclusively at KCHC; Greenberg Decl., ¶ 2; (d) during the relevant period, KCHC stored and updated biennially the paperwork to support the practicing privileges of Dr. Greenberg and his colleagues at KCHC; Ex. 63 (HHC 0261-75); Greenberg Decl., ¶ 2; (e) during the relevant period, KCHC kept records of Dr. Greenberg's completion of Continuing Medical Education courses; Greenberg Decl., ¶ 2; (f) during the relevant period, Dr. Pulitzer set the work schedule of Dr. Greenberg and his colleagues; Ex. 38 (Pulitzer Dep. (Second)) at 21-22; Greenberg Decl., ¶ 2; (g) Dr. Greenberg and his colleagues in the Radiology Department during the relevant period used KCHC's facilities and equipment; Greenberg Decl., ¶ 2; (h) Dr. Greenberg and his colleagues in the Radiology Department during the relevant held themselves out as medical staff of KCHC in terms of uniforms and identification; Id.; (i) Dr. Greenberg and his colleagues' salaries were paid by KCHC in a lump sum and SUNY then divvied up that lump sum into the amounts that each radiologist actually was compensated; Ex. 38 (Pulitzer Dep. (Second)) at 26-27; and finally, (j) Dr. Ghassan W. Jamaleddine, the Chief Medical Officer at KCHC during the relevant time, played a significant role in the termination of radiologists allegedly employed by Downstate, including but not limited to Dr. Alan Kantor, the predecessor to Steven Pulitzer as Chief of Service in the Department of Radiology at KCHC and Dr. Greenberg; Ex. 10 (Reede Dep.) at 31-33; Ex. 5 (Pulitzer Dep.) at 133-36; Ex. 38 (Pulitzer Dep. (Second)) at 42.  In addition to all of the above, pursuant to the Affiliation Agreement between SUNY and HHC, the latter had the authority to request in writing that a radiologist not be allowed to practice at KCHC and that request could turn into de facto removal from practice at KCHC, if SUNY was unable to cure the issue underlying the request.  Ex. 60 (HHC 0158, 163-76) (emphasis on 2.1(c) (HHC 0172))

2. Defendant Deborah Reede ("Reede") is employed by Downstate as a professor and Chairperson of the Department of Radiology. Id. at ¶ 5.

**Response:** Undisputed.

3. Defendant Stephen Pulitzer ("Pulitzer") is employed by Downstate as an assistant professor, and assigned via an affiliation agreement to KCHC. Id. at ¶6.

**Response:** Disputed. The analysis with respect to Dr. Greenberg's status as an employee of Downstate on the one hand and HHC and KCHC on the other hand is equally applicable to Dr. Pulitzer. Therefore, we incorporate by reference here all that is alleged in our response to paragraph 1 above. In addition, we note the following. First, according to the Affiliation Agreement, as Chief of Service, Dr. Pulitzer would have been appointed to that position by the Chief Executive of HHC. Ex. 60 (HHC 0164). Second, pursuant to the Affiliation Agreement, as Chief of Service, Dr. Pulitzer was a HHC supervisor of SUNY affiliate radiologists and he was tasked with generating annual evaluations of them on behalf of HHC. Id. (HHC 0174-75). Dr. Pulitzer admitted that he reported to both Dr. Reede (associated with Downstate) and Dr. Jamaleddine (the Chief Medical Officer of KCHC) and the kinds of information he reported was substantially similar; Ex. 5 (Pulitzer Dep.) at 26 & 136; Ex. 38 (Pulitzer Dep. (2d)) at 13-16.

4. Alan Kantor is a radiologist formerly employed by Downstate as a Clinical Assistant Professor in the Department of Radiology at Downstate. *See* Kantor employee change status form, Ex. "B," SUNY001849.

**Response:** Disputed. The analysis with respect to Dr. Pulitzer's status as an employee of Downstate on the one hand and HHC and KCHC on the other hand is equally applicable to Dr. Kantor who was Dr. Pulitzer's predecessor as Chief of Service, Department of

Radiology at KCHC.  Therefore, we incorporate by reference here all that we allege above in response to paragraph 3.

5.  Plaintiff responded to a job posting by Downstate and was hired in early 2001. Plaintiff was hired via a letter from Dr. David Stark ("Stark"), then Professor and Chairman of the Downstate Department of Radiology. The letter from Dr. Stark was printed on SUNY Downstate letterhead and does not reference Health + Hospitals defendants other than citing an affiliation agreement. *See* Plaintiff's Downstate Medical Center Personnel File ("Personnel File"), Ex. "C," at SUNY000218 & SUNY000207.

**Response**:    Undisputed as to what the offer letter and job posting referenced above indicate, as said documents speak for themselves.

6.  Plaintiff's [sic] was hired as an "Assistant Professor of Clinical Radiology" pursuant to an affiliation agreement between Downstate and Defendant HHC. Id. at SUNY000207 and SUNY000219.

**Response**:    Undisputed that Downstate and Defendant HHC's position is that the radiologists at KCHC are Downstate employees who are merely physically located at KCHC but disputed that such is an accurate characterization.  See supra, Responses to paragraphs 1, 3 & 4.

7.  Plaintiff's employment eligibility was verified to the United States Department of Justice on March 16, 2001 and his employer was listed as Downstate. Id. at SUNY000223.

**Response**:    Undisputed that Dr. Greenberg indicated Downstate as his employer when filling out the I-9 employment eligibility verification form in April of 2001.

8. Plaintiff's employment was verified by Downstate when he applied for a mortgage with Citibank. Id. at SUNY000001-000002 and SUNY000025.

**Response**: Undisputed that Dr. Greenberg indicated Downstate as his employer on an employment verification form in conjunction with establishing an account at a financial institution in or around September 9, 2014. See id.

9. Defendants HHC and KCHC were not involved in the hiring of plaintiff, and his Downstate personnel file is replete with indications that he was hired by Downstate. Id. passim, see also Deposition of Ghassan Jamaleddine ("Jamaleddine Tr."), Ex. "D," at 94:16-23.

**Response**: Disputed. The circumstances of Dr. Greenberg's return to employment at KCHC in or around 2010 or 2011 after stabilizing issues with his special-needs son was that he contacted Salvatore Sclafani who was then both Chair of the Radiology Department at Downstate and Chief of Service, Radiology Department at KCHC to see if there were any positions available. Ex. 1 (Greenberg Dep.) at 16-17 & 45. Like Dr. Pulitzer after him, Dr. Sclafani, in his role as Chief of Service, Radiology Department at KCHC, was appointed by and also acting on behalf of HHC. Ex. 64 (HHC 0548-49, 0562, 0580).

10. As an employee of Downstate, plaintiff was a member of United University Professions ("UUP"), a union representing nearly all of the physicians employed by Defendant SUNY, and was subject to the terms of the collective bargaining agreement between UUP and the State of New York. See Deposition of Oded Greenberg ("Pl. Tr."), Ex. "E," at 370:4-9 see also Union Agreement, Ex. "F," at SUNY 001620-001748.

**Response**: Undisputed that Dr. Greenberg was a member of UUP and some of the terms of his employment were informed by the collective bargaining agreement between UUP and the State of New York. It is also true, as mentioned in response to paragraph 1, that

Dr. Greenberg and his other colleagues in the Radiology Department at KCHC were subject to the rules, regulations and by-laws of KCHC.

11. As a member of UUP, plaintiff was only subject to discipline pursuant to article 19 of the agreement between UUP and the State of New York, which states "discipline shall be imposed upon employees only pursuant to this article." Health + Hospitals defendants were not a party to the agreement between UUP and the State of New York. *See* Union Agreement, Ex. "F," at SUNY001637-001638.

**Response**:    Disputed.  With respect to two instances relevant to this case, Dr. Jameladdine was integral, albeit de facto, to the discipline of a "Downstate employee."  First, Dr. Jameladdine caused the termination of Dr. Kantor as Chief of Service of the Radiology Department to which fact Dr. Reede testified.  Ex. 10 (Reede Dep.) at 31-34.  Second, Dr. Jameladdine was included in the decision to terminate Dr. Greenberg.  Ex. 5 (Pulitzer Dep.) at 133-376.  In addition, Dr. Pulitzer testified that Dr. Jameladdine made it clear that he would override any decision by SUNY to allow Dr. Greenbeg to resume practice at KCHC after the administrative leave imposed by Dr. Reede and Dr. Pulitzer in early October of 2014.  Ex. 38 (Pulitzer Dep. (Second)) at 42-43.

12. Plaintiff was paid by the State of New York and received pay increases pursuant to the agreement between UUP and the State of New York. *See* Personnel File, Ex. "C," at SUNY000050, SUNY000056 and SUNY000060.

**Response**:    Undisputed that the documents that memorialized Dr. Greenberg's pay raises were on Downstate letterhead.  Nonetheless, it is not disputed that HHC and/or KCHC paid the SUNY radiologists for their services in the aggregate, whereas the exact amount to be given to each radiologist remained within the discretion of SUNY.  Edgar Ex. 38 (Pulitzer Dep.

(Second)) at 26-27.  Notably, when Downstate was considering revamping the shift structure of the Radiology Department at KCHC commencing January of 2015 by adding an on-site night shift as opposed to using virtual radiologists, Dr. Reede and Dr. Pulitzer presented the plan to Dr. Jamaleddine in a PowerPoint presentation that included number of hires and their compensation rate; in a cover email to a draft version of this presentation sent to Dr. Reede, Dr. Pulitzer noted: "Here is a beginning proposal.  As long as it is cost neutral I think he [Dr. Jamaleddine] will not block it." Ex. 46 (HHC_ESI_002267).

13. Plaintiff's health insurance and related benefits were provided by virtue of his employment at Downstate. Id. at SUNY000092-93 and SUNY000105-106.

**Response**:  Undisputed that Dr. Greenberg's health insurance and related benefits were provided through a plan purchased by Downstate.

14. Plaintiff's time and attendance records were maintained by Downstate. *See* Time and Attendance Records, Ex. "G," at SUNY001750-001813.

**Response**:  Undisputed that certain time and attendance records associated with Dr. Greenberg were maintained by Downstate.  Although Downstate kept attendance sheets, Dr. Pulitzer made it a point to tell radiologists at a monthly departmental meeting in July 2014 that if a radiologist was sick and needed to call out then he or she was required to call staff at both Downstate and KCHC.  Ex. 42 (HHC 1382). .

15. Plaintiff temporarily resigned from his employment in April 2008, via letter to Dr. Salvatore Scalfani, then the Chairman of the Department of Radiology at Downstate. *See* Personnel File, Ex. "C," at SUNY000070.

**Response**:  Undisputed that the letter that Plaintiff wrote to Dr. Scalfani in April of 2008 in which he formalized his resignation was addressed to him qua Chairman of the

Department of Radiology at Downstate. As referenced above, Dr. Scalfani was also Chief of Service, Department of Radiology at KCHC.

16. On October 19, 2009, while plaintiff was working part-time as an hourly employee, Dr. Scalfani unilaterally reassigned plaintiff from KCHC to University Hospital, a facility maintained by the State University of New York. Id. at SUNY000075.

**Response**:     Undisputed.

17. In 2010, plaintiff was rehired to a full time position by Dr. Scalfani via letter written on Downstate letterhead. Plaintiff was re-hired as a "clinical assistant professor of radiology" in the College of Medicine of the State University of New York Downstate Medical Center. The position was subject to the approval of the Dean and President of SUNY Downstate Medical Center, Ian Taylor, M.D., and required only funding approval from HHC. *See* September 21, 2010 rehire letter, Ex. "H".

**Response**:     Undisputed.

18. Throughout his employment plaintiff was supervised by defendant Pulitzer, Dr. Alan Kantor, and Dr. Scalfani. *See* Pl. Tr., Ex. "E," at 44:3-45:5.

**Response**:     Undisputed.

19. Plaintiff acknowledges that his employer was Downstate, but nevertheless contends that Health + Hospitals defendants were "joint/co-employers" with Downstate, Reede, and Pulitzer (hereinafter "Downstate defendants"). *See* Plaintiff's Responses and Objections to Health + Hospitals Defendants' First Set of Contention Interrogatories ("cont. rog. resp.), Ex. "I," *passim, see also* Pl. Tr., Ex "E," at 373:10-375:4.

**Response**:     Undisputed.

**B.     Affiliation Agreement**

20. The affiliation agreement ("the agreement") under which plaintiff was assigned to work at KCHC classifies plaintiff as a "physician provider", refers to HHC as "the Corporation", and to Downstate as "the Affiliate". *See* Affiliation Agreement, Ex. "J," at SUNY001011 and SUNY001015.

**Response:**    Undisputed as the document speaks for itself.

21. The agreement provides that "[Downstate] may follow its own internal personnel policies and procedures with respect to hiring Physician Providers." Id. at SUNY001022.

**Response:**    Undisputed but note that in the following paragraph it is stated that HHC may accept or reject any hiring recommendation of Downstate "provided any such rejection is provided in writing and is not unreasonable." Id.

22. The agreement provides no mechanism for Health + Hospitals defendants to terminate a Physician Provider. Id. at *passim*.

**Response:**    Disputed.  While Health + Hospitals defendants could not terminate a Physician Provider from the employment of Downstate, HHC could make a request in writing that a Physician Provider not be assigned to one of its facilities, which would go into effect if the situation could not be cured to its satisfaction, as described above.  As Dr. Pulitzer clarified at his deposition, Dr. Jamaleddine had complete jurisdiction over KCHC while he was there as Chief Medical Officer and if he believed that a physician should not practice at KCHC he could effect their termination de facto by revoking his or her privileges.  Ex. 38 (Pulitzer Dep. (Second)) at 42-43.

23. The agreement only allows HHC to "request in writing that the affiliate no longer assign such person to the facility." Additionally, upon making such a request to have a

Physician Provider reassigned, Health + Hospitals defendants must "provide a written justification for such a request . . . and a reasonable opportunity to cure if the issue does not involve a threat to patient health or safety." Id. at SUNY001056-001057.

> **Response**:   Undisputed.

24. The agreement requires Downstate to maintain the time and attendance records of physician providers. Id. at SUNY001057-001558.

> **Response**:   Undisputed.

25. The agreement requires Downstate to ensure that physician providers are qualified for employment. Id. at SUNY001025-001029.

> **Response**:   Disputed.  Downstate's role in the credentialing process as outlined in the affiliation agreement is to notify in a timely fashion those physicians who need to complete forms, furnish those forms for completion and collect them in order to provide them to HHC, which then confirms that those documents are filled out completely and accurately. See id. Notably, as discussed above, the Chief of Service of the Radiology Department had to perform annual evaluations of the radiologists as per the Affiliation Agreement.

26. The agreement contemplates that in the performance of duties pursuant to the agreement, physician providers are considered employees of Downstate. Id. at SUNY001079.

> **Response**:   Undisputed that the affiliation agreement states as much.

27. The agreement clearly establishes that Health + Hospitals and Downstate defendants have separate management, ownership, and control. Id. *passim.*

> **Response**:   Disputed.

C.    **Plaintiff's Termination**

28. On May 5, 2014, and again on August 22, 2014, plaintiff was warned about the need to accurately report his time and attendance, as well as the need to report on time for his scheduled shift of 9:30 a.m. to 5:30 p.m. *See* August 22, 2014 Letter, Ex. "K," HHC1241.

**Response:**    Disputed.  To the extent that the above statement is meant to suggest that Dr. Greenberg was officially warned in the disciplinary sense on May 5, 2014 and then again on August 22, 2014, it is disputed.  On May 5, 2014, Dr. Reede met with Dr. Greenberg about an inaccuracy on his April timesheet. Ex. 9 (SUNY 003511).  She characterized this meeting as informal and not a disciplinary event. Ex. 10 (Reede Dep.) at 143. On August 22, 2014, Dr. Pulitzer met with Dr. Greenberg to relate that Dr. Reede wanted him to work an early, set schedule.  Dr. Pulitzer characterized this meeting as informal, friendly and most definitely not a counseling; he was basically trying to figure out what earlier set schedule Dr. Greenberg could adopt, given his personal constraints. Ex. 5 (Pulitzer Dep.) at 310-11.  The "letter" referenced as Exhibit "K" was likely a "predated" memo written by Dr. Pulitzer. There is no indication that it was written at the time that he met with Dr. Greenberg on August 22, 2014, as usually Dr. Pulitzer sent personnel memos written to the file to his administrative assistant immediately upon writing them.  There is no indication that he did so with this memo. See (below), Plaintiff's 56.1 Statement, ¶ 21.

29. On September 3, 2014, plaintiff was informed via letter by defendant Pulitzer that he was not authorized to take leave from September 4, 2014 through September 5, 2014. The letter directed plaintiff to report to work on those dates, and that a failure to do so would result in a referral to Downstate Labor Relations. *See* September 3, 2014 Letter, Ex. "L," HHC1206.

**Response:**    Undisputed.

30. Plaintiff did not appear for work on September 4, 2014 or September 5, 2014, and as a result was directed to appear at the Downstate Labor Relations Office. *See* Pl. Tr. Ex. "E," at 242:4-250:22.

**Response**:    Undisputed that Plaintiff did not go to work on September 4 and September 5, 2014.

31. On or about September 8, 2014, plaintiff entered into a settlement with Downstate to resolve allegations of 1) unscheduled absences, 2) tardiness, 3) interfering with departmental operations, 4) insubordination, and 5) misrepresenting hours worked on his timesheets. A penalty up to and including termination was held in abeyance so long as plaintiff did not engage in any similar conduct. Additionally, pursuant to the settlement agreed to with Downstate, plaintiff was placed on "time and attendance watch". Health + Hospitals defendants were not a party to the settlement agreement nor did they participate in any of the proceeding or negotiations leading to it. *See* Settlement Agreement, Ex. "M," SUNY000012-000013.

**Response**:    Disputed as to Health + Hospital defendants not being a participant in any of the proceedings leading to the Settlement Agreement to the extent that the referral to Labor Relations and the inevitable result of that referral - the execution of a settlement agreement - was done jointly by Dr. Reede and Dr. Pulitzer, the latter of whom at the time was Interim Chief of Service, Department of Radiology, Kings County Hospital Center. In that role, Dr. Pulitzer was an agent of Health + Hospitals and conducting himself on its behalf. Further, according to Mr. Michael Arabian, the representative of Labor Relations who entered into the settlement agreement on its behalf, before he presented a settlement agreement to an employee he would confirm with those who sent the employee to Labor Relations that they were in

agreement with its terms. Ex. 27 (Arabian Dep.) at 224-25. Here, that would have been Dr. Reede and Dr. Pulitzer.

32. On or about September 24, 2014, defendant Pulitzer reported two incidents involving plaintiff. The first incident involved an unauthorized leave of absence in violation of the September 8, 2014 agreement. The second involved the use of unauthorized attestations on patient medical records. *See* September 24, 2014 Letter, Ex. "N," HHC1522-1524.

**Response:**     Undisputed as to what the September 24, 2014 letter states. as it speaks for itself.

33. On October 10, 2014, plaintiff was questioned by the Downstate Labor Relations Office in regards to the issues referenced in the September 24, 2014 letter. At that time it was determined that plaintiff had violated the terms of the September 8, 2014 settlement agreement. On October 20, 2014, plaintiff was afforded an opportunity to explain why he should not be terminated as a result of the incidents described in the September 2014 letter. By letter dated October 22, 2014. plaintiff was informed by Downstate Labor Relations' Assistant Vice President, Leonzo Cuiman that he was being terminated effective immediately. *See* October 22, 2014 Letter, Ex. "O," SUNY001275.

**Response:**     Undisputed that plaintiff was interrogated by a representative of Downstate Labor Relations on October 10, 2014. Undisputed that plaintiff met once again with representatives of Downstate Labor Relations on October 20, 2014. Undisputed that Leonzo Cuiman signed a letter dated October 22, 2014 that stated that Dr. Greenberg's employment at KCHC was terminated. Undisputed that Labor Relations decided in conjunction with and approval from Dr. Pulitzer, Dr Reede and Dr. Jamaleddine that Dr. Greenberg's alleged conduct merited termination. Ex. 5 (Pulitzer Dep.) at 133, 135, 290, 439; Ex. 38 (Pulitzer Dep. (2d)) at

37, 41-42. Disputed that "[a]t that time it was determined that plaintiff had violated the terms of the September 8, 2014 settlement agreement" to the extent that the statement makes unclear who decided that Dr. Greenberg was in violation of the terms of the settlement agreement and when that determination was made.

34. The decision to terminate plaintiff was made jointly by Leonzo Cuiman, Assistant Vice President of Downstate Labor Relations, and Stephanie Bernadel, Senior Personnel Associate in the Downstate Labor Relations Office, along with Adriana Conde-Billy, Director of Downstate Labor Relations, and defendant Reede without input from any HHC or KCHC employee. *See* Deposition Leonzo Cuiman, ("Cuiman Tr."), Ex. "P," at 6:25-7:4; 63:20-64:4; 221:8-222:14; and 231:7-9.

**Response**:    Disputed. Dr. Pulitzer testified at his deposition that he, Dr. Reede and Dr. Jamaleddine were very involved in the decision to terminate Dr. Greenberg after the attestation episode. See Response above in paragraph 33. Dr. Jamaleddine and Dr. Pulitzer, at the time that they were discussing Dr. Greenberg's fate after the second referral to Labor Relations, were representatives of HHC and KCHC in that Dr. J was the Chief Medical Officer of KCHC and Dr. Pulitzer was the Section Chief of the Radiology Department there.

35. Ms. Bernadel did not speak with any HHC employees in connection with the investigation into Plaintiff's behavior, nor was anyone from KCHC notified when plaintiff was terminated. *See* Deposition of Stephanie Bernadel ("Bernadel Tr."), Ex. "Q," at 214:2-6 and 305:8-21, *see also* Cuiman Tr., Ex. "P," at 222:17-19.

**Response**:    Disputed in light of the fact that Dr. Pulitzer can be fairly characterized as an HHC and/or KCHC employee and he testified that he spoke with Ms. Bernadel after he referred Dr. Greenberg to Labor Relations the second time. Ex. 38 (Pulitzer

Dep. (2d)) at 41.  Also, Dr. Pulitzer testified that it was his impression that after the second referral of Dr. Greenberg to Labor Relations, someone there spoke to Dr. Jamaleddine about Dr. Greenberg.  See id. at 41-42.  Further, Ms. Bernadel did interview a KCHC employee by the name of Andre Pyle in the course of investigating Dr. Greenberg's conduct.  Ex. 65 (SUNY 000455).

36. Dr. Ghassan Jamaleddine, then the Chief Medical Officer of KCHC, was never told by anyone that they wanted plaintiff fired, never asked anyone himself to see to it that plaintiff would be fired, or even indicated that he himself wanted plaintiff to be fired.  See Jamaleddine Tr., Ex. "D," at 179:18-180:6.

**Response:**    Disputed.  Dr. Pulitzer testified that Dr. Jamaleddine conveyed to him multiple times that he agreed with the decision that Dr. Greenberg should be terminated and let it be known that he would not allow him to return to KCHC after the attestation episode.  Ex. 5 (Pulitzer Dep.) at 133, 136-37, 439; Ex. 38 (Pulitzer Dep. (Second)) at 37 & 42.

**C.    Alleged Discrimination**

37. Plaintiff alleges that his termination was part of an effort by defendant Reede to "reduce the number of non-black (principally White/Caucasian), and particularly Jewish, physicians and other personnel in the department [of radiology], and increase the number who were/are Black (African-or Caribbean American), non-Jewish and largely, if not uniformly, younger."  See SAC, Ex "A," at ¶17.

**Response:**    Undisputed as to what the Second Amended Complaint states.

38. Plaintiff alleges that the alleged discriminatory effort by defendant Reede included such actions as "the outright discharge of several White, Jewish and/or older physicians and other personnel; the slashing of the compensation of other White (including Jewish) and/or

older physicians and other personnel who were not immediately discharged (while the compensation of Black, non-Jewish and/or younger physicians was maintained); and the micro-management of those physicians in the conduct of their daily duties." Id at ¶¶17-20.

**Response:** Undisputed as to what the Second Amended Complaint states.

39. Plaintiff alleges that defendant Reede "made statements which disparaged and/or stereotyped Jews, cast them in a negative light, or otherwise made clear her plain and obvious bias against them on the basis of their race and religion. Id. at ¶ 21.

**Response:** Undisputed as to what the Second Amended Complaint states.

40. Plaintiff's only support for the aforementioned allegations is inadmissible hearsay. See Pl. Tr., Ex. "E," 510:20-519:7.

**Response:** Disputed. Esther Neiman testifies that Dr. Reede evinced discriminatory bias against Jews on several occasions while they worked in close proximity to each other in 2013. Declaration of Esther Neiman dated June 27, 2018.

41. The termination of other non-parties was for legitimate non-discriminatory reasons. Specifically, upon information and belief as set forth in the record, a restructuring of the Downstate Radiology Department took place following a report by the Accreditation Council for Graduate Medical Education ("ACGME"), that placed the department on probation. See ACGME Report, Ex. "R", passim, see also Deposition of Dr. Deborah Reede ("Reede Tr."), Ex. "S," 67:12-97:12.

**Response:** Undisputed only to the extent that the residency program at SUNY was placed on probation. Disputed as to the legitimacy of any non-discriminatory reasons.

