# 19-3570-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

➤➤ ◄◄

MD ODED GREENBERG,

*Plaintiff-Appellant,*

*v.*

STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL CENTER, AKA THE STATE UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER AT BROOKLYN, AKA STATE UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL CENTER, NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY HOSPITAL CENTER DEBORAH L. REEDE, STEVEN PULITZER,

*Defendants-Appellees,*

*and*

UNITED UNIVERSITY PROFESSIONS, (UUP), SUNY DOWNSTATE MEDICAL CENTER CHAPTER OF UNITED UNIVERSITY PROFESSIONS, JOHN AND JANE DOES 1-20

*Defendants.*

*On Appeal from the United States District Court for the Eastern District of New York*

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

CARDI & EDGAR LLP
*Attorneys for Plaintiff-Appellant*
*M.D. Oded Greenberg*
99 Madison Avenue, 8th Floor
New York, New York 10016
212-481-7770

## **TABLE OF CONTENTS**

I. JURISDICTIONAL STATEMENT ....................................................1

II. ISSUES PRESENTED FOR REVIEW ..............................................2

III. STATEMENT OF THE CASE .......................................................3

IV. SUMMARY OF ARGUMENT .......................................................6

V. STATEMENT OF RELEVANT FACTS .........................................10

    1. The May Meeting Between Dr. Greenberg and Dr. Reede .....................11

    2. The July 2014 Meeting Where Dr. Reede Explains
    To Dr. Greenberg Why He Will Not Assume the Position
    Of Director of ER Radiology That He Previously Held ..........................11

    3. Dr. Pulitzer's "Counseling" of Dr. Greenberg on August 22, 2014 ..........13

    4. Events Leading Up To Dr. Greenberg's Request for FMLA Leave .........15

    5. Dr. Greenberg's Request For FMLA Leave .............................................16

    6. Dr. Greenberg's Placement on Probation After Taking His FMLA
    Leave ...................................................................................18

    7. Dr. Reede's and Dr. Pulitzer's Close Surveillance of Dr.
    Greenberg And His Eventual Termination .......................................20

    8. HHC's Joint Employer Status ...............................................22

VI. ARGUMENT ...............................................................................24

    1. A *DE NOVO* STANDARD OF REVIEW APPLIES ON THIS
    APPEAL OF THE DISTRICT COURT'S SUMMARY
    JUDGMENT DECISION .........................................................24

i

2. PLAINTIFF ESTABLISHED AN INTERFERENCE CLAIM
   UNDER FMLA SUCH THAT A REASONABLE JURY COULD
   FIND IN HIS FAVOR ............................................................................25

3. PLAINTIFF ESTABLISHED A RETALIATION CLAIM
   UNDER FMLA SUCH THAT A REASONABLE JURY COULD
   FIND IN HIS FAVOR ............................................................................32

4. THERE ARE MATERIAL FACTS IN DISPUTE REGARDING
   PLAINTIFF'S TITLE VII DISCRIMINATION CLAIMS
   ARISING FROM THE FAILURE TO PROMOTE HIM AND
   TO TERMINATE HIM ..........................................................................40

   A. PLAINTIFF HAS PRODUCED SUFFICIENT EVIDENCE
      REGARDING HIS FAILURE-TO-PROMOTE CLAIM
      REQUIRING TRIAL OF THE ISSUE .........................................40

   B. PLAINTIFF HAS PRODUCED SUFFICIENT EVIDENCE
      REGARDING HIS DISCRIMINATION CLAIMS
      RELATING TO HIS TERMINATION TO REQUIRE
      TRIAL OF THE ISSUE .................................................................47

VII. CONCLUSION ...............................................................................54

# TABLE OF AUTHORITIES

## Cases

*Belgrave v. City of New York*,
　　95 Civ. 1507, 1999 WL 692034 (E.D.N.Y. 1999) ......................................30

*Blackwell v. Harris Chemical North America, Inc.*,
　　11 F. Supp. 2d 1302 (D. Kan. 1998) ...........................................................30

*Byrnie v. Town of Cromwell, Bd. Of Educ.*,
　　243 F.3d 93 (2d Cir. 2001) ...........................................................................43

*Danzer v. Norden Systems, Inc.*,
　　151 F.3d 50 (2d Cir. 1998) ...........................................................................46

*Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*,
　　691 F.3d 134 (2d Cir. 2012) ........................................................24, 32-33, 39

*Doran v. New York State Dep't of Health*
　　*Office of Medicaid Inspector General*, 15 Civ. 7217,
　　2019 WL 4735484 (S.D.N.Y. Sept. 27, 2019) ............................................47

*EEOC v. Ethan Allen, Inc.*,
　　44 F.3d 116 (2d Cir. 1994) ...........................................................................43

*Ejiogy v. Grand Manor Nursing and Rehabilitation Center*,
　　15 Civ. 505, 2017 WL 1184278 (S.D.N.Y. March 29, 2017) ......................30

*Ellis v. Century 21 Dep't Stores*,
　　975 F. Supp. 2d 244 (E.D.N.Y. 2013) .....................................................40-41

*Evarts v. Quinnipiac University*,
　　15 Civ. 1509, 2018 WL 4845743 (D. Conn. Oct. 4, 2018) .........................30

*Forsythe v. New York City Dept. of Citywide Adm. Svcs.*,
　　733 F. Supp. 2d 392 (S.D.N.Y. 2010) ..................................................47 n. 14

*Graziadio v. Culinary Institute of America*,
   817 F3d 415 (2d Cir. 2016) .........................................6, 25, 30-31, 32 n.8, 33

*Harris v. City of New York*,
   03 Civ. 6167, 2004 WL 2943101 (S.D.N.Y. Dec. 21, 2004) ......................47

*Henry v. Wyeth Pharmaceuticals*, 616 F.3d 134 (2d Cir. 2010) ...........................45

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) ..........................8, 34-35

*Kovaco v. Rockbestos-Surprenant Cable Corp.*,
   834 F.3d 128 (2d Cir. 2016) ................................................................48 n. 16

*Leibowitz v. Cornell University*,
   584 F.3d 487 (2d Cir. 2009) ................................................................49 n. 17

*Naumovski v. Norris*,
   934 F.3d 200 (2d Cir. 2019) ...........................................41 n.11, 49 n. 17, 52

*Poitras v. ConnectiCare, Inc.*,
   206 F. Supp. 3d 736 (D. Conn. 2016) ...........................................................30

*Rodriguez v. Webb Hosp. Corp.*,
   234 F. Supp. 3d 834 (S.D. Tex. 2017) ..........................................................30

*Ryan v. Judicial Branch of the State of Connecticut*,
   12 Civ. 1282, 2014 WL 12569528 (D. Conn. April 8, 2014) ......................39

*Tomassi v. Insignia Fin. Group, Inc.*,
   478 F.3d 111 (2d Cir. 2007) .......................................................................45

*Vega v. Hempstead Union Free School District*,
   801 F.3d 72 (2d Cir. 2015) ................................................................49 n. 17

*Woods v. START Treatment & Recovery Centers, Inc.*,
   864 F.3d 158, 169 (2017) .......................................................................8, 38

## Statutes

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................

28 U.S.C. § 1337 ...................................................................................

28 U.S.C. § 1367 ...................................................................................1

29 U.S.C. § 2614(a) ............................................................................30

29 U.S.C. § 2617 ...................................................................................1

42 U.S.C. § 1981 ...................................................................................1

42 U.S.C. § 1983 ...................................................................................1

42 U.S.C. § 2000e-5 ..............................................................................1

## Rules and Regulations

29 C.F.R. § 825.106 .........................................................................26 n.6

29 C.F.R. § 825.124(b) ..........................................................................36

# I. JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over Plaintiff's FMLA claims, Title VII claims, Sections 1981 and 1983 claims, under the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2617, Title VII of the Civil Rights Act of 1964 ("Title VII"), as codified, 42 U.S.C. Sections 2000e-5(f), and Title 42 of the United States Code, 42 U.S.C. §§ 1981 ("§ 1981"), 1983 ("§ 1983") respectively and pursuant to 28 U.S.C. §§ 1331, 1337. The District Court also had subject matter jurisdiction over Plaintiff's New York State Human Rights Law and New York City Human Rights Law claims pursuant to 28 U.S. Code § 1367. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. Plaintiff Oded Greenberg ("Plaintiff," "Appellant" or "Dr. Greenberg") timely filed his Notice of Appeal (A17) on October 29, 2019 from the Decision entered in favor of defendants State University Hospital-Downstate Medical a/k/a The State University of New York Health Science Center at Brooklyn a/k/a SUNY Downstate Medical Center ("SUNY"), Deborah L. Reede ("Dr. Reede"), Steven Pulitzer ("Dr. Pulitzer"), New York City Health and Hospitals Corporation ("HHC") and Kings County Hospital Center ("KCHC") (collectively, "Appellees") in the United States District Court, Eastern District of New York, on September 29, 2019. Dr. Greenberg's appeal is from a decision and order (A17, SPA1-55)

that granted summary judgment in favor of Appellees with respect to all of Dr. Greenberg's claims.

## II. ISSUES PRESENTED FOR REVIEW

**ISSUE 1**: Whether the district court erred in holding that Dr. Greenberg's FMLA interference claim was duplicative of his retaliation claim and/or he failed to state a *prima facie* interference case where it was undisputed that he was an eligible employee under the FMLA, that his request for leave was denied, that a reasonable juror could find that SUNY, HHC, Dr. Reede and Dr. Pulitzer (collectively, "Employers") were all his employers as defined by the FMLA, and that a reasonable juror could find based on admissible evidence both that Dr. Greenberg was entitled to take FMLA leave and he requested it in a manner that provided sufficient facts for his Employers to understand that he sought FMLA leave.

Standard of Review: De Novo.

**ISSUE 2**: Whether a jury could reasonably find that both Dr. Greenberg's request for FMLA leave and then his taking it despite Employers' denial of the request were negative factors in his subsequent termination by the Employers where the individuals who decided to terminate him were the same individuals who initially denied his FMLA request and then disciplined him for taking it in spite of their directive not to do so.

2

Standard of Review: De Novo.

**ISSUE 3**: Whether a jury could reasonably find that Dr. Greenberg's failure to be promoted and his eventual termination by SUNY and HHC were motivated by discrimination based on his religion where Dr. Greenberg produced admissible evidence that one of the individuals primarily responsible for the aforesaid adverse employment actions was known to make statements to the effect that Jewish religious observances undermined the efficient operations of the workplace that she supervised.

Standard of Review: De Novo.

### III. STATEMENT OF THE CASE

Dr. Greenberg brought the instant action against SUNY, HHC, KCHC, Dr. Reede and Dr. Pulitzer, amongst others, seeking damages, declaratory relief and permanent injunctive relief under the FMLA, Title VII, § 1981, § 1983 and various New York State and City statutes. In essence, Dr. Greenberg alleges that commencing with his request for FMLA leave in late August of 2014, two of his supervisors, one at SUNY (Dr. Reede) and the other at KCHC (Dr. Pulitzer), waged a campaign to get rid of him as a radiologist at KCHC by initially denying that request and then ultimately terminating him less than two months later for breaching a Last Chance Agreement that he was compelled to enter into in order to return from the FMLA leave that they would not authorize. Because Dr.

3

Greenberg's request for leave was protected by the FMLA the Employers' denial of the request and then placing him on probation when he returned to work gives rise to an interference claim under the FMLA. In addition, because the same supervisors ultimately terminated him less than two months later for breaching the terms of a probation that they imposed on him for his exercise of FMLA rights, it is a reasonable inference, given the circumstances that will be described more fully below, that retaliatory animus was a factor in their termination decision. Thus, Dr. Greenberg pressed below and continues to press here his FMLA retaliation claim. Finally, Dr. Greenberg alleges that it is at a minimum a factual dispute as to whether Dr. Reede's anti-Semitism was a factor both in her choosing not to promote him to the Director of ER Radiology position in July 2014 and to push for the termination of his employment in October of 2014.

This action was commenced on April 22, 2015 by the filing of a complaint in the Eastern District of New York. (A4). The parties conducted discovery after which all Appellees moved for full summary judgment. The Appellees' motions were fully submitted on September 14, 2018. (A14-16).

On September 29, 2019, the district court issued a Memorandum & Order (A17) granting Appellees' motions for summary judgment in all respects, and thereby dismissed the complaint. (SPA1-55).

4

In its September 29, 2019 summary judgment Memorandum & Order, the district court held that Dr. Greenberg's FMLA interference claim was a retaliation claim in disguise because he did not allege that he was prevented from taking FMLA leave. (SPA34-35).  It further noted that in any event he was not refused a benefit under the FMLA, one of the elements of a *prima facie* interference claim, because he was able to use accrued sick leave for the days off that he sought. (SPA35 n.17).  The district court held that the FMLA retaliation, Title VII, Section 1981 and 1983 claims failed because Dr. Greenberg could not establish a *prima facie* case or in the alternative because he could not demonstrate that the Employers' alleged legitimate business reason for terminating him was pretextual. (SPA36-54)[1]

Notably, in its decision, the district court did not reach the issue as to whether HHC was a joint employer of Dr. Greenberg for purposes of liability under either the FMLA or Title VII. (SPA19 n.14).

Plaintiff filed a timely notice of appeal on October 29, 2019. (A17).  This brief constitutes the perfection of the appeal.  On appeal, this Court can find that

---

[1]The district court also dismissed certain claims based on sovereign immunity, decisions that are not at issue in this appeal. (SPA24-25).  The claims that were not subject to sovereign immunity, according to the district court, were Plaintiff's interference and retaliation claims based on family care against SUNY and HHC, Dr. Reede and Dr. Pulitzer; the section 1981 claims against SUNY, Dr. Reede and Dr. Pulitzer; the section 1983, New York State and New York City damages claims against Dr. Reede and Dr. Pulitzer in their individual capacities; the section 1983 claims for prospective injunctive relief against Dr. Reede and Dr. Pulitzer in their official capacities; and Plaintiff's Title VII claims against all Defendants. (SPA26).

there are genuine disputes of material facts and a jury could reasonably find in Plaintiff's favor as to the FMLA and Title VII claims that are the subject of this appeal.

## IV. SUMMARY OF ARGUMENT

The district court misapplied the law when it granted Appellees' summary judgment with respect to Dr. Greenberg's FMLA interference claim. The district court cited two bases for its ruling in this regard: first, Plaintiff's interference claim was a retaliation claim in disguise to the extent that he did not allege that he was prevented from taking FMLA leave; and two, he failed to allege a *prima facie* case because he could not show that he was denied benefits under the statute. (SPA34-35 & n.17) With respect to the first basis for dismissing the interference claim, the district court departed from clear precedent. In *Graziadio*, this Court affirmed an interference claim where a plaintiff requested FMLA leave, took that leave and then had the leave's eligibility denied in retrospect for failing to provide sufficient documentation upon her return to work. *See Graziadio v. Culinary Institute of America*, 817 F.3d 415, 425 (2d Cir. 2016). The fact that the plaintiff there took the leave had no bearing on the analysis as to whether she stated an interference claim. As for the second basis of the ruling, that Dr. Greenberg failed to allege or show that he was denied a benefit, it should go without saying that a protected leave is itself a benefit under the FMLA. We strain to understand how being

6

denied the benefit of a protected leave, as was the case here, could be construed as failing to allege a denial of a benefit. In any event, it is well-established law that an employee is denied a benefit under the FMLA where his employer refuses to reinstate him to his pre-leave position under the same terms and conditions. Here, where Dr. Greenberg was placed on probation upon his return from leave, there was a clear denial of this benefit under the FMLA.

The district court also fumbled its analysis of Dr. Greenberg's FMLA retaliation claim by engaging in the kind of credibility determination that is not appropriate for summary judgment and not following the more lenient "negative factor" causality standard that this Court recently confirmed was applicable in such cases.

The district court held that Dr. Greenberg failed to adduce evidence to make out a *prima facie* retaliation case under FMLA because no reasonable jury could find that he sought a leave to take care of a family member. (SPA39). In so holding, the district court appeared to ignore, or, worse, chose not to believe the truth of, the excerpt of Dr. Greenberg's deposition where he stated that he made clear to his supervisor that he needed the leave to take care of his special-needs son who was being suddenly transferred to a different school. (*Compare* SPA38 with A531). With scant discussion, the district court accepted Dr. Pulitzer's version of the request for leave: that Dr. Greenberg did not communicate the need to take care

7

of his son with special needs in conjunction with the request. The district court justified its credibility determination by analogizing Dr. Greenberg to the plaintiff in *Jeffreys v. City of New York*. (SPA39). There, this Court carved out a limited exception to the well-established rule that district courts are not to engage in credibility determinations adverse to a non-movant plaintiff when deciding a summary judgment motion. Under no fair characterization of his various statements regarding his reason for asking for FMLA leave can they be likened to the patently contradictory statements of *Jeffreys*.

As a further basis for dismissing his FMLA retaliation claim, the district court found that Plaintiff did not adduce evidence upon which a reasonable jury could find that the legitimate reason for terminating him was pretextual. (SPA40). Notably, in its discussion of pretext in the context of the FMLA retaliation claim, the district court did not cite the relevant causation standard that this Court recently held to be applicable: "negative factor." *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 169 (2017). "Negative factor" is a lenient standard. Here, it was undisputed that the same decision-makers who decided to terminate Dr. Greenberg were also the same decision-makers who supported disciplining him in the form of probation upon his return from FMLA leave only one month earlier. Combine the lenient standard for surviving a motion for summary judgment, the lenient standard for alleging a FMLA retaliation claim, and the facts here where

8

the same decision-makers who denied Dr. Greenberg's FMLA request punished him for taking it in any event and then decided to terminate him less than two months later and it adds up to a claim that a jury could reasonably find in Dr. Greenberg's favor.

Finally, the district court dismissed Dr. Greenberg's discrimination claims based on anti-Semitic and racial animus pursuant to Title VII, Section 1981 and 1983 for failure both to adduce evidence to support a *prima facie* case and to show that the Employers' stated legitimate reason for termination was pretextual. Significant for the district court was the fact that one of Dr. Greenberg's supervisors at the center of the adverse employment actions was white and Jewish. The district court ignored Dr. Greenberg's argument below that Dr. Reede and not Dr. Pulitzer was the primary force behind the adverse employment actions at issue. The district court also noted that Dr. Reede and Dr. Pulitzer had the opportunity not to renew Dr. Greenberg's contract before the adverse employment actions at issue commenced but they refrained from doing so. The district court ignored the fact that Dr. Greenberg was considered by Dr. Pulitzer a superstar and therefore untouchable, unless a case against him was carefully constructed: that campaign spanned from before the renewal decision until he was terminated. Finally, according to the district court, the anti-Semitic remarks of Dr. Reede, the architect of the campaign against Dr. Greenberg, were held to be garden-variety "stray

9

remarks" in that they were stale, having occurred at least six months before the events at issue, and too remote in that they were not stated in the context of the termination decision. (SPA47-48). In so finding, the district court erred by deploying an "admissibility" analysis rather than a relevance analysis. With respect to the Title VII claims, the district court failed both to draw inferences in the non-movant's favor and to follow the more lenient standard under Title VII where plaintiff need only show that discriminatory animus was a motivating factor in an employer's adverse employment action.

## V. STATEMENT OF RELEVANT FACTS

At the time that Dr. Greenberg was unlawfully terminated from his employment at SUNY and KCHC, he had been a well-respected radiologist in the Emergency Room at KCHC for over fourteen years. (A18-19; A574 (426:22-25-427:3)). During his employment at SUNY and KCHC, Dr. Greenberg served as a Director of ER Radiology at KCHC from approximately 2005 or 2006 to 2009. (A529 (89:10-18)). Dr. Greenberg's credentials were both unusually strong and versatile in that he was fellowship-trained in Body Imaging by an ACGME-approved program and was board-certified in two sub-specialties, Diagnostic Radiology and Anatomic Pathology, a versatility shared by no other colleague at KCHC. (A49).

10

1.      **The May Meeting Between Dr. Greenberg and Dr. Reede**

In the spring of 2014, SUNY and KCHC implemented a round of layoffs

that were approved by Dr. Reede, Department Chair of Radiology, SUNY, and her

counterpart at KCHC, Dr. Jammeladine, Chief Medical Officer. (A466-67).

Although Dr. Greenberg survived this round of layoffs, he was soon to be targeted

for special scrutiny by Dr. Reede and Dr. Pulitzer, who was then assistant to Dr.

Alan Kantor who was, in turn, Chief of Service at the Radiology Department at

KCHC.  Specifically, on April 30, 2014, Dr. Pulitzer sent Dr. Reede an email

where he indicated what he believed to be Dr. Greenberg's first case "read" and

last case "read" from April 14 to April 22, 2014.  (A599).  Although there is no

context for this email, it implies that they were cooperating in the effort to

scrutinize the hours worked by Dr. Greenberg.  What is odd here is that Dr. Reede

is not including Dr. Kantor in this surveillance, even though he is still Chief of

Service in the department at KCHC; at this time, it appears that Dr. Reede and Dr.

Pulitzer have formed a back-channel alliance.

2.      **The July 2014 Meeting Where Dr. Reede Explains
        To Dr. Greenberg Why He Will Not Assume the Position
        Of Director of ER Radiology That He Previously Held**

Towards the end of June 2014, Dr. Reede announced to the department that

four radiologists, including Dr. Kantor, were not being renewed.  One of the

radiologists "downsized" was the Director of ER Radiology; in light of the open

11

position, Dr. Greenberg offered himself to Dr. Reede as a candidate to take over the role. (A612). Little did Dr. Greenberg know that Dr. Reede had already given the position to Dr. Jinel Scott-Moore, a considerably younger radiologist who he himself had trained when she was a resident at KCHC. (A603 & A584). Dr. Scott-Moore is black and not Jewish and was approximately 36 years old at the time of the appointment whereas Dr. Greenberg was 55 years old. (A576, A594 & A806).

According to her memo to the file, on July 23, 2014, Dr. Reede met with Dr. Reede where she related to him the reasons why he would not be promoted to the Director position: he lacked participation in administrative functions in the department; his resident evaluations showed deficiencies; he had no significant scholarly activity; and he did not demonstrate an interest in academic pursuits. (A613) Dr. Greenberg testified that Dr. Reede also told him that the reason she preferred Dr. Scott-Moore to him was that she was closer to her residency and therefore would be a better mentor to the residents. (A809). Neither Dr. Reede's memo to the file nor Dr. Greenberg's recollection indicate any discussion about a concern with his availability issues, i.e., not being where he is supposed to be, at this meeting, even though this issue would be one of the reasons that she cited to justify her decision at her deposition a few years later.

