# 19-3570

## United States Court of Appeals
## for the Second Circuit

---

MD ODED GREENBERG,

*Plaintiff-Appellant,*

v.

STATE UNIVERSITY HOSPITAL – DOWNSTATE MEDICAL CENTER, aka
the State University of New York Health Science Center at Brooklyn,
aka State University of New York Downstate Medical Center,
NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY
HOSPITAL CENTER, DEBORAH L. REEDE, STEVEN PULITZER,

*Defendants-Appellees,*

UNITED UNIVERSITY PROFESSIONS, (UUP), SUNY DOWNSTATE MEDICAL
CENTER CHAPTER OF UNITED UNIVERSITY PROFESSIONS, JOHN AND JANE DOES,

*Defendants.*

---

On Appeal from the United States District Court
for the Eastern District of New York

---

## BRIEF FOR STATE APPELLEES

---

BARBARA D. UNDERWOOD
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
AMIT R. VORA
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for State Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6167

Dated: June 2, 2020

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED ............................................................................ 3

STATEMENT OF THE CASE ................................................................ 3

    A.   Factual Background.......................................................................... 3

        1.   Dr. Reede's participation in selecting a Section
             Chief of Emergency Room Radiology in July 2014 .......... 3

        2.   Dr. Greenberg's time and attendance issues in the
             summer and fall of 2014...................................................... 5

        3.   Dr. Greenberg's first Labor Relations interrogation ...... 10

        4.   Dr. Greenberg attaches unauthorized medical
             record attestations to 180 patient files........................... 12

        5.   Dr. Greenberg's termination ........................................... 16

    B.   The District Court's Grant of Summary Judgment for
        Defendants .............................................................................. 17

STANDARD OF REVIEW...................................................................... 20

SUMMARY OF ARGUMENT ................................................................ 20

ARGUMENT

    THE DISTRICT COURT'S GRANT OF SUMMARY
    JUDGMENT FOR DEFENDANTS SHOULD BE AFFIRMED ........ 24

POINT I

    DR. GREENBERG'S TITLE VII CLAIMS FAIL ............................................ 24

i

**Page**

A.   Dr. Reede's Purported Remarks Do Not Support a
      Discriminatory Inference.......................................... 26

B.   Dr. Greenberg's Failure-to-Promote Claim Fails. ................. 33

C.   Dr. Greenberg's Termination Claim Fails. ........................... 40

POINT II

DR. GREENBERG'S FAMILY AND MEDICAL LEAVE ACT (FMLA)
CLAIMS FAIL ............................................................ 43

A.   Dr. Greenberg's FMLA Interference Claim Fails.................. 45

B.   Dr. Greenberg's FMLA Retaliation Claim Fails.................... 50

CONCLUSION ........................................................... 53

ii

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
626 F.3d 699 (2d Cir. 2010) ................................................................ 48

*Anderson v. Hertz Corp.*,
303 F. App'x 946 (2d Cir. 2008) ......................................................... 30

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................ 20

*Bentley v. AutoZoners, LLC*,
935 F.3d 76 (2d Cir. 2019) ................................................................. 49

*Bickerstaff v. Vassar Coll.*,
196 F.3d 435 (2d Cir. 1999) ............................................................... 28

*Boyce v. Bank of N.Y.*,
226 F. App'x 17 (2d Cir. 2006) ........................................................... 30

*Carlton v. Mystic Transp., Inc.*,
202 F.3d 129 (2d Cir. 2000) ........................................................ 29, 30

*Collins v. NTN-Bower Corp.*,
272 F.3d 1006 (7th Cir. 2001) ........................................................... 49

*Coutard v. Municipal Credit Union*,
848 F.3d 102 (2d Cir. 2017) ........................................................ 44, 47

*Danzer v. Norden Sys., Inc.*,
151 F.3d 50 (2d Cir. 1998) ................................................................. 27

*Del Franco v. New York City Off-Track Betting Corp.*,
429 F. Supp. 2d 529 (E.D.N.Y. 2006) ................................................ 29

*Ellis v. Century 21 Dep't Stores*,
975 F. Supp. 2d 244 (E.D.N.Y. 2013) ................................................ 29

*Elnashar v. Speedway SuperAmerica, LLC*,
484 F.3d 1046 (8th Cir. 2007) ........................................................... 40

**Cases**                                                               **Page(s)**

*Grady v. Affiliated Cent., Inc.*,
130 F.3d 553 (2d Cir. 1997) .................................................................. 29

*Graham v. Long Island R.R.*,
230 F.3d 34 (2d Cir. 2000) .................................................................... 33

*Graziadio v. Culinary Inst. of Am.*,
817 F.3d 415 (2d Cir. 2016) ............................................... 45, 46, 47, 50

*Greenwell v. State Farm Mut. Auto. Ins. Co.*,
486 F.3d 840 (5th Cir. 2007) ................................................................ 50

*Henry v. Wyeth Pharm., Inc.*,
616 F.3d 134 (2d Cir. 2010) ................................................................. 27

*James v. New York Racing Ass'n*,
233 F.3d 149 (2d Cir. 2000) ................................................................. 30

*LeBlanc v. Great Am. Ins. Co.*,
6 F.3d 836 (1st Cir. 1993) .................................................................... 30

*Lowe v. J.B. Hunt Transp., Inc.*,
963 F.2d 173 (8th Cir. 1992) ................................................................ 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................. 20

*Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc.*,
904 F.3d 208 (2d Cir. 2018) ................................................................. 20

*Naumovski v. Norris*,
934 F.3d 200 (2d Cir. 2019) ........................................................... 31, 32

*Petts v. Rockledge Furniture LLC*,
534 F.3d 715 (7th Cir. 2008) ................................................................ 28

*Potenza v. City of New York*,
365 F.3d 165 (2d Cir. 2004) ........................................................... 44, 46

| Cases | Page(s) |
|---|---|

*Proud v. Stone,*
  945 F.2d 796 (4th Cir. 1991) ................................................................ 30

*Ricks v. Conde Nast Publ'ns, Inc.,*
  6 F. App'x 74 (2d Cir. 2001) ................................................................ 30

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,*
  183 F.3d 155 (2d Cir. 1999) ................................................................ 46

*Sassaman v. Gamache,*
  566 F.3d 307 (2d Cir. 2009) ................................................................ 29

*Schnabel v. Abramson,*
  232 F.3d 83 (2d Cir. 2000) ................................................................ 42

*Sista v. CDC Ixis N. Am., Inc.,*
  445 F.3d 161 (2d Cir. 2006) ................................................................ 52

*Slattery v. Swiss Reinsurance Am. Corp.,*
  248 F.3d 87 (2d Cir. 2001) ................................................................ 42

*Tomassi v. Insignia Fin. Grp., Inc.,*
  478 F.3d 111 (2d Cir. 2007) ................................................................ 27

*Weinstock v. Columbia Univ.,*
  224 F.3d 33 (2d Cir. 2000) ................................................................ 24, 25

**Laws and Rules**

29 U.S.C.
  § 2611 ................................................................................................ 44, 46
  § 2612 ................................................................................................ 43, 44

29 C.F.R. § 825.303 ................................................................................ 44

Fed. R. Civ. P. 56 ................................................................................ 20

## PRELIMINARY STATEMENT

Defendant Dr. Deborah Reede participated in a decision to deny a management-level promotion to plaintiff–appellant Dr. Oded Greenberg—a radiologist affiliated with SUNY Downstate Medical Center who self-reported spending no time on research and scholarly activity with medical residents, and kept erratic hours that interfered with his teaching responsibilities. Subsequently, Dr. Greenberg affixed an unauthorized statement to the medical imaging records of 180 patients, exposing his employers to legal and financial risk. After a disciplinary inquiry initiated by defendant Dr. Steven Pulitzer, who was Dr. Greenberg's direct supervisor, Dr. Greenberg was terminated.

