# 19-3570

## United States Court of Appeals
## for the Second Circuit

MD ODED GREENBERG,

*Plaintiff-Appellant,*

*against*

STATE UNIVERSITY HOSPITAL DOWNSTATE MEDICAL
CENTER, AKA THE STATE UNIVERSITY OF NEW YORK
HEALTH SCIENCE CENTER AT BROOKLYN, AKA STATE
UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL CENTER,
NEW YORK CITY HEALTH AND HOSPITALS CORPORATION,
KINGS COUNTY HOSPITAL CENTER, DEBORAH L. REEDE,
STEVEN PULITZER,

*Defendants-Appellees,*

*(caption continued on inside cover)*

On Appeal from the United States District Court
for the Eastern District of New York

---

### BRIEF FOR CITY APPELLEES

---

RICHARD P. DEARING
DEBORAH A. BRENNER
JONATHAN A. POPOLOW
*of Counsel*

June 2, 2020

JAMES E. JOHNSON
*Corporation Counsel*
*of the City of New York*
Attorney for City Appellees
100 Church Street
New York, New York  10007
212-356-4084 or -0826
jpopolow@law.nyc.gov

Reproduced on Recycled Paper

―――――――――――

(*caption continued from cover*)

*and*

UNITED UNIVERSITY PROFESSIONS, (UUP), SUNY
DOWNSTATE MEDICAL CENTER CHAPTER OF UNITED
UNIVERSITY PROFESSIONS, JOHN AND JANE DOES 1-20,

*Defendants.*

―――――――――――

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iv

PRELIMINARY STATEMENT......................................................1

ISSUES PRESENTED FOR REVIEW .......................................3

STATEMENT OF THE CASE ..................................................4

    A.  Downstate's employment of Greenberg.....................................5

        1. The affiliation agreement between Downstate and NYC Health + Hospitals ..................................................5

        2. Downstate's hiring of Greenberg and his assignment by Downstate to Kings County Hospital under the affiliation agreement.......................................6

    B.  Downstate's decision to renew Greenberg's one-year contract but not to promote him.......................................8

    C.  Downstate's discipline of Greenberg and ultimate termination of his employment ...............................................11

        1. Downstate's counseling of Greenberg about his increasingly erratic work schedule ......................................11

        2. Downstate's discipline of Greenberg for his unauthorized absences..........................................................12

        3. Downstate's termination of Greenberg for his creation and use of unapproved attestations in official medical charts...................................................................................15

    D.  The district court's dismissal of Greenberg's claims at summary judgment.....................................................18

i

# TABLE OF CONTENTS (cont'd)

**Page**

SUMMARY OF ARGUMENT ................................................. 21

ARGUMENT ...................................................................... 23

POINT I ............................................................................ 23

    NYC HEALTH + HOSPITALS IS NOT LIABLE TO
    GREENBERG BECAUSE IT WAS NOT HIS EMPLOYER ........ 23

    A.  NYC Health + Hospitals could not and did not terminate
        Greenberg's employment. ....................................... 25

    B.  NYC Health + Hospitals did not hire Greenberg.................... 27

    C.  NYC Health + Hospitals could not and did not discipline
        Greenberg................................................................. 28

    D.  NYC Health + Hospitals  did not control Greenberg's pay,
        insurance, or employment records. ........................... 29

    E.  NYC Health + Hospitals did not directly supervise
        Greenberg................................................................. 30

POINT II........................................................................... 31

    EVEN IF NYC HEALTH + HOSPITALS WERE DEEMED A
    JOINT EMPLOYER, IT PLAYED NO PART IN THE
    DECISIONS GREENBERG CHALLENGES ................................ 31

    A.  Greenberg's Title VII claim against NYC Health +
        Hospitals would still fail because it had no role in his
        termination, let alone one motivated by discriminatory
        animus.................................................................... 32

    B.  For similar reasons, Greenberg's FMLA claims against
        NYC Health + Hospitals would also still fail............................. 34

## TABLE OF CONTENTS (cont'd)

**Page**

CONCLUSION ........................................................................ 36

CERTIFICATE OF COMPLIANCE........................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arculeo v. On-Site Sales & Mktg., L.L.C.,*
425 F3d 193 (2d Cir. 2005) ............................................................ 24

*AT&T v. NLRB,*
67 F.3d 446 (2d Cir. 1995) ...................................................... 30, 32

*Clinton's Ditch Coop. Co. v. NLRB,*
778 F.2d 132 (2d Cir. 1985) .......................................................... 23

*Conde v. Sisley Cosmetics USA, Inc.,*
2012 U.S. Dist. LEXIS 72726 (S.D.N.Y. May 22, 2012) ..................... 25

*Cook v. Arrowsmith Shelburne, Inc.,*
69 F.3d 1235 (2d Cir. 1995) .......................................................... 23

*Duplan v. City of New York,*
888 F.3d 612 (2d Cir. 2018) .......................................................... 20

*Griffin v. Sirva Inc.,*
835 F.3d 283 ............................................................................. 23

*Gulino v. N.Y. State Educ. Dep't,*
460 F.3d 361 (2d Cir. 2006) .......................................................... 23

*Lima v. Addeco,*
634 F. Supp. 2d 394 (S.D.N.Y. 2009),
*aff'd,* 375 F. App'x 54 (2d Cir. 2010) .......................................... 32, 33

*Liotard v. FedEx Freight Corp.,*
2016 U.S. Dist. LEXIS 34754 (S.D.N.Y. Mar. 17, 2016) ................... 25

*McCray v. CUNY,*
2011 U.S. Dist. LEXIS 31326 (S.D.N.Y. Mar. 25, 2011) ................... 25

