# 19-3570-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

➤➤ ◄◄

MD ODED GREENBERG,

*Plaintiff-Appellant,*

*v.*

STATE UNIVERSITY HOSPITAL-DOWNSTATE MEDICAL CENTER, AKA THE STATE
UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER AT BROOKLYN, AKA
STATE UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL CENTER, NEW YORK CITY
HEALTH AND HOSPITALS CORPORATION, KINGS COUNTY HOSPITAL CENTER
DEBORAH L. REEDE, STEVEN PULITZER,

*Defendants-Appellees,*

*and*

UNITED UNIVERSITY PROFESSIONS, (UUP), SUNY DOWNSTATE MEDICAL CENTER
CHAPTER OF UNITED UNIVERSITY PROFESSIONS, JOHN AND JANE DOES 1-20

*Defendants.*

————————

*On Appeal from the United States District Court
for the Eastern District of New York*

## REPLY BRIEF FOR
## PLAINTIFF-APPELLANT

CARDI & EDGAR LLP
*Attorneys for Plaintiff-Appellant
M.D. Oded Greenberg*
99 Madison Avenue, 8th Floor
New York, New York 10016
212-481-7770

## **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ..............................................................1

II. ARGUMENT ....................................................................................5

   1. PLAINTIFF PRODUCED SUFFICIENT EVIDENCE TO WARRANT
     A TRIAL ON THE ISSUE AS TO WHETHER THE SUNY AND
     CITY DEFENDANTS INTERFERED WITH HIS RIGHT TO FMLA
     LEAVE ..........................................................................................5

   2. PLAINTIFF'S FMLA RETALIATION CLAIM MUST BE DECIDED
     BY A JURY BECAUSE THE RECORD SUPPORTS THE FACT
     THAT HE ENGAGED IN PROTECTED ACTIVITY AND THOSE
     TERMINATING HIS EMPLOYMENT WERE THE SAME
     DECISION-MAKERS WHO DENIED HIS REQUEST FOR LEAVE..11

   3. PLAINTIFF'S TITLE VII CLAIMS AGAINST THE SUNY AND
     CITY DEFENDANTS SHOULD BE DECIDED BY A JURY IN
     LIGHT OF DR. REEDE'S ANTI-SEMITIC REMARKS AND OTHER
     CIRCUMSTANTIAL EVIDENCE ...........................................13

      A. PLAINTIFF'S TITLE VII FAILURE TO PROMOTE CLAIM IS
        SUPPORTED BY EVIDENCE THAT MUST BE RESOLVED
        BY A JURY …………………………………………….15

      B. PLAINTIFF'S TITLE VII TERMINATION CLAIM IS
        SUPPORTED BY EVIDENCE THAT MUST BE RESOLVED
        BY A JURY …………………………………………17

   4. THE ADMISSIBLE EVIDENCE SUFFICIENTLY ESTABLISHES
     THAT THERE ARE MATERIAL FACTUAL DISPUTES AS TO
     WHETHER HHC WAS PLAINTIFF'S JOINT EMPLOYER AND
     LIABLE UNDER TITLE VII ...............................................19

   5. THE ADMISSIBLE EVIDENCE SUFFICENTLY ESTABLISHES
     THAT THERE ARE MATERIAL FACTUAL DISPUTES AS TO
     WHETHER HHC WAS LIABLE UNDER THE FMLA AS A JOINT
     EMPLOYER …………………………………………………25

III. CONCLUSION ..............................................................................27

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

<u>Page</u>

*Bell v. Prefix, Inc.*,
  05 Civ. 74311, 2007 WL 2109569 (E.D. Mich. July 23, 2007) ……….........9

*Bell v. Prefix, Inc.*, 321 Fed. Appx. 423 (6th Cir. 2009) …………………..........9

*Fioto v. Manhattan Woods Golf Enterprises et al.*,
  270 F. Supp. 2d 401 (S.D.N.Y. 2003) …………………………...................9

*Fioto v. Manhattan Woods Enterprises LLC, et al.*,
  123 Fed. Appx. 26 (2d Cir. 2005) …………………………………….........7

*Forsythe v. New York City Dept. of Citywide Administrative Services*
  733 F. Supp. 2d 392 (S.D.N.Y. 2010) …………………………..................20

*Gonzalez v. City of New York*,
  15 Civ. 3158, 2015 WL 9450599 at *3 (E.D.N.Y. Dec. 22, 2015) ………..23

*Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 186 (N.Y. 2017) …………………….......22

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) ………………...........7

*Lima v. Addeco*, 634 F. Supp. 2d 394 (S.D.N.Y. 2009) ………………..................20

*Liotard v. FedEx Freight Corp.*,
  2016 WL 1071034 (S.D.N.Y. March 17, 2016) ………………………..21 n.7

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.*,
  715 F.3d 102, 108-09 (2d Cir. 2013) …………………………………..24 n.9

*Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019) ……………………….....15

*Popat v. Levy*, 253 F. Supp. 3d 527 (W.D.N.Y. 2017) …………………………...22

## Cases (cont.)

**Page**

*Tomassi v. Insignia Fin. Group, Inc.*,
 478 F.3d 111 (2d Cir. 2007) .........................................................................18

*Vasquez v. Empress Ambulance Service, Inc.*,
 835 F.3d 267 (2d Cir. 2016) …………………………………….........25