41. Plaintiff does not believe that Dr. Jamaleddine discriminated against him. See Pl. Tr., Ex. "E", at 463:10-25.

**Response:**     Undisputed as to what Dr. Greenberg stated at his deposition.

Notably, it is fairer characterization of Dr. Greenberg's testimony regarding Dr. Jamaleddine that

he willingly participated in a process that was informed by discriminatory animus. Id. at 463.

### Plaintiff's Statement of Material Facts That Preclude Summary Judgment

### Background Facts

1.     At the time that Dr. Greenberg was unlawfully terminated from his

employment at Downstate and KCHC, he had been a radiologist in the Emergency Room at

KCHC for over fourteen years. See Second Amended Complaint ("Compl."), ¶ 1.  During his

employment at Downstate and KCHC, Dr. Greenberg served as a Director of ER Radiology from

approximately 2005 or 2006 to 2009. Ex. 1 (Greenberg Dep.) at 89.[3]  Dr. Greenberg's

credentials were both unusually strong and versatile in that he was fellowship-trained in Body

Imaging by an ACGME-approved program and was board-certified in two sub-specialties,

Diagnostic Radiology and Anatomic Pathology, a versatility shared by no other colleague at

KCHC. See Compl. ¶ 1.

2.     According to his colleagues, even to those who played a pivotal role in

terminating his employment, namely, Dr. Deborah Reede, Chair of the Department of Radiology

at Downstate and Dr. Pulitzer, Chief of Service, Department of Radiology, KCHC, Dr.

Greenberg was a highly competent radiologist. Ex. 4 (SUNY000498); Ex. 5 (Pulitzer Dep.) at

426 ("Dr. Greenberg was a very well respected radiologist in our department.  I mean, he was

one of the best radiologists we've ever had and people look up to him"); Ex. 6 (Scott Dep.) at 90.

During 2013, according to departmental metrics that counted all studies completed by KCHC

radiologists and then weighted those studies according to their complexity, out of 24 radiologists,

---

[3]All subsequent citations to exhibits, "Ex.," will refer to those annexed to the Edgar Declaration.

Dr. Greenberg was the fifth highest in terms of productivity. Ex. 7 (SUNY 002439) (14,954 studies completed and weighted at 10,160.1). According to other colleagues, Dr. Greenberg was not only a highly capable radiologist but he was also a "good teacher." Ex. 6 (Scott Dep.) at 90.

**KCHC's Status As Dr. Greenberg's Employer**

3.     Dr. Greenberg, like many of his colleagues in the Radiology Department at KCHC, was considered a SUNY Downstate employee but practiced at KCHC subject to an affiliation agreement. Greenberg Decl., ¶ 2.

4.     Dr. Greenberg's employment relationship with KCHC consisted of the following: (a) for a total of approximately 11 years, he practiced only at KCHC and he was obliged to observe and follow KCHC's policies, procedures, rules and regulations in the course of performing his duties; Greenberg Decl., ¶ 2; (b) his credentials for practicing privileges were collected, renewed and stored by KCHC; Id. (c) in the course of his practice, he used only KCHC equipment; Id. (d) to the public, Dr. Greenberg and his colleagues were held out as KCHC representatives in terms of uniforms and identification; Id. (e) records of his completion of Continuing Medical Education courses were kept by KCHC; Id. (f) he was supervised by Dr. Steven Pulitzer who had a KCHC title (again, Chief of Service, Department of Radiology); Id. (g) Dr. Pulitzer set Dr. Greenberg's work schedule; Id. (h) when Dr. Greenberg requested time off he sought Dr. Pulitzer's permission; Id. and (i) Dr. Pulitzer was the manager who referred Dr. Greenberg to Labor Relations for discipline. Id.

**Dr. Steven Pulitzer's Position In the KCHC Organization**

5.     At his deposition, Dr. Pulitzer testified that as Chief of Service in the Radiology Department, he reported to the Chief Medical Officer of KCHC, which was Dr. Ghassan Jamaleddine. Ex. 38 (Pulitzer Dep. (2d)) at 13. By reporting to Dr. Jamaleddine, Dr.

Pulitzer explained that he meant: "Everything that was going on in my department in terms of physicians, technical staff, clerical staff; regulatory issues ... any daily operation of the department." Id. at 14. With respect to what he reported to Dr. Jamaleddine concerning the radiologists in the department, he would share any performance issues that were identified such as time and attendance and unruly behavior. Id. at 15. Dr. Pulitzer noted that he also reported to Dr. Reede and shared with her the same information that he shared with Dr. Jamaleddine. Id. at 16.

### Dr. Reede and Dr. Pulitzer Target Dr. Greenberg For Heightened Scrutiny and Then Mistreatment

6.      Although Dr. Greenberg survived a round of layoffs that were approved in April of 2014 by Dr. Deborah Reede, Department of Radiology, Downstate, and Dr. Jammeladine, Chief Medical Officer at KCHC, see Declaration of Deborah Reede, M.D. dated March 26, 2018 ("Reede Decl."), ¶ 9, he was soon to be targeted for special scrutiny at this time by Dr. Reede and Dr. Pulitzer, who was then assistant to Dr. Kantor who was, in turn, Chief of Service at the Radiology Department at KCHC. Specifically, on April 30, 2014, Dr. Pulitzer sent Dr. Reede an email conveying what he believed to be Dr. Greenberg's first case "read" and last case "read" from April 14 to April 22, 2014. Ex. 55 (SUNY 003486). Although there is no context for this email, it implies that that they were cooperating in the effort to scrutinize the hours worked by both Dr. Greenberg and Dr. Chen. What is odd here is that Dr. Reede is not including Dr. Kantor in this surveillance project.[4] Eventually, Dr. Greenberg would fill out his timesheet for April 2014, which is done monthly and once April is completed, and he fell into

---

[4]It is a safe assumption that Dr. Reede reached out to Dr. Pulitzer at this point and began exerting her influence because she knew, after discussions with Dr Jamaleddine, that Dr. Kantor was going to be terminated and Dr. Pulitzer was likely to be his replacement. See Declaration of Deborah L. Reede, M.D. dated March 26, 2018 ("Reede Decl."), ¶ 9.

the trap set by Dr. Reede and Dr. Pulitzer by erroneously indicating that he worked 9 to 5 p.m. on April 21, 2014 when in fact he arrived later than 9 a.m. Ex. 9 (SUNY 003511). Dr. Reede requested a meeting with Dr. Greenberg to discuss this error, which meeting occurred on May 5, 2014. See id. Notably, Dr. Reede suggested that it was an assistant who drew her attention to Dr. Greenberg's incorrect time entry, "[t]he administrative assistant responsible for monitoring the time sheets reported a discrepancy in his April time sheet," but she was clearly involved in spotting the error, as Dr. Pulitzer would not have sent to her information about Dr. Greenberg's activity log without a request from her. Id.; Ex. 10 (Reede Dep.) at 143-44. In her deposition, Dr. Reede admitted that this meeting was not disciplinary in any way. Ex 10 (Reede Dep.) at 143. Her memo of the meeting, however, implies that it was a counseling and her inclusion of the remark, "he did not see what the problem was because he read all the films," suggests that she wanted that nugget in the file in case there were subsequent issues with Dr. Greenberg. Ex. 9 (SUNY 003511). Dr. Greenberg's memorialization of the meeting in the form of an email that he sent to Dr. Reede addresses an issue that she does not even mention: a resident evaluation. Ex. 11 (SUNY 000477). It is as if Dr. Greenberg and Dr. Reede attended different meetings.

### Dr. Pulitzer's "Counseling" Of Dr. Greenberg on August 22, 2014

7. By the beginning of July 2014, Dr. Pulitzer assumed the position of Interim Chief of Service at the Department of Radiology. Ex. 5 (Pulitzer Dep.) at 10 & 13. Upon assuming the position, Dr. Pulitzer demonstrated that his leadership of the department would be deeply intertwined with Dr. Reede's oversight in that he intended to provide to her daily updates. Ex. 14 (HHC_ESI_000363).

8. Dr. Pulitzer was also focused on closely monitoring Dr. Greenberg's time and attendance. On August 20, 2014, Jayan Kurian, an IT administrator at KCHC, sent to Dr.

Pulitzer a daily log indicating when Dr. Greenberg completed a review of each film that he analyzed from July 1, 2014 to August 8, 2014. Ex. 15 (HHC_ESI_000777-872). Later the same day, Dr. Pulitzer forwarded this comprehensive log to Dr. Reede without a cover email, implying that they were in an ongoing conversation about Dr. Greenberg's time and attendance and/or productivity. Ex. 16 (HHC_ESI_873). No other radiologists in the department were singled out for scrutiny in this manner during this time period.

9. Two or three days after receiving the logs from Kurian, Dr. Pulitzer approached Dr. Greenberg at work to discuss his schedule. According to memos to the file that he created after the fact, Dr. Pulitzer approached Dr. Greenberg on either August 22 or 23, 2014 to "counsel" him about his erratic work schedule and to require him to work a set schedule of 9:30 a.m. to 5:30 p.m. Ex. 17 (HHC_ESI_001062-63; HHC_ESI_001092). At his deposition and under oath, Dr. Pulitzer recharacterized this encounter as a friendly discussion intended to accommodate Dr. Greenberg's scheduling preferences to the requirements of the department. Ex. 5 (Pulitzer Dep.) at 311. Notably, Dr. Pulitzer's memos to the file about this August 22 or 23, 2014 discussion between Dr. Greenberg and himself appear to have occurred after Dr. Greenberg approached him on September 2, 2014 to request permission to take the rest of the week off to take care of his autistic son – a request that Dr. Pulitzer immediately denied. Ex. 17 (HHC_ESI_001062-63). See, infra, ¶ 22.

10. Dr. Greenberg has a far different account as to the content of this discussion with Dr. Pulitzer. Greenberg Decl., ¶ 7. Basically, Dr. Pulitzer related that Dr. Reede wanted to impose an early, set schedule on Dr. Greenberg, in spite of the fact that imposing such would leave the later ER radiology shift without his assistance during most of the busiest hours from 4 p.m. to 8 p.m. and created a hardship for Dr. Greenberg who often came in later than 9

a.m. because he helped his special-needs son get ready for summer camp in the morning. Id. Dr. Pulitzer conveyed to Dr. Greenberg that Dr. Reede was insisting on the schedule and was out to get him. Id. According to Dr. Greenberg, he and Dr. Pulitzer did not discuss his so-called recent erratic work schedule nor the threat that continuation of such would lead to discipline. See id. In response to his discussion with Dr. Pulitzer, on August 25, 2014, Dr. Greenberg wrote an email where he continued the discussion about an earlier, set schedule in which he points out its illogic but agrees to comply. Ex. 3 (HHC_ESI_001006). It is a response that neither in tone nor in the fact that it includes three of his colleagues supports the theory that what just occurred was a disciplinary counseling. At his deposition when Dr. Pulitzer was questioned whether he made the statement to Dr. Greenberg that Dr. Reede was a like a cop and out to get him, Dr. Pulitzer stated that he could not remember whether he ever made this statement (as opposed to denying having ever made the statement to him). Ex. 5 (Pulitzer Dep.) at 325.

### Events Leading Up To Dr. Greenberg's Request for FMLA Leave

11.     During the week of August 25, 2014, Dr. Greenberg was scheduled to be on vacation for at least part of the week. Ex. 18 (HHC_ESI_000969-71). In the email that Dr. Greenberg sent to Dr. Pulitzer on August 25, 2014, he also mentioned that despite the fact that he was on vacation he was going to attend a multi-disciplinary meeting at KCHC where he was to present his findings as to why certain serious cases in the ER were not timely read by the Radiology Department. Ex. 3 (HHC_ESI_001006). After Dr. Greenberg attended the multi-disciplinary meeting, he went down to ER to check in with his colleagues and he saw that no one was in the Radiology reading room. Greenberg Decl., ¶ 8. Because he had just attended a meeting where he attributed one of the causes for untimely reading of cases in ER Radiology to staffing cuts Dr. Greenberg felt morally obligated to start reading cases to help the department.

Id. According to Dr. Greenberg, Dr. Hammill, the colleague in charge of the department while Dr. Pulitzer was on vacation, welcomed the assistance. Id. Further, the official schedule of the department was revised on August 26, 2014 to the extent of indicating that Dr. Greenberg would be working for the rest of the week. Ex. 19 (HHC_ESI_001044-45).

12. On Friday, August 29, 2014, Dr. Greenberg and his wife learned by email that their special needs son was in all probability going to be transferred to a different school. Ex. 20 (G212-13); Ex. 1 (Greenberg Dep.) at 224-26.

13. Upon learning that Jayden was likely to have to attend a different school for the new academic year, Dr. Greenberg and his wife conferred and came to the decision that in light of his special bond with Jayden, Dr. Greenberg should take leave from work for a few days the following week in order to assist with any arrangements that needed to be made to facilitate the transfer and to provide love and support to his son while he made the difficult transition to another school. Greenberg Decl., ¶ 9. On the same day that he received the email from Gateway School, on August 29, 2014, Dr. Greenberg attempted to call Dr. Reede to notify her of his need for a leave. Id. Dr. Reede was on vacation and her voicemail was full and not taking any additional messages. Id. With Dr. Pulitzer also on vacation, Dr. Greenberg resorted to emailing Dr. Reede's assistant, Linda McMurren, to notify her of his need to take a few days off the following week "on an emergent basis." Ex. 22 (HHC_ESI_001090). Linda McMurren, like her boss Dr. Reede, was on vacation on August 29, 2014; she did not respond to this email until September 4, 2014. Id. Dr. Greenberg's first opportunity to have a discussion about his need for a leave occurred on September 2, 2014, when Dr. Pulitzer arrived at work after his previous week's vacation.

14.     In attempting to reach out to Dr. Reede on the very same day that he learned that he would need a leave of absence the following week, Dr. Greenberg was following protocol in reaching out to Downstate's Department Chair to notify her of the need for an unexpected absence. Ex. 59 (SUNY 000677).

**Dr. Greenberg's Three Discussions With Dr. Pulitzer**
**About His Unexpected Family Leave**

15.     After Dr. Pulitzer told Dr. Greenberg that Dr. Reede was like a cop looking to catch him, Dr. Greenberg approached Dr. Pulitzer on September 2, 2014 in order to obtain permission to take a multi-day leave related to his special-needs son's unexpected transfer from one school to another. Ex. 17 (HHC_ESI_001063). On the very same day that Dr. Greenberg sought the leave from Dr. Pulitzer, Dr. Pulitzer denied it. Id. ("The operational needs of the department would not permit him to be off this week"). The next day Dr. Greenberg approached Dr. Pulitzer again stating that he needed to take the leave and was going to take it in any event. Ex. 5 (Pulitzer Dep.) at 351-52; 355-56. In response to Dr. Greenberg's statement that he was going to take the leave despite Dr. Pulitzer's denial of the request, Dr. Pulitzer testified that he sought the advice of Dr. Reede. Id. Dr. Reede told him to write a letter to Dr. Greenberg in which he expressly denied the leave request, ordered Dr. Greenberg to come to work on the days that he requested off and threaten to send him to Labor Relations if he failed to show up for work. Id. at 355-56. According to Dr. Pulitzer's testimony, he wrote the letter that Dr. Reede told him to write then went to Dr. Greenberg to hand deliver it. Ex. 5 at 358. He read the contents of the letter to Dr. Greenberg. Id. Dr. Greenberg said in sum and substance you are making me choose between my job and my family to which Dr. Pulitzer responded in sum and substance that he was not making that choice. Id. at 360. They had a conversation about each other's families for a few minutes and then he left Dr. Greenberg. Ex. 50 (HHC_ESI_001087).

16.    Dr. Greenberg contends that he notified Dr. Pulitzer from the outset that the reason he needed the time off in early September was to help Jayden with his transition to a new school. Ex. 1 (Greenberg Dep.) at 228-29. Dr. Pulitzer vehemently denied that Dr. Greenberg mentioned Jayden, a transition to a new school, and the need for Dr. Greenberg to be with his son to assist in this transition in the context of asking for this time off, which context included three separate discussions between them. Ex. 5 (Pulitzer Dep.) at 341, 345 & 359. Pulitzer admitted at his deposition that if he had known that the needs of Jayden were involved in the request for leave he would have worked to accommodate the request. Id. at 361.

17.    At the time that Dr. Greenberg sought a multi-day leave to assist in making arrangements for his special-needs son's transfer to another school and provide to him love, care and support because this transition was likely to be very difficult for Jayden given his severe mental deficits, Dr. Greenberg was eligible for leave under the Family Medical Leave Act, as he worked full time at KCHC (i.e., at least 40 hours per week) continuously since 2010. Greenberg Decl., ¶ 2.

18.    SUNY Downstate and KCHC are both entities that are instrumentalities of New York State and New York City respectively and therefore are "covered employers" as defined by the FMLA, meaning that they are obligated to provide FMLA leave for eligible requests. Greenberg Decl., ¶ 3.

19.    Jayden Greenberg has a serious condition. He has been diagnosed with autism spectrum disorder from which he has suffered since he was two years old and continues to suffer from the condition to this date. Greenberg Decl., ¶ 4. Since before he was two and continuously to date, he has had services that include at least weekly speech therapy, occupational therapy, physical therapy, psychotherapy and social skills therapy. Id. Since Dr.

Greenberg can remember, Jayden has had an Individualized Education Program. Id. Currently and at the time relevant to this litigation, Jayden was medicated for anxiety and depression. Id. Around the time of events relevant to this litigation, in 2014, Jayden went to The Gateway School that caters to students with learning disabilities. Id. At The Gateway School, Jayden's education was informed by an Individualized Education Plan which contemplated that he would be in a special education class with no more than 8 students per teacher at all times. Id. It also contemplated that he would receive speech therapy and physical therapy twice per week and psychological counseling once per week. Id. During this time, as indicated above, he was also under the continuing supervision of a psychotherapist who treated him with medication for attention deficit disorder, along with depression and anxiety. Id. Due to his severe deficits, during the time relevant to the litigation, when he was about eight years old, Jayden was unable to dress, eat and groom himself without assistance from Dr. Greenberg or his wife or his teachers when he was at school. Id. In short, Jayden required adult supervision at all times. Id. During the time when Jayden learned that he had to go to a new school, around the time that Dr. Greenberg asked for a short-term leave at work, he was presenting with tremendous stress and anxiety and Dr. Greenberg was concerned that it would lead to incapacity. Id.

**Dr. Greenberg Takes His Family Medical Leave**
**Despite Dr. Pulitzer's Threat Of Referral to Labor Relations**

20.     Dr. Greenberg took off September 4 and 5, 2014 without the permission of Dr. Pulitzer and under the threat that in doing so he would be referred to Labor Relations. In fact, Jayden did have to transition to a different school. By the morning of September 4, 2014, Jayden's maternal grandmother arrived in town to assist Dr. Greenberg and his wife provide love, support and care to Jayden while he made the transition. Ex. 1 (Greenberg Dep.) at 242. On September 5, 2014, Dr. Greenberg wrote an email to Linda McMurren and carbon copied Dr.

Pulitzer to provide an update as to his absence. Ex. 22 (HHC_ESI_001089-90). In this email, Dr. Greenberg related that he intended to come to work on September 4th but he threw his back out and was unable to come in because of it. Id. When questioned about this email at his deposition, Dr. Greenberg admitted that this email was written to provide an excuse for his absence since he was in fear of losing his job. Edgar Decl., Ex. 1 (Greenberg Dep.) at 246-47. When asked whether his resolve ever changed about not showing up for work on September 4 and 5, 2014, Dr. Greenberg testified no – that he always intended to stay at home to help Jayden. Id. at 242 & 247.

21.     On September 4 and 5, Dr. Reede and Dr. Pulitzer were busy papering the proverbial file and conferring with Labor Relations in order to set in motion the disciplinary machine that awaited Dr. Greenberg upon his return. On September 4, 2014 at 2:48 p.m., Dr. Reede notified Labor Relations that Dr. Greenberg did not come into work as ordered. Ex. 23 (SUNYESI000000278). Michael Arabian of Labor Relations reached out to Dr. Pulitzer later that day to get complete details as to what occurred when he hand-delivered the September 3, 2014 letter to Dr. Greenberg denying his request for leave. Ex. 24 (SUNY 000494). Dr. Pulitzer responded to the inquiry by sending Mr. Arabian a memo that addressed much more than what Mr. Arabian sought: a detailed background as to Dr. Greenberg's allegedly disruptive behavior throughout the month of August in addition to what occurred surrounding the request for leave. Ex. 25 (HHC 1135-36). On the same day that he sent the memo to Mr. Arabian, September. 5, 2014, Dr. Pulitzer generated what appears to be a "predated" memo to the file on KCHC letterhead; it purported to summarize the discussion with Dr. Greenberg on August 22, 2014. Ex. 17 (HHC_ESI_001092). Although the memo on KCHC letterhead omits use of the term "counseled" to describe this meeting (notably, the term was used in the unofficial memo to the

file on September 2, 2014, Ex. 17 (HHC_ESI_001063)), it nonetheless suggests that the meeting was disciplinary in nature. Significantly, Dr. Pulitzer was in the habit of sending memos regarding personnel issues immediately upon being written to his administrative assistant, Sade Jemmott. See, e.g., Ex. 17 (HHC_ESI_001062-63). The "predated" memo bears the date August 22, 2014 but there is no indication that he sent this memo to Ms. Jemmott on that date; rather, he sent it to her and Dr. Reede on September 5, 2014.

22.    At some point on September 5, 2014, Dr. Reede, Dr. Pulitzer and Mr. Arabian met to discuss Dr. Greenberg's referral to Labor Relations. Ex. 5 (Pulitzer Dep.) at 363-72. Dr. Pulitzer admitted that the meeting was arranged through Dr. Reede's office since she was familiar with Labor Relations and he was "a very, very new administrator." Id. at 363.

### Dr. Greenberg's Return To Work After Taking His FMLA Leave

23.    Dr. Greenberg returned to work on September 8, 2014 and was told by Dr. Pulitzer to report to Labor Relations immediately. Ex. 5 (Pulitzer Dep.) at 373. Dr. Greenberg reported to Labor Relations where he was interrogated by Mr. Arabian for approximately two hours regarding the circumstances arising from his request for a leave of absence, the denial of that request and what occurred on September 4th and 5th. Ex. 26 (SUNY 001280-1314). He was then asked to remain in his seat and in the room where he was interrogated for many hours while Mr. Arabian consulted with his supervisor as to the proposed terms of a settlement with Dr. Greenberg. Greenberg Decl., ¶ 10.

24.    What is notable about Dr. Greenberg's interrogation are the clear statements that he makes regarding the reasons why he sought a brief leave: that he had a special needs son; that this son was being transferred to a new school; that the son would find the transfer to be particularly difficult in light of his autism spectral disorder; and that his son needed

him for love, care and support. Ex. 26 (SUNY 001290-91, 1303-04, 1308-11). In hearing these reasons, Mr. Arabian nonetheless did not probe Dr. Greenberg as to whether he presented these circumstances to Dr. Pulitzer when he asked for the leave nor did he appear to probe further himself to see if they might fall within the ambit of the Family Medical Leave Act. At his deposition, when Mr. Arabian was asked whether he believed that the reasons that Dr. Greenberg stated for his request for a leave might qualify for the Family Medical Leave Act, he responded no. Ex. 27 (Arabian Dep.) at 272. Mr. Arabian admitted that he did not remember having any training on FMLA while employed at SUNY; further, he believed that the issue of FMLA was associated with Human Resources and not Labor Relations. Id. at 270-71.

25.     After signing a settlement agreement presented to him by Mr. Arabian in circumstances that can fairly be described as under duress, Dr. Greenberg returned to work. While Dr. Reede and Dr. Pulitzer testified that they had nothing to do with the terms of the settlement agreement presented to Dr. Greenberg, it is noteworthy that Mr. Arabian testified that in his experience at SUNY Labor Relations a settlement agreement would not be presented to an employee without first running its terms by the department heads who would be affected by the agreement. Id. at 224-25. Here, the department heads were Dr. Reede and Dr. Pulitzer.

26.     According to the terms of the settlement agreement, Dr. Greenberg could be terminated should he have any subsequent issues with: (1) unscheduled absences; (2) tardiness; (3) interference with the operations of the department; (4) insubordination or (5) misrepresentation of hours worked on timesheets. Ex. 29 (SUNY 006626-27). The terms of Dr. Greenberg's settlement were conspicuously harsh when compared to settlements reached with other staff in the Radiology Department around the same time: of the nine settlement agreements that defendants produced with respect to employees other than Dr. Greenberg who allegedly

committed misconduct during the relevant period that warranted referral to Labor Relations only one stripped the employee of his or her protection of termination for cause in a manner similar to Dr. Greenberg's settlement. Ex. 30 (SUNY 6601-3, 6582-83, 6625, 6652-53, 6621-22, and 6654-57).

### Dr. Reede's and Dr. Pulitzer's Close Surveillance of Dr. Greenberg

27.     Both Dr. Pulitzer and Dr. Reede intensified their already close scrutiny of Dr. Greenberg after he returned to work after the referral to Labor Relations. On September 9, 2014, Dr. Greenberg wrote an email to Dr. Pulitzer in which he complained about the slow speed in which certain archived messages were accessed by his computer; he asked if a workaround was available. Ex. 32 (HHC_ESI_001238). Dr. Pulitzer requested that his assistant put this email in Dr. Greenberg's personnel folder. Id. On September 12, 2014, Dr. Pulitzer emailed Dr. Reede one of his updates and the first item that he addressed was Dr. Greenberg: "Will monitor time and attendance and number of cases read per day." Ex. 33 (HHC_ESI_1243). On September 15, 2014 at 8:52 a.m., Dr. Reede emailed Dr. Pulitzer and posed the question: "is Dr. Greenberg reading films?" Ex. 34 (HHC_ESI_1259). Dr. Pulitzer responded within 35 **minutes** with the answer, "Yes. He is." Ex. 35 (HHC_ESI_1262).