12

### 3. Dr. Pulitzer's "Counseling" Of Dr. Greenberg on August 22, 2014

By the beginning of July 2014, Dr. Pulitzer assumed the position of Interim Chief of Service in the Department of Radiology at KCHC. (A549 (13:9-12)). Immediately, Dr. Pulitzer demonstrated that his leadership of the department would be deeply intertwined with Dr. Reede's oversight, as he intended to provide her daily updates. (A614). According to the Employers, around this time, in July and August 2014, Dr. Greenberg was allegedly working erratic hours. (A76-77).

During this time Dr. Reede and Dr. Pulitzer were closely monitoring Dr. Greenberg's time and attendance. On August 20, 2014, Jayan Kurian, an IT administrator at KCHC, sent to Dr. Pulitzer a daily log indicating when Dr. Greenberg completed a review of each film that he analyzed from July 1, 2014 to August 8, 2014. (A620-21). Later the same day, Dr. Pulitzer forwarded this comprehensive log to Dr. Reede without a cover email, implying that they were in an ongoing conversation about Dr. Greenberg's performance. (A622). No other radiologists in the department were singled out for scrutiny in this manner during this time period.

According to memos to the file that he created after the fact, Dr. Pulitzer approached Dr. Greenberg on either August 22 or 23, 2014 to "counsel" him about his allegedly erratic work schedule and to require him to work a set schedule of 9:30 a.m. to 5:30 p.m. (A623-26). At his deposition and under oath, Dr. Pulitzer

13

recharacterized this encounter as a friendly discussion intended to accommodate Dr. Greenberg's scheduling preferences. (A561 (310:21-311:25)).  Notably, Dr. Pulitzer's memos to the file about this August 22 or 23, 2014 discussion between Dr. Greenberg and himself appear to have been written after Dr. Greenberg approached him on September 2, 2014 to request permission to take the rest of the week off to take care of his autistic son – a request that Dr. Pulitzer immediately denied. (A623-26).  To be clear, these memos seem to be written with an eye to the storm that was developing about Dr. Greenberg's request for a leave in early September.

Dr. Greenberg has a far different account as to the content of this discussion with Dr. Pulitzer: according to Dr. Greenberg, Dr. Pulitzer related to him that although he understood that the new set schedule accorded neither with the schedule that he had historically worked nor his personal circumstances Dr. Reede was insisting on it because she was out to catch him and get rid of him. (A810). According to Dr. Greenberg, he and Dr. Pulitzer did not discuss his so-called recent erratic work schedule.  (*Id.*). In response to his discussion with Dr. Pulitzer, on August 25, 2014, Plaintiff wrote an email where he continued the discussion about the implementation of an earlier, set schedule in which he points out its illogic but agrees to comply. (A547).

14

### 4.     Events Leading Up To Dr. Greenberg's Request for FMLA Leave

During the week of August 25, 2014, Dr. Greenberg was scheduled to be on vacation for at least part of the week. (A627-9). In the August 25th email referenced above, Dr. Greenberg also mentioned that despite the fact that he was on vacation he was going to attend a multi-disciplinary meeting at KCHC where he was to present his findings as to why certain serious cases in the ER were not timely read by the Radiology Department. (A547). After Dr. Greenberg attended the multi-disciplinary meeting, he went down to ER to check in with his colleagues and he saw that no one was in the Radiology reading room; he decided to pitch in by reading cases. (A810-11). According to Plaintiff, Dr. Hammill, the colleague in charge of the department while Dr. Pulitzer was on vacation this week, welcomed the assistance. (A811). The official schedule of the department was revised on August 26, 2014 to show that Dr. Greenberg would be working for the rest of the week. (A630-32).

On Friday, August 29, 2014, Dr. Greenberg and his wife learned by email that their special needs son was in all probability going to be transferred to a different school. (A633 & A530-31 (224:8-226:16)). Upon learning that his son was likely to have to attend a different school for the new academic year, Dr. Greenberg and his wife conferred and came to the decision that he should take a few days off to help his special-needs son adjust to the new school. (A811). On

15

the same day that he received the email from Gateway School, on August 29, 2014, Dr. Greenberg attempted to call Dr. Reede to notify her of his need for a leave. (*Id.*). Dr. Reede was on vacation and her voicemail was full and not taking any additional messages. (*Id.*). With Dr. Pulitzer also on vacation, Dr. Greenberg resorted to emailing Dr. Reede's assistant, Linda McMurren, to notify her of his need to take a few days off the following week "on an emergent basis." (A658). Linda McMurren, like her boss Dr. Reede, was on vacation on August 29, 2014; she did not respond to this email until September 4, 2014. (A657). Dr. Greenberg's first opportunity to have a discussion about his need for a leave occurred on September 2, 2014, when Dr. Pulitzer arrived at work after being on vacation the previous week.

### 5. Dr. Greenberg's Requests For FMLA Leave

What was said during the first, second and third discussions between Dr. Greenberg and Dr. Pulitzer commencing on September 2, 2014 and continuing into the next day about the former's request of the latter for permission to take a brief (i.e., 2 or 3 days) leave of absence to assist with arrangements for his son's transfer to a different school and to provide him with love, care and support during the transition is the material factual dispute that cannot be resolved without trial. (A483-87, A509-12).

16

At his deposition, Dr. Pulitzer vehemently denied that Plaintiff mentioned his special-needs son or that son's transition to a new school in conjunction with the request for leave; he further testified that as a parent of a special-needs child he is sensitive to such issues. (A565-66 (341:6-345:25)). Dr. Pulitzer insisted that Dr. Greenberg never shared with him during three conversations about the leave the reason why he needed the leave. (A569 (359:10-22)).

At his deposition, Dr. Greenberg testified that on September 2, 2014, he told Dr. Pulitzer the following:

> Q:    And what was said during that conversation?
> A:    I told him that I had to care for my son, that he had to transition to a new school, and that I needed the time off to be with him.
> Q:    And is that what you said verbatim?
> A:    I don't know what I said verbatim.
> Q:    Do you remember anything specifically that you said?
> A:    I don't remember specifically, I know that I told him he – you know, he was well aware of my son's special needs, and I told him that I needed that time off to care for him during a very difficult transition.

(A531 (228:14-229:7)). Dr. Pulitzer testified that in the course of the three conversations he had with Dr. Greenberg about the leave he never asked him why he needed the leave. (A569 (360:4-8)).

Dr. Greenberg took off September 4 and 5, 2014 without the authorization of Dr. Pulitzer and under the threat that in doing so he would be referred to Labor Relations. In fact, his son did have to transition to a different school. By the morning of September 4, 2014, his son's maternal grandmother arrived in town to

17

assist Dr. Greenberg and his wife to provide love, support and care during the transition. (A533 (242:9-13)). On September 5, 2014, Dr. Greenberg wrote an email to Linda McMurren and carbon copied Dr. Pulitzer to provide an update as to his absence. (A657). In this email, Dr. Greenberg related that he intended to come to work on September 4th but he threw his back out and was unable to come in because of it. (*Id.*) When questioned about this email at his deposition, Dr. Greenberg admitted that it was false, that he always intended to take the two days off to provide care for his son and this email was written to provide an excuse for his absence since he was in fear of losing his job. (A534 (246:22-247:21)). When asked directly whether his resolve ever changed about not showing up for work on September 4 and 5, 2014, Plaintiff testified no – that he always intended to stay at home to help his special-needs son. (A534 (247:15-16)).

### 6. Dr. Greenberg's Placement on Probation After Taking His FMLA Leave

When Dr. Greenberg returned to work on September 8, 2014, Dr. Pulitzer sent him to Labor Relations where he was interrogated for hours. What is notable about Dr. Greenberg's interrogation are the clear statements that he makes regarding the reasons why he sought a brief leave: that he had a special needs son; that this son was being transferred to a new school; that the son would find the transfer to be particularly difficult in light of his autism spectral disorder; and that

18

his son needed him for love, care and support. (A183-84, A196-97, A201-04).[2]  In hearing these reasons, Mr. Arabian, the Labor Relations representative interrogating him, did not probe Dr. Greenberg as to whether he presented these circumstances to Dr. Pulitzer when he asked for the leave nor did he inquire further himself to see if they might fall within the ambit of the FMLA.

While Dr. Reede and Dr. Pulitzer testified that they had nothing to do with the terms of the settlement agreement presented to Dr. Greenberg in exchange for being able to return to work, Mr. Arabian testified that in his experience at Labor Relations a settlement agreement would not be presented to an employee without first running its terms by the department heads who would be affected by the agreement.  (A670-71 (224:24-225:8)).

According to the terms of the settlement agreement, Plaintiff was essentially stripped of job protections and placed on probation: he could be terminated should he have any subsequent issues with unscheduled absences, tardiness, interference with the operations of the department, insubordination or misrepresentation of hours worked on timesheets.  (A675-76).

---

[2] At the interrogation, Dr. Greenberg stated that he had intended to come to work on the days for which he requested leave. (A184).  This statement, like the email in September that he wrote to Ms. McMurren and about which he was questioned at his deposition, was motivated by the desire to save his job by characterizing himself as having been willing to come in on the days for which he sought and took leave but was unable to because of his back.

7.     **Dr. Reede's and Dr. Pulitzer's Close Surveillance of Dr. Greenberg And His Eventual Termination**

After Dr. Greenberg's execution of the draconian settlement agreement that effectively placed him on probation, both Dr. Pulitzer and Dr. Reede intensified their scrutiny of him.  On September 12, 2014, Dr. Pulitzer emailed Dr. Reede one of his updates and the first item that he addressed was related to Dr. Greenberg: "Will monitor time and attendance and number of cases read per day."  (A694).  On September 15, 2014 at 8:52 a.m., Dr. Reede emailed Dr. Pulitzer and asked: "is Dr. Greenberg reading films?"  (A696).  Dr. Pulitzer responded within 35 **minutes** with the answer, "Yes. He is."  (A697).

On September 15, 2014, Dr. Greenberg wrote to Dr. Pulitzer and carbon copied Dr. Reede.  In this email, he provided his account of events surrounding his allegedly insubordinate leave of absence on September 4 and 5, 2014. (A698).  In the email, Dr. Greenberg expressly and in writing references a family issue that was the basis for his request.  In response to this email, neither Dr. Reede nor Dr. Pulitzer responded to Dr. Greenberg; rather, they wrote to each other with Dr. Reede observing: "I see d ... Dr. Greenberg is trying to cover his tracts [sic]."

20

(A700).  To which Dr. Pulitzer responded: "Yes I have filed his email in his file. He is really all over the map."[3] (*Id.*)

On September 22, 2014, there was a Radiology Department meeting to which Dr. Greenberg arrived late.  (A812).  During the portion of the meeting that Dr. Greenberg attended, he understood that attestations would have to be affixed to all studies that indicated whether attending physicians agreed or disagreed with residents' initial readings of films.  (A812-13).  Dr. Greenberg was frustrated by this new requirement that would have him author language that he viewed as unnecessary and would add a step to the review of patient studies with the likely consequence that it would cause a backlog in the flow of work.  (A813).  When Dr. Greenberg returned to the ER reading room after the meeting, in his frustration, he authored an attestation that met the insurers' requirements as far as he understood them but in a playful or, at worst sarcastic, manner.  (*Id.*).  Having arrived late for the departmental meeting, he had no idea that the attestations to be used were available as a macro from one of his colleagues. (*Id.*).  Plaintiff started immediately affixing this attestation on studies.[4]

---

[3]At her deposition, Dr. Reede admitted that she was aware that Dr. Greenberg had a special-needs child, which makes her decision not to ask Dr. Greenberg follow-up questions regarding this email especially egregious.  (609-610 (324:23-325:7)).
[4]The studies to which Dr. Greenberg affixed his attestation were stale in the sense that they were months old, had already been acted upon clinically speaking, and were lingering in the department only because insurers rejected them because they lacked an attestation.  (A813).

Dr. Pulitzer never discussed the "playful" or "sarcastic" attestation with Dr. Greenberg. (A555-56 & A813-14). In the immediate aftermath of the discovery of the attestations, Dr. Pulitzer convened meetings with the Chief Medical Officer of KCHC, Dr. Ghassan Jamaleddine, and the Legal Department at KCHC to obtain guidance as to how he should proceed both with respect to the studies that had the attestation and what, if any, disciplinary measures should be imposed on Dr. Greenberg. (A83-84). In the end, in conjunction with Labor Relations and at the behest of Dr. Jamaleddine, Dr. Reede and Dr. Pulitzer decided to terminate Dr. Greenberg's employment at the Employers. (A673 (9:5-14), A573 (420:5-22), A463, A713-14). Dr. Greenberg was terminated by letter dated October 22, 2014 (A335).

### 8. HHC's Joint Employer Status

Under an affiliation agreement between SUNY and HHC, Dr. Greenberg and his colleagues in the Radiology Department were obliged to observe and follow KCHC's policies, procedures, rules and regulations in the course of performing their duties as purported SUNY employees. (A764-78 & A806). At all times relevant to this case, Dr. Greenberg and his fellow radiologists were supervised by Dr. Pulitzer whose KCHC title was Interim Chief of Service, Department of Radiology; the Chief Executive of HHC appointed him to that title. (A662-63, A716-18, A1486, A782-84 & A807). For a total of approximately 11

22

years, including during the relevant time period, Dr. Greenberg worked full time

and exclusively at KCHC. (A806-07). KCHC stored and updated biennially the

paperwork to support the practicing privileges of Dr. Greenberg and his colleagues

at KCHC. (A785-803 & A807). KCHC also kept records of Dr. Greenberg's

completion of Continuing Medical Education courses. (A807). Dr. Pulitzer, as

Interim Chief of Service of the KCHC Radiology Department, set the work

schedule of Dr. Greenberg and his colleagues. (A705-06 & A807). Dr. Greenberg

and his colleagues in the Radiology Department at KCHC used KCHC's facilities

and equipment and held themselves out to the public as the medical staff of KCHC.

(A807). The salaries of Dr. Greenberg and his colleagues were paid by KCHC in a

lump sum and SUNY then divvied up that lump sum into the amounts that each

radiologist actually was compensated. (A709-10). Dr. Ghassan W. Jamaleddine,

the Chief Medical Officer at KCHC during the relevant time, played a significant

role in the termination of radiologists allegedly employed by SUNY, including but

not limited to Dr. Alan Kantor, the predecessor to Dr. Pulitzer as Chief of Service

in the Department of Radiology at KCHC, and Dr. Greenberg. (A601-2 (31:14-

33:13), A552-53 (133:24-137:19), A713). Finally, according to the clear terms of

the Affiliation Agreement between SUNY and KCHC, KCHC had the ability to

prevent SUNY physicians like Dr. Greenberg from practicing at its facility.

(A1483) (section 2.1(c)).

23

# VI. ARGUMENT

1. **A *DE NOVO* STANDARD OF REVIEW APPLIES ON THIS APPEAL OF THE DISTRICT COURT'S SUMMARY JUDGMENT DECISION**

This Court has set forth the standard for reviewing summary judgment on appeal and stated it as follows:

> We review orders granting summary judgment de novo, assessing whether the district court properly concluded that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law .... While "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion" ... "we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought" ... Summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."

*Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (citations omitted).

In light of the foregoing and as to the instant appeal, this Court must assess the record below with a clean slate and if it finds, as we believe it must, that the district court did not resolve all ambiguities and draw all permissible factual inferences in favor of the non-movant when assessing whether there were disputed material facts as to the FMLA and the Title VII discrimination claims, then it must reverse the relevant portions of the decision and remand the case to the district court.

### 2. PLAINTIFF ESTABLISHED AN INTERFERENCE CLAIM UNDER FMLA SUCH THAT A REASONABLE JURY COULD FIND IN HIS FAVOR

In its decision, the district court held that Dr. Greenberg failed to establish a *prima facie* interference claim under the FMLA because he could not satisfy one its elements, i.e., that he was denied benefits to which he was entitled under the FMLA. (SPA35 n.17). Alternatively, the district court held that Dr. Greenberg's interference claim was merely a retaliation claim in disguise because "he was never prevented from actually taking FMLA leave." (SPA34). The district court erred in dismissing Dr. Greenberg's interference claim for these reasons.

To establish an interference claim under the FMLA, a plaintiff must demonstrate the following: (1) that he is an eligible employee under the statute; (2) that the defendant is an employer as defined by the statute; (3) that plaintiff was entitled to take leave under the statute; (4) that he gave notice to the defendant of his intention to take leave; and (5) that he was denied benefits to which he was entitled. *See Graziadio v. Culinary Institute of America*, 817 F.3d 415, 424 (2d Cir. 2016).[5]

---

[5] With respect to FMLA interference claims, *McDonnell Douglas*'s burden-shifting framework is inapplicable as there is no legitimate business reason that can justify interfering with FMLA rights; once a plaintiff establishes a *prima facie* case and the defendant disputes any material facts thereto, then the case must go to trial. *See Graziadio*, 817 F.3d at 424-26; 429.

25

With respect to the first element, Dr. Greenberg established below that he was an eligible employee under the FMLA, as he worked full-time and continuously for the Employers since 2010.  (A806).

According to the district court, Dr. Greenberg placed in material factual dispute the second element of his interference claim as to Dr. Pulitzer and Dr. Reede's status as employers; SUNY never contested its status as a covered employer. [6]  (SPA30-34).

With respect to the third element of the interference claim, whether Dr. Greenberg was entitled to take the leave, the district court did not address the question but it is clear that Dr. Greenberg met his burden of production thereto.  He testified that his special-needs son was suddenly being transferred to another school and that it would cause a lot of turmoil that would require his support, love and care.  (A807-8 & A811).  There were corroborating documents that confirmed the sudden transfer of his son. (A633-34).  The record below also includes admissible evidence that Plaintiff's special-needs son had a serious medical condition.  (A635-56; 807-08).  The district court held that Dr. Greenberg's notice to the Employers regarding his need for leave was in substantial conformity with

_____

[6] Plaintiff's position is that HCH, in addition to SUNY, is liable for any violation of the FMLA under a joint employer theory.  *See* 29 C.F.R. § 825.106 (finding joint employer liability where a placement agency such as SUNY supplies employees to another employer like HHC).  The district court did not reach the issue as to whether HCH was a joint employer of Plaintiff.  (SPA19 n.14)

statutory requirements.  (SPA37 n. 19).  Therefore, the record is clear that Dr.

Greenberg's son had a serious medical condition, that an event arose whereby he

would need to take care of his son because of the medical condition, and Dr.

Greenberg was in substantial conformity with the protocol for providing notice of

the need for a leave pursuant to FMLA.

With respect to the fourth element, Dr. Greenberg made a triable issue of the

fact that he gave notice of his intent to take FMLA.  As discussed above, while Dr.

Pulitzer testified that Dr. Greenberg did not state the reason for needing the leave,

i.e., he did not provide notice of his intent to take a leave pursuant to the FMLA,

his testimony is directly contradicted by Dr. Greenberg who testified at his

deposition that he said to Dr. Pulitzer at the time of the request that he needed time

off to care of his special-needs son during a very difficult transition.  *See*, *infra*, at

16-17.  While the district court held in the context of its discussion of Dr.

Greenberg's retaliation claim that it did not believe his testimony in this regard,

such a conclusion inappropriately engaged in the kind of credibility determination

from which courts should refrain when deciding a summary judgment motion.  Dr.

Greenberg testified that he gave notice of his intent to take a leave that qualified

under FMLA at the time that he made the request; Dr. Pulitzer testified that Dr.

Greenberg did not mention his special-needs son when requesting the leave; taken

27

together, the contradictory testimony required a jury to resolve the issue as to this element.

Finally, with respect to the fifth element, Plaintiff can establish that he was denied a benefit under the FMLA in two respects: first, he was denied the benefit of being allowed to take an eligible leave pursuant to FMLA; and second, he was not allowed to return to work to a position where all the terms and conditions of that position were intact and exactly as he left them.

With respect to the second benefit that Dr. Greenberg was denied, the underlying facts are not disputed.  On the very day that Dr. Greenberg returned to work, after he had been at his station reviewing films for a few hours, Dr. Pulitzer confronted him and ordered him to cease working immediately and to report to Labor Relations where he was interrogated for hours.  (A79, A572 (372:23-373:21) & A812).  After he was interrogated about various issues including his absences on September 4 and 5, 2014, Dr. Greenberg was presented with a Last Chance Agreement that described the two options with which he was presented by his employer at that point in time: he could choose either to continue a disciplinary process that could result in punishments that ranged from a letter of reprimand to termination or he could enter into a settlement agreement whereby the disciplinary process would be deferred.  (A216).  Should he choose the second option, Dr. Greenberg would have to agree to a year's probation during which time he could be

28

terminated without recourse to the due process or appeal that he would otherwise be eligible under a relevant collective bargaining agreement if he committed another infraction similar to the ones for which he stood accused. Dr. Greenberg "chose" the latter option: probation.

In the manner in which the Employers presented to Dr. Greenberg his options upon his return, i.e., offering him the choice of a disciplinary process that was likely to involve his Employers seeking his termination or a settlement agreement that allowed him immediately to return to work subject to probation, a reasonable juror could conclude that Dr. Greenberg was not offered a real choice: that probation was his only viable option upon his return to work and it was foisted upon him. The hollowness of any assertion that Dr. Greenberg "chose" probation is even more apparent when considered in conjunction with his physical condition at the time - suffering from back spasms. Jurors, not a court, should decide whether Dr. Greenberg really had a choice when he decided to accept probation as a condition of returning to work after taking a leave protected by the FMLA.

If the assumption is correct that the Employers in effect imposed probation on Dr. Greenberg as the condition to return to work, then they clearly withheld from him two benefits under the FMLA: permission to take a leave and the right to be restored to his position under the same terms and conditions as when he left for leave. It is clear from the statutory language of the FMLA that placing an

29

employee on probation after taking a protected leave violates the "Restoration to position" provision, which requires employers to restore covered employees to their position with equivalent "terms and conditions of employment." 29 U.S.C. § 2614(a). District courts have so held and assumed such to be the case. *See Blackwell v. Harris Chemical North America, Inc.*, 11 F. Supp. 2d 1302, 1310 (D. Kan. 1998) (finding a violation of the "restoration to position" provision where employer placed an employee on probation after returning to work after FMLA); *accord Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834 (S.D. Tex. 2017) (dismissing interference claim because plaintiff returned to work after her FMLA leave "without any demotion, probation, write up, or change in pay or benefits").