Dr. Greenberg now alleges that Dr. Reede failed to promote him— and that Drs. Reede and Pulitzer decided to terminate him—because of his Jewish faith, in violation of Title VII of the Civil Rights Act of 1964. He also claims that they violated his rights under the Family and Medical Leave Act (FMLA). The United States District Court for the Eastern

District of New York (Chen, J.) entered summary judgment against Dr. Greenberg on those claims. This Court should affirm.[1]

As the district court correctly observed, Dr. Greenberg adduced no evidence that religious bias played a part in the state defendants' decision not to promote him, or their later decision to terminate him. Moreover, the state defendants established legitimate, nondiscriminatory reasons for those employment decisions, and Dr. Greenberg did not show those reasons were pretextual.

The district court also correctly observed that the summary judgment record does not support Dr. Greenberg's claim that the state defendants interfered with his efforts to take FMLA leave or retaliated against him for taking such leave. Contemporaneous documentation instead shows that Dr. Greenberg did not inform the state defendants that he needed to take leave to attend to caregiving responsibilities, but instead asserted that he needed time off to nurse a minor back injury.

---

[1] This brief is submitted on behalf of Dr. Reede, Dr. Pulitzer, and SUNY Downstate Medical Center (collectively, "the state defendants"). Dr. Greenberg has also sued the New York City Health and Hospitals Corporation (HHC) and Kings County Hospital Center (KCHC). The Attorney General does not represent those defendants.

2

## ISSUES PRESENTED

1.    Whether the district court properly granted summary judgment to the state defendants on Dr. Greenberg's Title VII claims?

2.    Whether the district court properly granted summary judgment to the state defendants on Dr. Greenberg's FMLA interference and retaliation claims, where undisputed evidence showed that Dr. Greenberg had claimed his leave was for a back injury rather than to provide care for a family member?

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    Dr. Reede's decision to select a Section Chief of Emergency Room Radiology in July 2014

SUNY Downstate Medical Center (SUNY) is a teaching hospital. (Appendix (A.) 73 ¶ 4.) Through an affiliate agreement, SUNY employs several radiologists at Kings County Hospital Center (KCHC), a hospital that is across the street and operated by New York City.  (A. 72 ¶ 1.)

The Accreditation Council for Graduate Medical Education (ACGME) is responsible for accrediting most graduate medical training programs for physicians in the United States. (A. 73 ¶ 5.) In April 2014, ACGME

3

placed SUNY's Radiology Department on probation, finding that faculty members were failing to "show up for their scheduled supervision assignments" and not devoting sufficient time to educating medical residents. (A. 73–74 ¶¶ 6–7, 98–99.)

Dr. Reede, who was SUNY's Chair of Radiology at the time, oversaw the SUNY Radiology Department's daily operations and was responsible for its faculty and residents. (A. 465 ¶ 3.) She observed that, without significant changes before ACGME's follow-up visit in May 2015, SUNY's Radiology Department risked closure. (A. 466 ¶¶ 7–8.) Accordingly, she and KCHC's Chief Medical Officer, Dr. Ghassan Jamaleddine, agreed to replace certain low-performing faculty members, and further agreed to monitor staff scholarship and schedules. (A. 466–467 ¶ 9–11.) In June 2014, Dr. Reede declined to renew the one-year contracts of five radiologists. (A. 467 ¶ 9, 874 ¶ 4.) She renewed Dr. Greenberg's contract, however. (A. 467 ¶ 9, 874 ¶ 4.)

In July 2014, Dr. Reede was deciding among three candidates for the role of Section Chief of Emergency Room Radiology at KCHC, including Dr. Greenberg and Dr. Jinel Scott-Moore. (A. 423–425.) Dr. Greenberg had self-reported that, over the past year, he had spent *zero*

4

hours on research and academic activity with residents. (A. 356–357.) In light of the ACGME probationary report, Dr. Reede decided to select the candidate who was most committed to scholarship and teaching, and who had the least trouble with time and attendance: Dr. Scott-Moore. (A. 99, 419–420, 423–425.) Dr. Greenberg's supervisors had observed "time and attendance issues with Dr. Greenberg for many years." (A. 383.)

### 2. Dr. Greenberg's time and attendance issues in the summer and fall of 2014

Dr. Greenberg responded poorly to the Radiology Department's increased focus on time and attendance. For example, Dr. Reede received reports from residents that Dr. Greenberg was missing from the Emergency Room when they were "looking for him"; they did not know "where he was." (A. 427.) In May 2014, Dr. Reede met with Dr. Greenberg to discuss an April 2014 entry on his timesheet that appeared inaccurate based on his Talk Station data. (A. 122.) SUNY and KCHC radiologists are expected to spend most of their workday reading films. (A. 76 ¶ 17.) Talk Station is the Radiology Department's dictation system, which enables radiologists to dictate radiology reports. (A. 76 ¶ 17.) By reviewing a radiologist's Talk Station data for a particular workday, one can discern

when the radiologist started and stopped reading film, and confirm the accuracy of a radiologist's timesheet. (A. 76 ¶ 17, 122.)

As for the April 2014 entry, Dr. Greenberg's timesheet showed that he started work at 9:00 a.m., but the Talk Station data showed that he did not dictate a case until just after noon. (A. 122.) Dr. Reede instructed Dr. Greenberg to report his time correctly going forward, and reminded him that "his job responsibilities require him to be present for consultations as well as resident supervision and education." (A. 122.)

Dr. Pulitzer, who was KCHC's Interim Chair of Radiology, was Dr. Greenberg's supervisor during the summer of 2014. (A. 458 ¶ 2, 459 ¶ 3, 806 ¶ 2). In late July and August 2014, Dr. Pulitzer noticed that Dr. Greenberg was "coming in late" and "was on occasion leaving early." (A. 394–395.) As Dr. Pulitzer recounted, because he "often didn't know what time [Dr. Greenberg] was going to be in that day," he "couldn't reliably plan the schedule." (A. 394–395.) Likewise, Dr. Scott-Moore—KCHC's new Section Chief of Emergency Room Radiology—noted that Dr. Greenberg "would often come late to work" and held "erratic" hours, which could vary from "half an hour late to an hour to an hour and a half,

to two." (A. 453, 456.) Talk Station data from this period showed that he was often not reading his first case until after 10:30 a.m. (A. 154.)

On August 22, 2014, Dr. Pulitzer met with Dr. Greenberg to discuss time and attendance. (A. 154.) Dr. Pulitzer reminded Dr. Greenberg that he was required to be in the hospital for a set schedule from 9:30 a.m. to 5:00 p.m. (A. 154.) During the week of August 25, Dr. Greenberg was scheduled to be on a vacation. He nonetheless reported to work on August 26, and began working irregular hours "at his choosing." (A. 157, 397.) Dr. Scott-Moore reported that Dr. Greenberg's erratic hours led to a "mess." (A. 455.)

On Friday, August 29, 2014 (the Friday before Labor Day), Dr. Greenberg emailed Linda McMurren—Dr. Reede's administrative assistant—for approval to take leave during the following week "on an emergent basis." (A. 161, 429.) Dr. Greenberg did not mention any reason for the request. (A. 161.)

On Tuesday, September 2 (the day after Labor Day), Dr. Greenberg asked Dr. Pulitzer's for permission to take the rest of the week off. (A. 157, 171.) Dr. Pulitzer denied the request for leave due to staffing considerations because another radiologist was already on leave that

7

week. (A. 157, 171, 460 ¶ 9.) Dr. Pulitzer memorialized the exchange in a contemporaneous note showing that Dr. Greenberg never specified a reason for the request. (A. 157.)

The next day, September 3, Dr. Greenberg renewed his request to be absent on September 4 and September 5. (A. 171, 460 ¶ 9.) Dr. Pulitzer again denied the request due to staffing considerations. (A. 171, 460 ¶ 9.) A note memorializing the exchange that Dr. Pulitzer drafted on September 5 reflects that Dr. Greenberg did not specify a reason for the leave request. (A. 171.)