*Moreau v. Air France,*
343 F.3d 1179 (9th Cir. 2003) .................................................. 23, 30

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*NLRB v. Solid Waste Servs.*,
  38 F.3d 94 (2d Cir. 1994) ....................................................................24

*Shiflett v. Scores Holding Co.*,
  601 F. App'x 28 (2d Cir. 2015) ..........................................................24

*Singer v. Ferro*,
  711 F.3d 334 (2d Cir. 2013) ...............................................................21

*Tolbert v. Queens College*,
  242 F.3d 58 (2d Cir. 2001) .................................................................20

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003) .................................................................20

*Voltaire v. Home Servs. Sys.*,
  823 F. Supp. 2d 77 (E.D.N.Y. 2011) ..................................................24

**Statutes and Regulations**

29 C.F.R. 826.106(b) ...............................................................................24

29 C.F.R. 826.106(c) ...............................................................................34

29 C.F.R. 826.106(e) .........................................................................34, 35

**Other Authorities**

https://www.acgme.org .............................................................................9

https://www.cms.gov...............................................................................15

## PRELIMINARY STATEMENT

The State University of New York (SUNY) operates a medical school and sponsors resident training programs at its Downstate Medical Center. To offer its students and residents clinical experience and training, Downstate maintains an affiliation agreement with New York City Health and Hospitals Corporation (NYC Health +Hospitals), under which some of its physicians are assigned by Downstate to work at Kings County Hospital Center (KCHC). Plaintiff Oded Greenberg, a radiologist and attending physician was, until SUNY terminated his employment, assigned by Downstate to KCHC's emergency room.

Greenberg claims that defendant Deborah Reede, the chair of Downstate's radiology department, first denied him a promotion and family leave, and then orchestrated his termination because he is Jewish. He appeals from an order of the United States District Court for the Eastern District of New York (Chen, J.) granting summary judgment to all defendants on the ground that Greenberg failed to raise a genuine issue of fact as to whether the challenged employment decisions violated Title VII or the FMLA. For a full analysis of that sound decision, we defer to SUNY, which was Greenberg's employer.

This brief on behalf of the municipal appellees—KCHC and NYC Health + Hospitals—explains that the claims against them also fail on the narrower ground that NYC Health + Hospitals was not Greenberg's employer and cannot be liable to him under Title VII or the Family Medical Leave Act (FMLA).[1] The district court did not reach this issue.

Greenberg's contention that SUNY and NYC Health + Hospitals were his joint employers is belied by the factors courts typically consider in making that determination. Downstate hired Greenberg and controlled his pay, insurance, and employment records. He was directly supervised by other Downstate radiologists, including defendant Steven Pulitzer. NYC Health + Hospitals could not and did not discipline Greenberg—the disciplinary proceedings here were handled by Downstate's labor relations office under the terms of the collective bargaining agreement between Greenberg's union and the State. Perhaps most fundamentally, the affiliation agreement expressly provides that physicians like Greenberg are employees of Downstate and affords NYC Health + Hospitals no right to discharge them.

---

[1] Greenberg does not challenge the district court's decision that KCHC, a municipal health facility operated by NYC Health + Hospitals, is not a suable entity.

## ISSUES PRESENTED FOR REVIEW

1.     Whether only SUNY and not NYC Health + Hospitals can be considered Greenberg's employer, where the governing affiliation agreement expressly provided that physicians assigned by Downstate to KCHC were employees of Downstate; and where NYC Health + Hospitals: (a) did not hire Greenberg; (b) could not and did not discipline Greenberg; (c) could not and did not terminate Greenberg's employment; (d) did not control Greenberg's pay, insurance, or employment records; (e) did not directly supervise Greenberg; and (f) did not participate in the collective bargaining process between Greenberg's union and the State.

2.     Whether, even if NYC Health + Hospitals were deemed Greenberg's joint employer, only SUNY and not NYC Health + Hospitals could be liable to Greenberg on his Title VII and FMLA claims where NYC Health + Hospitals played no actionable part in the employment actions that Greenberg claims violated those statutes.

## STATEMENT OF THE CASE[2]

Plaintiff-appellant Dr. Oded Greenberg is a radiologist who was employed by defendant-appellee State University of New York, Downstate Medical Center (Downstate), as a professor of clinical radiology from 2001 to 2014 (Appendix ("A") 18-19, 21-22, 344, 361). Apart from a hiatus from 2008 to 2010, Greenberg was assigned by Downstate to defendant-appellee Kings County Hospital Center (KCHC) under an affiliation agreement between Downstate and defendant-appellee New York City Health and Hospitals Corporation (NYC Health + Hospitals) (A19, 22, 344, 361). At the time of his termination by Downstate's Labor Relations Board, Greenberg, who identifies as white and Jewish, was 54 years old (A18-19).

Defendant-appellee Dr. Deborah Reede, an African-American non-Jewish woman in her 60s, was appointed Chair of Radiology at Downstate in 2013 (A465, 472). Defendant-appellee Dr. Steven Pulitzer, a white Jewish man in his 50s, is a radiologist employed by Downstate

---

[2] The facts in the statement of the case are drawn from the summary judgment record. They are undisputed except as noted.

(A458). Like Greenberg, he was assigned to KCHC by Downstate under the affiliation agreement between Downstate (A458).

## A. Downstate's employment of Greenberg

### 1. The affiliation agreement between Downstate and NYC Health + Hospitals

Downstate operates a medical school and sponsors resident training programs (A1474). To fulfill its teaching and research mission, including providing students with clinical experience and residents with clinical training, Downstate entered into an affiliation agreement with NYC Health + Hospitals (A1474-75). Under this agreement, physicians employed by Downstate (denominated "physician providers") perform professional services such as faculty teaching, patient care, and research at KCHC and related facilities and clinics (A1474-75, 1478).