## Rules and Regulations

29 C.F.R. § 825.106 ........................................................................25 & 26

29 C.F.R. § 825.220(d) ……………………………………………………….3

# I. PRELIMINARY STATEMENT

Plaintiff-Appellant Oded Greenberg ("Plaintiff" or "Dr. Greenberg") submits the instant reply brief in response to briefs in opposition of Defendant-Appellees State University Hospital-Downstate Medical a/k/a the State University of New York Health Science Center at Brooklyn a/k/a SUNY Downstate Medical Center (hereafter "SUNY"), Deborah L. Reede ("Dr. Reede"), and Steven Pulitzer ("Dr. Pulitzer") (collectively "SUNY Defendants") and Defendant-Appellees New York Health and Hospitals Corporation ("HHC") and Kings County Hospital Center ("KCHC") (collectively "City Defendants"). The briefs of the SUNY Defendants ("SUNY Defs. Opp. Br.") and the City Defendants ("City Defs. Opp. Br.") confirm that this Court should reverse the district court's grant of summary judgment in their favor to the extent requested in Plaintiff's initial brief.

In their briefs, the SUNY and City Defendants both emphasize the fact that the challenged adverse employment actions occurred in a context of an endangered residency program. *See* SUNY Defs. Opp. Br. at 3-4; City Defs. Opp. Br. at 9. Both support the premise that poor faculty supervision was the source of the program's failure. Dr. Reede's determination at all costs to turn around the program became a justification for prosecuting a course of action that ultimately trammeled Dr. Greenberg's rights, especially his Family Medical Leave Act ("FMLA") rights.

1

There is no gainsaying the fact that an employee's request for FMLA leave can come at an inconvenient time for an employer. Here, by the SUNY Defendants' own admission, Dr. Greenberg's request came at a time when the Radiology Department was short staffed due to Dr. Reede's purge of allegedly low-performing radiologists. (A565). Plaintiff's theory of the case is that Dr. Reede and Dr. Pulitzer were so focused on their turnaround of a troubled Department that they were willing to trammel employee rights along the way, including those of Dr. Greenberg.

The SUNY Defendants support the district court's decision regarding the FMLA interference claim by arguing that Dr. Greenberg lost his eligibility and coverage under the statute after admitting at the September 8, 2014 Labor Relations interrogation that on the first morning he took leave to care for his disabled son he changed his mind and intended to come to work but was prevented from doing so by the onset of a minor back injury. Consequently, the SUNY Defendants duck the central issue of the FMLA interference claim – whether Drs. Reede and Pulitzer were already on notice that the leave Dr. Greenberg sought at the time he asked for it on September 2nd and 3rd was protected by the FMLA. Defendants clearly avoid addressing this contested factual issue; instead, they focus on the irrelevant issue as to whether Dr. Greenberg may have changed his mind about availing himself of his FMLA rights. This was on the morning of

2

September 4th, at a moment in time **after** Dr. Reede and Dr. Pulitzer had already

interfered with his FMLA rights by denying his leave request. Notably,

"employees cannot waive, nor may employers induce employees to waive their

rights under FMLA." 29 C.F.R. 825.220(d). As for relevant issues, i.e., what Dr.

Greenberg and Dr. Pulitzer said to each other when discussing the sought-after

leave before it was taken and what, if any, care and support Dr. Greenberg was

able to provide his son on the days in question, the interrogation is silent. The

Labor Relations representative presiding over the interrogation never probed these

areas. This is fatal for SUNY Defendants' argument that Dr. Greenberg offered

inconsistent statements as to these central issues.

    As for the FMLA retaliation claim, the SUNY Defendants argue that the

district court correctly granted summary judgment because Dr. Greenberg did not

engage in protected activity under the statute and in any event the decision to

terminate him was not based on the FMLA leave he sought in early September.

The SUNY Defendants' first argument is answered by Dr. Greenberg's contention

that he engaged in FMLA-protected activity. As to SUNY Defendants' contention

that Dr. Greenberg must show direct evidence that the SUNY and City Defendants

based his eventual termination on the September 4th and 5th absences, that simply

is not the law. In any event, as argued in Plaintiff's initial brief, the fact that the

same decision-makers who punished him for taking a FMLA leave terminated him shortly thereafter is sufficient to make retaliatory intent a question for a jury.

With respect to Dr. Greenberg's Title VII claims, the SUNY Defendants reiterate much of the district court's reasons for granting summary judgment with respect to them. They claim that anti-Semitic remarks attributed to Dr. Reede are stray and insufficient to support an inference of discriminatory intent. In the initial brief and below, Dr. Greenberg argues that Dr. Reede's remarks are far from stray in that they support the theory that she was impatient with her Jewish colleagues who took too many days off while she was desperately attempting to turn the department around.

Lastly, in their brief, the City Defendants seek to escape liability by arguing that they were not Dr. Greenberg's joint employer. The multi-factor test for assessing whether HHC was Dr. Greenberg's joint employer has sufficient factual disputes to make it a foregone conclusion that it is an issue for a jury. As for whether HHC should be held liable under both Title VII and the FMLA as a joint employer given the circumstances, that issue must also be decided by a jury since Dr. Pulitzer was arguably both a representative of the SUNY Defendants and the City Defendants when he made employment decisions adverse to Dr. Greenberg.