28.     On September 15, 2014, Dr. Greenberg wrote to Dr. Pulitzer and carbon copied Dr. Reede. In this email, he provided his account of events that led up to his allegedly insubordinate leave of absence on September 4 and 5, 2014. Ex. 36 (HHC 1529). What is particularly notable about this email is his return to the theme that he felt he had the right to take a leave of absence "for important family issues." Id. Here, Dr. Greenberg is expressly and in writing referencing a family issue that was the basis for his request. In response to this email, neither Dr. Reede nor Dr. Pulitzer responded to Dr. Greenberg; rather, they wrote to each other

with Dr. Reede observing: "Dr. Greenberg is trying to cover his tracts [sic]." Ex. 37

(HHC_ESI_001274). To which Dr. Pulitzer responded: "Yes I have filed his email in his file.

He is really all over the map." Id.

29.      Dr. Pulitzer testified that he related to Dr. Jamaleddine the circumstances

that led to Dr. Greenberg's initial referral to Labor Relations for taking an unauthorized leave of

absence on September 4 and 5, 2014. Ex. 38 (Pulitzer Dep. (2d)) at 23-24.

**Dr. Greenberg's Alleged Violation of His Probation**

30.      On September 22, 2014, there was a Radiology Department meeting to

which Dr. Greenberg arrived late. Greenberg Decl., ¶ 11. During the portion of the meeting that

Dr. Greenberg attended, he understood that another hurdle had been placed on him and his

already overly burdened colleagues – attestations that would have to be affixed to all studies that

indicated whether attending physicians agreed or disagreed with residents' initial readings of

films. Id. Dr. Greenberg was frustrated by this new requirement that would have him author

language that he viewed as unnecessary and would add a step to the review of patient studies

with the likely consequence that it would cause a backlog in the flow of work. Id. When Dr.

Greenberg returned to the reading room at ER after the meeting, in his frustration, he authored an

attestation that met the insurers' requirements as far as he understood them but in a playful or, at

worst sarcastic, manner. Id. Having arrived late for the departmental meeting, he had no idea

that the attestations to be used were available as a macro from one of his colleagues. Id. Dr.

Greenberg started immediately affixing this attestation that he authored on studies that were

stale, clinicians had already acted upon and were on his desk because they were rejected by

insurers for lack of an attestation. Id.

31.     On the very day that Dr. Greenberg's attestations were affixed to studies, one of his colleagues, Dr. Velayudhan, alerted him that it was causing a stir in the hallways – other physicians and radiologists were whispering about it. Greenberg Decl. ¶ 12. Dr. Velayudhan suggested to Dr. Greenberg that he inquire as to whether he could modify the attestation. Id. When Dr. Greenberg realized that his attestation was creating controversy, he immediately took action. He went to the IT Department to ascertain whether it was possible to modify the attestation that he already affixed to studies. Greenberg Decl., ¶ 12; Edgar Decl., Ex. 1 (Greenberg Dep.) at 291-93. Notably, he did not request the IT Department to do so, as defendants suggest; he merely asked whether it was possible. Greenberg Dec., ¶ 12. When one of the employees in the IT Department responded that it was possible but he would get in trouble for doing so, Dr. Greenberg reassured him that he would not ask him to do anything that was improper or would get him into trouble. Id.; Ex. 1 (Greenberg Dep.) at 293.

32.     Notably, Dr. Pulitzer, who according to his account of the attestation episode at his deposition and in his affidavit, viewed its distribution as a grave act of misconduct that was allegedly beyond the pale, never discussed the episode with Dr. Greenberg. Ex. 5 (Pulitzer Dep.) at 148-50; Greenberg Decl., ¶ 13. In the immediate aftermath of the discovery of Dr. Greenberg's attestations, Dr. Pulitzer convened meetings with the Chief Medical Officer of KCHC, Dr. Ghassan Jamaleddine, and the Legal Department at KCHC to obtain guidance as to how he should proceed both with respect to the studies that had the attestation and what, if any, disciplinary measures should be imposed on Dr. Greenberg; Dr. Jamaleddine was of the opinion that Dr. Greenberg must be terminated; in fact, he made it clear that he would not allow Dr. Greenberg to practice anymore at KCHC. Ex. 38 (Pulitzer Dep. (Second)) at 42. Dr. Reede and Dr. Pulitzer were both of the opinion that Dr. Greenberg should be terminated. Ex. 28 (Bernadel

Dep.) at 9; Ex. 5 (Pulitzer Dep.) at 420-421.  According to Dr. Pulitzer, Dr. Greenberg's use of the attestation suggested that "something had changed in him" and was therefore unfit for continued practice at KCHC.  Ex. 5 (Pulitzer Dep.) at 115.

33.     On September 24, 2014, Dr. Pulitzer sent a memo to Labor Relations in order to report two incidents that he viewed as violations of the terms of Dr. Greenberg's Settlement Agreement with Labor Relations.  Ex. 39 (SUNY000863-65).  The second incident described was the attestation that created a stir.  Id. (SUNY000863).  The first incident was Dr. Greenberg's alleged insubordination in leaving the ER without authorization after Dr. Pulitzer denied his request to be permitted to take a few hours off in the afternoon in addition to an authorized absence that he took in the morning to deal with funding issues related to Jayden's education.  Id.; Ex. 44 (HHC 1526).  Dr. Greenberg testified that he did not leave ER without authorization; rather, during the time in dispute, which was about 1 hour and 40 minutes, he conferred with another radiologist and then other clinicians at the ER and then for about 40 to 50 minutes he crossed the street to eat lunch at the SUNY campus, which he was allowed to do without asking for leave.  Ex. 1 (Greenberg Dep.) at 300-305; 308-09.  Dr. Pulitzer never approached Dr. Greenberg to get his account of this alleged unauthorized absence from the ER.  Greenberg Decl., ¶ 13.

34.     In a letter sent by Labor Relations dated October 3, 2014, Dr. Greenberg was notified that he was to report to Labor Relations on October 8, 2014 for another interrogation regarding alleged misconduct.  Ex. 40 (SUNY000014).  The interrogation was rescheduled to October 10, 2014 and continued on October 20, 2014.  Ms. Bernadel of Labor Relations was in charge of the second referral of Dr. Greenberg to Labor Relations.  In the course of her investigation, she spoke to Dr. Pulitzer in advance of the first interrogation.  Ex. 31

(SUNY 429-30). On October 14, 2014, she interviewed three radiologists who attended the September 22, 2014 meeting where attestations were discussed. Ex. 41 (SUNY 448-49 & 1252). The radiologists had varying accounts of the status of the attestations, i.e., whether there was an official policy at the time that Dr. Greenberg created his. Notably, Dr. Rhonda Osborne stated that she was unsure whether a final attestation form had been established at the time. Id. (SUNY 1252). Around the time of the second interrogation, Ms. Bernadel, along with her supervisor Leonzo Cuiman, spoke with Dr. Reede and Dr. Pulitzer either individually or together. Ex. 28 (Bernadel Dep.) at 9. According to Ms. Bernadel's account, she and Mr. Cuiman merely presented their findings of facts to Dr. Reede and Dr. Pulitzer as to Dr. Greenberg's conduct; in light of those facts, Dr. Reede and Dr. Pulitzer decided to terminate Dr. Greenberg. Id.; Ex. 5 (Pulitzer Dep.) at 420-421.

35.    Dr. Pulitzer testified that he repeatedly consulted with Dr. Jamaleddine about Dr. Greenberg's conduct in September of 2014, including Dr. Greenberg's use of an unauthorized attestation, and with respect to the decision to terminate Dr. Greenberg's employment. Ex. 5 (Pulitzer Dep.) at 136-38; 189-193; 438-39.

Date:  New York, New York
       July  6, 2018

                                                    CARDI & EDGAR LLP

                                    By:    _____
                                                    Chad L. Edgar
                                                    Dawn M. Cardi

                                                    99 Madison Avenue, 8th Floor
                                                    New York, New York 10016
                                                    212.481.7770 (tel.)
                                                    212.271.0665 (fax)
                                                    cedgar@cardiedgarlaw.com
                                                    dcardi@cardiedgarlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x

ODED GREENBERG,

                                        Plaintiff,

            -against-

STATE UNIVERSITY HOSPITAL-DOWNSTATE
MEDICAL CENTER a/ka/ THE STATE UNIVERSITY
OF NEW YORK HEALTH SCIENCE CENTER AT
BROOKLYN aka SUNY DOWNSTATE MEDICAL
CENTER, NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, UNITED UNIVERSITY
PROFESSIONALS, SUNY DOWNSTATE MEDICAL
CENTER CHAPTER OF UNITED UNIVERSITY
PROFESSIONALS, DEBORAH L. REEDE, STEVEN
PULITZER, and JOHN and JANE DOES 1-20,

                                        Defendants.

---------------------------------------------------------------------X

15-CV-2343 (PKC)(VMS)

**HEALTH + HOSPITALS
DEFENDANTS' RESPONSE
PLAINTIFF'S RULE 56.1
STATEMENT OF
ADDITIONAL MATERIAL
FACTS
IN OPPOSITION TO
DEFENDANTS' MOTION
FOR SUMMARY
JUDGMENT**

        Defendants New York City Health + Hospitals Corporation ("H+H Corp.") and Kings

County Hospital Center ("KCHC") (hereinafter "Health + Hospitals Defendants"), by their

attorney Zachary W. Carter, Corporation Counsel of the City of New York, pursuant to Local

Civil Rule 56.1 of the United States District Court, Eastern District of New York, hereby submit

the following responses to the statement of material facts as to which Plaintiff alleges there are

no genuine issues to be tried.

        **Background Facts**

        1.        At the time that Dr. Greenberg was unlawfully terminated from his

employment at Downstate and KCHC, he had been a radiologist in the Emergency Room at

KCHC for over fourteen years.  See Second Amended Complaint ("Compl."), ¶ 1.  During his

employment at Downstate and KCHC, Dr. Greenberg served as a Director of ER Radiology from approximately 2005 or 2006 to 2009.  Ex. 1 (Greenberg Dep.) at 89.[1]  Dr. Greenberg's credentials were both unusually strong and versatile in that he was fellowship-trained in Body Imaging by an ACGME-approved program and was board-certified in two sub-specialties, Diagnostic Radiology and Anatomic Pathology, a versatility shared by no other colleague at KCHC.  See Compl. ¶ 1.

      **Response:**  Disputed as to the characterization of Plaintiff's credentials as "unusually strong and versatile." Disputed to the extent the statement is argumentative and conclusory. Neita v. Precision Pipeline Sols., No. CV 15-649 (JS) (AKT), 2018 U.S. Dist. LEXIS 32898, at *25 (E.D.N.Y. Feb. 26, 2018), citing Hengjin Sun v. China 1221, Inc., No. 12-CV-7135, 2015 U.S. Dist. LEXIS 128637, at *3 (S.D.N.Y. Aug. 12, 2015) (finding legal argument in plaintiff's Rule 56.1 counter-statement improper and disregarding statements including improper argument); Watson v. Grady, No. 09-CV-3055, 2015 U.S. Dist. LEXIS 60719, at *1 (S.D.N.Y. May 7, 2015), aff'd sub nom. Watson v. Sims, 648 F. App'x 49 (2d Cir. 2016) (finding conclusory and/or argumentative allegations in 56.1 statement improper and declining to consider the same)Undisputed as to the length of Plaintiff's tenure and the positions previously held by him.

      2.     According to his colleagues, even to those who played a pivotal role in terminating his employment, namely, Dr. Deborah Reede, Chair of the Department of Radiology at Downstate and Dr. Pulitzer, Chief of Service, Department of Radiology, KCHC, Dr. Greenberg was a highly competent radiologist.  Ex. 4 (SUNY000498); Ex. 5 (Pulitzer Dep.) at 426 ("Dr. Greenberg was a very well respected radiologist in our department.  I mean, he was

---

[1]All subsequent citations to exhibits, "Ex.," will refer to those annexed to the Edgar Declaration.

**A1736**

one of the best radiologists we've ever had and people look up to him"); Ex. 6 (Scott Dep.) at 90. During 2013, according to departmental metrics that counted all studies completed by KCHC radiologists and then weighted those studies according to their complexity, out of 24 radiologists, Dr. Greenberg was the fifth highest in terms of productivity.  Ex. 7 (SUNY 002439) (14,954 studies completed and weighted at 10,160.1).  According to other colleagues, Dr. Greenberg was not only a highly capable radiologist but he was also a "good teacher."  Ex. 6 (Scott Dep.) at 90.

> **Response:**     Undisputed as to the substance of the testimony given by Drs. Pulitzer and Scott as well as the statistics set forth in the exhibit referenced therein, but state that the facts are immaterial to the Health + Hospitals Defendants' motion.

#### KCHC's Status As Dr. Greenberg's Employer

3.      Dr. Greenberg, like many of his colleagues in the Radiology Department at KCHC, was considered a SUNY Downstate employee but practiced at KCHC subject to an affiliation agreement.  Greenberg Decl., ¶ 2.

> **Response**:     Disputed as to any implication that Plaintiff was an employee of KCHC or H+H Corp. Undisputed that Plaintiff practiced at KCHC subject to an affiliation agreement.

4.      Dr. Greenberg's employment relationship with KCHC consisted of the following: (a) for a total of approximately 11 years, he practiced only at KCHC and he was obliged to observe and follow KCHC's policies, procedures, rules and regulations in the course of performing his duties;  Greenberg Decl., ¶ 2; (b) his credentials for practicing privileges were collected, renewed and stored by KCHC; Id. (c) in the course of his practice, he used only KCHC equipment; Id. (d) to the public, Dr. Greenberg and his colleagues were held out as KCHC representatives in terms of uniforms and identification; Id. (e) records of his completion of

Continuing Medical Education courses were kept by KCHC; Id. (f) he was supervised by Dr. Steven Pulitzer who had a KCHC title (again, Chief of Service, Department of Radiology); Id. (g) Dr. Pulitzer set Dr. Greenberg's work schedule; Id. (h) when Dr. Greenberg requested time off he sought Dr. Pulitzer's permission; Id. and (i) Dr. Pulitzer was the manager who referred Dr. Greenberg to Labor Relations for discipline.  Id.

**Response:**     Disputed as to any implication that Plaintiff was an employee of KCHC or H+H Corp. and refer the Court to the affiliation agreement, annexed to the Shaffer Decl. as Exhibit "J", for an accurate recitation of both Plaintiff and Health + Hospitals Defendants' obligations.

### Dr. Steven Pulitzer's Position In the KCHC Organization

5.     At his deposition, Dr. Pulitzer testified that as Chief of Service in the Radiology Department, he reported to the Chief Medical Officer of KCHC, which was Dr. Ghassan Jamaleddine.  Ex. 38 (Pulitzer Dep. (2d)) at 13.  By reporting to Dr. Jamaleddine, Dr. Pulitzer explained that he meant: "Everything that was going on in my department in terms of physicians, technical staff, clerical staff; regulatory issues ... any daily operation of the department."  Id. at 14.  With respect to what he reported to Dr. Jamaleddine concerning the radiologists in the department, he would share any performance issues that were identified such as time and attendance and unruly behavior.  Id. at 15.  Dr. Pulitzer noted that he also reported to Dr. Reede and shared with her the same information that he shared with Dr. Jamaleddine.  Id. at 16.

**Response:**     Disputed as to its materiality to the issues set forth in Health + Hospitals Defendants' motion for summary judgment. Undisputed as to the substance of the testimony given by Dr. Pulitzer.

**A1738**

### Dr. Reede and Dr. Pulitzer Target Dr. Greenberg
### For Heightened Scrutiny and Then Mistreatment

6.      Although Dr. Greenberg survived a round of layoffs that were approved in April of 2014 by Dr. Deborah Reede, Department of Radiology, Downstate, and Dr. Jammeladine, Chief Medical Officer at KCHC, see Declaration of Deborah Reede, M.D. dated March 26, 2018 ("Reede Decl."), ¶ 9, he was soon to be targeted for special scrutiny at this time by Dr. Reede and Dr. Pulitzer, who was then assistant to Dr. Kantor who was, in turn, Chief of Service at the Radiology Department at KCHC.  Specifically, on April 30, 2014, Dr. Pulitzer sent Dr. Reede an email conveying what he believed to be Dr. Greenberg's first case "read" and last case "read" from April 14 to April 22, 2014.  Ex. 55 (SUNY 003486).  Although there is no context for this email, it implies that that they were cooperating in the effort to scrutinize the hours worked by both Dr. Greenberg and Dr. Chen.  What is odd here is that Dr. Reede is not including Dr. Kantor in this surveillance project.[2]  Eventually, Dr. Greenberg would fill out his timesheet for April 2014, which is done monthly and once April is completed, and he fell into the trap set by Dr. Reede and Dr. Pulitzer by erroneously indicating that he worked 9 to 5 p.m. on April 21, 2014 when in fact he arrived later than 9 a.m.  Ex. 9 (SUNY 003511).  Dr. Reede requested a meeting with Dr. Greenberg to discuss this error, which meeting occurred on May 5, 2014.  See id.  Notably, Dr. Reede suggested that it was an assistant who drew her attention to Dr. Greenberg's incorrect time entry, "[t]he administrative assistant responsible for monitoring the time sheets reported a discrepancy in his April time sheet," but she was clearly involved in spotting the error, as Dr. Pulitzer would not have sent to her information about Dr. Greenberg's

---

[2]It is a safe assumption that Dr. Reede reached out to Dr. Pulitzer at this point and began exerting her influence because she knew, after discussions with Dr Jamaleddine, that Dr. Kantor was going to be terminated and Dr. Pulitzer was likely to be his replacement.  See Declaration of Deborah L. Reede, M.D. dated March 26, 2018 ("Reede Decl."), ¶ 9.

activity log without a request from her. Id.; Ex. 10 (Reede Dep.) at 143-44. In her deposition, Dr. Reede admitted that this meeting was not disciplinary in any way. Ex 10 (Reede Dep.) at 143. Her memo of the meeting, however, implies that it was a counseling and her inclusion of the remark, "he did not see what the problem was because he read all the films," suggests that she wanted that nugget in the file in case there were subsequent issues with Dr. Greenberg. Ex. 9 (SUNY 003511). Dr. Greenberg's memorialization of the meeting in the form of an email that he sent to Dr. Reede addresses an issue that she does not even mention: a resident evaluation. Ex. 11 (SUNY 000477). It is as if Dr. Greenberg and Dr. Reede attended different meetings.

**Response:** Disputed to the extent the statement is argumentative and conclusory as well as immaterial to the Health + Hospitals Defendants' motion.

### Dr. Pulitzer's "Counseling" Of Dr. Greenberg on August 22, 2014

7. By the beginning of July 2014, Dr. Pulitzer assumed the position of Interim Chief of Service at the Department of Radiology. Ex. 5 (Pulitzer Dep.) at 10 & 13. Upon assuming the position, Dr. Pulitzer demonstrated that his leadership of the department would be deeply intertwined with Dr. Reede's oversight in that he intended to provide to her daily updates. Ex. 14 (HHC_ESI_000363).

**Response:** Disputed as to the exhibit referenced therein establishing that Pulitzer's leadership would be "deeply intertwined" with Dr. Reede's oversight and his daily intentions. The exhibit referenced by Plaintiff establishes only that Dr. Pulitzer provided an update to Dr. Reede on June 23, 2014. Undisputed as to the position held by Dr. Pulitzer.

8. Dr. Pulitzer was also focused on closely monitoring Dr. Greenberg's time and attendance. On August 20, 2014, Jayan Kurian, an IT administrator at KCHC, sent to Dr. Pulitzer a daily log indicating when Dr. Greenberg completed a review of each film that he

analyzed from July 1, 2014 to August 8, 2014.  Ex. 15 (HHC_ESI_000777-872).  Later the same day, Dr. Pulitzer forwarded this comprehensive log to Dr. Reede without a cover email, implying that they were in an ongoing conversation about Dr. Greenberg's time and attendance and/or productivity.  Ex. 16 (HHC_ESI_873).  No other radiologists in the department were singled out for scrutiny in this manner during this time period.

**Response:**    Disputed as to statements unsupported by citation to record evidence. Disputed to the extent the statement is argumentative and conclusory as well as immaterial to the Health + Hospitals Defendants' motion. Disputed to the extent the statements mischaracterize the cited evidence. See Trs. of the Local 8A-28A Welfare Fund v. Am. Grp. Adm'rs, No. 14-CV-1088 (RRM)(PK), 2017 U.S. Dist. LEXIS 137365, at *9 (E.D.N.Y. Aug. 25, 2017). Undisputed as to the fact that information was sent to Dr. Pulitzer and then from Dr. Pulitzer to Dr. Reede.

9.    Two or three days after receiving the logs from Kurian, Dr. Pulitzer approached Dr. Greenberg at work to discuss his schedule.  According to memos to the file that he created after the fact, Dr. Pulitzer approached Dr. Greenberg on either August 22 or 23, 2014 to "counsel" him about his erratic work schedule and to require him to work a set schedule of 9:30 a.m. to 5:30 p.m.  Ex. 17 (HHC_ESI_001062-63; HHC_ESI_001092).  At his deposition and under oath, Dr. Pulitzer recharacterized this encounter as a friendly discussion intended to accommodate Dr. Greenberg's scheduling preferences to the requirements of the department.  Ex. 5 (Pulitzer Dep.) at 311.  Notably, Dr. Pulitzer's memos to the file about this August 22 or 23, 2014 discussion between Dr. Greenberg and himself appear to have occurred after Dr. Greenberg approached him on September 2, 2014 to request permission to take the rest of the

week off to take care of his autistic son – a request that Dr. Pulitzer immediately denied.  Ex. 17 (HHC_ESI_001062-63).  See, infra, ¶ 22.

      **Response:**    Disputed to the extent statements are not supported by record evidence.  Disputed to the extent the statement is argumentative, conclusory, and mischaracterizes the record evidence. Disputed as immaterial to the Health + Hospitals Defendants' motion.  Undisputed to the extent the documents speak for themselves.

      10.    Dr. Greenberg has a far different account as to the content of this discussion with Dr. Pulitzer.  Greenberg Decl., ¶ 7.  Basically, Dr. Pulitzer related that Dr. Reede wanted to impose an early, set schedule on Dr. Greenberg, in spite of the fact that imposing such would leave the later ER radiology shift without his assistance during most of the busiest hours from 4 p.m. to 8 p.m. and created a hardship for Dr. Greenberg who often came in later than 9 a.m. because he helped his special-needs son get ready for summer camp in the morning.  Id.  Dr. Pulitzer conveyed to Dr. Greenberg that Dr. Reede was insisting on the schedule and was out to get him.  Id.  According to Dr. Greenberg, he and Dr. Pulitzer did not discuss his so-called recent erratic work schedule nor the threat that continuation of such would lead to discipline.  See id.  In response to his discussion with Dr. Pulitzer, on August 25, 2014, Dr. Greenberg wrote an email where he continued the discussion about an earlier, set schedule in which he points out its illogic but agrees to comply.  Ex. 3 (HHC_ESI_001006).  It is a response that neither in tone nor in the fact that it includes three of his colleagues supports the theory that what just occurred was a disciplinary counseling.  At his deposition when Dr. Pulitzer was questioned whether he made the statement to Dr. Greenberg that Dr. Reede was a like a cop and out to get him, Dr. Pulitzer stated that he could not remember whether he ever made this statement (as opposed to denying having ever made the statement to him).  Ex. 5 (Pulitzer Dep.) at 325.

**Response:**    Disputed to the extent statements are not supported by record evidence and are immaterial to the Health + Hospitals Defendants' motion.  Disputed to the extent the statements are argumentative and mischaracterize the record evidence. Disputed to the extent Plaintiff asserts that Dr. Pulitzer told Plaintiff that Dr. Reede was "like a cop and out to get him" as the testimony clearly establishes the fact is in dispute. Undisputed to the extent the documents, not including plaintiff's self-serving affidavit, speak for themselves, and as to the substance of the testimony given by Dr. Pulitzer.

### Events Leading Up To Dr. Greenberg's Request for FMLA Leave

11.    During the week of August 25, 2014, Dr. Greenberg was scheduled to be on vacation for at least part of the week.  Ex. 18 (HHC_ESI_000969-71).  In the email that Dr. Greenberg sent to Dr. Pulitzer on August 25, 2014, he also mentioned that despite the fact that he was on vacation he was going to attend a multi-disciplinary meeting at KCHC where he was to present his findings as to why certain serious cases in the ER were not timely read by the Radiology Department.  Ex. 3 (HHC_ESI_001006).  After Dr. Greenberg attended the multi-disciplinary meeting, he went down to ER to check in with his colleagues and he saw that no one was in the Radiology reading room.  Greenberg Decl., ¶ 8.  Because he had just attended a meeting where he attributed one of the causes for untimely reading of cases in ER Radiology to staffing cuts Dr. Greenberg felt morally obligated to start reading cases to help the department. Id.  According to Dr. Greenberg, Dr. Hammill, the colleague in charge of the department while Dr. Pulitzer was on vacation, welcomed the assistance.  Id.  Further, the official schedule of the department was revised on August 26, 2014 to the extent of indicating that Dr. Greenberg would be working for the rest of the week.  Ex. 19 (HHC_ESI_001044-45).