An employer's failure to restore an employee to his position or an equivalent position as to its terms and conditions after an FMLA leave gives rise to an interference claim; district courts in this Circuit have repeatedly assumed as much. See *Ejiogy v. Grand Manor Nursing and Rehabilitation Center*, 15 Civ. 505, 2017 WL 1184278 (S.D.N.Y. March 29, 2017) (J. Cote); *Poitras v. ConnectiCare, Inc.*, 206 F. Supp. 3d 736, 743, 748 (D. Conn. 2016); *Evarts v. Quinnipiac University*, 15 Civ. 1509, 2018 WL 4845743, at *15 (D. Conn. Oct. 4, 2018); *Belgrave v. City of New York*, 95 Civ. 1507, 1999 WL 692034, at *42 (E.D.N.Y. Aug. 31, 1999).

Here, Dr. Greenberg alleges that upon his return to work after his FMLA leave, his Employers, in effect, forced him to accept his position but under

30

different terms and conditions, i.e., stripped of key job protections. There is no factual dispute that the position that Dr. Greenberg assumed upon his return to work was materially changed by the Last Chance Agreement that he was forced to sign in order to avoid suspension. The district court erred in not recognizing Plaintiff's *de facto* probation upon his return from FMLA leave as the kind of denial of benefits that can give rise to an interference claim.[7]

In addition to deciding erroneously that Dr. Greenberg could not establish a *prima facie* case of FMLA interference, the district court appeared to dismiss the claim as a disguised FMLA retaliation claim. (SPA35). The district court's reasoning appears to be that since Dr. Greenberg's interference and retaliation claims are based on the same facts they must be duplicative. (SPA34). Alternatively, the court's reasoning appears to be that because Dr. Greenberg engaged in self-help by actually taking off the days for which he sought FMLA leave he cannot show that "he was ever prevented from actually taking FMLA leave." (*Id.*). Neither of these bases for dismissing Dr. Greenberg's interference claim withstands scrutiny. As to the first, this Court has upheld FMLA interference and retaliation claims based on the same set of facts. *See Graziadio v.*

---

[7] It bears repeating that the Employers also denied a benefit under the FMLA by refusing to allow Dr. Greenberg to take his eligible leave. By refusing to grant the leave, the Employers forced Dr. Greenberg to take a leave that was not protected by FMLA, which placed him in jeopardy of losing his job. Upon his return, that jeopardy became a reality when he was referred to Labor Relations.

*Culinary Institute of America*, 817 F3d 415 (2d Cir. 2016). As for the second, the fact that Dr. Greenberg took his leave in spite of the denial of his request does not end the inquiry because upon his return, as discussed above, he was for all intents and purposes coerced into accepting a term of probation. Interference claims cover not only those violations that arise during the leave-requesting stage but also during the reinstatement stage.[8]

The district court clearly erred when it held that Dr. Greenberg failed to establish a *prima facie* FMLA interference claim. It also erred by holding that his interference claim was merely a retaliation claim in disguise.

### 3. PLAINTIFF ESTABLISHED A RETALIATION CLAIM UNDER FMLA SUCH THAT A REASONABLE JURY COULD FIND IN HIS FAVOR

In order to establish a *prima facie* case of retaliation under the FMLA, a plaintiff must establish that (1) he exercised rights protected by the FMLA; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.[9] *See Donnelly v. Greenburgh Cent. Sch. Dist. No. 7,*

---

[8] *Graziadio* appears to reject both bases for the district court's grant of summary judgment to Appellees with respect to the interference claim. As mentioned above, the Court approved the plaintiff's pursuit of interference and retaliation claims based on the same set of facts and found immaterial for establishing a *prima facie* case of interference the fact that she took the leave that her employer found later to be ineligible.

[9] As with the interference claim, with respect to the retaliation claim, Dr. Greenberg's position is that SUNY, HHC and Dr. Reede and Dr. Pulitzer were his employers. The former two because they were joint employers; the latter two because their conduct satisfies the criteria for finding

32

691 F.3d 134, 147 (2d Cir. 2012). After the plaintiff establishes a *prima facie* case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's explanation is pretextual. *See Graziadio*, 817 F.3d at 429.

Below, the district court correctly observed that there was no dispute with respect to the second and third elements, i.e., that Dr. Greenberg was qualified for the position he held with the Employers and that he suffered an adverse employment action. (SPA36-37).

With respect to the first prong — whether Dr. Greenberg exercised rights protected under the FMLA — the district court incorrectly found that Dr. Greenberg did not seek leave on September 4th and 5th in order to provide care for his special-needs son. In its finding regarding the issue as to whether he sought a leave that was covered by the FMLA, the district court offered an "exhaustive" list of the evidence adduced by the parties. (SPA38). Notably, the list does not include a bullet point to Dr. Greenberg's deposition testimony where he states that he conveyed to Dr. Pulitzer that the leave was to take care of his special-needs son. (A531 (228:14-229:7)). After providing the list of evidence adduced by the parties that pointedly does not include Dr. Greenberg's deposition testimony, the district

---

individual liability under the FMLA. As already stated, the district court did not reach the question as to whether HHC was Plaintiff's employer for the purpose of either the interference or retaliation claims under FMLA.

court stated as follows: "[e]ven after drawing all inferences in the light most favorable to Plaintiff and considering his own statements and deposition testimony, this Court finds that a reasonable jury could not conclude that Plaintiff did not report to work on September 4 and 5, 2014 to care for his son." (SPA39). In making this pronouncement, the court immediately cited *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), a case where the plaintiff's self-serving deposition testimony was so contradictory to his previous statements that no reasonable juror would believe it. *Jeffreys* is that rare instance where a credibility determination is warranted in the context of a summary judgment motion.

In *Jeffreys*, the plaintiff brought a police brutality case for violence that he allegedly endured upon his arrest. The plaintiff confessed three times to having received the injuries at issue by jumping out a window to escape pursuit by police when they caught him burglarizing a school. On three other occasions during criminal proceedings regarding this and other burglaries, he omitted any account of police brutality. It was only nine months after the incident and while serving his sentence that Jeffreys first alleged police brutality. Under these circumstances, where the plaintiff's belated account directly contradicted his own previous and numerous statements as to the same event, this Court upheld the district court's credibility determination that the plaintiff's uncorroborated, self-serving, later account could not fend off summary judgment. *Jeffreys* has proven to be that case

34

with unique circumstances that permits a district court to engage in limited credibility determinations.  The Plaintiff here is no Jeffreys.

In finding that Dr. Greenberg was similar to the plaintiff in *Jeffreys*, the district court apparently focused on the fact that in some of Dr. Greenberg's communications to his employers he related that he intended to come to work on September 4 & 5 but a back injury that occurred on the morning of September 4th prevented him from leaving the house.  (SPA38).  At his deposition, Plaintiff explained why he made these false statements to his employers: he was worried about possibly losing his job and thus he thought that relating that he actually intended to come to work on the days that he sought a leave would soften his appearance of insubordination.  (A534 (246:14-247:16)).  Dr. Greenberg's varying, contradictory accounts of his intentions with respect to his September 4 & 5 absence can be credibly and reasonably explained as caused by his conflict between what he wanted to do for his family and the responsibilities of his job. The varying, contradictory accounts of the plaintiff in *Jeffreys*, however, had no such excuse or reason to reconcile them.  Therefore, the issue as to whether Dr. Greenberg's varying accounts could be resolved in his favor as to the first element, i.e., that he intended to take the leave to take care of his son, is for a jury rather than the district court to resolve.

35

Alternatively, to the extent that the district court found that Dr. Greenberg did not establish the first element because his mother-in-law arrived in time to provide the needed support, the court erred.

As argued below, the fact that Dr. Greenberg was no longer necessary to take care of his son because of his mother-in-law's availability, which became clear only at the eleventh hour, does not translate into his leave suddenly becoming FMLA ineligible. *See* 29 C.F.R. 825.124(b) ("The employee need not be the only individual or family member available to care for the family member"). The fact that Dr. Greenberg's mother-in-law was available to provide love and support to the special-needs son did not strip Dr. Greenberg of his right to take FMLA leave.

If it is the district court's conclusion that Dr. Greenberg lost his eligibility to take FMLA leave to take care of his son because he threw out his back the morning of the commencement of the leave, then that conclusion must also be rejected. Following the logic of the rule that states eligibility for FMLA is not predicated on the employee being the only person available to take care of the family member, the fact that Dr. Greenberg had a more limited ability to care for his son on the day that he suffered a back injury does not mean that his eligibility for FMLA leave was somehow thereby revoked. While Dr. Greenberg's ability to make full use of his eligible FMLA leave to take care of his son was frustrated by his own

36

impairment, there is no principled reason that the impairment should have the effect of nullifying the status of the otherwise eligible leave.

In the end, the district court's finding that Dr. Greenberg did not take leave on September 4th and 5th to care for his son was an unwarranted departure from the standard that must guide district courts presiding over summary judgment: that all of the non-movant's testimony must be assumed to be true, except under very limited circumstances, and all inferences from that testimony must be drawn in the non-movant's favor. In light of the foregoing, it is clear that whether Dr. Greenberg intended to take leave to take care of his son was a question for the jury to resolve.

As for the fourth element of Dr. Greenberg's retaliation claim, the district court held that he could not establish that his termination occurred in circumstances that gave rise to an inference of retaliatory intent. In this regard, the court held that Dr. Greenberg could not overcome the legitimate business reason that the Employers had to terminate his employment. As the district court observed: "it is clear that Plaintiff was terminated, in large part, due to attaching the unapproved attestations to patients' charts." (SPA40).

Notably, in making this statement, the district court did not obviate the possibility that Dr. Greenberg was terminated for other reasons than "attaching the unapproved attestations to patients' charts." After all, the "large part" causation

37

that the district court attributed to the attestations still left room for the possibility that his termination was "in small part" attributable to his exercise of his rights under the FMLA.

As this Court well knows, it has only recently decided that the causality standard in FMLA retaliation claims is the more lenient one of showing that the exercise of FMLA rights was a "negative factor" in an adverse employment decision. *See Woods v. Start Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 169 (2d Cir. 2017). Here, Dr. Greenberg need only show that his insistence upon taking FMLA leave to take care of his son was a "negative factor" in his termination. He easily did so.

The supervisors who ultimately decided to terminate Dr. Greenberg's employment were the same individuals who referred him to Labor Relations because he went out on FMLA leave in direct contravention of their directive not to do so. (A568 (356:3-7) & A461) (Dr. Reede and Dr. Pulitzer collaborating in the referral to Labor Relations in response to Plaintiff's FMLA leave); (A573 (420:5-421:10) & A463) (Dr. Reede and Dr. Pulitzer collaborating in the decision to terminate Plaintiff's employment). While Dr. Pulitzer and Dr. Reede try to evade the reasonable inference that they exhibited retaliatory intent when they placed Dr. Greenberg on probation upon his return from leave on September 8th by insisting that he never gave them a clue that he was seeking a FMLA leave, their

testimony is contradicted by Dr. Greenberg's testimony, which must be credited.

Under such circumstances, where employers are shown to have previously and

expressly penalized and/or retaliated against a plaintiff for taking FMLA leave

before terminating him a short time later, this Court has suggested that "a sufficient

basis [exists] to send the question of [] retaliatory intent to the jury to reach a final

determination." *Donnelly v. Greenburgh Cent. School Dist. No. 7*, 691 F.3d 134

(2d Cir. 2012); *see also Ryan v. Judicial Branch of the State of Connecticut*, 12

Civ. 1282, 2014 WL 12569528, at * (D. Conn. April 8, 2014) ("To paraphrase the

Court's holding in Donnelly ... the fact that Defendant disciplined Plaintiff for

absences that a reasonable juror could find were protected by the FMLA provides a

sufficient basis to send the issue of Defendant's retaliatory intent to the jury").

Thus, the indisputable fact that the same individuals who initially disciplined Dr.

Greenberg for taking FMLA leave were the same individuals who terminated him

a short time later is sufficient not only to raise an inference of retaliatory intent for

the purpose of the fourth element of the *prima facie* case but to raise a triable issue

as to the pretextual nature of the legitimate reason offered by the Employers.

39

4. **THERE ARE MATERIAL FACTS IN DISPUTE REGARDING PLAINTIFF'S TITLE VII DISCRIMINATION CLAIMS ARISING FROM THE FAILURE TO PROMOTE HIM AND TO TERMINATE HIM**

   A. **PLAINTIFF HAS PRODUCED SUFFICIENT EVIDENCE REGARDING HIS FAILURE-TO-PROMOTE CLAIM REQUIRING TRIAL OF THE ISSUE**

In order to establish a prima *facie* case of failure to promote under Title VII, a plaintiff must adduce evidence that: (1) he was within a protected class; (2) that he was qualified for the position he sought; (3) that he was not chosen for the promotion; and (4) the failure to promote occurred in circumstances giving rise to an inference of discrimination.[10]  *See Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 266 (E.D.N.Y. 2013) (citing a string of this Court's and district court decisions).  After a plaintiff has established a *prima facie* case of discrimination, the burden shifts to the defendant to offer a legitimate business reason to justify its decision.  *See id.* at 265.  Should the defendant meet its burden of production then the plaintiff may survive summary judgment if he can point to sufficient evidence

---

[10] With respect to the failure-to-promote claim, Dr. Greenberg appeals the district court's decision to grant summary judgment to SUNY.  He also limits his appeal of the failure-to-promote claim based on animus towards his religion, i.e., his status as Jewish.  The district court also did not reach Plaintiff's New York State and City claims of discrimination due to the fact that it granted summary judgment with respect to all federal claims and then chose not to exercise supplemental jurisdiction over the remaining State and local claims.  Should Dr. Greenberg prevail in urging this Court to reverse the district court's decision on any of his federal claims we respectfully request a remand with the instruction that the district court exercise jurisdiction over the State and local discrimination claims for the purpose of trial.

40

to sustain a reasonable finding that the failure to promote was at least in part motivated by discrimination.[11]  *See id.*

The district court correctly noted that Dr. Greenberg satisfied the first and third elements by it being undisputed that he was Jewish and did not get the promotion to Director of ER Radiology.  (SPA44).  The district court found that Dr. Greenberg failed in his effort, however, to establish the other two elements of his failure-to-promote claim: that he was qualified for the position and the appointment of Dr. Scott-Moore occurred in circumstances giving rise to an inference of discrimination.  In so holding, the district court erred.

In finding that Dr. Greenberg was not qualified for the promotion, the district court emphasized the fact that Dr. Scott-Moore's credentials were stronger in those areas deemed important by the person doing the hiring — here, that was Dr. Reede who justified her decision to promote Dr. Scott-Moore based on her academic and scholarly activity.  (SPA49).  In the district court's decision, however, there is absolutely no mention of the point pressed below by Dr. Greenberg that this justification for preferring Dr. Scott-Moore over him was

---

[11] This Court recently clarified the lenient standard that informs a plaintiff's survival on summary judgment after a defendant has offered a legitimate business reason for the challenged decision.  "Under Title VII, a plaintiff may succeed simply by establishing that [a protected characteristic] was a 'motivating factor ... even though other factors also motivated the practice.'  Thus, even if an employer can establish that legitimate, non-discriminatory reasons also provided sufficient reason for the adverse action, the employer may still be liable under Title VII.  In other words, an employer's insistence that he would have terminated the plaintiff anyway is no defense."  *Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019).

pretextual by Scott-Moore's own admission: she testified that she had a different understanding as to her mission in fulfilling the position of Director.

When Dr. Scott-Moore was deposed, she admitted that upon becoming Director her efforts were focused on operational efficiencies rather than scholarly activity: she stated that the neglected condition of the department required that she had to expend more of her energies in administration, i.e., get the department running more smoothly and efficiently, rather than on research and publications. (A596-97). Dr. Scott-Moore's frank admission as to her perception of the mission upon assuming the role of Director and the fact that Dr. Greenberg had already performed such administrative tasks as a prior Director of ER Radiology at KCHC at the very least establishes both that Dr. Greenberg was qualified for the position at that point in time and that Dr. Scott-Moore's appointment over him occurred in circumstances giving rise to an inference of discrimination. In light of this testimony about what the Director of ER Radiology position actually entailed, a reasonable juror could find that Dr. Greenberg established a *prima facie* case of failure to promote.

Dr. Greenberg also produced evidence that Dr. Reede's reasons for promoting Dr. Scott-Moore rather than him were pretextual. First, Dr. Reede appeared to change her reasons over time. As this Court well knows, where a plaintiff can show that his employer changed its explanation for an adverse

42

employment action, that fact can be highly probative of pretext and an improper

motive. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105-06 (2d

Cir. 2001); *see also EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994)

(noting that a juror can reasonably view an employer's changing explanations as

"pretextual, developed over time to counter the evidence suggesting ...

discrimination"). According to Dr. Greenberg, when he first spoke with Dr. Reede

about being appointed to the Director position and learned that she was going to

appoint Dr. Scott-Moore, she justified the decision as based on the facts that Dr.

Scott-Moore appeared more engaged in scholarly activity and was closer to her

residency and therefore, presumably, more relatable to younger residents.[12]

(A809). Of course, Dr. Reede denied making the latter comment but for the

purpose of summary judgment Dr. Greenberg's testimony regarding this exchange

must be assumed to be true. At her deposition, two years after the events at issue,

Dr. Reede stated for the first time that Dr. Greenberg was not a good candidate for

the Director position because he had availability issues, meaning that residents

sometimes could not find him when they wanted to confer with him. (A604

(142:18-143:11)). Since discovery revealed that Dr. Reede kept careful watch of

---

[12] Below, Dr. Greenberg emphasized Dr. Reede's remark about Dr. Scott-Moore being more relatable to residents because of her younger age for the purpose of pursuing his age discrimination claims under New York State and City law. The district court did not decide the age discrimination claims because she decided not to exercise supplemental jurisdiction over them.

43

Dr. Greenberg for months before he sought his September 4th and 5th leave and wrote memos to personnel files religiously, it strains credulity that she would have omitted this issue from the relevant memo that she wrote regarding the meeting she had with Dr. Greenberg to discuss the reasons why he was not going to be appointed to the position of Director of ER Radiology.  (A353).

In addition to shifting her reasons for not appointing Dr. Greenberg to the Directorship, Dr. Reede was known to voice anti-Semitic sentiment upon her arrival at SUNY-Downstate Medical Center.[13]  (A815-16).  According to Ms. Esther Neiman, who had frequent contact with her, Dr. Reede disapproved of observant Jews who came to the floor of the Radiology Department for midday prayers, which practice she intended to stop because she viewed it as disruptive to the department's operations.  (A816).  She was also heard to make a sarcastic remark about the abundance of Jewish holidays and complained about observant Jews leaving work early on Fridays to observe Shabbat.  (*Id.*).  Dr. Reede's comments give rise to a reasonable inference that she harbored a belief that Jewish radiologists were not pulling their weight in the department due to religious observances.

---

[13] Defendants cannot benefit from the same-actor inference identified by the district court in its decision below with respect to the decision to promote Dr. Scott-Moore because Dr. Pulitzer, Jewish himself, was not a part of the promotion decision.

The district court found Dr. Reede's anti-Semitic remarks as failing even to establish the fourth element of a *prima facie* case: they were at least six months before the promotion decision, did not bear directly on the decision and appeared directed at orthodox Jews rather than more secular-seeming Jews like Dr. Greenberg. (SPA47-48). Further, the district court noted that Dr. Reede decided to renew Dr. Greenberg's contract in June of 2014 in juxtaposition to many of his colleagues whose contracts were not renewed. (SPA47).

The four-factor test from *Henry v. Wyeth Pharmaceuticals* that the district court invoked when assessing Dr. Reede's remarks is generally used as a framework to assess whether discriminatory remarks not expressly about the adverse employment action at issue should be admitted at trial. 616 F.3d 134, 149-50 (2d Cir. 2010). This Court has made clear to district courts that just because a discriminatory remark is "stray" in this particular sense does not mean it is not relevant to the issue of an employer's discriminatory intent, especially if it is indicative of pejorative assumptions or attitudes about a protected class. *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115-16 (2d Cir. 2007). Here, Dr. Reede's remarks clearly indicate anti-Semitic animus and she was the decision-maker behind the challenged employment decision. While she uttered the remarks months before the decision to promote Dr. Scott-Moore, a reasonable juror could nonetheless find that they support the theory that Dr. Scott-Moore was chosen over

45

Dr. Greenberg because she, as a non-Jew, would be more likely to pull her weight. To the extent that Dr. Reede's remarks can be so construed, they give rise to a reasonable inference that she set an unofficial policy of minimizing the presence of Jewish observances and those who pursue them in her department. *See Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 55 (2d Cir. 1998). As in *Danzer*, Dr. Reede's anti-Semitic comments were at the commencement of an increasingly aggressive campaign against all those who would interfere with her vision of an efficient Radiology Department, including those who would make inconvenient requests for FMLA leave and days off to observe Jewish holidays. Her comments not only establish the fourth element of a *prima facie* case, i.e., contribute to circumstances that give rise to an inference of discrimination, they create a factual dispute as to the pretextual nature of Dr. Reede's stated reason for promoting Dr. Scott-Moore rather than Dr. Greenberg to the position of Director of ER Radiology.

Finally, in the context of discriminatory failure-to-promote cases, courts have routinely found significant the fact that the position at issue was not publicly posted in the usual course for interested applicants, as was the case here. (A809). Rather than post the Director position, take applications from candidates and then interview them as would have been the usual course, Dr. Reede quietly offered the position behind the scenes to someone who had less experience and credentials than Dr. Greenberg but who is of the same race and religion as herself. Where

46

courts have been presented with evidence that credibly questions a defendant's reason for promoting someone other than the plaintiff and the promotion process occurred in a manner that strayed from the usual course, the question of discriminatory motive is one for the jury to resolve. *See Harris v. City of New York*, 03 Civ. 6167, 2004 WL 2943101, at *3-4 (S.D.N.Y. Dec. 21, 2004); *Doran v. New York State Dep't of Health Office of Medicaid Inspector General*, 15 Civ. 7217, 2019 WL 4735484, at *16-17 (S.D.N.Y. Sept. 27, 2019).

### B. PLAINTIFF HAS PRODUCED SUFFICIENT EVIDENCE REGARDING HIS DISCRIMINATION CLAIMS RELATED TO HIS TERMINATION TO REQUIRE TRIAL OF THE ISSUE

In order to establish a *prima facie* discrimination case arising from his termination, Plaintiff has to establish the same elements as required for the failure-to-promote claim.[14] With respect to the termination claim, as with the failure to promote claim, it was undisputed that Plaintiff was Jewish and therefore was in a category protected by Title VII.[15] It was further undisputed that he experienced an

---

[14] Dr. Greenberg appeals the Title VII claim arising from his termination against both Appellee SUNY and HHC. The district court did not reach HHC's liability under Title VII. HHC is liable with respect to the termination claim because it had control over the terms and conditions of Dr. Greenberg's employment at KCHC. *See Forsythe v. New York City Dept. of Citywide Adm. Svcs.*, 733 F. Supp. 2d 392, 397-98 (S.D.N.Y. 2010). The district court did not reach Dr. Greenberg's New York State and City claims of discrimination regarding his termination. Should Dr. Greenberg prevail in reversing the district court's decision on this Title VII claim we respectfully request that this Court remand the case with the instruction that the district court exercise jurisdiction over the State and local discrimination claims for the purpose of trial.