Immediately after the September 3rd conversation, Dr. Pulitzer consulted Dr. Reede. (A. 172, 461 ¶ 10.) They decided that Dr. Pulitzer should draft a letter to Dr. Greenberg denying his request for leave on September 4 and 5 and informing him that any absence would be referred to SUNY's Labor Relations Department. (A. 172, 461 ¶ 10.) That day, Dr. Pulitzer composed and handed the letter to Dr. Greenberg. (A. 172, 208, 461 ¶ 10.)

On the morning of September 4, Dr. Greenberg emailed McMurren, copying Dr. Pulitzer, stating: "Hi Linda. I unfortunately must take today and tomorrow off due to important family issues. Dr. Pulitzer is away,

8

just making it official." (A. 186.) Dr. Greenberg did not specify those family issues. (A. 186.) As a result of Dr. Greenberg's absence, Dr. Pulitzer needed to make last-minute arrangements for multiple radiologists to cover parts of Dr. Greenberg's shifts. (A. 402.)

In the early afternoon of September 5, Dr. Greenberg emailed McMurren, copying Dr. Pulitzer, stating: "As it turns out, I was going to come in regardless of my last e-mail Thursday. The family issues have been resolved Thursday morning. I then managed to throw my back out. My mobility has been severely limited since. Please forgive the confusion." (A. 160.)

On Monday, September 8, Dr. Greenberg called McMurren at 10:40 a.m. (after his work shift began) to inform her that he would be arriving late because he needed to receive treatment for his back. (A. 210.) He visited an urgent care center, received back treatment, and arrived to work at 12:30 p.m. (A. 211.)

Dr. Greenberg eventually submitted paperwork claiming September 4 and 5 as sick days, his sick accruals were charged, and he was compensated for those days. (A. 273–274.)

### 3. Dr. Greenberg's first Labor Relations interrogation

When Dr. Greenberg arrived to work on Monday, September 8, 2014, he was directed to SUNY's Labor Relations Department for an administrative interrogation concerning his time and attendance. (A. 173.) Michael Arabian of Labor Relations conducted the hearing. (A. 173.)

At the hearing, Dr. Greenberg acknowledged he was "on [the] schedule as 9 to 5" (A. 176), and that Dr. Pulitzer had recently instructed him to adhere to that set schedule (A. 177). But he admitted that he would occasionally "come in later and stay[] later," sometimes arriving at 10:30 a.m. or "a little bit later." (A. 176.) When he was asked whether he had the authority to set his own schedule, he replied that he had the "moral authority to do so." (A. 177.) Regarding his absences on September 4 and 5, Dr. Greenberg stated: "I have a child with special needs and he was kicked out of his school and he was to attend a new school and I had to spend time with him." (A. 183.)

But he then explained that this issue involving his son's schooling was *not* the reason he missed work on September 4 or 5. (A. 184, 188.) On the morning of September 4, his mother-in-law had arrived from out of town to provide his son with "appropriate support." (A. 184–185).

10

Consequently, he decided that he was going to "come in" to work. (A. 184.) As he was rolling out of bed, however, he pulled his back, and he was immobile and in pain from then until the present hearing. (A. 184.) Dr. Greenberg stated that, although his condition improved over the weekend, as he was heading into work on the morning of September 8 (that morning), he "hurt it again," necessitating a visit to urgent care and delaying his arrival at work until around 12:30 p.m. (A. 184.)

As Dr. Greenberg put it, he "wanted to take that time off for one reason," but "it turned out [he] had to take the time off for another." (A. 185.) He repeatedly insisted: "that's exactly the way it happened." (A. 186; *see also* A. 184–185.)

After the interrogation, Arabian consulted the Assistant Vice President for Labor Relations, Leonzo Cuiman, and prepared a settlement agreement, which Dr. Greenberg signed. (A. 216, 445.) The agreement stated that, in lieu of discipline for "unscheduled absences," "tardiness," "interfering with the operations of the department," "insubordination," and "misrepresenting hours worked on time sheets," a penalty ranging from a letter of reprimand to termination would be held in abeyance for one year, provided that Dr. Greenberg abided by the agreement. (A. 216.)

11

The agreement required Dr. Greenberg to work his scheduled shift of 9:00 a.m. to 5:00 p.m., accurately record his working hours, and adhere to departmental policies.  (A. 216.) If Dr. Greenberg violated the agreement's terms, he could be punished with discipline ranging from a reprimand to termination.  (A. 216.)

Dr. Reede and Dr. Pulitzer had no role in preparing the agreement, and they were unaware that the Labor Relations Department was preparing it.  (A. 431, 461 ¶ 11.)

### 4. Dr. Greenberg attaches unauthorized medical record attestations to 180 patient files

An attestation is a written statement by an attending radiologist at a teaching hospital that certifies the attending has reviewed a patient's imaging, which until that point would have been reviewed only by a medical resident. (A. 462 ¶¶ 12–13.) The attestation will reflect whether the attending radiologist agrees or disagrees with the resident's initial interpretation, and will render the report final. (A. 462 ¶¶ 12–13.)

Attestations became part of a patient's permanent medical records; once added, they cannot be deleted. (A. 390–391, 461 ¶ 12, 468–469 ¶ 14.) Attestations are also legal documents that are vital to hospital billing.

12

(A. 461 ¶ 12, 468–469 ¶ 14.) A nonconforming attestation can trigger an investigation by the Centers for Medicare & Medicaid Services, which requires standardized attestations on records for which residents provide the initial review. (A. 461 ¶ 12, 462 ¶ 15, 469 ¶ 14.) A nonconforming attestation also risks financial liability; for example, a hospital cannot receive reimbursement from insurance companies, Medicaid, or Medicare for a resident-reviewed image that is missing an attending radiologist's valid attestation. (A. 280–281, 461 ¶ 12, 462 ¶ 15, 468–469 ¶ 14.) And nonconforming attestations risk legal exposure, given that they are patients' medical and legal files. (461 ¶ 12, 462 ¶ 15, 469 ¶ 14.)

SUNY's Risk Management Department approved three standardized attestations for the Radiology Department and, beginning in July 2014, the Radiology Department convened numerous meetings to ensure that radiology staff were using those attestations. (A. 278.) During a meeting on September 15, 2014, the Radiology Department's billing company informed radiologists (including Dr. Greenberg) that using the three approved attestations was a prerequisite for payment with respect to resident-reviewed images, and instructed the radiologists on how to use them. (A. 278, 280–281.) During a meeting on September 22, 2014, Dr.

13

Pulitzer specifically instructed Dr. Greenberg on how to use the approved attestations. (A. 280, 461 ¶ 12.)

Shortly after the September 22, 2014 meeting, Dr. Greenberg attached an unapproved attestation that he had personally drafted to approximately 180 sets of patient records. (A. 278–279 (comparing Dr. Greenberg's unapproved attestation with the three approved attestations); *see also* A. 462 ¶ 14, 469 ¶ 16.) One clinician saw the modified attestation on an actual patient report, was alarmed, and contacted Dr. Pulitzer. (A. 280, 385, 462 ¶ 14.)

Dr. Pulitzer then consulted the IT Department and learned the extent of Dr. Greenberg's disruptive activity. (A. 384–387.) Dr. Pulitzer deemed Dr. Greenberg's conduct "insubordinate" and "egregious," and observed that Dr. Greenberg had exposed his colleagues and the hospital to "medical–legal jeopardy." (A. 384, 462 ¶ 14.) Further, an IT Department employee informed Dr. Pulitzer that Dr. Greenberg had later asked that employee whether it was possible to "take off" or "erase" each unauthorized attestation, which would have constituted tampering with patients' permanent medical and legal records. (A. 386, 462 ¶ 14.)