The agreement expressly provides that physician providers are employees of Downstate (A1543). It obligates Downstate—not KCHC or NYC Health + Hospitals—to maintain the time and attendance records of physician providers and to comply with worker's compensation, minimum wage, disability benefit, unemployment benefit, and other relevant labor laws for all covered physician providers (A1521-22, 1544).

The agreement likewise requires Downstate to ensure that physician providers are qualified for employment and authorizes Downstate to "follow its own internal personnel policies and procedures with respect to hiring physician providers" (A1484-85, 1488-92). It contains no mechanism for NYC Health + Hospitals to terminate or discipline a physician provider. Rather, NYC Health + Hospitals may only "request" that Downstate no longer assign a physician provider to KCHC (A1520). And NYC Health + Hospitals must then provide Downstate with "a written justification for such a request … and a reasonable opportunity to cure" unless the issue presents "a threat to patient health or safety" (A1520-21).

### 2. Downstate's hiring of Greenberg and his assignment by Downstate to Kings County Hospital under the affiliation agreement

In early 2001, Greenberg responded to a job posting by Downstate seeking an assistant professor of clinical radiology and received an appointment to the position (A1210-11). The letter confirming his appointment was printed on Downstate letterhead and signed by the chair of Downstate's radiology department and the dean of its college of medicine, not by any NYC Health + Hospitals or KCHC officer (A1199).

The letter referenced the affiliation agreement and informed Greenberg that he would be assigned to KCHC (A1199).

Throughout his employment, Greenberg's personnel file was maintained by Downstate (A993-1244). That file shows that it was Downstate, not NYC Health + Hospitals or KCHC, that verified his employment eligibility to the United States Department of Justice (A1215). More than decade later, it again was Downstate, not NYC Health + Hospitals or KCHC, that verified Greenberg's employment when he applied for a mortgage (A993-94, 1016-18).

As a Downstate employee, Greenberg was a member of United University Professions (UUP), a union representing most physicians employed by SUNY (A1254, 1260-1388). Under the terms of the collective bargaining agreement between UUP and the State of New York, Greenberg was subject to discipline only in accordance with article 19 of that agreement (A1277-81). He received salary increases under the terms of that agreement (*e.g.*, A1042, 1048). Similarly, his health insurance and related benefits were provided by virtue of his employment at Downstate (A1084-85, 1097-98). And his time and attendance records were maintained solely by Downstate (A1389-1452).

In late 2008, Greenberg temporarily resigned from his position as a full-time assistant professor via letter to Salvatore Scalfani, then the chair of Downstate's radiology department (A1062-63). A year later, while Greenberg was working part-time as an hourly employee, Scalfani unilaterally reassigned Greenberg from KCHC to University Hospital, a SUNY facility (A1067-73). In 2010, Scalfani rehired Greenberg to a full-time position as an assistant professor of clinical radiology in Downstate's college of medicine (A1453-56). Greenberg was again assigned to KCHC with a primary specialty of emergency radiology (A1454). The letter from Scalfani offering Greenberg the position, written on Downstate letterhead, noted that the offer was subject to the approval of Downstate's dean and president, and explicitly defined the "terms and conditions of [Greenberg's] employment by the State University of New York (SUNY) acting on behalf of its Department of Radiology, Downstate Medical Center" (A1453).

## B. Downstate's decision to renew Greenberg's one-year contract but not to promote him

In April 2014, the Accreditation Council for Graduate Medical Education (ACGME) placed Downstate's radiology department on

probation for not meeting core benchmarks related to resident teaching and faculty engagement (A98-107, 465-66).[3] The ACGME questioned the department's supervision and education of its residents, noting that some faculty did not show up for scheduled supervision assignments and did not demonstrate a strong interest in the education of the residents (A99). Downstate's radiology department (out of 201 in the county) was the only one ACGME placed on probation in 2014 (A466).

Reede, who had recently been appointed chair of Downstate's radiology department, was aware when hired that the residency program had been experiencing problems that required immediate attention (A465). In her view, ACGME's placement of the department on probation threatened the continued existence of the residency program unless the department showed significant improvement before ACGME's follow-up visit in 2015 (A466). She averred that she accordingly instituted significant personnel changes aimed at improving the department and its likelihood of successful accreditation (A466-67).

---

[3] ACGME is the body responsible for accrediting all graduate medical training programs for physicians in the United States. *See generally* https://www.acgme.org.

At the time, due to economic uncertainty, the physicians in Downstate's radiology department were operating under one-year contracts with no guarantee of annual renewal (A467). Although Downstate renewed Greenberg's contract at that point, it opted not to renew the contracts of five other physicians in its radiology department (A467), including Alan Kantor, who had then been serving as chief of service for radiology at KCHC (A459, 467, 992). After Kantor's departure, Pulitzer was appointed interim chief of service (A459). Under the affiliation agreement, an appointee to the position of chief of service for radiology, unlike the chiefs of service for other departments, shall not become an employee of NYC Health + Hospitals (A1486).

Following the non-renewals, four different radiologists transferred to Downstate from Long Island College Hospital, which had merged with Downstate and whose radiology department had a proven track record of teaching residents (A465, 467). One of those radiologists, Dr. Jinel Scott-Moore, was chosen by Reede for the newly-vacant position of section chief for ER radiology in Downstate's radiology department (A467, 612). Greenberg had expressed interest in that position, but Reede testified that she ultimately chose Scott-Moore "because she had

expressed a strong interest in academics … and had very good reports from the residents regarding her teaching" (A353, 424).