## II. ARGUMENT

1. **PLAINTIFF PRODUCED SUFFICIENT EVIDENCE TO WARRANT A TRIAL ON THE ISSUE AS TO WHETHER THE SUNY AND CITY DEFENDANTS INTERFERED WITH HIS RIGHT TO FMLA LEAVE**

One of the centerpieces of the SUNY Defendants' argument that Dr. Greenberg's interference claim under the FMLA fails is that he wrote an email in the morning of September 5, 2014 to Dr. Reede's administrative assistant and Dr. Pulitzer that he had intended to come to work the day before because his mother-in-law had arrived to assist in the care of his special-needs son, the reason for which he insists he sought leave in the first instance, but a back injury occurring that morning prevented his return. The SUNY Defendants view this email as a "gotcha" moment, especially when it is viewed alongside his statements at the September 8th interrogation.[1] It is only so if the Court endorses the SUNY Defendants' mischaracterization of the record.

---

[1] The SUNY Defendants appear to make the argument that they were compliant with FMLA because they were permitted to take Dr. Greenberg at his word when he wrote on September 5th that the reason for being absent on September 4th and 5th was because of a minor back injury. *See* SUNY Defs. Br. at 49. This argument overlooks the fact that this email was only part of a discussion continued at his interrogation, knowledge of which must be imputed to the SUNY Defendants as it was told to one of its representatives. Additionally, Dr. Greenberg wrote a follow-up email to Dr. Reede and Dr. Pulitzer on September 15, 2014 continuing the discussion. *See*, *infra*, at 11. Also notable is the SUNY Defendants' misleading impression that Dr. Pulitzer's contemporaneous notes indicate that Dr. Greenberg failed to state his reasons for needing a leave on September 4th and 5th. *See* SUNY Defs. Br. at 8. Dr. Pulitzer did not write in sum and substance, "Dr. Greenberg refused to provide the reason for needing a leave for these two days." (A157 & A171). Presumably, if Dr. Greenberg had refused to provide a reason for seeking the leave, then it would have been an important point for Dr. Pulitzer to memorialize.

Contrary to SUNY Defendants' representations, Dr. Greenberg's statements at the September 8, 2014 interrogation clarify that the reasons he sought to take leave on September 4th and 5th triggered the protections of the FMLA. What Dr. Greenberg stated in sum and substance were as follows: (1) he had to take the days off because he had a special-needs son who had been kicked out of his school and he needed to spend time with him; (2) he further mentioned that at the last minute, between 8 and 10 a.m. on the morning of September 4th, he understood that his mother-in-law could help care for his special- needs son and therefore he contemplated going to work at that point; and (3) Dr. Greenberg then injured his back while getting ready to go to work on the morning of September 4th. (A183-85). The SUNY Defendants then offer an off-hand remark by Dr. Greenberg where he observes the irony of the situation, "I initially wanted to take time off for one reason [to take care of his special needs son] and it turned out I had to take the time off for another [to rest his injured back]," as smoking gun evidence that the FMLA-eligible reason that he provided (i.e., care of his special-needs son) was somehow superseded or subject to recantation by the candid disclosure of his unforeseen back injury. But as we argued in our initial brief both the fact that Dr. Greenberg was no longer the only family member able to provide care to his special-needs son and the sudden onset of a limiting back injury during the course

6

of his eligible FMLA leave did not strip him of his right to that leave. *See* Brief and Special Appendix For Plaintiff-Appellant ("Plaintiff Br.") at 36-37.

If the SUNY Defendants' argument is that Dr. Greenberg's statement shows that he never intended to take care of his disabled son, the record disposes of the argument. Dr. Greenberg did not retract his initial reason for seeking a leave. Rather, his statement was nothing more than a comment on the fact that his initial reason was frustrated by his back injury. The fact remains that the record below is clear on the point: Dr. Greenberg always insisted that the reason he sought the leave was to spend time with his special-needs son and make arrangements for changes in his care. This Court has noted that a plaintiff satisfies the "needed to care for" element of an FMLA interference claim by showing that either he intended or actually provided care to a family member. *See Fioto v. Manhattan Woods Enterprises LLC, et al.*, 123 Fed. Appx. 26, 28 (2d Cir. 2005) (granting summary judgment where the plaintiff failed to show that "he intended to provide care for his mother at the hospital or actually gave her such support during his visit").

Without citing to *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), SUNY Defendants characterize Dr. Greenberg's insistence at his deposition that he always intended to take care of his special needs son as insufficient to create a material factual dispute because it is a statement during litigation that is directly

contrary to pre-litigation admissions, i.e., what he said to Dr. Reede's assistant and

Dr. Pulitzer in the September 5th email and again at his interrogation.  But notably

what Dr. Greenberg stated at his deposition is substantially the same account he

gave at the September 8, 2014 interrogation: that he sought a leave to take care of

his son, that on the morning of September 4th, a moment when the FMLA leave

was already under way, his mother-in-law was available to provide his son with

support, and that he injured his back on the morning of September 4th.  (A533).

The only shift in the two accounts is that in his September 5th email and at the

interrogation he stated that he intended to come to work once he learned of his

mother-in-law's availability while at his deposition he insisted that he always

intended to stay home to take care of his son.  (*Id.*)  All other aspects of his account

remain the same - hardly, a *Jeffreys*-type situation warranting the decision not to

credit the later contradictory statement.

As for Dr. Greenberg's explanation for stating that he intended to come to

work both in the email and at the interrogation when he had no such intention, the

jury should decide whether it is utterly lacking in credibility.  A reasonable juror

could find that Dr. Greenberg's anxiety about losing his job, based both on Dr.

Pulitzer's letter threatening to send him to Labor relations and Dr. Pulitzer's claim

10 days earlier that Dr. Reede was out to get him (A372), eventually eroded his

courage in insisting on taking leave to care for his disabled son.