**Response:**      Disputed to the extent statements are not supported by record evidence.  Disputed to the extent the statements are argumentative and mischaracterize the record evidence.  Disputed to the extent the statements are immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the documents speak for themselves.

12.      On Friday, August 29, 2014, Dr. Greenberg and his wife learned by email that their special needs son was in all probability going to be transferred to a different school. Ex. 20 (G212-13); Ex. 1 (Greenberg Dep.) at 224-26.

**Response:**      Disputed to the extent the statements are immaterial to the Health + Hospitals Defendants' motion.

13.      Upon learning that Jayden was likely to have to attend a different school for the new academic year, Dr. Greenberg and his wife conferred and came to the decision that in light of his special bond with Jayden, Dr. Greenberg should take leave from work for a few days the following week in order to assist with any arrangements that needed to be made to facilitate the transfer and to provide love and support to his son while he made the difficult transition to another school.  Greenberg Decl., ¶ 9.  On the same day that he received the email from Gateway School, on August 29, 2014, Dr. Greenberg attempted to call Dr. Reede to notify her of his need for a leave.  Id.  Dr. Reede was on vacation and her voicemail was full and not taking any additional messages.  Id.  With Dr. Pulitzer also on vacation, Dr. Greenberg resorted to emailing Dr. Reede's assistant, Linda McMurren, to notify her of his need to take a few days off the following week "on an emergent basis."  Ex. 22 (HHC_ESI_001090).  Linda McMurren, like her boss Dr. Reede, was on vacation on August 29, 2014; she did not respond to this email until September 4, 2014.  Id.  Dr. Greenberg's first opportunity to have a discussion about his need for

a leave occurred on September 2, 2014, when Dr. Pulitzer arrived at work after his previous week's vacation.

**Response:**    Disputed as the statements are immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the documents speak for themselves.

14.    In attempting to reach out to Dr. Reede on the very same day that he learned that he would need a leave of absence the following week, Dr. Greenberg was following protocol in reaching out to Downstate's Department Chair to notify her of the need for an unexpected absence.  Ex. 59 (SUNY 000677).

**Response:**    Disputed to the extent the statements are immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the document speaks for itself.

### Dr. Greenberg's Three Discussions With Dr. Pulitzer About His Unexpected Family Leave

15.    After Dr. Pulitzer told Dr. Greenberg that Dr. Reede was like a cop looking to catch him, Dr. Greenberg approached Dr. Pulitzer on September 2, 2014 in order to obtain permission to take a multi-day leave related to his special-needs son's unexpected transfer from one school to another.  Ex. 17 (HHC_ESI_001063).  On the very same day that Dr. Greenberg sought the leave from Dr. Pulitzer, Dr. Pulitzer denied it.  Id. ("The operational needs of the department would not permit him to be off this week").  The next day Dr. Greenberg approached Dr. Pulitzer again stating that he needed to take the leave and was going to take it in any event.  Ex. 5 (Pulitzer Dep.) at 351-52; 355-56.  In response to Dr. Greenberg's statement that he was going to take the leave despite Dr. Pulitzer's denial of the request, Dr. Pulitzer testified that he sought the advice of Dr. Reede.  Id.  Dr. Reede told him to write a letter to Dr. Greenberg in which he expressly denied the leave request, ordered Dr. Greenberg to come to work on the days that he requested off and threaten to send him to Labor Relations if he failed to

show up for work.  Id. at 355-56.  According to Dr. Pulitzer's testimony, he wrote the letter that Dr. Reede told him to write then went to Dr. Greenberg to hand deliver it.  Ex. 5 at 358.  He read the contents of the letter to Dr. Greenberg.  Id.  Dr. Greenberg said in sum and substance you are making me choose between my job and my family to which Dr. Pulitzer responded in sum and substance that he was not making that choice.  Id. at 360. They had a conversation about each other's families for a few minutes and then he left Dr. Greenberg.  Ex. 50 (HHC_ESI_001087).

      **Response:**    Disputed to the extent that exhibit 17 does not indicate Plaintiff's leave was related to his special-needs son's unexpected transfer from one school to another. Disputed to the extent that it is clearly in dispute as to whether Dr. Pulitzer told Plaintiff that Dr. Reede was "like a cop".  Disputed to the extent the statement is argumentative and conclusory. Disputed to the extent the statements are immaterial to the Health + Hospitals Defendants' motion. Undisputed as to the substance of the testimony given by Dr. Pulitzer and to the extent the documents cited speak for themselves.

      16.    Dr. Greenberg contends that he notified Dr. Pulitzer from the outset that the reason he needed the time off in early September was to help Jayden with his transition to a new school.  Ex. 1 (Greenberg Dep.) at 228-29.  Dr. Pulitzer vehemently denied that Dr. Greenberg mentioned Jayden, a transition to a new school, and the need for Dr. Greenberg to be with his son to assist in this transition in the context of asking for this time off, which context included three separate discussions between them.  Ex. 5 (Pulitzer Dep.) at 341, 345 & 359. Pulitzer admitted at his deposition that if he had known that the needs of Jayden were involved in the request for leave he would have worked to accommodate the request.  Id. at 361.

**Response:** Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent Plaintiff contends there is a conflict and therefor a dispute as to the facts testified to by Dr. Pulitzer and Plaintiff.

17. At the time that Dr. Greenberg sought a multi-day leave to assist in making arrangements for his special-needs son's transfer to another school and provide to him love, care and support because this transition was likely to be very difficult for Jayden given his severe mental deficits, Dr. Greenberg was eligible for leave under the Family Medical Leave Act, as he worked full time at KCHC (i.e., at least 40 hours per week) continuously since 2010. Greenberg Decl., ¶ 2.

**Response:** Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion.

18. SUNY Downstate and KCHC are both entities that are instrumentalities of New York State and New York City respectively and therefore are "covered employers" as defined by the FMLA, meaning that they are obligated to provide FMLA leave for eligible requests. Greenberg Decl., ¶ 3.

**Response:** Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion.

19. Jayden Greenberg has a serious condition. He has been diagnosed with autism spectrum disorder from which he has suffered since he was two years old and continues to suffer from the condition to this date. Greenberg Decl.,¶ 4. Since before he was two and continuously to date, he has had services that include at least weekly speech therapy, occupational therapy, physical therapy, psychotherapy and social skills therapy. Id. Since Dr. Greenberg can remember, Jayden has had an Individualized Education Program. Id. Currently

and at the time relevant to this litigation, Jayden was medicated for anxiety and depression.  Id.  Around the time of events relevant to this litigation, in 2014, Jayden went to The Gateway School that caters to students with learning disabilities.  Id.  At The Gateway School, Jayden's education was informed by an Individualized Education Plan which contemplated that he would be in a special education class with no more than 8 students per teacher at all times.  Id.  It also contemplated that he would receive speech therapy and physical therapy twice per week and psychological counseling once per week.  Id.  During this time, as indicated above, he was also under the continuing supervision of a psychotherapist who treated him with medication for attention deficit disorder, along with depression and anxiety.  Id.  Due to his severe deficits, during the time relevant to the litigation, when he was about eight years old, Jayden was unable to dress, eat and groom himself without assistance from Dr. Greenberg or his wife or his teachers when he was at school.  Id.  In short, Jayden required adult supervision at all times.  Id.  During the time when Jayden learned that he had to go to a new school, around the time that Dr. Greenberg asked for a short-term leave at work, he was presenting with tremendous stress and anxiety and Dr. Greenberg was concerned that it would lead to incapacity.  Id.

**Response:**   Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion.

### Dr. Greenberg Takes His Family Medical Leave
### Despite Dr. Pulitzer's Threat Of Referral to Labor Relations

20.   Dr. Greenberg took off September 4 and 5, 2014 without the permission of Dr. Pulitzer and under the threat that in doing so he would be referred to Labor Relations.  In fact, Jayden did have to transition to a different school.  By the morning of September 4, 2014, Jayden's maternal grandmother arrived in town to assist Dr. Greenberg and his wife provide love, support and care to Jayden while he made the transition.  Ex. 1 (Greenberg Dep.) at 242.

**A1748**

On September 5, 2014, Dr. Greenberg wrote an email to Linda McMurren and carbon copied Dr. Pulitzer to provide an update as to his absence. Ex. 22 (HHC_ESI_001089-90). In this email, Dr. Greenberg related that he intended to come to work on September 4th but he threw his back out and was unable to come in because of it. Id. When questioned about this email at his deposition, Dr. Greenberg admitted that this email was written to provide an excuse for his absence since he was in fear of losing his job. Edgar Decl., Ex. 1 (Greenberg Dep.) at 246-47. When asked whether his resolve ever changed about not showing up for work on September 4 and 5, 2014, Dr. Greenberg testified no – that he always intended to stay at home to help Jayden. Id. at 242 & 247.

**Response:** Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent Plaintiff admitted that he did not disclose the reasons for his absence. Undisputed to the extent the document speaks for itself and to the extent that Plaintiff provided the cited testimony.

21. On September 4 and 5, Dr. Reede and Dr. Pulitzer were busy papering the proverbial file and conferring with Labor Relations in order to set in motion the disciplinary machine that awaited Dr. Greenberg upon his return. On September 4, 2014 at 2:48 p.m., Dr. Reede notified Labor Relations that Dr. Greenberg did not come into work as ordered. Ex. 23 (SUNYESI000000278). Michael Arabian of Labor Relations reached out to Dr. Pulitzer later that day to get complete details as to what occurred when he hand-delivered the September 3, 2014 letter to Dr. Greenberg denying his request for leave. Ex. 24 (SUNY 000494). Dr. Pulitzer responded to the inquiry by sending Mr. Arabian a memo that addressed much more than what Mr. Arabian sought: a detailed background as to Dr. Greenberg's allegedly disruptive behavior throughout the month of August in addition to what occurred surrounding the request for leave.

**A1749**

Ex. 25 (HHC 1135-36).  On the same day that he sent the memo to Mr. Arabian, September, 5, 2014, Dr. Pulitzer generated what appears to be a "predated" memo to the file on KCHC letterhead; it purported to summarize the discussion with Dr. Greenberg on August 22, 2014. Ex. 17 (HHC_ESI_001092).  Although the memo on KCHC letterhead omits use of the term "counseled" to describe this meeting (notably, the term was used in the unofficial memo to the file on September 2, 2014, Ex. 17 (HHC_ESI_001063)), it nonetheless suggests that the meeting was disciplinary in nature. Significantly, Dr. Pulitzer was in the habit of sending memos regarding personnel issues immediately upon being written to his administrative assistant, Sade Jemmott.  See, e.g., Ex. 17 (HHC_ESI_001062-63).  The "predated" memo bears the date August 22, 2014 but there is no indication that he sent this memo to Ms. Jemmott on that date; rather, he sent it to her and Dr. Reede on September 5, 2014.

**Response:**    Disputed to the extent the statement is argumentative, conclusory and immaterial to the Health + Hospitals Defendants' motion.  Disputed to the extent the record evidence does not support the statement. Undisputed to the extent the cited documents speak for themselves.

22.    At some point on September 5, 2014, Dr. Reede, Dr. Pulitzer and Mr. Arabian met to discuss Dr. Greenberg's referral to Labor Relations.  Ex. 5 (Pulitzer Dep.) at 363-72.  Dr. Pulitzer admitted that the meeting was arranged through Dr. Reede's office since she was familiar with Labor Relations and he was "a very, very new administrator." Id. at 363.

**Response:**    Disputed to the extent the statement is a immaterial to the Health + Hospitals Defendants' motion.  Undisputed as to the testimony given by Dr. Pulitzer.

**Dr. Greenberg's Return To Work After Taking His FMLA Leave**

23.     Dr. Greenberg returned to work on September 8, 2014 and was told by Dr. Pulitzer to report to Labor Relations immediately.  Ex. 5 (Pulitzer Dep.) at 373.  Dr. Greenberg reported to Labor Relations where he was interrogated by Mr. Arabian for approximately two hours regarding the circumstances arising from his request for a leave of absence, the denial of that request and what occurred on September 4th and 5th.  Ex. 26 (SUNY 001280-1314).  He was then asked to remain in his seat and in the room where he was interrogated for many hours while Mr. Arabian consulted with his supervisor as to the proposed terms of a settlement with Dr. Greenberg.  Greenberg Decl., ¶ 10.

**Response:**     Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion. Undisputed that Plaintiff returned to work on September 8, 2014 and was told to report to Labor Relations. Undisputed that Plaintiff reported to Labor Relations.

24.     What is notable about Dr. Greenberg's interrogation are the clear statements that he makes regarding the reasons why he sought a brief leave: that he had a special needs son; that this son was being transferred to a new school; that the son would find the transfer to be particularly difficult in light of his autism spectral disorder; and that his son needed him for love, care and support.  Ex. 26 (SUNY 001290-91, 1303-04, 1308-11).  In hearing these reasons, Mr. Arabian nonetheless did not probe Dr. Greenberg as to whether he presented these circumstances to Dr. Pulitzer when he asked for the leave nor did he appear to probe further himself to see if they might fall within the ambit of the Family Medical Leave Act.  At his deposition, when Mr. Arabian was asked whether he believed that the reasons that Dr. Greenberg stated for his request for a leave might qualify for the Family Medical Leave Act, he responded no.  Ex. 27 (Arabian Dep.) at 272.  Mr. Arabian admitted that he did not remember having any

training on FMLA while employed at SUNY; further, he believed that the issue of FMLA was associated with Human Resources and not Labor Relations. Id. at 270-71.

**Response:** Disputed as immaterial to the Health + Hospitals Defendants' motion.

25. After signing a settlement agreement presented to him by Mr. Arabian in circumstances that can fairly be described as under duress, Dr. Greenberg returned to work. While Dr. Reede and Dr. Pulitzer testified that they had nothing to do with the terms of the settlement agreement presented to Dr. Greenberg, it is noteworthy that Mr. Arabian testified that in his experience at SUNY Labor Relations a settlement agreement would not be presented to an employee without first running its terms by the department heads who would be affected by the agreement. Id. at 224-25. Here, the department heads were Dr. Reede and Dr. Pulitzer.

**Response:** Disputed to the extent the statement is immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the statement establishes that Plaintiff as well as Drs. Reede and Pulitzer were employed by the SUNY Defendants.

26. According to the terms of the settlement agreement, Dr. Greenberg could be terminated should he have any subsequent issues with: (1) unscheduled absences; (2) tardiness; (3) interference with the operations of the department; (4) insubordination or (5) misrepresentation of hours worked on timesheets. Ex. 29 (SUNY 006626-27). The terms of Dr. Greenberg's settlement were conspicuously harsh when compared to settlements reached with other staff in the Radiology Department around the same time: of the nine settlement agreements that defendants produced with respect to employees other than Dr. Greenberg who allegedly committed misconduct during the relevant period that warranted referral to Labor Relations only one stripped the employee of his or her protection of termination for cause in a manner similar to

Dr. Greenberg's settlement.  Ex. 30 (SUNY 6601-3, 6582-83, 6625, 6652-53, 6621-22, and 6654-57).

**Response:**      Disputed to the extent the statement is argumentative, conclusory, and immaterial to the Health + Hospitals Defendants' motion. Undisputed to the extent the settlement agreements speak for themselves.

### Dr. Reede's and Dr. Pulitzer's Close Surveillance of Dr. Greenberg

27.      Both Dr. Pulitzer and Dr. Reede intensified their already close scrutiny of Dr. Greenberg after he returned to work after the referral to Labor Relations.  On September 9, 2014, Dr. Greenberg wrote an email to Dr. Pulitzer in which he complained about the slow speed in which certain archived messages were accessed by his computer; he asked if a workaround was available.  Ex. 32 (HHC_ESI_001238).  Dr. Pulitzer requested that his assistant put this email in Dr. Greenberg's personnel folder.  Id.  On September 12, 2014, Dr. Pulitzer emailed Dr. Reede one of his updates and the first item that he addressed was Dr. Greenberg: "Will monitor time and attendance and number of cases read per day."  Ex. 33 (HHC_ESI_1243).   On September 15, 2014 at 8:52 a.m., Dr. Reede emailed Dr. Pulitzer and posed the question: "is Dr. Greenberg reading films?"  Ex. 34 (HHC_ESI_1259).  Dr. Pulitzer responded within 35 **minutes** with the answer, "Yes. He is."  Ex. 35 (HHC_ESI_1262).

**Response:**      Disputed to the extent the statement does not include citations to record evidence, is argumentative, conclusory, and immaterial to Health + Hospitals Defendants' motion. Undisputed to the extent the documents speak for themselves.

28.      On September 15, 2014, Dr. Greenberg wrote to Dr. Pulitzer and carbon copied Dr. Reede.  In this email, he provided his account of events that led up to his allegedly insubordinate leave of absence on September 4 and 5, 2014.  Ex. 36 (HHC 1529).  What is

particularly notable about this email is his return to the theme that he felt he had the right to take a leave of absence "for important family issues." Id. Here, Dr. Greenberg is expressly and in writing referencing a family issue that was the basis for his request. In response to this email, neither Dr. Reede nor Dr. Pulitzer responded to Dr. Greenberg; rather, they wrote to each other with Dr. Reede observing: "Dr. Greenberg is trying to cover his tracts [sic]." Ex. 37 (HHC_ESI_001274). To which Dr. Pulitzer responded: "Yes I have filed his email in his file. He is really all over the map." Id.

**Response:** Disputed to the extent the statement is argumentative, conclusory, and immaterial to Health + Hospitals Defendants' motion. Undisputed to the extent the documents speak for themselves.

29. Dr. Pulitzer testified that he related to Dr. Jamaleddine the circumstances that led to Dr. Greenberg's initial referral to Labor Relations for taking an unauthorized leave of absence on September 4 and 5, 2014. Ex. 38 (Pulitzer Dep. (2d)) at 23-24.

**Response:** Disputed as immaterial to Health + Hospitals Defendants' motion. Undisputed that Dr. Pulitzer gave the cited testimony.

### Dr. Greenberg's Alleged Violation of His Probation

30. On September 22, 2014, there was a Radiology Department meeting to which Dr. Greenberg arrived late. Greenberg Decl., ¶ 11. During the portion of the meeting that Dr. Greenberg attended, he understood that another hurdle had been placed on him and his already overly burdened colleagues – attestations that would have to be affixed to all studies that indicated whether attending physicians agreed or disagreed with residents' initial readings of films. Id. Dr. Greenberg was frustrated by this new requirement that would have him author language that he viewed as unnecessary and would add a step to the review of patient studies

with the likely consequence that it would cause a backlog in the flow of work.  Id.  When Dr.

Greenberg returned to the reading room at ER after the meeting, in his frustration, he authored an

attestation that met the insurers' requirements as far as he understood them but in a playful or, at

worst sarcastic, manner.  Id.  Having arrived late for the departmental meeting, he had no idea

that the attestations to be used were available as a macro from one of his colleagues.  Id.  Dr.

Greenberg started immediately affixing this attestation that he authored on studies that were

stale, clinicians had already acted upon and were on his desk because they were rejected by

insurers for lack of an attestation.  Id.

      **Response:**   Disputed as conclusory and immaterial to Health + Hospitals

Defendants' motion.  Disputed that Plaintiff did not know or should not have known what was

required of him by his employers simply because he may have been a few minutes late to a

meeting that he was required to attend.

      31.    On the very day that Dr. Greenberg's attestations were affixed to studies,

one of his colleagues, Dr. Velayudhan, alerted him that it was causing a stir in the hallways –

other physicians and radiologists were whispering about it.  Greenberg Decl. ¶ 12.  Dr.

Velayudhan suggested to Dr. Greenberg that he inquire as to whether he could modify the

attestation.  Id.  When Dr. Greenberg realized that his attestation was creating controversy, he

immediately took action.  He went to the IT Department to ascertain whether it was possible to

modify the attestation that he already affixed to studies.  Greenberg Decl., ¶ 12; Edgar Decl., Ex.

1 (Greenberg Dep.) at 291-93.  Notably, he did not request the IT Department to do so, as

defendants suggest; he merely asked whether it was possible.  Greenberg Dec., ¶ 12.  When one

of the employees in the IT Department responded that it was possible but he would get in trouble

for doing so, Dr. Greenberg reassured him that he would not ask him to do anything that was improper or would get him into trouble.  Id.; Ex. 1 (Greenberg Dep.) at 293.

> **Response:**    Disputed to the extent the statement is self-serving, conclusory, and immaterial to Health + Hospitals Defendants' motion. Undisputed as to whether plaintiff gave the cited testimony.

32.    Notably, Dr. Pulitzer, who according to his account of the attestation episode at his deposition and in his affidavit, viewed its distribution as a grave act of misconduct that was allegedly beyond the pale, never discussed the episode with Dr. Greenberg.  Ex. 5 (Pulitzer Dep.) at 148-50; Greenberg Decl., ¶ 13.  In the immediate aftermath of the discovery of Dr. Greenberg's attestations, Dr. Pulitzer convened meetings with the Chief Medical Officer of KCHC, Dr. Ghassan Jamaleddine, and the Legal Department at KCHC to obtain guidance as to how he should proceed both with respect to the studies that had the attestation and what, if any, disciplinary measures should be imposed on Dr. Greenberg; Dr. Jamaleddine was of the opinion that Dr. Greenberg must be terminated; in fact, he made it clear that he would not allow Dr. Greenberg to practice anymore at KCHC.  Ex. 38 (Pulitzer Dep. (Second)) at 42.  Dr. Reede and Dr. Pulitzer were both of the opinion that Dr. Greenberg should be terminated.  Ex. 28 (Bernadel Dep.) at 9; Ex. 5 (Pulitzer Dep.) at 420-421.  According to Dr. Pulitzer, Dr. Greenberg's use of the attestation suggested that "something had changed in him" and was therefore unfit for continued practice at KCHC.  Ex. 5 (Pulitzer Dep.) at 115.

> **Response:**    Disputed to the extent the statement mischaracterizes the testimony given by Dr. Pulitzer, and to the extent the statement is immaterial to the Health + Hospitals Defendants' motion.

33.     On September 24, 2014, Dr. Pulitzer sent a memo to Labor Relations in order to report two incidents that he viewed as violations of the terms of Dr. Greenberg's Settlement Agreement with Labor Relations.  Ex. 39 (SUNY000863-65).  The second incident described was the attestation that created a stir.  Id. (SUNY000863).  The first incident was Dr. Greenberg's alleged insubordination in leaving the ER without authorization after Dr. Pulitzer denied his request to be permitted to take a few hours off in the afternoon in addition to an authorized absence that he took in the morning to deal with funding issues related to Jayden's education.  Id.; Ex. 44 (HHC 1526).  Dr. Greenberg testified that he did not leave ER without authorization; rather, during the time in dispute, which was about 1 hour and 40 minutes, he conferred with another radiologist and then other clinicians at the ER and then for about 40 to 50 minutes he crossed the street to eat lunch at the SUNY campus, which he was allowed to do without asking for leave.  Ex. 1 (Greenberg Dep.) at 300-305; 308-09.  Dr. Pulitzer never approached Dr. Greenberg to get his account of this alleged unauthorized absence from the ER. Greenberg Decl., ¶ 13.

**Response:**     Disputed to the extent the statement is immaterial to Health + Hospitals Defendants' motion. Undisputed as to what Plaintiff testified to. Undisputed as the documents speak for themselves.

34.     In a letter sent by Labor Relations dated October 3, 2014, Dr. Greenberg was notified that he was to report to Labor Relations on October 8, 2014 for another interrogation regarding alleged misconduct.  Ex. 40 (SUNY000014).  The interrogation was rescheduled to October 10, 2014 and continued on October 20, 2014.  Ms. Bernadel of Labor Relations was in charge of the second referral of Dr. Greenberg to Labor Relations.  In the course of her investigation, she spoke to Dr. Pulitzer in advance of the first interrogation. Ex. 31

(SUNY 429-30).  On October 14, 2014, she interviewed three radiologists who attended the September 22, 2014 meeting where attestations were discussed.  Ex. 41 (SUNY 448-49 & 1252). The radiologists had varying accounts of the status of the attestations, i.e., whether there was an official policy at the time that Dr. Greenberg created his.  Notably, Dr. Rhonda Osborne stated that she was unsure whether a final attestation form had been established at the time.  Id. (SUNY 1252).  Around the time of the second interrogation, Ms. Bernadel, along with her supervisor Leonzo Cuiman, spoke with Dr. Reede and Dr. Pulitzer either individually or together.  Ex. 28 (Bernadel Dep.) at 9.  According to Ms. Bernadel's account, she and Mr. Cuiman merely presented their findings of facts to Dr. Reede and Dr. Pulitzer as to Dr. Greenberg's conduct; in light of those facts, Dr. Reede and Dr. Pulitzer decided to terminate Dr. Greenberg.  Id.; Ex. 5 (Pulitzer Dep.) at 420-421.

**Response:**    Disputed to the extent the statement mischaracterizes the cited testimony, and is immaterial to the Health + Hospitals Defendants' motion.

35.    Dr. Pulitzer testified that he repeatedly consulted with Dr. Jamaleddine about Dr. Greenberg's conduct in September of 2014, including Dr. Greenberg's use of an unauthorized attestation, and with respect to the decision to terminate Dr. Greenberg's employment.  Ex. 5 (Pulitzer Dep. ) at 136-38; 189-193; 438-39.