[15] With respect to the termination claim as with the failure-to-promote claim, Plaintiff limits his appeal to discrimination based on religion, i.e., the fact that he was Jewish.

adverse action when he was terminated from employment by SUNY and HHC.
While the district court did not address the issue of Dr. Greenberg's qualifications
for his position in the context of this claim, he easily satisfies this element in light
of his credentials, the fact that Dr. Reede and Dr. Pulitzer decided to renew his
contract in 2014, Dr. Pulitzer's high praise for his competence and the lenient
standard for establishing this element of a *prima facie* case.[16]  According to the
district court, Plaintiff failed to establish his *prima facie* case by failing to establish
the fourth element: circumstances surrounding his termination that give rise to an
inference of discrimination.

In justifying its decision that Dr. Greenberg failed in this regard, the district
court pointed to the fact that Dr. Reede chose to renew his contract in 2014, well
before he was terminated, that one of the decision-makers as to the termination was
Jewish himself, and the remarks attributed to Dr. Reede to demonstrate her
discriminatory animus were too removed from the adverse employment action at
issue to be probative of her state of mind.  (SPA45-48).  The district court then
went on to observe that even if it could be said that Dr. Greenberg established his

---

[16] Dr. Pulitzer testified that Plaintiff was the Michael Jordan of radiologists in the department at
KCHC.  (A574 (426:22-427:3)) ("Dr Greenberg was a very well respected radiologist in our
department.  I mean, he was one of the best radiologists we've ever had and people look up to
him.  People looked to him to model what he's doing, just like a Michael Jordan or whomever").
The lenient standard for demonstrating that a plaintiff is qualified in a *prima facie* case is well-
established.  *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir.
2016) (observing that "'where discharge is at issue and the employer has already hired the
employee, the inference of minimal qualification is not difficult to draw.'")

*prima facie* case he is unable to establish that the reason for his termination – affixing sarcastic attestations to patient charts – was pretextual.

Given the evidence of Dr. Reede's single-minded campaign against Dr. Greenberg, paired with her anti-Semitic statements discussed above, and the lenient standard for finding discrimination under Title VII, the question as to the motives driving her decision to terminate Dr. Greenberg is one that should be resolved by a jury.[17]

Dr. Reede's campaign against Dr. Greenberg escalated when she advised Dr. Pulitzer to deny Dr. Greenberg's request for FMLA leave. If Dr. Greenberg's testimony is to be believed, and it should be for the purpose of this appeal, he repeatedly told Dr. Pulitzer that he needed two days off in circumstances that warranted FMLA leave. In violation of the statute, Dr. Pulitzer denied the request. Dr. Pulitzer admitted at his deposition that he turned to Dr. Reede for guidance as to how to proceed during this episode. According to Dr. Pulitzer, Dr. Reede told him to deny the request in writing, require Dr. Greenberg to come to work and

---

[17] Repeatedly, this Court has made clear that plaintiffs need only show that discriminatory animus was a "motivating factor" in an adverse employment decision under Title VII. *See Leibowitz v. Cornell University*, 584 F.3d 487, 498 (2d Cir. 2009) n. 2 ("Title VII, on the other hand, does authorize a 'mixed motive' discrimination claim ... ('Congress amended Title VII to allow for employer liability when discrimination was a motivating factor for any employment practice, even though other factors also motivated the practice'")") (emphasis in the original); *see also Vega v. Hempstead Union Free School District*, 801 F.3d 72, 85-86 (2d Cir. 2015). As noted previously, a plaintiff may still survive summary judgement where an employer can show a legitimate reason justified its decision. *See Naumovski*, 934 F.3d at 213.

49

threaten to refer him to Labor Relations if he did not show. (A568 (355:20-356:10)). All of the actions that Dr. Pulitzer took that led to Dr. Greenberg's interrogation at Labor Relations and the execution of a settlement agreement that stripped him of his job security and placed him on probation were at the instigation of Dr. Reede.[18] Dr. Reede's denial of Dr. Greenberg's rights under the FMLA was evidence of her campaign against him in addition to a blatant disregard of the protections under the statute.

As argued below, Dr. Reede's campaign against Dr. Greenberg included the resort to falsehoods and fabrications in the package of misconduct that she, operating through Dr. Pulitzer, sent to Labor Relations for the purpose of his interrogation and the memo to the file that they wrote to justify the determination to refer him to Labor Relations.

For Labor Relations, Dr. Pulitzer authored a memo in which he gave background information as to Dr. Greenberg's previous allegedly unruly conduct. (A661-62). In the memo, Dr. Pulitzer suggested that Dr. Greenberg was somehow being disruptive by appearing at the hospital and working when he should have been on vacation; he also noted that he never discussed this schedule change with

---

[18] Below, we emphasized Dr. Reede's role as puppet-master to Dr. Pulitzer with respect to the events that led to Dr. Greenberg's probation because SUNY cited the fact that Dr. Pulitzer's Caucasian and Jewish status undermined the contention that Dr. Greenberg was the target of racial and anti-Jewish bias. The evidence below supports the theory that the discriminatory animus behind the refusal to grant FMLA leave to Plaintiff was primarily that of Dr. Reede and Dr. Pulitzer merely aided and abetted it.

50

him. (A662). In actual fact, Dr. Greenberg wrote Dr. Pulitzer an email on August 25, 2014 informing him that he would be attending an inter-departmental meeting the next day. (A547). Also, on August 26, 2014, an official revised work schedule that included Dr. Greenberg was circulated, which undermined Dr. Pulitzer's narrative that Dr. Greenberg was somehow going rogue that week. (A630-32). Dr. Greenberg further testified, that Dr. Hammil, the radiologist supervising the department the week at issue, appeared appreciative that he was willing to work on his scheduled vacation; he never complained to Dr. Greenberg that he was being disruptive. (A811). In light of these facts, Dr. Pulitzer's misleading, if not false, memo to Labor Relations presumably following the advice of Dr. Reede was intended by both of them to place Dr. Greenberg in the worst possible light, as Labor Relations turned to the issue of his refusal to come to work for two days.

In addition to the memo to Labor Relations, Dr. Pulitzer papered Dr. Greenberg's personnel file with a memo where he characterized his August 22, 2014 discussion with Plaintiff as a counseling. Dr. Pulitzer's recantation of this memo by recharacterizing the discussion as friendly at his deposition (A561 (310:21-311:14)) serves to strengthen the strong inference that he and Dr. Reede were singling out Dr. Greenberg for unjustified and therefore suspicious mistreatment.

51

Dr. Reede's and Dr. Pulitzer's campaign against Dr. Greenberg escalated in their callous disregard of his attempt one last time on September 15, 2014 to discuss the reasons why he sought leave at issue. (A698). Rather than seize this opportunity to inquire as to what Dr. Greenberg meant exactly by his "important family issues" that required "an emergent absence," Dr. Pulitzer responded to it by placing it in his personnel file as if it was another instance of misconduct and Dr. Reede wrote: "Dr. Greenberg is trying to cover his tracts [sic]." (A700). Dr. Reede appeared to view the campaign against Dr. Greenberg as a game of chess in which she was winning.

On September 22, 2014, when Dr. Greenberg affixed to patient studies unapproved attestations that Dr. Pulitzer viewed as sarcastic, the trap that Dr. Reede and Dr. Pulitzer had set by placing him on probation and subjecting him to relentless surveillance proved successful. They finally had a "legitimate" basis to get rid of him. Of course, having a legitimate basis to terminate someone does not immunize an employer from liability under Title VII: where an employer's discriminatory animus is a factor in an employee's termination, liability under Title VII arises. *See Naumovski*, 934 F.3d at 213 ("Thus, even if an employer can establish that legitimate, non-discriminatory reasons also provided sufficient reason for the adverse action, the employer may still be liable under Title VII").

As to this incident, Dr. Pulitzer testified that it suggested a colleague who was careening out of control in his reckless departure from any concern about the hospital's reputation and exposure to liability. (A551 (115:8-21)). From Dr. Greenberg's perspective, Dr. Pulitzer's reaction was exaggerated and therefore suspicious. First, the studies upon which Dr. Greenberg affixed the attestations were stale: they were months old and had already been acted on by clinicians in terms of treatment; all that was at stake with respect to these cases was reimbursement from Medicaid. (A813). Second, the only way that the attestations could possibly expose the hospital to liability would be if someone along the chain of treating clinicians committed malpractice; liability would arise from that malpractice and not an attestation. Third, Dr. Pulitzer always drove home the point at departmental meetings that the attestation was significant only in its role of facilitating reimbursement. (A723 & 725). Dr. Pulitzer never gave the attestation the aura of importance with which he invested it subsequent to the attestation episode.

In addition, his conduct upon discovering what Dr. Greenberg did was inexplicable. While he testified in sum and substance that he felt that he was dealing with an out-of-control employee, Dr. Pulitzer never approached Dr. Greenberg with his concerns about the behavior. His decision not to approach him as this episode unfolded is especially strange in that Dr. Pulitzer and Dr. Greenberg

53

had been colleagues and friends for many years and had discussions at work that ranged from professional matters to personal matters such as each other's family life. (A813-14). It is as if Dr. Pulitzer had become his earlier characterization of Dr. Reede (according to Dr. Greenberg's testimony): a cop waiting for Dr. Greenberg to screw up in order to get rid of him rather than a good manager whose mission was timely to intervene when an employee seems to be in distress. It is a fair inference that at this point in time Dr. Pulitzer had moved from being a double agent torn between doing the bidding of Dr. Reede and warning his colleagues about her campaigns (as when he told Dr. Greenberg that she was like a cop waiting for him to screw up) to being solely the agent of Dr. Reede.

In the end, the combination of Dr. Reede's anti-Semitic remarks, her campaign of escalating mistreatment of Dr. Greenberg that was assisted and abetted by Dr. Pulitzer, and the exaggerated response to the attestation episode all add up to circumstances that a reasonable juror could find give rise to an inference that discrimination based on religion was a motivating factor in the decision to terminate Dr. Greenberg's employment at SUNY and HHC.

## VII. CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court: 1) reverse the district court's grant of summary judgment in favor of Appellees with respect to the FMLA interference and retaliation claims; 2) reverse the district

54

court's grant of summary judgment in favor of Appellees with respect to Plaintiff's Title VII discrimination claims arising from the failure to promote him to the position of Director of ER Radiology at KCHC and his termination; 3) remand the case to the district court for further proceedings; and 4) grant Plaintiff such other, further and different relief in his favor, as this Court deems just and proper.

Dated:      New York, New York
                 February 11, 2020

CARDI & EDGAR LLP

/s/

_____
Chad L. Edgar
99 Madison Avenue, 8th Floor
New York, NY 10016
212.481.7770 (tel.)
212.271.0665 (fax)
cedgar@cardiedgarlaw.com
*Attorneys for Plaintiff-Appellant*
*Oded Greenberg M.D.*

CERTIFICATION PURSUANT TO
Fed. R. App. P. 32(a)(7)(B) and (C)

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Rule 32.1(a)(4)(A) of this Court's Local Rule because the brief contains 13,880 words of text.

The brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief was prepare in a proportionally spaced typeface using Microsoft Word 2007, Times New Roman, Size 14.

Dated: February 11, 2020

/s/
_____
Chad L. Edgar

SPECIAL APPENDIX

## **Table of Contents**

**Page**

Memorandum Order of the Honorable Pamela K. Chen,
    dated September 29, 2019, Appealed From ................................... SPA1

SPA1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ODED GREENBERG, M.D.,

                              Plaintiff,

                 - against -

STATE UNIVERSITY HOSPITAL-
DOWNSTATE MEDICAL CENTER a/k/a
THE STATE UNIVERSITY OF NEW YORK
HEALTH SCIENCE CENTER AT
BROOKLYN a/k/a SUNY DOWNSTATE
MEDICAL CENTER, NEW YORK CITY
HEALTH AND HOPSITALS
CORPORATION, KINGS COUNTY
HOSPITAL CENTER, DEBORAH L. REEDE,
STEVEN PULITZER, AND JOHN and JANE
DOES 1-20,

                              Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CV-2343 (PKC) (VMS)

PAMELA K. CHEN, United States District Judge:

    Plaintiff Oded Greenberg, M.D., brings this action, alleging various types of employment-
related discrimination, against Defendants State University Hospital-Downstate Medical a/k/a The
State University of New York Health Science Center at Brooklyn a/k/a SUNY Downstate Medical
Center ("SUNY"); Individual Defendants Deborah L. Reede and Steven Pulitzer ("SUNY-
Employees"); New York City Health and Hospitals Corporation ("HHC"); and Kings County
Hospital Center ("KCHC").  Plaintiff asserts 28 causes of action, *i.e.*, violations of the Family and
Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); Title VII of the Civil Rights
Act of 1964 ("Title VII"), as codified, 42 U.S.C. Sections 2000e *et. seq.*; Sections 1981 and 1983
of Title 42 of the United States Code, 42 U.S.C. §§ 1981, 1983 ("§ 1981" and "§ 1983,"
respectively); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et
seq*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et.*

*seq.*  (*See* Second Amended Complaint ("SAC"), Dkt. 23, ¶ 8.)  Plaintiff seeks relief in the form

of damages, declaratory relief, and permanent injunctive relief.  (*Id.* at 30–31.)  Currently before

the Court are dispositive motions for summary judgment from SUNY and the SUNY-Employees

(collectively "SUNY-Defendants"), and KCHC and HHC.  For the following reasons the Court

grants Defendants' motions, in full, and dismisses the case.

## BACKGROUND

### I.      Facts[1]

#### A.      Parties to this Action

Plaintiff is a white, Jewish man who was 54 or 55 years old at the time he was terminated

from his employment with Defendant SUNY.  (SUNY-Defendants' 56.1 Statement ("S-Defs.'

56.1"), Dkt. 77, ¶ 1; Plaintiff's 56.1 Statement in Response to SUNY-Defendants' Motion ("Pl.'s

56.1-1"), Dkt. 92, ¶ 1; Plaintiff's Declaration, dated July 6, 2018 ("Pl.'s Decl."), Dkt. 94, ¶ 1.)

Plaintiff is a board-certified radiologist authorized to practice in the State of New York (Plaintiff's

56.1 Statement in Response to KCHC & HHC's Motion, Dkt. 91, ¶ 1) who began his employment

at SUNY in 2001, and was assigned to the KCHC emergency room, pursuant to an affiliation

agreement (Pl.'s Decl., Dkt. 94, ¶ 2).  Plaintiff worked as a SUNY employee assigned to KCHC

---

[1] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a party's 56.1 statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to the underlying document.  The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)).  Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).

from 2001 until his termination in October 2014, with the exception of a brief hiatus to stay at home to assist with the care of his special-needs son.  (Pl.'s 56.1-1, Dkt. 92, ¶ 1; Pl.'s Decl., Dkt. 94, ¶ 2.)

Defendant SUNY is a legal entity constituted under N.Y. Educ. Law §§ 351 *et seq*.  SUNY Downstate is a subdivision of SUNY and is not a legally-cognizable entity separate from SUNY.  (S-Defs.' 56.1, Dkt. 77, ¶ 4.)  SUNY employs a number of radiologists who practice at KCHC, a hospital operated by New York City that is across the street from SUNY Downstate, through an affiliation agreement.  (*Id.* ¶ 1; *see generally* Affiliation Agreement, Dkt. 81-10.)

Defendant HHC "is a body corporate and politic constituting a public benefit corporation existing and organized under the laws of the State of New York pursuant to Chapter 214-A of the New York Consolidated Laws."  (KCHC's & HHC's Answer[2] to Plaintiff's Second Amended Complaint, Dkt. 25, ¶ 3.)

KCHC is a hospital administered by HHC and maintains an affiliation agreement with SUNY-Downstate.  (*Id.* ¶ 4.)  Pursuant to that affiliation agreement, Plaintiff was assigned by Defendants to perform his employment duties as a radiologist at KCHC.  (*Id.*)

Defendant Dr. Deborah Reede is an African-American, non-Jewish, female physician, who was 67 years old at the time this lawsuit was filed.  (S-Defs.' 56.1, Dkt. 77, ¶ 2; Pl.'s 56.1-1, Dkt. 92, ¶ 2.)  In 2013, Dr. Reede was appointed Chair of the Radiology Department at SUNY Downstate.  (S-Defs.' 56.1, Dkt. 77, ¶ 2.)

---

[2] *See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation."); *Secs. & Exch. Comm'n v. Penn*, 225 F. Supp. 3d 225, 234 (S.D.N.Y. 2016) (assuming truth of "admissions in [the defendant's] answer" for purposes of summary judgment).

Defendant Dr. Stephen Pulitzer is a white, Jewish, male physician, who was 51 years old at the time this lawsuit was filed.  (*Id.* ¶ 3; Pl.'s 56.1-1, Dkt. 92, ¶ 3; Dr. Pulitzer's March 26, 2018 Declaration ("Pulitzer Decl."), Dkt. 79, ¶ 2.)  In July 2014, Dr. Pulitzer was appointed the Interim Chair of the Radiology Department at KCHC, the full Chair of the KCHC Radiology Department in January 2015, and the Chief Medical Officer at KCHC in November 2016.  (Pl.'s 56.1-1, Dkt. 92, ¶ 3; Pulitzer Decl., Dkt. 79, ¶ 2.)  In those roles, Dr. Pulitzer acted as the site director, with responsibility for the daily operations of KCHC's Radiology Department.  (*Id.* ¶ 3.)  During the relevant time period, Dr. Pulitzer was a SUNY employee, working at KCHC through an affiliation agreement.  (Pulitzer Decl., Dkt. 79, ¶ 2.)

**B.    The ACGME Report**

SUNY Downstate is a teaching hospital, and in April 2014, the Radiology Department's residency program was put on academic probation by the Accreditation Council for Graduate Medical Education ("ACGME"), the body responsible for accrediting the majority of graduate medical training programs for physicians in the United States.  (Pl.'s 56.1-1, Dkt. 92, ¶ 5; ACGME April 15, 2014 Report, Dkt. 87-1.)  The ACGME noted in its findings that "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule."  (ACGME Report, Dkt. 87-1, at 2; Pl.'s 56.1-1, Dkt. 92, ¶ 6.)  The Department was further criticized for not demonstrating that "an appropriate level of supervision is in place for all residents," and it was found that "faculty do not demonstrate a strong interest in the education of the residents."  (ACGME Report, Dkt. 87-1, at 2.)  On April 9, 2014, Dr. Reede met with Dr. Ross Clinchy, a physician from the Dean's Office at SUNY and the KCHC Chief Medical Officer at that time, to discuss changes they believed necessary to fix issues in the Radiology Department.  (Pl.'s 56.1-1, Dkt. 92, ¶ 8.)  Dr. Reede (1) proposed replacing a number of faculty members,

primarily based on teaching evaluations, and providing short-term extensions for several others, and (2) emphasized the need for monitoring of faculty member performance, increased work performance for physicians, productivity monitoring, and monitoring of teaching and scholarly activity.  (Pl.'s 56.1-1, Dkt. 92, ¶ 9; Deposition of Dr. Deborah Reede ("Reede Dep."), Dkt. 81-19, at 70:12–22; Deposition of Dr. Ghassan Jamaleddine ("Jamaleddine Dep."), Dkt. 87-61, at 101:11–17.)  The group also agreed to replace the then-current Chief of Radiology, Dr. Allen Cantor.  (Jamaleddine Dep., Dkt. 87-61, at 103:19–104:24.)  On June 23, 2014, the Department announced that five SUNY Downstate radiologists would not be renewed.  (Dr. Reede's March 26, 2018 Declaration ("Reede Decl."), Dkt. 80, ¶ 9).)  Plaintiff's contract was renewed in June 2014.  (*See id.*; Reede Reply Decl., Dkt. 98, ¶ 4.)

Following the non-renewal of the five radiologists,[3] on June 23, 2014, Plaintiff e-mailed Dr. Cantor (former Chief of the Radiology Department), that "[t]here is a special place in Hell for the administration and the powers that be for what has happened here. . . . [and] [h]opefully I will remain employed at least long enough to make a certain someones [sic] life miserable."  (Dkt. 87-3, at 2.)

### C.    Defendant Dr. Reede's Alleged Anti-Jewish Bias

In support of his allegations of SUNY Defendants' anti-Jewish bias, Plaintiff submits a declaration sworn to by Esther Neiman, who was the full-time Medical Student Coordinator for the University Physicians of Brooklyn, an affiliate of SUNY Downstate's Radiology Department. (Esther Neiman's June 27, 2018 Declaration ("Neiman Decl."), Dkt. 93, ¶ 2.)  Ms. Neiman worked

---

[3] There is no admissible evidence in the record indicating the religious affiliations of the five radiologists whose contracts were not renewed.  *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (requiring admissible evidence in opposition to summary judgment).

at SUNY Downstate five days per week, from about 10 am. to 6 p.m., from approximately 2002 until December of 2013.  (*Id.*)  In her declaration, Ms. Neiman states that her position required daily contact with Dr. Reede in 2013 and that she sat within earshot of Dr. Reede's office.  (*Id.* ¶ 3.)  According to Ms. Neiman, after Dr. Reede became the Chief of SUNY Downstate's Radiology Department, she referenced several Orthodox Jewish physicians as "you people" and "those people," was openly upset that Orthodox Jewish physicians would meet for midday prayers, and took as her own office a room that the Orthodox Jewish physicians had used for their midday prayers, and then announced that physicians would not be allowed to meet to pray during the workday on department premises.  (*Id.* ¶¶ 4–6.)  Dr. Reede disputes that she made any of these remarks.  (*See* Dr. Reede's September 14, 2018 Declaration ("Reede Reply Decl."), Dkt. 98, ¶ 5.)