14

After tracking down all of Dr. Greenberg's unauthorized attestations, Dr. Pulitzer scheduled a meeting with KCHC's Risk Management Department. (A. 388.) Officials there expressed concern that "if any of [those] cases became a medical legal case that there could be potential exposure to the hospital." (A. 392, 411–412.) They instructed Dr. Pulitzer to consider convening a Medical Board Hearing, which could have led to the revocation of Dr. Greenberg's medical credentials. (A. 291, 462–463 ¶ 16.) They also instructed Dr. Pulitzer to have another radiologist add a counter-attestation to each report. (A. 392, 411–412.)

Dr. Pulitzer conferred with Dr. Jamaleddine; they agreed to refer Dr. Greenberg to Labor Relations, and they considered referring him to the Office of Professional Medical Conduct, which investigates complaints against physicians. (A. 392–393.) Dr. Reede agreed with referring the matter to Labor Relations. (A. 462–463 ¶ 16, 469 ¶ 15.) In the meanwhile, Dr. Pulitzer himself corrected the 180 corrupted reports: he re-read each report, confirmed whether he agreed or disagreed with the resident's interpretation, and affixed his own counter-attestation beneath Dr. Greenberg's. (A. 336–337, 389–391.)

15

### 5.   Dr. Greenberg's termination

On October 10, 2014, Stephanie Bernadel of Labor Relations presided over a second administrative interrogation. (A. 297.)   Dr. Greenberg admitted that SUNY administrators had explained the purpose and importance of the attestations to him. (A. 311.) He stated that he disagreed with the policy and found it "ridiculous." (A. 312.)   He described his unauthorized attestation as "playful." (A. 323.)

On October 20, 2014, Cuiman and Bernadel met with Dr. Greenberg. (A. 218.) Dr. Greenberg once more insisted that the attestation requirement was "ridiculous," and described his nonconforming attestation as "playful." (A. 230). He criticized Dr. Reede as having "really piss-poor" character (A. 266.) He concluded the meeting by stating: "I expect to get my job back.  I expect an apology from [Dr. Reede] and I expect a raise." (A. 267.)

On October 22, 2014, the Labor Relations Department terminated Dr. Greenberg for affixing the nonconforming attestations, determining that his conduct constituted "insubordination" in violation of the September 2014 settlement agreement. (A. 228, 335, 439, 448.) Cuiman and Bernadel made the decision in consultation with Drs. Pulitzer,

16

Reede, and Jamaleddine. (A. 408, 439, 448, 463 ¶ 16, 713.) No single individual at SUNY or KCHC has the authority to terminate a physician; rather, termination decisions are jointly made by the Labor Relations Department and the relevant physician supervisors. (A. 439, 448.)

## B.  The District Court's Grant of Summary Judgment for Defendants

Dr. Greenberg subsequently brought this employment-discrimination suit against SUNY Downstate Medical Center, Dr. Reede, Dr. Pulitzer, the New York City Health and Hospitals Corporation, and Kings County Hospital Center. As relevant to the present appeal, he alleges that defendants violated his rights under Title VII of the Civil Rights Act of 1964, the Family and Medical Leave Act of 1993, the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL). (A. 32–48.)[2]

The United States District Court for the Eastern District of New York (Chen, J.) granted defendants' summary judgment motions in their

---

[2] Greenberg also alleged claims under 42 U.S.C. § 1981 and § 1983, but he is not pressing those claims on appeal. *See* Plaintiff's Brief (Br.) at 2–3, 5 n.1. In addition, he has expressly abandoned his Title VII racial discrimination claims, and is limiting his Title VII claims to discrimination based on his religion. *See* Br. at 40 n.10, 47 n.15.

17

entirety. (Special Appendix (S.P.A.) 55.) Regarding Dr. Greenberg's claims that defendants declined to promote him because of his Jewish faith, the court noted that the radiologist who ultimately received the promotion had a stronger record of interest in scholarship and teaching than Dr. Greenberg, as well as fewer time and attendance issues. (S.P.A. 51.) Regarding Dr. Greenberg's claims that defendants terminated him out of religious bias, the court observed that the state defendants had established a legitimate, non-discriminatory, and non-pretextual rationale for the termination: Dr, Greenberg's "conduct in attaching 180 unapproved attestations to patients' charts—which not only violated hospital policy, but placed the hospital at risk of liability"—and Greenberg's subsequent efforts to enlist "the IT Department's assistance to conceal his actions." (S.P.A. 48.)

Dr. Greenberg's FMLA claims were based on the allegation that defendants denied him leave to care for his special needs child on September 4 and 5, 2014, and then terminated him in retaliation for his having taken such leave. (S.P.A. 34, 37.) The district court observed that, in light of the summary judgment evidence, "a reasonable jury could not conclude that [Dr. Greenberg] did not report to work on September 4 and

5, 2014, to care for his son." (S.P.A. 389). Instead, as Dr. Greenberg himself told defendants, his absences on September 4 and 5 were due to a minor back injury unrelated to a need to care for his son. (S.P.A. 37–39.) The court thus concluded that Dr. Greenberg's FMLA claims failed because he did not exercise rights protected by the FMLA. (S.P.A. 37–39.) The court further concluded that even if Dr. Greenberg could show that he had properly exercised his FMLA rights, his retaliation claim would fail because the state defendants had shown that they terminated him for a legitimate, non-discriminatory reason entirely unrelated to his leave: his use of the unauthorized attestation. (S.P.A. 40.)

Having entered summary judgment against Dr. Greenberg on all of his federal claims, the court declined to exercise supplemental jurisdiction over his state law claims under the NYSHRL and NYCHRL. (S.P.A. 54–55.)

19

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *See Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc.*, 904 F.3d 208, 212 (2d Cir. 2018). Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "scintilla of evidence in support of the [non-movant's] position will be insufficient" to establish a genuine dispute, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## SUMMARY OF ARGUMENT

**I.** The district court correctly granted summary judgment to SUNY Downstate Medical Center, Dr. Deborah Reede, and Dr. Steven Pulitzer on Dr. Greenberg's Title VII claims that they discriminated against him for being Jewish when they declined to promote him and ultimately terminated him. Those defendants established a legitimate and non-discriminatory reason for declining to promote Dr. Greenberg to Section Chief of Emergency Room Radiology in July 2014: specifically, that his

20

qualifications were inferior to the candidate who was actually selected for the position.

In July 2014, the Accreditation Council for Graduate Medical Education was threatening to deny re-accreditation to SUNY's Radiology Department because of poor teaching by attending radiologists who maintained erratic schedules. Dr. Reede (the defendant who was responsible for the promotion decision) ultimately selected as Section Chief a candidate who had a far stronger scholarly record than Dr. Greenberg, and also had no problems with time or attendance—whereas Dr. Greenberg was notorious for his erratic hours.

The state defendants' reason for terminating Dr. Greenberg was likewise legitimate and nondiscriminatory. It is undisputed that Dr. Greenberg deliberately corrupted the permanent medical records of 180 patients. When a radiology resident reviews a patient's imaging, the report does not become final until an attending radiologist affixes an attestation—that is, a written statement certifying that the attending has reviewed the imaging and concurs with the analysis. Once added, an attestation cannot be removed. For reimbursement and liability reasons, SUNY Downstate had vetted and approved three standard attestations

21

that attending radiologists—including Dr. Greenberg—were expressly instructed to use. Dr. Greenberg instead added an unauthorized attestation of his own devising to the reports of 180 patients. In doing so, he exposed the hospital to unnecessary financial and legal risks.

Dr. Greenberg misses the mark in trying to elicit a discriminatory inference from assertions that another employee heard Dr. Reede state— at some point before December 2013—that Orthodox Jewish persons were disrupting the Radiology Department's operations by using the prayer room and leaving early. Dr. Greenberg has never alleged that he is Orthodox, participated in the prayer gatherings, or left early to observe Shabbat. Moreover, Dr. Reede renewed Dr. Greenberg's contract in June 2014, and promoted other Jewish physicians in July 2014. Thus, even if a fact-finder were to agree with Dr. Greenberg that Dr. Reede made those remarks, they are too remote to support an inference that Dr. Reede was motivated by religious animus when she decided not to promote Dr. Greenberg in July 2014, and when she participated in the decision to terminate him in October 2014. Dr. Greenberg proffers no evidence whatsoever that Dr. Pulitzer, who is himself Jewish, was biased against Dr. Greenberg based on Dr. Greenberg's religion.