## C. Downstate's discipline of Greenberg and ultimate termination of his employment

### 1. Downstate's counseling of Greenberg about his increasingly erratic work schedule

Greenberg had a documented history of time and attendance problems (A114-21), and Reede had received reports of residents being unable to locate him when he was supposed to be in the emergency room (A427). In the wake of ACGME's April 2014 findings, Reede stressed the crucial importance of the department's radiologists reliable presence and availability during their regularly scheduled shifts (A467-68). During a May 2014 meeting, she informed Greenberg that "his job responsibilities require[d] him to be present for consultations as well as resident supervision and education" (A122).

Yet these issues persisted into August 2014. According to Pulitzer, who handled the radiology department's scheduling, Greenberg was arriving late and on occasion leaving early to the point where Pulitzer often did not know what time Greenberg was going to be in on a particular day and could not reliably plan the schedule (A394-95, 459).

Scott-Moore, who worked in the same room as Greenberg, observed firsthand that "Greenberg was sometimes very erratic about his hours," noting that he "would often come late to work … from like half an hour late to an hour to an hour and a half, to two" (A453, 456-57). As a result, Pulitzer counseled Greenberg in person concerning time and attendance issues, reminding him that he was required to be present at the hospital for set hours of 9:30 a.m. to 5:30 p.m. (A154).

### 2. Downstate's discipline of Greenberg for his unauthorized absences

On Tuesday September 2, 2014, Greenberg met with Pulitzer and requested the remainder of the week off (A171). Pulitzer testified at his deposition that he denied the request due to the operational needs of the radiology department (A171). While Greenberg claims that he requested the time off to care for his autistic son, Pulitzer (who also has a child with special needs) did not recall any discussion of Greenberg's son, and testified that Greenberg did not specify the reason why he wanted the time off (A399-400).

The next day, Greenberg sought out Pulitzer and informed him that he "would not be reporting for duty on Thursday and Friday,

September 4-5, 2014" (A171). After Pulitzer related this conversation to Reede, she instructed him to send a letter to Greenberg notifying him that if he failed to report for duty as scheduled on Thursday and Friday, the matter would be referred to SUNY's labor relations department (A172, 208, 402).

On Thursday, September 4, about an hour before the start of his shift, Greenberg emailed Reede's assistant that he "unfortunately must take today and tomorrow off due to important family issues" (A209). He emailed her again the next day, explaining that his family issues actually had been resolved on Thursday morning and, notwithstanding his previous email, he had been planning to come in but "then managed to throw [his] back out" (A160). Reede advised Pulitzer to refer Greenberg to Downstate's department of labor relations (A468).

On Monday September 8, 2014, following his unauthorized absences the previous Thursday and Friday, Greenberg met with Michael Arabian, a senior personnel associate in SUNY's labor relations office who was investigating those absences (A173-207). In response to Arabian's questions, Greenberg acknowledged that attending to his child's special needs was not the reason he did not appear for work

those days (A183-85). While he said that had been his initial intention, he also explained that his mother-in-law had arrived in town to provide appropriate support for his son, freeing him to go to work (A183-84). But he purportedly threw out his back on Thursday morning, which prevented him from coming in (A184-85).

After consulting with Leonzo Cuiman, Downstate's Assistant Vice President for Labor Relations, Arabian prepared a settlement agreement, which Greenberg signed (A216-17, 445). NYC Health + Hospitals was not a party to the settlement agreement and did not participate in any of the proceedings or negotiations leading to the agreement (A216-17).

The settlement agreement covered Greenberg's September 4 and 5 absences as well as his time and attendance issues in July and August (A216-17). The agreement cited Greenberg's "(1) unscheduled absences, (2) tardiness, (3) interfering with the operations of the department, (4) insubordination and (5) misrepresenting hours worked on time sheets, as a result of absences and tardiness, [and] switching schedule without authorization of his supervisor." It stated that in lieu of serving a notice of discipline for those failings, Downstate would hold any penalty

14

(ranging from a letter of reprimand to termination) in abeyance for one year provided Greenberg abided by the terms of the agreement (A216).

### 3. Downstate's termination of Greenberg for his creation and use of unapproved attestations in official medical charts

A month later, an issue arose with Greenberg's "attestations" in office medical charts. As described by Reede, in "the context of radiology, an attestation is essentially a confirmation that an attending physician has reviewed a patient's images that ha[s] already been reviewed by a resident" (A469). The Centers for Medicare & Medicaid Services (CMS) require attestations in a standard format on all reports initially read by a resident (A469).[4] "Non-conforming or missing attestations could," Reede explained, "trigger a full investigation by the [CMS], as well as potential financial liability" (A469).

After consultation with their compliance departments, Downstate and KCHC had agreed on standard attestations to be used at the

---

[4] The Centers for Medicare & Medicaid Services is a federal agency within the United States Department of Health and Human Services that administers the Medicare program and works in partnership with state governments to administer Medicaid. *See generally* https://www.cms.gov.

respective institutions (A461, 469). Pulitzer averred that during a staff meeting in late September 2014, he personally instructed Greenberg to use the agreed-upon standard attestations (A461).

Not long after this meeting, Pulitzer learned that Greenberg had added unauthorized attestations, filled with inappropriate sarcastic language, to approximately 180 patients' records (A288-89, 462).[5] Pulitzer also learned that Greenberg had asked an IT department employee whether the unauthorized attestations could be removed from the records, which could have constituted tampering with patients' medical files (A386-87, 390-91).