8

Finally, to the extent that the State Defendants' argument is, that due to his back injury Dr. Greenberg did not actually provide care to his special-needs son and therefore does not satisfy the "needed to care for" element of his interference claim, the record is clear that he nonetheless did.[2] When questioned at his deposition on this point, Dr. Greenberg responded: "[] I spent all day with him cheering him up and basically providing some emotional and psychological comfort for him." (A534). As this Court well knows, what constitutes providing care is a lenient standard: "mere interaction with [the family member]" will do. *Bell v. Prefix, Inc.*, 05 Civ. 74311, 2007 WL 2109569, at *4 (E.D. Mich. July 23, 2007) (*quoting Fioto v. Manhattan Woods Golf Enterprises et al.*, 270 F. Supp. 2d 401, 405-06 (S.D.N.Y. 2003); *accord Bell v. Prefix, Inc.*, 321 Fed. Appx. 423, 427 (6th Cir. 2009) ("An employee may 'care' for a sick family member in a number of ways, including by … providing 'psychological comfort and reassurance'"). Therefore, even if Dr. Greenberg's mobility was limited due to a back injury on the days that he was out on FMLA leave, he nonetheless provided the kind of "emotional and psychological comfort" that satisfies the FMLA in testimony that was not contradicted by any of his previous statements.

---

[2]While this Court has not expressly held that a plaintiff satisfies the "needed to care for" element of a FMLA interference claim by showing only that he intended to provide care rather than showing both that he intended to provide care and actually did so, *Fioto* appears so to suggest. *See Fioto*, 123 Fed. Appx at 28.

The insurmountable problem for the SUNY Defendants in arguing that Dr. Greenberg contradicted himself at his deposition testimony is the fact that Mr. Michael Arabian, the Labor Relations representative who presided over the interrogation, failed to recognize that the FMLA was implicated by Dr. Greenberg's leave request. This is shocking in light of the fact that the office of Labor Relations is the SUNY authority on FMLA matters. It is indisputable that Mr. Arabian did not inquire as to the details that proved relevant here – what exactly Dr. Greenberg stated to Dr. Pulitzer when he sought the leave and what, if any, care he provided to his son when he suffered a back injury. Since he did not explore these areas, the SUNY Defendants cannot make a credible case that Dr. Greenberg contradicted himself on these crucial points.

Mr. Arabian's failure to recognize that FMLA was in play by what he heard at the interrogation supports Plaintiff's theory that the SUNY and City Defendants either were ignorant of or callous to their employees' FMLA rights. In this regard, we remind the Court of the email exchange between Dr. Reede and Dr. Pulitzer on September 16, 2014 where they appear to be amused by, but determined not to respond to, Dr. Greenberg's continued attempts to justify his September 4th and 5th leave because of a family issue. (A698-700). Notably, their response is devoid of any statements refuting that he ever mentioned family circumstances during his initial leave request and devoid of any attempt to gather further details. Their

10

response is indicative of a cavalier attitude towards Dr. Greenberg's FMLA rights.

Further troubling is evidence that Dr. Reede's assistant and the Department's

timekeeper noted on Dr. Greenberg's official time sheet for September 2014 that

the two absences at issue were for FMLA leave, which time sheets were approved

by Labor Relations.  (A1398 and A805).

In light of the foregoing, Dr. Greenberg's deposition testimony that he

related to Dr. Pulitzer the FMLA-eligible reasons for his requested leave must be

credited and the question as to whether the SUNY and City Defendants interfered

with his FMLA rights is necessarily a question for a jury.

**2. PLAINTIFF'S FMLA RETALIATION CLAIM MUST BE DECIDED BY A JURY BECAUSE THE RECORD SUPPORTS THE FACT THAT HE ENGAGED IN PROTECTED ACTIVITY AND THOSE TERMINATING HIS EMPLOYMENT WERE THE SAME DECISION-MAKERS WHO DENIED HIS REQUEST FOR LEAVE**

In addition to arguing that Dr. Greenberg did not engage in protected activity

to support a FMLA retaliation claim, SUNY Defendants argue that there is no

indication that Dr. Greenberg's termination was related to his denied leave request.

Thus they appear to suggest that their decision to send him to Labor Relations

upon his return from FMLA protected leave was driven by the "hope" that he

"would be counseled, agree to a particular schedule, and then abide by it."  SUNY

Defs. Br. at 51.

11

The record does not support the theory that Dr. Reede and Dr. Pulitzer were interested in Dr. Greenberg's reform or improvement. Rather, their email exchange on September 16th and the close surveillance of Dr. Greenberg after his interrogation suggested a determined effort to closely monitor him in the hopes of catching him if he stumbled, as alluded to by Dr. Pulitzer when he warned Dr. Greenberg on August 22nd that Dr. Reede was out to catch him.

The SUNY Defendants appear to view Dr. Greenberg's retaliation claim as depending on direct evidence that his termination was because of his September 4th and 5th absences. *See id.* That simply is not the case, as it is patently obvious that circumstantial evidence is sufficient. Here, where the same decision-makers who denied his FMLA leave were integral to his termination six weeks later, there is sufficient circumstantial evidence to render the issue one for the jury.[3]

Further, it is important to note that there were two bases for Dr. Greenberg's referral to Labor Relations in October: first, he was accused of using an unapproved attestation; **and** he was accused of engaging in a second episode of "unauthorized leave" (A277-78). The second "unauthorized leave" occurred in the context of Dr. Greenberg seeking a two-hour leave to further attend to matters

---

[3]It bears repeating that Dr. Greenberg's absences on September 4th and 5th resulted in his termination in that he was initially referred to Labor Relations for "unauthorized leave" and subsequently coerced into signing a "Last Chance Agreement." Dr. Greenberg's termination was then predicated on his breach of the Last Chance Agreement, which represented "a last chance" despite no history of prior "chances," discipline or progressive discipline during his nearly 30-year tenure with the SUNY and City Defendants.