**Response:**    Disputed to the extent the statement mischaracterizes the cited testimony, and is immaterial to the Health + Hospitals Defendants' motion.

Date:   New York, New York
        September 14, 2018

By:            /s
        RYAN G. SHAFFER

A1759

**A1760**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ODED GREENBERG, M.D.,

     Plaintiff,

   - against -

STATE UNIVERSITY HOSPITAL-
DOWNSTATE MEDICAL CENTER a/k/a
THE STATE UNIVERSITY OF NEW YORK
HEALTH SCIENCE CENTER AT
BROOKLYN a/k/a SUNY DOWNSTATE
MEDICAL CENTER, NEW YORK CITY
HEALTH AND HOPSITALS
CORPORATION, KINGS COUNTY
HOSPITAL CENTER, DEBORAH L. REEDE,
STEVEN PULITZER, AND JOHN and JANE
DOES 1-20,

     Defendants.

--------------------------------------------------------x

    **MEMORANDUM & ORDER**
    15-CV-2343 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

  Plaintiff Oded Greenberg, M.D., brings this action, alleging various types of employment-related discrimination, against Defendants State University Hospital-Downstate Medical a/k/a The State University of New York Health Science Center at Brooklyn a/k/a SUNY Downstate Medical Center ("SUNY"); Individual Defendants Deborah L. Reede and Steven Pulitzer ("SUNY-Employees"); New York City Health and Hospitals Corporation ("HHC"); and Kings County Hospital Center ("KCHC").  Plaintiff asserts 28 causes of action, *i.e.*, violations of the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); Title VII of the Civil Rights Act of 1964 ("Title VII"), as codified, 42 U.S.C. Sections 2000e *et. seq.*; Sections 1981 and 1983 of Title 42 of the United States Code, 42 U.S.C. §§ 1981, 1983 ("§ 1981" and "§ 1983," respectively); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et.*

*seq.* (*See* Second Amended Complaint ("SAC"), Dkt. 23, ¶ 8.)  Plaintiff seeks relief in the form

of damages, declaratory relief, and permanent injunctive relief.  (*Id.* at 30–31.)  Currently before

the Court are dispositive motions for summary judgment from SUNY and the SUNY-Employees

(collectively "SUNY-Defendants"), and KCHC and HHC.  For the following reasons the Court

grants Defendants' motions, in full, and dismisses the case.

## BACKGROUND

I.      **Facts**[1]

        A.      **Parties to this Action**

Plaintiff is a white, Jewish man who was 54 or 55 years old at the time he was terminated

from his employment with Defendant SUNY.  (SUNY-Defendants' 56.1 Statement ("S-Defs.'

56.1"), Dkt. 77, ¶ 1; Plaintiff's 56.1 Statement in Response to SUNY-Defendants' Motion ("Pl.'s

56.1-1"), Dkt. 92, ¶ 1; Plaintiff's Declaration, dated July 6, 2018 ("Pl.'s Decl."), Dkt. 94, ¶ 1.)

Plaintiff is a board-certified radiologist authorized to practice in the State of New York (Plaintiff's

56.1 Statement in Response to KCHC & HHC's Motion, Dkt. 91, ¶ 1) who began his employment

at SUNY in 2001, and was assigned to the KCHC emergency room, pursuant to an affiliation

agreement (Pl.'s Decl., Dkt. 94, ¶ 2).  Plaintiff worked as a SUNY employee assigned to KCHC

---

[1] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a party's 56.1 statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to the underlying document.  The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)).  Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).

from 2001 until his termination in October 2014, with the exception of a brief hiatus to stay at home to assist with the care of his special-needs son.  (Pl.'s 56.1-1, Dkt. 92, ¶ 1; Pl.'s Decl., Dkt. 94, ¶ 2.)

Defendant SUNY is a legal entity constituted under N.Y. Educ. Law §§ 351 *et seq.*  SUNY Downstate is a subdivision of SUNY and is not a legally-cognizable entity separate from SUNY. (S-Defs.' 56.1, Dkt. 77, ¶ 4.)  SUNY employs a number of radiologists who practice at KCHC, a hospital operated by New York City that is across the street from SUNY Downstate, through an affiliation agreement.  (*Id.* ¶ 1; *see generally* Affiliation Agreement, Dkt. 81-10.)

Defendant HHC "is a body corporate and politic constituting a public benefit corporation existing and organized under the laws of the State of New York pursuant to Chapter 214-A of the New York Consolidated Laws."  (KCHC's & HHC's Answer[2] to Plaintiff's Second Amended Complaint, Dkt. 25, ¶ 3.)

KCHC is a hospital administered by HHC and maintains an affiliation agreement with SUNY-Downstate.  (*Id.* ¶ 4.)  Pursuant to that affiliation agreement, Plaintiff was assigned by Defendants to perform his employment duties as a radiologist at KCHC.  (*Id.*)

Defendant Dr. Deborah Reede is an African-American, non-Jewish, female physician, who was 67 years old at the time this lawsuit was filed.  (S-Defs.' 56.1, Dkt. 77, ¶ 2; Pl.'s 56.1-1, Dkt. 92, ¶ 2.)  In 2013, Dr. Reede was appointed Chair of the Radiology Department at SUNY Downstate.  (S-Defs.' 56.1, Dkt. 77, ¶ 2.)

---

[2] *See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation."); *Secs. & Exch. Comm'n v. Penn*, 225 F. Supp. 3d 225, 234 (S.D.N.Y. 2016) (assuming truth of "admissions in [the defendant's] answer" for purposes of summary judgment).

Defendant Dr. Stephen Pulitzer is a white, Jewish, male physician, who was 51 years old at the time this lawsuit was filed. (*Id.* ¶ 3; Pl.'s 56.1-1, Dkt. 92, ¶ 3; Dr. Pulitzer's March 26, 2018 Declaration ("Pulitzer Decl."), Dkt. 79, ¶ 2.) In July 2014, Dr. Pulitzer was appointed the Interim Chair of the Radiology Department at KCHC, the full Chair of the KCHC Radiology Department in January 2015, and the Chief Medical Officer at KCHC in November 2016. (Pl.'s 56.1-1, Dkt. 92, ¶ 3; Pulitzer Decl., Dkt. 79, ¶ 2.) In those roles, Dr. Pulitzer acted as the site director, with responsibility for the daily operations of KCHC's Radiology Department. (*Id.* ¶ 3.) During the relevant time period, Dr. Pulitzer was a SUNY employee, working at KCHC through an affiliation agreement. (Pulitzer Decl., Dkt. 79, ¶ 2.)

### B.     The ACGME Report

SUNY Downstate is a teaching hospital, and in April 2014, the Radiology Department's residency program was put on academic probation by the Accreditation Council for Graduate Medical Education ("ACGME"), the body responsible for accrediting the majority of graduate medical training programs for physicians in the United States. (Pl.'s 56.1-1, Dkt. 92, ¶ 5; ACGME April 15, 2014 Report, Dkt. 87-1.) The ACGME noted in its findings that "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule." (ACGME Report, Dkt. 87-1, at 2; Pl.'s 56.1-1, Dkt. 92, ¶ 6.) The Department was further criticized for not demonstrating that "an appropriate level of supervision is in place for all residents," and it was found that "faculty do not demonstrate a strong interest in the education of the residents." (ACGME Report, Dkt. 87-1, at 2.) On April 9, 2014, Dr. Reede met with Dr. Ross Clinchy, a physician from the Dean's Office at SUNY and the KCHC Chief Medical Officer at that time, to discuss changes they believed necessary to fix issues in the Radiology Department. (Pl.'s 56.1-1, Dkt. 92, ¶ 8.) Dr. Reede (1) proposed replacing a number of faculty members,

primarily based on teaching evaluations, and providing short-term extensions for several others, and (2) emphasized the need for monitoring of faculty member performance, increased work performance for physicians, productivity monitoring, and monitoring of teaching and scholarly activity. (Pl.'s 56.1-1, Dkt. 92, ¶ 9; Deposition of Dr. Deborah Reede ("Reede Dep."), Dkt. 81-19, at 70:12–22; Deposition of Dr. Ghassan Jamaleddine ("Jamaleddine Dep."), Dkt. 87-61, at 101:11–17.) The group also agreed to replace the then-current Chief of Radiology, Dr. Allen Cantor. (Jamaleddine Dep., Dkt. 87-61, at 103:19–104:24.) On June 23, 2014, the Department announced that five SUNY Downstate radiologists would not be renewed. (Dr. Reede's March 26, 2018 Declaration ("Reede Decl."), Dkt. 80, ¶ 9).) Plaintiff's contract was renewed in June 2014. (*See id.*; Reede Reply Decl., Dkt. 98, ¶ 4.)

Following the non-renewal of the five radiologists,[3] on June 23, 2014, Plaintiff e-mailed Dr. Cantor (former Chief of the Radiology Department), that "[t]here is a special place in Hell for the administration and the powers that be for what has happened here. . . . [and] [h]opefully I will remain employed at least long enough to make a certain someones [sic] life miserable." (Dkt. 87-3, at 2.)

## C.   Defendant Dr. Reede's Alleged Anti-Jewish Bias

In support of his allegations of SUNY Defendants' anti-Jewish bias, Plaintiff submits a declaration sworn to by Esther Neiman, who was the full-time Medical Student Coordinator for the University Physicians of Brooklyn, an affiliate of SUNY Downstate's Radiology Department. (Esther Neiman's June 27, 2018 Declaration ("Neiman Decl."), Dkt. 93, ¶ 2.) Ms. Neiman worked

---

[3] There is no admissible evidence in the record indicating the religious affiliations of the five radiologists whose contracts were not renewed. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (requiring admissible evidence in opposition to summary judgment).

at SUNY Downstate five days per week, from about 10 am. to 6 p.m., from approximately 2002 until December of 2013.  (*Id.*)  In her declaration, Ms. Neiman states that her position required daily contact with Dr. Reede in 2013 and that she sat within earshot of Dr. Reede's office.  (*Id.* ¶ 3.)  According to Ms. Neiman, after Dr. Reede became the Chief of SUNY Downstate's Radiology Department, she referenced several Orthodox Jewish physicians as "you people" and "those people," was openly upset that Orthodox Jewish physicians would meet for midday prayers, and took as her own office a room that the Orthodox Jewish physicians had used for their midday prayers, and then announced that physicians would not be allowed to meet to pray during the workday on department premises.  (*Id.* ¶¶ 4–6.)  Dr. Reede disputes that she made any of these remarks.  (*See* Dr. Reede's September 14, 2018 Declaration ("Reede Reply Decl."), Dkt. 98, ¶ 5.)

### D. Plaintiff's Work Performance Issues

On May 5, 2014, following the ACGME Report, Dr. Reede "met with Plaintiff to discuss an incorrect time entry from April 21, 2014" and "reminded Plaintiff that his job responsibilities require him to be present for consultations as well as resident supervision and education[.]"  (S-Defs.' 56.1, Dkt. 77, ¶ 14 (quotation marks omitted); *see also* Reede Dep., Dkt. 87-59, at 142:22–143:9.)[4]  On May 8, 2014, at a SUNY Downstate Radiology Department meeting, Dr. Reede "reminded all of the attending radiologists in the department that 'everyone [must] document[] accurate information on their timesheets.'"  (S-Defs.' 56.1, Dkt. 77, ¶ 15.)  At a KCHC Radiology Department meeting on June 26, 2014, Dr. Pulitzer noted that time and attendance will be monitored and time sheets must be accurate.  (*Id.*)

---

[4] Plaintiff does not contest that this meeting occurred but disputes any suggestion that it was a disciplinary meeting.  (Pl.'s 56.1-1, Dkt. 92, ¶ 14.)

SUNY-Defendants contend that beginning in late July or August 2014 Plaintiff's work schedule became unpredictable.  (*Id.* ¶ 16.)  Dr. Pulitzer testified that Plaintiff was "coming in late, he was on occasion leaving early.  I often didn't know what time he was going to be in that day . . . I couldn't reliably plan the schedule."  (Deposition of Dr. Steven Pulitzer ("Pulitzer Dep."), Dkt. 87-57, at 305:23–306:9.)  Dr. Reede testified that she received reports that Plaintiff was sometimes not available when "residents would be looking for him."  (Reede Dep., Dkt. 87-59, at 142:22–143:9.)   Additionally, an August 22, 2014 memorandum, submitted by SUNY-Defendants, outlines five days between July 28 and August 7, 2014, when Plaintiff did not adhere to standard working hours.  (Dkt. 87-18.)

In August 2014, Plaintiff originally requested vacation time for August 11–22, 2014, but on August 13, he emailed Dr. Pulitzer, who was himself on vacation, and asked if he (Plaintiff) could return the following week and instead use his vacation time during the week of August 25.  (S-Defs.' 56.1, Dkt. 77, ¶ 19.)  Despite his then-scheduled vacation during the week of August 25, 2014, Plaintiff returned to work on August 26.  (*Id.* ¶ 21.)  Dr. Pulitzer contends that he received reports that Plaintiff was working "erratic hours," and that his time sheet indicates that, instead of working 9:30 a.m. to 5:30 p.m., he claimed to have worked from 11 a.m. to 7 p.m. three days that week and 10 a.m. to 6 p.m. another day that week.  (*Id.* ¶ 21.)  Data from the "talk station"[5] showed that, at the time, Plaintiff was frequently not reading his first film until after 10:30 a.m.  (Dkt. 87-

---

[5] SUNY-Defendants explain that "Talk Station data comprises information about a particular film, including which radiologist read the film, and when the film was opened and signed for by a radiologist.  By reviewing the data for one day, an approximation of when a radiologist started and stopped reading film can be discerned."  (Dkt. 78, at 8 n.2 (citing Pulitzer Decl., Dkt. 79, ¶ 6 (internal citation omitted)).)  Plaintiff disputes whether Talk Station data is an accurate measure as to when radiologists are at work because the data is only first captured when a radiologist *completes* his or her first study, and not when the film is first opened for review.  (Pl.'s Decl., Dkt. 94, ¶ 5.)

**A1767**

18, at 2).  Defendants contend that Plaintiff "maintained erratic hours" on multiple dates in August, necessitating Dr. Pulitzer to counsel him "on issues of time and attendance."  (*Id.*; Dkt. 87-17, at 2; Dkt. 87-18, at 2).)

Plaintiff disputes SUNY Defendants' characterization of these events.  Plaintiff insists that his schedule cannot be criticized as "erratic" as he "was scheduled to be off [that week] but instead decided to work both because his vacation plans fell through and the Department appeared to need the assistance."  (Pl.'s 56.1-1, Dkt. 92, ¶ 21.)  Moreover, Plaintiff asserts, his schedule conformed with the busiest hours and the Department's "acute need."  (*Id.*)  Plaintiff further claims that when he saw that his Department was understaffed, he felt "morally obligated . . . to pitch in," and that the physician supervising the department while Dr. Pulitzer was on vacation "appeared to welcome [Plaintiff's] assistance that week and never complained about [his] presence."  (Pl.'s Decl., Dkt. 94, ¶ 8.)

Plaintiff also claims that he was not approached by Dr. Pulitzer about his allegedly erratic hours in August until August 22, 2014.  (Pl.'s 56.1-1, Dkt. 92, ¶ 16.)  Plaintiff further avers that although Dr. Pulitzer stated at a Departmental meeting that radiologists were expected to arrive at KCHC by 9 a.m., the "delay in applying the requirement to [Plaintiff] suggests that the set, earlier schedule did not apply to him, which it did not historically."  (*Id.*)  Plaintiff further disputes that he was "counseled or warned" about his hours, but acknowledges that "[i]n mid-to late August of 2014, [Dr.] Steve Pulitzer approached [him] at work about [his] schedule . . . [and] related to [him] . . . that Dr. Reede wanted [him] to start to adhere to a set work schedule of 9 a.m. to 5 p.m."  (Pl.'s Decl., Dkt. 94, ¶ 7.)  According to Plaintiff, he responded that "such a schedule made no sense," in light of the Department's work-flow, and that the prior Service Chief of Radiology at KCHC, Dr. Cantor, had "pushed" a 4 p.m. to 8 p.m. schedule that was "compromise[d] to the extent that

**A1768**

[Plaintiff] tended to come in around 10 or 11 a.m. and work for 8 hours from that point." (*Id.*) Plaintiff states that he "agreed to the new set schedule once school [for his special-needs child] was underway in September." (*Id.*)

### E.      Failure to Promote Plaintiff in July 2014

In July 2014, Dr. Reede denied Plaintiff's application for reappointment and promotion to the position of Director of KCHC's ER Radiology Department. (*Id.* ¶ 6.) Around July 2014, Dr. Reede fired the then-current Director of ER Radiology, a physician of Orthodox Jewish faith, and hired Dr. Jinel Scott-Moore, a black non-Jewish radiologist who was younger than Plaintiff[6] and whom Plaintiff had supervised during her residency a few years earlier. (Pl.'s Decl., Dkt. 94, ¶ 6.) According to Plaintiff, Dr. Reede told Plaintiff that she hired Dr. Scott-Moore because she wanted someone closer to residency who could relate better to and educate resident physicians. (*Id.*) Defendants dispute that Dr. Reede made that statement, and offer that the statement is nevertheless neutral as to age. (S-Defs.' Reply 56.1, Dkt. 97, ¶ 10.) In her deposition, Dr. Reede testified that she hired Dr. Scott-Moore "because she had expressed a strong interest in academics . . . and she had very good reports from the residents regarding her teaching." (Reede Dep., Dkt. 87-59, at 124:10–22.) According to Dr. Reede, Dr. Scott-Moore also had "more interest in scholarly activity than [Plaintiff] at the time [Dr. Reede] decided on a new Chief of ER Radiology." (*Id.* at 131:15–132:25.) Plaintiff admits that when SUNY Downstate asked him to submit a form detailing his "research/scholarly activity with residents," he wrote that he "spen[t] zero hours," but claims in his declaration that he "did not understand what exactly was meant by this category" and that he

---

[6] Because Plaintiff's statements about the former ER Radiology Director's religion and Dr. Scott-Moore's race and age could be based on his personal observations of these individuals, as opposed to statements made to him, the Court does not preclude consideration of this evidence as inadmissible hearsay.

"was interested in academic research and scholarship in 2014."  (Pl.'s Decl., Dkt. 94, ¶ 14.)

Plaintiff cites the fact that "in 2013, for example, [he] and fellow radiologists and residents had

two case reports published."  (*Id.*)  Plaintiff does not state whether his employer was made aware

of those publications.  Dr. Reede also noted in her deposition that both Plaintiff and the other

physician being considered at that time for promotions had issues relating to "time and attendance

and availability."  (Reede Dep., Dkt. 87-59, at 137: 18–25.)[7]

### F.      Plaintiff's FMLA Request

Plaintiff's child has special needs due to his disability.[8]  Dr. Pulitzer does not dispute that

he was aware that Plaintiff has a special-needs child.  (SUNY-Defs.' Reply 56.1, Dkt. 97, ¶ 17.)

On August 29, 2014, Plaintiff was told by the child's school that due to difficulties relating to his

disability, the school could not continue to educate him, which, according to Plaintiff, required

him to take emergency leave at that time to care for his son.  (Pl.'s Decl., Dkt. 94, ¶ 9.)  Plaintiff

states that he called Dr. Reede to notify her that same day, but her voicemail was full so he could

not leave her a message and that he could not ask Dr. Pulitzer about his need for leave because Dr.

Pulitzer was on vacation at the time.  (Pl.'s 56.1-1, Dkt. 92, ¶ 22; Pl.'s Decl., Dkt. 94, ¶ 9.)  The

next day, Plaintiff inquired of Dr. Reede's assistant about the proper steps for taking emergency

---

[7] SUNY-Defendants have proffered multiple e-mails documenting alleged issues with Plaintiff's time, attendance, and behavior.  (*See, e.g.*, Dkts. 87-5, 87-6, 87-7, 87-8.)

[8] Plaintiff's child, J.G., was diagnosed with autism spectrum disorder at the age of two years old, and has also been diagnosed with depression, anxiety, and attention deficit disorder. (Pl.'s Decl., Dkt. 94, ¶ 4.)  Since prior to the age of two, and continuously to date, he has received services including weekly speech therapy, occupational therapy, physical therapy, psychotherapy, and social skills therapy.  (*Id.*)  J.G. also has an Individualized Education Program, and has attended a school that caters to children with learning disabilities.  (*Id.*)  J.G. is medicated for anxiety and depression.  (*Id.*)  During the time relevant to the litigation, J.G. was eight years old and "unable to dress, eat and groom himself without assistance . . . requir[ing] adult supervision at all times."  (*Id.*)

leave but received no response.  (Pl.'s Decl., Dkt. 94, ¶ 9.)  On or about September 2, 2014, Plaintiff spoke with his immediate superior, Dr. Pulitzer, to inform him of his need for a two-day leave on September 4 and 5, 2014.  (*Id.*; *see also* Pulitzer Decl., Dkt. 79, ¶ 9.)  SUNY-Defendants contest whether Plaintiff advised Dr. Pulitzer or anyone else at SUNY Downstate that the reason Plaintiff needed leave on September 4 and 5 was to care for his child with autism.  (Pulitzer Dep., Dkt. 87-57, at 344:5–9; 345:16–346:12; 359:16–22); *see also* Pulitzer Decl., Dkt. 79, ¶ 9.)  It is uncontested, however, that Dr. Pulitzer told Plaintiff that the department was short-staffed and that Plaintiff could not take those days off.  (Pl.'s Decl., Dkt. 94, ¶ 9.)  Plaintiff reiterated his request to Dr. Pulitzer on September 3 (still without stating that the reason was to take care of Plaintiff's child, according to Defendants), after which Dr. Pulitzer consulted with Dr. Reede and then presented Plaintiff with a letter stating that his request was denied, and that if he failed to appear for work on those days, the matter would be referred to "Labor Relations."  (Pulitzer Decl., Dkt. 79, ¶¶ 9–10.)  Plaintiff contends he then told Dr. Pulitzer that he did not think it was fair that Drs. Reede and Pulitzer were forcing him to choose between his career and family, and that he had no alternative but to address the urgent family leave.  (Pl.'s 56.1-1, Dkt. 92, ¶ 27.)  Dr. Pulitzer replied: "I hope you know what you are doing."  (Pulitzer Dep., Dkt. 87-57, at 360:4–10.)  On September 4, 2014, which was a Thursday, Plaintiff emailed Linda McMurren, Dr. Reede's assistant, to confirm that he was not coming in that day "due to important family issues," the nature of which he did not specify.  (S-Defs.' 56.1, Dkt. 77, ¶ 28; Dkt. 87-26, at 2.)

On Friday, September 5, 2014, Plaintiff e-mailed Ms. McMurren again, copying Dr. Pulitzer, and stating that he "was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out."  (S-Defs.' 56.1, Dkt. 77, ¶ 29; Dkt. 87-21, at 2.)  During his deposition, Plaintiff testified that he wrote this

**A1771**

e-mail to provide an excuse for his absence as he was in fear of losing his job. (Deposition of Oded Greenberg ("Pl.'s Dep."), Dkt. 95-1, at 246:14–247:16.) Plaintiff then attempted to return to work on September 8, 2014. (Pl.'s Decl., Dkt. 94, ¶ 10.) It is undisputed that he notified Ms. McMurren that he would be late because he had to seek medical treatment for his back injury. (S-Defs.' 56.1, Dkt. 77, ¶ 30.) After Plaintiff reported to work on September 8, he was instructed to report to the Labor Relations office. (*Id.* ¶ 31.) Plaintiff's meeting with Labor Relations was recorded, lasted for approximately four hours, and during which time, according to Plaintiff, he was not permitted to leave the room to eat, stretch, or take the pain medication he had been prescribed that morning for his recent back condition. (Pl.'s Decl., Dkt. 94, ¶ 10.)

During the meeting, Plaintiff admitted that he was "on the [Department's] schedule as 9 to 5," but he would occasionally "come in later and stay[] later," sometimes arriving at 10-10:30 or even "a little bit later." (Pl.'s 56.1-1, Dkt. 92, ¶ 32.) Plaintiff further stated that "if I come in late it doesn't make any difference. I stay a little bit later. I've been keep—adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening." (*Id.*) When Plaintiff was asked whether he had the authority to make his own schedule, he replied that he felt that he had the "moral authority to do so." (*Id.*) Plaintiff admitted that he had recently been told by Dr. Pulitzer to adhere to set hours, which he assumed were "9 to 5 as written on the schedule." Plaintiff promised during the meeting that he would abide by "the cookie cutter hours that they require . . . from now on." (*Id.*)

In discussing his September 4 and 5, 2014 absences, Plaintiff stated during the meeting that "I have a child with special needs and he was kicked out of his school and he was to attend a new school and I had to spend time with him." (Dkt. 87-24, at 11–12).) However, Plaintiff also stated that when he was absent on September 4 and 5, his mother-in-law came to help with his son, and he "had initially planned to take the day off, . . . [but] I rolled out of bed and I – and I stretched

**A1772**

my back out and I've been in pain and not able to be mobile since then."  (*Id.* at 12; *see also* Pl.'s 56.1-1, Dkt. 92, ¶ 33.)

> At the meeting, Plaintiff signed an agreement where
>
> [i]n lieu of [his] . . . being served a Notice of Discipline for: (1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department; (4) insubordination; (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, switching schedule without authorization of his supervisor, all parties agree that [Plaintiff] shall have a fine ranging from a letter of reprimand to termination from state service held in abeyance until one year from the signing of this agreement.