### D.     Plaintiff's Work Performance Issues

On May 5, 2014, following the ACGME Report, Dr. Reede "met with Plaintiff to discuss an incorrect time entry from April 21, 2014" and "reminded Plaintiff that his job responsibilities require him to be present for consultations as well as resident supervision and education[.]"  (S-Defs.' 56.1, Dkt. 77, ¶ 14 (quotation marks omitted); *see also* Reede Dep., Dkt. 87-59, at 142:22–143:9.)[4]  On May 8, 2014, at a SUNY Downstate Radiology Department meeting, Dr. Reede "reminded all of the attending radiologists in the department that 'everyone [must] document[] accurate information on their timesheets.'"  (S-Defs.' 56.1, Dkt. 77, ¶ 15.)  At a KCHC Radiology Department meeting on June 26, 2014, Dr. Pulitzer noted that time and attendance will be monitored and time sheets must be accurate.  (*Id.*)

---

[4] Plaintiff does not contest that this meeting occurred but disputes any suggestion that it was a disciplinary meeting.  (Pl.'s 56.1-1, Dkt. 92, ¶ 14.)

**SPA7**

SUNY-Defendants contend that beginning in late July or August 2014 Plaintiff's work schedule became unpredictable. (*Id.* ¶ 16.) Dr. Pulitzer testified that Plaintiff was "coming in late, he was on occasion leaving early. I often didn't know what time he was going to be in that day . . . I couldn't reliably plan the schedule." (Deposition of Dr. Steven Pulitzer ("Pulitzer Dep."), Dkt. 87-57, at 305:23–306:9.) Dr. Reede testified that she received reports that Plaintiff was sometimes not available when "residents would be looking for him." (Reede Dep., Dkt. 87-59, at 142:22–143:9.) Additionally, an August 22, 2014 memorandum, submitted by SUNY-Defendants, outlines five days between July 28 and August 7, 2014, when Plaintiff did not adhere to standard working hours. (Dkt. 87-18.)

In August 2014, Plaintiff originally requested vacation time for August 11–22, 2014, but on August 13, he emailed Dr. Pulitzer, who was himself on vacation, and asked if he (Plaintiff) could return the following week and instead use his vacation time during the week of August 25. (S-Defs.' 56.1, Dkt. 77, ¶ 19.) Despite his then-scheduled vacation during the week of August 25, 2014, Plaintiff returned to work on August 26. (*Id.* ¶ 21.) Dr. Pulitzer contends that he received reports that Plaintiff was working "erratic hours," and that his time sheet indicates that, instead of working 9:30 a.m. to 5:30 p.m., he claimed to have worked from 11 a.m. to 7 p.m. three days that week and 10 a.m. to 6 p.m. another day that week. (*Id.* ¶ 21.) Data from the "talk station"[5] showed that, at the time, Plaintiff was frequently not reading his first film until after 10:30 a.m. (Dkt. 87-

---

[5] SUNY-Defendants explain that "Talk Station data comprises information about a particular film, including which radiologist read the film, and when the film was opened and signed for by a radiologist. By reviewing the data for one day, an approximation of when a radiologist started and stopped reading film can be discerned." (Dkt. 78, at 8 n.2 (citing Pulitzer Decl., Dkt. 79, ¶ 6 (internal citation omitted)).) Plaintiff disputes whether Talk Station data is an accurate measure as to when radiologists are at work because the data is only first captured when a radiologist *completes* his or her first study, and not when the film is first opened for review. (Pl.'s Decl., Dkt. 94, ¶ 5.)

18, at 2).  Defendants contend that Plaintiff "maintained erratic hours" on multiple dates in August, necessitating Dr. Pulitzer to counsel him "on issues of time and attendance."  (*Id.*; Dkt. 87-17, at 2; Dkt. 87-18, at 2).)

Plaintiff disputes SUNY Defendants' characterization of these events.  Plaintiff insists that his schedule cannot be criticized as "erratic" as he "was scheduled to be off [that week] but instead decided to work both because his vacation plans fell through and the Department appeared to need the assistance."  (Pl.'s 56.1-1, Dkt. 92, ¶ 21.)  Moreover, Plaintiff asserts, his schedule conformed with the busiest hours and the Department's "acute need."  (*Id.*)  Plaintiff further claims that when he saw that his Department was understaffed, he felt "morally obligated . . . to pitch in," and that the physician supervising the department while Dr. Pulitzer was on vacation "appeared to welcome [Plaintiff's] assistance that week and never complained about [his] presence."  (Pl.'s Decl., Dkt. 94, ¶ 8.)

Plaintiff also claims that he was not approached by Dr. Pulitzer about his allegedly erratic hours in August until August 22, 2014.  (Pl.'s 56.1-1, Dkt. 92, ¶ 16.)  Plaintiff further avers that although Dr. Pulitzer stated at a Departmental meeting that radiologists were expected to arrive at KCHC by 9 a.m., the "delay in applying the requirement to [Plaintiff] suggests that the set, earlier schedule did not apply to him, which it did not historically."  (*Id.*)  Plaintiff further disputes that he was "counseled or warned" about his hours, but acknowledges that "[i]n mid-to late August of 2014, [Dr.] Steve Pulitzer approached [him] at work about [his] schedule . . . [and] related to [him] . . . that Dr. Reede wanted [him] to start to adhere to a set work schedule of 9 a.m. to 5 p.m."  (Pl.'s Decl., Dkt. 94, ¶ 7.)  According to Plaintiff, he responded that "such a schedule made no sense," in light of the Department's work-flow, and that the prior Service Chief of Radiology at KCHC, Dr. Cantor, had "pushed" a 4 p.m. to 8 p.m. schedule that was "compromise[ed] to the extent that

[Plaintiff] tended to come in around 10 or 11 a.m. and work for 8 hours from that point." (*Id.*) Plaintiff states that he "agreed to the new set schedule once school [for his special-needs child] was underway in September." (*Id.*)

### E.     Failure to Promote Plaintiff in July 2014

In July 2014, Dr. Reede denied Plaintiff's application for reappointment and promotion to the position of Director of KCHC's ER Radiology Department. (*Id.* ¶ 6.) Around July 2014, Dr. Reede fired the then-current Director of ER Radiology, a physician of Orthodox Jewish faith, and hired Dr. Jinel Scott-Moore, a black non-Jewish radiologist who was younger than Plaintiff[6] and whom Plaintiff had supervised during her residency a few years earlier. (Pl.'s Decl., Dkt. 94, ¶ 6.) According to Plaintiff, Dr. Reede told Plaintiff that she hired Dr. Scott-Moore because she wanted someone closer to residency who could relate better to and educate resident physicians. (*Id.*) Defendants dispute that Dr. Reede made that statement, and offer that the statement is nevertheless neutral as to age. (S-Defs.' Reply 56.1, Dkt. 97, ¶ 10.) In her deposition, Dr. Reede testified that she hired Dr. Scott-Moore "because she had expressed a strong interest in academics . . . and she had very good reports from the residents regarding her teaching." (Reede Dep., Dkt. 87-59, at 124:10–22.) According to Dr. Reede, Dr. Scott-Moore also had "more interest in scholarly activity than [Plaintiff] at the time [Dr. Reede] decided on a new Chief of ER Radiology." (*Id.* at 131:15–132:25.) Plaintiff admits that when SUNY Downstate asked him to submit a form detailing his "research/scholarly activity with residents," he wrote that he "spen[t] zero hours," but claims in his declaration that he "did not understand what exactly was meant by this category" and that he

---

[6] Because Plaintiff's statements about the former ER Radiology Director's religion and Dr. Scott-Moore's race and age could be based on his personal observations of these individuals, as opposed to statements made to him, the Court does not preclude consideration of this evidence as inadmissible hearsay.

"was interested in academic research and scholarship in 2014."  (Pl.'s Decl., Dkt. 94, ¶ 14.)

Plaintiff cites the fact that "in 2013, for example, [he] and fellow radiologists and residents had

two case reports published."  (*Id.*)  Plaintiff does not state whether his employer was made aware

of those publications.  Dr. Reede also noted in her deposition that both Plaintiff and the other

physician being considered at that time for promotions had issues relating to "time and attendance

and availability."  (Reede Dep., Dkt. 87-59, at 137: 18–25.)[7]

### F.    Plaintiff's FMLA Request

Plaintiff's child has special needs due to his disability.[8]  Dr. Pulitzer does not dispute that

he was aware that Plaintiff has a special-needs child.  (SUNY-Defs.' Reply 56.1, Dkt. 97, ¶ 17.)

On August 29, 2014, Plaintiff was told by the child's school that due to difficulties relating to his

disability, the school could not continue to educate him, which, according to Plaintiff, required

him to take emergency leave at that time to care for his son.  (Pl.'s Decl., Dkt. 94, ¶ 9.)  Plaintiff

states that he called Dr. Reede to notify her that same day, but her voicemail was full so he could

not leave her a message and that he could not ask Dr. Pulitzer about his need for leave because Dr.

Pulitzer was on vacation at the time.  (Pl.'s 56.1-1, Dkt. 92, ¶ 22; Pl.'s Decl., Dkt. 94, ¶ 9.)  The

next day, Plaintiff inquired of Dr. Reede's assistant about the proper steps for taking emergency

---

[7] SUNY-Defendants have proffered multiple e-mails documenting alleged issues with Plaintiff's time, attendance, and behavior.  (*See, e.g.*, Dkts. 87-5, 87-6, 87-7, 87-8.)

[8] Plaintiff's child, J.G., was diagnosed with autism spectrum disorder at the age of two years old, and has also been diagnosed with depression, anxiety, and attention deficit disorder. (Pl.'s Decl., Dkt. 94, ¶ 4.)  Since prior to the age of two, and continuously to date, he has received services including weekly speech therapy, occupational therapy, physical therapy, psychotherapy, and social skills therapy.  (*Id.*)  J.G. also has an Individualized Education Program, and has attended a school that caters to children with learning disabilities.  (*Id.*)  J.G. is medicated for anxiety and depression.  (*Id.*)  During the time relevant to the litigation, J.G. was eight years old and "unable to dress, eat and groom himself without assistance . . . requir[ing] adult supervision at all times."  (*Id.*)

leave but received no response.  (Pl.'s Decl., Dkt. 94, ¶ 9.)  On or about September 2, 2014,

Plaintiff spoke with his immediate superior, Dr. Pulitzer, to inform him of his need for a two-day

leave on September 4 and 5, 2014.  (*Id.*; *see also* Pulitzer Decl., Dkt. 79, ¶ 9.)  SUNY-Defendants

contest whether Plaintiff advised Dr. Pulitzer or anyone else at SUNY Downstate that the reason

Plaintiff needed leave on September 4 and 5 was to care for his child with autism.  (Pulitzer Dep.,

Dkt. 87-57, at 344:5–9; 345:16–346:12; 359:16–22); *see also* Pulitzer Decl., Dkt. 79, ¶ 9.)  It is

uncontested, however, that Dr. Pulitzer told Plaintiff that the department was short-staffed and that

Plaintiff could not take those days off.  (Pl.'s Decl., Dkt. 94, ¶ 9.)  Plaintiff reiterated his request

to Dr. Pulitzer on September 3 (still without stating that the reason was to take care of Plaintiff's

child, according to Defendants), after which Dr. Pulitzer consulted with Dr. Reede and then

presented Plaintiff with a letter stating that his request was denied, and that if he failed to appear

for work on those days, the matter would be referred to "Labor Relations."  (Pulitzer Decl., Dkt.

79, ¶¶ 9–10.)  Plaintiff contends he then told Dr. Pulitzer that he did not think it was fair that Drs.

Reede and Pulitzer were forcing him to choose between his career and family, and that he had no

alternative but to address the urgent family leave.  (Pl.'s 56.1-1, Dkt. 92, ¶ 27.)  Dr. Pulitzer replied:

"I hope you know what you are doing."  (Pulitzer Dep., Dkt. 87-57, at 360:4–10.)  On September

4, 2014, which was a Thursday, Plaintiff emailed Linda McMurren, Dr. Reede's assistant, to

confirm that he was not coming in that day "due to important family issues," the nature of which

he did not specify.  (S-Defs.' 56.1, Dkt. 77, ¶ 28; Dkt. 87-26, at 2.)

　　On Friday, September 5, 2014, Plaintiff e-mailed Ms. McMurren again, copying Dr.

Pulitzer, and stating that he "was going to come in regardless of my last email Thursday, the family

issues having been resolved Thursday morning, I then managed to throw my back out."  (S-Defs.'

56.1, Dkt. 77, ¶ 29; Dkt. 87-21, at 2.)  During his deposition, Plaintiff testified that he wrote this

e-mail to provide an excuse for his absence as he was in fear of losing his job.  (Deposition of Oded Greenberg ("Pl.'s Dep."), Dkt. 95-1, at 246:14–247:16.)  Plaintiff then attempted to return to work on September 8, 2014.  (Pl.'s Decl., Dkt. 94, ¶ 10.)  It is undisputed that he notified Ms. McMurren that he would be late because he had to seek medical treatment for his back injury.  (S-Defs.' 56.1, Dkt. 77, ¶ 30.)  After Plaintiff reported to work on September 8, he was instructed to report to the Labor Relations office.  (*Id.* ¶ 31.)  Plaintiff's meeting with Labor Relations was recorded, lasted for approximately four hours, and during which time, according to Plaintiff, he was not permitted to leave the room to eat, stretch, or take the pain medication he had been prescribed that morning for his recent back condition.  (Pl.'s Decl., Dkt. 94, ¶ 10.)

During the meeting, Plaintiff admitted that he was "on the [Department's] schedule as 9 to 5," but he would occasionally "come in later and stay[] later," sometimes arriving at 10-10:30 or even "a little bit later."  (Pl.'s 56.1-1, Dkt. 92, ¶ 32.)   Plaintiff further stated that "if I come in late it doesn't make any difference.  I stay a little bit later.  I've been keep—adhering to a schedule between, say, 10 and 11 and 6 and 7 in the evening." (*Id.*)  When Plaintiff was asked whether he had the authority to make his own schedule, he replied that he felt that he had the "moral authority to do so." (*Id.*)  Plaintiff admitted that he had recently been told by Dr. Pulitzer to adhere to set hours, which he assumed were "9 to 5 as written on the schedule."  Plaintiff promised during the meeting that he would abide by "the cookie cutter hours that they require . . . from now on." (*Id.*)

In discussing his September 4 and 5, 2014 absences, Plaintiff stated during the meeting that "I have a child with special needs and he was kicked out of his school and he was to attend a new school and I had to spend time with him." (Dkt. 87-24, at 11–12).)  However, Plaintiff also stated that when he was absent on September 4 and 5, his mother-in-law came to help with his son, and he "had initially planned to take the day off,  . . . [but] I rolled out of bed and I – and I stretched

my back out and I've been in pain and not able to be mobile since then." (*Id.* at 12; *see also* Pl.'s

56.1-1, Dkt. 92, ¶ 33.)

> At the meeting, Plaintiff signed an agreement where
>
> [i]n lieu of [his] . . . being served a Notice of Discipline for: (1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department; (4) insubordination; (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, switching schedule without authorization of his supervisor, all parties agree that [Plaintiff] shall have a fine ranging from a letter of reprimand to termination from state service held in abeyance until one year from the signing of this agreement.

(Settlement Agreement, Dkt. 87-29, ¶ 1.) The Agreement further specified that Plaintiff's work

schedule would be from 9 a.m. to 5 p.m. on Monday through Friday, and that Plaintiff "understands

that he must accurately list the hours that he works . . . [and] that day's [*sic*] off/vacation/changes

to vacation need to be approved by his supervisor." (*Id.* ¶ 2.) The Agreement "placed [Plaintiff]

on Time and Attendance Watch," requiring him to "submit verifiable documentation for each

unscheduled absence; including non-medical absences," and outlined specific procedures for those

requests. (*Id.* ¶ 3.) The Agreement further waived Plaintiff's rights to bring any suit, civil action,

legal claim, or to impose liability in any forum with respect to SUNY or any SUNY employee.

(*Id.* ¶ 6.) Lastly, the Agreement noted that Plaintiff "voluntarily waived his right to legal or union

representation," and "represented himself in this matter." (*Id.* at ECF[9] 3.) Plaintiff, however,

asserts that he "did not negotiate the terms of the Settlement Agreement and signed it without

reviewing it carefully . . . [as he] was in acute pain from back spasms during the time that he sat

through the Interrogation . . . a time period spanning approximately 4–5 hours." (Pl.'s 56.1-1, Dkt.

92, ¶ 36.) Plaintiff eventually submitted time sheets claiming September 4 and 5, 2014 as sick

---

[9] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

days.   (Dkt. 87-32, at 5.)   Plaintiff's sick leave accruals were charged, and he received

compensation for those days.  (*Id*.)

Several weeks later, around September 23, 2014, Plaintiff advised Dr. Pulitzer that he

needed to take a leave for approximately two hours.  (S-Defs.' 56.1, Dkt. 77, ¶ 44.)  Plaintiff

states that he "asked for the additional leave in order to attend further meetings related to the

funding for the education of his special needs son, J[]," but does not indicate that this

information was communicated to SUNY-employees. (Pl.'s 56.1-1, Dkt. 92, ¶ 44.)  Dr. Pulitzer

denied the request, claiming insufficient staffing.   (*Id.*) Plaintiff then arranged for another

physician to cover for him and used his lunch hour to attend to the family matter.  (S-Defs.'

56.1, Dkt. 77, ¶ 45.)  SUNY-Defendants maintain that Plaintiff was off-site for at least two

hours, as evidenced by the Talk Station data, and that the physician asked to cover for Plaintiff

was unable to read neuroradiology cases, which left the emergency room with inadequate

coverage.  (*Id.* ¶ 45.)

## II.     Plaintiff's Unapproved Attestations

An attestation is "a written statement made by an attending physician to certify that he or

she ha[s] reviewed a patient's report and that the report is now final."  (Pulitzer Decl., Dkt. 79,

¶¶ 12, 13.)  It is a "legal document[] that [is] vital to hospital billing, and non-conforming ones

could trigger an investigation by the Centers for Medicare & Medicaid Services ("CMS"), as well

as potential financial liability."  (*Id*.)  CMS requires attestations in a standard format on all reports

initially read by a resident, and three standard attestations for use of the Radiology Department

were approved by SUNY's Risk Management Department.  (Reede Decl., Dkt. 80, ¶ 14; Dkt. 87-

33, at 3).)[10]  Once an attestation is added to a patient's record it cannot be deleted and becomes

part of the permanent record.  (Pulitzer Dep., Dkt. 87-57, at 265:23–266:2.)  Plaintiff complained

on numerous occasions about the requirement to use attestations.  (*See* Pl.'s Decl., Dkt. 94, ¶ 11

("I have no doubt that I may have expressed my frustration with this new requirement to some of

my colleagues.").)  For example, one of Plaintiff's colleagues stated that

> [d]irectly after the meeting [about attestations], [Plaintiff] composed his own
> attestation.  He read it to me and he was laughing.  I thought he was joking, as he
> read it to me in a jovial way.  I didn't think he would actually use it.  Afterwards, I
> heard that a clinician had called down and asked 'what was the meaning of this'
> after they saw his modified attestation on an actual patient report . . .

(Dkt. 95-55, at 2.)

Shortly after September 22, 2014, Plaintiff attached to patients' records approximately 180

unapproved attestations filled with "sarcastic language" inconsistent with the approved

attestations.  (S-Defs.' 56.1, Dkt. 77, ¶ 40; Dkt. 87-38.)  Moreover, Defendants contend that Dr.

Pulitzer was informed that Plaintiff had asked an employee in the IT Department, to "take off" or

"erase" the incorrect attestations, which he believed would have constituted tampering with

patients' legal medical files.  (Pulitzer Dep., Dkt. 87-57, at 143:13–144:11.)

---

[10] The parties dispute whether Plaintiff was fully informed as to the form of the attestation
to be used.  Plaintiff submits that he "was late in arriving to the [September 22, 2014 Departmental]
meeting" where Dr. Pulitzer discussed the correct forms of attestations, missed the departmental
meeting where KCHC's billing vendor explained the attestations, and could not attend the
September 15, 2014 presentation by the company that handles the Radiology Department's billing
because he was covering the Emergency Room that day.  (Pl.'s 56.1-1, Dkt. 92, ¶¶ 37–38.)  In
contrast, Dr. Pulitzer contends that he personally instructed each staff member, including Plaintiff,
on use of the approved attestations during a meeting on September 22, 2014.  (S-Defs.' 56.1,
Dkt. 77, ¶ 39; *see also* Pulitzer Decl., Dkt. 79, ¶ 12.)

Plaintiff essentially admits these facts,[11] but attempts to justify his actions.  In his declaration, Plaintiff states that he was late to the Radiology department meeting at which it was explained that attestations were necessary for the hospital to be paid for patients receiving Medicaid and/or Medicare benefits, and that he was "under the impression that each faculty member would be required to author an attestation that met insurers' requirements."  (Pl.'s Decl., Dkt. 94, ¶ 11.)  Plaintiff further states that, "[a]s we were a department down in manpower, I was in disbelief that we were going to be required to perform another bureaucratic task that would slow our reading of cases and detrimentally affect our ability to timely provide care to patients."  (*Id.*)

Regarding Dr. Pulitzer's belief that Plaintiff sought to have the hospital's IT Department erase the unauthorized attestations, Plaintiff states in his declaration that at some point on September 22, 2014—the day that Plaintiff inserted his unapproved attestations into approximately 180 patient records—a colleague "alerted" him that his self-authored attestation was "causing a stir in the hallways" and "suggested that [he] modify [the] attestation and see if it could be inserted in the studies" that were already completed.  (*Id.* ¶ 12.)  Plaintiff asked the IT Department if this was possible, to which an IT employee responded that "it would get him into trouble"; Plaintiff withdrew his request.  (*Id.*)

---

[11] In his declaration, Plaintiff states that he has

no doubt that I may have expressed my frustration with this new requirement to some of my colleagues, and when he returned to work after the meeting at which the attestations were discussed, out of frustration and in a fit of pique, I drafted an attestation that I believed met the insurers' requirements but was playful or at worst sarcastic.  I started using it immediately on cases that were months old, had already been acted upon in terms of treating patients, had been submitted to insurers for reimbursement[,] and rejected for lack of an attestation.

(Pl.'s Decl., Dkt. 94, ¶ 12.)

Following this incident, Dr. Pulitzer consulted with the then Medical Director of KCHC, Dr. Jamaleddine, and scheduled a meeting with the Risk Management Department at KCHC. (Pulitzer Dep., Dkt. 87-57, at 155:3–156:11; *see also* Pulitzer Decl., Dkt. 79, ¶ 15.)   Risk Management told Dr. Pulitzer to consider a Medical Board Hearing for Plaintiff, which could have led to the revocation of his medical credentials, and to have a "second reader" add a "new, proper attestation to each file," to avoid "potential exposure to the hospital."  (Pulitzer Dep., Dkt. 87-57, at 155:3–156:11; 287:8–20.)   Dr. Reede was consulted and agreed with Dr. Pulitzer that the appropriate course of action would be to refer the matter back to Labor Relations.  (Pulitzer Decl., Dkt. 79, ¶ 16; Reede Decl., Dkt. 80, ¶ 15.)  Dr. Pulitzer eventually corrected the attestations himself by affixing a new counter-attestation to each of the 180 charts.  (S-Defs. 56.1, Dkt. 77, ¶ 56.)