22

**II.** The district court correctly entered summary judgment against Dr. Greenberg on his FMLA claims. Dr. Greenberg failed to adduce evidence that he properly notified the state defendants that he needed leave on September 4 and 5, 2014, to take care of his special-needs son. Instead, he notified SUNY via email that he had taken leave on those days to nurse a minor back injury. To be sure, he claims that he had told Dr. Pulitzer that he would need those days off to help his son transition to a new school. And he initially emailed SUNY that he would need to take leave on those days to deal with family issues. But it is undisputed that he *then* emailed SUNY that he had resolved his family issues, but would need those days off anyway because he had hurt his back.

Furthermore, in his administrative interrogation with Labor Relations, Dr. Greenberg asserted that his back injury—not any issue involving his son's schooling—was the reason that he missed work on September 4 and 5. Because Dr. Greenberg indisputably stated that he was not attempting to take leave for an FMLA-qualifying reason, his interference claim is unavailing.

Dr. Greenberg's FMLA retaliation claim likewise fails for the simple reason that he never exercised his FMLA rights. Moreover, even if he had

exercised those rights, his retaliation claim would fail because the state defendants have established that they terminated him for attaching unauthorized attestations to 180 patient records, not for two absences.

## ARGUMENT

### THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT FOR DEFENDANTS SHOULD BE AFFIRMED

### POINT I

### DR. GREENBERG'S TITLE VII CLAIMS FAIL

In a Title VII employment discrimination case "where there is no direct or overt evidence of discriminatory conduct," this Court applies "the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), to determine whether summary judgment is appropriate." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). "First, the plaintiff must establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Id.* (emphasis omitted).

24

"[E]ven if the plaintiff succeeds in presenting a prima facie case, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* (emphasis omitted). Upon such a showing, "[f]or the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.* To meet that standard, "the plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* (quotation and alteration marks omitted).

Dr. Greenberg attempts to raise two Title VII claims. First, he asserts that Dr. Reede declined to promote him to Section Chief of Emergency Room Radiology at KCHC in July 2014 because of his Jewish faith. Second, he contends that Dr. Reede discriminatorily terminated him in October 2014, with the assistance of Dr. Pulitzer. *See* Br. at 40–54. The district court correctly determined that Dr. Greenberg had failed to establish a prima facie case foe either claim—and that, in any event, the

state defendants identified legitimate reasons for their decisions, which were not pretextual. (S.P.A. 45–51.)

## A. Dr. Reede's Purported Remarks Do Not Support a Discriminatory Inference.

The sole piece of evidence that Dr. Greenberg presented to support both of his Title VII claims against Dr. Reede is a declaration from Esther Neiman, an administrative staff member of a SUNY affiliate who sat within earshot of Dr. Reede's office until Neiman was terminated from that position in December 2013. (A. 815 ¶ 1, 874 ¶ 5.) According to Neiman, Dr. Reede once noticed Orthodox Jewish employees gathering for prayer in a room within the Radiology Department and asked Neiman, "What are your people doing here at this time of day?" (A. 815 ¶ 4.) Neiman alleged that she overheard Dr. Reede threaten to end the practice because it was "disruptive to [the] department's operations." (A. 816 ¶ 5.) Neiman also alleged that she overheard Dr. Reede remark that she wished she were Jewish so that she could get Jewish holidays off. (A. 816 ¶ 6.) Finally, Neiman alleged that she overheard Dr. Reede express frustration that she was unable to locate observant Jewish employees who were leaving on Friday afternoons to observe Shabbat. (A. 816 ¶ 6.)

26

In determining whether remarks are probative of discriminatory intent in the Title VII context, this Court considers "who made the remark," "the content," "when [it] was made in relation to the employment decision at issue," and "the context," that is, "whether it was related to the decision-making process." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Thus, "stray remarks alone do not support a discrimination suit." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (quotation marks omitted).

The content, timing, and context of Dr. Reede's purported remarks underscore their irrelevance to any employment decisions concerning Dr. Greenberg.[3] For one, Dr. Greenberg does not fall within the class of persons whom the purported remarks targeted: he has never alleged that

---

[3] Dr. Reede disputes that she made these remarks. (A. 874 ¶ 5.) As Dr. Reede notes, it would not have made sense for her to state that she wished she could get Jewish holidays off, "since Jewish physicians must use leave time for Jewish holidays." (A. 874 ¶ 5.)

he is Orthodox, observes Shabbat, or participated in the prayer gatherings. Dr. Reede's purported remarks thus do not "logically" and "reasonably lead to the conclusion the [she] was in the grip of [religious] bias" against Dr. Greenberg's class of persons—as opposed to a different class of persons. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450–51, 454 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999). Additionally, although she allegedly made her remarks, at the latest, in December 2013 (A. 815 ¶ 2), she did not decline to promote Dr. Greenberg until July 2014 (A. 874 ¶ 6), and she did not participate in the decision to terminate him until late October 2014 (A. 463 ¶ 16). The at least seventh-month gap between Dr. Reede's purported remarks and her decision not to promote him, and the at least ten-month gap between her purported remarks and her participation in the decision-making process to terminate him, weakens the inference of discriminatory animus. *Compare Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722 (7th Cir. 2008) (remarks made "three and even two months before the challenged employment action fail to create a reasonable inference of discrimination"), *with*

28

*Sassaman v. Gamache*, 566 F.3d 307, 314 (2d Cir. 2009) (remarks made on same day as adverse action raised discriminatory inference).[4]

Moreover, Dr. Reede renewed Dr. Greenberg's contract in June 2014—*after* she allegedly made the remarks. (A. 874 ¶ 4.) At that time, she was aware of Dr. Greenberg's religion (A. 874 ¶ 4), and she could have declined to renew him without cause (A. 467 ¶ 9). Where "the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).

This principle—which is known as the "same actor inference"—is especially compelling when an employer's decisions to hire and fire are close in time. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137–38 (2d Cir. 2000). Here, Dr. Reede renewed Dr. Greenberg's contract in June

---

[4] *See also Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 276 (E.D.N.Y. 2013) ("five month lapse" is "too long a gap to find the remark probative of discrimination"); *Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 537 (E.D.N.Y. 2006) (finding no temporal connection because "slightly more than three months" elapsed between remark and termination), *aff'd*, 245 F. App'x 42 (2d Cir. 2007).

2014, decided not to promote him in July 2014, and contributed to the decision to terminate him in October 2014. *Compare Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (six months supports a strong same-actor inference), *with Carlton*, 202 F.3d at 138 (seven years defeats the same-actor inference).[5]

In addition, Dr. Reede promoted several Jewish physicians during the relevant period, which further shows that anti-Jewish bias was not motivating her employment decisions. *See James v. New York Racing Ass'n*, 233 F.3d 149, 152–53 (2d Cir. 2000) (declining to draw inference of age discrimination where plaintiff's employer recently hired a 66-year-old and 67-year-old). She promoted Dr. Craig Linen, a Jewish radiologist, to the position of Section Chief of Neuroradiology at KCHC in July 2014, and promoted him to Vice Chair of Education and Academic Affairs in

---

[5] *See also LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993) (less than two years supports a same-actor inference); *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 174–75 (8th Cir. 1992) (same); *Anderson v. Hertz Corp.*, 303 F. App'x 946, 948 (2d Cir. 2008) (ten months); *Boyce v. Bank of N.Y.*, 226 F. App'x 17, 19 (2d Cir. 2006) (less than two and a half years); *Ricks v. Conde Nast Publ'ns, Inc.*, 6 F. App'x 74, 78 (2d Cir. 2001) (few months).

late 2016. (A. 467 ¶ 9.) She also selected Dr. Pulitzer, who is Jewish, as Interim Chief of Radiology in July 2014. (A. 458 ¶ 2.)