Concerned about the ramifications of Greenberg's use of unauthorized attestations, Pulitzer brought the issue to the attention of Reede and Ghassan Jameladdine, KCHC's chief medical officer (A462-63, 468-69). Jameladdine advised Pulitzer to contact KCHC's risk management department to determine KCHC's potential legal exposure (A462). Ultimately, a new attestation had to be affixed to all 180

---

[5] Greenberg acknowledges that the attestations he submitted contained unapproved language, but downplays his conduct, characterizing them as "playful" (App. Br. 21). Sarcastic would, however, appear to be the more accurate descriptor (*see* A278-79 (comparing attestation used by Greenberg to the approved attestations)).

medical files in addition to the unapproved attestation authored by Greenberg (A469). Jameladdine agreed with Pulitzer that the issue should be referred to Downstate's labor relations department (A392-93).

Reede reviewed Greenberg's unapproved attestations after Pulitzer brought them to her attention and found them "seriously problematic" (A469). She viewed Greenberg's behavior as insubordinate, especially since it followed close on the heels of a direct instruction to use the approved attestation forms (A469). Reede discussed the issue with Pulitzer and both agreed that the matter should be referred to Downstate's labor relations department (A463, 469).

Cuiman and Stephanie Bernadel, both from Downstate's labor relations office, investigated Greenberg's use of unapproved attestations (A218-67, 297-326). On October 22, 2014, Cuiman notified Greenberg that his appointment as a clinical assistant professor was terminated, effective immediately, for violating the September settlement agreement (A335). Cuiman testified at his deposition that the decision to terminate Greenberg was made by him, Bernadel, Reede, and Adriana Conde-Billy, Downstate's director of labor relations, without input from anyone at KCHC (including Jameladdine) (A1247, 1674-75).

17

Bernadel similarly testified that during her investigation of Greenberg she did not consult with anyone at KCHC (A1677-78).

### D. The district court's dismissal of Greenberg's claims at summary judgment

Following his termination, Greenberg sued Downstate, Reede, Pulitzer, NYC Health + Hospitals, and KCHC, asserting violations of Title VII, the FMLA, 42 U.S.C. §§ 1981 and 1983, and pendent claims under state and local law (A18-48). According to Greenberg, almost immediately after Reede assumed her position as chair of Downstate's radiology department, she launched a campaign of discrimination against older, white Jewish physicians and others in the department—discharging several, slashing the compensation of others, and micromanaging those not discharged in an attempt to force their resignation or retirement (A22-24). Greenberg claimed that during her campaign to alter the racial and religious composition of Downstate's radiology department and make it younger, Reede "made no secret of her unfavorable view of Jews" (A24).

Reede, Greenberg alleged, "made statements which disparaged and/or stereotyped Jews, cast them in a negative light, or otherwise

made clear her plain and obvious bias against them on the basis of their race and religion" (A24). Greenberg's complaint did not identify any individual other than Reede who harbored a discriminatory animus against him on the basis of race, religion or age. Greenberg nevertheless alleged that all defendants violated the FMLA by denying his request for leave on September 4 and 5, 2014, and then later disciplining and ultimately terminating him as retaliation for attempting to exercise, and then actually exercising, his FMLA rights (A32-34).

Downstate, Pulitzer and Reede (the SUNY defendants) jointly moved for summary judgment (ECF 76).[6] As relevant here, they argued that Greenberg had failed to raise a genuine issue of fact as to whether Downstate's challenged employment decisions violated Title VII or the FMLA (ECF 78). NYC Health + Hospitals also moved for summary judgment (ECF 86). It primarily argued that it could not be liable to Greenberg because he could not show that NYC Health + Hospitals was his employer, as required for liability to attach under Title VII and the FMLA (ECF 83).

---

[6] Citations with the prefix "ECF" refer to entries on the district court docket.

The district court granted both motions in their entirety (SPA1-55). At the outset, the court dismissed KCHC as a non-suable entity (SPA19-20, 55). The court also, as a threshold matter, dismissed several of Greenberg's claims against Downstate, and Pulitzer and Reede in their official capacities, on the basis of Eleventh Amendment immunity (SPA20-26, 55). The court declined to reach the issue of whether NYC Health + Hospitals was Greenberg's employer (SPA19), opting instead to dismiss Greenberg's Title VII and FMLA claims on the grounds asserted by the SUNY defendants (SPA19, 34-54). Finally, the court declined to exercise supplemental jurisdiction over Greenberg's pendent state and local law claims (SPA54-55). [7]

---

[7] Greenberg has abandoned his 42 U.S.C. section 1981 and 1983 claims on appeal. *See United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003) (arguments not raised in appellant's opening brief are waived); *Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) (issues addressed only in a perfunctory manner are waived). Moreover, Greenberg never asserted a section 1981 claim against NYC Health + Hospitals (*see* A37). And even if he had, and had properly preserved the claim, it would still fail because section 1981 "does not provide a separate private right of action against" municipal actors such as NYC Health + Hospitals. *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018). The section 1983 claim, even if Greenberg had properly preserved it, also would fail because Greenberg did not allege or adduce evidence that the "challenged acts were performed pursuant to a municipal policy or custom." *Id.*

## SUMMARY OF ARGUMENT

This Court reviews de novo the district court's grant of summary judgment. *See Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013). On appeal, Greenberg challenges only the dismissal of his FMLA interference and retaliation claims (App. Br. 25-39), and limited aspects of his Title VII claims (App. Br. 40-54). Those claims were properly dismissed against NYC Health + Hospitals for several reasons.