12

related to his disabled son. (A293-94). Thus, this second referral to Labor Relations that led to Dr. Greenberg's termination was, in fact, a repetition of key aspects of the first referral: it was presided over by Dr. Pulitzer and at least partially caused by Dr. Greenberg's requests for leaves of absence related to his disabled son. These facts are certainly enough to make the issue of the SUNY and City Defendants' retaliatory intent a matter to be decided by a jury where Plaintiff need only show that his attempt to exercise his FMLA rights was a "negative factor" in the termination decision.

**3. PLAINTIFF'S TITLE VII CLAIMS AGAINST THE SUNY AND CITY DEFENDANTS SHOULD BE DECIDED BY A JURY IN LIGHT OF DR. REEDE'S ANTI-SEMITIC REMARKS AND OTHER CIRCUMSTANTIAL EVIDENCE**

The SUNY Defendants support the district court's decision with respect to Dr. Greenberg's Title VII claims by reiterating that Dr. Reede's anti-Semitic comments are insufficient to overcome summary judgment.

First, SUNY Defendants argue that Dr. Reede's comments are irrelevant to Dr. Greenberg because their animus appears directed at Orthodox Jews, which Dr. Greenberg is not. As an initial matter, at least one of Dr. Reede's comments is applicable to secular Jews in addition to Orthodox Jews, i.e., when she stated that she wished she were Jewish in order to make use of the numerous Jewish holidays. Like many of his colleagues, both Orthodox and secular Jews, Dr. Greenberg did not work on numerous Jewish holidays such as Passover. (A1436-37). In this

13

regard, he, like his other Jewish colleagues, could be viewed as not pulling their weight when it came to time and attendance.  In any event, one of the comments attributed to Dr. Reede by Ms. Esther Neiman, "Your people" (A815-16), suggests a willingness to lump Orthodox and secular Jews into one group.  The Court should swiftly reject the suggestion that the animus implied by these comments could be rationally limited to an animus directed only towards Orthodox Jews.

The SUNY Defendants also support other points made by the district court about the Title VII claims that, for example, there is a considerable time lag between Dr. Reede's anti-Semitic remarks and her adverse employment decisions regarding Dr. Greenberg; and that she did, in fact, renew Dr. Greenberg in June of 2014, promoted a Jewish physician (Dr. Craig Linden) and therefore should receive the benefit of the same-actor inference.

As noted in the initial brief, these points do not resolve the issue of Dr. Reede's alleged anti-Semitic bias.  At the same time that Dr. Reede was "hiring" Dr. Greenberg, she had already initiated a surveillance campaign of him with the assistance of Dr. Pulitzer. [4]  In addition, in spite of Dr. Greenberg's prior experience as head of the ER Radiology Department, she never seriously

---

[4] The SUNY Defendants overemphasize the fact that Dr. Reede "hired" Dr. Greenberg.  She did not "hire" Dr. Greenberg; rather, she passively renewed his contract while simultaneously placing him on a kind of secret probation by having his activities monitored by Dr. Pulitzer.  *See* Pl. Br. at 11.

considered returning him to that position when it became available in the summer of 2014.

Dr. Greenberg's case is not solely supported by a stray remark as was the case in *Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019). Rather, here, there is the relatively rare instance of a plaintiff in an employment case able to produce admissible evidence that not only expresses the animus at issue (anti-Semitism) but is also relevant to the plaintiff's litigation theory (that in her zeal to turn around the ailing Radiology Department Dr. Reede was willing to trample on the civil and FMLA rights of her employees). Dr. Greenberg provided that rare piece of evidence and yet the district court and SUNY Defendants insist that it is not enough to warrant a jury trial on his Title VII claims.

## A. PLAINTIFF'S TITLE VII FAILURE TO PROMOTE CLAIM IS SUPPORTED BY EVIDENCE THAT MUST BE RESOLVED BY A JURY

In supporting the district court's decision with respect to the failure to promote claim, the SUNY Defendants mainly rehash the court's reasons for doing so, i.e., that Dr. Reede was justified in choosing Dr. Jinel Scott-Moore over Dr. Greenberg because she was more engaged in scholarly activity. The justification is unconvincing because Dr. Scott admitted that her primary mission as Director was primarily administrative and also because absent a job posting/description required under the extant collective bargaining agreement, Dr. Reede's comments regarding

15

the required qualifications are post-hoc rationalizations in an otherwise non-competitive promotion process. These justifications make no sense in the absence of provable job criteria and Dr. Scott's understanding of her primary mission having nothing to do with scholarly activity. Indeed, absent the bogus criteria, Dr. Greenberg was far more qualified in terms of education and experience, further emphasized by the fact that he had previously held the very same position a few years prior. Clearly, the "scholarly activity" criterion was a cover for an improper preference for Dr. Scott-Moore as it is generally understood that employers do not choose less qualified employees for business reasons.[5]

As for the SUNY Defendants' point that Dr. Greenberg had time and attendance issues, this basis is also easily dismissed. As mentioned in the initial brief, the "time and attendance" issue rears its head for the first-time during Dr. Reede's deposition, a few years after the event at issue. If nothing else, Dr. Reede was a prolific writer of memos to the file when she had an encounter with an employee that she was monitoring. In her memo to the file about the discussion she had with Dr. Greenberg about her decision not to appoint him to the Director position, there is no mention of "time and attendance" issues.