(Settlement Agreement, Dkt. 87-29, ¶ 1.)  The Agreement further specified that Plaintiff's work schedule would be from 9 a.m. to 5 p.m. on Monday through Friday, and that Plaintiff "understands that he must accurately list the hours that he works . . . [and] that day's [*sic*] off/vacation/changes to vacation need to be approved by his supervisor."  (*Id.* ¶ 2.)  The Agreement "placed [Plaintiff] on Time and Attendance Watch," requiring him to "submit verifiable documentation for each unscheduled absence; including non-medical absences," and outlined specific procedures for those requests.  (*Id.* ¶ 3.)  The Agreement further waived Plaintiff's rights to bring any suit, civil action, legal claim, or to impose liability in any forum with respect to SUNY or any SUNY employee. (*Id.* ¶ 6.)  Lastly, the Agreement noted that Plaintiff "voluntarily waived his right to legal or union representation," and "represented himself in this matter."  (*Id.* at ECF[9] 3.)  Plaintiff, however, asserts that he "did not negotiate the terms of the Settlement Agreement and signed it without reviewing it carefully . . . [as he] was in acute pain from back spasms during the time that he sat through the Interrogation . . . a time period spanning approximately 4–5 hours."  (Pl.'s 56.1-1, Dkt. 92, ¶ 36.)  Plaintiff eventually submitted time sheets claiming September 4 and 5, 2014 as sick

---

[9] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

days.   (Dkt. 87-32, at 5.)   Plaintiff's sick leave accruals were charged, and he received compensation for those days.  (*Id*.)

Several weeks later, around September 23, 2014, Plaintiff advised Dr. Pulitzer that he needed to take a leave for approximately two hours.  (S-Defs.' 56.1, Dkt. 77, ¶ 44.)  Plaintiff states that he "asked for the additional leave in order to attend further meetings related to the funding for the education of his special needs son, J[]," but does not indicate that this information was communicated to SUNY-employees. (Pl.'s 56.1-1, Dkt. 92, ¶ 44.) Dr. Pulitzer denied the request, claiming insufficient staffing.  (*Id.*) Plaintiff then arranged for another physician to cover for him and used his lunch hour to attend to the family matter.  (S-Defs.' 56.1, Dkt. 77, ¶ 45.)  SUNY-Defendants maintain that Plaintiff was off-site for at least two hours, as evidenced by the Talk Station data, and that the physician asked to cover for Plaintiff was unable to read neuroradiology cases, which left the emergency room with inadequate coverage.  (*Id.* ¶ 45.)

## II.    Plaintiff's Unapproved Attestations

An attestation is "a written statement made by an attending physician to certify that he or she ha[s] reviewed a patient's report and that the report is now final."  (Pulitzer Decl., Dkt. 79, ¶¶ 12, 13.)  It is a "legal document[] that [is] vital to hospital billing, and non-conforming ones could trigger an investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well as potential financial liability."  (*Id*.)  CMS requires attestations in a standard format on all reports initially read by a resident, and three standard attestations for use of the Radiology Department were approved by SUNY's Risk Management Department.  (Reede Decl., Dkt. 80, ¶ 14; Dkt. 87-

33, at 3).)[10]  Once an attestation is added to a patient's record it cannot be deleted and becomes part of the permanent record.  (Pulitzer Dep., Dkt. 87-57, at 265:23–266:2.)  Plaintiff complained on numerous occasions about the requirement to use attestations.  (*See* Pl.'s Decl., Dkt. 94, ¶ 11 ("I have no doubt that I may have expressed my frustration with this new requirement to some of my colleagues.").)  For example, one of Plaintiff's colleagues stated that

> [d]irectly after the meeting [about attestations], [Plaintiff] composed his own attestation.  He read it to me and he was laughing.  I thought he was joking, as he read it to me in a jovial way.  I didn't think he would actually use it.  Afterwards, I heard that a clinician had called down and asked 'what was the meaning of this' after they saw his modified attestation on an actual patient report . . .

(Dkt. 95-55, at 2.)

Shortly after September 22, 2014, Plaintiff attached to patients' records approximately 180 unapproved attestations filled with "sarcastic language" inconsistent with the approved attestations.  (S-Defs.' 56.1, Dkt. 77, ¶ 40; Dkt. 87-38.)  Moreover, Defendants contend that Dr. Pulitzer was informed that Plaintiff had asked an employee in the IT Department, to "take off" or "erase" the incorrect attestations, which he believed would have constituted tampering with patients' legal medical files.  (Pulitzer Dep., Dkt. 87-57, at 143:13–144:11.)

---

[10] The parties dispute whether Plaintiff was fully informed as to the form of the attestation to be used.  Plaintiff submits that he "was late in arriving to the [September 22, 2014 Departmental] meeting" where Dr. Pulitzer discussed the correct forms of attestations, missed the departmental meeting where KCHC's billing vendor explained the attestations, and could not attend the September 15, 2014 presentation by the company that handles the Radiology Department's billing because he was covering the Emergency Room that day.  (Pl.'s 56.1-1, Dkt. 92, ¶¶ 37–38.)  In contrast, Dr. Pulitzer contends that he personally instructed each staff member, including Plaintiff, on use of the approved attestations during a meeting on September 22, 2014.  (S-Defs.' 56.1, Dkt. 77, ¶ 39; *see also* Pulitzer Decl., Dkt. 79, ¶ 12.)

Plaintiff essentially admits these facts,[11] but attempts to justify his actions.  In his declaration, Plaintiff states that he was late to the Radiology department meeting at which it was explained that attestations were necessary for the hospital to be paid for patients receiving Medicaid and/or Medicare benefits, and that he was "under the impression that each faculty member would be required to author an attestation that met insurers' requirements."  (Pl.'s Decl., Dkt. 94, ¶ 11.)  Plaintiff further states that, "[a]s we were a department down in manpower, I was in disbelief that we were going to be required to perform another bureaucratic task that would slow our reading of cases and detrimentally affect our ability to timely provide care to patients."  (*Id.*)

Regarding Dr. Pulitzer's belief that Plaintiff sought to have the hospital's IT Department erase the unauthorized attestations, Plaintiff states in his declaration that at some point on September 22, 2014—the day that Plaintiff inserted his unapproved attestations into approximately 180 patient records—a colleague "alerted" him that his self-authored attestation was "causing a stir in the hallways" and "suggested that [he] modify [the] attestation and see if it could be inserted in the studies" that were already completed.  (*Id.* ¶ 12.)  Plaintiff asked the IT Department if this was possible, to which an IT employee responded that "it would get him into trouble"; Plaintiff withdrew his request.  (*Id.*)

---

[11] In his declaration, Plaintiff states that he has

> no doubt that I may have expressed my frustration with this new requirement to some of my colleagues, and when he returned to work after the meeting at which the attestations were discussed, out of frustration and in a fit of pique, I drafted an attestation that I believed met the insurers' requirements but was playful or at worst sarcastic.  I started using it immediately on cases that were months old, had already been acted upon in terms of treating patients, had been submitted to insurers for reimbursement[,] and rejected for lack of an attestation.

(Pl.'s Decl., Dkt. 94, ¶ 12.)

Following this incident, Dr. Pulitzer consulted with the then Medical Director of KCHC, Dr. Jamaleddine, and scheduled a meeting with the Risk Management Department at KCHC. (Pulitzer Dep., Dkt. 87-57, at 155:3–156:11; *see also* Pulitzer Decl., Dkt. 79, ¶ 15.)   Risk Management told Dr. Pulitzer to consider a Medical Board Hearing for Plaintiff, which could have led to the revocation of his medical credentials, and to have a "second reader" add a "new, proper attestation to each file," to avoid "potential exposure to the hospital." (Pulitzer Dep., Dkt. 87-57, at 155:3–156:11; 287:8–20.)   Dr. Reede was consulted and agreed with Dr. Pulitzer that the appropriate course of action would be to refer the matter back to Labor Relations. (Pulitzer Decl., Dkt. 79, ¶ 16; Reede Decl., Dkt. 80, ¶ 15.) Dr. Pulitzer eventually corrected the attestations himself by affixing a new counter-attestation to each of the 180 charts. (S-Defs. 56.1, Dkt. 77, ¶ 56.)

## III.   Plaintiff's Termination

On October 3, 2014, Drs. Reede and Pulitzer sent Plaintiff another letter directing him to report to Labor Relations on October 8, 2014 to "discuss allegations of insubordination, leaving the worksite without authorization[,] and related matters." (S-Defs.' 56.1, Dkt. 77, ¶ 46; *see also* Letter, Dkt. 87-44.)   After a delay to allow Plaintiff an attempt to locate an outside attorney, Plaintiff's "interrogation" was postponed to October 10, 2014. (S-Defs.' 56.1, Dkt. 77, ¶ 46.)

At the October 10, 2014 interrogation,[12] Stephanie Bernadel, Labor Relations Personnel Associate (Dkt. 87-44, at ECF 2), questioned Plaintiff about his lunch-hour absence on September 23, 2014. (S-Defs.' 56.1, Dkt. 77, ¶ 47.)   She further informed Plaintiff that he was being considered for discharge for a second instance of unauthorized leave and insubordination. (*Id.*) During the meeting, Plaintiff stated, in part, that

---

[12] Transcripts of Plaintiff's interrogations by SUNY-Defendants' employee were submitted in support of SUNY-Defendants' motion for summary judgment. (*See* Dkt. 87-24; Dkt. 87-43.)

> I'm being singled out.  And to me, it doesn't seem like it makes sense that all of this is happening because of something I did.  I mean, it's clear to me that I'm being singled out and, I don't know, I mean, is someone trying to fire me?  Is it [be]cause I'm Jewish?  Is it because of some other reason?  I don't know.  Is it for some economic reason?  I have no idea, but it doesn't make any sense to me . . . To me it seems like there's clearly something different about the way I'm being treated.  I don't know exactly what it is, but on the face of it, it could be something like [discrimination].  I don't know.

(Dkt. 87-43, at 28–29.)  A few days subsequent, Bernadel sent Plaintiff a letter informing him that claims of discrimination were handled by Defendants' "Office of Diversity."  (S-Defs.' 56.1, Dkt. 77, ¶ 49.)

On or about October 20, 2014, another meeting was held between personnel from the Labor Relations Department, including Bernadel and Leonzo Cuiman,  Assistant Vice-President for Labor Relations, and Plaintiff.  (*Id.* ¶ 54.)  At the meeting, Plaintiff was offered the opportunity to resign his position instead of being discharged.  (Dkt. 87-30, at 47.)   Plaintiff reiterated his concerns about Dr. Reede firing Jewish physicians.[13]  (*Id.* at 35.)  During the meeting, Plaintiff continued to complain about the use of the required attestations, repeating his view that the

---

[13] Plaintiff stated:

> I – this is a deliberate action on Dr. Reede's part to replace me with people from her own institution from [Long Island College Hospital].  She's done this repeatedly.  She's fired seven people from our department; five of who were Jewish, all of whom were white.  She's replaced—and I don't have any issue with them replacing people with African-American or Caribbean-Americans, that's fine.  But there's a pattern here, and I'm being treated differently; despite the fact that I am the best producer in the department, I'm the most important person, the most important cog in the wheel, at Kings County Hospital . . . This is retaliation . . . This is the issue.  She is deliberately trying to get rid of me and she is putting all this stuff in front of me to trip me up deliberately so she can fire me . . . But I just—this is just to point to her character and to point to the fact that there's a deliberate attempt to get rid of me.  Deliberate attempt to get rid of me for complaining about patient care issues; she's fired half our department.

(*Id.* at 35–37.)

"purpose of the attestation" was "so that insurance companies make you jump through another hoop before they pay you," or "so that you can get sued better. . . . there's no real good reason for it;" Plaintiff went on to say that "[i]t just adds more work to my day." (*Id.* at 11–21.) Plaintiff concluded the meeting by stating that "I expect to get my job back. I expect an apology from [Dr. Reede] and I expect a raise." (*Id.* at 50.)

Two days later, on October 22, 2014, Plaintiff was terminated from his employment with SUNY Downstate. (S-Defs.' 56.1, Dkt. 77, ¶ 55.)

## IV.    Procedural History

Plaintiff commenced this action, *pro se*, on April 22, 2015. (Dkt. 1.) He retained counsel and amended the complaint on October 19, 2015. (Dkt. 6.) After SUNY-Defendants indicated they would move to dismiss certain claims (Dkt. 13), Plaintiff amended the complaint again and filed the operative complaint in this action, the Second Amended Complaint, on December 23, 2015 (Dkt. 17); a redacted and non-sealed version of the Second Amended Complaint was filed on January 21, 2016 (Dkt. 23 ("SAC")). Following the close of discovery, all Defendants filed motions for summary judgment (Dkts. 76, 86), which are currently before the Court.

## DISCUSSION

## I.    Kings County Hospital Center is Not a Suable Entity[14]

KCHC argues that it is not a suable entity (*see* Dkt. 75, at 4), an assertion to which Plaintiff fails to respond (*see generally* Dkt. 89). Thus, all of Plaintiff's claims against KCHC are deemed abandoned. *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response

---

[14] To the extent that HHC asserts that it was not Plaintiff's employer for the purposes of any of the statutes at issue, the Court declines to reach that question, as all claims against HHC are dismissed on other grounds.

arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

However, even assuming that Plaintiff properly responded, Plaintiff's claims against KCHC would have to be dismissed because an agency of the City of New York is not an entity that can be sued. N.Y. City Charter ch. 17, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the [C]ity of New York and not in that of any agency, except where otherwise provided by law."); *see also Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *Winters v. NYCDOC*, No. 19-CV-7271 (RA), 2019 WL 3817400, at *1 (S.D.N.Y. Aug. 14, 2019); *Emerson v. City of New York*, 740 F. Supp. 2d 385, 395 (S.D.N.Y. 2010) ("[A] plaintiff is generally prohibited from suing a municipal agency.").

Accordingly, KCHC is dismissed as a Defendant in this matter.

## II.   Eleventh Amendment Sovereign Immunity and State Defendants[15]

SUNY-Defendants assert that, pursuant to the Eleventh Amendment, Plaintiff's FMLA, § 1983, and NYSHRL claims against SUNY and SUNY-Employees in their official capacities,

---

[15] Despite SUNY-Defendants' assertion to the contrary (Dkt. 78, at 21), whether a state's sovereign immunity under the Eleventh Amendment presents a question of subject matter jurisdiction is an open question in the Supreme Court and the Second Circuit. *See Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 391 (1998) ("[A]t the time of removal, this case fell within the 'original jurisdiction' of the federal courts. The State's later invocation of the Eleventh Amendment placed the particular *claim* beyond the power of the federal courts to decide, but it did not destroy [subject matter] jurisdiction over the entire case."); *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) (leaving open "whether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense"). In light of this uncertainty, the Court will first address the sovereign immunity defenses raised by Defendants. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("[S]ubject-matter jurisdiction necessarily precedes a ruling on the merits."). However, SUNY-Defendants only expressly assert a sovereign immunity defense with respect to Plaintiff's FMLA, § 1983, NYSHRL, and NYCHRL claims, and do not reference Plaintiff's causes of action

and his NYCHRL claims against SUNY-Employees in their official capacities, should all be dismissed.  (Dkt. 78, at 21.)  The Court agrees with respect to Plaintiff's § 1983 claim for damages, NYSHRL, and NYCHRL claims, but disagrees with respect to the FMLA to the extent that Plaintiff asserts claims under the "family-care provisions."

"As a general matter, states enjoy sovereign immunity from suit in federal court, even if the claim arises under federal law."  *KM Enters., Inc. v. McDonald*, 518 F. App'x 12, 13 (2d Cir. 2013) (summary order) (citing U.S. Const. amend. XI; *Alden v. Maine*, 527 U.S. 706, 727–28 (1999)); *see also McCluskey v. N.Y. State Unified Ct. Sys.*, No. 10-CV-2144 (JFB) (ETB), 2010 WL 2558624, at *5 (E.D.N.Y. June 17, 2010) ("Absent a state's consent to suit or an express statutory waiver, the Eleventh Amendment bars federal court claims against states."), *aff'd*, 442 F. App'x 586 (2d Cir. 2011) (summary order); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) ("[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State.").  The Eleventh Amendment of the United States Constitution "generally bars suits in federal court by private individuals against non-consenting states," and precludes "actions in which a state is actually named as a defendant, and certain actions against state agents and instrumentalities, including actions for the recovery of money from the state." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Port Auth. Trans– Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *see also Seminole Tribe of Fla. v. Florida*,

---

pursuant to 42 U.S.C. § 1981.  (Dkt. 78, at 19–21; SAC, Dkt. 23, ¶¶ 88–99.)  A § 1981 claim brought against SUNY or SUNY-Employees in their official capacities should be barred by sovereign immunity, as Congress did not abrogate immunity in enacting § 1981 and New York State has not consented to suit under that statute.  *See Jennings v. SUNY Health Sci. Ctr.*, 201 F. Supp. 3d 332, 335 (E.D.N.Y. 2016).  However, given the uncertainty as to whether sovereign immunity presents a jurisdictional bar (as opposed to an affirmative defense that SUNY-Defendants must assert), the Court reaches and dismisses the § 1981 claims against SUNY and SUNY-Employees on their merits.

517 U.S. 44, 54 (1996); *Hans v. Louisiana*, 134 U.S. 1 (1890).  New York's sovereign immunity extends to the State University of New York system, *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990), and can protect a state university hospital from being sued in an employment discrimination action, *see, e.g.*, *Bamba v. Fenton*, 758 F. App'x 8, 10 (2d Cir. 2018) (summary order).  The Eleventh Amendment, under most circumstances, also immunizes state officials sued in their official capacities, *see Stinson v. City Univ. of N.Y.*, No. 17-CV-3949 (KBF), 2018 WL 2727886, at *5 (S.D.N.Y. June 6, 2018) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984); *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir. 2004)).

However, there exists an exception to sovereign immunity, first announced in *Ex parte Young*, 209 U.S. 123 (1908), that "permits plaintiffs seeking prospective, injunctive relief to sue state government officials for violations of federal law."  *Gringas v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019).  The *Ex parte Young* exception "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes."  *Va. Office for Prot. & Advocacy*, 563 U.S. at 255 (internal citation omitted).  As the Second Circuit has reasoned, "[i]n such circumstances, a plaintiff does not ask equity to create a remedy not authorized by the underlying law.  Rather, it generally invokes equity preemptively to assert a defense that would be available to it in a state or local enforcement action."  *Friends of the E. Hampton Airport v. Town of East Hampton*, 841 F.3d 133, 144 (2d Cir. 2016).

Accordingly, absent an express waiver of sovereign immunity, a clear abrogation of that immunity by Congress, or the applicability of the *Ex parte Young* exception, the Eleventh Amendment generally bars Plaintiff from suing SUNY and SUNY-Employees in their official capacities.

**A1782**

### A.    FMLA Claims

Plaintiff asserts claims pursuant to the FMLA against all Defendants.   The FMLA allows eligible employees to take up to 12 work weeks of unpaid leave per year for, *inter alia*, the care of a "spouse . . . son, daughter, or parent" with "a serious health condition," and the employee's own "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(C), (D).  "The Act creates a private right of action to seek both equitable relief and money damages 'against any employer (including a public agency) in any Federal or State court of competent jurisdiction.'"  *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 34 (2012) (quoting 29 U.S.C. § 2617(a)(2)).

For the purposes of sovereign immunity analysis, the Supreme Court has distinguished the "family-care provisions" of the FMLA from the "self-care" provisions.  *Id.*  Supreme Court and Second Circuit precedent make clear that Congress has not abrogated state sovereign immunity by enacting the "self-care" provision of the FMLA.  *See id.* at 37 ("Standing alone, the self-care provision [of the FMLA] is not a valid abrogation of the States' immunity from suit.").  However, that is not the case with respect to the "family-care provisions" of the FMLA, through which, the Supreme Court has determined, Congress expressly abrogated the States' immunity from suit pursuant to its powers under § 5 of the Fourteenth Amendment.  *Id.* at 35–37 (citing *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (1972)).  Plaintiff and SUNY-Defendants disagree about whether Plaintiff's FMLA claims were brought pursuant to the "self-care" or "family-care" provisions; however, given that Plaintiff asserted three causes of action pursuant to the "family-care" provisions of 29 U.S.C. § 2615(a) and (b) (*see* SAC, Dkt. 23, ¶¶ 60, 65, 70), and that he expressly alleges discriminatory and retaliatory actions were taken against him due to his need to care for his child with a disability (*see id.* ¶¶ 28, 32, 34–36, 53–55), the Court finds that Plaintiff

has asserted his FMLA claims pursuant to the "family-care" provisions of the statute, which are thus not barred by the sovereign immunity doctrine.

### B.      Section 1983 Claims

"It is well-established that New York State has not waived its sovereign immunity from Section 1983 claims." *Harrison v. New York*, 95 F. Supp. 3d 293, 314 (E.D.N.Y. 2015) (internal quotations and citation omitted); *see id.* (collecting cases).  Moreover, "it is well settled that 42 U.S.C. § 1983 does not constitute an exercise of [Congress's] authority [to abrogate sovereign immunity]." *Dube*, 900 F.2d at 594.  Therefore, Plaintiff's Equal Protection claim brought pursuant to § 1983 against SUNY is dismissed. For substantially the same reasons, the damages claims brought pursuant to § 1983 against SUNY-Employees in their official capacities are dismissed.[16] *See Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities.").

However, the Court finds that Plaintiff's claims for prospective injunctive relief against SUNY-Employees in their official capacities are not barred by sovereign immunity.  Under *Ex parte Young*, a plaintiff may only sue a state official acting in his official capacity "for *prospective, injunctive relief* from violations of federal law." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (internal quotation marks and citation omitted) (emphasis added). "The Second Circuit has held that claims for reinstatement to previous employment fall under the Ex parte Young exception." *Ighile v. Kingsboro ATC*, No. 16-CV-4294 (AMD) (JO), 2019 WL 267042, at *3 (E.D.N.Y. Jan. 18, 2019) (citing *Rowland*, 494 F.3d at 96); *Dotson v. Griesa*, 398 F.3d 156, 178 (2d Cir. 2005) ("A court order of reinstatement, whether of government benefits or

---

[16] To the extent that SUNY-Employees also raise a qualified immunity defense to Plaintiff's § 1983 claims (SUNY-Defendants' Reply Brief, Dkt. 96, at 2 n.2), the Court does not reach this issue, as these claims are dismissed on other bases.

employment, is not barred by sovereign immunity.")); *cf. Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 245 (E.D.N.Y. 2015) (finding that plaintiff's claims against individual state officers in their official capacities did not fall under the *Ex parte Young* exception because plaintiffs did not "allege[] that the [i]ndividual CUNY [d]efendants have the responsibility or capacity to provide him with the prospective relief he seeks, i.e. reinstate him"); *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014) (finding that the Ex parte Young "exception to sovereign immunity only authorizes suits against officials with the authority to provide the requested relief"). As described *infra*, Plaintiff has asserted sufficient facts to allege that the SUNY-Employees have at least some capacity to provide the requested prospective injunctive relief. The Court, therefore, addresses these claims on the merits.

## III.   Pendant Claims Arising Under State and City Laws

New York State also has not waived its Eleventh Amendment immunity and consented to suit in federal court under the NYSHRL. *Lambert v. N.Y. State Office of Mental Health*, No. 97-CV-1347 (JG), 2000 WL 574193, at *7 (E.D.N.Y. Apr. 24, 2000), *aff'd*, 22 F. App'x 71 (2d Cir. 2001) (summary order) ("[D]istrict courts in this circuit have uniformly found [that] the New York Human Rights Law [New York State Executive Law § 296] includes no waiver of the state's immunity to suit in federal court."); *see also Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 537–38 (S.D.N.Y. 2014). The same can be said for claims against the State brought pursuant to the NYCHRL. *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) ("The City of New York does not have the power to abrogate the immunity of the State, and we have found no evidence that the State has consented to suit in federal court under the NYCHRL."). Accordingly, Plaintiff's claims against SUNY under the NYSHRL and NYCHRL must be dismissed.

The same claims must also be dismissed as to SUNY-Employees in their official capacities. *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as [the plaintiff] is suing the individual defendants [who are SUNY administrators and professors] in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent that it shields SUNY."); *Serrano v. N.Y. State Dep't of Envtl. Conservation*, No. 12-CV-1592 (MAD) (CFH), 2013 WL 6816787, at \*14 (N.D.N.Y. Dec. 20, 2013) (dismissing plaintiffs "[NYSHRL] discrimination and retaliation claims against [the] [d]efendant DEC and in individual [d]efendants sued in their official capacities" based on "Eleventh Amendment immunity").

Likewise, Plaintiff's prospective claims against SUNY-Employees in their official capacities under the NYSHRL and NYCHRL fail because "a federal court's grant of injunctive relief against a state official may *not* be based on violations of state law." *Dube*, 900 F.2d at 595.

\*       \*       \*

Thus, Plaintiff is not barred by sovereign immunity from asserting FMLA interference and retaliation (family-care) claims against all SUNY-Defendants; § 1981 claims against all SUNY-Defendants; and § 1983, NYSHRL, and NYCHRL damages claims against SUNY-Employees in their individual capacities, and § 1983 claims for prospective injunctive relief against SUNY-employees in their official capacities.  Plaintiff's ability to assert claims under Title VII was not challenged as a threshold matter.  Having addressed these threshold issues, the Court now considers whether the movants are entitled to summary judgment on the surviving claims.