**III.    Plaintiff's Termination**

On October 3, 2014, Drs. Reede and Pulitzer sent Plaintiff another letter directing him to report to Labor Relations on October 8, 2014 to "discuss allegations of insubordination, leaving the worksite without authorization[,] and related matters."  (S-Defs.' 56.1, Dkt. 77, ¶ 46; *see also* Letter, Dkt. 87-44.)  After a delay to allow Plaintiff an attempt to locate an outside attorney, Plaintiff's "interrogation" was postponed to October 10, 2014.  (S-Defs.' 56.1, Dkt. 77, ¶ 46.)

At the October 10, 2014 interrogation,[12] Stephanie Bernadel, Labor Relations Personnel Associate (Dkt. 87-44, at ECF 2), questioned Plaintiff about his lunch-hour absence on September 23, 2014.  (S-Defs.' 56.1, Dkt. 77, ¶ 47.)  She further informed Plaintiff that he was being considered for discharge for a second instance of unauthorized leave and insubordination.  (*Id.*) During the meeting, Plaintiff stated, in part, that

---

[12] Transcripts of Plaintiff's interrogations by SUNY-Defendants' employee were submitted in support of SUNY-Defendants' motion for summary judgment.  (*See* Dkt. 87-24; Dkt. 87-43.)

I'm being singled out. And to me, it doesn't seem like it makes sense that all of this is happening because of something I did. I mean, it's clear to me that I'm being singled out and, I don't know, I mean, is someone trying to fire me? Is it [be]cause I'm Jewish? Is it because of some other reason? I don't know. Is it for some economic reason? I have no idea, but it doesn't make any sense to me . . . To me it seems like there's clearly something different about the way I'm being treated. I don't know exactly what it is, but on the face of it, it could be something like [discrimination]. I don't know.

(Dkt. 87-43, at 28–29.) A few days subsequent, Bernadel sent Plaintiff a letter informing him that claims of discrimination were handled by Defendants' "Office of Diversity." (S-Defs.' 56.1, Dkt. 77, ¶ 49.)

On or about October 20, 2014, another meeting was held between personnel from the Labor Relations Department, including Bernadel and Leonzo Cuiman, Assistant Vice-President for Labor Relations, and Plaintiff. (*Id.* ¶ 54.) At the meeting, Plaintiff was offered the opportunity to resign his position instead of being discharged. (Dkt. 87-30, at 47.) Plaintiff reiterated his concerns about Dr. Reede firing Jewish physicians.[13] (*Id.* at 35.) During the meeting, Plaintiff continued to complain about the use of the required attestations, repeating his view that the

---

[13] Plaintiff stated:

I – this is a deliberate action on Dr. Reede's part to replace me with people from her own institution from [Long Island College Hospital]. She's done this repeatedly. She's fired seven people from our department; five of who were Jewish, all of whom were white. She's replaced—and I don't have any issue with them replacing people with African-American or Caribbean-Americans, that's fine. But there's a pattern here, and I'm being treated differently; despite the fact that I am the best producer in the department, I'm the most important person, the most important cog in the wheel, at Kings County Hospital . . . This is retaliation . . . This is the issue. She is deliberately trying to get rid of me and she is putting all this stuff in front of me to trip me up deliberately so she can fire me . . . But I just—this is just to point to her character and to point to the fact that there's a deliberate attempt to get rid of me. Deliberate attempt to get rid of me for complaining about patient care issues; she's fired half our department.

(*Id.* at 35–37.)

**SPA19**

"purpose of the attestation" was "so that insurance companies make you jump through another hoop before they pay you," or "so that you can get sued better. . . . there's no real good reason for it;" Plaintiff went on to say that "[i]t just adds more work to my day."  (*Id.* at 11–21.)  Plaintiff concluded the meeting by stating that "I expect to get my job back.  I expect an apology from [Dr. Reede] and I expect a raise."  (*Id.* at 50.)

Two days later, on October 22, 2014, Plaintiff was terminated from his employment with SUNY Downstate.  (S-Defs.' 56.1, Dkt. 77, ¶ 55.)

**IV.    Procedural History**

Plaintiff commenced this action, *pro se*, on April 22, 2015.  (Dkt. 1.)  He retained counsel and amended the complaint on October 19, 2015.  (Dkt. 6.)  After SUNY-Defendants indicated they would move to dismiss certain claims (Dkt. 13), Plaintiff amended the complaint again and filed the operative complaint in this action, the Second Amended Complaint, on December 23, 2015 (Dkt. 17); a redacted and non-sealed version of the Second Amended Complaint was filed on January 21, 2016 (Dkt. 23 ("SAC")).  Following the close of discovery, all Defendants filed motions for summary judgment (Dkts. 76, 86), which are currently before the Court.

**DISCUSSION**

**I.    Kings County Hospital Center is Not a Suable Entity[14]**

KCHC argues that it is not a suable entity (*see* Dkt. 75, at 4), an assertion to which Plaintiff fails to respond (*see generally* Dkt. 89).  Thus, all of Plaintiff's claims against KCHC are deemed abandoned.  *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response

---

[14] To the extent that HHC asserts that it was not Plaintiff's employer for the purposes of any of the statutes at issue, the Court declines to reach that question, as all claims against HHC are dismissed on other grounds.

arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

However, even assuming that Plaintiff properly responded, Plaintiff's claims against KCHC would have to be dismissed because an agency of the City of New York is not an entity that can be sued.  N.Y. City Charter ch. 17, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the [C]ity of New York and not in that of any agency, except where otherwise provided by law."); *see also Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *Winters v. NYCDOC*, No. 19-CV-7271 (RA), 2019 WL 3817400, at *1 (S.D.N.Y. Aug. 14, 2019); *Emerson v. City of New York*, 740 F. Supp. 2d 385, 395 (S.D.N.Y. 2010) ("[A] plaintiff is generally prohibited from suing a municipal agency.").

Accordingly, KCHC is dismissed as a Defendant in this matter.

## II.  Eleventh Amendment Sovereign Immunity and State Defendants[15]

SUNY-Defendants assert that, pursuant to the Eleventh Amendment, Plaintiff's FMLA, § 1983, and NYSHRL claims against SUNY and SUNY-Employees in their official capacities,

---

[15] Despite SUNY-Defendants' assertion to the contrary (Dkt. 78, at 21), whether a state's sovereign immunity under the Eleventh Amendment presents a question of subject matter jurisdiction is an open question in the Supreme Court and the Second Circuit.  *See Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 391 (1998) ("[A]t the time of removal, this case fell within the 'original jurisdiction' of the federal courts.  The State's later invocation of the Eleventh Amendment placed the particular *claim* beyond the power of the federal courts to decide, but it did not destroy [subject matter] jurisdiction over the entire case."); *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) (leaving open "whether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense").  In light of this uncertainty, the Court will first address the sovereign immunity defenses raised by Defendants.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("[S]ubject-matter jurisdiction necessarily precedes a ruling on the merits.").  However, SUNY-Defendants only expressly assert a sovereign immunity defense with respect to Plaintiff's FMLA, § 1983, NYSHRL, and NYCHRL claims, and do not reference Plaintiff's causes of action

and his NYCHRL claims against SUNY-Employees in their official capacities, should all be dismissed.  (Dkt. 78, at 21.)  The Court agrees with respect to Plaintiff's § 1983 claim for damages, NYSHRL, and NYCHRL claims, but disagrees with respect to the FMLA to the extent that Plaintiff asserts claims under the "family-care provisions."

"As a general matter, states enjoy sovereign immunity from suit in federal court, even if the claim arises under federal law."  *KM Enters., Inc. v. McDonald*, 518 F. App'x 12, 13 (2d Cir. 2013) (summary order) (citing U.S. Const. amend. XI; *Alden v. Maine*, 527 U.S. 706, 727–28 (1999)); *see also McCluskey v. N.Y. State Unified Ct. Sys.*, No. 10-CV-2144 (JFB) (ETB), 2010 WL 2558624, at *5 (E.D.N.Y. June 17, 2010) ("Absent a state's consent to suit or an express statutory waiver, the Eleventh Amendment bars federal court claims against states."), *aff'd*, 442 F. App'x 586 (2d Cir. 2011) (summary order); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) ("[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State.").  The Eleventh Amendment of the United States Constitution "generally bars suits in federal court by private individuals against non-consenting states," and precludes "actions in which a state is actually named as a defendant, and certain actions against state agents and instrumentalities, including actions for the recovery of money from the state."  *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *see also Seminole Tribe of Fla. v. Florida*,

pursuant to 42 U.S.C. § 1981.  (Dkt. 78, at 19–21; SAC, Dkt. 23, ¶¶ 88–99.)  A § 1981 claim brought against SUNY or SUNY-Employees in their official capacities should be barred by sovereign immunity, as Congress did not abrogate immunity in enacting § 1981 and New York State has not consented to suit under that statute.  *See Jennings v. SUNY Health Sci. Ctr.*, 201 F. Supp. 3d 332, 335 (E.D.N.Y. 2016).  However, given the uncertainty as to whether sovereign immunity presents a jurisdictional bar (as opposed to an affirmative defense that SUNY-Defendants must assert), the Court reaches and dismisses the § 1981 claims against SUNY and SUNY-Employees on their merits.

517 U.S. 44, 54 (1996); *Hans v. Louisiana*, 134 U.S. 1 (1890). New York's sovereign immunity

extends to the State University of New York system, *Dube v. State Univ. of N.Y.*, 900 F.2d 587,

594 (2d Cir. 1990), and can protect a state university hospital from being sued in an employment

discrimination action, *see, e.g.*, *Bamba v. Fenton*, 758 F. App'x 8, 10 (2d Cir. 2018) (summary

order). The Eleventh Amendment, under most circumstances, also immunizes state officials sued

in their official capacities, *see Stinson v. City Univ. of N.Y.*, No. 17-CV-3949 (KBF), 2018 WL

2727886, at *5 (S.D.N.Y. June 6, 2018) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465

U.S. 89, 101–02 (1984); *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir. 2004)).

However, there exists an exception to sovereign immunity, first announced in *Ex parte

Young*, 209 U.S. 123 (1908), that "permits plaintiffs seeking prospective, injunctive relief to sue

state government officials for violations of federal law." *Gringas v. Think Fin., Inc.*, 922 F.3d

112, 121 (2d Cir. 2019). The *Ex parte Young* exception "rests on the premise—less delicately

called a 'fiction'—that when a federal court commands a state official to do nothing more than

refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office

for Prot. & Advocacy*, 563 U.S. at 255 (internal citation omitted). As the Second Circuit has

reasoned, "[i]n such circumstances, a plaintiff does not ask equity to create a remedy not authorized

by the underlying law. Rather, it generally invokes equity preemptively to assert a defense that

would be available to it in a state or local enforcement action." *Friends of the E. Hampton Airport

v. Town of East Hampton*, 841 F.3d 133, 144 (2d Cir. 2016).

Accordingly, absent an express waiver of sovereign immunity, a clear abrogation of that

immunity by Congress, or the applicability of the *Ex parte Young* exception, the Eleventh

Amendment generally bars Plaintiff from suing SUNY and SUNY-Employees in their official

capacities.

A.      **FMLA Claims**

Plaintiff asserts claims pursuant to the FMLA against all Defendants.   The FMLA allows

eligible employees to take up to 12 work weeks of unpaid leave per year for, *inter alia*, the care of

a "spouse . . . son, daughter, or parent" with "a serious health condition," and the employee's own

"serious health condition that makes the employee unable to perform the functions of the position

of such employee."   29 U.S.C. § 2612(a)(1)(C), (D).   "The Act creates a private right of action to

seek both equitable relief and money damages 'against any employer (including a public agency)

in any Federal or State court of competent jurisdiction.'"   *Coleman v. Ct. of Appeals of Md.*, 566

U.S. 30, 34 (2012) (quoting 29 U.S.C. § 2617(a)(2)).

For the purposes of sovereign immunity analysis, the Supreme Court has distinguished the

"family-care provisions" of the FMLA from the "self-care" provisions.   *Id.*   Supreme Court and

Second Circuit precedent make clear that Congress has not abrogated state sovereign immunity by

enacting the "self-care" provision of the FMLA.   *See id.* at 37 ("Standing alone, the self-care

provision [of the FMLA] is not a valid abrogation of the States' immunity from suit.").   However,

that is not the case with respect to the "family-care provisions" of the FMLA, through which, the

Supreme Court has determined, Congress expressly abrogated the States' immunity from suit

pursuant to its powers under § 5 of the Fourteenth Amendment.   *Id.* at 35–37 (citing *Nev. Dep't of*

*Human Res. v. Hibbs*, 538 U.S. 721 (1972)).   Plaintiff and SUNY-Defendants disagree about

whether Plaintiff's FMLA claims were brought pursuant to the "self-care" or "family-care"

provisions; however, given that Plaintiff asserted three causes of action pursuant to the "family-

care" provisions of 29 U.S.C. § 2615(a) and (b) (*see* SAC, Dkt. 23, ¶¶ 60, 65, 70), and that he

expressly alleges discriminatory and retaliatory actions were taken against him due to his need to

care for his child with a disability (*see id.* ¶¶ 28, 32, 34–36, 53–55), the Court finds that Plaintiff

has asserted his FMLA claims pursuant to the "family-care" provisions of the statute, which are thus not barred by the sovereign immunity doctrine.

**B.    Section 1983 Claims**

"It is well-established that New York State has not waived its sovereign immunity from Section 1983 claims." *Harrison v. New York*, 95 F. Supp. 3d 293, 314 (E.D.N.Y. 2015) (internal quotations and citation omitted); *see id.* (collecting cases).  Moreover, "it is well settled that 42 U.S.C. § 1983 does not constitute an exercise of [Congress's] authority [to abrogate sovereign immunity]." *Dube*, 900 F.2d at 594.  Therefore, Plaintiff's Equal Protection claim brought pursuant to § 1983 against SUNY is dismissed. For substantially the same reasons, the damages claims brought pursuant to § 1983 against SUNY-Employees in their official capacities are dismissed.[16] *See Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities.").

However, the Court finds that Plaintiff's claims for prospective injunctive relief against SUNY-Employees in their official capacities are not barred by sovereign immunity.  Under *Ex parte Young*, a plaintiff may only sue a state official acting in his official capacity "for *prospective, injunctive relief* from violations of federal law."  *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (internal quotation marks and citation omitted) (emphasis added). "The Second Circuit has held that claims for reinstatement to previous employment fall under the Ex parte Young exception."  *Ighile v. Kingsboro ATC*, No. 16-CV-4294 (AMD) (JO), 2019 WL 267042, at *3 (E.D.N.Y. Jan. 18, 2019) (citing *Rowland*, 494 F.3d at 96); *Dotson v. Griesa*, 398 F.3d 156, 178 (2d Cir. 2005) ("A court order of reinstatement, whether of government benefits or

---

[16] To the extent that SUNY-Employees also raise a qualified immunity defense to Plaintiff's § 1983 claims (SUNY-Defendants' Reply Brief, Dkt. 96, at 2 n.2), the Court does not reach this issue, as these claims are dismissed on other bases.

employment, is not barred by sovereign immunity.")); *cf. Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 245 (E.D.N.Y. 2015) (finding that plaintiff's claims against individual state officers in their official capacities did not fall under the *Ex parte Young* exception because plaintiffs did not "allege[] that the [i]ndividual CUNY [d]efendants have the responsibility or capacity to provide him with the prospective relief he seeks, i.e. reinstate him"); *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014) (finding that the Ex parte Young "exception to sovereign immunity only authorizes suits against officials with the authority to provide the requested relief").  As described *infra*, Plaintiff has asserted sufficient facts to allege that the SUNY-Employees have at least some capacity to provide the requested prospective injunctive relief.  The Court, therefore, addresses these claims on the merits.

**III.     Pendant Claims Arising Under State and City Laws**

New York State also has not waived its Eleventh Amendment immunity and consented to suit in federal court under the NYSHRL.  *Lambert v. N.Y. State Office of Mental Health*, No. 97-CV-1347 (JG), 2000 WL 574193, at *7 (E.D.N.Y. Apr. 24, 2000), *aff'd*, 22 F. App'x 71 (2d Cir. 2001) (summary order) ("[D]istrict courts in this circuit have uniformly found [that] the New York Human Rights Law [New York State Executive Law § 296] includes no waiver of the state's immunity to suit in federal court."); *see also Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 537–38 (S.D.N.Y. 2014).  The same can be said for claims against the State brought pursuant to the NYCHRL.  *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) ("The City of New York does not have the power to abrogate the immunity of the State, and we have found no evidence that the State has consented to suit in federal court under the NYCHRL.").  Accordingly, Plaintiff's claims against SUNY under the NYSHRL and NYCHRL must be dismissed.

The same claims must also be dismissed as to SUNY-Employees in their official capacities. *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as [the plaintiff] is suing the individual defendants [who are SUNY administrators and professors] in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent that it shields SUNY."); *Serrano v. N.Y. State Dep't of Envtl. Conservation*, No. 12-CV-1592 (MAD) (CFH), 2013 WL 6816787, at *14 (N.D.N.Y. Dec. 20, 2013) (dismissing plaintiffs "[NYSHRL] discrimination and retaliation claims against [the] [d]efendant DEC and in individual [d]efendants sued in their official capacities" based on "Eleventh Amendment immunity").

Likewise, Plaintiff's prospective claims against SUNY-Employees in their official capacities under the NYSHRL and NYCHRL fail because "a federal court's grant of injunctive relief against a state official may *not* be based on violations of state law." *Dube*, 900 F.2d at 595.

\*     \*     \*

Thus, Plaintiff is not barred by sovereign immunity from asserting FMLA interference and retaliation (family-care) claims against all SUNY-Defendants; § 1981 claims against all SUNY-Defendants; and § 1983, NYSHRL, and NYCHRL damages claims against SUNY-Employees in their individual capacities, and § 1983 claims for prospective injunctive relief against SUNY-employees in their official capacities.  Plaintiff's ability to assert claims under Title VII was not challenged as a threshold matter.  Having addressed these threshold issues, the Court now considers whether the movants are entitled to summary judgment on the surviving claims.

**IV.   Summary Judgment**

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law").  A dispute of fact is "genuine" if "the [record] evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests

with the moving party.  *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir.

2010).  Once this burden is met, however, the burden shifts to the nonmoving party to put forward

some evidence establishing the existence of a question of fact that must be resolved at trial.

*Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23 (1986).  A mere "scintilla of evidence" in support of the nonmoving party

is insufficient; "there must be evidence on which the jury could reasonably find for the [non-

movant]."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (internal quotation marks

omitted) (alteration in original).  In other words, "[t]he nonmoving party must come forward with

specific facts showing that there is a genuine issue for trial."  *Caldarola v. Calabrese*, 298 F.3d

156, 160 (2d Cir. 2002) (internal quotation marks omitted).  In determining whether a genuine

issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences

against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309

(2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the

nonmoving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970).  However, "the

mere existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 247–48.

The Second Circuit has "explicitly cautioned district courts to use extra care when deciding

whether to grant summary judgment [in employment discrimination cases] because the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." *Thompson v. Kaufman's Bakery, Inc.*, No. 03-CV-340 (WMS), 2005 WL 643433, at *3 (W.D.N.Y. March 16, 2005) (internal quotation marks and citation omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (noting that "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions" (internal quotation marks and citation omitted)).   Nevertheless, the "summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."); *Marmulszteyn v. Napolitano*, No. 08-CV-4094 (DLI), 2012 WL 3645776, at *5 (E.D.N.Y. Aug. 22, 2012) ("Although '[t]he Second Circuit has stated that district courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question,' summary judgment in such a case may still be warranted if the plaintiff relies 'on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." (quoting *Figueroa v. N.Y. Health & Hosps. Corp.*, 500 F. Supp. 2d 227–28 (S.D.N.Y. 2007))).   "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

A.      Plaintiff's FMLA Claims

"The FMLA provides generally that a covered employer is required to grant an eligible employee up to a total of 12 weeks leave during any 12-month period for personal or family needs indicated in the Act." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017) (citing 29 U.S.C. § 2612(a)).  The FMLA also provides a "private right of action" to "employees who need to take time away from work to deal with serious health conditions of the employee or [his] family" and are not provided that time by their employers.  *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006)).

In order to ensure that eligible employees are not deprived of their statutory rights, the FMLA makes it unlawful for an employer (1) "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" established by the FMLA, or (2) "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C. § 2615(a).  Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions[,] or disciplinary actions."  29 C.F.R. § 825.220(c).  Employers are also prohibited from discriminating against any employee for filing any charge or instituting any proceeding under or related to the FMLA.  *See* 29 U.S.C. § 2615(b)(1).  In the Second Circuit, these prohibitions give rise to two distinct types of FMLA claims:  interference claims and retaliation claims.  *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).  Plaintiff has asserted both types of FMLA claims in this case.  (*See* SAC, Dkt. 23, at 3.)

1.    SUNY-Employees' Individual Liability

"Eligibility is a threshold issue" for an FMLA claim.  *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 465 (S.D.N.Y. 2011) (quoting *Spurlock v. NYNEX*, 949 F. Supp. 1022, 1033 (W.D.N.Y. 1996)).  SUNY-Employees assert that they cannot be held liable as "individuals" under the FMLA.  (Dkt. 78, at 34.)  The Court disagrees.

"An individual may be held liable under the FMLA only if she is an 'employer,' which is defined as encompassing 'any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer.'"  *Graziadio v. Culinary Institute of Am.*, 817 F.3d 415, 422 (2d Cir. 2016) (quoting 29 U.S.C. § 2611(4)(A)(ii)(I)) (citing 29 C.F.R. § 825.104(d)).  In *Graziadio*, the Second Circuit analyzed the appropriate test for individual liability under the FMLA, and concluded that the "economic-reality test," tracking the language applied in the context of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d), is the appropriate analysis:

> Under this test, courts ask whether the alleged employer possessed the power to control the worker in question, with an eye to the economic reality presented by the facts of each case.  To do so, they consider a nonexclusive and overlapping set of factors intended to encompass the totality of circumstances.  These factors include whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.  No one of the four factors standing alone is dispositive and any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition.  In the FMLA context, courts assessing the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer controlled in whole or in part plaintiff's rights under the FMLA.