Where a plaintiff claiming employment discrimination invokes only stray remarks—as Greenberg does here—the plaintiff must present "other indicia of discrimination" to survive summary judgment. *Naumovski v. Norris*, 934 F.3d 200, 216 (2d Cir. 2019) (quotation marks omitted). Dr. Greenberg has advanced no additional indicia. Instead, he simply alleges that Dr. Reede led a "single-minded campaign" of "escalating mistreatment" against Dr. Greenberg, while serving as the "puppet master" of Dr. Pulitzer. *See* Br. at 49, 50 n.18, 54. For example, Dr. Greenberg alleges that Dr. Reede and Dr. Pulitzer conspired to give Labor Relations the false impression that he had time and attendance issues in late August 2014. Br. at 50–51. The summary judgment record conclusively rebuts Dr. Greenberg's allegations, however.

Undisputed record evidence shows that from late July 2014 through August 2014, Dr. Greenberg was routinely showing up late. See *supra* at 5–7. Dr. Reede advised him that he needed to abide by a regular schedule so that the residents could rely on him. (A. 122.) Dr. Pulitzer advised him that he needed to abide by a regular schedule so that Dr. Pulitzer could

31

reliably plan the schedule for KCHC's Radiology Department. (A. 154, 394–396.) Yet, during the week of August 25, 2014—immediately after his meeting with Dr. Pulitzer—Dr. Greenberg logged such erratic hours that they led to a "mess," according to Dr. Scott-Moore, who was Section Chief of the Emergency Room where Dr. Greenberg was stationed. (A. 455.) Dr. Greenberg counters that he should not be faulted for logging erratic hours that week because he was supposed to be on vacation, but his plans fell through. (A. 810–811 ¶ 8.) He asserts that one radiologist "appeared to welcome my assistance that week and never complained about my presence." (A. 811 ¶ 8.) But Dr. Greenberg demonstrably failed to grasp that by working whenever *he* wanted to work (A. 177), he was continuing a pattern of behavior that prevented the residents from determining his availability, and prevented Dr. Pulitzer from planning coherent staff schedules. Dr. Reede and Dr. Greenberg thus rightfully forwarded his late August 2014 absences, along with his other absences, to Labor Relations.

Because Dr. Greenberg presents no "other indicia of discrimination," *see Naumovski*, 934 F.3d at 216 (quotation marks omitted), he has not established a prima facie case on either his non-promotion or his

32

termination claims. Indeed, besides the purported remarks that Neiman overheard, the only other evidence of Dr. Reede's discriminatory animus that Dr. Greenberg attempts to advance is her selection of a non-Jewish candidate for the promotion that Dr. Greenberg sought in July 2014. For the reasons below, however, Dr. Greenberg fails in his attempt to extract a discriminatory inference from that decision.

## B.    Dr. Greenberg's Failure-to-Promote Claim Fails.

Dr. Greenberg failed to adduce summary judgment evidence demonstrating that anti-Jewish bias motivated Dr. Reede to promote Dr. Scott-Moore, who is not Jewish, to Section Chief of Emergency Room Radiology at KCHC in July 2014. Dr. Greenberg was not "similarly situated in all material respects" to Dr. Scott-Moore. *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quotation marks omitted). The indisputable evidence establishes that Dr. Reede chose Dr. Scott-Moore because of her superior commitment to scholarship and teaching, and her lack of time and attendance issues. These legitimate, nondiscriminatory criteria mattered to Dr. Reede, who was concerned about the prospect that the Accreditation Council for Graduate Medical Education (ACGME) might strip SUNY's Radiology Department of

33

accreditation if SUNY did not remedy the shortcomings identified in an earlier ACGME report that had placed SUNY's Radiology program on probation. (A. 419–420, 424–425, 466 ¶¶ 7–8.) The report had referenced concerns that certain faculty members in the Radiology Department were not devoting sufficient time to educating residents and were missing supervisory assignments. (A. 99.)

Dr. Reede's candidate pool "boiled down" to Dr. Scott-Moore, Dr. Greenberg, and one other radiologist, Dr. Qi Chen. (A. 423–424.) Dr. Reede reviewed the evaluations that medical residents submitted for Dr. Scott-Moore in 2014 and saw that the residents "regarded [her] as an excellent teacher." (A. 424.) As one evaluation noted: "Dr. Scott seems to genuinely care about resident education." (A. 852.) Dr. Scott-Moore received a score of 5 out of 5 on whether she was "available to assist residents in writing manuscripts for publication or preparing . . . presentations for local or national meetings," and on whether she "[h]elps residents design and overcome problems in pursuing resident research projects." (A. 849–850.)

In addition, as Dr. Scott-Moore's CV reflects, by the time Dr. Reede was considering Dr. Scott-Moore for the 2014 promotion, Dr. Scott-Moore

34

had earned numerous scholarly awards and honors; had hosted weekly and biweekly resident teaching conferences; had conducted three case reviews as a visiting scholar at other institutions; had prepared five scientific posters or education exhibits;[6] and was a member of two radiological societies. (A. 346–352.) She had also recently worked on three teaching modules. (A. 424–425.)

Because Dr. Scott-Moore had worked for Dr. Reede for three years at SUNY's Long Island College Hospital (LICH), Dr. Reede was familiar with Dr. Scott-Moore's abilities. (A. 423.) Dr. Reede also knew that Dr. Scott-Moore had no time or attendance issues. (A. 426.) And Dr. Reede knew that Dr. Scott-Moore had prior experience in a similar role: Section Chief of Musculoskeletal Radiology at LICH. (A. 433.)

As for Dr. Greenberg, the evidence is indisputable and overwhelming that he had substantial problems with time and attendance. See *supra* at 5–7. Dr. Reede knew that his hours were erratic, and she and Dr. Pulitzer counseled him on the importance of adhering to a schedule—for

---

[6] The posters that physicians prepare for presentation at a medical conference are usually part of the groundwork for publication in a medical journal. (A. 425.)

the residents' sake, and for the other attending radiologists' sake. (A. 122, 154, 394–396.) But he continued his behavior, claiming a "moral authority" to work whatever hours he wanted. (A. 177.)[7]

With respect to scholarship and teaching, Dr. Greenberg's CV listed two papers, both undated and without the name of a journal, over the course of his career. (A. 344–345.) One of the papers, which Dr. Greenberg wrote in 1988 or 1989, was never published. (A. 361.) Dr. Greenberg was not a member of any radiological societies and did not list any academic accomplishments beyond the two articles. (A. 344–345.) Dr. Greenberg had also submitted a summary of his scholarly activity to the ACGME; that summary showed zero hours spent on "Research/scholarly activity with residents," and no scholarly activity whatsoever in the prior year. (A. 356–357.)

Even before the position of Emergency Room Radiology Section Chief became available, Dr. Reede had made clear that scholarly activity was connected to promotion, and that without such activity, Dr. Greenberg should not expect a promotion. During Dr. Greenberg's annual

---

[7] Dr. Reede ultimately decided against Dr. Qi Chen because he, like Dr. Greenberg, had time and attendance issues. (A. 426, 873–874 ¶ 3.)

review in February 2014, Dr. Greenberg filled out a form listing his accomplishments during the prior year. (A. 820–821.) Dr. Greenberg left two boxes completely blank: "scholarly distinction and accomplishment" and "mutual expectations regarding promotion." (A. 820–821, 858.) In the blank box for "mutual expectations regarding promotion," Dr. Reede wrote: "No scholarly activity to support promotion." (A. 820–821, 858.)