Most fundamentally, SUNY, not NYC Health + Hospitals, was Greenberg's employer. NYC Health + Hospitals lacked control over the most basic functions of Greenberg's employment—hiring, firing, and discipline. It was SUNY that assigned Greenberg to KCHC, where he was directly supervised by other SUNY employees who also were assigned by SUNY to KCHC. And it was SUNY that paid Greenberg, maintained his time and attendance records, and provided his health insurance and related benefits. These factors foreclose any attempt by Greenberg to impose liability on NYC Health + Hospitals under a joint employer theory.

Secondarily, even if NYC Health + Hospitals could be deemed to be Greenberg's joint employer, it cannot be liable to Greenberg on his

Title VII and FMLA claims because it played no actionable part in the employment actions that Greenberg claims violated those statutes. On appeal, Greenberg no longer presses his Title VII failure-to-promote claim against NYC Health + Hospitals (App. Br. 40), attributing that decision solely to Reede, who unquestionably worked only for SUNY. While Greenberg has not abandoned his Title VII termination claim, he does not attribute anti-Jewish discriminatory animus to any NYC Health + Hospitals employee, let alone identify evidence showing that any such employee played a role in his termination (App. Br. 49-54). His FMLA claims also suffer from the same flaw. NYC Health + Hospitals did not refuse to grant him leave, refuse to reinstate him after he supposedly took leave, or terminate him in retaliation for attempting to take, or actually taking, leave.

Finally, even leaving aside the joint employer issue, the district court correctly concluded that Greenberg failed to raise a genuine issue of fact as to whether the challenged employment decisions violated Title VII or the FMLA. We defer to SUNY, Greenberg's direct employer, for a full analysis of why the district court's grant of summary judgment should be affirmed on that basis.

# ARGUMENT

## POINT I

### NYC HEALTH + HOSPITALS IS NOT LIABLE TO GREENBERG BECAUSE IT WAS NOT HIS EMPLOYER

The existence of an employer-employee relationship is a necessary element of Greenberg's Title VII and FMLA claims. *See Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006) (Title VII); *Moreau v. Air France*, 343 F.3d 1179, 1190-91 (9th Cir. 2003) (FMLA). And, on this record, Greenberg cannot make use of either of the two narrow exceptions to the general rule that employment actions may be maintained only against a plaintiff's direct employer. *See Griffin v. Sirva Inc.*, 835 F.3d 283, 292. Greenberg has foregone any reliance on the first exception—the single employer doctrine.[8] And, as we show

---

[8] This is a wise decision. A single employer situation exists "where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a single employer." *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985). This Court looks at four factors to determine whether two separate entities should be considered a single employer for purposes of employment claims: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *See Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995). Here, the affiliation agreement makes abundantly clear that HHC and SUNY are distinct entities with separate management, operations, ownership, and control (A1469-1503).

below, NYC Health + Hospitals cannot be liable to Greenberg under the other exception, the joint employer doctrine.

Under that doctrine, an employee is "formally employed" by one entity but has been "assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity[.]" *Arculeo v. On-Site Sales & Mktg., L.L.C.*, 425 F3d 193, 198 (2d Cir. 2005). This Court has not yet articulated a definitive test for what constitutes joint employment in the context of Title VII or FMLA. *See Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 30 (2d Cir. 2015) (Title VII) (summary order); *Voltaire v. Home Servs. Sys.*, 823 F. Supp. 2d 77, 96 (E.D.N.Y. 2011) (FMLA).

The Court has, however, identified a number of factors relevant to determining whether a defendant qualifies as a joint employer, including "commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *NLRB v. Solid Waste Servs.*, 38 F.3d 93, 94 (2d Cir. 1994) (per curiam); *accord* 29 C.F.R. § 825.106(b)(1) (under FMLA, a "determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its

totality"). These factors, especially when viewed cumulatively, undermine Greenberg's contention that NYC Health + Hospitals was his joint employer.

### A. NYC Health + Hospitals could not and did not terminate Greenberg's employment.

First, NYC Health + Hospitals had no power to terminate Greenberg's employment. The affiliation agreement expressly provides that physician providers like Greenberg are employees of SUNY Downstate (A1543). The section of the agreement entitled "Termination of Physician Providers, Post-Graduate Trainee and Students" affords NYC Health + Hospitals no right to discharge a physician provider from employment. Rather, the agreement limits NYC Health + Hospitals to requesting that Downstate reassign a particular physician provider to a facility other than KCHC (A1520-21).

Greenberg claims that this provision is enough to predicate employer liability (App. Br. 23). But the ability to request a transfer or reassignment does not give rise to an employer/employee relationship. *See*, *e.g.*, *Liotard v. FedEx Freight Corp.*, 2016 U.S. Dist. LEXIS 34754 (S.D.N.Y. Mar. 17, 2016) (no joint employer relationship where

defendants had ability to terminate plaintiff's placement at their facility but no authority to fire her); *Conde v. Sisley Cosmetics USA, Inc.*, 2012 U.S. Dist. LEXIS 72726, at *12 (S.D.N.Y. May 22, 2012) ("entity that has the power to request that an employee be moved but not to cause her to be terminated is not a joint employer"); *McCray v. CUNY*, 2011 U.S. Dist. LEXIS 31326, at *11 (S.D.N.Y. Mar. 25, 2011) (entity's request "that a security guard no longer be assigned to its work sites does not in itself give rise to an employer-employee relationship").