---

[5] Notably, SUNY Defendants cannot argue that Dr. Moore was clearly the better teacher than Dr. Greenberg. She, along with Dr. Reede, both admitted at their depositions that he was an excellent teacher. (A584 & A760).

16

In the end, with respect to the failure-to-promote claim, the SUNY

Defendants add very little beyond reiterating the reasons offered by the district

court to support the grant of summary judgment. While they attempt to offer

additional evidence of Dr. Greenberg's lack of scholarship and his time and

attendance issues, the effort misses the mark in the absence of provable job criteria,

Dr. Scott's understanding of her role having nothing to do with scholarship and the

fact that Dr. Reede never cited in contemporary memos Dr. Greenberg's "time and

attendance" issues as the reason not to promote him.[6]

In light of Dr. Reede's anti-Semitic remarks and issues of pretext

surrounding the promotion process, the district court clearly erred by not allowing

a jury to hear Dr. Greenberg's failure-to-promote claim.

### B. PLAINTIFF'S TITLE VII TERMINATION CLAIM IS SUPPORTED BY EVIDENCE THAT MUST BE RESOLVED BY A JURY

The SUNY Defendants attempt to support the district court's contention that

Dr. Greenberg failed to produce evidence of a *prima facie* case of wrongful

termination by arguing that he was terminated by committee thus muting the

implication that the decision was guided by Dr. Reede's discriminatory animus and

---

[6] Notably, the SUNY Defendants point to resident evaluations in support of their contention that Dr. Moore-Scott was a more attentive teacher than Dr. Greenberg. *See* SUNY Defs. Br. at 35 citing A852. This resident also states in the evaluation that Dr. Scott sometimes had difficulties finding time to teach. (A852). Another evaluation on the same document wrote: "Her lectures are not high-quality teaching experiences …." *Id.*

further that her suggested animus was only supported by a stray remark. These arguments fail.

First, SUNY Defendants did not form a committee to terminate Dr. Greenberg. His second referral to Labor Relations was at the instigation of Dr. Pulitzer and Dr. Reede who did so after conferring with Dr. Jamaleddine. Once Dr. Greenberg was referred to Labor Relations, the representatives there gathered information as to the facts and circumstances that led to the referral and then they presented them to Dr. Reede and Dr. Pulitzer. A fair characterization of the process is that Dr. Pulitzer and Dr. Reede were the primary decision-makers as to Dr. Greenberg's termination. They were the committee that decided to terminate him. Further, Dr. Reede's animus cannot be dismissed as supported by only a stray remark, especially given a willful denial of an emergent family leave request and pretextual actions involved in what can only be described as a sham promotional process. Therefore, any cases for the proposition that a stray discriminatory remark by one of many decision-makers who terminated an employee is insufficient, such as *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115-16 (2d Cir. 2007), completely misses the mark.

The SUNY Defendants also press the district court's point that there was a legitimate business reason for terminating Dr. Greenberg – his use of an unapproved attestation. There is one point that gets continually misrepresented

18

about this episode that needs to be corrected.  Dr. Greenberg did not attempt to
alter the medical records to which he had affixed the attestations at issue by
somehow hacking into the hospital's network and engaging in rogue activity as the
SUNY Defendants appear to suggest; rather, he asked an IT employee if it was
within the realm of possibility to change the attestation that he used and he made
the inquiry at the urging of a colleague who understood that it was causing a stir
among those who saw it.  (A813).  Dr. Greenberg's supposedly surreptitious
"cover up" was in truth merely asking a custodian of those records if re-attestation
was possible and then immediately backing away when that custodian told him that
it was possible to fix the reports but not proper.  This episode is not the rogue
activity the SUNY Defendants otherwise suggest.

In any event, the initial brief lays out how Drs. Reede and Pulitzer's conduct
leading up to the attestation episode and the exaggerated concern over the
unapproved attestation that Dr. Greenberg used were pretextual.  *See* Pl. Br. at 47-
54.

**4.    THE ADMISSIBLE EVIDENCE SUFFICIENTLY ESTABLISHES
THAT THERE ARE MATERIAL FACTUAL DISPUTES AS TO
WHETHER HHC WAS PLAINTIFF'S JOINT EMPLOYER AND
LIABLE UNDER TITLE VII**

As this Court well knows, there are situations where multiple employers
may be liable to an employee for a violation of Title VII.  One of those situations
occurs where two employers choose "to handle certain aspects of their employer-

employee relationships jointly." *Forsythe v. New York City Dept. of Citywide Administrative Services*, 733 F. Supp. 2d 392, 397 (S.D.N.Y. 2010) (quoting *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009)). The so-called joint employer theory of liability analyzes whether two employers have "'commonality of hiring, firing, discipline, pay, insurance, records and supervision.'" *Id.* *Forsythe* is particularly instructive as the facts there mirror Dr. Greenberg's employment relationship with both the SUNY and the City Defendants. Like Dr. Greenberg, the plaintiff in *Forsythe* had a direct employer, Tristar, that processed his paychecks and provided him with benefits. Tristar, like SUNY, had an agreement with another party (New York City) to provide security guards at the sites controlled by the other party (again, New York City) through a contract. Such an arrangement parallels SUNY's affiliation agreement with HHC whereby SUNY provided radiologists who practiced at KCHC. The plaintiff in *Forsythe* was subject to a collective bargaining agreement between his union and Tristar, which was the exact same arrangement here where Dr. Greenberg was subject to a collective bargaining agreement between his union and SUNY. What was crucial for the court in *Forsythe* to render the City liable as a joint employer was that it retained the right to reject and bar from its facility any Tristar employee. *See id.* at 398. According to the express terms of the affiliation agreement, HHC had that

right if it followed the contemplated procedure.[7]  (A1520-21).  In *Forsythe*, joint employer status is found there **because** the City was able to exert this kind of control.  Here, HHC had exactly the same power.