## IV.       Summary Judgment

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (internal quotation marks omitted) (alteration in original). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotation marks omitted). In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

The Second Circuit has "explicitly cautioned district courts to use extra care when deciding

whether to grant summary judgment [in employment discrimination cases] because the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." *Thompson v. Kaufman's Bakery, Inc.*, No. 03-CV-340 (WMS), 2005 WL 643433, at *3 (W.D.N.Y. March 16, 2005) (internal quotation marks and citation omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (noting that "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions" (internal quotation marks and citation omitted)).   Nevertheless, the "summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."); *Marmulszteyn v. Napolitano*, No. 08-CV-4094 (DLI), 2012 WL 3645776, at *5 (E.D.N.Y. Aug. 22, 2012) ("Although '[t]he Second Circuit has stated that district courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question,' summary judgment in such a case may still be warranted if the plaintiff relies 'on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." (quoting *Figueroa v. N.Y. Health & Hosps. Corp.*, 500 F. Supp. 2d 227–28 (S.D.N.Y. 2007))).   "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

###### A. Plaintiff's FMLA Claims

"The FMLA provides generally that a covered employer is required to grant an eligible employee up to a total of 12 weeks leave during any 12-month period for personal or family needs indicated in the Act." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017) (citing 29 U.S.C. § 2612(a)). The FMLA also provides a "private right of action" to "employees who need to take time away from work to deal with serious health conditions of the employee or [his] family" and are not provided that time by their employers. *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006)).

In order to ensure that eligible employees are not deprived of their statutory rights, the FMLA makes it unlawful for an employer (1) "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" established by the FMLA, or (2) "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a). Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions[,] or disciplinary actions." 29 C.F.R. § 825.220(c). Employers are also prohibited from discriminating against any employee for filing any charge or instituting any proceeding under or related to the FMLA. *See* 29 U.S.C. § 2615(b)(1). In the Second Circuit, these prohibitions give rise to two distinct types of FMLA claims: interference claims and retaliation claims. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). Plaintiff has asserted both types of FMLA claims in this case. (*See* SAC, Dkt. 23, at 3.)

1.       SUNY-Employees' Individual Liability

"Eligibility is a threshold issue" for an FMLA claim.  *Smith v. Westchester Cty.*, 769 F.

Supp. 2d 448, 465 (S.D.N.Y. 2011) (quoting *Spurlock v. NYNEX*, 949 F. Supp. 1022, 1033

(W.D.N.Y. 1996)).  SUNY-Employees assert that they cannot be held liable as "individuals" under

the FMLA.  (Dkt. 78, at 34.)  The Court disagrees.

"An individual may be held liable under the FMLA only if she is an 'employer,' which is

defined as encompassing 'any person who acts, directly or indirectly, in the interest of an employer

to any of the employees of such employer.'"  *Graziadio v. Culinary Institute of Am.*, 817 F.3d 415,

422 (2d Cir. 2016) (quoting 29 U.S.C. § 2611(4)(A)(ii)(I)) (citing 29 C.F.R. § 825.104(d)).  In

*Graziadio*, the Second Circuit analyzed the appropriate test for individual liability under the

FMLA, and concluded that the "economic-reality test," tracking the language applied in the

context of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d), is the appropriate analysis:

> Under this test, courts ask whether the alleged employer possessed the power to
> control the worker in question, with an eye to the economic reality presented by the
> facts of each case.  To do so, they consider a nonexclusive and overlapping set of
> factors intended to encompass the totality of circumstances.  These factors include
> whether the alleged employer (1) had the power to hire and fire the employees,
> (2) supervised and controlled employee work schedules or conditions of
> employment, (3) determined the rate and method of payment, and (4) maintained
> employment records.  No one of the four factors standing alone is dispositive and
> any relevant evidence may be examined so as to avoid having the test confined to
> a narrow legalistic definition.  In the FMLA context, courts assessing the economic
> reality of an employment relationship have construed this test as asking essentially
> whether the putative employer controlled in whole or in part plaintiff's rights under
> the FMLA.

*Graziadio*, 817 F.3d at 422–23 (internal quotation marks, citations, and alterations omitted).  In

*Graziadio*, the district court had dismissed an individual defendant on a motion for summary

judgment after focusing on the facts that the defendant "lacked meaningful 'power to hire and

fire,'" and that the plaintiff had not offered evidence that the defendant "supervised or controlled

employee work schedules or conditions of employment, determined the rate and method of employee payment, or maintained employment records." *Id.* at 423.  The Second Circuit reversed, and in applying the economic-reality test, focused on the evidence demonstrating that

> on the overarching question of whether [the defendant] controlled plaintiff's rights under the FMLA, there seems to be ample evidence to support the conclusion that she did: deposition testimony and email exchanges demonstrate a) that [the defendant] reviewed [the plaintiff's] FMLA paperwork, b) that she determined its adequacy, c) that she controlled [the plaintiff]'s ability to return to work and under what conditions, and d) that she sent [the plaintiff] nearly every communication regarding her leave and employment (including the letter ultimately communicating her termination). Indeed, [the defendant] specifically instructed [other employees] that they were not to communicate with [the plaintiff] and that [the defendant] alone would handle [her] leave dispute and return to work.

*Id.* at 424.  Given that evidence, the panel in *Graziadio* concluded, that "a rational jury could find, under the totality of the circumstances, that [the defendant] exercised sufficient control over [the plaintiff]'s employment to be subject to liability under the FMLA."  *Id.*

Among other material, the following evidence was submitted by the parties on this issue:

- Stephanie Bernadel, a member of SUNY's Labor Relations Department, testified at her deposition that "[a]fter reviewing the facts and the result of the investigation, we discussed it . . . with Dr. Pulitzer and with Dr. Reede[,] . . . and Dr. Reede and Dr. Pulitzer both together and separately felt that [Plaintiff] had violated his agreement and so he, you know, should be terminated. . . . After consulting with Dr. Pulitzer and Dr. Reede, they both felt that [Plaintiff] had been insubordinate and had violated the terms of his agreement, and so we all discussed it and we all decided that he was in violation of his agreement."  (Bernadel Dep., Dkt. 95-30, at 9:5–10:24).

- Letters from Dr. Reede to physicians in the SUNY Downstate Department of Radiology, not including Plaintiff, regarding salary adjustments.  (Dkt. 95-47.)

- An email from Dr. Pulitzer to Dr. Reede regarding Radiology Department personnel and a coverage proposal.  (Dkt. 95-48.)

- Dr. Pulitzer's declaration in support of SUNY-Defendants' summary motion (Pulitzer Decl., Dkt. 79) stating, *inter alia*, that:

    o In his role as Chair of Radiology at KCHC he "did not hire or fire radiologists, determine the rate of their pay, or maintain employment records."  (*Id.* ¶ 3.)

**A1791**

- o In his role as "Interim Chair of the [KCHC] department," Dr. Pulitzer "assumed a supervisory role with respect to managing radiologists' schedules and ensuring adequate coverage for the department." (*Id.* ¶ 5.)

- o Dr. Pulitzer, in his role as Chair of the KCHC Radiology Department, "reviewed requests for time off." (*Id.* ¶ 7.)

- o Dr. Pulitzer did not approve Plaintiff's leave request for September 4 and September 5, 2014 (*Id.* ¶ 9), communicated with Dr. Reede about that absence, and with Dr. Reede referred that issue to SUNY Downstate's Labor Relations Department (*Id.* ¶ 10).

- o Following Plaintiff's alleged attachment of inappropriate attestations to patients' charts, Dr. Pulitzer "brought the issue to the attention of . . . the Chief Medical Officer of KCHC," met with an individual in KCHC's Office of Risk Management, considered convening a Medical Board Hearing, and "notified Dr. Reede of the situation[.]"  "Dr[s]. Reede and [Pulitzer] agreed to refer the issue to SUNY Downstate's Department of Labor Relations.  Following the investigation by Labor Relations, [Dr. Pulitzer] conferred with Labor Relations and Dr. Reede, and . . . ultimately concluded that Plaintiff should be terminated." (*Id.* ¶¶ 15–16.)

- Dr. Reede's declaration in support of SUNY-Defendants' summary judgment motion (Reede Decl., Dkt. 80), in which she stated, *inter alia*, that:

- o In her "role as Chair of Radiology [at SUNY Downstate], [she] cannot by [her]self hire or fire physicians in the department or determine their rate of pay, and [she] do[es] not maintain employment records." (*Id.* ¶ 3.)

- o Dr. Reede was aware of the September 2014 attendance incident to the extent that Dr. Pulitzer informed her that Plaintiff insisted on taking time off without Dr. Pulitzer's approval, and that Dr. Reed "advised [Dr.] Pulitzer to refer Plaintiff to Downstate's Department of Labor Relations." (*Id.* ¶ 12.)

- o Dr. Reede "was very familiar with Plaintiff's issues with time and attendance, having counseled Plaintiff in May and having heard reports that Plaintiff was often not in the ER when he was supposed to be." (*Id.*)

- o Dr. Reede discussed the non-standard attestation issue with Dr. Pulitzer and "agreed that the matter should be referred to the Department of Labor Relations at SUNY Downstate." (*Id.* ¶ 15.)

- o Following the Labor Relations investigation, Dr. Reede "conferred with Labor Relations and Dr. Pulitzer, and . . . ultimately concluded that Plaintiff should be terminated." (*Id.* ¶ 16.)

- A meeting summary regarding "time and attendance" between Drs. Reede and Plaintiff, written by Dr. Reede (Dkt. 87-9) and the same written by Dr. Pulitzer (Dkt. 87-18).

- Dr. Pulitzer's letters denying Plaintiff's request for time off and Plaintiff's attendance sheets.  (*E.g.*, Dkt. 87-23; Dkt. 87-32, at ECF 4–7.)

- Plaintiff's e-mails to Dr. Pulitzer regarding his attendance, time-off requests, and absences.  (*See, e.g.*, Dkt. 87-14.)

The Court finds that this evidence presents a genuine dispute as to material facts underlying any analysis of the *Graziadio* factors for purposes of determining whether SUNY-Employees are subject to individual liability under the FMLA.  *See* Fed. R. Civ. P. 56(a).  The economic reality test does not require an individual to have absolute control over the Plaintiff's rights under the FMLA, but sufficient control in whole or in part.  *See Graziadio*, 817 F.3d at 422.

The evidentiary submissions demonstrate that it would be reasonable for a jury to conclude that: (1) Dr. Pulitzer was sufficiently involved in both the investigation referrals and the actual decision to terminate Plaintiff, such that he "had the power to hire and fire the employees"; (2) the fact that Plaintiff had to ask Dr. Pulitzer for leave time, that Dr. Pulitzer had the authority to deny that time, and that Dr. Pulitzer testified that he assumed that supervisory role shows that Dr. Pulitzer "supervised and controlled employee work schedules"; and (3) the fact that Dr. Pulitzer authored documents for placement in Plaintiff's employment file shows that Dr. Pulitzer "maintained [Plaintiff's] employment records."  *See id.* at 422–23.  Although the evidence does not suggest that Dr. Pulitzer "determined the rate and method of [Plaintiff's] payment," "[n]o one of the four factors standing alone is dispositive[.]"  *Id.* at 422.  Rather, "in the FMLA context, courts assessing the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer "controlled in whole or in part plaintiff's rights under the FMLA."  *Id.* at 423.  The Court concludes that there is sufficient evidence to allow a

reasonable jury to find that Dr. Pulitzer controlled, at least in part, Plaintiff's rights under the FMLA.

The evidence similarly demonstrates that it would be reasonable for a jury to conclude that Dr. Reede is also subject to individual liability. A jury could look at Dr. Reede's involvement in both the investigation referrals and actual decision to terminate Plaintiff to conclude that she "had the power to hire and fire the employees"; that she was sufficiently involved in the oversight of SUNY Downstate's Radiology staff; in consultation with Dr. Pulitzer, "supervised . . . employee work schedules" at KCHC; that she "determined the rate and method of payment," as reflected in the letters Dr. Reede sent to the Radiology Department physicians regarding their rates of pay; and that she "maintained [Plaintiff's] employment record," as reflected in the numerous employment-related documents she authored. *Id.* at 422.

Accordingly, the Court denies SUNY-Defendants' summary judgment motion as to SUNY-Employees on the ground that no jury could find that they qualify as "individuals" under the FMLA.

### 2.    Plaintiff's FMLA Interference Claims

Plaintiff asserts both an FMLA interference cause of action and FMLA retaliation cause of action, based on the same facts. SUNY-Defendants argue that Plaintiff's allegations sound entirely as a retaliation claim and not as an interference claim. (Dkt. 78, at 30.) The Court agrees.

Plaintiff is essentially claiming that he was subjected to adverse employment actions—probation and then termination—for exercising his FMLA rights. (*See* SAC, Dkt. 23, ¶¶ 26–58.) He does not state that he was ever prevented from actually taking FMLA leave. (*See generally id.*) As the Second Circuit explained:

> In a general sense, an employee brings an "interference" claim when [his] employer has prevented or otherwise impeded the employee's ability to exercise rights under

the FMLA.  "Retaliation" claims, on the other hand, involve an employee actually exercising [his] rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer.  The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA.

*Woods*, 864 F.3d at 166 (internal citations omitted); *see also LeClair v. Berkshire Union Free Sch. Dist.*, No. 08-CV-1354 (LEK) (RFT), 2010 WL 4366897, at *6 (N.D.N.Y. Oct. 28, 2010) ("Plaintiff's theory of interference by termination is merely a retaliation theory in disguise"); *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009) (holding plaintiff's interference claim "really is no more than an effort to dress [his] retaliation claim in (barely) different clothing").  To the extent that Plaintiff relies on a District of Maryland decision to argue that the "distinction between an interference claim and a retaliation claim under the FMLA is not always clear," and that his decision to proceed with FMLA-eligible leave led to his probation, thus asserting an interference claim, that reliance is misplaced.  (Dkt. 90, at 29–30 (quoting *Edusei v. Adventist Healthcare, Inc.*, No. 13-CV-157 (DKC), 2014 WL 3345051, at *6 (D. Md. July 7, 2014).  The facts of *Edusei* do not support Plaintiff's argument.  The Court there distinguished between a claim arising from the deprivation of an FMLA entitlement—such as being denied the ability to take leave—from retaliation for an employee's exercise of their FMLA rights—such as being fired or placed on probation for taking that leave.  *See Edusei*, 2014 WL 3345051, at *6.  As previously described, Plaintiff is alleging retaliation and not interference.

For these reasons, Plaintiff's FMLA interference claims are dismissed.[17]

---

[17] Regardless, Plaintiff's interference claims would fail.  To succeed on an FMLA interference claim, Plaintiff must establish

1) that [he] is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that [he] was entitled to take leave under the

      3.      Plaintiff's FMLA Retaliation Claims

A plaintiff may bring FMLA retaliation claims for violations of both 29 U.S.C. § 2615(a)(1) and 29 U.S.C. § 2615(a)(2). *See Woods*, 864 F.3d at 167; *see also* § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."); § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."). FMLA retaliation claims are analyzed under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Graziadio*, 817 F.3d at 429. Accordingly, "[t]o establish a prima facie case of FMLA retaliation, a plaintiff must establish that (1) he exercised rights protected under the FMLA, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (internal quotation marks omitted). There is no dispute that Plaintiff has established the second and third prongs of a *prima facie* case—that Plaintiff was qualified for his position and that he suffered an

> FMLA; 4) that [he] gave notice to the defendant of [his] intention to take leave; and
> 5) that [he] was denied benefits to which [he] was entitled under the FMLA.

*Graziadio*, 817 F.3d at 424 (adopting requirements for a *prima facie* case of interference with FMLA rights). At a minimum, Plaintiff did not assert sufficient facts to prevail on the fifth prong: that he was denied benefits to which he was entitled. It is undisputed that Plaintiff utilized accrued sick leave for the time he was absent from work on September 4 and 5, 2014, and therefore was not denied any benefit. *See* 29 U.S.C. § 2612(d)(2)(B) ("An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided . . . for any part of the 12-week period of such leave under [the Act.]").

adverse employment action.[18]  (SUNY-Defendants' Opening Brief, Dkt. 78, at 31 ("Plaintiff has failed to establish the first and fourth prongs of a *prima facie* FMLA retaliation claim."); Plaintiff's Memorandum in Response, Dkt. 90, at 35 ("SUNY Defendants move to dismiss the retaliation claim on two grounds: (1) [Plaintiff] did not exercise rights protected under the FMLA; and (2) he cannot show that his termination occurred under circumstances that give rise to an inference of retaliatory intent.").)  The parties' source of disagreement lies in the analysis of the first and fourth prongs.

The first prong requires that Plaintiff establish that he exercised rights protected under the FMLA.  SUNY-Defendants contend that Plaintiff did not exercise rights protected by the FMLA because, when he missed work on September 4 and 5 and was subsequently placed on probation, he missed those days due to an injured back, unrelated to a need to care for his son, the reason he is asserting FMLA protections.  (Dkt. 78, at 20–21.)   Plaintiff, in opposition, contends that he sought the leave to assist with planning for his child with autism to be placed at an appropriate school, and to "provide love and support" to that child, who was having difficulty with transitions. (Dkt. 90, at 8 (citing Pl.'s Decl., Dkt. 94, ¶ 9).)[19]

---

[18] The Court declines to address SUNY-Defendants' arguments regarding whether the settlement agreement and subsequent probation constituted an adverse action under the FMLA, given the dismissal of the FMLA retaliation claim on other grounds.

[19] To the extent that SUNY-Defendants also advance the argument that Plaintiff did not follow the proper notice and procedural requirements for an FMLA leave request, that assertion is belied by their own evidence.  Generally, while the FMLA allows an employer to establish its own policies for usual and customary notice for requesting leave, 29 C.F.R. § 825.303(c), "[a]n employer cannot use its own notice policy to circumscribe an employee's rights under the FMLA," *Slaughter v. Am. Bldg. Maint. Co. of N.Y.*, 64 F. Supp. 2d 319, 327 (S.D.N.Y. 1999); *see also Hill v. City of New York*, 136 F. Supp. 3d 304, 343 (E.D.N.Y. 2015).  "The FMLA does not impose a specific time requirement for an employee to request FMLA leave, only requiring that 'an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case.'"  *Id.* at 343 (quoting 29 C.F.R. § 825.303(a)).  SUNY-

**A1797**

The evidence adduced by the parties demonstrates that:

- Plaintiff's request for time-off does not indicate that he made the request based on the need to care for his child. (*See* Dr. Pulitzer's contemporaneous notes, letters, and e-mails regarding Plaintiff's leave request, Dkts. 87-19, at ECF 3; 87-23, at ECF 2; 95-19, at ECF 3; Dkt. 95-26, at ECF 2.)

- Plaintiff's initial request does not indicate a reason for the requested time off. (*See* Dkt. 87-21 at ECF 3; Dkt. 95-38, at ECF 3.)

- An Impartial Hearing Officer at the New York City Department of Education did indicate that certain paperwork regarding Plaintiff's child's school placement had to be completed by September 4, 2014. (Dkt. 95-22, at ECF 2.)

- During the Labor Relations Interrogation on September 8, 2014, Plaintiff admitted that he had planned to go to work on September 4, because the situation with his son had been resolved, but that he hurt his back getting out of bed, which led to him not appearing for work that day. (Dkt. 87-24, at 12:7–8 (Plaintiff stating, "I-I-I was gonna come in, I rolled out of bed and I – and I stretched my back out and I've been in pain and not able to be mobile since then.").)

- Plaintiff sent Dr. Pulitzer an email on September 5, 2014, stating, "[a]s it turns out I was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out. My mobility has been severely limited since. Please forgive the confusion." (Dkt. 87-21, at ECF 2.)

- Plaintiff visited an urgent care center on September 8, 2014 to receive care for his back injury. (Dkt. 87-28.)

- During the second Labor Relations meeting on October 20, 2014, Plaintiff stated, "[s]o rather than just call in sick the next day, Thursday and Friday, which is what everybody else does, and what everybody else has told me that I should have done, I prepared the department for my absence . . . And it turns out, the next morning, I got out of bed and I threw out my back. So I physically, even if I wanted to, couldn't come to the hospital . . . I couldn't – I couldn't physically make it to the hospital, and I had to deal with my son's issues. He's the most important thing in the world to me." (Dkt. 87-30, at 4:1–16.)

Defendants contend that "Plaintiff first requested the [alleged FMLA] leave on August 29, 2014 by emailing Ms. McMurren, who was not the appropriate person to contact." (Dkt. 78, at 32.) However, SUNY-Defendants submitted a slide detailing the "Sick Day Policy for KCHC" which states that Ms. McMurren, who works for Dr. Reede, is indeed one of the correct people to contact. (Dkt. 87-13, at ECF 8; *see also* Dkt. 87-22, at ECF 10 ("Department Chair's office must be promptly notified . . . Additional daily email notification to Chair and Chair's staff is also expected *where possible*." (emphasis added)).) To the extent that SUNY-Defendants argue that Plaintiff did not follow the precise notification procedures, within a practicable time, they appear to be promoting form over the substance of the law.

Even after drawing all inferences in the light most favorable to Plaintiff and considering his own statements and deposition testimony, this Court finds that a reasonable jury could not conclude that Plaintiff did not report to work on September 4 and 5, 2014 to care for his son.   The Court finds *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), analogous.   There, the Second Circuit reasoned:

> In the circumstances presented in the instant case—where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe [plaintiff]'s testimony, we hold that the District Court did not err by awarding summary judgment.

*Id.* at 555 (internal citations, quotation marks, and alterations omitted).[20]

For these reasons alone Plaintiff's FMLA retaliation claims fail.   However, even assuming *arguendo* that Plaintiff did sufficiently allege a *prima facie* case, the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse action, *see Esser v. Rainbow Advert. Sales Corp.*, 448 F. Supp. 2d 574, 581 (S.D.N.Y. 2006), which SUNY-

---

[20] To the extent that Plaintiff relies on the Second Circuit decision in *Coutard v. Municipal Credit Union*, 848 F.3d 102 (2d Cir. 2017), to argue that Dr. Pulitzer was under an obligation to ask further questions of Plaintiff as to the exact nature of the circumstances of his request for leave to see if the leave was FMLA-eligible, that reliance is misplaced.   (Dkt. 90, at 34.)   In *Coutard* the Plaintiff sought leave to take care of his seriously ill grandfather with whom he had an *in loco parentis* relationship, and informed his employer that he needed leave, without describing that relationship.   The Court concluded that because "[plaintiff] met the eligibility requirements for FMLA leave and requested that leave expressly to care for his seriously ill grandfather, [defendant] as an employer covered by the Act had an obligation to specify the additional information that it needed in order to determine whether he was entitled to such leave."   *Coutard*, 848 F.3d at 104.   Here, the question is whether Plaintiff, as an initial matter, met the eligibility requirements for FMLA leave by "expressly" stating that he sought leave to take care of a family member—which the plaintiff in *Coutard* did.   *Id.*   Since Plaintiff did not, the additional requirements imposed on the employer by *Coutard* to obtain additional information about the reasons for the leave simply have no application here.

**A1799**

Defendants have done.  There is no dispute that Plaintiff attached unapproved attestations required for proper hospital reimbursements to multiple—indeed, almost 200—patients' charts, and then sought information from IT about if and how the attestations could be deleted.  (*See* Pulitzer Dep., Dkt. 87-57, at 143:13–144:11; Pl.'s Decl., Dkt. 94, ¶ 12.)  Furthermore, it is clear that Plaintiff was terminated, in large part, due to attaching the unapproved attestations to patients' charts.  (*See* S-Defs.' 56.1, Dkt. 77, ¶¶ 42–43, 46, 55–56.)[21]  SUNY Defendants' have established a legitimate, non-discriminatory reason for Plaintiff's termination.  Thus, the Court finds that Plaintiff cannot prove that the cause of his termination was merely a pretext for discrimination.

Accordingly, Plaintiff's FMLA retaliation claims are dismissed.

### B.  Federal Race and Religion Discrimination Claims

 Plaintiff also brings discrimination and retaliation claims under Title VII, and §§ 1981 and 1983, and alleges that he faced discrimination because of his race and religion.  (SAC, Dkt. 23, ¶¶ 1, 21–27, 73–81; Dkt. 90, at 17.)  Plaintiff asserts that, as a result of this discrimination, he was not promoted to Director of the ER Radiology Department, a job he had previously occupied, despite being more qualified than the doctor hired for that position.  Plaintiff also claims that as a result of race and religion, in combination with the FMLA discrimination discussed *supra*, he was placed on probation and ultimately terminated.  (Dkt. 90, at 17–19.)