*Graziadio*, 817 F.3d at 422–23 (internal quotation marks, citations, and alterations omitted).  In *Graziadio*, the district court had dismissed an individual defendant on a motion for summary judgment after focusing on the facts that the defendant "lacked meaningful 'power to hire and fire,'" and that the plaintiff had not offered evidence that the defendant "supervised or controlled

employee work schedules or conditions of employment, determined the rate and method of employee payment, or maintained employment records." *Id.* at 423.  The Second Circuit reversed, and in applying the economic-reality test, focused on the evidence demonstrating that

> on the overarching question of whether [the defendant] controlled plaintiff's rights under the FMLA, there seems to be ample evidence to support the conclusion that she did: deposition testimony and email exchanges demonstrate a) that [the defendant] reviewed [the plaintiff's] FMLA paperwork, b) that she determined its adequacy, c) that she controlled [the plaintiff]'s ability to return to work and under what conditions, and d) that she sent [the plaintiff] nearly every communication regarding her leave and employment (including the letter ultimately communicating her termination). Indeed, [the defendant] specifically instructed [other employees] that they were not to communicate with [the plaintiff] and that [the defendant] alone would handle [her] leave dispute and return to work.

*Id.* at 424.  Given that evidence, the panel in *Graziadio* concluded, that "a rational jury could find, under the totality of the circumstances, that [the defendant] exercised sufficient control over [the plaintiff]'s employment to be subject to liability under the FMLA."  *Id.*

Among other material, the following evidence was submitted by the parties on this issue:

- Stephanie Bernadel, a member of SUNY's Labor Relations Department, testified at her deposition that "[a]fter reviewing the facts and the result of the investigation, we discussed it . . . with Dr. Pulitzer and with Dr. Reede[,] . . . and Dr. Reede and Dr. Pulitzer both together and separately felt that [Plaintiff] had violated his agreement and so he, you know, should be terminated. . . . After consulting with Dr. Pulitzer and Dr. Reede, they both felt that [Plaintiff] had been insubordinate and had violated the terms of his agreement, and so we all discussed it and we all decided that he was in violation of his agreement."  (Bernadel Dep., Dkt. 95-30, at 9:5–10:24).

- Letters from Dr. Reede to physicians in the SUNY Downstate Department of Radiology, not including Plaintiff, regarding salary adjustments.  (Dkt. 95-47.)

- An email from Dr. Pulitzer to Dr. Reede regarding Radiology Department personnel and a coverage proposal.  (Dkt. 95-48.)

- Dr. Pulitzer's declaration in support of SUNY-Defendants' summary motion (Pulitzer Decl., Dkt. 79) stating, *inter alia*, that:

  - In his role as Chair of Radiology at KCHC he "did not hire or fire radiologists, determine the rate of their pay, or maintain employment records."  (*Id.* ¶ 3.)

o   In his role as "Interim Chair of the [KCHC] department," Dr. Pulitzer "assumed a supervisory role with respect to managing radiologists' schedules and ensuring adequate coverage for the department."  (*Id.* ¶ 5.)

o   Dr. Pulitzer, in his role as Chair of the KCHC Radiology Department, "reviewed requests for time off."  (*Id.* ¶ 7.)

o   Dr. Pulitzer did not approve Plaintiff's leave request for September 4 and September 5, 2014 (*Id.* ¶ 9), communicated with Dr. Reede about that absence, and with Dr. Reede referred that issue to SUNY Downstate's Labor Relations Department (*Id.* ¶ 10).

o   Following Plaintiff's alleged attachment of inappropriate attestations to patients' charts, Dr. Pulitzer "brought the issue to the attention of . . . the Chief Medical Officer of KCHC," met with an individual in KCHC's Office of Risk Management, considered convening a Medical Board Hearing, and "notified Dr. Reede of the situation[.]"  "Dr[s]. Reede and [Pulitzer] agreed to refer the issue to SUNY Downstate's Department of Labor Relations.  Following the investigation by Labor Relations, [Dr. Pulitzer] conferred with Labor Relations and Dr. Reede, and . . . ultimately concluded that Plaintiff should be terminated."  (*Id.* ¶¶ 15–16.)

•  Dr. Reede's declaration in support of SUNY-Defendants' summary judgment motion (Reede Decl., Dkt. 80), in which she stated, *inter alia*, that:

o   In her "role as Chair of Radiology [at SUNY Downstate], [she] cannot by [her]self hire or fire physicians in the department or determine their rate of pay, and [she] do[es] not maintain employment records."  (*Id.* ¶ 3.)

o   Dr. Reede was aware of the September 2014 attendance incident to the extent that Dr. Pulitzer informed her that Plaintiff insisted on taking time off without Dr. Pulitzer's approval, and that Dr. Reed "advised [Dr.] Pulitzer to refer Plaintiff to Downstate's Department of Labor Relations."  (*Id.* ¶ 12.)

o   Dr. Reede "was very familiar with Plaintiff's issues with time and attendance, having counseled Plaintiff in May and having heard reports that Plaintiff was often not in the ER when he was supposed to be."  (*Id.*)

o   Dr. Reede discussed the non-standard attestation issue with Dr. Pulitzer and "agreed that the matter should be referred to the Department of Labor Relations at SUNY Downstate."  (*Id.* ¶ 15.)

o   Following the Labor Relations investigation, Dr. Reede "conferred with Labor Relations and Dr. Pulitzer, and . . . ultimately concluded that Plaintiff should be terminated."  (*Id.* ¶ 16.)

- A meeting summary regarding "time and attendance" between Drs. Reede and Plaintiff, written by Dr. Reede (Dkt. 87-9) and the same written by Dr. Pulitzer (Dkt. 87-18).

- Dr. Pulitzer's letters denying Plaintiff's request for time off and Plaintiff's attendance sheets.  (*E.g.*, Dkt. 87-23; Dkt. 87-32, at ECF 4–7.)

- Plaintiff's e-mails to Dr. Pulitzer regarding his attendance, time-off requests, and absences.  (*See, e.g.*, Dkt. 87-14.)

The Court finds that this evidence presents a genuine dispute as to material facts underlying any analysis of the *Graziadio* factors for purposes of determining whether SUNY-Employees are subject to individual liability under the FMLA.  *See* Fed. R. Civ. P. 56(a).  The economic reality test does not require an individual to have absolute control over the Plaintiff's rights under the FMLA, but sufficient control in whole or in part.  *See Graziadio*, 817 F.3d at 422.

The evidentiary submissions demonstrate that it would be reasonable for a jury to conclude that: (1) Dr. Pulitzer was sufficiently involved in both the investigation referrals and the actual decision to terminate Plaintiff, such that he "had the power to hire and fire the employees"; (2) the fact that Plaintiff had to ask Dr. Pulitzer for leave time, that Dr. Pulitzer had the authority to deny that time, and that Dr. Pulitzer testified that he assumed that supervisory role shows that Dr. Pulitzer "supervised and controlled employee work schedules"; and (3) the fact that Dr. Pulitzer authored documents for placement in Plaintiff's employment file shows that Dr. Pulitzer "maintained [Plaintiff's] employment records."  *See id.* at 422–23.  Although the evidence does not suggest that Dr. Pulitzer "determined the rate and method of [Plaintiff's] payment," "[n]o one of the four factors standing alone is dispositive[.]"  *Id.* at 422.  Rather, "in the FMLA context, courts assessing the economic reality of an employment relationship have construed this test as asking essentially whether the putative employer "controlled in whole or in part plaintiff's rights under the FMLA."  *Id.* at 423.  The Court concludes that there is sufficient evidence to allow a

reasonable jury to find that Dr. Pulitzer controlled, at least in part, Plaintiff's rights under the FMLA.

   The evidence similarly demonstrates that it would be reasonable for a jury to conclude that Dr. Reede is also subject to individual liability.  A jury could look at Dr. Reede's involvement in both the investigation referrals and actual decision to terminate Plaintiff to conclude that she "had the power to hire and fire the employees"; that she was sufficiently involved in the oversight of SUNY Downstate's Radiology staff; in consultation with Dr. Pulitzer, "supervised . . . employee work schedules" at KCHC; that she "determined the rate and method of payment," as reflected in the letters Dr. Reede sent to the Radiology Department physicians regarding their rates of pay; and that she "maintained [Plaintiff's] employment record," as reflected in the numerous employment-related documents she authored.  *Id.* at 422.

   Accordingly, the Court denies SUNY-Defendants' summary judgment motion as to SUNY-Employees on the ground that no jury could find that they qualify as "individuals" under the FMLA.

### 2.   Plaintiff's FMLA Interference Claims

   Plaintiff asserts both an FMLA interference cause of action and FMLA retaliation cause of action, based on the same facts.  SUNY-Defendants argue that Plaintiff's allegations sound entirely as a retaliation claim and not as an interference claim.  (Dkt. 78, at 30.)  The Court agrees.

   Plaintiff is essentially claiming that he was subjected to adverse employment actions—probation and then termination—for exercising his FMLA rights.  (*See* SAC, Dkt. 23, ¶¶ 26–58.) He does not state that he was ever prevented from actually taking FMLA leave.  (*See generally id.*)  As the Second Circuit explained:

> In a general sense, an employee brings an "interference" claim when [his] employer has prevented or otherwise impeded the employee's ability to exercise rights under

the FMLA.  "Retaliation" claims, on the other hand, involve an employee actually exercising [his] rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer.  The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA.

*Woods*, 864 F.3d at 166 (internal citations omitted); *see also LeClair v. Berkshire Union Free Sch. Dist.*, No. 08-CV-1354 (LEK) (RFT), 2010 WL 4366897, at *6 (N.D.N.Y. Oct. 28, 2010) ("Plaintiff's theory of interference by termination is merely a retaliation theory in disguise"); *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009) (holding plaintiff's interference claim "really is no more than an effort to dress [his] retaliation claim in (barely) different clothing").  To the extent that Plaintiff relies on a District of Maryland decision to argue that the "distinction between an interference claim and a retaliation claim under the FMLA is not always clear," and that his decision to proceed with FMLA-eligible leave led to his probation, thus asserting an interference claim, that reliance is misplaced.  (Dkt. 90, at 29–30 (quoting *Edusei v. Adventist Healthcare, Inc.*, No. 13-CV-157 (DKC), 2014 WL 3345051, at *6 (D. Md. July 7, 2014).  The facts of *Edusei* do not support Plaintiff's argument.  The Court there distinguished between a claim arising from the deprivation of an FMLA entitlement—such as being denied the ability to take leave—from retaliation for an employee's exercise of their FMLA rights—such as being fired or placed on probation for taking that leave.  *See Edusei*, 2014 WL 3345051, at *6.  As previously described, Plaintiff is alleging retaliation and not interference.

        For these reasons, Plaintiff's FMLA interference claims are dismissed.[17]

_____

[17] Regardless, Plaintiff's interference claims would fail.  To succeed on an FMLA interference claim, Plaintiff must establish

        1) that [he] is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that [he] was entitled to take leave under the

3.      Plaintiff's FMLA Retaliation Claims

A plaintiff may bring FMLA retaliation claims for violations of both 29 U.S.C. § 2615(a)(1) and 29 U.S.C. § 2615(a)(2). *See Woods*, 864 F.3d at 167; *see also* § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."); § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."). FMLA retaliation claims are analyzed under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Graziadio*, 817 F.3d at 429. Accordingly, "[t]o establish a prima facie case of FMLA retaliation, a plaintiff must establish that (1) he exercised rights protected under the FMLA, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (internal quotation marks omitted). There is no dispute that Plaintiff has established the second and third prongs of a *prima facie* case—that Plaintiff was qualified for his position and that he suffered an

> FMLA; 4) that [he] gave notice to the defendant of [his] intention to take leave; and
> 5) that [he] was denied benefits to which [he] was entitled under the FMLA.

*Graziadio*, 817 F.3d at 424 (adopting requirements for a *prima facie* case of interference with FMLA rights). At a minimum, Plaintiff did not assert sufficient facts to prevail on the fifth prong: that he was denied benefits to which he was entitled. It is undisputed that Plaintiff utilized accrued sick leave for the time he was absent from work on September 4 and 5, 2014, and therefore was not denied any benefit. *See* 29 U.S.C. § 2612(d)(2)(B) ("An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided . . . for any part of the 12-week period of such leave under [the Act.]").

adverse employment action.[18]  (SUNY-Defendants' Opening Brief, Dkt. 78, at 31 ("Plaintiff has

failed to establish the first and fourth prongs of a *prima facie* FMLA retaliation claim."); Plaintiff's

Memorandum in Response, Dkt. 90, at 35 ("SUNY Defendants move to dismiss the retaliation

claim on two grounds: (1) [Plaintiff] did not exercise rights protected under the FMLA; and (2) he

cannot show that his termination occurred under circumstances that give rise to an inference of

retaliatory intent.").)  The parties' source of disagreement lies in the analysis of the first and fourth

prongs.

    The first prong requires that Plaintiff establish that he exercised rights protected under the

FMLA.  SUNY-Defendants contend that Plaintiff did not exercise rights protected by the FMLA

because, when he missed work on September 4 and 5 and was subsequently placed on probation,

he missed those days due to an injured back, unrelated to a need to care for his son, the reason he

is asserting FMLA protections.  (Dkt. 78, at 20–21.)  Plaintiff, in opposition, contends that he

sought the leave to assist with planning for his child with autism to be placed at an appropriate

school, and to "provide love and support" to that child, who was having difficulty with transitions.

(Dkt. 90, at 8 (citing Pl.'s Decl., Dkt. 94, ¶ 9).)[19]

────────────────

[18] The Court declines to address SUNY-Defendants' arguments regarding whether the
settlement agreement and subsequent probation constituted an adverse action under the FMLA,
given the dismissal of the FMLA retaliation claim on other grounds.

[19] To the extent that SUNY-Defendants also advance the argument that Plaintiff did not
follow the proper notice and procedural requirements for an FMLA leave request, that assertion is
belied by their own evidence.  Generally, while the FMLA allows an employer to establish its own
policies for usual and customary notice for requesting leave, 29 C.F.R. § 825.303(c), "[a]n
employer cannot use its own notice policy to circumscribe an employee's rights under
the FMLA," *Slaughter v. Am. Bldg. Maint. Co. of N.Y.*, 64 F. Supp. 2d 319, 327 (S.D.N.Y. 1999);
*see also Hill v. City of New York*, 136 F. Supp. 3d 304, 343 (E.D.N.Y. 2015).  "The FMLA does
not impose a specific time requirement for an employee to request FMLA leave, only requiring
that 'an employee must provide notice to the employer as soon as practicable under the facts and
circumstances of the particular case.'"  *Id.* at 343 (quoting 29 C.F.R. § 825.303(a)).  SUNY-

The evidence adduced by the parties demonstrates that:

- Plaintiff's request for time-off does not indicate that he made the request based on the need to care for his child.  (*See* Dr. Pulitzer's contemporaneous notes, letters, and e-mails regarding Plaintiff's leave request, Dkts. 87-19, at ECF 3; 87-23, at ECF 2; 95-19, at ECF 3; Dkt. 95-26, at ECF 2.)

- Plaintiff's initial request does not indicate a reason for the requested time off.  (*See* Dkt. 87-21 at ECF 3; Dkt. 95-38, at ECF 3.)

- An Impartial Hearing Officer at the New York City Department of Education did indicate that certain paperwork regarding Plaintiff's child's school placement had to be completed by September 4, 2014.  (Dkt. 95-22, at ECF 2.)

- During the Labor Relations Interrogation on September 8, 2014, Plaintiff admitted that he had planned to go to work on September 4, because the situation with his son had been resolved, but that he hurt his back getting out of bed, which led to him not appearing for work that day.  (Dkt. 87-24, at 12:7–8 (Plaintiff stating, "I-I-I was gonna come in, I rolled out of bed and I – and I stretched my back out and I've been in pain and not able to be mobile since then.").)

- Plaintiff sent Dr. Pulitzer an email on September 5, 2014, stating, "[a]s it turns out I was going to come in regardless of my last email Thursday, the family issues having been resolved Thursday morning, I then managed to throw my back out.  My mobility has been severely limited since.  Please forgive the confusion."  (Dkt. 87-21, at ECF 2.)

- Plaintiff visited an urgent care center on September 8, 2014 to receive care for his back injury.  (Dkt. 87-28.)

- During the second Labor Relations meeting on October 20, 2014, Plaintiff stated, "[s]o rather than just call in sick the next day, Thursday and Friday, which is what everybody else does, and what everybody else has told me that I should have done, I prepared the department for my absence . . . And it turns out, the next morning, I got out of bed and I threw out my back.  So I physically, even if I wanted to, couldn't come to the hospital . . . I couldn't – I couldn't physically make it to the hospital, and I had to deal with my son's issues.  He's the most important thing in the world to me."  (Dkt. 87-30, at 4:1–16.)

Defendants contend that "Plaintiff first requested the [alleged FMLA] leave on August 29, 2014 by emailing Ms. McMurren, who was not the appropriate person to contact."  (Dkt. 78, at 32.) However, SUNY-Defendants submitted a slide detailing the "Sick Day Policy for KCHC" which states that Ms. McMurren, who works for Dr. Reede, is indeed one of the correct people to contact. (Dkt. 87-13, at ECF 8; *see also* Dkt. 87-22, at ECF 10 ("Department Chair's office must be promptly notified . . . Additional daily email notification to Chair and Chair's staff is also expected *where possible*." (emphasis added)).)  To the extent that SUNY-Defendants argue that Plaintiff did not follow the precise notification procedures, within a practicable time, they appear to be promoting form over the substance of the law.

Even after drawing all inferences in the light most favorable to Plaintiff and considering his own statements and deposition testimony, this Court finds that a reasonable jury could not conclude that Plaintiff did not report to work on September 4 and 5, 2014 to care for his son.  The Court finds *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), analogous.  There, the Second Circuit reasoned:

> In the circumstances presented in the instant case—where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe [plaintiff]'s testimony, we hold that the District Court did not err by awarding summary judgment.

*Id.* at 555 (internal citations, quotation marks, and alterations omitted).[20]

For these reasons alone Plaintiff's FMLA retaliation claims fail.  However, even assuming *arguendo* that Plaintiff did sufficiently allege a *prima facie* case, the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse action, *see Esser v. Rainbow Advert. Sales Corp.*, 448 F. Supp. 2d 574, 581 (S.D.N.Y. 2006), which SUNY-

---

[20] To the extent that Plaintiff relies on the Second Circuit decision in *Coutard v. Municipal Credit Union*, 848 F.3d 102 (2d Cir. 2017), to argue that Dr. Pulitzer was under an obligation to ask further questions of Plaintiff as to the exact nature of the circumstances of his request for leave to see if the leave was FMLA-eligible, that reliance is misplaced.  (Dkt. 90, at 34.)  In *Coutard* the Plaintiff sought leave to take care of his seriously ill grandfather with whom he had an *in loco parentis* relationship, and informed his employer that he needed leave, without describing that relationship.  The Court concluded that because "[plaintiff] met the eligibility requirements for FMLA leave and requested that leave expressly to care for his seriously ill grandfather, [defendant] as an employer covered by the Act had an obligation to specify the additional information that it needed in order to determine whether he was entitled to such leave."  *Coutard*, 848 F.3d at 104.  Here, the question is whether Plaintiff, as an initial matter, met the eligibility requirements for FMLA leave by "expressly" stating that he sought leave to take care of a family member—which the plaintiff in *Coutard* did.  *Id.*  Since Plaintiff did not, the additional requirements imposed on the employer by *Coutard* to obtain additional information about the reasons for the leave simply have no application here.

Defendants have done.  There is no dispute that Plaintiff attached unapproved attestations required for proper hospital reimbursements to multiple—indeed, almost 200—patients' charts, and then sought information from IT about if and how the attestations could be deleted.  (*See* Pulitzer Dep., Dkt. 87-57, at 143:13–144:11; Pl.'s Decl., Dkt. 94, ¶ 12.)  Furthermore, it is clear that Plaintiff was terminated, in large part, due to attaching the unapproved attestations to patients' charts.  (*See* S-Defs.' 56.1, Dkt. 77, ¶¶ 42–43, 46, 55–56.)[21]  SUNY Defendants' have established a legitimate, non-discriminatory reason for Plaintiff's termination.  Thus, the Court finds that Plaintiff cannot prove that the cause of his termination was merely a pretext for discrimination.

Accordingly, Plaintiff's FMLA retaliation claims are dismissed.

**B.      Federal Race and Religion Discrimination Claims**

Plaintiff also brings discrimination and retaliation claims under Title VII, and §§ 1981 and 1983, and alleges that he faced discrimination because of his race and religion.  (SAC, Dkt. 23, ¶¶ 1, 21–27, 73–81; Dkt. 90, at 17.)  Plaintiff asserts that, as a result of this discrimination, he was not promoted to Director of the ER Radiology Department, a job he had previously occupied, despite being more qualified than the doctor hired for that position.  Plaintiff also claims that as a result of race and religion, in combination with the FMLA discrimination discussed *supra*, he was placed on probation and ultimately terminated.  (Dkt. 90, at 17–19.)

---

[21] Plaintiff does not dispute that he was terminated for violations of the September 8, 2014 disciplinary settlement due to, *inter alia*, "allegations of insubordination," but disputes which employees made the decision.  (Pl.'s 56.1-1, Dkt. 91, ¶ 55.)  Plaintiff notes that the evidence shows that Drs. Reede and Pulitzer decided he should be terminated; that Ms. Bernadel and Mr. Cuiman agreed with that decision; and, that, according to Dr. Pulitzer, Dr. Jamaleddine, KCHC's Chief Medical Officer, "made it known that he would not allow Dr. Greenberg to continue to practice at KCHC and therefore, in effect, he was saying that Dr. Greenberg had to be terminated."  (*Id.*)

1.     Plaintiff's Section 1981 Claims

At the outset, the Court notes that it will consider Plaintiff's § 1981 claims in tandem with

his § 1983 claims.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United

States shall have the same right in every State and Territory to make and enforce contracts[.]"  42

U.S.C. § 1981(a).   The Civil Rights Act of 1991 expanded § 1981 to outlaw discrimination

occurring after contract formation "with respect to the enjoyment of benefits, privileges, terms,

and conditions of a contractual relationship[.]"  *Patterson v. Cty. of Oneida*, 375 F.3d 206, 224 (2d

Cir. 2004).  Section 1981 does not provide an independent cause of action against state actors;

rather, § 1981 claims must be brought through § 1983.  *Duplan v. City of New York*, 888 F.3d 612,

619–21 (2d Cir. 2018) (joining nine other circuits to reaffirm the applicability of *Jett v. Dallas

Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)); *see Jett*, 491 U.S. at 733 ("[T]he express cause of

action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the

rights guaranteed in § 1981 by state governmental units.").  "[W]here defendants are state actors,

Section 1983, not Section 1981, is the appropriate vehicle through which a plaintiff may pursue

discrimination claims for damages."  *Zaniewska v. City of New York*, No. 11-CV-2446 (RRM)

(VVP), 2013 WL 3990751, at *8 (E.D.N.Y. Aug. 5, 2013), *aff'd*, 569 F. Appx. 39 (2d Cir. 2014)

(summary order); *see also Jett*, 491 U.S. at 735 ("We hold that the express action at law provided

by § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution

and laws [of the United States], provides the exclusive federal damages remedy for the violation

of the rights guaranteed by § 1981 when the claim is pressed against a state actor.") (internal

quotation marks omitted).   "The holding in *Jett* has been interpreted to encompass not only

governmental entities, but also individuals sued in their individual capacities who are state actors."

*Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381, 400-01 (S.D.N.Y. 2008) (internal quotation

**SPA42**

marks omitted); *Bamba*, 2017 WL 3446806, at *10 (collecting cases).  The Court, therefore, analyzes Plaintiff's §§ 1981 and 1983 claims together under § 1983.

> 2.   Plaintiff's Title VII, § 1981, and § 1983 Discrimination Claims[22]

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  The purpose of the section to which Plaintiff cites, 42 U.S.C. § 2000e–16a, "is to provide procedures to protect the rights of certain government employees, with respect to their public employment, to be free of discrimination on the basis of race, color, religion, sex, national origin, age, or disability."  To succeed on a claim of discrimination under Title VII a plaintiff must first establish a *prima facie* case of discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  To do this, the plaintiff must show that he was (1) "within the protected class"; (2) "qualified for the position"; (3) "was subject to an adverse employment action"; and (4) "the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009), *superseded in part by statute as stated in Vogel v. CA, Inc.*, 662 F. App'x 72 (2d Cir. 2016) (summary order).  When a plaintiff alleges a failure to promote, the fourth prong requires that plaintiff to show "that the failure to promote occurred under circumstances giving rise to an inference of discriminatory intent."  *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 266 (citing *Yi v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122 (2d Cir. 2012) (summary order), among other cases).

---

[22] The Court notes that Plaintiff only asserts age discrimination claims in the context of his state law and municipal law claims.  (*See* SAC, Dkt. 23, ¶¶ 59–161.)

SPA43

Once a *prima facie* case has been established the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Once the defendant has made a showing of a neutral reason for the alleged action, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trs. of Columbia Univ. in City of N.Y.*, 131 F.3d 305, 312 (2d Cir. 1997). "If the plaintiff's evidence was barely sufficient to make out a prima facie case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral rationale." *Id.*; *see also Naumovski v. Norris*, 934 F.3d 200, 215 n.39 (2d Cir. 2019). "Showing an employer's motivation to discriminate is 'usually' accomplished through the 'cumulative weight of circumstantial evidence.'" *United States v. City of New York*, 713 F. Supp. 2d 300, 322 (S.D.N.Y. 2010) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).

Section 1983 employment discrimination claims may generally be analyzed using the same *McDonnell Douglas* framework that applies in a Title VII discrimination case. *Naumovski*, 934 F.3d at 214. However, a § 1983 claim carries a higher burden: "a Title VII plaintiff need only prove that the employer's stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action. By contrast, to establish 'pretext' under § 1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action." *Id.* at 214–15 (emphasis in the original). Put another way, "a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Id.* at 215. "A plaintiff pursuing a claim for employment discrimination under § 1983 . . . must establish that the defendant's discriminatory

SPA44

intent was a 'but-for' cause of the adverse employment action or the hostile environment.  It is insufficient to establish simply that invidious discrimination was 'a motivating factor' of the offending conduct."  *Id.* at 214.  "Accordingly, a court considering a § 1983 claim at summary judgment must determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred 'but-for' [the] discrimination."  *Id.*

There is no dispute that Plaintiff Greenberg is Jewish and white, and thus within two protected classes, *see Klings v. N.Y. State Office of Ct. Admin.*, No. 04–CV–3400 (KAM) (LB), 2010 WL 1292256, at *6 (E.D.N.Y. Apr. 5, 2010); *Vill. of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016) ("[In a prior case]  we assumed the viability of a Title VII claim for intentional racial discrimination based on the plaintiff's status as 'white, Jewish, and/or not Hispanic.'" (internal citation omitted)), or that by reason of his non-promotion, *see Ellis*, 975 F. Supp. 2d at 266, and probation and subsequent termination, he was subject to adverse employment actions, *see Terry v. Ashcroft,* 336 F.3d 128, 137–138 (2d Cir. 2003) (finding an adverse employment action is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities," and may "include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." (internal quotation marks, citations, and alterations omitted)).  However, the Court finds that taking the submissions of the parties, together, do not show a genuine dispute as to material facts that would give rise for a reasonable jury to find that any of the alleged adverse actions gives rise to an

inference of discrimination based on religion or race.[23]  *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 248; *cf. Patterson*, 375 F.3d at 223 ("In sum, [plaintiff] produced no evidence that racial harassment at the hands of fellow officers had any bearing on the Department's decision to terminate his employment.  We conclude that there plainly was a dearth of evidence to show that the termination of his employment occurred under circumstances giving rise to an inference of discrimination.").

First, as relevant to all of Plaintiff's claims of discrimination, he could have been terminated, without cause, in June 2014.  (*See* Reede Decl., Dkt. 80, ¶ 9 (noting that at the time five radiologists were not renewed in June of 2014, Plaintiff was renewed); Reede Reply Decl., Dkt. 98, ¶ 4 ("I made the decision to renew [Plaintiff] in June 2014 at the time that five radiologists were no[t]-renewed, and I was aware of his race and age at the time of the decision to renew him.").)  Moreover, the same actors Plaintiff alleges to have discriminated against him actually renewed his contract four months prior (*see id.* ¶ 4), strongly suggesting that invidious discrimination was not the likely cause.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[S]ome factors strongly suggest that invidious discrimination was unlikely.  For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.").

With respect to Plaintiff's claims of race and religious discrimination, the Court notes that

---

[23] The Court notes that it is analyzing Plaintiff's Title VII and §1983 claims together although the causation standard is more demanding for § 1983 actions and requires "a court considering a § 1983 claim at summary judgment . . . [to] determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred but-for [the] discrimination."  *Naumovski*, 934 F.3d at 214.  Since, as discussed below, the Court does not reach the causation element as to the Title VII or § 1983 claims, it analyzes Plaintiff's Title VII and § 1983 claims together.

Dr. Pulitzer is also white and Jewish and belongs to the same class as Plaintiff.  (Pulitzer Decl., Dkt. 79, ¶ 2 ("I self-identify as White and am Jewish.")  "It is a well-settled, albeit not dispositive, principle that where the alleged discriminator is a member of the same protected class as Plaintiff, an inference against discrimination exists and claims of discrimination become less plausible." *Meyer v. State of N.Y. Office of Mental Health*, 174 F. Supp. 3d 673, 687 (E.D.N.Y. 2016) (citing *Allen v. Chanel, Inc.*, No. 12-CV-6758 (LAP), 2015 WL 3938096, at *5 (S.D.N.Y. June 26, 2015); *see Allen*, 2015 WL 3938096, at *5 (granting summary judgment on sex discrimination claim because "when the decision-maker is in the same protected class(es) as the plaintiff-employee, courts can draw inferences against discriminatory intent," and here the decision makers were "all female" just like plaintiff); *Palak v. St. Francis Hosp.*, No. 14–CV–4383 (JG), 2015 WL 3682805, at *8, 2015 (E.D.N.Y. June 12, 2015) (collecting cases for proposition that it "provides an additional inference against discrimination" "where the person who participated in the allegedly adverse decision is also a member of the same protected class" (internal quotation marks omitted)).

In support of his claim of religious discrimination, Plaintiff asserts that Dr. Reede "appeared to harbor anti-Semitic sentiment."  (Dkt. 90, at 4 n.4.)  Plaintiff submitted a declaration from a SUNY Downstate staff member who worked near Dr. Reede alleging, *inter alia*, that:  (1) Dr. Reede "expressed disapproval" when she saw observant Jewish staff gathering to pray; (2) Dr. Reede stated that she would end midday prayers of observant Jews; (3) Dr. Reede "sarcastically comment[ed] that she wished she were Jewish in order to get so many holidays from work;" and (4) Dr. Reede "express[ed] dissatisfaction with Jewish radiologists and staff leaving work early on Fridays in order to observe Shabbat."  (*Id.*)  Aside from his own termination, discussed *supra*, this declaration is the only evidence Plaintiff proffers regarding SUNY-Defendants' alleged anti-Jewish animus.  This is plainly insufficient.  As a general matter, scant, isolated references are not

enough to allege discrimination under the fourth element of Title VII.  *See Gonzalez v. Allied Barton Sec. Servs.*, No. 08-CV-9291 (RJS) (RLE), 2010 WL 3766964, at \*5 (S.D.N.Y. Sept. 7, 2010) (explaining that "isolated derogatory remarks . . . alone do not raise an inference of discrimination" (citing *Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir.1998))), *report and recommendation adopted*, 2010 WL 3766954 (S.D.N.Y. Sept. 27, 2010).  As the Second Circuit has explained,

> district courts in this circuit have developed a standardized approach for applying these concepts to individual cases. In determining whether a remark is probative, they have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).  While we caution that none of these factors should be regarded as dispositive, we think this framework will often provide a useful approach to the admission or exclusion of remarks not directly related to the adverse action against the plaintiff, and employ it here.

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010) (internal citations omitted).

Applying these factors, the Court notes that even assuming Dr. Reede made the comments attributed to her, Plaintiff offers no evidence establishing a connection between the comments and the adverse employment actions at issue.  The undated remarks by Dr. Reede were made at least six months prior to Dr. Scott-Moore's appointment and ten months before Plaintiff's termination, given that the staff member stopped working at KCHC in December of 2013.  (Neiman Decl., Dkt. 93, ¶ 2.)  *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (finding that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  And, it bears repeating that these alleged remarks by Dr. Reede were made *prior* to the decision to *renew* Plaintiff's contract.  Lastly,

Plaintiff, though Jewish, does not claim to be Orthodox or to pray during the work day; thus, even assuming *arguendo* that Dr. Reede harbored any negative sentiments about the Orthodox Jewish doctors at SUNY Downstate, that fact would have little to no connection to any action taken against Plaintiff.

For these reasons, the Court finds that Plaintiff failed to establish a *prima facie* case of discrimination.  However, for the reasons discussed *supra* in the context of the FMLA discussion, even assuming *arguendo* that Plaintiff could successfully establish a *prima facie* case, SUNY-Defendants have established a legitimate and non-discriminatory rationale for his termination: Plaintiff's conduct in attaching 180 unapproved attestations to patients' charts—which not only violated hospital policy, but placed the hospital at risk of liability—and then seeking the IT Department's assistance to conceal his actions.  Plaintiff has failed to prove, under both the Title VII and the § 1983 standards, that his termination was pre-textual, based in whole or in part on discrimination, or that discrimination was a "but-for" cause of his termination.  Plaintiff has failed to show that discrimination on the basis of race or religion was even a *minimal* factor in his termination.

With respect to Plaintiff's claims of discrimination as related to the failure to promote him, Plaintiff asserts that Dr. Scott-Moore's appointment as Director of ER Radiology alone—"as a non-Jewish black who was also younger than Dr. Greenberg"—satisfies the fourth element of a *prima facie* case.  (Dkt. 90, at 19 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) (additional citation omitted).)  "[A] plaintiff may seek to raise an inference of discrimination by 'showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group.'"  *Perreti v. Bank*, No. 11-CV-3925 (BMC), 2012 WL 2458137, at *4 (E.D.N.Y. Jun. 27, 2012) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368,

379 (2d Cir. 2003)).  That inquiry requires the plaintiff to demonstrate that he "was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted).  In the promotion context, that means comparing the qualifications of the plaintiff with those of the person promoted.  *See Mandell*, 316 F.3d at 379 (finding that plaintiff had adduced sufficient evidence to show that "the promoted officers and plaintiff were sufficiently similarly situated to support an inference of discrimination"); *see also Terry*, 336 F.3d at 139.

> Plaintiff asserts that he
>
> was not only a legendary radiologist within the KCHC universe but he was highly respected by his colleagues who sought to imitate him.  He had been a radiologist for more than twice the number of years as Dr. Scott; he had spent more than a decade practicing at a Level One Trauma Center[,] . . . while Dr. Scott had no such experience, except when she was doing her residency at KCHC under Dr. Greenberg's supervision amongst others; and she had never been a Director of an ER Radiology Department at a Level One Trauma Center, while Dr. Greenberg had.

(Dkt. 90, at 19–20.)

While it is undisputed that Plaintiff had more years of experience as a radiologist than Dr. Scott-Moore, Defendants argue that the criteria that separated the two candidates and resulted in Dr. Scott-Moore's appointment over Plaintiff was their education-related experience and accomplishments.[24]  Thus, the crux of the factual dispute between the parties is how important the candidates' involvement in scholarly activity and academics was in SUNY-Defendants' hiring/promotion decision.  (*Compare* Dkt. 96, at 11, *with* Dkt. 90, at 20–21.)  SUNY-Defendants contend that academic and scholarship achievements was a significant consideration when making

---

[24] Although not highlighted by SUNY-Defendants' briefs (*see generally* Dkts. 78, 96), the Court notes that Dr. Scott-Moore was also a section chief of Musculoskeletal Radiology prior to her appointment as Director of Emergency Room Radiology at KCHC (*see* Reede Dep., Dkt. 87-60, at 122:22–123:2).

**SPA50**

the promotion decision, pointing to the ACGME probation report that specifically criticized the faculty for their perceived lack of interest in the education of residents.  (Dkt. 96, at 11 (quoting Dkt. 87-1, at 3).)  In her meeting with Plaintiff on July 23, 2014, Dr. Reede told him that he was not offered the position due to:  his "[l]ack of participation in major administrative and educational meetings in the department . . ."; "[r]esident evaluations show[ing] deficiencies in several areas"; "[n]o significant scholarly activity"; and the hospital's "[n]eed [for] someone that is more interested in academics because [the hospital] want[ed] to explore the possibility of starting an ER Fellowship."  (Dkt. 87-53, at ECF 2.)

"Eligibility requirements are defined by the employer, and a plaintiff's subjective belief that [he] is qualified for the position is not sufficient."  *Ellis*, 975 F. Supp. 2d at 267; *see also Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 127 (2d Cir. 2004) (explaining that "being 'qualified' refers to the criteria the employer has specified for the position"); *Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 131 (E.D.N.Y. 2012).  Plaintiff does not deny that he filled out a form indicating that he spent "zero hours doing 'research/ scholarly activity with residents.'"  (Pl.'s Decl., Dkt. 94, ¶ 14.)  Plaintiff's CV, provided to Dr. Reede during the application process, listed only two papers over the course of Plaintiff's at least nineteen-year career; both papers were undated and without the name of a journal.[25]  (Dkt. 87-51, at ECF 3.)  During Plaintiff's February 2014 annual review, prior to Dr. Scott-Moore's appointment, Plaintiff left the boxes for "scholarly distinction and accomplishment" entirely blank.  (Dkt. 100-1, at ECF 2.)  By contrast, the current

---

[25] In his deposition, Plaintiff admitted that one of the papers, which was written in the late 1980s, was never published.  (Pl.'s Dep., Dkt. 87-55, at 10:23–11:18.)

**SPA51**

*curriculum vitae* of Dr. Scott-Moore that SUNY-Defendants submitted into evidence[26] listed three entries for "educational responsibilities;" membership in two professional societies; numerous awards and honors beginning in 1999; three visiting professorships, grand rounds, and invited lectures; and five scientific posters or education exhibits.  (Dkt. 87-52, at ECF 6–8.)  Additionally, Dr. Scott-Moore and the other candidate besides Plaintiff for the Director position, did not have the same time and attendance issues as Plaintiff, which was a particular concern to SUNY-Defendants given the recent ACGME report placing SUNY Downstate's radiology residency program on probation, in part, because "'some faculty' do not 'show up' for their scheduled supervision assignments and the program has not enforced adherence to the schedule."  (AGCME Report, Dkt. 87-1, at 2; *see* Reede Dep., Dkt. 87-59, at 137:18–25.)

    For these reasons the Court finds that Dr. Scott-Moore and Plaintiff were not similarly situated in all material respects and that Plaintiff cannot establish that he was qualified for the position based on the criteria the employer specified.  Plaintiff, therefore, cannot establish a *prima facie* case with respect to his discrimination claims for failure to promote.  *Cf. Workneh*, 897 F. Supp. 2d at 131 ("[I]n determining whether a plaintiff has met his *prima facie* burden of demonstrating he was qualified for a position, being qualified refers to the criteria the employer has specified for the positions, and a plaintiff's subjective belief he is qualified will not suffice[.]"

---

[26] The Court notes that SUNY-Defendants did not submit the version of the Dr. Scott-Moore's curriculum vitae that was considered at the time of her promotion.  However, based on the testimony discussed *supra*, and the information contained within the *curriculum vitae*, the Court assumes the validity of Dr. Scott-Moore's credentials.  But the Court does not consider scholarship or educational efforts that Dr. Scott-Moore engaged in *after* being promoted, in assessing SUNY-Defendants' asserted reasons for promoting Dr. Scott-Moore over Plaintiff and the other candidate (*see* Dkt. 96, at 12–13), since that information could not possibly have been available to Defendants for their consideration.

(internal quotation marks omitted) (quoting *Williams*, 368 F.3d at 127)).[27]

### 3.    Plaintiff's Retaliation Claims

"Once the color of state law requirement is met, except for the issue of individual liability, an 'equal protection claim parallels a plaintiff's Title VII claim . . . [and] there is no sound reason to deviate from this principle for a retaliation claim.'"  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 81–82 (2d Cir. 2015).  The Court accordingly considers Plaintiff's Title VII and § 1981/§ 1983 claims in tandem.

> Title VII . . . prohibits an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. . . .
>
> [T]he antiretaliation provision . . . covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56–57 (2006).

To prevail on a retaliation claim under Title VII, "an employee must show that (1) [he] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected

---

[27] In addition to Dr. Reede's allegedly disparaging comments about observant Jews and Dr. Scott-Moore's appointment over Plaintiff as Director of ER Radiology, Plaintiff points to the alleged termination or "micro-management" of "a number of Jewish, white, and/or older physicians" at KCHC, at a time when "younger, black, non-Jewish physicians" are being hired or "given more leeway" at work, as another fact upon which an inference of discrimination can be found.  Plaintiff, however, has offered no evidence to support either part of this assertion.  Thus, the Court does not consider it.  Moreover, for the reasons previously discussed, the Court does not find, even when considered in combination, that Dr. Reede's alleged hostility to observant Jews— even if established—and Dr. Scott-Moore's appointment are enough to support an inference of discrimination on the basis of religion or race for purposes of Plaintiff's §1981, § 1983, and Title VII claims.

activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "[E]ven without direct evidence of causation, a plaintiff can indirectly establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Zann Kwan v. Andalez Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (internal quotation marks and alterations omitted).

Plaintiff's *prima facie* retaliation claim fails because he cannot establish that there was a causal nexus between any protected activity and an adverse employment action. Plaintiff contends that he complained about discrimination in his meeting with Ms. Bernadel on October 10, 2014 and was then terminated only twelve days later, giving rise to that nexus. (Dkt. 90, at 28.) However, similar to the plaintiff in *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (internal citation omitted):

> The only basis [Plaintiff] suggests for finding such a nexus is time. He claims that his placement on probation and his subsequent firing followed his complaints closely enough to support an inference of retaliation. It is, of course, true that temporal proximity can demonstrate a causal nexus. But in this case the adverse employment actions were both part, and the ultimate product, of "an extensive period of progressive discipline" which began when [Defendant] diminished [Plaintiff]'s job responsibilities a full five months prior to his filing of the EEOC charges. Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.

Although Plaintiff disputes when SUNY-Defendants began subjecting him to progressive discipline (*see* Dkt. 90, at 27–28), it is undisputed that he was subjected to some form of discipline at least by September 8, 2014, when he met with Labor Relations staff and signed an agreement placing him on probation—forty-four days before his termination, and prior to his complaint of anti-Jewish bias to Ms. Bernadel in Labor Relations. (Settlement Agreement, Dkt. 87-29.) *See also Hazelwood v. Highland Hosp.*, 763 F. App'x 60, 63 (2d Cir. 2019) (summary order) (finding no causal nexus where the adverse employment action occurred ten months after the alleged

protected activity, and plaintiff's "supervisors began calling performance deficiencies to her attention months before she complained to management . . . ." (internal citations omitted)).

Moreover, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 23 (2d Cir. 2015) (summary order).  For all the reasons discussed *supra*, Plaintiff is not able to rebut the legitimate and non-discriminatory reason for his termination established by SUNY-Defendants.  *Cf. Parron v. Herbert*, 768 F. App'x 75, 77 (2d Cir. 2019) (summary order) ("Even if there were a genuine dispute as to whether [plaintiff] had violated company policy, [plaintiff] did not produce any evidence demonstrating that these reasons were pretextual other than the timing of his suspension. . . .  But timing alone is insufficient to establish pretext."); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (finding in context of a Title VII retaliation claim that, while timing "might be enough to establish a prima facie case, temporal proximity alone is not enough to establish pretext in this Circuit").

For these reasons Plaintiff's Title VII, and §§ 1981 and 1983 retaliation claims are dismissed.

### C.       NYSHRL and NYCHRL Claims

In light of the Court's dismissal of all of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims, which are therefore dismissed without prejudice.  *See Missick v. City of New York*, 707 F. Supp. 2d 336, 354–55 (E.D.N.Y. 2010); *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170

**SPA55**

(2d Cir. 2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (internal quotation marks omitted)).

### CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment are granted in their entirety. All claims against KCHC are dismissed because it is not a suable entity. Plaintiff's claims against SUNY and SUNY-Employees in their official capacities, seeking damages pursuant to § 1983, and Plaintiff's damages claims against SUNY and SUNY-Employees pursuant to the NYSHRL and NYCHRL, are dismissed under the Eleventh Amendment. Plaintiff's remaining claims for FMLA interference and retaliation, Title VII discrimination and retaliation, § 1981 discrimination and retaliation, and § 1983 discrimination claims are dismissed for failure to establish a *prima facie* case. In light of the Court's dismissal of all of Plaintiff's federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL and NYCHRL claims, which are dismissed without prejudice.

The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2019
        Brooklyn, New York