Moreover, Dr. Greenberg's 2014 resident evaluations underscored both his lack of commitment to teaching and his time and attendance issues. One resident commented that Dr. Greenberg "would disappear for hours at a time." (A. 836.) The resident also stated Dr. Greenberg was "extremely disinterested in teaching" and his lectures were "embarrassing and very insulting to the residents." (A. 836.) Residents walked out of a particular lecture that Dr. Greenberg was not prepared to give. (A. 836.) Another resident suggested that Dr. Greenberg "be more available." (A. 836.) These evaluations corroborated comments from residents to Dr. Reede that Dr. Greenberg was missing from the Emergency Room when they were "looking for him"; they did not know "where he was." (A. 427.)

37

In his 2014 resident evaluations, Dr. Greenberg received a score of 3.11 out of 5 on whether he was "available to assist residents in writing manuscripts for publication or preparing … presentations for local or national meetings," and a score of 3 out of 5 on whether he "[h]elps residents design and overcome problems in pursuing resident research projects." (A. 833–834.) As noted, Dr. Scott-Moore received a perfect score on those metrics. (A. 849–850.)

In attempting to show pretext, Dr. Greenberg misplaces his reliance on Dr. Scott-Moore's deposition testimony that, when she started her new role, her first priority was to get the Emergency Room to "function appropriately": that is, she sought "to improve our turnarounds, to increase the services that we offered, optimize our coverage." (A. 596–597.) Dr. Greenberg argues that these immediate priorities show that Dr. Reed's interest in selecting a candidate committed to scholarship and teaching was purely pretextual. *See* Br. at 41–42. But in doing so, he overlooks Dr. Scott-Moore's follow-up remarks that she continued to conduct "scholarly activity" even while trying to improve the Emergency Room's services. (A. 597.) Within her first two years, she prepared six scientific posters or education exhibits and conducted two research studies—a greater

38

volume of scholarly work than Dr. Greenberg had completed in his entire career. (*Compare* A. 350–352, *with* A. 344–345.)

Equally unavailing is Dr. Greenberg's attempt to show pretext by suggesting that Dr. Reede's rationale for rejecting him kept shifting. *See* Br. at 43–44. In a July 2014 memorandum that Dr. Reede drafted after Dr. Reede and Dr. Greenberg met to discuss the reasons why he was not being promoted, Dr. Reede noted that she had told Dr. Greenberg that he was not an "ideal candidate" for the role because he had "[n]o significant scholarly activity"; he "[l]ack[ed] of participation in major administrative and educational meetings in the department"; she was looking for "someone that [was] more interested in academics"; and his "[r]esident evaluations show[ed] deficiencies in several areas." (A. 353, 874 ¶ 6.) As noted, the 2014 resident evaluations addressed Dr. Greenberg's time and attendance issues (A. 836).

## C. Dr. Greenberg's Termination Claim Fails.

Dr. Greenberg's Title VII termination claim fails for several reasons. First, Dr. Reede—the person whom Dr. Greenberg alleges harbored anti-Jewish bias—was not the chief decisionmaker regarding Dr. Greenberg's termination. Unlike promotion decisions, termination decisions at SUNY and KCHC are made by committee; no single individual has the authority to terminate a physician. (A. 439.) Here, the Labor Relations Department made the decision to terminate Dr. Greenberg in consultation with Drs. Reede, Jamaleddine, and Pulitzer. (A. 408, 439, 448, 463 ¶ 16, 713.) Dr. Greenberg does not allege that anyone other than Dr. Reede harbored discriminatory animus—and, as explained, Dr. Greenberg has adduced no evidence that Dr. Reede harbored any anti-Jewish bias with which she could have infected the termination decision. *See Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1057 (8th Cir. 2007) (finding that stray remarks by one of multiple decisionmakers did not create discriminatory inference). Dr. Greenberg has thus failed to establish a prima facie case of religious discrimination with respect to his termination claim.

Second, the state defendants established a legitimate, nondiscriminatory reason for terminating Dr. Greenberg. The Labor Relations Department—in consultation with Drs. Reede, Jamaleddine, and Pulitzer—terminated him because, after an inquiry by Dr. Pulitzer, he was found to have affixed an unauthorized attestation to the imaging reports of 180 patients. (A. 228, 335, 408, 439, 448, 462 ¶ 14, 463 ¶ 16, 469 ¶ 16, 713; *see also* A. 278–279 (comparing Dr. Greenberg's unapproved attestation with the three approved attestations).) An attestation is necessary to establish that an attending physician has approved the preliminary assessment by a medical resident. (A. 462 ¶¶ 12–13.) The Centers for Medicare & Medicaid Services (CMS) require standardized attestations. (A. 461 ¶ 12, 462 ¶ 15, 469 ¶ 14.) Insurance companies, Medicaid, and Medicare will not reimburse a resident-reviewed imaging report unless it contains a valid attestation (A. 280–281, 461 ¶ 12, 462 ¶ 15, 468–469 ¶ 14.)

Dr. Greenberg's actions thus created financial and legal risks for the hospital. (A. 384, 392, 411–412, 461 ¶ 12, 462 ¶¶ 14–15, 469 ¶ 14.) His conduct also amounted to insubordination because he had been instructed to use a conforming attestation, but he refused to heed hospital

policy. (A. 278, 280–281, 384, 461 ¶ 12, 462 ¶ 14.) Dr. Greenberg's efforts to cover up what he had done only exacerbated the situation. Specifically, he asked an IT Department employee whether he could "take off" or "erase" each unauthorized attestation, which would have constituted unlawful tampering with patients' permanent medical–legal records. (A. 386, 462 ¶ 14.) *See Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000) (holding that "contempt for … clients," "difficulty following instruction," "outright insubordination," and "inept performance" were legitimate grounds (quotation and alteration marks omitted)).

Dr. Greenberg effectively concedes that the state defendants had a legitimate, nondiscriminatory reason to terminate him, acknowledging that his conduct affected potential reimbursements for the hospital's medical services. Br. at 53. Impeding an employer's ability to bill and be reimbursed for its services is, on its own, a legitimate, nondiscriminatory ground for terminating an employee. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 93 (2d Cir. 2001) (holding that plaintiff's "incapacity to bring in new business" was legitimate ground).

Dr. Greenberg claims that Drs. Reede and Pulitzer exploited the attestation incident to "trap" him (Br. at 52), but that claim finds no

42

support in the record. Dr. Greenberg was instructed to use a conforming attestation, but he decided to attach an unauthorized one instead—180 times. Another clinician—neither Dr. Reede nor Dr. Pulitzer—first spotted one of Dr. Greenberg's unauthorized attestations on an image, and was startled. (A. 280, 385, 462 ¶ 14.) That clinician notified Dr. Pulitzer, who notified KCHC's Risk Management Department, which recommended a worse fate than termination: a Medical Board Hearing, which could have led to the revocation of Dr. Greenberg's medical credentials. (A. 291, 462–463 ¶ 16.) Fortunately for Dr. Greenberg, Drs. Reede and Pulitzer agreed only to terminate him. (A. 408, 439, 448, 463 ¶ 16.)

## POINT II

### DR. GREENBERG'S FAMILY AND MEDICAL LEAVE ACT (FMLA) CLAIMS FAIL

Under the FMLA, an eligible employee is entitled to receive twelve workweeks of unpaid leave per year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An eligible employee is also entitled to such leave "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a

serious health condition." *Id.* § 2612(a)(1)(C). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care" or "continuing treatment by a health care provider." *Id.* § 2611(11).

When an employee's FMLA leave is unforeseeable, the employee must provide notice to the employer "as soon as practicable," 29 C.F.R. § 825.303(a), and must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request," *id.* § 825.303(b). This Court has clarified that "an employee has provided sufficient notice to [the] employer if that notice indicates reasonably that the FMLA may apply." *Coutard v. Municipal Credit Union*, 848 F.3d 102, 111 (2d Cir. 2017).