Moreover, the record is clear that the decision to terminate Greenberg's employment was made by Downstate pursuant to its disciplinary procedures, not by not NYC Health + Hospitals. Cuiman, the assistant vice-president in Downstate's labor relations office who investigated Greenberg, testified at his deposition that the decision to terminate Greenberg was made by him, Reede, Bernadel—an associate in the labor relations office who also investigated Greenberg—and Conde-Billy, Downstate's director of labor relations, without input from KCHC or its officials (A1674-75). Bernadel similarly testified that during her investigation of Greenberg she did not consult with anyone at KCHC (A1677-78). Indeed, Greenberg himself essentially concedes

this point in his brief, referencing Reede's alleged "single-minded campaign" against him and "her decision to terminate" him (App. Br. 49).

## B. NYC Health + Hospitals did not hire Greenberg.

Likewise, Greenberg was hired by Downstate, not NYC Health + Hospitals. The affiliation agreement authorizes Downstate to "follow its own internal personnel policies and procedures" when hiring physician providers like Greenberg and expressly provides that those physician providers are employees of Downstate (A1485, 1543). In Greenberg's case, he received his initial appointment as an assistant professor of clinical radiology in response to a job posting by Downstate (A1210-11). While the letter from Downstate confirming his appointment referenced the affiliation agreement and assigned him to KCHC (A1199), Greenberg has adduced no evidence showing that NYC Health + Hospitals had any role in his hiring or assignment.

Indeed, nearly a decade later, after Greenberg had temporarily resigned his professorship and was working part-time as an hourly employee, Salvatore Scalfini, then chair of SUNY Downstate's radiology department, unilaterally reassigned Greenberg from KCHC to

University Hospital, a SUNY facility (A1062-63, 1067-73). And when Scalfini later rehired Greenberg to a full-time position as an assistant professor of clinical radiology in Downstate's college of medicine and reassigned him to KCHC, the offer letter explicitly defined the "terms and conditions of [Greenberg's] employment by the State University of New York (SUNY) acting on behalf of its Department of Radiology, Downstate Medical Center" (A1453-56). NYC Health + Hospitals played no role in any of these employment decisions, either.

### C. NYC Health + Hospitals could not and did not discipline Greenberg.

In addition to neither hiring nor firing Greenberg, NYC Health + Hospitals also lacked any authority to discipline him. Greenberg was a member of the UUP union, which represents most physicians employed by SUNY, and was covered by the collective bargaining agreement between the State and UUP (A1254, 1260-1388). NYC Health + Hospitals and KCHC were not participants in the collective bargaining process that led to the agreement; nor are they signatories to the agreement (*id.*). Accordingly, Greenberg cannot claim that NYC Health + Hospitals had any power to discipline him, as it was not a party to the

collective bargaining agreement setting forth the rules for doing so. Nor does the record reveal the slightest NYC Health + Hospitals involvement in the disciplinary proceedings conducted by SUNY's labor relations office that culminated in Greenberg's termination.

### D. NYC Health + Hospitals did not control Greenberg's pay, insurance, or employment records.

In addition to lacking control over the most basic functions of Greenberg's employment—hiring, firing, and discipline—NYC Health + Hospitals also had little connection with Greenberg's pay, insurance, or basic employment records. Greenberg's personnel file was maintained by SUNY Downstate (A993-1244). His time and attendance records also were maintained by SUNY Downstate (A1389-1452). His health insurance and related benefits were provided by virtue of his employment at Downstate (A1084-85, 1097-98).

Downstate may have used payments it received from NYC Health + Hospitals under the affiliation agreement to pay Greenberg (*see* A1518). But that hardly means, as Greenberg asserts (App. Br. 23), that KCHC paid his salary. Indeed, Greenberg cannot deny that he was paid directly by Downstate and received periodic pay increases in accordance

29

with the terms of the collective bargaining agreement between UUP and the State of New York (*e.g.*, A1042, 1048, 1455).

### E. NYC Health + Hospitals did not directly supervise Greenberg.

Greenberg's contention that he was supervised by NYC Health + Hospitals rests upon Pulitzer's July 2014 appointment as interim chief of service for radiology at KCHC (App. Br. 22). But he ignores that under the affiliation agreement, the chief of service for radiology, unlike the chiefs of service for other departments, "shall not become an employee of Health + Hospitals" (A1486). And in any event, "[l]imited and routine supervision, without an ability to hire, fire, or discipline, cannot justify a finding of joint employer status." *AT&T v. NLRB*, 67 F.3d 446, 452 (2d Cir. 1995); *see also Moreau*, 343 F.3d at 1189-90 (for FMLA purposes, airline did not jointly employ airport ground maintenance workers even though airline representatives directly supervised and trained workers).[9]

---

[9] Greenberg's claim that the affiliation agreement obliged him "to observe and follow KCHC's policies, procedures, ruled and regulations" (App. Br. 22) rests on assertions in his own declaration (A806) not citation to the agreement. In any event, Greenberg provides no authority for the proposition that KCHC's grant of clinical privileges to qualified Downstate physicians (A1485) makes them KCHC employees.

## POINT II

## EVEN IF NYC HEALTH + HOSPITALS WERE DEEMED A JOINT EMPLOYER, IT PLAYED NO PART IN THE DECISIONS GREENBERG CHALLENGES

Even leaving aside the joint employer question, Greenberg failed to adduce evidence sufficient to defeat summary judgment on his Title VII termination claim and his FMLA interference and retaliation claims. On these issues, NYC Health + Hospitals largely defers to Downstate, which unquestionably was Greenberg's direct employer, to explain why the district court's dismissal of those claims on the grounds advanced by the SUNY defendants was correct and should be affirmed. We separately note additional and specific reasons why the Title VII termination claim and the FMLA claims would still fail as to NYC Health + Hospitals even if it could be deemed to be Greenberg's joint employer: in a nutshell, it had no involvement in the allegedly discriminatory and retaliatory acts.