How the aforementioned provision worked in actual fact supports Dr. Greenberg's contention that HHC had and used this power to control its workplace. At her deposition, Dr. Reede testified that in or around the spring of 2014 Dr. Jamaleddine, the Chief Medical Officer of KCHC, requested that she replace Dr. Alan Kantor, the Chief of Service of the Radiology Department, because he viewed him as a weak leader.  (A601-02).   When pressed as to whether Dr. Jamaleddine's request was, in fact, a requirement she basically said yes.  (*Id.*).  In addition, at his deposition, Dr. Pulitzer stated that Dr. Jamaleddine made it clear to him that he would not let Dr. Greenberg return to practice at KCHC after the attestation episode.  (A713-14).  Dr. Pulitzer testified further by stating his belief that Dr. Jamaleddine had the power and discretion to override SUNY's decision to

---

[7] The City Defendants cite *Liotard v. FedEx Freight Corp.*, 2016 WL 1071034 (S.D.N.Y. March 17, 2016) and other cases for the proposition that an employer's ability to demand that an individual no longer be assigned to its site by a staffing agency is not a sufficient basis upon which to predicate joint employer liability.  *See* City Defs. Br. at 25-26.  In *Liotard*, the court limits that proposition to scenarios where the employee at issue remains employed and is quickly reassigned to another job site.  *See id.* at *5.  That is simply not how the relationship worked between SUNY and HHC.  If HHC prevented a SUNY radiologist from working at the KCHC that radiologist would be out of a job.  In any event, the power to fire is only one factor of many in deciding whether HHC was Dr. Greenberg's joint employer.

allow Dr. Greenberg back to work, if that was its decision, by not allowing him to practice at KCHC.  (*Id.*).

Under these circumstances, where KCHC had and routinely exercised its control over which SUNY Downstate radiologists provided services at KCHC, there is clearly a dispute of material fact, following *Forsythe*, as to whether HHC was a joint employer of Dr. Greenberg under Title VII.[8]

With respect to joint employer status under the New York State Human Rights Law ("NYSHRL"), this Court is well aware that district courts have differed as to what standard to use in finding indirect (i.e., "single" or "joint") employer liability under the NYSHRL.  *See Popat v. Levy*, 253 F. Supp. 3d 527 (W.D.N.Y. 2017).  This Court recently certified to the Court of Appeals the question as to whether the joint employer and/or single employer doctrines should be used in the context of holding an indirect employer liable for discriminating against the plaintiff due to his criminal history under relevant state law.  *See Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 186 (N.Y. 2017).  The Court of Appeals answered that under this particular provision of the NYSHRL the standard to be used was a four-factor test adopted by an earlier appellate court, which was comprised of the

---

[8] A further argument in favor of finding HHC as his employer is the fact that Dr. Greenberg's immediate supervisor who monitored his daily activities was Dr. Pulitzer qua agent of HHC as Interim Chief of Service, Department of Radiology, Kings County Hospital Center.  Notably, when Dr. Pulitzer wrote memos to personnel files regarding Dr. Greenberg, he did so on KCHC letterhead.  (A171-2; A277-79).  By his own admission, Dr. Pulitzer routinely reported to Dr. Jamaleddine.  (A701-03).  In *Forsythe*, the plaintiff was not monitored in his daily activities by the putative employer.

following questions to ask of the putative employer: (1) did it select and engage the "employee"? (2) did it pay the "employee"? (3) did it have the power to dismiss the "employee"? and (4) did it have the power to control the "employee's" conduct? *Id.* Notably, the Court of Appeals held that the fourth factor was the most important. *Id.*

Here, under the foregoing four-factor test and in light of the previous discussion, HHC acting through KCHC clearly qualified as Dr. Greenberg's employer. In addition, Dr. Pulitzer, as Interim Chief of Service, Department of Radiology, Kings County Hospital Center, was a representative of KCHC and acting on its behalf when: (1) he made, oversaw and adjusted the work schedule of radiologists in the department; (2) he monitored the time, attendance and misconduct of radiologists and reported same in a memo using KCHC letterhead to a personnel file that he kept or to Labor Relations; and (3) when he provided routine updates to the Chief Medical Officer regarding his department. At the very least, it is a disputed material fact that must be decided by a jury as to whether HHC was a joint employer of Dr. Greenberg under the NYSHRL.