---

[21] Plaintiff does not dispute that he was terminated for violations of the September 8, 2014 disciplinary settlement due to, *inter alia*, "allegations of insubordination," but disputes which employees made the decision.  (Pl.'s 56.1-1, Dkt. 91, ¶ 55.)  Plaintiff notes that the evidence shows that Drs. Reede and Pulitzer decided he should be terminated; that Ms. Bernadel and Mr. Cuiman agreed with that decision; and, that, according to Dr. Pulitzer, Dr. Jamaleddine, KCHC's Chief Medical Officer, "made it known that he would not allow Dr. Greenberg to continue to practice at KCHC and therefore, in effect, he was saying that Dr. Greenberg had to be terminated."  (*Id.*)

1.      Plaintiff's Section 1981 Claims

At the outset, the Court notes that it will consider Plaintiff's § 1981 claims in tandem with his § 1983 claims.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts[.]"  42 U.S.C. § 1981(a).   The Civil Rights Act of 1991 expanded § 1981 to outlaw discrimination occurring after contract formation "with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship[.]"  *Patterson v. Cty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004).  Section 1981 does not provide an independent cause of action against state actors; rather, § 1981 claims must be brought through § 1983.  *Duplan v. City of New York*, 888 F.3d 612, 619–21 (2d Cir. 2018) (joining nine other circuits to reaffirm the applicability of *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)); *see Jett*, 491 U.S. at 733 ("[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.").   "[W]here defendants are state actors, Section 1983, not Section 1981, is the appropriate vehicle through which a plaintiff may pursue discrimination claims for damages."  *Zaniewska v. City of New York*, No. 11-CV-2446 (RRM) (VVP), 2013 WL 3990751, at *8 (E.D.N.Y. Aug. 5, 2013), *aff'd*, 569 F. Appx. 39 (2d Cir. 2014) (summary order); *see also Jett*, 491 U.S. at 735 ("We hold that the express action at law provided by § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States], provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.") (internal quotation marks omitted).   "The holding in *Jett* has been interpreted to encompass not only governmental entities, but also individuals sued in their individual capacities who are state actors."  *Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381, 400-01 (S.D.N.Y. 2008) (internal quotation

**A1801**

marks omitted); *Bamba*, 2017 WL 3446806, at \*10 (collecting cases).  The Court, therefore, analyzes Plaintiff's §§ 1981 and 1983 claims together under § 1983.

> ### 2.  Plaintiff's Title VII, § 1981, and § 1983 Discrimination Claims[22]

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  The purpose of the section to which Plaintiff cites, 42 U.S.C. § 2000e–16a, "is to provide procedures to protect the rights of certain government employees, with respect to their public employment, to be free of discrimination on the basis of race, color, religion, sex, national origin, age, or disability."  To succeed on a claim of discrimination under Title VII a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802.  To do this, the plaintiff must show that he was (1) "within the protected class"; (2) "qualified for the position"; (3) "was subject to an adverse employment action"; and (4) "the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009), *superseded in part by statute as stated in Vogel v. CA, Inc.*, 662 F. App'x 72 (2d Cir. 2016) (summary order).  When a plaintiff alleges a failure to promote, the fourth prong requires that plaintiff to show "that the failure to promote occurred under circumstances giving rise to an inference of discriminatory intent."  *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 266 (citing *Yi v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122 (2d Cir. 2012) (summary order), among other cases).

---

[22] The Court notes that Plaintiff only asserts age discrimination claims in the context of his state law and municipal law claims.  (*See* SAC, Dkt. 23, ¶¶ 59–161.)

**A1802**

Once a *prima facie* case has been established the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Once the defendant has made a showing of a neutral reason for the alleged action, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trs. of Columbia Univ. in City of N.Y.*, 131 F.3d 305, 312 (2d Cir. 1997). "If the plaintiff's evidence was barely sufficient to make out a prima facie case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral rationale." *Id.*; *see also Naumovski v. Norris*, 934 F.3d 200, 215 n.39 (2d Cir. 2019). "Showing an employer's motivation to discriminate is 'usually' accomplished through the 'cumulative weight of circumstantial evidence.'" *United States v. City of New York*, 713 F. Supp. 2d 300, 322 (S.D.N.Y. 2010) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).

Section 1983 employment discrimination claims may generally be analyzed using the same *McDonnell Douglas* framework that applies in a Title VII discrimination case. *Naumovski*, 934 F.3d at 214. However, a § 1983 claim carries a higher burden: "a Title VII plaintiff need only prove that the employer's stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action. By contrast, to establish 'pretext' under § 1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action." *Id.* at 214–15 (emphasis in the original). Put another way, "a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Id.* at 215. "A plaintiff pursuing a claim for employment discrimination under § 1983 . . . must establish that the defendant's discriminatory

intent was a 'but-for' cause of the adverse employment action or the hostile environment.  It is insufficient to establish simply that invidious discrimination was 'a motivating factor' of the offending conduct."  *Id.* at 214.  "Accordingly, a court considering a § 1983 claim at summary judgment must determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred 'but-for' [the] discrimination."  *Id.*

There is no dispute that Plaintiff Greenberg is Jewish and white, and thus within two protected classes, *see Klings v. N.Y. State Office of Ct. Admin.*, No. 04–CV–3400 (KAM) (LB), 2010 WL 1292256, at *6 (E.D.N.Y. Apr. 5, 2010); *Vill. of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016) ("[In a prior case]  we assumed the viability of a Title VII claim for intentional racial discrimination based on the plaintiff's status as 'white, Jewish, and/or not Hispanic.'" (internal citation omitted)), or that by reason of his non-promotion, *see Ellis*, 975 F. Supp. 2d at 266, and probation and subsequent termination, he was subject to adverse employment actions, *see Terry v. Ashcroft,* 336 F.3d 128, 137–138 (2d Cir. 2003) (finding an adverse employment action is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities," and may "include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." (internal quotation marks, citations, and alterations omitted)).  However, the Court finds that taking the submissions of the parties, together, do not show a genuine dispute as to material facts that would give rise for a reasonable jury to find that any of the alleged adverse actions gives rise to an

**A1804**

inference of discrimination based on religion or race.[23]  *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 248; *cf. Patterson*, 375 F.3d at 223 ("In sum, [plaintiff] produced no evidence that racial harassment at the hands of fellow officers had any bearing on the Department's decision to terminate his employment.  We conclude that there plainly was a dearth of evidence to show that the termination of his employment occurred under circumstances giving rise to an inference of discrimination.").

First, as relevant to all of Plaintiff's claims of discrimination, he could have been terminated, without cause, in June 2014.  (*See* Reede Decl., Dkt. 80, ¶ 9 (noting that at the time five radiologists were not renewed in June of 2014, Plaintiff was renewed); Reede Reply Decl., Dkt. 98, ¶ 4 ("I made the decision to renew [Plaintiff] in June 2014 at the time that five radiologists were no[t]-renewed, and I was aware of his race and age at the time of the decision to renew him.").)  Moreover, the same actors Plaintiff alleges to have discriminated against him actually renewed his contract four months prior (*see id.* ¶ 4), strongly suggesting that invidious discrimination was not the likely cause.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[S]ome factors strongly suggest that invidious discrimination was unlikely.  For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.").

With respect to Plaintiff's claims of race and religious discrimination, the Court notes that

---

[23] The Court notes that it is analyzing Plaintiff's Title VII and §1983 claims together although the causation standard is more demanding for § 1983 actions and requires "a court considering a § 1983 claim at summary judgment . . . [to] determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred but-for [the] discrimination." *Naumovski*, 934 F.3d at 214.  Since, as discussed below, the Court does not reach the causation element as to the Title VII or § 1983 claims, it analyzes Plaintiff's Title VII and § 1983 claims together.

**A1805**

Dr. Pulitzer is also white and Jewish and belongs to the same class as Plaintiff.  (Pulitzer Decl., Dkt. 79, ¶ 2 ("I self-identify as White and am Jewish."))  "It is a well-settled, albeit not dispositive, principle that where the alleged discriminator is a member of the same protected class as Plaintiff, an inference against discrimination exists and claims of discrimination become less plausible." *Meyer v. State of N.Y. Office of Mental Health*, 174 F. Supp. 3d 673, 687 (E.D.N.Y. 2016) (citing *Allen v. Chanel, Inc.*, No. 12-CV-6758 (LAP), 2015 WL 3938096, at *5 (S.D.N.Y. June 26, 2015); *see Allen*, 2015 WL 3938096, at *5 (granting summary judgment on sex discrimination claim because "when the decision-maker is in the same protected class(es) as the plaintiff-employee, courts can draw inferences against discriminatory intent," and here the decision makers were "all female" just like plaintiff); *Palak v. St. Francis Hosp.*, No. 14–CV–4383 (JG), 2015 WL 3682805, at *8, 2015 (E.D.N.Y. June 12, 2015) (collecting cases for proposition that it "provides an additional inference against discrimination" "where the person who participated in the allegedly adverse decision is also a member of the same protected class" (internal quotation marks omitted)).

In support of his claim of religious discrimination, Plaintiff asserts that Dr. Reede "appeared to harbor anti-Semitic sentiment." (Dkt. 90, at 4 n.4.)  Plaintiff submitted a declaration from a SUNY Downstate staff member who worked near Dr. Reede alleging, *inter alia*, that:  (1) Dr. Reede "expressed disapproval" when she saw observant Jewish staff gathering to pray; (2) Dr. Reede stated that she would end midday prayers of observant Jews; (3) Dr. Reede "sarcastically comment[ed] that she wished she were Jewish in order to get so many holidays from work;" and (4) Dr. Reede "express[ed] dissatisfaction with Jewish radiologists and staff leaving work early on Fridays in order to observe Shabbat." (*Id.*)  Aside from his own termination, discussed *supra*, this declaration is the only evidence Plaintiff proffers regarding SUNY-Defendants' alleged anti-Jewish animus.  This is plainly insufficient.  As a general matter, scant, isolated references are not

enough to allege discrimination under the fourth element of Title VII. *See Gonzalez v. Allied Barton Sec. Servs.*, No. 08-CV-9291 (RJS) (RLE), 2010 WL 3766964, at \*5 (S.D.N.Y. Sept. 7, 2010) (explaining that "isolated derogatory remarks . . . alone do not raise an inference of discrimination" (citing *Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir.1998))), *report and recommendation adopted*, 2010 WL 3766954 (S.D.N.Y. Sept. 27, 2010).  As the Second Circuit has explained,

> district courts in this circuit have developed a standardized approach for applying these concepts to individual cases. In determining whether a remark is probative, they have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).  While we caution that none of these factors should be regarded as dispositive, we think this framework will often provide a useful approach to the admission or exclusion of remarks not directly related to the adverse action against the plaintiff, and employ it here.

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010) (internal citations omitted).

Applying these factors, the Court notes that even assuming Dr. Reede made the comments attributed to her, Plaintiff offers no evidence establishing a connection between the comments and the adverse employment actions at issue.  The undated remarks by Dr. Reede were made at least six months prior to Dr. Scott-Moore's appointment and ten months before Plaintiff's termination, given that the staff member stopped working at KCHC in December of 2013.  (Neiman Decl., Dkt. 93, ¶ 2.)  *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (finding that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  And, it bears repeating that these alleged remarks by Dr. Reede were made *prior* to the decision to *renew* Plaintiff's contract.  Lastly,

**A1807**

Plaintiff, though Jewish, does not claim to be Orthodox or to pray during the work day; thus, even assuming *arguendo* that Dr. Reede harbored any negative sentiments about the Orthodox Jewish doctors at SUNY Downstate, that fact would have little to no connection to any action taken against Plaintiff.

For these reasons, the Court finds that Plaintiff failed to establish a *prima facie* case of discrimination. However, for the reasons discussed *supra* in the context of the FMLA discussion, even assuming *arguendo* that Plaintiff could successfully establish a *prima facie* case, SUNY-Defendants have established a legitimate and non-discriminatory rationale for his termination: Plaintiff's conduct in attaching 180 unapproved attestations to patients' charts—which not only violated hospital policy, but placed the hospital at risk of liability—and then seeking the IT Department's assistance to conceal his actions. Plaintiff has failed to prove, under both the Title VII and the § 1983 standards, that his termination was pre-textual, based in whole or in part on discrimination, or that discrimination was a "but-for" cause of his termination. Plaintiff has failed to show that discrimination on the basis of race or religion was even a *minimal* factor in his termination.

With respect to Plaintiff's claims of discrimination as related to the failure to promote him, Plaintiff asserts that Dr. Scott-Moore's appointment as Director of ER Radiology alone—"as a non-Jewish black who was also younger than Dr. Greenberg"—satisfies the fourth element of a *prima facie* case. (Dkt. 90, at 19 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) (additional citation omitted).) "[A] plaintiff may seek to raise an inference of discrimination by 'showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group.'" *Perreti v. Bank*, No. 11-CV-3925 (BMC), 2012 WL 2458137, at *4 (E.D.N.Y. Jun. 27, 2012) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368,

379 (2d Cir. 2003)).   That inquiry requires the plaintiff to demonstrate that he "was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self."   *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted).   In the promotion context, that means comparing the qualifications of the plaintiff with those of the person promoted.   *See Mandell*, 316 F.3d at 379 (finding that plaintiff had adduced sufficient evidence to show that "the promoted officers and plaintiff were sufficiently similarly situated to support an inference of discrimination"); *see also Terry*, 336 F.3d at 139.

> Plaintiff asserts that he
>
> was not only a legendary radiologist within the KCHC universe but he was highly respected by his colleagues who sought to imitate him.  He had been a radiologist for more than twice the number of years as Dr. Scott; he had spent more than a decade practicing at a Level One Trauma Center[,] . . . while Dr. Scott had no such experience, except when she was doing her residency at KCHC under Dr. Greenberg's supervision amongst others; and she had never been a Director of an ER Radiology Department at a Level One Trauma Center, while Dr. Greenberg had.

(Dkt. 90, at 19–20.)

While it is undisputed that Plaintiff had more years of experience as a radiologist than Dr. Scott-Moore, Defendants argue that the criteria that separated the two candidates and resulted in Dr. Scott-Moore's appointment over Plaintiff was their education-related experience and accomplishments.[24]   Thus, the crux of the factual dispute between the parties is how important the candidates' involvement in scholarly activity and academics was in SUNY-Defendants' hiring/promotion decision.   (*Compare* Dkt. 96, at 11, *with* Dkt. 90, at 20–21.)   SUNY-Defendants contend that academic and scholarship achievements was a significant consideration when making

---

[24] Although not highlighted by SUNY-Defendants' briefs (*see generally* Dkts. 78, 96), the Court notes that Dr. Scott-Moore was also a section chief of Musculoskeletal Radiology prior to her appointment as Director of Emergency Room Radiology at KCHC (*see* Reede Dep., Dkt. 87-60, at 122:22–123:2).

the promotion decision, pointing to the ACGME probation report that specifically criticized the faculty for their perceived lack of interest in the education of residents.  (Dkt. 96, at 11 (quoting Dkt. 87-1, at 3).)  In her meeting with Plaintiff on July 23, 2014, Dr. Reede told him that he was not offered the position due to:  his "[l]ack of participation in major administrative and educational meetings in the department . . ."; "[r]esident evaluations show[ing] deficiencies in several areas"; "[n]o significant scholarly activity"; and the hospital's "[n]eed [for] someone that is more interested in academics because [the hospital] want[ed] to explore the possibility of starting an ER Fellowship."  (Dkt. 87-53, at ECF 2.)

"Eligibility requirements are defined by the employer, and a plaintiff's subjective belief that [he] is qualified for the position is not sufficient."  *Ellis*, 975 F. Supp. 2d at 267; *see also Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 127 (2d Cir. 2004) (explaining that "being 'qualified' refers to the criteria the employer has specified for the position"); *Workneh v.  Pall Corp.*, 897 F. Supp. 2d 121, 131 (E.D.N.Y. 2012).  Plaintiff does not deny that he filled out a form indicating that he spent "zero hours doing 'research/ scholarly activity with residents.'"  (Pl.'s Decl., Dkt. 94, ¶ 14.)  Plaintiff's CV, provided to Dr. Reede during the application process, listed only two papers over the course of Plaintiff's at least nineteen-year career; both papers were undated and without the name of a journal.[25]  (Dkt. 87-51, at ECF 3.)  During Plaintiff's February 2014 annual review, prior to Dr. Scott-Moore's appointment, Plaintiff left the boxes for "scholarly distinction and accomplishment" entirely blank.  (Dkt. 100-1, at ECF 2.)  By contrast, the current

---

[25] In his deposition, Plaintiff admitted that one of the papers, which was written in the late 1980s, was never published.  (Pl.'s Dep., Dkt. 87-55, at 10:23–11:18.)

*curriculum vitae* of Dr. Scott-Moore that SUNY-Defendants submitted into evidence[26] listed three entries for "educational responsibilities;" membership in two professional societies; numerous awards and honors beginning in 1999; three visiting professorships, grand rounds, and invited lectures; and five scientific posters or education exhibits. (Dkt. 87-52, at ECF 6–8.) Additionally, Dr. Scott-Moore and the other candidate besides Plaintiff for the Director position, did not have the same time and attendance issues as Plaintiff, which was a particular concern to SUNY-Defendants given the recent ACGME report placing SUNY Downstate's radiology residency program on probation, in part, because "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule." (AGCME Report, Dkt. 87-1, at 2; *see* Reede Dep., Dkt. 87-59, at 137:18–25.)

For these reasons the Court finds that Dr. Scott-Moore and Plaintiff were not similarly situated in all material respects and that Plaintiff cannot establish that he was qualified for the position based on the criteria the employer specified. Plaintiff, therefore, cannot establish a *prima facie* case with respect to his discrimination claims for failure to promote. *Cf. Workneh*, 897 F. Supp. 2d at 131 ("[I]n determining whether a plaintiff has met his *prima facie* burden of demonstrating he was qualified for a position, being qualified refers to the criteria the employer has specified for the positions, and a plaintiff's subjective belief he is qualified will not suffice[.]"

---

[26] The Court notes that SUNY-Defendants did not submit the version of the Dr. Scott-Moore's curriculum vitae that was considered at the time of her promotion. However, based on the testimony discussed *supra*, and the information contained within the *curriculum vitae*, the Court assumes the validity of Dr. Scott-Moore's credentials. But the Court does not consider scholarship or educational efforts that Dr. Scott-Moore engaged in *after* being promoted, in assessing SUNY-Defendants' asserted reasons for promoting Dr. Scott-Moore over Plaintiff and the other candidate (*see* Dkt. 96, at 12–13), since that information could not possibly have been available to Defendants for their consideration.

(internal quotation marks omitted) (quoting *Williams*, 368 F.3d at 127)).[27]

### 3.    Plaintiff's Retaliation Claims

"Once the color of state law requirement is met, except for the issue of individual liability, an 'equal protection claim parallels a plaintiff's Title VII claim . . . [and] there is no sound reason to deviate from this principle for a retaliation claim.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 81–82 (2d Cir. 2015).  The Court accordingly considers Plaintiff's Title VII and § 1981/§ 1983 claims in tandem.

> Title VII . . . prohibits an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. . . .
>
> [T]he antiretaliation provision . . . covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56–57 (2006).

To prevail on a retaliation claim under Title VII, "an employee must show that (1) [he] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected

---

[27] In addition to Dr. Reede's allegedly disparaging comments about observant Jews and Dr. Scott-Moore's appointment over Plaintiff as Director of ER Radiology, Plaintiff points to the alleged termination or "micro-management" of "a number of Jewish, white, and/or older physicians" at KCHC, at a time when "younger, black, non-Jewish physicians" are being hired or "given more leeway" at work, as another fact upon which an inference of discrimination can be found.  Plaintiff, however, has offered no evidence to support either part of this assertion.  Thus, the Court does not consider it.  Moreover, for the reasons previously discussed, the Court does not find, even when considered in combination, that Dr. Reede's alleged hostility to observant Jews— even if established—and Dr. Scott-Moore's appointment are enough to support an inference of discrimination on the basis of religion or race for purposes of Plaintiff's §1981, § 1983, and Title VII claims.

**A1812**

activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "[E]ven without direct evidence of causation, a plaintiff can indirectly establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Zann Kwan v. Andalez Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (internal quotation marks and alterations omitted).

Plaintiff's *prima facie* retaliation claim fails because he cannot establish that there was a causal nexus between any protected activity and an adverse employment action.  Plaintiff contends that he complained about discrimination in his meeting with Ms. Bernadel on October 10, 2014 and was then terminated only twelve days later, giving rise to that nexus.  (Dkt. 90, at 28.) However, similar to the plaintiff in *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (internal citation omitted):

> The only basis [Plaintiff] suggests for finding such a nexus is time. He claims that his placement on probation and his subsequent firing followed his complaints closely enough to support an inference of retaliation. It is, of course, true that temporal proximity can demonstrate a causal nexus.  But in this case the adverse employment actions were both part, and the ultimate product, of "an extensive period of progressive discipline" which began when [Defendant] diminished [Plaintiff]'s job responsibilities a full five months prior to his filing of the EEOC charges. Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.

Although Plaintiff disputes when SUNY-Defendants began subjecting him to progressive discipline (*see* Dkt. 90, at 27–28), it is undisputed that he was subjected to some form of discipline at least by September 8, 2014, when he met with Labor Relations staff and signed an agreement placing him on probation—forty-four days before his termination, and prior to his complaint of anti-Jewish bias to Ms. Bernadel in Labor Relations.  (Settlement Agreement, Dkt. 87-29.)  *See also Hazelwood v. Highland Hosp.*, 763 F. App'x 60, 63 (2d Cir. 2019) (summary order) (finding no causal nexus where the adverse employment action occurred ten months after the alleged

protected activity, and plaintiff's "supervisors began calling performance deficiencies to her attention months before she complained to management . . . ." (internal citations omitted)).

Moreover, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015) (summary order).  For all the reasons discussed *supra*, Plaintiff is not able to rebut the legitimate and non-discriminatory reason for his termination established by SUNY-Defendants.  *Cf. Parron v. Herbert*, 768 F. App'x 75, 77 (2d Cir. 2019) (summary order) ("Even if there were a genuine dispute as to whether [plaintiff] had violated company policy, [plaintiff] did not produce any evidence demonstrating that these reasons were pretextual other than the timing of his suspension. . . .  But timing alone is insufficient to establish pretext."); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (finding in context of a Title VII retaliation claim that, while timing "might be enough to establish a prima facie case, temporal proximity alone is not enough to establish pretext in this Circuit").

For these reasons Plaintiff's Title VII, and §§ 1981 and 1983 retaliation claims are dismissed.

### C.     NYSHRL and NYCHRL Claims

In light of the Court's dismissal of all of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims, which are therefore dismissed without prejudice.  *See Missick v. City of New York*, 707 F. Supp. 2d 336, 354–55 (E.D.N.Y. 2010); *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170

**A1814**

(2d Cir. 2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (internal quotation marks omitted)).

**CONCLUSION**

For the reasons stated above, Defendants' motions for summary judgment are granted in their entirety. All claims against KCHC are dismissed because it is not a suable entity. Plaintiff's claims against SUNY and SUNY-Employees in their official capacities, seeking damages pursuant to § 1983, and Plaintiff's damages claims against SUNY and SUNY-Employees pursuant to the NYSHRL and NYCHRL, are dismissed under the Eleventh Amendment. Plaintiff's remaining claims for FMLA interference and retaliation, Title VII discrimination and retaliation, § 1981 discrimination and retaliation, and § 1983 discrimination claims are dismissed for failure to establish a *prima facie* case. In light of the Court's dismissal of all of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims, which are dismissed without prejudice.

The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2019
      Brooklyn, New York

Case 1:15-cv-02343-PKC-VMS   Document 104   Filed 10/29/19   Page 1 of 58 PageID #: 2801

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ODED GREENBERG,

                           Plaintiff,               15 Civ. 2343 (PKC) (VMS)

     - against -                         **NOTICE OF APPEAL**

SUNY DOWNSTATE et al.,

                          Defendants.

-------------------------------------------------------------X

TO:    Office of the New York State Attorney General
       By: Mr. Christopher V. Coulston, Esq.
       *Attorneys for State University Hospital –*
        *Downstate Medical Center, Steven Pulitzer*
        *Deborah L. Reede*
       28 Liberty Street
       New York, NY 10005
       Tel.: 212-416-8556
       Fax: 212-416-6075

       New York City Law Department
       Office of the Corporation Counsel
       By: Ms. Amanda Blair, Esq.
       *Attorneys for New York City Health and Hospitals Corp. and*
        *Kings County Hospital Center*
       100 Church Street
       New York, NY 10007
       Tel.: 212-356-8767
       Fax: 212-356-2089

       United States District Court, EDNY
       (NOA via ECF)
       Clerk of the Court
       225 Cadman Plaza East
       Brooklyn, NY 11201
       Tel.: 718-613-2600

       PLEASE TAKE NOTICE that plaintiff Oded Greenberg, by his attorneys Cardi & Edgar

LLP, hereby appeals to the United States Court of Appeals for the Second Circuit, from an Order

of the United States District Court for the Eastern District of New York, Hon. Pamela K. Chen,

filed and entered on September 29, 2019.  Plaintiff-appellant Oded Greenberg also appeals all

other related orders, judgment and papers in this action, if any.

The Order appealed from granted defendants' motions for summary judgment.

This appeal is taken from each and every part of the Order described above as well as the

whole thereof.

Dated:  New York, New York
        October 29, 2019

                                 Respectfully submitted,

                                 Cardi & Edgar LLP

                                   /s/ Chad L. Edgar
                                 _____

                                By: Chad L. Edgar, Esq.
                                Attorneys for Plaintiff
                                99 Madison Avenue, 8th Floor
                                New York, NY 10016
                                Tel.: 212-481-7770

**A1817**

## CERTIFICATE OF SERVICE

I, Chad L. Edgar, counsel for plaintiff Oded Greenberg, hereby certify that a copy of the

foregoing Notice of Appeal was served on October 29, 2019 on counsel of record for defendants,

Mr. Christopher V. Coulston, Esq. and Ms. Amanda Blair, Esq., via this Court's ECF filing

system.

Dated:  New York, New York
        October 29, 2019

        /s/ Chad L. Edgar
_____

Chad L. Edgar