This Court recognizes two types of FMLA claims: interference claims and retaliation claims. *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). Dr. Greenberg claims that he gave SUNY notice of his intention to take leave on September 4 and 5, 2014, in order to facilitate his special-needs son's transition to a new school. Br. at 27. He argues that the state defendants interfered with his FMLA rights by denying his request for FMLA-qualifying leave, and by punishing him when he took

44

that leave anyway. Br. at 27–28. And he argues that the state defendants retaliated against him for taking FMLA-qualifying leave on September 4 and 5 by terminating him. Br. at 37–39.

The district court held that Dr. Greenberg's interference claim was essentially a retaliation claim, and that his retaliation claim failed. (S.P.A 34–40.) This Court should affirm because Dr. Greenberg's theories of FMLA liability—whether they are distinct or duplicative—fail for the same fundamental reason: Dr. Greenberg did not provide an FMLA-qualifying reason when requesting the disputed leave.

## A. Dr. Greenberg's FMLA Interference Claim Fails.

To prevail on an FMLA interference claim, a plaintiff must establish: "(1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). Crucially, to survive summary judgment, the plaintiff must adduce evidence that he or she "actually sought" or "attempted to take leave" for an FMLA-

qualifying reason, *id.* at 424–426 (quotation marks omitted), and that the defendants "impeded the employee's exercise of his or her right," *Potenza*, 365 F.3d at 168; *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999) (noting that it is unlawful to "impede an employee's actual or attempted exercise of a right provided under" the FMLA) (quotation marks omitted).

Here, undisputed evidence shows that Dr. Greenberg did not alert SUNY that he needed leave on September 4 and 5, 2014, for an FMLA-qualifying reason. He notified SUNY via email that he was taking leave on those days because of a minor back injury. (A. 160.) Although he initially emailed SUNY that he would need to miss those days for "important family issues" (A. 186), he then emailed SUNY that his "family issues" had been "resolved" but that he would need to miss those days anyway because he had "thrown out [his] back." (A. 160). Dr. Greenberg does not—and could not—argue that his minor back injury was a "serious health condition." *See* 29 U.S.C. § 2611(11).

By emailing SUNY that he was taking leave to tend to a minor back injury, Dr. Greenberg failed to "indicate reasonably that the FMLA may

apply" to his absence. *See Coutard*, 848 F.3d at 111. His FMLA interference claim therefore fails. *See Graziadio*, 817 F.3d at 424–426.

Dr. Greenberg's own contemporaneous statements reinforce the conclusion that he never "actually sought" or "attempted to take" FMLA-qualifying leave. *See id.* (quotation marks omitted). In his administrative interrogation with Labor Relations, he repeatedly testified that his back injury—not any issue involving his son's schooling—was the reason that he missed work on September 4 and 5; and that, but for his back injury, he would have come into work. (A. 184–185.) He stated that he "wanted to take that time off for one reason," but after his mother-in-law arrived to help with his son, "it turned out [he] had to take the time off for another" reason. (A. 185.) He insisted: "that's exactly what happened." (A. 186; *see also* A. 184–185.)

Dr. Greenberg misses the mark in arguing that his deposition testimony in this lawsuit creates a factual dispute that precludes summary judgment. *See* Br. at 33. At his deposition, he stated that Dr. Pulitzer "was well aware of [his] son's special needs," and that he had told Dr. Pulitzer that he needed September 4 and 5 off during two meetings—on September 2 and 3—for the following reason: "I told him

that I had to care for my son, that he had to transition to a new school, and that I needed the time off to be with him." (A. 531.)

But regardless of whether Dr. Greenberg initially suggested to Dr. Pulitzer that the FMLA could be at play, it is undisputed that *after* his meetings with Dr. Pulitzer, Dr. Greenberg sent an email expressly attributing his absence to his back and recanting any suggestion that he needed leave to help his family. (A. 160.) At bottom, as the district court found, a jury could not reasonably conclude that Dr. Greenberg put Dr. Pulitzer on notice that he needed leave for an FMLA-qualifying reason. (S.P.A. 39 & n.20.)

Dr. Greenberg counters that his email, and his testimony at the Labor Relations interrogation, was a lie. Br. at 35. But a party cannot create a triable factual issue by relying on evidence that was generated during the litigation and is directly contrary to a pre-litigation admission. *AEP Energy Servs. Gas Holding Co. v. Bank of Am.*, *N.A.*, 626 F.3d 699,

736 (2d Cir. 2010) (holding that plaintiffs' claims in expert reports could not negate contradictory claims in pre-litigation regulatory filings).[8]

In any event, the state defendants were entitled to take Dr. Greenberg at his word when he attributed his absence to a minor back injury. Even assuming that Dr. Greenberg's email was misleading, the state defendants had no way of knowing so. *See Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008–09 (7th Cir. 2001) (communication that "not only withheld important information from the employer but likely threw it off the scent" precluded the employer from knowing that the FMLA "could be applicable"). The FMLA's notice requirement would be meaningless if "employees, for the purposes of litigation, can later designate leave as FMLA-qualifying without making a proper showing that, at the time they requested leave, they put their employer on notice

---

[8] Nor has Dr. Greenberg has offered a "plausible explanation" for the inconsistency. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019). He contends that he feared losing his job and thought that a back injury would be a more acceptable excuse for his absence. Br. at 35. But that does not explain why Dr. Greenberg initially claimed that he needed to take off September 4 and 5 for "important family issues." (A. 186.) If he were genuinely afraid that missing work on those days for a family-related reason would cost him his job, he would not have offered that reason in the first place.

that FMLA leave was necessary due to a serious medical condition." *Greenwell v. State Farm Mut. Auto. Ins. Co.*, 486 F.3d 840, 843 (5th Cir. 2007) (quotation and alteration marks omitted).

## B.   Dr. Greenberg's FMLA Retaliation Claim Fails.

To establish a prima facie case of FMLA retaliation, the plaintiff "must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 424 (quotation marks omitted). In response to the plaintiff's prima facie showing, "the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that the defendant's proffered explanation is pretextual." *Id.*

As a threshold matter, Dr. Greenberg's retaliation claim fails for the same reason that his interference claim does: he has not established that he exercised, or attempted to exercise, any right under the FMLA. In addition to sending his supervisors an email attributing his absence to a minor back injury, he recorded September 4 and 5, 2014, as sick days,

50

his sick accruals were charged, and he was compensated for those days. (A. 160, 273–274.) Moreover, even if Dr. Greenberg's absences on September 4 and 5 could be viewed as an exercise of his FMLA rights, he has not shown that the state defendants were retaliating against him for those particular absences when they terminated him. There is no evidence that Dr. Pulitzer, Dr. Reede, or any member of Labor Relations considered terminating him for those absences. There is no evidence that Dr. Jamaleddine was aware of those absences. In fact, Dr. Pulitzer referred Dr. Greenberg to Labor Relations in the "hope" that Dr. Greenberg "would be counseled, agree to a particular schedule, and then abide by it." (A. 461 ¶ 10.)

It was Dr. Greenberg's decision to attach unauthorized attestations to 180 patient reports that triggered his termination. Cuiman and Bernadel of Labor Relations convened with Drs. Pulitzer, Reede, and Jamaleddine, and the entire group decided that Dr. Greenberg's attestations warranted termination. (A. 228, 335, 408, 439, 448, 462 ¶ 14, 463 ¶ 16, 469 ¶ 16, 713.) Thus, contrary to Dr. Greenberg's contention on appeal (Br. at 38), the record contains no evidence that the September 4 and 5 absences constituted even a "negative factor" in the termination

decision. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006) (quotation marks omitted).

As this Court has observed, the "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." *Id.* (quotation marks omitted). Here, because Dr. Greenberg was terminated for a reason entirely unrelated to the FMLA, he cannot invoke the FMLA to shield himself from the termination.

## CONCLUSION

This Court should affirm the grant of summary judgment to the

state defendants.

Dated:  New York, New York
June 2, 2020

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for State Appellees


By:   */s/ Amit R. Vora*
AMIT R. VORA
Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
AMIT R. VORA
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-6167

53

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, William P. Ford, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 10,238 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ *William P. Ford*