### A. Greenberg's Title VII claim against NYC Health + Hospitals would still fail because it had no role in his termination, let alone one motivated by discriminatory animus.

"Even where two companies are deemed a joint employer … it is not necessarily the case that both are liable for discriminatory conduct in violation of Title VII." *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009), *aff'd*, 375 F. App'x 54 (2d Cir. 2010) (summary order). Here, Greenberg has acknowledged that he does not have a colorable failure-to-promote claim against NYC Health + Hospitals because that decision was, he claims, attributable solely to Reede's supposed anti-Jewish animus (App. Br. 40, 44). Yet he continues to press his termination claim against NYC Health + Hospitals even though he also ascribes that decision, like the promotion decision, to Reede's alleged anti-Jewish animus (*see* App. Br. 49 (arguing that "the question as to the motives driving [Reede's] decision to terminate Greenberg … should be determined by a jury")).

NYC Health + Hospitals, which had no part whatsoever in Greenberg's termination—let alone a role even allegedly motivated by anti-Jewish animus—cannot have committed a violation of Title VII. *See AT&T*, 67 F.3d at 451 (even if petitioner were a joint employer, it

32

still could not have violated labor relations act because it played no role in the decision to terminate the contract with respondent nor was it a party to the contract). Even accepting Greenberg's unsupported contention that Jameladdine, KCHC's chief medical officer, played a "significant role" in Greenberg's termination (App. Br. 23), Greenberg's termination claim would still fail because Greenberg does not claim that Jameladdine, or any other KCHC employee, harbored any anti-Jewish animus against him (*see* A1256). Thus, his allegations of discriminatory treatment involve only conduct by Downstate.[10]

And beyond that, the record contains no indication that Greenberg brought forth any allegations of discrimination to Jameladdine or to KCHC's labor relations or equal employment opportunity offices—he did so only in discussions with Downstate's labor relations office (A1002). *See Lima*, 634 F. Supp. 2d at 400 (plaintiff must show that

---

[10] As noted, *supra* at 10, 30, Pulitzer remained a Downstate employee after he was appointed interim chief of service for radiology at KCHC in July 2014. But even if he were considered a KCHC employee, Greenberg does not claim that Pulitzer, who like Greenberg is Jewish, harbored discriminatory animus against him on the basis of religion. Indeed, Greenberg describes Reede as the "architect of the campaign against him," a "puppet-master to" Pulitzer, who "merely aided and abetted" Reede's "discriminatory animus" (App. Br. 9, 50)).

33

joint employer knew or should have known of alleged discriminatory conduct and failed to take corrective measures within its control).

**B. For similar reasons, Greenberg's FMLA claims against NYC Health + Hospitals would also still fail.**

Similarly, even if NYC Health + Hospitals were deemed to be Greenberg's joint employer, it still would not be liable to him under the FMLA. "In joint employment relationships, only the primary employer is responsible for giving required notices to its employees, providing FMLA leave, and maintenance of health benefits." 29 C.F.R. 826.106(c). "Factors considered in determining which is the primary employer include authority/responsibility to hire and fire, assign/place the employee, make payroll, and provide employment benefits." *Id.* Each of these factors supports a determination that Downstate, not NYC Health + Hospitals, was Greenberg's primary employer. *See supra* at 25-30.

"Job restoration is the primary responsibility of the primary employer." 29 C.F.R. 826.106(e). As Greenberg's secondary employer, NYC Health + Hospitals was responsible only for (1) accepting Greenberg upon his return from leave; (2) refraining from interfering with Greenberg's rights under the FMLA; and (3) refraining from

discharging or discriminating against Greenberg for opposing a practice which is unlawful under the FMLA. *Id*. The record shows no breach of these principles by NYC Health + Hospitals.

Even assuming Greenberg was entitled to take—and actually took—FMLA leave on September 4 and 5, 2014, it is undisputed that he returned to work on September 8, the following Monday. Greenberg nonetheless claims, in support of his interference theory, that he was not restored to the same terms and conditions of employment because the settlement agreement he reached with Downstate was a type of de facto probation (App. Br. 28-31). But NYC Health + Hospitals was not a party to that agreement, which was the result of a disciplinary proceeding conducted by Downstate's labor relations office without any participation by NYC Health + Hospitals (A216-17). Similarly, Downstate's decision to terminate Greenberg's employment was made following an investigation and disciplinary proceeding conducted by Downstate's labor relations office alone, without any consultation with, input from, or participation by NYC Health + Hospitals (A1247, 1674-75, 1677-78). Accordingly, even if NYC Health + Hospitals were deemed

Greenberg's joint employer, Greenberg cannot establish an FMLA interference or retaliation claim against NYC Health + Hospitals.

## CONCLUSION

This Court should affirm the grant of summary judgment to defendants-appellees New York City Health and Hospitals Corporation and Kings County Hospital Center.

Dated:  New York, NY
   June 2, 2020

       Respectfully submitted,

       JAMES E. JOHNSON
       *Corporation Counsel*
       *of the City of New York*
       Attorney for City Appellees


     By:  /s/  Jonathan A. Popolow
       JONATHAN A. POPOLOW
       Assistant Corporation Counsel

       100 Church Street
       New York, NY 10007
       212-356-4084
       jpopolow@law.nyc.gov

RICHARD P. DEARING
DEBORAH A. BRENNER
JONATHAN A. POPOLOW
 *of Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word 2010, and according to that software, it contains 6,623 words, not including the table of contents, table of authorities, this certificate, and the cover.


**_/s/ Jonathan A. Popolow_**
JONATHAN A. POPOLOW