Courts view the standard for analyzing whether a putative employer is a joint employer under the NYCHRL similar to those used under the NYSHRL. *See, e.g., Gonzalez v. City of New York*, 15 Civ. 3158, 2015 WL 9450599 at *3

23

(E.D.N.Y. Dec. 22, 2015). Therefore, under the NYCHRL, Dr. Greenberg shows that there is a material factual dispute as to whether HHC was his joint employer.[9]

As for the issue of HHC's liability for Dr. Greenberg's termination flowing from its joint employer status under Title VII and the parallel State and City statutes, City Defendants argue that they cannot be held liable, as alleged discriminatory treatment involves only conduct by SUNY Defendants. That is not accurate as HHC acted through Dr. Pulitzer who ratified Dr. Reede's anti-Semitic animus in deferring to her guidance when it came to decisions regarding counseling and disciplining Dr. Greenberg. *See* Pl. Br. at 49-50. Further, it was in his role as Interim Chief of Service, Department of Radiology, Kings County Hospital Center that Dr. Pulitzer referred Dr. Greenberg to Labor Relations in September and October 2014. Notably he used KCH letterhead to refer Dr. Greenberg to Labor Relations. Thus, during his referral to Labor Relations, Dr. Pulitzer acted as an agent of HHS. Since joint employer status is confirmed by the fact that Dr. Pulitzer wore two hats as both a SUNY and HHC employee, HHC cannot immunize itself from liability by mounting a false wall between itself and Dr. Reede. HHS ratified Dr. Reede's discriminatory animus through Dr. Pulitzer.

---

[9] Should Plaintiff's Title VII claims pursued in this appeal be remanded to the district court, it should naturally follow that his New York State and City claims based on anti-Jewish animus and not subject to sovereign immunity must also be remanded. Plaintiff's burden of production with respect to New York State and City discrimination claims is either the same or more lenient than that for Title VII. *See Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108-09 (2d Cir. 2013).

Should this Court disagree with the analysis that Dr. Pulitzer was operating on behalf of HHC, Dr. Jamaleddine nonetheless rendered HHC liable for discrimination by allowing Dr. Reede through Dr. Pulitzer to pursue a discriminatory course of action against Dr. Greenberg when it was his duty to supervise Dr. Pulitzer. (A553). Under the so-called cat's paw theory of liability, HHC should be held liable for discrimination against Dr. Greenberg in light of the fact that Dr. Jamaleddine had a duty to supervise Dr. Pulitzer and did so negligently by permitting him to adopt the discriminatory animus of a colleague with respect to an employment decision. *See Vasquez v. Empress Ambulance Service, Inc.*, 835 F.3d 267 (2d Cir. 2016). Considering the foregoing, the question of HHC's liability under Title VII, NYSHR and NYCHR for wrongful termination should be submitted to a jury.

**5.    THE ADMISSIBLE EVIDENCE SUFFICIENTLY ESTABLISHES THAT THERE ARE MATERIAL FACTUAL DISPUTES AS TO WHETHER HHC WAS LIABLE UNDER THE FMLA AS A JOINT EMPLOYER**

As for HHC's liability with respect to Dr. Greenberg's FMLA claims, relevant federal regulations provide guidance as to whether two employers are joint employers under the statute. See 29 C.F.R. § 825.106. The regulations provide in pertinent part: "joint employment will ordinarily be found to exist when a temporary placement agency supplies employees to a second employer." § 825.106(b)(1). The affiliation agreement between SUNY and HHC is closely

analogous to the kind of agreements between temporary placement agencies and their client-employers. The regulations also provide in relevant part: "A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship to be viewed in its totality." *Id.* The four-factor test that district courts use in the context of discerning whether a joint employer relationship exists in the context of Title VII claims is arguably an attempt to assess the relationship "in its totality." As discussed above, under this test, HHC through KCHC is clearly a joint employer with SUNY Downstate.

The City Defendants argue that even if HHC is found to be a joint employer under the FMLA, they nonetheless are immunized from liability from Dr. Greenberg's claims because they were not his "primary employer." *See* City Defs. Br. At 34-36. The City Defendants err in their analysis. Even as a so-called secondary employer, they were required to comply with the prohibited acts provision of the FMLA, including the prohibitions against interfering with Dr. Greenberg's exercise of his rights under the FMLA and terminating his employment related to any such exercise. *See* 29 C.F.R. § 825.106(e).

As with the Title VII termination claim, the City Defendants' theory of defense is predicated on the erroneously assumed fact that Dr. Pulitzer was solely operating as a SUNY Downstate employer and representative when he participated

26

in the events that gave rise to Dr. Greenberg's FMLA claims.  He was not.  He was also acting as a representative of HHC.  Assuming that to be the case, as it must on a motion for summary judgment where material facts are in dispute as to whether his employer was both SUNY and HHC, the FMLA claims against the City Defendants must be decided by a jury.

### III. CONCLUSION

Based on the foregoing and in his initial brief, Plaintiff kindly requests that this Honorable Court reverse summary judgment for the SUNY and City Defendants to the extent indicated and remand to the district court for a trial as to liability and damages and grant Plaintiff such other further and different relief in his favor, as this Court deems just and proper.

Dated: June 16, 2020

> Respectfully submitted,
>
> CARDI & EDGAR LLP
>
> /s/
>
> _____
> By: Chad L. Edgar, Esq.
> Counsel for Plaintiff-Appellant
> Oded Greenberg, M.D.
> 99 Madison Avenue, 8th Floor
> New York, NY 10016
> 212.481.7770 (tel.)
> 212.271.0665 (fax)
> cedgar@cardiedgarlaw.com

CERTIFICATION PURSUANT TO
Fed. R. App. P. 32(a)(7)(B) and (C)

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Rule 32.1(a)(4)(A) of this Court's Local Rule because the brief contains 6861 words of text.

The brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2007, Times New Roman, Size 14.

Dated: June 16, 2020

/s/

_____

Chad L. Edgar